EXHIBIT 34

```
1           IN THE UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3

4    - - - - - - - - - - - - - - - - - X

5    MONIQUE RUSSELL, JASMINE          :

6    RIGGINS, ELSA M. POWELL           :

7    and DESIRE EVANS,                 : Civil Action No.

8              Plaintiffs,     :   18-5629

9    v.                                :

10   EDUCATIONAL COMMISSION FOR        :

11   FOREIGN MEDICAL GRADUATES,        :

12              Defendant.      :

13   - - - - - - - - - - - - - - - - - X

14

15      Videotaped Deposition Of MONIQUE RUSSELL

16              Washington, D.C.

17          Monday, September 16, 2019

18                 1:51 p.m.

19

20

21   Job No. 88394

22   Pages:  1 - 136

23   Reported by:  Dana C. Ryan, RPR, CRR, CSR (GA)

24

25
```

Page 2

1

2

3

4

5               September 16, 2019

6                   1:51 p.m.

7

8

9

10     Videotaped Deposition of MONIQUE RUSSELL,

11 held at the law offices of Morgan, Lewis &

12 Bockius, LLP, 1111 Pennsylvania Avenue, Northwest,

13 Washington, D.C., before Dana C. Ryan, Registered

14 Professional Reporter, Certified Realtime

15 Reporter, Certified Shorthand Reporter (GA) and

16 Notary Public in and for the District of Columbia.

17

18

19

20

21

22

23

24

25

Page 3

1          A P P E A R A N C E S

2

3   ON BEHALF OF THE PLAINTIFFS:

4     CORY L. ZAJDEL, Esquire

5     Z Law, LLC

6     2345 York Road, #B-13

7     Timonium, Maryland 21093

8     Telephone:  (443) 213-1977

9     Email: clz@zlawmaryland.com

10

11   ON BEHALF OF THE DEFENDANT:

12     BARRY W. SHAFFER, Esquire

13     MATTHEW D. KLAYMAN, Esquire

14     Morgan, Lewis & Bockius, LLP

15     1701 Market Street

16     Philadelphia, Pennsylvania 19103

17     Telephone: (215) 963-5100

18     Email: barry.shaffer@morganlewis.com

19     Email: matthew.klayman@morganlewis.com

20

21   Also present:

22     David Campbell, Videographer

23

24

25

Page 4

1         C O N T E N T S

2 EXAMINATION OF MONIQUE RUSSELL:    PAGE:

3 By Mr. Shaffer               7

4 By Mr. Zajdel             133

5

6

7

8        E X H I B I T S

9    (Attached to the Transcript)

10 RUSSELL DEPOSITION         PAGE:

11 Exhibit 1   Screenshot Of A July 2017   16

12        Facebook Messenger Messaging

13        Stream Between Jasmine

14        Riggins And Monique Russell

15 Exhibit 2   May 14, 2016 Prince George's   87

16        Hospital Center Report, Bates

17        Stamped Plaintiffs0000001082

18 Exhibit 3   May 14, 2016 Prince George's   89

19        Hospital Center Social

20        History Report Of Monique

21        Russell, Bates Stamped

22        Plaintiffs0000001123 Through

23        0000001131

24

25

Page 5

1

2   E X H I B I T S   C O N T I N U E D

3    (Attached to the Transcript)

4 RUSSELL DEPOSITION         PAGE:

5 Exhibit 4   Medical Records From Major   91

6        Medical, LLC, For Monique

7        Russell, Bates Stamped

8        Plaintiffs0000118654 Through

9        0000118679

10 Exhibit 5   June 27, 2017 Facebook Post   105

11        By Monique Russell To The

12        MaMa Sisterhood Of Prince

13        George's County Facebook

14        Group

15 Exhibit 6   Stipulation Of Dismissal   113

16        Without Prejudice, Bates

17        Stamped Plaintiffs0000118860

18        Through 0000118863

19 Exhibit 7   Plaintiff Monique Russell's   116

20        Responses To Defendants'

21        Requests For Admission

22

23

24

25

Monique Russell

Page 6

```
 1          P R O C E E D I N G S
 2          THE VIDEOGRAPHER:  We are now on the
 3   record.  My name is David Campbell, and I am a
 4   videographer for Golkow Litigation Services.
 5   Today's date is September 16th, 2019, and the time
 6   is 1:51 p.m.  This deposition is being held at
 7   1111 Pennsylvania Avenue, Northwest, Washington,
 8   D.C. 20004.
 9          This is in the matter of Monique
10   Russell, et al., versus Educational Commission for
11   Foreign Medical Graduates.  This is in the United
12   States District Court for the Eastern District of
13   Pennsylvania, number 18-5629.
14          The deponent is Monique Russell.  The
15   court reporter is Dana Ryan.
16          Counsel, will you please identify
17   yourselves for the record, and then the court
18   reporter will please swear in the witness and we
19   can proceed.
20          MR. ZAJDEL:  Cory Zajdel on behalf of
21   the plaintiff.
22          MR. SHAFFER:  Brian Shaffer on behalf
23   of the Educational Commission for Foreign Medical
24   Graduates.
25          MR. KLAYMAN:  And Matthew Klayman for
```

Page 7

```
 1   the defendant the Educational Commission for
 2   Foreign Medical Graduates.
 3      EXAMINATION BY COUNSEL FOR THE DEFENDANT
 4      BY MR. SHAFFER:
 5      Q    Good afternoon, Ms. Russell.
 6      A    Good afternoon.
 7      Q    We met briefly before we started here
 8   today.  My name is Brian Shaffer, and I'm a lawyer
 9   represent -- representing the Educational
10   Commission for Foreign Medical Graduates,
11   sometimes known at ECFMG.  We're here to take your
12   deposition in connection with a lawsuit that you
13   have filed against ECFMG.
14          Will you understand that that's who I'm
15   referring to if I use those initials?
16      A    Yes, I do.
17      Q    Great.
18          Have you had your deposition taken
19   before?
20      A    I don't think so.
21      Q    Okay.  I'll give you a few basic ground
22   rules --
23      A    Okay.
24      Q    -- to hopefully make this go as
25   smoothly as possible here today.
```

Page 8

```
 1          The oath that you just took from the
 2   court reporter is the same one that you would take
 3   in a court of law before a judge and a jury.
 4          Do you understand that?
 5      A    Yes, I do.
 6      Q    And the court reporter sitted to my --
 7   seated to my left is taking down my questions and
 8   your answers into a little booklet that will be
 9   transcribed, and you'll have the opportunity to
10   review after we complete the deposition today.
11          Do you understand that?
12      A    Yes.
13      Q    And, so, because she's going to be
14   taking down the questions and the answers, it's
15   important that we try not to talk over top of each
16   other because she can't take us both down at the
17   same time.
18          I'll try to do that on my part.  Will
19   you -- will you do the same?
20      A    Yes.
21      Q    We also have a videographer here who's
22   taking the deposition on video so that we'll be
23   able to see the questions and answers as well.
24   But even so, the court reporter -- it's hard for
25   her to take down nonverbal responses.  So a shake
```

Page 9

```
 1   of the head, we might be able to see it on the
 2   video, but it might not be clear on the
 3   transcript.  And, so, if I ask you for an audible
 4   response or if I repeat your answer to make sure
 5   that I heard it correctly, that's why I'm doing
 6   it, so that the court reporter can take down the
 7   questions and answers as best she can.
 8          Is that understood?
 9      A    Yes.
10      Q    This is not an endurance contest.  If
11   you need to take a break at any point in time, use
12   the facilities, talk to your counsel, that's fine.
13   Just let me know and we'll -- we'll go ahead and
14   do that, okay?
15      A    Okay.
16      Q    There may be questions that I have to
17   ask you today that relate to subjects of a
18   personal nature, and I'm not trying to pry or do
19   anything other than get facts that I need to have
20   to understand the basis for the lawsuit, and
21   that's why I'm asking those questions, okay?
22      A    Okay.
23      Q    If at any time you don't understand my
24   question or didn't hear my question and want me to
25   repeat it or rephrase it, just let me know, and
```

Monique Russell

Page 10

1 either the court reporter will read it back to you
2 or I'll try again to do a better job of asking my
3 question, okay?
4      A    Okay.
5      Q    Are you on any medication today that
6 would affect your ability to remember things or to
7 testify truthfully?
8      A    No.
9      Q    Okay.  As you sit here today, can you
10 think of any reason why you couldn't testify
11 truthfully and answer questions to the best of
12 your ability?
13     A    No.
14     Q    Okay.  Do you have any questions for me
15 before we start?
16     A    Not at this time.
17     Q    Okay.  Can you give me your full name,
18 please?
19     A    Sure.  My name is Monique Melissa
20 Russell.
21     Q    Okay.  And your date of birth?
22     A    July 16th, 1977.
23     Q    And what's your current address?
24     A    In the States, it is 1906 Beeches Glory
25 Path, Annapolis, Maryland 21401, but I am

Page 11

1 currently residing in Costa Rica on a two-year
2 contract.
3      Q    Okay.  And when did you start your time
4 in Costa Rica?
5      A    On August of last year.
6      Q    So August of 2018?
7      A    Yes.
8      Q    And when are you scheduled to return
9 completely from the two-year contract?  August of
10 '20?
11     A    I'm in the second year of my two-year
12 contract.
13     Q    And who is the contract with?
14     A    Country Day School.
15     Q    And what job are you doing in Costa
16 Rica for them?
17     A    I'm the curriculum coordinator for the
18 early childhood and elementary schools.
19     Q    And what is your responsibilities in
20 that job?
21     A    I work with the principals of both
22 schools on alignment of curriculum from
23 prekindergarten to fifth grade, and provide
24 training and professional development to all of
25 the teachers and work with them in planning

Page 12

1 meetings.
2      Q    And when you say the two schools, there
3 are two separate schools in Costa Rica?
4      A    No, they call them schools.  Country
5 Day School is a campus that goes from early
6 childhood to high school, and so there are four
7 schools, the early childhood, elementary, middle
8 and high school, and I work with the two lower
9 schools.
10     Q    And are you in Costa Rica by yourself,
11 or is your family with you?
12     A    My family is with me.
13     Q    And who is that that's with you there?
14     A    My husband and my son.
15     Q    Okay.  And your husband's name is?
16     A    Christopher William Russell.
17     Q    Okay.  And how old is he?
18     A    He is -- how old am I? -- 46.
19     Q    And your son?
20     A    Is Luka.
21     Q    Okay.  And how old is Luka?
22     A    Three.
23     Q    Okay.  And was Luka born or May 25th,
24 2016?
25     A    Yes.

Page 13

1      Q    Okay.  Do you have any other children?
2      A    No.
3      Q    And how long have you been married?
4      A    For five years in October.
5      Q    Okay.  And you are here in Washington,
6 D.C. today having returned from Costa Rica;
7 correct?
8      A    Yes, I flew from Costa Rica.
9      Q    Okay.  And when did you arrive here in
10 Washington?
11     A    Last night.
12     Q    Okay.  And what, if anything, have you
13 done to prepare to come and testify here today in
14 this deposition?
15     A    I reviewed my interrogatories and the
16 paperwork of the course --
17     Q    Uh-huh.
18     A    -- of the case, but that's about it.
19     Q    Okay.  You -- you have filed, as I
20 understand it, two different lawsuits related to
21 your interactions with a Dr. Charles Akoda;
22 correct?
23     A    Yes.
24     Q    Did you review materials related to
25 both of those cases before coming in to testify

Page 14

1 today, or just the case against ECFMG?
2   A   Just this case.
3   Q   Okay.  And did you talk with your
4 counsel to prepare for the deposition today?
5   A   Yes.
6   Q   When did you do that?
7   A   At lunch.
8   Q   Today before coming in; correct?
9   A   Yes.
10   Q   And that's Mr. -- it's Cory sitting
11 next to me; correct?
12   A   Yes.
13   Q   Did you speak with any other lawyers to
14 prepare for your deposition today?
15   A   No.  I did email with another lawyer
16 from the team.
17   Q   Okay.  Did that lawyer provide you any
18 documents to review or information to review?
19      MR. ZAJDEL:  Objection.  That would be
20 attorney-client privilege.
21      BY MR. SHAFFER:
22   Q   Did you review any documents that were
23 provided to you by your attorneys before coming in
24 to testify today?
25   A   The same interrogatories that I

Page 15

1 mentioned earlier.
2   Q   Okay.  Apart from reviewing the
3 interrogatories, did you do any other research or
4 review any other materials before coming in to
5 testify today?
6   A   No.  I'm not sure what . . .
7   Q   Like googling Dr. Akoda --
8   A   No.
9   Q   -- or Googling ECFMG or Googling
10 Dimensions Health Care or anything like that.
11   A   No, I did not.
12   Q   Okay.  You also provided, I think, to
13 your lawyers some screenshots of some
14 communications you had with a Jasmine Riggins?
15   A   Yes, I did.
16   Q   Okay.  And when did you -- when did you
17 provide those?
18   A   Are you referencing the screenshot
19 that's in front of you?
20   Q   (Indicated affirmative.)
21   A   I believe yesterday or the day before.
22   Q   Okay.  And somehow you became aware
23 that we were asking if there were communications
24 between you and Ms. Riggins related to any of the
25 allegations regarding Dr. Akoda?

Page 16

1   A   Yes.
2   Q   Okay.  Let's mark this and just make
3 sure we understand what it is.
4      (Russell Deposition Exhibit 1 was
5 marked for identification and attached to the
6 transcript.)
7      BY MR. SHAFFER:
8   Q   I'm going to hand this to you.  This is
9 a printout of some screenshots, I believe, from
10 your phone or your computer; is --
11   A   Yes.
12   Q   -- that right?
13   A   Yes.
14   Q   And -- well, why don't you tell me in
15 more detail what it is since you -- since you
16 collected it?
17   A   Sure.  These are -- this is the only
18 conversation that I have had with Jasmine Riggins
19 aside from saying hello to each other in the lobby
20 this morning.
21   Q   Okay.  Ms. Riggins testified on
22 Thursday of last week that she believed she had
23 conversations or communications with you a month
24 or so ago.
25      Is that consistent with your

Page 17

1 recollection?
2   A   I don't remember having any
3 conversations with her a month ago.
4   Q   Okay.
5   A   And if I did, then I would think they'd
6 be in this same conversation thread.
7   Q   Okay.  What kind of thread is the
8 document that's Russell 1 in front of you?  Is
9 this an app?
10   A   This is from Facebook Messenger.
11   Q   And I understand from your lawyer that
12 there may be some materials on your Facebook page
13 that relate to Dr. Akoda; is that correct?
14   A   Not on my Facebook page.
15   Q   Okay.  A posting of some kind by you
16 that relates to Dr. Russell -- or Dr. Akoda,
17 sorry?
18   A   I posted about Akoda in a mommy group
19 on Facebook.
20   Q   Okay.  And there is -- what's a mommy
21 group?
22   A   A mommy group is a, like, community of
23 mothers that talk about mom things, like --
24   Q   Uh-huh.
25   A   -- so . . .

Page 18

1    Q    And so you posted something on -- on
2  Facebook in this group and -- about Dr. Akoda, and
3  there have been comments or messages by people
4  left with respect to this --
5    A    Yes.
6    Q    -- posting?
7    A    Yes.
8    Q    And that's what you provided to your
9  counsel?
10    A    Yes.
11    Q    Okay.  And I understand that we're
12  trying to get a copy of it in here so we can ask
13  you about it.
14        Apart from that posting in the mommy
15  group on Facebook and this (indicating) string
16  with Jasmine Riggins, have you had communications
17  in writing with anyone other than your lawyers
18  about Dr. Akoda?
19    A    Only from people who responded to the
20  post in the mommy group.
21    Q    Okay.  Would you have had similar
22  Messenger communications like the one that's
23  marked Russell 1 with other women besides
24  Ms. Riggins?
25    A    With one other woman.

Page 19

1    Q    Okay.  And who is that?
2    A    I don't know if this is her actual
3  name --
4    Q    Uh-huh.
5    A    -- but it was Amber -- I think Amber
6  Loftin.
7    Q    And do you still have that
8  communication?
9    A    It would be in my inbox -- or in my
10  messages.
11    Q    Is that something that you could
12  provide to your counsel if we requested it and
13  your counsel agreed to request it from you?
14    A    Yes.
15        MR. SHAFFER:  Counsel, we'll make a
16  request if the person with whom she's referencing
17  is a putative class member, we'll make a request
18  for production of that communication.
19        MR. ZAJDEL:  Yeah.  Sure.  Do you know
20  how to spell the name that you said?
21        THE WITNESS:  I believe it would be
22  L-O-F-T-I-N.
23        MR. ZAJDEL:  Okay.  We'll take a look
24  for it.
25        BY MR. SHAFFER:

Page 20

1    Q    Let's take a quick look at what's been
2  marked as Russell 1.  And I apologize, it's
3  oversized, but sometimes when you print
4  screenshots, they get big; and my eyesight is bad
5  anyway.
6        So does this look to be a complete
7  exchange between you and Ms. Riggins related to
8  Dr. Akoda?
9    A    Yes.
10    Q    Okay.  Did you have any phone calls
11  with Ms. Riggins either as a follow-up to this
12  exchange or otherwise?
13    A    I don't believe so.
14    Q    And it looks like the time period here
15  for this exchange is July 3rd to July 13th of
16  2017.
17    A    Yes, it does look like that.
18    Q    And, so, again to just make sure I'm
19  understanding your testimony, since July 13th of
20  2017 until this morning, you'd not had any
21  communications, interactions, emails,
22  messengering, commenting with Ms. Riggins?
23    A    Not that I know of.  This is the only
24  way that I would know to communicate with her.
25    Q    Okay.  In your communication with

Page 21

1  Ms. Riggins, you notified her, among other things,
2  that you were going to be filing a class action
3  lawsuit against Dimensions Health Care.
4        Do you see that?
5    A    Yes.
6    Q    And you noted that you have a very
7  experienced and successful class action lawyer.
8        Do you see that?
9    A    Yes.
10    Q    Who were you referring to there?
11    A    I was referring to my counsel, Cory
12  Zajdel.
13    Q    Okay.  And how did you become aware of
14  Cory?
15    A    A friend referred me to him.
16    Q    Okay.  And did you ever have
17  communications with Ms. Riggins at her Yahoo email
18  address that's referenced on the fourth page of
19  your screenshot?
20    A    No, I did not.
21    Q    Let me ask a couple more background
22  questions.  So in Costa Rica, is Lukao in school?
23    A    Yes, he is.
24    Q    Okay.
25    A    Luka.

Monique Russell

Page 22

1    Q    Luka with an A?
2    A    Yes.
3    Q    Okay.  I apologize for that.
4         Who takes care of him when he's not in
5  school?
6    A    His father.
7    Q    Okay.  And is your father -- is your
8  husband working outside of taking care of Luka?
9    A    He returns to the States to work
10 periodically.
11   Q    Okay.  What does he do?
12   A    He's a musician and a deejay.
13   Q    Okay.  Does he go by a name that I
14 would know?
15   A    Ty Hussell.
16   Q    Ty Hussell, I'll have to look that one
17 up.
18        Do you have help with child care in
19 Costa Rica when your husband is traveling for
20 work?
21   A    Yes.
22   Q    Who do you use for that?
23   A    I use either a friend who is also a
24 teacher --
25   Q    Uh-huh.

Page 23

1    A    -- or the assistant teachers in the
2  early childhood program.
3    Q    And how many hours a week do they
4  typically help you with Luka?
5    A    Maybe once a month for a couple of
6  hours.
7    Q    Otherwise, you and your husband are
8  able to -- to manage coverage?
9    A    Yes.
10   Q    What is your typical day like down
11 there?
12   A    I typically get up at -- pretty early
13 and walk and do some yoga before I go to work.  We
14 all get ready.  Luka attends the school that I
15 teach at now -- or that I work at.
16   Q    Uh-huh.
17   A    I'm not a teacher anymore.  And I go to
18 work from 7:30 to 4:30.  Luka gets out at 3:00 so
19 his father picks him up, and then they hang out
20 and do something until I get off.  And then we go
21 home and make dinner and maybe take a walk.
22   Q    Okay.  And how much sleep do you
23 usually get per night?
24   A    It depends.  Say, typically, six to
25 seven hours.

Page 24

1    Q    And what kinds of things do you like to
2  do on the weekends?
3    A    Walk, go to parks.
4    Q    And where in -- I should have asked
5  this earlier.  Where in Costa Rica do you -- is
6  the school and where do you live?
7    A    We're located just outside of San Jose.
8    Q    Is that one of the larger cities in
9  Costa Rica?
10   A    Yes, it's the capital.
11   Q    Okay.  And your position is a two-year
12 contract, you said?
13   A    My position is a one-year contract.
14   Q    Okay.
15   A    I'm in the middle of a two-year
16 contract.  I was hired as a teacher and promoted.
17   Q    Great.
18        And how did you find out about this
19 opportunity?
20   A    Through a job fair.
21   Q    Okay.  And approximately when did you
22 apply to or -- or learn about this opportunity?
23   A    I went to the job fair in February of
24 2018.
25   Q    Okay.  And were you working at that

Page 25

1  time?
2    A    Yes.
3    Q    And where were you working then?
4    A    For D.C. Public Schools.
5    Q    And what was your position?
6    A    Instructional specialist.
7    Q    And was there a particular school that
8  you were assigned to?
9    A    No, I worked for the department -- for
10 the division of early childhood, and I was
11 assigned anywhere from three to nine schools at a
12 time.
13   Q    And how long did you work for the D.C.
14 Public Schools?
15   A    For nine years.
16   Q    And did you have the same position the
17 entire time?
18   A    No, for six years I was a classroom
19 teacher, and for the last three I was an
20 instructional specialist.
21   Q    What -- what grades did you teach when
22 you were a teacher?
23   A    Prekindergarten.
24   Q    And is that mandatory in the District?
25   A    No.

Page 26

1    Q    Okay.  So this was an optional --
2    A    Encouraged.
3    Q    Correct.  Strongly encouraged; right?
4         Did you have to resign from the D.C.
5    Public Schools to take this position in Costa
6    Rica?
7    A    Yes.
8    Q    Okay.  And when did you do that?
9    A    Probably in -- in the spring.  I don't
10   know exactly what day.
11   Q    Spring of 2018?
12   A    Yes.
13   Q    And my understanding of the claims that
14   you're making in the case against ECFMG is that
15   you are not seeking any economic damages, loss of
16   wages, loss of revenue from jobs or anything like
17   that; is that correct?
18   A    That is correct.
19   Q    Okay.  So then I don't need to ask you
20   how much you make and all that kind of thing if
21   you're not going to be saying that you have lost
22   money related to any of the allegations that
23   you're making.
24        Do you understand that?
25   A    Yes.

Page 27

1    Q    Okay.  Can you give me a little bit of
2    your educational background?
3    A    Sure.  I studied art education at the
4    University of Maryland, and then got a teacher
5    certification in early childhood education through
6    the Center for Inspired Teaching.  And then did a
7    master's in teaching at Trinity Washington
8    University.
9    Q    When did you graduate from University
10   of Maryland?
11   A    2009.
12   Q    And when did you get your teacher
13   certification?
14   A    2009.
15   Q    Was that contemporaneous with your
16   graduation or -- or afterwards?
17   A    No, it happened afterwards.
18   Q    Okay.  How long did it take you to get
19   the certification?
20   A    I don't know.  You get a -- like a
21   temporary certification first, and then I was
22   involved in a certification program, so when you
23   finish it, then you get a different type of
24   certification.
25   Q    Okay.  And then when did you get your

Page 28

1    master's?
2    A    That's terrible.  I don't -- when did I
3    get married?  It was the same year.  2015 -- '14.
4    2014.
5    Q    Okay.  That would be five years ago
6    which is I think what you --
7    A    Yes.
8    Q    -- said earlier, so you were correct
9    then.
10   A    I should be better at math as a
11   teacher.
12   Q    What was your subjects that you would
13   teach?  I guess if it was early education, did it
14   cover a lot of different topics?
15   A    Everything.
16   Q    And the school that you're at now, is
17   it an English-speaking or bilingual or Spanish?
18   A    It is -- it's an English-speaking
19   school.
20   Q    And is it a private school --
21   A    Yes.
22   Q    -- that people pay to go to in Costa
23   Rica?
24   A    Yes.
25   Q    Okay.  And before you moved to Costa

Page 29

1    Rica, you lived here in Washington, D.C.?
2    A    Yes, and in Maryland.
3    Q    Okay.  Where did you live in Maryland?
4    A    In Cheverly, Maryland.
5    Q    And where is that?
6    A    It's just over the D.C. line, over the
7    northeast section of the D.C. line.
8    Q    Okay.  And did you live -- did you move
9    to -- well, strike that.
10        Where did you live after you graduated
11   from University of Maryland and started working?
12   A    When I graduated from the University of
13   Maryland, I first lived in Takoma Park and then
14   moved into D.C., I believe in the same school
15   year.
16   Q    And did you go to work immediately upon
17   graduation to the D.C. Public Schools?
18   A    Yes.
19   Q    And did you work in the summertimes?
20   Is the D.C. public school calendar one that goes
21   through the summer, or did you do something
22   different in the summers?
23   A    When I was an instructional specialist,
24   I worked year round.
25   Q    Okay.  How about when you were a

Monique Russell

---

Page 30

1  teacher?
2      A    When I was a classroom teacher, I
3  worked ten months.  I did not work summers.
4      Q    Okay.  And what did you do during the
5  summers?
6      A    Some summers I would work; I would wait
7  tables.
8      Q    Uh-huh.
9      A    Or -- I'm trying to think what other --
10  but jobs like that.  One summer I traveled.
11      Q    Okay.  Recuperated and got ready for
12  the next school year?
13      A    Yes.
14      Q    I don't blame you.
15          I want to talk a little bit about --
16  what do I want to talk about?  Strike that.
17          Let me ask you some background
18  questions about the lawsuit so I understand
19  what -- what you know and what you're familiar
20  with.
21          When did you first decide to retain
22  Mr. Zajdel as your -- as your counsel?
23      A    I don't know exactly what month, but it
24  was probably more than a month after I found out
25  about Akoda.

---

Page 31

1      Q    And if I understand from your discovery
2  responses in the case, you believe that you found
3  out about the fact that Dr. Akoda, who I believe
4  helped deliver your son, Luka, you found out he
5  had pled guilty in June of 2017?
6      A    I'm not sure if that's the time, but if
7  that's what your record shows, probably.
8      Q    We can go through, and we probably will
9  go through, some of the questions.  I'm not trying
10  to -- to trick you on that, so . . .
11          Why don't you tell me just generally
12  how you came to learn about any issues with
13  Dr. Akoda?
14      A    Sure.  So I -- in the neighborhood
15  where I lived at the time, there was a parent
16  listserv where people would post recommendations
17  or ask for advice and things like that.  And
18  someone asked for a recommendation for an OB/GYN.
19  And I wanted to recommend my OB/GYN, Dr. Waldrop,
20  but I wanted to make sure that the person knew if
21  they went to Dr. Waldrop that there was a chance
22  that they would end up having their baby delivered
23  with Akoda, and I did not have a good experience
24  with him during the delivery, and so I wanted to
25  make sure the person was aware of that.

---

Page 32

1          And I went to his Web site to confirm
2  the spelling of his name, and he wasn't on their
3  Web site anymore.  So I went and looked at my
4  paperwork, confirmed the spelling, I looked him up
5  to see like, maybe he moved somewhere else so that
6  wouldn't be an issue for this person.  And I
7  discovered a press release from the Department of
8  Justice saying that he had been arrested for
9  charges of fraud very shortly after he performed a
10  C-section on me.
11      Q    And the physician that you mentioned,
12  Dr. Waltrop?
13      A    Waldrop.
14      Q    Waldrop.  That was your OB/GYN?
15      A    Yes.
16      Q    How long -- when did you first start
17  going to see Dr. Waldrop?
18      A    I'm not sure.  Maybe three months into
19  my pregnancy.
20      Q    And how did you come to start visiting
21  Dr. Waldrop?
22      A    She was recommended by a woman that I
23  met on the hospital tour.
24      Q    Okay.  And what hospital was that?
25      A    P.G. County, Dimensions Hospital.

---

Page 33

1      Q    And did you have a OB/GYN before
2  Dr. Waldrop?
3      A    I had a -- I saw a high-risk
4  specialist, but I didn't have a regular OB/GYN.
5      Q    Okay.  And what was the name of the
6  high-risk specialist?
7      A    I don't remember.  I didn't see that
8  doctor for the most of my pregnancy.
9          Dr. Footer, I think.
10      Q    F-O-O-T-E-R?
11      A    Yes.  But there are two Dr. Footers.
12      Q    Okay.
13      A    The older Dr. Footer.
14      Q    And that was -- and, again, I'm not
15  trying to be overly personal on this.  I'm just
16  trying to get the information.
17          Were you at high risk because of your
18  age or because of other conditions?
19      A    Yes, primarily because of my age, and I
20  had bleeding at the beginning of my pregnancy, and
21  so they wanted to monitor that.
22      Q    And, so, who was it that -- if anyone,
23  that directed you to Dr. Footer as the high-risk
24  specialist?
25      A    A coworker.

---

Page 34

1    Q    Okay.  So this was someone at the D.C.
2  Public Schools who said here's someone to -- to go
3  see as a high-risk specialist?
4    A    Yes.
5    Q    Okay.  And I think you were saying that
6  you didn't see Dr. Footer for all that long during
7  your pregnancy, but within about the first three
8  months, you had decided to go see Dr. Waldrop?
9    A    Yes.
10    Q    And how did you come to see
11  Dr. Waldrop?  That was a recommendation on the
12  hospital tour?
13    A    Yes, from another -- another woman in
14  the tour was asking a lot of the same questions
15  that I would be asking, and so she seemed to want
16  the same things in her birth, and I asked her who
17  she -- who her doctor was, and she recommended
18  Dr. Waldrop.
19    Q    Okay.  I saw references in your
20  discovery responses to a Dr. Moore?
21    A    Yes.
22    Q    Who is Dr. Moore?
23    A    Dr. Moore owns the practice that
24  Dr. Waldrop works for and Akoda was working for.
25    Q    And -- and is that Moore and

Page 35

1  Associates; is that --
2    A    Yes.
3    Q    -- how they're known as?
4    A    Yes.
5    Q    Okay.  And did you ever meet Dr. Moore
6  during your pregnancy?
7    A    I did.
8    Q    Okay.
9    A    I may have been seen by Dr. Moore once.
10  I met him for sure, like, just to see -- know who
11  he was in case he were to deliver my baby, and I
12  may have been seen by him once when Dr. Waldrop
13  wasn't available.
14    Q    Okay.  Do you know how many other
15  doctors besides Dr. Akoda and Dr. Waldrop and
16  Dr. Moore that were in the practice when you were
17  going there?
18    A    I believe there were only those three.
19    Q    Okay.  Did you ever hear of a
20  Dr. Chaudry?
21    A    I have heard of him.
22    Q    And how do you know of Dr. Chaudry?
23    A    I believe that Akoda was working for
24  him in a separate practice at the time.
25    Q    And how did you come to learn that?

Page 36

1    A    From Dr. Moore.
2    Q    When you -- when you decided to go with
3  Dr. Waldrop of Dr. Moore's practice as your
4  primary OG -- OB/GYN, what type of research did
5  you do on Dr. Waldrop?
6    A    I looked up her -- I looked up reviews.
7  I looked her up on different sites where they give
8  information about credentials and patient reviews.
9    Q    Do you remember what any of those were
10  called?
11    A    I don't know all of them.  I know I
12  looked on Yelp because they give patient reviews,
13  and I think they're pretty honest, but I don't
14  know where I looked up her affiliations.
15    Q    Okay.  Do you know whether you went to
16  State of Maryland licensing or credential sites to
17  look up Dr. Waldrop?
18    A    No, I did not.
19    Q    Do you know whether you went to the
20  American Medical Association to look up
21  Dr. Waldrop?
22    A    I may have gone to the American Medical
23  Association.
24    Q    Okay.
25    A    Or the association for gynecologists.

Page 37

1    Q    Okay.  And do you know whether there
2  was information on Dr. Waldrop there?
3    A    If there was, I didn't find anything
4  negative.
5    Q    Okay.  And when you went to meet with
6  Dr. Waldrop -- I think you mentioned already you
7  met with Dr. Moore at least once, perhaps, as
8  well -- did you ever meet with Dr. Akoda?
9    A    I did not before I was in labor.
10    Q    Okay.  But you understood he was a
11  member of the practice of Dr. Moore; correct?
12    A    Yes, but he did not see patients.
13    Q    How do you know he didn't see patients?
14    A    They told me that he did not see
15  patients; that he only assisted them at the
16  hospital.
17    Q    Okay.  Who told you that?
18    A    Dr. Moore.
19    Q    Okay.  And was that after you gave
20  birth to Luka or was that in an earlier meeting
21  while you were --
22    A    That was before.
23    Q    Okay.  Did you understand from
24  Dr. Waldrop that it was possible that she would
25  not be available to help you in labor and

Page 38

1 delivery, including a C-section if that were
2 necessary?
3     A   Yes, I did.
4     Q   How did you know that?
5     A   Because Dr. Moore told me that there
6 were three doctors and that if Dr. Waldrop was not
7 available, that Dr. Moore or Akoda would deliver
8 the baby.  And that if Waldrop was not available
9 during the practice, then he could see me --
10 Dr. Moore could see me but Akoda would not see me
11 because he only worked at the hospital.
12     Q   And do you recall whether you filled
13 out a consent with Dr. Waldrop that acknowledged
14 that that could be the case and that you could be
15 seen by other doctors other than her if she was
16 not available?
17     A   I don't recall, but I'm sure that I
18 did.
19     Q   Okay.
20         MR. SHAFFER: I'll mark this.  Well,
21 hold on.  We'll get to it.
22     BY MR. SHAFFER:
23     Q   Did you have any issues with your
24 pregnancy?
25     A   I did have some complications.  As I

Page 39

1 mentioned, I had some bleeding early on.  I also
2 have a -- a uncommon but benign
3 cardio-neurological disorder called vasovagal
4 syncope that under everyday conditions is truly
5 benign, but pregnancy exacerbated the condition.
6     Q   Uh-huh.  And what are some of the risks
7 or symptoms that go along with that condition?
8     A   Getting dizzy and passing out.
9     Q   Okay.
10     A   Which is benign unless you hurt
11 yourself on the way down.
12     Q   Right.  Or -- or a baby if you have a
13 baby?
14     A   Yes.
15     Q   And, so, as a result of that, were you
16 taking any extra precautions while you were
17 pregnant?  Were you anticipating the possibility
18 of having to have medication or anything like
19 that?
20     A   I was not anticipating the need for any
21 medication.  I was seeing a cardiologist in
22 conjunction with my gynecological visits.  And
23 after seven months, I was put on essentially kind
24 of house arrest where I could do everything.  I
25 just couldn't be alone for much unless -- in case

Page 40

1 I got dizzy.
2     Q   Uh-huh.  And did you get -- I saw some
3 reference in your -- your medical records to an
4 accommodation from D.C. Public Schools where maybe
5 you were able to work at home for a period of
6 time.
7         Was that part of this situation?
8     A   Yes.
9     Q   Okay.  And . . .
10     A   So and --
11     Q   I'm sorry.  Go ahead.
12     A   I could be alone.  I couldn't be, like,
13 out driving alone or, so I worked from home.  But
14 if I was going to go out and do things, then I
15 needed somebody to be with me.
16     Q   Okay.  Did -- did this condition and
17 having this condition and worrying about it cause
18 you stress during the time that you were pregnant?
19     A   No, not really because I've had the
20 condition for most of my life.
21     Q   Uh-huh.
22     A   It was -- once I realized that it
23 wouldn't impact my job, there wasn't much stress
24 related to it.
25     Q   Okay.  And -- and I think you said

Page 41

1 earlier that -- that Luka was born in May of 2017;
2 correct?
3     A   Yes.
4     Q   And was he born by C-section?
5     A   Yes.
6     Q   And was that a planned C-section?
7     A   No, it was not.
8     Q   What were the circumstances that led to
9 him being born by C-section?
10     A   I had been in labor for, I believe, 32
11 hours at that point, and after a period of time,
12 they recommended that I take a drug called Pitocin
13 that they hoped would -- Akoda recommended it to
14 speed up contractions so that I would dilate.
15     Q   Uh-huh.
16     A   It did not have that effect.
17         And then after 30, 32 hours, he
18 recommended an epidural.  Immediately after he did
19 the epidural, he said that my baby was in distress
20 and that he needed an emergency C-section.
21     Q   Okay.  And was your original plan for
22 birth to go to the hospital and have someone from
23 Dr. Moore's practice deliver vaginally?
24     A   Yes, that was my original plan.
25     Q   Okay.  I saw a reference in your

Page 42

1 records to a doula or maybe two doulas?
2    A    Yes.
3    Q    What role, if any, had you anticipated
4 doulas playing in the birth?
5    A    Doulas provide emotional support during
6 the birth.  They also help to give the father a
7 break and help the father or partner --
8    Q    Uh-huh.
9    A    -- to be a more supportive partner.
10    Q    And had you planned on having a doula
11 present for your birth?
12    A    I did.
13    Q    Okay.  And did that occur?
14    A    Yes.
15    Q    Okay.  And who was that?
16    A    Her name is Emily.  I forget her last
17 name right now.  But it was Doulas of Capitol
18 Hill.
19    Q    Uh-huh.
20    A    And in the contract, the doula is
21 present for the first 24 hours and then after that
22 they can switch to a backup.  I believe that Emily
23 was there for maybe 28 hours before she switched
24 to a backup which was her partner Nicole.
25    Q    And did the doula meet you at the

Page 43

1 hospital or were you with the doula before you
2 went to the hospital?
3    A    I believe that she met me at the
4 hospital.
5    Q    And when you were describing the length
6 of your labor -- and I'm sorry for that length of
7 labor -- was that all at the hospital, or did it
8 start at home and then continue while you were
9 there?
10    A    It started at Dr. Waldrop's office --
11    Q    Okay.
12    A    -- during an examination.  My water
13 broke.
14    Q    And -- and my understanding, because I
15 have children, too, is that sometimes when your
16 water breaks, the rest of the body may not be
17 ready to give birth vaginally, but that once the
18 water breaks, there's a certain period of time
19 before a baby is supposed to be gotten out.
20        Is that -- is that a fair summary of
21 your understanding at the time?
22    A    That is my understanding.
23    Q    Okay.  And Pitocin, which you indicated
24 Dr. Akoda gave you, is one of the very common
25 medicines that they will give to try to move along

Page 44

1 contractions when somebody's water breaks, isn't
2 it?
3    A    That is my understanding.
4    Q    Okay.  And -- and -- and is it also
5 your understanding that sometimes it works and
6 sometimes it doesn't work as well?
7    A    I did not have much -- much
8 understanding of Pitocin.
9    Q    Okay.  Did you receive any information
10 from your husband or either of the doulas that
11 were in the room with you that -- when Dr. Akoda
12 said a C-section was necessary because of the baby
13 being in distress, that that wasn't a good idea;
14 that you shouldn't go ahead with that?
15    A    My husband did not agree.
16    Q    Okay.  What did he want to do?
17    A    He had been watching the monitors, and
18 he saw that the stats had gone back up and thought
19 that, you know, it looked better; that it should
20 be waited out.
21    Q    Okay.  And what about the doulas?
22    A    The doulas do not advise on medical
23 decisions.
24    Q    Okay.
25    A    They're there for emotional support.

Page 45

1    Q    And ultimately, the decision to have
2 the C-section was yours then?
3    A    Yes.
4    Q    And --
5    A    I followed Akoda's advice because at
6 the time I believed him to be a real doctor.
7    Q    And when you say "a real doctor," you
8 believe today that he is not a real doctor;
9 correct?
10    A    He is a fake doctor.
11    Q    And what do you mean when you say he's
12 a fake doctor?
13    A    That he was not properly trained as a
14 doctor or credentialed as a doctor.
15    Q    What -- what is it about his training
16 that you believe either does or does not make him
17 a doctor?
18    A    That he used fake documents to get into
19 the country and was allowed to take medical boards
20 without proper credentials.
21    Q    As you sit here today, do you know
22 whether or not Dr. Akoda has gone to medical
23 school?
24    A    I do not know.  The federal trial
25 transcript that I read, the U.S. government said

Monique Russell

Page 46

1  that there was no evidence that he ever attended
2  or graduated from medical school.
3      Q   Okay.  Do you know whether or not
4  Dr. Akoda's medical school in Nigeria ever
5  verified the authenticity of his diploma to
6  anyone?
7      A   I do not --
8          MR. ZAJDEL:  Objection.  Hold on for a
9  second.
10         Objection:  The question assumes facts.
11         But you can answer.
12         THE WITNESS:  I don't know.
13     BY MR. SHAFFER:
14     Q   Do you know whether Dr. Akoda's medical
15 school in Nigeria ever verified the authenticity
16 of Dr. Akoda's diploma to ECFMG?
17         MR. ZAJDEL:  Objection:  The question
18 assumes facts.  You can answer it.
19         THE WITNESS:  I'll decline.
20         Should I answer these?
21         MR. ZAJDEL:  Yeah, you can answer.
22         THE WITNESS:  I don't know.
23         MR. ZAJDEL:  Okay.
24     BY MR. SHAFFER:
25     Q   Did -- I take it from your answers that

Page 47

1  you have looked at some of the materials including
2  a press release and, I guess, a transcript of
3  Dr. Akoda's guilty plea with the Department of
4  Justice?
5      A   Yes.
6      Q   Do you know whether Dr. Akoda pled
7  guilty to not having gone to medical school?
8      A   I do not know.
9      Q   Okay.  Do you know whether or not
10 Dr. Akoda pled guilty to falsifying his diploma?
11     A   I don't know, but since he was found
12 guilty of fraud, I'm not sure what things were
13 true and what were not.
14     Q   And the thing that he pled guilty to as
15 fraud, do you remember what specifically he
16 admitted doing?
17     A   I don't know.
18     Q   Okay.  And I take it from your answer,
19 then, that -- that having pled guilty to fraud,
20 you don't believe he's a real doctor from your
21 perspective?
22     A   I know that he used three -- at least
23 three different Social Security numbers to be
24 approved by the foreign medical board, the board
25 to certify foreign medical graduates, in order to

Page 48

1  take his -- his medical boards.
2          I'm sorry.  Can you repeat the
3  question?
4      Q   That -- that's okay.  I think you
5  answered -- you answered that part of the
6  question.  I'll ask you a different question
7  and -- and if it triggers something else, you can
8  add it.
9          I guess I was asking what it was that
10 you knew of that, in your mind, made you say that
11 he was not a real doctor.
12     A   That he used multiple different Social
13 Security numbers in order to be approved to take
14 the medical boards; that the U.S. government said
15 there is no evidence that he ever attended medical
16 school or graduated from med- -- medical school.
17 That he was kicked out of a residency program in
18 New Jersey when they discovered that he did not
19 have the credentials to be in that program; that
20 he had been somehow approved by the commission to
21 certify foreign medical graduates.  That he took
22 the medical board and failed multiple times, so
23 many times by the time that he passed it nobody
24 would hire him, so then he used another Social
25 Security number to get approved to take the boards

Page 49

1  again under another different name.  He used three
2  different names.  And that he did practices like
3  this in multiple states.
4          So if you were a real doctor, why would
5  you do that?
6      Q   Do you know what steps Dr. Akoda had to
7  go through to be able to work in the Prince
8  George's County Hospital where he delivered Luka
9  through C-section?
10     A   I don't know all of them.
11     Q   Okay.  Which ones do you know?
12     A   I know that first he'd have to go
13 through the education commission that certifies
14 foreign medical graduates and have all of his
15 documents to be approved to be able to take the
16 medical boards.  He'd have to pass the medical
17 boards.  He'd have to get into a residency program
18 and be hired and get privileges.
19     Q   Okay.  Have you ever discussed your
20 experiences with Dr. Akoda with anyone from the
21 Educational Commission for Foreign Medical
22 Graduates?
23     A   No, I have not.
24     Q   Okay.  Have you ever spoken with anyone
25 there?

Monique Russell

Page 50

1    A    No, I have not.
2    Q    Not -- for any reason?
3    A    No.
4    Q    No.
5         Have you -- what information, if any,
6    do you have about ECFMG?
7    A    My understanding is that if you are a
8    graduate of a medical program from outside of the
9    United States, then that is where you first have
10   to get approved to be able to do any next steps.
11   Q    And what's --
12   A    And your --
13   Q    I'm sorry.
14   A    Your documentation has to be verified
15   at that office.
16   Q    And how -- what's the basis for that
17   information?  How do you know that?
18   A    I looked it up when I found out from
19   the Justice Department that Akoda was a fraud.  I
20   looked up what that government agency did.
21   Q    And when you say "that government
22   agency," who are you referring to?
23   A    The educational commission to certify
24   foreign medical graduates.
25   Q    And what --

Page 51

1    A    I think I'm calling them the wrong
2    thing, but you know what I mean.
3    Q    I understood when you were saying that
4    the commission to certify foreign medical
5    graduates --
6    A    Okay.
7    Q    -- you were meaning --
8    A    Yes.
9    Q    -- the company that you sued in
10   Philadelphia, the ECFMG; is that --
11        We've been saying -- meaning the same
12   thing?
13   A    Yes.
14   Q    Okay.  Great.
15        And you mentioned it, I think -- we
16   could check your answer.  I'm just trying to make
17   sure I understand -- that ECFMG is -- is a
18   governmental entity of some kind?
19   A    That's what I thought.  Is that --
20   Q    And what -- what part of the government
21   does ECFMG work with?
22   A    I don't know.
23   Q    Do you know on what basis you think
24   that would be the case?
25   A    I don't know.  I thought that when I

Page 52

1    looked them up, but that was two years ago.
2    Q    Okay.  Do you know whether or not --
3    strike that.
4         You mentioned that you understood that
5    ECFMG -- I forget what the word is -- verifies
6    documentation of foreign medical students or
7    graduates; correct?
8    A    Yes.
9    Q    What documents is it your understanding
10   ECFMG is supposed to verify?
11   A    I don't know exactly, but I would
12   understand a diploma --
13   Q    Okay.
14   A    -- for one.  From my -- it's been a
15   while since I looked this up, but I remember that
16   there were schools that were specifically, like,
17   vetted or listed with the commission, and so they
18   would have to verify that those diplomas were real
19   or that the person graduated from that
20   institution.
21   Q    Anything else?
22   A    I don't know.
23   Q    Do you know where Dr. Waldrop went to
24   medical school?
25   A    I believe she did a residency at

Page 53

1    Howard.
2    Q    Okay.  And how about medical school
3    before that?
4    A    I don't remember.
5    Q    Okay.  And do you know where Dr. Moore
6    went to medical school?
7    A    I don't remember.
8    Q    Okay.  Do you know whether Dr. Moore is
9    a -- went to a U.S. medical school or a foreign
10   medical school?
11   A    I do not know.
12   Q    Okay.  I'll finish up on -- on the
13   birth of Luka.  You had the C-section after a very
14   lengthy labor.
15        Was -- how was Luka's birth?  Was he
16   born okay?  Any health problems?
17   A    Luka has had no health problems.
18   Q    Great.
19        And did you have any symptoms or
20   physical conditions after the C-section?
21   A    No, I did not, nothing atypical.
22   Q    Right.
23        It's a major abdominal surgery, so
24   there was probably some recovery; right?
25   A    Yes.

Monique Russell

Page 54

1    Q    Okay.
2    A    Having knowing what -- that Akoda is a
3 fraud, I do question whether or not my C-section
4 was necessary.
5    Q    Okay.  And that was something that you
6 started -- you thought of after you found the
7 information sometime in 2017 related to
8 Dr. Akoda's guilty plea?
9    A    Well, before that because my husband at
10 the time did not believe that it was necessary,
11 and then once I found that information out, it
12 made me question it more.
13    Q    Okay.  Do you know what the -- did you
14 ever ask Dr. Moore or Dr. Waldrop whether they
15 would have had you do a C-section after 32 hours
16 of labor and a baby in distress?
17    A    I did not speak to Dr. Moore --
18 Dr. Waldrop once I found out Akoda was a fraud.
19    Q    Did you speak with Dr. Moore at any
20 point after you learned the information about
21 Dr. Akoda?
22    A    I did.
23    Q    Okay.  Tell me about that.
24    A    I went to him to find out, A, if he
25 knew; and why he had not notified patients that

Page 55

1 Akoda was a fraud.
2    Q    And at this point in time, you were not
3 a patient in that practice anymore; correct?
4    A    No, I was no longer --
5    Q    Okay.  And --
6    A    I would have still been, but I wasn't
7 pregnant or needing women's care.
8    Q    Right.
9        So you -- why did you go to Dr. Moore
10 instead of Dr. Waldrop?
11    A    Because Dr. Moore is the head of the
12 practice.
13    Q    Okay.  And how did you make contact to
14 go meet with Dr. Moore?
15    A    I set an appointment.
16    Q    Okay.
17    A    I called the office.
18    Q    Okay.  Did you tell them what you
19 wanted to talk about?
20    A    No.  I might have.  I don't know.
21    Q    Okay.  And do you remember how long
22 after you had met with -- you had seen the
23 information of Dr. Akoda's guilty plea that you
24 went to talk to Dr. Moore?
25    A    I don't know, but it was fairly soon.

Page 56

1    Q    Okay.  And what do you recall about
2 that meeting with Dr. Moore?
3    A    Dr. Moore seemed just as surprised, and
4 he told me that he had also been working for
5 another doctor's office, Dr. Chaudry.
6    Q    Okay.  Did you ask Dr. Moore any
7 questions or express any views to him?
8    A    I did.  I asked him -- I was trying to
9 make sense of what happened, and he told me they
10 raided his -- Akoda's office, I believe, at
11 Chaudry's office and his home, and they discovered
12 machines that make, like things to make diplomas
13 with and details like that.
14        I asked him why he didn't notify
15 patients.
16    Q    Uh-huh.
17    A    And he said that wasn't a requirement
18 or . . .
19    Q    How did you feel about that response?
20    A    It's upsetting because I think every
21 woman who has ever been a patient of Akoda should
22 know that he was not a real doctor.
23    Q    And the response you got from Dr. Moore
24 who, if I'm understanding it correctly, had hired
25 Dr. Akoda into his practice, was it wasn't his

Page 57

1 place to do it or he didn't have to do it; it
2 wasn't a requirement for him to do it?
3    A    He felt -- and I don't remember exactly
4 how he said it, but he felt that he had been duped
5 as well.
6    Q    Okay.  Did you ask him what type of
7 investigation or vetting he had done of Dr. Akoda
8 before hiring him?
9    A    I did, and he said he had worked with
10 him in the residency program at Howard University.
11    Q    Did you ask him about doing any kind of
12 background check or investigation of him before
13 hiring him?
14    A    I did, and he said that he had worked
15 with him in the Howard residency program.
16    Q    Okay.  Did he tell you whether he had
17 done a background check or not?
18    A    He did not.
19    Q    He did not tell you or he did not do
20 one?
21    A    He said he did not do one.
22    Q    Okay.  What was your reaction to that
23 answer?
24    A    I was surprised, but he said that
25 because of all of the certifications and everyone

Monique Russell

Page 58

1 who had would have had to do it by contracts, that
2 he didn't feel it was necessary --
3    Q    Okay.
4    A    -- because he had been -- he had gotten
5 privileges at P.G. County; he had been approved
6 from these other organizations.
7    Q    Did he tell you whether or not he in
8 the future would be considering doing background
9 checks of people he hired to be doctors in his
10 practice?
11    A    Yes, he did.
12    Q    What did he say?
13    A    He said he would consider doing that.
14    Q    And what was your reaction to that?
15    A    I thought that that would be a good
16 idea.
17    Q    In your position at D.C. Public
18 Schools, did they have to do a background check on
19 you before hiring you?
20    A    Yes, they do.
21    Q    And they're your employer; right?
22    A    Yes.
23        MR. SHAFFER:  Let's take a short --
24 short five-minute break --
25        THE WITNESS:  Okay.

Page 59

1        MR. SHAFFER:  -- and then we'll pick
2 back up.
3        THE VIDEOGRAPHER:  Off the record at
4 2:50.
5        (Recess -- 2:50 p.m.)
6        (After recess -- 3:15 p.m.)
7        THE VIDEOGRAPHER:  We are back on the
8 record at 3:15.
9    BY MR. SHAFFER:
10    Q    Ms. Russell, we're back on the record
11 after a short break.  You understand you're still
12 under oath?
13    A    Yes.
14    Q    Okay.  I'm going to talk a little bit
15 about some of the doctors that you've seen over
16 your adult life and I'll just make sure I
17 understand some of the chronology on that.
18        Do you currently have a primary care
19 doctor that you see?
20    A    Not really.
21    Q    Do you have a doctor that you've seen
22 from time to time for general issues, colds or
23 antibiotics or anything like that?
24    A    I did, but not since discovering about
25 Akoda.  I have not found a primary care doctor.

Page 60

1    Q    So as of today, you don't have a
2 primary care doctor?
3    A    No.
4    Q    Have you seen -- have you seen any
5 doctor of any kind since June of 2017?
6    A    Yes.
7    Q    Who is that?
8    A    I have seen -- I don't know the
9 doctor's name.  It was at an urgent care facility
10 in Costa Rica called (speaking Spanish).
11    Q    Okay.  And why did you go there?
12    A    I -- Dr. Waldrop, after my son was
13 born --
14    Q    Uh-huh.
15    A    -- placed an IUD --
16    Q    Uh-huh.
17    A    -- and I was having complications from
18 the IUD.
19    Q    Okay.  And, again, just so I get the
20 timeline correct, Luka was born in May of '16.
21    A    Yes.
22    Q    When did you have the IUD implanted?
23    A    Probably six months after.
24    Q    Okay.  So end of 2016?
25    A    That's pretty -- yes.

Page 61

1    Q    Beginning of 2017, something like that?
2    A    Something around there.
3    Q    Okay.  And when did your contract
4 with -- when did you go to Costa Rica?
5    A    In the last week of July of 2018.
6    Q    And -- and since July of 2018, when
7 have you come back to the States?
8    A    I came back for the December break last
9 year.
10    Q    So that would have been December of
11 '18?
12    A    Yes.
13        And then I came back this summer in
14 July -- essentially the month of July.
15    Q    Okay.  And in neither December of
16 '18 or summer of '19, you didn't see any doctors
17 here in the U.S.; correct?
18    A    No.
19    Q    Okay.  And before going to Costa Rica
20 in around July of '18, had you seen any doctors
21 between when you got the IUD put in and you went
22 to Costa Rica?
23    A    I -- I'm not sure when I last saw
24 Dr. Major.  Dr. Major was my primary care
25 physician for about ten years.

Monique Russell

Page 62

1    Q    Okay.
2    A    And I'm not sure when I last saw him,
3 but it was -- I did see him after I found out
4 about Akoda.
5    Q    Okay.  And Dr. Major is his name?
6    A    Yes.
7    Q    And you said he is a primary care
8 doctor?
9    A    Yes.
10   Q    And where is his office?
11   A    He has an office in Silver Spring,
12 Maryland, and in Clinton, Maryland, I believe is
13 the other one.
14   Q    And where did you see him?
15   A    I've seen him at both, but mostly the
16 Silver Spring office.
17   Q    And you said he's been your primary
18 care doctor for about ten years?
19   A    Yes.
20   Q    And you saw him at some point between
21 June of 2017 and today?
22   A    Yes.
23   Q    How many times?
24   A    Once.
25   Q    Okay.  When do you think that was,

Page 63

1 approximately?
2    A    Maybe July.  It was shortly after I
3 found out.
4    Q    Okay.
5    A    And I didn't know when I saw him what I
6 was -- what I was going to do.  I didn't -- so it
7 must have been soon after I found out.
8    Q    And did you make an appointment to go
9 in and see him?
10   A    Yes.
11   Q    Okay.  And did you get any treatment
12 from him while you were there?
13   A    I don't remember why I went to see him.
14   Q    Okay.  But you think this was probably
15 shortly after you found out about Dr. Akoda in the
16 2017 -- summer of 2017?
17   A    Yes, because I told him about it.
18   Q    Okay.  And what -- what did you tell
19 him?
20   A    I told him that I found out that the
21 doctor was a fake.
22   Q    Okay.
23   A    And that he was -- had been charged and
24 tried by the U.S. government.
25   Q    Okay.  What did Dr. Major say?

Page 64

1    A    He was really surprised, and he --
2 during my pregnancy, he told me that he knew
3 Daniel Waldrop, my OB/GYN, and that they had known
4 each other for a number of years, but he didn't
5 say much about it.  He was just really surprised.
6        But knowing that he had a close
7 relationship with the office, I did not feel
8 comfortable seeing him anymore.
9    Q    Okay.  And did you tell him that when
10 you went and met with him?
11   A    No.
12   Q    Okay.  Did you --
13   A    I just stopped going.
14   Q    Okay.  And I think you -- you said that
15 you don't recall why you went to see Dr. Major?
16   A    No, I don't know.
17   Q    How did you originally start going to
18 see Dr. Major?
19   A    I was a teacher.  I got sick a lot.
20 And the -- my -- the primary care physician I had
21 at the time, Ms. Shelly something, she could never
22 see me on the day that I was sick.  And, so, I
23 went on my insurance Web site and found another
24 doctor, looked up reviews and everything, and this
25 doctor -- people said that they were able to get

Page 65

1 in quickly and, you know, really positive
2 experiences.  And, so, I switched to Dr. Major.
3    Q    Okay.  And where did Dr. Major go to
4 medical school?
5    A    I don't remember.
6    Q    Do you know if Dr. Major has ever been
7 convicted to a crime?
8    A    Not to my knowledge.  I looked him up
9 on a -- a state of Maryland site where you can
10 look for sanctions and things --
11   Q    Okay.
12   A    -- and there was nothing there.
13   Q    Okay.  When did you do that?
14   A    I don't remember.
15   Q    Was it after you found out about
16 Dr. Akoda?
17   A    Yes.  I didn't know that the site
18 existed before then.
19   Q    Okay.  And other than Dr. Major, have
20 you seen any other doctors since the middle of
21 2017?
22   A    Only in Costa Rica and only in urgent
23 care.
24   Q    Okay.  You currently have an OB/GYN?
25   A    No.  I have seen an OB/GYN because of

Monique Russell

Page 66

1  the problem with my IUD, but I don't currently
2  have one.
3      Q      And was that someone you saw in Costa
4  Rica or someone you saw here?
5      A      I saw someone in Costa Rica.
6      Q      Okay.  And when was that,
7  approximately?
8      A      It was last year.  I don't -- I don't
9  remember when last year, but I went to urgent care
10 because I was having pain and bleeding, and they
11 did an x-ray and confirmed my IUD was still
12 there --
13     Q      Uh-huh.
14     A      -- but were concerned that it had moved
15 or shifted somehow.  And, so, they wanted me to
16 see an OB/GYN.
17     Q      Okay.  And you went and did that?
18     A      Uh-huh.
19     Q      Okay.
20     A      Yes.
21     Q      And were you treated for issues with
22 the IUD?
23     A      Yes.
24     Q      Okay.  And was that successful?  Did
25 they --

Page 67

1      A      Yes.
2      Q      -- fix it?
3      A      Sorry.
4      Q      That's okay.  Sure.
5      A      Yes.  I was treated.  They removed the
6  IUD, the doctor did.
7      Q      Okay.  And that was down in Costa
8  Rica --
9      A      Yes.
10     Q      -- sometime last year?
11     A      Yes.  It wasn't a surgical procedure.
12     Q      Uh-huh.  Okay.  And other than the
13 urgent care and the doctor in Costa Rica and
14 seeing Dr. Major, have you seen any other doctors
15 or -- or health care providers in -- since the
16 mid-2017?
17     A      I get physical therapy, but not from a
18 doctor.
19     Q      Okay.  Where do you get that?
20     A      In Costa Rica and in the States.  In
21 the States, I see a woman that my husband has seen
22 for 15 years, maybe.
23     Q      Uh-huh.
24     A      And in Costa Rica, I see a physical
25 therapist that I found through the same place that

Page 68

1  I go for urgent care.
2      Q      Okay.  And, excuse me, what -- what are
3  you doing physical therapy for?
4      A      My back.
5      Q      Okay.  And is that -- how long have you
6  had that condition?
7      A      Probably since my son was about a year
8  old, so about 2017.
9      Q      And has it -- has it been diagnosed
10 as --
11     A      Stress related.
12     Q      Okay.  And when did the stress start or
13 the stress that -- that you've been told relates
14 to the back injury?
15     A      The pain started after my son was about
16 a year, which would have been June of 2017.
17     Q      And had you ever suffered from stress
18 or anxiety prior to June of 2017?
19     A      Yes.
20     Q      Okay.  And what -- what can you tell me
21 about that?
22     A      When I lost my sister in 2007, I had
23 stress-related back pain.
24     Q      Okay.  And that was -- were you treated
25 for depression or anxiety or stress in -- in 2007?

Page 69

1      A      I was treated for depression, briefly.
2      Q      Okay.
3      A      And for, maybe two weeks, given
4  medication for my back and then taught breathing
5  exercises to alleviate the pain when stressful
6  situations occurred.
7      Q      Okay.  Were you ever provided an
8  antidepressant or anything like that?
9      A      I was shortly after my sister's death.
10     Q      Okay.  And do you remember which one?
11     A      I think it was Lexapro.
12     Q      Okay.  And for how long did you take
13 that?
14     A      Several months, maybe -- no more than
15 six months.
16     Q      Okay.  Are you on any medications
17 today?
18     A      No.
19     Q      Okay.
20     A      Just vitamins.
21     Q      In terms of other types of treatment,
22 have you ever in your adult life seen a
23 psychologist or a psychiatrist for treatment?
24     A      No.
25     Q      Have you ever gone into therapy at any

Page 70

1 point in your adult life?
2    A   No.
3    Q   And, so, you're not currently being
4 treated by a psychiatrist or psychologist?
5    A   No, I'm not.
6    Q   Other than Dr. Major and Dr. Moore's
7 practice, and the doctor at urgent care and the
8 doctor that you saw in Costa Ricia -- Rica
9 regarding the IUD and your physical therapist,
10 what other doctors have you seen in your adult
11 life?
12    A   I have a cardiologist who helped
13 diagnose my condition.
14    Q   And that's the --
15    A   Dr. Howell, Shawn Howell.
16    Q   And that's the condition you were
17 talking about earlier?
18    A   Yes, vasovagal syncope.
19    Q   You said it better than me.
20    A   And I did see her periodically
21 throughout my pregnancy for monitoring.
22    Q   And this is Shawn Howell?
23    A   Yes.
24    Q   And where is she -- where does she
25 practice?

Page 71

1    A   I believe on K Street.
2    Q   A couple of blocks from us here?
3    A   Yes, very close by.
4    Q   Does she have hospital privileges?
5    A   I don't know.
6    Q   Okay.  Do you know where she went to
7 medical school?
8    A   I don't remember.  It might have been
9 Howard.
10    Q   Okay.  And do you know if she's board
11 certified?
12    A   I believe she is.
13    Q   Okay.  Do you know by what board?
14    A   I do not.
15    Q   Okay.  Any other doctors?
16    A   In my adult life, certainly.  I don't
17 remember any more that that.  I know there are --
18 I know it -- before Dr. Major I had a different
19 primary care physician and a different OB/GYN.  I
20 don't remember their names.
21    Q   Okay.  And do you know how you went to
22 start seeing Dr. Howell?
23    A   I was recommended by Dr. Major.
24    Q   Okay.  And I apologize if I asked you
25 this already, but I can't remember the answer.

Page 72

1       How did you come to see Dr. Major?
2    A   I found him through my insurance --
3    Q   You did say that, okay.
4       Do you -- do you ever have to take Luka
5 to the doctor?
6    A   Yes.
7    Q   Where -- where does he go to the
8 doctors?
9    A   He goes to a doctor in Costa Rica.
10    Q   Okay.  Is it a pediatric practice?
11    A   Yes.
12    Q   Okay.  What -- what's the name of the
13 practice?
14    A   Dr. Holtermann.
15    Q   Okay.  And how did you find
16 Dr. Holtermann?
17    A   Through the same way they found my
18 physical therapist.
19    Q   Okay.
20    A   The -- I don't know what it's called.
21 They call it a hospital, but it's like more than a
22 hospital --
23    Q   Sort of a --
24    A   More of a center.
25    Q   -- like a clinic provider, something

Page 73

1 like that?
2    A   Yes.
3    Q   A one-stop shop for --
4    A   Yes.
5    Q   -- primary care, pediatrics, maybe a
6 pharmacy, maybe physical therapy?
7    A   It's not all in one place, but it's
8 like a network.
9    Q   Got it.  And that is through the school
10 that you are with --
11    A   No.
12    Q   -- that you were given that?  No?
13       Okay.  Do you have health insurance?
14    A   I do.
15    Q   Okay.  And does the health insurance
16 cover Dr. Holtermann and --
17    A   The health insurance doesn't cover
18 much.  It doesn't cover my child.
19    Q   Okay.  And so when you go to see
20 Dr. Holtermann, do you pay for it or --
21    A   Yes.
22    Q   And --
23    A   I -- I use a -- in Costa Rica, they
24 have a medical discount program that -- because
25 Costa Rica has socialized health care.

Monique Russell

Page 74

1    Q    Uh-huh.
2    A    And I have international health
3 insurance because I go back and forth.
4    Q    Uh-huh.
5    A    But in the country, I used -- I use
6 this medical discount program that feels like what
7 we would think of as insurance --
8    Q    Uh-huh.
9    A    -- but it's not insurance.
10    Q    Got it.
11        Other than Dr. Holtermann, have you had
12 to take your son to see any other doctors?
13    A    I did have to take him to urgent care.
14    Q    And what types of things have you taken
15 him to see Dr. Holtermann or urgent care?  Typical
16 colds and --
17    A    For urgent care, I took him for a
18 fever.
19    Q    Uh-huh.
20    A    And for Holtermann I took him because
21 the school requires an annual wellness check.
22    Q    Okay.  And so, you've taken him two
23 times now to do that or just once?
24    A    And he had hand, foot and mouth.
25    Q    Also a right of passage probably in the

Page 75

1 lower school; right?
2    A    Yes.
3    Q    Okay.  And I understand that you, as
4 you've said in -- in written responses to
5 interrogatories, that you -- you have suffered
6 from emotional distress as a result of learning
7 about Dr. Akoda; is that right?
8    A    Yes.
9    Q    And what in particular is it that you
10 are experiencing as a result of what you found out
11 about Dr. Akoda?
12    A    I feel violated by Dr. Akoda.  I feel a
13 sense of distrust in the medical community in
14 general.  Like I wouldn't want, for example, to go
15 find a therapist to see to talk to about these
16 things because how do I what their certification
17 is worth or their licensure is worth based on how
18 far doctor -- not even a doctor, how far Akoda got
19 with false papers.
20        I don't trust the institutions that are
21 in place to -- to check that these doctors are who
22 they say they are, doing the right thing, or have
23 the credentials they do, which makes it very hard
24 for me to then use sources I would have used to
25 check on a doctor.

Page 76

1        And I don't feel equipped to do
2 background checks on doctors myself.
3        I feel violated, and it makes it very
4 difficult to -- I'm sorry.  It makes it very
5 difficult to see an OB/GYN.
6    Q    And I take it that when you found out
7 about Dr. Akoda's guilty plea regarding the use of
8 Social Security numbers, that . . .
9        MR. SHAFFER:  There's some tissues back
10 there.
11        BY MR. SHAFFER:
12    Q    Here you go.
13        I take it when you found out about the
14 guilty plea, you -- you were angry with Dr. Moore
15 and Dr. Waldrop who you had seen in connection
16 with that pregnancy; right?
17    A    No.  I was angry in general, but I
18 don't necessarily hold blame or anger towards
19 Dr. Waldrop and Dr. Moore because they relied on
20 sources they should have been able to trust.  For
21 example, I was a teacher.  I had to have
22 background -- extensive background checks done in
23 order to hold a job within DCPS.  So when I rented
24 my basement apartment, and as a mother I wanted to
25 find somebody safe to live in the home with us,

Page 77

1 and a teacher applied, I didn't feel like I needed
2 to run the full background check on them because I
3 knew that they had gone through that background
4 check with the public school system.  So, instead,
5 I could do -- rely on other sources because I
6 trusted the school system's background check.
7        So I didn't hold anger.  I was very
8 surprised that Dr. Moore hadn't done a background
9 check, but I understood why he relied on
10 institutions like the commission to certify
11 foreign medical graduates instead of doing it all
12 over again himself.
13    Q    And your view there is that your
14 understanding of ECFMG as a governmental entity,
15 that it would do background checks on people like
16 Dr. Akoda --
17    A    Yes.
18    Q    -- correct?
19        And I --
20    A    Yes --
21    Q    I'm sorry.  Go ahead.
22    A    At least to verify that they had
23 attended and graduated school.
24    Q    And do you know whether ECFMG tried to
25 do that?

Monique Russell

Page 78

1    A    I do not know.
2    Q    Okay.
3    A    But if they did, they seemed to have
4  failed.
5    Q    Do you know whether ECFMG ever
6  identified that Dr. Akoda had used multiple names
7  to try to come and take examinations with ECFMG?
8    A    I do not know.
9    Q    Do you know whether ECFMG ever helped
10 the Department of Justice build a case and
11 prosecute a case against Dr. Akoda?
12   A    I do not know.
13   Q    Okay.  And do you know whether or not
14 ECFMG ever received verification from Dr. Akoda's
15 Nigerian medical school as to whether or not his
16 diploma was authentic?
17        MR. ZAJDEL:  Objection.  That assumes
18 facts.
19        You can answer.
20        THE WITNESS:  I do not know.
21        MR. SHAFFER:
22   Q    You filed a suit against Dimensions
23 Health Care in Maryland; correct?
24   A    Yes.
25   Q    When did you do that?

Page 79

1    A    I don't remember exactly --
2    Q    Okay.
3    A    -- but . . .
4    Q    We probably have a document in all our
5  documents here that --
6    A    Probably --
7    Q    -- says --
8    A    -- so.
9    Q    -- when that occurred.
10        You think it was sometime in 2018 or
11 earlier than that?
12   A    I don't know.
13   Q    Okay.  And when you were suing
14 Dimensions Health Corporation, who did you
15 understand that that encompassed?  Who was that?
16   A    The company that owns the hospital
17 where my son was born where Akoda performed a
18 C-section.
19   Q    Did that include Dr. Moore's practice?
20   A    I don't know.  I don't know.
21   Q    I'm sorry?
22   A    I don't know.
23   Q    Okay.  Did it include Dr. Akoda's --
24 personally Dr. Akoda?
25   A    I don't know.

Page 80

1    Q    Okay.  Did it include the other
2  practice with Dr. Chaudry that Dr. Akoda was
3  apparently associated with?
4    A    I don't know.
5    Q    Okay.  What did you understand that you
6  were saying in filing that lawsuit?
7    A    That I was suing similarly to this suit
8  for emotional distress and representing a class.
9    Q    Okay.  And -- and you were suing
10 Dimensions Health Corporation which you understood
11 to be the Prince George's County Hospital, among
12 others, because you believed that they should
13 have -- they were responsible for the emotional
14 distress that you felt from Dr. Akoda's actions?
15   A    I believe that they share in the
16 responsibility along with the commission to
17 certify foreign medical graduates.
18   Q    Okay.  Who else shares in that
19 responsibility?
20   A    I don't know, but I think they are the
21 two most responsible because the commission to
22 certify foreign medical graduates is the first
23 gatekeeper, and Dimensions is the -- oversees the
24 entire hospital.
25   Q    Do you know whether ECFMG licenses

Page 81

1  physicians to practice in the U.S.?
2    A    Not to my knowledge.
3    Q    Okay.  Do you know who licenses
4  physicians to practice in hospitals in Maryland?
5    A    I do not, but I would assume it's a
6  state organization.
7    Q    Okay.  And do you believe that the
8  state bears any responsibility for what -- your
9  emotional distress that you feel from Dr. Akoda?
10   A    I think it would depend on the nature
11 of the relationship between -- and the process of
12 how state licensure is determined based on what
13 the foreign medical -- the commission to certify
14 foreign medical graduates does.
15   Q    And, so, if the licensure board has
16 responsibility to do its own investigation of
17 anybody it's going to license, would you agree
18 with me that they would share responsibility, in
19 your view, for any of the emotional distress that
20 you believe was caused by Dr. Akoda?
21   A    Yes, I would, but I think it would not
22 be possible for them to license if the commission
23 to certify foreign medical graduates had stopped
24 Akoda from being able to enter the country and
25 take the medical boards in the first place.

Monique Russell

Page 82

1    Q    And do you know whether Dr. Akoda ever
2    lied to ECFMG?
3    A    To my understanding, he did.  He used
4    three different Social Security numbers and
5    multiple names to come through and get approved to
6    take boards multiple times.
7    Q    Do you know whether Dr. Akoda did a
8    residency in the U.S.?
9    A    My understanding is that he started a
10   residency in New Jersey before they discovered
11   that he was a fraud and referred back to the
12   commission to certify foreign medical graduates,
13   and that he was still then approved again through
14   the commission and eventually received residency
15   at Howard University.
16   Q    And what's the basis for that
17   understanding?
18   A    The court documents that I read from
19   his federal trial.
20   Q    This is the -- the guilty plea of
21   Dr. Akoda?
22   A    The transcript of the trial.
23   Q    Okay.  And do you know whether ECFMG
24   certification is sufficient to allow a person to
25   obtain a residency in the United States?

Page 83

1    A    I don't understand the --
2    Q    Well, I -- I -- I've heard you say that
3    you blame ECFMG, at least in part, because I think
4    you've called them the first gatekeeper, and I was
5    trying to understand whether you believe that
6    ECFMG certification in and of itself is sufficient
7    to allow a person to be in a residency program.
8    A    I don't think so.  I think that it's
9    required for them to be able to take the medical
10   boards in the first place which is a requirement
11   for a residency program.
12   Q    And the basis for that understanding
13   is?
14   A    The documents that I read from the
15   federal trial.
16       MR. SHAFFER:  Okay.  Let's go ahead and
17   mark this.  You know what?  Off the record a
18   second.
19       THE VIDEOGRAPHER:  Off the record at
20   3:47.
21       (Recess -- 3:47 p.m.)
22       (After recess -- 3:50 p.m.)
23       THE VIDEOGRAPHER:  Back on the record
24   at 3:50.
25       BY MR. SHAFFER:

Page 84

1    Q    Okay.  We're back on the record.  You
2    understand you're still under oath?
3    A    Yes.
4    Q    Okay.  I need to ask you a couple of
5    questions about some of the statements that are in
6    your discovery responses.
7    A    Okay.
8    Q    And one of them asks -- and I know you
9    reviewed these in advance of coming in, and I can
10   show them to you if it would be helpful, but if
11   not, I'll just ask you some of the questions.
12       I think you've described here that you
13   feel emotional distress as a result of what you
14   learned about Dr. Akoda; correct?
15   A    Yes.
16   Q    Are there any physical conditions that
17   today you attribute to that emotional distress?
18   A    I had not thought of this until you
19   asked me about the date that my current back pain
20   started which coincides with when I learned about
21   Akoda.  And, so, I don't know if they are related
22   or not.
23   Q    Okay.  None of the doctors that you've
24   seen for that have told you that that's likely
25   related to Dr. Akoda; correct?

Page 85

1    A    None of the doctors I've seen of that
2    know about doctor -- know about Akoda.
3    Q    Okay.  Well, Dr. Major did; correct?
4    A    Yes, but I didn't see Dr. Major for my
5    back pain.
6    Q    The doctor you saw for back pain was?
7    A    I saw a physical therapist here, ATI
8    Physical Therapy.  And I see a physical therapist
9    in Costa Rica named Eduardo Reyes.
10   Q    Do you know --
11   A    And I see a family -- someone my
12   husband has seen for a long time who is a
13   structural integrationist named Priscilla Soto.
14   Q    Is Priscilla a M.D.?
15   A    No, none of these are M.D.s.
16   Q    And your physical therapists were not
17   M.D.s --
18   A    No.
19   Q    -- correct?
20       Your supplemental answer to
21   interrogatory number 2 we asked said that you are
22   a survivor of previous sexual abuse --
23   A    Yes.
24   Q    -- is that correct?
25   A    Yes.

Monique Russell

Page 86

1    Q    When did that occur?
2    A    I was molested as a child, and I was a
3 victim of sexual assault as an adult.
4    Q    Okay.  As an adult what year
5 approximately would that have been?
6    A    On multiple -- twice.
7    Q    Okay.  Did you ever -- I'm sorry to
8 hear that.
9         Did you ever speak to any of your
10 doctors about that experience?
11    A    No.
12    Q    Why not?
13    A    Because it's very difficult to talk
14 about.
15    Q    Okay.  And I apologize for having to
16 ask you those questions, but it was -- it was in
17 your response.
18         And I take it -- go ahead.
19    A    I did -- I would have spoken to a
20 doctor.  I did not tell the doctor that I was
21 sexually assaulted, but I did have a STD check --
22    Q    Okay.
23    A    -- afterwards.
24    Q    And in seeing doctors even before you
25 heard about Dr. Akoda in June of 2017, would you

Page 87

1 have mentioned that prior abuse to any of those
2 doctors?
3    A    No, it wouldn't have been as relevant.
4    Q    Okay.  Do you know whether they asked
5 those questions when you would go in?
6    A    I'm sure in some cases and if they had
7 asked I would say, but it's not something I would
8 bring up as a concern.
9    Q    Okay.
10         (Russell Deposition Exhibit 2 was
11 marked for identification and attached to the
12 transcript.)
13 BY MR. SHAFFER:
14    Q    I've handed you, Ms. Russell, what
15 we've marked as Exhibit 2 which is a report from
16 Prince George's Hospital Center.  It looks like it
17 was May 14th, 2016; correct?
18    A    Yes.
19    Q    So that would have been shortly before
20 Luka was born?
21    A    Yes, I think I remember this
22 appointment.
23    Q    Okay.  And you're seeing, it looks like
24 attending at the bottom it says Dr. Waldrop;
25 correct?  Do you see that?

Page 88

1    A    Yes.
2    Q    Okay.  And I also see a reference to
3 Traci Gore, R.N.?
4    A    Okay.  Right.  Because Dr. Waldrop was
5 not at this appointment.
6    Q    Okay.  And do you think Traci Gore was
7 the person at this appointment?
8    A    Yes.  I believe she would be a nurse
9 midwife.
10    Q    Okay.  It looks like she has R.N. --
11    A    Okay.
12    Q    -- so a registered nurse would be
13 consistent.
14         And I -- again, I'm just trying to make
15 sure I understand the facts here.  Under sexual
16 detail, it says history of sexual abuse, no.
17         So I'm wondering -- you said previously
18 that if you were asked you would have said
19 something, but it looks like here you responded
20 no; correct?
21    A    Or that I wasn't asked.  I don't
22 remember.
23    Q    Okay.  So you think the reference to
24 "no" means that you weren't asked?
25    A    I would assume that.

Page 89

1    Q    Okay.
2    A    Because it's not a secret.
3    Q    Okay.  And this appointment would have
4 been well before you heard anything about
5 Dr. Akoda in 2017; correct?
6    A    Yes.
7         (Russell Deposition Exhibit 3 was
8 marked for identification and attached to the
9 transcript.)
10 BY MR. SHAFFER:
11    Q    Ms. Russell, I've handed you what's
12 been marked as Exhibit 3 which is an obstetrical
13 form from the Prince George's Hospital Center.
14 Again, this one looks like it references a series
15 of medical triage and assessments for May 14th,
16 2016.
17         Do you see that?
18    A    Yes.
19    Q    Okay.  Do you know whether this was the
20 same appointment that we just looked at or a
21 different one?
22    A    It appears to be since this marks the
23 same date and only minutes apart.
24    Q    And if you turn to the page which has
25 the Bates number, which is the big number at the

Page 90

1 bottom, 1129, at the top it references questions
2 about substance abuse, and the answer is none.
3         Was that accurate from your perspective
4 there; that if you were asked about substance
5 abuse, you would say there was none?
6    A    Yes.
7    Q    Okay.  And then there's a reference to
8 sexual -- a history of sexual abuse, and the
9 answer is, referenced here again, no; correct?
10   A    Yes.
11   Q    In connection with your discovery
12 responses, you say that your experiences with
13 Dr. Akoda have flowed into your marriage and
14 created intimacy issues; correct?
15   A    Yes.
16   Q    In what way has that interfered with
17 your marital relationship?
18   A    It has been difficult to be sexually
19 intimate, and it's impacted family planning
20 because we want more children, and that is
21 challenging when it is hard to see an OB/GYN.  And
22 it's -- intimacy with my husband is better now,
23 but it's -- it's not like it was before.  And
24 after I found out about this, it was very
25 difficult.

Page 91

1    Q    And have you seen or talked to anyone?
2 I know you mentioned sort of doing yoga in the
3 morning and doing walks, and things like that.
4         Have you spoken with a therapist or
5 anyone in the health care facility, or is this
6 something you've handled on your own?
7    A    No, I've not spoken to anybody in the
8 health care industry.  Just on my own.
9    Q    Okay.
10   A    With my husband.
11   Q    Okay.  Did you see a counselor -- a
12 marriage counselor or it's something you've worked
13 on together?
14   A    No, we just work on it together.
15   Q    Okay.
16       (Russell Deposition Exhibit 4 was
17 marked for identification and attached to the
18 transcript.)
19   BY MR. SHAFFER:
20   Q    Here's more paper for you.
21       Ms. Russell, I've handed you what's
22 been marked as Exhibit 4 which, I think -- and you
23 can tell me if I've got it wrong -- but I think
24 are a series of records from Dr. Major's office.
25   A    Yes.

Page 92

1    Q    And you had mentioned previously that
2 Dr. Major was someone who's been your primary care
3 or was your primary care physician for about ten
4 years up through sometime in 2018?
5    A    Yes.
6    Q    Okay.  I have some questions about this
7 group of -- of records which I'll represent were
8 provided to us by your lawyers.
9    A    Uh-huh.
10   Q    So the first page which has 118654 at
11 the bottom looks like it references a visit from
12 2015, 10/8/2015?
13   A    That's correct.
14   Q    And that would have been, looks like,
15 in connection with maybe a pregnancy test related
16 to Luka?
17   A    Yes.
18   Q    Okay.  And then on the second page, you
19 went to see -- when you were in to see Dr. Major,
20 there were reported findings on the visit.  I'm
21 looking at the box that says ROS up on the top
22 left-hand side there.
23   A    Okay.
24   Q    And there's a number of reports, most
25 of -- if not all of them saying no this, no that,

Page 93

1 no the other thing.
2         And you can look through the whole
3 discussion there, but I wanted to turn your
4 attention to sort of the -- the -- I guess the
5 last three sentences.  It states that she -- and
6 this is referring to you -- reports no depression,
7 no sleep disturbances, feeling safe in a
8 relationship, no alcohol abuse, no anxiety, no
9 hallucinations, no sui- -- suicidal thoughts, no
10 fatigue and thereon.
11        Does that all sound consistent with how
12 you were feeling at that point in time?
13   A    I don't know when this is from.
14   Q    This is still from October of 2015?
15   A    Yes.
16   Q    Okay.  If we keep going, it looks like
17 there is another visit to see Dr. Major, and this
18 page is 118664.
19        Do you see that one?
20   A    Yes.
21   Q    It looks like that was from May of
22 2017; correct?
23        I'm looking --
24   A    Where -- okay.
25   Q    -- under the vitals there in the middle

Monique Russell

Page 94

1 of the page?
2     A    Yes.
3     Q    Which is the same place we looked at
4 the October date from the last report.
5         It says up above under chief complaint,
6 patient is here today for physical exam only; had
7 blood work; eye exam; swelling lymph nodes; and
8 looks like neck mass?
9     A    Uh-huh.
10     Q    Do you see that?
11         Do you recall why you went to see
12 Dr. Major in May of 2017?
13     A    For this (indicating).
14     Q    Okay.  You can see it a little bit
15 there.  Still there?
16     A    Yep, still there.
17     Q    Okay.  As part of your examination with
18 Dr. Major in May of 2017, and now I'm turning to
19 the page that has 666 at the bottom of it -- it
20 might be two pages later.  It's got a -- it starts
21 at the bottom of 65.  It's the ROS section?
22     A    ROS, okay.
23     Q    And again, I'm focusing the attention
24 on the reports in here that she -- that's
25 referring to you -- reports no depression, no

Page 95

1 sleep disturbances, feeling safe in a
2 relationship, no alcohol abuse, no anxiety, no
3 hallucinations and no suicidal thoughts.
4         MR. ZAJDEL:  Hold on.
5         BY MR. SHAFFER:
6     Q    And my question is the same as I asked
7 you on the other report.  This would be consistent
8 with how you reported to Dr. Major you were
9 feeling at that time?
10     A    Yes.
11     Q    Okay.  If we turn to the next report in
12 here which is the page that starts 668 or ends
13 with 668.  Sorry.
14         If you look under the vitals section,
15 it looks like this is a report of June 28th, 2018.
16     A    Uh-huh.
17     Q    Do you see that?
18     A    Yes.
19     Q    Okay.  And the chief complaint
20 referenced here is a follow-up.  Patient complains
21 of muscle spasm since pregnancy -- since after
22 pregnancy.  Also complains of right elbow pain and
23 lump on right side of neck.
24         Do you recall what led you to go see
25 Dr. Major in June of 2018?

Page 96

1     A    I do not.
2     Q    Do you know what the muscle spasm since
3 pregnancy is that's referenced under the
4 complaint?  It says since after pregnancy.
5     A    It would think my back because this is
6     Q    Uh-huh.
7     A    I would think my back because this is
8 about when it started.  6/28.  June.  After my son
9 was a year.
10     Q    Well, this, I guess, would actually be
11 two years; right?  June of 20 --
12     A    This is two years, okay.
13     Q    This would have been last summer, I
14 guess, before you --
15     A    This would have been --
16     Q    I'm sorry.  Go ahead.
17     A    So this would have been after.
18     Q    It seems like this would have been
19 before you were going to Costa Rica.
20     A    Yes, yes.  So I would have already been
21 getting -- having trouble with this for a year.
22     Q    And that's your --
23     A    And I wanted to get physical -- I
24 wanted to get therapy?
25     Q    Got it.  And that's your testimony;

Page 97

1 that you believe it started about a year after
2 your -- his pregnancy.  That's not reflected in
3 this report; right?
4     A    No.
5         MR. ZAJDEL:  Objection.  I think that
6 misstates facts.  I just think you misspoke.
7         THE WITNESS:  Can you restate?
8         BY MR. SHAFFER:
9     Q    I'll ask you the question again just to
10 make sure we're clear.
11     A    Thank you.
12     Q    You were -- you were saying that -- I
13 think you testified here earlier today that the
14 back pain that you were experiencing you think
15 started about a year after Luka was born; right?
16     A    Yes.
17     Q    Okay.  And this report doesn't
18 reference --
19     A    It does --
20     Q    -- Monique has had back pain for the
21 past year; it just says muscle spasm since after
22 pregnancy.  It's not specific as to time.
23     A    Correct.
24     Q    Okay.  It also makes reference to right
25 elbow pain.  Do you know what that was?

Page 98

1    A    It was a pain in my right elbow.  I
2  don't know why.
3    Q    Okay.  Do you recall being treated for
4  it?
5    A    The pain in my elbow?
6    Q    Uh-huh.
7    A    Yes.
8    Q    Okay.
9    A    Dr. Major recommended that I get a
10  brace -- a compression brace.
11    Q    Uh-huh.
12    A    That helped.
13    Q    Okay.  Looking again at the report
14  again here from June of 2018, under the ROS
15  section, this is on page 670.
16          It references that you were reporting
17  arthralgias and joint pain.
18    A    It was a shooting pain up my legs.
19    Q    Okay.  And so that was accurate in
20  terms of what was reflected there; correct?
21    A    Yes.
22    Q    Okay.  And then later down in the
23  report there, it states that she -- referring to
24  you -- reports no depression, no sleep
25  disturbances, feeling safe in a relationship, no

Page 99

1  alcohol abuse, no anxiety, no hallucinations, and
2  no suicidal thoughts; correct?
3    A    Yes.
4    Q    And that's what you would have reported
5  at that time to Dr. Major?
6    A    If he asked, then I would.  But when I
7  go see a doctor, they don't ask you all of those
8  questions every time.
9    Q    Okay.  If we turn to page 672 are the
10  last three, this is -- it looks like a visit to
11  see Dr. Major again in July of 2018?
12    A    Yes.
13    Q    Do you see that?
14          Okay.  So that was an additional time
15  you went to see Dr. Major, after the June visit?
16    A    Yes.  I'm looking to see why.
17    Q    Under the chief complaint box on 672,
18  it says, Patient was seen in office today for a
19  physical exam only.
20    A    That may have been a requirement for my
21  new job.
22    Q    Okay.  You had to get a physical exam
23  before you went to --
24    A    Costa Rica.
25    Q    -- Costa Rica?

Page 100

1          Okay.  And you would have gone to see
2  Dr. --
3    A    Major.
4    Q    -- Major for that?
5    A    Yes.
6    Q    And, again, looking at the report of
7  that visit, if we turn to the page 674, there's
8  the ROS section.  Again it reports, No fever, no
9  night sweats, no significant weight gain, no
10  significant weight loss, no exercise intolerance,
11  a bunch of other negative responses.
12          And then it again states, She reports
13  no depression, no sleep disturbances, feeling safe
14  in a relationship, no alcohol abuse, no anxiety,
15  no hallucinations and no suithidal -- suicidal
16  thoughts.
17          Correct?
18    A    It also says that I report no GERD, no
19  vomiting blood, no hematuria, which are not things
20  that I would have been asked.
21    Q    Okay.  So you don't believe you were
22  asked about these things?
23    A    I do not believe I was asked about
24  these each visit.
25    Q    Okay.  You were asked about them at

Page 101

1  some visits?
2    A    I don't ever remember being asked if I
3  felt safe in a relationship by any doctor in my
4  entire life.
5    Q    Okay.
6    A    I've never been asked about many of
7  these things.
8    Q    Turn to the report that is 676.  Do you
9  see that one?
10    A    Uh-huh.
11    Q    It looks like that's a visit on
12  July 20th, 2018, again to Dr. Major?
13    A    Yes.
14    Q    And this one says, Follow-up,
15  injection, lab review and injection, Tetanus shot.
16          Do you have a recollection of why you
17  went to see Dr. Major for this visit?
18    A    For my new job in Costa Rica.
19    Q    Okay.  What -- what do you -- do you
20  recall either based on being refreshed by the
21  report or from your own memory why you went to see
22  Dr. Major on July 20th?
23    A    Because I needed a tetanus shot.
24    Q    Okay.  Is that the only reason for the
25  visit?

Monique Russell

Page 102

1    A    I don't know, but I know I did need a
2  tetanus shot for my job, and that's on here.
3    Q    If you turn to page 677, which is the
4  second page of that report, if you look under some
5  of the boxes on this page, including family
6  history, social history, surgical history,
7  gynecological history, all of those expressly
8  state that history was not reviewed at this visit;
9  correct?
10   A    Where is this?  Reviewed, okay.
11   Q    Sorry.  If you look under problems, it
12 says, Problems not reviewed, last reviewed
13 May 2017.  Same thing with family history, social
14 history, surgical history, GYN history, obstetric
15 history.
16   A    Yes.
17   Q    Okay.  On page 8 -- 678 where you've
18 got HPI and ROS and physical exam, none of those
19 states not reviewed; correct?
20   A    HPI, ROS, yes.
21   Q    Yes.  None of those make that same
22 reference?
23   A    Correct.
24   Q    Okay.
25   A    What does ROS stand for?

Page 103

1    Q    I guess would be report on symptoms,
2  but I'm not a doctor either, so I tried to answer
3  it to the best of my ability.
4         And if you look under the ROS
5  section -- well, if you look under the HPI
6  section, you see a reference to back pain reported
7  by patient; correct?
8    A    Yes.
9    Q    And I think you've described that
10 before and said that's accurate.  At the time last
11 summer you were feeling back pain; correct?
12   A    Yes.
13   Q    And under the ROS section you also
14 reported back pain; correct?
15   A    Yes, except that it also says no muscle
16 aches which is not -- I could not have back pain
17 without muscle aches, so this doesn't really make
18 sense.
19   Q    Okay.  And, so, you think again that
20 none of the items that were in the ROS discussion
21 which again here in July of 2018 states that she
22 reports no depression, no sleep disturbances,
23 feeling safe in a relationship, no alcohol abuse,
24 no anxiety, no hallucinations and no suicidal
25 thoughts, you believe that you didn't discuss any

Page 104

1  of those things with Dr. Major?
2    A    Correct.
3    Q    Do you think you discussed back pain
4  with Dr. Major?
5    A    Yes.
6    Q    Do you think you discussed the
7  location, quality, severity, alleviating factors
8  and aggravating factors with Dr. Major?
9    A    Yes, I did.
10   Q    Okay.
11   A    I do believe I did.  I was not asked on
12 every visit that I went to Dr. Major whether or
13 not I was experiencing sinus problems or
14 depression or GERD, and so I doubt that I was
15 asked about all of these things unless I
16 specifically said these are my symptoms.
17   Q    Which one of these appointments with
18 Dr. Major did you talk about Dr. Akoda?
19   A    I don't know.  It would have been -- I
20 don't know.
21   Q    Okay.
22        MR. SHAFFER:  Let's take another short
23 five-minute break if that's okay.
24        THE VIDEOGRAPHER:  Off the record at
25 4:20.

Page 105

1         (Recess -- 4:20 p.m.)
2         (After recess -- 4:31 p.m.)
3         THE VIDEOGRAPHER:  We are back on the
4  record at 4:31.
5         BY MR. SHAFFER:
6    Q    Okay.  Ms. Russell, we're back on the
7  record.  Do you understand you're still under
8  oath?
9    A    Yes.
10   Q    Great.
11        (Russell Deposition Exhibit 5 was
12 marked for identification and attached to the
13 transcript.)
14        BY MR. SHAFFER:
15   Q    I'll hand you what's been marked as
16 Russell 5, which I understand to be a screenshot
17 from your posting in the mommy group that we
18 talked about this morning.
19   A    Yes.
20   Q    And I guess it's not just a mommy
21 group.  It's the MaMa Sisterhood of Prince
22 George's County?
23   A    Yes.
24   Q    Did you name it that?
25   A    I did not.  I did not start the group.

Page 106

Q Okay. So this was an existing kind of mom's Web site, and you posted this posting --
A Yes.
Q -- to that group?
A Yes.
Q Did you have to be invited to join that group?
A No, you have to request to join it which I would have done probably during my pregnancy.
Q Uh-huh. And -- and, so, you had been a part of this group before you posted this?
A Yes.
Q Okay. And it looks like you posted this around June 27th, 2017; correct?
A Yes.
Q Okay. And looking at Russell 5, there's some text underneath your name and the -- the date and time.
Did you write that?
A Yes.
Q Okay. And did anybody help you write that or you wrote that yourself?
A No, I wrote that myself.
Q Okay. And then you have a link, it

Page 107

looks like, at the bottom of the post to the Department of Justice press release for Dr. Akoda's guilty plea?
A Yes.
Q Okay. What happens in the group once you post something like this?
A People can comment on it.
Q Okay. Did anyone comment on this?
A Many people did.
Q Okay. And can you see -- do the comments come back to you?
A Anyone in the group can see the comments.
Q Okay. And did you get -- you were able to look at the comments because you're in the group; correct?
A Yes.
Q Okay. Do you have access to the comments that are associated with this?
A Yes.
Q Okay. Did you send those comments to Cory or any other of your lawyers?
A No. They're difficult to -- to screenshot like that because it would be a long list.

Page 108

Q Understood.
But it sounds like it's all in one place and it's a running list of comments like you would see on Facebook --
A Yes.
Q -- in response to any post; right?
A Yes.
Q And, so, it is possible for somebody to take screenshots or send a link or something to be able to get those comments; right?
A It's possible to take screenshots, but you wouldn't be able to access a link unless you were a member of the group.
Q Got it.
But you could do screenshots even if you had to piece it together like we did with your --
A Yes.
Q -- text with Ms. Riggins; right?
A Yes.
Q Okay. Is that something that you could do if we asked your lawyers for copies of the comments that go along with this post? You'd be physically able to do it?
A Yes.

Page 109

MR. SHAFFER: Okay. Counsel, we're going to make a request for the complete posting and comments that are associated with Ms. Russell's posting here that is Russell 5 and that she indicated are in response to her posting about Dr. Akoda. They're -- they're responsive to numerous of our request for production of documents, and so we would -- we would ask for those as soon as possible and hopefully don't need to ask follow-up questions of Ms. Russell about those, but at a minimum, we need to see them.
MR. ZAJDEL: We'll -- we'll look into it. I've never tried to produce something like that, so we'll see what we can come up with.
MR. SHAFFER: Great.
BY MR. SHAFFER:
Q Is that something that people could still post to today? It's like a living post? Somebody could add a post today or it closed up at some point in time?
A I don't know if it's still open.
Q Okay. But you were able to go to this either yesterday or over the weekend to be able to screenshot this post at least?
A Yes. You can still find it. I don't

Monique Russell

Page 110

1  know if you can still comment on it or not.
2      Q    Got it.  Okay.  All right.  Well, we
3  made our request and so we'll move on to some
4  other questions.
5          We talked a little bit earlier about
6  the lawsuit that you filed in Maryland.  Is that
7  case still active today?
8      A    No, it's not.
9      Q    Okay.  What's your understanding of the
10 current status of that case?
11     A    That it's been dismissed.
12     Q    Okay.  And when did you -- when did you
13 find out that it was dismissed?
14     A    I'm not sure.
15     Q    Okay.  Do you know whether -- well, you
16 were consulted before you filed the case; right?
17     A    Before I filed the case in the first
18 place?
19     Q    Uh-huh.
20     A    Yes.
21     Q    Okay.  Were you consulted before you
22 dismissed the case?
23     A    Yes.
24     Q    Okay.  What's your understanding of the
25 terms on which your case has been dismissed?

Page 111

1      A    That it's not active right now, but I
2  intend to pursue it later, and if I want to, then
3  I can.
4      Q    Okay.  And what do you mean it's not
5  active but you can pursue it later?
6      A    Like if I want to go back and continue
7  to sue the hospital, that I can.
8      Q    Okay.  And did you have any discussions
9  with anyone other than your lawyers about
10 dismissing that case?
11     A    No.
12     Q    Did you receive any money in connection
13 with dismissing that case?
14     A    No.
15     Q    Did you -- did you consult with members
16 of the putative class you were representing in the
17 case before you dismissed the case?
18     A    I acted on advice of my counsel.
19     Q    But did you speak with any of those
20 class members before you dismissed the case?
21     A    No.  The only class member that I've
22 spoken to is Jasmine Riggins, and you have the
23 conversation that we had.
24     Q    Okay.  And that was in 2017?
25     A    Yes.

Page 112

1      Q    Okay.  It is your understanding that in
2  addition to being able to pursue the case in the
3  future if you want, that you will receive money in
4  the future in connection with dismissing the case?
5      A    No.
6      Q    Okay.  Did you dismiss the case because
7  any of the facts that you provided in connection
8  with that litigation you believe now are false?
9      A    No.
10     Q    Okay.  You believe that the answers,
11 for example, to interrogatories that you provided
12 under oath in that litigation are still true and
13 correct to the best of your understanding?
14     A    To the best of my knowledge.
15     Q    Okay.  And answers that you gave to
16 requests for admissions that were asked of you,
17 written questions to admit or deny a particular
18 fact that you answered in that litigation are
19 still true and correct to the best of your
20 knowledge?
21     A    To the best of my knowledge.
22     Q    Okay.  And do you know when the case
23 was dismissed?
24     A    I don't know exactly.
25     Q    Okay.

Page 113

1          (Russell Deposition Exhibit 6 was
2  marked for identification and attached to the
3  transcript.)
4          THE WITNESS:  (Reviews document.)
5  BY MR. SHAFFER:
6      Q    Okay.  Ms. Russell, I've given you
7  what's been marked as Exhibit 6, and it's a
8  stipulation of dismissal without prejudice.  That
9  if you turn to the last page called a certificate
10 of service, it says that it was mailed on
11 September 3rd, 2019, so about two weeks ago.
12     A    Okay.
13     Q    Do you see that?
14     A    Yeah.
15     Q    Does that refresh your recollection as
16 to when you dismissed your case against Dimensions
17 Health Care in Maryland?
18     A    I guess so, but I'm in Costa Rica, so
19 when we discuss things and when things are -- are
20 exactly happening or dated, there's -- it's not
21 always clear or then they -- we talk and then this
22 happens the next day.
23     Q    Okay.  So it would have been sometime
24 before September 3rd, but might have been earlier
25 than September 2nd?

Monique Russell

Page 114

1    A    Yes.
2    Q    Okay.  And have you seen this document
3  itself before I showed it to you now?
4    A    I believe I have it in my email.
5    Q    Okay.  And do you know who Christina
6  Dews is?
7    A    I do not.
8    Q    Do you know who Latisa Gaymon is?
9    A    I do not recognize any of the names of
10  the other plaintiffs other than Jasmine Riggins.
11    Q    And you've never spoken with any of
12  them?
13    A    Not to my knowledge.
14    Q    In the second paragraph of the first
15  page, it says that the parties further agree and
16  stipulate that the filing of case numbers
17  CAL-17-22761, and the other two numbers, the
18  earliest of which was filed on September 7, 2017,
19  had the effect of tolling any applicable statutes
20  of limitations, statutes of repose or other
21  time-based defenses on behalf of patients of
22  Oluwafemi Charles Igberase, a/k/a Charles Akoda
23  during the pendency of this litigation as to
24  claims arising out of defendants' credentialing,
25  supervising, retaining and employment of Akoda and

Page 115

1  those claims set forth in the class action
2  complaints.
3        Do you see that?
4    A    Yes.
5    Q    What does that mean?
6        MR. ZAJDEL:  Objection: calls for a
7  legal conclusion.
8        You can answer.
9        THE WITNESS:  I don't know the
10  legalese, but my understanding is that it's
11  dismissed, but that I or any of the other class
12  members can continue to pursue it at any time.
13    BY MR. SHAFFER:
14    Q    Do you know who Thomas Bojko is?
15    A    No.
16    Q    Did you ever see any documents in
17  connection with your lawsuit in Maryland against
18  Dimensions Health Corp. that related to
19  conclusions about whether Dimensions had been
20  negligent in its hiring, supervising,
21  credentialing, background checks of Dr. Akoda?
22    A    Did I ever see any documents --
23    Q    Speaking to that issue.
24    A    Not to my knowledge.
25    Q    You're aware that in the complaint that

Page 116

1  you filed you made numerous allegations that
2  Dimensions had been negligent in doing all those
3  things; right?
4    A    Well, if he used three different Social
5  Security numbers and if he was fingerprinted the
6  way that I am in -- as a D.C. public school
7  teacher, then I would assume that they would be
8  able to catch that.
9    Q    Right.  And, again, I think -- I
10  think -- I'm just trying to make sure I understand
11  it -- your -- your belief was they didn't do that
12  and the steps that Dimensions did take were not
13  appropriate and, in fact, were below the standard
14  that they should have done; correct?
15    A    I believe that of Dimensions and of the
16  commission that certifies foreign medical
17  graduates.
18    Q    And you didn't say the foreign medical
19  graduates piece in your Maryland litigation;
20  right?
21    A    I don't know.
22        (Russell Deposition Exhibit 7 was
23  marked for identification and attached to the
24  transcript.)
25    BY MR. SHAFFER:

Page 117

1    Q    Ms. Russell, I've handed you what's
2  been marked as Exhibit 7, and these are Plaintiff
3  Monique Russell's Responses to Defendants'
4  Requests for Admissions in the Dimensions Health
5  Corporation lawsuit that you filed in Prince
6  George's County, Maryland.
7        Do you see that?
8    A    Yes.
9    Q    Have you seen this document before?
10    A    Yes.
11    Q    And as we were talking before, this is
12  one of the sets of discovery or information
13  requests that were asked of you by Dimensions'
14  lawyers in that case in Maryland; correct?
15    A    Yes.
16    Q    And you -- you, under the rules, were
17  to provide written admits or denies in response to
18  these requests and worked with your lawyers to do
19  that; correct?
20    A    Yes.
21    Q    And did you, in looking at these, have
22  a chance to review these before they were sent to
23  the lawyers for Dimensions?
24    A    Yes.
25    Q    And when you sent them, were they true

Monique Russell

Page 118

1  and correct to the best of your knowledge?
2     A    To the best of my knowledge.
3     Q    Okay.  And as you sit here today,
4  when's the last time you looked at these?
5     A    I looked over all of the documents,
6  about a hundred pages of documents yesterday.
7     Q    Okay.
8     A    And looked through a little bit more
9  earlier today.
10    Q    Okay.  Do you know whether this
11 particular set of responses was part of that?
12    A    I believe so, but I'm not sure.
13    Q    Okay.  I want to ask you about a couple
14 of them in particular just to make sure that we're
15 refreshed and that you're not changing your answer
16 on any of these.
17          If we look at request number 6, which
18 is on the page 790, it asks that you admit at this
19 time you are still unaware that the individual
20 known to defendants as Akoda had been certified by
21 ECFMG to practice medicine, had applied for, was
22 accepted and successfully completed an accredited
23 residency program through Howard University
24 Hospital, was licensed to practice medicine in you
25 the state of Maryland, was licensed to practice

Page 119

1  medicine in the Commonwealth of Virginia and was
2  board certified by the American College of
3  Obstetricians and Gynecologists.
4          In response you said, Denied that Akoda
5  had been certified by ECFMG to practice medicine.
6          Do you see that?
7     A    Uh-huh.
8     Q    Why did you deny that Akoda had been
9  certified by ECFMG to practice medicine?
10    A    I don't know, and I don't quite
11 understand -- you're unaware that this person is
12 certified.  I don't really understand what request
13 number 6 is saying.
14    Q    Do you see that you denied that Akoda
15 had been certified by ECFMG to practice medicine?
16    A    Yes.
17    Q    Do you -- so is it your position that
18 Dr. Akoda had not been certified by ECFMG to
19 practice medicine?
20    A    No, I believe that he was -- he faked
21 his way through certification.
22    Q    Okay.  And that's the reason that you
23 denied the request?
24    A    Yes.
25    Q    Okay.  And when you say he faked his

Page 120

1  way through, he faked his way through ECFMG?
2     A    Right.  ECFMG accepted fake documents.
3     Q    Or that he submitted fake documents to
4  ECFMG?
5     A    Which they accepted.
6     Q    Request number 9 says, You did not and
7  have not specifically verified the facts about the
8  qualifications to practice medicine of the
9  individual known to defendants at Dr. Akoda, which
10 were provided to you as the basis of the events
11 giving rise to your claim.
12          And you admitted that; correct?
13    A    Right.  I did not call his school to
14 verify.
15    Q    Any of the qualifications of his to
16 practice medicine; correct?
17    A    Any of the qualifications?  Such as?
18    Q    Such as whether he had applied for,
19 been accepted to and completed an accredited
20 residency program at Howard University Hospital.
21          You didn't verify any facts about that?
22    A    I did look up credentials.
23    Q    How about specifically with respect to
24 his application, acceptance and completion of an
25 accredited residency program through Howard

Page 121

1  University Hospital?
2     A    I did not.
3     Q    How about --
4     A    I saw that he was board certified.
5     Q    How about through his licensure to
6  practice medicine in the state of Maryland?
7     A    I did look to see that he was on the
8  Web site for licensed doctors.
9     Q    How about whether he was licensed to
10 practice medicine in the Commonwealth of Virginia?
11    A    No.
12    Q    And how about if he was board certified
13 by the American College of Obstetricians and
14 Gynecologists?
15    A    I saw it, but I did not go to the
16 board.
17    Q    Okay.  Request number 12, turning back
18 to page 791, says, You claim that you suffer from
19 post-traumatic stress disorder as result of
20 allegations against defendants.
21          And you denied that; correct?
22    A    Yes.
23    Q    You're not claiming post-traumatic
24 stress disorder?
25    A    No.

Monique Russell

Page 122

1    Q    Request number 18 at the bottom of 792
2  says, You do not suffer depression as a result of
3  the events giving rise to your claim.
4         And you admit that; correct?
5    A    Correct.
6    Q    You're not claiming that you suffer
7  from depression as a result of the events
8  involving Dr. Akoda?
9    A    No.
10   Q    And request number 24 -- I'm jumping
11 ahead a little bit to try to move this along, 794,
12 question number 24, says, You have never been
13 formally diagnosed with depression.
14        And you admit that; correct?
15   A    Correct. I did see a doctor after --
16 my family doctor after my sister died who
17 prescribed antidepressants --
18   Q    Uh-huh.
19   A    -- but I was not formally diagnosed.
20   Q    And since June of 2017, no diagnosis or
21 treatment for depression of any kind?
22   A    No.
23   Q    On page 795, request 31 says, You claim
24 that you suffer from anxiety as a result of your
25 allegations against the defendants.

Page 123

1    A    Yes.
2    Q    And you admit that, so you do say you
3  have anxiety from these issues; correct?
4    A    Yes.
5    Q    Okay. And 32 says, You claim that
6  you're alleged anxiety has affected your
7  relationship with your family.
8         And you deny that --
9    A    Yes.
10   Q    -- correct?
11        So you have anxiety, but it's not
12 affected your relationship with your family?
13   A    Correct.
14   Q    Okay. And 37 on the next page says,
15 You have never been formally diagnosed with
16 anxiety.
17        That's correct?
18   A    Correct.
19   Q    And 39 says, You claim that you suffer
20 from physical pain as a result of your allegations
21 against the defendants.
22        And that is denied?
23   A    That is correct.
24   Q    Okay.
25   A    That's what I wrote.

Page 124

1    Q    Is that true today?
2    A    Since you brought up the timeline of
3  when my back pain started, I'm not sure that it's
4  true.
5    Q    Okay. And this is your reference to
6  your testimony that about a year after your son
7  was born, you started having back pain?
8    A    Yes.
9    Q    And request number 40 says, You have
10 never been diagnosed with a physical injury
11 resulting from your allegations against the
12 defendants.
13        And that's admitted; correct?
14   A    Correct.
15   Q    Is that true today?
16   A    Again, I don't know if my back pain is
17 related to that because of the timeline.
18   Q    Okay. And no doctor has told you that
19 it is related to that --
20   A    No.
21   Q    -- correct?
22   A    But I've not talked to any doctor I've
23 seen for my back pain about Akoda.
24   Q    Other than Dr. Major?
25   A    Yes, but Dr. Major didn't treat my back

Page 125

1  pain. He just referred me out to be treated.
2    Q    Okay. And he did not, in the reports
3  that we saw from the summer of 2018, associate
4  your back pain with any of the allegations
5  regarding Dr. Akoda; correct?
6    A    The reports that we show don't say
7  anything about what he attributes the pain to at
8  all.
9    Q    And they don't make any reference to
10 Dr. Akoda?
11   A    No. Which would not make sense to put
12 into a medical report.
13   Q    Even if the patient had reported that
14 was the basis for -- for coming to see the doctor?
15   A    I didn't go to see the doctor because
16 of Akoda. I went to see the doctor because of the
17 back pain. Whether or not the stress from
18 discovering that my doc -- my baby was delivered
19 by a fake doctor contributed to my back pain, I
20 didn't know at the time. I still don't know. And
21 Dr. Major wouldn't have had any reason to write
22 that in the report.
23   Q    And who did he refer you out to?
24   A    To ATI Physical Therapy.
25   Q    Okay. And has ATI Physical Therapy

Monique Russell

Page 126

1   attributed your back pain to issues with
2   Dr. Akoda?
3       A    They don't know anything about issues
4   with Dr. Akoda.
5       Q    And so the answer is, no, they have
6   not; correct?
7       A    That is correct.
8       Q    Looking at paragraph 45 on page 797,
9   that says that you claim that you suffer
10  difficulty sleeping as a result of your
11  allegations against the defendants.
12          And that's denied; correct?
13      A    Yes.
14      Q    So you are not claiming that you suffer
15  difficulty sleeping as a result of the
16  allegations?
17      A    No, I'm not.
18      Q    Okay.  In request number 47, you were
19  asked whether you suffer from permanent disability
20  as a result of the care you received from
21  Dr. Akoda, and you said that emotional --
22  plaintiff's emotional injuries are permanent;
23  correct?
24      A    Correct.
25      Q    You admit that the last time you saw

Page 127

1   Dr. Akoda was on or about May 28th, 2016; correct?
2       A    Correct.
3       Q    Is that accurate?
4       A    That would have been when I was
5   discharged from the hospital.
6       Q    Paragraph 49 -- request 49, sorry, it
7   says, you claim your alleged permanent disability
8   has affected your relationship with your family.
9           And you denied that; correct?
10      A    Correct.
11      Q    So your emotional injuries you denied
12  have an affect on your relationship with your
13  family?
14      A    Correct.
15      Q    Is that true today?
16      A    They had relationship on our sex life
17  but not our relationship.
18      Q    And request number 50 is that you have
19  never been diagnosed with a permanent disability;
20  correct?
21      A    Correct.
22      Q    And that is accurate today?
23      A    Yes.
24      Q    Okay.
25      A    My ears just popped.  Finally.

Page 128

1       Q    Request number 53 at the bottom of 798
2   says, You have not done any independent research
3   to determine the status of ECFMG certification,
4   residency program completion, licensure or board
5   certification for the individual known to
6   defendants as Akoda.
7           And you admitted that; correct?
8       A    Yes.
9       Q    Is that true today?
10      A    Correct.  I've been notified, but I
11  haven't done any research to find these things.
12      Q    What do you mean you've been notified?
13      A    Like I was notified that -- after he
14  was kicked out of the residency program in New
15  Jersey, that they reported it to ECFMG, but that's
16  all.
17      Q    And how were you notified of that?
18      A    In the legal documents.
19      Q    This is the transcript of the federal
20  court trial or something else?
21      A    No.  I'm not sure.
22      Q    Okay.  Do you believe the competency to
23  practice medicine includes honesty and
24  truthfulness?
25      A    Yes, I do.

Page 129

1       Q    And as to what -- and do you believe
2   that a physician who lies about anything is not
3   competent to treat patients?
4       A    No, but I believe that a physician who
5   lies about his credentials is not competent to
6   practice medicine.
7       Q    Okay.  Have you ever reported any
8   concerns about Dr. Akoda's competency to practice
9   medicine to any law enforcement or hospital
10  personnel at any time?
11      A    No.  At the time that I discovered,
12  Dr. Akoda was in -- awaiting sentencing for fraud.
13      Q    Okay.  Do you know what he's doing
14  today?
15      A    I do not.
16      Q    Jumping ahead to page 807 and request
17  number 99, it says, You do not claim that you were
18  abused sexually by Dr. Akoda; correct?
19      A    That is correct.
20      Q    And you admitted -- your answer is an
21  admittance so you're not claiming that; correct?
22      A    I'm not claiming that.
23      Q    And request number 101 says, During
24  your visits with Dr. Akoda you never felt as if
25  you were being abused sexually.

Monique Russell

Page 130

1    And you admit that; correct?
2    A    I do.
3    Q    So you did not feel that during your
4 visits with Dr. Akoda that you were being abused
5 sexually?
6    A    At the time I did not feel that way.
7    Q    Do you believe -- do you feel that way
8 now?
9    A    I feel violated for a fake doctor to be
10 in my vagina, yes.  I feel like I'm a victim of
11 sexual assault now.
12    Q    Have you reported that to the
13 authorities?
14    A    No, that's why I'm doing a class action
15 lawsuit so that every woman who he has ever seen
16 can be notified.
17    Q    Do you know whether any of them have
18 been notified?
19    A    I'm sure some have because there have
20 been ads, I understand.  I posted where I could
21 notify women.  So I know that some have.  I don't
22 know how many women there are over the close to
23 ten years that he's been doing this who would
24 still need to be notified.
25        MR. SHAFFER:  Let's go off the record

Page 131

1 for a second.
2        THE VIDEOGRAPHER:  Off the record at
3 5:03.
4        (Recess -- 5:03 p.m.)
5        (After recess -- 5:06 p.m.)
6        THE VIDEOGRAPHER:  Back on the record
7 at 5:06.
8        BY MR. SHAFFER:
9    Q    Ms. Russell, we're back on the record.
10 You understand you're still under oath?
11    A    Yes.
12    Q    Okay.  Apart from the answers you've
13 given me today, and I appreciate your willingness
14 to talk about some of those things, are there any
15 other emotional experiences or conditions or
16 impacts from Dr. Akoda that we haven't talked
17 about already that you believe you're experiencing
18 from having found out about his guilty plea in
19 2017?
20    A    I believe we've covered everything.
21    Q    In some of the all- -- in some of the
22 pleadings that you filed whether in Maryland or
23 Pennsylvania related to the Dr. Akoda situation,
24 you've made references to the circumstances of
25 other women who were treated by Dr. Akoda.

Page 132

1    Are you aware of that?
2    A    Yes.
3    Q    And is it fair to say that having
4 reviewed those documents that your experience with
5 Dr. Akoda is your personal experience; it's
6 certainly not the same as anyone else's; right?
7    A    I would believe that many of the women
8 have different experiences.
9    Q    And -- and you haven't talked to any of
10 them other than what we've talked about with
11 Ms. Riggins to know exactly how different or
12 varied they may be; correct?
13    A    Right.  And I have not talked to
14 Ms. Riggins about the details of her experience.
15    Q    Apart from the comment section of that
16 Facebook mommy group post, have you posted any
17 other information about Dr. Akoda anywhere on the
18 Internet, Twitter or Instagram or other apps?
19    A    Not on any other social media or sites,
20 and I don't think on any other groups because I
21 think that is the only group that would be
22 relevant.
23    Q    And when are you returning to Costa
24 Rica?
25    A    On Wednesday.

Page 133

1    Q    And have you decided what your plans
2 are at the end of your contract year this year?
3    A    We have not.  My husband and I are
4 still discussing.
5        MR. SHAFFER:  I thank you for your time
6 this afternoon.  I appreciate you coming.  I don't
7 have any questions.  We obviously reserve the
8 right to have to ask additional questions related
9 to the documents we don't have, but I appreciate
10 the time in answering our questions.
11        MR. ZAJDEL:  I'm going to -- I'm going
12 to ask, if you don't mind.
13        MR. SHAFFER:  Yeah.
14    EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
15        BY MR. ZAJDEL:
16    Q    Do you -- is it your belief that Akoda
17 should have touched any of the women who you are
18 trying to represent in this case?
19    A    Absolutely not.  If I had known what I
20 know about him now, I would have never allowed him
21 to touch me.
22        MR. ZAJDEL:  That's all I have.
23        MR. SHAFFER:  Nothing further at this
24 time.
25        MR. ZAJDEL:  Okay.

Monique Russell

Page 134

1    THE VIDEOGRAPHER:  All right.  That is
2  everything.  We are off the record at -- on
3  September 16th, 2019, at 5:10 p.m.
4
5
6
7         (Signature having not been waived, the
8  Videotaped Deposition of MONIQUE RUSSELL ended at
9  5:10 p m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 136

1      ACKNOWLEDGMENT OF DEPONENT
2      I, Monique Russell, do hereby
3  acknowledge that I have read and examined the
4  foregoing testimony, and the same is a true,
5  correct and complete transcription of the
6  testimony given by me and any corrections appear
7  on the attached Errata sheet signed by me.
8
9
10
11  _____   _____
12  (DATE)              (SIGNATURE)
13
14
15      CERTIFICATE OF NOTARY PUBLIC
16  Sworn and subscribed to before me this
17  _____ day of _____, _____
18
19
20  _____   _____
21  NOTARY PUBLIC          MY COMMISSION EXPIRES
22
23
24
25

Page 135

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2      I, Dana C. Ryan, Registered Professional
3  Reporter, Certified Realtime Reporter, the officer
4  before whom the foregoing proceedings were taken
5  do hereby certify that the foregoing transcript is
6  a true and correct record to the best of my
7  ability of the proceedings; that said proceedings
8  were taken by me stenographically and thereafter
9  reduced to typewriting under my supervision; and
10  that I am neither counsel for, related to, nor
11  employed by any of the parties to this case and
12  have no interest, financial or otherwise, in its
13  outcome.
14      IN WITNESS WHEREOF, I have hereunto set
15  my hand and affixed my notarial seal this 26th day
16  of September 2019.
17  My Commission expires:
18  July 15, 2020
19
20
21
22  _____
23  NOTARY PUBLIC IN AND FOR THE
24  DISTRICT OF COLUMBIA
25