EXHIBIT 35

```
 1             IN THE UNITED STATES DISTRICT COURT
 2          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3
 4    --------------------------------
 5    MONIQUE RUSSELL, JASMINE
      RIGGINS, ELSA M. POWELL, and
 6    DESIRE EVANS,
                 Plaintiffs,        Case No. 18-5629
 7         v.
      EDUCATIONAL COMMISSION FOR
 8    FOREIGN MEDICAL GRADUATES,
                 Defendants.
 9    --------------------------------
10                   Washington, D.C.
11                Friday, September 12, 2019
12            Deposition of JASMINE RIGGINS, a witness
13     herein, called for examination by counsel for the
14     Defendant in the above-entitled matter, pursuant
15     to notice, the witness being duly sworn by Barbara
16     DeVico, a Notary Public in and for the District of
17     Columbia, taken at the offices of MORGAN, LEWIS &
18     BOCKIUS, LLP, 1111 Pennsylvania Avenue,
19     Washington, D.C., at 11:33 a.m.,
20     Thursday,September 12, 2019, and the proceedings
21     being taken down by Stenotype by BARBARA De VICO,
22     CRR, RMR, and transcribed under her direction.
23
24
25
```

Jasmine Riggins

Page 2

```
 1   APPEARANCES:
 2     On Behalf of the Plaintiffs
 3       CORY L. ZAJDEL, ESQUIRE
 4       Z LAW, LLC
 5       2345 York Road, #B-13
 6       Timonium, MD   21093
 7
 8     On behalf of the Defendant:
 9       BRIAN W. SHAFFER, ESQUIRE
10       MORGAN, LEWIS & BOCKIUS, LLP
11       1701 Market Street
12       Philadelphia, PA   19103-2921
13       brian.shaffer@morganlewis.com
14
15
16
17   Also Present:  Nam Ngo, Videographer
18
19
20
21
22
23
24
25
```

Page 3

```
 1           TABLE OF CONTENTS
 2               WITNESSES
 3   WITNESS                    PAGE
 4   BY MR. SHAFFER               5
 5
 6
 7
               _____EXHIBITS_____
 8
     EXHIBIT     DESCRIPTION        PAGE
 9
     Exhibit 1   Medical records      36
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1           P R O C E E D I N G S
 2       THE VIDEOGRAPHER:  This is the
 3   start of the videotaped deposition of
 4   Jasmine Riggins in the matter of Monique
 5   Russell et al. versus Educational
 6   Commission for Foreign Medical Graduates
 7   in the United States District Court for
 8   the Eastern District of Pennsylvania.
 9       This deposition is being held at
10   Morgan Lewis, 1111 Pennsylvania Avenue, NW
11   about, Washington, D.C. on September 12,
12   2019, at approximately 11:34 a m.
13       My name is Nam Ngo from Golkow
14   Litigation Services, and I'm the legal
15   video specialist.  The court reporter is
16   Barbara DeVico.  Would counsel please
17   introduce yourself.
18           (Attorneys stated their
19         appearances for the record.)
20       THE VIDEOGRAPHER:  Would the court
21   reporter please swear in the witness.
22   ************************
23
24
25
```

Page 5

```
 1       JASMINE RIGGINS,
 2   having been called as a witness on behalf of the
 3   Plaintiffs and having been first duly sworn, was
 4   examined and testified as follows:
 5   EXAMINATION BY
 6   MR. SHAFFER:
 7       Q.   Ms. Riggins, good morning.
 8       A.   Good morning.
 9       Q.   We met very briefly this morning.
10   My name is Brian Shaffer.  I'm an attorney that
11   represents the defendant in a lawsuit that you and
12   several other plaintiffs have brought.  My client
13   is the Educational Commission for Foreign Medical
14   Graduates, ECFMG.  Do you understand that if I call
15   it ECFMG what we're referring to?
16       A.   Yes.
17       Q.   Great.  We're here to take your
18   deposition in connection with the lawsuit that you
19   filed in Pennsylvania against ECFMG, correct?
20       A.   Correct.
21       Q.   And have you had your deposition
22   taken before?
23       A.   Yes.
24       Q.   How many times?
25       A.   Once.
```

Jasmine Riggins

Page 6

1    Q.    And was that earlier this year?
2    A.    Yes.
3    Q.    Okay.  Was that in connection with
4 another lawsuit that you filed?
5    A.    Yes.
6    Q.    And was that a lawsuit that was
7 filed in Maryland against Dimensions Healthcare?
8    A.    Yes.
9    Q.    And that's the only deposition
10 you've ever given besides this one?
11    A.    Correct.
12    Q.    Okay.  A few ground rules just to
13 remind you about how a deposition works.
14        The oath that you gave this morning is the
15 same one that you would give in a courtroom before
16 a judge and a jury.
17        Do you understand that?
18    A.    Yes.
19    Q.    And we're here to ask you some
20 questions and get your best answer and
21 understanding as to those questions.
22        Do you understand that?
23    A.    Yes.
24    Q.    If I ask a question and you don't
25 understand what I'm asking, will you tell me that?

Page 7

1    A.    Yes.
2    Q.    And I'll be happy to try to correct
3 it.  That's what I want you to tell me.
4    A.    Okay.
5    Q.    If you don't hear me, the court
6 reporter can read the question back or I'll repeat
7 the question for you.  Is that fair?
8    A.    Sure.
9    Q.    We're taking your testimony down
10 both by the court reporter here that will come in a
11 little booklet on a page as well as on a videotape.
12        Do you understand that?
13    A.    Yes.
14    Q.    It's important that you speak as
15 loudly and as clear as you can.  We all have little
16 microphones, but it will still be easier for
17 everyone if you try to speak up.  If somebody
18 doesn't hear you, I may ask you to repeat yourself
19 just so everyone can hear you.  Is that okay?
20    A.    Yes.
21    Q.    Same thing, even though on the
22 videotape we might see a nod of the head or a shake
23 of the head, the court reporter can't take that
24 down as clearly, so I may ask you for an audible
25 response.  Again I'm not trying to be difficult.

Page 8

1 I'm just trying to make sure there's no confusion
2 as to what you meant when you shake your head.
3        Is that fair?
4    A.    Yes.
5    Q.    We'll take a break at any point that
6 you need to today as long as there's not a question
7 that's pending.  This isn't an endurance contest.
8 If you need to take a break for any reason, we'll
9 do that, okay?
10    A.    Okay.
11    Q.    There are some topics that we may
12 talk about today about your personal health that
13 may be sensitive or uncomfortable, and I apologize
14 for that.  I'm not trying to be intrusive.  But
15 there are certain questions that I may need to ask,
16 and I'm going to try to do that as best I can.  If
17 you feel uncomfortable about that, will you let me
18 know?
19    A.    Yes.
20    Q.    Thank you.
21        Do you have any questions before we begin
22 the deposition?
23    A.    No.
24    Q.    What did you do to prepare, if
25 anything, for coming in here today?

Page 9

1    A.    Just practiced, talked to my
2 attorneys.
3    Q.    Okay.  So you met with your
4 attorney, Mr. Zajdel, who is here with us this
5 morning?
6    A.    Yes.
7    Q.    How many times did you meet with him
8 to prepare for the deposition?
9    A.    Just once.
10    Q.    When was that?
11    A.    No.  Tuesday.  I spoke with Cory,
12 I'm sorry.  Not Cory, David, my apologies.
13    Q.    Okay.
14    A.    I spoke with David on Tuesday.
15    Q.    Okay.  And David is another one of
16 your lawyers?
17    A.    Yes.
18    Q.    So you spoke with David by the
19 telephone on Tuesday?
20    A.    Yes.
21    Q.    Okay.  For how long did you talk to
22 David?
23    A.    Not long.  A few minutes.
24    Q.    Less than 30 minutes?
25    A.    Yes.

Jasmine Riggins

Page 10

1    Q.    Did you look at any documents while
2  you were talking to David?  Did David show you any
3  documents?
4        MR. ZAJDEL:  Objection.  Don't
5     answer that.
6    Q.    I'll rephrase.
7        Did you look at any documents in connection
8  with preparing for the deposition?
9    A.    Yes.
10   Q.    What documents did you look at?
11   A.    My deposition documents.
12   Q.    So your deposition transcript from
13 the Maryland Dimensions case?
14   A.    Yes.
15   Q.    The transcript, the little booklet
16 that had questions and answers, is that what you're
17 referring to?
18   A.    Yes.
19   Q.    When did you review that?
20   A.    A few days ago.
21   Q.    What other documents did you review
22 before coming in to testify today?
23   A.    Just that.
24   Q.    Okay.  Did you do any online
25 Internet research or review before coming in to

Page 11

1  testify today?
2    A.    Not today.
3    Q.    Have you done any Internet research
4  in connection with this lawsuit ever?
5    A.    Yes.
6    Q.    When was that?
7    A.    About a few weeks ago.  It's been
8  ongoing, different times.
9    Q.    What did you look at a few weeks ago
10 online in connection with this lawsuit?
11   A.    Just the Akoda case, just about the
12 case and what was going on with him.  Just
13 basically researching him pretty much.
14   Q.    Okay.  So you were, for lack of a
15 better word, Googling Dr. Akoda's name and looking
16 online for information about him?
17   A.    Something like that, yes.
18   Q.    You tell me what you did.  I wasn't
19 there.
20   A.    Well, basically I was just looking
21 at, just looking at the things that were posted
22 years ago.
23   Q.    Okay.
24   A.    About, you know, the fraud, him
25 being a fraud and everything like that.

Page 12

1    Q.    And what kind of things were they?
2  Were they newspaper articles?
3    A.    No.
4    Q.    Were they court filings?
5    A.    I don't recall.
6    Q.    Were they -- what do you recall
7  about what they were?
8    A.    Just about him being fraudulent.  I
9  don't really recall word for word.
10   Q.    And you said you looked at those few
11 weeks ago?
12   A.    Uh-huh.
13   Q.    Was that before or after you knew
14 you were going to give a deposition in this case?
15   A.    It was before.
16   Q.    And other than talking with your
17 counsel on Tuesday of this week, did you have any
18 additional conversations with anyone before coming
19 in to testify here today?
20   A.    I've spoken to Monique Russell, but
21 I haven't spoken to her in the past month or so.
22   Q.    When was the last time you spoke
23 with Ms. Russell?
24   A.    I don't recall.  It's been a little
25 while.

Page 13

1    Q.    Would it be more than a month or
2  less than a month?
3    A.    A little more than a month.
4    Q.    Did you ever text with Ms. Russell?
5    A.    No.
6    Q.    Did you ever email with Ms. Russell?
7    A.    I have.
8    Q.    And when was the last time you
9  emailed Ms. Russell?
10   A.    The last time I spoke with her.
11   Q.    So the last communication you had
12 with her, more than a month ago, was by email?
13   A.    Yes.
14   Q.    And what was the -- did your
15 communications have anything to do with Dr. Akoda?
16   A.    Yes.
17   Q.    What was the nature of your
18 communications with Ms. Russell about Dr. Akoda?
19   A.    Just about how I felt and how she
20 felt.
21   Q.    Okay.  Was this a communication that
22 she initiated or that you initiated?
23   A.    I initiated it.
24   Q.    And this is something that you have
25 in your emails?

Jasmine Riggins

Page 14

1      A.   I should.
2      Q.   Did you communicate with her through
3  like a Facebook direct message, or this was direct
4  message?
5      A.   Just like a Facebook message.
6      Q.   And this was a Facebook message in
7  the last month or so, a little more than a month
8  ago?
9      A.   Yes.
10     Q.   Okay.  And have you spoken with
11 Ms. Russell or communicated with Ms. Russell at any
12 time in the last month?
13     A.   No.
14     Q.   Have you spoken with Ms. Russell
15 about your lawsuit against ECFMG?
16     A.   I don't recall.
17     Q.   Did you speak with Ms. Russell about
18 your lawsuit against Dimensions Healthcare in
19 Maryland?
20     A.   Yes.
21     Q.   And what did you and Ms. Russell
22 discuss about the lawsuit against Dimensions
23 Healthcare in Maryland?
24     A.   We just talked about the lawsuit.
25 We didn't really -- I don't recall the full details

Page 15

1  of our conversation.  She was asking me about how I
2  felt about it.  Just basically about our feelings.
3      Q.   And this was by email again, or was
4  this a phone call?
5      A.   I believe this was a phone call.  I
6  don't recall.  It could have been an email or phone
7  call.
8      Q.   As you sit here today, have you had
9  discussions with Ms. Russell at any point in time
10 about your lawsuit against ECFMG?
11     A.   I don't recall.
12     Q.   Do you still have a Facebook account
13 where you and Ms. Russell are connected as friends
14 through Facebook?
15     A.   Yes, but I don't have the password.
16 I can't recover the password.
17     Q.   Okay.  How did you communicate with
18 her by Facebook if you couldn't recover the
19 password?
20     A.   It's a messenger app that I had on
21 my old phone, but I have a new phone.
22     Q.   So some time between the last time
23 you communicated with Ms. Russell and today, you no
24 longer have access to the Facebook directory?
25     A.   I can get it, but I don't have

Page 16

1  access at this moment, no.
2      Q.   But that's something you can get?
3      A.   Yes.  It's a process you have to go
4  through.
5      Q.   At any point in time were you asked
6  to provide lawyers for ECFMG with any documents you
7  have related to Dr. Akoda or the lawsuit or your
8  feelings about Dr. Akoda, anything like that?
9          MR. ZAJDEL:  Objection.  Form.
10     You can answer.
11     A.   So what is your question?
12     Q.   At any point in time after having
13 filed a lawsuit against ECFMG, did you ever become
14 aware of a request by lawyers for ECFMG for any
15 documents that you might have related to Dr. Akoda?
16         MR. ZAJDEL:  Objection.  That's
17     attorney-client privilege.
18         MR. SHAFFER:  I'm not asking for
19     the substance of the communication.  I'm
20     asking if she was aware.
21         MR. ZAJDEL:  I would suggest that
22     you ask it differently.
23 BY MR. SHAFFER:
24     Q.   Did you ever collect Facebook direct
25 messages, email communications, text messages that

Page 17

1  you might have in your possession related to
2  Dr. Akoda and give them to anybody?
3      A.   No.  Did I ever collect it and give
4  it to anyone?
5      Q.   Yes.
6      A.   No.
7      Q.   Did you ever forward it to anybody
8  or pull it all together and provide it to anybody?
9      A.   No.
10     Q.   And I take it you were not asked to
11 do that?
12     A.   No.
13     Q.   And I think as you testified, at
14 least email communications or direct messaging
15 application messages you could still access, you
16 just can't do it while we're sitting here with your
17 new phone; correct?
18     A.   Correct.
19     Q.   Okay.
20         MR. SHAFFER:  Counsel, I'm going
21     to make a request for the documents that
22     are in the possession of Ms. Riggins that
23     are responsive to our requests for
24     production of documents which would
25     include these types of communications and

Page 18

1     which have not been produced.
2         MR. ZAJDEL:  I would suggest that
3     you do that in writing so that we can
4     respond in writing.
5 BY MR. SHAFFER:
6     Q.    Ms. Riggins, in preparing for the
7 deposition today, you said you reviewed your
8 deposition transcript from your deposition earlier
9 this year in the Dimensions Healthcare case;
10 correct?
11    A.    Right.
12    Q.    In reviewing that deposition
13 transcript, did you identify any answers that you
14 gave that you now believe are wrong?
15    A.    I'm not sure.  Can you ask me that
16 again.
17    Q.    In reviewing the transcript, you
18 were under oath like you are today; right?
19    A.    Uh-huh.
20    Q.    You've now had a chance to review
21 that transcript before coming in to testify today.
22 And my question is whether when you read through
23 the transcript this week you said Oh, boy, I made a
24 mistake.  What I testified to wasn't correct in my
25 deposition in the Dimension case.

Page 19

1     A.    No.
2     Q.    And part of this is to try to save
3 time today.  So I guess my question having read the
4 deposition just a few days ago, as you sit here
5 today do you still believe that everything you
6 testified earlier this year in the Dimensions
7 Healthcare deposition is true and accurate to the
8 best of your ability?
9     A.    Yes.
10    Q.    I'm going to jump around a little
11 bit then and try to hit on some questions just to
12 make sure I'm correct.  But if I jump around too
13 quickly and you don't follow where I'm going, just
14 let me know because I'm trying to, again, save some
15 time because we won't need to ask every question
16 that was asked in the Dimensions deposition again
17 today, okay?
18    A.    Okay.
19    Q.    Are you currently on any medication?
20    A.    No.
21    Q.    Is there any reason that you can
22 think of sitting here today that you couldn't
23 testify truthfully and to the best of your ability?
24    A.    No.
25    Q.    You mentioned your full name before

Page 20

1 as Jasmine Riggins, correct?
2     A.    Yes.
3     Q.    Is your birthday July 4, 1992?
4     A.    Yes.
5     Q.    And how old would that make you?
6     A.    27.
7     Q.    Are you currently married?
8     A.    No.
9     Q.    Do you have any children?
10    A.    Yes.
11    Q.    How many children?
12    A.    Three.
13    Q.    And can you give me their names and
14 their current ages?
15    A.    Santana is 10, Messiah is 10, Taniya
16 will be two next month.
17    Q.    Are Santana and Messiah both boys?
18    A.    Yes.
19    Q.    And Taniya is a girl?
20    A.    Yes.
21    Q.    And earlier this year in your
22 deposition in the Dimensions case you indicated
23 that you were engaged.  Is that status the same, or
24 has it changed?
25    A.    It's the same.

Page 21

1     Q.    What's your current address?
2     A.    3699 J Street, Apartment 301, N.E.,
3 Washington, D.C. 20019.
4     Q.    How long have you lived there?
5     A.    Almost a year.
6     Q.    You have a high school GED, is that
7 right?
8     A.    Yes.
9     Q.    Do you have any other subsequent
10 education beyond that?
11    A.    No.
12    Q.    Are you currently employed?
13    A.    Yes.
14    Q.    Where is that?
15    A.    Potbelly Sandwich Shop.
16    Q.    When did you start working there?
17    A.    April of this year.
18    Q.    And you've worked at Potbelly's
19 since April of this year?
20    A.    Yes.
21    Q.    And how many hours a week,
22 approximately, do you work?
23    A.    About 22.  Slower season.
24    Q.    So is this part-time work?
25    A.    Yes.

Page 22

1    Q.    Prior to working at Potbelly
2  starting earlier this year, had you worked -- had
3  you worked anywhere else in 2019, or was there a
4  period of time when you weren't working?
5    A.    I was working at the Home Depot.
6    Q.    And how long -- did you leave
7  directly from Home Depot and go to Potbelly, or was
8  there a break?
9    A.    There was about a month break, a
10 month or so.
11    Q.    And again for purposes of trying to
12 speed this up, in the Maryland Dimensions
13 Healthcare litigation you gave some written
14 response to questions.
15    Do you recall having done that?  We call
16 them interrogatories.
17    A.    Yes.
18    Q.    And one of the interrogatories you
19 were asked in that case was to list your prior
20 employment.  And you indicated in that case that
21 you had started working at Home Depot in March of
22 2017.  Does that sound correct?
23    A.    Yes.
24    Q.    And so you worked at Home Depot from
25 March of 2017 to about February or March of 2019?

Page 23

1    A.    Yes.
2    Q.    And then you started at Potbelly in
3  April of 2019 and are still working there through
4  today?
5    A.    Yes.
6    Q.    Great.  Prior to working at Home
7  Depot starting in March of 2017, was there a period
8  of time before that that you were not working?
9  Immediately before, I'm looking at the beginning
10 part of 2017.
11    A.    No.  No.
12    Q.    Where were you working when you
13 went, before you went to Home Depot?
14    A.    At Paul Bakery.
15    Q.    Got it.  And how long did you work
16 there, approximately?
17    A.    About almost two years.
18    Q.    And would it be correct then to say
19 that you worked at Paul Bakery from about March of
20 2015 to March of 2017?
21    A.    Yes.
22    Q.    Was there a period of time between
23 Paul Bakery and Home Depot when you weren't
24 working, or did you go right from one to the next?
25    A.    Yes, that's exactly what happened.

Page 24

1  I went from one to the next.
2    Q.    Again, just to make sure that I'm
3  not missing anything, before coming in to testify
4  today, you didn't review the complaint that was
5  filed against ECFMG in the federal court or the
6  court in Pennsylvania; correct?
7    A.    You said I didn't.
8    Q.    You didn't review that?
9    A.    Not that I can recall.  I'm sorry.
10 I can't recall.
11    Q.    Okay.  As you sit here today, you
12 don't have a recollection of looking at the
13 complaint that you filed against ECFMG?
14    A.    Oh, yes.  I'm sorry.  I'm sorry.
15 I'm sorry.  I didn't understand what you were
16 asking me.
17    Q.    That's all right.
18    A.    I did receive that -- did I get that
19 in the email?  I believe so.  I'm sorry.
20    Q.    That's okay.  When you say you think
21 you may have received it in an email, who was the
22 email from?
23    A.    I'm sure I've seen it.  I'm sure
24 I've seen it.  Yeah, I'm sure I've seen it.
25    Q.    Do you know when it was filed,

Page 25

1  approximately?
2    A.    I don't recall.
3    Q.    Do you know whether it was filed in
4  2019?  Since January or earlier than that.
5    A.    I'm sorry, I don't recall.
6    Q.    Okay.  That's okay.  Again, I'm just
7  asking for your best understanding and recollection
8  as you sit here today without guessing.
9    But I take it that since you can't remember
10 when you might have seen it but you think you did
11 that you didn't review it specifically to come in
12 here today.  Is that correct?
13    A.    That's correct.
14    Q.    And I take it from your earlier
15 answers, but I just want to make sure, that when
16 you said a couple of weeks ago you went online
17 looking at Dr. Akoda information, you didn't go to
18 the ECFMG website, for example; correct?
19    A.    Correct.
20    Q.    Have you ever gone to the ECFMG
21 website?
22    A.    No.
23    Q.    And you've not ever reviewed any of
24 the information that is on the ECFMG website,
25 correct?

Jasmine Riggins

Page 26

1     A.   No.
2     Q.   When was the first time you ever
3  heard of ECFMG?
4     A.   From my attorneys.
5     Q.   Okay.  And approximately when was
6  that?
7     A.   I don't recall.
8     Q.   Is it fair to say that at no point
9  prior to having spoken with the attorneys that
10  currently represent you that you had ever heard of
11  ECFMG?
12     A.   Repeat that again.
13     Q.   Sure.  Prior to speaking with your
14  current attorneys who are bringing the lawsuit
15  against ECFMG, you had never even heard of ECFMG?
16     A.   That is correct.
17     Q.   Okay.  As you sit here today, what
18  do you know about ECFMG?
19     A.   I know that they're a business who
20  gives foreigners their certificates or give them
21  permission to practice medicine in the United
22  States.
23     Q.   Do you know whether or not ECFMG is
24  a nonprofit organization?
25     A.   I do not.

Page 27

1     Q.   Do you know whether people who apply
2  to ECFMG could be U.S. citizens or not?
3     A.   I do not.
4     Q.   You don't know?
5     A.   You said -- no, because it's for
6  foreigners; correct?
7     Q.   I'm trying to get your
8  understanding.  So your understanding is that a
9  U.S. citizen could not apply to ECFMG for
10  certification or any services by ECFMG.  It's only
11  for foreigners?
12     A.   Correct.
13     Q.   And is it your understanding, I
14  think you said that -- and please correct me
15  because I'm just trying to remember back what you
16  said -- that ECFMG is responsible for certifying
17  you to practice medicine in the United States.  Is
18  that correct?
19     A.   I believe so.
20     Q.   Okay.  And what is it that you think
21  ECFMG does to certify people to practice medicine
22  in the United States?
23     A.   Give an exam.  I'm not -- give an
24  exam.
25     Q.   Okay.

Page 28

1     A.   Questions, interviews, background
2  checks.
3     Q.   Okay.  And your understanding is
4  that among the things that ECFMG does is do
5  background checks on foreigners who want to come
6  and practice medicine in the United States?
7     A.   Yes.
8     Q.   And what's the basis for that
9  understanding?
10     MR. ZAJDEL:  Objection.  You can
11     answer.
12     MR. SHAFFER:  I'll rephrase the
13     question.
14  BY MR. SHAFFER:
15     Q.   Other than from information told to
16  you by your lawyers, do you have any other source
17  of information of any kind about what ECFMG is,
18  what it does, what it doesn't do, who can apply,
19  who can't apply, what types of things ECFMG
20  requires?
21     Do you have any source of information about
22  any of that other than your lawyers?
23     A.   No.
24     Q.   I'm sorry?
25     A.   No.

Page 29

1     Q.   Okay.  We asked a couple of
2  questions earlier that referenced, and I think your
3  answer might have been the first to reference a
4  Dr. Akoda.
5     Do you recall mentioning Dr. Akoda?
6     A.   Not a Dr. Akoda, no.
7     Q.   You understand that there is an
8  individual who you saw in connection with one of
9  the children that you gave birth to, correct?
10     A.   I'm sorry?
11     Q.   Well, I'll rephrase that.
12     So you're not aware of a Dr. Akoda.  You
13  never heard that phrase before?
14     A.   Yes, I've heard that -- I heard that
15  phrase, yes.
16     Q.   Okay.
17     A.   Can I run to the bathroom, please?
18  I'm sorry.  You're in the middle of a question.  My
19  apologies.
20     Q.   You answered the question, which was
21  you've heard reference to a Dr. Akoda.  So we'll
22  take a break and then go ahead to the rest room and
23  then we'll come back.
24     THE VIDEOGRAPHER:  We are going
25     off the record.  The time is 11:53 a.m.

Page 30

1    (Recess)
2    THE VIDEOGRAPHER:  We are back on
3  the record.  The time is 11:57 a.m.
4  BY MR. SHAFFER:
5    Q.   Okay, Ms. Riggins, we're back on the
6  record, and we were talking before a quick break
7  there about an individual named Dr. Akoda, an
8  individual, and I think you took some issue with
9  calling him Dr. Akoda.  Why is that?
10    A.   He's not a doctor.
11    Q.   And why do you say that?
12    A.   Because he doesn't have credentials
13  and certifications to be a doctor.
14    Q.   Do you know -- and just so again I
15  want to make sure that we're talking about the same
16  things today so we don't have to go back later on,
17  when we refer to an individual known as Dr. Akoda
18  or the person that you believe is not a doctor
19  about, we're talking about the person that you saw
20  in connection with the birth of your second child;
21  correct?
22    A.   Correct.
23    Q.   And, at the time that you were being
24  seen by him and actually gave birth with him
25  through C-section, correct?

Page 31

1    A.   Correct.
2    Q.   You understood and knew him to be
3  Dr. Akoda?  Correct?  I'm sorry.
4    A.   Correct.
5    Q.   And since that time you've come to
6  learn that Dr. Akoda pled guilty to using a
7  different Social Security number, correct?
8    A.   Correct.
9    Q.   Okay.  And so based on that
10  information, it's your belief that the person that
11  you knew as Dr. Akoda is not a doctor?
12    A.   Correct.
13    Q.   Okay.  Do you know whether that
14  individual went to medical school?
15    A.   No, no.
16    Q.   He did not go to medical school?
17    A.   No.
18    Q.   How do you know that?
19    A.   I'm saying no, I don't.
20    Q.   You don't know whether he went?
21    A.   Yeah.
22    Q.   As you sit here today, do you have
23  any information or facts that would allow you to
24  say he didn't go to medical school?
25    A.   The fact that he pled guilty and the

Page 32

1  fact that he had fake credentials.
2    Q.   Okay.  And the fact that he pled
3  guilty, he didn't plead guilty to not going to
4  medical school; correct?
5    A.   Correct.
6    Q.   And do you know whether or not
7  Dr. Akoda's medical school in Nigeria ever verified
8  the authenticity of his diploma to Educational
9  Commission?
10    MR. ZAJDEL:  Objection.  Assumes
11  facts.  You can answer that question.
12    Q.   Do you know whether or not?
13    A.   No.
14    Q.   Would it surprise you to learn that
15  a medical school in Nigeria verified Dr. Akoda's
16  diploma to ECFMG?
17    MR. ZAJDEL:  Objection.  Assumes
18  facts.
19    Q.   You can go ahead and answer.
20    A.   Okay.  You said would it surprise
21  me?
22    Q.   Yes.
23    A.   Yes.
24    Q.   Why is that?
25    A.   Because it would be a surprise to me

Page 33

1  that he had information provided that he's a real
2  doctor or went to medical school.
3    Q.   During the time that you were being
4  treated by Dr. Akoda, you never had any reason to
5  question whether or not he had gone to medical
6  school; correct?
7    A.   When I was being seen by him?  No.
8  I wouldn't -- had I have known I wouldn't have
9  chosen him.
10    Q.   And there was nothing about his care
11  and treatment of you in connection with your
12  pregnancy and the birth of Messiah that ever caused
13  you to doubt that he had gone to medical school and
14  was a real medical doctor, correct?
15    A.   You said during my treatment with
16  him, no.
17    Q.   When was it that you first received
18  any information that caused you to question whether
19  the person you had seen, Dr. Akoda, was not a real
20  doctor, as you say?
21    A.   You said when was --
22    Q.   When did you first, first come to
23  have any information where you said everything
24  seemed fine while I was being treated with him but
25  now there's a problem?  When was that?

Jasmine Riggins

Page 34

1      A.    Well, there were problems after my
2  pregnancy, after the delivery, I had issues.
3      Q.    What were those issues?
4      A.    Pain, severe pain in my stomach and
5  my abdominal at work, I would have pain throughout
6  the day.  And I couldn't have my tubes tied due to
7  the damaged tissues on my C-section, which caused a
8  lot of pain.
9      Q.    And so this is after the birth of
10  Messiah, and Messiah was born by C-section;
11  correct?
12      A.    Correct.
13      Q.    And you said at a later point in
14  time you wanted to have a tubal ligation and were
15  told you couldn't have one?
16      A.    Correct.
17      Q.    And you were told it was because of
18  scarring that was present from earlier C-sections?
19      A.    Correct.
20      Q.    And was that scarring that you say
21  precluded you from having the tubal ligation, that
22  was something you attribute to the C-section
23  Dr. Akoda did?
24      A.    Correct.
25      Q.    And why do -- why do you do that?

Page 35

1      A.    Because it was able to be done
2  before, but I decided against it.
3      Q.    When was it able to be done before?
4      A.    With my first son.
5      Q.    Do you know whether or not -- and
6  your first son, Santana; correct?
7      A.    Correct.
8      Q.    Was born by C-section, correct?
9      A.    Correct.
10      Q.    And who was the doctor that you saw
11  for Santana?
12      A.    I don't recall her name.
13      Q.    Was it at Howard University?
14      A.    Correct.
15      Q.    And do you know whether or not there
16  was any scarring that was later identified from the
17  C-section that you received at Howard University?
18      A.    No, there was not.  There wasn't
19  any.
20      Q.    If there had been some, do you think
21  that's the kind of thing that would be shown in
22  medical records of you that would have come later?
23      A.    Could you repeat your question.
24      Q.    Sure.  You told me you don't think
25  there was any scarring from the first C-section,

Page 36

1  correct?
2      A.    Correct.
3      Q.    And I take it that that's because
4  immediately following the C-section you were told
5  you could have a tubal ligation?
6      A.    No.  Correct, correct, I'm sorry.
7      Q.    Okay.  But then after the second,
8  the birth of your second child and the second
9  C-section, you were told you couldn't have one?
10      A.    After the third.
11      Q.    After the third?
12      A.    Correct.
13      Q.    And after the third, you were told
14  that there was significant scarring from your other
15  C-section; correct?
16      A.    Correct.
17      Q.    If Dr. Akoda had seen significant
18  scarring at the time that he did the second
19  C-section, that would suggest that that scarring
20  came from the first C-section; right?
21      A.    Correct.
22      Q.    Because scarring doesn't happen
23  overnight.  It takes time to develop.  Correct?
24      A.    Correct.
25          (Exhibit 1, medical records,

Page 37

1          was marked for identification.)
2      Q.    Ms. Riggins, we're handing you
3  what's been marked as Riggins-1, which I'll
4  represent to you is medical records that relate to
5  your treatment at Prince George Hospital Center in
6  2013.
7          Could you take a quick look at that, and
8  then I'll have some quick questions.
9      A.    (Witness complies with request.)
10      Q.    Just let me know when you're ready.
11          MR. ZAJDEL:  Put it on the record
12       that we reserve the right to make
13       everything confidential after the
14       deposition.
15      Q.    I'm not going to ask you about every
16  word, but let me focus on a couple of things here.
17          So Riggins-1 is a document Bates labeled
18  Plaintiff's -2024 and -2025, which again I'll
19  represent to you was produced to us in this case,
20  and it appears to be an operative report for you,
21  Jasmine Riggins.  And it references a date of a
22  procedure on 3/18/2013.
23          Do you see on the top part of the page?
24      A.    Yes.
25      Q.    Did you have a procedure at Prince

Page 38

1 George's County on 3/18/2013?
2     A.     Yes.
3     Q.     What did you have?
4     A.     A C-section.
5     Q.     That's when Messiah was born?
6     A.     Yes.
7     Q.     And you can see that this is a
8 two-page record signed by Charles Akoda, M.D. --
9 not signed but his name appears at the end of the
10 document.  Correct?
11     A.     Yes.
12     Q.     And if you look -- well, the top of
13 the page there's a fax server date and time.  It
14 says, "3/19/2013 at 2:42:42 p.m."
15         Do you see that?
16     A.     Yes.
17     Q.     So does this appear to be a record
18 then that would have been created and sent
19 immediately after your C-section with Messiah in
20 March of 2013?
21         MR. ZAJDEL:  Objection.
22     A.     Yes.
23     Q.     That's the date you had the
24 C-section, right, 3/18/2013?
25     A.     Yes.

Page 39

1     Q.     If you look at the description here
2 of what occurred, and it's a little bit technical
3 in medical terms, but if you look at the findings
4 at the bottom of page 1.  So flip back to the first
5 page of it.  Under Findings it says, "Male infant,
6 encephalic presentation."
7         Do you see that?
8     A.     Yes.
9     Q.     Do you understand that to be
10 Messiah, when he went in to do the C-section,
11 that's the male infant that he saw?
12     A.     Yes.
13     Q.     Okay.  And the next sentence,
14 section of that finding says, "Significant scarring
15 and adhesion formation."
16         Do you see that?
17     A.     Yes.
18     Q.     And so does that indicate that in
19 addition to finding Messiah when he went in to do
20 the C-section, he also saw significant scarring and
21 adhesion formation section?
22     A.     Okay.
23     Q.     Right?
24     A.     Okay, yes.
25     Q.     That's what it says, right?

Page 40

1     A.     Uh-huh.
2     Q.     I'm sorry.
3     A.     Yes, yes, yes, yes.  My children,
4 I'm sorry.
5         THE VIDEOGRAPHER:  We are going
6 off the record.  The time is 12:11 p.m.
7         (Recess)
8         THE VIDEOGRAPHER:  We are back on
9 the record.  The time is 12:24 p.m.
10         MR. SHAFFER:  This is Brian
11 Shaffer for ECFMG.  We're back on the
12 record after a short break.
13         We've had a couple of logistical
14 issues come up this morning with respect
15 to Ms. Riggins and her child care, and we
16 got started a little bit late this morning
17 due to some travel and traffic issues.
18 And so we've been talking offline here to
19 try to solve for those things and make
20 sure that we get the deposition completed.
21         And what we've discussed here is
22 that we will adjourn the deposition today
23 now with the questions that we've gotten
24 asked and answered so far.  We will
25 reconvene on Monday morning, the 16th,

Page 41

1 here at the same place starting at 9:30,
2 and we will pick up with Ms. Riggins'
3 deposition at that point in time.
4         This is being done as an
5 accommodation to schedules and not for any
6 other reason, and so for that reason I've
7 discussed with both counsel and
8 Ms. Riggins the understanding that she'll
9 have no substantive discussions with
10 anyone, including her counsel, any person,
11 witness, Ms. Russell, anybody else about
12 the case, about her testimony here today,
13 her testimony that she'll give on Monday.
14 It will be as if we were picking up right
15 now.  Instead we will be picking up Monday
16 at 9:30.
17         That will include no text messages,
18 no, emails.  She also had agreed that
19 she'll not do any research or go online or
20 look at any documents or do anything other
21 than what she came here today prepared to
22 talk about.
23         Is that a correct recitation of our
24 agreement?
25         MR. ZAJDEL:  Yes.

Jasmine Riggins

Page 42

1    THE WITNESS:  Yes.
2    MR. ZAJDEL:  With the exception
3    that I'm certainly going to send an email
4    with a date and the time to be here on
5    Monday.  You said no communication.  I
6    just want to make sure, no substantive
7    communication about the contents of the
8    deposition.  That's agreed.
9    MR. SHAFFER:  And then we will
10   continue with Ms. Riggins' deposition on
11   Monday at 9:30.  After we complete that
12   we'll move forward with the other
13   deposition that's been noticed for 10:30
14   but that we've agreed will start after
15   the completion of Ms. Riggins.  Correct?
16   MR. ZAJDEL:  Yes, and I will take
17   care of adjusting Ms. Russell to let her
18   know.
19   MR. SHAFFER:  I think that is it
20   for the record here today, and we will
21   pick back up on Monday.
22   THE VIDEOGRAPHER:  We are going
23   off the record.  The time is 12:27 p.m.
24   (Proceedings adjourned at
25   12:26 p.m.)

Page 43

1  DISTRICT OF COLUMBIA:            SS
2    I, Barbara DeVico, a Registered Court Reporter
3  of the District of Columbia, do hereby certify
4  that these proceedings took place before me at the
5  time and place herein set out, and the proceedings
6  were recorded stenographically by me and this
7  transcript is a true record of the proceedings.
8
9    I further certify that I am not of counsel to
10  any of the parties, nor an employee of counsel nor
11  related to any of the parties, nor in any way
12  interested in the outcome of this action.
13
14
15
16  _____
17            BARBARA DeVICO, CRR, RMR
18
19  _____
20  My Commission Expires:
21  July 31, 2023
22
23
24
25

Jasmine Riggins

1            IN THE UNITED STATES DISTRICT COURT

2         FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3

4      - - - - - - - - - - - - - - - - X

5      MONIQUE RUSSELL, JASMINE          :

6      RIGGINS, ELSA M. POWELL           :

7      and DESIRE EVANS,                 : Civil Action No.

8               Plaintiffs,         :   18-5629

9      v.                                :

10     EDUCATIONAL COMMISSION FOR        :

11     FOREIGN MEDICAL GRADUATES,        :

12               Defendant.         :

13     - - - - - - - - - - - - - - - - X

14

15                    Volume II

16     Continued Videotaped Deposition Of JASMINE RIGGINS

17                 Washington, D.C.

18             Monday, September 16, 2019

19                    9:56 a.m.

20

21

22     Job No. 88391

23     Pages:  44 - 145

24     Reported by:  Dana C. Ryan, RPR, CRR, CSR (GA)

25

Jasmine Riggins

Page 45

```
1
2
3
4
5                      September 16, 2019
6                        9:56 a.m.
7
8
9
10        Continued Videotaped Deposition of JASMINE
11   RIGGINS, held at the law offices of Morgan, Lewis
12   & Bockius, LLP, 1111 Pennsylvania Avenue,
13   Northwest, Washington, D.C., before Dana C. Ryan,
14   Registered Professional Reporter, Certified
15   Realtime Reporter, Certified Shorthand Reporter
16   (GA) and Notary Public in and for the District of
17   Columbia.
18
19
20
21
22
23
24
25
```

Page 47

```
1                C O N T E N T S
2    EXAMINATION OF JASMINE RIGGINS:        PAGE:
3    By Mr. Klayman              51
4    By Mr. Shaffer              111
5
6
7
8                E X H I B I T S
9          (Attached to the Transcript)
10   RIGGINS DEPOSITION                PAGE:
11   Exhibit 2    September 23, 2016 J Unity      71
12          Health Care Progress Note
13          For Jasmine Riggins, Bates
14          Stamped Plaintiffs0000006408
15          Through 0000006411
16   Exhibit 3    February 19, 2017 J Unity      78
17          Health Care Progress Note
18          For Jasmine Riggins, Bates
19          Stamped Plaintiffs0000007576
20          Through 0000007579
21
22
23
24
25
```

Page 46

```
1             A P P E A R A N C E S
2
3      ON BEHALF OF THE PLAINTIFFS:
4          CORY L. ZAJDEL, Esquire
5          Z Law, LLC
6          2345 York Road, #B-13
7          Timonium, Maryland 21093
8          Telephone:  (443) 213-1977
9          Email: clz@zlawmaryland.com
10
11     ON BEHALF OF THE DEFENDANT:
12          BARRY W. SHAFFER, Esquire
13          MATTHEW D. KLAYMAN, Esquire
14          Morgan, Lewis & Bockius, LLP
15          1701 Market Street
16          Philadelphia, Pennsylvania 19103
17          Telephone: (215) 963-5100
18          Email: barry.shaffer@morganlewis.com
19          Email: matthew.klayman@morganlewis.com
20
21     Also present:
22          David Campbell, Videographer
23
24
25
```

Page 48

```
1        E X H I B I T S   C O N T I N U E D
2          (Attached to the Transcript)
3    RIGGINS DEPOSITION                PAGE:
4    Exhibit 4    Plaintiff Jasmine Riggins'      82
5          Supplemental Answers To First
6          Set Of Interrogatories And
7          Supplemental Responses To
8          First Set Of Requests For
9          Production Of Documents
10   Exhibit 5    September 7, 2017 J Unity      87
11          Health Care Progress Note
12          For Jasmine Riggins, Bates
13          Stamped Plaintiffs0000006442
14          Through 0000006444
15   Exhibit 6    October 13, 2017 J Unity      90
16          Health Care Progress Note
17          For Jasmine Riggins, Bates
18          Stamped Plaintiffs0000006478
19          Through 000000479
20   Exhibit 7    Class Action Complaint      95
21   Exhibit 8    November 9, 2017 J Unity      96
22          Health Care Progress Note
23          For Jasmine Riggins, Bates
24          Stamped Plaintiffs0000006480
25          Through 0000006482
```

Jasmine Riggins

Page 49

1      E X H I B I T S   C O N T I N U E D
2          (Attached to the Transcript)
3  RIGGINS DEPOSITION              PAGE:
4  Exhibit 9   Complaint Filed To Initiate      101
5              The Lawsuit On November 14,
6              2018
7  Exhibit 10  April 18, 2019 J Unity          103
8              Health Care Progress Note
9              For Jasmine Riggins, Bates
10             Stamped Plaintiffs0000006488
11             Through 0000006490
12 Exhibit 11  Plaintiff Jasmine Riggins'      105
13             Responses To Defendants'
14             Requests For Admissions,
15             Bates Stamped
16             Plaintiffs0000006513 Through
17             0000006537
18 Exhibit 12  Stipulation Of Dismissal        114
19             Without Prejudice, Bates
20             Stamped Plaintiffs0000118860
21             Through 0000118863
22 Exhibit 13  First Amended Class Action      120
23             Complaint
24 Exhibit 14  Claimants' Certificate Of       124
25             Merit

Page 50

1          P R O C E E D I N G S
2          THE VIDEOGRAPHER:  We are now on the
3  record.  My name is David Campbell.  I am the
4  videographer for Golkow Litigation Services.
5          Today's date is September 16th, 2019,
6  and the time is 9:56 a.m.
7          This video deposition is being held at
8  1111 Pennsylvania Avenue, Northwest, Washington,
9  D.C. 20004, in the matter of Monique Russell, et
10 al., versus Educational Commission for Foreign
11 Medical Graduates.  This is in the United States
12 District Court for the Eastern District of
13 Pennsylvania, Number 18-5629.
14         The deponent today is Jasmine Riggins.
15         The court reporter is Dana Ryan.
16         Counsel, will you please identify
17 yourselves for the record, and then the court
18 reporter will please swear in the witness and we
19 can proceed.
20         MR. ZAJDEL:  Cory Zajdel on behalf of
21 Ms. Riggins.
22         MR. SHAFFER:  Brian Shaffer on behalf
23 of defendant Educational Commission for Foreign
24 Medical Graduates.
25         MR. KLAYMAN:  Matthew Klayman, counsel

Page 51

1  for the Educational Commission for Foreign Medical
2  Graduates, the defendant.
3          (Mr. Shaffer exits the deposition
4  proceedings.)
5          - - - - - - - - - - - - - - -
6              JASMINE RIGGINS,
7  having been duly sworn, testified as follows:
8          - - - - - - - - - - - - - - -
9  EXAMINATION BY COUNSEL FOR THE DEFENDANT
10 BY MR. KLAYMAN:
11     Q    Good morning, Ms. Riggins.
12     A    Good morning.
13     Q    We met a moment ago, but I'm Matthew
14 Klayman.  I'm colleagues with Brian Shaffer.  I'm
15 going to ask you some questions this morning.
16     A    Okay.
17     Q    We're picking up from a deposition that
18 began on Thursday; correct?
19     A    Correct.
20     Q    Now, between Thursday and today, have
21 you had any substantive communications about your
22 testimony with anybody?
23     A    No.
24     Q    Have you done any independent research
25 about the substance of your testimony or the facts

Page 52

1  or circumstances of the case?
2      A    No.
3      Q    I understand that on Thursday you were
4  asked about certain communications that you had
5  with Monique Russell.
6          Do you -- do you remember that?
7      A    Yes.
8      Q    Certain written communications.
9          And I understand that you are -- that
10 there was some discussion about you going to look
11 for them or gather them.
12         Do you recall that?
13     A    Correct.
14     Q    Did you do anything like that?
15     A    I have not.
16     Q    Were you asked to do that?
17         MR. ZAJDEL:  Objection.  That would be
18 attorney-client privilege.
19         Well, to the extent you're not asking
20 attorney-client privilege, I could see how that
21 would be answerable.
22         So you can answer the question to the
23 extent he's not asking you about communications
24 between you or any of your attorneys.
25         THE WITNESS:  Okay.  So could you

Jasmine Riggins

Page 53

1  repeat your question?
2       BY MR. KLAYMAN:
3       Q    So were you asked to look for copies of
4  communications you had with Monique Russell?
5       A    Yes.
6       Q    Did you find any communications with
7  Monique Russell?
8       A    I didn't look for them.
9       Q    Oh, you didn't look for them?
10      A    No.
11      Q    Okay.  Is that something you would be
12  willing to do?
13      A    Yes.
14      Q    Okay.  Is that -- when do you think
15  you'd be able to complete a search for
16  communications you had with Monique Russell?
17      A    I will try to get that done by the end
18  of this week.
19      Q    Okay.
20      A    Yes.
21      Q    Great.
22           This was the subject of written
23  communications from Mr. Shaffer, my colleague, so
24  I want to just make sure that we have on the
25  record that you'll go take a look and that

Page 54

1  responsive communications would be produced.
2           MR. ZAJDEL:  Well, she testified she
3  will look for them and she'll produce them to me,
4  and then we'll decide whether it's discoverable,
5  and if they are, we'll produce them.
6           MR. KLAYMAN:  Sure.
7       BY MR. KLAYMAN:
8       Q    Now, at the beginning of your
9  deposition on Thursday, I understand Mr. Shaffer
10  went through some -- some ground rules about
11  telling the truth, not speaking over one another,
12  that kind of thing.
13           Do you remember that?
14      A    Yes.
15      Q    Is that -- I just want to make sure
16  that we're still on the same page, so I don't --
17  so if you could, to make sure that the transcript
18  is clear, I won't speak over you and you won't
19  speak over me.
20      A    We didn't --
21      Q    Do you --
22      A    -- have --
23      Q    -- understand?
24      A    -- that issue.
25      Q    Great.

Page 55

1       A    We didn't have that issue at all.
2       Q    Just making sure.
3       A    No, that was not an issue.
4       Q    Okay.  Great.
5           Now, we're here today because
6  you've brought a lawsuit against the Educational
7  Commission for Foreign Medical Graduates; correct?
8       A    Correct.
9       Q    I'm going to refer to them as ECFMG, so
10  you'll understand what I mean when I say ECFMG?
11      A    Correct.
12      Q    And you allege that you've suffered
13  emotional distress; correct?
14      A    Correct.
15      Q    And that distress was the result of
16  learning about Dr. Akoda's guilty plea; is that
17  correct?
18      A    I'm sorry?
19      Q    So the -- the emotional distress that's
20  the subject of the lawsuit --
21      A    Uh-huh.
22      Q    -- when did that start?
23      A    Right when I found out about him being
24  a fake doctor.
25      Q    And when about was that, if you recall?

Page 56

1       A    A couple of years ago.
2       Q    Was it, you know, talking 2015, 2016?
3       A    Yeah, around that time, 2016.
4       Q    Okay.  Now, is emotional distress the
5  only injury that you're suing for in this lawsuit?
6       A    Correct.
7       Q    And you're suing ECFMG because you
8  contend that ECFMG is responsible, in whole or in
9  part, for your emotional distress?
10      A    Correct.
11      Q    Do you also contend that Prince
12  George's Hospital Center is responsible, in whole
13  or in part, for your emotional distress?
14      A    Correct.
15      Q    Do you also contend that the Maryland
16  Board of Physicians is responsible, in whole or in
17  part, for your emotional distress?
18      A    Correct.
19      Q    Do you also contend that Dr. Abdul
20  Chaudry is responsible, in whole or in part, for
21  your emotional distress?
22      A    Correct.
23      Q    Do you also contend that the American
24  Board of Obstetricians and Gynecologists are
25  responsible, in whole or in part, for your

Jasmine Riggins

Page 57

1  emotional distress?
2      A    Correct.
3      Q    So you would say that anyone that you
4  contend did anything to enable Dr. Akoda to
5  practice medicine is responsible, in whole or in
6  part, for your emotional distress?
7      A    Correct.
8      Q    Tell me about your emotional distress.
9      A    I feel angry, sad, embarrassed,
10 ashamed.  My emotions are, like, all over the
11 place.  I can't even put them into as many words
12 that I can think of.  I just can't believe that
13 someone would do that.  It's beyond me.
14     Q    And when you say "that," what are you
15 referring to?
16     A    To pretend to be someone that they're
17 not, to practice something that they had no rights
18 to practice without the proper process of it all.
19     Q    And by "proper process of it all," what
20 do you mean?
21     A    Going about it the correct way.
22     Q    And by "the correct way," you mean
23 what?
24     A    Receiving proper documents, being
25 truthful, being honest, doing the things that a

Page 58

1  real doctor would do.
2      Q    So you're saying that a real doctor
3  would be honest?
4      A    Correct.
5      Q    And someone who is not honest is not a
6  real doctor?
7      A    No, not necessarily.  But if you're
8  pretending to be something that you're not, that's
9  not being honest.
10     Q    And by "something that you're not,"
11 what do you mean?
12     A    Not a real doctor.  By practicing on
13 women, you have no rights to do that, period, if
14 you don't have the proper credentials.  Just going
15 through school, anything that you need to do
16 properly to become a doctor, you should do that
17 before you do anything that a doctor does.
18     Q    Do you know one way or the other if
19 Dr. Akoda went to medical school?
20         MR. ZAJDEL:  Objection: asked and
21 answered.
22         But you can answer.
23         THE WITNESS:  No, I do not.
24     BY MR. KLAYMAN:
25     Q    Now, getting back to when you first

Page 59

1  learned about the basis for this lawsuit, you
2  learned about it from Facebook; is that correct?
3      A    Correct, from --
4      Q    And that was from a post by Monique
5  Russell?
6      A    Correct.
7      Q    And that's one of the communications
8  that we were talking about this morning; right?
9      A    Correct.
10     Q    So -- so you'll go take a look to see
11 if you can find that post that Monique Russell
12 made that you saw?
13     A    I can try to find that, yes.
14     Q    Now, with respect to your emotional
15 distress, do you have anxiety or worry?
16     A    When it comes to physicians.
17     Q    So not in general?
18     A    No, not necessarily.
19     Q    Do you have a depressed mood?
20     A    No.
21     Q    Do you have suicidal thoughts?
22     A    No.
23     Q    Are you able to laugh and see the funny
24 side of things?
25     A    Yes.

Page 60

1      Q    Do you look forward with enjoyment to
2  things?
3      A    Yes.
4      Q    Do you blame yourself unnecessarily
5  when things go wrong?
6      A    No.
7      Q    Are you anxious or worried for no good
8  reason?
9      A    No.
10     Q    Do you feel scared or panicky for no
11 good reason?
12     A    No.
13     Q    Do you feel that things are getting on
14 top of you?
15         MR. ZAJDEL:  Objection.  It --
16         You can answer the question.
17         THE WITNESS:  What -- what do you mean?
18     BY MR. KLAYMAN:
19     Q    Do you feel that things overwhelm you
20 sometimes?
21     A    Yes.
22     Q    Do you have difficulty sleeping?
23     A    Sometimes.
24     Q    How long has that been going on?
25     A    For some time -- quite some time.

Page 61

1    Q    If you had to give your best estimate,
2  are we talking a few -- a few weeks, many years?
3    A    Yeah, probably like a couple of years.
4    Q    Couple of years?
5    A    (Witness nods head.)
6    Q    If you had to give your best estimate
7  about when that began --
8    A    I can't.
9    Q    You can't.
10       Do you feel sad or miserable?
11   A    Not miserable, no.  I -- I mean, in
12  general, no, not sad.
13   Q    Are you so unhappy that you cry?
14   A    Are we, like, in general?  At times --
15  I feel like these questions can be -- at times I
16  can feel sad to the point where I want to cry, so
17  are you speaking in general, at times?
18   Q    Sure.
19       Let's say over the last six months,
20  have you -- have you at any time been so unhappy
21  that you've cried?
22   A    Yes.
23   Q    And do you recall what made you
24  unhappy?
25   A    Yes.

Page 62

1    Q    And what was that?
2    A    I don't want to talk about it.
3    Q    I -- I understand that you might not
4  want to talk about it, but you're under oath so
5  I -- I need an answer to the question.
6       MR. ZAJDEL:  Objection.  If it's
7  unrelated -- if the question is related to the
8  case, then I would agree she would have to talk
9  about it.  But if it's -- I'm sorry, if she's
10  saying it's unrelated to the case, I don't know
11  why it would be relevant.
12       MR. KLAYMAN:  Well, it's -- she's
13  bringing a claim for emotional distress, so other
14  things going on in her life that might be factors
15  in emotional distress that she's suffering is
16  directly relevant to the claim.
17       MR. ZAJDEL:  Well, I wouldn't agree
18  with that.  I'll have --
19       MR. KLAYMAN:  Let me -- maybe I'll --
20  let me try a question.
21       BY MR. KLAYMAN:
22   Q    Is the cause of that unhappiness that
23  you referred to completely unrelated to the facts
24  of this case?
25   A    Sometimes.  So the things that make me

Page 63

1  unhappy for -- so far as this case, just knowing
2  what I know about it, the way it makes me feel,
3  the fact that I had to -- I got a second -- second
4  C-section, and I didn't have to get that.  That
5  makes me very unhappy sometimes, yes.
6    Q    But to your testimony just now, there
7  are other things going on in your life that also
8  make you very unhappy or, as I asked, so unhappy
9  that you cry?
10   A    Okay.  So there's one thing.  My
11  grandmother had back surgery and it made me sad.
12  That was about it.
13   Q    I'm sorry to hear that.  That just --
14   A    Yeah, so . . .
15   Q    And that's what you were referring to
16  when you --
17   A    Correct.
18   Q    -- said you'd rather not talk about it?
19       Now, does the thought of harming
20  yourself occur to you?
21   A    No.
22   Q    Do you have post-traumatic stress
23  disorder because of the events giving rise to this
24  lawsuit, sometimes known as PTSD?
25   A    No.

Page 64

1    Q    Have you suffered any physical distress
2  after learning about Dr. Akoda in -- from Monique
3  Russell's Facebook post?
4    A    Physically -- no, not necessarily.
5    Q    When you say "not necessarily," is that
6  a no?
7    A    No.
8    Q    Have you ever been diagnosed with
9  depression?
10   A    No.
11   Q    Have you ever seen a medical
12  professional to discuss depression?
13   A    No.
14   Q    Have you ever discussed your emotional
15  distress with a medical professional?
16   A    No.
17   Q    If you were asked by a medical
18  professional about your emotional distress, would
19  you tell the truth?
20   A    Yes.
21   Q    And if you had been asked by a medical
22  professional in the past about your emotional
23  distress, you would have told the truth?
24   A    Yes.
25   Q    Do you typically tell the truth to

Jasmine Riggins

Page 65

1 medical professionals when they ask you questions
2 in the course of treatment?
3    A    Yes.
4    Q    Have you always told the truth to
5 medical professionals when they're treating you?
6    A    Yes.
7    Q    When was the last time you saw a
8 medical professional for treatment, any -- any
9 medical professional?
10    A    Okay.  I went to the doctor last month,
11 not -- yeah, last month I had a doctor's
12 appointment.
13    Q    So that would be -- I forget what
14 month -- August?
15    A    Yes, in August.
16    Q    August of 2019?
17    A    Yes.
18    Q    Okay.  And where was that?
19    A    That was Unity Health Care.
20    Q    What is Unity Health Care?
21    A    It's a doctor's office.  It's a clinic.
22    Q    If you recall -- do you recall which
23 doctor you were seeing?
24    A    Dr. King.
25    Q    Dr. King.

Page 66

1        Do you know Dr. King's first name?
2    A    I don't recall.
3    Q    Is Dr. King a man or a woman?
4    A    A woman.
5    Q    What kind of doctor is Dr. King?
6    A    She's a physician.
7    Q    Is she a specialist or a general
8 practitioner, if you know?
9    A    I don't recall.
10    Q    Were you going for a routine physical?
11    A    Correct.
12    Q    How did you choose Dr. King as your
13 doctor?
14    A    Well, I was referred to her.
15    Q    Okay.  And referred by whom?
16    A    My cousin.
17    Q    Okay.  Your cousin.
18        And who is your cousin?
19    A    You need her name?
20    Q    Just for the record, yeah.
21    A    Oh, okay.  Her name is Davida Limes.
22    Q    How do you spell the last name?
23    A    L-I-M-E-S.
24    Q    L-I-M-E-S.
25        So -- so your cousin referred you to

Page 67

1 Dr. King.
2        Did you do anything to research
3 Dr. King before you went to see her for treatment?
4    A    Yes.
5    Q    What did you do?
6    A    I asked my cousin about her.  I went to
7 the doctor's office to meet her prior to my visit.
8    Q    So you met Dr. King once before you
9 became a patient?
10    A    Yes.
11    Q    Did you look at Dr. King's resume?
12    A    No.
13    Q    Did you ask for references beyond that
14 of your cousin?
15    A    No.
16    Q    Did you check to see if Dr. King had
17 any specific credentials or certificates?
18    A    No.
19    Q    Did you ask to see Dr. King's test
20 scores or medical school transcript or anything
21 like that?
22    A    No.
23    Q    Have you ever switched doctors?
24    A    Yes.
25    Q    So if you don't like a doctor you're

Page 68

1 seeing, you -- you find a new doctor?
2    A    Yes.
3    Q    Now, other than to deliver a child,
4 have you ever been hospitalized?
5    A    Yes.
6    Q    And when was that?
7    A    I think it was 2015, I believe.
8    Q    And what was the reason for the
9 hospitalization?
10    A    My birth control was giving me some bad
11 side effects.
12    Q    Do you remember how long you were in
13 the hospital?
14    A    I'm just a -- overnight, maybe a few
15 hours.
16    Q    What was that?  I'm sorry.
17    A    It was late morning, and I didn't leave
18 until, like, the next morning, so I don't know if
19 that's considered overnight or a few hours or --
20    Q    Sure.
21        But you came in on one date and you
22 left on the next date?
23    A    It was the same day I got there, maybe
24 midnight; and I left maybe 9:00 in the next
25 morning.

Page 69

1    Q    Oh, I see.
2    A    So that's why -- yeah, I didn't know if
3  that was -- just to be technical.
4    Q    I appreciate that.
5         So you got in really late at night or
6  really early in the morning?
7    A    Yeah.
8    Q    Depending on how you're looking at it,
9  I guess?
10   A    Yes.
11   Q    And then you left on the same date; it
12  was just several hours later?
13   A    Correct.
14   Q    Any other times that you were
15  hospitalized that you recall other than child
16  birth, again?
17   A    No, not that I can recall.
18   Q    Have you ever been to an emergency
19  room?
20   A    Yes.
21   Q    About how many times?
22   A    A few.  I don't recall.
23   Q    Do you recall what -- what was the
24  reason for going to the emergency room?
25   A    Being sick, you know.

Page 70

1    Q    A variety of reasons?
2    A    Yes.  Correct.
3    Q    Anything traumatic like a -- for a car
4  accident, for example, or --
5    A    No.
6    Q    All right.  Do you have health
7  insurance?
8    A    Yes.
9    Q    Does insurance play a role in which
10  medical professionals you use?
11   A    Yes.
12   Q    Tell me about what role it plays.
13   A    Because of the insurance, I have these
14  certain doctors I can go -- certain offices that
15  accepts my insurances, and some doesn't.
16   Q    What insurance is that, if -- if you
17  know?
18   A    Amerigroup.
19   Q    Does your insurance company assign you
20  doctors?
21   A    Yes, but you don't have to stick with
22  that doctor.
23   Q    Okay.  So -- so the -- so am I right to
24  say that the insurance company will assign you a
25  doctor, but then you have the choice to then go to

Page 71

1  some -- another doctor if you prefer?
2    A    Correct.
3    Q    Did you have insurance when you were
4  treated by Dr. Akoda?
5    A    Yes.
6    Q    Do you remember if he was in network or
7  if he -- if he -- if his treatment was covered by
8  insurance?
9    A    Yes.
10   Q    Okay.
11        (Riggins Deposition Exhibit 2 was
12  marked for identification and attached to the
13  transcript.)
14   BY MR. KLAYMAN:
15   Q    So --
16        THE COURT REPORTER:  Wait a minute.
17   BY MR. KLAYMAN:
18   Q    The court reporter --
19        THE COURT REPORTER:  Let me give it to
20  her.
21        There you go.  Thank you.
22   BY MR. KLAYMAN:
23   Q    So you've just been handed a document
24  that we've marked Riggins 2.  It's a record
25  produced by the plaintiffs that they received from

Page 72

1  Unity Health Care which is the company we were
2  just discussing; right?
3    A    Yes.
4    Q    Okay.  And you see that it's dated
5  September 23rd, 2016?
6    A    Yes.
7    Q    And just for the record, it's Bates
8  number Plaintiffs, and then a bunch of zeros, and
9  then 6408.  So if I ask you to turn to a
10  particular page as we go through, I'm just going
11  to refer to the number at the end of --
12   A    Okay.
13   Q    -- that stamp.  We call it a Bates
14  stamp.  I don't know who Mr. Bates was.
15        So I want to ask you a couple of
16  questions about this.  Do you recall -- how long
17  have you been a patient at Unity Health Care?
18   A    It's been years.  I don't recall the
19  exact year, but I've always been in that area with
20  that doctor, this office.
21   Q    This office?
22   A    Yeah.
23   Q    So -- so this would have been your
24  doctor's office in September 2016?
25   A    Correct.

Jasmine Riggins

Page 73

1    Q   Do you know who Alison Lesht is?  Her
2  name is on the top right next to progress note.
3    A   I don't recall.
4    Q   From the "NP," I would gather that
5  she's a nurse practitioner.
6        Does that refresh your recollection
7  or --
8    A   No.
9    Q   Now, you see the first bolded language
10 at the top of page 6408, it says, Reason for
11 Appointment.
12       Do you see that?
13   A   Yes.
14   Q   And it says, Medical - Adult EST
15 Patient.  That was next to 1.
16       And then 2, Accepted HIV Test - Serum
17 Test Needed.
18       3, Physical Exam.
19       Do you see that?
20   A   Yes.
21   Q   Does that sound like the kinds of
22 treatment you've gotten from Unity Health Care in
23 the past?
24   A   Yes.
25   Q   Okay.  So next it says, History of

Page 74

1  Present Illness.  And then it starts, PHQ-2.
2        Do you know what PHQ-2 means?
3    A   No.
4    Q   So in the text underneath it, it says,
5  PHQ-2 Little interest or pleasure in doing things.
6  And then it again repeats, Little interest or
7  pleasure in doing things: No.  Feeling down,
8  depressed or hopeless: No.
9        Do you see that?
10   A   Yes.
11   Q   Were those questions that you were
12 asked?
13   A   I don't recall.
14   Q   You don't recall.
15       But in September 2016, were those true
16 statements?
17   A   Yes.
18   Q   And it wouldn't surprise you if you had
19 told that to your treating physician --
20   A   No.
21   Q   -- if asked these questions?
22   A   Right.
23       No.
24   Q   If you could turn to the next page, so
25 it's Bates 6409.  Under Family History, which is

Page 75

1  the first item at the top, in the third line down
2  all the way on the right, it says, Two sons -
3  Healthy.
4        Is that -- do you see what I'm -- what
5  I'm referring to?
6    A   Yes.
7    Q   Was that true at the time -- that was
8  true at the time that this was written; right?
9    A   Yes.
10   Q   All right.  Now, under -- moving on to
11 the next section, which is Social History, we're
12 going to go through -- the first one is tobacco
13 use.  And it says, Tobacco Use Questions Current
14 or past tobacco use:  Current some day smoker.
15       Do you see that?
16   A   Yes.
17   Q   Was that -- and that was true and
18 correct in September 2016?
19   A   Correct.
20   Q   Skipping ahead to Drug/Alcohol Use, do
21 you see where I'm --
22   A   Yes.
23   Q   Do you see where I am?
24   A   Yes.
25   Q   So it says, Drug Use Questions.  Date

Page 76

1  updated 09/23/2016.  Past or current drug use?
2  Yes - current use.  Which drugs used:  Marijuana.
3  Current Use/Frequency - Marijuana: occasionally.
4        Alcohol Use Questions.  Dated updated:
5  09/23/2016.  Past or current alcohol use:  Yes.
6  What type of alcohol?  Wine.  (One drink equals
7  one glass equals five ounces.)  How often?  Once
8  or a few times a week.  How many drinks in one
9  sitting?  Four drinks (guideline for max per
10 sitting, for men).
11       Did I read that right?
12   A   Uh-huh.
13   Q   Was that true and acc- -- and that was
14 true and accurate in September 2016?
15       MR. ZAJDEL:  Objection.  And I'm going
16 to instruct the witness not to answer the question
17 with respect to marijuana use.
18       You can answer the rest of that
19 question.
20       BY MR. KLAYMAN:
21   Q   So you can -- yeah, you can go ahead.
22   A   Okay.  So to the drinking, yes.
23       MR. KLAYMAN:  Are you -- are you
24 instructing her to assert her Fifth Amendment
25 privilege?

Page 77

1    MR. ZAJDEL: Yes. You're -- you're
2 asking a question about -- I've instructed her not
3 to answer, and --
4    MR. KLAYMAN: I'm just trying to
5 understand the basis. Is it the Fifth Amendment?
6    MR. ZAJDEL: Yes.
7    BY MR. KLAYMAN:
8    Q    And you're accepting counsel's
9 instruction not to answer?
10   A    Yes.
11       MR. ZAJDEL: Also, just -- and I'm not
12 trying to make a speaking objection. I just want
13 to put on the record -- and we did this in the
14 previous deposition -- that there's a -- with all
15 these medical records and some testimony will be
16 some information that we think deserves a
17 confidentiality stamp. We just want to reserve
18 the right to mark anything confidential before a
19 final transcript is released, including any
20 exhibits.
21       MR. KLAYMAN: Okay. That's -- that's
22 a -- your comment is noted, and we can -- we can
23 discuss that.
24       BY MR. KLAYMAN:
25   Q    Now, going down to the section on OB

Page 78

1 History. If you'll see, it's right in the middle
2 of that page?
3    A    Yes.
4    Q    It says, Total pregnancies, four;
5 abortions, two; C-sections, two.
6       Do you see that?
7    A    Yes.
8    Q    Was that a true -- that was a true and
9 accurate statement in September 2016; correct?
10   A    Correct.
11   Q    When, if you recall, were the
12 abortions? Ballpark time period.
13   A    I don't recall.
14   Q    Were they -- do you recall if they were
15 before the C-sections?
16   A    Yes.
17   Q    And they -- and they were before the
18 C-sections?
19   A    Yes.
20   Q    Okay. I'm sorry. I just -- I asked a
21 bad question, so . . .
22       (Riggins Deposition Exhibit 3 was
23 marked for identification and attached to the
24 transcript.)
25       BY MR. KLAYMAN:

Page 79

1    Q    So the court reporter just handed you
2 the document beginning with Bates number 7576
3 that's been marked Riggins Exhibit 3.
4       And this, again, is a Unity Health Care
5 record; right?
6    A    Yes.
7    Q    And the date for this one is
8 February 19th, 2017. Do you see that --
9    A    Yes.
10   Q    -- on the top left?
11       And you were still a patient at Unity
12 Health Care at this time?
13   A    Yes.
14   Q    Have you been a patient at Unity Health
15 Care continuously from, I guess, the last record,
16 September 2016, at least until today?
17   A    Correct.
18   Q    And, again, next to the progress note,
19 it says Martine H. Tchinda, NP.
20       Do you know who Martine H. Tchinda, NP
21 is?
22   A    No.
23   Q    But, again, the "NP" seems to signify
24 nurse practitioner, so it could be someone that
25 treated you; correct?

Page 80

1       MR. ZAJDEL: Objection.
2       THE WITNESS: Right.
3       BY MR. KLAYMAN:
4    Q    So moving down to the reason for
5 appointment. Do you see where I'm at?
6    A    Yes.
7    Q    It says, 1, Medical - Walk-in pregnancy
8 test.
9       Does that sound like a reason you
10 would -- does that refresh your recollection --
11 let me strike that.
12       Do you recall why you were going to
13 Unity Health Care in February 2017?
14   A    Yes.
15   Q    And why was that?
16   A    For a pregnancy test.
17   Q    If you skip down to the section on
18 surgical history -- that's still on page 7576.
19 It's the third bolded section from the bottom.
20       Do you see where it is?
21   A    Yes.
22   Q    So it says, C-sections times two;
23 surgical abortion 2/2016.
24       Do you see that?
25   A    Yes.

Jasmine Riggins

Page 81

1     Q    Does that refresh your recollection at
2  all about when the abortions happened?
3     A    Yes.
4     Q    And when did those happen?
5     A    2016.
6     Q    2016.
7     A    About that time somewhat.
8     Q    Now, if you move out -- move on to the
9  next page, so 7577.  I'm looking at smack in the
10  middle where it says, Review of Systems.
11        Do you see that in the bolded language?
12     A    Yes.
13     Q    So if you go down to the last
14  underlined item in that section where it says,
15  Psych, do you see that?
16     A    Yes.
17     Q    And it says, Negative for
18  anxiety/worry, depressed mood, suicidal thoughts.
19        Did I read that right?
20     A    Yes.
21     Q    And that was a true and accurate --
22  accurate statement of your well-being in
23  February 2017?
24     A    Yes.
25        MR. KLAYMAN:  That will be 4.

Page 82

1        (Riggins Deposition Exhibit 4 was
2  marked for identification and attached to the
3  transcript.)
4  BY MR. KLAYMAN:
5     Q    So the court reporter has just handed
6  you the document that's been marked Riggins
7  Exhibit 4.
8        Do you recognize the document?
9     A    I can't say yes or no.
10     Q    Are you familiar with -- with
11  interrogatories?
12     A    Yes.
13     Q    So -- so as you can see from the title
14  there, this document is entitled, Plaintiff
15  Jasmine Riggins' Supplemental Answers to First Set
16  of Interrogatories and Supplemental Responses to
17  First Set of Requests for Production of Documents.
18     A    Uh-huh.
19     Q    Right?
20     A    Yes.
21     Q    So these are discovery requests that
22  were served by your counsel on ECFMG in response
23  to certain interrogatories and document requests.
24        Does it -- and if you turn to the back,
25  let's see, there's a long list of names, but right

Page 83

1  before that, there's a certificate of service, and
2  then the page before that, there's a page called
3  Verification.
4     A    Oh, yeah.
5     Q    It has a 14 at the bottom.
6        Do you see that?
7     A    Yes.
8     Q    Okay.  And it says, I, Jasmine Riggins,
9  hereby aver that the factual statements in the
10  foregoing answers to interrogatories are true and
11  correct to the best of my knowledge, information
12  and belief, and that these answers are made
13  subject to the penalties relating to unsworn
14  falsification to authorities.
15        Right?
16     A    Yes.
17     Q    And then it's dated June 13, 2019; is
18  that right?
19     A    Yes.
20     Q    And then there's a line for -- and a
21  signature that -- are those your signature for
22  Jasmine Riggins?
23     A    Yes.
24     Q    Does that refresh your recollection
25  about if whether you've seen this document before?

Page 84

1     A    Yes.
2     Q    Earlier today, you testified that you
3  weren't sure of when you saw the Facebook post
4  from Monique Russell.
5        Do you recall that?
6     A    You said that I wasn't sure that --
7     Q    Yeah, that you said you weren't sure.
8     A    Okay.
9     Q    Of the date; is that right?
10     A    The date, yes.
11     Q    Yes.
12     A    Correct.
13     Q    So if you could turn to page 3 of the
14  interrogatories.
15     A    Okay.
16     Q    I'll just direct you to the very
17  bottom, the first full line where it says,
18  Plaintiff began experiencing these injuries when
19  she learned in July 2017 that Akoda was not really
20  a doctor.
21        Do you see that?
22     A    Yes.
23     Q    Does that refresh your recollection
24  about when you saw Monique Russell's Facebook post
25  about Dr. Akoda?

Page 85

1    A    Correct.
2    Q    And -- and when was that?
3    A    In 2017.
4    Q    In July 2017; right?
5    A    Yes.
6    Q    Okay.  So all of the medical records
7  that we've looked at so far -- so that would be
8  Riggins Exhibit 2 and Exhibit 3 -- were from
9  before July of 2017; right?
10        You can pull them up again if you want
11 to --
12   A    Yeah, they say -- this is 2016.
13        Yes.
14   Q    How soon after learning, as you say in
15 your interrogatory response, that Akoda was not
16 really a doctor, did you begin experiencing
17 emotional distress?
18   A    Immediately once I --
19   Q    Immediately?
20   A    Yeah, once I found out, I just felt
21 really bad, yeah.
22   Q    Did you experience the emotional
23 distress continuously after that time, or was it
24 intermittent?
25   A    Yeah, intermittent.

Page 86

1    Q    Intermittent?
2    A    Yeah.
3    Q    So it would come and it would go, in
4  other words?
5    A    Yes.
6    Q    How frequently would you experience the
7  emotional distress?
8    A    More often than not, yeah.  The more I
9  thought about it, it weighed on me, yeah.
10   Q    And how often would you think about it?
11   A    Almost every day, every other day.  I
12 tried not to think about it, but it would always
13 come up in my mind.
14   Q    So on page 3 of the -- of Exhibit 4,
15 the second line from the bottom says, Plaintiff
16 has not seen any health care providers for
17 treatment of these injuries.
18        Do you see that?
19   A    Yes.
20   Q    And that was a true and accurate
21 statement when these were -- when you signed the
22 verification in June of 2019; correct?
23   A    Correct.
24   Q    And that's still a true and accurate
25 statement --

Page 87

1    A    Correct.
2    Q    -- correct?
3        Have you thought about going to see a
4  health care provider for treatment of your
5  injuries?
6    A    Yeah, I thought about it.
7    Q    And you decided against it?
8    A    It just so -- it was just a thought,
9  like -- yeah, you could say I decided against it.
10 Just wasn't something I really wanted to keep
11 talking about.
12        (Riggins Deposition Exhibit 5 was
13 marked for identification and attached to the
14 transcript.)
15   BY MR. KLAYMAN:
16   Q    So the court reporter has handed you
17 the document that's been marked Riggins Exhibit 5
18 which begins on Bates number 6442.  And this again
19 looks like a Unity Health Care record; right?
20   A    Yes.
21   Q    And in the top left, the date here is
22 September 7th, 2017 --
23   A    Yes.
24   Q    -- is that right?
25        So that's after the July 2017 date that

Page 88

1  was referred to in the interrogatories?
2    A    Correct.
3    Q    And up in the top right where it says
4  progress note, this time it says, Yolanda E.
5  Klemmer, CNM.
6        Do you know who Dr. Klemmer is?
7    A    Yes.
8    Q    And who is Dr. Klemmer?
9        MR. ZAJDEL:  Objection: misstates
10 facts.  It says certified nurse --
11       MR. KLAYMAN:  Oh, sure.  I forgot.
12 Forgive me.
13   BY MR. KLAYMAN:
14   Q    So do you know who Yolanda Klemmer is?
15   A    Yes.
16   Q    And who is Yolanda Klemmer?
17   A    She was my OB when I was at Unity.
18   Q    Was it your understanding that she was
19 a medical doctor or that she is a medical doctor?
20       Do you still -- strike that.  Let me
21 start again.
22       Do you still see Yolanda Klemmer?
23   A    No.
24   Q    When was the last time you saw Yolanda
25 Klemmer for treatment?

Jasmine Riggins

Page 89

1    A    Back in 27 -- 2018 after I had my baby.
2    Q    But you're not a current patient of
3  Yolanda Klemmer?
4    A    No.
5    Q    And it was your understanding when you
6  were a patient that she was a medical doctor?
7    A    Yes.
8    Q    Would you refer to her as Dr. Klemmer
9  when you saw her?
10    A    Yes.
11    Q    Now, if you look at, again, the Reason
12  for Appointment --
13        That will be the first bolded language.
14  Do you say where I'm at?
15    A    Yeah.
16    Q    Okay.  So it says, 1, medical - OB
17  visit.  2, prenatal care.
18        And that's a true and accurate
19  statement of the treatment you were receiving from
20  Klemmer in September 2017?
21    A    Yes.
22    Q    Moving on to the next bolded language
23  where it says History of Present Illness, do you
24  see that?
25    A    Yes.

Page 90

1    Q    So here is again that reference to
2  PHQ-2.  And it says PHQ-2, little interest or
3  pleasure in doing things.  Little interest or
4  pleasure in doing things, no.  Feeling down,
5  depressed or hopeless, no.
6        Did I read that right?
7    A    Yes.
8    Q    And that's -- and that's a true and
9  accurate statement of your well-being in
10  September 2017; correct?
11    A    Yes.
12        (Riggins Deposition Exhibit 6 was
13  marked for identification and attached to the
14  transcript.)
15  BY MR. KLAYMAN:
16    Q    So the court reporter just handed you
17  another document.  This one is Riggins Exhibit 6.
18  And it begins on Bates number 6478.  And this also
19  appears to be a Unity Health Care medical record;
20  right?
21    A    Yes.
22    Q    And the date up in the top left is
23  October 13, 2017.
24    A    Yes.
25    Q    And again, next to Progress Note it has

Page 91

1  Yolanda E. Klemmer; right?
2    A    Yes.
3    Q    And here it says -- go through again
4  what we did in the last record.
5        So Reason for Appointment, 1, medical,
6  dash, OB visit.
7        Do you see that?
8    A    Yes.
9    Q    And that's a true and accurate
10  statement for why you were seeing Yolanda Klemmer
11  in October 2017?
12    A    Yes.
13    Q    Klemmer was treating you in connection
14  with your -- with the birth of your third child;
15  is that right?
16    A    Yes.
17    Q    So again moving down to the PHQ-2,
18  PHQ-2, little interest or pleasure in doing
19  things.  Little interest or pleasure in doing
20  things, no.  Feeling down depressed or hopeless,
21  no.
22        Do you see that?
23    A    Yes.
24    Q    And that's a true and accurate
25  statement of your well-being in October 2017?

Page 92

1    A    Yes.
2    Q    Now, moving down to the next underlined
3  section which is postpartum visit.
4        So I gather from postpartum that this
5  is after you gave birth?
6    A    Yes.
7    Q    When -- when -- when did you give birth
8  for -- in 2017?
9    A    It was on October 2nd.
10    Q    Okay.  So this is within two weeks of
11  the -- of the birth?
12    A    Yes.
13    Q    Okay.  We're going to read through it
14  and I'll ask you a couple of questions.
15        So, Delivery (if not captured in
16  flowsheet), Maternal date of discharge October 4,
17  2017.  Newborn date of discharge, October 4, 2017.
18  Date of delivery, October 2nd, 2017.
19        So that's the same date you just said;
20  right?
21    A    Yes.
22    Q    Right.
23        Intrapartum complications, none.  Type
24  of delivery, C/S.  That's probably a reference to
25  a C-section; is that right?

Page 93

1    A    I believe so.
2    Q    You delivered your child in 2017
3 through a C-section?
4    A    Yes.
5    Q    Place of delivery, Washington Hospital
6 Center; is that right?
7    A    Yes.
8    Q    Anesthesia, epidural/spinal.  And
9 that's the correct method of anesthesia that you
10 had during delivery?
11    A    Correct.
12    Q    Gender, female.  I take it that
13 that's -- I take it that's --
14    A    Correct.
15    Q    -- for your daughter?
16    A    Yes.
17    Q    Birth weight pounds, 7; birth weight
18 ounces, 13.
19         So next is postpartum depression
20 screening.  I have been able to laugh and see the
21 funny side of things: 0 - As much as I always
22 could.  I have looked forward with enjoyment to
23 things: 0 - As much as I ever did.  I have blamed
24 myself unnecessarily when things went wrong: 0 -
25 No, never.  I have been anxious or worried for no

Page 94

1 good reason: 0 - No, not at all.  I felt scared or
2 panicky for no good reason: 0 - No, not at all.
3 Things have been getting on top of me:  0 - No, I
4 have been coping as well as ever.  I have been so
5 unhappy that I have had difficulty sleeping: 0 -
6 No, not at all.  I have felt sad or miserable:
7 0 - No, not at all.  I've been so unhappy that I
8 have been crying: 0 - No, never.  The thought of
9 harming myself has occurred to me: 0 - Never.
10 Total score: 0.  Score is 12 or higher:  No.
11 Negative screening result: Yes.
12         Did I read that all correctly?
13    A    Yes.
14    Q    Now, I know that was a lot of
15 questions, but was that a true and correct
16 statement of your well-being in October 2017?
17    A    Correct.
18    Q    And then name of child, Taniya?
19    A    Taniya.
20    Q    Taniya?
21    A    Yes.
22    Q    Oh.  Even better.  Taniya Richardson.
23 Great.
24         Just give me one second while I figure
25 something out.

Page 95

1         So you're the named plaintiff in --
2 strike that.
3         You were a named plaintiff in
4 litigation relating to Dr. Akoda in Maryland; is
5 that right?
6    A    Yes.
7    Q    Do you recall when that lawsuit was
8 filed?
9    A    No, I don't recall.
10    MR. KLAYMAN:  This is 7.
11    (Riggins Deposition Exhibit 7 was
12 marked for identification and attached to the
13 transcript.)
14    BY MR. KLAYMAN:
15    Q    So the court reporter has just handed
16 you a document that's been marked Riggins
17 Exhibit 7.
18         Do you recognize the document?
19    A    Yes.
20    Q    And what is it?
21    A    It's a class action complaint.
22    Q    And it's in the Circuit Court for
23 Prince George's County, Maryland?
24    A    Correct.
25    Q    And your name is in the top left of the

Page 96

1 caption, so it says -- right underneath Monique
2 Russell, it says Jasmine Riggins, 312 37th Street,
3 Apartment Number 304, Washington, D.C., 20019?
4    A    Yes.
5    Q    And that's you?
6    A    Yes.
7    Q    And then if you look at the stamp
8 that's kind of sideways on the front page, you see
9 the -- the year is a little fuzzy, I guess, but it
10 looks like 2000 -- to my eye it looks like 2017,
11 September 11.
12         Do you see that?
13    A    Yes.
14    Q    So does that refresh your recollection
15 about when the lawsuit was filed in Maryland?
16    A    Yes.
17    Q    And when was that?
18    A    In September of 2017.
19    Q    Okay.
20    (Riggins Deposition Exhibit 8 was
21 marked for identification and attached to the
22 transcript.)
23    BY MR. KLAYMAN:
24    Q    So the court reporter has handed you a
25 document that's been marked Riggins Exhibit 8, and

Jasmine Riggins

Page 97

1 the Bates number on the bottom is 6480.  And it
2 looks like another united -- Unity Health Care
3 medical record; right?
4     A    Yes.
5     Q    And in the top left of this first page,
6 the date on it is November 9th, 2017.
7         Do you see that?
8     A    Yes.
9     Q    And again, the progress note has
10 Yolanda E. Klemmer; right?
11    A    Yes.
12    Q    And this time the Reason for
13 Appointment is -- you see where I'm at --
14    A    Yes.
15    Q    -- looking at the top?
16        So 1, Medical - OB visit; 2, Pregnancy
17 test; 3, Postpartum exam.
18        Is that a true and correct statement of
19 the reasons you went to Unity Health Care in
20 November 2017?
21    A    Correct.
22    Q    Again, under History of Present
23 Illness, it says at the first couple of lines,
24 PHQ-2, little interest or pleasure of doing
25 things.  Little pleasure or interest in doing

Page 98

1 things, no.  Feeling down, depressed or hopeless,
2 no.
3         Do you see that?
4     A    Yes.
5     Q    And that's a true and accurate
6 statement of your well-being in November of 2017?
7     A    Yes.
8     Q    And again if you go down to postpartum
9 visit, so it's underlined, I'm going to skip the
10 first couple of lines, but in the fifth line down
11 right in the middle, do you see the words
12 "postpartum depression screening"?
13    A    Yes.
14    Q    Okay.  I'm just going to read it into
15 the record.  I have been able to laugh and see the
16 funny side of things: 0 - As much as I always
17 could.  I have looked forward with enjoyment to
18 things: 0 - As much as I ever did.  I have blamed
19 myself unnecessarily when things went wrong: 2 -
20 Yes, some of the time.  I have been anxious or
21 worried for no good reason:  0 - No, not at all.
22 I have felt scared or panicky for no good reason:
23 0 - No, not at all.  Things have been getting on
24 top of me:  0 - No, I have been coping as well as
25 ever.  I have been so unhappy that I have had

Page 99

1 difficulty sleeping:  0 - No, not at all.  I have
2 felt sad or miserable:  0 - No, not at all.  I
3 have been so unhappy that I have been crying:  0 -
4 No, never.  The thought of harming myself has
5 occurred to me:  0 - Never.  Total score: 2.
6 Score is 12 or higher:  No.  Negative screening
7 result:  Yes.
8         Did I read that all correctly?
9     A    Yes.
10    Q    And is that a true and accurate
11 statement of your well-being in November of 2017?
12    A    Yeah.
13        MR. ZAJDEL:  Objection.
14        THE WITNESS:  Sorry.  Sorry.
15        MR. ZAJDEL:  Objection: compound
16 question.
17        She can answer it.
18        MR. KLAYMAN:  Sure.  So -- so --
19        MR. ZAJDEL:  I think she already did,
20 but --
21        BY MR. KLAYMAN:
22    Q    Yeah.  So each of those -- so each of
23 those is a true statement of your well-being in
24 November 2017?
25    A    Yes.

Page 100

1     Q    If you recall earlier, I asked you
2 about your difficulty sleeping.
3         Do you remember I asked you that -- a
4 question about that?
5     A    Yes.
6     Q    So does the statement here from
7 November 2017, I've been so unhappy that I've had
8 difficulty sleeping, 0, no, not at all.  Does that
9 refresh your recollection about when any sleep
10 difficulties you've testified to earlier began?
11    A    Yes, but this is -- I haven't been so
12 unhappy that it caused difficulty sleeping.
13    Q    Oh, okay.  So the difficulty sleeping
14 is unrelated to your emotional distress?
15        MR. ZAJDEL:  Objection.  The question
16 was asked and answered.
17        You can answer -- you can answer the
18 question.
19        THE WITNESS:  What was the question?
20        BY MR. KLAYMAN:
21    Q    The question was so is the difficulty
22 sleeping that you testified to earlier unrelated
23 to your emotional distress?
24    A    Correct.  I'd say that.
25        MR. KLAYMAN:  I'm sorry.  Just give me

Jasmine Riggins

Page 101

1   one second.
2      BY MR. KLAYMAN:
3      Q    Do you recall when this lawsuit was
4   filed?
5      A    In 2017?  This one?
6      Q    So, I'm not talking about the Maryland
7   litigation.  I'm talking about the litigation
8   that's here against ECFMG that we're here for
9   today?
10     A    I believe it was -- I don't recall.  I
11  don't want to give the wrong day.
12         (Riggins Deposition Exhibit 9 was
13  marked for identification and attached to the
14  transcript.)
15     BY MR. KLAYMAN:
16     Q    So the court reporter has just handed
17  you a document that is marked Riggins Exhibit 9.
18         Have you seen this document before?
19         You can flip through it to see if
20  it . . .
21     A    (Witness reviews document.)
22         I honestly . . .
23         (Witness continues reviewing document.)
24         Okay.  I'm not honestly sure.
25         Sorry.  I don't recall seeing this.

Page 102

1   Some of it looks familiar, but I can't --
2      Q    Okay.  Well, on the third page of the
3   document, which has a -- a case caption, you'll
4   see -- or, yeah, right there.
5         Underneath Monique Russell, it says
6   Jasmine Riggins, 312 37th Street, Apartment Number
7   304 --
8      A    Yes.
9      Q    -- Washington, D.C. 20019.
10         Right?
11     A    Yes.
12     Q    And that's you?
13     A    Yes.
14     Q    So this is the complaint that was filed
15  to initiate this lawsuit?
16     A    (Witness nods head.)
17     Q    And on the front page, do you see --
18  there's a stamp -- there are two stamps, actually.
19         One says -- one in the middle says,
20  Filed Pro Prothy, November 14, 2018.
21         Do you see that?
22     A    Yes.
23     Q    Does that refresh your recollection at
24  all as to when the lawsuit was filed?
25     A    Yes.

Page 103

1      Q    And -- and when was it filed?
2      A    November of 2018.
3      Q    Okay.  You can set that aside for a
4   moment.
5         (Riggins Deposition Exhibit 10 was
6   marked for identification and attached to the
7   transcript.)
8      BY MR. KLAYMAN:
9      Q    So the court reporter has handed you a
10  document that's marked Riggins Exhibit 10, and the
11  Bates number is 6488 is where it begins.
12         And again this looks like a Unity
13  Health Care medical record; right?
14     A    Yes.
15     Q    And this time the date is April 18th,
16  2019, in the top left; is that right?
17     A    Yes.
18     Q    And next to the progress note, it says,
19  Taisei Suzuki, DO.
20         Do you know who that is?
21     A    Yes.
22     Q    And who is that?
23     A    He's a doctor at Unity Health Care, but
24  he's a -- he's a doctor at Unity Health Care.
25     Q    He's a doctor at Unity Health Care you

Page 104

1   said?
2      A    Yeah.
3      Q    I'm sorry.  I just couldn't hear you.
4      A    Yeah.  Sorry about that.
5      Q    Do you know what kind of doctor, like,
6   an OB or a general practitioner or you're not
7   sure?
8      A    I'm not sure.
9      Q    Okay.  And moving to the first, it
10  says, Reason for Appointment, 1, Medical - adult
11  EST patient, patient request birth control
12  referral; 2, FP - birth control.
13         Do you see -- did I read that right?
14     A    Yes.
15     Q    And that's a true and accurate
16  statement of the reasons why you went to Unity
17  Health Care in April of 2019?
18     A    Yes.
19     Q    And moving down, excuse me, to -- under
20  History of Present Illness, so the second
21  underline is PHQ-2 where it says, PHQ-2, little
22  interest or pleasure in doing things.  Little
23  interest or pleasure in doing things, no.  Feeling
24  down, depressed or hopeless, no.
25         Do you see that?

Jasmine Riggins

Page 105

1    A    Yes.
2    Q    Is that a true and accurate statement
3 of your well-being in April 2019?
4    A    Yes.
5    Q    Have you ever testified to feeling
6 depressed?
7    A    I'm sorry?
8    Q    Have you ever testified to feeling
9 depressed?
10    A    I don't recall.
11        MR. KLAYMAN:  Is this 11?
12        THE COURT REPORTER:  Uh-huh.
13        (Riggins Deposition Exhibit 11 was
14 marked for identification and attached to the
15 transcript.)
16        BY MR. KLAYMAN:
17    Q    So the court reporter has just handed
18 you what's been marked Russell -- uh, Riggins -- I
19 get them confused here -- Riggins Exhibit 11.
20        Do you recognize this document?
21    A    (Witness reviews document.)  Yes.
22        Yes.
23    Q    Yes?
24        And what is it?
25    A    Response to defendants' request for

Page 106

1 admissions.
2    Q    And you can see from the top of the
3 first page it's in the Circuit Court for Prince
4 George's County, Maryland?
5    A    Yes.
6    Q    And in the case caption, it's Monique
7 Russell, et al. -- there are multiple names,
8 but -- versus Dimensions Health Corp.
9        Do you see that?
10    A    Yes.
11    Q    Okay.  And this is the other lawsuit
12 that you were a plaintiff in?
13    A    Correct.
14    Q    So if you turn to request number 21, it
15 says, You claim that you suffer from depression as
16 a result of your allegations against the
17 defendants.
18        And then the response is an objection.
19 And then it says, As plaintiff testified at her
20 deposition, she has been depressed.
21    A    Okay.
22    Q    Do you see that?
23    A    Yes.
24    Q    So does that refresh your recollection
25 about whether you testified --

Page 107

1    A    Yes.
2    Q    -- about feeling depressed?
3    A    Uh-huh.  I don't recall the dates.
4    Q    You don't recall the dates, you said?
5    A    Yeah.
6    Q    Oh, okay.
7    A    Yeah.
8    Q    Of -- the dates of what?
9    A    Of the question.
10    Q    Oh, of when the -- when you answered
11 this question?
12    A    Yes.
13    Q    Okay.  But you -- but you do recall
14 having testified at your deposition --
15    A    Correct.
16    Q    -- that you were feeling depressed?
17    A    Correct.
18        It's cold in here.
19    Q    So in April 2019, in Riggins
20 Exhibit 10, you told your medical professional
21 that you were not feeling depressed; right?
22    A    Yes.
23    Q    But then at your deposition in the
24 Maryland litigation, you testified that you were
25 feeling depressed?

Page 108

1    A    Correct.  I was not feeling depressed
2 at that time of my visit.
3    Q    At the time of your visit?
4    A    Yeah, I was not feeling depressed at
5 that time.
6    Q    Okay.  So you're -- and you're talking
7 about your visit to Unity Health Care?
8    A    Correct.
9    Q    Okay.  Do you recall being asked about
10 feeling depressed when you visited Unity Health
11 Care?
12    A    Yes.  They always ask those questions.
13    Q    Okay.  Did you ever think to say to
14 them that you had been feeling depressed in
15 between visits?
16    A    No.
17    Q    Did they ever ask if you were feeling
18 depressed in between visits?
19    A    No.
20    Q    Did they ask these orally or did they
21 ask them in writing, if you recall?
22    A    They asked them orally.
23    Q    Orally.
24        And you gave the same answer from
25 Riggins Exhibit 10 in several of the other Unity

Jasmine Riggins

Page 109

1  Health Care medical records that we went through;
2  right?
3      A    Correct.  They asked about that day.
4      Q    Okay.  So each time you -- you went,
5  you were answering about that day?
6      A    Correct.
7      Q    And you never thought to tell them that
8  you were feeling depressed in between your visits?
9      A    No.
10     Q    During any of these time periods?
11     A    No.
12     Q    Why do you think your -- that Unity
13  Health Care was asking you these questions?
14     A    Because it's just something that they
15  want to know how you feel during that day at the
16  time of visit.
17     Q    Do you think they would be interested
18  to -- in -- in terms of treating you, do you think
19  they would have wanted to know if you had been
20  depressed in between visits?
21     A    I'm not honestly sure.  I don't think
22  there's something -- I didn't think that that was
23  something that they would consider, something that
24  they would deal with.  I would think that I would
25  go to another place for that.

Page 110

1      Q    Another place?
2      A    Yeah.
3      Q    What do you mean?
4      A    Like to see someone else versus this
5  Unity Health Care.
6      Q    Where else would you have gone to seek
7  treatment?
8      A    Other places that help, like a
9  therapist or anybody else that has to do with
10  emotional depression, things like that, how you
11  feel.
12     Q    Do you know whether Unity Health Care
13  has therapists on staff?
14     A    I do -- no, not really.
15     Q    Did you ever ask?
16     A    No.
17     Q    Why not?
18     A    It just didn't seem like that type of
19  place.
20     Q    Did you ever ask them for a referral to
21  a -- to a -- a place that would be more equipped
22  in your estimation to treat your feeling -- your
23  intermittent depression, I guess?
24     A    You said would I ask them?
25     Q    Would you have asked -- or did you ask

Page 111

1  them for a referral to somewhere that could treat
2  your depression?
3      A    No.
4      Q    Do you think they would be able to
5  refer you to someone who could treat your -- your
6  feeling depressed?
7      A    I'm not honestly sure.
8          MR. KLAYMAN:  We've been going for a
9  little while, so why don't we take a quick break
10  if that's all right.
11         THE WITNESS:  Okay.
12         THE VIDEOGRAPHER:  Off the record at
13  11:23.
14         (Recess -- 11:23 a.m.)
15         (After recess -- 11:35 a.m.)
16         THE VIDEOGRAPHER:  We are back on the
17  record at 11:35.
18     EXAMINATION BY COUNSEL FOR THE DEFENDANT
19     BY MR. SHAFFER:
20     Q    Ms. Riggins, I want to ask you some
21  questions about the litigation that you initiated
22  in Maryland state court against Dimensions Health
23  Care, okay?
24     A    Okay.
25     Q    When did you file that lawsuit?

Page 112

1          MR. ZAJDEL:  Objection: asked and
2  answered.
3          You can answer.
4          MR. SHAFFER:  When?  This morning?
5          MR. ZAJDEL:  (Indicating
6  affirmatively.)
7      BY MR. SHAFFER:
8      Q    Okay.  So you told my colleague that it
9  was in September of 2017; is that correct?
10     A    Correct.
11     Q    Okay.  And why did you file that
12  lawsuit?
13     A    I'm sorry.
14     Q    That's okay.
15         My question was why you filed the
16  lawsuit.  Was -- was the reason you filed the
17  lawsuit because you believed that Dimensions
18  Health Care was responsible for your emotional
19  injuries related to your interactions with
20  Dr. Akoda?
21     A    Correct.
22     Q    Okay.  And you're one of the named
23  plaintiffs in that lawsuit; correct?
24     A    Correct.
25     Q    Okay.  Is that lawst- -- lawsuit still

Jasmine Riggins

Page 113

1  active today?
2      A    Correct.
3      Q    It is?
4      A    I believe -- I'm sorry.
5      Q    If you don't know, just --
6      A    Yeah.  I don't recall.  I'm sorry.
7      Q    Okay.  Have you gotten any money from
8  Dimensions Health Care in connection with your
9  lawsuit?
10      A    No.
11      Q    Has anybody told you that you will be
12  getting money from Dimensions Health Care?
13      A    No.
14      Q    Okay.  Did anybody tell you whether
15  they were going to dismiss your lawsuit against
16  Dimensions Health Care?
17          MR. ZAJDEL:  Objection.  That would be
18  attorney-client privilege.
19          BY MR. SHAFFER:
20      Q    Well, do you know whether your lawsuit
21  against Dimensions Health Care has been dismissed
22  or not?
23      A    I don't recall.
24      Q    Okay.  So it might have been, but it
25  might not have been?

Page 114

1      A    Correct.  It might have --
2      Q    Isn't that kind of a big deal, like if
3  you filed a lawsuit and then it got dismissed, you
4  would know?
5      A    Correct.
6      Q    But you -- as you sit here today, you
7  don't know?
8      A    I don't recall, correct.
9      Q    Okay.
10          (Riggins Deposition Exhibit 12 was
11  marked for identification and attached to the
12  transcript.)
13          BY MR. SHAFFER:
14      Q    Ms. Riggins, I've handed you what's
15  been marked as Exhibit 12 in your deposition.
16  It's a pleading in the Circuit Court for Prince
17  George's County, Maryland, entitled Stipulation of
18  Dismissal Without Prejudice.
19          Take a look at that and let me know
20  when you're finished.
21      A    (Witness reviews document.)  Okay.
22      Q    Okay.  Have you had a chance to look at
23  that?
24      A    Yes.
25      Q    And if you flip over to the very last

Page 115

1  page, which has the Bates number ending in 8683,
2  you'll see that it's a certificate of service
3  dated September 3rd, 2019, which was 13 days ago.
4          Have you ever seen this document
5  before?
6      A    No.
7      Q    Do you know what this document is?
8      A    A stipulation of dismissal without
9  prejudice in the Circuit Court of Prince George's
10  County, Maryland.
11      Q    What's your understanding of what
12  this -- what this document does?
13      A    Dismisses a case.
14      Q    Okay.  Do you know whether this is the
15  lawsuit that you held -- you are a plaintiff in
16  against Dimensions Health Care?
17      A    Yes.
18      Q    It is?
19      A    Yes, I see my name.
20      Q    Okay.  I think you have some exhibits
21  in front of you.  Do you want to look back at
22  Exhibit 7 that Mr. Klayman showed you this
23  morning?
24          And if you take a look at the first
25  page of Riggins 7, there's a case number on the

Page 116

1  right-hand side in the middle, handwritten,
2  CAL17-22761 --
3      A    Uh-huh.
4      Q    Do you see that?
5      A    Yes.
6      Q    And then if you look at Riggins 12 and
7  look at the top caption on the first page, it
8  says, Monique Russell, et al., versus Dimensions
9  Health Corp., et al., and the number is the same,
10  CAL17-22761?
11      A    Correct.
12      Q    Okay.  Looking at Riggins 7 and
13  Riggins 12, as you sit here today, do you have an
14  understanding of whether your case against
15  Dimensions Health Care in Maryland has been
16  dismissed?
17      A    Yes.
18      Q    It has; correct?
19      A    Correct.
20      Q    And how do you know that?
21      A    From the information.
22      Q    What information?
23          MR. ZAJDEL:  Objection to the extent
24  you're asking questions about communications
25  between attorney-client.

Jasmine Riggins

Page 117

BY MR. SHAFFER:

Q    Well, here's what I'm trying to get at. I asked you a few moments ago if you knew whether the case was dismissed or not, and you said you didn't remember.

We had that discussion --

A    Okay.

Q    -- do you recall that?

A    Yes.

Q    Okay.  And now I've showed you these two documents including a stipulation of dismissal from 13 days ago.

My question is:  Do you now recall that your case has been dismissed against Dimensions Health Care?

A    Yes.

Q    And how long ago did you learn that your case against Dimensions Health Care had been dismissed?

A    My memory was refreshed today.

Q    Okay.  Did you know that your case against Dimensions Health Care had been dismissed before September 3rd?

A    Yes.  I don't recall.  I'm sorry.  I don't recall.

Page 118

Q    Okay.

A    I don't recall the dates.

Q    But you are aware, as you sit here today, that sometime before today you were aware that your case had been dismissed?

A    Correct.

Q    Okay.  And what are the terms on which you understand that dismissal occurred?

A    I'm sorry?

Q    Are you getting any money for dismissing the case?

A    No.

Q    Did you have to agree to pay any money to Dimensions Health Care as part of dismissing that case?

A    No.

Q    Did you have to agree whether the statute of limitations would or would not be impacted by your dismissal of the case?

A    No.

Q    Did you have any discussions with anyone besides your lawyers about dismissing that case?

A    No.

Q    Okay.  You believed Dimensions Health

Page 119

Care was responsible for what you say are your emotional injuries from Dr. Akoda, but yet you dismissed the case against them without getting any money; correct?

A    Correct.

Q    Why did you do that?

MR. ZAJDEL:  Objection.

To the extent he's asking for communications between your attorneys and yourself.

THE WITNESS:  So what's the question?

BY MR. SHAFFER:

Q    I don't want to know about your communication with your lawyers.  I'm just asking you the question why did you agree to dismiss this case.

Well, let me -- let me back up.  Did you agree to dismiss the case?

A    Correct.

Q    Why did you agree?

A    Something I talked to my attorneys about.

Q    Did you agree to dismiss the case because statements you made in that litigation against Dimensions Health were not true?

Page 120

A    No.

Q    Okay.  You still believe everything you said in that case is true and correct to the best of your ability; right?

A    Correct.

Q    Let's take a look at -- at Riggins 7 which is the class action complaint that was filed.

A    Okay.

Q    Actually, I'm going to give you an amended complaint that you filed in that case, just because that's the one I have marked up so it will be easier if we go through that one.  I'm going to mark it as exhibit Riggins 13 and give you a copy.

(Riggins Deposition Exhibit 13 was marked for identification and attached to the transcript.)

BY MR. SHAFFER:

Q    And, Ms. Riggins, looking at what has been marked as Exhibit 13, do you recognize that as the first amended class action complaint that you filed in Prince George's County, Maryland, against Dimensions Health Corporation --

A    Yes.

Jasmine Riggins

Page 121

1    Q    -- in December of 2017?
2    A    Yes.
3    Q    If we turn to page 3 of that document,
4  paragraph 14, just at the bottom.
5    A    Okay.
6    Q    You state, Jasmine Riggins was a
7  patient of Oluwafemi Charles Igberase between
8  August 2012 and March 2013 at Dimensions, period.
9  Jasmine Riggins knew Oluwafemi Charles Igberase as
10  Akoda.
11        Is that true to the best of your
12  knowledge?
13    A    Yes.
14    Q    Turn to page 11, and look at
15  paragraph 66 where you state, Between 2008 and
16  2016, Akoda was an actual and/or apparent, duly
17  authorized agent, servant and/or employee of
18  Dimensions, holding a medical staff position
19  and/or enjoying hospital privileges.
20        Is that true and correct to the best of
21  your knowledge?
22    A    Yes.
23    Q    I'm sorry?
24    A    Yes.
25    Q    Okay.  Okay.  Turn to the next page.

Page 122

1  Actually, let's -- let's go back to paragraph 67
2  where you state, Between 2008 and 2016, Dimensions
3  was responsible to assure and maintain patient
4  safety and privacy for members of the public who
5  received treatment from its agents, servants
6  and/or employees, such as physicians who were
7  medical staff members and/or enjoyed hospital
8  privileges, including specifically but not limited
9  to Akoda.
10        Again, true and correct to the best of
11  your knowledge?
12    A    Yes.
13    Q    Okay.  Paragraph 71 on the next page,
14  you wrote, Dimensions knew or should have known,
15  that Oluwafemi Charles Igberase had assumed a fake
16  identity using the name Charles J. Akoda, M.D.;
17  correct?
18    A    Correct.
19    Q    And that was true and correct to the
20  best of your knowledge --
21    A    Correct.
22    Q    -- correct?
23        Okay.  If you look at paragraphs 72,
24  73, 74, 75, 76, 77, 78, 79, 80, all of those
25  statements relate to things that you believed

Page 123

1  Dimensions knew or should have done to protect you
2  from Dr. Akoda; correct?
3    A    Correct.
4    Q    And those are true and correct to the
5  best of your knowledge?
6    A    Correct.
7    Q    Okay.  And in paragraph 81, you state
8  that Dimensions' negligence was the sole and
9  proximate cause of the injuries, damages, and
10  permanent disability of named plaintiffs and class
11  members with named plaintiffs and class members
12  being in no way contributorily negligent.
13        Again, that's your statement and true
14  and correct to the best of your knowledge?
15    A    Correct.
16    Q    Turning to page 16 of this document,
17  you stated, Dimensions is liable and vicariously
18  liable for Akoda's conduct.
19        And you believe that to be true and
20  correct to the best of your knowledge?
21    A    Correct.
22    Q    In paragraph 88 you say that
23  Dimensions' negligence was the sole and proximate
24  cause of the injuries, damages and permanent
25  disability of named plaintiffs in the class, with

Page 124

1  named plaintiffs in the class being in no way
2  contributorily negligent.
3        Correct?
4        MR. ZAJDEL:  Okay.  Before you answer,
5  what paragraph was --
6        MR. SHAFFER:  88.
7        MR. ZAJDEL:  Okay.  You can answer.
8  BY MR. SHAFFER:
9    Q    I'm going to rephrase the question.
10        In paragraph 88 you wrote that
11  Dimensions' negligence was the sole and proximate
12  cause of the injuries, damages and permanent
13  disability of named plaintiffs in the class, with
14  named plaintiffs in the class being in no way
15  contributorily negligent.
16        And you understand and believe that to
17  be true and correct; right?
18    A    Correct.
19        (Riggins Deposition Exhibit 14 was
20  marked for identification and attached to the
21  transcript.)
22  BY MR. SHAFFER:
23    Q    I'm going to hand you what's been
24  marked as Exhibit 14.
25        Riggins 14 is a document again from the

Page 125

1  matter of Monique Russell versus Dimensions Health
2  Corporation entitled Claimants' Certificate of
3  Merit.
4      Take a quick look at this if you would.
5   A   (Witness reviews document.)
6   Q   Ms. Riggins, this document is entitled
7  Claimants' Certificate of Merit, and the first
8  page is a certificate by a gentleman named Thomas
9  Bojko.
10      Do you see that?
11  A   Yes.
12  Q   I'm sorry.  Just try to keep your voice
13  up.
14  A   Yeah, it's a little cold in here.  I'm
15  sorry. I'm just trying --
16  Q   That's okay.  We'll try to get it
17  warmer.
18      Okay.  Do you know who Mr. Bojko is?
19  A   I do not.
20  Q   Okay.  Do you see in the second
21  paragraph that he says he has reviewed the
22  captioned Class Action Amended Statement of Claim,
23  a final decision and order of the Board of
24  Maryland Board of Physicians, Department of
25  Justice materials, proceedings of the criminal

Page 126

1  case against Dr. Charles Akoda/Igberase and other
2  related materials regarding the above captioned
3  case?
4   A   Yes.
5   Q   Okay.  Do you know whether or not
6  Mr. Bojko was hired by your lawyers to offer
7  opinions about Dimensions Health Corporation's
8  conduct?
9   A   No.
10  Q   Okay.  Do you see in paragraph 3 of
11  Riggins 14 where Mr. Bojko certifies that there
12  have been violations of the applicable standards
13  of administrative care by Dimensions Health
14  Corporation and Dimensions Health Corporation
15  d/b/a Prince George's Hospital Center,
16  individually and through their duly authorized
17  agents, apparent agents, servants and/or
18  employees, including but not limited to Charles J.
19  Akoda/Oluwafemi Charles Igberase which have
20  directly and proximately resulted in damages,
21  injuries and permanent disability to the claimants
22  and others situated.
23      Do you understand what Mr. Bojko is
24  saying there?
25  A   Not really.

Page 127

1   Q   Okay.  Were you aware of these
2  certifications and statements by Mr. Bojko before
3  you dismissed your case against Dimensions Health
4  Corporation?
5   A   No.
6   Q   Okay.  Turn to the third page of
7  Exhibit 14, which is a letter dated February 26th,
8  2018, to a Paul Vettori.
9      Do you know Mr. Vettori?
10  A   Yes.
11  Q   Who is he?
12  A   He's an attorney.
13  Q   Okay.  Is he one of your attorneys in
14  the lawsuit in Maryland and in Philadelphia?
15  A   Yes.
16  Q   Okay.  This is a letter to him from
17  Thomas Bojko, M.D., M.S., J.D., president and
18  managing partner of Aviva Healthcare Solutions.
19  And he writes to Mr. Vettori in the first
20  paragraph, This is to acknowledge that after a
21  review of materials involved in the
22  above-referenced case, I have concluded that there
23  have been violations of the applicable standards
24  of administrative care by Dimensions Health
25  Corporation d/b/a Prince George's Hospital Center,

Page 128

1  individually and through their duly authorized
2  agents, apparent agents, servants and/or
3  employees, including but not limited to Charles J.
4  Akoda/Oluwafemi Charles Igberase ("Akoda"), which
5  have directly and proximately resulted in
6  injuries, damages and permanent disability to the
7  claimants and others similarly situated.
8      Do you see that?
9   A   Yes.
10  Q   Were you aware of Mr. Bojko's opinions
11  related to the activities of Dimensions Health
12  Corporation?
13  A   No.
14      MR. ZAJDEL:  Objection: asked and
15  answered.
16  BY MR. SHAFFER:
17  Q   Okay.  Look at the second paragraph of
18  this letter.  Mr. Bojko states, It is my opinion
19  the defendants, Dimensions Health Corporation,
20  breached the applicable standards of
21  administrative care by negligently failing to use
22  required and reasonable care to investigate,
23  credential, grant privileges, monitor and
24  supervise their medical personnel, including but
25  not limited to, Akoda and to discover, stop and

Page 129

1  report any professional misconduct of which they
2  should have known.
3        Do you agree with Mr. Bojko?
4    A    Yes.
5    Q    Okay.  Next sentence he writes, As a
6  direct and proximate result of the defendants'
7  continuing negligence, the claimants, and others
8  similarly situated, suffered physical pain,
9  emotional anguish, and damages as well as personal
10  disability.
11        Do you agree with that?
12    A    Yes.
13    Q    Is that a yes?
14    A    Yes.
15    Q    Thank you.
16        And then he writes, Had the defendants
17  complied with the applicable standards of
18  administrative care the claimants, and others
19  similarly situated, would not have suffered their
20  injuries, damages and permanent disability.
21        Do you agree with that?
22        MR. ZAJDEL:  Objection: calls for a
23  legal conclusion.
24        You can answer.
25        THE WITNESS:  Yes.

Page 130

1        BY MR. SHAFFER:
2    Q    Okay.  Do you know who hired Dr. Akoda
3  to work at Prince George's?
4    A    No.
5    Q    I just want to ask a question to make
6  sure that we're on the same page.  When we talked
7  on Thursday, I think you told me that you did not
8  have any information about ECFMG except what you
9  may have been told by your lawyers; correct?
10    A    Correct.
11    Q    Okay.  And is it fair for me to then
12  assume that if this matter were to go to a trial,
13  that you would not come to trial and expect to
14  testify about ECFMG; is that fair?
15    A    Could you repeat your question?  I'm
16  sorry.
17    Q    Sure.
18        You don't know anything about ECFMG
19  today other than what your lawyers told you;
20  right?
21    A    Correct.
22    Q    You don't have any firsthand knowledge,
23  firsthand interactions, never spoke to anybody at
24  ECFMG, never went to their Web site, never looked
25  at any of their materials; correct?

Page 131

1    A    Correct.
2    Q    Okay.  And my question is, if you come
3  to trial in this matter, will you agree that
4  because you don't have that information and
5  anything your lawyers told you isn't something you
6  know personally, that you're not going to come to
7  trial and testify about things regarding ECFMG?
8        MR. ZAJDEL:  Objection.  That's a
9  decision that's going to be made by her attorneys,
10  so I -- don't answer that question.  I instruct
11  the witness not to answer that question.
12        MR. SHAFFER:  On what grounds?
13        MR. ZAJDEL:  You're asking her about a
14  decision that's to be made between her and her
15  counsel.  You're going to -- you -- you've
16  propounded discovery.  I'm sure we've listed who
17  our witnesses are, or whatever the deadline date
18  is for discovery closing we'll list who the
19  witnesses are, and if her name is not there, she
20  won't be testifying at trial.  If her name is
21  there, she'll be testifying at trial.
22        MR. SHAFFER:  And my question was a
23  little -- it was a little more specific.
24        BY MR. SHAFFER:
25    Q    I understand you may come testify at

Page 132

1  trial.  What I don't want to have happen is
2  there's a situation where you come and you've
3  looked at a whole bunch of documents and materials
4  that you didn't look at before you came in here
5  today.
6        MR. SHAFFER:  So that's my question.
7  If the answer is the same, we'll take it up at the
8  appropriate time.
9        MR. ZAJDEL:  Well, I'm still going to
10  object to that question because I can't confirm or
11  deny what Ms. Riggins will see or not see before
12  the trial in preparing for a trial.
13        But if what you're trying to find out
14  is is she going to testify to her personal
15  knowledge about ECFMG differently than what she
16  testified to today, then I -- I believe that
17  answer is not going to change.  Her knowledge as
18  of today was her knowledge as of today.
19        MR. SHAFFER:  Right.
20        BY MR. SHAFFER:
21    Q    Again, in the interest of trying to
22  move this along, take a look at Riggins 11 which
23  has already been marked this morning.
24        And these are Plaintiff Jasmine Riggins
25  Responses to Defendants' Requests for Admissions

Jasmine Riggins

Page 133

1  that you served on the defendants in the
2  Dimensions Health Care Corporation case in
3  Maryland, and I think Mr. Klayman asked you a
4  question or two about this?
5      A    Yes.
6      Q    And my question is in responding to
7  these requests for admissions, were you trying to
8  be as truthful and as accurate as you could be in
9  answering the questions that were asked?
10     A    Yes.
11     Q    And as you sit here today, do you
12 believe that the answers that you gave in response
13 to these requests for admissions back in the
14 Dimensions Health Care case are still true and
15 accurate to the best of your ability?
16     A    Yes.
17     Q    You don't want to change any of these
18 answers today based on the dismissal of the
19 Dimensions Health Care case; right?
20     A    No.
21     Q    Okay.
22          MR. SHAFFER:  Let's go off the record
23 for a minute.
24          THE VIDEOGRAPHER:  Off the record at
25 12:06.

Page 134

1          (Recess -- 12:06 p.m.)
2          (After recess -- 12:14 p.m.)
3          THE VIDEOGRAPHER:  We are back on the
4  record at 12:14.
5          BY MR. SHAFFER:
6      Q    Ms. Riggins, we're almost done here.  I
7  have a few more questions for you.  I want to make
8  sure I cover a couple of things that we started to
9  talk about on Thursday and didn't get to finish.
10         I think we talked a little bit about
11 the different doctors that you have seen in
12 connection with your three children.  There were
13 three different doctors that you saw, one for each
14 birth; correct?
15     A    Correct.
16     Q    And you had a C-section in connection
17 with each of them; correct?
18     A    Correct.
19     Q    And I think we saw in the medical
20 record that was prepared after your C-section
21 involving Messiah reporting the existence of
22 significant scarring at that time.
23         Do you recall that?
24     A    Correct.
25     Q    And I think we talked about how that

Page 135

1  was something you were not aware of prior to
2  Thursday; correct?
3      A    Correct.
4      Q    Prior to Thursday, what you had been
5  told or assumed was that that scarring had
6  occurred during the second C-section because it
7  was noted in your discussions with your third
8  doctor; correct?
9      A    Correct.
10     Q    Okay.  I think you also mentioned
11 briefly on Thursday that following the birth of
12 Messiah -- and it was a good birth; right?  He was
13 born healthy; right?
14     A    Correct.
15     Q    -- that you have had some pain
16 resulting after the birth; is that correct?
17     A    Correct.
18     Q    What -- what exactly were you
19 describing there?  What was the condition that you
20 were describing?
21     A    The abdominal pains in my stomach.
22     Q    And do you think that that was the
23 result of having had the C-section?
24     A    Yes.
25     Q    Okay.  And have you had pain following

Page 136

1  each of the C-sections that you've had in your
2  abdominal area?
3      A    No, not as bad, no.
4      Q    Okay.  It might not have been as bad,
5  but is it fair to say that C-section is a major
6  surgery in your abdominal area?
7      A    Correct, but I was --
8      Q    Okay.  Did you have abdominal pain
9  after the first C-section?
10     A    Slight.
11     Q    And if you were experiencing pain as a
12 result of the C-section, that's something that you
13 would have reported to your doctors; correct?
14     A    I'm sorry?
15     Q    If you were experiencing pain --
16 abdominal pain following the C-sections, that's
17 something you would have reported to your doctors?
18     A    Correct.
19     Q    Okay.  I saw somewhere in -- in the
20 documents we've received reference to Charter
21 Health Clinic.
22         Do you know who that is?
23     A    Yes.
24     Q    Who is that?
25     A    It's the office -- doctor's office I

Page 137

1  used to go to.
2      Q    Okay.  When did you go there?
3      A    Years ago.
4      Q    Okay.  What kind of doctor's office?
5      A    The same as Unity.  It was actually
6  Charter before it was Unity.
7      Q    Okay.  So it was your general
8  practitioner physician?
9      A    Correct.
10     Q    Okay.  For what reasons would you go to
11 Charter Health Clinic?
12     A    Regular checkups, if I was feeling ill.
13     Q    When was the last time you were there?
14     A    I don't recall.
15     Q    Do you know whether they still have any
16 medical records from you?
17     A    I do not know that.
18     Q    Okay.  And I apologize.  I know you
19 went over this, I think, with Mr. Klayman.  But
20 when we talked on Thursday, you had mentioned some
21 communications with Monique Russell a month or so
22 ago, and we talked about and made a request at the
23 deposition that you bring those with you today.
24          And you have not done that; correct?
25     A    Correct.

Page 138

1      Q    And you have not looked for those;
2  correct?
3      A    Correct.
4      Q    Why not?
5      A    I've had other things going on,
6  unfortunately.
7      Q    Is that something that you are still
8  willing to collect and provide to your attorneys
9  to provide to us?
10     A    Yes.
11     Q    Okay.  And just so I'm clear, the
12 things that you think Dr. Akoda did that were
13 wrong are what?
14     A    Performing on women, doing C-sections,
15 looking at women's private parts, violating them,
16 touching them, not being honest with them.
17     Q    And what is it that you think ECFMG
18 should have done?
19     A    Paid attention to his credentials and
20 actually paid attention to him being interviewed
21 under two different names.  Just be more careful
22 about their job, pretty much.  Be more careful
23 about who they certify.
24     Q    And do you know whether or not they
25 identified instances where Dr. Akoda had used

Page 139

1  multiple names?
2      A    I'm sorry?
3      Q    Are you aware of whether or not ECFMG
4  actually identified situations where Dr. Akoda had
5  used different names?
6      A    Could you rephrase your question?  I'm
7  sorry.
8          MR. SHAFFER:  Can you read it back?
9          (The Record was read as requested.)
10         THE WITNESS:  I'm not aware.
11         MR. ZAJDEL:  I'm sorry.  I didn't hear
12 that.
13         MR. SHAFFER:  She said, I think, I'm
14 not aware.
15         THE WITNESS:  I -- no.  Sorry.
16         MR. ZAJDEL:  Can -- are you answering
17 the question no, you're not aware?  I want to make
18 sure --
19         MR. SHAFFER:  Yeah.
20         MR. ZAJDEL:  -- I understand.  I'm not
21 trying to be in the way.
22         THE WITNESS:  Right.
23         So you're asking if I'm aware -- I'm
24 sorry.
25         MR. SHAFFER:  That's all right.

Page 140

1  Let's --
2          THE WITNESS:  I'm --
3          MR. SHAFFER:  -- try --
4          THE WITNESS:  -- having --
5          MR. SHAFFER:  -- again.
6          THE WITNESS:  -- a hard time
7  comprehending this question.
8          MR. ZAJDEL:  So you haven't answered
9  the question yet?
10         THE WITNESS:  No.
11         MR. ZAJDEL:  Okay.  I didn't know if
12 she was answering your question or.
13         MR. SHAFFER:  I'm not sure either.  So
14 we're going to have --
15         THE WITNESS:  Sorry.
16         MR. SHAFFER:  -- the court reporter --
17 that's okay.  We're going to have the court
18 reporter read it back and see if -- see if we can
19 get there.
20         (The Record was read as requested.)
21         THE WITNESS:  No.  I'm sorry.  I'm
22 having a hard time comprehending that question.
23         BY MR. SHAFFER:
24     Q    Well, let me -- let me ask it again
25 because I don't want there to be any confusion

Jasmine Riggins

Page 141

1  about it.
2          You said ECFMG should be more careful;
3  right?
4      A    Uh-huh.
5      Q    Those were your words?
6      A    Yes.
7      Q    All right.  And my question, you said
8  sort of -- strike that.
9          And I guess my question was, do you
10  know or would it make a difference in your mind if
11  you were to learn that ECFMG actually did find
12  situations where Dr. Akoda had tried to use
13  different names?
14      A    Would it make a difference in my mind?
15      I'm sorry.
16      Q    You don't know?
17      A    No.
18      Q    Would it make a difference in your mind
19  if you were to learn that ECFMG had cooperated
20  with the U.S. Attorney's Office and helped them
21  build a case against Dr. Akoda?
22      A    Possibly, you know.
23      Q    Okay.  And tell me again what you think
24  Dimensions Health Care should have done to prevent
25  Dr. Akoda from seeing you?

Page 142

1          MR. ZAJDEL:  Objection: asked and
2  answered.
3          You can answer.
4          THE WITNESS:  Okay.  Just be more
5  careful about who they allow to practice in their
6  offices, hospitals; pay more attention; be more --
7  take more pride in what they do, you know what I
8  mean, like -- just being on top -- being more
9  careful.
10          MR. SHAFFER:  Okay.  I don't -- I don't
11  have any more questions at this time.  We reserve
12  the right to -- to requestion Ms. Riggins in light
13  of additional documents that might be produced or
14  a change in her position regarding the information
15  that she has not been able to speak to from
16  personal knowledge here today, whether regarding
17  ECFMG or something else.
18          But subject to those comments, we'll
19  adjourn the deposition.
20          MR. ZAJDEL:  Okay.  I don't have any
21  questions.
22          THE VIDEOGRAPHER:  If that is
23  everything, we are off the record on
24  September 16th, 2019, at 12:26.
25

Page 143

1          (Signature having not been waived, the
2  Videotaped Deposition of JASMINE RIGGINS ended at
3  12:26 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 144

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2      I, Dana C. Ryan, Registered Professional
3  Reporter, Certified Realtime Reporter, the officer
4  before whom the foregoing proceedings were taken
5  do hereby certify that the foregoing transcript is
6  a true and correct record to the best of my
7  ability of the proceedings; that said proceedings
8  were taken by me stenographically and thereafter
9  reduced to typewriting under my supervision; and
10  that I am neither counsel for, related to, nor
11  employed by any of the parties to this case and
12  have no interest, financial or otherwise, in its
13  outcome.
14      IN WITNESS WHEREOF, I have hereunto set
15  my hand and affixed my notarial seal this 26th day
16  of September 2019.
17  My Commission expires:
18  July 15, 2020
19
20
21
22  _____
23  NOTARY PUBLIC IN AND FOR THE
24  DISTRICT OF COLUMBIA
25

Jasmine Riggins

Page 145

```
1         ACKNOWLEDGMENT OF DEPONENT
2         I, Jasmine Riggins, do hereby
3  acknowledge that I have read and examined the
4  foregoing testimony, and the same is a true,
5  correct and complete transcription of the
6  testimony given by me and any corrections appear
7  on the attached Errata sheet signed by me.
8
9
10
11 _____  _____
12 (DATE)              (SIGNATURE)
13
14
15        CERTIFICATE OF NOTARY PUBLIC
16 Sworn and subscribed to before me this
17 _____ day of _____, _____
18
19
20 _____  _____
21 NOTARY PUBLIC         MY COMMISSION EXPIRES
22
23
24
25
```