EXHIBIT 36

Page 1

1    IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY

2   MONIQUE RUSSELL, et al.  :

3      Plaintiffs          : Case No.:

4          Vs.             : CAL17-22761

5   DIMENSIONS HEALTH CORP., : CAL17-37091

6   et al.                 : CAL18-07863

7      Defendants          :

8              --------------------

9

10        Deposition of ELSA MIGUELINA POWELL, was

11   taken via Videotape on Wednesday, March 27, 2019,

12   commencing at 9:56 a.m., at Schochor, Federico &

13   Staton, P.A., The Paulton, 1211 St. Paul Street,

14   Baltimore, Maryland, before MICHELE D. LAMBIE,

15   Notary Public.

16              --------------------

17

18

19

20

21   Reported By:  Michele D. Lambie, CSR-RPR

Elsa M. Powell                                                    March 27, 2019

Page 2

1 APPEARANCES:

2      ON BEHALF OF THE PLAINTIFFS:

3 Schochor, Federico & Staton, P.A.

4      TARA CLARY, ESQUIRE

5      tclary@sfspa.com

6      The Paulton

7      1211 St. Paul Street

8      Baltimore, Maryland 21202

9      (410) 234-1000

10

11      ON BEHALF OF THE DEFENDANTS:

12 Pessin Katz Law, P.A.

13      BRIAN M. CATHELL, ESQUIRE

14      bcathell@pklaw.com

15      901 Dulaney Valley Road, Suite 400

16      Towson, Maryland 21204

17      (410) 938-8800

18

19 ALSO PRESENT:  Curtis Roginski - Videographer

20

21

Page 3

1      EXAMINATION INDEX

2

WITNESS:  ELSA MIGUELINA POWELL     PAGE

3 DIRECT BY MR. CATHELL      5

4

5      EXHIBIT INDEX

6      (Attached to Transcript.)

7           MARKED

ELSA MIGUELINA POWELL

8 Exhibit 1 Answers to Interrogatories    12

9 Exhibit 2 Consent Form      56

10 Exhibit 3 Consent Form      57

11 Exhibit 4 Consent Form      58

12 Exhibit 5 Birth Band      64

13 Exhibit 6 Consent Form      67

14

15

16

17

18

19

20

21

Page 4

1      P R O C E E D I N G S

2      THE VIDEOGRAPHER:  Good morning.  We are

3 going on the record at 9:56 a.m. on March 27th,

4 2019.  This media unit one of the video-recorded

5 deposition of Elsa Powell taken in the matter of

6 Monique Russell, et al. v Dimensions Health Corp,

7 et al. filed in the Circuit Court for Prince

8 George's County, Maryland.  The Case Number is

9 CAL17-22761, and Case Number CAL17-37091, and Case

10 Number CAL18-07863.

11      This deposition is being held at

12 Schochor, Federico and Staton located at 1211

13 St. Paul Street, Baltimore, Maryland 21202.

14      My name is Curtis Roginski, and I'm the

15 videographer.  The court reporter is Michele

16 Lambie.

17      Will counsel please identify yourselves

18 and state whom you represent?

19      MS. CLARY:  Tara Clary for the

20 Plaintiffs.

21      MR. CATHELL:  Brian Cathell on behalf of

Page 5

1 the Defendants.

2      THE VIDEOGRAPHER:  Will the court

3 reporter please swear in the witness.

4      ELSA MIGUELINA POWELL

5 the Deponent, called for examination by the

6 Defendants, being first duly sworn to tell the

7 truth, the whole truth, and nothing but the truth,

8 testified as follows:

9      DIRECT EXAMINATION

10      BY MR. CATHELL:

11    Q.  Good morning, Ms. Powell.  I introduced

12 myself informally off the record.  Have you had

13 your deposition taken before?

14    A.  No.

15    Q.  Okay.  So, just a few rules before we get

16 started, okay?  The first rule or -- the first rule

17 is if you need a break at any time, you're allowed

18 to do so.  You can take a break for any reason or

19 no reason.  Just let one of us know, and we may

20 take a break as well.

21      So, if -- if you need to go to the

Elsa M. Powell                                    March 27, 2019

1 bathroom or get a drink or something, that's
2 certainly okay, all right?
3    A. (Nodding head yes.)
4    Q. We're not holding you hostage, fair?
5    A. Fair.
6    Q. Okay. She is taking down everything that
7 we say. Because of that, your responses need to be
8 verbal; yes, no, I don't know. But they can't be
9 head nods or um-hums or huh-uhs because she has
10 difficulty typing that down, is that fair?
11    A. Fair.
12    Q. Okay. If -- if I ask you a question
13 today that you don't understand, which is entirely
14 possible, please let me know, and I'm happy to
15 rephrase it as many times as I need to, okay?
16    A. Yes, sir.
17    Q. If we're talking about a topic that
18 you're confused about, which is likely my fault,
19 just let me know, and I'm happy to try to clarify
20 my questions and to drill down on what it is I'm
21 asking for, okay?

1    A. Yes, sir.
2    Q. And, lastly, I think we're going to talk
3 about some personal and -- and difficult topics
4 today, and it is not my intention to embarrass you.
5 This is our opportunity to explore the topic of
6 class certification, and so there are certain areas
7 that I need to explore with you here today. So,
8 I -- I don't want you to embarrass you, and I
9 certainly don't want to upset you, okay?
10    A. I understand.
11    Q. Okay. What is your name?
12    A. Elsa Powell.
13    Q. And what is your date of birth,
14 Ms. Powell?
15    A. April 14, 1987.
16    Q. And what is your current address?
17    A. 12705 Livo Place, Upper Marlboro,
18 Maryland 20772.
19    Q. Okay. And have you gone by any other
20 names or aliases?
21    A. My maiden name, which is Delvillar-Mejia.

1    Q. And what did you assume the new name,
2 take the new name of Powell?
3    A. January 13, 2015.
4    Q. And are you currently married?
5    A. Yes.
6    Q. And I assume you've been married
7 continuously since January 13th, 2015?
8    A. Correct.
9    Q. And was that your first marriage?
10    A. Yes.
11    Q. And what's the name of your spouse?
12    A. Gregory Lamont Powell, III.
13    Q. And how many children do you have?
14    A. Five.
15    Q. Okay. Can you tell me their names and
16 ages starting with the oldest?
17    A. Lucy, she's 13. Nestor, he's 12.
18 Josiah, he's eight. Jaiden, he's four, and
19 Tatiana, she's two.
20    Q. Who lives in your home with you now?
21    A. Myself, my husband, and my children.

1    Q. All five children?
2    A. Yes.
3    Q. And which children do you share in common
4 with Mr. Powell?
5    A. Jaiden and Tatiana.
6    Q. And do Lucy, Nestor, and Josiah share a
7 father?
8    A. Lucy and Nestor do.
9    Q. Okay. What was his name or is his name?
10    A. Nestor Mercedes.
11    Q. Okay. And what is the name of the father
12 of Josiah?
13    A. Waldemar Rodriguez.
14    Q. Can you spell the first part for me?
15    A. W-A-L-D-E-M-A-R.
16    Q. Rodriguez?
17    A. Yes.
18    Q. Okay. And who was living with you in
19 September of 2014 when you -- when you were in
20 contact with Dr. Akoda or when -- I assume that's
21 when you gave birth to Jaiden, correct?

3 (Pages 6 - 9)

Elsa M. Powell                                           March 27, 2019

Page 10

1    A.  That's correct.

2    Q.  Okay.  Who was living with you at that
3 time?

4    A.  My three oldest children.

5    Q.  And Mr. Powell?

6    A.  No.

7    Q.  And when did Mr. Powell first start
8 living with you?

9    A.  January 2015.

10   Q.  So, after the marriage?

11   A.  Yes.

12   Q.  I'd like to talk about your educational
13 background.  Do you hold any degrees or
14 certifications?

15   A.  Certifications, yes.

16   Q.  Okay.  And which certifications do you
17 hold?

18   A.  I'm certified in the Spanish language.  I
19 also hold a Maryland guard card.

20   Q.  Is that National Guard?

21   A.  No.  It's a security guard card.  They

Page 11

1 call it certification card.  A CPR certification
2 card as well.

3    Q.  And a certification in Spanish language,
4 I -- I won't go into that too much, but that's a
5 certification that you're proficient in --

6    A.  In the Spanish language.

7    Q.  -- speaking or teaching Spanish, correct?

8    A.  Correct.

9    Q.  Are you employed currently?

10   A.  Yes.

11   Q.  So, for the sake of brevity, I -- you
12 participate -- I assume you participated in -- in
13 drafting Answers to Interrogatories, and in the
14 interrogatories, you include your employment
15 positions.  So, I will show you what I've marked
16 as -- what I'm going to mark.  Instead of us going
17 through all of them, I'm just going to show you the
18 interrogatories, and then ask you questions about
19 each, is that fair?

20   A.  Um-hum.  Yes, sir.

21      (Whereupon, Powell Deposition Exhibit 1,

Page 12

1 Answers to Interrogatories, marked for
2 identification.)

3 BY MR. CATHELL:

4    Q.  And if you'll turn to the second to the
5 last page I believe -- the third to the last page.

6       MS. CLARY:  Are you looking for the
7 signature line?

8       MR. CATHELL:  Yes.

9       MS. CLARY:  Do you mind if I grab it for
10 you?

11     (Document tendered.)

12      MS. CLARY:  I'm not sure I'm doing any
13 better here.  There you go.

14 BY MR. CATHELL:

15   Q.  In the top-left portion of the document,
16 is that your signature, Ms. Powell?

17   A.  That's correct.

18   Q.  Okay.  And did you participate or provide
19 information for your attorneys to draft the Answers
20 to Interrogatories?

21   A.  That's correct.

Page 13

1    Q.  Okay.  If you'll turn to page 12,
2 specifically answer to Interrogatory Number 16,
3 your employment history is listed?

4    A.  Page 12?

5    Q.  Yes.  If you'll just review that for me
6 briefly.  Is that employment history still accurate
7 as we sit here today?

8    A.  No.  There's been some change.

9    Q.  Okay.  And what are those changes?

10   A.  MVM, it's partner with Paragon Systems,
11 and we're contractors for NIH.

12   Q.  So, the entity title has changed, but
13 you're still employed at the same --

14   A.  Yes.

15   Q.  -- in the same position, correct?

16   A.  Correct.

17   Q.  And you started with MVM in June of 2018,
18 correct?

19   A.  Correct.

20   Q.  And what are your responsibilities at
21 MVM?

4 (Pages 10 - 13)

Elsa M. Powell                                      March 27, 2019

Page 14

1    A.   Administrative.

2    Q.   Okay.  And are you in a particular

3  department, or are you just administrative?

4    A.   Building 31 at NIH.

5    Q.   And what are your daily roles and

6  responsibilities?

7    A.   Answer the phone, do reports, cover

8  shifts.

9    Q.   Okay.

10    A.   It's a lot.

11    Q.   All right.

12    A.   It's --

13    A.   I'm sure it is.  Are you full time?

14    A.   Yes.

15    Q.   And is that five days a week?

16    A.   Yes.

17    Q.   Okay.  And prior to MVM, you were with

18  Blueline Security Services, correct?

19    A.   That's correct.

20    Q.   And what were the circumstances under

21  which you left Blueline Ser--- Services?

Page 15

1    A.   MVM offered a better opportunity for me.

2    Q.   And what did you do between April of

3  18 -- 2018 and June of 2018?

4    A.   I was taking care of my two-year-old

5  daughter, who was born with a kidney issue.

6    Q.   Okay.  And would that have been Tatiana?

7    A.   Yes.

8    Q.   Okay.  Prior to Blueline Security

9  Services, you were a front-desk agent at VMG

10  Resources, correct?

11    A.   That's correct.

12    Q.   And you were there from February 2014 to

13  July 2014?

14    A.   That's correct.

15    Q.   What employment outside of the

16  home -- understanding that employment inside of the

17  home is much more rigorous than employment outside

18  of the home.  What employment, if any, did you hold

19  outside of the home between July 2014 and November

20  2017?

21    A.   I was not working outside of the home at

Page 16

1  the time.

2    Q.   And what were the circumstances under

3  which you left VMG Resources in July 2014?

4    A.   My other three children needed full-time

5  care that I wasn't provided with my schedule at VMG

6  Resources.

7    Q.   And prior to VMG Resources, you were with

8  Little Imaginations Development Center.  Is that a

9  child-care facility?

10    A.   Yes.

11    Q.   Okay.  And you were there from April 2013

12  to June 2013?

13    A.   Correct.

14    Q.   And what were the circumstances under

15  which you left Little Imaginations in June of 2013?

16    A.   The pay was not what I expected.

17    Q.   And did you work outside of the home

18  between June 2013 and February of 2014?

19    A.   No, I did not.

20    Q.   And I assume that was also to care for

21  your children at that time?

Page 17

1    A.   Yes.

2    Q.   I notice in your Answers to

3  Interrogatories, you listed George Washington

4  Hospital special police officer.  Are you still

5  credentialed as a police officer?

6    A.   No.  I'm credentialed as a security

7  guard.

8    Q.   Okay.  Were you credentialed as a special

9  police officer?

10    A.   Yes, I was.

11    Q.   And it's my understanding that that is a

12  certification that you have to maintain as the

13  years pass; is that correct?

14    A.   Correct.

15    Q.   And I assume you just, for whatever

16  reason, didn't maintain that certification?

17    A.   That's correct.

18    Q.   So, this is a question that we're -- that

19  I have to ask everybody, so it's not particular to

20  you.

21           Have you since your 18th birthday, while

5 (Pages 14 - 17)

Elsa M. Powell                                    March 27, 2019

Page 18

1  you were represented by counsel, ever pleaded
2  guilty to or have been convicted of any crime,
3  other than a minor traffic violation?
4       MS. CLARY:  Objection, but you can
5  answer.
6       THE WITNESS:  Never.
7  BY MR. CATHELL:
8    Q.  I didn't -- I didn't suspect so.  And
9  you've never had your deposition taken before,
10 correct?
11   A.  Correct.
12   Q.  Have you ever been a Plaintiff or a
13 defendant in any lawsuit?
14   A.  No.
15   Q.  Have you ever made a claim for injury
16 against any individual, business, or other entity?
17   A.  Yes.
18   Q.  Okay.  And tell me about that claim.
19   A.  CVS about nine years ago gave me the
20 wrong medication.
21   Q.  And was that in Baltimore?

Page 19

1    A.  No.
2    Q.  Or in Maryland?
3    A.  Maryland, yes.
4    Q.  Okay.  And what type of claim did
5  you -- did you make?
6    A.  I do not recall.  I -- my lawyer handled
7  everything.  I know there was a settlement for
8  10,000.
9    Q.  Okay.  Do you know if a lawsuit was ever
10 filed on your behalf?
11   A.  I do not recall.
12   Q.  And the medication error, did it cause
13 you injury?
14   A.  Yes.
15   Q.  And tell me about the injury it caused
16 you.
17   A.  It caused me to bleed out.
18   Q.  Can you describe that for me?
19   A.  I was in the process of having a
20 miscarriage, and CVS gave me aspirin, which led for
21 me to bleed out.

Page 20

1    Q.  When -- when you say you bled out, did
2  you -- were you hospitalized as a result of
3  the -- the -- taking the aspirin?
4    A.  Not hospitalized.  They let me go the
5  same day, but it kind of pushed the miscarriage.
6    Q.  I'm sorry.  Did you have any lasting or
7  permanent injury as a result of the medication
8  error?
9    A.  No.
10   Q.  Did you make a claim for that same
11 scenario for any mental health damages, --
12   A.  No.
13   Q.  -- such as depression or anxiety?
14   A.  No.
15   Q.  Is that the only claim you've made?
16 Other than the current lawsuit, is that the only
17 claim you've made against a healthcare provider?
18   A.  Yes.
19   Q.  Have you ever made a Workers'
20 Compensation claim?
21   A.  No.

Page 21

1    Q.  Have you ever suffered physical,
2  emotional, or sexual abuse of any kind by any
3  person at any time in your life?
4    A.  No.
5    Q.  Have you ever been injured physically,
6  mentally, or emotionally in any way by any other
7  person at any time?
8    A.  No.
9    Q.  Have you ever been hospitalized, other
10 than to deliver one of your children?
11   A.  No.
12   Q.  I know you have five children.
13 How -- how many times have you been pregnant?
14   A.  Six.
15   Q.  Have you ever been diagnosed with a
16 condition that affects or limits your activities in
17 any way?
18   A.  No.
19   Q.  And that would include a mental or a
20 physical condition?
21   A.  No.

6 (Pages 18 - 21)

Elsa M. Powell                                                    March 27, 2019

Page 22

1    Q.   Have you ever been diagnosed with a
2  mental illness of any kind?
3    A.   No.
4    Q.   Have you taken any medications at any
5  time in your life for a mental illness, which would
6  also include depression or anxiety?
7    A.   No.
8    Q.   Have you ever been diagnosed with
9  posttraumatic stress disorder?
10    A.   No.
11    Q.   Talking about your prior medical history,
12  who is -- starting with your current primary care
13  provider.  Do you have a current primary care
14  provider?
15    A.   Yes, I do.
16    Q.   And what is his or her name?
17    A.   Emily Lo, L-O.
18    Q.   And where is Dr. Lo located?
19    A.   Kaiser Permanente', Camp Springs,
20  Maryland.
21    Q.   And how long have you been a patient of

Page 23

1  Dr. Lo, if you know?
2    A.   Three to four years.
3    Q.   And how often do you see Dr. Lo?
4    A.   Not often.
5    Q.   Do you see her once a year, once every
6  six months, once every two years?
7    A.   Unless I'm really sick and I can't take
8  it any more, then I'll go see her.  Other than
9  that, I don't see her.
10    Q.   When is the last time you saw Dr. Lo, if
11  you can recall?
12    A.   The last time I saw her was some time in
13  February.
14    Q.   Of 2019?
15    A.   Yes.
16    Q.   Okay.  And what was that for?
17    A.   I had a terrible cough, so I went to see
18  her.
19    Q.   And did she prescribe you medication or
20  offer other treatment for the cough?
21    A.   Yeah.  She said I had an upper-body

Page 24

1  respiratory infection, so she prescribed some cough
2  pills and an inhaler.
3    Q.   Do you currently have an OB/GYN?
4    A.   Yes, I do.
5    Q.   And who is that?  What is that person's
6  name?
7    A.   I do not know his name.
8    Q.   And the doctor is a male?
9    A.   Yes.
10    Q.   Do you know where his office is located?
11    A.   Kaiser Permanente', Marlton.
12    Q.   Are you saying --
13    A.   Marlton.
14    Q.   -- Marlton?
15    A.   Yes.  It's -- it's in Marlton,
16  and --
17    Q.   Marlton as -- as in the city of Marlton?
18    A.   In Maryland.  Well, it's considered
19  Temple Hills as well.
20    Q.   Okay.
21        MS. CLARY:  M-A-R-L-T-O-N.

Page 25

1        MR. CATHELL:  Thank you.  I had not heard
2  of that.
3        MS. CLARY:  I had not either, but I have
4  an IPad in front of me, so I looked it up.
5  BY MR. CATHELL:
6    Q.   Do you have any other identifying
7  information that I could use to try to find
8  this -- this doctor?  It's a male at Kaiser
9  Perm -- Permanente' in Marlton.  Do you know, is he
10  part of a practice group?
11    A.   I just know that he's with Kaiser.
12    Q.   Okay.  Is he -- do you know, is he
13  Caucasian or African American?
14    A.   I haven't -- I haven't -- I haven't seen
15  him yet.  They told me to make an appointment, and
16  I haven't -- I haven't gone and seen him.
17    Q.   So, you haven't actually received
18  treatment from this doctor, correct?
19    A.   No.
20    Q.   Prior to deciding that you would see
21  the -- this -- the male doctor at Kaiser

7 (Pages 22 - 25)

Elsa M. Powell                                    March 27, 2019

Page 26

1 Permanente', did you have an OB/GYN?

2     A.   Yes, when I was pregnant with my youngest

3 daughter.

4     Q.   And who was that doctor?

5     A.   I had Dr. Kingsley.  The same location.

6     Q.   Kingsley?

7     A.   Yes, and it was -- it was another female

8 doctor.  I can't remember her name.

9     Q.   And how often did you say or

10 what -- strike that.

11        What years did you see Dr. Kingsley?

12     A.   I saw Dr. Kingsley from 2015 till 2016.

13     Q.   So, from 2016 until making arrangements

14 with the unidentified male physician at Kaiser

15 Permanente', did you see any other OB/GYNs?

16     A.   No.

17     Q.   Would your primary care provider during

18 that time perform yearly wellness checks, or did

19 you just not get the yearly wellness checks?

20     A.   I did not get them.

21     Q.   Prior to Dr. Kingsley, who was your

Page 27

1 OB/GYN?

2     A.   Prior to Dr. Kingsley?

3     Q.   Yes.

4     A.   Dr. Akoda.

5     Q.   And we're going to explore that in detail

6 in a couple of minutes, but what years did you see

7 Dr. Akoda, if you recall?

8     A.   I saw Dr. Akoda from 2014 to 2015.

9     Q.   And prior to Dr. Akoda in -- do you

10 remember the specific month, by chance, that you

11 first came into contact with Dr. Akoda?

12     A.   If I'm not mistaken, it was around April

13 or May of 2014.

14     Q.   And prior to Dr. Akoda, who was your

15 OB/GYN?

16     A.   I do not remember her name.

17     Q.   Had that OB/GYN -- you said her, so I

18 assume it was a female, correct?

19     A.   It was a female, yes.

20     Q.   Had that OB/GYN been the OB/GYN who cared

21 for you during your pregnancies and delivered your

Page 28

1 first three children?

2     A.   No.  She was my OB/GYN with Jaiden, my

3 four-year-old.  I started with her.  Her

4 practice -- at her office, you only could go a

5 certain amount of months, and then she would refer

6 you.

7     Q.   And I assume she referred you in 2014 to

8 Dr. Akoda, correct?

9     A.   Not him, per se.

10     Q.   Fair enough.  To Dr. -- to Dr. Chaudry's

11 practice, correct?

12     A.   Correct.

13     Q.   Who was the OB/GYN that -- if there -- if

14 there was one single doctor, who was the OB/GYN

15 that cared for you and delivered the first three

16 children, if you -- if there is one specific

17 person?

18     A.   It was in Virginia.  Arlington Hospital.

19 It's a prac- -- an office -- a doctor's office,

20 OB/GYN.  I do not remember his name.  It's so long

21 ago.

Page 29

1     Q.   Have you since your involvement with

2 Dr. Akoda seen any healthcare provider of any kind

3 for any issue you claim is related to your

4 involvement with Dr. Akoda?

5     A.   No.

6     Q.   What medications do you currently take?

7     A.   Ibuprofen.

8     Q.   So, you don't have any prescription

9 medications, is that fair?

10     A.   Besides the cough medicine,

11 that's -- that's it.

12     Q.   Okay.  Have you at any time had an OB/GYN

13 or primary care provider that we have not already

14 discussed?

15     A.   No.

16     Q.   So, Dr. Lo, who you began working with

17 three to four years ago, would have been your first

18 primary care provider?

19     A.   Yes.

20     Q.   What evidence do you have regarding

21 Dr. Akoda's background?

8 (Pages 26 - 29)

Elsa M. Powell                                   March 27, 2019

Page 30

1    A.   What evidence do I have?

2         MS. CLARY:  Let me --

3  BY MR. CATHELL:

4    Q.   If any.  If any.

5         MS. CLARY:  I'm just going to object to

6  the overbroad nature, but you can answer as best

7  you can.

8         THE WITNESS:  I don't -- I'm not

9  understanding the question.

10 BY MR. CATHELL:

11   Q.   Okay.  Do you have any evidence

12 regarding -- you yourself -- let me strike that.

13        These questions pertain only to you, not

14 what you've learned from your attorneys.  But just

15 I'm trying to explore what you personally have

16 either in your possession or your knowledge, is

17 that fair?

18   A.   That's fair.

19   Q.   Okay.  Do you have any evidence yourself

20 regarding Dr. Akoda's background?

21   A.   No.

Page 31

1    Q.   It's not a trick question.  I'm just -- I

2  want to make sure I cover everything.

3         Do you have any evidence regarding

4  whether Dr. Akoda was licensed to practice medicine

5  in Maryland?

6    A.   No.

7    Q.   Do you have any evidence regarding

8  whether Dr. Akoda was licensed to practice medicine

9  in Virginia?

10   A.   No.

11   Q.   What evidence do you have regarding

12 Dr. Akoda's training as a doctor?

13   A.   None.

14   Q.   Do you know where Dr. Akoda went to

15 medical school?

16   A.   No.

17   Q.   Do you know where Dr. Akoda did his

18 residency?

19   A.   No.

20   Q.   Do you know what a residency is?

21   A.   I'm assuming it's a medical school for

Page 32

1  doctors.

2    Q.   Do you know what goes into successfully

3  completing a medical residency?

4    A.   Years of training and hard dedication.

5    Q.   Do you know whether Dr. Akoda

6  successfully completed a medical residency?

7    A.   No.

8    Q.   Do you know if Dr. Akoda passed all

9  national examinations in order to complete his

10 residency?

11   A.   No.

12   Q.   Do you know whether Dr. Akoda passed or

13 failed any medical examinations?

14   A.   No.

15   Q.   Do you know whether Dr. Akoda was board

16 certified by the American Board of Obstetrics and

17 Gyn -- and Gynecology?

18   A.   No.

19   Q.   Do you know what is entailed with -- in

20 order for a physician to become board certified?

21   A.   No, I do not.

Page 33

1    Q.   Were you aware that Dr. Akoda took a

2  written board examination and passed?

3    A.   No, I do not.

4    Q.   Were you aware that Dr. Akoda took an

5  oral examination and passed?

6    A.   No.

7    Q.   What do you know about how Dr. Akoda

8  began using the name Akoda?

9    A.   Nothing.  I thought he was born with it.

10   Q.   Do you know when Dr. Akoda began using

11 the name Akoda?

12   A.   No.

13   Q.   Do you know why he began using the name

14 Akoda?

15   A.   No.

16   Q.   Do you know what ECFMG certification

17 stands for?

18   A.   Yes.

19   Q.   What is that?

20   A.   It's -- it's where they decide who's

21 qualified, which -- which foreign doctor is

9 (Pages 30 - 33)

Elsa M. Powell                                             March 27, 2019

Page 34

1 qualified to practice.

2    Q.   The acronym stands for Educational

3 Commission for Foreign Med- -- Medical Graduates?

4    A.   (Nodding head yes.)

5    Q.   Were you aware that to be certified a

6 foreign medical graduate takes an examination

7 administered by ECFMG?

8    A.   No.

9    Q.   Do you know whether Dr. Akoda took such

10 an examination?

11    A.   No.

12    Q.   Do you know how many times Dr. Akoda

13 successfully passed the ECFMG examinations?

14    A.   No.

15    Q.   Do you know under which names Dr. Akoda

16 took the ECFMG examinations?

17    A.   No.

18    Q.   Do you know whether Dr. Akoda was

19 certified by ECFMG?

20    A.   No.

21    Q.   Do you have any information regarding

Page 35

1 what occurred with Dr. Akoda's ECFMG

2 certifications?

3    A.   No.

4    Q.   Are you aware of a lawsuit pending in the

5 United States Federal District Court in

6 Philadelphia against ECFMG regarding their

7 certification of Dr. Akoda?

8    A.   Yes.

9    Q.   Okay.  What is your knowledge of that

10 lawsuit?

11    A.   What is my knowledge of that lawsuit?

12    Q.   I can rephrase.  Are you -- are you a

13 Plaintiff in that lawsuit?

14    A.   Yes.

15    Q.   And we're not -- I'm not going to get

16 into what you know as a result of conversations

17 with your attorneys, but I just want to explore

18 peripherally.

19       Are you represented by the law

20 firm -- law firm, Schochor, Federico and Staton, in

21 that lawsuit?

Page 36

1       MS. CLARY:  I'm going to object, and she

2 can certainly answer just yes or no.

3       MR. CATHELL:  Right.

4       THE WITNESS:  Yes.

5 BY MR. CATHELL:

6    Q.   And are you a -- to your knowledge, are

7 you a class Plaintiff in that lawsuit?

8    A.   Yes.

9    Q.   Have you been deposed in that lawsuit?

10    A.   I'm sorry?

11    Q.   I assume -- you told me earlier you

12 haven't sat for a deposition, but -- so I assume

13 you have not been deposed in that lawsuit

14 yet, --

15    A.   No.

16    Q.   -- correct?  Is what you know about

17 Dr. Akoda limited to what information your Counsel

18 has provided you?

19    A.   Yes.

20    Q.   Do you have any evidence outside of what

21 your Counsel has advised you about Dr. Akoda?

Page 37

1    A.   No.

2    Q.   How did you -- and, again, no discussions

3 with your attorneys.  How did you come to be a

4 client of the Schochor, Federico and Staton law

5 firm regarding this claim and the Philadelphia

6 claim?

7       MS. CLARY:  I'm going to object and

8 instruct her not to answer anything with respect to

9 not just discussions that we had, but contacts that

10 she had with our office.

11       In terms of any discussions that she may

12 have had with others not involved or people who are

13 not employed by our law firm who may have -- I

14 don't want to make a speaking objection.  I just

15 want her to be clear as to what she can talk about

16 and what I'm instructing her not to answer.

17       I don't have a problem, and you're -- I

18 want you to answer the question with respect to how

19 somebody told you about Dr. Akoda and how you

20 were -- how you got in touch with us, but once the

21 phone call or whatever that first contact was with

10 (Pages 34 - 37)

Elsa M. Powell                                                    March 27, 2019

Page 38

1  us, anything from that point forward, I'm going to
2  instruct you not to answer.
3       THE WITNESS:  Okay.
4       MR. CATHELL:  So, one second.  Note our
5  response from the prior depositions.
6  BY MR. CATHELL:
7       Q.  Let me ask you a more pointed question,
8  understanding Counsel's objection, which we needed
9  to get on the record.
10      What caused you to first reach out to the
11 Schochor, Federico and Staton law firm?
12      A.  Well, a friend of mine called me and told
13 me about the situation.  So, she gave me the
14 number.  She said, I need you to call this number.
15 So, I asked her why?  Whose number is this?  So,
16 she said, you just need to know that Dr. Akoda is
17 not a doctor.  Call this number.  So, that's when I
18 called the number.
19      Q.  Okay.  You can stop there based on
20 Counsel's objection.  Who was -- what's the name of
21 your friend that called you?

Page 39

1       THE WITNESS:  Am I allowed to say it?
2       MS. CLARY:  Yes.
3       THE WITNESS:  Latisa.
4  BY MR. CATHELL:
5       Q.  Is that Latisa Gaymon?
6       A.  Yes.
7       Q.  Are you aware that Ms. Gaymon is also a
8  Plaintiff in this lawsuit?
9       A.  Yes.
10      Q.  And when did Dr. -- Ms. Gaymon call you,
11 if you recall?
12      A.  Some time in late 2018.
13      Q.  Late 2018?
14      A.  Some time in 2018.  I can't really
15 remember the exact month.
16      Q.  And I know you told me that she said that
17 you needed to call a certain telephone number and
18 that she told you about the situation.  Can you be
19 more specific as to what she told you?
20      A.  She told me that Dr. Akoda wasn't a real
21 doctor, and I was confused, and I didn't know what

Page 40

1  she was talking about.  So, she said, if you don't
2  believe me, you can look it up.  That's when I
3  Googled it, and that's when I read everything that
4  the news had provided.
5       Q.  Do you know how Ms. Gaymon knew that you
6  had been a patient of Dr. Akoda's?
7       A.  We met at the patient's -- at the office.
8       Q.  Okay.  So, you met at the office in 2014
9  and remained friends, or at least acquaintances,
10 since --
11      A.  Yes.
12      Q.  -- that time?  And do you recall what you
13 saw when you Googled the allegations?  Was it a
14 specific website, a video, or advertisement?
15      A.  It was the news.  It was FOX, NBC.  They
16 had different links about how Dr. Akoda wasn't a
17 real doctor, and his name wasn't really Akoda.
18      Q.  How long between the time Ms. Gaymon
19 called you did you call the number that she gave
20 you?
21      A.  Two days after.

Page 41

1       Q.  Prior to this statement from your friend,
2  or the telephone call from your friend, you had no
3  prior -- you had no -- strike all of that.
4       Prior to the statement or the telephone
5  call by your friend, you had no prior complaints
6  about Dr. Akoda; is that correct?
7       A.  Complaints?  Like how complaints?  Like
8  formal complaints?
9       Q.  How -- how do you define complaints?
10      MS. CLARY:  I'm going to object to the
11 form of the question.  You can answer as best you
12 can.
13      THE WITNESS:  Okay.  I did have a couple
14 of -- of complaints and concern.  When I was being
15 seen by him, he was flirtatious and inappropriate.
16 BY MR. CATHELL:
17      Q.  And we'll explore this more in a bit.
18 Anything other than being flirtatious or being
19 inappropriate?
20      A.  No.
21      Q.  Had you -- had you made those formal

11 (Pages 38 - 41)

Elsa M. Powell                                                    March 27, 2019

Page 42

1 complaints to anybody?

2    A.   To one of the nurses at the -- the

3 doctor's office.

4    Q.   And which doctor's office was that?

5 Dr. Chaudry's?

6    A.   Dr. Chaudry's.

7    Q.   And do you remember the identity of the

8 nurse?

9    A.   She was an African American.

10   Q.   Older?  Younger?

11   A.   Older.

12   Q.   Short hair?  Long hair?

13   A.   Older.

14   A.   Older.

15   A.   Short hair.

16   Q.   Did she speak with an accent, do you

17 know?

18   A.   No, she did not.

19   Q.   Did she have glasses?

20   A.   No, she did not.

21   Q.   And what was your specific complaint to

Page 43

1 this nurse?

2    A.   That he was very flirtatious, and when I

3 was getting my breasts examined, he would make

4 comments and say that I have wonderful breasts.

5    Q.   Can you describe what you mean by

6 flirtatious?

7        MS. CLARY:  Objection to the extent I

8 think she covered that, but go ahead.

9 BY MR. CATHELL:

10   Q.   To the extent you haven't covered it, do

11 you have anything else to further describe what you

12 mean by very flirtatious?

13   A.   He would be very flirtatious as in, oh,

14 you look very nice today.  You should marry me one

15 day.  At first, I thought it was like a joke, but

16 then, you know, he would constantly say comments

17 like that.  And when he said, oh, you have really

18 nice breasts, that's when I was like, okay,

19 this -- this is not professional.

20   Q.   On how many occasions -- on how many

21 occasions did he tell you you had very nice

Page 44

1 breasts?

2    A.   Two occasions.

3    Q.   And do you remember the date of those

4 statements?

5    A.   No, I do not remember the dates.

6    Q.   And on how many occasions was he very

7 flirtatious, what you've described as telling you,

8 you look nice or that he wants to marry you or

9 other flirtatious behavior?

10   A.   It was two or three times.

11   Q.   Were those on the same dates as when he

12 told you you had very nice breasts?

13   A.   A week apart.

14   Q.   And when did you bring this to the

15 attention of the nurse in Dr. Chaudry's office?

16   A.   The first time that he said that I had

17 nice breasts, I brought it to her attention.  I

18 also requested a female nurse while I was getting

19 my check-ups.

20   Q.   Do you recall the date that you told the

21 nurse?

Page 45

1    A.   No, I do not recall the date.

2    Q.   After telling the nurse in Dr. Chaudry's

3 office of the statement, what happened?

4 Did -- were you given a female nurse while being

5 examined?

6    A.   Yes.  She would be in the -- in the room.

7    Q.   And is it fair to say that your only

8 involvement with this specific nurse would have

9 been in Dr. Chaudry's office?

10   A.   Yes.

11   Q.   Did you report the inappropriate behavior

12 to anyone other than the nurse in Dr. Chaudry's

13 office?

14   A.   No.

15   Q.   Did the in-  -- alleged inappropriate

16 touching or statements occur in the presence of any

17 other individual?  Bless you.

18   A.   No.  Bless you.

19       MS. CLARY:  Sorry.

20 BY MR. CATHELL:

21   Q.   And did they occur in the examination

Page 46

1 room?

2   A.   Yes.

3   Q.   At -- at Dr. Chaudry's office?

4   A.   That's correct.

5   Q.   So, it's fair to say there were no

6 witnesses to the inappropriate statements or

7 touching?

8   A.   No.

9   Q.   Do you know whether there was any type of

10 recording, whether it's an audio recording or video

11 recording, of the inappropriate statements or

12 touching?

13   A.   I'm not -- I'm not sure.

14   Q.   You've told me that you reported that

15 Dr. Akoda commented on your breasts, and the first

16 time you told the nurse in Dr. Chaudry's office; is

17 that correct?

18   A.   That's correct.

19   Q.   And you also told me that that behavior

20 continued, I believe, two to three times; is that

21 correct?

Page 47

1   A.   That's correct.

2   Q.   Did you continue to report the

3 inappropriate conduct to the nurse or to anyone

4 else?

5   A.   Well, the nurse wasn't always there every

6 time I saw Dr. Akoda.  Sometimes she would be

7 there; sometimes she would not be there.

8   Q.   Did any of the alleged inappropriate

9 behavior -- behavior occur while the nurse was in

10 the examination room?

11   A.   No.

12   Q.   Again, without discussing specific

13 conversations that you may or may not have had with

14 an attorney, did you make an effort to reach out to

15 an attorney to investigate the -- what you've

16 described as the inappropriate statements or

17 touching?

18       MS. CLARY:  I'm going to object and

19 instruct her not to answer to the extent I believe

20 that's covered by the attorney/client privilege and

21 work product doctrine.

Page 48

1       MR. CATHELL:  And our -- our response,

2 just for the record, I don't think we've covered

3 this one, is that it is just soliciting counsel.

4 I'm not trying to get into the specific initial

5 conversation, just the action of deciding to retain

6 counsel or to investigate a potential claim, but I

7 note your objection, and we'll move on.

8 BY MR. CATHELL:

9   Q.   Were you ever -- strike that.

10       Did you ever make a claim for the alleged

11 inappropriate statement or contact of any kind?

12       MS. CLARY:  Objection.  Outside of this

13 litigation?

14 BY MR. CATHELL:

15   Q.   Outside of this litigation?

16   A.   No.

17   Q.   And I believe I asked you this, but --

18 so, I apologize if I'm asking it again.  Do you

19 know the name of the nurse?

20   A.   No, I do not.

21   Q.   Do you have any evidence that Dr. Akoda

Page 49

1 lacked OB/GYN training or skills?

2       MS. CLARY:  Objection to the extent I

3 think it's been asked and answered, but go ahead

4 again.

5       THE WITNESS:  No.

6 BY MR. CATHELL:

7   Q.   How did you become aware of Dr. Akoda as

8 an OB/GYN?

9   A.   I was referred to Dr. Chaudry's office.

10   Q.   And what were the circumstances under

11 which you were referred to Dr. Chaudry's office?

12       MS. CLARY:  Objection to the extent I

13 think she has talked about it, but you can go ahead

14 again.

15       THE WITNESS:  The female OB/GYN that I

16 was seeing at first, she only covered the first few

17 months of the pregnancy, so she referred me to

18 Dr. Chaudry's office.  I thought I was going to see

19 Dr. Chaudry, but that's when all of my visits were

20 with Dr. Akoda.

21 BY MR. CATHELL:

13 (Pages 46 - 49)

Veritext Legal Solutions

Elsa M. Powell                                    March 27, 2019

Page 50

1   Q.   Okay.  And did you ever see Dr. Chaudry

2 during that time?

3   A.   No.

4   Q.   I should ask a better question.  Were you

5 ever cared for or treated by Dr. Chaudry during

6 that time?

7   A.   Once at the hospital, after I had my

8 emergency surgery, he came to remove the bandages.

9   Q.   And that would have been the postpartum

10 surgical procedure that you underwent?

11   A.   No.  It was complications after I had my

12 son.

13   Q.   I know you told me your first contact

14 with Dr. Akoda would have been in April or May of

15 2014, correct?

16   A.   (Nodding head yes.)

17   Q.   And I -- may I assume that that first

18 contact occurred at the office of Dr. Chaudry?

19   A.   Correct.

20   Q.   And on the first date that you presented

21 to Dr. Chaudry, after being referred by your prior

Page 51

1 OB/GYN, were you seen by Dr. Akoda?

2   A.   I was.

3   Q.   And how often, following that initial

4 visit, were you seen by Dr. Akoda?

5   A.   It started every month, and then it was

6 every week.

7   Q.   When did it become every week, if you

8 recall?

9   A.   Around August/October.

10   Q.   So, leading up to as you became -- as it

11 became closer to delivery time, that's when you

12 started seeing Dr. Akoda every week, is that fair?

13   A.   That's correct.

14   Q.   And it's my understanding from your

15 medical records that all of your contacts with

16 Dr. Akoda, prior to the actual birth of Jaiden,

17 were at Dr. Chaudry's office; is that correct?

18   A.   That's correct.

19   Q.   Do you know approximately how many times

20 you received treatment from Dr. Akoda?

21     MS. CLARY:  Prenatally?

Page 52

1     MR. CATHELL:  Any.

2     MS. CLARY:  Okay.  Thank you.

3     THE WITNESS:  Any?  Geez, it was a few,

4 because after I had my son, I went for my

5 six -- six-week check-up with Dr. Akoda.

6 BY MR. CATHELL:

7   Q.   Do you recall what Dr. Akoda looked like?

8   A.   Yes.  African male.  He was about I will

9 say 6'1", older, glasses.

10   Q.   Okay.  Thank you.  Do you -- do you

11 recall what Dr. Akoda sounded like?

12   A.   Strong accent.

13   Q.   Other than what you've told me about as

14 far as the inappropriate statements or touching, do

15 you have any inter- -- are there any interactions

16 with Dr. Akoda that we -- that you have a specific

17 memory of that we haven't discussed?

18   A.   No.  Not including the delivery, right?

19   Q.   Well, just including everything.

20   A.   Okay.

21   Q.   I guess what I'm -- I', trying to get at,

Page 53

1 are there any interactions that you had with

2 Dr. Akoda prior to delivery of Jaiden that we have

3 not discussed?

4   A.   My six-week check-up, he did a procedure

5 at Dr. Chaudry's office.  He said I had an ovarian

6 cyst, and he did a procedure right there at the

7 office where he burned it.

8   Q.   And this would have been your six-week

9 postpartum check-up?

10   A.   Yeah.  Yes, sir.  That's the last time I

11 saw him.

12   Q.   Had you been having symptoms or signs of

13 an ovarian cyst?

14   A.   No.

15   Q.   What evidence do you have that Dr. Akoda

16 was affiliated with the Prince George's County

17 Hospital Center?

18   A.   My birth band.  The band they give you at

19 the hospital.

20   Q.   And do you still have that?

21   A.   I sure do.

14 (Pages 50 - 53)

Elsa M. Powell March 27, 2019

Page 54

1   Q.   And if it's possible, I would ask that
2 we -- you provide that to your Counsel so we can
3 have a copy of it, okay?
4   A.   Okay.
5      MS. CLARY:  Okay.  That's fine.  We'll
6 make a copy of it so she can keep it for
7 sentimental reasons.
8      MR. CATHELL:  Yes.  That's what I said,
9 copy.
10      MS. CLARY:  Sure.
11      MR. CATHELL:  I know we have ours framed
12 and the whole nine yards.
13 BY MR. CATHELL:
14   Q.   What about -- what information was on the
15 birth band that led you to believe Dr. Akoda was
16 affiliated with the hospital?
17   A.   Well, his name was on it.  His name was
18 on it.
19   Q.   And do you recall the specific date that
20 you presented to Prince George's County Hospital to
21 deliver Jaiden?

Page 55

1   A.   September 13, 2014.
2   Q.   And what caused you to go to the hospital
3 at that time?
4   A.   I was getting induced.
5   Q.   And, to your knowledge, who made the
6 decision -- the medical decision to induce you?
7   A.   Dr. Akoda.
8   Q.   And did Dr. Akoda, in fact, induce you on
9 September 13, 2014?
10   A.   Yes.
11   Q.   And when you presented to the hospital,
12 throughout the course of your care, do you recall
13 being presented with various consent forms that you
14 ultimately read and signed?
15   A.   Yes, I remember them.
16      MR. CATHELL:  Can I see your Answers to
17 Interrogatories?
18      (Document tendered.)
19      MR. CATHELL:  I want to make sure my
20 Exhibit Numbers are correct.
21      (Whereupon, Powell Deposition Exhibit 2,

Page 56

1 Consent Form, marked for identification.)
2 BY MR. CATHELL:
3   Q.   Okay.  I'm showing you a two-page
4 document that is dated September 16, 2014, and the
5 exhibit sticker is on the first page.  If you'll
6 take a look at that document for me.
7      MS. CLARY:  That's the first page.
8 That's the second page.
9      (Whereupon, there was a pause for
10 document examination.)
11 BY MR. CATHELL:
12   Q.   And --
13   A.   Okay.
14   Q.   Could I have that back real quick?
15      (Document tendered.)
16 BY MR. CATHELL:
17   Q.   I couldn't see from where I'm sitting.
18 Is the -- is this your signature on the document
19 towards the bottom left of the second page?
20   A.   Yes.
21   Q.   And on the first page, there's a

Page 57

1 paragraph at top -- at the top that is titled
2 Physicians Not as Employees, is that -- are those
3 your initials at the end of that paragraph?
4   A.   Yes.
5   Q.   And did you read through this document
6 and understand its consents prior to signing it?
7   A.   No.  I'm not even going to lie.  I did
8 not read it.  They just said without it, if you
9 didn't sign it, they can't -- they couldn't give me
10 the -- the care that I needed.  And I was just
11 thinking about the care, and I needed to deliver my
12 baby, so I just signed it.
13      (Whereupon, Deposition Exhibit Number 3,
14 Consent Form, marked for identification.)
15 BY MR. CATHELL:
16   Q.   I'm handing you a three-page document
17 that is labeled Exhibit 3.  On the first page, you
18 would agree those are your initials on the
19 left-hand column of that document?
20   A.   Okay.
21   Q.   Is that a yes or no?

15 (Pages 54 - 57)

Elsa M. Powell                                                    March 27, 2019

Page 58

1    A.   Yes.  That's a yes.

2    Q.   On the second page, you would agree those

3  are your initials and your signature in two

4  locations on the document?

5    A.   Yes.

6    Q.   And the third page I'm just putting in

7  for completeness, but it doesn't have your

8  signature.

9        And, again, I apologize for all of the

10  exhibits, but Exhibit Number 4 is a three-page

11  document labeled Deposition Exhibit 4.

12       (Whereupon, Powell Deposition Exhibit 4,

13  Consent Form, marked for identification.)

14  BY MR. CATHELL:

15    Q.   It's a three-page document, and you would

16  agree that it is your signature on the third page

17  in the upper right-hand corner?

18       MS. CLARY:  I'm sorry, it's on the third

19  page?

20       MR. CATHELL:  Yes.

21       THE WITNESS:  Yes.

Page 59

1  BY MR. CATHELL:

2    Q.   Are you okay?  Do you need a break?

3    A.   No.  I'm good.

4        MS. CLARY:  I might need one in a few

5  minutes.  I don't want to interrupt you.

6        MR. CATHELL:  Now would be perfect.

7        MS. CLARY:  If you get -- have a good

8  stopping point.

9        MR. CATHELL:  Now would be perfect.

10       THE VIDEOGRAPHER:  This marks the end of

11  media unit number one.  Going off record.  The time

12  is 10:59 a.m.

13       (Recess taken -- 10:59 a.m.)

14       (After recess -- 11:07 a.m.)

15       THE VIDEOGRAPHER:  This marks the

16  beginning of media unit number two.  Going back on

17  record.  The time is 11:07 a.m.

18  BY MR. CATHELL:

19    Q.   Ms. Powell, do you have -- we had just

20  been talking about what evidence you have that

21  Dr. Akoda was affiliated with the Prince George's

Page 60

1  County Hospital Center, okay?

2    A.   Yes.

3        THE VIDEOGRAPHER:  Brian, your mic.

4  BY MR. CATHELL:

5    Q.   We had just been talking about what

6  evidence you had, if any, regarding Dr. Akoda's

7  affiliation with the Prince George's County

8  Hospital Center, correct?

9    A.   Correct.

10    Q.   And you mentioned the birth band that you

11  were given when you first presented to deliver

12  Jaiden?

13    A.   Correct.

14    Q.   Do you have any additional evidence

15  regarding Dr. Akoda's affiliation with Prince

16  George's County Hospital Center?

17    A.   Besides the band, that is it.

18    Q.   Was Dr. Akoda the first doctor you came

19  in contact with when you first made it to Prince

20  George's County Hospital Center on the 13th of

21  September?

Page 61

1    A.   Yes.

2    Q.   And I assume that was because it was a

3  planned induction, correct?

4    A.   Correct.

5    Q.   When you were seen by Dr. Akoda in

6  Dr. Chaudry's office, was there anything in the

7  office that led you to believe that Dr. Akoda was

8  affiliated with the hospital?

9    A.   No.

10    Q.   So, you understood that Dr. Akoda was in

11  private practice, correct?

12       MS. CLARY:  Objection.  You can answer.

13       THE WITNESS:  No, I did not know.

14  BY MR. CATHELL:

15    Q.   Following the first alleged inappropriate

16  action by Dr. Akoda when you were seeing him at

17  Dr. Chaudry's office, how many times did

18  you -- approximately how many times did you see

19  Dr. Akoda after that?

20    A.   After that, it's a few -- a few times

21  after that.

16 (Pages 58 - 61)

Elsa M. Powell                                March 27, 2019

Page 62

1    Q.   Is it fair to classify those visits as
2  prenatal visits?
3    A.   Yes.
4    Q.   Did Dr. Akoda perform vaginal
5  examinations during those visits?
6    A.   Yes.
7    Q.   Did you find those examinations
8  inappropriate in any way?
9    A.   No.  I believed they were normal routine.
10   Q.   Is it fair to say that you never
11 discussed with Dr. Akoda the subject of hospital
12 privileges?
13   A.   No.
14   Q.   That was a bad question.  Did you ever
15 discuss with Dr. Akoda the subject of hospital
16 privileges?
17   A.   No.
18   Q.   Did you ever ask to see Dr. Akoda's
19 driver's license?
20   A.   No.
21   Q.   Or his passport?

Page 63

1    A.   No.
2    Q.   I assume you never asked Dr. Akoda if he
3  had any other names?
4    A.   No.
5    Q.   Did you see Dr. Akoda interact with staff
6  in any inappropriate way?
7    A.   No.  I didn't pay attention.
8    Q.   You would agree that the delivery of
9  Jaiden was performed successfully?
10   A.   The delivery, yes.  After the delivery,
11 no.
12   Q.   I'm going to get there.  I've looked
13 through your medical records, and I promise that
14 I'll get there, okay?
15   A.   (Nodding head yes.)
16   Q.   Were you satisfied with the medical
17 services that Dr. Akoda provided to you in
18 delivering Jaiden?
19   A.   Yes.
20   Q.   Were you satisfied with the medical
21 services that Dr. Akoda provided to you prior to

Page 64

1  coming to Prince George's County Hospital Center on
2  September 13, 2014?
3    A.   No.
4    Q.   And tell me why not, if it's a reason
5  that we haven't already discussed.
6    A.   The reason we discussed.
7    Q.   And that would be -- I assume that would
8  be the alleged inappropriate statements and
9  touching?
10   A.   Correct.
11   Q.   Putting those aside, but not intending to
12 mitigate those in any way or minimize those, were
13 you satisfied with the medical services that
14 Dr. Akoda provided to you prior to September 2014?
15   A.   Yes.
16      (Whereupon, Powell Deposition Exhibit 5,
17 Birth Band, marked for identification.)
18 BY MR. CATHELL:
19   Q.   And you've been kind enough to provide us
20 with a color picture of the birth band that you
21 described.  I've marked it as Exhibit 5.  If I can

Page 65

1  show it to you, and you can just briefly tell us
2  what it is for the record?
3    A.   It's my hospital band of when I went to
4  deliver Jaiden.
5    Q.   All right.  I was asking you about the
6  delivery, and you started to tell me that you
7  were -- you may have had a complication following
8  the delivery.  Can you tell us what that was?
9    A.   After I had Jaiden, I noticed that I was
10 bleeding out of the normal.  So, I panicked, and I
11 asked the nurse if she could please get the doctor,
12 Dr. Akoda.
13      So, she got him, and when he -- when he
14 came in, I explained to him that I was gushing out.
15 It was going through the sheets and in the hospital
16 bed, and I also had big blood clots.
17      So, he examined me, and he kept saying,
18 I'm sorry.  I should have detected it sooner.  I'm
19 so sorry.  I'm so sorry.  So, I was confused of
20 what was going on, and he told me he was going to
21 rush me to the OR.  I was going to get surgery.  I

17 (Pages 62 - 65)

Elsa M. Powell                                             March 27, 2019

Page 66

1 was crying, devastated because I didn't know what
2 was going to happen with my son, and I didn't know
3 what was going to happen to me.  I didn't know -- I
4 didn't know what was going on.
5      So, then there was this hospital employee
6 pushing me in the bed down to the OR, and I was put
7 to sleep.  When I woke up, I had tubes everywhere.
8 I couldn't talk.  I was crying.
9      Then -- probably like 30 minutes after,
10 then they took me to my room, and I remember the
11 same guy that rode me down to the OR told me that I
12 had lost a lot of blood and that they had -- they
13 did remove all of the blood clots, that they were
14 big, and that they did remove them all, but I did
15 lose a lot of blood.
16      Q.   And if I told you the name of that
17 medical procedure was the suction curettage, would
18 that -- does that ring a bell?
19      A.   No.
20      Q.   And do you recall what date that occurred
21 on?

Page 67

1      A.   It was the same day I delivered.
2      Q.   The same day or the next day?
3      A.   September -- I believe it was the same
4 day, September 14.
5      Q.   Just for completeness, I'll hand you
6 the -- what I'll proffer are the consent forms for
7 the curettage, which I have marked as Exhibit 6.
8      (Whereupon, Powell Deposition Exhibit 6,
9 Consent Form, marked for identification.)
10 BY MR. CATHELL:
11      Q.   It's a two-page document.  Will you agree
12 or would you agree that in the middle of both
13 pages, it -- that is your signature, please?
14      A.   Yes.
15      Q.   Yes as to both pages?
16      A.   Yes as to both pages.
17      Q.   Thank you.  And it's my understanding
18 from your medical record that, despite what you've
19 just described, you made a full recovery and were
20 discharged on September 19th; is that correct?
21      A.   The 19th?  Yes, that's correct.  That is

Page 68

1 correct.
2      Q.   And it's my understanding from reading
3 the medical records that when you were discharged,
4 you had no ongoing signs or symptoms of -- of
5 hemorrhage or of any other injury; is that correct?
6      A.   That's correct.
7      Q.   Has a medical provider, meaning a doctor,
8 nurse, P.A., what have you, ever told you that
9 Dr. Akoda performed the delivery of Jaiden in a
10 manner that did not comply with the standard of
11 care?
12      A.   No.
13      Q.   Did Dr. -- has any medical provider ever
14 told you that Dr. Akoda's postpartum care, so in
15 the days after you gave birth to Jaiden, but before
16 you were discharged, has any medical provider told
17 you that Dr. Akoda's care of you during that time
18 did not comply with the standard of care?
19      A.   No.
20      Q.   You would agree that you did not have any
21 permanent injury as a result of the care provided

Page 69

1 to you by Dr. Akoda during your admission to Prince
2 George's County Hospital Center in September of
3 2014?
4      A.   No.
5      Q.   You would not agree?
6      A.   I -- besides trust issues, no, nothing
7 medical.
8      Q.   Between the time you were discharged in
9 September of 2014 and the time you received the
10 telephone call from Latisa Gaymon, had you
11 sustained any injury as a result of the care
12 provided to you by Dr. Akoda?
13      A.   No, no injuries.
14      Q.   So, it's my understanding, just so the
15 record is clear, that it is your claim that when
16 you learned of the allegations regarding
17 Dr. Akoda's license or credentialing from Latisa
18 Gaymon is when you first occurred -- incurred the
19 injury, correct?
20      A.   I'm sorry?
21      Q.   It's my understanding that the -- the

18 (Pages 66 - 69)

Elsa M. Powell                                    March 27, 2019

Page 70

1 telephone call to you from Latisa Gaymon is when
2 you first suffered the injury as a result of the
3 allegations surrounding Dr. Akoda?
4    A.  Yes.
5    Q.  When you first chose him as your
6 physician or when you -- strike that.
7        When you continued to see Dr. Akoda, were
8 you aware of his privileging status?
9    A.  No.
10   Q.  Did you do any research on his skills and
11 abilities?
12   A.  No.
13   Q.  Nothing he did during his care made you
14 feel he was not qualified or cared for you or
15 qualified to care for you appropriately, correct?
16   A.  No.  Correct.
17   Q.  At no time did you fire him as a
18 physician, correct?
19   A.  That's correct.
20   Q.  Do you accuse Dr. Akoda of any failure to
21 properly render medical care to you or your baby?

Page 71

1 I think we covered that.  You would agree your
2 answer to that would be no?
3    A.  No.  No.
4       MS. CLARY:  She said no.
5 BY MR. CATHELL:
6    Q.  I'm sorry.  I thought you said oh.
7       MS. CLARY:  You didn't get that nnh in
8 there.
9 BY MR. CATHELL:
10   Q.  Do you know of anyone else accusing
11 Dr. Akoda of any sexual -- of any sexual
12 impropriety or have any information of any kind on
13 that subject, other than what we've discussed?
14   A.  No.
15   Q.  And you -- I believe you told me your
16 last visit with Dr. Akoda was your six-week
17 postpartum visit, correct?
18   A.  Correct.
19   Q.  Have we discussed all of your claims
20 against Dr. Akoda for sexual misconduct?
21   A.  Yes.

Page 72

1    Q.  There is an -- a medical doctor involved
2 in this litigation named Dr. Susan Fiester.  Are
3 you familiar with Dr. Fiester?
4    A.  Yes.
5    Q.  Okay.  And did you meet with Dr. Fiester?
6    A.  Phone.
7    Q.  Meaning a telephone call?
8    A.  Yes.
9    Q.  And do you recall when that occurred?
10   A.  February.
11   Q.  Of 2019?
12   A.  2019.
13   Q.  Are you okay?
14   A.  Yes.  February or January 2019.
15   Q.  And do you recall how long the telephone
16 call was?
17   A.  I do not recall.
18   Q.  Was it hours, minutes?  You just have no
19 recollection?
20   A.  No recollection.
21   Q.  Where were you when you made the -- when

Page 73

1 you talked to Dr. Fiester on the call?
2    A.  Home.
3    Q.  Was anyone else present with you?
4    A.  My two-year-old daughter.
5    Q.  Were you and Dr. Fiester the only two
6 people on the -- on the telephone call?
7    A.  Yes.
8    Q.  And did she initiate the call to you?
9    A.  Yes.
10   Q.  Do you consider Dr. Fiester to be your
11 doctor?
12   A.  No.
13   Q.  Did Dr. Fiester provide you with any
14 treatment recommendations?
15   A.  No.
16   Q.  Did she refer you to any other healthcare
17 providers for treatment?
18   A.  No.
19   Q.  And I assume she didn't prescribe to you
20 any medication, correct?
21   A.  Correct.  She did not.

19 (Pages 70 - 73)

Elsa M. Powell							March 27, 2019

Page 74

1    Q.  Can you tell me what you recall about the
2  telephone interview with Dr. Fiester?
3    A.  We talked about the situation.  She
4  mainly asked me how did I feel.  She asked me to
5  give her a rundown of how was my delivery and
6  everything I experienced through the whole process
7  when I was under Dr. Akoda's care.
8    Q.  Did she share with you what any of the
9  other Plaintiffs that she had identified -- strike
10  that.
11        Did she share with you what any of the
12  other Plaintiffs that she had interviewed had
13  shared with her?
14    A.  No.
15    Q.  And in response to the question of how
16  did you feel about the situation, which I assume,
17  for the record, is the -- are the allegations
18  surrounding Dr. Akoda, correct?
19    A.  That's correct.
20    Q.  What did you tell her in response to the
21  question of how do you feel?

Page 75

1    A.  I feel betrayed.  I feel like I can't
2  trust any OB/GYNs any more, or doctors.
3        Every time I even take my oldest
4  daughter, I have to ask questions, check
5  credentials.
6        I trusted Dr. Akoda.  I trusted him with
7  my life.  I believed he was real.  I was very
8  disappointed, and I feel violated.
9    Q.  And I'm certainly not going to get into
10  any specifics regarding your -- your daughter.  You
11  said you take your daughter to an OB/GYN.  Is that
12  the same person that -- that you have -- that
13  you're scheduled to see?
14    A.  No.  Her -- her doctor.
15    Q.  Okay.
16    A.  I'm scared to go to an OB/GYN.
17    Q.  And I believe the other general question
18  that Dr. Fiester was asking, based on her report
19  and other information, is -- was how that -- how
20  you have been affected as a result of the
21  allegations; is that correct?

Page 76

1    A.  That's correct.
2    Q.  Okay.  And what did you tell her in
3  response to that question?
4    A.  That I don't -- I don't trust these
5  doctors any more.  I have a hard time trusting.  I
6  have a hard time even going to my OB/GYN myself.
7    Q.  Anything else?
8    A.  And that I feel kind of violated.
9    Q.  Anything else?  Any other -- strike that.
10        Has this impacted you in any other way?
11    A.  No.
12    Q.  I don't believe Dr. Fiester diagnosed you
13  with any physical or mental illness; is that
14  correct?
15    A.  That's correct.
16    Q.  Have you read the -- strike that.
17        A Complaint in litigation are the papers
18  that your attorneys file with the court to start
19  the proceedings.  With that understanding, have you
20  read the Complaint in this case?
21    A.  Yes.

Page 77

1    Q.  Do you know whether you read the
2  Complaint before it was filed?
3    A.  No.
4    Q.  Did you read the Complaint before it was
5  filed?
6    A.  What do you mean?
7    Q.  So, to start the litigation, your
8  attorneys would prepare a Complaint, and then to
9  actually start the lawsuit, they filed the
10  Complaint.
11    A.  Yes.  Yes.
12    Q.  Okay.  So, prior to them actually filing
13  it -- and you might not know, but prior to them
14  actually filing it, did you read the Complaint?
15    A.  Yes.
16    Q.  You did read it?
17    A.  I looked at it, yes.
18    Q.  Did you meet with your attorneys before
19  the Complaint was filed?
20        MS. CLARY:  I'm going to object and
21  instruct her not to answer that question as it's

20 (Pages 74 - 77)

Elsa M. Powell                                      March 27, 2019

Page 78

1 violative of the attorney/client privilege and work
2 product doctrine.
3       MR. CATHELL:  Since the -- understanding
4 that, and our response is noted.
5       MS. CLARY:  Sure.
6 BY MR. CATHELL:
7    Q.  I would also ask you questions about how
8 frequently you had met with your attorneys and how
9 many -- what you discussed as far as filing the
10 Complaint and those allegations.
11      It's my understanding that your Counsel
12 would instruct you not to answer, so I respect --
13 I -- I won't go through all of those questions,
14 but --
15      MS. CLARY:  I understand that those are
16 questions you would pose.  I do have the same
17 objections, and I understand your response is as we
18 have discussed.
19      MR. CATHELL:  Thank you.
20 BY MR. CATHELL:
21    Q.  Understanding your attorney's objections

Page 79

1 about your contact with them, I'm going to ask you
2 questions about your contact with other Plaintiffs,
3 okay?
4    A.  Okay.
5    Q.  Have you at any time -- I know you talked
6 to Latisa Gaymon.  Have you at any time talked to
7 any of the other Plaintiffs?
8    A.  No.
9    Q.  Okay.  Do you know any of the -- the
10 names of any of the other Plaintiffs?
11    A.  No.
12    Q.  Have you read any of the other papers
13 that have been filed in this court case?
14    A.  No, I have not.
15    Q.  Have you gone to court to any of the
16 hearings that have occurred?
17    A.  No.
18    Q.  And why not?
19    A.  I haven't gone.
20    Q.  Were you made aware of the hearings?
21    A.  Yes.

Page 80

1    Q.  Do you plan on going to court in terms of
2 any of the remaining hearings in this case?
3    A.  If my lawyers find it that I need to be
4 there, then, yes.
5    Q.  Do you know what class certification is?
6    A.  Yes.
7    Q.  What is it?
8    A.  The class action, it's a lawsuit with a
9 group that's been going through the same situation.
10    Q.  Do you know what causes of action are
11 being asserted in the Complaint?
12      MS. CLARY:  I'm going to object to the
13 extent that it's calling, the way you phrased it,
14 for a legal conclusion.  You can answer the best
15 you can.
16 BY MR. CATHELL:
17    Q.  If you know.  Do you know what the causes
18 of action are being -- are being asserted in the
19 Complaint?
20      MS. CLARY:  Same objection.  Go ahead.
21      THE WITNESS:  Yes.

Page 81

1 BY MR. CATHELL:
2    Q.  What are those?
3    A.  I don't recall right now.  I'm sorry.
4    Q.  Do you know what damages the Complaint is
5 seeking?
6      MS. CLARY:  Same objection as before.
7 You can go ahead and answer if you can.
8      THE WITNESS:  No, I don't.
9 BY MR. CATHELL:
10    Q.  Do you know -- know the names of the
11 Defendants that you are suing in the case?
12    A.  Yes, I do know the name.
13    Q.  And what is the name of the Defendants?
14    A.  Well, I know because I heard you say it
15 earlier, but I don't -- I don't remember them.
16    Q.  Have -- have you met with any of the
17 other Plaintiffs?
18    A.  No.
19    Q.  Including Latisa Gaymon?
20    A.  Besides social, if -- that's it.
21    Q.  When was the last time you were at a

21 (Pages 78 - 81)

Elsa M. Powell                                   March 27, 2019

Page 82

1 social event with Latisa?

2   A.   It was last Thanksgiving.

3   Q.   How would you describe the -- the

4 relationship between you and Latisa?  Are you

5 friends, acquaintances, family?

6   A.   Friends.

7   Q.   Are you aware that the Complaint is

8 asking the court to certify this case as a class

9 action?

10   A.   Yes.

11   Q.   Do you know what it means to proceed as a

12 class action?

13   A.   Yes.

14   Q.   And I think you already described your

15 understanding, so I'll spare you the follow-up

16 question.

17       Do you know how many proposed class

18 members there are?

19   A.   No.

20   Q.   Do you know which law firms represent the

21 proposed class members?

Page 83

1   A.   Yes.

2   Q.   And which firms are those?

3   A.   Well, I know this law firm, the one that

4 represents me.

5   Q.   Any others?

6   A.   Other than that, no, I don't know of any

7 others.

8   Q.   Do you know whether each member of the

9 proposed class is asserting the same claims as you

10 are?

11   A.   No, I do not know.

12   Q.   Have you tried to learn about the claims

13 of the other proposed class members in this case?

14   A.   No.

15   Q.   Have you determined whether your claims

16 are different than theirs in any way?

17   A.   No.

18   Q.   Do you know whether each member of the

19 proposed class is seeking the same damages as you

20 in this case?

21   A.   No.

Page 84

1   Q.   I'm assuming you are aware that you've

2 been designated as a class representative in this

3 lawsuit?

4   A.   Yes.

5   Q.   You're also aware that you've been

6 des- -- actually, I believe you told me you do not

7 know if you were designated as a class

8 representative in the federal lawsuit, correct?

9       MS. CLARY:  Objection.  I don't think you

10 asked her that.

11 BY MR. CATHELL:

12   Q.   Have you been designated as a class

13 representative in the federal suit against ECFMG?

14   A.   Yes.

15       MS. CLARY:  Hence, why I thought you did

16 not ask.

17 BY MR. CATHELL:

18   Q.   Do you know what it means to be

19 a -- strike that.

20       What is your role as a class

21 representative?

Page 85

1   A.   To be the voice of all of the ladies that

2 can't speak.

3   Q.   Why can't they speak?

4   A.   They could speak, but they can't speak

5 right here right now.  They can't tell you guys how

6 disgusted they feel, how violated, how hurt to

7 trust somebody who they called their doctor, and

8 come to find out, that doctor, who we put our life

9 in his hands, was a fraud.

10   Q.   Do you know whether there was a mediation

11 in this matter?

12   A.   No.

13   Q.   Have you --

14       MS. CLARY:  I'm sorry.  It's belated, but

15 I'd just object to the term mediation.  As a

16 nonlawyer, she may not know what that is.

17 BY MR. CATHELL:

18   Q.   Do you know whether the parties in this

19 case engaged in settlement talks in an effort to

20 settle the case?

21   A.   Yes.

22 (Pages 82 - 85)

Page 86

1   Q.   You do know that?

2   A.   Yes, I do.

3   Q.   Okay.  And what is -- did you at any time

4   talk or correspond with the other Plaintiffs

5   regarding those settlement discussions?

6   A.   No.

7   Q.   Are you aware that a settlement offer was

8   made --

9   A.   Yes.

10   Q.   -- on behalf of the Defendants?

11   A.   Yes.

12   Q.   Okay.  And what is your understanding as

13   to what that settlement offer was?

14   A.   A thousand.

15   Q.   And did you decline that settlement

16   offer?

17   A.   Yes.

18   Q.   And Ms. Clary is going to object, so if

19   you'll give her a second before answering.  Do you

20   know whether you're responsible for paying any of

21   the costs and expenses of this litigation?

Page 87

1       MS. CLARY:  Objection.  I'm going to

2   instruct her not to answer for the reasons we've

3   discussed already.

4   BY MR. CATHELL:

5   Q.   Did you --

6       MR. CATHELL:  Thank you.

7   BY MR. CATHELL:

8   Q.   Did you sign a retainer agreement with

9   Schochor, Federico and Staton?

10       MS. CLARY:  I'm going to let you answer

11   yes or no, but I don't want you to disclose

12   anything further beyond a yes or a no answer.

13       THE WITNESS:  Yes.

14   BY MR. CATHELL:

15   Q.   And we would ask -- we will be asking

16   your attorney to provide it  I know they object.

17       MR. CATHELL:  But just, for the record, I

18   want to indicate that we are requesting the

19   retainer agreement.

20       MS. CLARY:  I object.  I think we've

21   covered the objection and your response, and we'll

Page 88

1   take it up later.

2   BY MR. CATHELL:

3   Q.   Have you seen any of the documents that

4   have been produced by the Defendants in this case?

5   A.   Yes, I did.

6   Q.   Okay.  What did you review?

7   A.   There's been so many documents.  I do not

8   remember.

9   Q.   Do you know whether Dr. -- I'm sorry,

10   were you finished?

11   A.   Yes.

12   Q.   Okay.  Do you know whether Dr. Akoda is a

13   defendant in this lawsuit or not?

14   A.   No, I do not know.

15   Q.   What is your understanding as to what the

16   allegations are in the federal suit against ECFMG?

17       MS. CLARY:  Objection to the extent I do

18   think that was covered, but go ahead again.

19       THE WITNESS:  They allowed him to

20   continue to practice without him having the proper

21   credentials that is needed.

Page 89

1   BY MR. CATHELL:

2   Q.   What is your understanding of ECFMG's

3   role in certifying Dr. Akoda?

4   A.   Could you repeat that?

5   Q.   Sure.  What is your understanding -- and

6   I'm asking you this as a result of your being in

7   that lawsuit.

8       What is your understanding of ECFMG's

9   role in certifying Dr. Akoda?

10   A.   I do not recall.  I don't remember.

11   Q.   Do you have any knowledge as to what type

12   of background checks ECFMG conducts?

13   A.   Birth certificate, Social Security,

14   passport.

15   Q.   Other than the call you received from

16   Latisa Gaymon -- strike that.

17       You received a telephone call from

18   Ms. Gaymon.  You then proceeded to Google the

19   allegations against Dr. Akoda.

20       Did you at any time see any advertising,

21   such as TV commercials, or social media links, or

23 (Pages 86 - 89)

Elsa M. Powell                                                March 27, 2019

Page 90

1 radio commercials regarding the all- -- sorry,

2 regarding the allegations?

3    A.   After the fact.

4    Q.   After what fact?

5    A.   After I already had contacted my lawyers.

6    Q.   And what do you recall -- again, not

7 anything related to them, but what do you recall

8 see -- recall seeing or hearing?

9    A.   On the radio, if you were a patient of

10 Dr. Akoda, please contact, and they said a phone

11 number.  You have been a victim of a scam.

12    Q.   Anything else?

13    A.   No.

14    Q.   And do you remember specifically, was it

15 a TV advertisement or -- I'm sorry, you said it was

16 a radio advertisement?

17    A.   Radio.

18    Q.   And do you recall specifically which law

19 firm was sponsoring that advertisement?

20    A.   I do not remember.  I don't recall which

21 firm it was.

Page 91

1    Q.   And hearing that advertisement -- strike

2 that.

3         Did you participate in any interview with

4 any media person or organization about your

5 involvement with Dr. Akoda?

6    A.   No.

7    Q.   Did you go on The Dr. Oz Show?

8    A.   No.

9    Q.   Were you contacted to go on The Dr. Oz

10 Show?

11    A.   No.

12    Q.   Is it fair to say that when you were

13 choosing your OB/GYN, you selected an OB/GYN based

14 upon the skill set of the physician?

15    A.   Yes.

16    Q.   And your concern was that he or she could

17 deliver your baby safely and healthy, correct?

18    A.   Yes.

19    Q.   And you did not care if your OB/GYN was a

20 man or a woman?

21    A.   No.

Page 92

1    Q.   And you did not care about the OB/GYN's

2 race?

3    A.   No.

4    Q.   Or nationality?

5    A.   No.

6    Q.   And you did not care about the exact

7 location of the OB/GYN, beyond being local,

8 correct?

9    A.   Well, at first, I didn't want to deliver

10 my child at PGH, but I didn't have no choice.

11    Q.   And why did you not have a choice?

12    A.   Because the doctor's office, that was the

13 only hospital they were associated with.

14    Q.   Is it fair to say that you not -- did not

15 care about the name of your physician?

16    A.   The name, no.

17    Q.   You agree that Dr. Akoda delivered your

18 baby safe -- safe and healthy?

19         MS. CLARY:  Objection.  I think it's been

20 covered, but go ahead.

21         THE WITNESS:  Yes.

Page 93

1 BY MR. CATHELL:

2    Q.   And it's my understanding that Jaiden is

3 four now, correct?

4    A.   Correct.

5    Q.   And I'm hopeful that Jaiden is currently

6 healthy; is that correct?

7    A.   Yes.

8    Q.   And was Jaiden the only baby you

9 delivered with Dr. Akoda?

10    A.   Yes.

11    Q.   At any time during any care and treatment

12 that Dr. Akoda provided to -- to you, did you ever

13 ask for a different doctor?

14    A.   No.

15    Q.   We talked briefly about the six-week

16 check -- postpartum check-up where you came back in

17 to see Dr. Akoda, and you mentioned that he

18 diagnosed you with a cyst at that time and had

19 removed that cyst, is that an accurate

20 representation of your testimony?

21    A.   That's correct.

24 (Pages 90 - 93)

Elsa M. Powell                                        March 27, 2019

Page 94

1   Q.  And, to your knowledge, was the cyst, in

2 fact, removed at that time?

3   A.  I don't have -- he claimed he -- he

4 burned it.  I don't know.

5   Q.  Okay.  Fair enough.  If -- do you have

6 any ongoing signs or symptoms or injuries related

7 to the cyst?

8   A.  I had pain.  I went to the emergency room

9 at Southern Maryland Hospital, and they said I had

10 an ovarian cyst still.  And this is recently, last

11 year recently.  I also have cyst in my kidneys.

12   Q.  Okay.

13   A.  This is recently.  So, if it was removed,

14 I'm -- I don't know.

15   Q.  As -- okay.  Is -- has anyone -- strike

16 that.

17      Has any doctor told you that Dr. Akoda

18 didn't effectively remove the ovarian cyst at your

19 six-week postpartum appointment?

20   A.  No.

21   Q.  Do you have any reason to believe that

Page 95

1 the ovarian cyst that was discovered at Southern

2 Maryland is the same cyst or is related to the cyst

3 that Dr. Akoda removed?

4   A.  I -- I wouldn't be able to tell you.  I

5 don't -- I don't know.

6   MR. CATHELL:  I think we're finished, if

7 I could just look through my notes briefly.

8   THE WITNESS:  Okay.

9   MS. CLARY:  Sure.

10   MR. CATHELL:  You'll definitely be on the

11 road by 12.

12      (Whereupon, there was a pause for

13 document examination.)

14 BY MR. CATHELL:

15   Q.  I showed you your Answers to

16 Interrogatories and marked them an exhibit, but I

17 don't think I asked you the question of whether

18 they are accurate sitting here today or whether you

19 would want to make any additions or revisions to

20 the answers?

21   MS. CLARY:  Other than the one revision

Page 96

1 she mentioned earlier.  She talked about the -- an

2 employment change.

3   MR. CATHELL:  Right.

4 BY MR. CATHELL:

5   Q.  Other than that?

6   A.  Other than that, no.

7   Q.  Okay.

8      (Whereupon, there was a pause for

9 document examination.)

10   MR. CATHELL:  That's all I have, ma'am.

11 Thank you very much.

12   MS. CLARY:  She'll read and sign.

13   THE WITNESS:  Thank you.

14   THE VIDEOGRAPHER:  This concludes today's

15 videotape deposition of Elsa Powell.  This is media

16 unit number two of two.  Going off the record.  The

17 time is 11:49 a.m.

18      (Whereupon, the deposition of Elsa

19 Miguelina Powell was concluded at 11:49 a.m., and

20 the reading and signing of the transcript was not

21 waived.)

Page 97

1      Russell v. Dimensions

2      Elsa Miguelina Powell

3      INSTRUCTIONS TO THE WITNESS

4      Please read your deposition over

5 carefully and make any necessary corrections.  You

6 should state the reason in the appropriate space on

7 the errata sheet for any corrections that are made.

8      After doing so, please sign the errata

9 sheet and date it.

10      You are signing same subject to the

11 changes you have noted on the errata sheet, what

12 will be attached to the deposition.

13      It is imperative that you return the

14 original errata sheet to the deposing attorney

15 thirty (30) days of receipt of the deposition

16 transcript by you.  If you fail to do so, the

17 deposition transcript may be deemed to be accurate

18 and may be used in court.

19

20

21 Job #3269933

25 (Pages 94 - 97)

Page 98

1     Russell v. Dimensions

2       Elsa Miguelina Powell

3         ERRATA

4     PAGE  LINE  CHANGE

5     ---  ---  --------------------------

6     Reason:_____

7     ---  ---  --------------------------

8     Reason:_____

9     ---  ---  --------------------------

10    Reason:_____

11    ---  ---  --------------------------

12    Reason:_____

13    ---  ---  --------------------------

14    Reason:_____

15    ---  ---  --------------------------

16    Reason:_____

17    ---  ---  --------------------------

18    Reason:_____

19    ---  ---  --------------------------

20    Reason:_____

21    Job #3269933

Page 99

1      Russell v. Dimensions

2       Elsa Miguelina Powell

3      ACKNOWLEDGMENT OF DEPONENT

4      I, ELSA MIGUELINA POWELL, do hereby

5 certify that I have read the foregoing pages and

6 that the same is a correct transcription of the

7 answers given by me to the questions therein

8 propounded, except for the corrections or changes

9 in form or substance, if any, noted in the attached

10 errata sheet.

11    _____          _____

12    DATE              SIGNATURE

13

14

15

16

17

18

19

20

21 Job #3269933

Page 100

1 State of Maryland

2 County of Baltimore, to wit:

3     I, Michele D. Lambie, a Notary Public of

4 the State of Maryland, County of Baltimore, do

5 hereby certify that the within-named witness

6 personally appeared before me at the time and place

7 herein set out, and after having been duly sworn by

8 me, according to law, was examined by counsel.

9     I further certify that the examination

10 was recorded stenographically by me and this

11 transcript is a true record of the proceedings.

12     I further certify that I am not of

13 counsel to any of the parties, nor related to any

14 of the parties, nor in any way interested in the

15 outcome of this action.

16     As witness my hand this 8th day of April, 2019.

17 8th day of April 2019.

18

19       *Michele D. Lambie*

      Michele D. Lambie

20

21 My Commission Expires:  April 29, 2020

26 (Pages 98 - 100)

Maryland Rules of Procedure

Title 2, Chapter 400, Rule 2-415

(D) Signature and Changes

Unless changes and signing are waived by the
deponent and the parties, the officer shall submit
the transcript to the deponent, accompanied by a
notice in substantially the following form:
[Caption of case], NOTICE TO [name of deponent].
The enclosed transcript of your deposition in the
above-captioned case is submitted to you on [date
of submission of the transcript to the deponent]
for your signature and any corrections or other
changes you wish to make. All corrections and other
changes will become part of your sworn testimony.
After you have read the transcript, sign it and, if
you are making changes, attach to the transcript a
separate correction sheet stating the changes and
the reason why each change is being made. Return
the signed transcript and any correction sheet to
[name and address of officer before whom the
deposition was taken] no later than 30 days after
the date stated above. If you fail to return the
signed transcript and any correction sheet within
the time allowed, the transcript may be used

As if signed by you. See Rules 2-415 and 2-501 of
the Maryland Rules of Procedure.

Within 30 days after the date the officer mails or
otherwise submits the transcript to the
Deponent, the deponent shall (1) sign the
transcript and (2) note any changes to the form or
substance of the testimony in the transcript on a
separate correction sheet, stating the reason why
each change is being made. The officer promptly
shall serve a copy of the correction sheet on the
parties and attach the correction sheet to the
transcript. The changes contained on the correction
sheet become part of the transcript. If the
deponent does not timely sign the transcript, the
officer shall sign the transcript, certifying the
date that the transcript was submitted to the
deponent with the notice required by this section
and that the transcript was not signed and returned
within the time allowed. The transcript may then be
used as if signed by the deponent, unless the court
finds, on a motion to suppress under section (i)
(j) of this Rule, that the reason for the failure
to sign requires rejection of all or part of the
transcript.

(I) Further Deposition Upon Substantive Changes to Transcript

If a correction sheet contains substantive changes, any party may serve notice of a further deposition of the deponent limited to the subject matter of the substantive changes made by the deponent unless the court, on motion of a party pursuant to Rule 2-403, enters a protective order precluding the further deposition.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.