EXHIBIT 37

                                                    Page 1

1      IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY

2    MONIQUE RUSSELL, et al.  :

3       Plaintiffs           : Case No.:

4            Vs.             : CAL17-22761

5    DIMENSIONS HEALTH CORP., : CAL17-37091

6    et al.                  : CAL18-07863

7       Defendants           :

8                  --------------------

9

10          Deposition of DESIRE N. EVANS, was taken

11   via videotape on Thursday, March 28, 2019,

12   commencing at 10:04 a.m., at Schochor, Federico &

13   Staton, P.A., The Paulton, 1211 St. Paul Street,

14   Baltimore, Maryland, before MICHELE D. LAMBIE,

15   Notary Public.

16                  --------------------

17

18

19

20

21    Reported By:  Michele D. Lambie, CSR-RPR

Desire Evans                                    March 28, 2019

Page 2

1 APPEARANCES:

2         ON BEHALF OF THE PLAINTIFFS:

3  Schochor, Federico & Staton, P.A.

4         TARA CLARY, ESQUIRE

5         tclary@sfspa.com

6         The Paulton

7         1211 St. Paul Street

8         Baltimore, Maryland 21202

9         (410) 234-1000

10

11        ON BEHALF OF THE DEFENDANTS:

12 Pessin Katz Law, P.A.

13        BRIAN M. CATHELL, ESQUIRE

14        bcathell@pklaw.com

15        901 Dulaney Valley Road, Suite 400

16        Towson, Maryland 21204

17        (410) 938-8800

18

19

20        ALSO PRESENT:  Sam Varipapa - Videographer

21

Page 3

1            EXAMINATION INDEX

2

   WITNESS:  DESIRE N. EVANS              PAGE

3    DIRECT BY MR. CATHELL                 5

     CROSS BY MS. CLARY                  122

4    REDIRECT BY MR. CATHELL             124

5

6            EXHIBIT INDEX

7        (Attached to Transcript.)

8                          MARKED

   DESIRE N. EVANS

9  Exhibit 1 Answers to Interrogatories      4

10 Exhibit 2 Consent Form               85

11

12

13

14

15

16

17

18

19

20

21

Page 4

1            P R O C E E D I N G S

2        (Whereupon, Evans Deposition Exhibit 1,

3  Answers to Interrogatories, marked for

4  identification.)

5        THE VIDEOGRAPHER:  Good morning.  We are

6  now on the record at 10:04 a.m., March 28, 2019.

7        This is media unit number one in the

8  video-recorded deposition of Desire Evans taken in

9  the matter of Monique Russell, et al v. Dimensions

10 Health Corp., et al. filed in the Circuit Court for

11 Prince George's County, Case Numbers CAL17-22761,

12 CAL17-37091, and CAL 18-07863.

13        This deposition is being held at the

14 office of Schochor, Federico and Staton located at

15 1211 St. Paul Street, Baltimore, Maryland.

16        My name is Sam Varipapa on behalf of

17 Veritext, and I'm today's videographer.  The court

18 reporter is Michele Lambie, also on behalf of

19 Veritext.

20        At this time, will Counsel now state

21 their appearances and affiliations for the record

Page 5

1  beginning with the party that noticed this

2  proceeding?

3        MR. CATHELL:  Brian Cathell on behalf of

4  the Defendants.

5        MS. CLARY:  Tara Clary on behalf of the

6  Plaintiff.

7        THE VIDEOGRAPHER:  Michele, would you

8  administer oath?

9            DESIRE N. EVANS

10 the Deponent, called for examination by the

11 Defendants, being first duly sworn to tell the

12 truth, the whole truth, and nothing but the truth,

13 testified as follows:

14            DIRECT EXAMINATION

15 BY MR. CATHELL:

16 Q.   Good morning, Ms. Evans.  I introduced

17 myself off the -- off the record.  My name is

18 Brian.  Have you given a deposition before today?

19 A.   No, sir.

20 Q.   Okay.  So, just a few ground rules.  The

21 first is if you feel a break today for any reason

Desire Evans                                                March 28, 2019

Page 6

1 or no reason, that is okay, and you can just let us
2 know.  We're happy to take a break for you to go to
3 the bathroom, to get more water, or just to get
4 some fresh air, okay?  So, we're not holding you
5 hostage, all right?
6    A.  Okay.
7    Q.  The second is she is taking down
8 everything that we say, and she can't take down
9 non-verbal responses, such as head nods or um-hums
10 or huh-uhs, things like that, so the responses
11 should be yes, no, I don't know, or another verbal
12 response, --
13    A.  Okay.
14    Q.  -- is that fair?
15    A.  Yes.
16    Q.  Okay.  If I ask you a question that you
17 don't understand, which is entirely possible,
18 please let me know, and I am happy to rephrase it
19 as many times as I need to so that you can
20 understand it, okay?
21    A.  Yes.

Page 7

1    Q.  If we're talking about times or a
2 situation that is confusing, please let me know
3 that, because I don't want you to answer questions
4 that you don't fully understand, and I'm happy to
5 clarify to the best -- to the extent that I can to
6 get the specific question out that you understand
7 so that you can provide an answer, okay?
8    A.  Yes.
9    Q.  Lastly, I know that we are going to be
10 talking about some sensitive topics today, and I
11 assure you it's not my goal, it's not my intent,
12 and I don't take any pleasure in asking you about
13 those things.
14        This is our opportunity to explore class
15 certification, and so there are certain issues
16 that -- in -- in our investigation that I need to
17 explore with you, --
18    A.  Okay.
19    Q.  -- okay?
20    A.  Yes.
21    Q.  Okay.  And what is your full name?

Page 8

1    A.  Desire Nicole Evans.
2    Q.  And what is your current address?
3    A.  4057 Parker Court, Waldorf, Maryland
4 20602.
5    Q.  And how long have you lived at that
6 address?
7    A.  About one year.
8    Q.  And what is your date of birth?
9    A.  March 25th, 1979.
10    Q.  And have you gone by any other names or
11 aliases?
12    A.  No, sir.
13    Q.  And it's my understanding that you are
14 married?
15    A.  Yes, and this is actually my married
16 name.  Sorry.
17    Q.  Okay.  That's all right.  Prior to being
18 married, what was your maiden name?
19    A.  Clifton.
20    Q.  And how many times have you been married?
21    A.  Once.

Page 9

1    Q.  And on what date were you married to
2 Mr. Evans?
3    A.  December 31st, 2015.
4    Q.  And you've remained married and living in
5 the same home since that time?
6    A.  Yes.
7    Q.  Okay.  How many children do you have?
8    A.  One.
9    Q.  And what is the child's name?
10    A.  Peyton.
11    Q.  With an A or an E?
12    A.  E.
13    Q.  And I assume Peyton was born in March of
14 2016?
15    A.  Yes.  March 17th, 2016.
16    Q.  And is Peyton a healthy child?
17    A.  Yes.
18    Q.  And has Peyton lived with you since his
19 birth on March 17th, --
20    A.  Yes.
21    Q.  -- 2016?

Desire Evans                                                                    March 28, 2019

Page 10

1   A.   Yes.

2   Q.   So, living in your home is, it's you,

3 Peyton, and Mr. Evans, correct?

4   A.   And Piper, our dog.

5   Q.   Okay.  Dogs count nowadays.

6       MS. CLARY:  Absolutely.

7 BY MR. CATHELL:

8   Q.   And at the time you became involved with

9 Dr. Akoda, and we're going to explore that in depth

10 in a few minutes, but in December of 2015, who was

11 living in your home?

12   A.   It was my husband and I.

13   Q.   Okay.  And you worked with your attorneys

14 in this case to provide information or to draft

15 Answers to Interrogatories, do you recall doing

16 that?

17   A.   Yes.

18   Q.   Okay.  And I have a copy of your signed

19 Answers to Interrogatories, which include, among

20 other information, a, a list of your residential

21 history, so I'm going to show you that.  I'll ask

Page 11

1 you if you signed the document, and then if you'll

2 just look at answer to Interrogatory Number 1, that

3 will save me the time of having to go through each

4 place that you lived, --

5   A.   Um-hum.

6   Q.   -- is that fair?

7   A.   Yes.

8       MS. CLARY:  Do you want the first

9 signature?

10       MR. CATHELL:  The second.  The last page,

11 please, or it may be the third.

12 BY MR. CATHELL:

13   Q.   Is that your signature?

14   A.   Yes.

15   Q.   And reviewing answer to Interrogatory

16 Number 1, is your residential history accurate as

17 you sit here today?

18   A.   Yes.

19       MS. CLARY:  Do you want her to keep this?

20       MR. CATHELL:  Sure.  We'll get back to

21 that.

Page 12

1       MS. CLARY:  Sure.

2 BY MR. CATHELL:

3   Q.   Do you hold any degrees or

4 certifications?

5   A.   No, not currently.

6   Q.   And what is your highest level of

7 education?

8   A.   I graduated high school, and I'm

9 currently in college now.

10   Q.   And what year did you graduate high

11 school?

12   A.   '97.  Okay.  And where are you in college?

13   Q.   Okay.  And where are you in college?

14   A.   Strayer University.

15   Q.   And what are you studying?

16   A.   Cyber security.

17   Q.   We might need to retain you.  Our firm

18 was just attacked by ransom-ware.

19       MS. CLARY:  I heard this.  You were off

20 line for a week.  Was it like bliss or hell?

21       MR. CATHELL:  It was terrible.

Page 13

1       MS. CLARY:  Okay.

2       MR. CATHELL:  No phones, no email.

3       THE WITNESS:  Wow.

4       MS. CLARY:  I would have called that

5 bliss, but, you know, the other side of the table

6 here.

7 BY MR. CATHELL:

8   Q.   Are you currently employed?

9   A.   Yes.

10   Q.   And where are you employed?

11   A.   Blue Cross Blue Shield.

12   Q.   When do you -- when do you anticipate

13 receiving a degree from Strayer University?

14   A.   I should have my -- I won't have my

15 degree until 2021, but my first certification I'll

16 have in December.

17   Q.   And is -- are you working to obtain a

18 bachelor's --

19   A.   Yes.

20   Q.   -- or -- okay.  Bachelor's of Science?

21   A.   Yes, sir.

4 (Pages 10 - 13)

Desire Evans                                                    March 28, 2019

Page 14

1    Q.   And what certification will you get in
2 December?
3    A.   My Comptiaa.  C-O-M-P-T-I-A-A.
4    Q.   And is that a cyber security
5 related --
6    A.   Yes.
7    Q.   -- certification?  Good for you.  In your
8 Answers to Interrogatories -- we're going to just
9 briefly talk about your employment history.
10        I believe in Interrogatory Number 16, if
11 you'll look, you listed out your past employment
12 positions?
13    A.   That would be page 16?  Is that what that
14 means, Number 16?
15    Q.   Yeah.  And I just realized I marked my
16 copy, so let me mark this copy.  That might
17 be --
18    A.   Oh, I see it.  I see, Number 16.
19        MS. CLARY:  You got it?
20        THE WITNESS:  Um-hum.
21        MR. CATHELL:  Let me switch the copies.

Page 15

1        (Document tendered.)
2 BY MR. CATHELL:
3    Q.   Thank you.
4    A.   Yes, sir.
5    Q.   Is your employment history as listed
6 accurate as you sit here today?
7    A.   Yes.
8    Q.   Okay.  You've been with CareFirst Blue
9 Cross Blue Shield since 2015, correct?
10    A.   Yes.
11    Q.   And you're a senior customer service
12 advisor?
13    A.   Yes.
14    Q.   Briefly describe for me your roles and
15 responsibilities there, please.
16    A.   I deal with customer issues, customer
17 complaints, benefit questions, resolving issues, or
18 escalation of iss- -- issues, and that's about it.
19    Q.   And have you been full time there since
20 2015?
21    A.   Yes.

Page 16

1    Q.   And since 2015, have you missed any
2 significant period of time from work for any
3 reason, other than a vacation?
4    A.   Yes.
5    Q.   Okay.
6    A.   Currently, Sundays, since -- since this
7 has happened, I've been on FMLA.  I have 24 hours a
8 week to where I can, I guess, call out or if I have
9 to go to the doctors or I have a video appointment
10 with my doctors or whatever the case may be, so
11 I've missed a significant amount of work in the
12 past year and a half.
13    Q.   Okay.  Let's -- let's explore that more
14 when I -- when we get --
15    A.   Okay.
16    Q.   -- determine specific dates of -- of when
17 you learned about certain things.
18    A.   Um-hum.
19    Q.   And I promise, I'll come back to it.
20 Other than the FMLA --
21    A.   No.

Page 17

1    Q.   -- time off, have you missed any
2 significant time for work -- from work for any
3 reason, other than a vacation?
4    A.   Well, having my child.  Does that count?
5    Q.   Fair enough.
6    A.   Okay.
7    Q.   Other than a child or FMLA?
8    A.   No.
9    Q.   And you said you have 24 hours per week.
10 Does that mean you're working 24 hours per
11 week, --
12    A.   No.
13    Q.   -- or you're missing 24 hours a week?
14    A.   I'm missing 24 hours a week.
15    Q.   Okay.  And is that 24 hours per week that
16 you're missing reimbursed to you through FMLA?
17    A.   No.
18    Q.   Is FMLA permitting you to miss 24 hours
19 per week?
20    A.   Yes.  If I have PTO, I can use that, but
21 I don't have -- you don't get paid for FMLA.

5 (Pages 14 - 17)

Desire Evans                                        March 28, 2019

Page 18

1    Q.  Have you -- have you used PTO to satisfy
2  the 24 hours per week that you're missing?
3    A.  Sometimes, if I have it available.
4    Q.  Here today, do you have any PTO
5  available?
6    A.  No.
7    Q.  When will you next have PTO available?
8    A.  January 1st of 2020.
9    Q.  So, in January of each year, you're given
10  a, a certain amount of PTO time; is that correct?
11    A.  Yes.
12    Q.  In 2019, you were given a certain amount
13  of PTO time; is that correct?
14    A.  Yes.
15    Q.  And is it your testimony that you have
16  used your yearly allotment of PTO for 2019?
17    A.  Yes.
18    Q.  And how many hours or days, however it's
19  broken down, were you given in January of 2019 in
20  PTO?
21    A.  One hundred and 20 hours.

Page 19

1    Q.  So, that's approximately 15 workdays?
2    A.  (Nodding head yes.)
3        THE COURT REPORTER:  You have to answer
4  out loud.
5        MS. CLARY:  You have to answer.
6        THE WITNESS:  I'm sorry.  Yes.  I'm sorry
7  about that, ma'am.
8        MS. CLARY:  You're doing fine.
9        THE WITNESS:  Yes.
10        MS. CLARY:  Everybody does it.  You just
11  have to answer verbally so that when we look at the
12  transcript later, we don't see um-hum and huh-uh
13  and wonder what you meant.
14        THE WITNESS:  What, okay.
15  BY MR. CATHELL:
16    Q.  Prior to using -- well, I don't want to
17  get into yet specifically when you learned about
18  the allegations surrounding Dr. Akoda, because I
19  want to explore those fully, but how long have you
20  been using FMLA to support you in taking off the 24
21  hours per week?

Page 20

1        MS. CLARY:  I'm just going to object to
2  the extent I'm not sure it's an either/or.  I don't
3  want to make a speaking objection, but PTO, if
4  accrued, may be used sporadically, and FMLA is
5  used -- being used FMLA.
6        So, I'm assuming you're asking her when
7  she first started to need to use FMLA for the first
8  time?
9        MR. CATHELL:  Let me back up.  I
10  appreciate the clarification.
11  BY MR. CATHELL:
12    Q.  When did you first -- let's explore that
13  in a little bit when I -- when I bring in some
14  different timelines, okay?  I'll come back to it.
15        Prior to CareFirst Blue Cross Blue
16  Shield, you were employed with Arbitron --
17    A.  Um-hum.
18    Q.  -- correct?
19    A.  Yes.
20    Q.  As a customer service interviewer?
21    A.  Yes.

Page 21

1    Q.  And what were your roles and
2  responsibilities there?
3    A.  Making outbound calls to -- for Neilson
4  Ratings.
5    Q.  Okay.  And do you remember which month
6  you left Arbitron in 2015?
7    A.  September.
8    Q.  And why did you leave Arbitron?
9    A.  They closed.
10    Q.  The company closed?
11    A.  Yeah.  Nielsen bought it out.
12    Q.  And do you remember when you started with
13  CareFirst Blue Cross Blue Shield?
14    A.  June of 2015.
15    Q.  So, while you -- so, there was a period
16  of time where you were working for both Arbitron
17  and CareFirst Blue Cross Blue Shield?
18    A.  Correct.  We were aware that Arbitron was
19  closing ahead of time.
20    Q.  Prior to Arbitron, you were employed with
21  HealthStream Research as a medical interviewer?

Desire Evans                                                    March 28, 2019

Page 22

1    A.  Correct.

2    Q.  And what were your roles and

3  responsibilities there?

4    A.  Outbound calls, conducting healthcare

5  surveys for local hospitals.

6    Q.  And do you recall which hospitals you

7  were calling on behalf of?

8    A.  It was several.

9    Q.  Do you recall the names of the hospitals?

10   A.  No.

11   Q.  And why did you leave HealthStream

12  Research?

13   A.  I don't -- I don't recall.

14   Q.  So, I ask this question to everyone, so

15  it's not directed to you specifically.  Have you

16  since your 18th birthday, while represented by

17  counsel, ever pleaded guilty to or been convicted

18  of any crime, other than a minor traffic violation?

19   A.  No.

20       MS. CLARY:  Objection, but you can

21  answer.

Page 23

1        THE WITNESS:  Oh, sorry.

2        MS. CLARY:  That's okay.

3  BY MR. CATHELL:

4    Q.  Have you ever been a plaintiff or a

5  defendant in any other lawsuit?

6    A.  No.

7    Q.  Have you ever made a claim for injury

8  against any individual, business, or other entity?

9    A.  No.

10   Q.  Have you ever made a claim or complaint

11  of any kind against a healthcare provider, other

12  than the current lawsuit?

13   A.  No.

14   Q.  Have you ever made a Workers'

15  Compensation claim?

16   A.  No.

17   Q.  Have you ever suffered physical,

18  emotional, or sexual abuse of any kind by any

19  person at any time in your life?

20   A.  No.

21   Q.  Have you ever been injured physically,

Page 24

1  mentally, or emotionally in any way by any other

2  person at any time?

3    A.  No.

4    Q.  Have you ever been hospitalized, other

5  than to deliver a child?

6    A.  No.

7    Q.  Have you ever been diagnosed with a

8  condition that affects or limits your activities in

9  any way?

10   A.  No.

11   Q.  Have you ever been diagnosed with a

12  men- -- a mental illness of any kind at any time in

13  your life?

14   A.  No.

15   Q.  Have you taken any medications at any

16  time in your life for mental illness of any kind?

17   A.  Does that count now?  Current?

18       MS. CLARY:  At any time.

19       THE WITNESS:  Yes.

20  BY MR. CATHELL:

21   Q.  Correct.

Page 25

1    A.  Yes.

2    Q.  Okay.  And which medications have you

3  taken?

4    A.  Express -- Expressor -- Effexor.

5  Effexor.  Effexor, Ativan, Trazodone, Prozac.  I

6  think that's it.  I think.

7    Q.  Okay.  And are you currently taking all

8  four of those medications at the current time?

9    A.  Everything except for the Prozac, yes.

10   Q.  Okay.  So, you're taking Afexa, Ativan,

11  and Trazodone at the current time?

12   A.  Yes.

13   Q.  And --

14       MS. CLARY:  I think it's Effexor.

15       THE WITNESS:  Effexor.  Yes, I'm sorry.

16  BY MR. CATHELL:

17   Q.  Effexor.  How long have you been taking

18  these med- -- those three medications?

19   A.  I've been taking those three

20  medications -- one moment.  Feb -- February of

21  200- -- I don't remember if it was '17 or '18.  Can

7 (Pages 22 - 25)

Desire Evans                                                   March 28, 2019

Page 26

1  you -- is that in my answer?
2      MS. CLARY:  It may or may not be.  If you
3  know, you can answer.
4      THE WITNESS:  Okay.
5      MS. CLARY:  If you don't know, tell him
6  you don't know.
7      THE WITNESS:  I don't remember.
8  BY MR. CATHELL:
9      Q.  And you also mentioned that you had taken
10  Prozac in the past, correct?
11      A.  Yes.
12      Q.  And when did you take Prozac?
13      A.  Well, Prozac, I was -- I was prescribed
14  Prozac, along with the Trazodone and the Ativan, at
15  first, and then they switched it to Effexor.  So,
16  it's been around the same amount of time I've been
17  taking all of them.  They just switched my
18  medications to something else.
19      Q.  Okay.  And who prescribed those
20  medications?
21      A.  My first -- the first one was Shanda

Page 27

1  Smith at Kaiser, and then now I'm seeing Elumi
2  Neuwamini (sic).
3      Q.  All right.  That one is definitely going
4  to need to be spelled.  Do you know how to spell
5  it?
6      A.  I don't.  I sent it -- I sent it to you
7  all yesterday, the name.
8      MS. CLARY:  I will -- I'm going to look
9  it up.
10      THE WITNESS:  I'm sorry.
11      MS. CLARY:  No.
12  BY MR. CATHELL:
13      Q.  So, in your answers -- and I'm happy to
14  show them to you, --
15      A.  Um-hum.
16      Q.  -- you're -- the last physician or
17  medical provider you report seeing was Shanda
18  Smith.
19      A.  Correct.
20      Q.  So, I don't believe the last individual
21  that you mentioned is -- is listed.  Can you say

Page 28

1  the name one more time so I can at least write it
2  down so I can ask you questions?
3      A.  Igim -- Igenmino.  Igemino.  I don't
4  know.  Igemial Nanamuju -- Nanmiju.  I literally
5  had to call Mr. Ceryes back yesterday with the
6  spelling of her name because I couldn't pronounce
7  it.
8      Q.  All right.  So, first, you were seeing
9  Dr. Smith?
10      A.  Yes.
11      Q.  And it's my understanding Dr. Smith is a
12  psychiatrist --
13      A.  Yes.
14      Q.  -- with Kaiser Permanente'?
15      A.  Yes.
16      Q.  And from what -- what time period were
17  you seeing Dr. Smith?
18      A.  From February of -- I want to say
19  February of '18 to June of '18 or July of '18.
20      Q.  February of 2018 to July of 2018?
21      A.  Yeah.

Page 29

1      Q.  And --
2      A.  Wait.  I don't remember when
3  I -- when I stopped seeing her.  My husband -- we
4  had to switch insurances, so I had to get another
5  doctor.  But we switched insurances in October, so
6  I'm thinking it was more October of '18.
7      Q.  And when you stopped seeing Dr. Smith in
8  October of '18, is that when you went to see
9  Dr. Namamichu?
10      A.  Yes.
11      Q.  Is Dr. Namamichu also a psychiatrist?
12      A.  Yes.
13      Q.  And have you continuously seen
14  Dr. Namamichu since October of 2018?
15      A.  Yes.
16      Q.  And when you were seeing Dr. Smith
17  starting in February of 2018, were you seeing her
18  continuously until October of 2018?
19      A.  Yeah.  Well, not seeing -- we -- we have
20  video calls or phone calls, yes.
21      Q.  And how often would you see Dr. Smith?

8 (Pages 26 - 29)

Page 30

1    A.  On an as-needed basis, but usually
2 scheduled about twice a week.
3    Q.  And were those by weekly video
4 conference?
5    A.  No.  We video conferenced every time,
6 except for the first consultation.
7    Q.  So, you saw Dr. Smith in the office one
8 time, and then the remainder of the interactions
9 were by video conference, --
10    A.  Yes.
11    Q.  -- correct?
12    A.  Yes.
13    Q.  Did you see Dr. Namamichu in his office
14 at any time?
15    A.  Yes.  I saw her in the office.
16    Q.  It is a her?
17    A.  Um-hum.
18    Q.  I'm sorry.
19    A.  That's okay.
20    Q.  And how often have you been seeing
21 Dr. Namamichu?

Page 31

1    A.  I only see her for medication
2 maintenance, so it's a phone interview once a
3 month.
4    Q.  And how did you find Dr. Namamichu?
5    A.  Through my -- my goodness.  What's the
6 other name of that person that's not a
7 psychiatrist?  The one that can't prescribe
8 medicine.
9    Q.  A psychologist?
10    A.  A psychologist.  Through my psychologist.
11 I couldn't think of it.
12    Q.  Okay.  And who is your psychologist?
13    A.  Paul Donato.
14    Q.  Do you know how to spell his last name?
15    A.  D-O-N-A-T-O, I'm assuming.
16    Q.  And how long have you been seeing
17 Psychiatrist Donato or Psychologist Donato?
18    A.  Since about March -- no, no, no.  June of
19 '18.
20    MS. CLARY:  I have a name and a spelling.
21 Do you want me to jump in with it?

Page 32

1    MR. CATHELL:  Sure.
2    MS. CLARY:  Dr. Nnamani.
3    THE WITNESS:  Nnamani.
4    MS. CLARY:  The first name is
5 I-G-E-O-M-A, last name is N-N-A-M-A-N-I.
6    MR. CATHELL:  Okay.
7    MS. CLARY:  Igeoma Nnamani -- excuse me,
8 Nnamani.
9    MR. CATHELL:  Nnamani?
10    MS. CLARY:  Yes.  I have mad skills.
11 You're welcome.
12    MR. CATHELL:  Thank you very much.
13 BY MR. CATHELL:
14    Q.  We can agree that -- that the
15 psychologist -- the psychiatrist I've been
16 referring to as Dr. Namamichu is Dr. Nnamani,
17 correct?
18    A.  Yes.  Namamichu, yes.
19    Q.  You've been seeing psychologist
20 Dr. -- strike that.
21    You've been seeing Psychologist Donato

Page 33

1 since June of 2018, correct?
2    A.  Yes.
3    Q.  And do you currently see Mr. Donato?
4    A.  Not in the office, but we converse; yeah.
5    Q.  And how often do you receive treatment
6 from Mr. Donato?
7    A.  Also on an as-needed basis, but scheduled
8 twice a week.
9    Q.  Are those video conferences?
10    A.  Just phone conferences.  He doesn't have
11 video.  He's kind of old schooled.
12    Q.  Does Dr. Nnamani participate in video or
13 telephone conferences with you?
14    A.  Telephone, yes.
15    Q.  And how often do you speak to
16 Dr. -- speak or see on video Dr. Nnamani?
17    A.  Once a month for medication maintenance.
18    Q.  So, a typical week for you would have you
19 speaking to Psychologist Donato two times per week
20 on the telephone and Dr. Nnamani one time per month
21 on the telephone for medication maintenance?

9 (Pages 30 - 33)

Desire Evans                                                        March 28, 2019

Page 34

1    A.  Yes.

2    Q.  Did I miss anything regarding the

3 treatment you're receiving for any mental illness

4 as far as providers?

5    A.  No.

6    Q.  And when Dr. Smith prescribed to you the

7 four medications, understanding you were only

8 taking three at a time, did she make a diagnosis of

9 you at that time?

10    A.  Yes.

11    Q.  And what was the diagnosis?

12    A.  The diagnosis was, or is, depression,

13 anxiety, and PTSD.

14    Q.  And in -- was it Dr. Smith who diagnosed

15 you with those conditions?

16    A.  Yes.

17    Q.  And do you recall when she diagnosed you

18 with those conditions?

19    A.  I don't.  It was during her -- our first

20 visit.

21    Q.  So, that would have been in February

Page 35

1 2018, correct?

2    A.  (Nodding head yes.)

3    Q.  Yes?

4    A.  Yes.  I'm sorry.  Yes.

5    Q.  That's okay.

6    A.  Yes.

7       THE WITNESS:  I'm sorry, ma'am.

8       MS. CLARY:  You're doing fine.

9       THE WITNESS:  Okay.

10 BY MR. CATHELL:

11    Q.  To your knowledge, has Dr. Nnamani

12 diagnosed you with either the same conditions or

13 anything additional?

14    A.  Not that I'm aware of.

15    Q.  Has Dr. Nnamani recommended any

16 additional prescription medication for you?

17    A.  No.  She's actually the one who changed

18 my medication from Prozac to Effexor.

19    Q.  Okay.  Prior to February of 2018, had you

20 ever been diagnosed with depression?

21    A.  No.

Page 36

1    Q.  Prior to February of 2018, had you ever

2 been diagnosed with anxiety?

3    A.  No.

4    Q.  Prior to 2018, had you ever been

5 diagnosed with posttraumatic stress disorder?

6    A.  No.

7    Q.  Prior to February of 2018, had you taken

8 any medications at any time in your life for mental

9 illness of any kind?

10    A.  No.

11    Q.  Prior to 2018, had you felt depressed?

12    A.  No.

13    Q.  Prior to 2018, had you ever felt

14 anx- -- anxious?

15    A.  No.

16    Q.  Since beginning your medication regimen

17 in February of 2018, have you seen an improvement

18 in your depression?

19    A.  Some days, but for the most part, no.

20    Q.  And can you describe for me which days

21 or -- you see improvement and which days you don't?

Page 37

1    A.  It's kind of hard to say which days, but

2 sometimes I wake up, and I feel like I can go on

3 through my day and go to work just fine; some days

4 I can't get out of bed at all.

5    Q.  Since 200- -- since February of 2018,

6 have you seen an improvement in your anxiety?

7    A.  No.

8    Q.  So, it's fair to say the medications you

9 you've been taking since February 2018 have not

10 improved or reduced your anxiety, correct?

11    A.  Yes.

12    Q.  Since February 2018, when you began

13 taking the medications you've described, have you

14 seen an improvement or reduction in the symptoms of

15 posttraumatic stress disorder?

16    A.  No.

17    Q.  What is posttraumatic stress disorder, if

18 you know?

19       MS. CLARY:  Objection to the extent I

20 think it calls for psychiatric expertise, but you

21 can go ahead as best you can.

10 (Pages 34 - 37)

Page 38

1        THE WITNESS:  From my understanding, it's
2  a -- it's a -- it's me having -- it's me having
3  stress or -- for something that happened to me in
4  my past or anxiety or social anxiety.  That's it.
5  BY MR. CATHELL:
6      Q.  Did Dr. Smith ever give you her opinion
7  that your depression -- strike that.
8          Did Dr. -- Dr. Smith ever share with you
9  an opinion regarding the cause of your depression?
10     A.  No.
11     Q.  Did Dr. Smith ever share with you an
12  opinion regarding the cause of your anxiety?
13     A.  No.
14     Q.  Did Dr. Smith ever share with you her
15  opinion regarding the cause of your posttraumatic
16  stress disorder?
17     A.  No.
18     Q.  Is this -- is your answer to all three of
19  those questions the same for Dr. Nnamani?
20     A.  Yes.  Can I ask a question?  Are you
21  asking me if they gave me a reason for diagnosing

Page 39

1  me with those things?
2      Q.  So, I'm not allowed to ask you -- answer
3  your question, --
4      A.  Oh.
5      Q.  -- but I'm happy to rephrase it if you
6  don't understand.  I'm -- it's not a trick
7  question.
8      A.  Can I ask my lawyer?
9      Q.  What -- what -- let me -- let me
10  ask -- kind of ask -- did you not understand the
11  question?
12     A.  Well, I'm just making sure I answered it
13  correctly.
14     Q.  I -- I mean --
15         MS. CLARY:  If you don't ask her now, I
16  will later.  So, you might want to ask her now,
17  because the word "causation or cause" can have a
18  legal significance.  And, again, I'm not
19  trying -- I'm trying my very best not to make a
20  speaking objection, but I think what you're asking
21  her is, has anybody told her why she has the

Page 40

1  conditions that she testified to.
2          MR. CATHELL:  Right.
3  BY MR. CATHELL:
4      Q.  My -- my question was, did Dr. Smith
5  share with you her opinion as to the cause of your
6  depression?
7          MS. CLARY:  I'm going to object to the
8  form for the reasons I stated.  You can answer as
9  best you can.
10         THE WITNESS:  Okay.  So, I'm still going
11  to say, no, I think.
12  BY MR. CATHELL:
13     Q.  For the sake of going through the rest of
14  those, is the answer -- do your -- did Dr. Smith
15  share with you her opinion regarding the cause of
16  your anxiety?
17         MS. CLARY:  Same objection.  You can go
18  ahead.
19         THE WITNESS:  No.
20  BY MR. CATHELL:
21     Q.  Did Dr. Smith -- Smith share with you her

Page 41

1  opinion regarding the cause of your posttraumatic
2  stress disorder?
3          MS. CLARY:  Same objection.  You can go
4  ahead.
5          THE WITNESS:  No.
6  BY MR. CATHELL:
7      Q.  Did Dr. Nnamani share with you her
8  opinion regarding the cause of your depression?
9          MS. CLARY:  Same objection.
10         THE WITNESS:  No.
11  BY MR. CATHELL:
12     Q.  Did Dr. Nnamani share with you her
13  opinion regarding the cause of your anxiety?
14         MS. CLARY:  Same objection.  Go ahead.
15         THE WITNESS:  No.
16         MS. CLARY:  Can I have a continuing
17  objection?
18         MR. CATHELL:  Sure.
19         MS. CLARY:  Thank you.
20  BY MR. CATHELL:
21     Q.  Did Dr. Nnamani share with you her

11 (Pages 38 - 41)

Desire Evans                                                          March 28, 2019

Page 42

1  opinion regarding the cause of your posttraumatic
2  stress disorder?
3      A.  No.
4      Q.  Have you ever been seen by a healthcare
5  specialist, other than an OB/GYN, other than
6  routine check-up care, such as mammography or
7  dermatologic screening?
8      A.  No.
9      Q.  Who is your primary care provider?
10     A.  I don't have a primary care provider.
11     Q.  When did you last have a primary care
12  provider?
13     A.  Before I had my son.  In 2016, I
14  guess -- 2015.
15     Q.  And who was your primary care provider at
16  that time?
17     A.  Dainty Jackson.
18     Q.  Dainty?
19     A.  (Nodding head yes.)
20     Q.  Is that a female?
21     A.  Yes.

Page 43

1      Q.  And do you know where Dr. Jackson was
2  located?
3      A.  Waldorf, Maryland.  I don't know the
4  exact address.
5      Q.  And how long had Dr. Jackson been your
6  primary care provider?
7      A.  I seen her one time.  She was assigned by
8  insurance.
9      Q.  Prior to seeing Dr. Jackson, did you have
10  a primary care provider?
11     A.  No.
12     Q.  Should I understand your answer to mean
13  you have never had a primary care provider prior to
14  seeing Dr. Jackson on the one occasion?
15     A.  Correct.  I didn't have insurance.
16     Q.  Do you currently have an OB/GYN?
17     A.  Nope.  No.  Sorry.
18     Q.  That's all right.  And when did you last
19  have an OB/GYN?
20     A.  When I had my son.
21     Q.  And what was the name of your last

Page 44

1  OB/GYN?
2      A.  J-A-V-A-K-A, Moore, M-O-O-R-E.
3      Q.  Prior to Dr. Moore, who was serving as
4  your OB/GYN?
5      A.  I went to -- I went to Moore OB/GYN, but
6  I just saw any.  I didn't have a, a particular
7  OB/GYN.
8      Q.  What years were -- did Dr. Moore or his
9  office serve as your OB/GYN?
10     A.  I moved to Maryland in -- I think I moved
11  to Maryland in 2013, so maybe about 2014 until I
12  had my son.
13     Q.  And did you have a -- have an OB/GYN
14  prior to 2014?
15     A.  No.  Not a regular OB/GYN, no.
16     Q.  When you say not a regular OB/GYN, were
17  you seeing OB/GYNs as needed?
18     A.  As needed, yeah.  I wasn't going for like
19  regular check-ups or anything.
20     Q.  When was the last time you saw a
21  healthcare provider of any kind?

Page 45

1      A.  Like physically?  Like went into their
2  office?
3      Q.  Yes.
4      A.  September of 2018.
5      Q.  And who was that?
6      A.  Dr. Nnamani.  October of 2018,
7  Dr. Nnamani.
8      Q.  Prior to seeing Dr. Nnamani, who was the
9  healthcare provider that you saw most recently?
10     A.  Shanda.
11     Q.  Is that Dr. Smith?
12     A.  Yes, and Dr. Donato as well.
13     Q.  Other than Dr. Nnamani, Dr. Smith, and
14  Dr. Donato, have you seen any other healthcare
15  providers since your child was born in March of
16  2016?
17     A.  No.
18     Q.  Have you gone to any hospitals, emergency
19  departments, or urgent care centers since March of
20  2016 to receive care or treatment?
21     A.  I did go to the emergency room, yes.

12 (Pages 42 - 45)

Desire Evans                                           March 28, 2019

1   Q.   And when was that?

2   A.   December, maybe.

3   Q.   Of 2018?

4   A.   '18.  Um-hum.

5   Q.   And what caused you to go to the

6 emergency department in December of 2018?

7   A.   I had a rup- -- ruptured cyst on my

8 ovary.

9   Q.   And which hospital did you go to?

10   A.   Charles County.  La Plata, I believe.

11   Q.   And I assume you were seen by healthcare

12 providers there?

13   A.   Yes.

14   Q.   Okay.  And what did those healthcare

15 providers do regarding the ruptured cyst on your

16 ovary?

17   A.   Gave me antibiotics.

18   Q.   And did the antibiotics have their

19 intended effect and resolve the cyst?

20   A.   Well, I'm no longer in pain.  I never

21 went to a follow-up appointment to find out.

1   Q.   Do you happen to recall the names of any

2 of the healthcare providers who saw you at the

3 emergency department?

4   A.   No.

5   Q.   Have you at any time been seen by a

6 primary care provider that we haven't otherwise

7 discussed?

8   A.   No.

9   Q.   Other than Dr. Moore and Dr. Akoda, who

10 we're going to talk about, have you been seen by

11 any other OGB -- OB/GYN that we have not otherwise

12 discussed?

13   A.   No.

14   Q.   I know you've told me about the mental

15 health treatment you've been receiving.  Other than

16 that, have you -- since your alleged involvement

17 with Dr. Akoda -- seen any healthcare provider of

18 any kind for any issue you claim is related to your

19 involvement with Dr. Akoda?

20   A.   No.

21   Q.   And the four medications we discussed,

1 understanding you're taking three at the current

2 time, are there any other medications that you

3 currently take that we have not discussed?

4   A.   No.

5   Q.   What pharmacy or pharmacies have you

6 filled prescriptions at in the last three years?

7   A.   Walmart, CVS, and Walgreens.

8   Q.   And are those in La Plata?

9   A.   Waldorf.

10   Q.   All are in Waldorf?

11   A.   Um-hum.  Yes.  Sorry.

12   Q.   That's okay.  Prior to March of

13 2016 -- well, strike that.

14       I recall reading in your Answers to

15 Interrogatories that you had been hospitalized in

16 2015 for a slip and fall; is that corr- -- is that

17 accurate?

18   A.   Oh, yeah.  I'm sorry.

19   Q.   And you described that incident as you

20 lost your footing and fell resulting in

21 hospital -- hospitalization for approximately one

1 week at Washington Hospital Center, correct?

2   A.   Yes.

3   Q.   And any injuries you sustained as a

4 result of the slip and fall, have those since

5 resolved?

6   A.   Yes.

7   Q.   So, you don't have any lingering back

8 issues or bone issues?

9   A.   Not that I can contribute to that.

10 That -- I mean, I'm not a medical professional, so

11 I wouldn't know why my back was hurting.

12   Q.   The next series of questions I'm asking

13 for information just known by you or evidence that

14 you have, not information that was shared by your

15 attorney or that has been provided by your

16 attorney; is that fair?

17   A.   Yes.

18   Q.   Okay.  What evidence do you have

19 regarding Dr. Akoda's background?

20   A.   None.

21   Q.   What evidence do you have regarding

13 (Pages 46 - 49)

Desire Evans                                                                    March 28, 2019

Page 50

1 whether Dr. Akoda was licensed in Maryland?

2    A.   None.

3    Q.   What evidence -- evidence do you have

4 regarding whether Dr. Akoda was licensed to

5 practice medicine in Virginia?

6    A.   None.

7    Q.   What evidence do you have regarding

8 Dr. Akoda's training as a medical doctor?

9    A.   None.

10   Q.   Do you know whether Dr. Akoda went to

11 medical school?

12   A.   I'm not aware.  I don't -- I'm not aware

13 if he went to medical school.

14   Q.   Do you know where Dr. Akoda did his

15 residency?

16   A.   No.

17   Q.   Do you know what a residency is?

18   A.   I think so.  To become a -- it's like an

19 internship for doctors.

20   Q.   Do you know whether Dr. Akoda

21 successfully completed a residency?

Page 51

1    A.   No.

2    Q.   Do you know if he passed all national

3 examinations to complete a residency?

4    A.   No.

5    Q.   Do you know whether Dr. Akoda was board

6 certified by the American Board of Obstetrics and

7 Gynecology?

8    A.   No.

9    Q.   Do you know what is entailed in becoming

10 board certified?

11   A.   No.

12   Q.   Were you aware that Dr. Akoda took

13 written and oral examinations and passed them to

14 become board certified?

15   A.   No.

16   Q.   What do you know about when Dr. Akoda

17 began using the name Akoda?

18   A.   Nothing.

19   Q.   Do you know why Dr. Akoda began using the

20 name Akoda?

21   A.   No.

Page 52

1    Q.   Do you know what ECFMG certification

2 stands for?

3    A.   No.

4    Q.   It stands for the Educational Commission

5 for Foreign Medical Graduates.  Were you aware that

6 to be certified a foreign medical graduate takes

7 an -- an examination administered by ECFMG?

8    A.   No.

9    Q.   Do you know whether Dr. Akoda took such

10 an examination?

11   A.   No.

12   Q.   How many times he successfully passed the

13 examination?

14   A.   No.

15   Q.   Do you have any evidence regarding how

16 many times Dr. Akoda took the examination?

17   A.   No.

18   Q.   Do you have any evidence regarding under

19 which what names Dr. Akoda took the examination?

20   A.   No.

21   Q.   Do you know whether Dr. Akoda was

Page 53

1 certified by ECFMG?

2    A.   No.

3    Q.   Is all of the information you have

4 regarding Dr. Akoda limited to that information

5 which has been provided to you by your counsel?

6    A.   Yes.

7    Q.   The next series of questions, if you will

8 just give your attorney time to object, I want to

9 be fair.

10       How did you come to be a client of

11 Schochor, Federico and Staton?

12       MS. CLARY:  I'm going to object.  I'm

13 going to let you answer up to the point that you

14 made first contact with us.

15       I assume what you're asking her is to

16 talk about how she got -- made her way here?

17       MR. CATHELL:  Let me -- let me rephrase

18 the question.

19 BY MR. CATHELL:

20   Q.   What -- when was the first you learned of

21 allegations surrounding Dr. Akoda?

14 (Pages 50 - 53)

Desire Evans                                              March 28, 2019

Page 54

1    A.   On the radio.

2    Q.   And do you recall when that was?

3    A.   Maybe fall of '18, but I can't be sure.

4    Q.   Do you recall which radio station you

5 were listening to?

6    A.   93.9.

7    Q.   And do you recall what the advertisement

8 said?

9    A.   Not verbatim, of course, but something to

10 the effect of, Doc -- Dr. Akoda -- if you were seen

11 by Dr. Akoda or something to that effect.

12    Q.   If you were seen by Dr. Akoda?

13    A.   Contact -- I -- I -- I can't remember

14 exactly.

15    Q.   And what did you do based on that

16 advertisement?

17    A.   I discussed it with my husband, and then

18 we contacted the lawyer's office.

19    Q.   How long between the time you heard the

20 radio advertisement did you wait before calling the

21 number that was on the advertisement?

Page 55

1        MS. CLARY:  You can answer that.

2        THE WITNESS:  The next day.

3 BY MR. CATHELL:

4    Q.   And do you recall which law firm you

5 spoke to when you made that initial call?

6    A.   This law firm.

7    Q.   Do you recall whether the radio

8 advertisement said anything, other than if you were

9 a patient of Dr. Akoda, you should call this

10 certain telephone number?  In other words, did it

11 say, state any allegations regarding Dr. Akoda?

12    A.   I really can't recall.

13    Q.   Other than the radio advertisement we've

14 discussed, did you --

15    A.   Can I go back?  It didn't say anything

16 about allegations, because I wasn't sure.  I

17 thought that it was like for a sexual assault or

18 something.  I wasn't exactly sure what the -- the

19 lawsuit was about.

20    Q.   When did you first become aware of what

21 the lawsuit was about?

Page 56

1        MS. CLARY:  I'm going to object to the

2 extent I think that now is going into discussions

3 that she would have had with counsel.

4        So, you can answer if you have an

5 understanding outside of any conversation you've

6 had with anybody here at this law firm.  Do you

7 understand what -- how I'm directing you?  He

8 wants --

9        MR. CATHELL:  Let me try to ask a better

10 question.

11        MS. CLARY:  Okay.

12 BY MR. CATHELL:

13    Q.   Prior to making the telephone call to

14 this law firm, --

15    A.   Um-hum.

16    Q.   -- did you have an understanding of what

17 the lawsuit was about?

18    A.   No.

19    Q.   Is any information you have regarding

20 what the lawsuit about -- lawsuit is about

21 information that was provided to you by your

Page 57

1 attorney as compared to information you saw on TV

2 or the Internet?

3        MS. CLARY:  I'm going to object.  Just

4 by the way you've phrased this, it's soliciting her

5 testifying about what information she got from us.

6 So, I'm not sure that she can parse that out with

7 the way that you phrased the question, so --

8 BY MR. CATHELL:

9    Q.   Since -- since hearing the radio

10 advertisement, have you seen -- have you heard any

11 other radio advertisements regarding Dr. Akoda?

12    A.   Like from other law firms?  Just in

13 general?

14    Q.   Just any radio advertisements.

15    A.   Oh, yes.

16    Q.   Okay.  And what did those radio

17 advertisements say?

18    A.   They -- a class action suit against

19 Charles Akoda, if you saw this doctor, give us a

20 call type situation.

21    Q.   Did any of the radio advertisements state

15 (Pages 54 - 57)

Page 58

1 the substance of the allegations surrounding
2 Dr. Akoda.
3    A.   No.
4    Q.   Have you at any time seen any television
5 advertisements regarding the allegations pertaining
6 to Dr. Akoda?
7    A.   No.
8    Q.   Did you at any time conduct an Internet
9 search regarding the allegations involving
10 Dr. Akoda?
11    A.   Yes.
12    Q.   Okay.  And tell me what you did.
13    A.   Well, I -- once I found out what
14 the -- you know, what the allegations were, I
15 looked him up, and I just wanted to see what the
16 story was behind it and what his real name was.
17 You know, I was just doing my own research on the
18 person who --
19    Q.   And what did you discover?
20    A.   I didn't discover anything new that
21 wasn't -- that I didn't know already.  I just

Page 59

1 discovered that he wasn't who he said he was when
2 he told me who he said he was -- who he was what he
3 said he was.
4    Q.   Anything else?
5    A.   No.
6    Q.   Other than the radio advertisements that
7 we've talked about and your Internet search and any
8 communications from your attorneys, have you
9 received any additional information regarding the
10 substance of the allegations against Dr. Akoda?
11    A.   No.
12    Q.   I asked you earlier if Dr. Akoda -- if
13 you knew whether Dr. Akoda had gone to
14 medical -- medical school or residency.  Do you
15 have an understanding or belief whether he had
16 gone -- undergone any medical training?
17    A.   No.  I just assumed that if he was at the
18 hospital, he would have training.
19    Q.   Do you know whether Dr. Akoda was trained
20 as an OB/GYN?
21    A.   No.

Page 60

1    Q.   Do you have any evidence that Dr. Akoda
2 lacked OB/GYN training or skills?
3    A.   No.
4    Q.   How did you become aware of Dr. Akoda as
5 an OB/GYN?
6    A.   He came into my room as I was about to
7 deliver my son.
8    Q.   And it's my understanding from your
9 medical chart that you had been receiving prenatal
10 care from Dr. Moore; is that correct?
11    A.   Correct.
12    Q.   And it's my understanding from your
13 medical chart, and other information, that your
14 first, and only, contact with Dr. Akoda occurred
15 immediately prior to and during the birth of your
16 child; is that correct?
17    A.   Correct.
18    Q.   And do you recall when you presented to
19 the Prince George's County Hospital Center to
20 deliver your child?
21    A.   On March 16th.

Page 61

1    Q.   When you first presented to Prince
2 George's County Hospital Center, you were seen by
3 Dr. Moore, correct?
4    A.   No.
5    Q.   If your medical records -- are you sure
6 you returned to PG County Hospital Center for
7 delivery on March 16th compared to March 14, 2016,
8 for example?
9    A.   Yeah.
10    Q.   Who was the first healthcare provider
11 that you came into contact with on March 16?
12    A.   A nurse.  I don't -- it was a nurse up
13 until my water broke.
14       THE WITNESS:  I'm sorry, am I doing that
15 to your computer?  I was shaking it.  I'm sorry.
16 BY MR. CATHELL:
17    Q.   And when did you first come into contact
18 with Dr. Akoda?  Immediately after your water
19 broke?
20    A.   About that, yes.
21    Q.   And did you know that Dr. Moore would not

16 (Pages 58 - 61)

Desire Evans

March 28, 2019

Page 62

1 be present?

2    A.   No.

3    Q.   And describe for me your interaction with

4 Dr. Akoda on --

5    A.   And it was 3-17 at this point.

6    Q.   March -- right, on March 17, 2016.

7    A.   He came in the room, and they set the

8 room up for delivery.  What else do you need to

9 know?  What else are you asking?  I'm sorry.

10    Q.   Describe your interaction with Dr. Akoda.

11 Tell me what happened when he came in the room

12 and -- and the care and treatment he provided to

13 you.

14    A.   He just said that he would be delivering

15 my baby, that he was the doctor on call.  He had

16 been there at the hospital for 16, 18 hours at that

17 time, and he would just be in charge of delivery.

18    Q.   Did you have an understanding as to

19 whether Dr. Akoda and Dr. Moore had a professional

20 relationship?

21    A.   No.  My understanding was that he was

Page 63

1 there on behalf of the hospital.

2    Q.   And what led you to -- to arrive at that

3 understanding?

4    A.   Because he had said he had already been

5 there for hours, which means that he wasn't there

6 for me.

7    Q.   Did you have any indication as to whether

8 Dr. Akoda and Dr. Moore worked together?

9    A.   No.

10    Q.   Was March 17, 2016 your only interaction

11 with Dr. Akoda?

12    A.   Yes.

13    Q.   What evidence, other than the statement

14 you told me that Dr. Akoda made, do you have that

15 Dr. Akoda was affiliated with the hospital?

16    A.   None.  That's just my assumption when you

17 go to a hospital.

18    Q.   I believe we left off Dr. -- when

19 Dr. Akoda said that he would be performing your

20 delivery.  Can you tell me what happened next,

21 please?

Page 64

1    A.   That was it.  He was in and out of the

2 room a lot up until I actually started pushing.

3 So, he was just in and out a lot, so it really

4 wasn't a lot of him explaining or introducing

5 himself.

6    Q.   Okay.  What happened next?

7    A.   So, then it's time for delivery.  So, I

8 was pushing.  It was only -- it wasn't a nurse in

9 the room at the time.  It was just the doctor and

10 my husband and my mom, and we were -- I'm pushing

11 and pushing, but my son wasn't coming out.  That

12 went on for several hours.  And in the process, he

13 started -- I don't know how to say it.  I don't

14 know how to say it.

15    MS. CLARY:  Do the best you can.

16    THE WITNESS:  Just say it?

17    MS. CLARY:  Just say it.

18 BY MR. CATHELL:

19    Q.   We're -- we're all adults here.

20    A.   I know, but it's just weird.  He started

21 like fondling with my lady parts, and my husband

Page 65

1 was asking him, like, why are you doing that?  And

2 he said that it was to stim- --- stimulate the baby

3 coming out, because my son wasn't coming out.

4    MS. CLARY:  Do you need a break?

5    THE WITNESS:  (Shaking head no.)

6    MS. CLARY:  Okay.  Brian, I am going to

7 need a break at some point.

8    MR. CATHELL:  Let's -- let's take a

9 break.

10    MS. CLARY:  -- so --

11    MR. CATHELL:  And then -- and then we can

12 just pick up where we've left off.

13    MS. CLARY:  If you want to finish like a

14 section, I can wait, but I just do need a bathroom

15 break, and I apologize.

16    MR. CATHELL:  Okay.

17    MS. CLARY:  Do you want to finish?

18    MR. CATHELL:  Yeah.

19    THE VIDEOGRAPHER:  Off the record.

20    MS. CLARY:  Well, hold on one second just

21 while we decide.

17 (Pages 62 - 65)

Page 66

1        MR. CATHELL:  Yes, let me finish up just
2  this area.
3        MS. CLARY:  Okay.
4  BY MR. CATHELL:
5    Q.   So, understanding that it's
6  difficult --
7    A.   Um-hum.
8    Q.   -- or, frankly, not understanding
9  actually, but -- and I'm certainly not trying to
10  embarrass you, --
11    A.   Um-hum.
12    Q.   -- but it's a claim that you're making in
13  the case.
14    A.   I understand.
15    Q.   And so I would ask you to describe for me
16  when you say -- I think you said fuddling with your
17  lady parts.  Is there any better description you
18  can give us --
19    A.   He --
20    Q.   -- as to what he was doing?
21    A.   -- he was fingering my clitoris, I

Page 67

1  guess, --
2    Q.   Okay.
3    A.   -- if that makes sense.
4    Q.   And how -- how long was he doing that
5  for?
6    A.   He would do it for like a few seconds,
7  and then stop, and then go back and do it again for
8  a few -- a few seconds, and then stop.
9    Q.   And --
10    A.   And that lasted for maybe five or six
11  minutes, I guess.  I'm just -- I'm just throwing a
12  number out there, before my husband was like, Yo,
13  like, what are you doing, Man?  And then that's
14  when he said that he -- my son wasn't coming out,
15  so he had -- that was a way for him to
16  stim- -- stimulate; lubrication I guess.  I don't
17  know.
18    Q.   And present in the room during this time
19  were your husband and your mother?
20    A.   My mom.  Um-hum.
21    Q.   Were any other healthcare providers in

Page 68

1  the room?  Healthcare providers meaning nurses,
2  aides, --
3    A.   No.
4    Q.   -- what have you in the
5  five-to-six-minute period?
6    A.   No.
7    Q.   When your husband asked Dr. Akoda what he
8  was doing, and Dr. Akoda allegedly explained why he
9  was doing that, did Dr. Akoda continue to touch you
10  in that way?
11    A.   Not as frequently.  So, it was like
12  before he just kept -- you know, it was like every
13  few seconds he was doing that, and then once my
14  husband said something, it wasn't -- he still did
15  it, but it was like maybe one or two times after
16  that.
17    Q.   Did Dr. Akoda say anything to you during
18  that time while he was touching you in that manner?
19    A.   Like telling me to, push, push.  He
20  was -- and he was calling me Baby and Momma, which
21  also was uncomfortable.

Page 69

1    Q.   Did he say anything else to you?
2    A.   No.
3    Q.   Did Dr. -- strike that.
4        Are you alleging any additional sexual
5  impropriety on behalf of Dr. Akoda, other than what
6  you've described for me?
7    A.   No.
8    Q.   To your knowledge, are there any audio
9  recordings of the statements or video recordings of
10  the acts that you've described?
11    A.   No.
12    Q.   Did you -- did you report Dr. Akoda's
13  behavior to anyone?
14    A.   I didn't.
15    Q.   To your knowledge, did your husband or
16  your mother report Dr. Akoda's behavior to anyone?
17    A.   No, sir.
18    Q.   Did -- I think we covered it in the last
19  question, but I just want to be clear for the
20  record.  Did you make any type of claim arising
21  from Dr. Akoda's behavior that you've just

Desire Evans                                           March 28, 2019

Page 70

1  described?

2      A.  No.

3      Q.  Did you contact, you or your husband or

4  your mother, to your knowledge, contact any police

5  department or law enforcement department regarding

6  the alleged sexual contact?

7      A.  No.

8      Q.  To your knowledge, were there any

9  additional witnesses to any of the alleged

10 inappropriate contact, other than those that you've

11 told me about?

12     A.  Not to my knowledge, no.

13     Q.  Did any other healthcare provider or

14 person that was around at the same time that you

15 and Dr. Akoda were together make any statements

16 regarding Dr. Akoda?

17     A.  No, not that I can recall.

18         MR. CATHELL:  Do you want to take a

19 break?

20         MS. CLARY:  If you don't mind.

21         THE VIDEOGRAPHER:  Stand by.  The time is

Page 71

1  now 11:14, and we are off the record.

2      (Recess taken -- 11:14 a.m.)

3      (After recess -- 11:23 a.m.)

4         THE VIDEOGRAPHER:  The time is now 11:23,

5  and we are back on the record.

6      You lost your microphone.  The clip is

7  still there.  The mic fell off.

8         MS. CLARY:  We had a clip problem

9  yesterday, and I'm just wondering if he's just

10 trying to steal a clip.

11        MR. CATHELL:  It's just what I need,

12 right?

13        MS. CLARY:  That's right.

14 BY MR. CATHELL:

15     Q.  All right.  So, we established -- I want

16 to back up just a few topics, Ms. Evans.  We

17 established that you started seeing Dr. Smith in

18 February of 2018, correct?

19     A.  Um-hum.

20        MS. CLARY:  Yes?

21        THE WITNESS:  Yes.  Sorry.

Page 72

1         MS. CLARY:  That's okay.

2  BY MR. CATHELL:

3      Q.  And we had talked earlier about time that

4  you had been missing from work?

5      A.  Yes.

6      Q.  And I wanted to come back to that, and

7  now that we know, generally, when you started

8  seeing Dr. Smith, I'd like to try to nail down time

9  frames, as best we can, as to when you started

10 missing work.

11     A.  Okay.

12     Q.  Okay.  When -- and I -- I believe you

13 told us that you heard the radio advertisement in

14 either the fall of 2017 or the fall of 2018.  Can I

15 assume that because you started seeing Dr. Smith in

16 February of 2018, you would have heard the radio

17 advertisement in the fall of 2017?

18     A.  No.  I was seeing Dr. Smith before I

19 heard the advertisement.

20     Q.  Okay.  And what caused you to go see

21 Dr. Smith?

Page 73

1      A.  I was -- I was very sad and depressed and

2  anxious and having a hard time working.  I was

3  missing a lot -- starting to miss a lot of time

4  from work, and I went to go see her to see if I

5  could get treatment and also to see if I can get

6  FMLA to help with the time that I was missing from

7  work.

8      Q.  And how long had you felt depressed,

9  anxious, and been missing work prior to seeing her

10 in February of 2018?

11     A.  Maybe like a year.

12     Q.  So, starting approximately in February

13 2017, you began feeling depressed, anxious, and

14 missing time from work?

15     A.  Yes.

16     Q.  And can you describe for us what it was

17 that was making you feel anxious and depressed?

18     A.  No.  Just every day life.  Like any

19 things that didn't bother me before, like started

20 bothering me.  I started noticing a decline in my

21 social interaction with people and not -- just not

19 (Pages 70 - 73)

Desire Evans                                    March 28, 2019

Page 74

1  wanting to be bothered.

2     Q.  Do you know what was causing those

3  symptoms at that time?

4     A.  No.  No.

5     Q.  Were you working full-time at that time?

6     A.  Yes.

7     Q.  Was your husband working full time at

8  that time?

9     A.  Yes.

10    Q.  And what was happening with --

11       MS. CLARY:  Peyton?

12 BY MR. CATHELL:

13    Q.  -- Peyton while you both were working

14 full time?

15    A.  Peyton has always stayed home with me.  I

16 work from home.

17    Q.  Do you currently still work from home?

18    A.  I do.

19    Q.  And have you worked from home at all

20 times since March of 2016?

21    A.  Yes.

Page 75

1     Q.  So, you had been seeing Dr. Smith prior

2  to learning of the allegations surrounding

3  Dr. Akoda?

4     A.  Correct.

5     Q.  Had you been prescribed medication by

6  Dr. Smith prior to learning of the allegations

7  surrounding Dr. Akoda?

8     A.  Yes.

9     Q.  Once learning of the allegations

10 involving Dr. Akoda, how did your mental health

11 change at all, if it did?

12    A.  I want to say it got worse, because I

13 started to understand why I was feeling the way

14 that I was feeling, and also, I felt stupid

15 because -- because at first, I didn't know what the

16 allegations were.  I just knew that it was

17 Dr. Akoda, and I knew what he had done to me.  So,

18 I was assuming that that's what the allegations

19 were about.

20       So, it made me feel -- before contacting

21 them, it made me feel stupid that I didn't reach

Page 76

1  out to someone beforehand to discuss what had

2  happened to me.  So, it declined significantly.

3     Q.  And tell me how it declined

4  significantly.

5     A.  I became more withdrawn, more anxious,

6  and definitely I don't want -- I didn't want to see

7  a doctor after that.

8     Q.  And how many days from work did you miss

9  in 2017, given your testimony that in February of

10 2017 you began feeling depressed, anxious, and

11 started missing time from work?

12    A.  I don't know how many days.  It was

13 enough for me to use my PTO to where my job had to

14 extend an additional ten unpaid days for me.

15    Q.  Now, I assume that was accommodated

16 without the use of FMLA?

17    A.  Correct.

18    Q.  In 2018, how many days did you miss from

19 work, if you recall?

20    A.  I don't know how many days, but I do know

21 that my PTO was just used before the end of the

Page 77

1  year -- before September.

2     Q.  And tell me what happened in September.

3     A.  Well, I'm just saying before September it

4  was done.  I'm just giving you a timeline of how

5  much -- how fast I used it.

6     Q.  Sure.  Did there come a point in time

7  after you had extinguished your PTO that you needed

8  additional days?

9     A.  Um-hum.

10    Q.  Okay.  And --

11       MS. CLARY:  You have to say yes.

12       THE WITNESS:  Oh, I'm sorry.  Yes.

13 BY MR. CATHELL:

14    Q.  And how did your employer accomplish

15 that, if they did?

16    A.  They -- they don't.  They don't.  So,

17 that's -- that's -- they were able to extend me an

18 additional ten days of unpaid time off.

19    Q.  Also in 2018?

20    A.  Um-hum, (Nodding head yes.)

21       MS. CLARY:  Yes?

20 (Pages 74 - 77)

Desire Evans                                                                March 28, 2019

Page 78

1 BY MR. CATHELL:

2   Q.  Okay.

3   A.  Yes.  Sorry.

4       MS. CLARY:  That's okay.  Everybody does

5 it.

6       THE WITNESS:  I'm old.  I keep

7 forgetting.

8       MS. CLARY:  Everybody does it, young and

9 old.

10 BY MR. CATHELL:

11   Q.  So, in your Answers to Interrogatories,

12 as well as potentially in the Complaint, I can't

13 represent that I know the specific part of the

14 Complaint attributed to you, but there's a, a

15 discussion of a lost wages claim.  So, that's what

16 I'm trying to understand is, how much time you're

17 missing from work.  You're using your PTO and then

18 any accommodations your -- your employer is making,

19 as well as actual time off --

20   A.  Um-hum.

21   Q.  -- okay?

Page 79

1   A.  Um-hum.  Yes.

2   Q.  All right.  So, you used your PTO in

3 2018.  You were then extended ten additional unpaid

4 days in 2018?

5   A.  Yes.

6   Q.  Did you miss any time, in addition to

7 your PTO and those ten unpaid days?

8   A.  Yes.

9   Q.  How many days did you miss in addition?

10   A.  I'm going to say an additional 15 days,

11 maybe.  I can't really say what for sure, but it's

12 quite often.

13   Q.  And I assume those days were unpaid?

14   A.  Yes.

15   Q.  And as a result of missing that time, has

16 your employer taken any adverse action regarding

17 your employment status?

18   A.  No.  That's why I needed to get FMLA.

19   Q.  And when did you get FMLA?

20   A.  February of '18.

21   Q.  February of 2018?

Page 80

1   A.  Yes.

2   Q.  And is there a certain amount of time

3 that your employer, in complying with FMLA, has

4 ensured you that you can miss per year without

5 losing your position or suffering another demerit,

6 if you will?

7   A.  No.  I have to renew my FMLA every six

8 months, and I'm also on ADA.

9   Q.  And how is that assisting you?

10   A.  Well, it -- that's how I'm able to work

11 from home, and it assists with my anxiety a lot

12 being around people.

13   Q.  Prior to giving birth in March of 2016,

14 were you working from home?

15   A.  No.

16   Q.  Did you ever work from home prior to

17 March of 2016?

18   A.  No.

19   Q.  So, following the birth of your

20 first -- of your child, Peyton, is when you began

21 staying home, correct?

Page 81

1   A.  Yes.

2   Q.  Or working from home?

3   A.  Yes.

4   Q.  So, as I understand your testimony, in

5 2018, you're claiming lost wages for approximately

6 25 unpaid days; is that correct?

7   A.  Yes.

8   Q.  And carrying over into 2019, we talked

9 earlier that you've used your paid time off?

10   A.  Yes.

11   Q.  Have you also been extended ten

12 additional days of unpaid leave?

13   A.  No.  They don't do that any more.

14   Q.  How many days in addition to

15 your -- strike that.

16       How many days over your PTO have you

17 taken off in 2019?

18   A.  What is this, March?  Give me a second.

19 Maybe 24 days.  I'm just -- I'm doing an

20 approximate six days a month times four.

21   Q.  Okay.  So, it's March --

21 (Pages 78 - 81)

Desire Evans                                                March 28, 2019

Page 82

1    A.  So, three -- so 18.

2    Q.  So, if -- are -- the 18 or 24 days, is

3  that including the PTO that you told me I think was

4  15 days?

5    A.  Um-hum, (Nodding head yes.)

6        MS. CLARY:  Yes.

7  BY MR. CATHELL:

8    Q.  Okay.

9    A.  Yes.

10       THE WITNESS:  Sorry.

11       MS. CLARY:  That's okay.

12  BY MR. CATHELL:

13   Q.  All right.  So, in that scenario,

14  understanding that you're estimating, we would be

15  talking about three unpaid days to nine unpaid

16  days; is that correct?

17   A.  Yes.

18   Q.  Okay.  And what is -- what is causing you

19  to take that time off?

20   A.  Sometimes -- sometimes I just can't get

21  out of bed; other times I actually get to work and

Page 83

1  can't focus on what's going on.  Other days I

2  just -- I don't feel well enough to get up.  I

3  just -- I'm depressed or my anxiety -- or I'm not

4  sleeping at night, so I can't get up in the

5  morning.  And a lot of times if I deal with a

6  person over the phone -- if I deal with a person

7  over the phone, it can -- in a -- in a negative

8  way, it affects me emotionally like for the rest of

9  the day.  So, I can't go back to work sometimes.

10      I mean, it really just depends because

11  anything can trigger me feeling sad or depressed or

12  worthless.

13   Q.  And if you were -- so, because you're

14  working from home, I assume when you were talking

15  about taking time off, you're calling in saying

16  that you're not available to work that day --

17   A.  Correct.

18   Q.  -- from home, correct?

19   A.  Correct.  Yeah.  We're talking about

20  going downstairs from my bedroom to my office; yes.

21   Q.  Has any healthcare provider given you the

Page 84

1  opinion that you cannot work because of your

2  anxiety?

3    A.  Yes.

4    Q.  Okay.  And which healthcare provider was

5  that?

6    A.  Dr. Donato.

7    Q.  And he was your psychologist?

8    A.  Yes.

9    Q.  And did he also offer the opinion that

10  you couldn't work because of your depression?

11   A.  Yes.

12   Q.  And has he declared that you can't work

13  as a result of any other condition?

14   A.  No.

15   Q.  Do you recall what Dr. Akoda looked like?

16   A.  Yeah.

17   Q.  Can you just briefly describe his

18  appearance for me?

19   A.  Tall, African with glasses.

20   Q.  Did he speak with an accent, do you know?

21   A.  Yes.

Page 85

1    Q.  And it's my understanding from your

2  records that your child was delivered successfully,

3  and healthy, and without complication; is that

4  correct?

5    A.  Yes.

6    Q.  Did you have any additional interactions

7  with Dr. Akoda that we haven't otherwise discussed?

8    A.  No.

9    Q.  Do you recall when you were admitted to

10  the OB service at PG County Hospital Center on

11  March 16, 2016 that you were --

12      MS. CLARY:  Excuse me.

13  BY MR. CATHELL:

14   Q.  -- that you executed a consent form?

15   A.  I'm -- I'm assuming.  I guess I did sign

16  it.

17      (Whereupon, Evans Deposition Exhibit 2,

18  Consent Form, marked for identification.)

19  BY MR. CATHELL:

20   Q.  I'm going to show you what's been marked

21  as Defense Exhibit 2.  The first page has the

22 (Pages 82 - 85)

Page 86

1  exhibit sticker on it.

2      A.  Um-hum.

3      Q.  The second page, I will ask you if you

4  can identify the signature, which is on the

5  left-hand column towards the bottom, please.

6          (Whereupon, there was a pause for

7  document examination.)

8      THE WITNESS:  Yes.

9  BY MR. CATHELL:

10     Q.  Is that your signature on the second

11  page?

12     A.  Yes.

13     Q.  Also, on the first page, the top

14  paragraph, there is a paragraph starting with

15  the -- in all capital letters, Physicians Not As

16  Employees.  Would you agree that those are your

17  init- -- your initials at the conclusion of that

18  paragraph?

19     A.  Yes.

20     Q.  Did you ever see Dr. Moore -- strike

21  that.

Page 87

1          Were you ever seen by Dr. Moore at

2  Dr. Moore's private practice?

3      A.  Yes.

4      Q.  Was there anything in Dr. Moore's private

5  practice that led you to believe he was affiliated

6  with the Prince George's County Hospital Center?

7      A.  At his office, no, but that's what he

8  told me.

9      Q.  That's what Dr. Moore told you?

10     A.  Yeah.  That was the reason that's where

11  my delivery was scheduled.

12     Q.  And what did he tell you?

13     A.  That that's where he had privileges.

14     Q.  Is it -- is it your contention that you

15  were suffering from depression, anxiety, and the

16  sleepless nights prior to learning of the

17  Akoda -- the allegations surrounding Dr. Akoda?

18     A.  Yes.

19     Q.  Is it your contention that you were

20  suffering those things as a result of your

21  experience at Prince George's County Hospital

Page 88

1  Center in March of 2016?

2      A.  Yes.

3      Q.  Okay.  And describe that contention for

4  me, please.

5      A.  I wasn't feeling like that beforehand.

6  The experience that I had with him left --

7      Q.  Him being, just so the record is clear?

8      A.  Him being Dr. Akoda.  I'm sorry.  The

9  experience I had with Dr. Akoda left me feeling

10  uncomfortable with any kind of medical professional

11  directly after that.  I didn't even go for a

12  six-week check-up.  And me not knowing what to do

13  about how I -- how I felt I was treated during the

14  delivery of my son with the sexual things that he

15  were doing -- he was doing, I didn't know how to

16  handle that.  I didn't know if it was the right

17  thing to do.  I don't know if he was supposed to do

18  that, so I was going through a lot of stuff while

19  trying to raise a newborn just by going through

20  that whole -- that whole scenario.

21     Q.  That whole scenario being?

Page 89

1      A.  The -- the sex -- the way he treated me

2  sexually, the way that my son -- like I pushed my

3  son out was -- my son -- I was in delivery for 12

4  hours before they took me to -- before they took me

5  for a C-section, so it was -- it was just a, a very

6  long process that was draining, and I didn't leave

7  the hospital with the best -- like this was the

8  best-day-of-my-life feeling.

9      Q.  Did you report the -- did you report the

10  inappropriate contact by Dr. Akoda to your

11  psychiatrist, Dr. Smith, I believe?

12     A.  Yes.

13     Q.  Did you report it to Dr. Nnamani?

14     A.  Yes.

15     Q.  And did you report it to your

16  psychologist, Dr. Donato?

17     A.  Yes.

18     Q.  The Answers to Interrogatories we have

19  been referencing were received by us in July of

20  2018, so presumably you signed them before that

21  date, correct?

23 (Pages 86 - 89)

Desire Evans
March 28, 2019

Page 90

1    A.   Yes.

2    Q.   Does that in any way refresh your
3 recollection as to when you would have first
4 learned of the allegations surrounding Dr. Akoda as
5 a result of the radio advertisement you described?

6    A.   June or July of '18 or June or July of
7 that year.

8    Q.   Is it correct to say that you never
9 discussed with Dr. Akoda the subject of hospital
10 privileges?

11    A.   Is it safe to say that?

12    Q.   Yes.

13    A.   Yes.  Yeah, I didn't discuss that.

14    Q.   Did you ever ask to see Dr. Akoda's
15 driver's license?

16    A.   No.

17    Q.   His passport?

18    A.   No.

19    Q.   Did you ever ask if Dr. Akoda had any
20 names, other than Dr. Akoda?

21    A.   No.

Page 91

1    Q.   Did you see Dr. Akoda interact with staff
2 on any occasions?

3    A.   No.  Not interaction, no.  Just in and
4 out the room preparing to get the room set up for
5 delivery.

6    Q.   Did you see Dr. Akoda perform or act
7 inappropriately towards staff at any point?

8    A.   No.

9    Q.   You would agree that your -- the delivery
10 of Peyton was successful?

11    A.   Yeah, meaning that Peyton is fine, and he
12 came out fine, but there were -- like I said, I was
13 in labor for several hours before I actually had
14 the C-section.  So, it was -- it seemed like there
15 might have been some complications in that process,
16 because they could have just took me for a
17 C-section instead of having me push for all that
18 time.

19    Q.   Okay.  Has -- has anyone given you -- has
20 any medical provider or medical expert given you
21 the opinion that Dr. Akoda's actions on March 17,

Page 92

1 2016 did not comply with the standard of care?

2    A.   No.

3    Q.   You would agree that when Dr. Akoda came
4 in to care for you, you agreed to allow him
5 to -- to deliver your child and, otherwise, provide
6 medical care to you?

7    A.   Yes.

8    Q.   Have you researched or learned of any
9 additional information regarding his privileging
10 status, other than that which has been provided by
11 your attorneys?

12    A.   No.

13    Q.   Did anything Dr. Akoda do on March 17th,
14 2016 make you feel that he was not medically
15 qualified to care for you?

16       MS. CLARY:  Objection.  Other than what
17 she's testified to?

18 BY MR. CATHELL:

19    Q.   Other than what you've testified to?

20    A.   Other than what I've testified to, no.

21    Q.   Did you confront Dr. Akoda directly

Page 93

1 regarding the alleged inappropriate contact?

2    A.   No.  My husband did, and I didn't know
3 how to -- I didn't know what to do about it,
4 actually.

5    Q.   Did you at any time fire Dr. Akoda?

6    A.   Fire him?

7    Q.   As your physician.

8    A.   He wasn't my physician to fire him.

9    Q.   Did you have -- I'm sorry.  Go ahead.

10    A.   No, I was just saying, he wasn't my
11 physician to fire him.

12    Q.   At any time while Dr. Akoda was caring
13 for you on March 17, 2016, did you ask for another
14 physician to render assistance to you?

15    A.   No.  I was in labor, sir.

16    Q.   These are not judgmental questions.

17    A.   Okay.

18    Q.   I'm just asking questions --

19    A.   Oh, no.

20    Q.   -- that we believe are pertaining to
21 class certification.

24 (Pages 90 - 93)

Desire Evans                                                    March 28, 2019

Page 94

1    A.   No.

2    Q.   We've established that at no time did you

3  report the event to anyone, other than your

4  husband, who was, obviously, witnessing it,

5  correct?

6    A.   Correct.

7    Q.   Do you know of anyone else accusing

8  Dr. Akoda of sexual impropriety?

9    A.   No.

10    Q.   Did any of the advertisements you heard

11  mention or discuss claims of sexual impropriety

12  against Dr. Akoda?

13    A.   No.

14    Q.   Are you aware that other -- strike that.

15        Are you aware if other Plaintiffs in this

16  lawsuit are claiming sexual impropriety on the part

17  of Dr. Akoda?

18    A.   I am not.

19    Q.   Did any of the information you found on

20  the Internet as a result of your Internet search

21  mention or describe any claims of sexual

Page 95

1  impropriety against Dr. Akoda?

2    A.   No, sir.

3    Q.   Did you have a life-threatening

4  experience when interacting with Dr. Akoda?

5    A.   No.

6    Q.   I believe you told me that you first

7  began having symptoms regarding your interaction

8  with Dr. Akoda approximately one year after

9  delivery; is that accurate?

10    A.   Yes.

11    Q.   And that would be approximately February

12  2017, correct?

13    A.   Correct.  Now, that's saying that the

14  symptoms -- realizing that the symptoms weren't

15  just regular symptoms from childbirth or being

16  depressed after having a baby, you know, or

17  something like that.  Does that change any -- okay.

18  Does that -- okay.  I just want to make sure that I

19  say that.

20        I always -- not always, but I felt -- I

21  didn't just start feeling that way a year after the

Page 96

1  fact.  I started realizing that it wasn't something

2  that was related to just the natural things of a

3  woman giving birth, if that makes sense.

4    Q.   I can't pretend to --

5    A.   To know --

6    Q.   -- to know about giving birth and making

7  sense, but I -- so, you -- the -- the symptoms

8  became apparent to you in February 2017, and it's

9  my understanding that you first saw Dr. Smith in

10  February of 2018?

11    A.   (Nodding head yes.)

12    Q.   Between February of 2017 and 2018, what

13  were you doing, if anything, to treat those

14  symptoms?

15    A.   Nothing.  I didn't have health insurance.

16    Q.   And when did you get health insurance?

17    A.   We got health insurance through my

18  husband's employer around I want to say maybe

19  October.  Because open enrollment is in September,

20  so maybe October of '17, maybe.

21    Q.   And have you maintained that health

Page 97

1  insurance since that time?

2    A.   Well, now we have health insurance

3  through my employer, but we've -- we've remained

4  having health insurance, not that one, but we do

5  have health insurance.

6    Q.   Did you have health insurance at the time

7  you gave birth to Peyton?

8    A.   I had Medicaid.

9    Q.   Had you reached out to Medicaid or to an

10  individual medical provider in an effort to receive

11  mental health treatment and whether that treatment

12  would be covered by Medicaid?

13    A.   No.  My Medicaid was only covering the

14  deliver -- the delivery of my son, because I

15  actually made too much money at my job to be

16  qualified for regular Medicaid, and then my job's

17  insurance didn't start until after -- after I would

18  have already been out of work.  So, I was able to

19  get emergency Medicaid for that period of time just

20  so I could have delivery.  So, I didn't have

21  Medicaid after delivering my son.

25 (Pages 94 - 97)

Page 98

1   Q.   Okay.  And upon seeking treatment with
2 Dr. Smith in February of 2018, did you immediately
3 tell Dr. Smith that you had been touched
4 inappropriately by Dr. Akoda?
5   A.   Yeah.  We discussed it, everything during
6 that first encounter.
7   Q.   Did you talk with a doctor named
8 Dr. Fiester in this case?
9   A.   I did.
10   Q.   And do you recall when you talked to
11 Dr. Fiester?
12   A.   I don't.  I don't know if it was -- I
13 want to say it was between maybe October and
14 December of '18, but I can't be sure.
15   Q.   Okay.
16       MR. CATHELL:  One second while I look for
17 that report, please.
18       (Whereupon, there was a pause for
19 document examination.)
20 BY MR. CATHELL:
21   Q.   How many times did you talk to

Page 99

1 Dr. Fiester?
2   A.   One time.
3   Q.   And did you meet with Dr. Fiester in
4 person?
5   A.   No.
6   Q.   How did you talk with Dr. Fiester?  Was
7 that over the telephone, --
8   A.   Yes.
9   Q.   -- or was that by video conference?
10   A.   It was over the telephone.
11   Q.   Have you met Dr. Fiester at any time?
12   A.   No.
13   Q.   And do you recall how long the interview
14 with Dr. Fiester lasted?
15   A.   More than an hour.
16   Q.   More than an hour?
17   A.   (Nodding head yes.)  Maybe an hour.
18   Q.   And were you asked to prepare anything
19 prior to the interview with Dr. Fiester?
20   A.   No.
21   Q.   Did you take any notes during the

Page 100

1 interview with Dr. Fiester?
2   A.   No.
3   Q.   Where were you when you spoke to
4 Dr. Fiester?
5   A.   Home.
6   Q.   Was anyone present?
7   A.   No.
8   Q.   Was anyone present with you while you
9 were talking to Dr. Fiester?
10   A.   No.
11   Q.   Had you discussed with anyone, other than
12 your attorneys, what to expect during the call with
13 Dr. Fiester?
14   A.   No.
15   Q.   Had you been provided any
16 information -- strike that.
17       What did Dr. Fiester ask you or -- or, if
18 you prefer, just describe for me the interview?
19   A.   We just talked about anything that might
20 have happened in my past, things that are going on
21 now, and what I felt -- how I felt about Dr. Akoda.

Page 101

1   Q.   And describe for me what you discussed
2 about things that occurred in the past.
3   A.   There were no trauma in my past.  Nothing
4 to talk about, really.
5   Q.   Okay.  You also mentioned that you
6 discussed things going on now.  Can you describe
7 that for me?
8   A.   Um-hum.  Like -- like work, every day
9 life, being a mom.  You know, just normal -- you
10 know, just how my life is on an everyday basis.
11   Q.   And you also said that you talked about
12 the things going on with Dr. Akoda?
13   A.   Um-hum.
14   Q.   What did you discuss in that regard?
15   A.   She asked me to explain to her exactly
16 what happened and how I felt about it, and I did
17 the same as I did with you just now.
18   Q.   Did you share with her any additional
19 information that we have not discussed today?
20   A.   No.
21   Q.   And did Dr. Fiester make any treatment

26 (Pages 98 - 101)

Page 102

1 recommendations for you?

2    A.   She said that I should have some kind of

3 therapy, but I forget what the name of it was.

4    Q.   Had you shared with her that you had been

5 receiving therapy by Dr. Donato?

6    A.   Yes.  It was a specific kind of therapy.

7 EMI, EMD.  I haven't found anyone who specializes

8 in that yet.

9    Q.   Can you say that again, please?

10    A.   It was EMI or EMD or something to that

11 effect.  I can't remember the initials.

12    Q.   And do you have an understanding as to

13 what that specific treatment is designed to treat?

14    A.   It's-- I think it's a mechanism -- it

15 helps to deal with PTSD, I believe, and anxiety.

16    Q.   Have you been working with Drs. Donato

17 and Nnamani regarding your PTSD?

18    A.   Yes.

19    Q.   And we talked about Dr. Smith's diagnoses

20 of depression and anxiety.  When were you first

21 diagnosed with PTSD?

Page 103

1    A.   Through Dr. Donato.

2    Q.   And when did Dr. Donato first diagnose

3 you with that?

4    A.   During our first visit.

5    Q.   Which I under -- understand to be, I

6 believe, October of 2018; is that correct?

7    A.   That's when I -- no.  I saw Donato in the

8 summer of '18.  I saw Dr. Nnamani in October of

9 '18.

10    Q.   Other than Dr. Donato, did Dr. Smith or

11 Nnamani ever diagnose you with PTSD?

12    A.   No.  I only saw Dr. Smith once

13 face-to-face, and after that, it was phone

14 interviews.  And Dr. Nnamani was -- didn't do any

15 additional diagnosis.

16    Q.   Did Dr. Fiester diagnose you with

17 anything?

18    A.   No.

19    Q.   Do you consider Dr. Fiester to be your

20 doctor?

21    A.   No.

Page 104

1    Q.   Other than the recommendation of EIMED

2 therapy for the PTSD, did she make any other

3 treatment recommendations?

4    A.   No.

5    Q.   Did she at any time refer you to anyone

6 else for treatment?

7    A.   No.

8    Q.   Just to be clear for the record, did

9 Dr. Fiester diagnose you with depression?

10    A.   No.

11    Q.   Or anxiety?

12    A.   No.

13    Q.   Or PTSD?

14    A.   No.

15    Q.   Have you read the Complaint in this

16 matter?

17    A.   Yes.

18    Q.   Okay.  And do you know what the Complaint

19 is in a lawsuit?

20    A.   Yes.

21    Q.   And when did you first review the

Page 105

1 Complaint?

2    A.   I don't recall when I first reviewed it.

3    Q.   Did you review it prior to it being

4 filed?

5    A.   I don't know when it was filed.

6    Q.   Okay.

7        MR. CATHELL:  Do you have that?

8        MS. CLARY:  The Complaint?

9        MR. CATHELL:  Yeah.

10        MS. CLARY:  I have the Complaint.  I'm

11 not sure she would know -- well --

12        MR. CATHELL:  I don't think I'm really

13 going to follow up, but can I see just it?

14        MS. CLARY:  Yeah.  Sure.  It looks like

15 there's the date stamp.

16        (Document tendered.)

17        MR. CATHELL:  Yeah.

18        (Whereupon, there was a pause for

19 document examination.)

20 BY MR. CATHELL:

21    Q.   I believe your response was that you

27 (Pages 102 - 105)

Desire Evans                                                    March 28, 2019

Page 106

1 don't know whether you reviewed it --

2    A.   Correct.

3    Q.   -- prior to it being filed, correct?

4    A.   Um-hum.

5        MS. CLARY:  Yes?

6        THE WITNESS:  Yes.

7 BY MR. CATHELL:

8    Q.   How many times have you reviewed the

9 Complaint?

10    A.   Twice.

11    Q.   If you'll give your attorney a second to

12 object, please.  Did you meet with your attorneys

13 before the Complaint was filed?

14        MS. CLARY:  Objection, and I'm going to

15 instruct you not to answer in that it's protected

16 by the attorney/client privilege and work product

17 doctrine.

18        MR. CATHELL:  And note our response from

19 prior depositions.

20        MS. CLARY:  Sure.

21 BY MR. CATHELL:

Page 107

1    Q.   I would ask you a series of questions,

2 for the record, regarding your interactions with

3 your counsel, how many times you have met with them

4 in preparing the Complaint, in participation in

5 preparing the Complaint, your general input in

6 preparing the Complaint, as well as the -- the

7 contact you've had with them regarding this class

8 certification process.

9        It's my understanding your attorney is

10 going to object to those questions.  I just want to

11 make sure the record is clear that I would ask

12 them, that we take exception to the objection to

13 the extent we think they're relevant for class

14 certification, and so I will move on.

15        MS. CLARY:  Fair enough.  I do object.  I

16 note your exception.

17 BY MR. CATHELL:

18    Q.   Have you been in contact with any of the

19 other class Plaintiffs?

20    A.   No.

21    Q.   Have you read any of the papers that have

Page 108

1 been filed in court in this case, other than

2 the -- the Complaint that we've already discussed?

3    A.   No.

4    Q.   Have you gone to any of the court

5 hearings in this case?

6    A.   No.

7    Q.   And why not?

8    A.   I didn't know I needed to be at them.

9    Q.   Do you plan on going to future court

10 hearings in this case?

11    A.   If requested by my attorney.

12    Q.   Will you be attending the hearing on

13 class certification?

14    A.   If -- if I need to be there.

15    Q.   Do you know what class certification is?

16    A.   Yes.

17    Q.   Please tell me what your understanding

18 is.

19    A.   It's a, a lot of people with one issue, I

20 guess, under one lawsuit instead of it all being

21 individual ones.

Page 109

1    Q.   Do you know what causes of action are

2 being asserted in the Complaint?

3    A.   No.

4    Q.   Do you know what damages the Complaint is

5 seeking?

6    A.   No.

7    Q.   Do you know the names of the Defendants

8 that you are suing in this case?

9    A.   Dimensions Health Corp.

10    Q.   Anyone else?

11    A.   No.

12    Q.   Is Dr. Akoda a defendant in this lawsuit?

13    A.   No.

14    Q.   I asked if you had been in contact with

15 any of the other Plaintiffs, and you said, no.  I

16 assume you haven't met with any of the other

17 Plaintiffs?

18    A.   Correct.  No.

19    Q.   Do you know the names of any other

20 Plaintiff?

21    A.   I do not.

28 (Pages 106 - 109)

Page 110

1    Q.   Are you aware that the Complaint is

2  asking the court to certify this case as a class

3  action?

4    A.   Yes.

5    Q.   And do you know how many proposed class

6  members there are?

7    A.   I do not.

8    Q.   Do you know which law firms represent the

9  proposed class members?

10    A.   No.

11    Q.   Do you know whether each member of the

12  proposed class is asserting the same claims as you

13  in the case?

14    A.   No.

15    Q.   Have you tried to learn about the claims

16  of the other proposed class members?

17    A.   No, sir.

18    Q.   Have you determined whether your claims

19  are different than yours in any way?

20    A.   No, sir.

21    Q.   Do you know whether each member of the

Page 111

1  proposed class is seeking the same damages as you

2  are in this case?

3    A.   I do not.

4    Q.   Are you aware that you've been designated

5  as a class representative in this lawsuit?

6    A.   Yes.

7    Q.   And do you know what it means to be a

8  class representative in a class action?

9    A.   Yes.

10    Q.   Please describe your understanding for

11  me.

12    A.   My understanding is that I am -- my case

13  is just an example of the overall cases to

14  represent everyone else.

15    Q.   And what is your role as a class

16  representative?

17    A.   Just to represent or to -- yeah, to give

18  the correct information to help represent everyone

19  else that's -- that can't be interviewed, I'm

20  assuming.  I don't know.

21    Q.   And why would they not be able to be

Page 112

1  interviewed, if you know?

2    A.   I don't know.  It's a lot of people, I

3  guess.  I don't know.  I'm assuming class action

4  means a lot of people, and that's a lot of

5  interviews.  I'm not sure.

6    Q.   Do you know if there was a mediation in

7  this case?  And if you don't understand what a

8  mediation is, I'm happy to rephrase the question.

9    A.   Yes.  Yes, I'm aware.

10    Q.   Okay.

11        MS. CLARY:  She did a good job there,

12  didn't she?

13        MR. CATHELL:  Ready for law school.

14  BY MR. CATHELL:

15    Q.   Do you know what occurred at the

16  mediation?

17    A.   Yes.

18    Q.   And tell me your understanding of what

19  occurred, absent discussions with your attorneys.

20    A.   That there was a settlement offered and

21  rejected.

Page 113

1    Q.   Okay.  Do you -- how much was the

2  settlement offer, do you know?

3    A.   $1,000.

4    Q.   $1,000 per Plaintiff, correct?

5    A.   Per Plaintiff.

6    Q.   Prior to the mediation, what involvement

7  did you have in determining what dollar amount

8  recovery would be acceptable to you and/or a

9  potential class?

10        MS. CLARY:  I'm going to object and

11  instruct her not to answer.  That's protected by

12  both the attorney/client privilege and the work

13  product doctrine.

14        MR. CATHELL:  Note our response for the

15  record, please.

16  BY MR. CATHELL:

17    Q.   Do you know whether you are responsible

18  for paying any of the costs or expenses for this

19  litigation?

20        MS. CLARY:  Same objection, and I am -- I

21  am instructing her not to answer that question.

Desire Evans
March 28, 2019

Page 114

1 BY MR. CATHELL:

2    Q.   Did you sign a retainer agreement with

3 the Schochor law firm?

4       MS. CLARY:  I'm also going to object.

5 You can answer yes or no as to whether you signed

6 an agreement, a retainer with us.

7       THE WITNESS:  No -- yes.  I don't know

8 what -- I don't, because what is --

9 BY MR. CATHELL:

10    Q.   Just a yes or no.  Because I don't want

11 you to start --

12    A.   Okay.

13    Q.   She objected, --

14    A.   Okay.

15    Q.   -- and I don't want you to talk about you

16 things that --

17    A.   Okay.  So -- oh.

18    Q.   She objected.  If you don't know, it's

19 okay.  I -- I don't want you to explain and say

20 things that she objected to --

21    A.   I don't know.

Page 115

1    Q.   -- out of fairness to her.

2    A.   I don't know.

3    Q.   Okay.

4       MS. CLARY:  I can certainly proffer, if

5 you would like me to, that we do have a signed

6 agreement of retainer from Mrs. Evans, --

7       MR. CATHELL:  Thank you.

8       MS. CLARY:  -- but I'm going to object to

9 providing it.

10       MR. CATHELL:  Sure.

11       THE WITNESS:  Okay.

12 BY MR. CATHELL:

13    Q.   We would -- we would request production

14 of the retainer agreement.  That's something that

15 would be effected through your counsel.  They're

16 objecting to it, and it's an issue that will be

17 taken up with the court.  But I'm simply telling

18 you that, to put you on notice that if the court

19 were to decide that we could prevail, that we would

20 be able to obtain a copy of your retainer

21 agreement, okay?

Page 116

1    A.   (Nodding head yes.)

2    Q.   I would ask you questions -- additional

3 questions about the retainer agreement.  Counsel

4 has objected to those in prior depositions, and

5 we've noted our responses for the record.

6       MS. CLARY:  Agreed.

7 BY MR. CATHELL:

8    Q.   Have you seen any documents that were

9 produced by the Defendants in this case?

10    A.   No.

11       MS. CLARY:  Oh, I heard that.

12       THE WITNESS:  That's that 40 kicking in,

13 ma'am.

14 BY MR. CATHELL:

15    Q.   Do you know whether Dr. Akoda is a

16 Defendant in any other pending lawsuit?

17    A.   I do not know, sir.

18    Q.   Are you part of a class action lawsuit in

19 the United States Federal District Court in

20 Philadelphia against ECFMG regarding their

21 certification of Dr. Akoda?

Page 117

1    A.   I am.

2    Q.   Are you a class Plaintiff in that as

3 well?

4    A.   Yes.

5    Q.   Have you given a deposition in that case?

6    A.   No.

7    Q.   What is your understanding as to the

8 allegations in that lawsuit?

9    A.   That they didn't do proper

10 cre- -- credentialing.

11    Q.   Based on your status as a class Plaintiff

12 in that lawsuit, do you have an understanding of

13 ECFMG's role in certifying Dr. Akoda?

14    A.   Yes.

15    Q.   And what is your understanding?

16    A.   That they have the obligation to make

17 sure that all of his documents are correct and that

18 he who -- he is who he says he is.

19    Q.   And do you know how ECFMG does its

20 certification?

21    A.   I do not.

30 (Pages 114 - 117)

Page 118

1    Q.   Are you aware of the background checks
2  that ECFMG conducts?
3    A.   No, sir.
4    Q.   Earlier I was asking you questions about
5  radio advertisements, TV advertisements, and your
6  Internet search, and I probably should have phrased
7  this question as to include media coverage and not
8  just advertisements.
9         So, you told me that you didn't observe
10  any television advertisements, but have you at any
11  time observed television coverage regarding the
12  allegations against Dr. Akoda?
13    A.   Yes.
14    Q.   Okay.  And what was that?  What were
15  those -- what was that coverage that you observed?
16    A.   I don't know what news it was, but it was
17  on the news about Dr. Akoda.  I believe it said he
18  wasn't a doctor.
19    Q.   Anything else that you recall?
20    A.   No.
21    Q.   And the same for your Internet search,

Page 119

1  were there -- was there information you learned
2  through the Internet that was not an advertisement
3  regarding Dr. -- the allegations surrounding
4  Dr. Akoda?
5    A.   No.
6    Q.   Is that the same with the radio as well?
7    A.   Yes.
8    Q.   Did you participate in any interview with
9  any media person or organization about your
10  involvement with Dr. Akoda?
11    A.   No.
12    Q.   Did you go on The Dr. Oz Show?
13    A.   No.
14    Q.   Were you contacted to go on The Dr. Oz
15  Show?
16    A.   No.
17    Q.   Is it fair to say that when choosing your
18  OB/GYN, you selected based upon the skill set of
19  the physician?
20    A.   Yes.
21    Q.   And I assume your concern was that he or

Page 120

1  she could deliver your baby safe and healthy,
2  correct?
3    A.   When choosing one, yes.
4    Q.   You did not care if your OB/GYN was a man
5  or a woman?
6    A.   No.
7    Q.   You didn't care about the OB/GYN's race?
8    A.   No.
9    Q.   Or nationality?
10    A.   No.
11    Q.   And you did not care about the exact
12  location of the physician, beyond he or she being
13  local to the area, correct?
14    A.   Correct.
15    Q.   You agree that you did not care about the
16  OB/GYN's name alone?
17    A.   No.
18    Q.   In other words, would you have not
19  selected an OB/GYN based upon that OB/GYN's
20  specific name?
21    A.   No.  No.

Page 121

1    Q.   And you've agreed earlier in the
2  deposition, I believe, that Dr. Akoda delivered
3  your baby safe and healthy, correct?
4    A.   Yes.
5    Q.   We've established that you have one
6  child.  How many pregnancies have you had?
7    A.   Two.
8    Q.   Okay.  And when was the second pregnancy?
9    A.   That was the second pregnancy.
10    Q.   When was the first pregnancy?
11    A.   Maybe a year and a half prior.
12    Q.   And I apologize, but what -- what -- what
13  did that pregnancy result in?
14    A.   A miscarriage.
15    Q.   And were you under the care of an OB/GYN
16  during that pregnancy?
17    A.   No.  I had a miscarriage early in the
18  pregnancy.
19        MR. CATHELL:  I believe we're finished.
20  If I could just look at my notes, please.
21        THE WITNESS:  Yes, sir.

31 (Pages 118 - 121)

Desire Evans                                                                March 28, 2019

Page 122

1      THE VIDEOGRAPHER:  Do you want to stay on
2  the record?
3      MS. CLARY:  I have just one follow-up
4  question.
5      MR. CATHELL:  Okay.
6      MS. CLARY:  Why don't I do that while you
7  look at your notes, if you don't mind.
8      MR. CATHELL:  Go ahead.
9          CROSS-EXAMINATION
10     BY MS. CLARY:
11  Q.  I apologize if -- if you've covered this
12  already, but going back to how you were feeling
13  emotionally after the delivery of your son and
14  after the time in which you sought care, can you
15  help us understand whether you had a worsening of
16  how you were feeling after you found out that
17  Dr. Akoda was not who he said he was?
18  A.  Yes.
19  Q.  Can you describe for us how things got
20  worse for you --
21  A.  Um-hum.

Page 123

1  Q.  -- at that point in time?
2  A.  Yeah.  So, after that, as I mentioned, I
3  definitely didn't want to see a doctor after that.
4  I already didn't want to see a doctor anyway
5  because of how I felt he was inappropriate with me,
6  but wasn't sure if that was really the process of
7  having a baby.  I never had a baby before,
8  so -- and his explanation seemed like it was valid.
9  You know, this is what I need to do in order for
10  the baby to come out, you know.
11      So, realizing that that wasn't the case
12  and that I didn't say anything was extremely --
13  that's -- I think that's the one thing that made it
14  worse to me, was that I didn't say anything
15  beforehand.  I didn't do anything beforehand.
16      So, it made me feel -- I don't know the
17  word to use.  I -- I started feeling more
18  worthless.  Like I couldn't even stand up for
19  myself at that point, so that's how it got worse
20  for me, not being able to stand up for myself and
21  not being able to see a doctor at all because you

Page 124

1  don't know.
2      MS. CLARY:  Thank you.
3          REDIRECT EXAMINATION
4      BY MR. CATHELL:
5  Q.  Just in following up with that.  What --
6  one thing that we -- I was trying to explore --
7  A.  Um-hum.
8  Q.  -- is you just -- you just said in
9  response to your counsel that your condition
10  worsened when you realized that his contact with
11  you wasn't the case, meaning -- I think you were
12  meaning that you realized that the contact he had
13  with you, you realized may have been inappropriate;
14  is that fair?
15  A.  Correct.
16  Q.  And my questions earlier were designed to
17  try to determine when you learned or figured out or
18  understood that his contact with you may have been
19  inappropriate, and it's my understanding that the
20  radio advertisements you heard did not discuss any
21  type of substance of the allegations regarding

Page 125

1  Dr. Akoda, correct?
2  A.  Correct.
3  Q.  And the Internet articles that you read
4  did not include any of the substance against
5  Dr. Akoda, except that I think you told me they
6  suggested he may be a fraudulent doctor; is that
7  fair?
8  A.  That's correct.
9  Q.  Was there anything, outside of what you
10  learned from your attorney, that caused you to
11  believe that Dr. Akoda's contact with you was
12  inappropriate?
13      MS. CLARY:  Objection to the extent I
14  think she's covered that, but you can go ahead
15  again.
16      THE WITNESS:  Well, first, I always felt
17  it was inappropriate because of the way it made me
18  feel; however, me not being a medical professional
19  or never having a baby before, I didn't know if
20  what he was doing was actually a valid thing that
21  you do when someone is giving birth to stimulate

32 (Pages 122 - 125)

Page 126

1  delivery.
2      So, after I think I spoke to my cousin,
3  who's a doctor, I spoke to my mom, and I spoke to
4  my husband, and they let me know that my feelings
5  were valid, and no, he wasn't supposed to do that,
6  and you are one hundred percent okay with feeling
7  the way that you feel.
8  BY MR. CATHELL:
9      Q.  And when did you have those conversations
10  with your cousin, your doctor -- I'm sorry, your
11  cousin, your husband, and your mother?
12      A.  Well, my husband and my mom immediately
13  after.  You know, like, you know, maybe a week or
14  so after going through the process of bringing the
15  baby home and all of that, and probably my cousin,
16  maybe a few weeks after that.
17      Q.  And so it was during those conversations
18  that you came to the understanding that the contact
19  Dr. Akoda made with you, that you've described for
20  me earlier, was inappropriate?
21      A.  Correct.  I have validation that it was

Page 127

1  inappropriate, because I always believed that it
2  was.
3      Q.  And did you share with your -- you said
4  your cousin is a doctor?
5      A.  Yes.
6      Q.  Did you share with your doctor or
7  your -- I'm sorry.  Strike all of that.
8      Did you share with your cousin the
9  specifics of the alleged sexual impropriety against
10  Dr. Akoda?
11      A.  By me, yes.
12      Q.  And what's your cousin's name?
13      A.  Tyrell Newton, M.D.
14      Q.  And is Dr. Newton a doctor in Maryland?
15      A.  No.
16      Q.  And where does he live or practice?
17      A.  North -- Florida.  Jacksonville, Florida.
18      Q.  To your knowledge, did Dr. Newton report
19  to anyone the alleged sexual contact?
20      A.  No.
21      Q.  Are there any claims that you are making,

Page 128

1  Ms. Evans, that we haven't, otherwise, discussed
2  today?
3      A.  No, sir.
4      Q.  You were discharged three days following
5  the birth of Peyton, correct?
6      A.  Yes.
7      Q.  And it seems to me that your medical
8  records suggest that you were discharged to recover
9  without complication?
10      A.  Yes.
11      MR. CATHELL:  That's all I have.  Thank
12  you very much.
13      THE WITNESS:  Thank you.
14      MS. CLARY:  She'll read and sign.  You're
15  all done.
16      THE VIDEOGRAPHER:  All right.  Stand by.
17      This concludes today's video-recorded
18  deposition of Desire Evans.  The time is now 12:27,
19  and we are off the record.
20      (Deposition concluded at 12:27 p.m.)
21

Page 129

1      Russell, et al. v. Dimensions Health Corp., et al
2          Desire N. Evans
3      INSTRUCTIONS TO THE WITNESS
4      Please read your deposition over
5  carefully and make any necessary corrections.  You
6  should state the reason in the appropriate space on
7  the errata sheet for any corrections that are made.
8      After doing so, please sign the errata
9  sheet and date it.
10      You are signing same subject to the
11  changes you have noted on the errata sheet, what
12  will be attached to the deposition.
13      It is imperative that you return the
14  original errata sheet to the deposing attorney
15  thirty (30) days of receipt of the deposition
16  transcript by you.  If you fail to do so, the
17  deposition transcript may be deemed to be accurate
18  and may be used in court.
19
20
21

33 (Pages 126 - 129)

Page 130

1    Russell, et al. v. Dimensions Health Corp., et al.

2         Desire N. Evans

3              ERRATA

4    PAGE  LINE  CHANGE

5    ---   ---  ----------------------------

6    Reason:_____

7    ---   ---  ----------------------------

8    Reason:_____

9    ---   ---  ----------------------------

10   Reason:_____

11   ---   ---  ----------------------------

12   Reason:_____

13   ---   ---  ----------------------------

14   Reason:_____

15   ---   ---  ----------------------------

16   Reason:_____

17   ---   ---  ----------------------------

18   Reason:_____

19   ---   ---  ----------------------------

20   Reason:_____

21   Job #3269942

Page 131

1    Russell, et al. v. Dimensions Health Corp., et al

2         Desire N. Evans

3       ACKNOWLEDGMENT OF DEPONENT

4       I, DESIRE N. EVANS, do hereby certify

5    that I have read the foregoing pages and that the

6    same is a correct transcription of the answers

7    given by me to the questions therein propounded,

8    except for the corrections or changes in form or

9    substance, if any, noted in the attached errata

10   sheet.

11   _____    _____

12   DATE          SIGNATURE

13

14

15

16

17

18

19

20

21   Job #3269942

Page 132

1    State of Maryland

2    County of Baltimore, to wit:

3         I, Michele D. Lambie, a Notary Public of

4    the State of Maryland, County of Baltimore, do

5    hereby certify that the within-named witness

6    personally appeared before me at the time and place

7    herein set out, and after having been duly sworn by

8    me, according to law, was examined by counsel.

9         I further certify that the examination

10   was recorded stenographically by me and this

11   transcript is a true record of the proceedings.

12        I further certify that I am not of

13   counsel to any of the parties, nor related to any

14   of the parties, nor in any way interested in the

15   outcome of this action.

16        As witness my hand this 11th day of April, 2019.

17

18        *Michele D. Lambie*
          Michele D. Lambie

19

20

21   My Commission Expires:  April 29, 2020

34 (Pages 130 - 132)