EXHIBIT 40



# BURROUGHS

*HEALTHCARE CONSULTING NETWORK*

## REPORT

**In the matter of**

## Jane Monique Russell, Jasmine Riggins, Elsa Powell, and Desire Evans

## v.

## Educational Commission for Foreign Medical Graduates (ECFMG)

Prepared for

Jonathan Schochor, Esq. and Brent Ceryes, Esq.
Schochor. Federico, and Staton, PA
1211 Saint Paul Street
Baltimore, Maryland 21202

Report Date: September 21, 2019

Jonathan H. Burroughs, MD, MBA, FACHE, FAAPL
President and CEO, The Burroughs Healthcare Consulting Network, Inc.

**TABLE OF CONTENTS:**

**A. Professional Background and Training** --------------------------------------------------------**page 3**

**B. Recent Publications**-------------------------------------------------------------------------------**page 5**

**C. Sources of Information**--------------------------------------------------------------------------**page 8**

**D. Introduction**----------------------------------------------------------------------------------------**page 10**

**E. Opinion**---------------- --------------------------------------------------------------------------------**page 10**

**F. Foundations of Opinion** ---------------------------------------------------------------------------**page 10**

**G. Conclusion and Final Commentary**-----------------------------------------------------------**page 29**

**H. Fee Schedule**-------------------------------------------------------------------------------------------**page 31**

**A. Professional Training and Background:**

Jonathan H. Burroughs, MD, MBA, FACHE, FAAPL:

**Healthcare professional with:**

- **30-year clinical experience as an emergency physician**
- **16 year management experience as medical director of three emergency departments and increasing physician leadership roles**
- **9 year experience on a governing board of a not for profit healthcare entity**
- **15-year experience as a healthcare administrative consultant with > 1,500 clients in all 50 states focusing on all areas of the physician/healthcare executive interface, population health, clinical integration, and healthcare transformation**
- **Author of "Redesign the Medical Staff Model-A Guide to Collaborative Change" published in 2015 by Health Administration Press and winner of the 2016 James A. Hamilton Award for outstanding healthcare management book of the year**
- **Author/Editor of "Fundamental Operational Components for High Performing Healthcare Enterprises" published in 2018 by Health Administration Press**
- **Participant as a healthcare administrative expert in 95 legal cases since 2010 (see attached CV for details)**

- Johns Hopkins University, Baltimore, MD (BA-1972; graduated first in class senior year)
- Case Western Reserve School of Medicine, Cleveland, OH (MD-1977)
- University of California, Davis Medical Center, Sacramento, CA (Resident in Family Medicine-1977-1980)
- University of Massachusetts Affiliated Hospitals, Pittsfield, MA (Resident in General Surgery-1980-1981)
- Board Certified Emergency Physician (1981-2015) with 30 years of clinical experience (1978-2008)
- Medical Director, Emergency Departments (1982-1988; 2006-2008)
- Faculty, Director's Academy, American College of Emergency Physicians (ACEP)
- Introduced EMS defibrillation (1982) and EMS automated defibrillation (1985) into the field (Eastern US) in conjunction with Mickey Eisenberg, University of Washington, Seattle, PhysioControl, and Dartmouth Hitchcock Medical Center
- President of the Medical Staff, Memorial Hospital, North Conway, NH (2000-2004)
- Past President of the Medical Staff, Memorial Hospital, North Conway, NH (2004-2008)
- Board Member, Memorial Hospital, North Conway, NH (2000-2008)
- American Association for Physician Leadership (formerly American College of Physician Executives), Tampa, FL (Certified Physician Executive 2004 and Fellow of the American College of Physician Executives 2005-)
- Faculty, American Association for Physician Leadership (formerly American College of Physician Executives) (2005-)
- University of Massachusetts Eisenberg School of Business, Amherst, MA (MBA 2008; graduated first in class and elected into Beta Gamma Sigma, international honor society for business schools )
- Senior Consultant and Director of Education, The Greeley Company, Danvers, MA (2004-2012): worked with over 700 healthcare organizations and medical staffs to perform the following functions- physician leadership training (top rated educator and speaker), bylaws redesign, credentialing/privileging redesign, peer review redesign, medical staff assessment and redesign, physician-hospital alignment strategies, physician-hospital contracting, alternative dispute resolution, expert witness for corporate negligence cases (credentialing/privileging, peer review, performance management, corrective action and fair/judicial hearings), coaching for physicians and management regarding performance management, behavioral, and health issues, OPPE/FPPE, accreditation compliance, legal/regulatory compliance, author or co-author of the following books: *The Complete Guide to FPPE (2012), Medical Staff Leadership Essentials (2011), Engage and Align the Medical Staff and Hospital Management: Expert Strategies and Field Tested Tools* (2010), *A Practical Guide to Managing Disruptive and Impaired Physicians* (2010), *The Top 40 Medical Staff Policies and Procedures,* Fourth Edition (2010), *Emergency Department On-Call Strategies: Solutions for Physician-Hospital Alignment* (2009), and *Peer Review Best Practices: Case Studies and Lessons Learned* (2008).
- Fellow of the American College of Healthcare Executives (2012-)
- Faculty of the American College of Healthcare Executives (2013-), faculty for twelve hour cluster program "Redesign the Medical Staff for Healthcare Reform", and winner of a national development grant (with David Nash, MD) to create a twelve hour cluster program entitled

"Leading in a Changing Environment-Population Health" and of a development grant with John Byrnes, MD and Rich Priore, FACHE to create a twelve hour cluster program entitled "Physician Leadership Essentials-Management Skills", frequent national speaker at ACHE Congress, Chicago, Illinois.

- Co-creator of ACHE National Cluster Program entitled "Monetizing Quality in a Pay for Value Era"
- Co-creator of AAPL National Programs entitled "The CMO Academy" and "Optimizing Clinical and Financial Performance through Physician-C Suite Collaboration"
- NAMSS Faculty and featured in national webinars, meetings, and state chapter programs
- President and CEO, The Burroughs Healthcare Consulting Network, Inc. (2012-): work with physicians and healthcare organizations throughout the nation and beyond on clinical, management, governance, and business solutions to optimize quality/service and minimize costs. Network includes some of the nation's top healthcare consultants
- Cumulative work with over 1,500 healthcare organizations and systems in 50 states on: physician leadership academies, physician engagement/alignment strategies, physician performance strategies, medical staff redesign (credentialing/privileging, peer review, performance management, strategic medical staff development planning, medical staff structures/functions, medical staff and corporate bylaws), service line development, contracting strategies, population health, quality/safety/service/cost structure optimization, leadership (board, management, physician) retreats and facilitations, population health, clinical integration
- Author of "Redesign the Medical Staff Model-A Collaborative Approach", published by Health Administration Press, January, 2015 (2016 James A. Hamilton Book Award for outstanding healthcare management book)
- Author of monthly national healthcare blog on Hospital Impact, a Fierce Healthcare Publication, Washington, DC
- Frequent contributor to Board Room Press, a publication of The Governance Institute, San Diego, California
- Healthcare Legal Consulting with an emphasis in: negligent credentialing, negligent peer review, fair/judicial hearings, physician performance management, medical appropriateness, false claims act, corporate negligence and compliance
- Member of the American Health Lawyers Association (AHLA): presenter and contributor to association publications and American College of Legal Medicine (ACLM).

**B.  Recent Publications:**

1.      Burroughs, Jon (editor and author), "Essential Operational Components for High Performing Healthcare Enterprises," Health Administration Press, September, 2018.

2.      Burroughs, Jon., "Redesign the Medical Staff Model-A Collaborative Approach," Health Administration Press, November,2015 (Winner of the 2016 James A. Hamilton Award for Outstanding Healthcare Management Book)

3.      Burroughs, Jonathan H., "21st Century Skills for Accountable Boards," The Board Room Press, The Governance Institute, February 2019.

4.      Burroughs, Jon, "How to Build a Population Health Program," Pediatric Focus, The Governance Institute, December, 2018.

3.      Burroughs, Jon, "Rethinking Physician Documentation," Healthcare Executive, May-June, 2018, pages

4.      Burroughs, Jon, Rural Focus: "Rural Healthcare: A Vision for 2018, The Governance Institute, March, 2018.

5.      Burroughs, Jonathan H., Industry Voices: "The ACA is Flawed but a New Legal Threat could set the US Healthcare System back Decades," Fierce Healthcare, February 28, 2018.

6.      Burroughs, Jonathan H., Hospital Impact: "Medicaid on the Chopping Block for 2018." Fierce Healthcare, February 6, 2018.

7.      Burroughs, Jonathan H., Hospital Impact: "Why Funding of the Children's Health Insurance Program Matters," Fierce Healthcare, January 9, 2018.

8.      Burroughs, Jonathan H., Hospital Impact: "Why Doctors should Oversee, Not Conduct Clinical Documentation, Fierce Healthcare, December 7, 2017.

9.      Burroughs, Jonathan H. et al,"ACHE Roundtable: A focus on Physician Leadership," Healthcare Executive, volume 32, number 6, November/December, 2017, pp 20-26.

10.     Burroughs, Jonathan H., Hospital Impact: "Medical Staff Services Professionals-A New Role for the 21st Century," Fierce Healthcare, August 31, 2017.

11.     Burroughs, Jonathan H., Hospital Impact: "Death of the Skinny Repeal Bill and why Covered Lives Matter," Fierce Healthcare, August 3, 2017.

12.     Burroughs, Jonathan H., Hospital Impact: "What's Next for the AHCA? Hopefully, pragmatic solutions to healthcare policy dilemmas," Fierce Healthcare, June 8, 2017.

13.     Burroughs, Jonathan H., Hospital Impact: "The Meadows-MacArthur Amendment is Strike Two for the American Health Care Act", Fierce Healthcare, May 1, 2017.

14.     Burroughs, Jonathan H., "What it takes to be a Top Performing Organization," NAMSS Synergy, May-June, 2017.

15.     Burroughs, Jonathan H., "Hospital Impact-CBO Report Reveals Republican Healthcare Bill is Political Position," Fierce Healthcare, March 16, 2017.

16.     Burroughs, Jonathan H., "Hospital Impact-A Closer Look at the GOP's 'Replace then Repeal' Proposal, Fierce Healthcare, February 22, 2017.

17.     Burroughs, Jonathan H., "Hospital Impact-No Consensus in Sight for the Republican ACA Replacement," Fierce Healthcare, February 2, 2017.

18.     Burroughs, Jonathan H., "Hospital Impact-The Implications of Donald Trump's ACA Executive Order," Fierce Healthcare, January 25, 2017.

19.     Burroughs, Jon, "Regain Lost Luster with Modern Medicine Ideas," Physician Leadership Journal, Volume 4, Issue 1, January/February, 2017.

20.     Burroughs, Jonathan H., "Hospital Impact-Drug Companies Win, Patient Safety Loses with the 21st Century Cures Act, Fierce Healthcare, December 15, 2016.

21.     Burroughs, Jonathan H., "Hospital Impact-Why the GOP will not Repeal the Affordable Care Act in its Entirety," Fierce Healthcare, November 16, 2016.

22.     Burroughs, Jonathan H., "Industry Voices: For President Candidates, Two very Different Views on Healthcare, Fierce Healthcare, November 7, 2016.

23.     Burroughs, Jonathan H., "Three Keys to Giving Healthcare Consumers what they Want," Hospital Impact, September 26, 2016.

24.     Burroughs, Jonathan H., "Everything you need to know about the New CMS Cardiac Bundled Payment Program," Hospital Impact, August 17, 2016.

25.     Burroughs, Jonathan H., "Healthcare Policy Implications of the Presidential Election," Hospital Impact, July 14, 2016.

26.     Burroughs, Jonathan H., "MACRA is Now! A Roadmap to Compliance," Hospital Impact, June 15, 2016.

27.     Burroughs, Jonathan H., "End Physician Burnout by Allowing Doctors to be Doctors Again," Hospital Impact, May 12, 2016.

28.     Burroughs, Jonathan H., "Clinical Pharmacist-An Essential Member of the Healthcare Team," Hospital Impact, April 21, 2016.

29.    Burroughs, Jonathan H., "When it comes to Patient Safety-Culture is Everything," Hospital Impact, March 17, 2016.

30.    Burroughs, Jonathan H., "How MACRA is Hastening the Demise of Fee for Service," Hospital Impact, February 18, 2016.

31.    Burroughs, Jonathan H., "The Ten Traits of a Great Healthcare Organization," Hospital Impact, January 21, 2016.

32.    Burroughs, Jonathan H., "Five Steps to Staging and Integrating a Population Health Program," Hospital Impact, December 10, 2015.

33.    Burroughs, Jonathan H., "The Supreme Court and the ACA Contraception Mandate-Deja Vu All over Again," Hospital Impact, November 12, 2015.

34.    Burroughs, Jonathan H., "ICD-10: Collaborative Ways to Reduce Operating Costs," Hospital Impact, October 29, 2015.

35.    Burroughs, Jonathan H., "Medical Overuse and why Fee for Service must Go," Hospital Impact, September 3, 2015.

36.    Burroughs, Jonathan H., "Medicare's Potential Reimbursement for End of Life Discussion: A Big Step Forward," Hospital Impact, July 23, 2015.

37.    Burroughs, Jonathan H., "Ken Cohn- In Tribute to a Colleague and a Friend," Hospital Impact, July 16, 2015.

38.    Burroughs, Jonathan H., "Activity Base Costing Helps Providers Deliver High Quality Low Cost Care," Hospital Impact, May 20, 2015.

39.    Burroughs, Jonathan H., "Strategies to Survive a Brave New Value Based World," Hospital Impact, April 1, 2015.

40.    Burroughs, Jonathan H. and Nash, David, "Population Health and the Disruptive Innovative Business Models Necessary to Support It," Boardroom Press, April 2015

41.    Burroughs, Jonathan H., "Are you ready for E-Health Invasion?" Hospital Impact, February 19, 2015.

42.    Burroughs, Jonathan H., "How the Unraveling of the Affordable Care Act could Affect Providers," Hospital Impact, January 14, 2015.

43.    Burroughs, Jonathan H., "Ebola-Fear not Facts Drive Frenzy," Hospital Impact, November 13, 2014.

44.    Burroughs, Jonathan H., "St. Luke's Population Health Programs Promote Innovation," Hospital Impact, October 23, 2014.

45.    Burroughs, Jonathan H., "Silence can Kill: Doctors, Nurses, and Staff must hold each other Accountable," Hospital Impact, September 4, 2014.

46.    Burroughs, Jonathan H., "Disruptive Innovation in Healthcare: Are you ready?" The Governance Institute's E-Briefings, Volume 11, Number 7, September, 2014.

47.    Burroughs, Jonathan H., "Involving Physicians in Strategic Planning," Hospital Impact, August 6, 2014.

48.    Burroughs, Jonathan H., "What Does the Hobby Lobby Ruling mean for Healthcare and the Separation of Church and State?" Hospital Impact, July 2, 2014.

49.    Burroughs, Jonathan H., "Population Health is the Next Big Thing," Hospital Impact, June 5, 2014.

50.    Burroughs, Jonathan H., and Bartholomew, Kathleen, "New Ways for Physicians and Nurses to Work Together, " Physician Executive Journal, Volume 40, Number 3, May-June, 2014.

51.    Burroughs, Jonathan H., "Same Sex Marriage, Human Rights, and Affordable Healthcare," Hospital Impact, May 1, 2014.

52.    Burroughs, Jonathan H., "Actuarial Management Key to Changing Industry," Hospital Impact, March 19, 2014.

53.    Burroughs, Jonathan H., "Large Employers and the Drive for Healthcare Transformation," Hospital Impact, February 4, 2014.

54.    Burroughs, Jonathan H., "The ACA and the Separation of Church and State," Hospital Impact, January 23, 2014.

55.    Burroughs, Jonathan H., "More Unintended Consequences of Healthcare Reform," Hospital Impact, December 3, 2013.

56.    Burroughs, Jonathan H., "Healthcare Leaders face Unintended Consequences of Reform," Hospital Impact, November 25, 2013.

57.    Burroughs, Jonathan H., "The Origins of Healthcare-Aviation Comparisons," Hospital Impact, October 22, 2013.

58.    Burroughs, Jonathan H., "Six Strategies Hospital Should Steal from the Airline Industry," Hospital Impact, September 17, 2013.

59.    Burroughs, Jonathan H., "Informal Doc Leaders-A Help or Hindrance?" Hospital Impact, August 5, 2013.

60.    Burroughs, Jonathan H., "Physician Engagement-Must Dos," Hospital Impact, July 10,

2013.
61.     Burroughs, Jonathan H., "Physicians are not the only ones losing their Autonomy in Healthcare Reform," The Governance Institute's E-Briefings, Volume 10, Number 4, July, 2013.
62.     Burroughs, Jonathan H., "Physician Engagement-What Not to Do," Hospital Impact, June 24, 2013.
63.     Burroughs, Jonathan H., "Just what is Healthcare Reform Anyway?" Hospital Impact, May 20, 2013.
64.     Burroughs, Jonathan H., "Is there Life after a Data Bank Report?", Physician Executive Journal, March-April, 2013.
65.     Burroughs, Jonathan H., "How to Handle Medical Professional Conduct Violations," Hospital Impact, March 27, 2013.
66.     Burroughs, Jonathan H., "How Healthcare Leaders can Prevent Doc Suspension," Hospital Impact, February 27, 2013.
67.     Burroughs, Jonathan H., "Why it matters if States don't Expand Medicaid," Hospital Impact, January 23, 2013.
68.     Burroughs, Jonathan H., "Is there Life for Docs after a Data Bank Report?" Hospital Impact, December 17, 2012.
69.     Burroughs, Jonathan H., "Trends in Governance for New Care Delivery Models," Boardroom Press, December, 2012.
70.     Burroughs, Jonathan H., "Revisiting the Key Components of the Affordable Care Act," Hospital Impact, November 24, 2012.
71.     Burroughs, Jonathan H., "Dealing with the Aging Physician Advocacy or Betrayal," The Physician Executive," 38:6, November-December 2012.
72.     Burroughs, Jonathan H., "What If? Two Post-Elections Scenarios for Healthcare," Hospital Impact, October 24, 2012.
73.     Burroughs, Jonathan H., "Succession Planning-Luxury or Necessity?" Hospital Impact, October 10, 2012.
74.     Burroughs, Jonathan H., "More ways to Reduce Hospital Readmissions," Hospital Impact, September 19, 2012.
75.     Burroughs, Jonathan H., "Reducing Readmissions: It's Harder than it Looks," Hospital Impact, September 12, 2012.
76.     Burroughs, Jonathan H., "New Models in Hospital-Physician Governance," Boardroom Press, August, 2012.
77.     Burroughs, Jonathan H., "More of what Health Reform Doesn't Do," Hospital Impact, July 31, 2012.
78.     Burroughs, Jonathan H., "What the Affordable Care Act Doesn't Do," Hospital Impact, July 26, 2012.
79.     Burroughs, Jonathan H., "Improve Hospital-Doc Alignment with Job Expectations and Incentives," Hospital Impact, June 13, 2012.
80.     Burroughs, Jonathan H., "Tips to Optimize Doc-Nurse Relationships," Hospital Impact, May 3, 2012.
81.     Burroughs, Jonathan H., "Have Physician-Nurse Relationships Improved?" Hospital Impact, April 11, 2012.

C. **Sources of Information: Monique Russell, Jasmine Riggins, Elsa Powell, and Desire Evans v. Educational Commission for Foreign Medical Graduates (ECFMG)**

1. Jane Doe 1-10 v. Dimensions Healthcare System Class Action Complaint
2. Final Decision and Order re Charles Akoda MD v. Maryland State Board of Physicians (7/10/17)
3. United States District Court Judgment against Charles Akoda (3/2/17)
4. Virginia Department of Health Professions Order of Mandatory Suspension (4/25/17)
5. Deposition of William C. Kelly, ECFMG with Exhibits (8/20/19)
6. Information Booklet ECFMG Certification and Application Step 1 and Step 2 of the United States Medical Licensing Exam (USMLE) and ECFMG English Test (1996)
7. United States Medical Licensing Examination (USMLE) Bulletin of Information (1996)
8. ECFMG Information Booklet (1995)
9. Education Commission for Foreign Medical Graduates Application Form (7/95)
10. Correspondence from William C. Kelly to Dr. Charles Olufemi Igberase (6/22/95)
11. Correspondence from Dr. Igberase Oluwafemi Charles to William C. Kelly (7/14/95)
12. Correspondence from William C. Kelly to Kenneth Cotton, USMLE (12/7/95)
13. Birth Certificate of Igberase Oluwafemi-Charles (4/7/62)
14. Correspondence from William C. Kelly to Dr. Igberase Olufemi-Charles (12/7/95)
15. USMLE Application completed by Dr. Femi Charles Igberaese (10/23/00)
16. Correspondence from William C. Kelly to "Dr. Femi Charles Igberaese (11/16/00)
17. Correspondence from William C. Kelly to Dr. Igberase Oluwafemi-Charles (5/3/01)
18. Correspondence from "Dr. Femi Charles Igberase" to William C. Kelly (6/17/01)
19. Correspondence from William C. Kelly to "Dr. Oluwafemi Charles Igberase (5/22/02)
20. USMLE Application completed by Dr. Charles Oluwafemi Igberaese (3/13/02)
21. Medical Diploma from the University of Ibadan to Dr. Charles Igberaese Oluwafemi (6/18/96)
22. Correspondence from William C. Kelly to Dr. Igberase Oluwafemi-Charles (11/12/02)
23. Medical Diploma from the University of Ibadan to Dr. Charles Olufemi Igberase (6/19/87)
24. Correspondence from William C. Kelly to Dr. Charles Igberaese Oluwafemi (7/22/02)
25. Correspondence from Susan Deltsch to Dr. Charles Ugberaese Oluwafemi (6/17/03)
26. Correspondence from Ms. Kara Corado, JD to Dr. John Nosa Akoda (12/19/16)
27. Correspondence from Lisa Cover, MHA to National and International Professional Societies and Licensing Boards re ECFMG Irregular Behavior and Associated Actions/Sanctions (3/1/17)
28. USMLE Application completed by Dr. John Nosa Akoda (12/31/95)
29. USMLE Application completed by Dr. John Nosa Akoda (8/29/96)
30. Medical Diploma from the University of Benin to Dr. Johnbull Enosakhare Akoda (2/6/88)
31. ECFMG Standard Certificate Awarded to Dr. John Nosa Akoda (8/18/97)
32. Printouts of Dr. John Nosa Akoda's ECFMG Record
33. Correspondence from Stephen S. Seeling, JD (ECFMG) to James McCorkel, PhD, Jersey Shore Medical Center (8/22/00)
34. Request for Permanent Validation of Standard ECFMG Certificate by Dr. John-Charles Akoda (9/2/98)
35. Correspondence from James McCorkel, PhD, Jersey Shore Medical Center to Rice Holms, ECFMG (8/11/00)
36. Correspondence from Stephen Seeling, JD to James McCorkel, PhD (8/22/00)
37. Correspondence from William C. Kelly to Dr. John Akoda (8/22/00)

38. Memorandum from William C. Kelly to Dr. John Akoda File (8/28/00)
39. Correspondence from Dr. John Akoda to William C. Kelly (8/29/00)
40. Correspondence from William C. Kelly to Dr. John Akoda File (9/13/00)
41. Correspondence from William C. Kelly to Dr. John Akoda File (9/27/00)
42. Republic of Nigeria Passport for John Nosakhane Charles Akoda Birthdate 1/1/59
43. Transcript of Appeal Procedures ECFMG for Igberase Oluwafemi Charles (7/10/96)
44. Notes of Telephone Conversation with William C. Kelly and Dr. McCorkel re Dr. Akoda (10/5/00)
45. E-mail correspondence from John Akoda, MD (Ferni Charles) to William C. Kelly (12/21/00)
46. Correspondence from William C. Kelly to Dr. John Akoda's File (12/21/00)
47. Memorandum from William C. Kelly to Stephen S. Seeling, JD (12/22/00)
48. Correspondence from Ramon Heard, Senior Investigator, Office of Professional Discipline, New York to Stephen S. Seeling, JD (12/17/02)
49. Correspondence from William C. Kelly to Ramon Heard (1/14/03)
50. Correspondence from Ramon Heard to William C. Kelly (3/31/03)
51. Correspondence from William C. Kelly to Ramon Heard (4/29/03)
52. ERAS Residency Application Submission Form for John C. Nosa Akoda, MD (10/3/06)
53. Letter of Reference for Dr. Akoda from Dr. Charles A. Francis, MD (10/1/06)
54. Correspondence from William C. Kelly to Dr. Charles A. Francis, MD (11/22/06)
55. Letter for reference for Dr. John-Charles Nosa Akoda from Dr. A.O. Roberts, Head of OBGYN, University of Ibadan, Nigeria (8/20/06)
56. Correspondence from William C. Kelly to Dr. A.O. Roberts (11/22/06)
57. Letter for Reference for Dr. John-Charles Akoda from Phil Robertson, MD, Medical Director of MaxiCare Inc. (9/28/06)
58. Correspondence from William C. Kelly to Phil Robertson, MD (11/22/06)
59. ECFMG Computer Printout for Dr. Akoda's file (8/14/00)
60. Deposition of Stephen Seeling, JD, Vice President of Operations, ECFMG (9/16/19)
61. Deposition of Kara Corado, JD, Current VP of Operations ECFMG (9/10/19)
62. Maryland State Board of Physicians Final Decision and Order re Charles Akoda, MD (7/10/17)
63. Virginia Department of Health Professions Order of Mandatory Suspension re Charles Akoda, MD (4/25/17)
64. Educational Commission for Foreign Medical Graduates Website (https://www.ecfmg.org/)

### D.  Introduction:

Mr. Schochor and Mr. Ceryes have asked me to articulate my expert opinions as to the issues of corporate responsibility of the Educational Commission for Foreign Medical Graduates (ECFMG) pursuant to its certification of Oluwafemi Charles Igberase AKA Johnbull Enosakhare Akoda AKA multiple other aliases.

### E.  Expert Opinions

I.  **To a reasonable degree of professional and administrative certainty, the Educational Commission for Foreign Medical Graduates (ECFMG) negligently certified Oluwafemi Charles Igberase AKA Johnbull Enosakhare Akoda AKA multiple other aliases which placed residency programs and the public at risk for having an unqualified individual and self-acknowledged felon providing medical services to those who rely on ECFMG to serve as an effective "gatekeeper" upon which the healthcare system can rely to protect the public from inadvertent harm**

### F.  Foundations for Expert Opinion

1.  **Background of the Educational Commission for Foreign Medical Graduates (ECFMG) and its mission**

Established in 1956 as a private not for profit organization, The Evaluation Service for Foreign Medical Graduates (ESFMG) was established to meet the growing needs of the US healthcare industry to utilize foreign medical graduates to fulfill rapidly growing demand both in its graduate medical education (GME) programs and in the US healthcare system at large. The organization then changed its name to the Educational Council for Foreign Medical Graduates (ECFMG) and developed the first ECFMG certification program which consisted of a basic sciences exam and English language proficiency test. In 1958, the organization administered its first exams and certified its first foreign medical graduates. The AMA and AHA recognized ECFMG as the primary certifying body for foreign medical graduates seeking to enter the United States healthcare system. In 1974, ECFMG merged with the Commission of Foreign Medical Graduates (CFMG) and the combined organization was named the Educational Commission for Foreign Medical Graduates and combined the certification exam with conducting research on international medical graduates and monitoring the visas for exchange foreign medical visitors (currently the J-1 visa program). Over the years, it has grown its database entitled the Electronic Portfolio of International Credentials (EPIC) to be a primary source verification tool for healthcare organizations with regards to foreign medical graduates. ECFMG partnered with the National Board of Medical Examiners to create the United States Medical Licensure Examination (USMLE) which now includes Step 1 (basic sciences), Step 2CK (clinical knowledge), Step 2CS (clinical skills), and Step 3

(clinical management in ambulatory settings) as well as an English Proficiency examination. Other programs include:

- Exchange Visitor Sponsorship Program (EVSP) for J-1 visa recipients
- Electronic Residency Application Service (ERAS) to transmit credentialing data to potential residency programs
- Certification Verification Services (CVS) that confirms ECFMG certification or accreditors and outside agencies
- ECFMG Certificate Holders' Office (ECHO) which helps foreign medical graduates who become ECFMG certified to stay in touch with ECFMG
- Foundation for Advancement of International Medical Education and Research (FAIMER) which performs research to enrich foreign medical education
- GEMx which is a program that promotes foreign medical graduate exchanges

Through its work, ECFMG has enabled international medical graduates (IMGs) to integrate into the US healthcare system and IMGs now make up 25% of the physician workforce in this country. Today, ECFMG has over 800 employees and net assets of over $165 million and is the pre-eminent 'gatekeeper' for foreign medical graduates who wish to enter the United States healthcare system.

## 2. The primary purpose of ECFMG is to serve as a 'gatekeeper' to ensure that foreign medical graduates meet established criteria to transition into the United States Healthcare System

ECFMG states the following on its website as its mission: "The ECFMG promotes quality health care for the public by certifying international medical graduates for entry into U.S. graduate medical education, and by participating in the evaluation and certification of other physicians and health care professionals nationally and internationally. In conjunction with its Foundation for Advancement of International Medical Education and Research (FAIMER), and other partners, it actively seeks opportunities to promote medical education through programmatic and research activities."

To be certified by ECFMG, a foreign medical graduate must successfully complete the following requirements:

- ✓ **A medical school listed in the "World Directory of Medical Schools" which meets ECFMG's requirements**
- ✓ **Complete a medical school listed in the "World Directory of Medical Schools" during eligible years per ECFMG**
- ✓ **Submit an application for the ECFMG Certification Examination that includes a confirmation of identity, local address, and medical school graduation**
- ✓ Pass the medical science examination requirement (USMLE Step 1 and Step 2 CK)
- ✓ Pass the clinical skills requirement (USMLE Step 2 CS)
- ✓ Pass the English Proficiency Examination

Once the certification process is successfully completed, the candidate is awarded an ECFMG Certificate that is numbered and dated. This certificate and its number must be referenced when applying for a medical license or ACGME residency program in the United States.

Among its stated purposes, ECFMG includes the following:

➢ **Certify the readiness of international medical graduates** for entry into graduate medical education and health care systems in the United States through an evaluation of their qualifications.
➢ **Verify credentials** and provide other services to health care professionals worldwide.

Finally, ECFMG states the following as its core values:

"Improving world health through excellence in medical education in the context of ECFMG's core values of collaboration, professionalism and accountability."

Thus, through its certification process, ECFMG **certifies the readiness of international medical graduates, verifies credentials, confirms the identity, local address, and medical school graduation of its foreign medical graduate applicants,** and improves world health through its accountability to the healthcare entities it serves as both a 'gate keeper' and a repository of information with regards to the qualifications of FMGs who desire to enter the US healthcare system.

### 3. US Licensure Bodies, ACGME accredited Residency Programs and the public at large rely on ECFMG to serve as an effective 'gatekeeper'

US Licensure bodies, ACGME accredited residency programs rely on ECFMG's ability to: certify the readiness of international medical graduates, verify credentials, confirm the identity, local address, and medical school graduation of its foreign medical graduate applicants and this was confirmed in the 30 (b) (6) deposition of Kara Corado, JD, Current Vice President of Operations at ECFMG:

"Do hospitals rely on ECFMG to provide primary-source verification of a physician's medical credentials as part of the application process? A- I'm not sure if hospitals have a requirement to primary-source verified medical education credentials. **If they do, they can use an ECFMG certification report to indicate whether or not a physician is certified by ECFMG which would include primary-source verification of their medical education credentials.** Q. You're aware that hospitals do use ECFMG for that purpose? A. Yes." (pages 42-43)

**Commentary:** Hospitals are required to primary source verify a physician's medical education and training as well as his/her identity (through at least two separate sources), and nationality (eligibility to apply and meet the organization's criteria for membership and privileges.
**"Q. What's in an ECFMG report to the hospital? A. The status report would contain the physician's name; date of birth; the name of the medical school, and the country of the medical school where they went to school; their year of graduation; whether or not they are ECFMG certified, and what the**

**validity of that certification is, whether it's valid indefinitely or expired**, et cetera; and there may be score information on examinations, it depends on who the recipient of the report is. **Q. Was that also true back in the late 1990s when Akoda was applying for residency programs? A. Yes.** Q. Was that also true in the mid-2000s when Akoda was applying for residency programs? A. Yes." (pages 44-45)

**"Q. Is it ECFMG's expectation that state medical boards will rely on reports of ECFMG certification status for any purpose? A. Yes. Q. Is it ECFMG's expectation that residency programs, such as that at Howard University, would rely on ECFMG status for any purpose? A. Yes, to demarcate that that person met the certification so they could enter GME among whatever other requirements the program had. Q. It is ECFMG's expectation that hospitals that are considering whether to grant clinical privileges to a physician rely on ECFMG status for any purpose? A. I think it would be fair to say that they have the same expectation as the licensing board and the residency programs have on the status reports; on ECFMG providing information about certificate status."** (pages 247-248)

Stephen Seeling, JD, Former Vice President of Operations at ECFMG agrees:

**"Q.    Generally speaking, was it your understanding that residency programs would not attempt to verify a foreign medical graduate's diploma on their own but instead would rely upon determination of that diploma's veracity or   authenticity? A-Generally speaking, I think that's true."** (page 26)

**Commentary:**

Thus, while it is true that licensure bodies, ACGME accredited residency programs and other accreditors (The Joint Commission) perform their own assessments of the qualifications of physicians working within the US healthcare system, they rely on ECFMG to accurately verify the: **the readiness of international medical graduates, verifies credentials, confirms the identity, local address, and medical school graduation of its foreign medical graduate applicants entering the US healthcare system.**

4. **Oluwafemi Charles Igberase AKA Johnbull Enosakhare Akoda AKA multiple other aliases established himself as engaging in multiple confirmed examples of 'irregular behavior' violating the established requirements of ECFMG**

According to the 1996 United States Medical Licensing Examination (USMLE) Bulletin of Information: **Irregular behavior includes all actions on the part of applicants or examinees….that subvert or attempt to subvert the examination process**. **Specific examples of irregular behavior include but are not limited to the following: ….falsifying information on the application or registration forms; impersonating an examinee** or engaging a proxy to take the examination;…**In addition to actions described in this section, appropriate legal action will be taken when any such infringement has occurred.** If upon review and analysis of all available information, it is determined that irregular behavior has occurred, an annotation of this determination will be entered in the applicant's USMLE

record and will appear on applicable score reports and on transcripts. All medical licensing authorities having received a transcript for this examinee in the past will receive an updated transcript. **If it is determined that the irregular behavior threatens the future integrity of the examination system, the examinee may be barred from future USMLE steps. The USMLE program reserves the right to bar an individual from USMLE or to have special test administration procedures implemented when information on behavior of examinees on USMLE or on predecessors of the USMLE system indicates such actions may be necessary to ensure the security of USMLE**" (pages 22-25)

On October, 1991 a man by the 'name' of Oluwafemi Charles Igberase enters the United States on a non-immigrant visa. Mr. Igberase allegedly completes his PG-1 and PG-2 years in the Department of OBGYN at the University of Ibadan in Nigeria with outstanding standardized testing scores (99%tile) from June, 1990-July, 1992 despite the fact that he entered the United States in October, 1991.

In November, 1991, Mr. Igberase applies for a social security number and receives a social security number ending 5054 with a birth date of April 17, 1962.

In March 31, 1992 Mr. Igberase submits an application to the Educational Commission for Foreign Medical Graduates (ECFMG) certification utilizing the name Oluwafemi Charles Igberase utilizing the SSN ending 5054 and a birth date of April 17, 1962

According to William C. Kelly, Mr. Igberase did not complete his application to ECFMG properly:

"Q. We have the section here which requests a certification from medical school official regarding the photograph that is included as part of the application. To your understanding, Mr. Kelly, what is the purpose of having a medical school official certify that the photograph, signature, and information on the form accurately applies to the individual named above? A. My recollection it was to help confirm this was the individual who went to that medical school. Q. Now, in this particular application on behalf of Igberase, there is no certification from a medical school official, correct? A. That is correct. Q. However, there is an option as I understand it that there would be a notarized -- a signature from a Notary and an explanation as to why the form could not be signed in the presence of a medical school dean; is that correct? A. That is correct. Q. Those are two separate options that the applicant can select in completing this application? A. Yes. Q. On this particular application there's no explanation provided at all, correct? A. On this form, that is correct. Q. With respect to this form, it would not represent a completed application on behalf of Igberase? A. Yeah, I don't know that I would say – all the information is not on this form…" (Deposition of William C. Kelly, pages 181-183)

The following events transpired between 1992 and 1994:

July, 1992: Mr. Igberase fails both the basic medical science and clinical science of the ECFMG certification exam.

January, 1993: Mr. Igberase fails the basic medical science portion of the ECFMG certification exam.

September, 1993: Mr. Igberase sits for the three step United States Medical Licensing Exam (USMLE) and fails step 1.

1992-September 1993: Mr. Igberase sits for ECFMG certification examination and passes all three parts under the name of Oluwafemi Charles Igberase and a false birth date.

March, 1994: Mr. Akoda applies for a second ECFMG certification under the name of Igberase Oluwafemi Charles.

August, 1994-September 1994: Mr. "Charles" passes all three parts of the USMLE.

According to the 1995 ECFMG Information Booklet, no steps that have been passed can be repeated within a seven-year period:

1995: ECFMG Information Booklet:

 "Is there a limit to the number of times an applicant can take Step 1 and Step 2?

Answer:  For purposes of ECFMG certification, there is no limit on the number of attempts of step 1 and step 2 until one or both steps have been passed. **If one step is passed, applicants may not repeat that step and will have seven years to pass the other step**....If the other step is not passed within a maximum of seven years, the applicant's previous passing score will no longer be valid and the entire process must be repeated." (page 1)


In January, 1995, Mr. Igberase applies for a second social security number ending 9065 under the name of Charles Oluwafemi Igberase, Jr. and a false birth date

According to a June 22, 1995 Correspondence from William C. Kelly, Manager of Medical Education to Mr. Charles Olufemi Igberase,  Mr. Kelly documents the following to Mr. Charles Olufemi Igberase:

•       Dr. Igberase misrepresented that he had never taken the ECFMG examination before or completed a prior ECFMG application (September, 1994)
•       Dr. igberase represented his name as Igberase Oluwafemi Charles (September, 1994)
•       Dr. Igberase represented his birth date as 4/17/61 (September, 1994)
•       He was issued a prior ECFMG/USMLE identification number of 0-519-573-0
•       He represented his name as Oluwafemi Charles Igberase (July, 1992)
•       He represented his birth date as 4/17/62 (July, 1992)
•       He failed both step 1 and step 2 in July, 1992
•       He failed step 1 in September, 1992
•       He failed step 1 and passed step 2 and the English test in January, 1993
•       He passed step 1, met the medical educational credentialing requirement and was issued an ECFMG Certificate # 0-482-700-2 in July, 1993
•       Contrary to ECFMG rules (see booklet), he repeated step 1 in September, 1994 which he passed

Mr. Charles is asked to provide immediate input and provides the following correspondence back to Mr. Kelly in July 14, 1995: Mr. Charles admits that he:

•       Attempted to get into to "150" residency programs but that his ECFMG scores were not competitive enough
•       Knowingly lied about having taken the tests before in order to get a new identification number and to improve upon his ECFMG scores
•       The error in date of birth (1961 v. 1962) was inadvertent (actual birthdate is 4/17/62)
•       Actual name is Igberase Oluwafemi-Charles (0-519-573-0)

As a part of the application process, Mr. Igberase signed and agreed to abide by the following statement:

July, 1995: Education Commission for Foreign Medical Graduates Application Form
Part C: Certification by Applicant

**"I hereby certify that the information in this application is true and accurate to the best of my knowledge and that the photographs enclosed are recent photographs of me."**

**"I understand that the 1)falsification of this application or the 2) submission of any false educational documents to ECFMG….or any other conduct that subverts or attempts to subvert the examination process may be sufficient cause for ECFMG to bar me from the examination, to terminate my participation in the examination, to withhold or invalidate the results of my examination, to withhold a certificate, to revoke a certificate, or to take other appropriate action."**

As a result, on December 7, 1995 The ECFMG Committee revokes Mr. Akoda's ECFMG certification due to the discovery that he submitted two separate applications utilizing two different names with two different SSNs, and two different dates of birth.

That day, William C. Kelly notifies Mr. Igberase the following:
Correspondence from William C. Kelly to Mr. Igberase Olufemi-Charles (12/7/95):

Formal actions of ECFMG Committee on Medical Education Credentials include:

•       Revoke the first standard ECFMG Certificate issued under the number 0-482-700-2
•       Invalidate the second standard ECFMG Certificate issued under the second number 0-519-573-0
•       Report the actions to USMLE Committee on Irregular Behavior for further determination as deemed appropriate

In December 31, 1995 Mr. Igberase applies for the USMLE examination under one of his aliases John Nosa Akoda. He states that he graduated from the University of Benin, Nigeria (10/87), birthdate 1/1/59, no social security number, no prior exam or ECFMG number, could not sign in front of medical school dean due to inconsistent mail delivery.

1996: United States Medical Licensing Examination (USMLE) Bulletin of Information unequivocally states that:

**"Your identity will be verified before you are admitted to the testing room and at other times during the examination."** (page 17)

On March 7, 1996, ECFMG receives a request from Dr. Charles to appeal the decision to revoke his ECFMG Standard Certificate numbered 0-482-700-2.

It should be noted that Mr. Igberase and Mr. Akoda provide different medical school diplomas for the ECFMG credentialing process:

June 19, 1987: Medical Diploma from the University of Ibadan to Dr. Charles Olufemi Igberase

**There is no   verification that the confirmation of this diploma was ever verified as being true and accurate.**

February 6, 1988: Medical Diploma from the University of Benin to Dr. Johnbull Enosakhare Akoda

**There is no verification that the confirmation of this diploma was ever verified as being true and accurate.**

Thus, since one person cannot complete both schools within eight months, it is clear that one or both diplomas is not genuine and that Mr. Igberase AKA Mr. Akoda may or may not be a physician and have completed medical school in Nigeria.

On July 10, 1996, Mr. Charles appears before an appeals board of ECFMG in Washington DC consisting of Floyd Malveaux, MD, PhD, Marvin M. Dunn, MD, and Alexander H. Williams III and they uphold the original decision except that they limit the revocation of the ECFMG Standard Certificate numbered 0-482-700-2 to five years from July 10, 1996-July 10, 2001 at which time the certificate may be reinstated if he meets all other eligibility criteria.

On August 29, 1996, a USMLE Application is completed by Dr. John Nosa Akoda.  Mr. Akoda applies for a third application for ECFMG Certification under the name of John Nosa Akoda utilizing a false Nigerian Passport. Again, no social security number, same false birthdate, and he applied for prior exam with ECFMG number the year prior but was unable to make the exam.

Mr. Akoda passes all three steps of the USMLE and receives a third ECFMG Certification under the Akoda name (ECFMG Number 0-553-258-5) on August 18, 1997.

On, September, 1998, Mr. Akoda applies for a third social security number ending 7353 under the name of Oluwafemi Igberase with a false birthdate and uses this SSN to fraudulently apply for federal education loans for his children.

In 1999, Mr. Akoda applies for and receives a fourth social security number ending 1623.

**Commentary:** It is clear that Mr. Igberase AKA Mr. Akoda falsified his name, social security number, birthdate, ECFMG Number, passport, and statements alleging he had never taken the USMLE exam on any prior occasion innumerable times and had one his ECFMG certificates invalidated and the preceding one revoked for five years due to 'irregular behavior'. Mr. Igberase AKA Mr. Akoda clearly intended to defraud the Educational Commission for Foreign Medical Graduates and engage in 'irregular behavior' over an eight-year period and thus undermined the security and integrity of the ECFMG certification process.


5. **Charles Olufemi Igberase AKA Johnbull Enosakhare Akoda AKA multiple other aliases confirmed to ECFMG that he engaged in social security and identity fraud**

On August 11, 2000, Dr. James McCorkel, Residency Director at Jersey Shore Medical Center, Neptune City, New Jersey where Mr. Akoda was serving as a resident wrote to Rice Holms at ECFMG inquiring as to whether "Dr." Akoda went under aliases with differing birthdates, ECFMG certificate numbers, dates of graduation from medical school and social security numbers.

The matter is referred to Stephen Seeling, JD, Vice President of Operations who responds to Dr. McCorkel on August 22, 2000 confirming that "Dr." Akoda has three identities, two social security numbers, three dates of birth, two medical schools and three ECFMG numbers.

August 22, 2000: Correspondence from Stephen S. Seeling, JD (ECFMG) to James McCorkel, PhD, Jersey Shore Medical Center

**"An inquiry is made as to whether Dr. John Nosa Akoda (birthdate 1/1/59)  end social security number of 9065 has another identity and ECFMG shares their information regarding Olafuwemi Charles Igberase with a different birthdate (4/17/62), medical school, ECFMG number 0-482-700-2, end social security number 5054 and the recent revocation of his ECFMG Standard Certificate due to irregular behavior. In addition, they shared that this physician is also "Dr. Igberase Olafuwemi Charles" (birthdate 4/17/61) and ECFMG Identification Number 0-519-573-0 without any social security number. This ECFMG Certificate was invalidated in November, 1995."**

That same day, William C. Kelly writes to "Dr." Akoda sharing the allegations and investigation at Jersey Shore Medical Center and requests an immediate explanation.


On August 29, 2000, "Dr." Akoda responds to Mr. Kelly and claims that the allegations that he has at least three identities is false and that Dr. Igberase Olafuwemi-Charles is his cousin who is now practicing in South Africa. He does acknowledge that he utilized Dr. Charles' social security number while awaiting his own.

On September 27, 2000, **Dr. Akoda stops by ECFMG to reiterate that he is not "Dr." Charles although he utilized his ("Dr." Charles') social security number and left copies of his Nigeria Passport and International Driving Permit.**

On December 21, 2000 Mr. Kelly is notified by Dr. McCorkel that "Dr." Akoda has been suspended from Jersey Shore Medical Center (he choses not to appeal the decision) on November 17, 2000 for the following reasons:

- **Used a false social security number to apply to the hospital (of his 'cousin' Charles Igberase)**
- **The two green cards utilized had different numbers, names, expiration dates, and dates of birth**

On December 22, 2000, William C. Kelly informs Stephen S. Seeling, JD that he believes that "Dr." John Akoda and "Dr." Igberase are one and the same person because:

- **Dr. McCorkel has information from an unnamed informant**
- **Dr. Igberase does not respond to his attempts to contact him**
- **Dr. Igberase's address is 'correct'; however, his phone number is not**
- **Dr. Akoda responds to Dr. Igberase's e-mail requests**

On April 18, 2001 the ECFMG Committee on Medical Education Credentials met to discuss the falsified application from "Dr. Femi Charles Igberaese" and decided to:

- Extend the revocation of ECGME Certificate for an unspecified period and to notify the Federation of State Medical  Boards Action Data Bank,  Graduate Medical Residency Program Directors, Canadian Licensing entities and refer the matter to the USMLE Committee on Irregular Behavior

On March 13, 2002, a USMLE Application completed by Dr. Charles Oluwafemi Igberaese. A birthdate is listed as 3/1/67 with 'non-guaranteed mailing system', no prior ECGME identification number, no prior exam history, and no social security number listed

On May 22, 2002, William C. Kelly notifies "Dr. Oluwafemi Charles Igberase  that the ECGME Medical Education Credentials Committee met again in May, 2002 and decided to permanently revoke his Standard ECFMG Certificate and to report his irregular behavior to The Federation of State Medical Boards, to the Graduate Medical Education Program Directors, and other interested entities.

On July 22, 2002, William C. Kelly notifies  "Dr." Charles Igberaese Oluwafemi  that there were irregularities in the March 13, 2002 application in which he checked that he had no prior ECGME number and had never taken a prior examination, a date of birth of March 1, 1967, a medical school diploma from the University of Ibadan, Nigeria dated June 18, 1996, attested that the information provided was

true and accurate. Mr. Kelly requests an explanation within 15 days of receipt and that he is ineligible to sit for any examinations.

On November 12, 2002, William C. Kelly notifies "Dr."  Igberase Oluwafemi-Charles (ECFMG NO. 0-482-700-2) that the ECGME Medical Education Credentials Committee met and affirmed to permanently revoke his Standard ECFMG Certificate and to report his irregular behavior to the USFLE, The Federation of State Medical Boards, to the Graduate Medical Education Program Directors, and other interested entities.

On June 17, 2003, Susan Deltsch notifies "Dr." Charles Ugberaese Oluwafemi (6/17/03) that the USMLE Committee on Irregular Behavior has determined that Dr. Oluwafemi's behavior through the multiple applications has been irregular and thus recommend that:There be a permanent bar to him taking a USMLE exam until such time as a State Licensing Board requests that he be permitted to take the exam based upon his full disclosure of the events which led to this decision.

In 2006, Mr. Akoda is accepted into a second residency program utilizing a false permanent resident card utilizing the name John-Charles Akoda and a social security number provided by another individual in 1999.

In August 20, 2006 there are three letters of reference for "Dr." John-Charles Nosa Akoda including references from:

1. Dr. A.O. Roberts, Head of OBGYN, University of Ibadan, Nigeria (who could not be identified nor found) who states that "Dr." Akoda completed his PG-1 and PG-2 years OBGYN Residency Program from June, 1990-July, 1992 despite the fact that "Dr." Akoda was documented as being in the United States throughout a significant part of that timeframe

2. September 28, 2006 letter of Reference for "Dr." John-Charles Akoda from Phil Robertson, MD, Medical Director of MaxiCare Inc. (which is not found on the internet with any url address and who could not be identified nor found) and which states that Dr. Akoda received his New York State nursing license through this corporation

3. Letter of Reference for Dr. Akoda from Dr. Charles A. Francis, MD (who could not be identified nor located)

In March, 2007, Mr. Akoda is accepted into yet another residency program and from 2008-2012: Prince George's Hospital Center permits Mr. Akoda to rotate through its premises as a resident in medicine and surgery

**In 2011, Mr. Akoda applies for a Maryland medical license utilizing a false permanent resident card and a false Nigerian passport as well as the SSN ending 1623 under the name Charles John Nosa Akoda**

On September 14, 2011, The State of Maryland issues Mr. Akoda a medical license under the name of Charles John Nosa Akoda (#D73049)

From March, 2012- September 30, 2016, **Mr. Akoda applies for medical staff membership and privileges as an OBGYN at Prince George's Hospital Center utilizing a false permanent address and false Maryland driver's license and serves on staff fraudulently as an OBGYN attending**

On March 1, 2012, Mr. Akoda submits a Medicare enrollment application under the SSN 1623, a false Maryland Driver's license, and the Akoda name and is denied because he does not provide an accurate social security number/

**On June 1, 2016, The United States Attorney indicts Mr. Akoda for fraud and aggravated identity theft. The indictment includes eleven aliases including Charles John Nosa Akoda.**

**On June 9, 2016, Law enforcement issues search warrants on Mr. Akoda and discover false: passports, social security numbers (ending 1623 under John Charles N. Akoda), Nigerian passport, and US visa in Akoda's name. In addition, other fraudulent or altered documents relating to immigration, medical diplomas, medical transcripts as well as letters of recommendation and birth certificates are found. They also found fraudulent bank applications filed under the fourth SSN 1623.**

**On October 19, 2016, Mr. Akoda receives an indictment charging him with additional social security fraud, false statements regarding a healthcare matter, an additional count of identity theft and fraud as well as misuse of an immigration document.**

**On September 30, 2016, Mr. Akoda allows his medical license to expire while under investigation per the Maryland Board of Physicians contrary to State law.**

**On November 15, 2016, Mr. Akoda pleads guilty to social security fraud as a part of plea bargain**

**On March 2, 2017, Mr. Akoda is sentenced to six months in prison as well as three years supervised release and home detention for six months and a fine of $100**

**On April 4, 2017, The attorney general files a motion to revoke Mr. Akoda's Maryland medical license**

**On April 25, 2017, Virginia Department of Health Professions Order of Mandatory Suspension re Charles Akoda, MD and his right to renew his medical license in Virginia is suspended**

**On July 10, 2017, Mr. Akoda's Maryland medical license is revoked**

**Commentary:**

As a credentialing expert for almost two decades who has reviewed thousands of credentialing files as both a medical staff leader and national healthcare administrative consultant, who has participated and testified in many negligent credentialing law suits and who has written chapters and articles on the subject, this may be the greatest case of deliberate certification and credentialing fraud that I have encountered. There are so many deliberate uses of fraudulent techniques by Mr. Akoda AKA Igberase that I cannot count nor inventory them.

It is unclear to me and has not in any way been verified in this case:

A. That Mr. Akoda/Igberase/Charles is who he says he is
B. What the true birthdate of this individual is
C. What the true country of origin of this individual is
D. Whether this individual attended and completed any undergraduate medical education and is in fact a physician or not
E. What the true social security number of this individual is
F. What the true purpose of his residence in the United States is
G. Who or what is providing him with the wealth of false and fraudulent documentation that he has utilized (and may be continuing to utilize)
H. Whether he continues to 'practice medicine' in the United States with or without a medical or DEA license
I. The motivation of the 'informant' who tipped Dr. McCorkel off to the nature of Mr. 'Akoda's' deceptions

Thus, this case raises serious concerns as to ECFMG's commitment to its own self-professed certification process and to the wellbeing and safety of the public whom it ultimately serves.

6. **ECFMG claims that it has no obligation to the public to screen foreign medical graduates who violate the law and who may be a risk to the healthcare system at large**

The primary purpose of certification and credentialing is to protect the public from potentially unqualified or even dangerous professionals. It is true that the state licensure bodies, ACGME accredited residency programs and hospitals have their own unique credentialing programs with varied credentialing criteria that must be applied to screen potential candidates. That being said, the Educational Commission for Foreign Medical Graduates (ECFMG) also has its own certification process based upon criteria outlined in its website and articulated by its executives and managers under oath.

First, ECFMG agrees on its web site that it has a primary responsibility to protect the public and to ensure that quality healthcare is delivered in the United States by its foreign medical graduates who receive ECFMG certification:
"Overview
**ECFMG is a world leader in promoting quality health care**—serving physicians, members of the medical education and regulatory communities, health care consumers, and those researching issues in medical education and health workforce planning."

**"ECFMG's commitment to promoting excellence in international medical education** led to the establishment of its nonprofit foundation, the Foundation for Advancement of International Medical Education and Research (FAIMER®)"

"The values of ECFMG are expressed in its vision statement:
**"Improving world health through excellence in medical education in the context of ECFMG's core values of collaboration, professionalism and accountability."**

"The purposes (goals) that actuate and accomplish ECFMG's mission are to:
**Certify the readiness of international medical graduates for entry into graduate medical education and health care systems in the United States through an evaluation of their qualifications**."

**"Verify credentials and provide other services to health care professionals worldwide**."

**Improve the quality of health care by providing research and consultation services to institutions that evaluate international medical graduates for entry into their country**."

**"EPIC (Electronic Portfolio of International Credentials) is a powerful tool to help them evaluate the credentials of their physician applicants, providing the assurance that those credentials have been authenticated through primary-source verification, a best practice."**

**"ECFMG's electronic Credentials Verification is an innovative, web-based program for international medical schools that makes the process of verifying credentials faster, easier, and more efficient. This program enables schools to verify the credentials of their graduates electronically and replaces the paper-based verification process."**

**"Evaluating the readiness of IMGs to enter graduate medical education (GME) programs in the United States has long been a concern of medical organizations, hospitals, state licensing agencies, and the public."**

**"In 2006, ECFMG celebrated 50 years of promoting excellence in international medical education. Established to evaluate the qualifications of IMGs entering GME in the United States, ECFMG has grown to meet the needs of physicians, health care consumers, medical educators, researchers in medical education and health workforce planning, licensing and credentialing agencies, and those involved in the evaluation and certification of health care professionals, both in the United States and abroad."**

These goals and values were shared by executives and management of ECFMG through their sworn testimony:
**"ECFMG works on behalf of domestic regulatory authorities to protect the public through its programs and services including primary source verification of physician credentials? A. I would say yes.** Q. Would it be accurate to say that ECFMG protects the public by, among other ways, seeing that foreign medical graduates have completed an acceptable medical education? A. In that that's part of the

certification process, yes. **Q. And would it be accurate to say that ECFMG serves to protect the public by seeing to it that foreign medical graduates can successfully pass the requirements of the USLME examinations? A. Yes."** (Deposition of William C. Kelly, page 24)

"ECFMG serves the public in a number of ways. Our original program which was **the certification program severs the public in ensuring that those physicians that are educated outside of the U.S. and Canada meet certain minimum requirements** in order to enter an accredited residency program in the United States. We also serve the public in facilitating an appropriate review of them, at the same time making sure that we are efficient about doing it, because IMGs -- or International Medical Graduates represent about 25 percent of the physicians that are working in the United States. **So, it's important from a physician-workforce point of view to make sure we have qualified physicians.** So in those two broad ways I would say that we serve the public." (Deposition of Kara Corado, page 40)

**"Q. Part of ECFMG's mission is to promote public health, correct? A. Part of ECFMG's mission is to promote public health and to protect the public, yes."** (Deposition of Kara Corado, page 47)

**"Q. Do you believe patients have the right to be treated by physicians who are appropriately credentialed? A- Yes. Do you believe that patients have the right to not be treated by physicians who have obtained ECFMG certification based on false pretenses? A- Yes."** (Deposition of Kara Corado, pages 52-53)

**"Q-…one of the things that ECFMG does for foreign medical graduates is to check and make sure they went to medical school, correct? A- Yes. Q.    And so part of that process is establishing that a medical diploma provided by an applicant is authentic? A.    Correct. Q.    Another aspect of ensuring that applicants have attended medical school is making sure that the medical diploma submitted by the applicant actually belongs to the applicant.  Fair? A- I think that's fair"**

**"Q.    Generally speaking, was it your understanding that residency programs would not attempt to verify a foreign medical graduate's diploma on their own but instead would rely upon determination of that diploma's veracity or   authenticity? A-Generally speaking, I think that's true."**

**"Q-Did you have an understanding, while employed with ECFMG, as to whether state medical boards required ECFMG certification for foreign medical graduates in order to license a physician? A- For an unrestricted license, most states, if not all states, would require ECFMG certification." (Deposition of Stephen Seeling, JD, pages 23-26)**

Thus, ECFMG makes a strong statement to the public that its primary goals and objectives include the protection of the public through the use of credentialing criteria to evaluate foreign medical graduates who desire to enter the US healthcare system.

Unfortunately, there were significant lapses pertaining to the case of Mr. Akoda AKA Igberase AKA multiple aliases that were acknowledged by members of the management team at ECFMG.

As a reminder ECFMG attests that among its certification criteria are:

ECFMG certifies the readiness of international medical graduates, verifies credentials, confirms the identity, local address, and medical school graduation of its foreign medical graduate applicants, and improves world health through its accountability to the healthcare entities it serves as both a 'gate keeper' and a repository of information with regards to the qualifications of FMGs who desire to enter the US healthcare system.

- ❖ Mr. Kelly testifies that Mr. Igberase submits an application in 1992 in which there is NO certification by his medical school of Mr. Igberase's photo (which would confirm that he attended that school) nor was there a notarized statement as to why the Dean's Office of the Medical School could not certify the school, thus rendering the application 'incomplete' and ineligible to be processed:

"Q. We have the section here which requests a certification from medical school official regarding the photograph that is included as part of the application. To your understanding, Mr. Kelly, what is the purpose of having a medical school official certify that the photograph, signature, and information on the form accurately applies to the individual named above? A. My recollection it was to help confirm this was the individual who went to that medical school. Q. Now, in this particular application on behalf of Igberase, there is no certification from a medical school official, correct? A. That is correct. Q. However, there is an option as I understand it that there would be a notarized -- a signature from a Notary and an explanation as to why the form could not be signed in the presence of a medical school dean; is that correct? A. That is correct. Q. Those are two separate options that the applicant can select in completing this application? A. Yes. Q. On this particular application there's no explanation provided at all, correct? A. On this form, that is correct. Q. With respect to this form, it would not represent a completed application on behalf of Igberase? A. Yeah, I don't know that I would say – all the information is not on this form, yes. (Deposition of William C. Kelly, pages 181-183)

- ❖ On September 27, 2000, Mr. Akoda stopped by ECFMG to reiterate that he is not Dr. Charles although he utilized his social security number and left copies of his Nigeria Passport and International Driving Permit. Mr. Kelly does nothing to verify the Nigerian Passport nor the International Driving Permit to ensure that they are valid and belong to the individual identified, despite the fact that the State and Social Security Departments have ample capability to perform such verifications. He also makes no attempt to notify the Department of Justice or Social Security Department that Mr. Akoda and Mr. Igberase may be one and the same individual and that Mr. Akoda may be involved in social security fraud and thus may be in the United States under a false identity.

"Q. And did you ever go back and check the date of birth on his passport in comparison with the date of birth on Exhibit 33, his request for permanent revalidation of standard ECFMG certificate? A. I don't know if I did. Q. Do you know how you would go about checking the authenticity of a Nigerian passport? A. Do I know? Q. Did you know at that time? A. I may have." (Deposition of William C. Kelly, page 127)

"I Googled Nigerian passports and that search tells me that a Nigerian passport has eight digits and one letter. How many digits do you see on the passport that I just marked as an exhibit? A. Are you talking about the passport number? Q. Yes, sir. A. It looks like one letter and six numbers -- six digits. Q. I think it is seven. A. Counting zero, yes." (Deposition of William C. Kelly, page 129)

"Q. So either before Akoda came into your office on September 27 or after he came into your office, did you undertake any investigation of your database to try to determine whether Akoda and Igberase were one and the same person? A. I don't remember. Q. If you, either before or after September" 27, had gone into the database to look for a photograph of Igberase and looked for a photograph of Akoda, you could have done that? A. I believe I could have, yes. Q. You didn't do that? A. I don't know if I did. (Deposition of William C. Kelly, pages 130-131)

"Q. Again, "he has given us a passport that appears to confirm his identify as John Akoda." You didn't verify the authenticity of that passport, did you? A-I don't remember. Q. Would it be safe or fair for me to assume that if you had verified the accuracy or authenticity of his passport, you would have made a statement to that effect somewhere? A. Yes." (Deposition of William C. Kelly, pages 149-150)

❖ Despite the fact that Mr. Kelly suspected that Mr. Akoda and Mr. Igberase were the same individual, he never compared photographs with their respective applications to compare, nor did he consider referring the matter to a federal agency that would have had software tools to compare photographs for both authenticity and potential match.

"you had the ability to look up all the computer photographs of Igberase and Akoda to verify whether they were one and the same person, correct? A-Yes. Q. And you didn't do that, correct? Q. So for example, when he came into your office, you could have looked at photographs on the computer, correct? A. Yes, that is correct. Q. Or when he left the office, you could have done it? A. That is correct. Q. And you didn't? A. I don't remember doing it. (Deposition of William C. Kelly pages 154-155)

❖ Mr. Kelly acknowledges that despite the overwhelming evidence of fraud and willful deception on the part of Mr. Akoda, Mr. Igberase, and his other aliases as of 2000, the ECFMG failed to take definitive action until 2016, despite the fact that this gentleman was actively caring for patients through various residencies and training programs during that time.

"Q. Well, I think we've also established that as of this date in late December 2000, you were present during the July 10, 1996 appeal hearing where Charles testified, correct? A. Yes. Q. And you had the ability to hear him testify at that proceeding? A. Yes. Q. And you heard him talk to you in your office in September 2000, correct? A. When he came to the office, yes. Q. And you knew according to Doctor McCorkel, at least, that Akoda had presented false green cards, correct? A. He had stated that, yes. Q. You could have but didn't verify that the passport that Akoda gave you when he came to the your office was authentic, correct? A. I did not verify the passport. Q. And as of late December 2000, you knew that Jersey Shore Medical Center has dismissed Akoda from its residency program, correct? A. Yes. Q. You knew that was at least in part due to the fact he used someone else's Social Security number? A. Yes. Q. And you sent Igberase an e-mail at the address he provided and Akoda replied to it. We've already established that, correct? A. Yes. Q. You were really surprised at that, correct? A. Apparently, yes. Q. So Doctor McCorkel told you that he believed Igberase and Akoda were

one and the same person as of December 2000, correct? A. Yes. Q. And you also believed Igberase and Akoda were one and the same person, correct? A. Yes. Q. And you were so concerned about this that you wrote a memorandum to Stephen Seeling that you didn't think should be made part of the file, correct? A. Yes. Q. And in your original letter to Akoda after Doctor McCorkel contacted ECFMG, you told him that all of the information would be referred to the ECFMG committee on medical credentials for review, correct? A. Yes. Q. You didn't do that, right? A. Correct Q. So despite all of these things that we just went over for the last couple of hours and in this last series of questions, ECFMG took no action against Akoda until December 2016 following his conviction, isn't that true? A. I don't know that. Q. Prior to the time you left in 2015, had ECFMG taken any action against Akoda? A. I don't recall. Q. Would you admit in having made a mistake? A. Would I admit? Q. Yes. A. If I had, yes. Q. Would you admit that you made a mistake not referring Akoda to the ECFMG credentials committee? A. I don't think it was a mistake. (Deposition of William C. Kelly, pages 155-158)

❖ ECFMG has no verification of Mr. Akoda's nursing New York State nursing license, despite the fact that Mr. Akoda AKA Mr. Igberase attests to have completed two separate medical schools in Nigeria and has no record of having ever attended nursing school anywhere.

"Do you know whether there's any document in ECFMG's files that ever reflects that Igberase was licensed as a nurse in New York? A. Separate from this statement here? Q. Separate from the information here. A. I have no knowledge." (Deposition of William C. Kelly, page 161)

❖ Mr. Kelly acknowledged that ECFMG only enters certain information from a foreign medical graduate's USMLE application and not the complete set of data which would have enable cross comparisons of similar applications to see if they differed in a significant way

"Would ECFMG do that, I mean, input the information on the application any time an IMG submitted this application, this type of application? A. The procedure was to enter some, but not all of the information from the application." (Deposition of William C. Kelly, page 31)

❖ None of Mr. Akoda's letters of recommendation were verified as being true and accurate by Mr. Kelly

"Q. In this particular case you reviewed with Mr. Vettori a series of letters that you wrote in response to an application written by Akoda asking those individuals to verify that the letters of recommendation were authentic. Do you recall that? A. Yes. Q. Is that not something that you would do in the normal course? A. That was not a routine procedure. Q. And as far as what is reflected in the record and to the best of your recollection, none of those individuals responded to your letters, correct? A. That is correct." (Deposition of William C. Kelly, pages 196-197)

❖ Mr. Kelly acknowledged that Mr. Johnbull Nosa Akoda was certified by ECFMG and allowed to be licensed and apply to an ACGME accredited residency program despite the fact that ECFMG never primary source verified his medical school credentials, thus failing to perform one of ECFMG's vital functions

"This is a medical degree of some sort, a purported medical degree for Johnbull Nosa Akoda. In your review of the medical chart, you never received a medical degree in the name of John Nosa Akoda, correct? A. There is none in these records. Q-Despite the fact that ECFMG had not received a medical

diploma in the name of John Nosa Akoda, it nevertheless certified that John Nosa Akoda had satisfied the requirements of ECFMG and could proceed on with residency training. Fair?A. And apply to residency training, yes." (Deposition of William C. Kelly, page 208)

❖ Mr. Kelly makes the decision to not submit Mr. Akoda to the ECFMG Credentials Committee despite the fact that there is a mountain of evidence by 2000 (as documented above) that Mr. Akoda AKA Mr. Igberase AKA Multiple Aliases engaged to multiple episodes of deception and fraud involving his name, birthdate, social security number, address, medical school etc.

"In this particular case you made the decision in 2000 that this -- the Akoda matter should not proceed to the credentialing committee, correct? A. It was my belief that it should not at that time go to the credentialing committee, yes. Q. Did you -- and ultimately you were the one responsible for, following discussion with staff as to making that decision whether it should or should not. Fair? A. At that time, yes. Q. And so in this situation what were the risks or what were the potential bad outcomes or consequences that would be associated with bringing this issue to the credentialing committee for their consideration? A. That there was not enough information for them to be make an informed decision." (Deposition of William C. Kelly, page 216)

❖ Ironically, Kara Corado, JD, Current VP of Operations testified that there were clear ECFMG policies and procedures guiding when ECFMG managers should refer matters of concern to the ECFMG Credentials Committee.

"Q. Is there another set of polices called -- that governs when to refer cases to the credentialing committee? A. There are procedures that we follow that would govern that. Did any procedure exist before that time that applied to how the organization should conduct irregular behavior investigations and when the staff should refer matters to the creds committee? A. Yes, those procedures that were documented in 2015 were the procedures that staff had been using at least since I started working directly on cases of irregular behavior, which is 2008 onward, and my understanding would be prior to that as well." (Deposition of Kara Corado, JD, pages 57-58 and page 60)

❖ She also testified that the acts that occurred with the Akoda/Igberase series of applications would be sufficient to warrant a referral to the ECFMG Credentials Committee

"So the policies and procedures on irregular behavior indicate that if staff determines there is sufficient evidence of irregular behavior the matter will be referred to the credentials committee. A. Sufficient evidence, it depends on the case. For example, if it's a falsified credential and the school responded and said the diploma is false, then that response would be sufficient evidence to make an allegation of irregular behavior on a falsified credential." (Deposition of Kara Corado, JD, page 77)

❖ Ms. Corado acknowledges that at no time did ECFMG ever certify the authenticity of Mr. Akoda's medical school diploma

"Q. So at no point in evaluating Akoda's credentials and qualifications did ECFMG receive an original or a certified copy of his diploma or registration certificate, correct? A- That's correct." (Deposition of Kara Corado, JD, page 219)

❖ Most significant of all is that Kara Corado, JD, VP of Operations testified under oath that

**ECFMG had no obligation to primary source verify or to validate a foreign medical graduate's identity, social security number or to refer issues pertaining to criminal activity (e.g. social security fraud) as a part of its credentialing process which is in contradiction to its own credentialing criteria published on its website and to management's other sworn testimony regarding the obligation of ECFMG to protect the public and to support the quality of healthcare provided by its certificate holders**

<span style="color:red">**"ECFMG's review of applicants that attempt to subvert it's policies and procedures is an important role that it has, but specifically that we have a role to detect whether an individual is or isn't that individual isn't part of our certification program." (Deposition of Kara Corado, JD, page 223)**</span>

<span style="color:red">**"A. So when we certify the status of an ECFMG certificate, we are not certifying to the organization necessarily the identity of the individual, but that an individual with that name and date of birth has met the requirements for certification and what the validity is of their certificate and where they went to medical school. Q. Is ECFMG certifying to the recipients of the ECFMG certification information that the applicant's social security number is accurate? A. No. Q. Is ECFMG certifying to the recipient of the ECFMG certification that the location of the birth is accurate? A. No." (Deposition of Kara Corado, JD, page 242)**</span>

G. **Conclusion:**

I. **To a reasonable degree of professional and administrative certainty, the Educational Commission for Foreign Medical Graduates (ECFMG) negligently certified Charles Oluwafemi Igberase AKA Johnbull Enosakhare Akoda AKA multiple other aliases which placed residency programs and the public at risk for having an unqualified individual and self-acknowledged felon providing medical services to those who rely on ECFMG to serve as an effective "gatekeeper" upon which the healthcare system can rely to protect the public from inadvertent harm.**

**Final Commentary:**

**The Educational Commission for Foreign Medical Graduates (ECFMG) failed to ascertain at any time the true identity, birthdate, social security number, address, and completion of medical education of Mr. Akoda AKA Mr. Igberase AKA multiple aliases and by so doing placed state licensing boards, ACGME accredited residency program, hospitals and the community at large at risk for receiving care and services by an unqualified individual who may or may not be a physician and who may or may not meet ECFMG's self-professed certification standards, in violation of the applicable standards of care.**

**Had ECFMG  complied with the administrative standard of care, "Mr." Akoda, would not have been issued an ECFMG certificate, would not have been able to participate in a residency at Howard University and would not have been issued a Maryland medical license. Without an ECFMG certificate, "Mr." Akoda would not have been able to obtain a Maryland license nor had access to the Plaintiffs and members of the class and therefore he would not have caused them any harm.**

According to ECFMG's website: "ECFMG Certification is an effective screening mechanism for ensuring that IMGs in patient care situations have met minimum standards." (https://www.ecfmg.org/certification/index.htm) "To be eligible for certification by ECFMG, an international medical graduate (IMG) must meet the following requirements. Medical School Requirements: The physician's medical school must meet requirements established by ECFMG. Schools that meet all requirements will be listed in the World Directory of Medical Schools as meeting eligibility requirements for their students and graduates to apply to ECFMG for ECFMG Certification and examination. The Application for ECFMG Certification requires applicants to confirm their identity, contact information, and graduation from or enrollment in a medical school that is listed in the World Directory of Medical Schools (World Directory) as meeting eligibility requirements for its students and graduates to apply to ECFMG for ECFMG Certification and examination. As part of the application, international medical students/graduates must also confirm their understanding of the purpose of ECFMG Certification and release certain legal claims." (https://www.ecfmg.org/certification/requirements-for-certification.html)

Thus, ECFMG requires of itself to fulfill these self-avowed credentialing criteria and had at its use its own credentialing committee and countless federal agencies to assist in a deeper investigation into the true identity of Mr. Akoda AKA Mr. Igberase AKA Multiple Aliases to ensure that the licensure bodies, residency programs, hospitals, and potential patients would be assured that the individual certified by ECFMG was who he attested that he was and that he was in fact a physician and not an individual alleging to be a physician without any formal or required medical training.

While it is true that licensing, residency, accreditation, and hospital organizations have their own credentialing requirements, ECFMG had and has an independent duty to the public to ensure that its certification procedures follow internal policies and are effective at protecting the public from imposters who seek to defraud the United States healthcare system and place the public at risk.

Unfortunately, ECFMG negligently failed to follow its own internal policies/procedures and in so doing, failed in its duty to protect the public and thus the potential quality of care provided by this foreign medical graduate whom it was committed to appropriately certify according to its own published criteria.

All of these opinions are stated to a degree of reasonable administrative and professional probability.

I further reserve the right to modify or add expert opinions as additional information becomes available, including remaining expert witness depositions and any further discovery.

H. **Fee Schedule:** $600/hour for expert legal consultation and for deposition (plus travel); $8,000/day + travel for trial testimony