EXHIBIT 45



Deposition of:

# Kara Corrado

*September 10, 2019*

In the Matter of:

# Russell, Monique  Vs. Educational Commission For Foreign Medical Graduates

Veritext Legal Solutions

888.777.6690 | cs-midatlantic@veritext.com  | 215-241-1000

Page 1

1           IN THE UNITED STATES DISTRICT COURT
2        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
3                       - - -
4   MONIQUE RUSSELL, JASMINE :  Case No.
    RIGGINS, ELSA M. POWELL   :
5   AND DESIRE EVANS,         :  2:18-cv-05629-JW
                              :
6            Plaintiffs,      :
                              :
7        vs.                  :  Hon. Joshua D. Wolson
                              :
8   EDUCATIONAL COMMISSION    :
    FOR FOREIGN MEDICAL       :
9   GRADUATES,                :
                              :
10           Defendant.       :
11                      - - -
12              September 10, 2019
13                      - - -
14           Oral deposition of KARA CORRADO, taken
15      at the offices of MORGAN LEWIS BOCKUS, LLP,
16    1701 Market Street, Philadelphia, Pennsylvania
17         beginning at 10:48 a.m., before
18     Jennifer L. McDonald, a Professional Reporter
19    and a Notary Public in and for the Commonwealth
20                  of Pennsylvania.
21                      - - -
22      VERITEXT NATIONAL COURT REPORTING COMPANY
                  MID-ATLANTIC REGION
23          1801 Market Street - Suite 1800
            Philadelphia, Pennsylvania 19103
24

Page 2

```
1 A P E A R A N C E S :
2
   JANET, JANET, & SUGGS, LLC
3 BY: PATRICK A THRONSON, ESQ
   Executive Centre At Hooks Kane
4 4 Reservoir Circle Suite 200
   Baltimore, Maryland 21208
5 (410) 653-3200
   PThronson@JJSjustice com
6 Representing the Plaintiff
7 MORGAN LEWIS & BOCKUS LLP
   BY: ELISA P McENROE, ESQ
8 1701 Market Street
   Philadelphia, Pennsylvania 19103
9 (215) 963-5176
   elisa mcenroe@morganlewis com
10 Representing the Defendant ECFMG
11 SCHOCHOR FEDERICO & STATON, P A
   BY: BRENT CERYES, ESQ
12 1211 St Paul Street
   Baltimore, Maryland 21202
13 (410) 234-1000
   bceryes@sfspa.com
14 Representing the Plaintiff Monique Russell
15
   LAW OFFICES OF PETER G ANGELOS
16 BY: PAUL M VETTORI, ESQ
   One Charles Center
17 100 N Charles Street, 22nd Floor
   Baltimore, Maryland 21201
18 (410) 649-2000
   pvettori@lawpga com
19 Representing the Plaintiff Jasmine Riggins
20
21
22
23
24
```

Page 3

```
1          I N D E X
2             - - -
3 Testimony of: KARA CORRADO
4 By Mr. Thronson              5, 247
5 By Ms. McEnroe               238
6
7
8             - - -
9        E X H I B I T S
10            - - -
11 EXHIBIT NUMBER  DESCRIPTION   PAGE MARKED
12
13 CORRADO-1 Notice of Deposition       7
14 CORRADO-2 Credential procedures draft  67
15 CORRADO-3 Email 8-6-18           94
16 CORRADO-4 Email 1-17-18          112
17 CORRADO-5 University of Benin documents  216
18 CORRADO-6 Email 2-12-18          227
19 CORRADO-7 Letter dated 8-29-2000     238
20 CORRADO-8 Email 11-27-17         252
21 CORRADO-9 Email 11-28-16         255
22
23            - - -
24
```

Page 4

```
1      DEPOSITION SUPPORT INDEX
2
3 DIRECTION TO WITNESS NOT TO ANSWER
4 Page   Line
5   8    12
6  235   13
7
8 REQUEST FOR PRODUCTION OF DOCUMENTS
9 Page   Line    Description
10  71   10 Table of contents
11 126   21 Diplomas
12
13 STIPULATIONS
14 Page   Line
15   5    1
16
17
18 QUESTIONS MARKED
19 Page   Line
20 None
21
22
23
24
```

Page 5

```
1        (It is hereby stipulated and
2   agreed by and between counsel that
3   sealing, certification and filing are
4   waived; and that all objections, except
5   as to the form of the question, are
6   reserved until the time of trial.)
7             - - -
8        KARA CORRADO, after having been
9   first duly sworn, was examined and
10  testified as follows:
11            - - -
12       DIRECT EXAMINATION
13            - - -
14 BY MR. THRONSON:
15  Q.      Would you please state your
16 name?
17  A.      Kara Corrado.
18  Q.      Ms. Corrado, my name is Patrick
19 Thronson. I'm an attorney representing the
20 plaintiffs in a lawsuit that's been brought
21 against ECFMG. We met briefly before the
22 deposition, and I appreciate you being here
23 today.
24       As I understand it, you are here
```

2 (Pages 2 - 5)

KARA CORRADO

Page 6

1  as a representative of ECFMG?
2      A.      Yes, that's correct.
3      Q.      You're providing testimony today
4  in the capacity of a representative of ECFMG?
5      A.      Yes.
6      Q.      So for clarity sake, I will try
7  to refer, ask questions as refer to ECFMG, but
8  if I happen to say "U" or something like that,
9  if you could just interpret that as referring
10 to ECFMG I'd appreciate that?
11     A.      Yes.
12     Q.      Do you work at ECFMG?
13     A.      Yes.
14     Q.      Can you tell us what ECFMG
15 stands for?
16     A.      Educational Commission for
17 Foreign Medical Graduates.
18     Q.      What is your position there?
19     A.      I'm the Vice President for
20 Operations.
21     Q.      Is it fair to say you're an
22 officer of ECFMG?
23          MS. McENROE:  Objection to form.
24          You can answer, if you know.

Page 7

1          THE WITNESS:  I don't know.
2  BY MR. THRONSON:
3      Q.      Is vice president of ECFMG
4  considered an officer of ECFMG?
5          MS. McENROE:  Objection to form.
6          THE WITNESS:  I am an executive
7      at ECFMG.
8  BY MR. THRONSON:
9      Q.      You understand that ECFMG is
10 responsible for producing a witness today who's
11 prepared to testify as to all of the matters
12 that were designated in the notice of
13 deposition?
14     A.      Yes.
15     Q.      Let me provide that to you.
16          MR. THRONSON:  We'll mark this.
17              - - -
18          (Whereupon the document was
19          marked, for identification purposes, as
20          Exhibit Number CORRADO-1.)
21              - - -
22 BY MR. THRONSON:
23     Q.      Ms. Corrado, you've seen this
24 notice before?

Page 8

1      A.      Yes.
2      Q.      Do you have full authority to
3  speak on behalf of ECFMG with respect to the
4  matters of inquiry that are identified within
5  the notice?
6          MS. McENROE:  Objection to form.
7          THE WITNESS:  Yes.
8  BY MR. THRONSON:
9      Q.      Who designated you to testify
10 today?
11         MS. McENROE:  Objection to form,
12     and I instruct her not to answer to the
13     extent it reveals conversations with
14     counsel on the basis of privilege.
15 BY MR. THRONSON:
16     Q.      Let me ask it this way:  Did
17 anyone at ECFMG designate you or make the
18 decision that you would be designated as a
19 representative of ECFMG to testify today?
20         MS. McENROE:  Objection to form.
21         THE WITNESS:  Representing ECFMG
22     at proceedings like this is part of my
23     job duties.
24 BY MR. THRONSON:

Page 9

1      Q.      Did you confer with anyone at
2  ECFMG who made the decision to have you
3  designated as a corporate representative today?
4          MS. McENROE:  Objection to form.
5          THE WITNESS:  I spoke with my
6      senior vice president.
7  BY MR. THRONSON:
8      Q.      Who's that?
9      A.      Lisa Cover.
10     Q.      Did she make that decision?
11         MS. McENROE:  Objection to form.
12         THE WITNESS:  I don't know.
13 BY MR. THRONSON:
14     Q.      What did you all talk about?
15     A.      I told her I had a deposition
16 today.
17     Q.      What did she say?
18     A.      Okay.
19     Q.      Did you talk about your
20 testimony at all?
21     A.      No.
22     Q.      Did you talk about the notice of
23 deposition at all?
24     A.      Other than the fact that it

3 (Pages 6 - 9)

KARA CORRADO

1 existed, no.
2     Q.     You are aware that the answers
3 you give to my questions today will be binding
4 upon ECFMG?
5         MS. McENROE:  Objection to form;
6     calls for a legal conclusion.
7         You may answer.
8         THE WITNESS:  Yes.
9 BY MR. THRONSON:
10     Q.     Do you agree to have your
11 answers to my questions be binding upon ECFMG?
12         MS. McENROE:  Objection to form;
13     calls for a legal conclusion.
14         THE WITNESS:  Yes.
15 BY MR. THRONSON:
16     Q.     Can you describe your current
17 job responsibilities?
18     A.     As I said, I'm the Vice
19 President for Operations.  In that role I
20 oversee a number of ECFMG's programs and
21 services which include our international
22 credential services which is known as EPIC; our
23 ECFMG certification program; our medical
24 education resources team, which is a team that

1 reviews and contacts medical schools; and our
2 special investigations team, and I'm
3 responsible for -- as the staff for our
4 irregular behavior proceedings at ECFMG.
5     Q.     When you say you oversee EPIC,
6 does that mean that you oversee credentialing
7 and primary-source verification of -- strike
8 that.
9         When you say that you oversee
10 EPIC, does that apply to the certification
11 process as a whole?
12     A.     Yes.  So it does apply to
13 ECFMG's primary-source verification of
14 credentials.
15     Q.     So it's fair to say that you
16 oversee the primary-source verification
17 function of ECFMG?
18     A.     Yes.
19     Q.     How long have you held that
20 responsibility?
21     A.     I have been responsible for some
22 of the programs that have primary-source
23 verification in them for -- I'm sorry, I have
24 to think about it for a second -- about seven

1 or eight years, and within the last two years,
2 I assumed responsibility for all of the lines
3 of service that we have that use primary-source
4 verification.
5     Q.     Who was your predecessor in that
6 role in terms of overseeing the primary-source
7 verification function at ECFMG?
8     A.     So our structure is a little bit
9 different than it had been in the past, but my
10 prior direct supervisor was William Kelly.
11     Q.     How has your structure changed?
12         MS. McENROE:  Objection to form.
13 BY MR. THRONSON:
14     Q.     As you refer to?
15     A.     There are a number of new
16 departments and new lines of services.  So we
17 have a senior vice president now, when we only
18 had a vice president of operations in the past.
19     Q.     You are a senior vice president?
20     A.     I'm a vice president.
21     Q.     You're a vice president, okay.
22 The senior vice president was Lisa Cover?
23     A.     Is Lisa Cover.
24     Q.     Is Lisa Cover, okay.  You

1 mentioned another -- commission in responsible
2 for primary-source verification and the medical
3 education resource team, special investigations
4 team, and also you're responsible as staff for
5 the irregular behavior; is that right?
6     A.     Yes, that's right.
7     Q.     I think there was one more that
8 I missed?  As if that wasn't enough.
9     A.     Maybe the ECFMG certification
10 program that's generally the areas of
11 responsibility that I have.
12     Q.     How would you distinguish your
13 responsibilities in the ECFMG certification
14 program from your responsibilities in
15 overseeing the primary-source verification of
16 ECFMG?
17     A.     How do I distinguish them?
18     Q.     I guess, how are they different,
19 or are they different?
20     A.     The primary-source verification
21 that we do for medical education credentials is
22 the same process regardless of the service that
23 we are doing primary-source verification for.
24 So the process that we use in the ECFMG

4 (Pages 10 - 13)

KARA CORRADO

1 certification program, is the same process that
2 the team that is working on our international
3 credential services, it is the same process.
4      Q.      How long have you overseen the
5 ECFMG certification program?
6      A.      Since -- it's about seven or
7 eight years. Since around -- I'm sorry, let me
8 think about it. No, it's about four or five
9 years.
10     Q.      Who was your predecessor in that
11 role?
12     A.      That would have been William
13 Kelly.
14     Q.      You mentioned also the medical
15 education resource team, can you describe that
16 responsibility for me?
17     A.      Yes. That team is the team that
18 communicates with medical schools and
19 hospitals, institutions around the world to
20 collect information that we use in our
21 primary-source verification.
22     Q.      What kind of information?
23     A.      They will reach out to the
24 medical school officials to determine who are

1 the officials of the school, who's the dean,
2 what their signatures look like, what the
3 school seal looks like, and to ask any
4 questions about the medical education at that
5 school; any questions that we may have, that
6 our staff may have.
7      Q.      About how often does the medical
8 education resources team reach out to an
9 individual school to update information about
10 deans, seals, signatures, that kind of thing?
11     A.      So they reach out on an ad hoc
12 basis depending upon the circumstances. So if
13 it's a new school and we don't know who the
14 officials are, then we, as part of the process
15 of adding a new school, will reach out to get
16 the list.
17         If we receive forms that are
18 signed by an official of the school that has
19 the same title as someone on the list, we will
20 reach out to the school to see if that -- if
21 it's the dean, has the dean been replaced, and
22 get an updated contact information.
23     Q.      Does that occur every time you
24 receive an application from an ECFMG candidate

1 for certification?
2      A.      Only if the school -- sorry, do
3 you mean, do we reach out to determine who the
4 officials are every time we get an application?
5      Q.      Right.
6      A.      Okay. So, no. Only if the
7 school is a new school. So if we don't already
8 have the information on file, then we will
9 reach out. If you are an applicant from a
10 school and we've already seen hundreds of
11 classmates of yours, then we don't reach out to
12 the school again because we know who the
13 responsible parties are.
14     Q.      How does ECFMG become aware if
15 there's been a change of deans at a school?
16     A.      We become aware in a variety of
17 ways. Sometimes there are many schools that
18 will reach out to us proactively because they
19 know we would ask for that information.
20         As I mentioned earlier,
21 sometimes we will see there is a new signatory
22 on a form and before we can accept it, we will
23 clarify with the school if there's been a
24 change; and occasionally, periodically we will

1 send out a request to the school if we haven't
2 had an update or if there's some other reason
3 that the coordinator is reaching out to the
4 school. They may notice the list is five years
5 old and while they are reaching out to ask
6 another question, they may ask is everything
7 up-to-date.
8      Q.      What does the special
9 investigations team do?
10     A.      The special investigations team
11 handles the review of investigation into
12 irregular behavior and also requests for
13 exceptions to ECFMG. They are also responsible
14 for reviewing any potential matches to the
15 specially designated national list which is the
16 department of treasury for OFAC.
17     Q.      Just skipping back, how long has
18 the medical education resources team existed?
19     A.      It has existed as a department
20 for about four years.
21     Q.      Prior to its existence as a
22 department, was there any other department that
23 performed all of the functions that the medical
24 education resources team currently performs?

5 (Pages 14 - 17)

KARA CORRADO

1    A.    Yes.  The department that
2  processed applications for examinations and for
3  ECFMG certification they would do the same type
4  of reach out to medical schools.
5    Q.    Why was -- why the change in
6  organizational structure to create a separate
7  medical education resources team?
8        MS. McENROE:  Objection to form.
9        You may answer.
10        THE WITNESS:  In our
11        credentialing verification services over
12        probably the last five years or so, we
13        have increased the number of regulatory
14        authorities that use our services.  In
15        doing that, we've increased the volume
16        and it became apparent to us that we
17        needed to have individuals fully focused;
18        their whole job would be to communicate
19        with medical schools and to get
20        information from them.
21  BY MR. THRONSON:
22    Q.    How long has that special
23  investigations team existed?
24    A.    The special investigations team

1  has existed as the department of special
2  investigations for about the same amount of
3  time, four to five years.
4    Q.    Why did it come to be?
5        MS. McENROE:  Objection to form.
6        THE WITNESS:  So, similar to the
7        answer that I just gave you about the
8        medical education resources team, we
9        increased our volume of credentials that
10        we are verifying and exponentially that
11        would increase the number of
12        investigations that we would need to do.
13        So there wasn't a department
14        called special investigations prior to
15        that time, however, there were personnel
16        assigned to the same type of work.
17  BY MR. THRONSON:
18    Q.    So obviously in this case as you
19  probably know we're talking about a period of
20  time from 1992 to 2017, in terms of conduct and
21  issues that are the focus of the case.  You are
22  aware of that?
23    A.    Yes.
24    Q.    Do you know over that period of

1  time any individuals who were responsible for
2  the functions of the special investigations
3  team?
4    A.    Yes.
5    Q.    Who were they?
6    A.    They were William Kelly and
7  Steve Seeling.  That would have been sometime
8  around '98 that Steve would have had oversight
9  as he was the vice president of operations.
10        Bill, or Bill Kelly, he was
11  responsible, as far as I know, during that time
12  period from '92 to -- well, to 2016 I think,
13  when he retired.  So he was involved in that
14  process during that time period.
15    Q.    Any other individuals you know
16  that were involved, that had a special
17  investigative team type role from 1992 to the
18  time in which the special investigations team
19  as a department was created?
20    A.    Yes.  So I started working on
21  those types of cases in 2008.  In a similar
22  role that my special investigations team does
23  now.
24        MR. VETTORI:  I didn't hear --

1        THE WITNESS:  2008.
2        MR. VETTORI:  Thank you, very
3    much.
4        THE WITNESS:  Now, we have
5    Virginia Kesting who is currently in the
6    special investigations department.  She
7    was working on those types of cases
8    probably from around 2001, around that
9    time period; and there was another woman
10    prior to that who is long retired who did
11    administrative work in coordinating the
12    meetings of the medical education
13    credentials committee.
14  BY MR. THRONSON:
15    Q.    Do you remember her name?
16    A.    Her name was Connie.  I don't
17  remember her last name, I'm sorry.
18    Q.    That's fine.  Anybody else?
19    A.    Not that I'm aware of.
20    Q.    Have you been deposed before?
21    A.    About this or in general?
22    Q.    Yes.
23    A.    No, I don't think so.
24    Q.    Have you testified at trial

KARA CORRADO

Page 22

1 before?
2    A.    Yes.
3    Q.    How many times?
4    A.    I testified before a grand jury.
5 Is that what you're asking about?
6    Q.    Any type of court proceeding?
7    A.    So twice, I think.
8    Q.    So you testified; one time was
9 before a grand jury?
10   A.    Yes.
11   Q.    Did that involve this case?
12   A.    No.
13   Q.    What type of matter generally
14 did it involve?
15        MS. McENROE:  Objection.  Just
16 to preserve the record and make sure -- I
17 don't know what sort of instructions you
18 were provided in conjunction with the
19 Grand Jury and whether the subject of it
20 is allowed to be public or not.
21        So I just want to make sure that
22 you are comfortable with providing the
23 responses to the questions that you've
24 been asked.

Page 23

1        THE WITNESS:  Okay.
2        MS. McENROE:  If you're not, you
3 don't have to.
4        THE WITNESS:  Okay.
5        MR. THRONSON:  Usually grand
6 jury secrecy doesn't apply to the
7 witness.
8        MS. McENROE:  She also just
9 testified it has nothing to do with this
10 case.
11       THE WITNESS:  I don't remember
12 what the instructions were.  It was a
13 long time ago.
14 BY MR. THRONSON:
15   Q.    Was it a matter that was similar
16 at all to this case?
17   A.    No.
18   Q.    Did it involve ECFMG
19 certification of a physician?
20   A.    No.
21   Q.    You mentioned another matter
22 that you testified in, what was that?
23   A.    That was a preliminary
24 injunction hearing.

Page 24

1    Q.    What type of matter?
2    A.    That is related to -- it's a
3 matter regarding a medical school.
4    Q.    Had you provided any other
5 testimony under oath besides on those two
6 occasions and our conversation today?
7    A.    No.  Not that I can recall.
8    Q.    Have you ever reviewed any
9 matters as an expert witness?
10   A.    No.
11   Q.    Did you prepare for the
12 deposition today?
13   A.    In what way?  Sorry.
14   Q.    I guess, let me ask this.  I'm
15 sure you did.  How did you prepare for the
16 deposition today?
17   A.    I looked over the documents.
18   Q.    Which documents?
19   A.    The legal documents and also the
20 bunch of documents from the file.
21   Q.    The legal documents mean filings
22 in this case?
23   A.    Yes.
24   Q.    To your knowledge, did all the

Page 25

1 documents that you reviewed to the best of the
2 your recollection have a Bates stamp on them?
3    A.    Yes, to the best of my
4 recollection.
5    Q.    Did you review any material that
6 you're aware that a privilege is being asserted
7 regarding...
8        MS. McENROE:  Objection to form.
9        MR. THRONSON:  Let me ask that
10    differently.
11 BY MR. THRONSON:
12   Q.    Did you review any information
13 that is privileged or that ECFMG might assert a
14 claim of privilege about?
15   A.    Not that I can recall.
16   Q.    About how many hours did you
17 spend reviewing today -- preparing for the
18 deposition today?  Sorry.
19   A.    Probably around eight.
20   Q.    Did you do anything else besides
21 review the documents in preparation for the
22 deposition today?
23   A.    No.
24   Q.    Just to cover my bases.  Did you

7 (Pages 22 - 25)

KARA CORRADO

Page 26

1 speak with anyone about the deposition today?
2     A.     Yes.
3     Q.     Who did you speak to?
4     A.     Elisa and Matthew.
5     Q.     Anybody else?
6     A.     No.
7     Q.     I guess you had a brief
8 conversation with Lisa Cover?
9     A.     Oh, yes.  I mean with respect to
10 I'm not going to be at work today because I
11 have a deposition.
12     Q.     Anyone else besides her at
13 ECFMG?
14     A.     I probably told -- my admin
15 probably told the team I was at a deposition
16 today.
17     Q.     So the only people you spoke to
18 about the substance of the deposition were
19 counsel for ECFMG at Morgan Lewis?
20     A.     Yes.
21     Q.     Did you learn any facts from
22 counsel that you weren't aware of in your
23 review of the documents or your experience
24 regarding the matters that are an issue in this

Page 27

1 case?
2         MS. McENROE:  Objection to form.
3     I'll just caution you not to devil with
4     privileged information.  Counsel is
5     specifically asking about facts you may
6     have learned, as opposed to advice or
7     substantive input or whatnot, guidance.
8         MR. THRONSON:  Exactly.
9         THE WITNESS:  So there were no
10     new facts that I learned.
11 BY MR. THRONSON:
12     Q.     About how much time did you
13 spend with Counsel in preparation for the
14 deposition today?
15     A.     About the same amount of time,
16 maybe a little bit less.
17     Q.     Same amount of time?
18     A.     I'm sorry.  As I answered
19 previously, in looking over the document.
20     Q.     So you spent about 8 hours
21 reviewing documents --
22     A.     And about 7 maybe with Counsel.
23     Q.     Okay.  Did anyone provide you
24 any information in writing regarding subjects

Page 28

1 that are -- I guess in preparation for the
2 deposition today?
3     A.     I'm sorry.  Can you say that
4 again?
5     Q.     You mentioned you didn't speak
6 with anyone other than Counsel about the
7 substance of the deposition.  Did you
8 correspond with anyone in writing about the
9 substance of the deposition?
10     A.     No.
11     Q.     Do you believe that everything
12 possible has been done to investigate and
13 gather all information known or reasonably
14 available to ECFMG to respond fully and
15 completely to the matters of inquiry listed on
16 the notice of deposition?
17         MS. McENROE:  Objection to form.
18         THE WITNESS:  Yes, that's my
19     understanding.
20 BY MR. THRONSON:
21     Q.     To ensure that a court and jury
22 would have all the information available for it
23 to make a determination of the facts on the law
24 in this case, do you think anything else could

Page 29

1 have been done to gather information relevant
2 to this case?
3         MS. McENROE:  Objection to form.
4 BY MR. THRONSON:
5     Q.     Relevant to the matters of
6 inquiry in the notice of deposition?
7         MS. McENROE:  Objection to form.
8         THE WITNESS:  Not that I'm aware
9     of.
10 BY MR. THRONSON:
11     Q.     Are there any documents that you
12 believe have not been made available to the
13 plaintiffs?
14     A.     No.
15     Q.     What has been your involvement
16 in the litigation so far apart from testifying
17 today?
18         MS. McENROE:  Objection to form;
19     just insofar it could divulge privileged
20     communications, but separate from that
21     you may answer in terms of the nuts and
22     bolts of things you might have done.
23         THE WITNESS:  For the
24     litigation?

8 (Pages 26 - 29)

KARA CORRADO

Page 30

1    MR. THRONSON: Right.
2       THE WITNESS: So I have not been
3  involved other than helping to produce
4  documents, locating the file, organizing,
5  those types of things.
6  BY MR. THRONSON:
7    Q.    I believe you may have assisted
8  in providing answers to interrogatories?
9    A.    Yes.
10   Q.    Did you help in drafting the
11 answer to the Complaint or providing
12 information regarding the answer to the
13 Complaint?
14   A.    Yes.
15   Q.    When did you first become aware
16 of the lawsuit?
17   A.    So I can't remember the date,
18 but right around at time the information was
19 provided to ECFMG.
20   Q.    Is that lawsuit the only claim
21 that you are aware of that has been asserted or
22 that you're aware of as a potential claim
23 against ECFMG regrading the conduct of Igberase
24 Akoda?

Page 31

1    A.    I am not aware of any other
2  litigation that ECFMG is involved in.
3    Q.    Are you aware of any other
4  litigation that ECFMG is involved in regarding
5  the allegations that ECFMG negligently
6  performed it's function in terms of
7  primary-source verification of a physician or
8  something similar?
9       MS. McENROE: Objection to form.
10      THE WITNESS: No, not that I'm
11 aware of.
12 BY MR. THRONSON:
13   Q.    Are you aware of any claim in
14 the past that's been asserted against ECFMG
15 regarding, alleging, that ECFMG negligently
16 certified an international medical graduate?
17      MS. McENROE: Objection to form.
18      THE WITNESS: Not that I'm aware
19 of.
20 BY MR. THRONSON:
21   Q.    Could you give me your
22 educational background since high school?
23   A.    I have a bachelors degree in
24 international relations with a minor in Eastern

Page 32

1  European studies and Russian from Saint Joe's
2  University in Philadelphia. I also have a law
3  degree from Temple University and a Master of
4  Liberal Arts from the University of
5  Pennsylvania.
6    Q.    When did you get your law
7  degree?
8    A.    2007.
9    Q.    Your MLA what is that?
10   A.    The master of liberal arts?
11   Q.    Right.
12   A.    Which school or...
13   Q.    I guess was it for writing or --
14   A.    It's a liberal arts master
15 degree so it covered a variety of essentially
16 electives in college of general studies at the
17 University of Pennsylvania so there is no
18 specific major or focus in the degree.
19   Q.    Why did you pursue that degree?
20   A.    I pursued that degree shortly
21 after I graduated from Saint Joe's because I
22 was not sure what I wanted to do in terms of
23 continuing my education; and to be perfectly
24 honest with you, the program was easy and you

Page 33

1  didn't have to take GREs to get into it and I
2  thought it would look good on my resume if I
3  had a degree from the University of
4  Pennsylvania.
5    Q.    That sounds great. What jobs
6  have you held since you graduated from college?
7    A.    So I starting working at ECFMG
8  two months after I graduated from college.
9    Q.    What year was that?
10   A.    1998.
11   Q.    Okay.
12   A.    I left because I moved in 1999,
13 and I worked at Gucci as a sales associate, and
14 then I came back to Philadelphia in 2001 and
15 started working at ECFMG again in May of 2001
16 until now.
17   Q.    Do you know approximately when
18 you left ECFMG?
19   A.    September 1999.
20   Q.    Was there any other reason other
21 than your relocation?
22   A.    No.
23   Q.    Why did you decide to come back?
24   A.    Because my wedding was called

9 (Pages 30 - 33)

KARA CORRADO

Page 34

1 off so I came back to Philadelphia, to home.
2    Q.    Can you tell me what your
3 positions were at ECFMG both before and after;
4 I guess in your initial employment and then
5 your second?
6    A.    Yes.  I was hired as an
7 applicant information services representative.
8 Then when I came back -- I got that job and
9 that's what I left in 1999 as.
10         When I came back in 2001, I got
11 the same job back as an applicant information
12 services representative.  I was promoted in
13 that same department to a senior advisor, I
14 think the title was.
15         Then I was assistant manager of
16 the credentials department, and I was assistant
17 manger of the registration and credentials
18 department.  Then I was the manager of the
19 operations program development department.
20 Then I became director of credentialing
21 services.  Then assistant vice president for
22 operations, and then vice president for
23 operations.
24    Q.    Can you remind me of about when

Page 35

1 you became director of credentialing services?
2    A.    Around 2013.
3    Q.    Before that, it sounds like you
4 had some supervisory authority over the
5 credentialing functioning at ECFMG.  When did
6 you -- I guess you started out in terms of a
7 managerial type role as an assistant manager of
8 the credentials department?
9    A.    That's correct.
10    Q.    When did that happen?
11    A.    2004.
12    Q.    Then can you kind of give me the
13 years, I guess, between 2004 and 2013 as to
14 when your positions changed?
15    A.    Sure.  2004 to 2005 it was about
16 one year I was the assistant manager of the
17 credentials department.  Then the registration
18 department and the credentials department
19 merged so I became the assistant manager of the
20 merged departments which was registration and
21 credentials.
22         Then in 2008 I became the
23 manager of the operations program development,
24 and then around 2013 I became director of

Page 36

1 credential services -- I'm sorry, assistant
2 vice president in 2015 or '16.  And then vice
3 president in 2018; give or take.
4    Q.    Understood.  Understood.  You
5 mentioned earlier one other job responsibility
6 that you were responsible as staff with respect
7 to the irregular behavior function of ECFMG.
8 Is that a fair way to describe it?
9    A.    Yes.
10    Q.    Can you tell me what your role
11 is there?
12    A.    My role is to run the, from a
13 staff perspective, I run the administrative
14 hearing that we have at our board of trustees
15 which is the medical education credentials
16 committee.
17         I'm responsible for sending out
18 charges of irregular behavior.  So I have
19 oversight of the team that are doing the
20 investigations, the letters go out under my
21 name; and that also includes exceptions,
22 requests for exceptions to our policies, that
23 committee hears both types of matters.
24    Q.    How long have you held that

Page 37

1 position?
2    A.    About four years in running the,
3 you know, in direct oversight in running the
4 administrative hearing.
5    Q.    Who preceded you in that role?
6    A.    That was Bill Kelly.
7    Q.    Is there anyone that works
8 alongside of you as staff in irregular behavior
9 function?
10    A.    So alongside you mean, has the
11 same responsibilities or works --
12    Q.    Is there any other staff?
13    A.    Yes.  The special investigations
14 department.
15    Q.    You may have told me this, I'm
16 sorry, but who else works in the special
17 investigations department?
18    A.    There's a manager, Scott Mealey,
19 and there are three case managers.
20    Q.    Can you spell Mr. Mealey's name?
21    A.    Yes, M-e-a-l-e-y.
22    Q.    Who are the three case managers?
23    A.    Virginia Kesting, Rosemary
24 Carlin, and Svetlana Gridneva.

10 (Pages 34 - 37)

KARA CORRADO

Page 38

1    Q.    Is the medical education
2 credentials committee a committee of the board
3 above trustees?
4    A.    Yes, it's a subcommittee.
5    Q.    So its membership is comprised
6 entirely of members of the board of trustees?
7         MS. McENROE:  Objection to form.
8         THE WITNESS:  Yes.
9 BY MR. THRONSON:
10    Q.    About how long has that
11 committee existed?
12    A.    Since about 1986.
13    Q.    Before your current, I guess,
14 managerial role in overseeing the irregular
15 behavior function, did you work as staff with
16 respect to that function at ECFMG?
17         MS. McENROE:  Objection to form.
18         THE WITNESS:  Yes.
19 BY MR. THRONSON:
20    Q.    What roles did you have in that;
21 is it a department of ECFMG?
22         MS. McENROE:  Objection to form.
23         THE WITNESS:  So the special
24    investigations is a department.  Prior to

Page 39

1    special investigations and the addition
2    of case managers, it fell under the
3    purview of the associate vice president,
4    who was Bill Kelly, and I, at the time, a
5    manager of operations program
6    development.
7         So Bill, myself, and Virginia
8    Kesting, who reported to me, we were the
9    folks working on the irregular behavior.
10    So in that respect when I was working for
11    Bill, I was staff.
12 BY MR. THRONSON:
13    Q.    When did you get involved in
14 work on irregular behavior matters?
15    A.    That was around 2008 when I
16 moved -- changed position.
17    Q.    So the staff for the irregular
18 behavior is part of the special investigations
19 team?
20    A.    That is the special
21 investigations team now, yes.
22    Q.    Okay.  Got it.  How does ECFMG
23 serve the public?
24         MS. McENROE:  Objection to form.

Page 40

1         THE WITNESS:  ECFMG serves the
2    public in a number of ways.  Our original
3    program which was the certification
4    program severs the public in ensuring
5    that those physicians that are educated
6    outside of the U.S. and Canada meet
7    certain minimum requirements in order to
8    enter an accredited residency program in
9    the United States.
10         We also serve the public in
11    facilitating an appropriate review of
12    them, at the same time making sure that
13    we are efficient about doing it, because
14    IMGs -- or International Medical
15    Graduates represent about 25 percent of
16    the physicians that are working in the
17    United States.
18         So it's important from a
19    physician-workforce point of view to make
20    sure we have qualified physicians.  So in
21    those two broad ways I would say that we
22    serve the public.
23 BY MR. THRONSON:
24    Q.    How does ECFMG serve medical

Page 41

1 residency programs?
2         MS. McENROE:  Objection to form.
3         THE WITNESS:  So ECFMG has a
4    certification program that is required
5    for entrance into ACGME accredited
6    residency programs.
7 BY MR. THRONSON:
8    Q.    Any other ways in which ECFMG
9 severs medical residency programs?
10         MS. McENROE:  Objection to form.
11         THE WITNESS:  So we also have an
12    exchange visitor sponsorship program.  We
13    are responsible for physicians who are
14    seeking residency and training in the
15    United States on a J-1 nonimmigracy
16    step.
17 BY MR. THRONSON:
18    Q.    Beyond the ways in which you
19 serve medical residency programs that you
20 described, how else does ECFMG serve hospitals?
21         MS. McENROE:  Objection to form.
22         THE WITNESS:  I don't know that
23    I would say that we serve hospitals,
24    however, we do provide a service for

11 (Pages 38 - 41)

Page 42

1    employers that will verify the
2    certification status of an IMG which is
3    typically required when physicians, who
4    are IMGs, are attempting to get
5    credentialing privileges at hospitals.
6  BY MR. THRONSON:
7    Q.    Hospitals rely on ECFMG to
8  provide that service?
9        MS. McENROE:  Objection to form.
10        THE WITNESS:  I think that
11    hospitals, either in-house or through a
12    third party, CVO, collect the
13    verification information on the
14    physicians which include the verification
15    report of an ECFMG certified physician.
16  BY MR. THRONSON:
17    Q.    Do hospitals -- strike that.  Do
18  hospitals rely on ECFMG to provide
19  primary-source verification of a physician's
20  medical credentials as part of the application
21  process?
22        MS. McENROE:  Objection to form.
23        THE WITNESS:  I'm not sure if
24    hospitals have a requirement to

Page 43

1    primary-source verified medical education
2    credentials.
3        If they do, they can use an
4    ECFMG certification report to indicate
5    whether or not a physician is certified
6    by ECFMG which would include
7    primary-source verification of their
8    medical education credentials.
9  BY MR. THRONSON:
10    Q.    You're aware that hospitals do
11  use ECFMG for that purpose?
12    A.    Yes.
13        MS. McENROE:  Objection to form.
14  BY MR. THRONSON:
15    Q.    Do a lot of hospitals use ECFMG
16  for that purpose?
17        MS. McENROE:  Objection to form.
18        THE WITNESS:  So I don't know
19    that I could say what the hospital's
20    purpose is in using the certification
21    report, but I can tell you that
22    physicians are required to be ECFMG
23    certified; and as part of the
24    credentialing process, the hospitals will

Page 44

1    typically verify that information.
2        So, yes, lots of hospitals are
3    requesting reports from us as part of
4    their routine, I think, credentialing of
5    the physicians that are working in their
6    hospitals.
7  BY MR. THRONSON:
8    Q.    What's in an ECFMG report to the
9  hospital?
10    A.    The status report would contain
11  the physician's name; date of birth; the name
12  of the medical school, and the country of the
13  medical school where they went to school; their
14  year of graduation; whether or not they are
15  ECFMG certified, and what the validity of that
16  certification is, whether it's valid
17  indefinitely or expired, et cetera; and there
18  may be score information on examinations, it
19  depends on who the recipient of the report is.
20    Q.    Was that also true back in the
21  late 1990s when Akoda was applying for
22  residency programs?
23    A.    Yes.
24    Q.    Was that also true in the

Page 45

1    mid-2000s when Akoda was applying for residency
2    programs?
3    A.    Yes.
4    Q.    During those two time frames, I
5  guess, from 1996 to the present, is it fair to
6  say that ECFMG undertook to provide medical
7  residency programs with information regarding
8  ECFMG certification and acted essentially as a
9  dean's office for those programs?
10        MS. McENROE:  Objection to form.
11        THE WITNESS:  So it's fair to
12    say that ECFMG would provide the
13    certification status reports to residency
14    programs to which the physician would
15    apply.
16        In some cases that's electronic
17    and in some cases it was paper, depending
18    upon the year.
19  BY MR. THRONSON:
20    Q.    Is it fair to say that from 1996
21  to the present -- let me back up.  Why is that
22  service that you provided to medical residency
23  programs, that we've been discussing, why is
24  that important?

12 (Pages 42 - 45)

KARA CORRADO

1    MS. McENROE:  Objection to form.
2    THE WITNESS:  The certification
3  verification service?
4    MR. THRONSON:  Right.
5    THE WITNESS:  Because the ACGME
6  which is the accreditation council for
7  graduate medical education, determined
8  that it would use ECFMG certification for
9  international medical graduates as one of
10  the requirements for entrance into those
11  residency programs.
12 BY MR. THRONSON:
13    Q.    Is it important to promote
14 public health?
15    A.    I don't -- I think it's
16 important because it demonstrates to the
17 program that that physician has met the minimum
18 requirements to enter GME in the United States.
19    Q.    Why is that important?
20    A.    That's important because the
21 organizations like the residency programs have
22 the requirement that there is a standard, a
23 minimum standard, for those physicians because
24 there's a variance in medical education

1  worldwide.
2    So I don't know when the ACGME
3  determined that in order to accept
4  international graduates they would have this
5  requirement of certification; but I think it's
6  important for them from a credentialing
7  perspective to make sure to know what the
8  status of the person is entering their program.
9    Q.    Part of ECFMG's mission is to
10 promote public health, correct?
11    A.    Part of ECFMG's mission is to
12 promote public health and to protect the
13 public, yes.
14    Q.    Is part of ECFMG's mission also
15 to promote patient safety?
16    MS. McENROE:  Objection to form.
17    THE WITNESS:  ECFMG's mission is
18  broader in terms of what we state about
19  the improvement of the world's health
20  essentially.
21 BY MR. THRONSON:
22    Q.    Why is primary-source
23 verification of an applicant's identity and
24 credentials important?

1    MS. McENROE:  Objection.
2    THE WITNESS:  Primary-source
3  verification of an applicant's medical
4  education credentials is the best
5  practice in medical regulation.
6    So the international association
7  of medical regulatory authorities has
8  indicated to regulatory authorities
9  around the world that it's the best
10  practice, you should go directly to the
11  source to determine if someone has an
12  education that they purport to have or
13  not.
14 BY MR. THRONSON:
15    Q.    That's been true from 1996 to
16 the present, at least?
17    A.    Yes, that's true.  Well, I don't
18 know if the international association has
19 promoted it since then, but for ECFMG that has
20 been our practice since 1996 until now.
21    Q.    Sounds like, also, ECFMG has
22 undertaken a responsibility to provide
23 hospitals with information regarding ECFMG
24 certification of applicants, correct?

1    MS. McENROE:  Objection to form.
2    THE WITNESS:  So we have a
3  service that hospitals can use to verify
4  certification status of physicians.
5 BY MR. THRONSON:
6    Q.    About how long has that service
7 existed?
8    A.    I don't know when the service
9 started, but the service was in existence at
10 least from the 1990s, early 1990s onward.  I
11 believe it existed even prior to that.  I just
12 don't have knowledge as to when exactly the
13 program started.
14    Q.    You are aware that hospitals
15 have an obligation to verify credentials of
16 physicians who apply to a hospital for medical
17 privileges?
18    MS. McENROE:  Objection to form.
19    THE WITNESS:  That's my
20  understanding.
21 BY MR. THRONSON:
22    Q.    Is it also your understanding
23 that the joint commission has opined that
24 hospitals can rely on reports from ECFMG to

KARA CORRADO

1 satisfy that obligation?
2          MS. McENROE:  Objection to form.
3          THE WITNESS:  I'm aware that the
4     joint commission has recognized the
5     ECFMG's certification status report as
6     meeting their requirements for
7     primary-source verification of
8     credentials.
9 BY MR. THRONSON:
10    Q.    Is that -- the service that
11 we've been discussing, that ECFMG provides to
12 hospitals, is that also part of ECFMG's role in
13 promoting public health as it sees it?
14          MS. McENROE:  Objection to form.
15          THE WITNESS:  I'm sorry.  Can
16     you ask me that again?
17 BY MR. THRONSON:
18    Q.    Sure.  Does the service you
19 provide to hospitals, in terms of information
20 about ECFMG certification, does that align with
21 the organization's role in promoting public
22 health and safety?
23          MS. McENROE:  Objection to form.
24          THE WITNESS:  So I think that

1     aligns to our mission as it relates to
2     public health in that we are certifying
3     the authenticity of a certificate, or the
4     validity of a certificate, to the
5     hospital so they have that information so
6     they can, as I mentioned earlier, bring
7     on the physician if that's part of their
8     requirements.
9 BY MR. THRONSON:
10    Q.    Is it fair to say that ECFMG
11 supplements a hospital's function of verifying
12 the credentials of medical residents and
13 doctors?
14          MS. McENROE:  Objection to form.
15          THE WITNESS:  I don't know what
16     the process is for all the hospitals or
17     all the residency programs.  So I don't
18     know that I could say that.
19 BY MR. THRONSON:
20    Q.    It sounds like ECF -- you are
21 aware that as part of a credentialing process
22 the hospital or residency program will request
23 information from ECFMG regarding whether an
24 applicant is ECFMG certified?

1    A.    Yes.
2    Q.    And you are aware that that's
3 part of the hospital's process of determining
4 whether a hospital will grant medical
5 privileges to physicians to practice at that
6 hospital?
7          MS. McENROE:  Objection to form.
8          THE WITNESS:  Yes, that's my
9     understanding.
10 BY MR. THRONSON:
11    Q.    Do you believe patients have the
12 right to be treated by physicians who are
13 appropriately credentialed?
14          MS. McENROE:  Objection to form.
15          THE WITNESS:  Yes.
16 BY MR. THRONSON:
17    Q.    Do you believe patients have the
18 right to be treated by a physician who did not
19 obtain ECFMG certification through
20 misrepresentations?
21          MS. McENROE:  Objection to form.
22          THE WITNESS:  So the question is
23     do I...
24 BY MR. THRONSON:

1    Q.    Sure.  Do you believe patients
2 have the right to be treated by physicians who
3 did not obtain ECFMG certification through
4 misrepresentations?
5          MS. McENROE:  Objection to form.
6 BY MR. THRONSON:
7    Q.    That is who obtained ECFMG
8 certification by providing accurate
9 information?
10          MS. McENROE:  Objection to form.
11          THE WITNESS:  So you're asking,
12     if they have the right not to be; is that
13     what you said?  I'm sorry.
14 BY MR. THRONSON:
15    Q.    No, it's okay.  It's my fault.
16 Do you believe that patients have the right to
17 not be treated by physicians who have obtained
18 ECFMG certification based on false pretenses?
19          MS. McENROE:  Objection to form.
20          THE WITNESS:  Yes.
21 BY MR. THRONSON:
22    Q.    Do you believe in providing the
23 services that we've been discussing to
24 hospitals and residency programs that ECFMG is

14 (Pages 50 - 53)

KARA CORRADO

Page 54

1 obligated to exercise reasonable care in
2 performing those services?
3          MS. McENROE:  Objection to form;
4     calls for legal conclusion as does this
5     whole line of questioning.
6          THE WITNESS:  So ECFMG has a set
7     of policies and procedures that it
8     enforces when it is processing applicants
9     or certifying them.
10 BY MR. THRONSON:
11     Q.     Okay.  Is following -- does
12 ECFMG have the obligation to follow those
13 policies and procedures?
14          MS. McENROE:  Objection to form;
15     also calls for legal conclusion.
16          THE WITNESS:  I mean ECFMG, I
17     think, like any organization will follow
18     it's policies and procedures and the
19     staff will follow the policies and
20     procedures, and in the course of their
21     normal work will be working to make sure
22     they are appropriately following those
23     policies and procedures.
24 BY MR. THRONSON:

Page 55

1     Q.     Can you tell me about the
2 various categories of policies and procedures
3 that have applied perhaps at different times
4 from 1996 to the present with respect to ECFMG
5 certification of IMGs?
6          MS. McENROE:  Objection to form;
7     calls for a narrative.
8          You can answer if you can.
9          THE WITNESS:  So there are
10     myriad policies and procedures that would
11     apply to ECFMG certification.  Is there a
12     specific one or type of policy that you
13     are interested in?
14 BY MR. THRONSON:
15     Q.     What I'm thinking of, is there a
16 set of policies on irregular behavior called
17 irregular behavior policies; is there a set of
18 policies called how to perform primary-source
19 verification of the diploma?
20          Just sort of broad categories of
21 policies or names of sets of policies?
22          MS. McENROE:  Objection to form.
23          THE WITNESS:  So ECFMG has
24     irregular behavior policies and

Page 56

1     procedures, and we also have an
2     information booklet that's updated yearly
3     that contains all of the policies related
4     to ECFMG certification; eligibility for
5     certification, eligibility for
6     examinations, and those types of
7     policies.
8 BY MR. THRONSON:
9     Q.     How about -- strike that.  Has
10 it had irregular behavior policies continuously
11 from 1996 to the present?
12     A.     Yes, that's my understanding.
13     Q.     Are there any internal irregular
14 behavior polices that are not necessarily
15 published on a website or in a booklet for the
16 benefit of IMGs?
17          So basically internal procedures
18 that govern the operation of ECFMG with respect
19 to irregular behavior?
20          MS. McENROE:  Objection to form.
21          THE WITNESS:  So there are
22     policies that are published on the
23     website, but there are also procedures
24     that staff would follow in terms of

Page 57

1     preparing cases for the committee and
2     sending letters out and things like that
3     that are not necessarily published.
4 BY MR. THRONSON:
5     Q.     One of the things that we've
6 been seeking in this case is just to get all
7 the relevant sets of polices and procedures,
8 and we have gotten some, but I'm trying to get
9 a sense of the universe of documents that might
10 be relevant to this case just so we have a full
11 picture of what ECFMG polices are.
12          So if we were to, say, request
13 polices from the organization obviously one set
14 of polices that we would request would be --
15 actually have some meaning, would be a request
16 for the irregular behavior policies and
17 procedures, right?
18          MS. McENROE:  Objection to form.
19          THE WITNESS:  (Nonverbal
20     response.)
21 BY MR. THRONSON:
22     Q.     Is there another set of polices
23 called -- that governs when to refer cases to
24 the credentialing committee?

15 (Pages 54 - 57)

KARA CORRADO

Page 58

1     A.     There are procedures that we
2 follow that would govern that.
3     Q.     What are those called?
4     A.     I'm not sure that they
5 necessarily have a set name.  It would just be
6 our internal procedures.
7     Q.     Do you remember the title of any
8 of those internal procedures or a number?
9     A.     We have a draft, a document that
10 is labeled draft procedures that captures the
11 procedures for irregular behavior.
12     Q.     What does -- can you sort of
13 generally describe what that draft procedure
14 document contains?
15          MS. McENROE:  Objection to form.
16          THE WITNESS:  It essentially
17     contains guidelines in reviewing cases or
18     matters that come before the staff that
19     are working on those investigations; how
20     we process the investigations.
21 BY MR. THRONSON:
22     Q.     The organization uses that draft
23 document essentially as a formal policy
24 governing the performance of irregular behavior

Page 59

1 investigations and referrals to the committee?
2          MS. McENROE:  Objection to form.
3          THE WITNESS:  Those procedures
4     are the procedures we follow, and have
5     followed, for quite some time in
6     reviewing the investigations of an
7     irregular behavior and referring matters
8     to the committee.
9 BY MR. THRONSON:
10     Q.     Are you aware of any other
11 irregular -- procedures that apply to how to
12 conduct irregular behavior investigations or
13 when to refer matters to a committee that have
14 applied from 1996 to the present, besides the
15 policy labeled "draft policy" that you just
16 mentioned?
17     A.     Not that I'm aware of.
18     Q.     How long has the policy that you
19 mentioned been in effect?
20     A.     The document I mentioned is, and
21 I might be splitting hairs, but it's
22 procedures.
23          So we have an irregular behavior
24 policy that governs the process that we publish

Page 60

1 on our website and that is given to
2 individuals.
3          The document that I'm referring
4 to that says "draft" is the procedures that
5 staff had been doing probably -- was probably
6 drafted around 2015 time frame, was put to
7 paper in 2015.
8     Q.     Did any procedure exist before
9 that time that applied to how the organization
10 should conduct irregular behavior
11 investigations and when the staff should refer
12 matters to the creds committee?
13     A.     Yes, those procedures that were
14 documented in 2015 were the procedures that
15 staff had been using at least since I started
16 working directly on cases of irregular
17 behavior, which is 2008 onward, and my
18 understanding would be prior to that as well.
19 I just wasn't working on those cases then.
20     Q.     So is it fair to say that up
21 until 2015, those procedures were a custom of
22 the organization in terms of how to conduct
23 investigations and when to refer matters to the
24 committee and then they were written down in

Page 61

1 2015 in the document that we've been talking
2 about?
3          MS. McENROE:  Objection to form.
4          THE WITNESS:  So I don't know if
5     I would characterize them as a custom,
6     but they were documented together in
7     2015.
8          But when I started working on
9     irregular behavior cases those procedures
10     were -- I was trained on those procedures
11     and how to conduct the case.
12 BY MR. THRONSON:
13     Q.     Was there a written policy --
14 sorry, written procedure that predated the 2015
15 procedure?
16          MS. McENROE:  Objection to form.
17          THE WITNESS:  Not that I
18     recall.
19 BY MR. THRONSON:
20     Q.     So as part of your training in
21 how to conduct irregular behavior
22 investigations prior to 2015, you weren't
23 trained on a particular written procedure; fair
24 to say?

16 (Pages 58 - 61)

1          MS. McENROE: Objection to form.
2          THE WITNESS: No. Not that I
3     recall other than the irregular behavior
4     policies and procedures that we have
5     written.
6   BY MR. THRONSON:
7     Q.     So 2015 is the first time that
8   an irregular behavior procedure, which included
9   procedures for referring matters to the
10  credentials committee, was written down at
11  ECFMG?
12    A.     To my knowledge -- I don't know.
13  I believe so. If they were written down
14  previously, I didn't see them; or they would
15  have been in communications from someone to
16  another person.
17    Q.     What do you mean by that?
18    A.     I don't know what people did
19  before I started working on those cases. I
20  guess what I'm trying to say is, I don't know
21  if I can say they were never written down
22  before, because I don't know what individuals
23  may or may not have done before me, but I have
24  not seen a set of written procedures prior to

1   that time.
2     Q.     So to the best of your knowledge
3   both individually and as a representative of
4   ECFMG, 2015 was the first time that an
5   irregular behavior procedure, including a
6   procedure for referring matters to the
7   credentials committee, was actually written
8   down at ECFMG; to the best of your knowledge?
9          MS. McENROE: Objection to form.
10         THE WITNESS: To the best of my
11    knowledge 2015 is when we documented the
12    procedures that we were using as staff to
13    process investigations for irregular
14    behavior.
15  BY MR. THRONSON:
16    Q.     What caused the organization to
17  write those procedures down in 2015?
18    A.     So William Kelly, who was the
19  vice president of operation at the time, he had
20  been doing that work for a very long time and
21  he was retiring and so as part of his
22  retirement he was still doing some consulting
23  for ECFMG, and one of the things I asked him to
24  do was to document all of the procedures in

1   writing for us because his knowledge of the
2   organization, historically, not just irregular
3   behavior procedures but things that the
4   organization had done, so when he was fully
5   gone we would have that resource.
6     Q.     Did anyone else contribute to
7   the drafting of those procedures?
8     A.     No.
9     Q.     So it's fair to say, before that
10  procedure was drafted what the procedure was
11  for irregular behavior at ECFMG was essentially
12  what Bill Kelly decided to do?
13         MS. McENROE: Objection to form.
14         THE WITNESS: No, I would not
15    characterize it that way.
16         What is documented in 2015 is a
17    set of procedures the organization had
18    used. Bill had used those procedures,
19    but not independently. So he would have
20    been consulting with his superior others
21    at the organization. He wouldn't just
22    act on his own to create procedures.
23  BY MR. THRONSON:
24    Q.     Understood.

1          MR. THRONSON: Obviously we'll
2     be requesting a copy of the --
3          MS. McENROE: I believe we
4     produced that already. We produced that
5     this morning, I think. Oh, great, I have
6     hard copies for you.
7          Also, we've been going for about
8     an hour and 20 minutes, and I think we
9     might have lunch ready if there's a good
10    time to take a break?
11         MR. THRONSON: Can we spend
12    about 5 more minutes to close out this
13    line of questioning; is that okay?
14         THE WITNESS: That's fine.
15  BY MR. THRONSON:
16    Q.     Why has the -- is there a reason
17  that the policy, at least on the face of it,
18  had remained a draft policy?
19         MS. McENROE: Objection to form.
20         THE WITNESS: No other reason
21    than we didn't change the title on the
22    Microsoft Word document.
23  BY MR. THRONSON:
24    Q.     So for all intents and purposes

17 (Pages 62 - 65)

KARA CORRADO

1 it's a final policy?
2          MS. McENROE:  Objection to form.
3          THE WITNESS:  I would say it
4 captures the procedure that we follow.
5 Off the top of my head, not looking at it
6 right now, I don't know if there are
7 other sort of processes that are not
8 documented in there, but it's generally
9 the guidelines that we use for
10 investigations.
11 BY MR. THRONSON:
12     Q.     Are there any other polices
13 from -- strike that.  Are there any other
14 procedures, from 1996 to the present, that
15 ECFMG has used with respect to investigations
16 of irregular behavior and determinations as to
17 whether to refer a matter to the credentials
18 committee other than the 2015 written policy --
19 written procedures we've been discussing?
20          MS. McENROE:  Objection to form.
21          THE WITNESS:  Not that I'm aware
22     of.
23 BY MR. THRONSON:
24     Q.     Does ECFMG have any procedures,

1 written procedures, regarding -- tell you what,
2 let me strike that.  Let's take a break.  I'll
3 look at the document, and then we can
4 reconvene.
5          - - -
6          (Whereupon there was a recess in
7      the proceeding from 12:09 p.m. to 12:51
8      p.m.)
9          - - -
10          MR. THRONSON:  Back on the
11     record.  We'll mark this.
12          - - -
13          (Whereupon the document was
14     marked, for identification purposes, as
15     Exhibit Number CORRADO-2.)
16          - - -
17 BY MR. THRONSON:
18     Q.     Ms. Corrado, before we left off
19 we were discussing a credentials procedure that
20 was drafted in 2015.
21          Ma'am, the court reporter has
22 marked a document as exhibit 2, and I'll
23 represent to you this document contains all the
24 production we were provided, supplement

1 production we were provided by defendants this
2 morning.
3          The first roughly 10 pages of
4 it, from Bates 10198 to 10208, does that
5 comprise the 2015 procedure we were talking
6 about?
7     A.     Yes.
8     Q.     It looks like there are a few
9 attachments to the procedure that are --
10 attachment 1 is referenced on page 10207,
11 that's a sample text to a third part in
12 response to an allegation.  Do you see that?
13     A.     I'm sorry.  Which page?
14     Q.     10207.  In the middle of the
15 page there, you'll see there's a reference to
16 an attachment?
17     A.     Yes, I see it.
18     Q.     Then on page 10205 there's a
19 reference to attachment 2 at the bottom of that
20 page.  Apparently attachment 2 is a sample
21 charge letter to an applicant.  Do you see
22 that?
23     A.     Yes.
24     Q.     It doesn't appear that those

1 attachments are in this production.  Other than
2 those attachments, does what you have in front
3 of you as Exhibit 2 contain the complete 2015
4 policy we've been discussing?
5          MS. McENROE:  Objection to form.
6          THE WITNESS:  Yes, this appears
7      to be the document from 2015.
8 BY MR. THRONSON:
9     Q.     On page 11 there are -- I guess
10 I'm wondering if the policy is incomplete or if
11 content was intended to be added to it?
12          It looks like there are some --
13 there's a charge of falsified credential,
14 charge of falsified student status, falsified
15 credentials, other consideration of ongoing
16 investigations.
17          Do you see that text?
18     A.     (Nonverbal response.)
19     Q.     Are those prospective of those
20 sections to be added to the policy?
21          MS. McENROE:  Objection to form.
22          THE WITNESS:  I am not sure.
23 BY MR. THRONSON:
24     Q.     Let me ask you, what do you

KARA CORRADO

Page 70

1 think those represent?
2     A.     Can I have a minute?
3     Q.     Yes.  Of course.  Take all the
4 time you need.
5     A.     I am not sure what the intent
6 would have been by Bill in these, but my
7 educated guess would be these are types of
8 tools -- these are types of cases that we
9 typically see of irregular behavior.
10     Q.     If you turn back to the first
11 page of the policy...
12          MS. McENROE:  Objection.
13          MR. THRONSON:  I'm sorry, what
14     is the objection?
15          MS. McENROE:  You kept calling
16     it a policy.  I went through it
17     extensively this morning, it's a
18     procedure not a policy.
19          MR. THRONSON:  Okay, fair
20     enough.
21 BY MR. THRONSON:
22     Q.     Apparently this belongs to a set
23 of ECFMG credentials procedures; is that
24 correct?

Page 71

1     A.     Yes.
2     Q.     It's labeled Section 5 of those
3 procedures, correct?
4     A.     This does, yes.
5     Q.     So are there other sections of
6 the ECFMG credentials procedures?
7     A.     I believe there are other
8 sections.
9          MR. THRONSON:  I'd like to
10     request a table of contents for those
11     procedures.
12          MS. McENROE:  We can investigate
13     if a table of contents exists.
14          MR. THRONSON:  If not that, then
15     the whole set.
16 BY MR. THRONSON:
17     Q.     Do you recall the headings of
18 the other sections or generally what the other
19 sections contain?
20     A.     Only one which would have been,
21 I believe, our procedures on exceptions to
22 credentialing policies, but I don't remember
23 the other ones.
24     Q.     All right.  Are there -- do you

Page 72

1 recall any others among the ECFMG credentials
2 procedures that bear on investigating
3 allegations of irregular behavior?
4     A.     I don't believe so.
5     Q.     Do you remember any other
6 section of the procedures that bear on the
7 question of when to refer a matter to the
8 medical education credentials committee?
9     A.     I don't believe so.
10     Q.     The document refers to the ECFMG
11 medical education and credentials committee
12 policies and procedures.  Is that a separate
13 set of policies and procedures?
14     A.     Yes.  That is a set of policies
15 and procedures that are published and provided
16 to the applicants when they are charged with
17 irregular behavior.
18     Q.     Are there any other policies and
19 procedures or polices that the credentials
20 committee -- that apply to the credentials
21 committee that are not published?
22     A.     Yes.  There is an appeals
23 procedure that is not published on our website
24 but it is given to any individual along with a

Page 73

1 decision letter when a determination of
2 irregular behavior is made.
3     Q.     Anything else?
4     A.     There are no other policies
5 related to irregular behavior that applies to
6 the credentials committee.
7     Q.     Does the credentials committee
8 itself have any policies and procedures that
9 govern when an allegation of irregular behavior
10 should be forwarded to the committee for
11 investigation and review?
12     A.     The irregular behavior policies
13 and procedures that we have are the ones that
14 govern the committee.
15     Q.     In Exhibit 2, in front of you?
16     A.     No.  The ones that are
17 referenced in here, the medical education
18 credentials committee polices and procedures.
19     Q.     Okay.
20     A.     Which are the irregular behavior
21 procedures that are published right now online,
22 those policies.
23     Q.     Do those published polices also
24 govern staff?

19 (Pages 70 - 73)

KARA CORRADO

Page 74

1           MS. McENROE:  Objection to form.
2           THE WITNESS:  I wouldn't say
3     they govern staff, but those are the
4     policies and procedures that staff use
5     when reviewing irregular behavior and
6     when we are communicating with
7     applicants.
8  BY MR. THRONSON:
9     Q.      Has that been true from '96 to
10    the present?
11    A.      Do you mean specifically this
12    policy?
13    Q.      I mean the policies that are
14    published regarding irregular behavior.  Has
15    the committee staff, such as yourself, followed
16    those polices from '96 to the present?
17    A.      That's my understanding.
18    Q.      Does Exhibit 2 vary at all from
19    the historical practice of the credentials
20    committee and credentials committee staff with
21    respect to investigations of irregular behavior
22    and referrals to the credentials committee?
23          MS. McENROE:  Objection to form.
24          THE WITNESS:  Not that I'm aware

Page 75

1     of.
2  BY MR. THRONSON:
3     Q.      So Mr. Kelly, in drafting this
4     document, never indicated to you that this is
5     something new that I'm putting in here, I think
6     we should change how we're doing a particular
7     thing?
8           MS. McENROE:  Objection to form.
9           THE WITNESS:  Not that I recall.
10 BY MR. THRONSON:
11    Q.      According to these procedures
12    when should an allegation of irregular behavior
13    be referred to the credentials committee?
14          MS. McENROE:  Objection to form.
15 BY MR. THRONSON:
16    Q.      By these procedures I mean the
17    ones in Exhibit 2.
18    A.      There is, on page 4, an
19    indication to send the allegation of irregular
20    behavior which in quotes we call "the charge
21    letter to the applicant."
22    Q.      Can you show me the language you
23    are referring to; read it for me?
24    A.      The bottom of page 4.  The very

Page 76

1  last two italicized phrases.
2     Q.      I see that.  So I'm interested
3  in knowing when staff becomes aware of an
4  allegation of irregular behavior, is there
5  anything in Exhibit 2 that indicates when staff
6  should refer that allegation to the credentials
7  committee?
8           MS. McENROE:  Objection to form.
9  BY MR. THRONSON:
10    Q.      Or under what circumstances the
11 staff should refer to the --
12    A.      The document -- the procedures
13 are documenting walking through the process of
14 the investigation which starts with determining
15 whether the irregular behavior relates to
16 ECFMG, whether the source of the allegation is
17 credible, and the process you go through when
18 this comes to the source of the allegation.
19    Q.      Is it ECFMG's position that if
20 staff determines an allegation is credible,
21 that that allegation should be forwarded to the
22 credentials committee?
23          MS. McENROE:  Objection to form.
24          THE WITNESS:  So the policies

Page 77

1     and procedures on irregular behavior
2     indicate that if staff determines there
3     is sufficient evidence of irregular
4     behavior the matter will be referred to
5     the credentials committee.
6  BY MR. THRONSON:
7     Q.      Is that language in this
8  procedure; is it written down somewhere else?
9     A.      So that language without sitting
10 and reading through here, I don't know for sure
11 if it's in this document or not; but it is in
12 the medical education credentials committee
13 polices and procedures on irregular behavior.
14    Q.      Okay.  Can you say that for me
15 again, if staff determines that there is
16 sufficient evidence; is that what you said?
17    A.      That is what I said, yes.
18    Q.      What is sufficient evidence?
19    A.      Sufficient evidence, it depends
20 on the case.  For example, if it's a falsified
21 credential and the school responded and said
22 the diploma is false, then that response would
23 be sufficient evidence to make an allegation of
24 irregular behavior on a falsified credential.

20 (Pages 74 - 77)

KARA CORRADO

Page 78

1    Q.    Okay. I'd like to walk through
2  some -- strike that. Has it been ECFMG's
3  procedure since 1996 that if staff determines
4  that an allegation is supported by sufficient
5  evidence that the allegation is referred to the
6  credentials committee?
7    A.    That is my understanding, yes.
8    Q.    Does the evidence have to be in
9  a particular form? For example, does there
10  have to be a particular kind of documentary
11  evidence, or does that depend on the case?
12    A.    It depends on the case.
13    Q.    On page 6 of the polices and
14  procedures, this is Bates 10203, the procedure
15  reads "if the third party is not already
16  provided the appropriate identifying
17  information about the individual" -- so on and
18  so forth -- "ECFMG staff must determine whether
19  the individual is an applicant to ECFMG for any
20  program or service such as ECFMG certification,
21  EPIC, et cetera. To do this staff must use all
22  the appropriate search functions to query all
23  ECFMG databases," and it mentions AMES, OASIS,
24  and EPIC as examples of those databases.

Page 79

1          Can you tell me about what each
2  of those databases are, what the acronym stands
3  for and what the databases do?
4    A.    I believe that the example --
5  the uses of these -- these are programs,
6  software programs for ECFMG. So I don't know
7  that they are really databases. They obviously
8  feed from a database, but I don't believe they
9  are the names of a database.
10          AMES is a program that our staff
11  uses to process records. OASIS is an external
12  facing portal that applicants can use to check
13  on their application status and their
14  certification status of ECFMG, and EPIC is our
15  electronic portfolio of international
16  credentials which has a variety of software
17  programs that we use. It's not in the name of
18  a program.
19    Q.    Are there any databases that
20  ECFMG uses in the course of the certification
21  process?
22          MS. McENROE: Objection to form.
23          THE WITNESS: I assume so, yes.
24  BY MR. THRONSON:

Page 80

1    Q.    Do you know the names of any of
2  those databases?
3    A.    I don't know if we have a name
4  for the database or if there's multiple
5  databases. We have a variety of software
6  programs that we use, and this is saying to
7  make sure we check in each of our lines of
8  service to see if the applicant exists in those
9  lines of service.
10    Q.    As a general matter, if a charge
11  letter is sent to an applicant should the
12  matter be referred to the credentials committee
13  for review?
14          MS. McENROE: Objection to form.
15          THE WITNESS: That is our
16      current process.
17  BY MR. THRONSON:
18    Q.    How long has that been a
19  process?
20    A.    That has been the process at
21  least since I've been working with the
22  credentials committee which is since 2008, and
23  I believe prior to that probably somewhere
24  around the late 90s early 2000s.

Page 81

1    Q.    So you believe that was also the
2  process in the late 90s, early 2000s?
3    A.    Yes.
4    Q.    Okay. Do you know of any --
5  strike that. Do you know of any circumstances
6  where you would -- where ECFMG would vary from
7  that process?
8          MS. McENORE: Objection to form.
9  BY MR. THRONSON:
10    Q.    That is, would vary from the
11  process of once a charge letter is sent to an
12  applicant to refer the matter to the
13  credentials committee for investigation?
14    A.    Prior to -- like I said, I think
15  it was around '99, 2000 that the matter would
16  be referred.
17          Let me just clarify. Unless
18  there was some exculpatory evidence that we
19  discovered after we sent the charge letter,
20  then we would withdraw the charge letter and it
21  wouldn't be referred to the credentials
22  committee; but prior to that there are cases
23  where we contacted the applicant to ask them to
24  provide information about an allegation or an

21 (Pages 78 - 81)

KARA CORRADO

1 anomaly.  In some of those cases they were not
2 referred to the committee, if that applicant
3 did not respond.
4      Q.      If the applicant did not respond
5 they were not referred to the committee?
6      A.      In some cases.  Right, you asked
7 me if we always referred them.
8      Q.      Sure.
9      A.      And the answer is no, because
10 there are some cases that are old, prior to my
11 time, that we contacted the individual about
12 the allegation but they are not necessarily
13 referred to the credentials committee.
14      Q.      Do you know why they were not
15 referred to the credentials committee in those
16 cases?
17      A.      I don't.
18      Q.      But as a general rule after a
19 charge letter was sent, the matter was referred
20 to the credentials committee as a matter of
21 course?
22          MS. McENROE:  Objection to form.
23          THE WITNESS:  Yes.
24 BY MR. THRONSON:

1      Q.      Obviously this case has a long
2 history and we covered a lot of this in the
3 deposition of William Kelly.  Did you happen to
4 read that deposition?
5      A.      I did not.
6      Q.      Was it made available to you for
7 review?
8      A.      No.
9      Q.      Do you know that it had taken
10 place?
11      A.      No.
12      Q.      Did ask you for a transcript?
13      A.      No, I did not.
14      Q.      Why not?
15          MS. McENROE:  Objection to form.
16          THE WITNESS:  I don't know.  I
17      didn't ask for one.
18 BY MR. THRONSON:
19      Q.      You didn't feel it was important
20 for your testimony today?
21          MS. McENROE:  Objection to form.
22          THE WITNESS:  I don't think I
23      thought about it to be perfectly honest.
24 BY MR. THRONSON:

1      Q.      I'd like to go through some of
2 the history and just so we can orientate
3 ourselves, is it ECFMG's understanding that the
4 names Charles Nosa Akoda, Igberase Oluwafemi
5 Charles, and Oluwafemi Charles Igberase were
6 names used by the same person?
7      A.      That is our understanding which
8 is based on the information that we got from
9 the plea that he signed.
10      Q.      Do you know what that
11 individual's given name was at birth?
12          MS. McENROE:  Objection to form.
13          THE WITNESS:  I do not know what
14      his given name was at birth.
15 BY MR. THRONSON:
16      Q.      Does the organization have an
17 opinion as to where he was born?
18          MS. McENROE:  Objection to form.
19          THE WITNESS:  We would only have
20      information that he provided to us about
21      where he was born.
22 BY MR. THRONSON:
23      Q.      Did he receive any medical
24 education before enrolling in a residency

1 program?
2      A.      ECFMG has documentation that the
3 medical school officials verified to us that he
4 completed medical education at a school in
5 Nigeria, and they verified his final medical
6 diploma to us.
7      Q.      Is it ECFMG's position that
8 Akoda actually graduated from the University of
9 Benin?
10      A.      So ECFMG's position on that is
11 that an individual with that name submitted a
12 diploma which was source verified by the
13 medical school officials, which indicated that
14 the diploma was authentic and confirmed that
15 the person named on that diploma graduated from
16 their medical school.  I believe it was Benin,
17 I can't remember, but assuming that's the
18 school on the diploma.
19      Q.      You are aware that same
20 individual, under the Igberase name, supplied a
21 medical degree from -- submitted a diploma from
22 the University of Ibadan as part of his
23 application --
24          MS. McENROE:  Objection to form.

22 (Pages 82 - 85)

KARA CORRADO

Page 86

1    THE WITNESS: Yes, so an
2    individual named -- well, one of his name
3    is Igberase, applied to ECFMG and
4    submitted a diploma which was source
5    verified by the University of Ibadan
6    indicating that he had attended medical
7    school there and the diploma was
8    authentic.
9  BY MR. THRONSON:
10    Q.    Does ECFMG believe Akoda
11  Igberase attended both the University of Ibadan
12  and the University of Benin?
13    MS. McENROE: Objection to form.
14    THE WITNESS: ECFMG has two
15    diplomas for Igberase in his file that
16    were source verified by the medical
17    school officials. Whether or not he
18    attended both of those medical schools,
19    that particular person that presented
20    those diplomas, I wouldn't know.
21  BY MR. THRONSON:
22    Q.    So the only -- if I'm
23  understanding you correctly, ECFMG doesn't take
24  a position on where Igberase Akoda actually

Page 87

1  went to medical school beyond that ECFMG
2  received these two diplomas that were source
3  verified by the institution?
4    A.    Yes, that's correct.
5    Q.    Does ECFMG have any information
6  apart from the source verification of those
7  diplomas that would indicate where this
8  individual actually went to medical school, if
9  anywhere?
10    A.    All of the information we have
11  about his medical education, aside from the
12  verification of the diploma by the medical
13  school's officials, would have been provided by
14  him on his applications to ECFMG.
15    Q.    So just to be totally clear,
16  apart from having these two diplomas that were
17  source verified by the institution and ECFMG's
18  belief, ECFMG can't say where and when this
19  individual, Akoda Igberase, went to medical
20  school, if anywhere?
21    MS. McENROE: Objection to form.
22    THE WITNESS: We could only
23    provide the information that the school
24    verified to us, which would include the

Page 88

1    graduation date on the diploma.
2  BY MR. THRONSON:
3    Q.    How did you obtain source
4  verification from the school?
5    A.    For those diplomas?
6    Q.    For those diplomas.
7    A.    We followed our processes at the
8  time for source verification which was to send
9  a copy of the diploma to the medical school
10  directly with a form for the school official to
11  complete, it's a safety paper form, and a
12  prepaid envelope, -- I'm sorry, it's not a
13  prepaid envelope, but an envelope addressed to
14  ECFMG to be returned to us.
15    Q.    At this time, did you also
16  request, we're talking about between 1992 to
17  2000, did you also request verification of
18  whether an individual was registered as a
19  medical practitioner or licensed to practice
20  medicine in his or her home country?
21    A.    The credentialing requirements
22  for certification at that time included source
23  verification of the diploma only, and the
24  individual was required to also submit a copy

Page 89

1  of their certificate of their full registration
2  or license, but those were not source-verified.
3    Q.    Why not?
4    A.    I don't know why they were not,
5  but the decision prior to me had been source
6  verification of diploma with a submission of
7  the license, which is not a requirement now.
8    Q.    Why did it cease becoming a
9  requirement?
10    A.    We introduced a clinical skills
11  assessment examination in 1998, and at that
12  time the organization determined it did not
13  need the license or certificate of registration
14  from an international medical graduate when it
15  introduced a clinic skill assessment which is
16  an in-person exam simulated with patients.
17    Q.    It has never been a requirement
18  for international medical graduates applying
19  for ECFMG certification to provide government
20  issued photoed identification, correct?
21    A.    It is a requirement to submit
22  photo identification currently, but it was not
23  in the past.
24    Q.    When did it become a

23 (Pages 86 - 89)

KARA CORRADO

Page 90

1 requirement?
2    A.    It varies based on the service.
3 So the international credential services, EPIC,
4 when that program was launched, which I believe
5 was I was in 2012 or 2013, part of the
6 requirement was to submit a copy of the
7 passport and have it notarized -- an
8 identification form notarized and for ECFMG
9 certification that became part of the
10 requirement in 2017, I believe, or 2018; maybe
11 2018, more recently.
12    Q.    Why did it become a requirement?
13    A.    We were looking across our
14 processes and programs and we wanted to
15 standardize it, work towards standardization,
16 and bring, like have a notary -- the process is
17 essentially the same as it had been but we
18 wanted to tighten it up in terms of having one
19 notary that we contract with to provide
20 notarization of the identification forms to us.
21    Q.    Is that a separate requirement,
22 in terms of ECFMG now has a requirement that an
23 applicant provide government issued photo
24 identification if I'm understanding you right?

Page 91

1    A.    Yes, to ECFMG.
2    Q.    I'm sorry -- right that it is
3 supplied to ECFMG.  There's a separate
4 requirement that the applicant used, I believe,
5 Notary Cam?
6    A.    (Nonverbal response.)
7       MS. McENROE:  Is that a "yes"?
8       THE WITNESS:  Yes.
9 BY MR. THRONSON:
10    Q.    Why was that Notary Cam
11 introduced?
12    A.    The requirement to use Notary
13 Cam?
14    Q.    Right.
15    A.    So Notary Cam is a vendor in the
16 United States that provides online notary
17 services.  They also have an ability -- they
18 have a database of passports so they know what
19 the passport should look like, and we decided
20 to use an online -- one notary that we knew in
21 order to essentially improve the process that
22 we've had over the years.
23       Over the years we've introduced
24 a number of improvement to all of our processes

Page 92

1 essentially and that was one of them for
2 identification.
3    Q.    Why do you think it wasn't
4 introduced beforehand?
5       MS. McENROE:  Objection to form.
6       THE WITNESS:  I believe it was
7    not introduced beforehand because,
8    frankly, of system restraints.
9 BY MR. THRONSON:
10    Q.    What do you mean by that?
11    A.    It is a technology matter, so to
12 speak, that we -- it was a project that we had
13 sort of in the pipeline for a while, and it
14 goes through a process with IT, and updating
15 the system to be able to accept those things
16 electronically took some time.
17    Q.    Why do you think the government
18 issued photo ID requirement was not a
19 requirement until 2017, 2018?
20       MS. McENROE:  Objection to form.
21       THE WITNESS:  So presenting the
22    government ID was a requirement prior to
23    this in the sense that as part of the
24    identification of the individual on an

Page 93

1 application they were required to appear
2 in front of a notary, first class
3 magistrate, Consul official or a medical
4 school official and provide their
5 identification to that individual to
6 notarize or sign off on their application
7 form, but they were not submitted to
8 ECFMG.
9 BY MR. THRONSON:
10    Q.    Where was it submitted?
11    A.    I assume it would be submitted
12 to the notary -- right -- you have to show up
13 to the notary and the instructions to the
14 notary indicate that they are certifying that
15 the person before them, based on their
16 government issued ID or other form of
17 identification, is that person.
18    Q.    Was the notary supposed to send
19 that documentation directly to ECFMG?
20    A.    The -- no, I don't belive so.
21    Q.    I wanted to go back to the issue
22 of the diplomas.  I believe that there were
23 some emails that were produced in production
24 from defense counsel in this case.

24 (Pages 90 - 93)

KARA CORRADO

1          One of them I'd like to mark as
2    Exhibit 3, please.
3                - - -
4          (Whereupon the document was
5          marked, for identification purposes, as
6          Exhibit Number CORRADO-3.)
7                - - -
8    BY MR. THRONSON:
9    Q.      So Ms. Corrado, I'm handing you
10   a copy of what's been marked as Exhibit 3.
11   This is Bates 3206 to 3209, and it appears to
12   be an exchange between you and -- initially a
13   few physicians, Nigerian physicians, and then
14   the most recent response on the exhibit is
15   between you and physician Dr. Okwukenye; is
16   that right?
17   A.      Yes.
18   Q.      Dr. Henry?
19   A.      Dr. Henry, yes.
20   Q.      It appears that you submitted
21   diplomas and certificates of full registration
22   that most of which it appears have been source
23   verified to Dr. Henry to take a look at, right?
24   A.      Yes.

1    Q.      First of all, how did you meet
2    Dr. Henry?
3    A.      Dr. Henry is, I believe, he is
4    the registrar of the Medical and Dental Council
5    of Nigeria.  The Medical and Dental Council of
6    Nigeria is one of the medical regulatory
7    authorities that uses our credentialing
8    verification services for applicants that are
9    applying to Nigeria for licensure in Nigeria.
10          So Dr. Henry has been one of our
11   point people in that relationship in providing
12   the services to the medical council.
13   Q.      Got it.  Has the Medical and
14   Dental Council of Nigeria been in existence
15   since at least 1996?
16   A.      That's my understanding.
17   Q.      How did you meet doctor Henry?
18   A.      I met Dr. Henry aside from
19   email, but in person I met him at a conference.
20   Q.      It looks like the AMCOA
21   Conference in Ghana?
22   A.      Yes, I met him at AMCOA, but I
23   might have met him at a previous conference of
24   AMCOA.

1    Q.      About how long do you think
2    you've known him?
3    A.      Probably around three years.
4    I'm not sure off the top of my head when they
5    signed on with us.  So from the time
6    essentially that the medical and dental council
7    signed on, Dr. Henry was the point person.  I
8    would have known him through email and then
9    when I met him at conferences that we both
10   attended.
11   Q.      What is the AMCOA Conference?
12   A.      That is the Association of
13   Medical Councils of Africa.
14   Q.      So it looks like you provided
15   copies of various diplomas and certificates of
16   full registrations that are listed on pages
17   3206 and 3207?
18   A.      Yes.
19   Q.      Those included diplomas and
20   certificates of full registration from the
21   individual Johnbull Enosakhare Akoda as well as
22   Charles Olufemi Igberase and Charles Igberase
23   Oluwafemi, correct?
24   A.      Yes.  All of the names that are

1    listed in the emails.
2    Q.      Got it.  Dr. Henry said he would
3    -- he was out of the office but would verify
4    these by Thursday?
5    A.      (Nonverbal response.)
6          MS. McENROE:  Is that a "yes"?
7          THE WITNESS:  Yes.  Sorry.
8    BY MR. THRONSON:
9    Q.      I don't have a response from
10   him.  Did he respond to you?
11   A.      Yes.  In here you mean or?
12   Q.      Subsequent to this email, did
13   you have correspondences with him?
14   A.      Not about this.  Not about this
15   that I'm aware of.
16   Q.      Did he ever give an opinion as
17   to whether any of the documents that you sent
18   him were authentic?
19   A.      He did not.
20   Q.      Did you ever follow up with him
21   to ask again?
22   A.      Yes, I believe I did in an
23   email.
24   Q.      Do you know about when you did

25 (Pages 94 - 97)

KARA CORRADO

Page 98

1 that?
2    A.    Probably a few months after
3 that.
4    Q.    Did he respond?
5    A.    I don't think he responded.
6    Q.    Has he every gotten back to you
7 about his opinion about whether the documents
8 you sent him were authentic?
9    A.    No.
10   Q.    Have you sent any of the
11 documents that are identified in this email
12 chain in Exhibit 3 to anybody else to get their
13 opinion on whether they were authentic?
14   A.    No.
15   Q.    Why did you send them to
16 Dr. Henry?
17   A.    Dr. Igberase applied to our
18 international credential services after the
19 issue that he had and his licenses were revoked
20 in the States.  He applied to use our services
21 indicating he was applying to Nigeria, and I
22 believe Ireland for licensure.
23          As part of our regular process
24 and procedure when an individual that has

Page 99

1 engaged in irregular behavior in any of our
2 programs and services uses our international
3 credentialing services and indicates they are
4 going to apply to another jurisdiction, we will
5 reach out to our partners at that jurisdiction
6 to let them know that an individual with an
7 annotation of irregular behavior has indicated
8 that they are going to apply to that regulatory
9 authority for licensure.
10          So that was the original email,
11 was notifying them that he had applied, and I'm
12 sorry, I think I lost the question.
13   Q.    That's fine.  So it looks like,
14 if the email is accurate, that while you were
15 at AMCOA, you discussed the case of
16 Dr. Igberase and Dr. Akoda with him, and this
17 was after the notification to the MDCN on June
18 29th --
19   A.    Yes.  Yes.  Sorry.
20   Q.    So why did you bring the case up
21 with him?
22   A.    So because he was applying to
23 them, we gave them the heads up about it, so
24 they could make a decision.  If he continued

Page 100

1 the process in Nigeria, the medical and dental
2 council would make a decision about his
3 application for licensure with a full
4 understanding of the information that we had
5 about this particular physician.
6          So when I met Dr. Henry in Ghana
7 we discussed this case because he had the
8 email, and I asked him if we could provide all
9 the documents to him because the individual,
10 you know, Dr. Igberase, was using our
11 credentialing services to apply to us, what
12 appeared to apply to other jurisdictions
13 seeking medical licensure.
14   Q.    Okay.  So it looks like you
15 provided the initial notification on June 29th,
16 then you had a conversation with him at the
17 conference that essentially grew out of that
18 initial notification?
19   A.    Yes, that is right.
20   Q.    He said that the medical council
21 could verify the documents that were submitted
22 to ECFMG by this individual, according to the
23 email here; is that right?
24   A.    Yes.

Page 101

1    Q.    Why did he offer, or why did you
2 ask him to do that?
3    A.    So because Dr. Igberase appeared
4 to be engaging in our credentialing services,
5 we would then be verifying these documents to
6 other organizations, and I wanted to cross
7 check the information.
8          We also hadn't ever necessarily
9 verified the registration certificates with the
10 medical and dental council.  Those had not been
11 previously source verified so I was looking to
12 source verify those as well, and then we could
13 put those in Dr. Igberase's account and send
14 out the verification of them to the regulatory
15 authorities he was applying to.
16   Q.    So even though the registrations
17 apparently had been verified as authentic by
18 deans at the schools Ibadan and Benin, that
19 didn't constitute source verification; correct?
20   A.    That is correct.
21   Q.    As he says in his email,
22 however, no dean in the world can verify full
23 registration.
24          Is that accurate?

26 (Pages 98 - 101)

KARA CORRADO

Page 102

1        MS. McENROE:  Objection to form.
2        THE WITNESS:  That's what
3   Dr. Henry told me about their process in
4   Nigeria.  So I assume that whoever he's
5   representing in Nigeria can't do that.
6   BY MR. THRONSON:
7        Q.      Does ECFMG agree that deans are
8   not able to verify full registration at least
9   in Nigeria?
10        MS. McENROE:  Objection to form.
11        THE WITNESS:  ECFMG will use the
12        issuing institution as the primary
13        source.  So we would not typically verify
14        a certificate of registration with a
15        medical school unless it was issued by
16        the medical school in some capacity, or
17        we were otherwise instructed by the
18        primary area source to the verification
19        with another organization.
20   BY MR. THRONSON:
21        Q.      Why in this case were the
22   certificates of full registration provided by
23   Igberase Akoda verified with the deans of these
24   schools instead of the MDCN?

Page 103

1        A.      So it wouldn't have been instead
2   of this time, because we weren't source
3   verifying registration or licensure.
4        So I don't know why the staff
5   person sent those along with the diploma to the
6   school.  In looking at the file, my assumption
7   would be they were stapled together with the
8   diploma so they just stapled it to the form and
9   mailed it to the school.
10        When it came back, since that
11   was a document that came back with the
12   verification we left it, but we would not have
13   considered it source verified or primary-source
14   verified.
15        Q.      The only way to determine --
16   strike that.  The best way to determine if a
17   document submitted by applicants is to
18   primary-source verify it; is that fair to say?
19        MS. McENROE:  Objection to form.
20        THE WITNESS:  That is our
21        process.  We will primary-source verify
22        credentials.
23   BY MR. THRONSON:
24        Q.      When, if ever, did it become

Page 104

1   ECFMG's process to source verify medical
2   registration?
3        A.      ECFMG, for ECFMG certification,
4   does not require source verification of
5   licensure or registration because it's not a
6   requirement for certification.
7        Q.      That ended in '98?
8        A.      Submission of the licensure
9   ended in '98.  We provide source verification
10   of registration certificates and licensure for
11   other regulatory authorities and other partners
12   that do require that, and outsource their
13   credentialing verification to us.
14        We are still verifying
15   certificates of registration and licensure
16   today, but not because it's a requirement of
17   ECFMG certification.
18        Q.      Let's go down the list here, and
19   I'd like to know ECFMG's position on whether
20   these documents are authentic or not.
21        So the MBBS diploma issued in
22   1987 to Charles Oluwafemi Igberase, I have
23   copies if you want, but you're probably very
24   well familiar with them -- that diploma issued

Page 105

1   in '87 from the University of Ibadan, in
2   ECFMG'S belief, is that diploma authentic?
3        MS. McENROE:  Objection to form.
4        THE WITNESS:  The very first one
5        you're talking about, correct, 19 --
6        MR. THRONSON:  Right.
7        THE WITNESS:  -- '87?
8        It's ECFMG's position that that
9        diploma has been source verified as
10        authentic.  We have no reason to believe
11        otherwise that it is not.
12   BY MR. THRONSON:
13        Q.      The second item on the list,
14   certificate of full registration, issued to
15   Charles Olufemi Igberase 1989, does ECFMG
16   believe that that certification of full
17   registration is authentic?
18        MS. McENROE:  Objection to form.
19        THE WITNESS:  ECFMG does not
20        have information to determine whether
21        this document is authentic or not because
22        we would verify it with a primary source.
23   BY MR. THRONSON:
24        Q.      Was it ECFMG's policy when it

27 (Pages 102 - 105)

Page 106

1 required provision -- submission of the
2 certificates to have some verification of the
3 authenticity of the certificate of
4 registration?
5     A.    Not to my knowledge. We did not
6 require a source verification of the
7 registration or license.
8     Q.    Why was that?
9     A.    I don't know.
10     Q.    Who would know?
11         MS. McENROE: Objection to form.
12         THE WITNESS: I don't know.
13 BY MR. THRONSON:
14     Q.    The third item on the list, the
15 MBBS diploma allegedly issued in '96 to Charles
16 Igberase Oluwafemi from the University of
17 Ibadan, what is ECFMG's position as to the
18 authenticity to that document?
19     A.    So ECFMG has no information
20 about the authenticity of that document.
21     Q.    So ECFMG doesn't take a position
22 either way?
23     A.    Correct.
24     Q.    The fourth item, the MBBS

Page 107

1 diploma, allegedly issued to Johnbull
2 Enosakhare Akoda in 1988 from the University of
3 Benin, what is ECFMG's position as to the
4 authenticity of that document?
5     A.    ECFMG's position is that this
6 document, the MBBS diploma, is authentic based
7 on the information that was provided to us from
8 the primary source at the medical school.
9     Q.    Does ECFMG have any reason to
10 believe that that diploma issued to Akoda is
11 not authentic?
12     A.    ECFMG has no reason to believe
13 that that diploma is not authentic.
14     Q.    The fifth -- strike that. Does
15 ECFMG -- is it ECFMG's position that the '87
16 diploma from Ibadan, the '96 diploma from
17 Ibadan, and the '88 diploma from Benin were all
18 obtained by the same person?
19         MS. McENROE: Objection to form.
20 BY MR. THRONSON:
21     Q.    Do you understand what I'm
22 asking, that one person actually graduated from
23 all those schools?
24     A.    Yes. We don't have information

Page 108

1 that we could take a position that one
2 individual graduated from all of those schools.
3         What we have is an individual
4 submitted those documents to ECFMG, and they
5 were verified as authentic.
6     Q.    Does ECFMG have any reason to
7 believe that one individual, a single
8 individual, did not obtain those three diplomas
9 from schools, from the three schools -- or from
10 Ibadan or Benin?
11         MS. McENROE: Objection to form.
12         THE WITNESS: So, again, I
13     doesn't have any information on which to
14     take a position on how those documents or
15     those educations were obtained.
16         What we have is an individual
17     that submitted documents to us that were
18     source verified to us as authentic.
19 BY MR. THRONSON:
20     Q.    I may have already asked this
21 but just to be sure. ECFMG has cooperated in
22 at least one federal, criminal investigation
23 regarding this matter; right?
24     A.    Yes.

Page 109

1     Q.    Has it cooperated in any other
2 investigations concerning this matter?
3     A.    I think it was part of the same
4 investigation, the Maryland Board of Physicians
5 reached out to us initially, I believe, about
6 requesting information on these two physicians.
7     Q.    During the course of that
8 process, including in a plea agreement, did
9 ECFMG obtain any additional insight as to the
10 authenticity of the five documents listed in
11 Exhibit 3?
12         MS. McENROE: Objection to form.
13         THE WITNESS: So at the time
14     when we reviewed the file for the medical
15     board, the information we have here is
16     the same information we had then which is
17     those documents were verified as
18     authentic. We didn't have any reason to
19     believe they were not authentic.
20 BY MR. THRONSON:
21     Q.    The fifth document listed, the
22 certificate of full registration, allegedly
23 issued to Johnbull Enosakhare Akoda, in 1989,
24 does ECFMG take a position as to whether that

KARA CORRADO

Page 110

1 document is authentic?
2    A.    ECFMG does not have enough
3 information to take a position on whether that
4 document is authentic or not, because it hasn't
5 been primary-source verified.
6    Q.    Does ECFMG take a position as to
7 whether any transcripts provided by this
8 applicant, on these various applications, are
9 authentic or not?
10    A.    I am not aware that ECFMG has
11 any transcripts for him unless they were
12 submitted through the -- they may have been
13 submitted through the residency application
14 service program; but I don't believe we ever
15 source verified a medical school transcript for
16 Dr. Igberase, because it wasn't a requirement
17 at the time he was certified.
18    Q.    Did it ever become a
19 requirement?
20    A.    Yes.
21    Q.    When did that happen?
22    A.    Approximately 2004.
23    Q.    Are you aware of any other cases
24 where allegations have been made of irregular

Page 111

1 behavior concerning applicants who presented
2 diplomas from the University of Ibadan?
3    A.    None that I can recall.  Our
4 falsified credentials are -- we get falsified
5 credentials from all different parts of the
6 world so I don't know off the top of my head if
7 we ever had someone else from that medical
8 school that submitted a falsified credential.
9    Q.    Do you know, both individually
10 and as a representative of ECFMG, if anyone has
11 been investigated for irregular behavior and
12 that person has submitted a diploma from the
13 University of Benin?
14    A.    My answer would be the same as
15 the last, that I don't know of the cases that
16 we reviewed over all time if there were any;
17 it's possible, but any school essentially is
18 possible.  We get fraudulent credentials from
19 different areas of the world.
20    Q.    You've received them from
21 Nigeria before?
22    A.    I don't know.  I'd have to
23 check.
24    Q.    I wanted you to review another

Page 112

1 email.
2         I'll have this marked as Exhibit
3 4.
4              - - -
5         (Whereupon the document was
6    marked, for identification purposes, as
7    Exhibit Number CORRADO-4.)
8              - - -
9 BY MR. THRONSON:
10    Q.    So Exhibit 4, I'll represent to
11 you is another document we received in the
12 course of discovery in this case, and it
13 appears to be an email exchange involving --
14 among staff in the special investigations team
15 at ECFMG; is that right?
16    A.    That's right.
17    Q.    So it appears that an individual
18 named Saraogi Chirag pulled data concerning the
19 University of Ibadan and the University of
20 Benin?
21    A.    I'm sorry, is that a question?
22    Q.    Yes.
23    A.    Yes, he did.
24    Q.    Are you aware of that project?

Page 113

1    A.    Yes.
2    Q.    What was it about?
3    A.    This was a review of these two
4 medical schools -- the applicants to ECFMG to
5 determine if there were any open cases of an
6 allegation of irregular behavior of another
7 anomaly.
8    Q.    Was this motivated by the Akoda
9 matter?
10    A.    Yes.
11    Q.    What were the findings, if any,
12 of this investigation; what did you all
13 conclude?
14    A.    If I recall correctly, there
15 were no other incidents of irregular behavior
16 or abnormalities.
17    Q.    No other incidents in the
18 history of the organization?
19    A.    No.  Not including people that
20 we maybe had already concluded a case on, but
21 was this anything from the past that had been
22 open and not concluded.
23    Q.    Got it.  Okay.  So the
24 conclusion that there weren't any other

29 (Pages 110 - 113)

KARA CORRADO

Page 114

1 incidents of irregular behavior from applicants
2 submitting credentials from these two
3 universities, that only applied to open cases
4 that hadn't yet been resolved by the
5 organization?
6     A.     Yes.
7     Q.     I want to just go through the
8 timeline a little bit of what happened here.
9 There are a lot of documents that you can refer
10 to in the -- review of exhibits from the
11 deposition of Bill Kelly.  If you need to
12 verify something in reference to my questions,
13 please feel free to do so.
14          My understanding is that
15 Igberase first applied to ECFMG in 1992?
16     A.     I believe that's correct.
17     Q.     He ultimately received a
18 certificate in 1993?
19     A.     Yes.
20     Q.     Then ECFMG received a separate
21 application from an individual, the same
22 individual going by the name Igberase Charles
23 in 1994?
24     A.     Yes.

Page 115

1     Q.     That certificate was issued to
2 him, I believe, in approximately 1995?
3     A.     Yes.
4     Q.     Then the creds committee, the
5 committee of medical education credentials,
6 revoked that certificate in '95?
7     A.     Yes.  Around that -- after that
8 meeting, yes.
9     Q.     Then it appears that the same
10 individual -- I have a letter it's Exhibit 7 to
11 the Kelly deposition -- where the creds
12 committee announced it's revocation of that
13 certificate in December 1995?
14     A.     Yes.
15     Q.     Then the same individual,
16 according to exhibit 23 of the Kelly
17 deposition, applied as Akado in 1996?
18     A.     Yes.  So we received an
19 application from Johnbull Akado in '96.
20     Q.     He did not provide a social
21 security number on this application, correct?
22     A.     Yes, that's correct.
23     Q.     Was it a requirement at that
24 time to provide one?

Page 116

1     A.     No.
2     Q.     Was it a requirement to state
3 one if you had one?
4     A.     No.
5     Q.     He indicated that he had not
6 taken an ECFMG examination before, correct?
7     A.     That's correct.
8     Q.     That statement was false?
9     A.     Yes.
10     Q.     In making that false statement,
11 that constituted irregular behavior?
12     A.     In making the false statement?
13     Q.     That he had never taken the
14 examination before?
15     A.     That would constitute evidence
16 of irregular behavior.
17     Q.     In fact, it was that same type
18 of irregular behavior that ultimately led to
19 the Igberase and Charles certificates being
20 revoked, correct?
21     A.     That's correct.
22     Q.     On page 705 of Exhibit 23 there
23 is a box for office use only in the lower
24 left-hand corner of the page.  Can you tell me

Page 117

1 what those various codes and numbers mean?
2     A.     I cannot tell you.
3     Q.     Who can?
4     A.     I don't know if there's anyone
5 that works at ECFMG that would know at this
6 point in time.
7     Q.     Then this individual, under the
8 Igberase moniker, took an appeal from the
9 revocation of ECFMG certificates March 7, 1996?
10          MS. McENROE:  Are you referring
11 to a specific exhibit you want her to
12 look at?
13          MR. THRONSON:  Sure Exhibit 9.
14          THE WITNESS:  Yes.
15 BY MR. THRONSON:
16     Q.     It appears that ECFMG, the
17 appeals committee, a review committee?
18     A.     Yes.
19     Q.     They affirmed the decision of
20 the creds committee that limited the period of
21 revocation to five years?
22     A.     That's correct.
23     Q.     Why did they do that?
24     A.     I don't know what their thought

30 (Pages 114 - 117)

KARA CORRADO

1 process was.
2    Q.    With respect to the 1996
3 application which is Exhibit 23, what was done
4 to -- you mentioned earlier that ECFMG
5 attempted primary-source verification with a
6 medical school, the University of Benin and
7 also verification of the medical registration
8 with Benin.
9          Did ECFMG conduct any other
10 investigation or inquiry with respect to this
11 application to determine whether it was true
12 and accurate in any or all respects?
13    A.    ECFMG staff would have processed
14 this application in accordance with the
15 procedures that were in effect at the time to
16 determine if there was another applicant in the
17 database with this same information or name.
18    Q.    How would it do that?
19    A.    The staff person would search
20 the database we had at the time, the system we
21 were using.  I don't know the specifics of how
22 that system worked.
23    Q.    Did the staff ever investigate
24 or inquire into whether the naterial (phonetic)

1 steel was authentic or suspicious in any way?
2    A.    Not that I'm aware of.  It was
3 processed as any other application would be
4 processed; with the same level of scrutiny.
5    Q.    So then in Exhibit 24, Akoda
6 applies again, my recollection is that he
7 either applied too late or he was a no show for
8 one round of exams and so applied again, and
9 this time indicated that he had taken an
10 examine previously, or he applied before;
11 correct?
12    A.    Yes.
13    Q.    Would ECFMG staff have compared
14 the contents of this application to the
15 contents of the previous application to see if
16 there were any red flags?
17         MS. McENROE:  Objection to form.
18         THE WITNESS:  The staff would
19 have updated any information the
20 applicant had provided in the system.  So
21 generally speaking they wouldn't look at
22 the paper application because it would be
23 in the file.
24         They would look at what was in

1 the system that had been data entered
2 when the last person processed the last
3 application.
4 BY MR. THRONSON:
5    Q.    What data information was
6 entered?
7    A.    Not all of the information on
8 the application is data entered.  So the
9 biographic information, name, address, date of
10 birth, social security number is provided.  In
11 the application software we would indicate
12 whether they are a student or a graduate, test
13 center information.  Their fees would have been
14 entered into the payment system.
15         We did not key in any secondary
16 school information.  We would key in the
17 medical school degree, school information,
18 attended state's information, birth place, and
19 citizenship would be collected as well.
20    Q.    Was the clerkship information
21 entered?
22    A.    No.  It was also not required to
23 be completed.
24    Q.    So -- I'm wondering how to

1 reconcile that statement with the statement
2 right at the top, under part A, all items on
3 all sides of the application must be filled out
4 completely for initial and reexamination or
5 application will not be accepted.
6    A.    Yes.  There were fields in here
7 that might not necessarily be applicable to
8 each person.
9         So as a matter of process, they
10 were not required when we received the
11 application; they would not have caused a
12 rejection because that would have impeded the
13 applicant over information that wasn't
14 necessarily relevant to their registration for
15 exam, and at that time we only gave exams, I
16 think, twice or three times a year so it could
17 be a problem if you missed the exam
18 registration.
19         So only the relevant information
20 we needed was required.
21    Q.    If you take a look, compare it
22 to 23 and 24 for a moment.  Just the clinical
23 clerkships under both.  So I'm wondering if
24 you'll agree that the clinical clerkship

31 (Pages 118 - 121)

KARA CORRADO

1 information provided on page 706 of Exhibit 23
2 differs from the clinical clerkship information
3 provided on page 646 of Exhibit 24?
4          MS. McENROE: Objection to form.
5          THE WITNESS: In what way?
6 BY MR. THRONSON:
7     Q.     So for example, the hospital and
8 the clinic in Exhibit 23, General Hospital
9 Warri; Exhibit 24, Specialist Hospital,
10 Benin/Warri?
11    A.     So I would say that how the
12 information is presented is different, but I
13 wouldn't be able to say whether that was the
14 same hospital or not.
15    Q.     Would it matter to ECFMG?
16    A.     Not as it related to
17 certification or registration for examination.
18    Q.     So under surgery for example, on
19 Exhibit 23, Akoda wrote he did a clerkship at
20 the Echos General Hospital Warri with
21 Dr. Henderson; and on Exhibit 24, he did it at
22 the Specialist Hospital Benin, Warri with
23 Dr. Eddiblekia (phonetic) -- or something like
24 that, but it's not Henderson, correct?

1     A.     Correct.
2     Q.     If ECFMG staff had gone back and
3 looked the at the paper applications and
4 compared this, these two applications in that
5 respect would that have prompted additional
6 investigation into this applicant?
7          MS. McENROE: Objection to form,
8     calls for speculation.
9          THE WITNESS: No. As I said the
10    clerkships were not required, and they
11    could have been partial clerkships. So
12    it might not necessarily be not true that
13    he had different surgery clerkships in
14    the same year.
15 BY MR. THRONSON:
16    Q.     So it would not be part of
17 ECFMG's procedures to contact the applicant to
18 ask the applicant about this?
19    A.     Not about clerkships, no.
20    Q.     It would not be part of ECFMG's
21 procedures to contact these hospitals to verify
22 that this individual had completed clerkships
23 at these hospitals?
24    A.     That was not part of our

1 requirement or process.
2     Q.     Has it ever been?
3     A.     Not to my knowledge.
4     Q.     Has it ever been part of ECFMG's
5 process to inquire, to ask an applicant about,
6 when confronted with inconsistent information,
7 about clerkships?
8     A.     No.
9     Q.     When ECFMG received the
10 applications in Exhibit 23 and 24, did it check
11 them against it's credentials reference
12 library?
13         MS. McENROE: Objection to form.
14         THE WITNESS: My understanding
15    of the process at the time was that the
16    credential would be checked against the
17    reference library.
18         Whether the person who was
19    processing these applications did that, I
20    was not there so I wouldn't be able to
21    say yes; but that was the process.
22 BY MR. THRONSON:
23    Q.     Does ECFMG take a position
24 either way as to whether information submitted

1 by this applicant, Akoda, was checked against
2 ECFMG reference library?
3     A.     So I would say the diploma would
4 have been checked against the reference
5 library.
6     Q.     How about the registration?
7     A.     We would not check the
8 registration against the library. I don't
9 believe that certificates of registration were
10 in the library at that time.
11    Q.     What did ECFMG do at the time
12 this application was submitted to make sure
13 that the credentials library was -- am I using
14 that term correctly?
15    A.     Yes.
16    Q.     Okay -- that the credentials
17 library was up-to-date with the most current
18 signatures that were being used on diplomas at
19 various schools?
20    A.     There were processes in place to
21 have the staff update the library with copies
22 of verified credentials. So if the format was
23 the same on a diploma as the year before and
24 the official verified it, they would send a

32 (Pages 122 - 125)

KARA CORRADO

1 copy of that diploma that had been verified to
2 the person that was responsible for putting the
3 documents into the library.
4        The library at that time was not
5 electronic.  So it was a paper file library
6 that could be accessed by the staff if they
7 needed to cross reference.
8    Q.    Are historical samples of the
9 diplomas maintained?  For example, could you
10 take the diploma from the University of Benin,
11 Exhibit 25 from Kelly deposition, and go into
12 the reference library and say, hey, in '96 did
13 ECFMG have a document on file where these
14 signatures match the document that was in the
15 reference library?
16    A.    So ECFMG has historical
17 information on diplomas.
18    Q.    So it's the kind of record it
19 would typically maintain?
20    A.    Yes.
21        MR. THRONSON:  I'd like to
22    request that also.
23        MS. McENROE:  Any new requests
24    that haven't been produced, if you can

1    put that in writing and we can evaluate
2    it following the deposition, that would
3    be fine.
4        MR. THRONSON:  We'll see if
5    they're actually new, but we can work
6    that out later.
7 BY MR. THRONSON:
8    Q.    It looks -- if you could just
9 turn to Exhibit 31.  So this is a letter from
10 Steve Steeling to James McCorkle dated
11 August 22, 2000.
12    A.    Yes.
13    Q.    On the second paragraph of the
14 letter it reads, the social security number he,
15 Akoda, provided ECFMG in 1998 is 9065.  Is that
16 ECFMG's understanding as well?
17        MS. McENROE:  Objection to form.
18        THE WITNESS:  I would say, yes,
19    if that's what we put in the letter at
20    that time.
21 BY MR. THRONSON:
22    Q.    Do you know how that social
23 security number was provided to ECFMG?
24    A.    I do not, unless it was on an

1 application.
2    Q.    If you could turn to Exhibit 33.
3 This is a request for permanent revalidation of
4 standard ECFMG certificate?
5    A.    Yes.
6    Q.    It looks here there's a social
7 security number -- there's an initial number
8 crossed out, then there's another number, it's
9 either 4065 or 9065 to my eye.  Do you think
10 that's where ECFMG was provided that social
11 security number?
12    A.    That's probably where the social
13 security number came from.
14    Q.    Can you explain what Exhibit 33
15 is?
16    A.    Exhibit 33 is a request for
17 permanent revalidation of the standard ECFMG
18 certificate.
19        At the time that Dr. Akoda was
20 ECFMG certified, the certificate had an
21 expiration date and it was based on the
22 validity of the English language test.  So a
23 test of the English language was a requirement
24 for certification, and that would only be valid

1 for a two-year period.
2        When the individual entered an
3 ACGME accredited program, they could then
4 request, on the basis of entering that training
5 program, a revalidation sticker for an
6 indefinite status so that they would not have
7 to continually revalidate the English
8 examination.
9        So this form is a request from
10 John Akoda requesting that revalidation sticker
11 for his certificate so that his status would be
12 updated to valid indefinitely.
13    Q.    It looks like that request was
14 approved by ECFMG?
15    A.    Yes.
16    Q.    Can you tell who approved it by
17 the signature on the page?
18    A.    No, I cannot.
19    Q.    Looks like the document asks for
20 notarization but is not notarized, correct?
21    A.    It doesn't appear to be
22 notarized.  Whether there was an institutional
23 seal that was raised on that and you cannot see
24 on the copy I don't know.

33 (Pages 126 - 129)

KARA CORRADO

1    Q.        When ECFMG received a request
2 like this, would it look anything up in the
3 system about the applicant before granting the
4 request?
5    A.        ECFMG would process these in the
6 system, the information you would be looking up
7 would be related to the certification status;
8 keying in the ID number and pulling up the
9 correct record.
10    Q.        Is part of that process -- was
11 it the procedure of ECFMG to verify that the
12 applicant's name was consistent between the
13 request for permanent revalidation and the name
14 that was on file for the applicant?
15    A.        That was not part of the process
16 that I'm aware of.
17    Q.        Was it the process of ECFMG to
18 verify that the date of birth given on the
19 request for permanent revalidation was
20 consistent with the date of birth on file with
21 ECFMG for the applicant?
22    A.        Not that I'm aware of.
23    Q.        Was there -- did ECFMG have any
24 requirements for its staff as to verifying

1 information on a request for permanent
2 revalidation was consistent with information
3 that it had on file for the applicant?
4    A.        I don't know what the specific
5 procedures were in terms of processing these
6 requests.
7    Q.        Obviously the name on this
8 application, John Charles Akoda, is different
9 than John Nosa Akoda?
10    A.        Yes.
11    Q.        The date of birth of
12 4/17/63 that's on the request for permanent
13 revalidation is different than the date of
14 birth that Akoda gave on his applications to
15 ECFMG of --
16    A.        Yes.
17    Q.        Now there's a difference between
18 the name on Akoda's diploma which you can see
19 on Exhibit 25.  The name on the diploma is
20 Johnbull Enosakhare Akoda?
21    A.        Yes.
22    Q.        And that's different obviously
23 then John Nosa Akoda?
24    A.        Yes.  It appears to be the

1 expanded versions of the names.
2    Q.        How do you know it's the
3 expanded version of the name?
4    A.        John is part of the name of
5 Johnbull and Nosa is part of the name
6 Enosakhare.
7    Q.        Obviously you can have
8 circumstances where an applicant's name
9 differed between a diploma and an application
10 the difference was benign and didn't reflect
11 anything about the authenticity of the
12 application, or the trustworthiness of it, or
13 the trustworthiness of the diploma; right?
14    A.        Yes.  You're asking me if we can
15 have benign variations in the name?
16    Q.        Right.
17    A.        Yes, there could be variation in
18 the name from the diploma to the name on the
19 applicant record.
20    Q.        There can also be variations
21 between the diploma and the name on the
22 applicant record that are not benign that may
23 suggest misconduct on the part of the applicant
24 or third parties, correct?

1    A.        Yes.  If someone submitted a
2 diploma with a totally different name.  I don't
3 know if I would characterize it as benign or
4 not benign, but it would raise a question.
5    Q.        Did ECFMG take any steps at this
6 time when it was faced with an application,
7 where the name on the application differed from
8 the name on the diploma, to determine whether
9 that difference, as we've characterized it, was
10 benign or not?
11    A.        At the time, the processes would
12 have allowed for cultural variations in names,
13 and in shortening names, like Johnbull -- so
14 would not have seemed incongruent with the
15 person whose name was on the application.
16        If the diploma name was Johnbull
17 and he's applying as John, the name of record
18 would be sent to the medical school when
19 verifying this diploma.  So the name of record,
20 if it varied, would be on the form that the
21 school would be verifying with this diploma
22 attached to it.
23    Q.        The name of the record being the
24 name on the application?

34 (Pages 130 - 133)

KARA CORRADO

Page 134

1    A.    Yes.
2        MS. McENROE:  We've been going
3    for about an hour and 40 minutes, is this
4    a good time to take a short break.
5        MR. THRONSON:  Sure.
6        - - -
7        (Whereupon there was a brief
8    recess in the proceeding.)
9        - - -
10       MR. THRONSON:  Back on.
11   BY MR. THRONSON:
12   Q.    Ms. Corrado, looking at Exhibit
13   25 in front of you.  You'll see there's a stamp
14   on it, received August 11, 2011, by the
15   Maryland Board of Physicians.
16       Do you know why that stamp is
17   there and why a Maryland Board of Physicians
18   document is in the ECFMG files?
19       MS. McENROE:  Objection to form.
20       THE WITNESS:  I don't know.  The
21   Maryland Board of Physicians would have
22   been responsible for licensing Dr. Akoda.
23   My understanding of their current
24   process, is that as part of the

Page 135

1    application process for an international
2    medical graduate they have to source
3    verify the medical education credentials.
4        Maryland currently has a form
5    where they will either accept the
6    verification through the Federation of
7    State Medical Boards or directly
8    themselves.  So they have a form that
9    they require the individual to send to
10   the medical school and must be sent back
11   directly to Maryland.
12       So I don't know why the Maryland
13   Board of Physician's copy is in this
14   file.
15   BY MR. THRONSON:
16   Q.    Okay.  Would it have happened as
17   the result of any criminal investigation that
18   ECFMG cooperated in?
19   A.    I don't -- I don't know.
20       My understanding of what -- when
21   we have requests on information about the case,
22   particularly -- I know we got a request from
23   the board of physicians in about the 2014 time
24   period.

Page 136

1        I'm not aware of anything prior
2    to that, so I can't speculate.
3    Q.    What was the request that you
4    got in 2014 about?
5    A.    The Maryland Board reached out
6    to us for, I believe, file copies or specific
7    copies of documents on Dr. Akoda and
8    Dr. Igberase.
9    Q.    Do you know why?
10   A.    I don't know.  I don't know.
11   There's an email, I think about it.
12   Q.    Yeah, there was a reference, I
13   believe, in one of these emails to the
14   information you had provided the board in 2014,
15   and there was a detective in one of the emails
16   who was in a sex crimes unit or sexual assault
17   unit.
18       Do you recall any sex crimes or
19   sexual assaults investigation that ECFMG
20   provided information in connection with or
21   participated in?
22       MS. McENROE:  Objection to form.
23       You mean specifically for Dr. Igberase
24       and Dr. Akoda?

Page 137

1        MR. THRONSON:  Correct.
2        THE WITNESS:  There was a
3    request around that same time period from
4    an individual, law enforcement, that I
5    think was in a sex crimes unit.
6    BY MR. THRONSON:
7    Q.    Do you know any of the details
8    or allegations that prompted that request?
9    A.    I do not.  ECFMG's procedure
10   when it comes to a request from law enforcement
11   is generally to cooperate with law enforcement.
12       So if a law enforcement official
13   reaches out and indicates to us that they have
14   an active investigation about an individual, we
15   will provide the information that they seek if
16   appropriate and if we have it.
17   Q.    Do you know what information you
18   provided in connection with that investigation?
19   A.    I believe we provided -- the
20   files we provided would be included in the
21   documents that are in this, in the binders.
22   Q.    So we got a little over 10,000
23   pages.  Do you think you gave all of that or...
24   A.    If they requested for the file,

35 (Pages 134 - 137)

KARA CORRADO

Page 138

1 we would have give them a copy of his file,
2 both files for those individuals. If they only
3 requested specific pieces of the file, like an
4 application, then we would give them that. It
5 just depends on what they're looking for.
6    Q.    Just to close this out. So
7 there was an investigation that the Maryland
8 Board of Physicians was doing that was around
9 the 2014 time period?
10    A.    That's my understanding from
11 their communication.
12    Q.    Were you involved in responding
13 to the inquiries from the Maryland Board?
14    A.    No, I was not.
15    Q.    Do you know what information was
16 provided?
17    A.    I know what information was
18 provided in the sense we provided the file. I
19 just don't know which parts of it at this
20 particular moment were provided; but what they
21 asked for we would have provided.
22    Q.    Do you know what the outcome
23 was?
24    A.    I do not; other than at the end

Page 139

1 of all of this, his Maryland license was
2 revoked.
3    Q.    Do you know what the outcome of
4 the sex crimes investigation was?
5    A.    I do not.
6    Q.    At some point you were contacted
7 by a federal law enforcement?
8    A.    Yes.
9    Q.    Who contacted you and when?
10    A.    I'm sorry, I don't remember the
11 name of the agent; and it was sometime, I
12 think, in the 2015 or 2016 time period.
13    Q.    That was FBI or U.S. Attorney's
14 Office?
15    A.    I believe it was -- I'm not
16 sure. I think there's communication that we
17 have in there. I don't want to misrepresent
18 who reached out to us; but yes, a federal
19 agency reached out to us in that time period.
20    MR. THRONSON: I have not seen
21 it, but we can talk about that.
22 BY MR. THRONSON:
23    Q.    What was your understanding of
24 the purpose of the investigation?

Page 140

1    A.    My understanding is that the
2 authorities were reviewing a matter involving
3 Dr. Igberase and Dr. Akoda and that there was
4 some type of potential fraud. They asked us
5 for information, and they asked us not to
6 provide information to anyone about their
7 investigation, because they were worried about
8 not being able to catch him. I think that's
9 generally the knowledge that I have of that
10 request.
11    Q.    Not being able to catch him
12 because he would flee the country?
13    A.    I'm not sure. It appeared from
14 the information that we have from them they
15 were trying to catch him, for a lack of better
16 words, and they were worried that he somehow
17 would be able to slip through. If he had got
18 any notice that someone was looking at his
19 record, it might tip him off.
20    Q.    Did you understand that to be a
21 legal obligation that you had to not notify
22 anyone about the investigation, or not notify
23 anyone about the potential fraud that Igberase
24 may have committed?

Page 141

1    MS. McENROE: Objection to form.
2    THE WITNESS: I would say that
3 we generally cooperate with law
4 enforcement. So if they asked us not to
5 do anything or not to provide information
6 to other parties we would generally do
7 what they ask of us.
8 BY MR. THRONSON:
9    Q.    Do you know generally what
10 information you provided to law enforcement in
11 connection to that investigation; 2015, 2016?
12    A.    So we would have provided the
13 files to the authorities on that investigation.
14    Q.    The files, as I understand it,
15 there are two hard files that we had the
16 opportunity to go through today that are under
17 the Igberase applicant number and Akado
18 applicant number, right?
19    A.    Yes.
20    Q.    What other files does ECFMG
21 maintain relative to Akado?
22    A.    Those are the hard copy file and
23 there would be an electronic file which would
24 have copies of some of the documents in there.

36 (Pages 138 - 141)

KARA CORRADO

1        We started doing electronic
2 files after Dr. Igberase came through our
3 system. So all of his information would be in
4 paper file, and then if he had communicated
5 with us after that time, that would be in the
6 electronic file and we would, when law
7 enforcement asked, combine those two things.
8    Q.    Is there a software program you
9 use to access the electronic file?
10    A.    Yeah. I forget what it's
11 called, but you can access the scanned
12 documents.
13    Q.    They are stored on a hard drive
14 somewhere at ECFMG?
15    A.    I don't know if they are on a
16 hard drive.
17    Q.    Or the cloud?
18    A.    But, yes, they are stored
19 somewhere in the electronic file.
20    Q.    Then is there a separate
21 electronic file that contains perhaps internal
22 memos about Akoda, deliberations, things of
23 that nature?
24    A.    The file, the record I should

1 say in our system, may include comments from
2 our staff that are progressing, that wouldn't
3 necessarily be in the electronic file. Those
4 are more operational kind of comments, you
5 know, process this, send it there.
6        The decision of the medical
7 education credentials committee are kept in the
8 applicant's file, but the minutes from the
9 meeting are not kept in the applicant's file.
10 So that would be the only other record, if you
11 will, of the applicant's irregular behavior.
12    Q.    Everything else would be in the
13 applicant's file?
14    A.    It would be in the file. It
15 would be in the system, the electronic system.
16    Q.    Going back to our story. When
17 did ECFMG first become aware that Akoda. Sorry
18 I'm skipping around.
19        When did ECFMG first become
20 aware that Akoda engaged in irregular behavior?
21        MS. McENROE: Objection to form.
22        THE WITNESS: There was
23    allegation that he had used a social
24    security number that was not his, and

1 that was reported to us by the residency
2 program at the time. So at that time
3 there would have been a review of that
4 scenario to determine if there was
5 sufficient evidence of irregular
6 behavior. If he had violated any of our
7 policies or provided any false documents
8 or anything like that to ECFMG.
9 BY MR. THRONSON:
10    Q.    If you turn to Exhibit 34, this
11 is a letter from James McCorkle at Jersey Shore
12 Medical Center to Rice Holmes at ECFMG sent and
13 received on August 11, 2000. This contains, I
14 believe, the information you were just
15 discussing about Akoda was using a social
16 security number that was issued to Igberase.
17        In the first paragraph McCorkel
18 reports that Akoda admitted using these various
19 names, Igberase, Charles Igberase and also
20 having admitted to using three birth dates.
21        Do you see that information?
22    A.    I do.
23    Q.    Did I characterize that
24 accurately?

1    A.    Yes.
2    Q.    He mentions the social security
3 number 9065. That's the same number on the
4 request to permanently revalidate his
5 certificate that we looked at earlier, right?
6    A.    Yes, I believe it was.
7    Q.    So is this the first date on
8 which ECFMG became aware that Akoda might have
9 engaged in irregular behavior when it got this
10 letter?
11        MS. McENROE: Objection to form.
12        THE WITNESS: Yes. Either on or
13    about this date. I don't know if he
14    called before that and then faxed this
15    over.
16 BY MR. THRONSON:
17    Q.    There wasn't anything before
18 this?
19    A.    Not that I'm aware of.
20    Q.    In the procedures we were
21 discussing earlier regarding irregular
22 behavior, there's a discussion about what makes
23 a credible allegation and an allegation that's
24 considered not credible.

37 (Pages 142 - 145)

KARA CORRADO

1        Is an allegation that's reported
2  by a vice president of academic affairs at a
3  residency program typically considered
4  credible?
5            MS. McENROE:  Objection to form.
6            THE WITNESS:  So it depends on
7     what the information is.  If the
8     credibility of the individual -- I would
9     say it just depends on what the
10    information is they are providing to us;
11    but generally if it's a residency program
12    director who's signing it that we can
13    follow up with, it would be something we
14    would follow up on.
15  BY MR. THRONSON:
16    Q.     Have you reviewed the
17  correspondence with Jersey Shore and the notes
18  that William Kelly made in the file regarding
19  his conversations with Jersey Shore?
20    A.     Yes.
21    Q.     It appears that Akoda came to
22  visit Kelly around September 27, 2000, and this
23  is -- you can see a memo about this Exhibit 41.
24  Exhibit 41 to Kelly's deposition is a memo to

1  file regarding Akoda.  Have you reviewed this
2  document before?
3    A.     Yes.
4    Q.     It is as I described?
5    A.     Yes.
6    Q.     So according to Kelly, he
7  admitted -- Akoda admitted to using Igberase
8  Charles's social security number?
9    A.     Yes.
10    Q.     So at that point surely
11  Dr. McCorkle's allegation that Akoda had
12  submitted a false social security number would
13  have been regarded as credible by ECFMG?
14    A.     That he submitted a false social
15  security number to the program, yes.
16    Q.     And he also submitted that false
17  social security number to ECFMG, correct?
18    A.     If...
19    Q.     On the request for permanent
20  certification at least if you turn to...
21    A.     Yes, because that's -- well,
22  that's the social security number that the
23  program -- that form is usually completed by
24  the program coordinator.

1        So whether he or she filled it
2  out based on the information he provided to
3  Jersey Shore, then it was sent to ECFMG.
4    Q.     Got it.  So at some point -- but
5  before this memo was released and before the
6  request for permanent recertification, Akoda
7  had submitted a social security number to ECFMG
8  that he represented was his, but it wasn't;
9  right?
10            MS. McENROE:  Objection to form.
11            THE WITNESS:  So the answer to
12    that question is yes, but that wasn't
13    something that was known to us at that
14    time, when we received this form.
15  BY MR. THRONSON:
16    Q.     But by September 27, 2000, when
17  Kelly wrote this memorandum, that was known to
18  ECFMG?
19    A.     Right.  We would have known that
20  he presented that social security number to the
21  program, and that he claimed that it wasn't
22  his, that it was Igberase's.
23    Q.     ECFMG would have known around
24  that time that Akoda submitted a false social

1  security number to ECFMG itself, correct?
2    A.     It would depend on whether -- I
3  mean we would have known, yeah.  I think we put
4  that in the letter to them, we got the social
5  security number.  So if -- if we knew because
6  they advised us that he had used the other
7  social security number that that was not his
8  social security number, yes.
9    Q.     If you turn to Exhibit 31, this
10  is the letter we were talking about earlier.
11  Exhibit 31 to the Kelly deposition from Steve
12  Seeling to James McCorkle.  In the second
13  paragraph Steve Seeling states the social
14  security number he provided ECFMG in 1998 is
15  9065?
16    A.     Yes, I see that.
17    Q.     Providing a false social
18  security number or using a false social
19  security number can be a federal, criminal
20  offense; correct?
21            MS. McENROE:  Objection to form;
22    calls for a legal conclusion.
23            THE WITNESS:  That's my
24    understanding, yes.

38 (Pages 146 - 149)

KARA CORRADO

1 BY MR. THRONSON:
2    Q.    At least based on the plea
3 agreement and so fourth --
4    A.    Yes.
5    Q.    Right, and it was also one of
6 the reasons that Akoda was ultimately kicked
7 out of the Jersey Shore residency, right?
8    A.    Yes.
9    Q.    Under ECFMG's judgement would
10 providing a false social security number to
11 ECFMG at that time have constituted irregular
12 behavior?
13    A.    I think it would depend on the
14 circumstances around how the information was
15 provided and what evidence we had of that.
16    Q.    Do you have a sense of what,
17 after ECFMG became aware that -- well, let me
18 back up.  You said it would depend on the
19 circumstances.  So under the circumstances of
20 this case, is it ECFMG's position that Akoda
21 providing a false social security number to
22 ECFMG in 1998 constituted irregular behavior?
23        MS. McENROE:  Objection to form.
24        THE WITNESS:  What I know is

1    that it constituted the allegation from
2    the residency program; constituted enough
3    information for us to do an investigation
4    on that, but we did not have sufficient
5    evidence of the irregular behavior to
6    charge him with irregular behavior.
7        So there would be a policy tie
8    to the provision of false information.
9    For example, I don't know where anybody
10    lives, you could put an address on the
11    application that is not really your
12    address.  You might be using someone
13    else's address that you know.  I don't
14    know that that necessarily constitutes
15    irregular.
16        So if I have evidence of -- if
17    someone wrote a social security number on
18    the application and maybe the number is
19    off, I don't have any way to verify
20    whether the social security is valid or
21    not.
22        So if you were providing a false
23    number to us, in addition to other pieces
24    of information, that would show that you

1    were trying to subvert our processes like
2    Dr. Igberase did in using different
3    pieces of information in order to subvert
4    the policy that you can't retake the
5    exam, then you would have evidence of
6    irregular behavior.
7 BY MR. THRONSON:
8    Q.    How about giving a false name on
9 an application, would you agree that in
10 applying for ECFMG certification in 1996 that
11 an individual identified himself as John Nosa
12 Akoda and that's a false name?
13        MS. McENROE:  Objection to form.
14        THE WITNESS:  Someone applied to
15    ECFMG in 1996 and used the name John Nosa
16    Akoda, and based on the facts that were
17    stipulated in plea bargain Igberase has
18    stated that he used John Nosa Akoda's
19    name.
20 BY MR. THRONSON:
21    Q.    It appears that Kelly suspected
22 in 2000 that Akoda and Igberase were the same
23 person, right?
24    A.    Yes.  He, I think, had a

1 suspicion.
2    Q.    McCorkle did as well?
3    A.    That's my understanding based on
4 the notes from the file.
5    Q.    Obviously Akoda -- it was
6 irregular behavior for Akoda to retake
7 examinations that he had already taken,
8 correct?
9        MS. McENROE:  Objection to form.
10        THE WITNESS:  It would be a
11    policy violation.  So if we had the
12    evidence to prove that he wasn't two
13    different people, then we would charge
14    him with irregular behavior which is what
15    the review that happened at that time was
16    intended to look at; is there sufficient
17    evidence here that we can demonstrate he
18    is the same person to charge with
19    irregular behavior.
20        After that review, there was at
21    that time and subsequently not evidence
22    to make the allegation.
23 BY MR. THRONSON:
24    Q.    Let's look at Exhibit 49.  So

39 (Pages 150 - 153)

KARA CORRADO

1  this is a memorandum from the file that Kelly
2  wrote separately, "since I did not think it
3  should be made part of the official file"?
4      A.     I don't think that's what I
5  have.
6      Q.     I'm sorry, 48.  So you have
7  Kelly Exhibit 48 in front of you?
8      A.     Yes, I do.
9      Q.     This is the memo that Kelly
10  wrote to file on December 22, 2000, that was
11  not made part of the official file?
12          MS. McENROE:  Just for
13      clarification you said "to file," are you
14      introducing a document?
15          MR. THRONSON:  Right.  It says,
16      "attached is a copy of the memorandum for
17      the file, this memorandum is being
18      written separately since I did not think
19      it should be made part of the official
20      file."
21          THE WITNESS:  That's what it
22      says, yes.
23  BY MR. THRONSON:
24      Q.     So I guess my first question is,

1  what is the difference between the official
2  file and the file?
3      A.     I'm not aware of what
4  Mr. Kelly's intentions were in terms of two
5  separate files.
6          My understanding is that this is
7  a document -- he wanted to document the
8  discussion that he had with McCorkle, but it
9  wouldn't be made part of the official file in
10  terms of, I guess, potentially giving a copy of
11  the file.
12          Sometimes applicants require a
13  copy of the file or if someone else required it
14  in the normal course of credentialing.  If they
15  needed something it wouldn't be part of the
16  official file.
17      Q.     Where was it stored at ECFMG;
18  where was it filed?
19      A.     I believe it was filed in a
20  paper file with Dr. Akoda's file.
21      Q.     I would have thought that would
22  be the official file.  I guess are we talking
23  about multiple files pertaining to Akoda?
24          MS. McENROE:  Objection to form.

1          THE WITNESS:  The
2      investigations -- I think what this may
3      be referring to now -- and I'm sorry to
4      clarify this.  When we start an
5      investigation on an individual, generally
6      because there's a lot of information that
7      we are collecting, we used to collect the
8      information in, and in a manila like
9      this.  That would be kept, in a sense,
10      with the official paper file of the
11      individual, in the office of the person
12      who was reviewing it.
13          So if Mr. Kelly was working on a
14      case, he would have the official file and
15      then there would probably be a working
16      file for the investigation that would
17      contain information relevant to the
18      investigation that was ongoing.  So that
19      would be my assumption on what Mr. Kelly
20      is indicating here.
21          Ultimately those files are
22      marked with the individual's name and so
23      they are stored -- if the person has a
24      paper file they're stored probably inside

1      the paper file, which is where I assume
2      this was.
3  BY MR. THRONSON:
4      Q.     Is there a separate
5  investigative file today which pertains to
6  Igberase or Akoda?
7      A.     No.
8      Q.     Who decides whether something is
9  made part of the official file or separate
10  investigative file?
11      A.     Currently today, the case
12  managers will creat ane electronic file they
13  can work out of when they receive information,
14  but all that information becomes part of the
15  individual's official electronic file.
16          So if I'm working on a case and
17  I have email correspondence and I have
18  correspondence with the school, I keep it in an
19  electronic file that is shared in that
20  investigative department.  Then once that case
21  is concluded all of that information is put
22  into the official electronic file.  So it's
23  just like a working file that ultimately ends
24  up in the official file.

40 (Pages 154 - 157)

KARA CORRADO

1    Q.    So today everything that was in
2 the working file's correspondence to this case
3 should be in the hard files?
4    A.    Yes.
5    Q.    So in the third paragraph Kelly
6 goes through some evidence, he talks about his
7 belief that Akoda and Igberase are one and the
8 same, right?
9    A.    Yes.
10    Q.    And states that Akoda admitted
11 in writing that he used Igberase's social
12 security number, correct?
13    A.    Yes.
14    Q.    And he also admitted that in
15 person when he visited the office on September
16 27, 2000, I think we went over that?
17    A.    Yes.  Yes, sorry.
18    Q.    He said, I don't think this is
19 enough for the committee.  Is that also ECFMG's
20 position at this time, that the evidence as of
21 December 22, 2000, that was reasonably
22 available to ECFMG, was not enough to refer the
23 case to the credentials committee?
24    A.    Yes.  I did not review it at

1 this time, but I reviewed the file again when
2 the federal authorities reached out to us, and
3 I came to the same conclusion that there was
4 not sufficient evidence based to make the
5 allegation of irregular behavior based on the
6 file and the information that ECFMG had.
7          We ultimately connected the two
8 together, once Igberase stipulated that he
9 provided that name to us and represented
10 himself as such to us.
11    Q.    Kelly also mentions that he
12 wrote to Igberase and Akoda responded, correct?
13    A.    Yes.
14    Q.    Would it have been inappropriate
15 for Kelly to refer this case to the credentials
16 committee at this point?
17          MS. McENROE:  Objection to form.
18          THE WITNESS:  I wouldn't use the
19    term inappropriate, but I would use the
20    term it didn't have sufficient evidence
21    for an allegation to be made to refer to
22    the committee because it was a suspicion
23    at the time, and we had not specific
24    evidence other than him saying, I'm not

1    that person, that was consistent with
2    what we understood he told the residency
3    program, that it was his cousin, and he
4    appeared in the office with the passport
5    and the driver's license to demonstrate
6    he was a separate person.
7 BY MR. THRONSON:
8    Q.    He says at the end of the
9 letter, we need to brainstorm on this one --
10 this memo, sorry, we need to brainstorm on this
11 one, maybe Shirley Williams can sit in.  Who is
12 Shirley Williams?
13    A.    Shirley Williams was an employee
14 at ECFMG.  She has retired.  In her latest
15 roles for quite sometime, at least 10 years,
16 she was a board secretary to FAIMER which is
17 the Foundation for the Advancement of
18 International Medical Education and Research
19 which is ECFMG's foundation.  Prior to that,
20 sometime earlier in her career, and she worked
21 at ECFMG for I think over 30 years, she worked
22 on, I think, the cases that were related to
23 restricting records of irregular behavior if
24 they came from the  USMLE program.  She may

1 have been an admin support for the board or for
2 the committee as well, but I'm not sure what
3 her specific role was.
4    Q.    Did ECFMG do anything to
5 determine whether the passport and
6 international driving certified that Akoda
7 provided to ECFMG in 2000 were genuine or
8 authentic?
9    A.    Other than their appearance of
10 being genuine or authentic, no.
11    Q.    What would it have done to
12 investigate -- what did it do to investigate
13 the appear -- when you say appearance were
14 there particular things that ECFMG assessed
15 from the document?
16    A.    My assumption would be that if
17 Dr. Akoda came in with a photocopy of a
18 passport and tried to pass it as an original
19 that would have triggered a question about it.
20          So I don't know that we were
21 looking at any specific details on the
22 passport, but if somebody hands you a passport
23 it looked and felt to Mr. Kelly to be an actual
24 passport and driver's license.

41 (Pages 158 - 161)

KARA CORRADO

Page 162

1    Q.    Does ECFMG inquire of any other
2  organizations today or entities to confirm the
3  validity of government issued documents such as
4  passports?
5    A.    Today as part of our
6  identification process and our work with Notary
7  Cam, we may reach out to a third party to help
8  validate passports and we use software to help
9  validate.
10        Not that it's -- the software
11  doesn't determine if it's a validly issued
12  passport, it determines whether the features of
13  the passport appear as they should.  So the
14  system is picking up if there could be any
15  potential abnormalities in the passport.
16    Q.    If you could turn briefly to
17  Exhibit 42.  This is a photocopy of the
18  passport that Akoda provided to ECFMG in
19  September of 2000?
20    A.    Yes.
21    Q.    You note that it lists the place
22  of birth as Lagos?
23    A.    Yes, that's what it says.
24    Q.    If you look at Exhibit 23, turn

Page 163

1  to page two of that.  This is an application
2  that Akoda submitted to ECFMG?
3    A.    Yes.
4    Q.    What's the place of birth listed
5  there?
6    A.    Benin City, Nigeria.
7    Q.    Those are different cities?
8    A.    Yes, that's my understanding.
9    Q.    If you turn to Exhibit 15, it's
10  an application that Igberase submitted to
11  ECFMG?
12    A.    Yes.
13    Q.    Dated, I guess, he signed it
14  10/18/2000 on the last page?
15    A.    Yes.
16    Q.    Turn to the third page of the
17  application Bates 3467?
18    A.    Yes.
19    Q.    I'm sorry.  The first page of it
20  3465.  What's the place of birth that Igberase
21  listed on his application?
22    A.    Lagos, Nigeria.
23    Q.    Obviously this is an exercise
24  that Mr. Kelly could have done at the time?

Page 164

1        MS. McENROE:  Objection to form.
2        THE WITNESS:  You mean look at
3    the birth places on the applications?
4  BY MR. THRONSON:
5    Q.    Yeah, could compare the birth
6  place listed on the passport to the birth
7  places listed on these two applications?
8    A.    Sure he could have done that.
9  He may have done that, but we wouldn't have the
10  information to know which is the correct city
11  of birth.
12    Q.    Could Mr. Kelly also have
13  compared, or anyone at ECFMG compared the
14  photograph on the passport with the photographs
15  accompanying the applications of Akoda,
16  Igberase?
17        MS. McENROE:  Objection to form;
18    calls for speculation.
19        THE WITNESS:  You could have.
20  It's not sort of presented to you right
21  there when you pull up the record, so you
22  have to look through the file to see a
23  photograph of the individual.
24    Q.    Did ECFMG ever take any action

Page 165

1  to verify that the passport was authentic?
2        MS. McENROE:  Objection to form.
3        THE WITNESS:  No.
4  BY MR. THRONSON:
5    Q.    Does it take the position today
6  that the passport that Akoda provided is
7  authentic?
8    A.    No, based on the information
9  that was stipulated to in the plea bargain that
10  he said, I presented a false passport to ECFMG.
11    Q.    Did it ever compare the
12  photographs accompanying the application of
13  Igberase and Akoda to assess if, to determine
14  if there was additional evidence in those
15  photographs to suggest that these two
16  applicants may be, in fact, the same
17  individual?
18    A.    It's likely that we would have
19  looked at the photographs but the photographs
20  would have been years apart, and we are not
21  necessarily experts in determining whether this
22  photograph is a photograph of that same person
23  so the could have looked similar.  The person
24  who is reviewing the file might say, yeah they

42 (Pages 162 - 165)

KARA CORRADO

Page 166

1 look similar, but there would be no way for us
2 to know if it was the same person in those
3 photographs.
4     Q.     If they were similar, that would
5 be additional evidence that could substantiate
6 the allegation of irregular behavior?
7          MS. McENROE:  Objection to form.
8          THE WITNESS:  It could.
9 BY MR. THRONSON:
10    Q.     So you don't know for sure one
11 way or the other if that was ever done?
12    A.     My assumption would be that it
13 was.  When we were investigating, we would look
14 at the files together.
15    Q.     We were looking earlier at
16 Exhibit 46.  So it appears in this memo that
17 Kelly is referring -- I'm sorry.
18          MR. VETTORI:  48.
19          MR. THRONSON:  48.  While you're
20 at it could you also pull out 36.
21 BY MR. THRONSON:
22    Q.     So let's first look at 36.  The
23 Kelly deposition.  This is a letter from
24 Mr. Kelly to Akoda dated August 22, 2000?

Page 167

1     A.     Yes.
2     Q.     This is what would be referred
3 to as a charging letter from ECFMG?
4     A.     Yes.
5     Q.     Is it ECFMG's position that --
6     A.     Sorry, can I just clarify that.
7 This is a letter -- I just want to take a
8 minute to read it.  Yes.  Sorry, yes.
9     Q.     Yes, it is a --
10    A.     Yes, it could be considered a
11 charge letter.
12    Q.     And in the letter -- take all
13 the time that you'd like to read it -- but
14 Kelly adverts to an allegation that Akoda may
15 have recently, previously applied to ECFMG
16 using the Igberase and Charles names, correct?
17    A.     Yes.
18    Q.     And he also refers to Akoda's
19 representation -- strike that.  On the second
20 page Kelly wrote, ECFMG requires an explanation
21 from you in writing within 15 days of your
22 receipt of this letter.  Did ECFMG ever receive
23 that explanation?
24    A.     ECFMG received the explanation

Page 168

1 in person from Dr. Akoda to Mr. Kelly, and I
2 believe maybe an email.  I'm just not sure of
3 the time frame and I don't think it was within
4 the 15 days.
5     Q.     Then he wrote, the information
6 in your ECFMG file together with your
7 explanation and any other material you submit
8 will be referred to the ECFMG committee on
9 medical education credentials for review at its
10 next scheduled meeting.
11          Did I read that correctly?
12    A.     Yes.
13    Q.     So at the time of writing this
14 letter Kelly apparently believed there was
15 sufficient information to refer Akoda's file to
16 the credentialing committee for review?
17    A.     Yes.  Well, he's writing to him
18 telling him about the allegation and asking him
19 for an explanation and then saying it would be
20 referred to the committee, yes.
21    Q.     When was it first referred to
22 the committee after Kelly sent this letter in
23 August 22, 2000?
24    A.     So it wasn't referred to the

Page 169

1 committee, because on the basis of the
2 information that Kelly subsequently gathered
3 from Akoda the determination was made that
4 there wasn't enough evidence to refer it to the
5 committee because Akoda had indicated that he
6 was a cousin of Igberase's; he brought the
7 passport in and the driver's license in which
8 the ECFMG believed to be authentic, which
9 demonstrated to us at the time that he was a
10 separate person from Igberase; and that we had
11 no other evidence to refer the matter to the
12 committee.
13          So if he had within 15 days
14 said, yes, I did that, he would have admitted
15 to doing it, and then we would have referred
16 it.  We had nothing except for his explanation
17 that was consistent with what he had provided
18 previously to the residency program,
19 supplemented by the in-office visit with what
20 appeared to be the authentic identification
21 documents.  So it wasn't referred to the
22 committee at that time.
23    Q.     When was Akoda's case first
24 referred to the committee aft -- I guess when

43 (Pages 166 - 169)

1 was the first time after 2000 it was referred
2 to the committee?
3      A.      So technically it was not
4 referred to the committee for a decision as an
5 information item, because when we received a
6 copy of the plea bargain in which Igberase
7 stipulated the fact that he had presented the
8 false passport to ECFMG and that he had used
9 this alias, John Nosa Akoda, that was
10 sufficient evidence then to demonstrate that
11 this person is the same person; and this person
12 Igberase already had his certificate
13 permanently revoked.
14           So it wasn't necessary to charge
15 Akoda, which essentially would have been
16 Igberase, with irregular behavior and go
17 through the committee process, because he had
18 already been permanently barred and had his
19 certificate permanently revoked.
20           So as we normally do when we
21 have consolidations of records, we would
22 consolidate the file, that is to say these
23 files belong together, because they belong to
24 the same person, and any annotation of

1 irregular behavior that was already there would
2 carry over to Akoda. So essentially we
3 consolidated the file, revoked the certificate
4 because it was -- it should not have been
5 obtained. He was not eligible to obtain that
6 certificate because he had admitted to being
7 Igberase at that point. The update was
8 provided to the committee to let them know that
9 this action had been taken by ECFMG to revoke
10 the other certificate.
11      Q.      As I recall that was an update
12 in approximately November 2016?
13      A.      Yes.
14      Q.      So before that update in
15 November of 2016, did the members of the
16 credentials committee have any awareness of the
17 Akoda matter?
18      A.      No.
19      Q.      Did the board of trustees have
20 any awareness the Akoda matter?
21      A.      No.
22      Q.      Who knew about it?
23           MS. McENROE:  Objection to form.
24           THE WITNESS:  I knew about it,

1 counsel knew about it.  Our senior vice
2 president knew about it.  The specialty
3 investigations committee would have known
4 about it, because they -- I would have
5 asked them to collect the documents or
6 the file, and that's part of their job
7 when we get subpoenas, so they would have
8 been aware of the request from law
9 enforcement in the case; and potentially
10 some of the executive team, if the senior
11 vice president shared that with the
12 executive team.
13 BY MR. THRONSON:
14      Q.      How about before federal law
15 enforcement got involved, 2015, 2106 as we
16 discussed, who knew at least about Mr. Kelly's
17 suspicion or the possibility as he expressed in
18 his December 2000 memorandum, not withstanding
19 Akoda's provision of the passport, his belief
20 that Akoda and Igberase might be the same
21 person, who knew about that from 2000 until the
22 feds got involved in 2015?
23           MS. McENROE:  Objection to form.
24           THE WITNESS:  I would say Steve

1 Seeling, who was the vice president of
2 operations would have known about that.
3           Then Virginia Kesting would have
4 been doing the administrative work on the
5 file, so by that token she may have known
6 about that conversation or been in the
7 room when they were having the
8 conversation.  Other than that, I'm not
9 aware of anyone else who worked on
10 irregular behavior files that would have
11 known about it.  Unless he did brainstorm
12 with Shirley Williams he might have done
13 that, but the file doesn't reflect that.
14 BY MR. THRONSON:
15      Q.      So it appears in the December
16 2000 memorandum that Kelly wrote to Seeling,
17 he's contemplating some additional
18 investigation or some additional action that
19 ECFMG might take to gather additional evidence
20 to rule out the possibility that Akoda is
21 Igberase; is that fair to say?
22           MS. McENROE:  Objection to form.
23           THE WITNESS:  I believe that
24 Mr. Kelly was trying to think about what

44 (Pages 170 - 173)

KARA CORRADO

1 other way we could get evidence to
2 substantiate that these two people were
3 the same person.
4 BY MR. THRONSON:
5 Q. What other efforts after this
6 point, but before the federal investigation,
7 did ECFMG undertake in that regard; that is to
8 determine whether Igberase and Akoda are the
9 same person?
10 A. I am not aware of any other
11 steps that we took in this investigation other
12 than it was an open investigation, such that if
13 we had gotten any future evidence that we could
14 still go back and make the allegation of
15 irregular behavior.
16 Q. So as a representative of ECFMG,
17 you're saying that ECFMG is not aware of any
18 additional steps that it took between December
19 of 2000 and 2015, 2016 timeframe to determine
20 whether Akoda and Igberase were the same
21 person?
22 MS. McENROE: Objection to form.
23 THE WITNESS: Yes, that's my
24 understanding. We had -- the file was

1 restricted internally, it was flagged, so
2 that if anything came in it would be
3 passed along to the case managers; and I
4 believe around the 2006 time frame when
5 Akoda applied for residency, we sent his
6 -- he had submitted letters of
7 recommendation, and we sent those for
8 verification. That was a process we
9 followed in investigations of irregular
10 behavior generally as a matter of course
11 that if there was some ongoing
12 investigation, even if it was unrelated
13 to that, we'd send the letters for
14 verification, so we did do that.
15 BY MR. THRONSON:
16 Q. There was no response to those
17 letters, the request for verification of
18 letters of recommendation, correct?
19 A. Correct.
20 Q. That tended to increase the
21 index of suspicions as to whether those letters
22 are genuine?
23 A. Generally, not. It's difficult
24 for us sometimes to get a response from

1 physicians who are working and busy, so it
2 doesn't necessarily indicate that they are not
3 authentic. Usually when they are not
4 authentic, that's when the office will reach
5 out to us to say they are not authentic.
6 Q. Did ECFMG call those physicians
7 who allegedly wrote the letters of
8 recommendations?
9 A. I'm not aware that the file
10 documents that. I don't know, it's possible.
11 Q. You haven't seen it documented
12 anywhere?
13 A. No.
14 Q. Why not do any additional
15 investigation from 2015 as to whether Akoda and
16 Igberase are the same person?
17 MS. McENROE: Objection to form.
18 BY MR. THRONSON:
19 Q. From ECFMG's perspective, why
20 not do that?
21 A. So the reason that we would not
22 have done it would be, at the time that we
23 didn't have any other way or venue; or had not
24 contemplated a way or venue that we could

1 substantiate this evidence or allegation
2 independently.
3 So like I said, if something
4 came in, the file was still restricted and it
5 would get referred to the group that was
6 reviewing the investigation, but there was no
7 other abnormality in the file to the extent
8 about -- there was no other accusation to say
9 that his credentials were not authentic or that
10 he didn't pass the exams, none of that was
11 alleged. So the only allegation that we had
12 would have been related to our policy about not
13 being able to retake exams that he had already
14 taken.
15 Q. So in essence, ECFMG didn't do
16 anything else to verify that Akoda and
17 Igberase, whether Akoda and Igberase were the
18 same person -- strike that.
19 In essence, ECFMG didn't do
20 anything else between 2000 and 2015 to
21 determine whether Akoda and Igberase were the
22 same person because from ECFMG's perspective
23 there was nothing else that could have been
24 done?

45 (Pages 174 - 177)

KARA CORRADO

Page 178

1          MS. McENROE:  Objection to form.
2          THE WITNESS:  So I think from
3     our perspective, there was nothing that
4     we had that would substantiate that they
5     were the same person, and we did not have
6     a way to prove it otherwise.
7  BY MR. THRONSON:
8     Q.     So ECFMG's view is that there's
9  nothing in the file up till this point, 2000,
10 either in Igberase's file or Akoda's, that
11 would substantiate that Akoda and Igberase are
12 the same person?
13         I'm talking about through
14 December of 2000, there's nothing ECFMG had
15 that would substantiate that conclusion; is
16 that what you're saying?
17         MS. McENROE:  Objection to form.
18         THE WITNESS:  What I'm saying
19    is, while the staff who were reviewing it
20    had a suspicion that he was the same
21    person, they didn't have sufficient
22    evidence to allege irregular behavior,
23    and in weighing that in the
24    investigation, in terms of all the

Page 179

1     processes that he would go through, there
2     wasn't at that time anything else to do.
3          For example, he got into a
4     residency training program who presumably
5     checked his information and vetted him in
6     a way that they were supposed to.  He got
7     licensed by the licensing board, so the
8     licensing board would have done its due
9     diligence on him.  He would have gone
10    through all of those steps.
11         Like I said, there was no
12    accusation that he was not -- that his
13    diploma was not authentic, or that he had
14    not received his medical education.  So
15    at the time, considering all of those
16    factors, there was not enough to charge
17    him with irregular behavior.
18 BY MR. THRONSON:
19    Q.     He got into the residency
20 program in part by information that ECFMG
21 supplied regarding his ECFMG certification,
22 correct?
23         MS. McENROE:  Objection to form.
24         THE WITNESS:  So he got into the

Page 180

1     residency program presumably on his
2     merits, his own merits, and we would have
3     verified it, as we do with all residency
4     programs.
5          What his certification status
6     was, which was true at the time that we
7     verified it to them, he had a certificate
8     that was issued to him in that name, and
9     it was valid.
10 BY MR. THRONSON:
11    Q.     That was information that -- the
12 certification information that ECFMG supplied,
13 that was one of the pieces of information that
14 Howard University had before when determining
15 whether to accept this person into its
16 residency program, correct?
17         MS. McENROE:  Objection to form.
18         THE WITNESS:  Yes.  They would
19    have received a status report through the
20    regular residency application process.
21 BY MR. THRONSON:
22    Q.     The same is true for the
23 Maryland Board of Physicians, in determining
24 whether to grant Igberase, Akoda a license to

Page 181

1  practice medicine it would have had before it
2  information supplied by ECFMG regarding his
3  ECFMG certification status?
4     A.     Yes.
5     Q.     The same is true for Prince
6  George's County Hospital?
7     A.     Yes.  I believe they requested a
8  verification of his certification status.
9     Q.     Did ECFMG ever tell anyone
10 outside of the organization of the suspicion of
11 at least one of it's staff members, perhaps
12 more, that Igberase and Akoda were the same
13 person, before the law enforcement
14 investigation?
15    A.     Before the law enforcement, not
16 that I'm aware of.  I don't think it would have
17 necessarily been appropriate for them to do
18 that if we didn't feel that we had evidence
19 that they were the same person, because we
20 could potentially be providing information that
21 was not substantiated that may have an impact
22 on a physician's career or on residency
23 program.
24    Q.     Did ECFMG ever notify anyone

46 (Pages 178 - 181)

1 outside of the organization, before the law
2 enforcement investigation, that Jersey Shore
3 had dismissed him from their residency program?
4    A.    Not that I'm aware of.
5    Q.    Why not?
6    A.    Why didn't we tell anyone about
7 a potential suspicion?
8    Q.    Why didn't you tell anyone that
9 he had been dismissed from his residency
10 program among other things, providing --
11    A.    That kind of information, that's
12 not within our scope or responsibility to
13 report loss of residency, I assume.  Well,
14 maybe not loss, but residents are dismissed
15 from their programs for a variety of reasons.
16 Unless they are a J-1, which he was not, we
17 don't get that kind of information or keep it
18 on a regular basis, and it's not in our scope
19 to report that to other organizations.
20    Q.    If this same set of facts came
21 before ECFMG today, came before your
22 department, would you handle it the same way?
23         MS. McENROE:  Objection to form;
24    calls for speculation.

1         THE WITNESS:  If it was exactly
2    identical as this, I would have come to
3    the same conclusion.  In fact, I did in
4    2016; when I looked at it again, I didn't
5    see that we had sufficient evidence to
6    make the allegation of irregular
7    behavior.
8 BY MR. THRONSON:
9    Q.    So essentially ECFMG's position
10 is if this all happened again today, we would
11 handle it exactly the same way as we did from
12 2015?
13         MS. McENROE:  Objection to form.
14         THE WITNESS:  I don't think we
15    could say that only because the processes
16    are not the same; the application process
17    is not the same; the technology that we
18    use is not the same.
19         So from that -- in that respect
20    I couldn't say we a hundred percent do
21    every single thing the same way, but we
22    come to the same conclusion that there
23    wasn't sufficient evidence.  We have
24    cases where there's not sufficient

1    evidence to make allegations on a number
2    of things.
3 BY MR. THRONSON:
4    Q.    At the time when this case
5 happened in 2000, I guess when the question of
6 whether Akoda and Igberase were the same person
7 was being considered, were there other
8 allegations of irregular behavior in which
9 ECFMG affirmatively sought out evidence beyond
10 what would normally have been in an applicant's
11 file?
12         Essentially were there
13 circumstances under which it sought out
14 evidence or made phone calls, interviews of a
15 type that it didn't do here?
16         MS. McENROE:  Objection to form.
17         THE WITNESS:  Not that I'm aware
18    of.  Our investigations would follow the
19    same process or procedure; but each
20    investigation is different, each case is
21    different, so who we would reach out to
22    might change or how we reach out to them
23    might change, but the general guiding
24    principles of the investigation would be

1    the same.
2 BY MR. THRONSON:
3    Q.    Today -- well, we are talking
4 about the draft, the policy and procedure on --
5    A.    Yes.
6    Q.    Exhibit 2 earlier, and if I
7 understand your testimony correctly the
8 substance -- that policy was essentially what
9 ECFMG followed between 2000 and the time that
10 this policy was drafted in 2015, even if it
11 wasn't written down before 2015?
12    A.    So just to clarify, this policy
13 would have been the published policy on
14 irregular behavior, and these would have been
15 the procedures that --
16    Q.    Right.  Sorry.
17    A.    That's okay -- that we followed,
18 and the organization followed prior to 2015
19 when these were documented.
20    Q.    You mentioned a restricted file
21 earlier, and I wanted to get more clarification
22 on that.  Were both Igberase's and Akoda's
23 files restricted before the federal
24 investigation began?

47 (Pages 182 - 185)

KARA CORRADO

Page 186

1    A.    Yes.
2    Q.    When was Akoda's first
3  restricted?
4    A.    Akoda's file would have been
5  first restricted when McCorkle reached out to
6  us with the allegation.  So it would be at the
7  start of an investigation.  Part of our
8  procedure, in the system, is to restrict the
9  file when we conduct an investigation.
10        Igberase's would be restricted
11  because there had been an investigation and a
12  finding of irregular behavior.  So his would
13  stay restricted.
14    Q.    What's the purpose of
15  restricting a file?
16    A.    The restriction is really an
17  operational procedure.  Such that it prevents
18  other staff in the organization from maybe
19  update information, processing applications,
20  any of that without first contacting the
21  investigative team that are doing the review of
22  it.  So it serves that purpose.  When we start
23  an investigation just to make sure if there's
24  any contact from that individual so we know

Page 187

1  about it, the people that are investigating
2  know about it.
3        It will also serve to -- it will
4  also serve as a flag in our certification
5  verification service that when a request comes
6  in electronically the file is restricted, they
7  have to be reviewed manually.  The system will
8  not automatically generate a report.
9        We do that so we can put the
10  annotation of irregular behavior onto the
11  report before it goes out to the recipient for
12  those individuals we have already determined
13  having irregular behavior.
14        There's a number of other
15  reasons that we use it internally just to keep
16  people from processing, but it's an operational
17  internal process, the restrictions.
18    Q.    Okay.  Let's take a look at
19  Exhibit 52, please, of the Kelly deposition.
20  Can you identify this document?
21    A.    This is a printout of one of our
22  internal programs.
23    Q.    It's the applicant status
24  program?

Page 188

1    A.    Yes.
2    Q.    At the bottom there's a date of
3  10/15/2014.  Do you know the significance of
4  that?
5    A.    That is likely when we first
6  produced a copy of this for the Maryland Board,
7  when they requested information.
8    Q.    So there's a date on the
9  left-hand column, left most column, does that
10  refer to the date an application was first
11  restricted?
12    A.    So what this column is is a date
13  that a restriction was put on the account.
14    Q.    Then there's a reason column,
15  and it appears that in 2000 it was restricted
16  because -- well, before we get there.  Sorry.
17  So column two is the reason for the
18  restriction?
19    A.    Yes.
20    Q.    The next column is the level of
21  restriction?
22    A.    Yes.
23    Q.    I see 3s and 1, 4.  What do
24  those numbers mean?

Page 189

1    A.    The numbers refer to the type of
2  access that would be granted when that level of
3  restriction is placed on the account.
4        So for example, a level 1
5  restriction is a read only.  So anybody who
6  would normally have access to the file would
7  still have access to the file and can see all
8  the information, they can't make any changes to
9  it.
10        It goes up from there.  Level 2
11  is, if you have a staff role you can't see
12  anything, but the manager -- you can read only,
13  but the manager would have rights if the
14  manager of the team wanted to do something.
15        It goes up from there.  So level
16  3 and 4 will prevent internal staff, other than
17  the investigation team, from being able to
18  process anything in the record and from seeing
19  most of the information in the record.
20    Q.    Why would you want to prevent
21  staff from seeing the information in the
22  record?
23    A.    If we're doing an investigation,
24  we don't want staff inadvertently providing

48 (Pages 186 - 189)

KARA CORRADO

1 information to the individual, in certain
2 cases, not in all cases, that might jeopardize
3 the investigation. Like if the person called
4 into our call center, if the account is
5 restricted, the phone representative will
6 contact special investigations who will either
7 take the call or advise them on how they can
8 respond appropriately.
9     Q.    Did Igberase, Akoda -- strike
10 that. Did Akoda have any in-person contact
11 with anyone working at ECFMG other than, I
12 suppose, the occasions on which he took the
13 examination and his meeting with William Kelly
14 on September 27, 2000?
15    A.    None that I'm aware of. His
16 file only documents the office visit that he
17 made with Mr. Kelly.
18    Q.    Did you have any awareness of
19 any telephone contact that he had with anyone
20 at ECFMG at any time?
21    A.    I'm not aware to answer the
22 question specifically, because we don't
23 catalogue every telephone call in our system.
24 So it's entirely possible that he called to ask

1 questions about getting registered or anything
2 like that.
3     Q.    Did he know anyone personally at
4 ECFMG either as a friend or relative?
5          MS. McENROE: Objection to form.
6          THE WITNESS: Not that I'm aware
7 of.
8 BY MR. THRONSON:
9     Q.    Did he have any business
10 relationship with ECFMG or anyone at ECFMG?
11    A.    Not that I'm aware of.
12    Q.    Turning back to Exhibit 52, then
13 there's a column called release dates. What
14 does that refer to?
15    A.    That is when the restriction is
16 released. So the restrictions -- just to
17 clarify something about the restrictions and
18 the reasons and the levels. There's not
19 necessarily a specific meaning to which reason
20 the person chose or the level between 3 and 4
21 in terms of what the restriction is.
22          So it's not as if the reasons,
23 invested the investigation into a different
24 area. It's just a feature that's built into

1 the system.
2          The release date is when we
3 release the restriction to either put a new
4 restriction on or to provide some service that
5 we've determined can be provided, despite the
6 fact the person is restricted.
7          So you would generally see that
8 the dates coincide with when it was
9 re-released, and then it would be re-restricted
10 again would generally be related to some
11 service or some point of contact.
12    Q.    Then there's a column -- well, I
13 guess, who would make the determination as to
14 whether a restriction should be released; who
15 made that determination over this time period?
16    A.    Bill Kelly would have made the
17 determination as the individual who had
18 oversight for the areas of investigation. I
19 mean would have directed, you know, Ms. Kesting
20 to go ahead and process whatever request had
21 come in at that time.
22    Q.    Do the comments refer to the
23 reason that an applicant is restricted?
24    A.    Generally, yes. That's a note

1 that our team will put in there that other
2 staff can see, and that is also sometimes a
3 note for ourselves so we know which
4 investigation it is.
5     Q.    So it appears in essence if you
6 compare the restrictions date the release date,
7 the application was restricted continuously
8 from August 17, 2000, through September 13,
9 2011, right?
10    A.    Yes.
11    Q.    Do you know why it was
12 repeatedly released and then re-restricted?
13    A.    Yes. Initially it looks like
14 Shirley had restricted the file then when
15 Mr. Kelly, when the case, I think, was bumped
16 up to him, he re-restricted it, put his own
17 notation in. So he would have released her
18 restriction, and put his own on there, because
19 the case would go to him.
20          Then these releases by Virginia
21 Kesting, these, I believe, coincide with
22 requests from organizations or from Dr. Akoda
23 to verify his ECFMG certification status.
24    Q.    Was the information that's

49 (Pages 190 - 193)

KARA CORRADO

1 reflected in the comments, that ECFMG's belief
2 that the applicant may have a previous ID
3 Number ever communicated to anyone outside
4 organization -- sorry, let me ask that
5 differently.
6           Was any of the information that
7 ECFMG provided annotated to reflect that
8 comment of the information in the comments in
9 Exhibit 52?
10          MS. McENROE:  Objection to form.
11          THE WITNESS:  No, because that
12     wouldn't have been consistent with our
13     process or procedure.  A determination of
14     irregular behavior hadn't been made, so
15     we wouldn't put an annotation on the
16     report.
17 BY MR. THRONSON:
18     Q.     What's the difference between a
19 level 3 and a level 4?
20     A.     I'm not sure, but it's
21 negligible.  It has to do with, like I said,
22 operationally who has access to view the
23 information in the system.
24          So it has to do with roles.

1 Three and 4, there are only certain people who
2 have the role 4.  If you have a role in the
3 system, based on the level you can still see
4 the information if you have that level.  So it
5 would have just been a smaller group of people
6 who had access to see; but in terms of the
7 prevention of services it would have been the
8 same between the two restrictions.
9     Q.     It looks like the application --
10 the applicant file of Akoda was released on
11 September 13, 2011, and then it was not
12 re-restricted after that time.  Is that your
13 understanding?
14     A.     I believe it was re-restricted
15 at some point after that time.
16     Q.     Okay.  Well, at least -- so the
17 date of this document, Kelly Exhibit --
18     A.     Yes, 2014.
19     Q.     Right, so at least between 2011
20 and 2014 it was not re-restricted?
21     A.     Yes.  That's what it appears on
22 here, right.
23     Q.     Do you know why?
24     A.     I don't.  I don't know why.

1 It's possible that they forgot to re-restrict
2 it just in terms of the process.
3     Q.     Between December of 2000 and the
4 commencement of the federal criminal
5 investigation, 2015, 2016, did ECFMG receive
6 any additional information that would tend to
7 dispel the suspicion that Akoda and Igberase
8 are not the same person?
9     A.     Before?  You said, before?
10     Q.     Yeah, between December 2000 and
11 2015, did ECFMG receive any exculpatory
12 information regarding Akoda or Igberase as to
13 this question whether they were the same
14 person?
15          MS. McENROE:  Objection to form.
16          THE WITNESS:  So the information
17     that we had during that time period, was
18     the same information that we had when we
19     made the review initially in 2000.
20 BY MR. THRONSON:
21     Q.     Okay.  What other information
22 would ECFMG reasonably have expected to come in
23 between 2000 and 2015 regarding this question
24 of whether Igberase and Akoda were the same

1 person?
2          MS. McENROE:  Objection to form.
3          THE WITNESS:  What other
4     information would we have expected?
5          MR. THRONSON:  Yeah.
6          THE WITNESS:  I don't know.  It
7     could be anything.
8 BY MR. THRONSON:
9     Q.     Is there any organization that
10 is better situated than ECFMG to determine
11 whether the applicant, who identified himself
12 as Igberase Charles, and the applicant who
13 identified himself as Akoda, were in fact the
14 same applicant?
15          MS. McENROE:  Objection to form.
16          THE WITNESS:  So the
17     verification of the identity of someone
18     who is showing up at the residency
19     program would be on the residency program
20     or the hospital, would be my assumption.
21          If they are hiring the
22     individual, they're not relying on ECFMG
23     to say that we identified -- that they
24     don't have to do their own review of who

50 (Pages 194 - 197)

KARA CORRADO

Page 198

1    that person; is that what you're asking?
2 BY MR. THRONSON:
3    Q.    Who is better situated?  Are you
4 saying the hospitals are in a better
5 position to answer -- strike that.
6          Were the hospitals in this case
7 in a better position to answer whether Igberase
8 and Akoda are the same person; are you
9 contending they were?
10         MS. McENROE:  Objection to form.
11         THE WITNESS:  What I'm saying
12 is, each organization has its own process
13 to verify identities or certification of
14 identities.
15         We would not -- those processes
16 would differ.  We are not hiring the
17 person so whatever the requirements would
18 be for identity, for VISA status, for any
19 of those things, it wouldn't be
20 appropriate for us to check those because
21 it's not within our scope of the
22 certification program.
23         For example, other than the J-1
24 visas we sponsor, we don't confirm to

Page 199

1 residency programs that those individuals
2 have the appropriate visas to be in the
3 United States.
4          It is the responsibility of the
5 individual and then the organization
6 that's hiring them to do that kind of
7 identification and review of the
8 individual.
9          I don't know that one is in a
10 better position than the other.  It's
11 just that each organization has different
12 processes and ways to certify identities
13 and records.
14 BY MR. THRONSON:
15    Q.    So is it your contention, that
16 it would have been inappropriate for ECFMG to
17 do further investigation into this question of
18 identity, to determine whether Igberase and
19 Akoda are the same person?
20         MS. McENROE:  Objection to form.
21         MR. THRONSON:  Are you saying
22 that would have been inappropriate?
23         MS. McENROE:  Objection to form.
24         THE WITNESS:  I wouldn't use the

Page 200

1 word inappropriate, but it wasn't part of
2 our process to go further or to see if
3 some -- I don't know what other
4 organization would have gone to at the
5 time to see if the two people were the
6 same; if that's what you are asking.
7 BY MR. THRONSON:
8    Q.    Could you have consulted with
9 someone from the Nigeria Consulate to determine
10 if the passport was authentic from their
11 perspective?
12         MS. McENROE:  Objection to form.
13         THE WITNESS:  I suppose we could
14 have, but that wasn't part of our process
15 at the time.
16 BY MR. THRONSON:
17    Q.    Could you have called any of the
18 references that Akoda gave to determine whether
19 the letters of recommendation were authentic?
20         MS. McENROE:  Objection to form.
21         THE WITNESS:  We could have, and
22 we may have.  I just don't have any
23 documentation in the file that we made
24 the phone calls.

Page 201

1 BY MR. THRONSON:
2    Q.    Obviously you could have
3 compared the photos between the two
4 applications to see if they resemble each
5 other?
6         MS. McENROE:  Objection to form.
7         THE WITNESS:  Yes, we could.  We
8 did when we reviewed the file.  We would
9 have looked at both photographs when we
10 reviewed the file in 2000 in the
11 investigation, but again we would -- the
12 photos could be -- they could look like
13 each other, but I look like my cousin,
14 right, so they are not definitive in and
15 of themselves to say they are the same
16 person.
17         We are not expert in being able
18 to do that between two photographs.
19 BY MR. THRONSON:
20    Q.    So you're saying that, ECFMG did
21 look through both applications; the
22 applications that Igberase Charles submitted
23 and the applications that Akoda submitted?
24    A.    In 2000 --

51 (Pages 198 - 201)

KARA CORRADO

1    Q.    Yes.
2    A.    Yes, that would have been done.
3 We would have looked at both files.
4    Q.    Is that inquiry documented
5 anywhere; that step, did anyone write down, hey
6 I that; this is the result?
7    A.    No.  It would have been in the
8 hard copy file if it was written down.
9    Q.    Have you seen any document like
10 that, that would reflect that those two
11 documents were compared?
12    A.    No.
13    Q.    That would have been normal
14 procedure at the time to do that, to compare
15 two files if there was an allegation that ECFMG
16 received that two applicants might, in fact, be
17 the same person?
18    A.    Oh, yes.
19    Q.    What else would have been
20 standard procedure at that time for ECFMG to do
21 if it were presented with such an allegation?
22    A.    You mean the investigation
23 steps; like what would we do to investigate if
24 somebody potentially was using a different

1 identity?
2    Q.    Right.
3    A.    We would look at the information
4 that was given to us; so where did the
5 information come from, request follow-up
6 information if possible from that source
7 depending on who the source was.  Then we would
8 review both files to see if there was any
9 evidence between the two files that they were
10 the same person; which is what happened with
11 Igberase two or three times.
12       We did that same review and you
13 saw the information crossed, and then we wrote
14 to him, and he responded, yes, I did it; that
15 was me.  So those are generally the steps we
16 would go through.
17       In Akoda's case, we did that.
18 And he said, it's not me; and it's my cousin --
19 right -- and I'm in the office, and here's my
20 passport that's demonstrating I'm a different
21 person; and, yes, I used his social security
22 number but it's not me.
23       So we follow the same steps in
24 the process.

1    Q.    Did you ever reach out to the
2 alleged cousin after Akoda came into the
3 office?
4    A.    You mean Igberase?
5    Q.    Yeah, and describe the
6 situation, say we have this allegation, Akoda
7 showed up, he says you're his cousin, and used
8 his social security number, is that true?
9    A.    I don't believe that we did
10 that.
11    Q.    Why not?
12    A.    I don't know.
13    Q.    So essentially if I understand
14 it, ECFMG's reason for believing that it
15 compared the two files of Akoda and Igberase at
16 the time in 2000, is that that was the standard
17 practice?
18    A.    In investigations like that,
19 yes.
20    Q.    But there is no direct evidence
21 that you are aware of that that was, in fact,
22 performed?
23       MS. McENROE:  Objection to form.
24       THE WITNESS:  Correct.

1       MS. McENROE:  We've been going
2 for about an hour an 45 minutes.
3       MR. THRONSON:  Okay.  Yes, let's
4 take a break.
5       - - -
6       (Whereupon there was a brief
7 recess in the proceeding.)
8       - - -
9       MR. THRONSON:  Back on.
10 BY MR. THRONSON:
11    Q.    Ms. Corrado, I'd like you to
12 take a look at Exhibit 47 from the Kelly
13 deposition, please.
14    A.    Yes.  Okay.  I have it.
15    Q.    Have you seen this document
16 before?
17    A.    Yes.
18    Q.    What is it?
19    A.    This is a summary of information
20 on Igberase Akoda prepared by ECFMG staff.
21    Q.    When was that prepared?
22    A.    This would have been prepared in
23 2014, I believe when the Maryland Board reached
24 out to us for information.

52 (Pages 202 - 205)

KARA CORRADO

1    Q.      Who prepared it?

2    A.      I believe Virginia Kesting would

3 have prepared it.

4    Q.      Did you review it around that

5 time, 2014?

6    A.      I did not review it in 2014.

7    Q.      When did you first see it?

8    A.      I reviewed it in 2015 or 2016,

9 sometimes in that timeframe when the federal

10 authorities reached out to us.

11    Q.      Why was it generated?

12    A.      It was generated to assist with

13 the review of the files at that time.

14    Q.      The review of the files that

15 ECFMG was going to provide to Maryland Board of

16 Physicians?

17    A.      Yes.

18    Q.      Was the issue of whether

19 Igberase and Akoda were the same person, was

20 that issue part of the Maryland Board of

21 Physicians investigation?

22        MS. McENROE:  Object to form.

23        THE WITNESS:  I don't recall if

24    they said in their message to us what

1    they were investigating.

2 BY MR. THRONSON:

3    Q.      Did ECFMG provide any

4 information to the Maryland Board of Physicians

5 -- strike that.  Did ECFMG provide files of

6 both Igberase, also know as Charles, and John

7 Nosa Akoda to the Maryland Board of Physicians?

8    A.      Yes.  Whatever they requested we

9 would have provided to them.

10    Q.      Did ECFMG provide this document

11 to the Maryland Board of Physicians, Exhibit

12 47?

13    A.      I don't think so.

14    Q.      Did ECFMG provide this document

15 to anyone outside of the organization?

16    A.      Other than in production for

17 this matter, not that I'm aware of.  It's an

18 internal document.

19    Q.      Who was it provided to at ECFMG?

20 After staff, you believe Ms. Kesting for

21 example generated...

22    A.      Yes, I believe that Ms. Kesting

23 generated this when the request came in so that

24 Mr. Kelly could review the matter again and

1 what the information was as it pertained to

2 both individuals since the request came in from

3 Maryland for the file.

4        That's generally part of our

5 procedure.  If we get a request from someone we

6 take a look at the file to see what information

7 we have about it; if we flagged it in any way.

8    Q.      Did ECFMG communicate to

9 Maryland Board of Physicians it's suspicion

10 that Igberase and Akoda might be the same

11 person?

12    A.      I don't think so.

13    Q.      Is ECFMG responsibile in any way

14 for confirming that an applicant is who she or

15 he say he or she is?

16        MS. McENROE:  Objection to form.

17        THE WITNESS:  So as part of the

18    application process, we have an identity

19    section for the individual to certify to

20    their identity, which the process has

21    evolved over time.

22 BY MR. THRONSON:

23    Q.      What has it evolved into?

24    A.      The process is, as I was

1 describing earlier, we originally had a notary

2 or a medical school official certify to the

3 identity and to the information on the

4 application.

5        That has since evolved where we

6 are still using a notary, but we have a notary

7 vendor and we require the individual to submit

8 a copy of their passport to us as part of the

9 their initial application to ECFMG.

10    Q.      You've reviewed the applications

11 that Igberase and Charles submitted to the

12 ECFMG?

13    A.      Yes.

14    Q.      You've seen photographs that

15 were submitted in connection with those

16 applications?

17    A.      Yes.

18    Q.      And obviously you've also seen

19 the photographs that were submitted to

20 accompany Akoda's applications, correct?

21    A.      Yes.

22    Q.      Is it ECFMG's position that any

23 of those photographs are photographs of --

24 strike that.

53 (Pages 206 - 209)

KARA CORRADO

1      Does ECFMG deny that the
2  photographs of Igberase and Charles are
3  photographs of the same person who identified
4  himself as Akoda?
5          MS. McENROE:  Objection to form.
6          THE WITNESS:  Based on the
7      information that we have now, that he
8      admitted to using the John Nosa Akoda
9      name, our understanding is that he
10     submitted both of those applications and
11     submitted both of those photographs.
12         We don't have any way of
13     verifying whether it's him in the
14     photographs, but he submitted them on
15     behalf of those applications.
16  BY MR. THRONSON:
17     Q.     Did the individual who
18  identified himself as Igberase and Charles take
19  all of the ECFMG examinations that he
20  represented that he sat for?
21         MS. McENROE:  Objection to form.
22         THE WITNESS:  So yes, he was
23     certified.  So the individual took the
24     exams and passed them.

1  BY MR. THRONSON:
2      Q.     You're certain also that Akoda
3  took the exams and passed them too; the
4  organization is certain that, for example, no
5  one else took the exams in Akoda's place?
6          MS. McENROE:  Objection to form.
7          THE WITNESS:  Based on the
8      information that we had, that the test
9      center would verify identity, we would
10     rely on that.  So if there was no report
11     that he wasn't the person that showed up
12     at the test center...
13  BY MR. THRONSON:
14     Q.     There was a reference in one of
15  the documents to a ECFMG pink card, what is
16  that?
17     A.     A pink card?
18     Q.     A pink card.  There was an
19  irregularity report -- we can dig it out --
20  that Igberase didn't have a pink card so he
21  supplied a Maryland driver's license instead?
22     A.     Yes.  So when the exams were
23  given in paper and pencil, they were given only
24  two times a year, when ECFMG registered an

1  individual you would get a permit, and that
2  permit which was pink in some years, had a
3  photograph of you on it and your information.
4          It was part of the application
5  that you filled out when you sent to ECFMG, you
6  were required to fill that out.  So once you
7  were registered, the permit would be mailed to
8  you so that you would take it to the center and
9  appear at the center with the permit; and it
10  was a very strictly followed rule that you had
11  to have the permit issued by ECFMG in order to
12  take the exam.
13         However, because it's high
14  stakes and it's only two times a year, if the
15  person lost the permit or forgot the permit
16  they would generally, the staff at the test
17  center, would call into ECFMG offices and
18  advise the person didn't have it, they would
19  check to see if the person was registered, and
20  then they would tell them they could use a
21  driver's license or another form of
22  identification to admit the individual to the
23  center.
24     Q.     In 1996 and 1997 when Akoda took

1  ECFMG exams, did ECFMG operate the test centers
2  where you took the exams?
3      A.     I would have to look at the
4  exams he took.  Specifically I can't remember
5  if they were USMLE examinations or if they were
6  the FMGMF examinations.
7      Q.     USMLE was step 3 at that time,
8  no?
9      A.     So USMLE had at the time 3
10  exams, which was a basic science Step 1;
11  clinical knowledge which is Step 2; and
12  clinical skills -- I'm sorry, they didn't have
13  clinical skills at that time.
14         They had Step 3 which was an
15  exam that you would take in order to fulfil one
16  of the requirements for licensure in the state.
17  Generally you would take it after you got into
18  a residency program.
19     Q.     Were there any exams in '96 and
20  '97 that ECFMG administered?
21     A.     I don't belive so.  I'm not sure
22  of the exact date when we stopped administering
23  the FMGFM exam.
24     Q.     Who was responsible for

54 (Pages 210 - 213)

Page 214

1 verifying a test taker's identity at the test
2 centers in '96 and '97?
3      A.      The individuals at the test
4 center.
5      Q.      Were those under contract with
6 ECFMG?
7      A.      That I don't know.  I'm not sure
8 how the process worked for those test centers.
9      Q.      How many employees does ECFMG
10 have?
11      A.      Roughly I think a thousand,
12 somewhere around there.  A good portion of
13 them, more than half are part-time standardized
14 patients that work in the Step 2 CF clinical
15 skills examination.
16      Q.      Do you know how many employees
17 ECFMG has apart from those part-time patients?
18      A.      So full-time ECFMG employees?
19      Q.      Right.
20      A.      I believe around, I believe,
21 it's around 200; somewhere around 200, 300.
22      Q.      Is it fair to say that fees
23 submitted by applicants to take ECFMG
24 examinations or other fees associated with

Page 215

1 their applications is a source of revenue for
2 ECFMG?
3          MS. McENROE:  Objection to form.
4          THE WITNESS:  Yes.
5 BY MR. THRONSON:
6      Q.      That also applies -- does ECFMG
7 charge a fee to residency programs to submit an
8 ECFMG report to the residency program for an
9 applicant?
10      A.      No, there is no fee for the
11 report to be sent to the residency program.
12      Q.      There are fees for ERAS tokens?
13      A.      Yes.
14      Q.      Do you charge fees to medical
15 boards to obtain information?
16      A.      There's a fee, yes, whether it's
17 the board requesting it or the physician
18 requesting it, there's a fee for the report to
19 go to the board.
20      Q.      Do you have any reason -- does
21 ECFMG have any reason to disagree that the
22 Maryland Board of Physicians, Howard
23 University, and Prince George's University
24 Hospital relied, at least in part, on

Page 216

1 information supplied by ECFMG when making it's
2 decisions regarding the medical practice of
3 Akoda?
4          MS. McENROE:  Objection to form.
5          THE WITNESS:  So, yes, those
6      organizations would have, I assume, taken
7      into account the status report we sent to
8      them as part of making their decision.
9 BY MR. THRONSON:
10      Q.      So you don't disagree with my
11 statement?  You agree they would have taken
12 that information into account?
13          MS. McENROE:  Objection to form.
14          THE WITNESS:  Yes.
15 BY MR. THRONSON:
16      Q.      I want to ask about this
17 document here.
18              - - -
19          (Whereupon the document was
20      marked, for identification purposes, as
21      Exhibit Number CORRADO-5.)
22              - - -
23      Q.      Ms. Corrado, I'm handing you the
24 original that corresponds to a copy that's

Page 217

1 being marked as Exhibit 5 to the deposition,
2 and I'm wondering if you can identify it for
3 me?
4          I'll represent to you that it
5 was a document that we reviewed in looking at
6 the -- the material in the original file of
7 Akoda before we took the deposition today.
8          Can you identify what it is?
9      A.      Yes.  This appears to be a copy
10 of the University of Benin Diploma for
11 Dr. Akoda; a copy of the certificate of full
12 registration for Dr. Akoda; a correspondence
13 from ECFMG from 1996 to Dr. Akoda; and a
14 statement of account which was generated by
15 ECFMG for Dr. Akoda; and it looks like another
16 copy of the certificate of full registration
17 for Dr. Akoda.
18      Q.      Is the first page of Exhibit 5,
19 the original, is that the original diploma from
20 the institution?
21      A.      No, I don't believe so.
22      Q.      Did ECFMG ever receive an
23 original copy of the diploma from the
24 University of Benin that was allegedly issued

55 (Pages 214 - 217)

KARA CORRADO

1 to Akoda?
2          MS. McENROE:  Objection to form.
3          THE WITNESS:  No.  We required
4     applicants to send us copies.  In fact,
5     we discourage them from sending us the
6     originals so that they wouldn't lose them
7     in the mail.  We would ask for two
8     photocopies of the degree.
9 BY MR. THRONSON:
10    Q.    Is that the copy that ECFMG
11 claims it sent to the University of Benin to be
12 verified?
13          MS. McENROE:  Objection to form.
14          THE WITNESS:  I would have to
15     look at the diploma that we sent, that
16     was attached to the verification.
17          I believe he applied.  He had an
18     application prior to this, so there may
19     have been another copy of the same
20     document that he submitted at that time
21     that could have been the one that was
22     sent.  If it wasn't, this would have been
23     the one that was sent.  I assume that if
24     there's two copies of them, they're the

1     same.
2 BY MR. THRONSON:
3     Q.    So at no point in evaluating
4 Akoda's credentials and qualifications did
5 ECFMG receive an original or a certified copy
6 of his diploma or registration certificate,
7 correct?
8          MS. McENROE:  Objection to form.
9          THE WITNESS:  That's correct.
10 BY MR. THRONSON:
11    Q.    Is that the practice today?
12    A.    To require a photocopy of a
13 diploma?
14    Q.    Yes, to not work with original
15 or certified copies?
16    A.    Yes.  So we require a photocopy
17 because we will source verify it with the
18 institution.  We don't require it to be a
19 certified copy because we're going to go to the
20 primary source and verify it.
21    Q.    Has ECFMG ever confronted a
22 situation in which an institution mistakenly
23 source verified a diploma as being genuine?
24          MS. McENROE:  Objection to form.

1          THE WITNESS:  Not that I can
2     recall.
3 BY MR. THRONSON:
4     Q.    I know you have not reviewed the
5 deposition of Bill Kelly, but I wanted to just
6 ask you about a couple aspects of his
7 testimony.
8          There is a transcript in the
9 front of that binder, Ms. McEnroe.
10          MS. McENROE:  What page are you
11     reading from?
12          MR. THRONSON:  The first is page
13     157 starting on line 21.
14 BY MR. THRONSON:
15    Q.    So this is the deposition of
16 Mr. Kelly on August 20, 2019.  Mr. Vettori
17 asked him, and it continues on to 158, so if he
18 had been referred to the --
19          MS. McENROE:  Hold on.  Which
20     line?
21          MR. THRONSON:  21.
22 BY MR. THRONSON:
23    Q.    "So if he had been referred to
24 the credentials committee would he have been

1 charged with irregular behavior for using
2 someone else's social security number?
3          MS. McENROE:  Objection to form.
4          ANSWER:  The irregular behavior
5 he would have been charged with would be
6 providing false information to ECFMG on an
7 application among other things?"
8          So do you agree with that
9 testimony?
10    A.    Yes, it would have been
11 providing false information to an application
12 to ECFMG among other things.
13    Q.    You believe that would have
14 occurred had he been referred based on the
15 information that ECFMG had in 2000?
16          MS. McENROE:  Objection to form.
17          THE WITNESS:  I'm sorry.  Are
18     you asking me if that would have been the
19     charge if we sent a letter to him?
20          MR. THRONSON:  Right.  I guess.
21     I'll tell you what, I'll withdraw that
22     question.
23 BY MR. THRONSON:
24    Q.    Are you aware if the document in

56 (Pages 218 - 221)

KARA CORRADO

Page 222

1 Exhibit 5 --
2          MS. McENROE:  Can I put the
3     transcript away?
4          MR. THRONSON:  Sorry.  There's
5     one more page I'll ask about first.  Page
6     185 to 86.
7          MS. McENROE:  185 to 186?
8          MR. THRONSON:  Yes.
9 BY MR. THRONSON:
10    Q.     On line 15 Mr. Vettori asked --
11         MR. VETTORI:  I think it's
12    Mr. Ceryes.
13 BY MR. THRONSON:
14    Q.     Ceryes, okay.
15         "And would you agree that ECFMG
16 plays an important role in public health to
17 verifying that physicians who come here to
18 practice medicine have the necessary and
19 requisite credentials to do so?
20         MS. McENROE:  Objection to form.
21         ANSWER:  That is part of it, to
22 protect the American public."
23         Do you agree with that statement
24 by Mr. Kelly?

Page 223

1     A.     Yes.
2     Q.     Then Mr. Ceryes continued:
3     "In another role that ECFMG
4 plays is detecting or endeavoring to detect
5 when an individual lacks the -- well, when an
6 individual has not been honest in presenting
7 their identity or credentials.
8         Objection to form.
9         MR. CERYES:  Fair."
10        Then Mr. Kelly responded "yes."
11 Do you agree with Mr. Kelly's statement?
12    A.     I'm not sure that I would agree
13 with this statement as it's phrased.
14         ECFMG's review of applicants
15 that attempt to subvert it's policies and
16 procedures is an important role that it has,
17 but specifically that we have a role to detect
18 whether an individual is or isn't that
19 individual isn't part of our certification
20 program.
21         So our certificate program is
22 about eligibility for the exams and for
23 credentials.  I don't know that I would agree
24 with it as it's phrased this way.

Page 224

1     Q.     So if you were to break down the
2 question Mr. Ceryes asked on 185, 22 to 186, 1;
3 which part of that do you not agree with?  Are
4 there certain words you can X out of it to make
5 it a statement you agree with?
6         MS. McENROE:  Objection to form.
7     The witness just answered that question.
8         THE WITNESS:  I wouldn't be --
9     it's not a sentence I would pull words
10    out of.  I would rephrase it as I just
11    mentioned.
12 BY MR. THRONSON:
13    Q.     If you took out the words
14 "identity or" is it a sentence -- a question
15 you would agree with?
16         MS. McENROE:  Objection to form;
17    asked and answered.
18         THE WITNESS:  I don't think in
19    the way that it's presented here, I would
20    agree with it even with the word taken
21    out.  I would rephrase it.
22 BY MR. THRONSON:
23    Q.     Akoda's certification was
24 revoked in approximately December of 2016?

Page 225

1     A.     Yes.
2     Q.     Then his case was brought before
3 the USMLE committee on individual review?
4     A.     I believe so, yes.
5     Q.     That committee made a
6 determination on his case; is that right?
7     A.     That is my understanding.
8     Q.     What's your understanding of the
9 decision that they made?
10    A.     I don't know what their decision
11 was.  I'd have to look at the letter that they
12 would have sent to him and what the specifics
13 of their findings were.
14    Q.     What's the relationship between
15 that committee and the creds committee of
16 ECFMG?
17    A.     The committee for individualized
18 review is a committee that is comprised of
19 members representing the USMLE program.
20         The USMLE program which is
21 owned, and the exams are administered by, the
22 National Board of Medical Examiners and the
23 Federation of State Medical Boards.  So they
24 have representatives from their board of

57 (Pages 222 - 225)

KARA CORRADO

Page 226

1 trustees, that are on that committee to review
2 allegations of irregular behavior; and they
3 also have members of ECFMG's board on that
4 committee as well to review irregular behavior.
5          If there is an irregular
6 behavior that relates to USMLE policies or
7 something in their jurisdiction, they will take
8 an independent action to review and make a
9 determination of irregular behavior.
10          So if we have information and
11 the allegation is related to an USMLE
12 application, then we will refer the case to
13 them for their review as well, so they can
14 determine whether they want to take an action
15 against the individual from their perspective
16 in accordance with their policies and
17 procedures.
18     Q.     Is the committee on individual
19 review and the ECFMG creds committee, are those
20 separate and independent --
21     A.     Yes.
22     Q.     So it's not like one has a
23 superior position over the other?
24     A.     That's correct.  They are

Page 227

1 separate, independent for each of the
2 organizations.
3          MR. THRONSON:  I'd like to mark
4     exhibit 6.
5              - - -
6          (Whereupon the document was
7     marked, for identification purposes, as
8     Exhibit Number CORRADO-6.)
9              - - -
10 BY MR. THRONSON:
11     Q.     I'm handing you what the court
12 reporter marked as exhibit 6.  This is a
13 document produced to us, that is a decision
14 summary from the committee for individualized
15 review; does that seem right to you?
16     A.     Yes.
17     Q.     Then on the last page of the
18 exhibit, Bates 9158, it appears that the
19 committee made a finding of irregular behavior,
20 minimum 5 year bar, with state medical board
21 sponsorship required, told beginning
22 12/12/2017.  What does that mean?
23     A.     That means that they have found
24 irregular behavior, so he will have a notation

Page 228

1 on his USMLE transcript that he engaged in
2 irregular behavior.  He is barred for a minimum
3 of 5 years from taking USMLE examinations, and
4 after five years they will only consider
5 letting him take the exam if a state medical
6 board sponsors him or if they request on his
7 behalf that they want him to take the
8 examination, and that time period starts as of
9 12/12/2017.
10     Q.     This individual has had his
11 ECFMG certificate permanently revoked, right?
12     A.     That's correct.
13     Q.     And he's barred from future
14 ECFMG examinations?
15     A.     That's correct.
16     Q.     And he would need to apply -- he
17 would need to obtain an ECFMG certificate in
18 order to practice medicine again in the United
19 States, correct?
20     A.     That is correct.  Unless he went
21 to a U.S. medical school over again.  If he
22 enrolled in a U.S. medical school, then he
23 wouldn't need an ECFMG certificate; but he
24 would have the bar or whatever restraints that

Page 229

1 the USLME put on him.
2     Q.     Do you believe that's the
3 possibility they're taking into account in
4 imposing a 5 year bar, as opposed to a lifetime
5 bar?
6          MS. McENROE:  Objection to form.
7          THE WITNESS:  I can't speak for
8     the committee for individualized review
9     on what their sanctions are, whether they
10     follow the same sanctions for the same
11     types of case.  So I don't know what
12     their reasoning was in giving him that
13     particular bar.
14 BY MR. THRONSON:
15     Q.     So from your standpoint Akoda
16 can't practice medicine in the United States
17 unless he attends and graduates from a US
18 medical school, correct?
19     A.     Correct, and he gets the state
20 board sponsorship to take the exams again, and
21 the USMLE allows him to take the exams again.
22 So it's not -- this is not a fait accompli.  He
23 would only be able to petition them with these
24 things and they could still tell him no.

58 (Pages 226 - 229)

KARA CORRADO

Page 230

1    Q.    Igberase and Akoda both needed
2 ECFMG certification in order to be able to --
3 strike that. The individual identifying
4 himself as Igberase and Akoda needed ECFMG
5 certification to be able to practice medicine
6 in the United States, correct?
7            MS. McENROE: Objection to form.
8            THE WITNESS: I would say he
9      needed a license to practice medicine,
10     but as an international medical graduate,
11     part of the requirements for him to get
12     into a training program, which would be a
13     requirement for licensure and to take
14     Step 3, was that he have a valid ECFMG
15     certificate.
16 BY MR. THRONSON:
17   Q.    So an ECFMG certificate was a
18 necessary condition for him to be able to
19 practice medicine in --
20           MS. McENROE: Objection to form.
21           THE WITNESS: Generally
22     speaking, unless the state board made an
23     exception for him. The state boards, the
24     regulatory authorities, have autonomy and

Page 231

1      the authority to issue a license to
2      whomever they want to; it's within their
3      regulation.
4            So generally speaking, yes, an
5      international medical graduate would have
6      to have an ECFMG certificate; but that's
7      not to say a licensing board couldn't
8      take its own decision to license him
9      without it.
10 BY MR. THRONSON:
11   Q.    Could Akoda have gotten into the
12 residency program at Howard without ECFMG
13 certification?
14           MS. McENROE: Objection to form.
15           THE WITNESS: If it's an ACGME
16     accredited program, then ECFMG
17     certification would have been required.
18     I don't know if they would make
19     exceptions to that or not, but
20     certification is required for entrance
21     into an ACGME accredited programs; and
22     assuming Howard is an ACGME accredited
23     program.
24 BY MR. THRONSON:

Page 232

1    Q.    To obtain a medical license to
2 practice in Maryland ECFMG certification was
3 required, correct?
4    A.    That's my understanding. As
5 part of their requirements, they needed
6 verification of his ECFMG certificate status.
7    Q.    Is ECFMG aware of any route
8 other than through ECFMG certification that
9 Akoda would have been able to obtain a place in
10 the residency program at Howard?
11           MS. McENROE: Objection to form.
12           THE WITNESS: Only if Howard
13     waived that requirement for him.
14 BY MR. THRONSON:
15   Q.    Is that typically done?
16   A.    I don't think so; but if you're
17 asking me if there's any other possible way,
18 that would be the only way I can think of for
19 him.
20   Q.    You're not contending that
21 Howard regularly waives that requirement?
22   A.    No.
23   Q.    Or did back then?
24   A.    No.

Page 233

1    Q.    Are you aware of any other
2 routes, beside through ECFMG certification, by
3 which Akoda could have obtained a license to
4 practice medicine in Maryland?
5    A.    Other than the exception process
6 by the licensing board, that I sort of just
7 described, no.
8    Q.    Do you know if Maryland has that
9 exception process?
10   A.    I do not know.
11   Q.    Have you ever spoken with Akoda?
12   A.    No, I don't believe so.
13   Q.    If ECFMG had believed that the
14 letters of recommendation it received in
15 connection with Akoda's eras*** application,
16 residency application, were not authentic,
17 would ECFMG have had an obligation to inform
18 the residency programs to which he was a part
19 of?
20           MS. McENROE: Objection to form.
21           THE WITNESS: I wouldn't say
22     that we would have an obligation, but if
23     we determine that letters of
24     recommendation were fraudulent, we would

59 (Pages 230 - 233)

KARA CORRADO

1    report it to the residency programs.  It
2    would be reported to residency programs
3    in general through our official
4    notification process.
5  BY MR. THRONSON:
6       Q.    Is the public entitled to have
7  confidence that ECFMG is acting in a reasonably
8  prudent fashion in assessing and verifying the
9  credentials and qualifications of international
10  medical graduates?
11        MS. McENROE:  Objection to form;
12    calls for legal conclusion.
13        THE WITNESS:  I wouldn't say
14    that they're entitled.  I would say that
15    they may have an expectation that ECFMG
16    or any organization is following its
17    procedures appropriately et cetera.
18  BY MR. THRONSON:
19       Q.    Should they have that
20  confidence?
21        MR. McENROE:  Objection to form.
22        THE WITNESS:  I mean, yes, I
23    think they could have that expectation.
24  BY MR. THRONSON:

1       Q.    Should they have that
2  expectation from 1996 to the present?
3        MS. McENROE:  Objection to form.
4        THE WITNESS:  You mean in
5    general, yeah, I don't think their
6    expectations have changed.
7  BY MR. THRONSON:
8       Q.    We've taken a few breaks during
9  the deposition did you confer with Counsel
10  about the substance of the deposition during
11  those breaks?
12        MS. McENROE:  Objection to form.
13    I instruct you not to answer to the
14    extent it divulge privileged information,
15    but generally speaking you can give a
16    sort of general answer.
17        THE WITNESS:  Yes, and no, in
18    that we talked about other things that
19    were not related to this deposition.
20  BY MR. THRONSON:
21       Q.    So you talked about other things
22  not related to the deposition.  Did you also
23  talk about the testimony that you have given in
24  the deposition?

1        MS. McENROE:  Objection, same
2    objection.
3        THE WITNESS:  I did raise a
4    question about the way that I phrased an
5    answer earlier, and whether I could
6    clarify that.  So it was related to a
7    question you had asked in the beginning
8    about, does the American public have the
9    right to have a physician that has been
10    appropriately vetted, something like
11    that.
12        In looking back, I thought I
13    would not have agreed with the words "the
14    right," but that they would have an
15    expectation.  I asked Counsel about
16    whether I could clarify that.
17  BY MR. THRONSON:
18       Q.    Anything else?
19       A.    No.
20       Q.    Did any procedural safeguards at
21  ECFMG fail in the process of certifying Akoda,
22  and then it's subsequent history with Akoda?
23        MS. McENROE:  Objection to form.
24        THE WITNESS:  No, I don't belive

1    so.
2  BY MR. THRONSON:
3       Q.    Have you seen any evidence in
4  the file that specifically indicates that the
5  verified -- the document that purports to be an
6  authentication of the diploma from Benin was
7  sent by Benin?
8       A.    I don't recall if there is an
9  envelope in the file or not.  So to that
10  extent, I don't know other than to say, whether
11  there is an envelope present or not, the
12  process, at the time and still is, if it's not
13  returned directly from the school we do not
14  accept it.
15       Q.    Okay.  Pass the witness.
16        MS. McENROE:  Can we take a
17    quick break so I can go over my notes?
18        MR. THRONSON:  Sure.
19          - - -
20        (Whereupon there was a brief
21    recess in the proceeding.)
22          - - -
23        MS. McENROE:  Back on.
24          - - -

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

KARA CORRADO

Page 238

1     (Whereupon the document was
2  marked, for identification purposes, as
3  Exhibit Number CORRADO-7.)
4       - - -
5     CROSS-EXAMINATION
6       - - -
7 BY MS. McENROE:
8     Q.    Ms. Corrado, my name is Elisa
9 McEnroe.  We are acquainted; that's correct?
10    A.    Yes.
11    Q.    I am counsel for ECFMG, you
12 understand that?
13    A.    Yes.
14    Q.    I have a couple of very narrow
15 questions, I'm hoping, about some testimony
16 that you gave today.  Do you understand that?
17    A.    Yes.
18    Q.    I'm handing you what I've marked
19 as CORRADO-7.  Do you recognize that letter?
20    A.    Yes.
21    Q.    What is it?
22    A.    This is a letter from Dr. Akoda
23 responding to Mr. Kelly's August 22, 2000,
24 letter in which he alleged that he was using

Page 239

1 Igberase's information.
2     Q.    You were asked some questions a
3 little bit earlier today regarding whether and
4 when Dr. Akoda responded to the letter from
5 Mr. Kelly dated August 22, 2000.  Do you recall
6 that?
7     A.    Yes.
8     Q.    Does this refresh your
9 recollection for that testimony?
10    A.    Yes.  So I think I said that he
11 had not responded within the requisite 15 days,
12 but looking at the receipt date on this it
13 appears that he did.
14    Q.    There was some discussion
15 earlier today about what it means to have a
16 finding of irregular behavior for false
17 information on an application.  Do you remember
18 generally that kind of testimony?
19    A.    Yes.
20    Q.    Can you clarify what could
21 constitute irregular behavior for false
22 information on an application to ECFMG?
23    A.    False information on an
24 application for ECFMG would, could consist of

Page 240

1 indicating to ECFMG that you had not taken an
2 exam previously when you had taken an exam.
3     It could also refer to your
4 medical school attendance and graduation if
5 when we sourced verified your diploma, it was
6 inauthentic.
7     Q.    Could an inaccurate address be
8 considered by ECFMG to be false information
9 that would constitute irregular behavior?
10    A.    That is not something that we
11 would consider irregular behavior.
12    Q.    What about the location of the
13 birth?
14    A.    No.
15    Q.    What about social security
16 number?
17    A.    No.
18    Q.    Is it possible for there to be
19 information that is false on an ECFMG
20 application that might constitute a violation
21 of law, but would not constitute a basis for
22 irregular behavior for ECFMG?
23    A.    Yes, that's possible.
24    Q.    Does ECFMG make allegations of

Page 241

1 irregular behavior for applicants' violations
2 of law just because they are a violation of
3 law?  So for example, rape or murder?
4     A.    No.  The criminal activities of
5 applicants are not within our jurisdiction for
6 irregular behavior.
7     Q.    There was a lot of discussion
8 today about ECFMG certification, correct?
9     A.    Yes.
10    Q.    What does an ECFMG certificate
11 signify?
12    A.    An ECFMG certificate signifies,
13 that the individual has met minimum
14 requirements which includes passing medical
15 licensing examinations, as well as meeting our
16 credentialing requirements.
17     It signifies to an ACGME
18 accredited residency program that the
19 individual has met those requirements for
20 admission to GME, and it is part of the
21 requirements for eligibility for Step 3 and for
22 licensure.
23    Q.    Does an ECFMG certificate
24 signify certification of an applicant's

61 (Pages 238 - 241)

KARA CORRADO

1 identity to a recipient of a ECFMG status
2 report indicating there's an ECFMG certificate
3 in place?
4     A.     No.
5     Q.     What do you mean by that?
6     A.     So when we certify the status of
7 an ECFMG certificate, we are not certifying to
8 the organization necessarily the identity of
9 the individual, but that an individual with
10 that name and date of birth has met the
11 requirements for certification and what the
12 validity is of their certificate and where they
13 went to medical school.
14     Q.     Is ECFMG certifying to the
15 recipients of the ECFMG certification
16 information that the applicant's social
17 security number is accurate?
18     A.     No.
19     Q.     Is ECFMG certifying to the
20 recipient of the ECFMG certification that the
21 location of the birth is accurate?
22     A.     No.
23     Q.     Is ECFMG certifying to the
24 recipients of the ECFMG certification status

1 that the clinical clerkships are accurate as
2 represented on ECFMG's application?
3     A.     No.
4     Q.     Is ECFMG's expectations that
5 individuals from the public rely on ECFMG
6 certification for any purpose?
7     A.     I'm sorry, can you say that
8 again?
9     Q.     Yes.  Is it ECFMG's expectation
10 that individuals from the public rely on ECFMG
11 status for any purpose?
12     A.     No.
13     Q.     So can an individual off the
14 street or who is examining the credentials of a
15 potential physician they want to go see, are
16 they entitled to contact ECFMG and ask about a
17 physician's certification status?
18     A.     No.  We would not release a
19 physician's certification status or a status
20 report to a member of the public.
21     Q.     Would ECFMG release a
22 certification status report to the individual
23 himself?
24     A.     No.

1     Q.     To whom would ECFMG release a
2 ECFMG certification status report?
3     A.     To residency programs, licensing
4 boards, and other organizations that are
5 employing the physician as a physician.
6     Q.     Like hospitals and --
7     A.     Hospitals, right, CVOs that are
8 working on behalf of the hospitals.
9     Q.     Is it ECFMG's expectation that
10 recipients of ECFMG certification get
11 additional credentials before laying hands on
12 patients independently?  I can restate that if
13 you need?
14     A.     Yes, can you.
15     Q.     Yes.  So what I'm asking is
16 there was a lot of questions today about
17 whether an ECFMG certificate was necessary for
18 an applicant to do other things, for example go
19 to a residency program.  Do you remember that
20 testimony?
21     A.     Yes.
22     Q.     Is it ECFMG's understanding that
23 an ECFMG certificate is sufficient for an
24 applicant to treat patients?

1     A.     No, it's not sufficient.
2     Q.     What else would be required
3 under ECFMG's expectations?
4     A.     So ECFMG certification is one of
5 the initial steps in the process for an
6 international medical graduate to ultimately
7 practice medicine in the United States.
8          While ECFMG certification may be
9 required for entrance into residency or for
10 licensure, it is not the only requirement that
11 the residency programs and the licensing boards
12 have in order to admit those individuals to
13 their programs or to license those individuals.
14     Q.     So to make sure I understand.
15 After an applicant gets an ECFMG certificate,
16 do they take any other board exams?
17     A.     Yes.  They need to take USMLE
18 Step 3.  So essentially they have to become
19 ECFMG certified which is the beginning of the
20 process, taking the examinations required for
21 certification; have their credentials source
22 verified; go through the residency application
23 process; get accepted to a residency program,
24 and meet whatever requirements the residency

62 (Pages 242 - 245)

KARA CORRADO

1 programs has.
2          They can then apply for Step 3,
3 and they have to be certified and meet the
4 eligibility requirements that the Federation of
5 State Medical Boards has for Step 3; complete
6 their training and then again meet whatever
7 requirements the licensing board would have on
8 them to be licensed.
9     Q.     You said "complete training,"
10 what do you mean by that?
11    A.     Graduate medical education
12 training is generally a requirement for
13 licensure in all states.
14    Q.     So in other words, would that be
15 like a residency program, for example?
16    A.     Yes, residency program.
17    Q.     So are the applicants coming
18 through ECFMG still in graduate medical
19 education as they are proceeding forward; do
20 they still have more education requirements
21 after they get an ECFMG certificate?
22    A.     To be licensed in the U.S., yes.
23    Q.     Is -- FSMB, that's an acronym
24 you just used, what does that stand for?

1     A.     That is the Federation of State
2 Medical Boards.
3     Q.     Is that an entity under ECFMG's
4 control?
5     A.     No.
6     Q.     That's a separate entity?
7     A.     Yes.
8     Q.     Thank you.
9          I have no further questions of
10 this witness.
11         MR. THRONSON:  Just a few follow
12     ups to echo a few of Counsel's questions.
13              - - -
14         REDIRECT EXAMINATION
15              - - -
16 BY MR. THRONSON:
17    Q.     Is it ECFMG's expectation that
18 state medical boards will rely on reports of
19 ECFMG certification status for any purpose?
20    A.     Yes.  To meet the requirement
21 that the board might have for ECFMG
22 certification.
23    Q.     Is it ECFMG's expectation that
24 residency programs, such as that at Howard

1 University, would rely on ECFMG status for any
2 purpose?
3     A.     Yes, to demarcate that that
4 person met the certification so they could
5 enter GME among whatever other requirements the
6 program had.
7     Q.     It is ECFMG's expectation that
8 hospitals that are considering whether to grant
9 clinical privileges to a physician rely on
10 ECFMG status for any purpose?
11    A.     I think it would be fair to say
12 that they have the same expectation as the
13 licensing board and the residency programs have
14 on the status reports; on ECFMG providing
15 information about certificate status.
16    Q.     The status report that was
17 provided to the Howard residency program
18 regarding Akoda, what was all the information
19 that that status report contained?
20    A.     The status report would contain,
21 his name; his USMLE identification number; his
22 medical school; the year he graduated; the
23 country of medical school; the validity of his
24 ECFMG certificate, what the status is; whether

1 it expired or valid indefinitely; and when it
2 was issued.
3     Q.     If there were any finding of
4 irregular behavior, would the status report
5 contain an annotation reflecting that finding?
6     A.     Yes.
7     Q.     Any other information that the
8 status report contains, in that was submitted
9 to the Howard Residency Program?
10    A.     The status report to the
11 residency program may have had the dates that
12 he passed the USMLE examinations; and that
13 would be for the exams that met ECFMG's
14 examination requirement, but we would not
15 include scores to the residency program because
16 they would get those through a USMLE
17 transcript.
18    Q.     Any other information?
19    A.     No, electronically through the
20 system I don't believe there's any other
21 information.
22    Q.     ECFMG also provided status
23 reports to the Maryland Board -- a status
24 report to the Maryland Board of Physicians,

63 (Pages 246 - 249)

KARA CORRADO

1 right?

2    A.    Yes.

3    Q.    Would that status report have
4 contained all the information that you just
5 mentioned?

6    A.    Yes.

7    Q.    Would it have been the same
8 status report that was sent to them?

9    A.    It would have been the same
10 status report, yes.  In terms of the
11 information that is on it, it's in a different
12 format.  When Howard gets it electronically,
13 it's not a PDF it's data; and when the Maryland
14 board gets it, it would be in more of a PDF
15 format --

16    Q.    Okay.

17    A.    -- the substance is the same.

18    Q.    Any additional information that
19 was on the report to the Maryland Board of
20 Physicians?

21    A.    Other than, our -- we have some
22 disclaimers at the bottom, but other than that
23 there's no other information that I recall.

24    Q.    What are the disclaimers?

1    A.    They are disclaimers about
2 ensuring that the requesting organization has
3 the authorization from the physician to request
4 the information about them.

5    Q.    Anything else?

6    A.    Not that I can recall.

7    Q.    ECFMG also sent that status
8 report regarding Akoda to Prince George's
9 County Hospital, right?

10    A.    Yes.

11    Q.    Was that status report identical
12 to the one sent to Howard University?

13    A.    Yes.

14    Q.    Did it contain any additional
15 information, or did it omit any information?

16    A.    It is all the same.

17    Q.    I just have some very brief
18 questions about two emails.

19    MS. McENROE:  Counsellor, I just
20 want to check, if this is outside the
21 scope of my cross, just in the interest
22 of everybody's time, trying to understand
23 how this fits into the course of how
24 you're conducting today's deposition.

1    MR. THRONSON:  I don't think so.
2 If you want to make that objection you
3 can.

4    MS. McENROE:  Let me take a look
5 real quick.  I do object.  I'm just
6 wondering what your nexus is to the
7 redirect examination?

8    MR. THRONSON:  I think it --
9 it's about the concerns -- it concerns
10 identity verification; it concerns the
11 role of ECFMG in doing that.  If you want
12 to put your objection on the record,
13 that's fine.

14    MS. McENROE:  Yes, just for the
15 sake of everybody's afternoon and
16 childcare obligations, I'm objecting to
17 the redirect examination being beyond the
18 scope of the cross-examination; preserve
19 any other objections that I have to
20 specific questions.

21         - - -

22    (Whereupon the document was
23 marked, for identification purposes, as
24 Exhibit Number CORRADO-8.)

1         - - -

2 BY MR. THRONSON:

3    Q.    This is an email that you sent
4 to Lisa Cover, Marc Malachesky, and Tracy Gill
5 dated 11/27/2017?

6    A.    Yes.

7    Q.    And in it you appeared to have
8 attached information, it was an update, I
9 believe, to the creds committee regarding the
10 Akoda matter?

11    A.    Yes.

12    Q.    You said in the third paragraph,
13 I think this case is the "worse case scenario,"
14 for applicants who attempt to establish new
15 identities.

16         What did you mean by "worse case
17 scenario"?

18    A.    This is an applicant
19 representing to us that he has a different
20 identity or defrauding us.  That this case was
21 a worse case scenario of that, that he was able
22 to defraud ECFMG with a wholly new identity and
23 that it was important for us to continue to
24 make the enhancements to our overall process.

KARA CORRADO

1    Q.    Is it ECFMG's position that
2 implementation -- or that Notary Cam technology
3 had been available earlier, been implemented
4 earlier, that it could have detected the fraud
5 at an earlier point?
6         MS. McENROE:  Objection to form;
7    calls for speculation.
8         THE WITNESS:  It would have been
9    more difficult for an individual to
10    present themselves to us with a wholly
11    different identity.
12         So I don't think it will a
13    hundred percent stop that.  I think it
14    will help to reduce it.
15 BY MR. THRONSON:
16    Q.    I see in some of the documents
17 you refer to an IV process.  Do you know what's
18 meant by that?
19    A.    Depends on what documents it's
20 in.  We refer to irregular behavior and special
21 investigations as IV, but the organization
22 generally looks at IV as the information
23 booklet.  So I don't know which document.
24    Q.    This is my last question.  I

1 understand this will probably also be taken
2 subject to objection.
3         MS. McENROE:  Same objection.
4         MR. THRONSON:  I'd like this
5    email to be marked as Exhibit 9.
6              - - -
7         (Whereupon the document was
8    marked, for identification purposes, as
9    Exhibit Number CORRADO-9.)
10              - - -
11 BY MR. THRONSON:
12    Q.    Exhibit 9 represents an email
13 chain that involves correspondence between you
14 and Lisa Cover and you and Amy Buono and some
15 other individuals at -- that are State Medical
16 Boards, National Board of Medical Examiners;
17 fair to say?
18    A.    Yes.
19    Q.    You were asked by Amy Buono can
20 you provide an update as to the work you've
21 done so far with the US Attorney's Office?
22    A.    Yes, she asked that.
23    Q.    You asked Lisa, you weren't sure
24 what more to share then "we provided insight

1 and information to Maryland".  Then you wrote
2 "I'm sensitive to the current issues related to
3 our IB."  What did you mean by that?
4    A.    Oh, that is related to the
5 contract that we have with the National Board
6 of Medical Examiners and the Federation of
7 State Medical Boards.  We have separate
8 processes, we talked about the committee for
9 individualized review.
10         In the past we adjudicated the
11 cases in a different way, in that we referred
12 them to the committee for individualized
13 review, and then they would be remanded, after
14 a determination was made they would be
15 remanded, for a sanction to be set.  We changed
16 that process because it was inefficient, so
17 it's related to that.
18    Q.    So there are contracts that
19 exist between ECFMG and the Federation of State
20 Medical Boards related to the irregular
21 behavior processes?
22    A.    The contract is related to
23 ECFMG's role in determining the eligibility for
24 international medical graduates to take the

1 United States Medical Licensing Examination.
2         So the USMLE program has
3 essentially contracted with ECFMG to do that
4 for international medical graduates.  So we
5 will enforce their eligibility requirements, as
6 well as our own requirements for certification
7 on international medical graduates.  That's
8 really related to efficiencies in the
9 examination process.
10         There were a number of
11 examinations in the past.  Licensing boards
12 used to give their own exams, ECFMG had exams,
13 and when the USMLE examinations were introduced
14 in the mid 90s, the licensing boards all
15 decided that they would use those examinations
16 to make the process more efficient for
17 physicians.
18         Then ECFMG at that time also
19 agreed to use the USMLE examination to meet its
20 examination requirements for certification.  So
21 in that process, the USMLE program agreed to
22 have ECFMG determine eligibility on its USMLE's
23 programs' behalf, for international medical
24 graduates.

65 (Pages 254 - 257)

KARA CORRADO

Page 258

1    Q.    So contractual arrangement began
2  in the mid 90s and has continued through until
3  today?
4    A.    Yes.
5    Q.    That's all the questions I have.
6         MS. McENROE:  Nothing further
7  from us.
8              - - -
9         (Witness excused.)
10             - - -
11  (Deposition concluded at 6:13 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 260

1         INSTRUCTIONS TO WITNESS
2
3         Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the appropriate
6  space on the errata sheet for any corrections
7  that are made.
8         After doing so, please sign the errata
9  sheet and date it.
10         You are signing same subject to the
11  changes you have noted on the errata sheet,
12  which will be attached to your deposition.
13         It is imperative that you return the
14  original errata sheet to the deposing attorney
15  within thirty (30) days of receipt of the
16  deposition transcript by you.  If you fail to
17  do so, the deposition transcript may be deemed
18  to be accurate and may be used in court.
19
20
21
22
23
24

Page 259

1       C E R T I F I C A T E
2
   COMMONWEALTH OF PENNSYLVANIA:
3
   COUNTY OF PHILADELPHIA:
4
5      I, Jennifer L. McDonald, a Notary
   Public within and for the County and State
6  aforesaid, do hereby certify that the foregoing
   deposition of KARA CORRADO was taken before me,
7  pursuant to notice, at the time and place
   indicated; that said deponent was by me duly
8  sworn to tell the truth, the whole truth, and
   nothing but the truth; that the testimony of
9  said deponent was correctly recorded in machine
   shorthand by me and thereafter transcribed
10  under my supervision with computer-aided
   transcription; that the deposition is a true
11  record of the testimony given by the witness;
   and that I am neither of counsel nor kin to any
12  party in said action, nor interested in the
   outcome thereof
13
       WITNESS my hand and official seal this
14  16th day of September 2019
15
16
17  _____
       Jennifer L. McDonald,
18       Notary Public
19
20
21
22
23
24

Page 261

1         - - - - -
         E R R A T A
2         - - - - -
3  PAGE  LINE   CHANGE
4  ___ ___  _____
5  Reason for
6  Change:_____
7  ___ ___  _____
8  Reason for
9  Change:_____
10  ___ ___  _____
11  Reason for
12  Change:_____
13  ___ ___  _____
14  Reason for Change:
15  _____
16  ___ ___  _____
17  Reason for Change:
18  _____
19  ___ ___  _____
20  Reason for Change:
21  _____
22  ___ ___  _____
23  Reason for Change:
24  _____

KARA CORRADO

Page 262

```
 1          ACKNOWLEDGMENT OF DEPONENT
 2      I, _____, do hereby
 3  certify that I have read the foregoing pages __
 4  to ___ and that the same is a correct
 5  transcription of the answers given by me to the
 6  questions therein propounded, except for the
 7  corrections or changes in form or substance, if
 8  any, noted in the attached Errata Sheet.
 9
10  _____  _____
11  DATE        SIGNATURE
12
13
14          Subscribed and sworn to before
15  me this _____ day of _____,
16  2017.
17
18          My commission expires:
19          _____
20          _____
21          Notary Public
22
23
24
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830