```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2                          -  -  -

 3   MONIQUE RUSSELL, et al.      :  CIVIL ACTION NO.
                                  :  2:18-cv-05629
 4      v.                        :
                                  :
 5   EDUCATION COMMISSION FOR     :
     FOREIGN MEDICAL GRADUATES    :  ORAL ARGUMENT
 6   _____

 7
                                      James A. Byrne U.S. Courthouse
 8                                    601 Market Street
                                      Philadelphia, PA 19106
 9                                    January 30, 2020
                                      Commencing at 2:06 p.m.
10   _____

11           BEFORE THE HONORABLE JOSHUA D. WOLSON

12   _____

13
     APPEARANCES:                     ORIGINAL
14
             JANET JANET & SUGGS LLC
15           BY:  PATRICK A. THRONSON, ESQUIRE
             4 Reservoir Circle
16           Suite 200
             Baltimore, Maryland 21208
17           (410) 653-3200
             pthronson@jjsjustice.com
18           Representing the Plaintiffs

19
                          -  -  -
20
                 Ann Marie Mitchell, CRR, RDR, RMR
21                    Official Court Reporter
                        (267) 299-7250
22

23   Proceedings taken stenographically and prepared utilizing
     computer-aided transcription
24

25
```

```
 1   APPEARANCES CONTINUED:

 2

           CONRAD O'BRIEN, PC
 3         BY:  NICHOLAS M. CENTRELLA, ESQUIRE
           1500 Market Street
 4         West Tower, Suite 3900
           Philadelphia, Pennsylvania 19102
 5         (215) 864-9600
           ncentrella@conradobrien.com
 6         Representing the Plaintiffs

 7

 8         LAW OFFICES PETER G. ANGELOS PC
           BY:  PAUL M. VETTORI, ESQUIRE
 9         One Charles Center
           100 N Charles Street, 20th FLoor
10         Baltimore, Maryland 21201
           (410) 649-2027
11         pvettori@lawpga.com
           Representing the Plaintiffs
12

13

           SCHOCHOR FEDERICO & STATION PA
14         BY:  BRENT P. CERYES, ESQUIRE
           1211 St. Paul Street
15         Baltimore, Maryland 21202
           (410) 598-1667
16         bceryes@sfspa.com
           Representing the Plaintiffs
17

18

           MORGAN, LEWIS & BOCKIUS LLP
19         BY:  BRIAN W. SHAFFER, ESQUIRE
           BY:  ELISA P. McENROE, ESQUIRE
20         BY:  MATTHEW DANIEL KLAYMAN, ESQUIRE
           1701 Market Street
21         Philadelphia, Pennsylvania 19103
           (215) 963-5000
22         bshaffer@morganlewis.com
           elisa.mcenroe@morganlewis.com
23         matthew.klayman@morganlewis.com
           Representing the Defendant
24

25                                  -  -  -
```

```
 1              (Court called to order at 2:06 p.m.)

 2              THE COURT:  Good afternoon.  Please be seated.

 3              RESPONSE:  Good afternoon, Your Honor.

 4              THE COURT:  So we're here for Russell v. Educational

 5  Commission for Foreign Medical Graduates, which is 18-5629.

 6              Let me get appearances of counsel if I could so I can

 7  put some faces with names.  Start with the plaintiff's side.

 8              MR. THRONSON:  Good morning, Your Honor.  Patrick

 9  Thronson on behalf of the plaintiffs.

10              THE COURT:  Good afternoon, Mr. Thronson.

11              MR. VETTORI:  Good morning, Your Honor.  Paul Vettori

12  on behalf of plaintiffs.

13              THE COURT:  Mr. Vettori.

14              MR. CENTRELLA:  Good morning, Your Honor.  Nick

15  Centrella on behalf of plaintiffs.

16              THE COURT:  Okay.

17              MR. CERYES:  Good afternoon, Your Honor.  Brent Ceryes

18  on behalf of the plaintiffs.

19              THE COURT:  Good afternoon, everybody.

20              And defense?

21              MR. SHAFFER:  Good afternoon, Your Honor.  Brian

22  Shaffer on behalf of ECFMG.

23              THE COURT:  Good afternoon.

24              MS. McENROE:  Good afternoon.  Elisa McEnroe, also for

25  ECFMG.
```

1          MR. KLAYMAN:  Good afternoon.  Matthew Klayman, also

2     on behalf of ECFMG.

3          THE COURT:  Great.  Welcome everybody.

4          So let me tell you what I want to do here.  We've been

5     through all of the pleadings and exhibits a couple times in

6     chambers.  And certainly I have I think a pretty good handle on

7     the issues, although maybe your arguments will tell me

8     otherwise.  And I've got some sort of questions and issues that

9     I want to hone in on.

10          And so what I sort of want to cover with you all

11     are -- I want to clarify the claims themselves that are

12     asserted in the case, just to make sure I understand them.  I

13     want to talk about some of class definition and

14     ascertainability issues that I know are floating around.  And

15     then I want to -- once we kind of get through those couple

16     things, I want to turn to the -- sort of the class

17     certification issues themselves and talk about some of the

18     issues that come up with the interplay between Rule 23(b) and

19     23(c) and then sort of talk about the two alternative

20     approaches that the plaintiffs have outlined in terms of class

21     certification.  And then we can sort of circle back from there

22     to cover some of the 23(a) factors after that that I know are

23     some of the arguments that the defense has made as well.

24          And then once I've kind of covered all that, to the

25     extent there are things we haven't covered that you all think

1  are important to say to me, I'll give you an opportunity to do

2  that.  I'll tell you now -- and I'll remind you then -- that

3  I've read everything pretty carefully, and so I don't need

4  repetitions of what's in the briefs, but if there are things

5  that either I say today that trigger something in your mind or

6  just you feel you want to say in addition to what's been

7  briefed, I'm certainly happy to hear that.

8        So with that in mind -- and in terms of process, I

9  mean, I'm going to go back and forth, so certainly you don't

10  have to step up.  I'm not going to be insulted if you stay

11  seated while you talk to me.  If you have an old habit that you

12  feel like you need to stand when I talk to you, that's fine,

13  but I won't be insulted if you don't.

14        So let me just start with the claims themselves that

15  have been asserted in the Complaint, and there's two.  There's

16  a negligence and a negligent infliction of emotional distress

17  claim.

18        And so I just want to make sure in the first instance

19  on negligence, is all of the harm that the plaintiffs are

20  asserting sort of under the rubric of emotional distress in

21  this case, or are there other harms that are at issue?

22        MR. THRONSON:  Yes, Your Honor.  The harm that we're

23  proposing for classwide -- essentially for individual

24  resolution after class treatment of the common issue is

25  emotional distress.

1          THE COURT:  Okay.  So there's a reference in your

2     brief to -- I think when you talk about the questions that you

3     wanted me to certify, there was a reference to emotional

4     distress and other damages, but that's sort of just -- I'm

5     taking that more as stray language than it is some

6     suggestion --

7          MR. THRONSON:  Right.

8          THE COURT:  -- that there are other damages out there

9     that are not emotional distress damages?

10          MR. THRONSON:  That's correct, Your Honor.  There may

11     be individual, you know, plaintiffs who, you know, sustained

12     other damages who we don't know about, but, you know, for

13     purposes of this case, this class, the damages are emotional

14     distress damages.

15          THE COURT:  Right.  They may have asserted --

16     sustained other damages, but they're not asserting them or at

17     least you guys are not proposing to represent them to assert

18     them in this case, which is I think a key element to me being

19     able to get to any kind of a class here.  Right?

20          MR. THRONSON:  That's correct.

21          THE COURT:  And then the negligent infliction of

22     emotional distress claim, you know, it's not spelled out in the

23     Complaint, wouldn't normally be, but I assume what you have in

24     mind is that it's asserted under Pennsylvania law based on the

25     choice of law arguments in the briefing; is that right?

1          MR. THRONSON:  That is correct, Your Honor.  Under

2   Maryland law you can assert a claim for negligence where

3   emotional distress is the only damages.  And so that can be

4   proved either through physical injuries, some physical

5   manifestation of the emotional distress, or in certain cases

6   involving fraud or egregious conduct, it can be proved just by

7   the testimony of the plaintiff him or herself without reference

8   to objective criteria.  But we do believe that, you know,

9   Pennsylvania law applies, and that claim, to the extent that we

10   assert it in the Complaint, is based on Pennsylvania law.

11          THE COURT:  And so Pennsylvania law, at least from

12   what I've seen, when you look at the elements of negligent

13   infliction of emotional distress, there's these four -- there's

14   sort of the basic four elements of negligence, right, and then

15   the sort of additional -- there's like these four alternatives.

16   Right?  And it's contractual fiduciary duty, which I assume is

17   not applicable here in your view.  Or is that one of bases that

18   you're proceeding under?

19          MR. THRONSON:  There's no fiduciary duty that we're

20   alleging between ECFMG and the plaintiffs.

21          THE COURT:  And certainly there's no contractual duty

22   because they didn't have a direct relationship?

23          MR. THRONSON:  Right.  There is a physician-patient

24   relationship between Akoda and the patient.

25          THE COURT:  Yes.  But that doesn't get you to

1    liability against them.

2              MR. THRONSON:  Sure.

3              THE COURT:  And then physical -- plaintiff suffered a

4    physical impact?

5              MR. THRONSON:  Right.

6              THE COURT:  Are you proceeding under that prong?

7              MR. THRONSON:  Yes.  A battery.

8              THE COURT:  As opposed to zone of danger or

9    contemporaneous perception of a tortious injury --

10             MR. THRONSON:  Right.

11             THE COURT:  -- to the other two.  Right?

12             And does there need to be a physical manifestation

13   under Pennsylvania law?

14             MR. THRONSON:  You do need to prove it by some kind of

15   evidence, so we'd offer medical records, testimony of the

16   plaintiff, testimony of relatives, in these individualized

17   proceedings that we're proposing.

18             THE COURT:  Okay.  Right.  And so that's all going to

19   be -- in your mind, that would all be left to the

20   individualized proceedings?

21             MR. THRONSON:  That's right.

22             THE COURT:  So you don't have a fraud claim in the

23   case, though.  Right?

24             MR. THRONSON:  Right.

25             THE COURT:  So there's some reference in the class

1    cert briefing to -- I think one of the issues you referenced

2    that I could certify is whether or not -- we're going with Dr.

3    Akoda?  Is that the name, Akoda?  I don't actually know if I

4    should put the "Dr."  In front of it or not under the

5    circumstances, but that's the name we're using; is that right?

6              MR. THRONSON:  That's fine.

7              MR. SHAFFER:  Right.

8              THE COURT:  So we're all on the same page.  Okay.

9              So there's some reference to certifying a class

10   about -- I think ECFMG assisting the commission of fraud under

11   Section 876 of the Restatement?

12             MR. THRONSON:  That's right, Your Honor.

13             Obviously, the evidence shows, the record shows, and I

14   don't think there's any dispute about this, that Dr. Akoda,

15   Akoda -- we're not saying he's a doctor, but -- committed fraud

16   against multiple entities.  And ECFMG provided evidence of

17   certification to a residency program at Howard, a residency

18   program at Jersey Shore, and each healthcare institution at

19   which Akoda purported to practice medicine.  And that

20   documentation verified that Akoda allegedly was properly

21   certified by ECFMG and that his certification was valid.  In

22   fact, the precise piece of paper that was provided, which is in

23   our exhibits, is that it was valid indefinitely.

24             So our claim is that ECFMG knew or should have known

25   that Akoda was committing fraud and was using, you know,

1  through, among other means, this ECFMG certification, which was

2  a prerequisite to practicing at each of these healthcare

3  institutions and being licensed to practice in Maryland.  And

4  so to that extent we think there is an issue that ECFMG aided

5  in the commission of fraud.

6       THE COURT:  But why does that matter for the claims of

7  the case?  I mean, you know, it may be true in the abstract.

8  It may be something that is interesting legally, but you don't

9  have a claim based on it.  Right?

10       MR. THRONSON:  Right.  But that -- I mean, to the

11  extent that any negligence arises from that.

12       THE COURT:  So it might go to the breach question.

13       MR. THRONSON:  Right.

14       THE COURT:  Right.  But -- okay.

15       It seems to strange to me that I would sort of certify

16  something specific to the issue of fraud in a case where

17  there's no fraud.  Right?  I mean, unless you're telling me

18  that's the only theory you have that constitutes a breach.  And

19  I don't think it is.

20       MR. THRONSON:  Right.

21       THE COURT:  So I don't think -- okay.

22       All right.  So -- all right.  That gives me some

23  clarity then, I think, on what's in the case and sort of

24  what's -- how that -- some of that does bear certainly on the

25  motion that's in front of me.

1          So let me talk about class definition stuff, and then

2    related to that, I mean, sort of flowing naturally from that

3    are the ascertainability questions, I think.

4          Again, I'm going to start with plaintiffs.  So who do

5    you want to include in the class?  Because there's -- and I ask

6    that because there's, you know, a bunch of stuff in the

7    defense's responses about, for instance, patients in Nigeria.

8    And my take on that in reading it was your class definition is

9    inartfully drafted, because on its face the way it's drafted

10   potentially includes -- I don't know what kind of training

11   Akoda had in Nigeria, I don't know whether he was exposed to

12   patients, but it potentially includes that.  I don't think

13   that's what you meant to include.  I think that predates his

14   submissions to ECFMG and to his coming here.  Right?

15          MR. THRONSON:  You're right.  Yeah.

16          THE COURT:  So it struck me as a little bit of a

17   sideshow in the briefing.  It doesn't -- it's not a reason for

18   me not to certify a class.  It's certainly a reason for me to

19   red pencil your class definition.

20          So tell me who you want to include in the class, you

21   know, with bearing some of those issues in mind.

22          MR. THRONSON:  Sure.  Your Honor, you're completely

23   correct as to the Nigeria issue.  It had not even occurred to

24   us that there would be patients in Nigeria because we had no

25   evidence there were.  And we don't believe that, again, he was

1    properly trained or he saw patients in Nigeria.

2            In terms of the class definition, it is, you know,

3    everyone who was treated by Akoda.  And what we take that to

4    mean is everyone who had a physician-patient relationship with

5    Akoda.  You know, if we -- and our method for ascertaining that

6    is, as was proposed and approved in the In Re:  Suboxone case,

7    is to send subpoenas to every known institution or entity at

8    which Akoda purported to practice medicine, everywhere where he

9    worked, and to say, identify all the individuals at your

10   institution who were treated by Akoda.

11           And we did this with Prince George's Hospital Center

12   in Maryland.  They said, here's a list of 712 individuals who

13   were treated by Akoda.

14           So this is something that is objective -- it's an

15   objective criteria in both a theoretical and a practical sense,

16   because healthcare institutions understand that phrase.

17           Now, it may be, just like with any class, that there

18   are individuals who were treated by Akoda who suffered no --

19   suffered no harm as a result of it, the involvement in the care

20   was minimal.  The individuals upon finding out of Akoda's fraud

21   didn't suffer any provable emotional distress.  But it really

22   is all individuals who had a physician-patient relationship

23   with Akoda.  And the way we would determine that is, again, the

24   subpoenas to healthcare institutions that the record shows he

25   worked at.

1          THE COURT:  So geographically, are we including Jersey

2     Shore Medical Center?

3          MR. THRONSON:  We would.

4          THE COURT:  Okay.  And then Howard University.  Right?

5          MR. THRONSON:  Right.

6          THE COURT:  And then you mentioned Prince George's

7     Medical Center.  And his private practice with Dr. Chaudry?

8          MR. THRONSON:  That's right.

9          THE COURT:  Anywhere else that I missed?

10         MR. THRONSON:  No.

11         THE COURT:  Okay.  And so when you talk about -- I

12    mean, I assume you probably know better than I do based on your

13    discussions with them that if you go somewhere like Prince

14    George and say, give us everyone who he treated, they basically

15    go find everyone for whom they obtained any professional

16    revenue from him.  Right?  And -- or sent out a bill, even if

17    they didn't actually get the revenue, and look to that.

18         Is that basically correct, or is there some other way?

19         You know, I assume billing codes is the only way

20    you're going to find that, but you tell me.

21         MR. THRONSON:  You would -- this is based on just our

22    best understanding.

23         THE COURT:  Yeah.

24         MR. THRONSON:  We didn't do the search ourselves,

25    obviously, but there was a chart search.  Individuals who -- or

1    hospitals keep track of what procedures individuals are

2    involved with.

3           The physician billing itself, I'm not sure that the

4    hospital would have taken care of that.  That may have been

5    submitted through his practice.

6           THE COURT:  Okay.

7           MR. THRONSON:  But it would correspond to the patient,

8    and it would reflect the services that were rendered.

9           So in terms of reflecting -- in requesting billing

10   records and also in asking the facilities to do a chart review

11   and identify the individuals who Akoda treated and to supply

12   their -- you know, their medical records under proper HIPAA

13   procedures, that's how we would identify the class members.

14          THE COURT:  Was he an employee at Prince George's or

15   did he just have privileges there?

16          MR. THRONSON:  He had privileges there.

17          THE COURT:  So he was coming in through the private

18   practice and just treating patients there?

19          MR. THRONSON:  That's right.

20          THE COURT:  So all the professional revenue would have

21   been deprived by the practice, and it was just technical

22   revenue to the hospital for stuff he did there.  Right?

23          MR. THRONSON:  That's right.

24          THE COURT:  And so I'm going to -- Mr. Shaffer, I'm

25   going to give you a chance in a second.  I do have a couple

1    more questions.

2           So one of the issues that does come up in the defense

3    briefing is this question of, you know, patients -- so I don't

4    know what kind of records are kept for -- let me start with

5    this -- records are kept for residents.

6           Is it only if he has -- because that's essentially the

7    Howard example.  Right?  Was it just a residency at Howard?

8    Was there a fellowship also, or was it just a residency?

9           MR. THRONSON:  Just a residency.

10          THE COURT:  So do they chart every time he has, what,

11   a physical encounter with a patient?  I presume they don't

12   chart every time he's, for example, in the room observing, but

13   how do you deal with some of those issues as to people for whom

14   he may have had contact but may not show up on a chart?

15          MR. THRONSON:  To the extent that he had any

16   meaningful involvement in a procedure and treatment of a

17   patient, we think that would have been charted, both for -- if

18   he is in the capacity of, you know, rendering some -- making

19   some clinical judgment, assisting in the care, providing care

20   to these patients, that should be reflected in the chart.

21          THE COURT:  So if he's just there on rounds, right,

22   some attending or some senior resident takes them around on

23   rounds in his first year and he stands there, that's not being

24   recorded anywhere.  Right?

25          MR. THRONSON:  I mean, to the extent -- I do medical

1   malpractice as another part of my practice.  And to the extent

2   that residents are -- residents are rounding with physicians,

3   you typically see that, in my experience, reflected in the

4   medical records.

5            THE COURT:  All right.  So Mr. Shaffer -- well, before

6   I get to Mr. Shaffer, because I think the one last issue that's

7   out there, you know, is this issue of document retention.

8            As you go back to, for example, Jersey Shore in

9   particular, but maybe Howard as well, you know, you may be

10  beyond the point where they've kept records for these patients.

11  Some of the patients may have come back, in which case their

12  charts may still exist.  But how do you deal with the issue of

13  records that are no longer in existence?

14           MR. THRONSON:  You would again look at -- essentially

15  through a -- let me back up.

16           First of all, there is a federal requirement as to

17  record retention.

18           THE COURT:  Right.

19           MR. THRONSON:  But institutions aren't bound by that.

20  So many institutions like Prince George's County Hospital

21  maintain records that went beyond that point.  So, you know,

22  places will still have -- based on our experience in this

23  litigation, will have documentation of a patient being seen

24  there.  So I mean, it's -- this is essentially an objective

25  means of identifying these individuals.  And it may not be 100

1  percent perfect.  It may not capture every single individual.

2  That's theoretically possible.  I have to acknowledge that.

3  But that's always the case.  I mean, you know, in an antitrust

4  case involving price fixing, you know, a pharmacy may not have

5  all of the records of an individual who purchased a certain

6  medication at that place or a group benefit administrator or a

7  hospital that purchased that medication.  But still, the

8  inquiry is whether it's feasible and it's capable of objective

9  ascertainment.  And we think this method is -- that's through

10  this method, yeah.

11         THE COURT:  So Mr. Shaffer, let's talk about that,

12  because what's -- I mean, I understand there is a possibility

13  of some false negatives.  Right?  Because I forgot to note Dr.

14  Akoda on a chart, particularly if he's rounding or documents

15  don't exist anymore, but -- so let's start with the sort of

16  objectivity piece of this.

17         Is there a problem in terms of those criteria from

18  your perspective in terms of identifying these people?

19         MR. SHAFFER:  Your Honor, I think there could be a

20  couple of different problems.  And part of it relates to some

21  of the ways in which even during this hearing they're modifying

22  the entities or the organizations which may or may not be part

23  of any class that they would seek to involve.

24         Certainly with respect to Nigeria, we believe there

25  would have been serious issues there.  They say fine, we didn't

1   mean that.

2          They have a reference to a Harlem Hospital in their

3   briefing where apparently they believe Dr. Akoda practiced at a

4   time.  They didn't mention that today as to whether that's an

5   organization that predated his involvement, his application to

6   ECFMG, but it's in their briefing.

7          The JSMC from 1998 to 2000, that predates the

8   information that they claim our client had that should have put

9   them on notice to do something with respect to Dr. Akoda's

10  certification, which was a report in 2000.  So they've got

11  folks who are in the 1998 to 2000 time period that they are

12  claiming are going to be part of the class that they're going

13  to purport to treat.

14         And then we've got folks from -- assuming 1998 to

15  2000, 2007 to 2011 where they have not gone and identified

16  whether there are records that exist as to folks who would have

17  been treated by Dr. Akoda.  It is more than ten years ago.  The

18  suggestion that billing records will reflect exactly who was

19  there, I think I heard that maybe it would, maybe it wouldn't.

20  You would have to then take billing records and go to medical

21  records.  We don't know what medical records would exist.  We

22  don't know that they would accurately reflect, certainly in a

23  residency program at Howard, whether or not he was there.  I

24  think that's a question.

25         And from our perspective, even the question of going

1   to a hospital and saying, who treated -- who did Dr. Akoda

2   treat, the description that I heard during Mr. Thronson's

3   recitation was sort of three or four different iterations of

4   what constitutes treatment.  And so there is an

5   ascertainability problem to decide whether someone would be

6   sufficiently identified as in the class or out, which is

7   important both for the class members as well as for ECFMG.

8           THE COURT:  Well, it is.  Some of those issues, it

9   seems to me, are issues that are not so much class

10  certification issues as they may be merits issues.

11          So for example, I hear you say, well, Jersey Shore,

12  there's an issue with, you know, this temporal issue, when was

13  your client on notice.  I can anticipate responses from the

14  other side as to what their liability theory is.  But even if I

15  certify the class and say the class is anyone who was treated

16  including at Jersey Shore and then I get to summary judgment

17  and say for whatever reason there's a temporal distinction and,

18  you know, maybe there's a duty that lies post this event and

19  not pre, I can deal with that.  Right?  I mean, it's not

20  really -- that's not really a class issue.  Right?

21          MR. SHAFFER:  I disagree, Your Honor, respectfully.

22  That is a class issue.

23          If you have to decide the question of duty and breach

24  in the context of different factual evidence with respect to

25  the class that they're offering -- and that's what we think

1   happens here with what they're proposing with their liability
2   and damages separation.  They're essentially going to be asking
3   the Court to make different decisions about whether a duty
4   existed, whether that duty was breached, involving individual
5   questions which will change depending on who the plaintiff or
6   the class member is.  And so it may also be a question that
7   summary judgment would decide for a particular plaintiff.  But
8   to decide that issue on a class basis is in our view
9   inconsistent with Rule 23.
10          THE COURT:  As far as the other issues go, you know, I
11  recognize there may be informational gaps.  But I view the
12  requirements on ascertainability as sort of twofold.  Right?
13  There's the question of is it objective or subjective.  I do
14  think it's objective.  Right?  Are they on -- you know, does
15  Akoda appear on the chart or doesn't he.  Right?  It's an
16  objective measure.  It's something that we can figure out.  We
17  can go to the hospitals and say this.
18          I will say, I mean, towards the end of my run in
19  private practice, this was an issue we confronted in a case
20  involving a physician group.  And we had to go to a hospital
21  and say, tell us everyone who these guys treated.  I mean, the
22  hospital griped, but they did it.  And so it strikes me that
23  that piece is okay.
24          Now, then there's the question of are there going to
25  be a whole bunch of false negatives.  Right?  That's

1  essentially what you're telling me is there will be a whole

2  bunch of false negatives because we don't identify them this

3  way because the records aren't there and that renders the class

4  sort of nonascertainable.  Is that's essentially right?

5          MR. SHAFFER:  I think that's one of piece of it, Your

6  Honor.  I guess you could even also have the person who comes

7  forward who says, I'm not in the records, but guess what, I was

8  treated by Dr. Akoda.  I remember the name.  I had a

9  conversation with someone.  I sat in a room, and I'm pretty

10 sure that was the guy who delivered my baby.

11         What do we do with someone like that, who -- again, is

12 that a subjective question and they are excluded?  Do we allow

13 all of those individuals without verification to become class

14 members?

15         THE COURT:  Isn't that true in every class?  I mean,

16 so, you know, hypothesize some antitrust class where it's

17 direct purchasers, so the records are there.  They're in the

18 possession of the defendant.  And then, you know, some third

19 party walks up and says, I bought from them too and they just

20 don't have the record of it.  They lost it.  Right?  I mean,

21 and yet everyone says, well, antitrust cases are particularly

22 well suited to class certification.  Right?

23         And so, you know, I mean, that issue exists and I

24 understand it exists, but it strikes me as sort of marginal.

25 Isn't it?

1        MR. SHAFFER:  I guess, Your Honor, we would view it as

2   not marginal, that it is a problem for the plaintiffs the way

3   they've defined the class.  I think there are much greater,

4   more fundamental problems with what they have proposed to you

5   with their issue class certification.  If you did find that the

6   class was sufficiently ascertainable with modifications from

7   what they drafted in their motion, there are still numerous

8   other problems that we can -- are happy to talk about.

9        THE COURT:  We're going to get to them.  Absolutely.

10       Okay.  All right.  So let's --

11       MR. THRONSON:  Your Honor, could I respond briefly

12   just on one point?

13       THE COURT:  Yeah, go ahead.

14       MR. THRONSON:  So we did include Harlem Hospital in

15   the briefing.  It appears that his involvement at Harlem

16   Hospital predated his application to ECFMG.  And that's, you

17   know, evidence that we've been processing, you know, over the

18   course of this briefing period.

19       So for the purpose of notice, if this were certified,

20   it could be appropriate to include that individual -- you know,

21   to include that institution, but that's probably an issue

22   that's best resolved on summary judgment.

23       And again, with respect to these false negatives, that

24   goes -- you know, in some ways that's more a merits issue and a

25   proof problem rather than a certification issue.

1          THE COURT:  I'm not sure it's easy enough to sort of

2    sweep it aside and say, well, it can be dealt with at summary

3    judgment.  You know, Mr. Shaffer's point is not an unfair one

4    when he says, well, if there are issues that mean that I have

5    to look at who the plaintiff is and where they were treated --

6    I guess where she was treated in almost every case here --

7    individually, then it's not so easy to -- you know, and that

8    may define liability, then doesn't that seem to undermine some

9    of the commonality issues that we would have for certification

10   even with an issue class?

11          And so I do think one of the things we need to do now,

12   not even at notice but now, is define whether it's temporally

13   or whether it's by institution.  And those two things may

14   effectively be the same thing here.  I think I need to define

15   who you think is in the class.  And I mean, we can do it by

16   year if you want to talk about it by year.  And I can hear from

17   Mr. Shaffer what problems he sees that posing.  Or we can do it

18   by institution.  But one way or another, I do think I need some

19   objective measure of who's in the class.  And I don't think I

20   can punt that issue to later to decide it if I'm going to

21   certify it.

22          I think -- and I'm jumping ahead on my outline, but

23   that's okay -- if I were to certify a class here -- and don't

24   read this as tea leaves saying that I'm going to.  But one of

25   the issues that I spotted is if I certify a class here, it is

1   ultimately a (b)(3) class.  Right?  Does everybody agree with

2   that?

3         MR. THRONSON:  In -- I think in part, Your Honor,

4   because --

5         THE COURT:  I mean, I understand there may be sort

6   of -- I understand I can tackle (c)(4) and define the issues

7   that I'm certifying, but in the end -- the reason I'm saying

8   that, isn't there going to be a notice of an opt-out period if

9   I certify some sort of class?

10        MR. THRONSON:  I think if the class is -- the case law

11  is a little unclear on (c)(4) notice.  But I would agree, we

12  would agree that in essence, it's a (b)(3) class.

13        I mean, in the sense that (b)(3) classes in most

14  instances are in some respects (c)(4) classes, because it's --

15  they're certifying on the issue of liability and they're not

16  determining damages on a classwide basis.

17        THE COURT:  That's not always true.

18        MR. THRONSON:  What's that?

19        THE COURT:  That's not always true.

20        MR. THRONSON:  Not always true.  Not always true.  But

21  in this context, it's essentially a (b)(3) class in terms of if

22  we're certifying on the issue of liability.

23        Now, if we're certifying on a threshold issue like did

24  ECFMG owe a duty to the class members, did it owe a duty to

25  hospitals and healthcare institutions or medical boards that --

1 to which it gave rise to obligations to the class members,

2 those threshold issues that we proposed a number of them in the

3 brief, then that -- that's more of a true (c)(4) class.  But I

4 think Your Honor is correct.

5          THE COURT:  But even if it's a true (c)(4) class, I

6 mean, don't I still -- so --

7          MR. THRONSON:  Yeah.  We still do notice and an

8 opt-out period.

9          THE COURT:  We still do notice and an opt-out period.

10 Right?

11          MR. THRONSON:  Yep.

12          THE COURT:  So given that and given the need to

13 identify the universe of people who are going to get notice, I

14 think we need to identify the institutions who are going to be

15 subject to presumably some sort of subpoena and, you know,

16 information retrieval process even to tackle the question of

17 defining a class.

18          MR. THRONSON:  I agree, Your Honor.  And I think that

19 the class definition, you know, to be crystal clear, could

20 clarify that we're only talking about patients within the

21 United States and we're only talking about patients who were --

22 you know, who encountered Akoda after ECFMG certified him, you

23 know, so from that point forward.  And that involves the

24 various institutions that we've talked about.

25          THE COURT:  Okay.  So it does not include Harlem?

1            MR. THRONSON:  No, it would not include Harlem.

2            THE COURT:  So we started to touch on this a little

3   bit.  And I guess one of my questions for you all is sort of

4   the interplay between Rule 23(a) and (b) on the one hand and

5   23(c)(4) on the other hand and in particular how you sort of

6   conceive of -- when do I tackle the 23(a) and -- really the

7   23(a) factors in the first instance?  I mean, and maybe the

8   (b)(3) factors and sort of do I have to decide the case as a

9   whole can be certified as a class and then define the issues,

10  or do I define the issues that I want to certify if I'm going

11  to do that and then apply the 23(a) factors to that sort of

12  universe as defined by those issues?

13            And so let me hear -- I'll start with the plaintiffs

14  and then I'll hear from the defense as to -- because I think

15  you have different views on how that works.

16            MR. THRONSON:  Your Honor, it's the latter in our

17  view, meaning defining the issues and then determining whether,

18  you know, predominance and superiority are satisfied with

19  respect to those issues.  23(a), that applies regardless.

20            THE COURT:  But 23(a) might be -- can 23(a) be

21  different?  Can the analysis be different if I'm defining the

22  issue first?  I mean, I know I'm going to find, you know,

23  that -- the 23(a) factors somewhere along the way if I do the

24  analysis.  I'm going to analyze them.

25            But so, for example, the defense has a bunch of

1  arguments about typicality and says, well, you know, the type

2  of encounter he had is significant here.  And so if I'm doing

3  the 23(a) analysis first, then that may be different and have a

4  different outcome, right, than if I'm doing it after defining

5  an issue now.  I mean, if I just say liability, it may not.

6  But if I do something narrower, then it may.  Right?

7          MR. THRONSON:  The -- I think in this case, in this

8  case not, because the issue here is -- you know, typicality

9  analysis is do the claims of the plaintiffs conflict with that

10  of the -- you know, the class members.  And, you know, can this

11  action be efficiently maintained as a class action given these

12  representative plaintiffs.  And do these plaintiffs have -- you

13  know, are they asserting claims that are typical of those of

14  the class.  Do they arise from, you know, common course of

15  conduct.

16          So I think in either event, whether you -- I guess you

17  would first look at the class definition that we're proposing

18  and the -- or that we develop and the issues that we are

19  proposing for certification, and then, you know, would go

20  through those (a)(3) factors.  But I think in either event with

21  respect to (a), the analysis is the same.

22          With respect to the interplay between (b)(3) and

23  (c)(4), I think the advisory committee on civil rules and the

24  most recent decisions -- circuit decision to analyze this

25  issue, which was Martin v. Behr.  In the Sixth Circuit, they've

1   essentially concluded that this circuit split is illusory.  And

2   the advisory committee at one point was considering, well, do

3   we need to clarify (c)(4) to address this issue, you know,

4   whether -- whether predominance and superiority have to apply

5   to the case as a whole or just to the issues within -- that are

6   defined for classwide treatment.

7        And their conclusion was that it didn't need any

8   modification, because the circuits had come into alignment with

9   respect to the predominance and superiority applying only to

10  those issues that are certified for classwide treatment as

11  opposed to needing to apply to the case as a whole.

12       In other words, Castano has been -- Castano is in the

13  past.

14       THE COURT:  Really, for me, it seems like on that last

15  point, the thing that -- I mean, I don't know that I know the

16  temporal answer, but, I mean, the Third Circuit identified that

17  split and then said we're not going either way.  Right?  That's

18  Gates.  Gates is still binding on me.  Regardless of what the

19  Sixth Circuit thinks or the advisory committee thinks, I live

20  under Gates and have to do that.  Right?  So that's sort of the

21  structure of the analysis here.

22       MR. THRONSON:  That's correct, Your Honor.

23       So if -- in terms of a (b)(3) type certification on

24  liability, you know, you would -- you know, either with that --

25  with that kind of certification or with issue certification,

1    you're looking at those factors, the Gates factors, with

2    respect to the issues in question.

3           And it doesn't really -- you know, I guess in Gates,

4    this issue doesn't really arise, because the Third Circuit has

5    taken the position of we're going to apply what's been termed a

6    functional superiority like analysis to this question rather

7    than getting way into the weeds of the interplay of how these

8    two provisions apply.

9           THE COURT:  I mean, I view Gates as essentially

10   imposing a bunch of factors that kind of capture the 23(b)(3)

11   analysis.  Right?  There's a lot of 23(b)(3) in there and then

12   maybe some more issues as well.  Right?

13          So I'm kind of doing a predominance, superiority,

14   almost like a superiority plus analysis is kind of how I

15   conceive of it.  Right?  I have to make sure it's a superior

16   way to go, but I also have to make sure that there aren't

17   issues floating around like constitutional problems and, you

18   know, choice of law problems and things like that that may

19   also -- and I understand choice of law can also come in in a,

20   you know, predominance choice -- or analysis.

21          But that's how I conceive of Gates.  So it's something

22   different.  I don't want to say it's more rigorous than (b)(3).

23   It may or may not be, but it's a little different is how I see

24   it.

25          So okay.  Let me --

1          MR. SHAFFER:  May I address --

2          THE COURT:  That's what I was going to ask, Mr.

3   Shaffer.  I want to give you a chance to talk about this before

4   I move to the sort of next thing on my list.

5          MR. SHAFFER:  Thank you, Your Honor.

6          Our view, and I think it is guided by the Third

7   Circuit's analysis in Gates and by the cases from this circuit,

8   Arch and Suboxone that are cited in our briefing, as well as a

9   decision from Judge Jordan back in December of this year,

10   Ferreras v. American Airlines, which came out after our

11   briefing.  That is 946 F.3d 178.  And the Third Circuit in that

12   case in reversing a district court's certification noted that

13   prior to certifying a class, a court must resolve every dispute

14   that is relevant to class certification before doing so.  And

15   I'm sure Your Honor is aware of that standard.  And Gates

16   similarly notes that you can't certify an issue class without

17   clearly enumerating the issues to be tried on the class basis

18   and explaining how remaining issues will be resolved.

19          And so it's not only that you can leave for another

20   day things that might not be tried in the issue class, but that

21   as part of any certification decision, the Court needs to

22   analyze whether, for example, problems of 23(a) or the

23   subsections of 23(b), including (b)(3), is analyzed through the

24   Gates factors whether or not they present a problem.  And in

25   our view, the way it's articulated here, there are problems

1  presented under 23(a), under the two alternatives, which in our

2  view are really just the same liability division that the

3  plaintiffs are arguing for.

4          23(c)(4) is a cleanup authority for the Court.  It

5  allows the Court to deal with permutations.  But as I think

6  Your Honor correctly noted, the way Gates analyzed the issue,

7  it certainly rejected Gunnells and the Fourth Circuit case

8  cited by the plaintiffs that there is not a superiority and a

9  predominance analysis as part of a (c)(4) class.  And we think

10  those are requirements that the Court needs to address.

11          THE COURT:  So do I look at the 23(a) factors sort of

12  colored by what I might do with the issues class?  Or do I have

13  to look at them for a case as a whole?  I mean, to the extent

14  there are distinctions, and there may be, what's your view on

15  that?

16          Because I don't -- well, let me say this:  I don't

17  think that Gates tackles that.  I do think that -- my

18  recollection is -- and maybe I'm going to get this name a

19  little off.  Hohider, was that the one that predated Gates in

20  the Third Circuit?

21          MR. SHAFFER:  Hohider.

22          THE COURT:  Yeah.  I think Hohider does seem to say

23  (a) and (b) kind of factor into this analysis.  And you would

24  look at both the (a) factors and the (b) factors with regard to

25  what you're considering, sort of what the issue you're

1  considering certifying.

2       MR. SHAFFER:  We think that's generally correct.  And

3  it probably can be done through several different lenses.  And

4  maybe even the Gates factors themselves allow you to think

5  about questions of commonality or typicality as you're

6  analyzing the questions that are presented.  They're

7  non-exhaustive factors.  And they specifically offer guidance

8  in an issues class like we have proposed here.

9       And I think the reason sort of logically why that

10  makes sense is otherwise plaintiffs could simply offer the

11  narrowest question for class treatment and say, well,

12  they're -- you know, typicality, commonality, numerosity are

13  satisfied as to this very, very narrow question, and Judge, you

14  don't -- you shouldn't look at anything else.  You shouldn't

15  look at the rest of the case and whether there are 23(a)

16  problems associated with that.  The Third Circuit I think would

17  reject that type of approach.

18       THE COURT:  I think as a practical matter -- and I

19  understand.  I think as a practical matter the Gates factors

20  kind of negate that possibility, personally.  I think that -- I

21  understand why it's a concern as I came into this and sort of

22  focus on the interplay of these sections.  And I understood the

23  argument about, well, you don't want to just sort of use the

24  issue class to define away the potential predominance problems

25  that are out there.  And I see that, and I think the Gates

1   factors kind of guide me in a way to say, no, look, I have to

2   look at the rest of this.  I have to look at the overlap

3   between what I'm putting in and out.  And, you know, is it kind

4   of proof, kind of witnesses, things like that, because that all

5   goes to manageability and efficiency as well.  I mean,

6   ultimately, if I'm doing this, it's because it's efficient.  I

7   mean, at some level that's -- I mean, I don't know if that word

8   is specifically in Gates, but it's sort of the guide star here

9   for why we would even consider doing this in the first place.

10          MR. SHAFFER:  And just to conclude on that, Your

11   Honor, I guess to the extent that Your Honor views the Gates

12   factors as providing a framework to look at the 23(a) factors

13   or the other 23(b) factors and is addressing those, as you say,

14   I don't think the Third Circuit has been crystal clear as to,

15   you know, you can only do it through marching through 23(a)

16   numerosity, typicality, commonality, adequacy of

17   representation, but certainly the substance of the analysis

18   must occur.

19          THE COURT:  Right.  I agree with that.

20          Okay.  I actually don't think -- listening to the two

21   of you, I understand you're different in where you want me to

22   go, but your sort of conceptual approach to how this gets

23   applied is actually not that far apart, so I'll chalk that up

24   as a win for me.

25          Okay.  So let me talk about the sort of two different

1    alternatives that you proposed here.  And let me start with

2    the -- sort of the broader version, which is option A I guess

3    you describe it as, this sort of full-fledged liability class.

4         And so cards on the table, I see problems with that.

5    Okay.  And let me tell you what they are and let you address

6    them.

7         You know, both of your claims include elements of

8    causation and harm.  And I see a problem potentially with the

9    overlap between that and the damages issue.  Right?  Isn't the

10   evidence of harm, which is an element of liability, basically

11   the same evidence of damages?

12        MR. THRONSON:  What we're proposing, Your Honor, is

13   that -- that obviously the questions of duty and breach be

14   addressed in a classwide basis.

15        And then with respect to harm, I think that there

16   is -- the relevant inquiry is whether there's an injury.  And

17   an injury is an invasion of a legally protected interest.  And

18   so here what we're proposing to determine on a classwide basis

19   is did ECFMG have a duty, you know, on all theories of

20   liability, did breach that duty on all theories of liability,

21   and was its conduct a cause of Akoda coming into contact with

22   patients, did it put him in the room with a patient, because

23   the injury here is unconsented to touching and medical

24   treatment.  That's the injury.  It's a battery.  It's, you

25   know, unconsented to treatment by a physician.

1          Now, the harm from that, the harm and the damages,

2    that's going to be determined in individualized proceedings.

3    So did that actually, you know, harm an individual class

4    member, meaning did the individual class member suffer damages

5    in some respect, and are those compensable.

6          So essentially that -- the causation inquiry doesn't

7    overlap in that sense, because the evidence that will be

8    presented in the individualized proceedings is what happened

9    with Akoda in that room.  It's already been concluded by the

10   first jury, assuming that we would succeed at the classwide

11   basis on the first class trial, that ECFMG was negligent and

12   that that caused Akoda to be in a position to cause harm to

13   these patients.  And it caused Akoda to cause an injury in

14   terms of an invasion of this legally protected interest that

15   we're talking about.

16         Now, this individualized proceeding, it's -- that's

17   the opportunity for the plaintiffs to come forward and say,

18   well, you know, did you actually see Akoda?  What happened?

19   Did you suffer emotional distress?  Is that emotional distress

20   traceable to this?  So in that sense the proof doesn't overlap.

21         THE COURT:  So I'm sorry, you said something now

22   that's going to make me go back.  But you talked about, you

23   know, the need to have come in contact with Akoda, right, that

24   it's essentially some sort of unauthorized touching.

25         And I guess that gives me some pause, because I see at

1   least two patterns where there's no touching within the

2   universe of people who you're defining as being within the

3   class.

4          So the first are, you know, you go back to the

5   rounding.  Right?  And there's, you know, some number of people

6   for whom he's just standing there.  Right?  He doesn't come in

7   contact with any of them.  So there's no battery, I don't

8   think.

9          MR. THRONSON:  That could be true in some instances,

10  that there's no battery.  But there are other -- there are

11  other interests at stake.  So, you know, was this patient --

12  was this patient naked?  Did ECFMG's negligence put Akoda in a

13  position where there's an invasion of privacy?

14         THE COURT:  But now you have a different harm.

15         MR. THRONSON:  Well, you've got -- you still have

16  injury.  So the question in the class proceeding is, is there

17  injury to patients in the form of invasion -- you know, this

18  battery that we're talking about, or, you know, an invasion of

19  privacy in terms of --

20         THE COURT:  But if those are different -- so if the

21  outcome is, you know, duty, breach, causes a battery, duty,

22  breach, causes an invasion of privacy, if those are different,

23  then doesn't that mean that potentially that last element is

24  not -- or maybe the last two elements are not susceptible to

25  classwide treatment, that we have to decide how they were

1    harmed, and isn't that an individual question?

2         MR. THRONSON:  I think, Your Honor, that it's -- the

3    classwide question is, was Akoda put in the room with patients,

4    was he put in the position to examine patients, to treat

5    patients, to touch them.

6         If -- to the extent that there are differing injuries

7    in this respect, you know, in terms of observation, then that

8    can be an issue that's addressed by subclasses.

9         THE COURT:  So let me ask a question.  If he's put in

10   the room, so he's just standing there before anything happens,

11   is the tort complete?

12        MR. THRONSON:  I think in some cases it would be.

13        THE COURT:  But not all cases?

14        MR. THRONSON:  Right.  Because just like with any --

15   with any class action, you know, you've got people who aren't

16   injured, who don't suffer any kind of injury as a result -- who

17   don't suffer any kind of harm as a result of it.

18        THE COURT:  But if they don't suffer a harm, I mean,

19   then how can I determine liability on a classwide basis for a

20   claim where one of the elements is harm?

21        MR. THRONSON:  So our allegation is that the tort --

22   the tort is complete when he's in the room, because there is

23   some invasion of a legally protected interest there.  There's a

24   touching, there's an observation of the person.  The person

25   didn't consent to an individual who is not a physician, who is

1    not a resident, who's obtained those qualifications through

2    fraud, the individual didn't consent to that person being

3    there.

4         THE COURT:  So let me just go back because I'm a

5    little concerned now on one of the other aspects of class

6    definition, which is the scenario where, you know, in the

7    private practice he meets with a patient but does not touch,

8    observe, et cetera.

9         So, you know, I'm hypothesizing, for example, you

10   know, someone who is pregnant and has a concern, comes in and

11   just sits in the room with him, maybe he's the guy there that

12   day.  Right?  And she comes in and they squeeze her in in an

13   emergency appointment.  And he sits in the room, in the office

14   with her across a desk and says, everything is normal, someone

15   did a sonogram, whatever it is, everything is normal, you're

16   fine, I understand it's nerve wracking, go home.

17        Is there a tort there in your world?

18        MR. THRONSON:  Yes.

19        THE COURT:  What's the harm then?

20        MR. THRONSON:  It's an invasion of privacy.  This

21   person disclosed confidential protected health information on

22   the basis of a fraud committed by this other person.  And Akoda

23   shouldn't have been there.  That's the whole crux of our case.

24   If ECFMG had done its job, Akoda shouldn't be there.

25        So the nature of the harm and damages is going to

1    differ, but there is a common injury in the sense that

2    regardless of the purpose of whether he's, you know --

3    regardless of the nature of his examination and treatment,

4    being in the room gives him access to confidential health

5    information of the patients.

6         THE COURT:  Okay.  I'm going to give you a chance to

7    respond, Mr. Shaffer, and then I have a different sort of

8    liability class issue for you -- question for you as well.

9         MR. SHAFFER:  Thank you, Your Honor.

10        I think your questions illustrate that what they are

11   trying to do, even with their issue class, presents the very

12   unworkable problem that the questions that they are trying to

13   carve out and say, well, these are common and can be addressed

14   without getting into individualized questions, we'll save those

15   for a later day, are involving the exact same evidence that are

16   going to go into whether there was an issue for an individual

17   person.

18        I mean, we didn't even talk about the fact that the

19   emotional distress that I understood that the plaintiffs were

20   trying to recover wasn't suffered the day they went in and met

21   with Dr. Akoda in this hypothetical meeting.  It was sometime

22   after 2016 when he pled guilty to Social Security fraud and

23   that was an event later on that may or may not have triggered

24   damage or a reaction, if they even heard about it, that is

25   necessary for their claim to begin with.

1          And so I think there are problems from a liability
2   perspective whether they want to try to identify it as a
3   liability-only question or whether they want to try to carve it
4   up into duty and breach.  And I'm happy to talk about that as
5   well.
6          THE COURT:  We're going to talk about that in a
7   second.
8          So let me ask, I think this is a sort of a logical
9   place to touch on some of the choice of law issues that you
10  raised as well.
11         Do I have to resolve the choice of law issues before I
12  certify the class, or can I sort of do it later?
13         And let me rephrase that.  Do I have to resolve them?
14  I mean, given sort of what you read to me and I think I saw in
15  the case that Judge Jordan handed down, where he says I've got
16  to resolve threshold issues if I'm going to certify a class, do
17  I just resolve it at this stage of the proceedings, or do I
18  have to say, well, because it's out there, it's a problem?
19         And just -- I know you want to answer.  I'm just going
20  to put one more little piece on this, which is, is the choice
21  really that significant from a class standpoint, because isn't
22  it really either Pennsylvania or Maryland law applies?  Or I
23  mean, I guess maybe there's a New Jersey possibility with
24  Jersey Shore, but otherwise, isn't it those two states?
25         MR. SHAFFER:  Let me take a couple of the questions

1    that you asked in order.

2            THE COURT:  Yeah.

3            MR. SHAFFER:  First of all, what is crystal clear is

4    that you cannot punt the choice of law issues and say, I don't

5    need to confront differences in choice of law; I don't need to

6    decide whether there are conflicts in choices of law and

7    certify a class at this stage.  That's not --

8            THE COURT:  Can't I say, look, I don't know which law

9    applies but it's going to be a state's law, and so therefore,

10   the claims will be common, without actually saying for certain

11   which state's law it is because maybe I want more factual

12   development on that?

13           MR. SHAFFER:  I don't think so in a class context,

14   Your Honor.  If you're going to certify a class -- I know Your

15   Honor had the Sheridan case recently where you were able to

16   defer the choice of law analysis for a more complete record.

17           I don't believe Rule 23, especially in the context of

18   looking at manageability, conflicts, triability of the case,

19   that you can -- that you have the luxury of that type of

20   approach in this case.  And I don't think it is clear that

21   there could only be two or three choices of law.

22           Pennsylvania's choice of law analysis is flexible.  We

23   have plaintiffs who are residents of Virginia, the District,

24   Maryland.  We have New Jersey.  We have Pennsylvania.

25           THE COURT:  So the way you characterize it in the

1   brief, and I think correctly, is to say, look, Pennsylvania

2   says you look at the state that has the most significant

3   interest in regulating this.  And the argument you make is,

4   well, Maryland has an interest in regulating the contact that

5   people who are seeing a doctor in Maryland have, you know, with

6   that doctor.

7          So even if -- I mean, let's assume I accept that

8   analysis.  It brings me, I guess, to the people in New Jersey

9   at Jersey Shore are subject to New Jersey law.  The people at

10  Prince George's and the private practice who are all seen in

11  Maryland are subject to Maryland law.  The people who are seen

12  at Howard are all subject to DC law.  Right?  But that should

13  be it, if that's the most significant interest test.  Right?

14  The fact that someone lives in Virginia doesn't bring Virginia

15  law into play.  Right?  Otherwise, I don't know how the most

16  significant interest test that you articulated works.

17         MR. SHAFFER:  I think that's probably right, Your

18  Honor.  You could, I suppose, have an individual plaintiff who

19  would argue that their choice of law analysis is different than

20  that.  But at a minimum, I agree with you that you're looking

21  at at least four subclasses for different choices of law if

22  you're going to adopt the proposition that there are -- that

23  the choice of law analysis is not a problem, because you're

24  going to have to analyze the question of whether, for example,

25  a negligent infliction of emotional distress claim even exists

1   under Maryland law.

2          THE COURT:  Or I could just look at those four states

3   and conclude their laws aren't meaningfully different and then

4   certify the class.  Right?  I'm not saying I've done that, but

5   if that's where that comes out, then I could do that.  Right?

6   Or potentially two subclasses if two states go one way and two

7   states go a different way or something like that.

8          MR. SHAFFER:  Obviously the choice of law analysis

9   will drive how many different laws are applied.  We certainly

10  think that there are conflicts here.  The false conflict

11  suggestion that the plaintiffs made certainly isn't true with

12  respect to Pennsylvania and Maryland.  And so I guess from our

13  perspective, we don't think the outcome of that choice of law

14  analysis would remove the problems that are presented by it,

15  but it would certainly have to be done.

16         THE COURT:  So, I mean, that answers one of my

17  questions, because I was concerned about, you know, the

18  hypothetical where, for example, someone has moved to Colorado

19  and would say Colorado law applies even though they were

20  treated in Maryland, but I don't think that's where we are.

21         So I think what I have to do to figure out -- I mean,

22  the words of the test sort of speak to it.  Right?  Which state

23  has the most significant interest.  And you say to me, well,

24  Maryland has got an interest, and maybe that's right, but you

25  haven't really weighed it against Pennsylvania's interest.

1  Right?  So Pennsylvania's interest is an entity.  It's

2  Pennsylvania.  It's Pennsylvania law.  Its actions occur in

3  Pennsylvania.  That's all of the actions that the plaintiffs

4  posit that give rise to the claim that are performed by that

5  entity take place in Pennsylvania.  Why doesn't Pennsylvania

6  have an interest that's at least as great as Maryland?  And if

7  Pennsylvania's interest is, you know, sort of the proverbial

8  balancing scales, that they're equal, why don't I apply

9  Pennsylvania?

10          MR. SHAFFER:  I guess, Your Honor, which plaintiff?

11  Right?  If we're talking about a named plaintiff who lives in

12  the District of Columbia who was seen at Howard County in

13  Maryland by -- with respect to a birth given in Maryland who

14  filed suit in Pennsylvania against a Pennsylvania company,

15  that's one choice of law analysis.  If you have a Maryland

16  resident with a Maryland injury, a Maryland birth at Howard

17  County and the only connection to Pennsylvania is that in this

18  case they've sued a Pennsylvania defendant, I think the choice

19  of law analysis that we cited would say Maryland has a greater

20  interest in regulating whether physicians, including those like

21  Dr. Akoda, can practice medicine in Maryland, what the standard

22  is going to be for a negligent infliction of emotional distress

23  claim in the context of the scenarios that the plaintiffs are

24  positing, there absolutely could be a greater interest on the

25  part of Maryland in defining the contours of what claim exists.

1          THE COURT:  So one of the things I find a little
2  strange about this is if there's a woman who was seen either in
3  the District of Columbia at Howard or in Maryland at Prince
4  George's County, I mean, that's a small area with a lot of
5  state boundaries nearby.  And so, you know, if you have, for
6  example, a woman who -- I'm going to sort of lay out one
7  variation of the hypothetical.  But who lives in Virginia and
8  gave birth at Howard and was treated by -- you know, seen Dr.
9  Akoda potentially as a resident or whatever, under the -- and
10  then she doesn't know anything about it until 2016 when she
11  was sort of -- until which she was sort of blissfully ignorant
12  and was living in Virginia with her kids and now she finds out
13  about it, says, this is horrible, right, I'm distressed.
14          So in that world, the ECFMG conduct takes place in
15  Pennsylvania.  Right?  And the -- I guess the plaintiff's
16  theory is that the harm arises in DC but the damages arise in
17  Virginia.  And it seems strange to me that for the most part,
18  none of the -- I mean, I don't know if I agree with your
19  conception.  And if I don't, then none of the elements of the
20  tort took place in DC, but you're still saying DC law would
21  apply.  And in their conception I guess one of the elements of
22  the tort took place in DC.  But it seems an odd outcome in some
23  respects to me that you could have this possibility where none
24  of the elements take place in the jurisdiction whose law you
25  think should apply.

1          MR. SHAFFER:  I guess the problem is you have to

2     choose a choice of law.

3          THE COURT:  But I could choose Pennsylvania, and in

4     Pennsylvania there's no doubt that some of the actions took

5     place for everybody.  Right?  I mean some of what happened at

6     issue in the case is ECFMG's conduct.

7          MR. SHAFFER:  So if this were a single plaintiff case

8     and that -- we had the scenario you articulated, which creates

9     problems, DC, Virginia, Pennsylvania, maybe they now move to

10    Colorado --

11         THE COURT:  Right.

12         MR. SHAFFER:  -- you could make an individualized

13    choice of law determination for that plaintiff and their

14    situation and their harm, and you could decide, there's nothing

15    really good here.  Pennsylvania seems to me to be the best and

16    it has the most interest.

17         We have a punitive class with individuals who will

18    have varying different analyses that have to be applied.  And

19    so from our perspective on a class basis to simply say, well,

20    because some class members might have no really good connection

21    to Maryland, so I'll just pick Pennsylvania, we would think

22    that would not be consistent with your obligations.

23         MR. THRONSON:  Just a brief response, Your Honor.

24         Courts, as you know, certify nationwide classes.  And

25    they certify, for instance, in the Warfarin case, the Court

1   noted, the Third Circuit:  When a defendant's singular conduct

2   gives rise to one cause of action in one state while providing

3   for a different cause of action in another state, the courts

4   may group both claims in a single class action.

5          And what courts do is they group relevant laws, you

6   know, similar laws together and apply them to the claims at

7   issue.

8          So here, as we talked about in our brief, we think

9   it's pretty clear that Pennsylvania law applies.  Defendants

10  haven't identified any relevant distinction on the negligence

11  claim.  Right?  Their only distinctions that they're raising

12  are on the negligent infliction of emotional distress claim.

13  So there's been no conflict that's been identified as to

14  negligence itself.

15         Moreover, you know, under Maryland law, you can't have

16  negligence that gives rise to emotional distress, as I

17  mentioned, in the absence of physical injury.  So we don't

18  think this is an issue under the case law or the facts of this

19  case that precludes class certification.

20         THE COURT:  Let me shift gears and focus on sort of

21  the option B prospects here for some narrower issues.  And I

22  mean, I'm -- I remain sort of dubious on the notion of any kind

23  of causation or harm issues being certified.  But let me talk

24  about the sort of duty and breach issues.  And let me start

25  with this.

1          I didn't see a lot, I don't think, in the briefs about

2     this, but I have seen some -- in some of what I've read about

3     it.  And maybe this has been resolved and I just missed it,

4     it's been resolved already.

5          But is there a constitutional problem under the 7th

6     Amendment if I allow some elements of the negligence claim to

7     be tried on a classwide basis and then have other elements

8     tried individually?

9          MR. THRONSON:  No, Your Honor.

10          THE COURT:  No?

11          You think yes?

12          MR. SHAFFER:  Absolutely could be, Your Honor.

13          THE COURT:  If there's overlap in the proofs; is that

14     right?

15          MR. SHAFFER:  Correct.  And there most certainly will

16     be.

17          THE COURT:  Well, let's get to that.

18          So let me sort of focus on sort of the duty and breach

19     elements, okay, because that's where I see the stronger

20     arguments here for certification.

21          It seems like from my perspective -- and, you know,

22     so, Mr. Shaffer, you can tell me why you think I'm wrong.  It

23     seems like the duty and breach analyses are sort of based on

24     the law, whichever law I determine is applicable.  And then as

25     a matter of law I decide if there's a duty.  And there's a

1   question about breach, but the breach is really about what

2   ECFMG did.  It's not about what any plaintiff did.  So why

3   aren't those issues subject to common proof?

4       MR. SHAFFER:  I think the simplest answer is that in

5   order to determine duty, whether it's a question of law for the

6   Court or it's an application of factual information to the law

7   to determine the existence of the duty, it's not a simple, does

8   ECFMG owe a duty to members of the public.  Duty is a

9   multifactorial analysis that the Court applies.  And the number

10  one factor that is part of that duty question is

11  foreseeability, and it's foreseeability of harm to the

12  plaintiff in a particular situation.  And your questions

13  earlier about harm highlight the very different nature of the

14  analysis that could occur with this particular case.

15      The other factors that go into duty, the degree of

16  certainty the plaintiff suffered the injury.  So the fact of

17  injury is relevant not only to causation but also to duty.  And

18  then another is the closeness of the connection between the

19  defendant's conduct and the injury suffered.

20      You know, we think of this as a Palsgraf or a

21  causation and remoteness context, which I think Your Honor has

22  pointed out, but the connection and the analysis of whether a

23  duty exists is highly individualized to look at a particular

24  plaintiff.  And --

25      THE COURT:  Why?

1          MR. SHAFFER:  We could look at two particular examples
2     here to perhaps think of a scenario.
3          Under the timeline that we have here, we could have a
4     question of whether someone who was seen at JMSC (sic) in 1998,
5     so a year after ECFMG had let the person through, no one else
6     had done anything, there is a person who's treated there, did
7     they owe that person a duty on the first day at JMSC not to
8     have certified Dr. Akoda, a legal duty that could result in
9     harm.
10          Then let's take a plaintiff like one of the named
11     plaintiffs here who wasn't seen until 2016 or 2017, after Dr.
12     Akoda had been hired by six, seven different entities, had been
13     subjected to licensing, to board certification, had been
14     through multiple employers, had been hired, had been fired, had
15     been hired by new individuals, whether they might have looked
16     at him.
17          And the question of whether ECFMG owes a duty to that
18     person in 2016 may be a different question.  We think there's
19     no duty in either respect, but there could be and there is a
20     different factual analysis that Your Honor has to address to
21     decide whether the duty that exists on January 1, 1998 is the
22     same as the duty in 2016.
23          THE COURT:  Why isn't that a causation argument?
24          MR. SHAFFER:  It's both.
25          THE COURT:  But it feels like you're blurring the two

1    elements then of the claim.

2         MR. SHAFFER:  The reason it's distinct is that

3    foreseeability is a requirement of duty.  It's a crux of duty.

4         THE COURT:  So foreseeability, as I understand it, is

5    a requirement both of duty and of causation.  But I think they

6    are different -- although the word is the same, I think they

7    are different foreseeability analyses.

8         As I -- and again, I'm going to have to go back and

9    read more on this, but as I at least understand it as I come in

10   here today, the foreseeability for the duty is, you know, sort

11   of analyzing whether the risk is there, whether you have

12   created a risk, versus the foreseeability for causation, which

13   is more -- you know, was the harm something you expected to

14   have happen.  And I think there's a distinction there.  And

15   maybe it's subtle, but I think at least in this context it's

16   important.

17        MR. SHAFFER:  I'll agree with you that there is a

18   distinction.  And I guess the way we have thought about it

19   here, it is a different foreseeability question.

20        So the question on the causation side really is, like

21   a Palsgraf, is it foreseeable that someone would read a report

22   from a US attorney's guilty plea about a Social Security fraud

23   and suffer injury related to some alleged conduct in 1996.

24   That's a causation/remoteness problem.

25        Here, even on duty, I guess the foreseeability

1    question is whether it was foreseeable that ECFMG's alleged

2    actions in 1996 after -- would have nonetheless placed the

3    plaintiff in 2016 after having been hired, fired, subject to

4    what everyone would expect an employer would do, what everyone

5    would expect a licensing board to do, what everyone would

6    expect a state to do before allowing that person to practice

7    medicine, whether those intervening steps, whether the

8    foreseeability of the harm to the plaintiff in 2016 because of

9    the degree of certainty, all of those separate acts, reviews,

10   obligations, many of which they have alleged in other cases,

11   are negligence on the part of those folks, whether those things

12   change the analysis on an individual basis for class members.

13   And if the answer is yes, then duty isn't a common question.

14   It still has individualized questions about who that plaintiff

15   is.

16         THE COURT:  Let me just break down two things.

17         I understand the argument about the individualized

18   issues.  I don't know whether I agree or disagree at this

19   point.  I'm still trying to figure it out.  But I understand

20   the argument.

21         I don't think from what you're telling me, and given

22   that the foreseeability analysis is different than it is for

23   the causation element, I don't think there's a common proof

24   problem as to that issue in terms of the sort of 7th Amendment

25   concern that I was articulating a couple minutes ago.  I think

1   the proofs are going to be different.  Right?  I'm going to ask
2   the jury at the duty and breach stage to evaluate one thing.
3   I'm going to ask the jury at the causation and damages phase to
4   answer something different.
5           MR. SHAFFER:  I guess I would -- A, we don't have a
6   trial plan to know whether or not what evidence would be
7   presented would be the same or different.  Given one of the
8   factors is the degree of certainty the plaintiff suffered the
9   injury, there absolutely would be a likelihood that the same
10  type of testimony that they're going to offer about a
11  particular plaintiff's interactions in the first phase is going
12  to be the exact same testimony they're going to offer in the
13  second phase.  And that's especially true I think in the
14  emotional distress context, where Spence kind of identified
15  this problem with, you know, an attempt to address certain
16  issues of duty and breach in the first phase and then damages
17  in the second phase and said they're interwoven.
18          And so we think given the nature of the claim here,
19  could I conceive of a case, for example, where it's, you know,
20  a mailing of some kind and there's no third parties and no
21  difference and everybody got it on the exact same day.  Maybe
22  Your Honor is correct in that scenario you don't have the
23  problem, but it is present here.
24          THE COURT:  So tell me what differences the plaintiff
25  sees in terms of sort of the foreseeability piece here.  I

1  mean, first off, tell me about it from -- the distinctions you

2  see in terms of the proof that would be presented as to duty

3  and breach versus harm and causation and then more generally

4  whether -- how you see the duty issues playing out classwide if

5  you think they can be done that way.

6       MR. THRONSON:  Your Honor, we see the evidence being

7  presented in the two stages as distinct.

8       The first stage would focus on ECFMG's conduct, what

9  ECFMG did or didn't do and whether that conduct was a cause of

10 Akoda coming into contact with patients.

11      Then the second phase, the evidence is what happened

12 in the interaction between Akoda and an individual patient.

13 Was it foreseeable that that interaction could give rise to

14 emotional distress on behalf of the plaintiffs, and learning of

15 his fraudulent certification years later, could that give rise

16 to emotional distress.

17      THE COURT:  So assume for a second that the causation

18 piece is something that I think needs to be done individually.

19 Okay?  So let's focus on sort of duty and breach.

20      You know, Mr. Shaffer identified a bunch of issues

21 that he thinks the -- sort of nature of the plaintiff, the

22 plaintiff's history, status, temporal -- you know, when they

23 encountered Mr. Akoda, all of that bears on the duty analysis.

24      You know, if that's right, then it does seem like

25 there's a bunch of individualized issues that preclude class

1    certification on -- even as to duty and breach.  Right?

2         MR. THRONSON:  I think that's an incorrect analysis of

3    duty.

4         THE COURT:  And why?

5         MR. THRONSON:  Because the issue of duty -- a duty is

6    determined primarily with reference to the defendant, you know.

7    They cite the Tulp case in which Judge Beetlestone identified a

8    common law duty on the part of ECFMG to give due process to

9    applicants.  And that was done without reference to this

10   individual's characteristics who was the plaintiff who was

11   aggrieved about a decision of ECFMG.  But the role of ECFMG

12   this is quasi public and private entity, its importance within

13   the healthcare system.

14        And you're right, there are those five factors.  One

15   of them is foreseeability of the injury, but it's not

16   foreseeability of the particular harm that's in question.  I

17   mean, when we -- in a medical malpractice case, you don't

18   reanalyze in every single case, well, does this doctor have a

19   duty to this patient who had a negligently performed C-section

20   and suffered these damages.  The duty analysis doesn't depend

21   on the individual characteristics of the plaintiff.  The duty

22   analysis depends, among other factors, on whether it's

23   foreseeable that a breach of this defendant's duty could cause

24   harm.  And it doesn't have to be the particular type of harm

25   that's suffered by the plaintiff.  It's just not how that

1  analysis occurs.

2          THE COURT:  Well, no, but it does -- I mean, doesn't

3  the nature of the plaintiff and her -- even in the medical

4  malpractice context, the nature of the plaintiff and, you know,

5  her injuries and the context in which she comes in contact with

6  the doctor, doesn't that impact what the scope of the doctor's

7  duty is?

8          MR. THRONSON:  So there has to be a doctor-patient

9  relationship, so that has to be shown.

10          THE COURT:  Right.  But even then, within the confines

11 of a doctor-patient relationship, for example, you know, I

12 mean, in the world of the absurd, if a patient who is pregnant

13 and is having pregnancy problems goes to see her dermatologist,

14 the dermatologist's duties are presumably different by virtue

15 of the nature of that interaction than they are if she goes to

16 see her OB.

17          MR. THRONSON:  The breach of the duty is different.  I

18 mean --

19          THE COURT:  The duty is different.  Right?

20          MR. THRONSON:  The duty is the same of reasonable care

21 under the circumstances with respect to the patient.

22          THE COURT:  Under the circumstances.

23          MR. THRONSON:  Yeah.  Acting as an ordinary physician.

24 And so the breach of the duty may be different with respect to

25 the dermatologist, the nature of the breach of it.

1          THE COURT:  But isn't it that -- I mean, if the

2  duty -- well, two things.  One is if the duty is different

3  under the circumstances, then doesn't that mean -- I mean, if I

4  port that logic here, then the circumstances -- if the

5  circumstances define or help define the duty, then I can't

6  certify a class, because the circumstances are going to be

7  different.

8          MR. THRONSON:  I'm not saying the duty differs.

9  That's not what I meant to say at all.

10          THE COURT:  Okay.

11          MR. THRONSON:  What I'm saying is that the duty -- the

12  duty doesn't depend on the individual nature of the harm and

13  damages suffered by these patients.  You know, these patients

14  all share a common characteristic, the proposed class.  They're

15  all patients of this one individual who was certified by ECFMG.

16  That's the relevant inquiry for class cert purposes, and that's

17  what can be determined on a classwide basis.

18          THE COURT:  Okay.  Let me just ask from both of your

19  perspectives -- let me ask the plaintiff in particular, because

20  you're the one who's positing a class here as a way to resolve

21  this.

22          If I resolve any of the duty or breach issues, let's

23  say I took one of your named plaintiffs as an initial test case

24  and resolved the duty issue in particular.  Let's start there,

25  because I resolve duty as a question of law.  Does that have

1   collateral estoppel effects in other cases, and is that an

2   alternative way to proceed that buys me some of the efficiency

3   without having to certify a class?

4          MR. THRONSON:  It does not, and it hasn't been the

5   experience I think of the judiciary that that is a workable

6   alternative.  Because under Park Lane, the inquiry is, is it

7   fair to apply this offensively to another case.  And so there's

8   going to be an argument from both sides that, well, it's not

9   fair to apply that result to this patient, this client, in this

10  case because there's some differences or because of mutuality.

11         This came up in the asbestos cases.  And there's

12  actually a reference in -- I think it's in the School Asbestos

13  Litigation case, In Re:  School Asbestos Litigation, where the

14  Court says, look, this has not proved to be a workable

15  alternative and certified the class as a (b)(3) class.

16         THE COURT:  So that seems a little strange to me from

17  an analytical standpoint, only because the reason collateral

18  estoppel doesn't apply is the differences, and the differences

19  are a reason to certify a class?  That seems like a strange

20  outcome.

21         MR. THRONSON:  I'm sorry, Your Honor.

22         THE COURT:  So I think what you said was, well,

23  collateral estoppel is not going to apply because the parties

24  are going to say, well, this plaintiff is different and this

25  plaintiff is different and this plaintiff is different, and

1   therefore, it's unfair to apply collateral estoppel; but if the

2   differences are what prevent the application of collateral

3   estoppel, and I'm looking at commonality in trying to find a

4   common solution, then doesn't that seem to suggest that I can't

5   certify a class because there are individual differences that

6   prevent the application of collateral estoppel as well?

7           MR. THRONSON:  I'm saying something slightly

8   different, which is that not that collateral estoppel wouldn't

9   apply, but you would get that argument with respect to each

10  plaintiff.

11          THE COURT:  So you're saying I wouldn't have to

12  relitigate the collateral estoppel?

13          MR. THRONSON:  Exactly.  It's a manageability issue.

14  You'd have to --

15          THE COURT:  Okay.  All right.  I understand.  Let me

16  see.

17          Okay.  We've covered -- from my perspective, we have

18  sort of already -- the discussion subsumed what I wanted to

19  cover on typicality.

20          I do want to hear from the defendant initially and

21  then hear your response on adequacy, because I'm not sure I

22  fully understood the issues.  You know, and I'm mostly

23  concerned again -- I understand the issues on adequacy as to

24  different types of injuries and encounters with Dr. Akoda, that

25  that sort of all -- I don't know whether it's right, but it all

1    makes sense to me, and I understand the arguments.

2            But the issue with respect to the Maryland litigation,

3    which I think was the first one you identified in your

4    opposition, I'm not sure I fully followed.  Both -- I mean, I

5    sort of know what happened.  I don't really want to retry the

6    litigation strategy decisions that were made in Maryland, but I

7    want to understand why you think that renders them inadequate.

8            MR. SHAFFER:  I guess what I will say about adequacy,

9    Your Honor, and it falls within the context of the types of

10   claims that are being asserted, which are emotional distress

11   claims, which we articulate in other parts of our brief,

12   individuals would have a strong interest in controlling, A,

13   whether they want to bring them; B, whether they want to be

14   involved in this particular case as to how they're going to

15   pursue it; and C, whether those class members believe that the

16   named plaintiffs who are here are aligned in terms of what any

17   individual class member might feel about their own situation.

18           And again, we're not in a position where we have, you

19   know, perspective on that, other than to know that you could

20   certainly understand that individuals, for example, might not

21   agree with having dismissed claims against the hospital in

22   Maryland that hired and allowed Akoda to treat 700 women for

23   nothing.

24           THE COURT:  But those were dismissed without a class

25   certification.  Right?

1        MR. SHAFFER:  Correct.

2        THE COURT:  So there's no preclusive effect of that.

3   And to the extent that someone here has a problem with the

4   litigation decision to pursue this as, say, an emotional

5   distress claim as opposed to a specific battery, intentional

6   tort type claim or something like that, they'll have the chance

7   to opt out and to do that if they want to.  Right?

8        MR. SHAFFER:  As we discussed earlier, there would

9   have to be an opt-out period.  The suggestion that there would

10  be some sort of limited issue class, there would be an opt out

11  of many individuals who might decide to bring their own claims,

12  and a second set of many mini-trials suggests that those

13  factors that talk about manageability and efficiency are not

14  served in a case like this.  Whether those are truly adequacy

15  of the representatives, maybe that's not the best prong to

16  identify those issues.

17       THE COURT:  I mean, the rubrics blur sometimes.  And I

18  understand that.  And, you know, the many mini-trials thing,

19  frankly, it doesn't -- it doesn't motivate me a lot, because it

20  does seem that they've signed a lot of plaintiffs up.  And one

21  way or another, there's probably going to be a lot of trials,

22  or, you know, a lot of -- at least a lot of time in court,

23  whether that's motions practice or what.

24       And so, you know, I think the thing I have to figure

25  out is whether there's a way to short-circuit some of that by

1    doing, you know, one trial on some issue and then a bunch of

2    what amount to like half-day trials or day-long trials on some

3    of the other issues.  If it's not that, if it's going to be,

4    well, I'm going to do the big trial and then we're still going

5    to have a bunch of three- and four-day trials, then I'm not

6    sure I get much.

7         And I understand you're -- I know you're about to say,

8    well, you don't have a trial plan, Judge.  And I heard that

9    argument, and I have to think about how significant that is

10   here.  I mean, obviously, I think to some extent the courts

11   have the discretion to call upon their experience to sort of

12   see how this case would play out.  If there's only one logical

13   way it would play out versus if there's a lot of ways it might

14   play out and there's a lot of uncertainty, then maybe it's

15   important for me to get a trial plan.

16        MR. SHAFFER:  And I think, again, we're speculating as

17   to what will come and what will ultimately be the posture of

18   plaintiffs who they have averred they have signed up.  We have

19   all been involved with cases with consolidated Complaints with

20   plaintiffs who all of a sudden it happens that there's far, far

21   fewer than there were represented to be.  And there are ways to

22   structure cases of consolidated actions in a way that don't run

23   afoul of Rule 23.

24        And so you know, I guess we would simply note for the

25   Court's consideration that the manageability and whether there

1   would be additional actions here or elsewhere, that if any

2   class action were trying to shoehorn a case into Rule 23 that

3   doesn't really belong there and that the Third Circuit has said

4   is not the kind of case that fits within that rubric doesn't

5   leave the Court without options on how to manage, administer

6   and effectively handle the docket.

7        THE COURT:  So I have two last issues on my outline to

8   cover, one sort of for each of you.  So I'll start with you,

9   Mr. Shaffer.

10       Statute of limitations, which I know you raise.  I

11  struggled a little bit with what your statute of limitations

12  argument is.  So tell me what your statute of limitations

13  argument is, and then I have some questions about how it

14  applies.

15       MR. SHAFFER:  Sure, Your Honor.

16       So the way in which a statute of limitations defense

17  would be presented here would be that the triggering event,

18  which we've heard from the named plaintiffs and I think was

19  averred in the Complaint, was the US Attorney's press release

20  announcing the guilty plea of Akoda for Social Security fraud

21  and that individual plaintiffs upon having read that suffered

22  harm or injury or damage as a result of having tied that to

23  some experience they had.

24       The Complaint in this case was filed two years minus

25  one day to the day of that press release.  And so there could

1    be a possibility that there would be individuals who would have

2    knowledge prior to the press release on an individual basis of

3    Akoda, of either his charge, of his arrest.  We have references

4    in some of the survey-like responses that we got from the

5    plaintiffs that certain individuals had suffered emotional

6    distress prior to that announcement by the US Attorney's

7    office.  And so if you have your emotional distress prior to

8    that date, it would be more than two years from the date of

9    filing, and that individual would have a potential statute of

10   limitations problem.

11          We pointed out as -- primarily to note that this is

12   not, as the plaintiffs tried to suggest, the only issue left

13   for another day is damages.  No.  There will be statute of

14   limitations issues that have to be resolved if there were

15   subsequent proceedings, not just amount of damages.

16          THE COURT:  So -- and, you know, I can go back and

17   find out, but with respect to the Akoda prosecution, there's an

18   announcement of a guilty plea.

19          Was there either an arrest or an indictment that

20   preceded that, or is this the kind of thing where there were

21   discussions with Akoda and his counsel, there's, you know, a

22   plea that's contemporaneous with the announcement?

23          MR. SHAFFER:  We don't know the answer for sure.  We

24   do know there was a pending medical malpractice claim against

25   Akoda at the time that he was arrested.

```
 1            THE COURT:  That alleged that he wasn't a doctor?
 2            MR. SHAFFER:  No.  But that would have perhaps --
 3   that's a class member who would have perhaps been in discovery,
 4   perhaps would have gained information about the arrest during
 5   that process that would potentially trigger again a question
 6   that would have to be resolved in that person's individual
 7   proceeding.
 8            To your question, I don't believe they issued a press
 9   release when the arrest occurred.
10            THE COURT:  So -- well, I mean, but if an arrest
11   occurred beforehand, you know, there's certainly -- I mean, you
12   know, there's a gossip mill and people may have known.
13            If there was no arrest, if there's just discussion,
14   he's a target, there's discussions with his counsel, he works
15   something out and then there's a press release at which time
16   either he turns himself in or, you know, has his first day
17   hearing or something like that, that's a little different in
18   terms of how much -- what the odds are that there's public
19   disclosure of it in advance.
20            And I guess that gets me to sort of my question here,
21   which is, you know -- I understand you're hypothesizing the
22   possibility that there are people who are going to be barred by
23   the statute of limitations, but is that enough to trigger a
24   statute of limitations defense that precludes class
25   certification?  Or -- you know, I mean, I haven't had you yet,
```

1    I've had some of your partners in Rule 16s with me.  One of my

2    bugaboos is that people plead affirmative defenses

3    prophylactically instead of affirmative defenses for which they

4    have a good faith basis under Rule 11.

5            Do you need a good faith basis under Rule 11 to say

6    that there are class members who are barred by the statute of

7    limitations, or is it just enough to say there might be?

8            MR. SHAFFER:  So I think what we have here at least,

9    Your Honor, evidence from the one malpractice case of an

10   individual who if they brought a -- if there was an issue class

11   certified and there was a secondary proceeding, there would be

12   a fight about whether that claim was barred by the statute of

13   limitations.  And our point in --

14           THE COURT:  But why?  I mean, doctors get sued for

15   malpractice all the time.  And sometimes it's meritorious and

16   sometimes it's not, but that doesn't mean that you have any

17   suspicion the person is not a doctor.

18           MR. SHAFFER:  If it -- I mean, the way the defense

19   would come up is in discovery and taking the deposition of that

20   plaintiff, did you hear about Dr. Akoda being arrested?  Yes.

21   How did you hear about that?  It was in the newspaper.  I don't

22   know.  I don't have specific information that says I know of

23   Person A who had knowledge that Dr. Akoda was arrested.  But if

24   discovery revealed that, we would be entitled to assert a

25   statute of limitations defense in a subsequent proceeding.

1          Maybe Ms. McEnroe can address you.

2          THE COURT:  You're welcome to address it.  That's

3    fine.

4          MS. McENROE:  Thank you.  One related point on that

5    also is there was a law enforcement search warrant executed at

6    the individual's residence, medical practice and vehicle in

7    June of 2016, which especially for the medical practice could

8    potentially more credibly implicate potential class members

9    who --

10         THE COURT:  I think I need a lot more detail before I

11   would be willing to conclude that that provided any kind of

12   constructive notice.  I mean, whether you have actual notice

13   because some patient is sitting in the waiting room when the

14   agents show up, I don't know.

15         Okay.  My last question, saved for the plaintiffs

16   before I kind of give you each a chance to cover anything you

17   think I haven't that you think I need to hear.  You know,

18   there's any number of cases out there that are resolved as mass

19   torts rather than as classes.  And there's a playbook for how

20   you do that.  And why isn't that what I should be doing here?

21   I mean, you've got a defendant that's in Pennsylvania.  Maybe

22   you get them with specific jurisdiction elsewhere, I don't even

23   know, for individual cases, but otherwise, you're going to file

24   it here.  The cases are all going to come here.  They're all

25   going to be related here.  Maybe or maybe not.  Maybe there

1   will be an MDL.  I don't know.

2          But, you know, it seems to me it's fairly likely one

3   way or another that even if I don't certify the class and even

4   if there is a bunch of individualized claims, you know, even if

5   you sue in Maryland, you know, I don't want to assume I know

6   Mr. Shaffer's playbook, but I'm willing to guess that he's

7   going to remove all of them if you file in Maryland Circuit

8   Court and -- or in, you know, Virginia or DC Superior Court.  I

9   think they're going to get removed.  And, you know, I see them

10  winding up here either via transfer motions or via an MDL.  I

11  don't presume to tell them how to consolidate things, but this

12  case is obviously a lot further along than anything else would

13  be.

14          And so why isn't that the way to resolve this?  And

15  just to do that and then either to have some test cases where I

16  could bracket value, you know, or you guys could just file your

17  cases here and we could consolidate them locally and, you know,

18  we could run some test cases and bracket value and then put a

19  master in place and try to get it resolved, why isn't that a

20  more efficient way to do this?

21          MR. THRONSON:  I think, Your Honor, you lose

22  efficiency in a couple of respects.

23          There's a lot of evidence that's going to need to

24  be -- to be put on as to this case.  And that's true of

25  other -- you know, other MDLs as well, but, you know -- cases

1    that are filed as mass torts.  But the conduct of ECFMG, the

2    conduct of Akoda, each side has identified eight to nine

3    experts.  It's a lot of trial time.

4           And so, you know, the pretrial proceedings for that

5    are going to be hotly contested I think in terms of who's an

6    appropriate bellwether plaintiff, you know, case information

7    sheets, things of that nature.

8           And at the end of the day, you don't have -- you've

9    got to put on the same evidence a number of times in any event

10   with the hope of eventually getting settlement.  And you don't

11   have a common resolution of these questions that we believe are

12   really common to each plaintiff and the resolution of which

13   will have a preclusive effect.

14          THE COURT:  So how does that distinguish this case

15   from any of the universe of mass tort cases that are out there

16   that the MDL panel consolidates somewhere, you know, whether

17   it's Opioids right now or -- you know, I mean, this Court has

18   had Fen-Phen over the years, and we had the Asbestos and, you

19   know, any of the other ones.  I mean, Tobacco was certainly a

20   case where -- you know, any number of Tobacco cases where there

21   was all kinds of common proof about the industry.  Years ago I

22   was in the Welding Fumes MDL where the allegation was that

23   there was this industrywide conspiracy to conceal the harmful

24   health effects of welding fumes.  And there was a lot of common

25   proof that had to be put on again and again and again.  And

1   some of it got done -- frankly, I thought -- maybe it was

2   inefficient that it got done again and again in the state

3   courts, but it also got done in federal court six or eight

4   times in the Northern District of Ohio, and then we were able

5   to sort of start sorting out where we stood.  And yeah, it's

6   common proof, and yeah, it's a little slower, but maybe it's

7   not a lot slower if there's a whole bunch of individual issues

8   that have to get tried anyway.

9        MR. THRONSON:  I think the distinction is in all of

10  those cases you have typically multiple producers, multiple

11  methods of distribution, multiple, you know, points of

12  consumption.  And so the -- there's common proof, but it

13  doesn't end up being very meaningful in terms of driving the

14  ultimate resolution of the litigation.

15       Here we have the actions of one corporation as to one

16  individual which caused damage to a group of plaintiffs.

17  That's the difference.  And it's just a lot easier and simpler

18  and cleaner to resolve these numerous common issues on a

19  classwide basis.

20       THE COURT:  What's your view on that?  I mean, in some

21  respects, I mean, I always felt weird saying it in practice,

22  but there's the arguable advantage to the defendant of having a

23  class certified as opposed to having to try the case, you know,

24  35 times just in bellwether trials, because if you win, it's a

25  grand slam.  You're done.

1          MR. SHAFFER:  And Your Honor, it's a question, but the

2    reality is the types of cases that we're talking about here,

3    the types of claims that are being asserted here, and the wide

4    range of experiences that we have and we already know about

5    from the individuals who are involved here, makes this much

6    more like your Welding Fume or your MDL or your consolidated

7    plaintiff at a -- you know, in a -- some sort of toxic case

8    than a class action with a single mailing, with a single

9    defendant and a single outcome four days after the letter is

10   mailed.  That's a class action -- you know, that has

11   feasibility and value in a class setting.

12          These cases may.  You're correct.  There are things

13   that can be done in a situation if there are consolidated

14   cases, if there are additional cases filed, that can be done to

15   advance multiple cases at once.  But Rule 23 doesn't allow you

16   to sort of, again, shoehorn cases that don't belong as a class

17   action in a class action purely for efficiency and especially

18   where there are other alternatives.  And you are correct, there

19   are -- there are risks to the defendant of that scenario as

20   well as, you know, to the class scenario.

21          But, you know, our view on that is it is not

22   appropriate.  The example we were talking about on a duty

23   question or a res judicata to say, you know, you can decide

24   that on a classwide basis and then individuals will come in and

25   fight about their facts were different and they weren't bound

1    anyway.

2            So we respectfully submit that Rule 23 isn't the way

3    you can go here.

4            THE COURT:  So I've covered what I wanted to cover

5    with you guys today.  I'll give you each a few minutes to wrap

6    up if there's things you want to cover with me, arguments you

7    want to make that I haven't covered, bearing in mind I hope you

8    can tell I read your briefs, and so I don't need you to repeat

9    that.  And also bear in mind that if you say to me, nope, I'm

10   good, I'm not going to look down on you and think that means

11   there's some weakness in your case.  I will be perfectly

12   happily to hear that.

13           MR. VETTORI:  Nope, we're good.

14           THE COURT:  From plaintiff's side?

15           MR. THRONSON:  I think one case that I think could be

16   instructive for Your Honor to take a look at is Wallace v.

17   Powell, which we cited in our brief.  That's the Kids for Cash

18   case.  And there was a -- it was a case that was certified on

19   all issues of liability out of the Middle District of

20   Pennsylvania.  And there were a variety of claims brought

21   there, you know, RICO claims, constitutional violation, various

22   constitutional violations, also state law false imprisonment.

23   And the Court found that certification on a classwide basis as

24   to liability was appropriate, notwithstanding obviously you

25   have all these plaintiffs, probably about 5,000 plaintiffs,

 1  different kinds of interaction with the judicial system,

 2  different injuries.  Emotional distress was claimed in that

 3  case.  But at the core of it all is a common course of conduct

 4  by Judge Shivarelo and these corporations to deprive these

 5  individuals of their constitutional rights.  And so that case I

 6  think is a good demonstration of the facts that the fact that

 7  emotional distress damages are claimed is no barrier to class

 8  certification.

 9          THE COURT:  Okay.  All right.  Mr. Shaffer, anything?

10          MR. SHAFFER:  Only one point to bring us back to.  I

11  think the very first question that Your Honor asked the

12  plaintiffs that I made a note of, and that related to the

13  damages that they're talking about asserting, only emotional

14  distress damages.  And we've discussed that yes, if there were

15  notice and an opt-out, that there would be maybe individuals

16  who believe that they had a personal injury claim of some kind

17  that they could decide to opt out.

18          I believe there would be a claim-splitting problem if

19  they don't opt out and go to judgment in this case, that they

20  couldn't say at the judgment, let's say our client prevails and

21  they say, well, I only asserted a claim for emotional distress.

22  Now I want to file a lawsuit for my personal injury arising

23  from the exact same conduct.  I believe that judgment is going

24  to bar them from all damages that would arise from the same

25  conduct.

1         And so again, it's just another point that certifying

2    this as a class both from the defendant's perspective but also

3    for class members could mean if they don't opt out, it's not

4    that the plaintiffs in this case have asserted the full panoply

5    of possible claims and damages that someone could envision

6    could arise from Dr. Akoda, and a judgment would potentially

7    raise the possibility that those claims are extinguished.

8         THE COURT:  Yeah.  I mean, I don't have to decide

9    that.  Right?  Because presumably they file somewhere else.

10   But it seems to me that's what the opt-out is for.  Right?  If

11   we think notice is meaningful, you know, if we operate under

12   the view that the notice that they get is meaningful, it

13   actually tells them what their rights are and then they get to

14   make an informed judgment.

15        And some plaintiffs choose -- I mean, a plaintiff

16   might say, no, I was damaged by more than this.  Some other

17   plaintiff might say, hey, great, there's less for me to do and

18   someone else is carrying the water.  So I'm less troubled by

19   that possibility in this circumstance as long as there's an

20   opt-out.

21        MR. SHAFFER:  I guess I would just simply compare it

22   to the typical (b)(3) opt-out case where you're not just simply

23   seeking one type of damages and you're excluding all the other

24   possible damages arising from an act.  You would -- presumably

25   most (b)(3) cases, the plaintiffs seek all the damages arising

1    from a particular conduct at one time.  And so --

2         THE COURT:  I don't know.  I mean, you know, I sat on

3    the plaintiff's side of cases sometimes where we'd say issue X,

4    Y or Z creates a problem for us from a class certification

5    standpoint and we don't think that makes sense and, you know,

6    we're not going to pursue, for instance, unjust enrichment.

7    Unjust enrichment is really, really hard to certify because of

8    the variations among state law.  And some plaintiffs will say,

9    let's drop it.  I don't want to do that.  Or I don't want to

10   pursue a state unfair competition claim instead of an antitrust

11   claim.

12        MR. SHAFFER:  And with respect to theories, I

13   understand and agree with Your Honor that that doesn't create

14   the issue I'm talking about here.  This is -- they're talking

15   about some of the interactions and saying that person gets up

16   and testifies about the interaction and the physical injury

17   that they suffered, then that person hasn't opted out, that

18   claim is going to be barred.  And again, maybe that's not for

19   today's problem, but when considering the practical

20   implications, the manageability and the issue certification

21   concept that they've offered, I just wanted to raise it since

22   it was the first Post-it note I kept.

23        THE COURT:  I will keep it in mind.

24        All right.  So no surprise, I'm not ruling today.  I'm

25   going to take it under advisement.  This was extraordinarily

1  helpful to me, so thank you.  And we'll try and get you

2  something expeditiously.  The motion I know has been pending

3  for a while, although it took a while to get the argument

4  scheduled too.  But I'll try to get you something, you know, in

5  the not too, too distant future so we've got some clarity about

6  what's going to happen with this case going forward.  Okay.

7         We're going to be adjourned.  I'm going to clean up

8  here for a minute, so you can sit or go about your business,

9  that's fine.  Have a good day, everybody.

10         (Proceedings concluded at 3:56 p.m.)

11

12

13         I certify that the foregoing is a correct transcript

14  from the record of proceedings in the above-entitled matter.

15

16  _____

17  Ann Marie Mitchell, CRR, RDR, RMR
   Official Court Reporter

18

19

20

21

22

23

24

25

**1** [1] - 50:20
**100** [2] - 2:9, 16:25
**11** [2] - 66:3, 66:4
**1211** [1] - 2:14
**1500** [1] - 2:3
**16s** [1] - 65:25
**1701** [1] - 2:20
**178** [1] - 30:11
**18-5629** [1] - 3:5
**19102** [1] - 2:4
**19103** [1] - 2:21
**19106** [1] - 1:8
**1996** [2] - 51:22, 52:1
**1998** [5] - 18:7, 18:11, 18:14, 50:4, 50:20
**200** [1] - 1:16
**2000** [4] - 18:7, 18:10, 18:11, 18:15
**2007** [1] - 18:15
**2011** [1] - 18:15
**2016** [8] - 39:22, 45:10, 50:10, 50:17, 50:21, 52:2, 52:7, 67:6
**2017** [1] - 50:10
**2020** [1] - 1:9
**20th** [1] - 2:9
**21201** [1] - 2:10
**21202** [1] - 2:15
**21208** [1] - 1:16
**215** [2] - 2:5, 2:21
**23** [6] - 20:9, 41:17, 62:22, 63:1, 71:14, 72:1
**23(a** [16] - 4:22, 26:4, 26:6, 26:7, 26:11, 26:19, 26:20, 26:23, 27:3, 30:22, 31:1, 31:11, 32:15, 33:12, 33:15
**23(b** [3] - 4:18, 30:23, 33:13
**23(b)(3** [2] - 29:10, 29:11
**23(c** [1] - 4:19
**23(c)(4** [2] - 26:5, 31:4
**267** [1] - 1:21
**299-7250** [1] - 1:21
**2:06** [2] - 1:9, 3:1
**2:18-cv-05629** [1] - 1:3
**30** [1] - 1:9
**35** [1] - 70:23
**3900** [1] - 2:4
**3:56** [1] - 76:9
**4** [1] - 1:15
**410** [3] - 1:17, 2:10, 2:15
**5,000** [1] - 72:24
**598-1667** [1] - 2:15
**601** [1] - 1:8
**649-2027** [1] - 2:10
**653-3200** [1] - 1:17
**700** [1] - 60:21
**712** [1] - 12:12
**7th** [2] - 48:5, 52:23
**864-9600** [1] - 2:5

**876** [1] - 9:11
**946** [1] - 30:11
**963-5000** [1] - 2:21
**a)(3** [1] - 27:20
**able** [3] - 6:19, 41:15, 70:3
**above-entitled** [1] - 76:13
**absence** [1] - 47:17
**absolutely** [4] - 22:9, 44:24, 48:12, 53:8
**abstract** [1] - 10:7
**absurd** [1] - 56:11
**accept** [1] - 42:7
**access** [1] - 39:4
**accurately** [1] - 18:22
**acknowledge** [1] - 17:2
**act** [1] - 74:23
**acting** [1] - 56:22
**ACTION** [1] - 1:3
**action** [11] - 27:11, 37:15, 47:2, 47:3, 47:4, 63:1, 71:7, 71:9, 71:16
**actions** [7] - 44:2, 44:3, 46:4, 52:1, 62:21, 62:25, 70:14
**acts** [1] - 52:8
**actual** [1] - 67:11
**addition** [1] - 5:6
**additional** [3] - 7:15, 62:25, 71:13
**address** [8] - 28:3, 30:1, 31:10, 34:5, 50:19, 53:14, 66:25, 67:1
**addressed** [3] - 34:14, 37:8, 39:13
**addressing** [1] - 33:13
**adequacy** [5] - 33:16, 59:20, 59:22, 60:7, 61:13
**adjourned** [1] - 76:6
**administer** [1] - 63:4
**administrator** [1] - 17:6
**adopt** [1] - 42:22
**advance** [2] - 65:18, 71:14
**advantage** [1] - 70:21
**advisement** [1] - 75:24
**advisory** [3] - 27:23, 28:2, 28:19
**afoul** [1] - 62:22
**afternoon** [9] - 3:2, 3:3, 3:10, 3:17, 3:19, 3:21, 3:23, 3:24, 4:1
**agents** [1] - 67:13
**aggrieved** [1] - 55:10
**ago** [3] - 18:17, 52:24, 69:20
**agree** [11] - 24:1, 24:11, 24:12, 25:18, 33:19, 42:20, 45:18, 51:16, 52:17, 60:20, 75:12
**ahead** [2] - 22:13, 23:22
**aided** [2] - 1:23, 10:4
**Airlines** [1] - 30:10

**Akoda** [53] - 7:24, 9:3, 9:14, 9:15, 9:19, 9:20, 9:25, 11:11, 12:3, 12:5, 12:8, 12:10, 12:13, 12:18, 12:23, 14:11, 17:14, 18:3, 18:17, 19:1, 20:15, 21:8, 25:22, 34:21, 35:9, 35:12, 35:13, 35:18, 35:23, 36:12, 37:3, 38:22, 38:24, 39:21, 44:21, 45:9, 50:8, 50:11, 54:9, 54:11, 54:22, 59:23, 60:21, 63:19, 64:2, 64:16, 64:20, 64:24, 66:19, 66:22, 69:1, 74:5
**Akoda's** [2] - 12:20, 18:9
**al** [1] - 1:3
**aligned** [1] - 60:15
**alignment** [1] - 28:8
**allegation** [2] - 37:21, 69:21
**alleged** [4] - 51:22, 51:25, 52:9, 64:25
**allegedly** [1] - 9:20
**alleging** [1] - 7:20
**allow** [4] - 21:12, 32:4, 48:6, 71:14
**allowed** [1] - 60:21
**allowing** [1] - 52:5
**allows** [1] - 31:5
**almost** [2] - 23:6, 29:14
**alternative** [4] - 4:19, 58:1, 58:5, 58:14
**alternatives** [4] - 7:15, 31:1, 34:1, 71:17
**Amendment** [2] - 48:6, 52:23
**American** [1] - 30:10
**amount** [2] - 62:1, 64:14
**analyses** [3] - 46:18, 48:23, 51:6
**analysis** [34] - 26:21, 26:24, 27:3, 27:9, 27:21, 28:21, 29:6, 29:11, 29:14, 29:20, 30:7, 31:9, 31:23, 33:17, 41:16, 41:22, 42:8, 42:19, 42:23, 43:8, 43:14, 44:15, 44:19, 49:9, 49:14, 49:22, 50:19, 52:11, 52:21, 54:22, 55:1, 55:19, 55:21, 55:25
**analytical** [1] - 58:16
**analyze** [4] - 26:24, 27:24, 30:22, 42:24
**analyzed** [2] - 30:23, 31:6
**analyzing** [2] - 32:6, 51:10
**ANGELOS** [1] - 2:8
**Ann** [2] - 1:20, 76:16
**announcement** [3] - 64:5, 64:17, 64:21
**announcing** [1] - 63:19
**answer** [6] - 28:16, 40:19, 49:4, 52:12, 53:3, 64:22
**answers** [1] - 43:16
**anticipate** [1] - 19:13

**antitrust** [4] - 17:3, 21:16, 21:21, 75:9
**anyway** [2] - 70:7, 71:25
**apart** [1] - 33:23
**appear** [1] - 20:15
**APPEARANCES** [2] - 1:13, 2:1
**appearances** [1] - 3:6
**applicable** [2] - 7:17, 48:24
**applicants** [1] - 55:8
**application** [5] - 18:5, 22:16, 49:6, 59:1, 59:5
**applied** [3] - 33:23, 43:9, 46:18
**applies** [8] - 7:9, 26:19, 40:22, 41:9, 43:19, 47:9, 49:9, 63:13
**apply** [15] - 26:11, 28:4, 28:11, 29:5, 29:8, 44:8, 45:21, 45:25, 47:6, 58:6, 58:8, 58:17, 58:22, 58:25, 59:8
**applying** [1] - 28:9
**appointment** [1] - 38:13
**approach** [3] - 32:17, 33:22, 41:20
**approaches** [1] - 4:20
**appropriate** [4] - 22:20, 69:5, 71:21, 72:23
**approved** [1] - 12:6
**Arch** [1] - 30:8
**area** [1] - 45:4
**arguable** [1] - 70:21
**argue** [1] - 42:19
**arguing** [1] - 31:3
**ARGUMENT** [1] - 1:5
**argument** [11] - 32:23, 42:3, 50:22, 52:16, 52:19, 58:7, 59:8, 62:8, 63:11, 63:12, 76:2
**arguments** [7] - 4:7, 4:23, 6:25, 27:1, 48:20, 59:25, 72:5
**arise** [5] - 27:14, 29:4, 45:16, 73:23, 74:5
**arises** [2] - 10:11, 45:16
**arising** [3] - 73:21, 74:23, 74:24
**arrest** [6] - 64:2, 64:18, 65:3, 65:8, 65:9, 65:12
**arrested** [3] - 64:24, 66:19, 66:22
**articulate** [1] - 60:10
**articulated** [3] - 30:25, 42:16, 46:8
**articulating** [1] - 52:24
**asbestos** [1] - 58:10
**Asbestos** [3] - 58:11, 58:12, 69:17
**ascertainability** [4] - 4:14,

11:3, 19:5, 20:12
**ascertainable** [1] - 22:6
**ascertaining** [1] - 12:5
**ascertainment** [1] - 17:9
**aside** [1] - 23:2
**aspects** [1] - 38:5
**assert** [4] - 6:17, 7:2, 7:10, 66:23
**asserted** [8] - 4:12, 5:15, 6:15, 6:24, 60:9, 71:2, 73:20, 74:3
**asserting** [4] - 5:20, 6:16, 27:13, 73:12
**assisting** [2] - 9:10, 15:19
**associated** [1] - 32:16
**assume** [7] - 6:23, 7:16, 13:12, 13:19, 42:7, 54:16, 68:4
**assuming** [2] - 18:14, 35:10
**attempt** [1] - 53:14
**attending** [1] - 15:22
**Attorney's** [2] - 63:18, 64:5
**attorney's** [1] - 51:21
**authority** [1] - 31:4
**averred** [2] - 62:17, 63:18
**aware** [2] - 30:15
**b)(3** [11] - 24:1, 24:12, 24:13, 24:21, 26:8, 27:22, 28:23, 30:23, 58:14, 74:21, 74:24
**b)(3)** [1] - 29:22
**baby** [1] - 21:10
**balancing** [1] - 44:8
**Baltimore** [3] - 1:16, 2:10, 2:15
**bar** [1] - 73:23
**barred** [4] - 65:21, 66:5, 66:11, 75:17
**barrier** [1] - 73:6
**based** [7] - 6:24, 7:10, 10:9, 13:12, 13:21, 16:22, 48:23
**bases** [1] - 7:17
**basic** [1] - 7:14
**basis** [18] - 20:8, 24:16, 30:17, 34:14, 34:18, 35:11, 37:19, 38:22, 46:19, 48:7, 52:11, 57:16, 64:1, 66:3, 66:4, 70:18, 71:23, 72:22
**battery** [7] - 8:7, 34:24, 36:7, 36:10, 36:18, 36:21, 61:4
**bceryes@sfspa.com** [1] - 2:16
**bear** [2] - 10:24, 72:8
**bearing** [2] - 11:21, 72:6
**bears** [1] - 54:22
**become** [1] - 21:13
**Beetlestone** [1] - 55:6
**BEFORE** [1] - 1:11
**beforehand** [1] - 65:10
**begin** [1] - 39:25

**behalf** [7] - 3:9, 3:12, 3:15, 3:18, 3:22, 4:2, 54:13
**Behr** [1] - 27:25
**bellwether** [2] - 69:5, 70:23
**belong** [2] - 63:2, 71:15
**benefit** [1] - 17:6
**best** [4] - 13:22, 22:22, 46:15, 61:14
**better** [1] - 13:12
**between** [9] - 4:18, 7:20, 7:24, 26:4, 27:22, 33:3, 34:9, 49:18, 54:11
**beyond** [2] - 16:10, 16:21
**big** [1] - 62:3
**bill** [1] - 13:16
**billing** [5] - 13:19, 14:3, 14:9, 18:18, 18:20
**binding** [1] - 28:18
**birth** [3] - 44:13, 44:16, 45:8
**bit** [3] - 11:16, 26:3, 63:10
**blissfully** [1] - 45:11
**blur** [1] - 61:16
**blurring** [1] - 50:24
**board** [2] - 50:12, 52:4
**boards** [1] - 24:25
**BOCKIUS** [1] - 2:18
**bought** [1] - 21:19
**bound** [2] - 16:19, 71:24
**boundaries** [1] - 45:5
**bracket** [2] - 68:15, 68:17
**breach** [23] - 10:12, 10:18, 19:23, 34:13, 34:20, 36:21, 36:22, 40:4, 47:24, 48:18, 48:23, 49:1, 53:1, 53:15, 54:2, 54:18, 54:25, 55:22, 56:16, 56:23, 56:24, 57:21
**breached** [1] - 20:4
**break** [1] - 52:15
**BRENT** [1] - 2:14
**Brent** [1] - 3:17
**BRIAN** [1] - 2:19
**Brian** [1] - 3:21
**brief** [6] - 6:2, 25:3, 42:1, 46:23, 47:8, 60:10, 72:16
**briefed** [1] - 5:7
**briefing** [10] - 6:25, 9:1, 11:17, 15:3, 18:3, 18:6, 22:15, 22:18, 30:8, 30:11
**briefly** [2] - 22:11
**briefs** [3] - 5:4, 48:1, 72:7
**bring** [4] - 42:14, 60:12, 61:10, 73:9
**brings** [1] - 42:8
**broader** [1] - 34:2
**brought** [2] - 66:9, 72:19
**bshaffer@morganlewis. com** [1] - 2:22
**bugaboos** [1] - 66:1
**bunch** [11] - 11:6, 20:25,

21:2, 26:25, 29:10, 54:19, 54:24, 61:25, 62:4, 68:3, 70:6
**business** [1] - 76:7
**buys** [1] - 58:1
**Byrne** [1] - 1:7
**c)(4** [8] - 24:6, 24:11, 24:14, 25:3, 25:5, 27:23, 28:3, 31:9
**C-section** [1] - 55:18
**cannot** [1] - 41:4
**capable** [1] - 17:8
**capacity** [1] - 15:18
**capture** [2] - 17:1, 29:10
**cards** [1] - 34:4
**care** [5] - 12:19, 14:4, 15:19, 56:19
**carefully** [1] - 5:3
**carrying** [1] - 74:17
**carve** [2] - 39:13, 40:3
**case** [68] - 4:12, 5:21, 6:13, 6:18, 8:23, 10:7, 10:16, 10:23, 12:6, 16:11, 17:3, 17:4, 20:19, 23:6, 24:10, 26:8, 27:7, 27:8, 28:5, 28:11, 30:12, 31:7, 31:13, 32:15, 38:23, 40:15, 41:15, 41:18, 41:20, 44:18, 46:6, 46:7, 46:25, 47:18, 47:19, 49:14, 53:18, 55:6, 55:16, 55:17, 57:22, 58:6, 58:9, 58:12, 60:13, 61:13, 62:11, 63:1, 63:3, 63:23, 66:8, 68:11, 68:23, 69:5, 69:13, 69:19, 70:22, 71:6, 72:10, 72:14, 72:17, 73:2, 73:4, 73:18, 74:3, 74:21, 76:5
**cases** [28] - 7:5, 21:21, 30:7, 37:12, 37:13, 52:9, 57:25, 58:10, 62:18, 62:21, 67:17, 67:22, 67:23, 68:14, 68:16, 68:17, 68:24, 69:14, 69:19, 70:9, 71:1, 71:11, 71:13, 71:14, 71:15, 74:24, 75:2
**Cash** [1] - 72:16
**Castano** [2] - 28:12
**causation** [13] - 34:8, 35:6, 47:23, 49:17, 49:21, 50:22, 51:4, 51:11, 51:19, 52:22, 53:2, 54:2, 54:16
**causation/remoteness** [1] - 51:23
**caused** [3] - 35:12, 35:13, 70:15
**causes** [2] - 36:21, 36:22
**Center** [4] - 2:9, 12:11, 13:2, 13:7
**Centrella** [1] - 3:15
**CENTRELLA** [2] - 2:3, 3:14
**cert** [2] - 9:1, 57:15
**certain** [5] - 7:5, 17:5, 41:10,

53:14, 64:4
**certainly** [17] - 4:6, 5:7, 5:9, 7:21, 10:24, 11:18, 17:24, 18:22, 31:7, 33:17, 43:9, 43:11, 43:15, 48:15, 60:19, 65:10, 69:18
**certainty** [3] - 49:16, 52:8, 53:7
**certification** [29] - 4:17, 4:21, 9:17, 9:21, 10:1, 18:10, 19:10, 21:22, 22:5, 22:25, 23:9, 27:19, 28:23, 28:25, 30:12, 30:14, 30:21, 47:19, 48:20, 50:12, 54:14, 54:25, 60:24, 65:24, 72:22, 73:7, 75:3, 75:19
**certified** [12] - 9:21, 22:19, 25:22, 26:9, 28:10, 47:23, 50:8, 57:14, 58:14, 66:10, 70:22, 72:17
**certify** [25] - 6:3, 9:2, 10:15, 11:18, 19:15, 23:21, 23:23, 23:25, 24:9, 26:10, 30:16, 40:12, 40:16, 41:7, 41:14, 43:4, 46:24, 46:25, 57:5, 58:2, 58:18, 59:4, 68:2, 75:6, 76:12
**certifying** [8] - 9:9, 24:7, 24:15, 24:22, 24:23, 30:13, 32:1, 73:25
**Ceryes** [1] - 3:17
**CERYES** [2] - 2:14, 3:17
**cetera** [1] - 38:8
**chalk** [1] - 33:23
**chambers** [1] - 4:6
**chance** [5] - 14:25, 30:3, 39:6, 61:5, 67:15
**change** [2] - 20:5, 52:11
**characteristic** [1] - 57:13
**characteristics** [2] - 55:9, 55:20
**characterize** [1] - 41:25
**charge** [1] - 64:2
**Charles** [2] - 2:9, 2:9
**chart** [8] - 13:25, 14:10, 15:10, 15:12, 15:14, 15:20, 17:14, 20:15
**charted** [1] - 15:17
**charts** [1] - 16:12
**Chaudry** [1] - 13:7
**choice** [19] - 6:25, 29:18, 29:19, 29:20, 40:9, 40:11, 40:20, 41:4, 41:5, 41:16, 41:22, 42:19, 42:23, 43:8, 43:13, 44:15, 44:18, 46:2, 46:13
**choices** [3] - 41:6, 41:21, 42:21
**choose** [3] - 46:2, 46:3, 74:14

**Circle** [1] - 1:15
**circle** [1] - 4:21
**circuit** [4] - 27:24, 28:1, 30:7, 61:24
**Circuit** [12] - 27:25, 28:16, 28:19, 29:4, 30:11, 31:7, 31:20, 32:16, 33:14, 47:1, 63:2, 68:6
**Circuit's** [1] - 30:7
**circuits** [1] - 28:8
**circumstance** [1] - 74:18
**circumstances** [7] - 9:5, 56:20, 56:21, 57:2, 57:3, 57:4, 57:5
**cite** [1] - 55:6
**cited** [4] - 30:8, 31:8, 44:19, 72:16
**CIVIL** [1] - 1:3
**civil** [1] - 27:23
**claim** [29] - 5:17, 6:22, 7:2, 7:9, 8:22, 9:24, 10:9, 18:8, 37:20, 39:25, 42:25, 44:4, 44:23, 44:25, 47:11, 47:12, 48:6, 50:25, 53:17, 61:4, 61:5, 64:23, 66:11, 73:15, 73:17, 73:20, 75:9, 75:10, 75:17
**claim-splitting** [1] - 73:17
**claimed** [2] - 73:1, 73:6
**claiming** [1] - 18:12
**claims** [19] - 4:11, 5:14, 10:6, 27:9, 27:13, 34:7, 41:10, 47:4, 47:6, 60:9, 60:10, 60:20, 61:10, 68:3, 71:2, 72:19, 72:20, 74:4, 74:6
**clarify** [3] - 4:11, 25:20, 28:3
**clarity** [2] - 10:23, 76:4
**class** [123] - 4:13, 4:16, 4:20, 5:24, 6:13, 6:19, 8:25, 9:9, 11:1, 11:5, 11:8, 11:18, 11:19, 11:20, 12:2, 12:17, 14:13, 17:23, 18:12, 19:6, 19:7, 19:9, 19:15, 19:20, 19:22, 19:25, 20:6, 20:8, 21:3, 21:13, 21:15, 21:16, 21:22, 22:3, 22:5, 22:6, 23:10, 23:15, 23:19, 23:23, 23:25, 24:1, 24:9, 24:10, 24:12, 24:21, 24:24, 25:1, 25:3, 25:5, 25:17, 25:19, 26:9, 27:10, 27:11, 27:14, 27:17, 30:13, 30:14, 30:16, 30:17, 30:20, 31:9, 31:12, 32:8, 32:11, 32:24, 34:3, 35:3, 35:4, 35:11, 36:3, 36:16, 37:15, 38:5, 39:8, 39:11, 40:12, 40:16, 40:21, 41:7, 41:13, 41:14, 43:4, 46:17, 46:19, 46:20, 47:4, 47:19, 52:11, 54:24, 57:5,

57:13, 57:15, 57:19, 58:2, 58:14, 58:18, 59:4, 60:14, 60:16, 60:23, 61:9, 63:1, 65:2, 65:23, 66:5, 66:9, 67:7, 68:2, 70:22, 71:7, 71:9, 71:10, 71:15, 71:16, 71:19, 73:6, 74:1, 74:2, 75:3
**classes** [4] - 24:13, 24:14, 46:24, 67:18
**classwide** [16] - 5:23, 24:16, 28:6, 28:10, 34:14, 34:18, 35:10, 36:25, 37:3, 37:19, 48:7, 54:3, 57:16, 70:18, 71:23, 72:22
**clean** [1] - 76:6
**cleaner** [1] - 70:17
**cleanup** [1] - 31:4
**clear** [5] - 25:19, 33:14, 41:3, 41:20, 47:9
**clearly** [1] - 30:17
**client** [4] - 18:8, 19:13, 58:8, 73:19
**clinical** [1] - 15:19
**closeness** [1] - 49:18
**codes** [1] - 13:19
**collateral** [8] - 57:25, 58:16, 58:22, 58:25, 59:1, 59:5, 59:7, 59:11
**Colorado** [3] - 43:18, 43:19, 46:10
**colored** [1] - 31:12
**Columbia** [2] - 44:12, 45:3
**coming** [4] - 11:14, 14:17, 34:21, 54:9
**Commencing** [1] - 1:9
**commission** [2] - 9:10, 10:5
**COMMISSION** [1] - 1:5
**Commission** [1] - 3:5
**committed** [2] - 9:15, 38:22
**committee** [3] - 27:23, 28:2, 28:19
**committing** [1] - 9:25
**common** [5] - 5:24, 27:14, 39:1, 39:13, 41:10, 49:3, 52:12, 52:22, 55:7, 57:13, 59:3, 69:10, 69:11, 69:20, 69:23, 70:5, 70:11, 70:17, 73:2
**commonality** [5] - 23:9, 32:5, 32:12, 33:16, 59:2
**company** [1] - 44:14
**compare** [1] - 74:20
**compensable** [1] - 35:5
**competition** [1] - 75:9
**Complaint** [5] - 5:15, 6:23, 7:10, 63:18, 63:23
**Complaints** [1] - 62:18
**complete** [3] - 37:11, 37:22, 41:16
**completely** [1] - 11:22

**computer** [1] - 1:23
**computer-aided** [1] - 1:23
**conceal** [1] - 69:22
**conceive** [4] - 26:6, 29:15, 29:21, 53:18
**concept** [1] - 75:20
**conception** [2] - 45:19, 45:21
**conceptual** [1] - 33:22
**concern** [3] - 32:21, 38:10, 52:24
**concerned** [3] - 38:5, 43:17, 59:22
**conclude** [3] - 33:10, 43:3, 67:10
**concluded** [3] - 28:1, 35:9, 76:9
**conclusion** [1] - 28:7
**conduct** [16] - 7:6, 27:15, 34:21, 45:14, 46:6, 47:1, 49:19, 51:22, 54:7, 54:8, 68:25, 69:1, 73:2, 73:22, 73:24, 74:25
**confidential** [2] - 38:21, 39:4
**confines** [1] - 56:9
**conflict** [3] - 27:9, 43:10, 47:13
**conflicts** [3] - 41:6, 41:18, 43:10
**confront** [1] - 41:5
**confronted** [1] - 20:19
**connection** [4] - 44:17, 46:20, 49:18, 49:22
**CONRAD** [1] - 2:2
**consent** [2] - 37:25, 38:2
**consider** [1] - 33:9
**consideration** [1] - 62:24
**considering** [4] - 28:2, 31:25, 32:1, 75:18
**consistent** [1] - 46:22
**consolidate** [2] - 68:10, 68:16
**consolidated** [4] - 62:18, 62:21, 71:5, 71:12
**consolidates** [1] - 69:15
**conspiracy** [1] - 69:22
**constitutes** [2] - 10:18, 19:4
**constitutional** [5] - 29:17, 48:5, 72:20, 72:21, 73:4
**constructive** [1] - 67:11
**consumption** [1] - 70:11
**contact** [7] - 15:14, 34:21, 35:23, 36:7, 42:4, 54:9, 56:4
**contemporaneous** [2] - 8:9, 64:21
**contested** [1] - 69:4
**context** [11] - 19:24, 24:21, 41:13, 41:17, 44:23, 49:21, 51:14, 53:13, 56:3, 56:4, 60:8

**CONTINUED** [1] - 2:1
**contours** [1] - 44:25
**contractual** [2] - 7:16, 7:21
**controlling** [1] - 60:11
**conversation** [1] - 21:9
**core** [1] - 73:2
**corporation** [1] - 70:14
**corporations** [1] - 73:3
**correct** [14] - 6:10, 6:20, 7:1, 11:23, 13:18, 25:4, 28:22, 32:2, 48:15, 53:21, 60:25, 71:11, 71:17, 76:12
**correctly** [2] - 31:6, 42:1
**correspond** [1] - 14:7
**counsel** [3] - 3:6, 64:20, 65:13
**County** [4] - 16:20, 44:12, 44:17, 45:4
**couple** [7] - 4:5, 4:15, 14:25, 17:20, 40:25, 52:24, 68:21
**course** [3] - 22:18, 27:14, 73:2
**COURT** [1] - 1:1
**Court** [6] - 1:21, 3:1, 68:7, 69:16, 76:16
**court** [3] - 30:13, 61:21, 70:2
**Court's** [1] - 62:24
**court's** [1] - 30:12
**Courthouse** [1] - 1:7
**courts** [5] - 46:24, 47:3, 47:5, 62:9, 70:2
**cover** [7] - 4:10, 4:22, 59:18, 63:7, 67:15, 72:3, 72:5
**covered** [5] - 4:24, 4:25, 59:16, 72:3, 72:6
**create** [1] - 75:12
**created** [1] - 51:11
**creates** [2] - 46:8, 75:3
**credibly** [1] - 67:7
**criteria** [3] - 7:8, 12:15, 17:17
**CRR** [2] - 1:20, 76:16
**crux** [2] - 38:23, 51:2
**crystal** [3] - 25:19, 33:14, 41:3
**damage** [3] - 39:24, 63:21, 70:15
**damaged** [1] - 74:15
**damages** [30] - 6:4, 6:8, 6:9, 6:12, 6:13, 6:14, 6:16, 7:3, 20:2, 24:16, 34:9, 34:11, 35:1, 35:4, 38:25, 45:16, 53:2, 53:15, 55:19, 57:12, 64:12, 64:14, 73:6, 73:12, 73:13, 73:23, 74:4, 74:22, 74:23, 74:24
**danger** [1] - 8:8
**DANIEL** [1] - 2:20
**date** [2] - 64:7
**day-long** [1] - 62:1
**days** [1] - 71:8

**DC** [7] - 42:12, 45:16, 45:20, 45:22, 46:9, 68:7

**deal** [4] - 15:13, 16:12, 19:19, 31:5

**dealt** [1] - 23:2

**December** [1] - 30:9

**decide** [15] - 19:5, 19:23, 20:7, 20:8, 23:20, 26:8, 36:25, 41:6, 46:14, 48:25, 50:20, 61:10, 71:22, 73:16, 74:7

**decision** [5] - 27:24, 30:9, 30:21, 55:10, 61:3

**decisions** [3] - 20:3, 27:24, 60:5

**Defendant** [1] - 2:23

**defendant** [8] - 21:18, 44:18, 55:5, 59:19, 67:20, 70:21, 71:8, 71:18

**defendant's** [4] - 47:1, 49:19, 55:22, 74:1

**defendants** [1] - 47:9

**defense** [9] - 3:20, 4:23, 15:2, 26:14, 26:25, 63:15, 65:23, 66:17, 66:24

**defense's** [1] - 11:7

**defenses** [2] - 66:1, 66:2

**defer** [1] - 41:16

**define** [9] - 23:8, 23:12, 23:14, 24:6, 26:9, 26:10, 32:24, 57:4

**defined** [3] - 22:3, 26:12, 28:6

**defining** [6] - 25:17, 26:17, 26:21, 27:4, 36:2, 44:25

**definition** [8] - 4:13, 11:1, 11:8, 11:19, 12:2, 25:19, 27:17, 38:6

**degree** [3] - 49:15, 52:8, 53:7

**delivered** [1] - 21:10

**demonstration** [1] - 73:5

**deposition** [1] - 66:18

**deprive** [1] - 73:3

**deprived** [1] - 14:21

**dermatologist** [2] - 56:12, 56:24

**dermatologist's** [1] - 56:13

**describe** [1] - 34:3

**description** [1] - 19:2

**desk** [1] - 38:14

**detail** [1] - 67:9

**determination** [1] - 46:13

**determine** [6] - 12:23, 34:18, 37:19, 48:24, 49:5, 49:7

**determined** [3] - 35:2, 55:5, 57:16

**determining** [2] - 24:16, 26:17

**develop** [1] - 27:18

**development** [1] - 41:12

**differ** [1] - 39:1

**difference** [2] - 53:20, 70:16

**differences** [7] - 41:5, 53:23, 58:9, 58:17, 59:1, 59:4

**different** [51] - 17:20, 19:3, 19:24, 20:3, 26:15, 26:21, 27:3, 27:4, 29:22, 29:23, 32:3, 33:21, 33:25, 36:14, 36:20, 36:22, 39:7, 42:19, 42:21, 43:3, 43:7, 43:9, 46:18, 47:3, 49:13, 50:11, 50:17, 50:19, 51:5, 51:6, 51:18, 52:21, 52:25, 53:3, 53:6, 56:13, 56:16, 56:18, 56:23, 57:1, 57:6, 58:23, 58:24, 59:7, 59:23, 65:16, 71:24, 72:25, 73:1

**differing** [1] - 37:6

**differs** [1] - 57:7

**direct** [2] - 7:22, 21:17

**disagree** [2] - 19:21, 52:17

**disclosed** [1] - 38:21

**disclosure** [1] - 65:18

**discovery** [3] - 65:2, 66:18, 66:23

**discretion** [1] - 62:10

**discussed** [2] - 61:7, 73:13

**discussion** [2] - 59:17, 65:12

**discussions** [3] - 13:13, 64:20, 65:13

**dismissed** [2] - 60:20, 60:23

**dispute** [2] - 9:14, 30:13

**distant** [1] - 76:4

**distinct** [2] - 51:1, 54:6

**distinction** [5] - 19:17, 47:10, 51:13, 51:17, 70:8

**distinctions** [3] - 31:14, 47:11, 53:25

**distinguish** [1] - 69:13

**distress** [29] - 5:16, 5:20, 5:25, 6:4, 6:9, 6:14, 6:22, 7:3, 7:5, 7:13, 12:21, 35:19, 39:19, 42:25, 44:22, 47:12, 47:16, 53:13, 54:13, 54:15, 60:9, 61:4, 64:5, 64:6, 73:1, 73:6, 73:13, 73:20

**distressed** [1] - 45:13

**distribution** [1] - 70:10

**district** [1] - 30:12

**DISTRICT** [2] - 1:1, 1:1

**District** [5] - 41:23, 44:12, 45:3, 70:3, 72:18

**division** [1] - 31:2

**docket** [1] - 63:5

**doctor** [9] - 9:15, 42:5, 42:6, 55:17, 56:5, 56:7, 56:10, 64:25, 66:16

**doctor's** [1] - 56:5

**doctor-patient** [2] - 56:7, 56:10

**doctors** [1] - 66:13

**document** [1] - 16:7

**documentation** [2] - 9:20, 16:23

**documents** [1] - 17:14

**done** [14] - 32:3, 38:24, 43:4, 43:15, 50:6, 54:4, 54:17, 55:8, 69:25, 70:1, 70:2, 70:24, 71:12, 71:13

**doubt** [1] - 46:4

**down** [3] - 40:15, 52:15, 72:9

**Dr** [19] - 9:2, 9:4, 9:14, 13:7, 17:13, 18:3, 18:9, 18:17, 19:1, 21:8, 39:21, 44:21, 45:8, 50:8, 50:10, 59:23, 66:19, 66:22, 74:5

**drafted** [3] - 11:9, 22:7

**drive** [1] - 43:9

**driving** [1] - 70:12

**drop** [1] - 75:8

**dubious** [1] - 47:22

**due** [1] - 55:7

**during** [3] - 17:21, 19:2, 65:3

**duties** [1] - 56:13

**duty** [69] - 7:16, 7:19, 7:21, 19:18, 19:23, 20:3, 20:4, 24:24, 34:13, 34:19, 34:20, 36:21, 40:4, 47:24, 48:18, 48:23, 48:25, 49:5, 49:7, 49:8, 49:10, 49:15, 49:17, 49:23, 50:7, 50:8, 50:16, 50:18, 50:20, 50:21, 51:2, 51:4, 51:9, 51:24, 52:12, 53:1, 53:15, 54:1, 54:3, 54:18, 54:22, 54:25, 55:2, 55:4, 55:7, 55:18, 55:19, 55:20, 55:22, 56:6, 56:16, 56:18, 56:19, 56:23, 57:1, 57:4, 57:7, 57:10, 57:11, 57:21, 57:23, 57:24, 71:21

**easier** [1] - 70:16

**EASTERN** [1] - 1:1

**easy** [2] - 23:1, 23:7

**ECFMG** [30] - 3:22, 3:25, 4:2, 7:20, 9:10, 9:16, 9:21, 9:24, 10:1, 10:4, 11:14, 18:6, 19:7, 22:16, 24:24, 25:22, 34:19, 35:11, 38:24, 45:14, 49:2, 49:8, 50:5, 50:16, 54:8, 55:7, 55:10, 57:14, 68:25

**ECFMG's** [4] - 36:12, 46:6, 51:25, 54:7

**EDUCATION** [1] - 1:5

**Educational** [1] - 3:4

**effect** [2] - 61:1, 69:12

**effectively** [2] - 23:14, 63:5

**effects** [2] - 57:25, 69:23

**efficiency** [5] - 33:5, 58:1, 61:12, 68:21, 71:16

**efficient** [2] - 33:6, 68:19

**efficiently** [1] - 27:11

**egregious** [1] - 7:6

**eight** [2] - 69:1, 70:2

**either** [14] - 5:5, 7:4, 27:16, 27:20, 28:17, 28:24, 40:22, 45:2, 50:18, 64:2, 64:18, 65:15, 68:9, 68:14

**element** [4] - 6:18, 34:10, 36:23, 52:22

**elements** [12] - 7:12, 7:14, 34:7, 36:24, 37:20, 45:19, 45:21, 45:24, 48:6, 48:7, 48:19, 50:25

**Elisa** [1] - 3:24

**ELISA** [1] - 2:19

**elisa.mcenroe@ morganlewis.com** [1] - 2:22

**elsewhere** [2] - 62:25, 67:21

**emergency** [1] - 38:13

**emotional** [29] - 5:16, 5:20, 5:25, 6:3, 6:9, 6:13, 6:22, 7:3, 7:5, 7:13, 12:21, 35:19, 39:19, 42:25, 44:22, 47:12, 47:16, 53:13, 54:13, 54:15, 60:9, 61:3, 64:4, 64:6, 73:1, 73:6, 73:12, 73:20

**employee** [1] - 14:14

**employer** [1] - 52:3

**employers** [1] - 50:13

**encounter** [2] - 15:11, 27:2

**encountered** [2] - 25:22, 54:22

**encounters** [1] - 59:23

**end** [4] - 20:18, 24:7, 69:7, 70:12

**enforcement** [1] - 67:4

**enrichment** [2] - 75:5, 75:6

**entities** [3] - 9:16, 17:22, 50:11

**entitled** [2] - 66:23, 76:13

**entity** [4] - 12:7, 44:1, 44:5, 55:11

**enumerating** [1] - 30:17

**envision** [1] - 74:4

**equal** [1] - 44:8

**especially** [4] - 41:17, 53:12, 67:6, 71:16

**ESQUIRE** [7] - 1:15, 2:3, 2:8, 2:14, 2:19, 2:19, 2:20

**essence** [1] - 24:12

**essentially** [12] - 5:23, 15:6, 16:14, 16:24, 20:2, 21:1, 21:4, 24:21, 28:1, 29:9, 35:6, 35:24

**estoppel** [8] - 57:25, 58:17, 58:22, 58:25, 59:2, 59:5, 59:7, 59:11

**et** [2] - 1:3, 38:8

**evaluate** [1] - 53:1

**event** [6] - 19:18, 27:16,

27:20, 39:23, 63:16, 69:8
**eventually** [1] - 69:9
**everywhere** [1] - 12:8
**evidence** [16] - 8:15, 9:13, 9:16, 11:25, 19:24, 22:17, 34:10, 34:11, 35:7, 39:15, 53:5, 54:5, 54:10, 66:8, 68:22, 69:8
**exact** [4] - 39:15, 53:11, 53:20, 73:22
**exactly** [2] - 18:18, 59:12
**examination** [1] - 39:3
**examine** [1] - 37:4
**example** [14] - 15:7, 15:12, 16:8, 19:11, 26:25, 30:22, 38:9, 42:24, 43:18, 45:6, 53:18, 56:10, 60:19, 71:21
**examples** [1] - 50:1
**excluded** [1] - 21:12
**excluding** [1] - 74:22
**executed** [1] - 67:4
**exhaustive** [1] - 32:7
**exhibits** [2] - 4:5, 9:23
**exist** [4] - 16:12, 17:15, 18:16, 18:21
**existed** [1] - 20:4
**existence** [2] - 16:13, 49:7
**exists** [6] - 21:23, 21:24, 42:25, 44:25, 49:23, 50:20
**expect** [3] - 52:3, 52:4, 52:5
**expected** [1] - 51:12
**expeditiously** [1] - 76:1
**experience** [5] - 16:3, 16:22, 58:4, 62:10, 63:22
**experiences** [1] - 71:3
**experts** [1] - 69:2
**explaining** [1] - 30:18
**exposed** [1] - 11:11
**extent** [12] - 4:25, 7:9, 10:4, 10:11, 15:15, 15:25, 16:1, 31:13, 33:11, 37:6, 61:2, 62:9
**extinguished** [1] - 74:6
**extraordinarily** [1] - 75:24
**F.3d** [1] - 30:11
**face** [1] - 11:9
**faces** [1] - 3:7
**facilities** [1] - 14:10
**fact** [5] - 9:22, 39:18, 42:14, 49:16, 73:5
**factor** [2] - 31:23, 49:10
**factors** [25] - 4:22, 26:7, 26:8, 26:11, 26:23, 27:20, 29:1, 29:10, 30:24, 31:11, 31:24, 32:4, 32:7, 32:19, 33:1, 33:12, 33:13, 49:15, 53:7, 55:13, 55:21, 61:12
**facts** [3] - 47:14, 71:24, 73:5
**factual** [4] - 19:24, 41:11, 49:6, 50:19

**fair** [2] - 58:6, 58:8
**fairly** [1] - 68:1
**faith** [2] - 66:3, 66:4
**falls** [1] - 60:8
**false** [6] - 17:13, 20:25, 21:2, 22:23, 43:10, 72:21
**far** [4] - 20:10, 33:23, 62:19
**feasibility** [1] - 71:10
**feasible** [1] - 17:8
**federal** [2] - 16:16, 70:2
**FEDERICO** [1] - 2:13
**fellowship** [1] - 15:8
**felt** [1] - 70:20
**Fen** [1] - 69:17
**Fen-Phen** [1] - 69:17
**Ferreras** [1] - 30:10
**few** [1] - 72:4
**fewer** [1] - 62:20
**fiduciary** [2] - 7:16, 7:19
**fight** [2] - 66:11, 71:24
**figure** [4] - 20:16, 43:21, 52:18, 61:23
**file** [5] - 67:22, 68:6, 68:15, 73:21, 74:8
**filed** [4] - 44:14, 63:23, 68:25, 71:13
**filing** [1] - 64:8
**fine** [6] - 5:12, 9:6, 17:25, 38:16, 67:2, 76:8
**fired** [21] - 5:18, 15:23, 16:16, 26:7, 26:22, 27:3, 27:17, 33:9, 35:10, 35:11, 36:4, 41:3, 50:7, 53:10, 53:15, 53:25, 54:7, 60:2, 65:15, 73:10, 75:21
**first** [21] - 5:18, 15:23, 16:16, 26:7, 26:22, 27:3, 27:17, 33:9, 35:10, 35:11, 36:4, 41:3, 50:7, 53:10, 53:15, 53:25, 54:7, 60:2, 65:15, 73:10, 75:21
**fits** [1] - 63:3
**five** [1] - 55:13
**fixing** [1] - 17:4
**fledged** [1] - 34:3
**flexible** [1] - 41:22
**floating** [2] - 4:14, 29:17
**FLoor** [1] - 2:9
**flowing** [1] - 11:2
**focus** [5] - 32:22, 47:20, 48:18, 54:7, 54:18
**folks** [4] - 18:11, 18:14, 18:16, 52:10
**followed** [1] - 60:3
**foregoing** [1] - 76:12
**FOREIGN** [1] - 1:5
**Foreign** [1] - 3:5
**foreseeability** [14] - 49:11, 51:2, 51:3, 51:6, 51:9, 51:11, 51:18, 51:24, 52:7, 52:21, 53:24, 55:14, 55:18
**foreseeable** [4] - 51:20, 51:25, 54:12, 55:22
**forgot** [1] - 17:13

**form** [1] - 36:17
**forth** [1] - 5:9
**forward** [4] - 21:7, 25:23, 35:17, 76:5
**four** [8] - 7:13, 7:14, 7:15, 19:3, 42:21, 43:2, 62:4, 71:8
**four-day** [1] - 62:4
**Fourth** [1] - 31:7
**framework** [1] - 33:12
**frankly** [2] - 61:18, 69:25
**fraud** [14] - 7:6, 8:22, 9:10, 9:15, 9:25, 10:5, 10:16, 10:17, 12:20, 38:2, 38:22, 39:22, 51:21, 63:19
**fraudulent** [1] - 54:14
**front** [2] - 9:4, 10:25
**full** [2] - 34:3, 74:3
**full-fledged** [1] - 34:3
**fully** [2] - 59:21, 60:3
**Fume** [1] - 71:5
**Fumes** [1] - 69:21
**fumes** [1] - 69:23
**functional** [1] - 29:6
**fundamental** [1] - 22:4
**future** [1] - 76:4
**gained** [1] - 65:3
**gaps** [1] - 20:11
**Gates** [18] - 28:18, 28:20, 29:1, 29:3, 29:9, 29:21, 30:7, 30:15, 30:24, 31:6, 31:17, 31:19, 32:4, 32:19, 32:25, 33:8, 33:11
**gears** [1] - 47:20
**generally** [2] - 32:2, 54:2
**geographically** [1] - 13:1
**George** [1] - 13:14
**George's** [6] - 12:11, 13:6, 14:14, 16:20, 42:10, 45:4
**given** [8] - 25:12, 27:11, 40:14, 44:13, 52:20, 53:6, 53:17
**gossip** [1] - 65:11
**GRADUATES** [1] - 1:5
**Graduates** [1] - 3:5
**grand** [1] - 70:24
**great** [3] - 4:3, 44:6, 74:16
**greater** [2] - 22:3, 44:19, 44:24
**griped** [1] - 20:22
**group** [5] - 17:6, 20:20, 47:4, 47:5, 70:15
**guess** [25] - 21:6, 21:7, 22:1, 23:6, 26:3, 27:16, 29:3, 33:11, 34:2, 35:25, 40:23, 42:8, 43:12, 44:10, 45:15, 45:21, 46:1, 51:17, 51:24, 53:4, 60:7, 62:23, 65:19, 68:5, 74:20
**guidance** [1] - 32:7
**guide** [2] - 33:1, 33:8

**guided** [1] - 30:6
**guilty** [4] - 39:22, 51:21, 63:19, 64:17
**Gunnells** [1] - 31:7
**guy** [2] - 21:10, 38:11
**guys** [4] - 6:17, 20:21, 68:15, 72:4
**habit** [1] - 5:11
**half** [1] - 62:1
**half-day** [1] - 62:1
**hand** [2] - 26:4, 26:5
**handed** [1] - 40:15
**handle** [2] - 4:6, 63:5
**happily** [1] - 72:11
**happy** [3] - 5:7, 22:8, 40:4
**hard** [1] - 75:6
**Harlem** [5] - 18:2, 22:14, 22:15, 25:25, 26:1
**harm** [30] - 5:19, 5:22, 12:19, 34:8, 34:10, 34:15, 35:1, 35:3, 35:12, 36:14, 37:17, 37:18, 37:20, 38:19, 38:25, 45:16, 46:14, 47:23, 49:11, 49:13, 50:8, 51:12, 52:7, 54:2, 55:15, 55:23, 57:11, 63:21
**harmed** [1] - 37:1
**harmful** [1] - 69:22
**harms** [1] - 5:21
**health** [3] - 38:21, 39:4, 69:23
**healthcare** [6] - 9:18, 10:2, 12:16, 12:24, 24:25, 55:12
**hear** [11] - 5:7, 19:11, 23:16, 26:13, 26:14, 59:19, 59:20, 66:19, 66:20, 67:16, 72:11
**heard** [5] - 18:19, 19:2, 39:24, 62:7, 63:17
**hearing** [2] - 17:21, 65:16
**help** [1] - 57:4
**helpful** [1] - 75:25
**herself** [1] - 7:7
**highlight** [1] - 49:13
**highly** [1] - 49:23
**himself** [1] - 65:15
**HIPAA** [1] - 14:12
**hired** [5] - 50:11, 50:13, 50:14, 52:2, 60:21
**history** [1] - 54:21
**Hohider** [3] - 31:19, 31:21, 31:22
**home** [1] - 38:16
**hone** [1] - 4:9
**Honor** [49] - 3:3, 3:8, 3:11, 3:14, 3:17, 3:21, 5:22, 6:10, 7:1, 9:12, 11:22, 17:19, 19:21, 21:6, 22:1, 22:11, 24:3, 25:4, 25:18, 26:16, 28:22, 30:5, 30:15, 31:6, 33:11, 34:12, 37:2, 39:9,

41:14, 41:15, 42:18, 44:10,
46:23, 48:9, 48:12, 49:21,
50:19, 53:21, 54:5, 58:20,
60:8, 63:14, 66:8, 68:20,
70:25, 72:15, 73:10, 75:12
**HONORABLE** [1] - 1:11
**hope** [2] - 69:9, 72:6
**horrible** [1] - 45:13
**Hospital** [5] - 12:11, 16:20,
18:2, 22:14, 22:16
**hospital** [7] - 14:4, 14:22,
17:7, 19:1, 20:20, 20:22,
60:20
**hospitals** [3] - 14:1, 20:17,
24:25
**hotly** [1] - 69:4
**Howard** [11] - 9:17, 13:4,
15:7, 16:9, 18:23, 42:12,
44:12, 44:16, 45:3, 45:8
**hypothesize** [1] - 21:16
**hypothesizing** [2] - 38:9,
65:20
**hypothetical** [3] - 39:21,
43:18, 45:7
**identified** [10] - 18:15, 19:6,
28:16, 47:10, 47:13, 53:13,
54:19, 55:6, 60:2, 69:1
**identify** [8] - 12:9, 14:11,
14:13, 21:2, 25:13, 25:14,
40:2, 61:15
**identifying** [2] - 16:25, 17:18
**ignorant** [1] - 45:11
**illusory** [1] - 28:1
**illustrate** [1] - 39:10
**impact** [2] - 8:4, 56:5
**implicate** [1] - 67:7
**implications** [1] - 75:19
**importance** [1] - 55:11
**important** [4] - 5:1, 19:7,
51:15, 62:14
**imposing** [1] - 29:10
**imprisonment** [1] - 72:21
**inadequate** [1] - 60:6
**inartfully** [1] - 11:9
**include** [9] - 11:5, 11:13,
11:20, 22:14, 22:20, 22:21,
25:25, 26:1, 34:7
**includes** [2] - 11:10, 11:12
**including** [4] - 13:1, 19:16,
30:23, 44:20
**inconsistent** [1] - 20:9
**incorrect** [1] - 55:1
**indefinitely** [1] - 9:23
**indictment** [1] - 64:18
**individual** [28] - 5:23, 6:11,
17:1, 17:5, 20:4, 22:20, 35:3,
35:4, 37:1, 37:25, 38:2,
39:16, 42:18, 52:11, 54:11,
55:20, 57:11, 57:14, 59:4,
60:16, 63:20, 64:1, 64:8,

65:5, 66:9, 67:22, 70:6,
70:15
**individual's** [2] - 55:9, 67:5
**individualized** [12] - 8:16,
8:20, 35:2, 35:8, 35:16,
39:14, 46:12, 49:23, 52:13,
52:16, 54:24, 68:3
**individually** [3] - 23:7, 48:8,
54:17
**individuals** [21] - 12:9,
12:12, 12:18, 12:20, 12:22,
13:25, 14:1, 14:11, 16:25,
21:13, 46:17, 50:14, 60:11,
60:19, 61:10, 63:25, 64:4,
71:4, 71:23, 73:4, 73:14
**industry** [1] - 69:20
**industrywide** [1] - 69:22
**inefficient** [1] - 70:1
**infliction** [6] - 5:16, 6:21,
7:13, 42:25, 44:22, 47:12
**information** [8] - 18:8, 25:16,
38:21, 39:5, 49:6, 65:3,
66:21, 69:5
**informational** [1] - 20:11
**informed** [1] - 74:13
**initial** [1] - 57:22
**injured** [1] - 37:16
**injuries** [5] - 7:4, 37:6, 56:4,
59:23, 73:1
**injury** [22] - 8:9, 34:16,
34:17, 34:23, 34:24, 35:13,
36:16, 36:17, 37:16, 39:1,
44:16, 47:17, 49:16, 49:17,
49:19, 51:22, 53:8, 55:14,
63:21, 73:15, 73:21, 75:15
**inquiry** [5] - 17:8, 34:16,
35:6, 57:15, 58:5
**instance** [5] - 5:18, 11:7,
26:7, 46:25, 75:5
**instances** [2] - 24:14, 36:9
**instead** [2] - 66:2, 75:9
**institution** [6] - 9:18, 12:7,
12:10, 22:21, 23:13, 23:18
**institutions** [8] - 10:3, 12:16,
12:24, 16:19, 16:20, 24:25,
25:14, 25:24
**instructive** [1] - 72:15
**insulted** [2] - 5:10, 5:13
**intentional** [1] - 61:4
**interaction** [5] - 54:11,
54:12, 56:14, 72:25, 75:15
**interactions** [2] - 53:10,
75:14
**interest** [17] - 34:17, 35:14,
37:23, 42:3, 42:4, 42:13,
42:16, 43:23, 43:24, 43:25,
44:1, 44:6, 44:7, 44:20,
44:24, 46:16, 60:11
**interesting** [1] - 10:8
**interests** [1] - 36:11

**interplay** [5] - 4:18, 26:4,
27:22, 29:7, 32:22
**intervening** [1] - 52:6
**interwoven** [1] - 53:16
**invasion** [8] - 34:17, 35:14,
36:13, 36:17, 36:18, 36:22,
37:23, 38:20
**involve** [1] - 17:23
**involved** [4] - 14:2, 60:13,
62:18, 71:4
**involvement** [4] - 12:19,
15:16, 18:5, 22:15
**involves** [1] - 25:23
**involving** [7] - 7:6, 17:4,
20:4, 20:20, 39:15
**issue** [56] - 5:21, 5:24, 10:4,
10:16, 11:23, 16:6, 16:7,
16:12, 19:12, 19:20, 19:22,
20:8, 20:19, 21:23, 22:5,
22:21, 22:24, 22:25, 23:10,
23:20, 24:15, 24:22, 24:23,
26:22, 27:5, 27:8, 27:25,
28:3, 28:25, 29:4, 30:16,
30:20, 31:6, 31:25, 32:24,
34:9, 37:8, 39:8, 39:11,
39:16, 46:6, 47:7, 47:18,
52:23, 55:4, 57:23, 59:12,
60:1, 61:9, 61:25, 64:11,
66:9, 75:2, 75:13, 75:19
**issued** [1] - 65:7
**issues** [58] - 4:7, 4:8, 4:14,
4:17, 4:18, 9:1, 11:21, 15:2,
15:13, 17:25, 19:8, 19:9,
19:10, 20:10, 23:4, 23:9,
23:25, 24:6, 25:2, 26:9,
26:10, 26:12, 26:17, 26:19,
27:18, 28:5, 28:10, 29:2,
29:12, 29:17, 30:17, 30:18,
31:12, 32:8, 40:9, 40:11,
40:16, 41:4, 47:21, 47:23,
47:24, 49:3, 52:17, 53:15,
54:3, 54:19, 54:24, 57:21,
59:21, 59:22, 61:15, 62:2,
63:6, 64:13, 70:6, 70:17,
72:18
**iterations** [1] - 19:3
**itself** [2] - 14:3, 47:14
**James** [1] - 1:7
**JANET** [2] - 1:14
**January** [2] - 1:9, 50:20
**Jersey** [11] - 9:18, 13:1, 16:8,
19:11, 19:16, 40:23, 40:24,
41:24, 42:8, 42:9
**JMSC** [2] - 50:4, 50:7
**job** [1] - 38:24
**Jordan** [2] - 30:9, 40:15
**JOSHUA** [1] - 1:11
**JSMC** [1] - 18:7
**Judge** [6] - 30:9, 32:13,
40:15, 55:6, 62:7, 73:3

**judgment** [10] - 15:19, 19:16,
20:7, 22:22, 23:3, 73:18,
73:19, 73:22, 74:5, 74:13
**judicata** [1] - 71:22
**judicial** [1] - 72:25
**judiciary** [1] - 58:4
**jumping** [1] - 23:22
**June** [1] - 67:6
**jurisdiction** [2] - 45:24,
67:21
**jury** [3] - 35:10, 53:1, 53:2
**keep** [2] - 14:1, 75:22
**kept** [4] - 15:4, 15:5, 16:10,
75:21
**key** [1] - 6:18
**Kids** [1] - 72:16
**kids** [1] - 45:12
**kind** [25] - 4:15, 4:24, 6:19,
8:14, 11:10, 15:4, 28:25,
29:10, 29:13, 29:14, 31:23,
32:20, 33:1, 33:3, 33:4,
37:16, 37:17, 47:22, 53:13,
53:19, 63:3, 64:19, 67:10,
67:15, 73:15
**kinds** [2] - 69:20, 72:25
**KLAYMAN** [2] - 2:20, 4:1
**Klayman** [1] - 4:1
**knowledge** [2] - 64:1, 66:22
**known** [3] - 9:24, 12:7, 65:11
**Lane** [1] - 58:5
**language** [1] - 6:5
**last** [6] - 16:6, 28:14, 36:23,
36:24, 63:6, 67:14
**latter** [1] - 26:16
**law** [53] - 6:24, 6:25, 7:2, 7:9,
7:10, 7:11, 8:13, 24:10,
29:18, 29:19, 40:9, 40:11,
40:22, 41:4, 41:5, 41:6, 41:8,
41:9, 41:11, 41:16, 41:21,
41:22, 42:9, 42:11, 42:12,
42:15, 42:19, 42:21, 42:23,
43:1, 43:8, 43:13, 43:19,
44:2, 44:15, 44:19, 45:20,
45:24, 46:2, 46:13, 47:9,
47:15, 47:18, 48:24, 48:25,
49:5, 49:6, 55:7, 57:24, 67:4,
72:21, 75:7
**LAW** [1] - 2:8
**laws** [4] - 43:3, 43:9, 47:5,
47:6
**lawsuit** [1] - 73:21
**lay** [1] - 45:6
**learning** [1] - 54:13
**least** [9] - 6:17, 7:11, 36:1,
42:21, 44:6, 51:8, 51:14,
61:21, 66:7
**leave** [2] - 30:19, 63:4
**leaves** [1] - 23:24
**left** [2] - 8:19, 64:11
**legal** [1] - 50:8

**legally** [4] - 10:8, 34:17, 35:14, 37:23
**lenses** [1] - 32:3
**less** [2] - 74:16, 74:17
**letter** [1] - 71:8
**level** [1] - 33:7
**LEWIS** [1] - 2:18
**liability** [19] - 8:1, 19:14, 20:1, 23:8, 24:15, 24:22, 27:5, 28:24, 31:2, 34:3, 34:10, 34:20, 37:19, 39:8, 40:1, 40:3, 72:18, 72:23
**liability-only** [1] - 40:3
**licensed** [1] - 10:3
**licensing** [2] - 50:12, 52:4
**lies** [1] - 19:18
**likelihood** [1] - 53:8
**likely** [1] - 68:1
**limitations** [11] - 63:9, 63:10, 63:11, 63:15, 64:9, 64:13, 65:22, 65:23, 66:6, 66:12, 66:24
**limited** [1] - 61:9
**list** [2] - 12:12, 30:4
**listening** [1] - 33:20
**Litigation** [2] - 58:12
**litigation** [5] - 16:23, 60:1, 60:5, 61:3, 70:13
**live** [1] - 28:19
**lives** [3] - 42:14, 44:11, 45:7
**living** [1] - 45:12
**LLC** [1] - 1:14
**LLP** [1] - 2:18
**locally** [1] - 68:16
**logic** [1] - 57:3
**logical** [2] - 40:8, 62:11
**logically** [1] - 32:9
**look** [23] - 7:12, 13:17, 16:14, 23:5, 27:17, 31:11, 31:13, 31:24, 32:14, 32:15, 33:1, 33:2, 33:12, 41:8, 42:1, 42:2, 43:2, 49:23, 50:1, 58:13, 72:9, 72:15
**looked** [1] - 50:14
**looking** [4] - 29:1, 41:18, 42:20, 59:2
**lose** [1] - 68:20
**lost** [1] - 21:20
**luxury** [1] - 41:19
**mailed** [1] - 71:9
**mailing** [2] - 53:19, 71:7
**maintain** [1] - 16:21
**maintained** [1] - 27:11
**malpractice** [6] - 16:1, 55:16, 56:3, 64:23, 66:8, 66:14
**manage** [1] - 63:4
**manageability** [6] - 33:5, 41:18, 59:12, 61:12, 62:24, 75:19

**manifestation** [2] - 7:5, 8:12
**marching** [1] - 33:15
**marginal** [2] - 21:24, 22:2
**Marie** [2] - 1:20, 76:16
**Market** [3] - 1:8, 2:3, 2:20
**Martin** [1] - 27:25
**Maryland** [33] - 1:16, 2:10, 2:15, 7:2, 10:3, 12:12, 40:22, 41:24, 42:4, 42:5, 42:11, 43:1, 43:12, 43:20, 43:24, 44:6, 44:13, 44:15, 44:16, 44:19, 44:21, 44:25, 45:3, 46:21, 47:15, 60:1, 60:5, 60:21, 68:4, 68:6
**mass** [3] - 67:17, 68:25, 69:14
**master** [1] - 68:18
**matter** [5] - 10:6, 32:18, 32:19, 48:25, 76:13
**MATTHEW** [1] - 2:20
**Matthew** [1] - 4:1
**matthew.klayman@ morganlewis.com** [1] - 2:23
**McEnroe** [5] - 2:19, 3:24, 66:25, 67:3
**MDL** [5] - 67:25, 68:9, 69:15, 69:21, 71:5
**MDLs** [1] - 68:24
**mean** [72] - 5:9, 10:7, 10:10, 10:17, 11:2, 12:4, 13:12, 15:25, 16:24, 17:3, 17:12, 18:1, 19:19, 20:18, 20:21, 21:15, 21:20, 21:23, 23:4, 23:15, 24:5, 24:13, 25:6, 26:7, 26:22, 27:5, 28:15, 28:16, 29:9, 31:13, 33:5, 33:7, 36:23, 37:18, 39:18, 40:14, 40:23, 42:7, 43:16, 43:21, 45:4, 45:18, 46:5, 47:22, 53:25, 55:16, 56:1, 56:11, 56:17, 56:25, 57:2, 60:3, 61:16, 62:9, 65:9, 65:10, 65:24, 66:13, 66:15, 66:17, 67:11, 67:20, 69:16, 69:18, 70:19, 70:20, 74:2, 74:7, 74:14, 75:1
**meaning** [2] - 26:17, 35:4
**meaningful** [4] - 15:16, 70:12, 74:10, 74:11
**meaningfully** [1] - 43:3
**means** [3] - 10:1, 16:25, 72:9
**meant** [2] - 11:13, 57:8
**measure** [2] - 20:16, 23:19
**MEDICAL** [1] - 1:5
**Medical** [3] - 3:5, 13:2, 13:7
**medical** [13] - 8:15, 14:12, 15:25, 16:4, 18:20, 18:21, 24:25, 34:23, 55:16, 56:2, 64:23, 67:5, 67:6
**medication** [2] - 17:6, 17:7

**medicine** [4] - 9:19, 12:8, 44:21, 52:6
**meeting** [1] - 39:21
**meets** [1] - 38:7
**member** [5] - 20:6, 35:4, 60:16, 65:2
**members** [13] - 14:13, 19:7, 21:14, 24:24, 25:1, 27:10, 46:20, 49:8, 52:11, 60:14, 66:5, 67:7, 74:2
**mention** [1] - 18:4
**mentioned** [2] - 13:6, 47:17
**meritorious** [1] - 66:14
**merits** [2] - 19:10, 22:24
**met** [1] - 39:20
**method** [3] - 12:5, 17:9, 17:10
**methods** [1] - 70:10
**Middle** [1] - 72:18
**might** [13] - 10:12, 26:20, 30:20, 31:12, 46:20, 50:14, 60:16, 60:19, 61:10, 62:12, 66:6, 74:15, 74:16
**mill** [1] - 65:11
**mind** [8] - 5:5, 5:8, 6:24, 8:19, 11:21, 72:6, 72:8, 75:22
**mini** [2] - 61:11, 61:17
**mini-trials** [2] - 61:11, 61:17
**minimal** [1] - 12:20
**minimum** [1] - 42:20
**minus** [1] - 63:23
**minute** [1] - 76:7
**minutes** [2] - 52:24, 72:4
**missed** [2] - 13:9, 48:3
**Mitchell** [2] - 1:20, 76:16
**modification** [1] - 28:8
**modifications** [1] - 22:6
**modifying** [1] - 17:21
**MONIQUE** [1] - 1:3
**moreover** [1] - 47:15
**MORGAN** [1] - 2:18
**morning** [3] - 3:8, 3:11, 3:14
**most** [10] - 24:13, 27:24, 42:2, 42:13, 42:15, 43:23, 45:17, 46:16, 48:15, 74:24
**mostly** [1] - 59:21
**motion** [3] - 10:25, 22:7, 76:1
**motions** [2] - 61:22, 68:9
**motivate** [1] - 61:18
**move** [2] - 30:4, 46:9
**moved** [1] - 43:18
**MR** [124] - 3:8, 3:11, 3:14, 3:17, 3:21, 4:1, 5:22, 6:7, 6:10, 6:20, 7:1, 7:19, 7:23, 8:2, 8:5, 8:7, 8:10, 8:14, 8:21, 8:24, 9:6, 9:7, 9:12, 10:10, 10:13, 10:20, 11:15, 11:22, 13:3, 13:5, 13:8, 13:10, 13:21, 13:24, 14:7,

**medicine** [4] - 9:19, 12:8, (duplicate header in next column — see right column below)
14:16, 14:19, 14:23, 15:9, 15:15, 15:25, 16:14, 16:19, 17:19, 19:21, 21:5, 22:1, 22:11, 22:14, 24:3, 24:10, 24:18, 24:20, 25:7, 25:11, 25:18, 26:1, 26:16, 27:7, 28:22, 30:1, 30:5, 31:21, 32:2, 33:10, 34:12, 36:9, 36:15, 37:2, 37:12, 37:14, 37:21, 38:18, 38:20, 39:9, 40:25, 41:3, 41:13, 42:17, 43:8, 44:10, 46:1, 46:7, 46:12, 46:23, 48:9, 48:12, 48:15, 49:4, 50:1, 50:23, 51:1, 51:16, 53:4, 54:5, 55:1, 55:4, 56:7, 56:16, 56:19, 56:22, 57:7, 57:10, 58:3, 58:20, 59:6, 59:12, 60:7, 60:25, 61:7, 62:15, 63:14, 64:22, 65:1, 66:7, 66:17, 68:20, 70:8, 70:25, 72:12, 72:14, 73:9, 74:20, 75:11
**MS** [2] - 3:24, 67:3
**multifactorial** [1] - 49:9
**multiple** [6] - 9:16, 50:13, 70:9, 70:10, 71:14
**must** [2] - 30:13, 33:18
**mutuality** [1] - 58:9
**naked** [1] - 36:12
**name** [4] - 9:3, 9:5, 21:8, 31:18
**named** [5] - 44:11, 50:9, 57:22, 60:15, 63:17
**names** [1] - 3:7
**narrow** [1] - 32:13
**narrower** [2] - 27:6, 47:21
**narrowest** [1] - 32:11
**nationwide** [1] - 46:24
**naturally** [1] - 11:2
**nature** [11] - 38:25, 39:3, 49:13, 53:17, 54:20, 56:2, 56:3, 56:14, 56:24, 57:11, 69:6
**ncentrella@conradobrien. com** [1] - 2:5
**nearby** [1] - 45:5
**necessary** [1] - 39:25
**need** [19] - 5:3, 5:12, 8:12, 8:14, 23:11, 23:14, 23:18, 25:12, 25:14, 28:3, 28:7, 35:23, 41:5, 66:4, 67:9, 67:16, 68:22, 72:7
**needing** [1] - 28:11
**needs** [3] - 30:21, 31:10, 54:17
**negate** [1] - 32:20
**negatives** [4] - 17:13, 20:25, 21:2, 22:23
**negligence** [11] - 5:16, 5:19, 7:2, 7:14, 10:11, 36:12,

47:10, 47:14, 47:16, 48:6, 52:10

**negligent** [7] - 5:16, 6:21, 7:12, 35:11, 42:25, 44:22, 47:12

**negligently** [1] - 55:18

**nerve** [1] - 38:16

**new** [1] - 50:14

**New** [4] - 40:23, 41:24, 42:8, 42:9

**newspaper** [1] - 66:20

**next** [1] - 30:4

**NICHOLAS** [1] - 2:3

**Nick** [1] - 3:14

**Nigeria** [6] - 11:7, 11:11, 11:23, 11:24, 12:1, 17:24

**nine** [1] - 69:1

**NO** [1] - 1:3

**non** [1] - 32:7

**non-exhaustive** [1] - 32:7

**nonascertainable** [1] - 21:4

**none** [3] - 45:18, 45:19, 45:23

**nonetheless** [1] - 52:1

**normal** [2] - 38:14, 38:15

**normally** [1] - 6:23

**Northern** [1] - 70:3

**note** [5] - 17:13, 62:23, 64:10, 73:11, 75:21

**noted** [3] - 30:12, 31:6, 47:1

**notes** [1] - 30:16

**nothing** [2] - 46:14, 60:22

**notice** [14] - 18:9, 19:13, 22:19, 23:12, 24:8, 24:11, 25:7, 25:9, 25:13, 67:11, 73:14, 74:10, 74:11

**notion** [1] - 47:22

**notwithstanding** [1] - 72:23

**number** [6] - 25:2, 36:5, 49:9, 67:17, 69:8, 69:19

**numerosity** [2] - 32:12, 33:16

**numerous** [2] - 22:7, 70:17

**O'BRIEN** [1] - 2:2

**OB** [1] - 56:15

**objective** [9] - 7:8, 12:14, 12:15, 16:24, 17:8, 20:13, 20:14, 20:16, 23:19

**objectivity** [1] - 17:16

**obligations** [3] - 25:1, 46:22, 52:9

**observation** [2] - 37:7, 37:24

**observe** [1] - 38:8

**observing** [1] - 15:12

**obtained** [2] - 13:15, 38:1

**obviously** [7] - 9:13, 13:25, 34:13, 43:8, 62:9, 68:11, 72:23

**occur** [3] - 33:18, 44:2, 49:14

**occurred** [3] - 11:23, 65:8, 65:10

**occurs** [1] - 55:25

**odd** [1] - 45:22

**odds** [1] - 65:17

**offensively** [1] - 58:6

**offer** [5] - 8:15, 32:7, 32:10, 53:9, 53:11

**offered** [1] - 75:20

**offering** [1] - 19:25

**office** [2] - 38:13, 64:6

**OFFICES** [1] - 2:8

**Official** [2] - 1:21, 76:16

**Ohio** [1] - 70:3

**old** [1] - 5:11

**once** [3] - 4:15, 4:24, 71:14

**one** [51] - 7:17, 9:1, 15:2, 16:6, 21:5, 22:12, 23:3, 23:11, 23:18, 23:24, 26:3, 26:4, 28:2, 31:19, 37:20, 38:5, 40:20, 43:6, 43:16, 44:15, 45:1, 45:6, 45:21, 47:2, 49:10, 50:5, 50:9, 53:1, 53:6, 55:13, 57:1, 57:14, 57:19, 57:22, 60:2, 61:19, 61:25, 62:11, 63:7, 63:24, 65:25, 66:8, 67:3, 68:1, 70:14, 72:14, 73:9, 74:22, 74:25

**One** [1] - 2:9

**ones** [1] - 69:18

**operate** [1] - 74:10

**Opioids** [1] - 69:16

**opportunity** [2] - 5:1, 35:17

**opposed** [4] - 8:8, 28:11, 61:4, 70:22

**opposition** [1] - 60:3

**opt** [13] - 24:8, 25:8, 25:9, 61:6, 61:8, 61:9, 73:14, 73:16, 73:18, 74:2, 74:9, 74:19, 74:21

**opt-out** [8] - 24:8, 25:8, 25:9, 61:8, 73:14, 74:9, 74:19, 74:21

**opted** [1] - 75:16

**option** [2] - 34:2, 47:21

**options** [1] - 63:4

**ORAL** [1] - 1:5

**order** [3] - 3:1, 41:1, 49:5

**ordinary** [1] - 56:22

**organization** [1] - 18:5

**organizations** [1] - 17:22

**otherwise** [5] - 4:8, 32:10, 40:24, 42:15, 67:22

**ourselves** [1] - 13:24

**outcome** [6] - 27:4, 36:21, 43:13, 45:22, 58:19, 71:8

**outline** [2] - 23:22, 63:6

**outlined** [1] - 4:20

**overlap** [5] - 33:2, 34:9, 35:7,

35:20, 48:13

**owe** [4] - 24:24, 49:8, 50:7

**owes** [1] - 50:16

**own** [2] - 60:16, 61:10

**p.m** [3] - 1:9, 3:1, 76:9

**PA** [2] - 1:8, 2:13

**page** [1] - 9:8

**Palsgraf** [2] - 49:20, 51:20

**panel** [1] - 69:15

**panoply** [1] - 74:3

**paper** [1] - 9:22

**Park** [1] - 58:5

**part** [12] - 16:1, 17:20, 17:22, 18:12, 24:3, 30:21, 31:9, 44:25, 45:17, 49:10, 52:10, 55:7

**particular** [14] - 16:9, 20:7, 26:5, 49:12, 49:14, 49:23, 50:1, 53:10, 55:15, 55:23, 57:18, 57:23, 60:13, 74:25

**particularly** [2] - 17:14, 21:21

**parties** [2] - 53:19, 58:22

**partners** [1] - 65:25

**parts** [1] - 60:10

**party** [1] - 21:19

**past** [1] - 28:13

**patient** [20] - 7:23, 7:24, 12:4, 12:22, 14:7, 15:11, 15:17, 16:23, 34:22, 36:11, 36:12, 38:7, 54:11, 55:18, 56:7, 56:10, 56:11, 56:20, 58:8, 67:12

**patients** [22] - 11:7, 11:12, 11:24, 12:1, 14:18, 15:3, 15:20, 16:10, 16:11, 25:20, 25:21, 34:22, 35:13, 36:17, 37:3, 37:4, 37:5, 39:5, 54:9, 57:12, 57:14

**Patrick** [1] - 3:8

**PATRICK** [1] - 1:15

**patterns** [1] - 36:1

**PAUL** [1] - 2:8

**Paul** [2] - 2:14, 3:11

**pause** [1] - 35:25

**PC** [2] - 2:2, 2:8

**pencil** [1] - 11:19

**pending** [2] - 64:23, 76:1

**Pennsylvania** [30] - 2:4, 2:21, 6:24, 7:9, 7:10, 7:11, 8:13, 40:22, 41:24, 42:1, 43:12, 44:2, 44:3, 44:5, 44:9, 44:14, 44:17, 44:18, 45:15, 46:3, 46:4, 46:9, 46:15, 46:21, 47:9, 67:20, 72:19

**PENNSYLVANIA** [1] - 1:1

**Pennsylvania's** [4] - 41:22, 43:25, 44:1, 44:7

**people** [13] - 15:13, 17:18, 25:13, 36:2, 36:5, 37:15,

42:5, 42:8, 42:9, 42:11, 65:11, 65:21, 66:1

**percent** [1] - 17:1

**perception** [1] - 8:9

**perfect** [1] - 17:1

**perfectly** [1] - 72:10

**performed** [2] - 44:4, 55:18

**perhaps** [4] - 50:2, 65:1, 65:2, 65:3

**period** [6] - 18:11, 22:18, 24:8, 25:8, 25:9, 61:8

**permutations** [1] - 31:5

**person** [15] - 21:6, 37:24, 38:2, 38:21, 38:22, 39:17, 50:5, 50:6, 50:7, 50:17, 52:5, 66:16, 75:14, 75:16

**Person** [1] - 66:22

**person's** [1] - 65:5

**personal** [2] - 73:15, 73:21

**personally** [1] - 32:20

**perspective** [9] - 17:18, 18:25, 40:2, 43:13, 46:19, 48:21, 59:16, 60:18, 74:1

**perspectives** [1] - 57:18

**PETER** [1] - 2:8

**pharmacy** [1] - 17:4

**phase** [6] - 53:2, 53:10, 53:12, 53:15, 53:16, 54:10

**Phen** [1] - 69:17

**Philadelphia** [3] - 1:8, 2:4, 2:21

**phrase** [1] - 12:16

**physical** [8] - 7:4, 8:3, 8:4, 8:12, 15:11, 47:17, 75:15

**physician** [8] - 7:23, 12:4, 12:22, 14:3, 20:20, 34:25, 37:25, 56:22

**physician-patient** [3] - 7:23, 12:4, 12:22

**physicians** [2] - 16:2, 44:20

**pick** [1] - 46:21

**piece** [7] - 9:22, 17:16, 20:23, 21:5, 40:20, 53:24, 54:17

**place** [10] - 17:6, 33:9, 40:9, 44:5, 45:14, 45:20, 45:22, 45:24, 46:5, 68:18

**placed** [1] - 52:1

**places** [1] - 16:22

**plaintiff** [38] - 7:7, 8:3, 8:16, 20:5, 20:7, 23:5, 42:18, 44:10, 44:11, 46:7, 46:13, 49:2, 49:12, 49:16, 49:24, 50:9, 52:2, 52:7, 52:13, 53:7, 53:23, 54:20, 55:9, 55:20, 55:24, 56:2, 56:3, 57:18, 58:23, 58:24, 59:9, 66:19, 69:5, 69:11, 71:6, 74:14, 74:16

**plaintiff's** [6] - 3:7, 45:15,

53:10, 54:21, 72:13, 75:2

**Plaintiffs** [4] - 1:18, 2:6, 2:11, 2:16

**plaintiffs** [43] - 3:9, 3:12, 3:15, 3:18, 4:20, 5:19, 6:11, 7:20, 11:4, 22:2, 26:13, 27:9, 27:12, 31:3, 31:8, 32:10, 35:17, 39:19, 41:23, 43:11, 44:3, 44:23, 50:10, 54:13, 57:22, 60:15, 61:19, 62:17, 62:19, 63:17, 63:20, 64:4, 64:11, 67:14, 70:15, 72:24, 73:11, 74:3, 74:14, 74:24, 75:7

**plan** [3] - 53:5, 62:7, 62:14

**play** [4] - 42:15, 62:11, 62:12, 62:13

**playbook** [2] - 67:18, 68:5

**playing** [1] - 54:3

**plea** [4] - 51:21, 63:19, 64:17, 64:21

**plead** [1] - 66:1

**pleadings** [1] - 4:5

**pled** [1] - 39:22

**plus** [1] - 29:14

**point** [12] - 16:10, 16:21, 22:12, 23:3, 25:23, 28:2, 28:15, 52:18, 66:12, 67:3, 73:9, 73:25

**pointed** [2] - 49:22, 64:10

**points** [1] - 70:10

**port** [1] - 57:3

**posing** [1] - 23:17

**posit** [1] - 44:4

**positing** [2] - 44:24, 57:19

**position** [5] - 29:5, 35:12, 36:13, 37:4, 60:17

**possession** [1] - 21:18

**possibility** [8] - 17:12, 32:20, 40:23, 45:23, 63:25, 65:21, 74:6, 74:18

**possible** [3] - 17:2, 74:4, 74:23

**Post** [1] - 75:21

**post** [1] - 19:18

**Post-it** [1] - 75:21

**posture** [1] - 62:16

**potential** [3] - 32:24, 64:8, 67:7

**potentially** [9] - 11:10, 11:12, 34:8, 36:23, 43:6, 45:9, 65:4, 67:7, 74:5

**Powell** [1] - 72:16

**practical** [2] - 12:15, 32:18, 32:19, 75:18

**practice** [17] - 9:19, 10:3, 12:8, 13:7, 14:5, 14:18, 14:21, 16:1, 20:19, 38:7, 42:10, 44:21, 52:5, 61:22, 67:5, 67:6, 70:20

**practiced** [1] - 18:3

**practicing** [1] - 10:2

**pre** [1] - 19:19

**preceded** [1] - 64:19

**precise** [1] - 9:22

**preclude** [1] - 54:24

**precludes** [2] - 47:19, 65:23

**preclusive** [1] - 61:1, 69:12

**predated** [3] - 18:5, 22:16, 31:19

**predates** [1] - 11:13, 18:7

**predominance** [7] - 26:18, 28:4, 28:9, 29:13, 29:20, 31:9, 32:24

**pregnancy** [1] - 56:12

**pregnant** [2] - 38:10, 56:11

**prepared** [1] - 1:23

**prerequisite** [1] - 10:2

**present** [2] - 30:24, 53:22

**presented** [8] - 31:1, 32:6, 35:8, 43:14, 53:6, 54:1, 54:6, 63:16

**presents** [1] - 39:11

**press** [5] - 63:18, 63:24, 64:1, 65:7, 65:14

**presumably** [4] - 25:15, 56:13, 74:8, 74:23

**presume** [2] - 15:11, 68:10

**pretrial** [1] - 69:3

**pretty** [4] - 4:6, 5:3, 21:9, 47:9

**prevails** [1] - 73:19

**prevent** [2] - 59:1, 59:5

**price** [1] - 17:4

**primarily** [2] - 55:5, 64:10

**Prince** [7] - 12:11, 13:6, 13:13, 14:14, 16:20, 42:10, 45:3

**privacy** [4] - 36:13, 36:19, 36:22, 38:20

**private** [6] - 13:7, 14:17, 20:19, 38:7, 42:10, 55:11

**privileges** [2] - 14:15, 14:16

**problem** [20] - 17:17, 19:5, 22:2, 22:25, 30:24, 34:8, 39:12, 40:18, 42:23, 46:1, 48:5, 51:23, 52:23, 53:14, 53:22, 61:2, 64:9, 73:17, 75:3, 75:18

**problems** [15] - 17:20, 22:4, 22:8, 23:17, 29:17, 29:18, 30:22, 30:25, 32:16, 32:24, 34:4, 40:1, 43:14, 46:9, 56:12

**procedure** [1] - 15:16

**procedures** [2] - 14:1, 14:13

**proceed** [1] - 58:1

**proceeding** [7] - 7:18, 8:6, 35:16, 36:16, 65:6, 66:10, 66:24

**Proceedings** [2] - 1:23, 76:9

**proceedings** [8] - 8:17, 8:20, 35:2, 35:8, 40:17, 64:14, 69:3, 76:13

**process** [4] - 5:8, 25:16, 55:7, 65:4

**processing** [1] - 22:17

**producers** [1] - 70:9

**professional** [2] - 13:15, 14:20

**program** [3] - 9:17, 9:18, 18:23

**prong** [2] - 8:6, 61:14

**proof** [10] - 22:25, 33:4, 35:20, 49:3, 52:22, 54:1, 69:20, 69:24, 70:5, 70:11

**proofs** [2] - 48:13, 52:25

**proper** [1] - 4:12

**properly** [2] - 9:20, 12:1

**prophylactically** [1] - 66:2

**proposed** [6] - 12:6, 22:4, 25:2, 32:8, 34:1, 57:13

**proposing** [8] - 5:23, 6:17, 8:17, 20:1, 27:17, 27:19, 34:12, 34:18

**proposition** [1] - 42:22

**prosecution** [1] - 64:16

**prospects** [1] - 47:21

**protected** [4] - 34:17, 35:14, 37:23, 38:21

**provable** [1] - 12:21

**prove** [1] - 8:14

**proved** [3] - 7:4, 7:6, 58:13

**proverbial** [1] - 44:7

**provided** [3] - 9:16, 9:22, 67:10

**providing** [3] - 15:19, 33:12, 47:2

**provisions** [1] - 29:8

**pthronson@jjsjustice.com** [1] - 1:17

**public** [3] - 49:8, 55:11, 65:17

**punitive** [1] - 46:17

**punt** [2] - 23:20, 41:4

**purchased** [2] - 17:5, 17:7

**purchasers** [1] - 21:17

**purely** [1] - 71:16

**purport** [1] - 18:13

**purported** [2] - 9:19, 12:8

**purpose** [2] - 22:19, 39:2

**purposes** [2] - 6:13, 57:15

**pursue** [4] - 60:14, 61:3, 75:5, 75:9

**put** [13] - 3:7, 9:4, 18:8, 34:22, 36:12, 37:3, 37:4, 37:9, 40:20, 68:17, 68:23, 69:8, 69:24

**putting** [1] - 33:3

**pvettori@lawpga.com** [1] - 2:11

**qualifications** [1] - 38:1

**quasi** [1] - 55:11

**questions** [18] - 4:8, 6:2, 11:3, 15:1, 20:5, 26:3, 32:5, 32:6, 34:13, 39:10, 39:12, 39:14, 40:25, 43:17, 49:12, 52:13, 63:12, 69:10

**raise** [3] - 63:9, 74:6, 75:20

**raised** [1] - 40:10

**raising** [1] - 47:11

**range** [1] - 71:3

**rather** [3] - 22:25, 29:6, 67:18

**RDR** [2] - 1:20, 76:16

**Re** [2] - 12:6, 58:12

**reaction** [1] - 39:24

**read** [8] - 5:3, 23:24, 40:14, 48:2, 51:8, 51:20, 63:20, 72:7

**reading** [1] - 11:8

**reality** [1] - 71:1

**really** [20] - 12:21, 19:20, 26:6, 28:14, 29:3, 29:4, 31:2, 40:21, 40:22, 43:25, 46:15, 46:20, 49:1, 51:19, 60:4, 63:2, 69:11, 75:6

**reanalyze** [1] - 55:17

**reason** [8] - 11:17, 11:18, 19:17, 24:7, 32:9, 51:1, 58:16, 58:18

**reasonable** [1] - 56:19

**recent** [1] - 27:24

**recently** [1] - 41:15

**recitation** [1] - 19:3

**recognize** [1] - 20:11

**recollection** [1] - 31:18

**record** [6] - 9:13, 12:24, 16:17, 21:20, 41:16, 76:13

**recorded** [1] - 15:24

**records** [18] - 8:15, 14:10, 14:12, 15:4, 15:5, 16:4, 16:10, 16:13, 16:21, 17:5, 18:16, 18:18, 18:20, 18:21, 21:3, 21:7, 21:17

**recover** [1] - 39:20

**red** [1] - 11:19

**reference** [9] - 6:1, 6:3, 7:7, 8:25, 9:9, 18:2, 55:5, 55:8, 58:11

**referenced** [1] - 9:1

**references** [1] - 64:2

**reflect** [3] - 14:8, 18:18, 18:22

**reflected** [2] - 15:20, 16:3

**reflecting** [1] - 14:9

**regard** [1] - 31:24

**regardless** [4] - 26:19, 28:18, 39:2, 39:3

**regulating** [3] - 42:3, 42:4, 44:20
**reject** [1] - 32:17
**rejected** [1] - 31:7
**related** [5] - 11:2, 51:22, 67:3, 67:24, 73:11
**relates** [1] - 17:20
**relationship** [6] - 7:22, 7:24, 12:4, 12:22, 56:8, 56:10
**relatives** [1] - 8:16
**release** [5] - 63:18, 63:24, 64:1, 65:8, 65:14
**relevant** [6] - 30:14, 34:16, 47:5, 47:10, 49:17, 57:15
**relitigate** [1] - 59:11
**remain** [1] - 47:22
**remaining** [1] - 30:18
**remember** [1] - 21:8
**remind** [1] - 5:2
**remoteness** [1] - 49:21
**remove** [2] - 43:14, 68:6
**removed** [1] - 68:8
**rendered** [1] - 14:8
**rendering** [1] - 15:18
**renders** [2] - 21:3, 60:6
**repeat** [1] - 72:7
**repetitions** [1] - 5:4
**rephrase** [1] - 40:13
**report** [2] - 18:10, 51:20
**Reporter** [2] - 1:21, 76:16
**represent** [1] - 6:17
**representation** [1] - 33:17
**representative** [1] - 27:12
**representatives** [1] - 61:14
**represented** [1] - 62:20
**Representing** [5] - 1:18, 2:6, 2:11, 2:16, 2:23
**requesting** [1] - 14:9
**requirement** [3] - 16:16, 51:2, 51:4
**requirements** [2] - 20:12, 31:10
**res** [1] - 71:22
**Reservoir** [1] - 1:15
**residence** [1] - 67:5
**residency** [6] - 9:17, 15:7, 15:8, 15:9, 18:23
**resident** [4] - 15:22, 38:1, 44:16, 45:9
**residents** [4] - 15:5, 16:2, 41:23
**resolution** [4] - 5:24, 69:10, 69:11, 70:13
**resolve** [10] - 30:13, 40:11, 40:13, 40:16, 40:17, 57:19, 57:21, 57:24, 68:13, 70:17
**resolved** [9] - 22:22, 30:18, 48:3, 48:4, 57:23, 64:13, 65:5, 67:17, 68:18

**respect** [21] - 17:24, 18:9, 19:24, 22:23, 26:19, 27:21, 27:22, 28:9, 29:2, 34:15, 35:5, 37:7, 43:12, 44:13, 50:18, 56:20, 56:23, 59:8, 60:1, 64:16, 75:11
**respectfully** [2] - 19:21, 72:1
**respects** [4] - 24:14, 45:23, 68:21, 70:20
**respond** [2] - 22:11, 39:7
**response** [2] - 46:23, 59:20
**RESPONSE** [1] - 3:3
**responses** [3] - 11:7, 19:13, 64:3
**rest** [2] - 32:15, 33:2
**Restatement** [1] - 9:11
**result** [6] - 12:19, 37:16, 37:17, 50:8, 58:8, 63:21
**retention** [2] - 16:7, 16:17
**retrieval** [1] - 25:16
**retry** [1] - 60:4
**revealed** [1] - 66:23
**revenue** [4] - 13:16, 13:17, 14:20, 14:22
**reversing** [1] - 30:12
**review** [1] - 14:10
**reviews** [1] - 52:8
**RICO** [1] - 72:20
**rights** [2] - 73:4, 74:12
**rigorous** [1] - 29:22
**rise** [6] - 25:1, 44:4, 47:2, 47:16, 54:12, 54:14
**risk** [2] - 51:10, 51:11
**risks** [1] - 71:18
**RMR** [2] - 1:20, 76:16
**role** [1] - 55:10
**room** [6] - 15:12, 21:9, 34:22, 35:9, 37:3, 37:10, 37:22, 38:11, 38:13, 39:4, 67:12
**rounding** [3] - 16:2, 17:14, 36:5
**rounds** [2] - 15:21, 15:23
**rubric** [2] - 5:20, 63:3
**rubrics** [1] - 61:16
**Rule** [11] - 4:18, 20:9, 26:4, 41:17, 62:22, 63:1, 65:25, 66:3, 66:4, 71:14, 72:1
**rules** [1] - 27:23
**ruling** [1] - 75:23
**run** [3] - 20:18, 62:21, 68:17
**RUSSELL** [1] - 1:3
**Russell** [1] - 3:4
**sat** [2] - 21:9, 75:1
**satisfied** [2] - 26:18, 32:13
**save** [1] - 39:14
**saved** [1] - 67:14
**saw** [2] - 12:1, 40:14
**scales** [1] - 44:8

**scenario** [6] - 38:6, 46:8, 50:2, 53:21, 71:18, 71:19
**scenarios** [1] - 44:23
**scheduled** [1] - 76:3
**SCHOCHOR** [1] - 2:13
**School** [2] - 58:11, 58:12
**scope** [1] - 56:5
**search** [3] - 13:24, 13:25, 67:4
**seated** [2] - 3:2, 5:11
**second** [7] - 14:25, 40:7, 53:12, 53:16, 54:10, 54:16, 61:11
**secondary** [1] - 66:10
**Section** [1] - 9:11
**section** [1] - 55:18
**sections** [1] - 32:22
**Security** [3] - 39:22, 51:21, 63:19
**see** [17] - 16:3, 29:23, 32:25, 34:4, 34:8, 35:18, 35:25, 48:1, 48:19, 54:1, 54:3, 54:5, 56:12, 56:15, 59:15, 62:11, 68:8
**seeing** [1] - 42:5
**seek** [2] - 17:23, 74:24
**seeking** [1] - 74:22
**seem** [5] - 23:8, 31:22, 54:23, 59:3, 61:19
**sees** [2] - 23:17, 53:24
**send** [1] - 12:7
**senior** [1] - 15:22
**sense** [8] - 12:15, 24:13, 32:10, 35:7, 35:20, 39:1, 59:25, 75:4
**sent** [1] - 13:16
**separate** [1] - 52:8
**separation** [1] - 20:2
**serious** [1] - 17:25
**served** [1] - 61:13
**services** [1] - 14:8
**set** [1] - 61:11
**setting** [1] - 71:10
**settlement** [1] - 69:9
**seven** [1] - 50:11
**several** [1] - 32:3
**SHAFFER** [43] - 2:19, 3:21, 9:7, 17:19, 19:21, 21:5, 22:1, 30:1, 30:5, 31:21, 32:2, 33:10, 39:9, 40:25, 41:3, 41:13, 42:17, 43:8, 44:10, 46:1, 46:7, 46:12, 48:12, 48:15, 49:4, 50:1, 50:23, 51:1, 51:16, 53:4, 60:7, 60:25, 61:7, 62:15, 63:14, 64:22, 65:1, 66:7, 66:17, 70:25, 73:9, 74:20, 75:11
**Shaffer** [12] - 3:22, 14:24, 16:5, 16:6, 17:11, 23:17, 30:3, 39:7, 48:22, 54:19,

63:8, 73:8
**Shaffer's** [2] - 23:3, 68:5
**share** [1] - 57:13
**sheets** [1] - 69:6
**Sheridan** [1] - 41:15
**shift** [1] - 47:20
**Shivarelo** [1] - 73:3
**shoehorn** [2] - 63:1, 71:15
**Shore** [7] - 9:18, 13:2, 16:8, 19:11, 19:16, 40:24, 42:9
**short** [1] - 61:24
**short-circuit** [1] - 61:24
**show** [2] - 15:14, 67:13
**shown** [1] - 56:8
**shows** [3] - 9:13, 12:24
**side** [6] - 3:7, 19:14, 51:19, 69:1, 72:13, 75:2
**sides** [1] - 58:7
**sideshow** [1] - 11:17
**signed** [2] - 61:19, 62:17
**significant** [7] - 27:2, 40:21, 42:2, 42:13, 42:16, 43:23, 62:8
**similar** [1] - 47:6
**similarly** [1] - 30:16
**simple** [1] - 49:7
**simpler** [1] - 70:16
**simplest** [1] - 49:4
**simply** [5] - 32:10, 46:19, 62:23, 74:20, 74:21
**single** [7] - 17:1, 46:7, 47:4, 55:17, 71:7, 71:8
**singular** [1] - 47:1
**sit** [1] - 76:7
**sits** [2] - 38:11, 38:13
**sitting** [1] - 67:12
**situation** [4] - 46:14, 49:12, 60:16, 71:12
**six** [2] - 50:11, 70:2
**Sixth** [2] - 27:25, 28:19
**slam** [1] - 70:24
**slightly** [1] - 59:6
**slower** [2] - 70:5, 70:6
**small** [1] - 45:4
**Social** [3] - 39:22, 51:21, 63:19
**solution** [1] - 59:3
**someone** [12] - 19:5, 21:9, 21:11, 38:10, 38:14, 42:14, 43:18, 50:4, 51:20, 61:2, 74:4, 74:17
**sometime** [1] - 39:21
**sometimes** [4] - 61:16, 66:14, 66:15, 75:2
**somewhere** [4] - 13:13, 26:23, 69:15, 74:8
**sonogram** [1] - 38:15
**sorry** [2] - 35:21, 58:20
**sort** [68] - 4:8, 4:10, 4:16,

4:19, 4:21, 5:20, 6:4, 7:14,
7:15, 10:15, 10:23, 11:2,
17:15, 19:3, 20:12, 21:4,
21:24, 23:1, 24:5, 24:9,
25:15, 26:3, 26:5, 26:8,
26:11, 28:20, 30:4, 31:11,
31:25, 32:9, 32:21, 32:23,
33:8, 33:22, 33:25, 34:2,
34:3, 35:24, 39:7, 40:8,
40:12, 40:14, 43:22, 44:7,
45:6, 45:11, 47:20, 47:22,
47:24, 48:18, 48:23, 51:9,
52:23, 53:24, 54:18, 54:20,
59:17, 59:24, 60:4, 61:9,
62:10, 63:7, 65:19, 70:4,
71:6, 71:15

**sorting** [1] - 70:4
**specific** [4] - 10:16, 61:4,
66:21, 67:21
**specifically** [2] - 32:7, 33:8
**speculating** [1] - 62:15
**spelled** [1] - 6:22
**Spence** [1] - 53:13
**split** [2] - 28:1, 28:17
**splitting** [1] - 73:17
**spotted** [1] - 23:25
**squeeze** [1] - 38:12
**St** [1] - 2:14
**stage** [4] - 40:17, 41:7, 53:1,
54:7
**stages** [1] - 54:6
**stake** [1] - 36:11
**stand** [1] - 5:12
**standard** [2] - 30:15, 44:21
**standing** [2] - 36:6, 37:10
**standpoint** [3] - 40:21,
58:16, 75:4
**stands** [1] - 15:23
**star** [1] - 33:8
**start** [11] - 3:7, 5:14, 11:4,
15:4, 17:15, 26:13, 34:1,
47:24, 57:23, 63:7, 70:4
**started** [1] - 26:2
**state** [10] - 42:2, 43:22, 45:5,
47:2, 47:3, 52:5, 70:1, 72:21,
75:7, 75:9
**state's** [2] - 41:9, 41:11
**STATES** [1] - 1:1
**States** [1] - 25:21
**states** [4] - 40:24, 43:2, 43:6,
43:7
**STATION** [1] - 2:13
**status** [1] - 54:21
**statute** [11] - 63:9, 63:10,
63:11, 63:15, 64:8, 64:12,
65:22, 65:23, 66:5, 66:11,
66:24
**stay** [1] - 5:10
**stenographically** [1] - 1:23
**step** [1] - 5:10

**steps** [1] - 52:6
**still** [13] - 16:12, 16:22, 17:7,
22:7, 25:6, 25:7, 25:9, 28:18,
36:15, 45:20, 52:13, 52:18,
62:3
**stood** [1] - 70:4
**strange** [5] - 10:15, 45:2,
45:17, 58:15, 58:18
**strategy** [1] - 60:5
**stray** [1] - 6:5
**Street** [5] - 1:8, 2:3, 2:9,
2:14, 2:20
**strikes** [2] - 20:22, 21:24
**strong** [1] - 60:11
**stronger** [1] - 48:19
**struck** [1] - 11:16
**structure** [2] - 28:21, 62:21
**struggled** [1] - 63:10
**stuff** [3] - 11:1, 11:6, 14:22
**subclasses** [3] - 37:8, 42:21,
43:6
**subject** [6] - 25:15, 42:9,
42:11, 42:12, 49:3, 52:2
**subjected** [1] - 50:12
**subjective** [2] - 20:13, 21:12
**submissions** [1] - 11:14
**submit** [1] - 72:1
**submitted** [1] - 14:5
**Suboxone** [2] - 12:6, 30:8
**subpoena** [1] - 25:15
**subpoenas** [2] - 12:7, 12:24
**subsections** [1] - 30:23
**subsequent** [2] - 64:14,
66:24
**substance** [1] - 33:17
**subsumed** [1] - 59:17
**subtle** [1] - 51:14
**succeed** [1] - 35:10
**sudden** [1] - 62:19
**sue** [1] - 68:4
**sued** [2] - 44:18, 66:13
**suffer** [7] - 12:21, 35:4,
35:19, 37:16, 37:17, 37:18,
51:22
**suffered** [13] - 8:3, 12:18,
12:19, 39:20, 49:16, 49:19,
53:7, 55:19, 55:24, 57:12,
63:20, 64:4, 75:16
**sufficiently** [2] - 19:6, 22:6
**suggest** [2] - 59:3, 64:11
**suggestion** [4] - 6:6, 18:18,
43:11, 61:8
**suggests** [1] - 61:11
**SUGGS** [1] - 1:14
**suit** [1] - 44:14
**Suite** [2] - 1:16, 2:4
**suited** [1] - 21:22
**summary** [4] - 19:16, 20:7,
22:22, 23:2

**superior** [1] - 29:15
**Superior** [1] - 68:7
**superiority** [7] - 26:18, 28:4,
28:9, 29:6, 29:13, 29:14,
31:8
**supply** [1] - 14:11
**suppose** [1] - 42:18
**surprise** [1] - 75:23
**survey** [1] - 64:3
**survey-like** [1] - 64:3
**susceptible** [1] - 36:24
**suspicion** [1] - 66:16
**sustained** [2] - 6:11, 6:16
**sweep** [1] - 23:2
**system** [2] - 55:12, 72:25

**table** [1] - 34:4
**tackle** [2] - 24:6, 25:16, 26:6
**tackles** [1] - 31:17
**target** [1] - 65:13
**tea** [1] - 23:24
**technical** [1] - 14:21
**temporal** [4] - 19:12, 19:17,
28:16, 54:21
**temporally** [1] - 23:12
**ten** [1] - 18:17
**termed** [1] - 29:5
**terms** [18] - 4:20, 5:8, 12:2,
14:9, 17:17, 17:18, 24:21,
28:23, 35:14, 36:19, 37:7,
52:23, 53:24, 54:1, 60:15,
65:17, 69:4, 70:12
**test** [6] - 42:13, 42:16, 43:22,
57:22, 68:14, 68:17
**testifies** [1] - 75:15
**testimony** [5] - 7:7, 8:15,
8:16, 53:9, 53:11
**The Court** [136] - 3:2, 3:4,
3:10, 3:13, 3:16, 3:19, 3:23,
4:3, 6:1, 6:8, 6:15, 6:21,
7:11, 7:21, 7:25, 8:3, 8:6,
8:8, 8:11, 8:18, 8:22, 8:25,
9:8, 10:6, 10:12, 10:14,
10:21, 11:16, 13:1, 13:4,
13:6, 13:9, 13:11, 13:23,
14:6, 14:14, 14:17, 14:20,
14:24, 15:10, 15:21, 16:5,
16:18, 17:11, 19:8, 20:3,
20:10, 21:15, 22:9, 22:13,
23:1, 24:5, 24:17, 24:19,
25:5, 25:9, 25:12, 25:25,
26:2, 26:20, 28:14, 29:9,
30:2, 30:21, 31:4, 31:5,
31:10, 31:11, 31:22, 32:18,
33:19, 35:21, 36:14, 36:20,
37:9, 37:13, 37:18, 38:4,
38:19, 39:6, 40:6, 41:2, 41:8,
41:25, 43:2, 43:16, 45:1,
46:3, 46:11, 46:25, 47:20,
48:10, 48:13, 48:17, 49:5,
49:9, 49:25, 50:22, 50:24,

51:3, 52:15, 53:23, 54:16,
55:3, 56:1, 56:9, 56:18,
56:21, 56:25, 57:9, 57:17,
58:12, 58:15, 58:21, 59:10,
59:14, 60:23, 61:1, 61:16,
63:4, 63:6, 64:15, 64:25,
65:9, 66:13, 67:1, 67:9,
69:13, 70:19, 72:3, 72:13,
72:22, 73:8, 74:7, 75:1,
75:22
**themselves** [4] - 4:11, 4:17,
5:14, 32:4
**theoretical** [1] - 12:15
**theoretically** [1] - 17:2
**theories** [3] - 34:19, 34:20,
75:11
**theory** [3] - 10:18, 19:14,
45:16
**therefore** [2] - 41:9, 58:25
**they've** [7] - 16:10, 18:10,
22:3, 27:25, 44:18, 61:19,
75:20
**thinks** [3] - 28:19, 54:20
**third** [2] - 21:18, 53:19
**Third** [9] - 28:16, 29:4, 30:6,
30:11, 31:20, 32:16, 33:14,
47:1, 63:2
**three** [3] - 19:3, 41:21, 62:4
**threshold** [3] - 24:23, 25:2,
40:16
**Thronson** [2] - 3:9, 3:10
**THRONSON** [78] - 1:15, 3:8,
5:22, 6:7, 6:10, 6:20, 7:1,
7:19, 7:23, 8:2, 8:5, 8:7,
8:10, 8:14, 8:21, 8:24, 9:6,
9:12, 10:10, 10:13, 10:20,
11:15, 11:22, 13:3, 13:5,
13:8, 13:10, 13:21, 13:24,
14:7, 14:16, 14:19, 14:23,
15:9, 15:15, 15:25, 16:14,
16:19, 22:11, 22:14, 24:3,
24:10, 24:18, 24:20, 25:7,
25:11, 25:18, 26:1, 26:16,
27:7, 28:22, 34:12, 36:9,
36:15, 37:2, 37:12, 37:14,
37:21, 38:18, 38:20, 46:23,
48:9, 54:5, 55:1, 55:4, 56:7,
56:16, 56:19, 56:22, 57:7,
57:10, 58:3, 58:20, 59:6,
59:12, 68:20, 70:8, 72:14
**Thronson's** [1] - 19:2
**tied** [1] - 63:21
**timeline** [1] - 50:3
**Tobacco** [2] - 69:18, 69:19
**today** [5] - 5:5, 18:4, 51:9,
72:4, 75:23
**today's** [1] - 75:18
**together** [1] - 47:6
**took** [5] - 45:20, 45:22, 46:4,
57:22, 76:2

**tort** [8] - 37:11, 37:21, 37:22, 38:17, 45:20, 45:22, 61:5, 69:14

**tortious** [1] - 8:9

**torts** [2] - 67:18, 68:25

**touch** [4] - 26:2, 37:5, 38:7, 40:9

**touching** [4] - 34:23, 35:24, 36:1, 37:24

**towards** [1] - 20:18

**Tower** [1] - 2:4

**toxic** [1] - 71:6

**traceable** [1] - 35:20

**track** [1] - 14:1

**trained** [1] - 12:1

**training** [1] - 11:10

**transcript** [1] - 76:12

**transcription** [1] - 1:23

**transfer** [1] - 68:9

**treat** [4] - 18:13, 19:2, 37:4, 60:21

**treated** [16] - 12:3, 12:10, 12:13, 12:18, 13:14, 14:11, 18:17, 19:1, 19:15, 20:21, 21:8, 23:5, 23:6, 43:20, 45:8, 50:6

**treating** [1] - 14:18

**treatment** [10] - 5:24, 15:16, 19:4, 28:6, 28:10, 32:11, 34:24, 34:25, 36:25, 39:3

**triability** [1] - 41:18

**trial** [7] - 35:11, 53:5, 61:25, 62:3, 62:7, 62:14, 69:2

**trials** [7] - 61:11, 61:17, 61:20, 62:1, 62:4, 70:23

**tried** [6] - 30:17, 30:20, 48:7, 48:8, 64:11, 70:7

**trigger** [3] - 5:5, 45:4, 65:22

**triggered** [1] - 39:23

**triggering** [1] - 63:16

**troubled** [1] - 74:17

**true** [12] - 10:7, 21:15, 24:17, 24:19, 24:20, 25:3, 25:5, 36:9, 43:11, 53:12, 68:23

**truly** [1] - 61:13

**try** [6] - 40:2, 40:3, 68:18, 70:22, 75:25, 76:3

**trying** [6] - 39:11, 39:12, 39:20, 52:18, 59:2, 63:1

**Tulp** [1] - 55:6

**turn** [1] - 4:16

**turns** [1] - 65:15

**two** [23] - 4:19, 5:15, 8:11, 23:13, 29:8, 31:1, 33:20, 33:25, 36:1, 36:24, 40:24, 41:21, 43:6, 50:1, 50:24, 52:15, 54:6, 57:1, 63:6, 63:23, 64:7

**twofold** [1] - 20:12

**type** [8] - 27:1, 28:23, 32:17,

41:19, 53:9, 55:23, 61:5, 74:22

**types** [4] - 59:23, 60:8, 71:1, 71:2

**typical** [2] - 27:13, 74:21

**typicality** [6] - 27:1, 27:8, 32:5, 32:12, 33:16, 59:18

**typically** [2] - 16:3, 70:9

**U.S** [1] - 1:7

**ultimate** [1] - 70:13

**ultimately** [3] - 24:1, 33:6, 62:16

**unauthorized** [1] - 35:24

**uncertainty** [1] - 62:13

**unclear** [1] - 24:11

**unconsented** [2] - 34:23, 34:25

**under** [26] - 5:20, 6:24, 7:1, 7:18, 8:6, 8:13, 9:4, 9:10, 14:12, 28:20, 31:1, 43:1, 45:9, 47:15, 47:18, 48:5, 50:3, 56:20, 56:21, 57:2, 58:5, 66:3, 66:4, 74:10, 75:24

**undermine** [1] - 23:8

**understood** [3] - 32:22, 39:19, 59:21

**unfair** [3] - 23:3, 58:25, 75:9

**United** [1] - 25:21

**UNITED** [1] - 1:1

**universe** [4] - 25:13, 26:12, 36:2, 69:14

**University** [1] - 13:4

**unjust** [2] - 75:5, 75:6

**unless** [1] - 10:17

**unworkable** [1] - 39:12

**up** [18] - 4:18, 5:10, 15:2, 15:14, 16:15, 21:19, 33:23, 40:4, 58:10, 61:19, 62:17, 66:18, 67:13, 68:9, 70:12, 72:5, 75:14, 76:6

**US** [3] - 51:21, 63:18, 64:5

**utilizing** [1] - 1:23

**valid** [2] - 9:21, 9:23

**value** [3] - 68:15, 68:17, 71:10

**variation** [1] - 45:7

**variations** [1] - 75:7

**variety** [1] - 72:19

**various** [2] - 25:24, 72:20

**varying** [1] - 46:18

**vehicle** [1] - 67:5

**verification** [1] - 21:13

**verified** [1] - 9:20

**version** [1] - 34:2

**versus** [3] - 51:11, 54:2, 62:12

**Vettori** [2] - 3:11, 3:13

**VETTORI** [3] - 2:8, 3:11, 72:12

**via** [2] - 68:9

**view** [13] - 7:17, 20:8, 20:11, 22:1, 26:17, 29:9, 30:6, 30:25, 31:2, 31:14, 70:19, 71:20, 74:11

**views** [2] - 26:15, 33:11

**violation** [1] - 72:20

**violations** [1] - 72:21

**Virginia** [8] - 41:23, 42:14, 45:7, 45:12, 45:17, 46:9, 68:7

**virtue** [1] - 56:13

**waiting** [1] - 67:12

**walks** [1] - 21:19

**Wallace** [1] - 72:15

**Warfarin** [1] - 46:25

**warrant** [1] - 67:4

**water** [1] - 74:17

**ways** [4] - 17:21, 22:24, 62:12, 62:20

**weakness** [1] - 72:10

**weeds** [1] - 29:7

**weighed** [1] - 43:25

**weird** [1] - 70:20

**welcome** [2] - 4:3, 67:1

**Welding** [2] - 69:21, 71:5

**welding** [1] - 69:23

**West** [1] - 2:4

**whichever** [1] - 48:24

**whole** [8] - 20:25, 21:1, 26:9, 28:5, 28:11, 31:13, 38:23, 70:6

**wide** [1] - 71:2

**willing** [2] - 67:10, 68:5

**win** [2] - 33:24, 70:23

**winding** [1] - 68:9

**witnesses** [1] - 33:4

**WOLSON** [1] - 1:11

**woman** [2] - 45:2, 45:6

**women** [1] - 60:21

**word** [2] - 33:7, 51:5

**words** [2] - 28:12, 43:22

**workable** [2] - 58:4, 58:13

**works** [3] - 26:15, 42:16, 65:13

**world** [3] - 38:17, 45:14, 56:11

**wracking** [1] - 38:16

**wrap** [1] - 72:4

**year** [5] - 15:23, 23:16, 30:9, 50:5

**years** [6] - 18:17, 54:14, 63:23, 64:7, 69:17, 69:20

**zone** [1] - 8:8