**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL, and DESIRE EVANS, | Civil Action No. 18-5629 |
| Plaintiffs, | Honorable Joshua D. Wolson |
| v. | |
| EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES, | |
| Defendant. | |

**DEFENDANT EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL
GRADUATES' MEMORANDUM OF LAW IN SUPPORT OF ITS
<u>MOTION FOR SUMMARY JUDGMENT</u>**

# REDACTED FOR PUBLIC FILING

Dated: December 10, 2021

Brian W. Shaffer, PA Bar No. 78851
Elisa P. McEnroe, PA Bar No. 206143
Matthew D. Klayman, PA Bar No. 319105
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone:     +1.215.963.5000
Facsimile:      +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for the Educational Commission for
Foreign Medical Graduates*

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................. 1

STATEMENT OF FACTS ..................................................................................................... 2

    I.      ECFMG's Certification and Irregular Behavior Processes.................................... 2

    II.     The Medical Field Uses ECFMG Certification For Limited Purposes.................. 4

    III.    John Nosa Akoda and His Aliases ........................................................................ 4

           A.       Residency Programs, Including Jersey Shore Medical Center and Howard University Hospital ..................................................................... 5

           B.       Maryland Board of Physicians and Virginia Board of Medicine ............. 6

           C.       Prince George's Hospital Center, Dr. Abdul Chaudry, and Dr. Javaka Moore ........................................................................................... 8

           D.       Other Evaluations of Dr. Akoda ............................................................. 8

           E.       Law Enforcement ..................................................................................... 9

    IV.    This Lawsuit........................................................................................................ 10

           A.       Monique Russell ..................................................................................... 10

           B.       Jasmine Riggins ..................................................................................... 11

           C.       Elsa Powell............................................................................................. 12

           D.       Desire Evans .......................................................................................... 13

LEGAL STANDARD............................................................................................................ 14

ARGUMENT ........................................................................................................................ 15

    I.      Recovery for Emotional Distress Is Not Permitted Under These Circumstances. ................................................................................................... 15

    II.     ECFMG Did Not Owe Plaintiffs A Legally Cognizable Duty of Care. ............. 17

           A.       ECFMG owed no general tort duty to Plaintiffs..................................... 17

            B.       ECFMG is not liable to Plaintiffs under Restatement (Second) of Torts § 324A. ........................................................................................ 23

           C.       ECFMG is not liable to Plaintiffs under Maryland law.......................... 26

    III.    ECFMG Was Not A Proximate Cause of Plaintiffs' Emotional Distress........... 29

    IV.    There Is No Evidence That Any Alleged Breach of Duty by ECFMG Was a But-For Cause of Plaintiffs' Emotional Distress. ............................................ 32

    V.     Plaintiffs Consented to Treatment by Dr. Akoda, and the Alleged Misrepresentations Did Not Vitiate That Consent.............................................. 34

i

VI.  There Is No Evidence That Plaintiffs Experienced Compensable Emotional Distress. .............................................................. 37

VII.  The Claims of Plaintiffs Evans and Powell Are Barred By Limitations. ............ 38

CONCLUSION ............................................................................................................... 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adamski v. Allstate Ins. Co.*,
   738 A.2d 1033 (Pa. Super. 1999)...........................................................................38

*Alban v. Fiels*,
   61 A.3d 867 (Md. Ct. Spec. App. 2013)...............................................................27

*Albany Urology Clinic, P.C. v. Cleveland*,
   528 S.E.2d 777 (Ga. 2000)....................................................................................36

*Althaus ex rel. Althaus v. Cohen*,
   756 A.2d 1166 (Pa. 2000) ............................................................17, 18, 19, 28

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).......................................................................................14, 15

*Armstrong v. Paoli Mem'l Hosp.*,
   633 A.2d 605 (Pa. Super. 1993)............................................................................37

*Ashburn v. Anne Arundel Cty.*,
   510 A.2d 1078 (Md. 1986) ............................................................................28, 29

*Barclay v. Briscoe*,
   47 A.3d 560 (Md. 2012) ........................................................................................29

*Berckeley Inv. Grp., Ltd. v. Colkitt*,
   455 F.3d 195 (3d Cir. 2006)..................................................................................14

*Bickell v. Stein*,
   435 A.2d 610 (Pa. Super. 1981)............................................................................40

*Black v. Cmty. Educ. Centers, Inc.*,
   No. 13–CV–6102, 2014 WL 859313 (E.D. Pa. Mar. 4, 2014) ............................16

*Bowman v. Williams*,
   165 A. 182 (Md. 1933) ..........................................................................................27

*Cantwell v. Allegheny Cty.*,
   483 A.2d 1350 (Pa. 1984) .......................................................................24, 25, 26

*Citizens Bank of Pennsylvania v. Reimbursement Tech., Inc.*,
   609 F. App'x 88 (3d Cir. 2015) ............................................................................18

*Commerce Bank/Penn. v. First Union Nat'l Bank*,
   911 A.2d 133 (Pa. Super. 2006)................................................................*passim*

*Credico v. Unknown Employee of the Houston FBI Forfeiture Unit*,
   567 F. App'x 83 (3d Cir. 2014) ...........................................................15

*Doe v. Philadelphia Cmty. Health Alternatives AIDS Task Force*,
   745 A.2d 25 (Pa. Super. 2000), *aff'd*, 767 A.2d 548 (Pa. 2001) ...........................................15

*Dudley v. USX Corp.*,
   606 A.2d 916 (Pa. Super. 1992)............................................................30

*Duttry v. Patterson*,
   771 A.2d 1255 (Pa. 2001) ..................................................................36

*El v. Southeastern Pa. Transp'n Auth. (SEPTA)*,
   479 F.3d 232 (3d Cir. 2007)................................................................14

*Emekekwue v. Offor*,
   No. 1:11–CV–01747, 2012 WL 1715066 (M.D. Pa. May 15, 2012) ......................................17

*Erisoty v. Rizik*,
   No. 93-6215, 1995 WL 91406 (E.D. Pa. Feb. 23, 1995) .......................................38

*Evans v. Otis Elevator Company*,
   168 A.2d 573 (Pa. 1961) .............................................................24, 26

*Farabaugh v. Pennsylvania Turnpike Com'n*,
   911 A.2d 1264 (Pa. 2006) ..........................................................24, 26

*First v. Zem Zem Temple*,
   686 A.2d 18 (Pa. Super. 1996)............................................................33

*Fragale v. Wells Fargo Bank, N.A.*,
   480 F. Supp. 3d 653 (E.D. Pa. 2020) ...................................................20, 21

*Gen. Refractories Co. v. First State Ins. Co.*,
   855 F.3d 152 (3d Cir. 2017)................................................................32

*Gibbs v. Ernst*,
   647 A.2d 882 (Pa. 1994) ................................................................17

*Griffith v. United Air Lines, Inc.*,
   203 A.2d 796 (Pa. 1964) ................................................................26

*Grimaldi v. Bank of Am.*,
   No. 12–CV–2345, 2013 WL 1050549 (M.D. Pa. Mar. 14, 2013) ........................................16

*Hall v. United States*,
    No. 2:19-cv-05256-KSM, 2020 WL 3265146 (E.D. Pa. June 17, 2020)................................18

*Hammersmith v. TIG Ins. Co.*,
    480 F.3d 220 (3d Cir. 2007)........................................................................................26

*Hawkins v. Fed. Nat. Mortgage Ass'n*,
    No. 13–CV–6068, 2014 WL 272082 (E.D. Pa. Jan. 23, 2014)................................16

*Hershman v. Muhlenberg Coll.*,
    17 F. Supp. 3d 454 (E.D. Pa. 2014) ........................................................................15

*Humphries v. Pa. State Univ.*,
    No. 4:20-CV-0064, 2021 WL 4355352 (M.D. Pa. Sept. 24, 2021).........................15

*Humphries v. Pennsylvania State Univ.*,
    492 F. Supp. 3d 393 (E.D. Pa. 2020) .....................................................................17

*Kazatsky v. King David Mem'l Park, Inc.*,
    527 A.2d 988 (Pa. 1987) .........................................................................................16

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
    313 U.S. 487 (1941)................................................................................................26

*Lacey v. Cessna Aircraft Co.*,
    932 F.2d 170 (3d Cir. 1991).....................................................................................27

*Lamb v. Hopkins*,
    492 A.2d 1297 (Md. 1985) ......................................................................................29

*LeJeune v. Bliss-Salem*,
    85 F.3d 1069 (3d Cir. 1996).....................................................................................27

*Love v. Cramer*,
    606 A.2d 1175 (Pa. Super. 1992).............................................................................37

*Lux v. Gerald E. Ort Trucking, Inc.*,
    887 A.2d 1281 (Pa. Super. 2005)........................................................................30, 31

*Madison v. Bethanna, Inc.*,
    No. 12-01330, 2012 WL 1867459 (E.D. Pa. May 23, 2012)...................................16

*Mazzagatti v. Everingham by Everingham*,
    516 A.2d 672 (Pa. 1986) .....................................................................................16, 21

*Melmark, Inc. v. Schutt by and through Schutt*,
    206 A.3d 1096 (Pa. 2019) .......................................................................................27

*Moore v. McComsey,*
    459 A.2d 841 (Pa. Super. 1983)..................................................................................38

*Mulawka v. Pennsylvania,*
    No. 2:11cv1651, 2013 WL 171911 (W.D. Pa. Jan. 16, 2013)..................................16

*Novak v. Jeannette Dist. Memorial Hosp.,*
    600 A.2d 616 (Pa. Super. 1991)..................................................................................30

*Okane v. Tropicana Entm't, Inc.,*
    No. 12–CV–6707, 2013 WL 56088 (E.D. Pa. Jan. 3, 2013).....................................17

*P.J.A. v. H.C.N.,*
    156 A.3d 284 (Pa. Super. 2017)..................................................................................38

*Palsgraf v. Long Island R.R. Co.,*
    162 N.E. 99 (N.Y. 1928)...............................................................................1, 19, 30

*Pearce v. Salvation Army,*
    674 A.2d 1123 (Pa. Super. 1996)................................................................................38

*Pendleton v. State,*
    921 A.2d 196 (Md. 2007) ...........................................................................................28

*Prince v. Esposito,*
    628 S.E.2d 601 (Ga. App. 2006).................................................................................36

*R.W. v. Manzek,*
    888 A.2d 740 (Pa. 2005).......................................................................................18, 19

*Reilly v. Tiergarten Inc.,*
    633 A.2d 208 (Pa. Super. 1993)..................................................................................30

*Remsburg v. Montgomery,*
    831 A.2d 18 (Md. 2003) .............................................................................................29

*Rice v. Brakel,*
    310 P.3d 16 (Ariz. App. 2013)....................................................................................36

*Rice v. Diocese of Altoona-Johnstown,*
    255 A.3d 237 (Pa. 2021) .............................................................................................40

*Russell v. Educ. Comm'n for Foreign Med. Graduates,*
    15 F.4th 259 (3d Cir. 2021) ..................................................................................17, 19

*Santini v. Fuentes,*
    795 F.3d 410 (3d Cir. 2015)........................................................................................14

*Shulick v. United Airlines*,
  No. 11–CV–1350, 2012 WL 315483 (E.D. Pa. Feb. 2, 2012) .................................................17

*Smith-McConnell v. Todd T. Thompson Funeral Home, Inc.*,
  No. 1035 WDA 2020, 2021 WL 3771822 (Pa. Super. Aug. 25, 2021) ..................................27

*Sutcliffe v. Bernese*,
  No. 4:19-CV-00317, 2019 WL 3776560 (M.D. Pa. Aug. 12, 2019) ......................................32

*Taylor v. Johnston*,
  985 P.2d 460 (Alaska 1999) .............................................................................................35, 36

*Toney v. Chester County Hospital*,
  36 A.3d 83 (Pa. 2011) ...........................................................................................16, 22, 27

*Toney v. Chester Cty. Hosp.*,
  961 A.2d 192 (Pa. Super. 2008), *aff'd*, 36 A.3d 83 (Pa. 2011) .............................................37

*Tulp v. Educ. Comm'n for Foreign Med. Graduates*,
  824 F. App'x 134 (3d Cir. 2020) ...........................................................................................3

*Tulp v. Educ. Comm'n for Foreign Med. Graduates*,
  Civ. A. No. 18-5540, 2019 WL 2601066 (E.D. Pa. June 25, 2019) ......................................21

*Valentine v. On Target, Inc.*,
  727 A.2d 947 (Md. 1999) .....................................................................................................29

*Walden v. Saint Gobain Corp.*,
  323 F. Supp. 2d 637 (E.D. Pa. 2004) ...................................................................................15

*Warr v. JMGM Group, LLC*,
  70 A.3d 347 (Md. 2013) ......................................................................................................29

*Weiley v. Albert Einstein Med. Ctr.*,
  51 A.3d 202 (Pa. Super. 2012) .............................................................................................17

*Wiest v. Tyco Electronics Corp.*,
  812 F.3d 319 (3d Cir. 2016) ................................................................................................14

*Willard v. Interpool, Ltd.*,
  758 A.2d 684 (Pa. Super. Ct. 2000) .....................................................................................30

*Willow Tree Learning Ctr., Inc. v. Prince George's Cty., Md.*,
  584 A.2d 157 (Md. Ct. Spec. App. 1991) ............................................................................29

*Estate of Witthoeft v. Kiskaddon*,
  733 A.2d 623 (Pa. 1999) .....................................................................................................20

*Yarnall v. Philadelphia Sch. Dist.*,
    No. 11–CV–3130, 2013 WL 5525297 (E.D. Pa. Oct. 7, 2013) .............................................16

**Other Authorities**

42 Pa. C. S. § 5521(b) ............................................................................................................38

Fed. R. Civ. P. 56(a) ..............................................................................................................14

Restatement (Second) of Torts § 7(3) .....................................................................................24

Restatement (Second) of Torts § 55 .......................................................................................35

Restatement (Second) of Torts § 324A ..............................................................................23, 24

Restatement (Second) of Torts § 892B ...................................................................................35

Am. Med. Ass'n, *How IMGs have changed the face of American medicine* (Oct.
    19, 2021), https://www.ama-assn.org/education/international-medical-
    education/how-imgs-have-changed-face-american-medicine ................................................22

Victor E. Schwartz, *Remoteness Doctrine: A Rational Limit on Tort Law*, 8
    Cornell J. of Law & Pub. Pol. 421, 425 (1999) ....................................................20, 22, 30, 32

## INTRODUCTION

This case is an unprecedented attempt to hold liable Defendant Educational Commission for Foreign Medical Graduates ("ECFMG") in negligence for emotional distress allegedly suffered by Plaintiffs from learning information, years after they were treated, about their former doctor's misuse of his name and Social Security number. Having previously (and unsuccessfully) pursued claims against the hospital where they were treated, Plaintiffs changed course and sued ECFMG, a private non-profit organization that serves an important, but strictly circumscribed, role in credentialing graduates of foreign medical schools.

Plaintiffs' claims against ECFMG run afoul of bedrock legal principles, including the limits of duty and foreseeability made famous in *Palsgraf v. Long Island Railroad* nearly a century ago, the limits of but-for and proximate causation, the remoteness doctrine, and the rational limits of tort law. Discovery is complete, and the undisputed facts entitle ECFMG to judgement as a matter of law on a number of grounds.

Plaintiffs have not proven that this case presents any of the limited circumstances under which recovery for emotional distress may be had. There is no evidence of emotional distress triggered by actual or impending physical impact or from witnessing injuries to a close relative, and ECFMG had absolutely no relationship with Plaintiffs, let alone the kind of legally cognizable "special relationship" that could possibly render it liable to them.

Nor did ECFMG owe even a general legal duty to Plaintiffs. At all relevant times, ECFMG played a limited role in the medical field; ECFMG Certification verified only that individuals seeking to enter post-graduate medical education in the United States completed certain exams and presented a medical school diploma primary-source verified as authentic by the issuing medical school. That's it. ECFMG Certification status information was available only to entities within the medical community—potential employers and licensors, not members of the general public—to use

as part of their robust independent processes for vetting and overseeing applicants. The remote possibility that an individual's receipt of ECFMG Certification would actually result in any particular patient, such as any of the four Plaintiffs, being treated—let alone suffering emotional distress years after treatment upon learning information about the individual's name or Social Security number—is not foreseeable as a matter of law. Under the laws of either Pennsylvania or Maryland, this does not warrant imposing a duty on ECFMG for the benefit of Plaintiffs.

Plaintiffs' claims also run head-on into a number of other insurmountable legal obstacles barring recovery. Their claims fail because they received precisely what they consented to: medical treatment by a licensed and Board-certified physician. Dr. Akoda's alleged misrepresentations did not vitiate that consent. There is no evidence that any breach by ECFMG of a legally cognizable duty caused the alleged emotional distress. The lengthy causal chain separating ECFMG from Dr. Akoda's treatment of Plaintiffs—including negligence of intervening third parties (undisputed by Plaintiffs)—defeats proximate causation. And Plaintiffs can only speculate that any specific act that ECFMG was allegedly required by law to take would have avoided harm to Plaintiffs, particularly since Plaintiffs' harm is largely premised on their mistaken beliefs about Dr. Akoda's licensure and training, and ECFMG's role in the medical field.

Plaintiffs aver emotional distress unaccompanied by physical harm. As a result, they do not satisfy an essential prerequisite for recovery. And the claims of Plaintiffs Evans and Powell are time-barred. They claim Dr. Akoda's treatment was injurious, so the limitations period began to run at the time of treatment. But they did not file suit until after the limitations period expired.

ECFMG's motion for summary judgment should be granted.

## STATEMENT OF FACTS

### I.   ECFMG's Certification and Irregular Behavior Processes

ECFMG is a private non-profit organization that promotes quality health care for the public

2

by, among other things, certifying eligible international medical graduates ("IMGs") of foreign medical schools who have met certain minimum requirements as ready to enter U.S. graduate medical education (usually residency programs). Def.'s Stmt. of Undisputed Material Facts ¶ 1 (hereinafter "¶ _"). At all relevant times, those requirements included (i) passing grades on an English exam and two substantive exams, and (ii) a primary-source verified medical school diploma. ¶ 3. To primary-source verify a diploma, ECFMG would send a copy directly to the issuing medical school, which would confirm for ECFMG whether the diploma was authentic. ¶ 3.

For various reasons, IMGs and others sometimes try to subvert ECFMG's requirements. ECFMG calls that "irregular behavior" and has a process for evaluating suspected irregular behavior. ¶ 20. That process is intended to ensure the integrity of ECFMG's programs and services while affording due process to the accused.[1] When ECFMG suspects that an individual may have engaged in irregular behavior, ECFMG staff investigates by, *inter alia*, communicating with the source of the suspicion and with the accused. ¶ 21. ECFMG is not a government, law enforcement, or investigative agency, but it uses the tools at its disposal to determine whether a suspicion of irregular behavior is well founded. ¶ 25. If ECFMG staff determines that there is sufficient evidence that an individual has engaged in irregular behavior, the matter is referred to ECFMG's Medical Education Credentials Committee ("MECC"), a sub-committee of ECFMG's Board of Trustees, for a formal determination on the merits. ¶ 24. Mere suspicions of irregular behavior are not made public or reported to third parties to avoid damage to the suspect individual's career and reputation based on unsubstantiated allegations. ¶ 23. If the MECC finds that an IMG engaged in irregular behavior, ECFMG annotates the individual's record and can, *inter alia*, limit the

---

[1] ECFMG has been sued (unsuccessfully) by those alleging that it deprived them of due process. *See Tulp v. Educ. Comm'n for Foreign Med. Graduates*, 824 F. App'x 134, 135 (3d Cir. 2020).

individual's participation in ECFMG programs or withhold or revoke ECFMG Certification. ¶ 24.

**II.    The Medical Field Uses ECFMG Certification For Limited Purposes.**

ECFMG Certification status information is made available only to certain third parties in the medical field, such as residency programs, hospitals, licensing boards, and employers. ¶ 5. It is not made available to patients. ¶ 6. At all relevant times, ECFMG Certification status reports communicated the IMG's name, date of birth, medical school name and country, graduation year, certification status, and certain examination scores (depending on the recipient). ¶ 7.

Recipients of ECFMG Certification status reports used them for limited purposes in their own processes. The reports are by no means the only information the recipients use when evaluating IMGs. ¶ 10. The reports do (and are not expected to) verify, among other things, an IMG's identity, Social Security number, immigration status, passport information, criminal background, readiness to treat patients, ethics, honesty, morality, or character. ¶ 8.

**III.    John Nosa Akoda and His Aliases**

Plaintiffs are former patients of an obstetrician/gynecologist ("OB/GYN") who got his ECFMG Certificate (No. 0-553-258-5) in 1996 under the name John Nosa Akoda based on his passing of an English exam and Steps 1 and 2 of the USMLE, and the primary source verification of a medical school diploma by the University of Benin. ¶¶ 44–52. ECFMG and Plaintiffs came to later learn that doctor committed Social Security fraud and went by several different names. ¶ 100.

In 1992, the doctor applied to ECFMG using the name Oluwafemi Charles Igberase and presenting ECFMG with a medical school diploma that was primary source verified by the University of Ibadan. ¶¶ 26–28. He ultimately got an ECFMG Certificate (No. 482-700-2) but did not gain admission to a residency program. ¶¶ 33–34. In 1994, he applied again for ECFMG Certification, this time using the name Igberase Oluwafemi Charles and misrepresenting that he had never applied to ECFMG before. ¶¶ 35–36. Using that name, he got a new ECFMG Certificate

4

(No. 0-519-573-0). ¶ 37. Soon thereafter, ECFMG staff determined that there was sufficient evidence the doctor had engaged in irregular behavior by misrepresenting his application history with ECFMG and promptly referred the matter to the MECC. ¶¶ 39–42. Following irregular behavior proceedings, the MECC found that he had engaged in irregular behavior and (1) invalidated the ECFMG Certificate issued to Oluwafemi Igberase Charles; and (2) revoked the ECFMG Certificate issued to Oluwafemi Charles Igberase. ¶ 42. ECFMG later barred the doctor from applying after he submitted additional applications using variations of the names Oluwafemi, Charles, and Igberase, each of which ECFMG identified and refused to process. ¶ 43.

When the doctor applied in 1996, he misrepresented his ECFMG application history and made no reference to the Igberase or Charles applications. ¶¶ 44, 48. After getting his ECFMG Certificate as Dr. Akoda—but before treating Plaintiffs—a number of other third parties evaluated, hired, credentialed and/or licensed Dr. Akoda and allowed him to practice medicine.

### A.    Residency Programs, Including Jersey Shore Medical Center and Howard University Hospital

Plaintiffs were not treated by Dr. Akoda while he was enrolled in a residency program. ¶¶ 74, 103, 134, 164, 188. But his admission to and successful completion of a residency program enabled him to continue practicing medicine and eventually treat Plaintiffs.

When considering a residency applicant, residency programs consider things beyond ECFMG Certification status, including (1) in-person interviews; (2) information provided directly by the IMG; (3) letters of recommendation; (4) skills assessments or additional examinations; (5) reports from prior educational or training programs; (6) medical school transcripts; (7) information obtained as part of a background check; and (8) ongoing performance monitoring. ¶ 10. There is no evidence that any residency programs evaluated, admitted, or approved of Dr. Akoda based solely (or even primarily) on his ECFMG Certification status.

Dr. Akoda initially gained admission to the residency program at Jersey Shore Medical Center ("JSMC") in 1998. ¶ 56. In 1999, JSMC came to suspect that Dr. Akoda had participated in two other U.S. residency programs under the name Oluwafemi Charles Igberase. ¶ 57. When JSMC tried to verify the Social Security number that Dr. Akoda provided directly to JSMC in his residency paperwork, JSMC concluded that it belonged to Charles Igberase. ¶ 58. JSMC ultimately discharged Dr. Akoda in 2000 because of perceived discrepancies involving his Social Security number and green card (the latter of which was not part of his ECFMG application). ¶ 67. JSMC stated that it would notify the Maryland Board of Physicians about those discrepancies. ¶ 68.

JSMC shared only limited information about and from its investigation with ECFMG, and ECFMG conducted its own investigation to determine if Dr. Akoda and Dr. Igberase were the same person. ¶¶ 59–60. Through its investigation, ECFMG discovered that some of the information JSMC gave ECFMG was inaccurate, ¶ 61, and Dr. Akoda provided ECFMG further explanations and supporting hard-copy documentation in person to show that he and Dr. Igberase were not the same person. ¶¶ 64–65. Despite some suspicions at the time—which were put in a memo separate from Dr. Akoda's file—ECFMG staff thought there was insufficient evidence to bring Dr. Akoda before the MECC on charges of irregular behavior. ¶¶ 66, 70. While ECFMG continued to investigate Dr. Akoda, it took no adverse action against him at that point because ECFMG staff concluded there was insufficient evidence of irregular behavior. ¶ 69.

Years later, in 2007, Dr. Akoda participated in the residency program at Howard University Hospital ("Howard"). ¶ 74. In connection with that program, Dr. Akoda provided Howard a false permanent resident card in the name "N. Akoda, John Charles." ¶ 73. Dr. Akoda successfully completed his residency at Howard in 2011. ¶ 74.

### B.    Maryland Board of Physicians and Virginia Board of Medicine

In 2011, Dr. Akoda was licensed by the Maryland Board of Physicians and the Virginia

Board of Medicine. ¶¶ 75–76. Those authorities usually evaluate applicants on a range of information, including, *inter alia*, evidence of good moral character and completion of at least two years of an accredited residency program. ¶¶ 10, 12–13. There is no evidence that either authority evaluated or approved of Dr. Akoda based solely (or even primarily) on his ECFMG Certification status. Rather, the ECFMG Status Report regarding Dr. Akoda received by the Maryland Board of Physicians in 2011 was intended only to indicate that Dr. Akoda was "certified by ECFMG" and that ECFMG "verified medical school credentials directly with the medical schools[.]" ¶ 79.

Dr. Akoda's application for licensure in Maryland required that if his name was "not written the same way on all documents," he had to "submit documentation to explain how and why [his] name differs and submit one of the following documents to support the name change: Passport, INS card, birth certificate, court document, marriage license, court decree." ¶ 78. Dr. Akoda's name appeared differently on his licensure application ("John Charles Nosa Akoda" and "Charles John Nosa Akoda"), ECFMG Certificate ("John Nosa Akoda"), medical school diploma ("Johnbull Enosakhare Akoda"), and residency program certificate of completion ("John-Charles Nosa Akoda"). ¶ 80. There is no evidence that Dr. Akoda provided documentation to explain the discrepancies to the Maryland Board of Physicians as required, and he later admitted to providing a false permanent resident card and a false Maryland driver's license in connection with his application for licensure in Maryland. ¶ 81. His application for medical licensure in Maryland also omitted his residency at JSMC. ¶ 77.

As early as 2014, the Maryland Board of Physicians was aware of the allegations that Dr. Akoda had used other names and may have misrepresented his identity. ¶ 82. It nonetheless did not revoke Dr. Akoda's medical license until 2017, after Dr. Akoda pleaded guilty to Social Security fraud in 2016. ¶¶ 83–84. Even then, it did so on the basis that Dr. Akoda's Social Security fraud conviction was for a so-called "crime of moral turpitude," not that he had used other names

7

or was not properly trained or credentialed. ¶ 84.

C.     **Prince George's Hospital Center, Dr. Abdul Chaudry, and Dr. Javaka Moore**

After successful completion of his Howard residency, Dr. Akoda obtained privileges at Prince George's Hospital Center ("PGHC") and worked with medical practices run by Drs. Abdul Chaudry and Javaka Moore. ¶¶ 87, 90. Each, although aware of Dr. Akoda's ECFMG Certificate, would have used its own processes to evaluate Dr. Akoda's training and credentials. ¶¶ 10, 15. Hospitals have their own procedures for credentialing physicians, generally including an interview, personal references with contact information, a current photograph, certificates of completion from all residencies and fellowships, letter of recommendation from program directors, Social Security number, valid passport or birth certificate, malpractice insurance history, licenses, a two-year case log, fingerprinting for a federal background check, and a urine drug screen. ¶ 10. IMGs are subject to normal employment processes and ongoing evaluation. ¶ 16.

Dr. Akoda treated each Plaintiff at PGHC. ¶¶ 103, 136, 164, 188. Dr. Akoda got privileges at PGHC by, among other things, submitting a false permanent residence card and a false Maryland driver's license. ¶ 81. Plaintiffs contend that PGHC failed to perform an appropriate and proper investigation and background check of Dr. Akoda before granting him privileges. ¶ 88. Had PGHC "use[d] require and reasonable care to investigate, credential, grant privileges, monitor and supervise" Dr. Akoda, his fraudulent conduct would have been discovered, he would not have seen patients at PGHC, and Plaintiffs "would not have suffered their injuries[.]" ¶ 89.

Ms. Russell and Ms. Evans were patients of Dr. Akoda by virtue of his affiliation with Dr. Moore's practice, and Ms. Powell and Ms. Riggins were patients of Dr. Akoda by virtue of his affiliation with Dr. Chaudry's practice. ¶¶ 106, 135, 165, 189.

D.     **Other Evaluations of Dr. Akoda**

In 2012, Dr. Akoda submitted a Medicare Enrollment Application to the Centers for

Medicare and Medicaid Services ("CMS"). ¶ 91. CMS denied the application based, in part, on its determination that Dr. Akoda did not provide an accurate Social Security number. ¶ 92. There is no evidence that CMS took any action to advise licensing boards, hospitals, or employers about inconsistencies with Dr. Akoda's Social Security number.

In 2014, Dr. Akoda achieved certification by the American Board of Obstetrics and Gynecology ("ABOG"). ¶ 93. Medical specialty board certification typically requires passing a written and oral examination, undergoing a personal interview, review of academic credentials, review of prior case logs, letters of recommendation from residency and fellowship directors, and consideration of any disciplinary action, criminal, or immoral behavior that comes to their attention. ¶ 18. Following Board certification, a candidate must comply with requirements for ongoing educational modules to maintain certification. ¶ 19. ABOG waited until January 2018— more than a year after Dr. Akoda's guilty plea—to revoke his diplomate status. ¶ 94.

E.     Law Enforcement

In 2014—before Ms. Evans and Ms. Russell encountered Dr. Akoda—ECFMG received a subpoena from the U.S. Attorney's office regarding Dr. Akoda. ¶ 95. ECFMG cooperated with the investigation and followed instructions from federal authorities not to impede the investigation and not to take adverse action against Dr. Akoda while the investigation was ongoing. ¶ 96. ECFMG worked together with the Maryland Board of Physicians to assist the investigation. ¶ 97. Then, in March 2016, the Prince George's County Police Department contacted ECFMG about Dr. Akoda. ¶ 98. ECFMG cooperated with that investigation and continued to follow instructions not to impede the investigation or take adverse action against Dr. Akoda while the investigation was ongoing. ¶ 99. Law enforcement did not stop Dr. Akoda from practicing medicine during their investigations. ¶¶ 83, 108, 137, 193.

In November 2016, Dr. Akoda pleaded guilty to misuse of a Social Security number and

9

stipulated that he and Oluwafemi Charles Igberase were the same person. ¶ 100. With that admission, ECFMG promptly consolidated the Igberase and Akoda files and revoked the ECFMG Certificate issued to John Nosa Akoda. ¶ 101.

## IV.    This Lawsuit

Plaintiffs are Dr. Akoda's former patients who generally contend that ECFMG was negligent in its certification and/or investigation of Dr. Akoda and that ECFMG's actions or inactions caused Plaintiffs to suffer emotional distress upon learning that Dr. Akoda went by other names and pleaded guilty to Social Security fraud. At the relevant time, each Plaintiff had consented to treatment by a licensed physician. ¶¶ 105, 136, 166, 191.

### A.    Monique Russell

Dr. Akoda performed a successful emergency c-section for Ms. Russell in May 2016 at PGHC when Ms. Russell was a Maryland resident and a patient at Dr. Moore's practice. ¶¶ 187–194. Ms. Russell had never previously been treated by Dr. Akoda, but she knew that he might assist her at the hospital. ¶¶ 189–190. Ms. Russell acknowledges that the consequences of Dr. Akoda's treatment were "minor," ¶ 195, and that Dr. Akoda rendered treatment that "really was best/necessary." ¶ 196.

Ms. Russell now claims to question whether her c-section was necessary because she mistakenly believes Dr. Akoda was a "fake doctor" who was "not properly trained as a doctor or credentialed as a doctor." ¶ 216. She also mistakenly believes that ECFMG is a "government agency" and that ECFMG Certification is a valid substitute for a background check. ¶ 214.

Ms. Russell claims to feel violated and have a sense of distrust in the medical community, but she continues to see physicians and take her family members to be treated by physicians. ¶¶ 208–209. Ms. Russell also claims to suffer from anxiety but has never been formally diagnosed with anxiety. ¶¶ 198, 203. There is no evidence of any physical symptoms attributable to the

10

emotional distress allegedly experienced by Ms. Russell. ¶ 205.

Ms. Russell believes that PGHC was negligent in credentialing Dr. Akoda. ¶ 208. She claims her emotional distress and distrust of doctors were amplified upon discovering that PGHC never performed a background check on Dr. Akoda. ¶ 208. She was also told by Dr. Moore that Dr. Akoda did not undergo a background check before joining his practice. ¶ 211.

### B.    Jasmine Riggins

Ms. Riggins was a patient with the practice of Dr. Chaudry in 2012 and 2013, through which she received prenatal care from Dr. Akoda. ¶ 165. Dr. Akoda subsequently performed a successful c-section for Ms. Riggins in 2013. ¶ 167. Ms. Riggins has reported that she did not have any concerns about her treatment with Dr. Akoda during prenatal visits, during the c-section, or after her healthy child's birth. ¶ 169.

Ms. Riggins never heard of ECFMG prior to speaking with her attorneys. ¶ 183. She mistakenly believes that ECFMG gives foreigners "permission to practice medicine in the United States" ¶ 184. She believes ECFMG should have been "more careful about who they certify," but she acknowledges that if she learned that ECFMG had cooperated with law enforcement to help build a case against Dr. Akoda, it may make a difference to her. ¶¶ 186–186.

Ms. Riggins also believes that PGHC knew or should have known that Dr. Akoda went by other names. ¶ 178. She contends that PGHC was negligent and that PGHC's negligence was the "sole and proximate cause" of her injuries. ¶ 177.

Ms. Riggins claims to have begun experiencing emotional distress upon coming to believe that Dr. Akoda was a "fake doctor." ¶ 169. Medical records throughout 2017 confirm that Ms. Riggins did not experience anxiety/worry, depressed mood, or suicidal thoughts after learning about Dr. Akoda's fraud. ¶¶ 173, 176. She claims to have experienced no physical manifestation of her emotional distress. ¶ 175. She has never been diagnosed with depression or any psychiatric

disorder, nor has she seen a medical professional to discuss her alleged emotional distress. ¶¶ 172, 179.

### C.     Elsa Powell

Ms. Powell began seeing Dr. Akoda at Dr. Chaudry's practice in 2014 when she was about 6 months pregnant. ¶¶ 134, 137. Ms. Powell alleges that Dr. Akoda was flirtatious during pre-natal visits and made comments about her breasts that she never reported. ¶ 138. She claims that she asked to have a nurse present during examinations because of Dr. Akoda's inappropriate conduct. ¶ 139.

Dr. Akoda successfully delivered her baby vaginally and helped with her post-natal care through January 2015. ¶ 142. Ms. Powell experienced post-partum bleeding that required Dr. Akoda to perform emergency surgery, at which time Dr. Akoda allegedly told her, "I'm sorry, I should have detected it sooner, I'm so sorry, we're getting the O.R. ready for you." ¶ 144–145.

Ms. Powell claims that she does not "have a peace of mind" since she found out Dr. Akoda "wasn't who he said he was." ¶ 148. Ms. Powell has no history of psychiatric or mental health disorder, never sought treatment for any such disorder, and does not present with symptoms compatible with any such disorder. ¶¶ 149, 151. There is no evidence that she suffered physical manifestations from her alleged emotional distress.

Ms. Powell had never heard of ECFMG until 2018 when she learned of ECFMG through her lawyer. ¶ 155. Even now, she mistakenly believes ECFMG "give[s] the license for foreigners" to "practice medicine in the United States." ¶ 156. Ms. Powell claims to doubt that Dr. Akoda had medical training, even though it is undisputed that he completed a residency program at Howard. ¶¶ 74, 158. She faults ECFMG for "actually provid[ing] him with a license to practice" but it is undisputed that ECFMG does not license physicians. ¶¶ 9, 157. She also contends that PGHC was negligent and should have discovered Dr. Akoda's alias sooner. ¶ 152.

### D.      Desire Evans

Desire Evans, a Maryland resident, was a patient with the practice of Dr. Moore. ¶¶ 102, 106. Dr. Akoda performed a successful emergency c-section for Ms. Evans at PGHC in March 2016. ¶ 108. Ms. Evans claims that Dr. Akoda inappropriately manipulated her clitoris in an effort to progress her labor. ¶ 112. She claims that her husband and mother witnessed Dr. Akoda's actions and asked about them. ¶¶ 113–114.

Ms. Evans did not do any research into the background, education, credentials, or certifications of any physicians at Dr. Moore's practice, including Dr. Akoda. ¶¶ 103–04. She had never heard of ECFMG Certification. ¶ 123. Ms. Evans mistakenly believes that ECFMG's purpose is "to verify identification documentation," not foreign medical diplomas, and that ECFMG is responsible for verifying IMGs' Social Security numbers, birth certificates, green cards, state medical licenses, board certifications, and any other "piece of identifying information about a foreign medical graduate." ¶ 125. She only learned of ECFMG's existence from her lawyers. ¶ 124.

Ms. Evans claims that she began experiencing increased anxiety and depression after giving birth to her son but before Dr. Akoda's guilty plea. ¶ 119. She claims that she is afraid to see a doctor, does not know who to trust, and her trust in the medical profession has diminished. ¶ 121. There is no evidence in the record of physical manifestations of alleged emotional distress.

Ms. Evans is the only Plaintiff who has sought mental health treatment since she encountered Dr. Akoda, but her psychiatric history extends well before she even met Dr. Akoda. She was hospitalized in 2009 (before Dr. Akoda even had his medical license) ███████ ████ and has reported histories of psychiatric symptoms on and off throughout her adult life. ¶ 116. Despite extensive mental health records from both before and after Ms. Evans learned of the charges against Dr. Akoda, not a single health record makes any reference to Dr. Akoda. ¶ 122.

Although Ms. Evans has psychiatric conditions, there is no causal connection between those conditions and the allegations in the Complaint. ¶ 128.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law. A dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"The moving party bears the initial burden to identify 'specific portions of the record that establish the absence of a genuine issue of material fact.'" *Wiest v. Tyco Electronics Corp.*, 812 F.3d 319, 328 (3d Cir. 2016) (quoting *Santini*, 795 F.3d at 416). "If the moving party satisfies its burden, the burden then 'shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial.'" *Id.* (internal quotation marks and citations omitted). To defeat summary judgment, the nonmoving party "cannot rest on mere pleadings or allegations; rather it must point to actual evidence in the record on which a jury could decide an issue of fact its way." *El v. Southeastern Pa. Transp'n Auth. (SEPTA)*, 479 F.3d 232, 238 (3d Cir. 2007) (internal citation omitted). "In this respect, summary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (internal citation omitted).

The party opposing summary judgment must support each essential element of that party's opposition with concrete evidence in the record. "If the evidence is merely colorable, or is not

14

significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50. This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense." *Walden v. Saint Gobain Corp.*, 323 F. Supp. 2d 637, 642 (E.D. Pa. 2004).

**ARGUMENT**

**I.    Recovery for Emotional Distress Is Not Permitted Under These Circumstances.**

Plaintiffs claim emotional distress resulting from ECFMG's alleged negligence. Pennsylvania law limits recovery on such claims to three circumstances. *Hershman v. Muhlenberg Coll.*, 17 F. Supp. 3d 454, 459 (E.D. Pa. 2014). They are "(1) when 'the plaintiff suffers a physical injury which causes the emotional distress'; (2) when the plaintiff was in the 'zone of danger'— or, in other words, experienced a 'near-miss' and suffered emotional distress from having been endangered, despite not having suffered physical harm; and (3) when the 'plaintiff witnesses an accident causing serious injury to a close family member.'" *Humphries v. Pa. State Univ.*, No. 4:20-CV-0064, 2021 WL 4355352, at *20 (M.D. Pa. Sept. 24, 2021).

None of these circumstances is present here. Each Plaintiff claims to have suffered emotional distress upon learning that Dr. Akoda used an alias and/or pleaded guilty to misuse of a Social Security number. They do not claim emotional distress as a result of a physical injury or a fear of "impending physical injury." *Credico v. Unknown Employee of the Houston FBI Forfeiture Unit*, 567 F. App'x 83, 83 (3d Cir. 2014).[2] They do not allege emotional distress resulting from actually witnessing an accident causing serious injury to a close family member. Nor could they. *See, e.g.*, *Doe v. Philadelphia Cmty. Health Alternatives AIDS Task Force*, 745 A.2d 25, 29 (Pa. Super. 2000), *aff'd*, 767 A.2d 548 (Pa. 2001) ("[W]e cannot conclude that two influenza vaccines,

---

[2] To the extent Plaintiffs claim that their emotional distress arose from physical injury at the time of treatment, their claims are time-barred. *See infra* Part VII.

which were not the cause of any lasting physical or emotional effects, are sufficient to bootstrap Appellant's claim that he suffered the 'physical impact' necessary to support a claim of negligent infliction of emotional distress."); *Kazatsky v. King David Mem'l Park, Inc.*, 527 A.2d 988, 993 (Pa. 1987) (noting that "learning of the accident from others after its occurrence" weighs against the possibility of liability); *Mazzagatti v. Everingham by Everingham*, 516 A.2d 672, 679 (Pa. 1986) ("Where, as here, the plaintiff has no contemporaneous sensory perception of the injury, the emotional distress results more from the particular emotional makeup of the plaintiff rather than from the nature of defendant's actions."). Accordingly, ECFMG cannot be liable for Plaintiffs' emotional distress.

Nor can Plaintiffs invoke *Toney v. Chester County Hospital*, 36 A.3d 83 (Pa. 2011), a non-precedential decision by less than a majority of the Pennsylvania Supreme Court, to suggest that recovery for emotional distress may be permitted based on a defendant's "special relationship" with a plaintiff. There was no "special relationship" between ECFMG and Plaintiffs. "[S]pecial relationships must encompass an implied duty to care for the plaintiff's emotional well-being." *Id.* at 90–95. They are limited "to preexisting relationships involving duties that obviously and objectively hold the potential of deep emotional harm in the event of breach." *Id.* Courts have recognized such "special relationships" only between medical professionals and patients and adoption agencies and adoptee parents. *See Mulawka v. Pennsylvania*, No. 2:11cv1651, 2013 WL 171911 (W.D. Pa. Jan. 16, 2013) (EMS technician / patient); *Madison v. Bethanna, Inc.*, No. 12-01330, 2012 WL 1867459, at *12 (E.D. Pa. May 23, 2012) (adoption agency and adoptee parents). Otherwise, courts have refused to extend liability farther.[3]

---

[3] *See, e.g.*, *Black v. Cmty. Educ. Centers, Inc.*, No. 13–CV–6102, 2014 WL 859313 (E.D. Pa. Mar. 4, 2014) (employer / employee); *Hawkins v. Fed. Nat. Mortgage Ass'n*, No. 13–CV–6068, 2014 WL 272082 (E.D. Pa. Jan. 23, 2014) (lender / borrower); *Yarnall v. Philadelphia Sch. Dist.*, No. 11–CV–3130, 2013 WL 5525297 (E.D. Pa. Oct. 7, 2013) (union and members); *Grimaldi v. Bank

ECFMG does not have a special relationship with Plaintiffs. No court has ever recognized a special relationship between ECFMG and members of the general public who might one day be treated by an IMG, and the indirect chain of links between ECFMG certifying an IMG and a doctor treating a patient is far removed from the narrow circumstances in which courts have found such a relationship to exist. In truth, Plaintiffs had **no** relationship with ECFMG at all, much less a "special relationship." None had heard of or interacted with ECFMG when they were treated by Dr. Akoda or learned of his aliases or Social Security fraud. Because recovery for emotional distress is unavailable as a matter of law, ECFMG is entitled to summary judgment.

## II.     ECFMG Did Not Owe Plaintiffs A Legally Cognizable Duty of Care.

### A.     ECFMG owed no general tort duty to Plaintiffs.

ECFMG is entitled to summary judgment on Plaintiffs' claims for negligence and negligent infliction of emotional distress ("NIED") because ECFMG did not owe a general tort duty to Plaintiffs. To prevail on either, Plaintiffs "must establish a prima facie case of negligence," *Humphries v. Pennsylvania State Univ.*, 492 F. Supp. 3d 393, 409 (E.D. Pa. 2020), including "the existence of a duty owed by one party to another," *Gibbs v. Ernst*, 647 A.2d 882, 890 (Pa. 1994).

"The determination of whether a duty exists in a particular case involves the weighing of several discrete factors which include: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequence of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution." *Althaus ex rel. Althaus v. Cohen*, 756 A.2d 1166, 1169 (Pa. 2000); *see Russell*

---

*of Am.*, No. 12–CV–2345, 2013 WL 1050549 (M.D. Pa. Mar. 14, 2013) (lender / borrower); *Okane v. Tropicana Entm't, Inc.*, No. 12–CV–6707, 2013 WL 56088 (E.D. Pa. Jan. 3, 2013) (casino / patron); *Emekekwue v. Offor*, No. 1:11–CV–01747, 2012 WL 1715066 (M.D. Pa. May 15, 2012) (ethnic group organization and member); *Shulick v. United Airlines*, No. 11–CV–1350, 2012 WL 315483 (E.D. Pa. Feb. 2, 2012) (airline and passengers); *Weiley v. Albert Einstein Med. Ctr.*, 51 A.3d 202, 218 (Pa. Super. 2012) (decedent's son and father's hospital).

*v. Educ. Comm'n. for Foreign Med. Graduates*, 15 F.4th 259, 272 (3d Cir. 2021) (citing *Althaus*, 756 A.2d at 1169). Here, each of the *Althaus* factors weighs against imposing on ECFMG a duty of care owed to Plaintiffs.

**First**, it there was no relationship whatsoever between ECFMG and Plaintiffs. "[D]uty is predicated on the relationship that exists between the parties at the relevant time." *R.W. v. Manzek*, 888 A.2d 740, 747 (Pa. 2005). When Plaintiffs were treated by Dr. Akoda and when they learned of Dr. Akoda's aliases/Social Security fraud, Plaintiffs did not even know that ECFMG existed, let alone rely on or interact with ECFMG. "Because the parties were essentially strangers to each other at the relevant time, this factor does not support a finding of a duty." *Commerce Bank/Penn. v. First Union Nat'l Bank*, 911 A.2d 133, 139 (Pa. Super. 2006); *see Hall v. United States*, No. 2:19-cv-05256-KSM, 2020 WL 3265146, at *5 (E.D. Pa. June 17, 2020) ("[B]ecause Hall does not plead any facts indicating that he was known to the Government at the time of his accident with Mullins, dismissal is further warranted."). The absence of a relationship between the parties amounts to "a **significant** factor that weights against the existence of a duty." *Citizens Bank of Pennsylvania v. Reimbursement Tech., Inc.*, 609 F. App'x 88, 92 (3d Cir. 2015) (emphasis added).

**Second**, there is not high social utility in imposing a duty here. ECFMG played a limited role in the process whereby an IMG might eventually treat any particular patient in the United States. ECFMG was not, and is not, contrary to the uninformed or mistaken views of Plaintiffs, a government entity of any kind. ECFMG Certification status communicated to sophisticated parties within the medical community only that an IMG was ready to apply for post-graduate medical education because he or she had passing grades on an English exam and two substantive exams and presented a primary-source verified medical school diploma. Nothing more. It did not cause an IMG to (1) be accepted to a residency, (2) successfully complete a residency, (3) be licensed by a licensing authority, (4) be hired for employment as a medical doctor, (5) be permitted to treat

patients on an ongoing basis, or (6) be certified by any specialty boards. An IMG's direct educators and employers are much more directly responsible for ensuring his or her preparedness to practice medicine and treat patients, like Plaintiffs.

There are many others who stand in line before ECFMG in any rational consideration of responsibility for Plaintiffs' alleged injuries, among them Dr. Akoda himself, Howard, the Maryland Board of Physicians, and PGHC. As described below in connection with the fourth and fifth *Althaus* factors, imposing a duty on ECFMG to try to take action to ensure that IMGs deal honestly with patients would fundamentally disrupt the complex alignment of roles and responsibilities regarding IMGs practicing in the United States. *See* Br. of Amici Curiae Am. Med. Ass'n et al. ("AMA Br.") at 3, *Russell v. Educ. Comm'n for Foreign Medical Graduates*, 15 F.4th 259 (3d Cir. 2021) (No. 20-2128) ("The pathway to physician licensure in the United States is a rigorous, complex process that involves education, testing, and training with an interconnected web of organizations supporting the process along the way."). The risk of such disruption greatly outweighs whatever minuscule utility might theoretically arise from imposing on ECFMG a duty to Plaintiffs in this unique and unusual context. Moreover, Ms. Russell and Ms. Evans were treated by Dr. Akoda after law enforcement requested that ECFMG help with its investigation and not take action that might jeopardize it. There can be no social utility in imposing a duty on ECFMG to disregard such requests by law enforcement.

***Third***, the nature of the risk imposed and the foreseeability of the harm incurred weigh strongly against imposing a duty. "[D]uty arises only when one engages in conduct which foreseeably creates an unreasonable risk of harm to others." *Manzek*, 888 A.2d at 747; *see also Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99, 101 (N.Y. 1928). "Courts have been reluctant to impose a duty to protect a member of the general public from the harmful acts of third parties, in the absence of special circumstances." *Commerce Bank/Penn.*, 911 A.2d at 139. To do so would

"stretch foreseeability beyond the point of recognition [and] make liability endless." *Estate of Witthoeft v. Kiskaddon*, 733 A.2d 623, 630 (Pa. 1999); *see* Victor E. Schwartz*, Remoteness Doctrine: A Rational Limit on Tort Law*, 8 Cornell J. of Law & Pub. Pol. 421, 425 (1999) ("Whatever conceptual vehicle is utilized – proximate cause or duty – the remoteness limitation on liability has endured as a basic doctrine of tort law.").

The nature of the risk at issue is minimal both in terms of likelihood and degree. Dr. Akoda's fraud on ECFMG and a host of third parties in the medical field is unprecedented. This is not a common occurrence that would necessitate the overreaction of imposing a tort duty on ECFMG as to members of the general public who might one day be treated by an IMG. Moreover, Plaintiffs were not truly harmed in any cognizable way. It cannot be disputed that Dr. Akoda was licensed to practice medicine. It cannot be disputed that he successfully completed post-graduate medical education in the United States. It cannot be disputed that he successfully performed serious medical procedures and that each Plaintiff emerged from her pregnancy healthy and with a healthy child. Beyond being licensed, Dr. Akoda was at all times affiliated with one more entity in the medical field that monitored his daily interactions with patients.

The foreseeability inquiry requires that "the nature of the risk and the foreseeability of harm **in this specific case**" be clear, not "vague and attenuated." *Commerce Bank/Pa.*, 911 A.2d at 139 (emphasis added). In *Fragale v. Wells Fargo Bank, N.A.*, 480 F. Supp. 3d 653 (E.D. Pa. 2020), for example, the court refused to impose a duty on banks to prevent the opening of fraudulent accounts. The court recognized that "[w]ith the benefit of hindsight," it may seem that "it was foreseeable that a noncustomer who was deceived into transferring money to an account at Wells Fargo might be the victim of a fraudulent scheme perpetrated by someone who opened the account for fraudulent purposes." *Id.* at 666. But it held that was insufficient to impose a duty.

Here, the foreseeability of harm is even more attenuated than in *Fragale*. For the harm at issue to result, Dr. Akoda had to defraud not just ECFMG and Plaintiffs, but also **the medical field**—including residency programs, hospitals, licensing boards, specialty boards, and private practitioners, not to mention all of the professionals he interacted with on a daily basis. With each additional actor that independently evaluated Dr. Akoda and concluded that he was qualified and permitted him to treat patients, the foreseeability of any harm resulting to Plaintiffs from ECFMG's allege negligence becomes less and less foreseeable. Moreover, the harm at issue here—Plaintiffs' emotional distress—is extremely unforeseeable given that it is based on Plaintiffs' later learning about Dr. Akoda's aliases/Social Security fraud. The harm reflects "the particular emotional makeup of [each] plaintiff rather than … the nature of defendant's actions." *Mazzagatti*, 516 A.2d at 679. It was not foreseeable to ECFMG that Dr. Akoda would not only perpetrate a fraud on the medical field, but also that Plaintiffs would suffer emotional distress based on their mistaken beliefs that he was a "fake doctor" when it is undisputed that he successfully completed his residency and was licensed to practice medicine. ECFMG can have no duty to prevent emotional distress resulting from Plaintiffs' miscomprehensions of the facts.

***Fourth***, the consequences of imposing a duty on ECFMG would be inconsistent with Pennsylvania law and unworkable. A duty for ECFMG to disclose suspicions about Dr. Akoda to third parties without first proceeding through ECFMG's irregular behavior process and making a determination on the merits could have violated Dr. Akoda's common law due process rights. *See Tulp v. Educ. Comm'n for Foreign Med. Graduates*, Civ. A. No. 18-5540, 2019 WL 2601066 (E.D. Pa. June 25, 2019) (granting summary judgment for ECFMG because ECFMG's irregular behavior procedures afford sufficient process to the accused). The law cannot simultaneously

21

impose both a duty on ECFMG to report suspicions of irregular behavior and a crosswise duty on ECFMG to refrain from disclosing suspicions pending due process.[4]

At the same time, ECFMG is not and cannot become a guarantor of each IMG's trustworthiness. Dr. Akoda got his ECFMG Certificate more than a decade before he treated any Plaintiff. Before treating Plaintiffs, Dr. Akoda was scrutinized—on much more wide-ranging criteria than ECFMG purported to evaluate—by a host of institutions who had much closer and repeated interactions with him. To impose a duty on ECFMG after Dr. Akoda had practiced medicine successfully for more than a decade would be absurd; arguably tantamount to imposing a duty on ECFMG to any member of the general public who may one day be treated by an IMG. With IMGs representing 25% of all licensed doctors in the United States, Am. Med. Ass'n, *How IMGs have changed the face of American medicine* (Oct. 19, 2021), https://www.ama-assn.org/education/international-medical-education/how-imgs-have-changed-face-american-medicine, such a duty could be impossibly onerous. The Court "must draw lines to prevent unlimited liability to an unlimited number of plaintiffs, notwithstanding the commission of negligent acts." *Toney*, 36 A.3d at 91; *see* Schwartz, *Remoteness Doctrine*, at 443 ("If one can stand back from the controversial cases and make objective judgments – judgments about the shape of the law and its rationale – the remoteness doctrine has clear, strong public policy bases that would continue to apply in a myriad of contexts."). And to impose a duty on ECFMG owed to Ms. Russell and Ms. Evans after ECFMG was asked by law enforcement not to act against Dr. Akoda in 2014 would put ECFMG to the impossible choice of complying with competing directives.

---

[4] If ECFMG owed a duty to refer Dr. Akoda to irregular behavior proceedings at some point, Plaintiffs' claims would still fail for lack of causation. *See infra*. There is no evidence that prior to Dr. Akoda's guilty plea, the MECC would have found that he engaged in irregular behavior, especially since ECFMG staff did not think there was sufficient evidence warranting a referral to the MECC, even if they had suspicions they could not substantiate.

***Fifth***, the public interest weighs strongly against imposing a wide-reaching duty on ECFMG to any member of the general public who may one day be treated by an IMG. The medical field is already thoroughly regulated. Licensing boards, hospitals, specialty boards and private employers routinely can and do conduct background checks on candidates. ECFMG is a non-profit responsible for working with foreign medical schools to confirm the authenticity of documents presented by IMGs and passage of certain exams (among other things, not relevant here). The public interest lies with imposing a duty on the entities actually responsible for deciding whether an IMG treats patients, not on a party removed from that decision by multiple degrees who supplies specific narrow information to be used by sophisticated actors in a broader exercise of discretion. Moreover, imposing a duty on any entity that has a role in allowing IMGs—of which there are currently almost 223,000 in this country—to practice medicine would "chill[] the medical community's efforts to provide access to care across America and, in particular, in patient communities of need." AMA Br. at 4.

*The Althaus* factors weigh conclusively against imposing a duty on ECFMG to Plaintiffs.

### B.    ECFMG is not liable to Plaintiffs under Restatement (Second) of Torts § 324A.

Plaintiffs have also suggested that ECFMG may be liable to Plaintiffs because ECFMG Certification status reports are provided to hospitals and licensing boards. Restatement (Second) of Torts § 324A provides that "[o]ne who undertakes … to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking" under three circumstances: "(a) his failure to exercise reasonable care increases the risk of such harm"; "(b) he has undertaken to perform a duty owed by the other to the third person"; or "(c) the harm is suffered because of reliance of the other or the third person upon the undertaking." Under those limited circumstances, the law imposes a duty to perform an

23

undertaking "in such manner that third persons—strangers to the [undertaking]—will not be injured thereby." *Cantwell v. Allegheny Cty.*, 483 A.2d 1350, 1353 (Pa. 1984) (quoting *Evans v. Otis Elevator Company*, 168 A.2d 573, 575–76 (Pa. 1961)). "[T]he orbit of the duty is measured by the nature and scope of the … undertaking." *Farabaugh v. Pennsylvania Turnpike Com'n*, 911 A.2d 1264, 1283 (Pa. 2006) (quoting *Otis Elevator*, 168 A.2d at 576).

As a threshold matter, Section 324A allows liability only for "physical harm." *See* Restatement (Second) of Torts § 7(3) ("the physical impairment of the human body"). Plaintiffs do not allege—let alone present any evidence—that ECFMG's conduct resulted in "physical harm." ¶¶ 174, 205; *see also infra* Part VI. Section 324A is therefore inapplicable.

Even then, the record confirms that there was no basis for ECFMG to believe that its services were "necessary for the protection" of Plaintiffs. Hospitals and licensing boards have their own robust requirements for choosing who can practice medicine. Whether Dr. Akoda was qualified to practice medicine was a question left to the discretion of hospitals and licensing boards, not ECFMG. There is no evidence that anyone at hospitals or licensing boards views ECFMG Certification status as a substitute for the vigorous vetting processes they undertake (and indeed, may be obligated to undertake for the protection the general public). ECFMG does not assess IMGs' suitability to practice medicine. Recipients of ECFMG Certification status reports independently evaluate IMGs through multiple methods that go far beyond ECFMG. No reasonable jury could conclude that ECFMG should have understood that any communication regarding Dr. Akoda's ECFMG Certification status was necessary to protect Plaintiffs treated by Dr. Akoda after he had been independently evaluated and approved by a residency program, medical licensing boards, a hospital, and a specialty board.

This is especially true as of 2014, after ECFMG received notice of the investigations by law enforcement into Dr. Akoda and was told not to take action. As a matter of law, ECFMG

24

should not have viewed any action that it could have taken as "necessary" for the protection of Plaintiffs yet to be treated (such as Ms. Russell and Ms. Evans) when law enforcement was investigating and itself waited years to take action to prevent Dr. Akoda from treating patients. It bears repeating: The FBI was investigating Dr. Akoda, and the U.S. Department of Justice allowed him to continue treating patients **for years**. The same is true of the Maryland Board of Physicians, which knew of the allegations about Dr. Akoda by 2014 (and perhaps even as early as 2011 from JSMC) but nonetheless allowed him to maintain his medical license until after he pleaded guilty.

*Cantwell* is instructive. In that case, the Pennsylvania Supreme Court ruled that a crime lab performing tests for the police cannot be liable to a criminal suspect for harm allegedly suffered as a result of negligent testing. 483 A.2d at 1354. The court noted that the crime lab "does not exist or renders its services for the protection of suspects or potential suspects; rather, its purpose is to assist the police and the Commonwealth in collecting and analyzing evidence which may be relevant in presenting a case to a jury." *Id.* It also noted the importance of "the discretion of the Commonwealth," which stood between the crime lab's conduct and its effect on third parties. "No matter how well or how poorly a crime lab performs, it has no control, or ability to foresee, the disposition of criminal suspects, since the prosecution of suspects in criminal cases depends to a large extent upon the discretion of the police and the district attorney's office." *Id.*

The same reasoning applies with even greater force here. ECFMG provided limited factual information to entities in the medical field for their consideration—along with a host of other information—in deciding whom to license or privilege or credential. Each of those entities in the medical field exercised discretion—one after another, based on wide-ranging information—and ECFMG had no control or ability to foresee whether an IMG may come to treat any patients, let alone Plaintiffs. Even then, Dr. Akoda had to independently decide to continue his fraud and misrepresent his identity to each additional third party (and to Plaintiffs) before he might one day

25

suffer emotional distress from learning about an IMG's aliases. If the single layer of discretion separating the crime lab in *Cantwell* from any alleged harm to a criminal suspect meant there was no duty as a matter of law in that case, the multiple layers separating ECFMG from any alleged harm to Plaintiffs means there cannot be any duty owed in this case.

Plaintiffs seek to impose upon ECFMG a duty that goes far beyond "the nature and scope" of the "undertaking" at issue. *Farabaugh*, 911 A.2d at 1283 (quoting *Otis Elevator*, 168 A.2d at 576). ECFMG's "undertaking" was to certify that Dr. Akoda had passed certain exams (he had) and that the issuing medical school primary source verified his diploma (it did). Nothing in any "undertaking" by ECFMG obligated it to communicate with anyone that Dr. Akoda may have used an alias or may be committing Social Security fraud.

ECFMG also cannot be liable to Plaintiffs based on any undertaking on behalf of JSMC, Howard, or the Virginia Board of Medicine. Plaintiffs were not treated by Dr. Akoda while he was a resident at JSMC or Howard. Nor were Plaintiffs treated by Dr. Akoda in Virginia pursuant to the license issued to him by the Virginia Board of Medicine. There is no basis to hold that any undertaking by ECFMG on behalf of those institutions could possibly have been "necessary for the protection" of Plaintiffs, who were treated elsewhere and years later by Dr. Akoda.

### C.   ECFMG is not liable to Plaintiffs under Maryland law.

ECFMG is also entitled to summary judgment because Plaintiffs' claims fail under Maryland law. In diversity cases like this, federal courts apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Here, the forum state (Pennsylvania) applies a "flexible" choice-of-law analysis that "permits analysis of the policies and interests underlying the particular issue before the court" and applies the law of the state with the "most interest in the problem." *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 227 (3d Cir. 2007) (quoting *Griffith v. United Air Lines, Inc.*, 203 A.2d 796, 805-06 (Pa. 1964)). The analysis differs

depending on whether the purported conflict is "true" or "false." A true conflict exists "when the governmental interests of **both** jurisdictions would be impaired if their law were not applied." *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187 n. 15 (3d Cir. 1991). If a true conflict exists, the Court examines "which state has the most significant relationship to the occurrence and the parties." *Melmark, Inc. v. Schutt by and through Schutt*, 206 A.3d 1096 (Pa. 2019). "A false conflict exists if only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction." *Lacey*, 932 F.2d at 187. If a false conflict exists, the Court must apply the law of the jurisdiction whose interests risk being impaired. *Id.*

Here, there are at least two true conflicts between the laws of Pennsylvania and Maryland warranting the application of Maryland law under which ECFMG is entitled to summary judgment.

*First*, Pennsylvania recognizes a claim for NIED, but Maryland does not. *Compare Smith-McConnell v. Todd T. Thompson Funeral Home, Inc.*, No. 1035 WDA 2020, 2021 WL 3771822, at *5 (Pa. Super. Aug. 25, 2021) (discussing claims for NIED under Pennsylvania law), *with Alban v. Fiels*, 61 A.3d 867, 876 (Md. Ct. Spec. App. 2013) (noting that Maryland "does not recognize the tort of negligent infliction of emotional distress"). Each state recognizes that emotional distress is "easily simulated and feigned" and thus presents a risk of "fictitious or speculative claims" and a "wide field for exploitation" by "unscrupulous litigants." *Bowman v. Williams*, 165 A. 182, 184 (Md. 1933); *see Toney v. Chester Cty. Hosp.*, 36 A.3d 83, 91 (Pa. 2011) (noting the importance of "setting standards to determine the veracity of the emotional distress and to limit the potential number of plaintiffs"). Each state thus has a compelling interest in applying its own carefully crafted standards to guard against fictitious or fraudulent claims for emotional distress. *See LeJeune v. Bliss-Salem*, 85 F.3d 1069, 1072 (3d Cir. 1996) ("a state could have a host of reasons for limiting liability, including encouraging economic activity in the state … and lowering costs to consumers"). Maryland has an overwhelming interest in regulating claims brought by Maryland

27

residents based on treatment rendered in Maryland by a physician licensed to practice in Maryland. Accordingly, Maryland law should apply, and Plaintiffs' NIED claim fails as a matter of law.

**Second**, Pennsylvania and Maryland apply different tests to determine whether a duty exists. Pennsylvania applies the *Althaus* factors discussed above. But under Maryland law, the "balancing of policy considerations to determine whether a duty exists" involves consideration of "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and the consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved." *Pendleton v. State*, 921 A.2d 196, 205 (Md. 2007) (quoting *Ashburn v. Anne Arundel Cty.*, 510 A.2d 1078, 1083 (Md. 1986)) (internal quotation marks omitted). Each state has an interest in using its own standard to decide whether a duty is imposed in a negligence case seeking recovery for emotional distress, and applying the other's standard would impair each state's effort guard against "fictitious or speculative" negligence claims. Because Maryland's interest in this case dwarfs Pennsylvania's interest, Maryland law applies.

ECFMG owes no duty to Plaintiffs under Maryland law. As explained above in connection with the *Althaus* factors, because harm to Plaintiffs was not foreseeable and ECFMG's conduct was far removed from Plaintiffs' alleged injuries, those factors similarly weigh against imposing a duty on ECFMG under Maryland law. *See supra*. Each factor considered by Maryland, but not by Pennsylvania, similarly weighs against imposing a duty on ECFMG. Plaintiffs have not presented evidence of any cognizable emotional distress, so the "degree of certainty that [Plaintiffs] suffered the injury" weighs against recognizing a duty. The lack of "moral blame" similarly weighs against imposing a duty because Plaintiffs suffered their injuries more than a

decade after Dr. Akoda secured ECFMG Certification, and ECFMG's role in the medical field is separated from Plaintiffs by numerous intervening third parties with independent responsibility to scrutinize Dr. Akoda. Nor is there any evidence regarding the availability of insurance.

Maryland law routinely declines to impose a duty on one party to protect the general public from the conduct of a third party. *See, e.g.*, *Warr v. JMGM Group, LLC*, 70 A.3d 347, 364 (Md. 2013) (declining to impose a duty on dram shop owners for injuries caused by their patrons who drove drunk after drinking alcohol at their establishment); *Barclay v. Briscoe*, 47 A.3d 560, 582 (Md. 2012) (declining to impose a duty on an employer for an employee's negligent driving after the employee worked a 22-hour shift); *Remsburg v. Montgomery*, 831 A.2d 18, 38 (Md. 2003) (declining to impose duty on the leader of a hunting party for injury to property owner by member of hunting party while hunting on the property owner's land); *Valentine v. On Target, Inc.*, 727 A.2d 947, 952–53 (Md. 1999) (declining to impose a duty on gun retailer to third parties for death of victim killed by a gun stolen from the gun retailer); *Ashburn v. Anne Arundel Cty.*, 510 A.2d 1078, 1087 (Md. 1986) (declining to impose a duty on police officer, police department, and county for injuries to a pedestrian by a drunk driver after police had pulled the drunk driver over and let him go); *Lamb v. Hopkins*, 492 A.2d 1297, 1306 (Md. 1985) (declining to impose a duty on probation officers for injuries caused by alleged driving under the influence of a probationer under the officers' supervision); *Willow Tree Learning Ctr., Inc. v. Prince George's Cty., Md.*, 584 A.2d 157 (Md. Ct. Spec. App. 1991) (declining to impose a duty on the county and county inspector to parents for fatal injury to a child at a daycare center when daycare center safety was regulated by state and county law). The same result is warranted here.

## III.   ECFMG Was Not A Proximate Cause of Plaintiffs' Emotional Distress.

Summary judgment is warranted because there is no evidence that ECFMG was the proximate cause of Plaintiffs' alleged emotional distress. "[T]he mere existence of negligence and

the occurrence of injury are insufficient to impose liability upon anyone as there remains to be proved the link of causation." *Lux v. Gerald E. Ort Trucking, Inc.*, 887 A.2d 1281, 1286 (Pa. Super. 2005); *see Palsgraf*, 162 N.E. at 99 ("Proof of negligence in the air, so to speak, will not do."). To establish causation, plaintiff must "demonstrate that the breach was both the proximate cause and the actual cause of his injury." *Reilly v. Tiergarten Inc.*, 633 A.2d 208, 210 (Pa. Super. 1993). Proximate cause "is defined as a wrongful act which was a substantial factor in bringing about the plaintiff's harm." *Dudley v. USX Corp.,* 606 A.2d 916, 923 (Pa. Super. 1992) (citations omitted). It is a question of law to be determined by the court before the issue of actual cause is put to the jury. *Reilly*, 633 A.2d 210 (citing *Novak v. Jeannette Dist. Memorial Hosp.*, 600 A.2d 616, 618 (Pa. Super. 1991)).

"A determination of legal causation, essentially regards whether the negligence, if any, was so remote that as a matter of law, [the actor] cannot be held legally responsible for [the] harm which subsequently, occurred." *Id.* (internal quotations and citations removed). It is guided by:

> (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;
>
> (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible; [and]
>
> (c) lapse of time

*Lux*, 887 A.2d at 1287 (quoting *Willard v. Interpool, Ltd.*, 758 A.2d 684, 688 (Pa. Super. Ct. 2000)).

The undisputed facts confirm that ECFMG was not a proximate cause of Plaintiffs' alleged injuries. The lengthy causal chain between ECFMG's conduct and Dr. Akoda's treatment of Plaintiffs—including the undisputed negligence of intervening third parties—precludes ECFMG from being a legal cause of Plaintiffs' alleged injuries. *See* Schwartz, *Remoteness Doctrine*, at 429

30

(explaining how proximate causation gives effect to the policies of the remoteness doctrine). Regarding the lapse of time consideration, nearly two decades passed between when Dr. Akoda got his ECFMG Certificate in 1996, ¶ 44, and treated Plaintiffs. *See* ¶ 164 (17 years for Ms. Riggins); ¶ 103 (20 years for Ms. Evans); ¶ 134 (18 years for Ms. Powell); ¶ 188 (20 years for Ms. Russell). At least twenty years passed before Plaintiffs suffered their alleged emotional distress upon learning of Dr. Akoda's aliases/Social Security fraud. ¶¶ 117, 153, 168, 210. Over the course of these two decades, Dr. Akoda: participated in two residency programs, graduating from the program at Howard in 2011; applied for and obtained a medical license to practice in Maryland and Virginia; obtained privileges at PGHC and employment in two medical practices; achieved board certification from the ABOG. ¶¶ 56, 74, 75, 76, 87, 90, 93. This substantial passage of time and the number of intervening actors who independently reviewed Dr. Akoda precludes ECFMG's alleged negligence from being a proximate cause. *See Lux*, 887 A.2d at 1287.

Pennsylvania courts have refused to hold that proximate causation exists when the alleged tortfeasor is separated from the alleged tort victim by a lengthy chain of parties defrauded by another. In *Commerce Bank/Pennsylvania v. First Union Nat. Bank*, 911 A.2d 133 (Pa Super. 2006), Commerce Bank alleged that First Union had allowed a third party to operate a check-kiting scheme and negligently failed to report the scheme or close the account. *Id.* at 135. Based on the existence of the First Union account, Commerce Bank allowed the third party to open a new account, through which the third party harmed Commerce Bank by engaging in a similar check-kiting scheme. *Id.* The Pennsylvania Superior Court rejected Commerce Bank's argument that First Union's negligence was the proximate cause of its harm, finding it "unduly speculative" and noting that such a theory "stretches the concepts of proximate cause and individual responsibility beyond the breaking point." *Id.* at 142. The Court found that First Union's actions were merely one minor factor in a long, attenuated chain of events leading to Commerce Bank's harm, citing

31

other significant factors that contributed to the harm such as (1) the perpetrator's decision to open an account; (2) Commerce Bank's decision to approve the new account without sufficient investigation; (3) the perpetrator's fraudulent activity; and (4) Commerce Bank's own failure to detect the fraud any earlier.

The reasoning from *Commerce Bank/Pennsylvania* applies with even greater force here because ECFMG's alleged negligence was just one minor factor separated from Plaintiffs' alleged injuries by a lengthy and attenuated causal chain, which included: (1) Dr. Akoda's decisions to apply for residency programs, state licenses, board certifications, and medical privileges; (2) the negligence of these independent third parties in providing him with these licenses and privileges; (3) Dr. Akoda's fraudulent and criminal activity that allegedly harmed Plaintiffs and triggered the involvement of law enforcement (who instructed ECFMG to not take adverse action against Dr. Akoda while their criminal investigation proceeded); and (4) Plaintiffs' consent to treatment. Accordingly, as a matter of law ECFMG's alleged breach cannot be a proximate cause of any harm Plaintiffs allege—its conduct is far too remote and Plaintiffs' theory of causation is far too speculative. *See Commerce Bank/Pennsylvania*, 911 A.2d at 142; *see* Schwartz*, Remoteness Doctrine*, at 426 (noting that the remoteness doctrine bars liability as a matter of law "most frequently in cases involving **attenuated harms**").

## IV.    There Is No Evidence That Any Alleged Breach of Duty by ECFMG Was a But-For Cause of Plaintiffs' Emotional Distress.

But-for causation represents a critical connection between the breach of the alleged tortfeasor and the injury of the alleged tort victim. It requires "proof that the alleged injury would not have occurred but for the negligent conduct of the defendant." *Sutcliffe v. Bernese*, No. 4:19-CV-00317, 2019 WL 3776560, at *3 (M.D. Pa. Aug. 12, 2019); *see Gen. Refractories Co. v. First State Ins. Co.*, 855 F.3d 152, 161 (3d Cir. 2017) ("Cause in fact or 'but for' causation provides that

if the harmful result would not have come about but for the negligent conduct then there is a direct causal connection between the negligence and the injury." (quoting *First v. Zem Zem Temple*, 686 A.2d 18, 21 n.2 (Pa. Super. 1996))). Here, Plaintiffs have failed to present evidence from which a jury could reasonably conclude that any Plaintiff would not have suffered emotional distress absent some specific act or omission by ECFMG that breached a duty to Plaintiffs.

There is no evidence, for example, that ECFMG's alleged breach—as opposed to sensationalized and factually incorrect reports from media outlets or Plaintiffs' counsel—caused Plaintiffs to hold the mistaken beliefs underlying their emotional distress. Plaintiffs' alleged injuries arise from their mistaken beliefs regarding whether Dr. Akoda was a "real doctor," whether Dr. Akoda was validly licensed to practice medicine, and whether Dr. Akoda had medical training. *See, e.g.*, ¶ 169 ("fake doctor"); ¶ 216. In truth, it is undisputed that Dr. Akoda completed a residency program at Howard, was licensed to practice medicine, was board certified, and maintained hospital privileges. ¶ 74, 76, 87, 90, 93. Plaintiffs' alleged injuries also arise from their mistaken belief that ECFMG was a government agency that licensed Dr. Akoda to practice medicine without conducting a full background check. ¶¶ 214–15 In reality, ECFMG is **not** a government agency, did **not** license him to practice medicine, and was **not** responsible for background checking him. ¶¶ 8, 9, 25. To the extent that any Plaintiff suffered compensable emotional distress, it arose from misunderstandings for which ECFMG bears no responsibility, and not from ECFMG's conduct.

There is similarly no evidence that if ECFMG had referred Dr. Akoda to the MECC on allegations of irregular behavior, then Plaintiffs would not have been injured. ECFMG's witnesses testified consistently that despite documented suspicions about Dr. Akoda, they did not have enough information to warrant an irregular behavior referral. ¶ 69. The contemporaneous documentary evidence confirms that they lacked the kind of evidence needed to initiate irregular

behavior proceedings. ¶ 69. Plaintiffs can only speculate that a referral to the MECC would have ultimately led the MECC to conclude that Dr. Akoda engaged in irregular behavior and that the appropriate sanction for that irregular behavior would have been revocation of his ECFMG Certificate such that he would not have practiced medicine. On this record, no reasonable jury could find as much.

Nor is there evidence that any legally required additional investigation or disclosures by ECFMG would have prevented Plaintiffs' injuries. ECFMG's investigation of Dr. Akoda was reasonable. It included contacting Dr. Akoda and third parties, as well as analyzing its own documents. ECFMG had received only limited information about Dr. Akoda from JSMC, some of which proved to be false and undermined the credibility of JSMC's allegations against Dr. Akoda. ECFMG is not a law enforcement agency and does not have subpoena power. It took at least 20 months of investigation by professional law enforcement to indict Dr. Akoda. Moreover, ECFMG has no legal basis to communicate unfounded suspicions about applicants to third parties because it has been found that individuals subject to irregular behavior proceedings must be afforded due process. *See supra*. And even if ECFMG had communicated its suspicions to third parties, there is no evidence that other institution would have acted differently or prevented Dr. Akoda from treating Plaintiffs. Both law enforcement and the Maryland Board of Physicians unquestionably knew of allegations concerning Dr. Akoda in 2014—before he treated Ms. Russell and Ms. Evans—and they took no action to stop him from practicing medicine.

**V.      Plaintiffs Consented to Treatment by Dr. Akoda, and the Alleged Misrepresentations Did Not Vitiate That Consent.**

Summary judgment should also be granted because Plaintiffs consented to have their babies delivered by Dr. Akoda, and any misrepresentation about Dr. Akoda's name or use of Social Security numbers did not vitiate that consent. It is undisputed that Dr. Akoda had a medical license

when he provided Plaintiffs with medical treatment. ¶¶ 76, 83. It is further undisputed that Plaintiffs actually consented to having their babies delivered by Dr. Akoda. ¶¶ 105, 136, 166, 191. Plaintiffs do not contend that Dr. Akoda exceeded the scope of consent by, for example, performing the wrong medical procedure. As a general matter, "consent is effective for all consequences of [an actor's] conduct." Restatement (Second) of Torts § 892B(1); *see also id.* § 55 (including the "harmful or offensive character" of the conduct). Plaintiffs cannot recover for any alleged injuries arising from their receipt of medical treatment to which they consented.

Recognizing that their claims are viable only if they can avoid the consequences of their consent, Plaintiffs may argue that Dr. Akoda's misrepresentations rendered their consent ineffective. But it is black-letter law that not all misrepresentations vitiate consent. Consent is ineffective only if it is induced "by a substantial mistake concerning the nature of the invasion of his interests or the extent of the harm to be expected from it," Restatement (Second) of Torts § 892B, or by "the harmful or offensive character of a contact," Restatement (Second) of Torts § 55. These situations are not present here. Dr. Akoda had a medical license, was Board certified, and was employed by a hospital that provided care to Plaintiffs. That care—which resulted in positive outcomes for Plaintiffs and their babies—is the care to which Plaintiffs consented.

That Plaintiffs believe Dr. Akoda should not have been licensed to practice medicine because of misrepresentations made to licensing authorities (and ECFMG) about his name and Social Security number does not vitiate their consent. Courts have uniformly held that misrepresentations like Dr. Akoda's—including those concerning the experience or credentials of a licensed physician—do not vitiate consent. *Taylor v. Johnston* is directly on point. 985 P.2d 460 (Alaska 1999). There, as here, a patient alleged that consent to treatment was ineffective because of the physician's fraudulent actions in obtaining a medical license. *Id.* at 464. The Alaska Supreme Court held that these actions did not vitiate consent: "[I]f a plaintiff could bring a fraud claim by

35

simply alleging a licensed physician was not properly licensed, nearly every medical negligence action would include a fraud claim." *Id.* at 465. Like *Taylor*, Plaintiffs have no claim because they were "not treated by someone who was falsely represented himself as licensed." *Id.* This reasoning is sound and should be followed by this Court.

Any number of cases, both in Pennsylvania and elsewhere, have reached consistent results. *See Duttry v. Patterson*, 771 A.2d 1255, 1259 (Pa. 2001) ("[I]nformation personal to the physician, whether solicited by the patient or not, is irrelevant to the doctrine of informed consent."); *Prince v. Esposito*, 628 S.E.2d 601, 604 (Ga. App. 2006) (holding that "a medical professional has no duty to disclose negative information about his personal life to patients," even if "the patient testifies that he or she would have sought treatment elsewhere upon discovering the information"); *Rice v. Brakel*, 310 P.3d 16, 20 (Ariz. App. 2013) (declining to "expand medical battery to a situation in which the surgeon fully explains the procedure and obtains consent, but fails to disclose some other potential issue"); *Albany Urology Clinic, P.C. v. Cleveland*, 528 S.E.2d 777, 778 (Ga. 2000) ("[A]bsent inquiry by a patient or client, there is neither a common law nor a statutory duty on the part of either physicians or other professionals to disclose to their patients or clients unspecified life factors which might be subjectively considered to adversely affect the professional's performance.").

Plaintiffs consented to medical treatment by someone licensed to practice medicine and with medical training. They received just that. Each Plaintiff emerged from their pregnancy healthy and with a healthy child. Any misrepresentation by Dr. Akoda in connection with his credentialing process did not concern the character of his contact with Plaintiffs, and Plaintiffs' contention that Dr. Akoda should not have been licensed to practice medicine—at best, an issue for licensing boards, not ECFMG—does not vitiate their consent or give rise to a claim.

36

**VI.    There Is No Evidence That Plaintiffs Experienced Compensable Emotional Distress.**

"Physical injury must be averred to sustain a cause of action for negligent infliction of emotional distress." *Armstrong v. Paoli Mem'l Hosp.*, 633 A.2d 605, 609 (Pa. Super. 1993); *see Toney v. Chester Cty. Hosp.*, 961 A.2d 192, 200 (Pa. Super. 2008), *aff'd*, 36 A.3d 83 (Pa. 2011) ("the plaintiff must have experienced physical injury as a result of having been exposed to the traumatic event"). "Temporary fright, nervous shock, nausea, grief, rage, and humiliation if transitory are not compensable harm; but, long continued nausea or headaches, repeated hysterical attacks or mental aberration are compensable injuries." *Armstrong*, 633 A.2d at 609. Summary judgment is warranted unless Plaintiffs present record evidence that they experienced physical injury such as "symptoms of severe depression, nightmares, stress and anxiety, requiring psychological treatment, and ... ongoing mental, physical and emotional harm." *Love v. Cramer*, 606 A.2d 1175, 1179 (Pa. Super. 1992); *see Armstrong*, 633 A.2d at 609 ("depression, nightmares, nervousness, insomnia and hysteria").

Here, Plaintiffs have presented no evidence of cognizable physical injury. Plaintiffs offer only generalized averments that they have experienced emotions. *See, e.g.*, ¶ 170 ("angry"); ¶ 170 ("sad"); ¶ 170 ("embarrassed"); ¶ 170 ("ashamed"); ¶ 208 ("distrust"); ¶ 148 (lacking "peace of mind"). But "[t]he law is not the guarantor of an emotionally peaceful life. Tort law cannot protect any of us from the emotional slings and arrows of daily living. Not every mistake that happens will be legally cognizable." *Armstrong*, 633 A.2d at 615. Plaintiffs even expressly disclaim both physical injuries and a variety of psychological issues. *See, e.g.*, ¶ 174 (physical injury); ¶ 202 (PTSD); ¶ 201 (anxiety). On this record, no reasonable jury could find that Plaintiffs experienced physical manifestations as a result of their alleged emotional distress that could support a recovery.

Ms. Evans is the only Plaintiff who sought mental health treatment after suffering her alleged emotional distress. But her emotional distress preceded any knowledge of Dr. Akoda's

guilty plea. She suffered from emotional disturbances long before she learned the information that supposedly precipitated the emotional distress for which she seeks to recover. ¶ 116. Indeed, the record shows that her emotional distress preceded even her treatment by Dr. Akoda. ¶ 116. It is common sense that Ms. Evans' emotional distress could not have been avoided by an alternative course of conduct by ECFMG when it predated any causal chain that traces back to ECFMG.

Ms. Russell claimed to experience back pain around the time that she learned of Dr. Akoda's alias. ¶ 217. But she admitted that she does not know if the back pain was attributable to her alleged emotional distress. ¶ 217. Other than her equivocal testimony, there is no evidence of physical harm. On this record, no reasonable jury could conclude that her back pain was attributable to ECFMG's conduct or at all related to her emotional distress.

## VII.    The Claims of Plaintiffs Evans and Powell Are Barred By Limitations.

Summary judgment should also be granted because the claims of Ms. Evans and Ms. Powell are time-barred. Plaintiffs' claims are subject to Pennsylvania's two-year statute of limitations. *See Erisoty v. Rizik*, No. 93-6215, 1995 WL 91406, at *10 n.4 (E.D. Pa. Feb. 23, 1995) (applying 42 Pa. C. S. § 5521(b) to hold that Pennsylvania's two-year statute of limitations—rather than Maryland's three-year statute of limitations—applies in a diversity action). "For tort actions, the general rule in Pennsylvania is that the statute begins to run when the cause of action arises, as determined by the occurrence of the final significant event necessary to make the claim suable." *P.J.A. v. H.C.N.*, 156 A.3d 284, 291 (Pa. Super. 2017); *see also Moore v. McComsey*, 459 A.2d 841, 844 (Pa. Super. 1983). What matters is "when a plaintiff is harmed and not when the precise amount or extent of the damages is determined." *Adamski v. Allstate Ins. Co.*, 738 A.2d 1033, 1042 (Pa. Super. 1999); *see also Pearce v. Salvation Army*, 674 A.2d 1123 (Pa. Super. 1996) (holding that the statute of limitations begins to run "when the injured party possesses sufficient crucial

38

facts to put [her] on notice that a wrong has been committed and that [s]he need investigate to determine whether [s]he is entitled to redress.").

Ms. Evans and Ms. Powell believed that they suffered an injury at the time of their treatment by Dr. Akoda. As a result, even if they did not know the full extent of their alleged harm, the statute of limitations began running at the time of treatment.

Ms. Evans testified that even before Dr. Akoda assisted with her delivery in March 2016, she believed he was unprofessional because he performed intrusive pelvic examinations and used inappropriate language. ¶ 11. Ms. Evans also testified that she (and her husband and mother) were suspicious of Dr. Akoda during the delivery in March 2016 after Dr. Akoda allegedly manipulated her clitoris and claimed it would help with labor. ¶ 115. In other words, Ms. Evans testified that she was aware that a wrong had been committed against her at the time of treatment in March 2016. Her statute of limitations for any claims based on treatment by Dr. Akoda thus began running at that point in time. Ms. Evans did not file suit until November 2018, more than eight months after the statute of limitations had run.

Ms. Powell was treated by Dr. Akoda from April 2014 to January 2015. ¶ 137. She testified that during that time, Dr. Akoda was flirtatious, made lewd comments, and performed intrusive pelvic examinations. ¶ 138. At one point, she claimed to be so uncomfortable with Dr. Akoda's behavior that she asked for a nurse to be present in the room during examinations. ¶ 139. Then, she experienced post-partum bleeding that required Dr. Akoda to perform emergency surgery, at which time Dr. Akoda allegedly told her, "I'm sorry, I should have detected it sooner, I'm so sorry, we're getting the O.R. ready for you." ¶ 145. According to her testimony Ms. Powell was aware that she had suffered a wrong at the time of treatment. Her statute of limitations thus began running in January 2015. She had to file suit by January 2017, but she did not file suit until November 2018. Her claims are therefore time-barred.

Recognizing this issue, Plaintiffs frame their claims as arising from emotional distress they suffered upon learning of Dr. Akoda's guilty plea (which seems to bring the claims just within the statute of limitations). But this formulation does not save Plaintiffs' time-barred claims because Ms. Evans and Ms. Powell were already aware of harm they felt as a result of their treatment.

Nor does the discovery rule save Plaintiffs' claims. To benefit from the discovery rule, plaintiffs must show they made reasonable efforts to protect their interests and explain why they were unable to discover the operative facts necessary to plead their claims before the limitations period expired. *See Bickell v. Stein*, 435 A.2d 610, 612 (Pa. Super. 1981). There is no evidence in the record indicating that Ms. Evans or Ms. Powell made reasonable efforts to protect their interests so as to trigger the discovery rule. And the Pennsylvania Supreme Court has repeatedly stressed that Pennsylvania follows an inquiry notice approach tying "commencement of the limitations period to actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct, without the necessity of notice of the full extent of the injury, the fact of actual negligence, or precise cause." *Rice v. Diocese of Altoona-Johnstown*, 255 A.3d 237, 247 (Pa. 2021) (internal citations and quotes omitted). Where a plaintiff has knowledge of a cause of significant harm, she is on inquiry notice regarding other potentially liable actors as well. *Id.* at 251. Here, Ms. Riggins and Ms. Powell were aware that Dr. Akoda's treatment had allegedly harmed them. The statute of limitations began to run at that time, and their claims are time-barred as a result.

## CONCLUSION

For these reasons, this Court should grant summary judgment for ECFMG.

Dated: December 10, 2021

/s/ Brian W. Shaffer
Brian W. Shaffer, PA Bar No. 78851
Elisa P. McEnroe, PA Bar No. 206143
Matthew D. Klayman, PA Bar No. 319105
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone:    +1.215.963.5000
Facsimile:    +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for the Educational Commission for Foreign Medical Graduates*

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that on this date, I caused true and correct copies of the foregoing document to be served via electronic filing upon all counsel of record via the ECF system and/or e-mail.

DATED: December 10, 2021

*/s/ Brian W. Shaffer*
Brian W. Shaffer