**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL, and DESIRE EVANS, | Civil Action No. 2:18-cv-5629 |
| Plaintiffs, | Honorable Joshua D. Wolson |
| v. | |
| EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES, | |
| Defendant. | |

**DEFENDANT EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE THE OPINIONS AND ANTICIPATED TESTIMONY OF <u>PLAINTIFFS' EXPERT DR. ANNIE STEINBERG</u>**

Dated: December 10, 2021

Brian W. Shaffer, PA Bar No. 78851
Elisa P. McEnroe, PA Bar No. 206143
Matthew D. Klayman, PA Bar No. 319105
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone:    +1.215.963.5000
Facsimile:    +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for the Educational Commission for Foreign Medical Graduates*

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................. 1

II.    BACKGROUND .................................................................................................. 2

       A.    Factual and Procedural History.............................................................. 2

       B.    Dr. Steinberg's Questionnaire................................................................. 3

       C.    Dr. Steinberg's Report and Opinions...................................................... 5

       D.    Reliable Survey Science Principles and ECFMG's Rebuttal Expert Dr.
             Susan McDonald ..................................................................................... 6

       E.    Plaintiffs' Belated Production of Supporting Materials for Dr. Steinberg's
             Report...................................................................................................... 7

III.   LEGAL STANDARD.......................................................................................... 8

IV.    ARGUMENT ...................................................................................................... 9

       A.    Dr. Steinberg Is Not Qualified to Perform a True, Reliable Survey.................. 10

       B.    Dr. Steinberg's Questionnaire Methodology Is Unreliable Making the
             Responses She Received Inadmissible. ............................................... 12

             i.     Dr. Steinberg's Questionnaire Has Sampling Errors. ............................ 14

             ii.    The Design of Dr. Steinberg's Questionnaire Is Flawed. ........................ 15

             iii.   Dr. Steinberg's Interpretation of the Questionnaire Results Is
                    Flawed................................................................................... 20

       C.    The Questionnaire Responses and Dr. Steinberg's Conclusions Are
             Unhelpful to the Factfinder and Lack Sufficient Connection or Fit to
             Issues in This Case................................................................................. 21

       D.    Rule 403 Also Supports Excluding Dr. Steinberg's Opinions............................ 23

V.     CONCLUSION.................................................................................................. 24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AHP Subsidiary Holding Co. v. Stuart Hale Co.*,
  1 F.3d 611 (7th Cir. 1993) .................................................13

*Church & Dwight Co., Inc. v. S.C. Johnson & Son, Inc.*,
  873 F. Supp. 893 (D.N.J. 1994) .............................................19

*Citizens Fin. Grp. v. Citizens Nat. Bank of Evans City*,
  383 F.3d 110 (3d Cir. 2004)..........................................9, 13, 23

*In re ConAgra Foods, Inc.*,
  90 F. Supp. 3d 919 (C.D. Cal. 2015) ....................................10, 16

*Daubert v. Merrell Dow Pharm.*,
  509 U.S. 579 (1993)....................................................*passim*

*Schneider ex rel. Estate of Schneider v. Fried*,
  320 F.3d 396 (3d Cir. 2003)..................................................8

*Evans v. Philadelphia Hous. Auth.*,
  No. 93-5547, 1995 WL 154872 (E.D. Pa. Mar. 31, 1995) ......................12

*Goodman v. Burlington Coat Factory*,
  No. 11-4395 (JHR), 2019 WL 4567366 (D.N.J. Sept. 20, 2019) ................20

*Hartle v. FirstEnergy Generation Corp.*,
  Nos. 08-1019, 08-1025, 08-1030, 2014 WL 1317702 (W.D. Pa. Mar. 31,
  2014) ....................................................................16

*Hurt v. Commerce Energy, Inc.*,
  No. 1:12-CV-00758, 2015 WL 410703 (N.D. Oh. Jan. 29, 2015) ........14, 15, 21

*J&J Snack Foods Corp. v. Earthgrains Co.*,
  220 F. Supp. 2d 358 (D.N.J. 2002) ......................................22, 23

*Johnson & Johnson-Merck v. Rhone-Poulenc Rorer Pharm., Inc.*,
  19 F.3d 125 (3d Cir. 1994)..................................................16

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)..........................................................9

*Oddi v. Ford Motor Co.*,
  234 F.3d 136 (3d Cir. 2000)..................................................8

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994)...........................................................................9, 12

*Pittsburgh Press Club v. United States*,
    579 F.2d 751 (3d Cir. 1978)................................................................. *passim*

*Senne v. Kansas City Royals Baseball Corp.*,
    315 F.R.D. 523 (N.D. Cal. 2016)..............................................................14

*Sterling v. Redevelopment Auth. of City of Phila.*,
    836 F. Supp. 2d 251 (E.D. Pa. 2011) .......................................................24

*Therasense, Inc. v Becton Dickinson & Co.*,
    No. C 04-02123 WHA, 2008 WL 2323856 (N.D. Cal. May 22, 2008)..................24

## Other Authorities

Fed. R. Civ. P. 23 ...............................................................................................1

Fed. R. Evid. 403 ...........................................................................................2, 23, 24

Fed. R. Evid. 702 ..........................................................................................1, 8, 9

Fed. R. Evid. 703 ................................................................................... *passim*

## I.     INTRODUCTION

In an attempt to bolster their claims, Plaintiffs have put forth a psychiatrist, Dr. Annie Steinberg, who aggregated responses to a questionnaire that she put together, which Plaintiffs' Counsel sent to the named Plaintiffs and certain absent class members. Based on the responses received, Dr. Steinberg takes an extraordinary leap and tries to purportedly "outline the degree to which women treated by 'Dr. Akoda' report [to] have suffered as a result of his actions and the agents that enabled him to practice medicine and surgery" and "opine on current psychological issues that relate to the subject incidents and their consequences." Exhibit 1, Steinberg Expert Report ("Steinberg Rep.") at 1.

Dr. Steinberg's questionnaire, and the opinions and testimony she purports to offer based on the responses, are inadmissible under Federal Rules of Evidence 702 and 703 and *Daubert v. Merrell Dow Pharm.,* 509 U.S. 579 (1993). First, Dr. Steinberg is not qualified to develop or administer a scientifically valid survey that would be necessary to support the conclusions she offers. Second, and more fundamentally, she did not generate or conduct such a valid survey in this matter: the questionnaire she created and the responses she collected are unreliable based on principles of survey methodology. Third, given the flawed methodology associated with the questionnaire, the sweeping opinions Dr. Steinberg offers and the cherry-picked statistics she calculates from the responses are wholly unreliable and not useful in evaluating the claims in this case.

In addition, Dr. Steinberg's testimony would be highly prejudicial and inappropriate under Federal Rule of Evidence 403. Despite claiming that she was asked by Plaintiffs' counsel for a "forensic psychiatric consultation . . . to assess the potential damages, if any, that class members may have experienced concerning the actions of 'Dr. Akoda'" (Steinberg Rep. at 3), Dr. Steinberg admits that she did not conduct individual evaluations of any of the putative class members, nor

would it be possible to do a "group" diagnosis of them. Accordingly, any psychiatric opinions Dr. Steinberg offers about the anonymous respondents do not stem from a recognized diagnostic methodology. Moreover, while Federal Rule of Evidence 703 allows experts to rely on hearsay if trustworthy and normally employed by experts in the field, the hearsay narratives Dr. Steinberg pulls from the unreliable questionnaire responses plainly do not meet this standard, and experts cannot simply serve as conduits for hearsay, as Dr. Steinberg proposes to do by parroting survey responses.

## II.   BACKGROUND

### A.   <u>Factual and Procedural History</u>

ECFMG knows the Court is familiar with the background and status of this matter. In November 2016, Dr. John Nosa Akoda pleaded guilty to misuse of a Social Security number and stipulated that another name that he used was Oluwafemi Charles Igberase. Both John Nosa Akoda and Oluwafemi Charles Igberase were the names of applicants to ECFMG, a Philadelphia-based private non-profit organization that promotes quality health care for the public, by, among other things, certifying that eligible graduates of international medical schools have met certain minimum requirements for entry into U.S. graduate medical education (usually residency programs).

ECFMG revoked its certification of Oluwafemi Charles Igberase when ECFMG learned that he had misrepresented his application history in an effort to wipe clean his record of failed examinations. After losing his certification under the name Dr. Igberase, the doctor applied for and received ECFMG certification under the name John Nosa Akoda. Dr. Akoda then completed a residency program at Howard University and obtained medical licenses from Maryland and Virginia.

The named Plaintiffs are former patients seen by Dr. Akoda, either as their regular obstetrician/gynecologist or as the doctor "on-call" at the hospital when they gave birth. Compl., ECF 1. After learning of Dr. Akoda's criminal conviction, Plaintiffs filed suit in Maryland against the Prince George's Hospital System and Dr. Akoda's practice. Later, Plaintiffs pivoted, dismissed that case and filed this one as a putative class action, changing theories of liability and asserting that ECFMG was negligent in its certification and investigation of Dr. Akoda, and that ECFMG's actions directly caused them to suffer emotional distress upon learning of Dr. Akoda's conduct.

ECFMG files this *Daubert* motion contemporaneously with its Supplemental Brief in Opposition to Class Certification, Motion for Summary Judgment as to the named Plaintiffs, and *Daubert* motion directed at Plaintiffs' "credentialing experts," Drs. David Markenson, John Charles Hyde, and Jerry Williamson.

### B.    Dr. Steinberg's Questionnaire

In order for the Court to perform its gatekeeping function and assess the admissibility of Dr. Steinberg's opinions, some background on the questionnaire that she generated is necessary. According to Dr. Steinberg, Plaintiffs engaged her for "forensic psychiatric consultation . . . to assess the potential damages, if any, that class members may have experienced concerning the actions of 'Dr. Akoda.'" Steinberg Rep. at 3. As part of this engagement, she designed a sixty-item questionnaire that was then distributed to putative class members by Plaintiffs' counsel. *Id.* The questionnaire was in large part adapted from a prior questionnaire she designed with anthropologist Girija Kaimal, clinical psychologist Elizabeth Hembree, and an unnamed Drexel professor for a case involving a rabbi alleged to have videotaped women participating in a ceremonial cleansing ritual without their knowledge. Exhibit 2, Steinberg Deposition Transcript ("Steinberg Tr."), Steinberg Tr. 29:15–30:5; 52:23–53:7. The purpose of that prior questionnaire was to assist with a mediation and the apportionment of a potential lump sum financial settlement among the

different women involved. Exhibit 3, October 11, 2019 Email from B. Ceryes to E. McEnroe. Dr.
Steinberg did not reach out to her collaborators from the earlier case—whose questionnaire she
based this one on—to assess (or assist with) her adaption of the questionnaire because "[she] used
the same methodology and versions of the same questionnaire and [she] felt very comfortable with
what [they] had developed before and this was an adaptation of that." Steinberg Tr. 52:20–53:20.

Dr. Steinberg performed very little independent background investigation into the
allegations in this case, obtaining information for the factual background portion of her report from
(1) a letter Plaintiffs' counsel drafted containing their description of the case, on which she "relied
heavily;" (2) the Complaint; (3) two of the four named Plaintiffs' deposition transcripts; and (4)
the deposition transcript of one ECFMG representative (that she "perused"). Steinberg Tr. 75:22–
76:10, 80:24–81:12. During the development and administration of the questionnaire, Dr.
Steinberg worked with Lisa Bain, a "science writer" who does not appear to have any degrees in
marketing or survey methodology. Steinberg Tr. 50:7–54:16. Dr. Steinberg also worked with
Stephen Ehrlich, an information technology consultant who set up a website that hosted the
questionnaire and formatted the questionnaire so that participants "would not be intimidated by
it." Steinberg Tr. 58:18–60:7.

About her work, Dr. Steinberg noted that "there was so much information in a very short
time. It was a very crazy time." Steinberg Tr. 80:24 – 81:12. Given the extremely short turnaround
time (*id*. at 93:18-24) Dr. Steinberg relied on Ms. Bain as an "extender" of herself, helping to draft
and edit both the questionnaire and report. Steinberg Tr. 50:7–53:14. While Ehrlich helped Bain
and Dr. Steinberg extract spreadsheets and pie charts from some of the questionnaire responses to
support Dr. Steinberg's statistical analyses, there was not enough time for him to do so for every
question. Steinberg Tr. 54:19-55:6. Also, although her team left the questionnaire open for

additional responses, she did not review any responses that may have come in after her pre-determined cutoff date. Steinberg Tr. 94:21–95:5; Exhibit 4, Emails0003 (indicating that respondents had less than a week from when they were notified of the questionnaire to complete it). Dr. Steinberg had only ten days from the cutoff date to analyze the results and draft her report.

The questionnaire was sent to 575 individuals who were "presumed" to be Dr. Akoda's patients because they are purportedly represented by Plaintiffs' counsel in this matter. Steinberg Rep. at 4. Dr. Steinberg then analyzed 305 questionnaires that were completed, including 131 summary statements that accompanied these questionnaires. *Id.* The respondent population included a significant portion of under-privileged patients; 73% responded that they were on Medicaid when they were treated by Dr. Akoda. Steinberg Rep. at 5.

### C.     Dr. Steinberg's Report and Opinions

Dr. Steinberg contends that this questionnaire and her assessment of the responses "outline the degree to which women treated by 'Dr. Akoda' report [to] have suffered as a result of his actions and the agents that enabled him to practice medicine and surgery" and allow her to opine on "current psychological issues that relate to the subject incidents and their consequences." Steinberg Rep. at 1. From the responses she received on her questionnaire, Steinberg draws the following conclusions:

- "The misconduct of Oluwafemi Charles Igberase (fraudulently known as Dr. Akoda) has resulted in varying degrees of confusion, anxiety, depression, avoidance and fear of medical caregivers, and the loss of trust in medical providers and health care institutions; for some even more broadly applied." Steinberg Rep. at 21.

- "The consistency and intensity of the narrative content across three hundred women both affirms the veracity of the histories and reported symptoms experienced as a result of learning of their doctor's fraudulent activities." Steinberg Rep. at 21.

Dr. Steinberg provides rudimentary statistical analyses of responses for a limited number of the questions. Steinberg Rep. at 5–10; Steinberg Tr. 54:21–55:16. Dr. Steinberg also directly copies

some language verbatim from the questionnaire responses into her report, despite the fact that she did not directly interview these individuals, does not know who they are, and did not have the opportunity to pose follow-up questions to assess the meaning or significance of the responses. Steinberg Rep. at 10–20. She concludes that verbatim snippets from the responses are consistent with alleged boundary violations by Dr. Akoda, and disrespect for patients, betrayal of trust, and patients' emotional distress—all despite admitting that she did not diagnosis any of these individuals nor would a group diagnosis even be possible. Steinberg Rep. 10–20; Steinberg Tr. 44: 20–24 ("I would never diagnose somebody on the basis of a response to a questionnaire"), 45:1–7 ("It was never my intention to present psychiatric diagnoses of any individual women in this matter"), 45:8–24 (finding it "laughable" or "unfathomable" that there could be a group diagnosis). Despite Dr. Steinberg's multiple acknowledgements of the limited scope of her report, *see* Steinberg Rep. 4, 21, 22, she baldly concludes that: "the response rate and sample size would be more than adequate to provide reasonable confidence intervals for the percentages of Plaintiffs in each of several categories of damage severity." Steinberg Rep. 4.

### D. Reliable Survey Science Principles and ECFMG's Rebuttal Expert Dr. Susan McDonald

Dr. Steinberg's approach—drawing conclusions about a broader universe of Dr. Akoda's patients from a small subset of responses—is an attempt, albeit a fundamentally flawed one, at a recognized survey methodology. ECFMG engaged Dr. Susan McDonald, who has a doctoral degree in social psychology and communications theory, to assess the merits and validity of Dr. Steinberg's questionnaire. Dr. McDonald has significant educational and professional experience in survey science, a discipline focused on using survey measurement to learn details about a large number of people based on a representative sample. Exhibit 5, Rebuttal Report of Dr. Susan McDonald ("McDonald Rep.") 3–4, 6. "A survey collects data from a representative subset based

on the premise that when properly sampled and correctly interviewed, that small set of individuals can enable us to draw accurate conclusions about the broader universe." McDonald Rep. at 6. Dr. McDonald draws a distinction between surveys and qualitative studies, noting that qualitative studies with a majority of open-ended questions require "improvisation and proving based on the particular answers," as opposed to surveys which require no improvisation in order to be able to derive sample statistics to apply to a broader population. *Id.* She notes that to assess a survey's validity, one should look to: (1) the reliability of the sampling; (2) the validity of the design; and (3) the interpretation and analysis of the survey responses. McDonald Rep. at 7.

Dr. McDonald has expertise in survey design, implementation, analysis, and interpretation based on her graduate training in social sciences, as well as professional experience using survey research to consult on product development, brand strategy, and other strategic marketing activities. McDonald Rep. 2–3, App. A. In sharp contrast to Dr. McDonald's credentials and experience, Dr. Steinberg recounted no specific experience with traditional surveys; had difficulty remembering whether her past work was survey or interview-based; had difficulty explaining the difference between an interview and survey; does not have any degrees related to survey design; and admitted that she did not consult with any literature on surveys and survey design for her work on this matter. Steinberg Tr. 18:23–19:22; 43:7–44:15; 46:11–47:8; 49:14–19.

### E.   Plaintiffs' Belated Production of Supporting Materials for Dr. Steinberg's Report

Plaintiffs' disclosure of Dr. Steinberg's supporting materials of her report to ECFMG was delayed and deficient. For example, Plaintiffs did not even produce the final questionnaire that was completed by the respondents until after Dr. Steinberg's deposition. *See* Ex. 3 Oct. 11, 2019 Email from B. Ceryes to E. McEnroe. Furthermore, raw malleable data associated with the responses was not produced until six weeks after the rebuttal expert's deadline had passed (and,

more importantly more than nine weeks after Dr. Steinberg completed her analysis and report). *See* Exhibit 6 Dec. 1, 2019 Email from B. Ceryes to E. McEnroe. As ECFMG's rebuttal expert, Dr. McDonald, explained, Dr. Steinberg's "claim not to have such a database at her disposal is highly unusual insofar as survey programs produce readily manipulated databases as a matter of course." McDonald Rep. 5.

## III.   LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence allows for the testimony of expert witnesses only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The Third Circuit has explained that Rule 702 imposes various requirements on proponents of expert testimony centered around "qualification, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). The proponent of expert testimony has the burden of establishing that it meets these requirements by a preponderance of proof. *See Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000).

In *Daubert v. Merrell Dow Pharmaceuticals*, the United States Supreme Court held that Rule 702 requires a court to examine any proffered expert testimony for reliability, methodology, and connection between the data and the expert's conclusion. 509 U.S. 579 (1993). More specifically, *Daubert* provided five factors to guide a district court in its assessment of these requirements: (1) whether the methodology can and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the known or potential rate of error of the methodology; (4) the existence and maintenance of standards controlling the technique's

operation; and (5) whether the technique has been generally accepted in the proper scientific community. *See id.* at 593-94.

The Third Circuit has enumerated three additional factors that courts may consider in assessing the admissibility of expert reports and testimony, including: (1) the relationship of the technique to methods that have been established to be reliable, (2) the expert witness's qualifications, and (3) the non-judicial uses to which the method has been put. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 n.8 (3d Cir. 1994). District courts must act as "gatekeeper[s]" for all expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 145 (1999).

Rule 703 of the Federal Rules of Evidence governs the admissibility of the facts or data that an expert bases his or her opinion on and applies the same reliability standard as *Daubert*. *See In re Paoli,* 35 F.3d at 748–49, n. 18. In addition, an expert can only rely on facts and data that are otherwise inadmissible if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. P. 703.

## IV.     ARGUMENT

Dr. Steinberg's questionnaire, responses, and opinions should be excluded because they do not meet the requirements of Federal Rules of Evidence 702 and 703. *See also Citizens Fin. Grp. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110, 121-22 (3d Cir. 2004) (affirming exclusion of not only an expert's opinion but also the survey and responses underlying the expert's opinion for failure to meet requirements of Federal Rule of Evidence 702 and Rule 403 concerns).

In particular: (1) Dr. Steinberg does not have the qualifications to develop, administer, and interpret a reliable survey methodology; (2) her questionnaire is unreliable; and (3) her opinions developed from the questionnaire and responses lack the necessary fit to be useful to a fact finder.

### A.      Dr. Steinberg Is Not Qualified to Perform a True, Reliable Survey.

Because Dr. Steinberg lacks the qualifications to develop, administer, and interpret a reliable questionnaire or scientific survey, her opinions and questionnaire in this case should be excluded. Her experience is in qualitative interviews, not surveys or questionnaires. When asked whether any of her experience was with traditional surveys Dr. Steinberg did not identify any and instead responded: "Well, let's see. I believe – I honestly don't remember. Isn't that terrible?" Steinberg Tr. 20:7–9. She was transparent about the fact that she did not have any degrees related to survey design and she would not be able to lecture and teach other individuals on survey design:

> I don't know that that – you know, that I can profess to give you a lecture on sound survey design. I just can tell you that I studied it like – like if you asked me, you know, the basis for a psychiatric interview, I suppose because I'm a forensic psychiatrist I would have to be able to provide that for you, but I don't have any degrees in survey design and I don't know that I would want to make a feeble effort at articulating that for you. I – I only know that I've studied it and that I've learned from smart people and someplace it's in the soup. You know, it's mixed in the – it's in the blend of what I have come to understand and to have learned from very good teachers.

Steinberg Tr. 46:11-47:8.

Dr. Steinberg's past experience with qualitative interviews does not make her qualified to conduct a survey supporting the opinions she tries to offer. When an expert is "not sufficiently familiar with the methodology used to design and administer the survey to [be able to] opine that it was 'conducted according to accepted principles' and reliable," it is appropriate to exclude that expert's opinion. *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 951-52 (C.D. Cal. 2015) (citing *In re TMI Litigation Cases Consolidated II*, 922 F. Supp. 1038, 1046-48 (M.D. Pa. 1996)). Here, Dr. Steinberg's methodology was based off another team's questionnaire used in a different case for a very different purpose (settlement and apportionment of damages)—yet she did not consult with that team (or similar survey experts) on this case to see if the same methodology was

appropriate for the opinions she purports to offer here. Steinberg Tr. 52:23–53:20. This lack of familiarity with the underlying methodology disqualifies Dr. Steinberg from opining on it.

In fact, Dr. Steinberg concedes her lack of relevant expertise and that a polling expert might be better at interpreting the results of a questionnaire. Steinberg Tr. 156:5–157:1; 159:2–3; 210:7 – 211:19 (admitting that the domain of her training is not in survey science and marketing and that she did not consult experts on how surveys induce respondents to pick a certain response). While Dr. Steinberg may be qualified to comment on certain areas of psychiatry, she admits she did no independent medical evaluations ("IMEs")[1] here, Steinberg Tr. 156:5–157:1, and she admits that she issued the questionnaire without meeting any of the women, examining their medical records, or observing Dr. Akoda's practices. Steinberg Tr. 99:19-100:6. As a result, she firmly states that she was not diagnosing these questionnaire respondents and that a group diagnosis is not possible. Steinberg Tr. 44: 20–24; 45:1–7; 45:8–24. Accordingly, even though she is a psychiatrist, she cannot rely on the statements from the questionnaire responses, *see* Steinberg Rep. at 10–20, to make an expert opinion on "the degree to which women treated by 'Dr. Akoda' report [to] have suffered as a result of . . . agents that enabled him to practice medicine" and psychological issues that stem from Dr. Akoda's treatment. Steinberg Rep. at 1. These questionnaire responses would be inadmissible hearsay, and they are not derived from a diagnostic method reasonably relied on in forensic psychiatry. *Pittsburgh Press Club v. United States*, 579 F.2d 751, 755, 757 (3d Cir. 1978) (excluding flawed survey as "nothing more than compilation of hearsay," opining that "[t]he survey was no more than a summary and distillation of 281 extrajudicial declarations offered to prove the truth of the matters asserted in those declarations"); *see also* Fed. R. Evid. 703

---

[1] Notably, both parties engaged experts to conduct IMEs of the four named Plaintiffs in this matter. *See* ECF 32-1 at 10; ECF 39-26, 46-10. At this time, ECFMG is not moving to exclude Plaintiffs' expert Dr. Tellefsen, who conducted one set of IMEs.

(restricting experts from relying on inadmissible facts or data when the contested facts or data are not reasonably relied on in that particular field).

Accordingly, Dr. Steinberg was not qualified to conduct this questionnaire, as is required by both *Daubert* and Third Circuit case law on the admissibility of surveys. *See Pittsburgh Press Club*, 579 F.2d. at 758 ("[T]he persons conducting the survey must be experts."). Nor does her expertise in forensic psychiatry save her flawed methodology because she admits that her questionnaire methodology is not a valid diagnostic tool.

**B.      Dr. Steinberg's Questionnaire Methodology Is Unreliable Making the Responses She Received Inadmissible.**

Even if Dr. Steinberg were qualified in survey design and administration, her methodology is deeply flawed and unreliable and thus inadmissible. One factor the Third Circuit has added to the original five *Daubert* factors is the relationship of the challenged technique or methodology to those methodologies and techniques that have been established as reliable. *See In re Paoli.*, 35 F.3d at 742 n.8. Surveying, provided that the developed survey is consistent with generally accepted principles, is one such reliable methodology to which Dr. Steinberg's methods can be compared. A review of valid survey methodology principles demonstrates that Dr. Steinberg has not employed established and standard methods found to be reliable (as the fourth *Daubert* factor requires); has not used a generally accepted technique to design and interpret her questionnaire (inconsistent with the fifth *Daubert* factor); and has not used a method that would enable others to test her hypotheses (inconsistent with the first *Daubert* factor).

"The failure of a survey to comport with generally accepted survey principles, with the results used in a statistically correct way, renders that survey inadmissible." *Evans v. Philadelphia Hous. Auth.*, No. 93-5547, 1995 WL 154872, *5 (E.D. Pa. Mar. 31, 1995). This is important

because these survey principles serve as "circumstantial guarantees of trustworthiness" and are "intended to assure a poll's reliability." *Pittsburgh Press Club*, 579 F.2d at 758.

The Third Circuit has identified various survey principles that are generally accepted:

- A proper universe must be examined and a representative sample must be chosen;
- the persons conducting the survey must be experts;
- the data must be properly gathered and accurately reported;
- the sample design, the questionnaires and the manner of interviewing [must] meet the standards of objective surveying and statistical techniques;
- the survey must be conducted independently of the attorneys involved in the litigation. The interviewers or sample designers should, of course, be trained, and ideally should be unaware of the purpose of the survey or the litigation.

*Id*. A proffered survey should be excluded where, as here, it is "so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible." *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir. 1993). Although minor shortcomings may affect a survey's weight for the trier of fact, some suveys are so flawed that they must be excluded. *Id*.; *see also Citizens Fin. Grp., Inc.*, 383 F.3d at 121–22 (excluding survey that suffered from fatal flaws, rather than mere technical flaws, because danger of undue prejudice far outweighed the limited probative value of the survey).

Dr. Steinberg's questionnaire is not a scientific survey. Her own description of the development, management, and analysis of the questionnaire responses demonstrates her lack of preparation and rigor. Stated simply, rather than being an "expert," Dr. Steinberg's work is "amateurish." *See* Exhibit 7 McDonald Deposition Transcript ("McDonald Tr."), McDonald Tr. 69:7–71:19; McDonald Rep. at 3 ("Based on my expertise in survey design, implementation, analysis, and interpretation, I have concluded that Dr. Steinberg's survey is not simply amateurish; **it is so methodologically deficient and so biasing as to lack validity as a survey measurement tool**. Due to numerous disabling methodological flaws, none of the statistics generated by this survey can be taken at face value or serve as the basis for conclusions, even with a confidence

interval applied.") (emphasis added). It comes as no surprise that Dr. Steinberg's method was not subject to peer review (implicating the second *Daubert* factor). Steinberg Tr. 115:19-118:4.

In addition, Dr. Steinberg's work suffers from errors in sampling, design, and interpretation, as described in Sections IV(B)(i)-(iii) below.

### i.   Dr. Steinberg's Questionnaire Has Sampling Errors.

Survey methodology principles demand that the respondent sample be representative. McDonald Rep. 6 ("A survey collects data from a representative subset based on the premise that when properly sampled and correctly interviewed, that small set of individuals can enable us to draw accurate conclusions about a broader universe."). The Third Circuit has found unreliable surveys where the respondents are limited to interested parties in a litigation who were told of the precise nature of the litigation and the purpose of the survey. *See Pittsburgh Press Club*, 579 F.2d at 759 (noting that survey respondents who were parties to a litigation consequently knew "which responses would be helpful [ ] and [,] conversely, which would be harmful. Moreover, it was possible that a recipient of the questionnaire would fail to respond because he knew an honest answer would be harmful"). Other courts have similarly rejected surveys where the chosen respondents are based on the convenience or bias of the parties' counsel. *See, e.g., Hurt v. Commerce Energy, Inc.*, No. 1:12-CV-00758, 2015 WL 410703, *5 (N.D. Oh. Jan. 29, 2015) (noting that there was systematic bias evident in the survey when the respondents only covered members of the class with higher damages); *Senne v. Kansas City Royals Baseball Corp.*, 315 F.R.D. 523, 589 (N.D. Cal. 2016) (noting that a survey invitation that mentioned that a recipient had a vested interested in the results was sufficient to raise questions about the reliability of the results).

Dr. Steinberg's questionnaire was only sent to putative class members identified by Plaintiffs' counsel. Steinberg Report 1, 4 ("Confirmed patients/class members were contacted by

e-mail and given instructions for logging on and completing the questionnaire"); McDonald Rep. 2, 9-10; McDonald Tr. 41:24-42:17. While this alone suggests that the sample of respondents was not representative of all of Dr. Akoda's patients, the lack of representativeness was exacerbated by the invitation that accompanied the questionnaire link: Plaintiffs' counsel said that the individual's participation was necessary "so that we can proceed with your case." *See* Emails0003; Dr. McDonald Report 9-10. The selection bias was further exacerbated by the fact that only some individuals responded to the survey. Dr. Steinberg has no reliable basis—there is none—for assuming that the individuals who chose to respond to the survey are representative of the full set of individuals to whom the survey is sent, much less the full set of all of Dr. Akoda's patients.

Counsel's participation in the administration of this questionnaire, alongside biased instructions that tied questionnaire participation to litigation participation and success, exacerbated these sampling problems. *See Hurt*, 2015 WL 410703 at *4 (noting that a survey was unreliable in part because the cover email to the survey explained that it would be used to properly seek recovery for unpaid wages, enhancing the likelihood that respondents would inflate their hours to increase damages they could recover).

### ii.    The Design of Dr. Steinberg's Questionnaire Is Flawed.

A flawed survey design will result in skewed or distorted data. McDonald Rep. 7. The questionnaire must be clearly written, consistent, and non-biasing to be valid. *Id.; see also Pittsburgh Press*, 579 F.2d at 758 ("It is essential that the sample design, the questionnaires and the manner of interviewing meet the standards of objective surveying and statistical techniques."). Dr. Steinberg's questionnaire design suffers from: (1) lack of pre-testing, (2) unclear, ambiguous, or leading questions, and (3) lack of filtering mechanisms or skip patterns to weed out irrelevant answers. Each is described below.

*1.     Lack of Pre-testing*

Pre-testing enables a surveyor to "identify and help eliminate response bias," such as determining "whether the phrasing or ordering of questions may have suggested certain answers or caused respondents to systematically overestimate or underestimate" their responses. *Hurt*, 2015 WL 410703 at*5. Pre-testing involves having a small group of respondents take the survey and debrief with the administrators on what questions or instructions puzzled or confused them. McDonald Rep. at 10.

Dr. Steinberg did not pre-test her questionnaire; she and Bain only ran through the questionnaire to see how long it would take. Steinberg Tr. 118: 5-19. Without a pre-test, Dr. Steinberg was unable to determine which questions were puzzling or could have caused difficulty for the disproportionate number of under-privileged women taking the questionnaire, answering sensitive questions about their reproductive care. McDonald Rep. 10.

Pre-testing also may have caught errors in her methodology (implicating the third *Daubert* factor) that Dr. Steinberg was unable to explain later. *See, e.g.*, Steinberg Tr. 221:8–222:24 (acknowledging that it was "just probably an error" that there was no 'I don't know' or 'I don't remember' option for question 4c); Tr. 232:23 – 236:5 (attempting to side step error in inserting skip patterns); Tr. 239:3–18 (admitting that her team had overlooked putting in a skip pattern in place for Question 6). The presence of errors is a reason for finding a survey methodology too unreliable to be useful in a case. *See also In re ConAgra Foods, Inc.*, 90 F. Supp. 3d at 950-951 (a high percentage of clearly incorrect answers on the survey demonstrates that the survey methodology was unreliable).

*2.     Unclear, Ambiguous, and Leading Questions*

"Proper questions are critical to the reliability of the survey. 'When unclear questions are included in a survey .... If the crucial question is sufficiently ambiguous or unclear, it may be the

basis for rejection the survey.'" *Hartle v. FirstEnergy Generation Corp.*, Nos. 08-1019, 08-1025, 08-1030, 2014 WL 1317702, at *6 (W.D. Pa. Mar. 31, 2014) (citation omitted). Furthermore, "[a] survey is not credible if it relies on leading questions which are inherently suggestive and invite guessing by those who did not get any clear message at all." *Johnson & Johnson-Merck v. Rhone-Poulenc Rorer Pharm., Inc.*, 19 F.3d 125, 134 (3d Cir. 1994) (citation omitted).

Dr. Steinberg's questionnaire was littered with unclear, ambiguous or leading questions and undefined terms. For example, she asked whether the respondents experienced "emotional distress" or "intense physical reactions" as a result of Dr. Akoda's treatment without defining either term or giving further guidance. Exhibit 8, Akoda Questionnaire 6a-6d. She asked respondents to identify physical symptoms such as high blood pressure, chest pain, and fatigue, that they believe are the result of Dr. Akoda's conduct; a question that rests on the bold assumption that this questionnaire population has both the clinical judgment and ability to make such a determination on causation. Akoda Questionnaire 6t; Dr. McDonald Rep. 17.

The unclear, ambiguous, and leading nature of Dr. Steinberg's questions were exacerbated by the proposed answers. One example of problematic answer sets involved yes/no questions where the respondent was given three different variations on "yes," with different qualifications, and one variation of no. *See* Akoda Questionnaire 6e, 6g, 6i–6s ("Have you had any upsetting thoughts, memories or dreams of being treated by Dr. Akoda? Yes, before I learned of the charges against him.; Yes, only after I learned of the charges against him; Yes, both before and after I learned of the charges against him.; No"). Such stacked yes answers bias the respondent and prompt an expected answer. McDonald Rep. at 11.

Dr. Steinberg also failed to provide "don't know" or "can't recall" options for many questions where a questionnaire respondent may be on the fence or that would have required a

respondent to recall events and emotions that happened years ago. The absence of these options sends a signal to the respondent that uncertainty or hesitation is illegitimate, and they are more likely to choose a response that they believe is socially acceptable or likely to please an interviewer, making the data gleaned from the questionnaire questionable. McDonald Rep. at 12–13.

Dr. Steinberg further biased the questionnaire respondents by using loaded language in the proposed answers. For example, questions better-suited for open-ended responses—such as respondents' emotions when they heard about the charges against Dr. Akoda—instead had supplied answers overwhelmingly capturing negative emotions (shocked, angry, betrayed, sad). Akoda Questionnaire 5b. Thus, a woman "who was mildly disconcerted or incredulous or had some other reaction not captured by Dr. Steinberg's options had to work harder than others to express her point of view." McDonald Rep. 13. Any conclusions that Dr. Steinberg draws from these questions and supplied answers are flawed given their leading nature.

### 3.   Lack of Skip Patterns

Dr. Steinberg's failure to use skip patterns on the questionnaire also calls into question the questionnaire's validity. As a result, many respondents answered questions that they were ineligible to answer based on their prior answers, potentially prompting them to change their answers.

By way of illustration, respondents were asked whether they trusted Dr. Akoda. Akoda Questionnaire 2a. Even though 79% responded yes, they did trust Dr. Akoda, Dr. Steinberg's questionnaire then gave respondents an opportunity to change their mind in 2b, in a highly suggestive manner: "If you answered yes to question 2a but at some point began not to trust him, what happened that changed?" Akoda Questionnaire 2b; McDonald Rep. 14-15 ("Thanks to that second bite, almost no one could get through this series without ultimately affirming lack of trust

in Dr. Akoda . . . By the time respondents reached Q. 2 (ever feel scared or threatened during care, yes/no), they were primed to respond in hyperbolic ways about Dr. Akoda."). The lack of skip patterns continued in Question 5, where all respondents were required to answer 5c ("If you are upset about what Dr. Akoda did, why"), even if their answer to preceding questions indicated that they were not upset.

Courts in this Circuit have noted the importance of using filter mechanisms (such as skip patterns) to screen out survey participants whose answers are not relevant to the inquiry. *Church & Dwight Co., Inc. v. S.C. Johnson & Son, Inc.*, 873 F. Supp. 893, 908 (D.N.J. 1994) (citing proposition that "[a] survey should be properly 'filtered' to screen out those" whose responses would be irrelevant, and acknowledging that skipped questions in reaction to the response of a prior question is one such filtering mechanism) (citation omitted). Dr. Steinberg's failure to use such a mechanism made the follow-up questions leading and put ideas in the head of questionnaire participants who were ineligible to respond to those follow-up questions based on their initial responses.

Dr. Steinberg's explanation and defense of the lack of skip patterns demonstrates how weak her questionnaire design is. When asked about Question 6 (respondent's emotional distress) and a particular respondent's contradictory responses in 6a and 6b, Dr. Steinberg explained: "[M]y thought is, and as I'm looking at this right now, is that this exemplifies the complex nature of emotions and how a person can have multiple and contradictory experiences of the same thing. . . . So in two questions, one right next to the other, you see the contradictory nature of her emotions about this." Steinberg Tr. 233:3–236:5. Dr. Steinberg's attempt to side-step this error and to explain away the impact of missing skip patterns demonstrates her flawed approach: her questionnaire was rife with bias designed to prompt specific answers on how a patient should react

to Dr. Akoda's conduct, consistent with Dr. Steinberg's predetermined view. *See* McDonald Rep. 8 ("A good survey researcher, no matter how deeply committed to her viewpoints and hypotheses, must do everything possible to guard against response bias in designing her instrument, lest research become an instrument of prophecy fulfillment, not scientific inquiry. Dr. Steinberg's avowed commitment to proving preconceptions, combined with her evident lack of expertise in survey methodology, produced a study afflicted with nearly as many problems as there were survey questions."). Courts have criticized such outcome-determinative studies and surveys, where the design encourages biases. *See, e.g.*, *Goodman v. Burlington Coat Factory*, No. 11-4395 (JHR), 2019 WL 4567366, *9 (D.N.J. Sept. 20, 2019) (finding that an observational survey's design improperly "pigeon-holed" survey administrators into recording a particular result and, as a result, the expert's "ultimate conclusions [were] predicated upon impermissible speculation and assumption in part.").

*     *     *

The flaws in Dr. Steinberg's questionnaire—lack of pre-testing, flaws in biased questions and available answers, and lack of skip patterns—show that the questionnaire's design does not "meet the standards of objective surveying and statistical techniques" as required in this Circuit to make the questionnaire reliable. *Pittsburgh Press Club*, 579 F.2d at 758.

### iii.    Dr. Steinberg's Interpretation of the Questionnaire Results Is Flawed.

Dr. Steinberg's attempt to extrapolate broader conclusions from the responses is also flawed. Dr. Steinberg provided only "a superficial analysis" of the questionnaire responses, failing to analyze diverse responses or to meaningfully engage with open-ended responses. McDonald Rep. 18 – 19. In such instances where an expert's opinions are "devoid of critical interaction" with those being observed or interviewed, any conclusions stemming from the opinions lack sufficient foundational evidence and information to support findings. *Goodman*, 2019 WL 4567366 at *9.

20

For example, Dr. Steinberg did not analyze or dig deeper into questions where a substantial portion of the questionnaire respondents responded "other." *See* Akoda Questionnaire 2b; Steinberg Report 6 (127 out of 383 respondents chose "other" as the reason why at some point they began to not trust Dr. Akoda); *see also* Akoda Questionnaire 4f; Steinberg Report 7 (62 out of 291 respondents chose "other" as the reason for not telling anyone about Dr. Akoda's inappropriate behavior). Despite these instances where the "other" responses dominate over the answers Dr. Steinberg chose to suggest, she did not attempt to code or tabulate the "other" responses at all, even though "[a]s a general rule, the appearance of large numbers of 'other' responses is a signal that the pre-specified response categories have not been adequate to the job." McDonald Report 16.

As a result, Dr. Steinberg's conclusions, including that the majority of respondents experience "varying degrees of confusion, anxiety, depression, avoidance and fear of medical caregivers, and the loss of trust in medical providers and health care institutions" as a result of Dr. Akoda's conduct, must be rejected. Steinberg Rep. 21. Her superficial and limited analysis of the questionnaire responses, and failure to address "other" responses, cannot support her opinions.

As detailed above, her methodology ignores generally accepted principles of survey design, and she fails many of the *Daubert* reliability factors. As a result, Dr. Steinberg's questionnaire, her responses, and opinions should be excluded.

**C.    The Questionnaire Responses and Dr. Steinberg's Conclusions Are Unhelpful to the Factfinder and Lack Sufficient Connection or Fit to Issues in This Case.**

Due to Dr. Steinberg's lack of qualifications and flawed questionnaire methodology, any opinions or conclusions she derives from the questionnaire are inherently unreliable and should be excluded. When a survey is inadmissible, evidence based on the survey should be excluded as

well, as it is not helpful to the factfinder. *Pittsburgh Press Club*, 579 F.2d at 760; *see also Hurt*, 2015 WL 410703, at *7 (excluding expert report when survey was unreliable).

Even if Dr. Steinberg's questionnaire was reliable and otherwise admissible—which it is not—both the questionnaire responses and her conclusions stemming from the questionnaire lack sufficient connection or fit to the issues in the case. "Above all, the survey's design must fit the issue which is to be decided by the jury, and not some inaccurate restatement of the issue, lest the survey findings inject confusion or inappropriate definitions into evidence, confounding rather than assisting the jury." *J&J Snack Foods Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 370 (D.N.J. 2002). Plaintiffs have not articulated how Dr. Steinberg's conclusions would help the factfinder at either an issue class trial or individual trial.

The proposed issue class trial would only concern the duty and breach elements of Plaintiffs' claim. ECF 32-1 at 11; ECF 58 at 2. Dr. Steinberg solely gathered information about the respondent's demographics, their interaction with Dr. Akoda, and their perceptions of emotional distress and physical symptoms they have faced as a result of Dr. Akoda's conduct. *See* Akoda Questionnaire; Steinberg Rep. Such information would not inform what an issue class jury would determine: whether ECFMG owed a duty to members of the class that it breached. With the exception of Dr. Steinberg's background section in her report, which she admitted was based largely on Plaintiffs counsel's letter reciting the alleged facts of the case and the Complaint, Steinberg Tr. 80:24-81:9, Dr. Steinberg does not mention or opine on ECFMG in her report at all. *See* Section IV. D. Because she does not opine on issues even arguably suited for class treatment, her testimony would be irrelevant at an issue class trial and serve no valid purpose.

Dr. Steinberg's opinions and conclusions also would have no valid purpose at individualized class members proceedings on causation and damages. Evaluating causation would

still require the individual trial jury to reflect on any alleged wrongdoing by ECFMG, (see Supplemental Brief in Opposition to Class Certification at Argument §I.A), on which, as covered above, Dr. Steinberg does not gather material or reach conclusions. She, likewise, does not gather information on the multiple actors in the causal chain, whose actions a jury would need to assess in determining but-for causation. *See* Motion for Summary Judgment at Argument § V. Regarding damages, while her questionnaire is adapted from a prior engagement where she was asked to assist with a mediation and the apportionment of damages, (Steinberg Tr. 29:15–30:5; 52:23–53:7; October 11, 2019 Email from B. Ceryes to E. McEnroe), the damages inquiry here at an individualized level would be significantly different. Dr. Steinberg's conclusions are not psychiatric diagnoses that can help a jury identify injury, (see Section IV.A), and her report does not even bother to identify and opine on individual plaintiffs (such as the named Plaintiffs, whose claims ECFMG is simultaneously moving for summary disposition). Her cherry-picked statistics and response verbatims would be of no use to juries assessing an individual's injury and extent of damages.

Thus, the questionnaire responses and conclusions do not directly implicate the issues at hand in any potential issue class trial or individualized proceeding and will not assist the factfinder with any of the disputed issues. Excluding her conclusions, report, and testimony is proper to avoid "confounding rather than assisting the jury." *J&J Snack Foods Corp.,* 220 F. Supp. 2d at 370.

**D.      Rule 403 Also Supports Excluding Dr. Steinberg's Opinions.**

Given how unreliable Dr. Steinberg's questionnaire results are, and her use of inadmissible hearsay without using a methodology to actually make a psychiatry diagnosis (see Section IV.A), Federal Rule of Evidence 403 also counsels excluding her expert opinion. *J&J Snack Foods Corp.*, 220 F. Supp. 2d at 369 ("Significant methodological deficiencies lessen the survey's probative value so that its probative value is substantially outweighed by the prejudice, waste of time, and

confusion that it would cause at trial.") (citing Fed. R. Evid. 403). Rule 403 is especially applicable here, where there is a concern that "if an expert, a person with special knowledge and expertise, testifies as to the skewed [questionnaire] results, a jury is likely to give special weight to the skewed conclusion." *Citizens Fin. Grp., Inc.*, 383 F.3d 110 at 120.

Given Dr. Steinberg's admission that she did not independently investigate and assess ECFMG's actions, see Section II.B, it is important for the Court to block Plaintiffs' counsel's efforts here to use Dr. Steinberg's report as a mechanism to promote their litigation theory. *Sterling v. Redevelopment Auth. of City of Phila.*, 836 F. Supp. 2d 251, 272 (E.D. Pa. 2011) (excluding expert opinion that relied solely on plaintiffs' assumptions and that was not buttressed by expert's own independent investigation). Federal Rule of Evidence 703 may not be used to avoid the admissibility rules by creating improper expert opinions solely as a vehicle for getting in client statements normally blocked by the rules of hearsay. "One of the worst abuses in civil litigation is the attempted spoon-feeding of client-prepared and lawyer-orchestrated 'facts' to a hired expert who then 'relies' on the information to express an opinion." *Therasense, Inc. v Becton Dickinson & Co.*, No. C 04-02123 WHA, 2008 WL 2323856, at *1 (N.D. Cal. May 22, 2008) (excluding an expert opinion under both Rules 403 and 703). Rule 403 provides an additional basis for excluding this expert report and testimony and correcting this abuse.

## V.    CONCLUSION

Because Dr. Steinberg's report and anticipated testimony does not meet the requirements of expert testimony—qualification, reliability, and fit—ECFMG respectfully requests that this Court exclude Dr. Steinberg's report, questionnaire responses, and anticipated testimony from this case. Plaintiffs cannot meet the burden of establishing that Dr. Steinberg's methodology meets the requirements of Rule 703, and admission of the report, questionnaire responses, and anticipated

testimony would prejudice ECFMG under Rule 403, substantially outweighing the probative value

of her report and expert opinion (if any).

Dated: December 10, 2021

/s/ Brian W. Shaffer
Brian W. Shaffer, PA Bar No. 78851
Elisa P. McEnroe, PA Bar No. 206143
Matthew D. Klayman, PA Bar No. 319105
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone:      +1.215.963.5000
Facsimile:      +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com


*Attorneys for the Educational Commission for
Foreign Medical Graduates*

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that on this date, I caused true and correct copies of the foregoing document to be served via electronic filing upon all counsel of record via the ECF system and/or e-mail.


DATED:  December 10, 2021                    */s/ Brian W. Shaffer*

                                             Brian W. Shaffer