# Exhibit 1

**Annie Steinberg, M.D.**
**The Bridge**
**31 N. Narberth Avenue**
**Narberth, PA 19072**

September 23, 2019.

Brent Ceryes, Esq.
Jonathan Schochor, Esq.
Schochor, Federico & Staton, P.A.
1211 Saint Paul Street
Baltimore, Maryland  21202

Re: 'Akoda' Matter

Dear Mr. Ceryes, Mr. Schochor and colleagues:

Pursuant to your request, I have reviewed the information provided and gathered additional
information from the claimants involved in this matter.  In this correspondence, I offer my
synthesis of the findings in this matter to date.  My findings will include the process by which
this matter was assessed (in the aggregate) with respect to the individual plaintiffs and will
outline the degree to which women treated by "Dr. Akoda" report have suffered as a result of his
actions and the agents that enabled him to practice medicine and surgery.  I will also opine on
current psychological issues that relate to the subject incidents and their consequences.

While the contents of this correspondence are subject to amendment or supplementation with the
availability of new or additional information, this report incorporates information from the
individual responses to a self-administered questionnaire completed by over 300 women who
have come forth as former patients of "Dr. Akoda", now plaintiffs in this matter, and will also
address issues from the larger collective or summative perspective.  Individual narratives will be
included in this report without grammatical correction and precisely as written by the class
member.

1. **Background**

Oluwafemi Charles Igberase practiced medicine in Maryland as an obstetrician and gynecologist
between 2008 and 2016, treating more than 1,000 patients after fraudulently obtaining a medical
license under the name John Charles Akoda.

Igberase had immigrated to the United States from Nigeria in 1991.  Little is known about his
life, medical education, and training in Nigeria.  Between 1991 and 1999, Igberase applied for
and obtained at least three different Social Security numbers using different names and birth
dates. Between 1992 and 1997, he also applied for and received three separate certifications from
the Educational Commission for Foreign Medical Graduates (ECFMG), again using different
names, birthdates, Social Security numbers, and falsified passports.  His first certification was

subsequently revoked and the second certification invalidated based on ECFMG's conclusion that he had provided false information.   In 1997, using the name John Charles Akoda, Igberase applied for and received a third certification.

'Akoda' a/k/a "Oluwafemi Igeberase," has since admitted to using various fictious identities, including the 'Akoda' identity, as well as a variety of fake identification documents, including a fake passport, a fraudulent social security number, fraudulent or altered medical transcripts, fraudulent or altered diplomas, and fraudulent letters of recommendation, in order to obtain ECFMG certification, obtain admission to residency programs and ultimately act as an obstetrician/gynecologist, performing medical and surgical procedures and gynecologic examinations on patients.  Through his conduct, he circumvented the lawful process designed to ensure the competency and character of foreign medical graduates, placing patients at risk.

A lawsuit has been filed against the Educational Commission for Foreign Medical Graduates, which was made aware in 2000 that 'Akoda' had used a fraudulent social security number in documentation submitted to ECFMG and the Jersey Shore residency program.  ECFMG was also made aware at that time that 'Akoda' had admitted to previously using other aliases, including the "Igberase" identity.  ECFMG had previously revoked the ECFMG certification of "Igberase" as a result of false statements he made on ECFMG applications.

It has been alleged that ECFMG was negligent in failing to investigate and take appropriate action to revoke the ECFMG certification issued to 'Akoda' after having been made aware of these and other concerns, and that as a result of this negligence, the women who encountered him as patients seeking obstetrical and gynecologic care have suffered significant emotional distress, including the distress they experienced upon learning that the individual they trusted to render medical care was not a lawfully-licensed physician, and had engaged in substantial fraud in order to become their obstetrician/gynecologist.   Additionally, clients have identified concerns regarding potential inappropriate behavior and conduct.

ECFMG was established to ensure that international medical graduates have the education, credentials, and knowledge necessary to enter medical residency and fellowship programs in the United States.  To receive certification, applicants are required to pass examinations administered by USMLE as well as an English examination, and to submit their medical diplomas for review.  'Akoda' has claimed that he attended medical school in Nigeria, although STAT news was unable to verify this claim.

With his ECFMG certification in hand, in 1998, Igbarase (using the name Akoda) applied for and was accepted into a residency program at Jersey Shore Medical Center (JSMC) but was dismissed in 2000.  He then used a different Social Security number to apply for a residency at Howard University in 2006.  He was admitted to this program and completed the residency in 2011.  Later that year, using the name Charles John Nosa Akoda, a falsified Social Security number, a fake permanent residence card, and a fake Nigerian passport, he applied for and received a Maryland medical license.

Using these same fake documents as well as a fake Maryland driver's license and fake letters of recommendation, he obtained privileges and became a member of the medical staff at Prince

George's Hospital Center (PGHC).  Between February and June of 2012, he was also employed by Dimensions Healthcare Associates, Inc.

In 2016, law enforcement searched the residence, medical office, and vehicle of the man posing as "Dr. Akoda," where they found fraudulent documents related to immigration, medical diplomas, medical transcripts, letters of recommendation, and birth certificates.  Igberase signed a plea agreement admitting to the misuse of a Social Security number.  Igberase's 'Akoda' ECFMG certification was then revoked, and he was sentenced to 6 months incarceration, 3 years of supervised release, home detention for 6 months, and a file of $100.  In 2017, Prince George's Hospital Center terminated his medical privileges and the Maryland Board of Physicians revoked his medical license on the basis of fraud and a felony conviction.

As a result of Igbarase's ability to fraudulently gain admission to residency programs and become employed as a physician, he was able to practice obstetrics and gynecology between 2008 and 2016, delivering care to approximately 1000 women at Howard University, Prince George's Hospital Center, and the practices of A. G. Chaudry, M.D. and Javaka Moore, M.D.

Legal action was filed on December 10, 2018 in the Court of Common Pleas of Philadelphia County and thereafter removed to Federal District Court for the Eastern District of Pennsylvania, claiming that ECFMG's negligent certification of the man known as Dr. Akoda enabled him to violate the boundaries of trust with his patients, causing physical pain, emotional anguish, fear, anxiety, humiiation, embarrassment, and other physical and emotional injuries; and that these damages have resulted in both economic and non-economic damages.


## 2.  Description of Evaluation Process

Forensic psychiatric consultation was requested to assess the potential damages, if any, that class members may have experienced concerning the actions of "Dr. Akoda." A 60-item survey questionnaire was designed by this psychiatrist/writer which you distributed securely to your clients (with names removed and an identification number provided).  The results of this survey questionnaire and a provisional analysis of the results are offered in this correspondence.

"Dr. Akoda" had at least 1000 patients between 2008 and 2016.  Approximately 575 patients who were treated by the man they knew as Dr. Akoda had come forward for legal representation by your firm and other law firms working cooperatively, and these 575 individuals had been vetted and identified as class members.  In an effort to evaluate the presence and severity of injuries sustained by the Plaintiffs' class, this psychiatrist developed a 60 item standardized questionnaire suitable for on-line administration to gather consistent and reliable data across class members.

Following the digitization of the electronic questionnaire, link and report portal setup, the secure hosting of the form and form data, the 60 item questionnaire was sent electronically to identified class members.  Collected demographic information included age, partner status, primary language, ethnicity, and type of health insurance; as well as information about patients' experiences with the person they knew as Dr. Akoda.  Questions were written in plain language

to ensure clarity and understanding among all claimants regardless of their educational background.

Sections of the questionnaire addressed demographic information and 8 topical domains:
1) Meeting "Dr. Akoda" and the experience of being his patient
2) Trust in "Dr. Akoda"
3) Experiences of "Dr. Akoda" during his gynecological exam and related care
4) Unusual behaviors by "Dr. Akoda"
5) Learning about the charges against "Dr. Akoda"
6) Impact of experience with "Dr. Akoda" on respondents' mental and physical health
7) Impact of experience with "Dr. Akoda" on other aspects of respondents' lives
8) Other factors that may have influenced the degree of harm, such as previous experience with abuse.

Respondents were provided with checkboxes to ensure that the questionnaire could be completed in approximately 15 minutes. Multiple choice responses were utilized throughout the questionnaire so as to facilitate quantitative analysis. Text boxes were also available for many questions to enable respondents to provide additional details, and respondents were offered the option of including a statement. A secure custom application had been developed to capture electronically the answers to the questionnaire and could be viewed real time to facilitate accurate data collection, documentation, and quantitative analysis, as well as to collate the summary statements for a more qualitative examination.

Confirmed patients/class members were contacted by e-mail and given instructions for logging on and completing the questionnaire. A total of 575 presumed patients were sent the email and 306 returned the questionnaire, with 292 completed fully; 14 of the questionnaires were missing one or more responses. This synthesis analyzed the data when 305 questionnaires were returned. Summary statements were offered by 131 women. In order to assess the aggregate severity and distribution of potential damages among the entire Plaintiffs' class, the response rate and sample size would be more than adequate to provide reasonable confidence intervals for the percentages of Plaintiffs in each of several categories of damage severity but this exceeded the scope of this report. Statistically reliable information was also gathered in a mode that ensured an equal opportunity for each class member to communicate her experience related to "Dr. Akoda."

This analysis incorporates only some of the data collected, represented here with both numerical/ quantitative information as well as qualitative data in the form of narrative or selected quotes. Some topical sections have a sample of quotes by individual women; the quotes are presented in large quantities so as to demonstrate the consistency of experiences among the Plaintiffs.

## 3. Results

*"I really don't Trust no male doctors he mess up that I trusted him with my body and he wasn't even who say he was…"*

This section summarizes statistically the results of the questionnaire. Although 306 class members started the questionnaire, some did not answer every question; thus, the percentages calculated reflect responses only from those who answered a particular question. For questions where multiple answers were allowed, the percentages are calculated based on the total number of results rather than the total number of responses.

### a. Patient demographics

The women seen by "Dr. Akoda" vary in age from 22 to 59, with a median age of 35.  The vast majority of patients (89%) identified themselves as African American and used English as their primary language (96%).  An additional 10 patients were mixed or biracial, six were Hispanic, two were Caucasian, and one was Asian.  Most patients (57%) were single; 43% were married or in a long-term relationship.  During the time in when they were treated by "Dr. Akoda", 73% were on Medicaid, 21% had private insurance, and 5% had no insurance.

### b. Patients' experiences with Akoda

Respondents were asked how they became a patient of "Dr. Akoda."  Most (55%) said they had gone to see another doctor but were re-assigned to see "Dr. Akoda" instead.  About 6% were referred by another doctor, and another 6% found his name on a list of doctors; 5% walked into the clinic; and 4% were referred by a family member. The remaining 24% became his patient through other means.

More than half (59%) of claimants reported that they saw "Dr. Akoda" at the medical practice of Dr. A.G. Chaudry, 31% reported that they encountered him at PGHC, and 11% reported that they saw him somewhere else, although none reported seeing him at JSMC, Howard University Hospital, or the medical practice of Dr. Moore.

A few respondents saw "Dr. Akoda" before 2012, but most saw him between 2012 and 2016.  Forty-three percent (43%) saw him more than 5 times, and another 37% saw him between two and five times.  About 20% saw him only one time.  Approximately half (50%) of these appointments were for prenatal, delivery, and postnatal obstetric visits. Other reasons for seeing "Dr. Akoda" included routine annual gynecological care (26%), surgery (13%), and other medical care (11%).

### c. Perceived trustworthiness

Initially, patients expressed a high level of trust in "Dr. Akoda," with 79% saying they initially trusted him.  However, about 75% of those who indicated initial trust in him reported that their trust changed at some point, very often for a change in his demeanor that left them uncomfortable, a rude or sexualized comment that they did not fully understand but was out of the range of what they had previously experienced.  Reasons given for this loss of trust are illustrated in Figure 1. About 29% of patients indicated they felt scared or threatened by "Dr. Akoda" during their time in his care.  Vignettes offered later in this report elaborate on the prevalence of "Dr. Akoda's" disrespectful posture with his patients during routine health care maintenance as well as during tumultuous deliveries.

**Figure 1. Changes in perceived trustworthiness of "Dr. Akoda"**



2b. If you answered yes to question 2a but at some point began not to trust him, what happened that changed? (Check all that apply)

He was rude, 40
It was just something about..., 106
He made sexual comments, 37
He hurt me, 24
Pelvic exams were too long, 49
Other, 127

383 responses in 291 results

### d.   Pelvic and breast exams

Class members were asked how "Dr. Akoda's" pelvic and breast exams compared with other doctors' exams before or since they saw him. For pelvic exams, responses were evenly split between those who responded that there was no difference in the exams and the exams being perceived as worse than other doctors.  About 2% said they liked "Dr. Akoda's" pelvic exams better than previous pelvic exams they had experienced.  43% of women said "Dr. Akoda's" pelvic exams were more painful, while 10% said they were less painful. Most (74%) patients reported that Akoda's breast exams were similar to those of other doctors, but 23% indicated that they were worse, e.g., rougher, longer, or sexualized).

Also explored is whether or not a nurse or chaperone was present during pelvic exams and whether "Dr. Akoda" always wore gloves, since both are considered standard practice.  Many patients (58%) said there was always or sometimes a nurse or chaperone in the room during pelvic examinations, although about 23% reported that a nurse or chaperone was never present and about 19% of the respondents did not remember.  About 25% said the nurse or chaperone never stayed throughout the examination and about 30% said she never stood in a place where she could see the examination.  10% of patients said he sometimes or always performed a pelvic exam without using gloves.

### e.   "Dr. Akoda's" inappropriate behavior

Nearly half (46%) of patients said they were uncomfortable during or after the exam and about 62% said they considered changing doctors.  About 30% said "Dr. Akoda" touched them in a way that felt uncomfortable or wrong and 24% said he "talked dirty" or made sexual or otherwise inappropriate comments.  Eight patients said they felt sexually aroused or had an orgasmic response during the examination.  Asked if patients who felt that "Dr. Akoda's" behavior had been

inappropriate ever told anyone, who they told, and why they may not have told anyone.   Of the 46% of patients who said they told someone, most told a family member,

128(46%) patients said they told someone about Akoda's inappropriate comments or behavior. They most often told a family member (48%) or friend (27%). Several told a nurse or other healthcare provider (8%), another doctor (6%), an administrator (<1%), or someone else (11%). 53% of patients did not tell anyone for reasons illustrated in Figure 2.

**Figure 2.  Reasons for not telling anyone about "Dr. Akoda's" inappropriate behavior**



f.   **Learning about the charges against "Dr. Akoda"**

Most patients first learned that charges had been made against Dr. Akoda through the news media, either from something viewed on the television (59%), heard on the radio (16%), or read in the newspaper (2%).  About 12% heard about it from a friend, and a few (2%) received a call from a healthcare provider. Figure 3 illustrates the feelings of patients when they heard about these charges:

**Figure 3. Patients' feelings upon learning about the charges against "Dr. Akoda"**



Only 8 patients said they were not upset about what they heard. The reasons other patients gave for being upset are shown in Figure 4.

**Figure 4. Reasons patients were upset about what "Dr. Akoda" did**



546 responses in 291 results

### g. Emotional and physical distress experienced as a result of "Dr. Akoda's" conduct

Survey questions explored the emotional distress experienced by class members.  In response to the global question of whether, when, and for how long class members experienced emotional distress as a result of Akoda's conduct or from learning that he may not have been a licensed doctor and had falsified documents to obtain certification, 89% said they did experience emotional distress.  Of these, nearly half (47%) indicated that their emotional distress occurred only after learning about the charges against him. 84% of respondents indicated that they still experience emotional distress.

Emotional distress was also experienced physically by class members.  65% of respondents reported intense physical reactions such as rapid heartbeat, shortness of breath, or excessive sweating when reminded of being treated by Akoda.  More than half (55%) said these physical manifestations occurred only after learning about the charges against him and 70% said they have persisted.

Most class members (79%) reported having upsetting thoughts, memories, or dreams of being treated by Akoda, with 54% indicating this only occurred after learning about the charges against him and 84% saying these upsetting thoughts still occur.  75% said they try to avoid thoughts or feelings about what happened with Akoda, and 39% said they find it hard to recall some aspects of what transpired.

Class members were asked whether and when they experienced specific signs or symptoms of post-traumatic stress.  These results (rounded to the nearest percent) are presented in Table 1,

**Table 1. Signs and Symptoms of Post-traumatic Stress experienced by patients of Dr. Akoda**

| Symptom | Yes, only in the past month | Yes, only prior to the past month | Yes, both in the past month and prior | No |
|---|---|---|---|---|
| Mood changes or depression | 4% | 6% | 49% | 41% |

| Reduced interest or pleasure with important activities | 3% | 6% | 38% | 53% |
|---|---|---|---|---|
| Irritability or anger | 7% | 9% | 53% | 31% |
| Difficulty concentrating | 5% | 5% | 42% | 49% |
| Feeling jumpy, overly alert, or easily startled | 4% | 5% | 37% | 55% |
| Trouble sleeping, bad dreams, or nightmares | 4% | 8% | 42% | 46% |
| Embarrassment, shame, or humiliation | 6% | 5% | 56% | 33% |
| Trouble making decisions | 4% | 3% | 27% | 66% |
| Overuse of drugs or alcohol | <1% | 1% | 5% | 94% |
| Discomfort with body or reduced self-care | 4% | 6% | 36% | 53% |

Class members also reported a variety of physical symptoms that they attributed to Dr. Akoda's conduct. These are summarized in Figure 5. These symptoms were described as mild by 26% of respondents, moderate by 53%, and severe by 21%.

**Figure 5. Physical symptoms experienced as a result of Dr. Akoda's conduct**



**6t. Have you experienced any of the physical symptoms listed below as a result of Dr. Akoda's conduct (Check all that apply)?**

Abdominal pain, nausea, ref..., 82
Fatigue or insomnia, 56
Weight gain or weight loss, 85
Numbness, loss of enjoyment..., 64
Pain, trembling and/or nerv..., 32
I have not experienced any ..., 78
Other:, 43
Headache/dizziness, 76
High blood pressure, 28
Chest pain or shortness of ..., 42

**586 responses in 290 results**

Most class members (82%) have not received any psychological, psychiatric, or medical treatment for symptoms arising from their experience with Akoda. Among those who have received treatment, these treatments included non-psychiatric medication (46%), psychiatric medication

(17%), and therapy or counseling (37%). Only slightly more than half of class members (158 individuals) described receiving psychiatric or medical diagnoses that they believed were related to their experience with Akoda. These included Major Depressive Disorder in 64 patients, Anxiety Disorder in 52 patients, Post-Traumatic Stress Disorder in 30 patients, and Substance Abuse in 12 patients.

### h.  Loss of trust and aversion to medical care

The vast majority of class members (94%) said that their experience with Dr. Akoda affected their trust in doctors. They were also asked how this experience affected their use of medical care. More than half said it has changed how often they visit and obstetrician/gynecologist (53%) and/or has affected the medical choices or decisions they make (53%). Slightly fewer said it has changed how often they visit any doctor (45%) and/or has affected the types of specialists they see (49%). Only 8% said it has not affected their use of medical care.

### i.  Effects on non-medical aspects of life

 Many class members reported that their experience with Dr. Akoda affected other non-medical aspects of their lives as well. 46% said they were concerned about their daughters going to see an obstetrician/gynecologist; 27% said it has affected their relationship with a spouse or partner; and 6% said it had affected their relationship with their children.  Only 23% said it had not affected non-medical aspects of their lives.

Some class members (21%) reported that their experience with Dr. Akoda had negatively affected their work lives. For example, 13% of respondents said they were not able to go to work for some period of time. Others said they missed work deadlines (6%), quit their jobs (3%), or were fired (2%).

About 32% of class members reported effects on their social life, for example, avoiding friends, neighbors, and relatives (21%); avoiding certain types of social events (24%); avoiding certain neighborhoods (10%), not reading mail or email (5%), and not retuning messages and phone calls (11%). Thirty class members (10%) said they were afraid of or avoided leaving home.

### j.  Prior vulnerabilities

Since previous experiences with violence or abuse may make individuals especially vulnerable to subsequent abuse, class members were asked about prior experiences.  26% reported that they had been threatened by somebody (6% declined to answer), 19% said they had experienced or witnessed violence in their own homes (4% declined to answer), 17% said they had been forced to have sex or been threatened with violence if they didn't (9% declined to answer), and 22% said they had been sexually abused in other ways. (9% declined to answer)

### 4.  Analysis of Damages

*Boundary Violations in Gynecological Care*

It is well established in the literature that sexual contact between physicians and their patients can have devastating consequences for the patients (Dehlendorf and Wolfe, 1998, Feldman-

Summers and Jones, 1984).  Patients' responses to physician sexual misconduct has been examined specifically in the context of gynecological care and sexually abusive internal examinations and found to impact on patients in specific ways (Burgess, A.W.,1981).  Sexual exploitation, defined as situations in which a person is used primarily for another person's gratification, profit or selfish purpose, was explored with interviews of women who had been exploited with intentional genital manipulation during internal gynecological examinations over an eight year span of time.

In this matter, 'Dr. Akoda' was perceived to have lengthy exams by some, with misuse of his hands, and occasional absence of a nurse during the examination.   The claimants consistently describe physical discomfort, feeling disrespected, a sense of powerlessness, annoyance, anger, and shame.  Some women described a feeling of being degraded and exploited, and felt that their credibility was at risk, emphasizing the unequal power status.

In this matter, women reported negative experiences during their time in care with 'Dr. Akoda, including physical and emotional discomfort with the genital examination (prolonged duration, painful exam, absence of gloves, the departure of the chaperone, sexualized touching of the vagina and clitoris, rude, inappropriate, and crude sexual comments, and overly personal interactions:

*"I just wanna say that this whole situation has changed my life. It puts me in a place to where I'm uncomfortable about going to the doctors. Only because Dr. Akoda did what he did to me. This man did exams on me he barely used gloves I feel so violated. I only remember him using gloves 4 times out of my whole pregnancy that was only in the beginning. But when I started getting into my second trimester and at the end of it he didn't use gloves and in my 3rd trimester he never used them."*

*"I went to his office when i was over 1 5weeks pregnant after the pap smear the female lady stepped out and i was putting on my clothes and he slapped my ass telling me i have big buttocks. I felt so sad and i cried on leaving which was my second visit to him."*

*"My doctor (s) were not available to come to the hospital and so he was the doctor they told me would delivery my daughter. After delivering my daughter, my husband kept talking about how uncomfortable he was with him as the doctor. He felt that he was touching my inappropriately and not doing some things correctly. After a while, we forgot all about it and moved on thinking that maybe that was what was suppose to happen. Like a year later, we received word about a fake doctor at PG Hospital and when the person showed us that picture, my husband immediately knew that was the doctor that deliver my daughter. Once getting the paperwork from the hospital, it was confirmed!"*

*"I'd also like to elaborate on #6t. After my pelvic exam in which he smelled his fingers. I grew very self conscience of my body and vaginal health. I couldn't understand why he would do that and never explained why. I was too ashamed to ask but I noticed that major decrease in my* libido after that experience."

*"I am small breasted and during the breast exam he stated that they were so small I shouldn't have a problem finding anything!  I was very embarrassed and couldn't wait to leave. I didn't get another yearly exam for two years."*

11

*"During my appointment with Akoda, my fiancé was in the room with us, once he saw that Akoda had no gloves on during my removal of the Mirana and breast exam, he asked him "aren't you suppose to have gloves on?" and Akoda stated no, My fiancé got uncomfortable and frustrated and left the room. After the door closed Akoda stated "he is a very jealous man". I will never forget how he look, and how his hands were extremely ashy."*

*"Then one day I went for office visit and he told me to stop having more babies that I could kill myself if I keep having more babies. Then I was really upset and reported the case to Dr. Chaudry and when I got home I also reported to my husband who accompanied me to the clinic on my next visit. Dr. Chaudry asked him to apologized to me which he did that very day in the presence of my husband."*

*"My oldest daughter would accompany me to my appointments and would always tell me there was something about him that didn't sit well with her. He made a comment about the size of my vagina and uterus that made me feel disgusting and dirty. The day he scheduled my induction he also told me he had 11 other inducements that day and that he would be leaving for Africa the next day which according to him was his birthday. He rushed me and even suggested I have a C-Section, I told him he was going to be patient and wait for my child and I would not allow him to cut me. My daughter is now a thriving 7 year old second grader, but as a parent I always fear what her future holds as a result of him having ever touched her with his sick, in-educated, moral less hands."*

*"He is a demon doctor he let me go in shock while on the eximanation table while i went unconcious he had his han in me and then went up on me lying still unconcious he ripped the point of my cloterist wide open saying how that you have three children and still so neat. I told him that l was seperated from my husband for seveteen years and hoping for him to come back. He dr okada is a real Deamon."*

Sexual contact between physicians and patients violates the fiduciary nature of the relationship that requires physicians to act in the best interest of their patients; fiduciary actually being a legal term that is applied to a professional in whom the patient places her trust.  Most physicians adhere to one or more sets of ethics codes, depending on the professional organizations to which they belong.  An example of such a code would be the American Medical Association's "Principles of Medical Ethics," which notes, "The relationship between patient and physician is based on trust and gives rise to physicians' ethical obligations to place patients' welfare above their own self-interest and above obligations to other groups, and to advocate for their patients' welfare."  It is not clear if Igberase received the necessary training and supervision in medical school to be knowledgeable about the physician's Code of Ethics.

The AMA Code specifically addresses sexual misconduct in the practice of medicine and states that, "sexual contact that occurs concurrent with the physician-patient relationship constitutes sexual misconduct.  Sexual interactions between physician and patients detract from the goals of the physician/patient relationship and may exploit the vulnerability of the patient, may obscure the physician's objective judgement concerning the patient's health care and ultimately, may be detrimental to the patient's well being."

The Code of Professional Ethics of the American College of Obstetrics and Gynecology is another example of the provision of rules for ethical conduct to the members of a professional organization. The code of this organization, one to which 'Dr. Akoda' may or may not have belonged, also addresses the fiduciary nature of the relationship, and states clearly that, "sexual misconduct on the part of the obstetrician–gynecologist is an abuse of professional power and a violation of patient trust."'Akoda's' reported irregular pelvic examinations, protracted and painful examinations (some without gloves), inappropriate comments, and intentional vaginal, clitoral, and breast stimulation together suggest the abuse of power with a vulnerable population.

   *Disrespect and Adverse Clinical Outcomes*

The power imbalance and vulnerability of his patients did not yield a confrontation by his work colleagues of the very significant misconduct and abuse of power; many of the vignettes offered by claimants suggest blatant disrespect for and neglect of claimants so great that it was described as a factor adversely affecting the clinical outcome:

*"I was scheduled to have an induction from Dr. Javaka Moore's office and Dr Akoda was the delivering doctor at that time. He was very rude and pushy. He kept telling me to shut up and hurry up and push the baby out because he had somewhere to be and didn't have time for me all night. He kept saying if I didn't hurry up he was going to perform a C Section . He just kept saying that over and over. So halfway during my delivery the baby was coming out and he just left me there for a few with the baby half way in and half way out and i was telling him that that was so painful and he told me to shut up and stop crying like a baby."*

*"My overall experience with Dr. Akoda was completely terrifying! I feared for my child's life and safety as he failed to perform the necessary c-section procedure after he discovered that my child was in complete distress during my labor in March of 2016. Dr. Akoda did not show any concern. As a result of Dr. Akodas negligence, my child was born with his umbilical cord wrapped around his neck, strangling him and blocking his airways preventing him from breathing. I thought my child was DEAD! He was completely blue in the face! He had swallowed his own urine and feces!"*

*"Akoda was the doctor that delivered my son 2015. He took over because my actual doctor was out of town...I believe. He left me (in active labor) went home and returned late evening the next day to attend to me (so uncalled for). I almost lost my son and my life during the process. I felt sick and was admitted at PG hospital after emergency C-section was done of me for about 5 days with tons of blood transfusion."*

*"Dr. Akoda made decisions in the delivery room that affected both me and my son. He tried to break my water after it already broke. I felt a sharp paid and started to bleed profusely. He then attempted to deliver my son without any antibiotic even though my chart stated I was gbs positive. My son suffered an infection and had to be hospitalized at 2 weeks old due to this."*

*"My delivery process was rushed I was not giving the time to go through the different phases of labor as I have intended. Instead Dr Akoda, came into my room and brook my water after one hour of being admitted and he stated, "I want to help you speed up this process." After breaking*

my water, Dr. Akoda told me not to tell the nurse. the nurse came into my room and asked me what he just did and I told her that he broke my water. The nurse stated "why would he do that." My trust for Dr. Akoda was broken after he rushed my delivery because he wanted to live [leave] and did not want another doctor to take over. I was hurt and broken but I was thankful that I came out of the delivery room alive after everything I went through while laying in that delivery table. First my epidural was no longer effective at the time of the surgery and I could feel Dr. Akoda cutting my stomach. I screamed in pain and he said that I should not be feeling anything but pressure. Second I was finally put to sleep with general anesthesia because I was in so much pain. The day after my surgery, Dr. Akoda, came to my room and stated "You are lucky to be alive" "I have been a medical doctor for many years and I have never had a difficult surgery as yours." Dr. Akoda also stated that if it was not for his years of experience he would have performed a hysterectomy on me and advised that I should plan on not having kids again in the future. This statement has tormented my husband and I for the past three years. My experience at Prince George's Hospital and with Dr. Akoda was rough and I was afraid to ever become pregnant and to have to ever go through the same thing I went through during delivery."

"Dr Akota told me I was pregnant in my tubes and performed surgery on me and couldn't find the baby and I was drugged up and put to sleep and I don't know what happens after that I woke up in my room in a lot of pain then hours or next day dr akota came into my room and gave me a shot in my arm and said he couldn't find the baby so I started going off on him saying he cut me open for nothing then dr akota gave me a shot in my arm saying that shot is to kill the baby and so I can bleed it out I bleed for days weeks and in a hole lot of pain and all I can think of was what really happened to me while I was drugged up under the Anastasia and if dr akota didn't know what he was doing and if I was really pregnant in my tubes I think bout all this since the day it all happened."

"Dr. Akoda did some things to me that I know now were completely wrong. He did NOT properly medicate me because I rememner the whole C-Section. I felt the whole thing I screamed and cried through the whole thing. Also, he cut my son while he was coming out of me and he still has the scar to this day. I don't remember much from my sons first 3 month of life. And I Learned when I had my daughter, there is pain med that will make you forgot things. He scared me and I will never forgive him!"

"As I'm typing this I'm experiencing so many emotions at this time.It's so hard and very painful just thinking about Akoda I'm feeling sick. He was rude and unprofessional,I was told that I should have my tubes tied because I have a Nigerian husband with to many kids.He said if I don't tie my tubes I would be pregnant again because Nigerians love making babies, that was on my first visit in 2013.I pray this comes to a end soon because just thinking about him makes me angry,sad sick and betrayal."

"A life time mental exhaustion remains in my family due to an unwanted outcome .. My family and I have to cared for my son forever and it makes me depressed on a daily basis. And sometimes I get worried about the c-section if it was done right. I also suffered placenta previa during my pregnancy and was never diagnosed by Dr Akoda until it happened and was diagnosed at the hospital! And moreover Dr Akoda lied to me and he failed to answer my

*questions after the birth of my so . I am still angry and grieving about what happened to my son."*

While all misconduct is a fiduciary failure, 'Dr. Akoda' recognized the extreme power imbalance and his capacity to control his patients in their most exposed and defenseless moments.  A physician associated with a powerful institution, he likely found his female patients looking up to him because of his social status; this also resulted in an imbalance of credibility; when questioning themselves about what had transpired, they would presume that they had only imagined misconduct.  Furthermore, his patient population was a very vulnerable group of women; 89% African American and 73% Medicaid recipients, 19% reported having experienced domestic violence; 17% had been forced at some point to engage in sexual relations; and 22% reported having been sexually abused in other ways in the past.  While it is possible (likely even) that the above percentages are not independent – women may have said yes to multiple types of abuse and may have been thinking of the same events, these figures are not surprising and do lend support to the premise that his patients were a particularly vulnerable population and that his physical and sexual misconduct and betrayal of trust would be high impact event.

### Emotional Distress Upon Learning of Fraud Allegations Against 'Akoda'

While some wondered if his behavior (e.g. protracted pelvic examinations) were the source of some damage or the etiology of precipitated labor or miscarriage, most women experienced an array of powerful sentiments after learning that 'Dr. Akoda's name and medical credentials were falsified.  The majority experienced shock, anger, sadness embarrassment and a sense of betrayal, acute emotional distress upon learning of the allegations against 'Akoda.'  Only eight patients (of 306 respondents) reported not feeling upset.  65% reported intense physical reactions when reminded of being treated by 'Akoda.'  79% reported re-experiencing with upsetting thoughts, memories and dreams of being treated by 'Akoda' and 75% reported attempts to avoid thinking about what had transpired and the implications of his fraudulent credentials.

*"Every time i think or talk about this situation, i cry, i cant concentrate, i cant sleep and my body tingles and go numb. I trusted him and he betrayed my trust of care, i was comfortable thinking i can depend on my doctor, who i thought had my best interest for me and the delivery of my child. The fact that i have to live knowing his credentials and education is false and someone did not do their job thoroughly, to be one of so many women who are victimized is very stressful. to know he delivered my daughter and now i have to live with this thought and knowing he is a fake doctor with false credentials and my daughter was delivered by a fake doctor. No matter how old she gets this will taunt me and i will have this uncomfortable feeling i would get from him and the thought of it all for the rest of my life. I am crying typing this this is so upsetting, i want this to be over it seems like a bad nightmare that just will not end. when will this be over!!"*

*"He would hint and say, my private area is loose. I can do some exercises to tighten. While fully undressed, he'd take the full blue blanket off my complete body. Thought was weird, the first time, walking away thinking I was over thinking the situation. Second time, he became extra talkative and friendly, even coming to the front desk as I checked out to joke. What finally did it, when my daughter came out the examine room, to say, I think that doctor was flirting with me. After her pregnancy, we both moved to another location/doctor. Eventually after knowing Dr,*

*Akoda would be doing my paps instead of the other doctor I left seeing him. He made me feel weird and even today, I hate and am right now contemplating if I can trust this male foreign doctor I have, if he is a fraud, or do I just not have pap smears done. Which I know I'm only hurting myself by not doing so. Have to make a decision soon. I'm thinking, I'd rather take the chance with a woman at least she has the same private parts as I. But I am left feeling embarrassed about my body. Wondering which of my insurance choices are truly licensed before exposing myself to them again. The nurses would leave the room when I was examined after taking my vitals. Yes, his exams were more painful than what i was used to. Before finding out who he is, I just thought maybe the pain was coming from my body changing as he said my pelvic is dropping. As well as my vagina is tilted. (TMI). I still remember him examining my breast. Just the thought. I hate to think about it. I talk with my daughter to help us get through this. The worst, he also prescribed us prescription drugs.  Were they right or wrong?  The thoughts are endless."*

*"The visits with Dr. Akoda were so painful it often left me sore and wondering if my baby was ok. It felt like pure hell and I dread going back to the office because of how rough the dilated checkups were. I would always cry after I left his office it was a horrible feeling. And now I feel like I have PTSD when I step inside a doctors office for a OBGYN visit because of the pain he puts me through, I'm always gripping the seat during the checkup and feels like my heart is beating a million miles a minute."*

*"My experience with Akoda has made it very difficult to trust doctors or to be examined by a medical doctor. I have avoided women's health care, such as gynecological exams, and have only gone to see a gynecologist in an emergency situation since discovering that Akoda was a fake doctor and that multiple gatekeepers accepted his fake documents and credentials. Since discovering this information, I have experienced a lot of anxiety, resulting in insomnia, lack of concentration at times, and even back pain."*

Altered mood and post-traumatic responses to learning of allegations against Akoda also included a state of arousal with nightmares, irritability, hyperalertness, to name but a few.  Most (82%) have not accessed mental health services, however, more than half of the class members described receiving psychiatric or medical diagnoses that they believed to be related to their experiences with Akoda, as noted below Figure 5 earlier in this report.

*"My experience with Charles Akoda has truly been very traumatizing. It has effected the way I approach my medical care, my social life, and I've had plenty of nightmares about him. I don't know who I can trust. It has improved slightly but when I think about him I get chills down spine. How could this have happened? I look at my sons birth certificate and I see his name and it puts me in bad state of mind."*

*"Dr. Akoda took away the full enjoyments of my son birth, by his actions. The nightmares interrupted my time with my spouse and caused emotional stress on my family. How can you not lose sleep with such roaming around in her head??? When I saw his face on the news, it was something you can't prepare for... I would then go online to check hospital website for my health information to confirm, it was him. Once that confirmation was done, I started screaming and*

*bursting into tears and when my son came in my view , it really hit me, because, his birth will* forever be scarred and he will know later in life, he was a victim of fraud in his birth."

*"I think it's a shame that he got away with this so long I haven't been able to go to a GYN doctor sense I have a therapist and a psychiatrist now and trust issues with any male doctors."*

*"He used to wear Creed cologne and another strong scent like Tom Ford. I asked him the scent and whenever i smell it on a male I instantly get a sick feeling to my stomach because i think of Dr.Akota. This scent that Would make a female attracted to a man, something i would want to buy a boyfriend, something arousing now makes me so nauseas and nervous. The smell of betrayal. He would always smell like he just put it on and would always be eating a breath mint."*

### Betrayal of Trust

Trust has been defined as "a psychological state comprising the intention to accept vulnerability based upon positive expectations of the intentions or behaviors of another" (Rousseau, Sitkin, Burt, & Camerer 1998). This definition includes three key components: a relationship of dependency, vulnerability of at least one party, and confident expectations or beliefs by at least one party that the other will behave towards him or her in a positive manner (Koehler & Gershoff, 2003). However, sometimes those whom one trusts instead actively cause the very harm they were entrusted to prevent; the response to such a betrayal varies, although fight or flight behaviors are common.

The impact of "Dr. Akoda's" betrayal of the trust his patients had placed in him was multidimensional, with profound feelings of hurt and disappointment that his name and his credentials were not real, and that he was not the doctor they thought him to be.

*"I am angry to hear that we lost this man as lied to many of us we trusted with our body's ,babies we as mother are expect to be safe when we go to the doctors to trust them feel comfort while we are going through this Journey to bring life in to the world , my self being a previous rape/molested victim it's hard for me to trust how am i suppose to be comfortable knowing that this person as completely lied."*

*"I feel lied to and i feel angry that i put my trust in a doctor who was suppose to help me but instead lied and could have killed my self and my child."*

a.   Loss of Trust in medical providers, aversion to medical care, system's failure to protect

The fraud perpetrated by 'Akoda' resulted in 94% of claimants affirming that their trust in physicians has been impacted, and more than half acknowledged that it had changed their use of medical care. were the obvious feelings that doctors can't be trusted, the resultant avoidance of medical care and of male providers. This negative impact directly creates a barrier to accessible medical care, of particular significance given that cancer and other diseases are already detected late and more often associated with poor outcome in this demographic.

*"This was a horrible expereince in my life. To be diagnised and hav a doctor with his hand in my private area holding my uterus and not being certified to make any decisions or do any procedures was allows to practice medicine and be involved in such a personal aspect in a womens and babies life. The instutuions and the Mr. Akoda or whatever his name is should be held accountable fully. How we trust any physician or hospital again after the did not properly veet and investiagate the people they hire to make life-altering changes."*

*"At the moment, i still feel sad and betrayed with the medical profession board for allowing me to go through this betrayal and risk twice. I have put my life and that of my two daughters at the highest risk and perhaps the surgical procedures i went through were not in the first place necessary."*

*"Learning that he is not a real doctor has really made me scared for my children when seeing other doctors. Also i think about what if something went wrong when he was delivering my son. I feel violated that he was able to get so close to my personal area and even touch me and then to find out that he is not licensed is really scary."*

*"I saw Akoda on days that Dr. Chaudry wasn't available. I sat straight up in the bed on that morning and screamed when I saw his picture and heard his name about 5 am on FOX 5 news!!. As I think back about me allowing some man to touch me... I feel like this a case of rape! I am extremely disgusted, humiliated and disappointed amongst other things. I initially allowed my daughter, now 23, to go to this practice. I am so glad that she never experienced Akoda but even she is upset and traumatized and scared. its bad enough for me at 49! It has definitely made me rethink my position with drs. He should be in jail for life. He raped hundreds of women!"*

A common belief expressed by the claimants is that 'Dr. Akoda's' clinical practice was the cause of perinatal trauma and stress, and ultimately, problems for the newborn infant later in life.

*"...This ordeal has impacted my life greatly. After waiting hours to push, we were told that our baby was in distress with the umbilical chord wrapped around her neck. Instead of expediting the delivery, we waited all day into the evening. Finally, I was rushed in for an emergency C-section. In the process of the C-section, Dr. Akoda was arguing with the medical staff. He even dropped a tool on the floor so they had to count every tool to ensure that one wasn't left inside of me. Our daughter was silent, limp and blue when she was delivered. This was very scary because she didn't make a sound or move. She was sent to the NICU immediately, where she resided for a week. The whole enjoyable experience of her being placed in our arms, rooming and being discharged with me was stripped from us. We were looking forward to a safe delivery. Upon my initial engagement with Dr. Akoda, I felt uneasy. This was my second live birth and I knew something wasn't right with him or the experience. He was abrasive, rude and unprofessional. I experienced a miscarriage less than a year after delivering my daughter that Akoda delivered. I never had a miscarriage before this ordeal. We have been trying to conceive and haven't been able to ever since. I truly believe it has something to do with the treatment from Akoda. My lower abdomen is still numb. I should have never been under the care of Akoda. A man that practiced under false pretenses. We can't reverse time, but justice can be served for the negative impact that this ordeal has caused me and my family."*

*"Not once were any of those [previous] doctors rough with the way they inserted the speculums. Nor how they put their fingers in your vagina, and never has a doctor ever pressed downward in my vagina, there is nothing truly there. It was like he was scratching my insides. So I am not sure if he used a glove or not. There was no conversation, so I can't tell you what was on this mans mind. I bleed for an hour that day, and was wondering why he had to be so rough. Why he would never talk the whole time. It was like an awkward silence. Regardless, of what kind of doctor he was somewhere else, medicine is practiced differently all over the world. Everyone has to go through a process for a reason and this man thought his way was the best way and skipped the formalities of American ways. He violated and performed aggressive exams that only reminded me of times I was sexually asasulted. That's how rough and cold the exam was."*

b.     Loss of Trust in Obstetrician-Gynecologists

Obstetrics-gynecology specialists were identified as particularly untrustworthy, with a reduction in visits for care reported by 53% of respondents.  The lingering mistrust of practitioners appeared to pose a continuing barrier to appropriate health care, particularly with avoidance of gynecological care; some reported a particular concern about daughters' consultation with this subspecialist.

*"I am contemplating having another child with my husband, but my experience with Dr. Akoda has made me an emotional wreck every time I think about it. It is now affecting my marriage because my husband wants more children but I am terrified. I am terrified because I had a C-section, something that now in hindsight, I believe I did not need. Dr. Akoda talked about a c-section very early in my pregnancy without a medical need. There was no medical reason earlier on that suggested I may need it, yet he continuously talked about it and suggested it.In the end he came into the hospital the day after my induction instead of Dr. Chaudry who was scheduled to deliver my baby. He told my husband and I a story of Dr. Chaudry forcing a vaginal delivery the day before causing a birth defect and that why he was not present. He suggested we have a C-section to prevent the same because if he forces a vaginal delivery for a baby as big as ours he will bare no responsibility. In the end our daughter was delivered via c-section by him because of the fear he instilled in us regarding natural birth. He told us she was too big to be delivered vaginally and turned out to weigh 7lbs 12 ounces and not the 9lbs he mentioned. "*

*"Because of Akoda every time I go to a physician I want to know what school and see their certification for them to be doctors I don't trust any doctor anymore I never felt so violated in my life I trusted somebody they saw my intimate areas and wasn't even a doctor never been so betrayed in my life because of this doctor I don't go to OBGYN I avoid any type of check up if is not necessary because of my trust issue."*

*"I had prior shared with Dr. Akoda that my husband had a vasectomy but because of our desire of wanting more, we would begin the process of having a reversal. He at that time offed to give me some medication to help my husband's sperm count rise that would help. I then thought something was off but never 2nd guessed it. But my 2nd experience with him, he was telling me I was pregnant. As soon as I showed my excitement he stated that I was having a miscarriage. But*

*when he walked out only to return with this lack of compassion of me taking what just happen to me just to pass me a prescription following the words of " take this to complete the flushing process". I was so offended I stormed out crying. I called my husband not knowing how to explain what just happened. Mind you, My husband thinking we can't have any kids almost had him questioning my faithfulness to our marriage. Well, I had no choice but to explain what was just told to me. I just remember crying for a while. As a mother of two already I couldn't even be a mother to them. I was not myself because I was having this fight in my mind of was I or was I not. I ended up at the hospital the next day looking crazy to the doctors and nurses. I was told there were no signs of me ever being pregnant. My whole experience has been one that I can't forget about. I still don't know if I was or not but If I was did he do something to hurt our chances?!"*


Betrayal Trauma

*"Question I have is why??? If you can legitimately be a doctor, why you didn't do it the right way, why do it by fraudulent means??? That alone shows, he shouldn't have been able to use fraudulent documents, if the ones that license had truly vetted his credentials for something so important."*

Betrayal is the violation of implicit or explicit trust.  The closer and/ or more necessary the relationship, the greater the degree of betrayal.  Much of what is traumatic to human beings involves some degree of betrayal.  The phrase 'betrayal trauma' can be used to refer to a kind of trauma independent of the reaction to the trauma.  It occurs when the people or institutions on which a person depends for survival significantly violate that person's trust or well being. Physical, sexual, and emotional abuse perpetrated by an individual who is in a caregiving position are examples of betrayal trauma.

Betrayal trauma theory is a theory that predicts that the degree to which a negative event represents a betrayal by a trusted and needed other will influence the way in which that event is processed (Freyd, 1996).  It posits that there is a social utility in remaining unaware of abuse when the perpetrator is a caregiver; that under certain conditions, betrayal necessitates a 'blindness' in which the person does not have a conscious awareness of the betrayal, and that the response to the trauma of the betrayal significantly influences the encoding of the experience and the accessibility of the experience to awareness, as well as the psychological response.  Some people come to allow themselves to fully realize that they have been betrayed a long time after the event, and this recovery from the betrayal only begins when the individual forms a new understanding of a remembered event.

Self-interest would seem to demand that individuals would be highly sensitive to betrayal.  As a general rule, to the extent that you are able to choose with whom to engage, you would want to avoid those who had previously betrayed you.  However, in certain kinds of abusive betrayals, removal is not perceived to be a viable option, the person doing the betraying is someone who is believed to be vital and the individual feels that he or she cannot afford *not* to trust.  The ability to detect and acknowledge betrayal may need to be stifled for the greater goal, and it is perceived that it may be more advantageous to be blind to the betrayal.

Being sensitive to betrayal brings pain, and the pain can be great.  When the betrayer is someone on whom we are dependent, one either must block the awareness or experience the distress.  Perpetrators can take advantage and even enhance the likelihood of the natural inclination of victims to block awareness and to forget.  Forced silence, prohibition of contact and communication with others, is a common component of abusive behaviors.

The effects of betrayal are widespread and lasting, varying depending on the nature of the betrayal (Rachman, 2010).  A harmful disclosure of information, for example, can cause distress, punitive thoughts, and anger.  Infidelity may cause shock, loss, distress, ruminative pre-occupation, self-doubting, lowered self-esteem, and anger.  A failure to provide expected assistance causes distress, disbelief, ruminations, and anger.  Dishonesty causes anger, distress, and punitive thoughts.  In some extreme cases, betrayal can cause PTSD-like symptoms such as emotional numbing, distress, avoidance of reminders, intrusive images, rumination, foreshortened future, a morbid pre-occupation with the breach of trust, self-doubt, and anger.  Betrayal can also leave the violated person feeling polluted and can be triggered by images or memories of the violation or the violator.   This feeling of contamination occurs because victims feel degraded and humiliated, and the feelings of degradation leave them feeling sullied and polluted.

## Summary of Findings and Opinion

For all of the reasons outlined above, it is this examiner's professional opinion, within a reasonable degree of certainty, based on the aggregate data gathered with over three hundred class members, that the fraudulent behavior of Oluwafemi Charles Igberase constituted the intent to harm unknowing women who entrusted him with the most intimate parts of their body selves and the most important moments of their lives.  His objectification of their bodies for his own stimulation and/or sadistic control is an additional aspect of wrongdoing that resulted in the infliction of emotional distress.  The misconduct of Oluwafemi Charles Igberase (fraudulently known as Dr. Akoda) has resulted in varying degrees of confusion, anxiety, depression, avoidance and fear of medical caregivers, and the loss of trust in medical providers and health care institutions; for some, even more broadly applied.

Some of Igberase's patients were particularly vulnerable due to the prevalence of prior trauma and peri-traumatic psychological processes due to the imbalance of power and betrayal trauma.  A history of childhood abuse, female gender, low socioeconomic status and social disadvantage, psychiatric history, and various types of previous adversity are all factors that may have enhanced the risk of symptoms for individual class members. Using the dataset to address these risk factors for severity of damages was beyond the scope of this endeavor,

The consistency and intensity of the narrative content across three hundred women both affirms the veracity of the histories and reported symptoms experienced as a result of learning of their doctor's fraudulent activities.  The presence of a substantial percentage of neutral responses further enhances the credibility of the findings and renders less likely the prospect that the

litigation itself has led to exaggerative patient reports.  Some of the narratives suggest frank medical malpractice, though this, too, was beyond the scope of this consultation and report. At a minimum, the fraudulent misconduct and exploitation of patients committed by Igberase has been a significant contributing factor to the well- being and current clinical status of many of the women he exploited.

I am a Pediatrician and Child and Adolescent Psychiatrist with a Clinical Professor faculty appointment in the Department of Psychiatry at The Perelman School of Medicine at the University of Pennsylvania.  For 19 years, I worked at The School of Medicine and the Children's Hospital of Philadelphia (CHOP) where I served in both the Department of Child and Adolescent Psychiatry and the Division of Child Development and Rehabilitation in the Department of Pediatrics.  Since September of 2006, I have been in the private practice of adult and child psychiatry and consult to community based mental health agencies.

While my curriculum vitae largely reflects my academic research pursuits, my clinical work bears relevance to this matter:
-  In mass tort claims involving the transgressions of physicians, I have served as forensic psychiatry consultant and expert for the plaintiff, the defense, the claims administrator, and the judge assigned to disburse funds.
-  In my clinical practice have treated hundreds of adults and children who have experienced trauma, abuse, and neglect; including sexual abuse.
-  I have been granted support from the Pew Charitable Trusts in the past to conduct best interest evaluations in the City of Philadelphia, and continue to be funded by the Van Pelt Foundation to conduct trainings for family court judges, as well as child protection agencies on the issues of trauma, abuse, and neglect, and the resulting sequela and treatment of trauma.
-  I have presented nationally on the complexity of these evaluations and best practices.
-  I have lectured about and recently authored a chapter on abuse and neglect in a 2012 textbook of Forensic Psychiatry.
-  I currently direct the Child Forensic Psychiatry track in the Forensic Psychiatry fellowship at the Perelman School of Medicine at the University of Pennsylvania.

I have completed additional training in adolescent medicine, forensic psychiatry, pediatric forensic psychiatry, and am board certified in four areas: Pediatrics, Adult Psychiatry, Child and Adolescent Psychiatry and (specialization in Forensic Psychiatry.  I am a former Robert Wood Johnson Clinical Scholar and Picker/Commonwealth Scholar, having focused on issues related to vulnerability, resilience and childhood disabilities.

Consistent with Federal Rule 26, I have included a complete statement of my opinions and the basis and reasons for them; the data considered in forming them; the records reviewed that support my opinion.  I have appended the questionnaire used to collect the data that informed this consultation as well as the statements over 100 class members offered when completing the questionnaires; the complete dataset is available upon request.

I have attached my curriculum vitae as well as a list of cases in which I have testified as an expert at trial or by deposition.  I have billed for 27 hours as compensation for this forensic psychiatric consultation and my hourly rate is $600/hour.  I was assisted in this assessment by

two colleagues, Lisa Bain and Stephen Ehrlich.  Lisa Bain is a science writer and her hourly rate is $125/hour; she worked 25 hours on the development of this assessment tool and data analysis. Stephen Ehrlich is an information technology consultant whose charge was $2300 for his role in the development and digitalization of the on-line self-administered questionnaire, link and report portal setup, secure hosting of the data management form for archiving, organizing and quantitatively analyzing the dataset, and assistance with data analysis.

The above opinions have been rendered within a reasonable degree of medical certainty, based on the review of materials provided to me.  If provided with additional information, this report would be revised to incorporate new data.

Thank you for the opportunity to review this matter and render an opinion.  Should questions arise regarding this correspondence, or if I can be of further assistance, please do not hesitate to contact me.

Sincerely,

`Annie Steinberg, M.D.` (signed electronically)
_____
Annie Steinberg, M.D.
Clinical Professor, Department of Psychiatry
Perelman School of Medicine at the University of Pennsylvania

**Attachments**
Attachment 1- Questionnaire
Attachment 2- Summary Statements

**References**

American College of Obstetrics and Gynecology (2011).   Washington, D.C.

American Medical Association (2001). Council on Ethics and Judicial Affairs: Code of Medical
        Ethics: Current Opinions with Annotations. Chicago, IL.

Bloom, J.D., Nadelson, C. Notman, M.T. (1999) Physician Sexual Misconduct. American
        Psychiatric Press, Washington, D.C.

Burgess, A.W. (1981). Physician Sexual Misconduct and Patients' Responses. *American Journal
        of Psychiatry* 138: 10, 1335- 1342.

Dehlendorf, C.E. & Wolfe, S.M.(1996). Physicians Disciplined for Sex-Related Offenses.
        *Journal of the American Medical Association* 279: 23, 1883-1888.

Feldman-Summers S. & Jones, G. (1984). Psychological impact of sexual contact between
        therapists or other health care practitioners and their clients. Journal of Consulting and
        Clinical Psychology 52: 1054-1061.

Freyd, J. (1996). Betrayal Trauma.  Harvard University Press, Cambridge, MA.

Koehler, J.J., & Gershoff, A.D. (2003). Betrayal aversion: When agents of protection become
        agents of harm. *Organizational Behavior and Human Decision Process*, *90*, 244-261.
        doi:10.1016/S0749-5978(02)00518-6

Rachman, S. (2010). Betrayal: A psychology analysis.*Behavior and Research Therapy*, *48*, 304
        311. doi: doi:10.1016/j.brat.2009.12.002

Redleaf, A. (2008).  Boundaries in Healthcare. International Health Publishing, U.S.A.

Rousseau, D. M., Sitkin, S. B., Burt, R. S., & Camerer, C. (1998). Not so different after all: A
        cross-discipline view of trust. *Academy of Management Review*, *23*(3), 393-404.
        Retrieved from http://portal.psychology.uoguelph.ca/faculty/gill/7140/
        WEEK_3_Jan.25/ Rousseau,Sitkin, Burt, & Camerer_AMR1998.pdf