# Exhibit 2

Annie G. Steinberg, M.D.

```
 1        IN THE UNITED STATES DISTRICT COURT
 2    FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3                    -  -  -
      MONIQUE RUSSELL,      :
 4    JASMINE RIGGINS,      :
      ELSA M. POWELL, and :
 5    DESIRE EVANS,         :
              Plaintiffs,  : Civil Action No.
 6                         : 18-5629
              v.           :
 7                         : Honorable
      EDUCATIONAL          : Joshua D. Wolson
 8    COMMISSION FOR        :
      FOREIGN MEDICAL       :
 9    GRADUATES,            :
              Defendant.    :
10

                      -  -  -
11
                October 10, 2019
12
                      -  -  -
13
14            Videotaped deposition of
15    ANNIE G. STEINBERG, M.D., taken pursuant
16    to notice, was held at The Bridge, 31
17    North Narberth Avenue, Narberth,
18    Pennsylvania 19072, beginning at 9:42
19    a.m., on the above date, before Kristy L.
20    Liedtka, a Professional Court Reporter
21    and Notary Public in and for the
22    Commonwealth of Pennsylvania.
23          GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
24            deps@golkow.com
```

Annie G. Steinberg, M.D.

1    pull them and take a look at them --

2        A.    Sure.

3        Q.    -- would I be able to see

4    that you did a questionnaire or a survey

5    like you did in this case?

6        A.    Sure.  Let me see.  So

7    qualitative health research was --

8        Q.    Which one?  Let's make sure

9    I can find the one you're talking about.

10        A.    The fifth down was one of my

11    earlier pieces.

12        Q.    From 1997?

13        A.    Yeah, that was an early

14    qualitative.

15        Q.    So was that a population

16    identified like this that was

17    predetermined and then you drafted a

18    survey to survey them?

19        A.    Uh-huh.

20        Q.    That's a yes?

21        A.    That was not a survey.  That

22    was an interview study.

23        Q.    So that was in-person

24    interviews?

Annie G. Steinberg, M.D.

1          A.     Yes.

2          Q.     So I'm talking about --

3          A.     I might have had --

4          Q.     -- surveys?

5          A.     -- a questionnaire.  I don't

6     remember.  The next one --

7          Q.     And, Dr. Steinberg, I

8     appreciate your help today, but can you

9     let me finish my questions --

10         A.     Sure.

11         Q.     -- and I'll let you finish

12    your answers?

13         A.     Uh-huh.

14         Q.     Great.  So that one was

15    interview studies in-person.  So I'm not

16    talking about the in-person interviews --

17         A.     Uh-huh.

18         Q.     -- because I'm sure in your

19    line of work you've interviewed a lot of

20    people in person.  I'm talking

21    specifically about the surveys or the

22    questionnaires.

23         A.     The DIS study was

24    essentially a survey, not in-person,

Annie G. Steinberg, M.D.

1    because we used interactive video.

2          Q.    And which one is that?

3          A.    That's the American Journal

4    of Psychiatry, I believe.  I can't

5    remember these very well.  It was 1998.

6    But --

7          Q.    Okay.  So you think that one

8    was a survey like you -- or a

9    questionnaire like you sent out in this

10   case to a defined population of patients?

11              MR. CERYES:  Objection to

12         form and foundation.

13              You can answer.

14              THE WITNESS:  I think it was

15         a video survey, if I recall.

16   BY MS. McENROE:

17         Q.    So those would be video

18   interviews you're saying?

19         A.    I -- I don't remember,

20   honestly.

21         Q.    Okay.

22         A.    So I better not say.

23              The next one down is also an

24   interview survey.

Annie G. Steinberg, M.D.

1          Q.    Right.  So I'm sure you did

2     a lot of interview surveys, but taking a

3     look through these, if there are any that

4     were not interview surveys, that were

5     more traditional surveys in the way that

6     you provided today for this case?

7          A.    Well, let's see.  I

8     believe -- I honestly don't remember.

9     Isn't that terrible?  Let's see.  All

10    of -- all of these things involved

11    interviews and questionnaire development,

12    whether the questionnaire was

13    administered in an interview format or

14    not.  It's just pretty much everything,

15    deaf woman, ah, here's one that was a

16    survey.  This one made JAMA.  That's my

17    best journal.  That is page 15, second

18    down.

19          Q.    Yep.  2003?

20          A.    That was a survey

21    administered to medical faculty that

22    related to their experiences in the

23    academic environment, and JAMA thought it

24    was good enough, I guess, so that's good.

Annie G. Steinberg, M.D.

1      Q.    Yep.  And were there

2  interviews in conjunction with those

3  surveys?

4      A.    No, I don't believe there

5  were.  Uh-uh.

6      Q.    Okay.  Any others?

7      A.    I believe some of the

8  parental decision-making that followed it

9  on the next page.

10     Q.    The next page, so page 16?

11     A.    No, following immediately

12 that JAMA article.  The Archives of

13 Pediatric and Adolescent Medicine --

14     Q.    Yeah.

15     A.    -- I believe that was a

16 survey.

17     Q.    With interviews?

18     A.    But I -- it may have had

19 interviews.  I'm -- I'm really not

20 remembering.

21     Q.    Okay.  Any others?

22     A.    Honestly, I cannot recall.

23 There are many studies that look the same

24 to me now.  Some on genetic testing,

Annie G. Steinberg, M.D.

1    claims had to be excluded.  And so we

2    trained, oh, maybe 30 interviewers,

3    something like that, and then I sort of

4    managed oversight of those interviewers.

5    Did -- listened in on their tapes, gave

6    them feedback for future interviews and

7    basically did sort of quality control on

8    the interview process, what they were --

9    how they were facilitating the interview,

10   tried to keep it to the integrity of the

11   actual questionnaire or interview, if you

12   will.  So basically administered --

13   administered questionnaire.

14        Q.    So the questionnaire that we

15   were just discussing in the second case

16   wasn't sort of like it was disseminated

17   here by email, it was administered

18   through an interview process?

19        A.    Yes.  Uh-huh.

20        Q.    Okay.  And you mentioned

21   that in this case with the OB/GYN, that

22   it went from approximately 13,000

23   patients to about 9,000 patients because

24   there were some fraudulent claims; is

Annie G. Steinberg, M.D.

1    that correct?

2        A.    Or people didn't follow

3    through with it.  One or the other.

4        Q.    What do you mean by

5    "fraudulent claims"?

6        A.    Oh, well, when you have

7    these sorts of class actions, mass torts,

8    mass tort claims, a number of people find

9    their way to this information, might live

10   in Alabama, Texas and claim that they

11   were patients of this physician.

12       Q.    And what was the third of

13   the case settlements you were mentioning

14   before?

15       A.    The third one involved a

16   rabbi and the rabbi was in charge of --

17   it's called a mikvah.  It's sort of a

18   ceremonial religious immersion.  That

19   women go into this cleansing ritual once

20   a month after their period is finished or

21   before they get married or at other vital

22   times where they want to be purified.

23   And the rabbi had set up video equipment.

24   So that was a -- like the second case I

Annie G. Steinberg, M.D.

1    mentioned where the women were unaware

2    that they were videotaped until later; in

3    this case the women were also unaware at

4    the time and the damages occurred when

5    they found out.

6         Q.    And was that a

7    self-administered questionnaire?  Was

8    that an interview?

9         A.    That was a self-administered

10   questionnaire, yes.

11        Q.    Were there interviews in

12   conjunction with those questionnaires?

13        A.    There were not.  Uh-uh.

14        Q.    And approximately how large

15   was that patient pop -- I'm sorry,

16   that --

17        A.    It was hundreds.

18        Q.    -- victim population?

19        A.    Hundreds.  Not thousands.  I

20   forget the exact number.

21        Q.    Did you design that

22   questionnaire?

23        A.    I did.

24        Q.    And did you administer that

Annie G. Steinberg, M.D.

1    questionnaire?

2         A.    That was a comp --

3         Q.    Did you -- were you involved

4    in sending it out?

5         A.    It was a computer.

6         Q.    Okay.  Were you seeking

7    information on emotional damages through

8    that questionnaire?

9         A.    I was.  Uh-huh.

10         Q.    When was that?

11         A.    That was over the past year,

12    maybe 15, 18 months at the most.  It was

13    about a year process.  Finished up a few

14    little straggler cases in the last couple

15    of months.

16         Q.    So for any of these cases

17    you mentioned or any of the other cases

18    you recall working on, had you ever

19    worked with plaintiffs' counsel involved

20    in this case before?

21         A.    They were involved in -- and

22    I -- they were involved in the second

23    case.  They retained me in the second

24    case.  That's the only case in which they

Annie G. Steinberg, M.D.

1              can get a tremendous amount of

2              information from each one.

3    BY MS. McENROE:

4              Q.    What are the differences?

5                   MR. CERYES:  Same objection.

6                   THE WITNESS:  It probably

7         varies person to person more than

8         anything.  With studies in which

9         aren't really clinical work, in

10        which I do both, the surveys are

11        nicer because you can make sure

12        you don't miss any areas.  If

13        you're just doing an interview,

14        you can't remember everything to

15        ask, but if you use inventories,

16        anxiety, depression,

17        post-traumatic stress, you can

18        cover a lot of ground in a short

19        amount of time and uncover areas

20        that you might not otherwise have

21        remembered to ask about or that

22        somebody face-to-face will not

23        say.

24   BY MS. McENROE:

Annie G. Steinberg, M.D.

1      Q.    You mean using a diagnostic
2   tool?
3      A.    Using an -- using a
4   questionnaire or a survey --
5      Q.    Okay.
6      A.    -- as you call it.
7      Q.    Okay.  But is -- but I'm
8   trying to figure out if there's a
9   distinction in your mind between the more
10  canned, if you will, or standardized
11  diagnostic tools or questionnaires as
12  opposed to a survey --
13     A.    Surveys.
14     Q.    -- like the one designed in
15  this case?
16     A.    You know --
17            MR. CERYES:  Objection.
18      Form and foundation.
19            THE WITNESS:  You know, I --
20      I no longer am certain.  I would
21      have always wanted to do an
22      interview in -- in the past, but
23      in the recent case I did involving
24      the rabbi, for example, the

Annie G. Steinberg, M.D.

1       lawyers were quite vehemently

2       opposed to an interview and only

3       wanted me to do -- develop a

4       questionnaire and administer it

5       through the computer.

6           I thought it would be a

7       shortcoming, but in fact, there

8       was a tremendous amount of

9       information that women poured into

10      their responses.  So I really have

11      come to understand that when

12      people are motivated to express

13      themselves, they will use whatever

14      modality is available to them to

15      communicate their experiences.

16  BY MS. McENROE:

17      Q.    In that rabbi case, did you

18  view yourself as diagnosing anyone

19  through those questionnaires?

20      A.    We did ask about symptoms of

21  depression, anxiety and post-traumatic

22  stress, but of course I would never

23  diagnose somebody on the basis of a

24  response to a questionnaire.

Annie G. Steinberg, M.D.

1       Q.    Is that true in this case as

2   well, that you would not consider

3   yourself as diagnosing any of these

4   individuals?

5       A.    It was never my intention to

6   present psychiatric diagnoses of any

7   individual woman in this matter.

8       Q.    Okay.  Individually or as a

9   group?  You haven't diagnosed them as a

10  whole?

11      A.    Correct.

12      Q.    Okay.

13      A.    I would not --

14      Q.    And you're --

15      A.    I would not --

16      Q.    You're laughing a little,

17  but can you explain what you mean by

18  that?  Would you be able to diagnose a

19  group as a whole?

20      A.    No, a psychiatric diagnosis

21  is administered individually, but I would

22  not fathom a group diagnosis, no.

23      Q.    Okay.

24      A.    Group psychiatric diagnosis.

Annie G. Steinberg, M.D.

1          Q.    We discussed a little bit

2   earlier some of your experience of

3   designing and administering surveys and

4   some of your prior professional

5   experiences.  Can you articulate for us

6   the principles that govern the sound

7   survey design?

8               MR. CERYES:  Objection to

9          the breadth of the question.

10              You can answer.

11              THE WITNESS:  I don't know

12         that that -- you know, that I can

13         profess to give you a lecture on

14         sound survey design.  I just can

15         tell you that I studied it like --

16         like if you asked me, you know,

17         the basis for a psychiatric

18         interview, I suppose because I'm a

19         forensic psychiatrist I would have

20         to be able to provide that for

21         you, but I don't have any degrees

22         in survey design and I don't know

23         that I would want to make a feeble

24         effort at articulating that for

Annie G. Steinberg, M.D.

1      you.  I -- I only know that I've

2      studied it and that I've learned

3      from smart people and someplace

4      it's in the soup.  You know, it's

5      mixed in the -- it's in the blend

6      of what I have come to understand

7      and to have learned from very good

8      teachers.

9  BY MS. McENROE:

10      Q.    So what is it that you

11  learned from the smart people about

12  governing surveys?

13      A.    That question --

14          MR. CERYES:  Same objection.

15          You can answer.

16          THE WITNESS:  That questions

17      need to be written as open-ended

18      as possible and not directing

19      people, but that choices do need

20      to be given for those people who

21      may not be able to retrieve words

22      or descriptors.

23  BY MS. McENROE:

24      Q.    Anything else?

Annie G. Steinberg, M.D.

1          MR. CERYES:  Same objection.

2          THE WITNESS:  That you open

3     gently and you proceed with

4     respect and caution and

5     thoughtfulness.

6  BY MS. McENROE:

7          Q.    Anything else?

8          A.    And in this case --

9          MR. CERYES:  Same objection.

10          THE WITNESS:  Sorry.

11          And in this case, that I

12     don't extend beyond my domain.

13  BY MS. McENROE:

14          Q.    What do you mean by that?

15          A.    If my domain is psychiatry,

16  then the questions I ask should not be

17  about obstetrics or gynecology beyond --

18  beyond common sense.

19          Q.    You don't think that your

20  questions in the questionnaire in this

21  case had anything to do with obstetrics

22  or gynecology?

23          A.    I said beyond the common

24  understanding of general practice and

Annie G. Steinberg, M.D.

```
1   demeanor --

2          Q.    Okay.

3          A.    -- of a physician.

4          Q.    Anything else?

5          A.    No, I think that's probably

6   all I would say for now.

7          Q.    Did you sort -- I'm sorry,

8   strike that.

9                Did you cite any sources in

10  ensuring that you were preparing a sound

11  survey in this case?

12         A.    I'm sorry, I don't

13  understand your question.  Did I cite?

14         Q.    Did you consult with

15  literature on surveys or those types of

16  issues and how to design a survey in

17  preparing the one that you did for this

18  case?

19         A.    No, I don't think I did.

20  Uh-uh.

21         Q.    You worked with others in

22  doing the project for this case --

23         A.    Uh-huh.

24         Q.    -- is that correct?
```

Annie G. Steinberg, M.D.

1        A.    Correct.  Uh-huh.

2        Q.    So I have Lisa Bain and

3    Stephen Ehrlich; is that correct?

4        A.    Yes.

5        Q.    Anybody else?

6        A.    That's it.

7        Q.    Okay.  So Lisa Bain --

8        A.    Uh-huh.

9        Q.    -- in your report you wrote

10   that she's a science writer and her

11   hourly rate is $125 per hour.  She worked

12   25 hours on the development of this

13   assessment tool and her data analysis.

14             Does that sound right?

15       A.    Yes.  Uh-huh.

16       Q.    What do you mean by her

17   development -- or I should -- strike

18   that.

19             What do you mean by "the

20   development of this assessment tool"?

21       A.    I considered Lisa Bain to be

22   a fantastic extender for me.  She worked

23   with me over many years as the program

24   manager for those other grants involving

Annie G. Steinberg, M.D.

1    questionnaires and interviews.  So we

2    work fairly seamlessly together and she's

3    an excellent writer, so she can edit me,

4    I can edit her and we can go back and

5    forth and discuss ways to phrase

6    questions about dates of birth versus age

7    versus -- you know, and what -- how we

8    can capture the information in the best

9    way.

10           Q.    What is her educational

11   background?

12           A.    She has I believe a master's

13   degree in science writing.

14           Q.    Do you know if she has any

15   degrees in marketing or surveys?

16           A.    No, I don't believe she

17   does.

18           Q.    Was she involved in any of

19   those other cases you mentioned, the

20   pediatrician, the OB/GYN with the

21   videotape and -- or the rabbi with the

22   videotape?

23           A.    She was definitely involved

24   in the OB/GYN.  And let me just think.

Annie G. Steinberg, M.D.

1    She was definitely involved in the rabbi

2    case too.  I don't think she was involved

3    in the pediatrician case.

4         Q.    And when you say she was

5    involved, in a similar way to her

6    involvement in this case?

7         A.    Yes.  She did more -- she

8    spent a tremendous amount of time

9    listening to the interviews that the

10   trainees, most of them were like

11   psychologists or psych -- psychology

12   interns, people who have already finished

13   some of their psychology training, that

14   they -- that they were doing -- not live,

15   she would listen to them after and then

16   give them feedback or give me feedback

17   and we'd give feedback together to the

18   interviewer about how the -- those

19   interviews were going.

20        Q.    Did she help to design any

21   questions or questionnaires involved in

22   the OB/GYN or the rabbi case?

23        A.    No, I believe for -- I

24   worked with -- in those I worked with

Annie G. Steinberg, M.D.

1    Girija Kaimal, who is -- she might be an

2    anthropologist.  I forget what her --

3    she's a professor at Drexel and -- so she

4    helped with the methodology.  And I also

5    worked with Elizabeth Hembree, who's a

6    researcher at Penn on those

7    questionnaires.

8          Q.    Why didn't you work with

9    them in this case?

10         A.    Because I used the same

11   methodology and versions of the same

12   questionnaire and I felt very comfortable

13   with what we had developed before and

14   this was an adaptation of that.

15         Q.    Did they review the

16   questionnaire in this case?

17         A.    No.  Uh-uh.

18         Q.    Did you discuss this case

19   with either of them?

20         A.    No.

21         Q.    For Lisa Bain, when you say

22   that she did data analysis, what do you

23   mean about that?

24         A.    I mean she and I both

Annie G. Steinberg, M.D.

1    reviewed all the computerized data that

2    you have on the 300 and some -- 305

3    women, and that was a lot of work, as you

4    may know.  So we both did it and then we

5    talked about it a number of times and

6    discussed what trends we were seeing and

7    what could be said.  Really just a -- I

8    always need somebody to -- to work with

9    to bounce off the ideas, make sure that I

10   am perceiving things correctly.  And then

11   we discussed how we would write up the

12   synthesis or summary of what was

13   discussed and we shared back and forth in

14   that process.

15        Q.    When you say that you were

16   reviewing the computerized data, in what

17   format were you doing that?

18        A.    On the laptop.

19        Q.    And was that provided to you

20   in Excel form or how did you get it?

21        A.    Same as you.  It was in

22   individual -- you know, you would have to

23   open individual files to review.  And

24   ultimately we did create spreadsheets and

1    so on and so forth and then fancy pie

2    charts and so on were derived from the

3    data.

4           Q.    Did you create spreadsheets

5    on each of the questions?

6           A.    No, I don't think we did.  I

7    think we had -- we had spreadsheets on

8    the summary statements.  We developed in

9    the end some spreadsheets on those and

10   then I think we asked Stephen particular

11   questions and to -- we had different

12   versions and formats of looking at that

13   to -- in a way that would be visually

14   understandable to other people and

15   decided on sort of pie chart

16   configurations this time.

17          Q.    And do you have --

18                MR. CERYES:  Just jump in

19          here for a second.  I think we're

20          getting close to what would

21          constitute attorney work product

22          in terms of communications that

23          Dr. Steinberg had with other

24          consultants of ours in this case.

Annie G. Steinberg, M.D.

1          And so -- and I agree you're

2          entitled to any facts and data

3          that Dr. Steinberg considered,

4          but, you know, I would object and

5          instruct Dr. Steinberg not to go

6          beyond that in terms of

7          discussions and communications

8          that she has had with Stephen

9          Ehrlich and Lisa Bain.  And move

10          to strike to the extent that we've

11          gotten into that already, but with

12          that objection we can proceed.

13               MS. McENROE:  So I disagree.

14   BY MS. McENROE:

15          Q.   I mean, Lisa is not an

16   attorney, I presume?

17          A.   Uh-uh.

18          Q.   She's not a --

19          A.   No.

20          Q.   Okay.  And Stephen Ehrlich

21   is not an attorney?

22          A.   No.

23          Q.   And they were both hired to

24   help assist you in your work in this

Annie G. Steinberg, M.D.

1    case?

2         A.    Well, I identified them, but

3    I believe they were hired by the

4    attorney.

5         Q.    Right.  But they did assist

6    you with your work in this case?

7         A.    They did.  Uh-huh.

8         Q.    Okay.

9              MS. McENROE:  And I'm glad

10             that you, counsel, agree that

11             we're entitled to the data.  So I

12             would ask that we work out that we

13             can get all of that data after

14             this -- after the deposition is

15             done.  We've only gotten the raw

16             versions of the survey responses

17             and the empty survey Word

18             document, but other than that, to

19             the extent that there's other data

20             that exists, we would request that

21             we get that.

22             MR. CERYES:  Right.  And you

23             have all of the data that was

24             compiled on these individuals.  To

Annie G. Steinberg, M.D.

1          the extent that there were other

2          drafts in terms of their

3          presentation of collections of

4          those data or statistics regarding

5          those data, our position would be

6          that that would constitute

7          attorney work product and draft

8          versions of the reports, which

9          would similarly not be

10         discoverable.

11              MS. McENROE:  Well, let's

12         talk about it after --

13              MR. CERYES:  Sure.

14              MS. McENROE:  -- the

15         deposition or we can I'm sure

16         write each other letters about it,

17         but we disagree.

18    BY MS. McENROE:

19         Q.    So Stephen Ehrlich, have you

20    worked with him before?

21         A.    Uh-huh.  Yes.

22         Q.    Okay.  And in your report

23    you wrote that he's an information

24    technology consultant, correct?

Annie G. Steinberg, M.D.

1        A.    Yes.   Uh-huh.

2        Q.    So just in plain words

3   basically what did he do to help in this

4   case?

5        A.    So Stephen set up a website,

6   a confidential website that would be

7   secure and created the technology for

8   allowing women to enter that secure site

9   with an ID and -- so that we would not

10  have their names, that they would be

11  anonymized for us.  That they would be an

12  ID number as opposed to a name.  And he

13  also created the technology so that the

14  written questionnaire that we had could

15  be put into a computer form and to design

16  it so that it would be visually

17  accessible to women, that they would not

18  be intimidated by it, that it would flow

19  and they continue -- complete the

20  questionnaire, which is not a small feat.

21  And then Stephen also created a mode for

22  us to gain access with our own specific

23  passwords so that we could follow daily,

24  hourly sometimes, how many women had

Annie G. Steinberg, M.D.

1   completed, what they had written, and

2   then later he helped us to compile the

3   data in a way that was easier for us to

4   see the different responses.  Their ages,

5   their -- how long they had known Dr.

6   Akoda, under what circumstance they had

7   come to him and so on.

8          Q.    Have you seen what the

9   survey looked like when it was on the

10  website?

11         A.    Yes.

12         Q.    Okay.  So you've seen what

13  the user experience was like?

14         A.    Yes, uh-huh.

15         Q.    Did you have any say or

16  input into figuring out or deciding how

17  that would appear?

18         A.    Totally.

19         Q.    Okay.  And so describe to me

20  when someone would log in using their

21  user ID what they would see next.

22         A.    Let me see if I have it.

23  They would see an introduction and then

24  they would see the first question and --

Annie G. Steinberg, M.D.

1   and so on.  I don't remember how many

2   questions per screen they had.

3           Q.    Well, that's what I was

4   going to ask.  Was it a choose your own

5   adventure?  Right?  If you said yes to

6   one and then it said to skip to the next

7   question, would it automatically do that

8   for you?

9           A.    There were a couple of --

10  two or maybe three questions at the most

11  where we decided if they said no to

12  something, that it would automatically

13  move them to the next, but typically

14  we -- most of the questionnaire was

15  complete everything.

16          Q.    But were they automatically

17  moved to the next if that was what their

18  response had prescribed for in those

19  circumstances or was it a circumstance

20  that they could have responded even for

21  the other questions that they were sort

22  of then not eligible for or that didn't

23  make sense for them to answer?

24          A.    I'm trying to remember the

Annie G. Steinberg, M.D.

1          A.     Correct.

2          Q.     -- say back?

3          A.     I think he smirked.

4          Q.     Okay.  So that was a

5     nonresponse response?

6          A.     Yes.

7          Q.     Is he being compensated for

8     his time in --

9          A.     No --

10          Q.     -- connection with this

11     case?

12          A.     -- he's not.

13          Q.     Who first contacted you in

14     connection with this litigation?

15          A.     I believe it was Mr. Ceryes.

16          Q.     Okay.  And when was that?

17          A.     In September.

18          Q.     Of 2019?

19          A.     Yes.

20          Q.     Would September 4th sound

21     about right?

22          A.     3rd, 4th, something around

23     there.

24          Q.     In or around that time.  And

Annie G. Steinberg, M.D.

1  then the report you produced was dated

2  September 23rd, correct?

3         A.    Yes.

4         Q.    So in between September 3rd

5  or 4th and September 23rd, is it correct

6  that you designed, administered and then

7  digested the outcome from the

8  questionnaire in this case?

9         A.    Are you going to ask me if

10  I've slept during that time?

11        Q.    But that's true, correct?

12        A.    That is true.

13        Q.    Okay.  And that's also the

14  time in which you reviewed, if at all,

15  the materials involved in this case --

16        A.    Uh-huh.

17        Q.    -- separate from the survey

18  responses?

19        A.    Uh-huh.

20        Q.    Is that correct?

21        A.    Correct.  Uh-huh.

22        Q.    Where did you get the

23  information for the background section in

24  your report?

Annie G. Steinberg, M.D.

1          A.    I had asked Mr. Ceryes to

2    send me a letter with the facts of the

3    case.  I had the Complaint and I had --

4    at the time I had two depositions.  I

5    don't even think I had time to review the

6    second set of those depositions.  So I

7    think it was the first set of depositions

8    for the two plaintiffs and I had also one

9    deposition from somebody associated with

10   ECFMG that I perused.

11          Q.    So it looks to me like your

12   counsel has indicated to us that you got

13   deposition transcripts for plaintiffs

14   Evans, Powell -- Evans and Powell.  Were

15   those the two plaintiffs whose

16   depositions you reviewed?

17          A.    I brought everything with

18   me, so I can check.  I don't remember --

19          Q.    Great.

20          A.    -- their names.

21          Q.    Yeah, let's take a look.

22          A.    Evans, Powell and Mr. Kelly.

23          Q.    Great.  Okay.  And what else

24   do you have in that pile, just so I don't

Annie G. Steinberg, M.D.

1    lose track of it?

2          A.    I have your Exhibit 3.

3          Q.    Yeah.  So you can put that

4    aside.  But then you have a copy of your

5    report, it looks like.

6          A.    I have your Exhibit 2.

7          Q.    Yep.

8          A.    I have now a collated

9    version of the Complaint -- the -- the

10   statements.

11         Q.    So just to make sure I

12   understand what that is.  So those are

13   the statements that -- there was a

14   statement and then colon section on the

15   questionnaire that people could chose to

16   write in a statement.  So is this just a

17   document pulling together each of the

18   sections from each of those?

19         A.    All of the --

20         Q.    If there was one?

21         A.    Yes.  All of the decided 300

22   individual comments would not be suitable

23   to bring today.  And I have the notice of

24   deposition.

Annie G. Steinberg, M.D.

1      Q.    Great.

2      A.    I should have printed it

3  out, but I don't have it here.

4      Q.    That's okay.  What is STAT

5  News, S-T-A-T News?

6      A.    Did I cite that as a source?

7      Q.    Yeah, you said Akoda has

8  claimed he attended medical school in

9  Nigeria, although STAT News was unable to

10  verify this claim.

11      A.    I don't recall, but when Mr.

12  Ceryes called me, I probably ran a search

13  on Google of the name "Akoda" and

14  probably was something on a website

15  someplace.

16      Q.    So in addition to the

17  materials considered here, the facts

18  provided to you from counsel, you also

19  googled Dr. Akoda?

20      A.    Yes.

21      Q.    What else did you find about

22  Dr. Akoda other than the STAT News --

23      A.    I don't believe I had much

24  time to search very much.  I just wanted

Annie G. Steinberg, M.D.

1    to see kind of what was out there.

2         Q.    And what was out there?

3    What did you see?

4         A.    I don't even remember.  If I

5    cited it, that's because I saw it and

6    scribbled something down and included it

7    in here, but that...

8         Q.    Is STAT News a news source

9    that you refer to in checking out other

10   physicians in your usual practice?

11        A.    I don't usually check out

12   other physicians, but if I get a case, I

13   sometimes will do a quick search.

14   Usually I spend more time with it.  In

15   this case, I had to get on to the task at

16   hand.  So I'm surprised I even included

17   it in here.  So -- I don't even remember

18   doing that, but...

19        Q.    Okay.  It's possible you

20   weren't the one who wrote that?

21        A.    No, it's possible I did, but

22   I just don't remember.

23        Q.    Okay.

24        A.    There was so much

Annie G. Steinberg, M.D.

1  information in a very short time.  It was

2  a very crazy time.

3      Q.    Well, that's what I'm trying

4  to understand, how you got this

5  background section together in that short

6  of time and on the limited sources that

7  you had?

8      A.    I relied heavily on Mr.

9  Ceryes's letter and the Complaint.

10      Q.    Okay.

11      A.    I would say the Complaint

12  probably the most -- most of all.

13          MR. CERYES:  Just for the

14          record, it's Ceryes, like World

15          Series.

16          THE WITNESS:  I'm sorry.

17          MR. CERYES:  That's okay.

18          Just in case we're going to use my

19          name a lot more, I want to get it

20          right.

21  BY MS. McENROE:

22      Q.    Okay.  So looking in the

23  background section on page 2.  Towards

24  the bottom there's a paragraph that

Annie G. Steinberg, M.D.

1    starts "with his ECFMG certification in

2    hand."

3              Do you see that?

4         A.    Uh-huh.

5         Q.    Towards the end there's a

6    sentence that starts "later that year."

7    It's about three lines up from the bottom

8    of that paragraph.

9              Do you see where I am?

10        A.    Yes.

11        Q.    It says, "Later that year,

12   using the name Charles John Nosa Akoda, a

13   falsified Social Security number, a fake

14   permanent residence card, and a fake

15   Nigerian passport, he applied for and

16   received a Maryland medical license."

17             Do you see that?

18        A.    Yes.

19        Q.    Do you know what name was on

20   Dr. Akoda's ECFMG certificate?

21        A.    No.

22        Q.    Are you aware of whether the

23   plaintiffs in this case have filed any

24   other lawsuits stemming out of

Annie G. Steinberg, M.D.

1   certain way when they learned about

2   Dr. Akoda's history?

3        A.   Yes, each response was

4   different.  Each and every response was

5   different.

6        Q.   What do you understand the

7   purpose of your report to be in this

8   lawsuit?

9        A.   My report was simply to give

10  information to the plaintiffs' attorneys

11  about what the women reported.

12       Q.   Okay.  Were you trying to

13  give a set of data from which any other

14  conclusions could be drawn, to

15  extrapolate to another population of

16  patients, for example?

17       A.   I don't think I understand

18  the question.

19       Q.   So what I mean by that is,

20  so of the population that was given the

21  survey, about half responded, correct?

22       A.   Uh-huh.  Yes.  Uh-huh.

23       Q.   Was it your intention to use

24  the outcome of the results from the half

Annie G. Steinberg, M.D.

1   that responded to be statistically

2   significant for the half that did not

3   respond or for those who may have been

4   treated or examined by Dr. Akoda, but did

5   not receive the survey?

6              MR. CERYES:  Objection.

7         Form and foundation.

8              You can answer.

9              THE WITNESS:  Yes, I think

10        that that response rate would

11        suggest that there is

12        reasonable -- it is reasonable to

13        assume that of the women that did

14        not respond, some of those women

15        would have also had an experience

16        similar to these women.

17  BY MS. McENROE:

18        Q.   Do you think that there's

19  anything at all meaningful to the fact

20  that half of the women didn't choose to

21  respond?

22        A.   No, we had a very short

23  turnaround time.  Extremely short

24  turnaround time.

Annie G. Steinberg, M.D.

1      Q.    And so you think it's just a

2  matter of convenience.  It's not a matter

3  of that they may have just chosen not to

4  respond?

5      A.    Oh, well, that was certainly

6  a good part of it.  We had a remarkable

7  response rate given the women were not

8  even given a week to respond.

9      Q.    On what basis do you say

10  that you got a remarkable response rate?

11      A.    Because people are busy and

12  this was an unexpected intrusion into

13  their lives and their daily schedules.

14      Q.    Do you have a sense for how

15  quickly or frequently plaintiffs in

16  lawsuits tend to respond to requests from

17  their counsel?

18      A.    I know in other cases that

19  I've done that a week would not have been

20  adequate time.

21      Q.    Have you gotten responses

22  since September 23rd?

23      A.    I don't know.

24      Q.    Have you asked?

Annie G. Steinberg, M.D.

1        A.    No, we decided to keep it

2   open, but I did not check.

3        Q.    Do you know if anyone else

4   checked?

5        A.    I don't know.

6        Q.    So was it your intention to

7   use the outcome of this questionnaire or

8   this survey to help diagnose any

9   individual plaintiff?

10        A.    No.

11        Q.    Is it your intention for the

12   outcome of this questionnaire or survey

13   to help diagnose the plaintiff class as a

14   whole?

15        A.    Not to present psychiatric

16   diagnoses, no.

17        Q.    Okay.  At one point in your

18   report you say, "forensic psychiatric

19   consultation was requested."  What do you

20   mean by "forensic psychiatric

21   consultation" in that -- in that --

22        A.    Sure.

23        Q.    -- usage?

24        A.    Well, it's a consultation

Annie G. Steinberg, M.D.

1    because they have asked my -- for my

2    input in the matter.  It's psychiatric

3    because it's addressing emotional

4    damages, and as a psychiatrist I have

5    some experience with listening to people

6    and understanding what their internal

7    experience of an action might have been,

8    and it's forensic because it pertains to

9    the court and matters related to

10   questions that can appear in court.

11          Q.    I see.  Okay.  At one point,

12   you call your responses -- strike that.

13          At one point you call your

14   analysis provisional.  Have you done any

15   non-provisional analysis since then?

16          A.    No.

17          Q.    Do you intend to?

18          A.    Only if asked.

19          Q.    Have you written any other

20   expert report in this case other than --

21   and I'm not talking about drafts of, but

22   any other reports other than what's been

23   marked as Exhibit 3?

24          A.    No.

Annie G. Steinberg, M.D.

1    Aggrieved is a funny word.  It's more

2    like a complaint as opposed to damage.

3         Q.   So you think that through

4    your questionnaire you've proven to

5    yourself at least that there were

6    specific damages to particular patients

7    in this case?

8         A.   I do believe that, yes.

9         Q.   Having not spoken to any of

10   them?

11        A.   I do believe that, yes.

12        Q.   What do you believe your

13   opinions to be through this expert

14   report?

15            MR. CERYES:  Objection.

16        Breadth of the question.

17            You can answer.

18            THE WITNESS:  My opinion is

19        that it's not good for women to

20        find out that their doctor may not

21        have gone to medical school or

22        have, in fact, been a doctor as

23        they perceive credentialing to

24        imply.

Annie G. Steinberg, M.D.

1                    And in this particular case,

2          it was additional affirmation for

3          the women that the behaviors he

4          exhibited in the office with them,

5          in the hospital with them were

6          abusive, not just atypical.

7    BY MS. McENROE:

8          Q.    What do you mean by that

9    second statement?

10         A.    That some of the comments he

11   made, some of the ways he put his hands

12   on them and in them were wrong and not

13   just -- not just a cultural difference or

14   a moment in time, but that they were --

15   they were related to something bigger.

16         Q.    So that's an opinion you're

17   offering in this case?

18         A.    Yes.  Uh-huh.

19         Q.    Having not actually spoken

20   to any of the individual plaintiffs?

21         A.    Correct.

22         Q.    Having not examined their

23   medical records?

24         A.    Correct.

Annie G. Steinberg, M.D.

1        Q.    Having not spoken to

2   Dr. Akoda?

3        A.    Correct.

4        Q.    Having not observed

5   Dr. Akoda in practice?

6        A.    Yes, that's correct.

7        Q.    Okay.  And so you said the

8   opinion you're offering in this case --

9   one of the opinions you're offering in

10  this case is that it's not good for women

11  to find out that their doctor did not go

12  to medical school or that he was not

13  really a doctor.  If it turns out that

14  Dr. Akoda really was a doctor --

15       A.    Uh-huh.

16       Q.    -- but that he had committed

17  Social Security fraud --

18       A.    Uh-huh.

19       Q.    -- but that the plaintiffs

20  were led to believe that he was not

21  really a doctor --

22       A.    Uh-huh.

23       Q.    -- wouldn't that lie to them

24  about him not really having been a doctor

Annie G. Steinberg, M.D.

1    be what actually caused them the harm?

2              MR. CERYES:  Objection.

3         Form and foundation.

4              THE WITNESS:  Well, I would

5         have to say the question was a

6         little bit convoluted for me, so

7         if you ask it in a simpler way for

8         my brain, that I would probably be

9         happy to answer.

10   BY MS. McENROE:

11        Q.    Sure.  So you had said that

12   one of your opinions is that it's not

13   good for women to find out that their

14   doctor basically was not a doctor.

15        A.    Uh-huh.  Uh-huh.

16        Q.    Is that correct?

17        A.    Yes, that's correct.

18        Q.    If Dr. Akoda really was a

19   doctor --

20        A.    Uh-huh.

21        Q.    Correct?  I'm making sure

22   you understand what I'm saying.

23        A.    I'm following you.

24        Q.    Okay.  If it turns out that

Annie G. Steinberg, M.D.

1    substance abuse or Internet

2    addiction or other things.  I will

3    pull a questionnaire relating to

4    that.  Sometimes I'll use a

5    questionnaire about autism

6    spectrum symptoms.  So -- same for

7    OCD.  So I have a wide variety of

8    questionnaires in my office that

9    after I am finished interviewing

10   or sometimes in the midst of it, I

11   will give them a questionnaire.  I

12   do not administer psychological

13   testing.  That is not my domain.

14   I'm not a psychologist.  I haven't

15   been trained to do that.  So I use

16   forms that have been developed,

17   validated, widely accepted for the

18   most part, and I find them to be

19   helpful and even -- even the ones

20   that -- I have also written out

21   some -- some questions that I use

22   routinely.  I guess you would call

23   them a questionnaire.  They're

24   projective questions that I do

Annie G. Steinberg, M.D.

1          administer routinely that is not

2          self-administered.  I will usually

3          ask the questions.

4  BY MS. McENROE:

5          Q.    In an interview format?

6          A.    Uh-huh.

7          Q.    That's a yes?

8          A.    That's -- sorry.  That's a

9  yes.

10          Q.    You mentioned that you use

11  some questionnaires or surveys that have

12  been validated or widely accepted.  What

13  do you mean by that?

14          A.    They are typically

15  questionnaires that are not new.  They

16  are published in peer reviewed journals

17  and sort of the standard forms that can

18  augment my clinical interview.

19          Q.    Have you ever published a

20  questionnaire or a survey in a peer

21  reviewed publication?

22          A.    You know, I -- I might have

23  thought no, but I recently received some

24  requests for questionnaires I had

Annie G. Steinberg, M.D.

1    developed and I had to notify the

2    individual that I no longer have access

3    to them myself.  They related to

4    decision-making and somebody from South

5    America wrote to me about an

6    autism-related questionnaire with blind

7    individuals.

8            Q.    Right.  But -- so my --

9            A.    So I guess I did develop

10   some questionnaires and they were

11   published in peer reviewed journals, yes.

12           Q.    But the questionnaires

13   themselves were published?

14           A.    Yes.

15           Q.    Not just the --

16           A.    Well, you know, it's funny.

17   The questionnaires were not included,

18   they never are in -- well, they rarely

19   are because very often people want to

20   sell their questionnaires.

21           Q.    So what I'm trying to

22   understand is when you said that you used

23   validated and widely accepted

24   questionnaires, what that means.  And you

Annie G. Steinberg, M.D.

1   said that they're in published --

2          A.    Uh-huh.

3          Q.    -- they're often older,

4   they've been used a lot --

5          A.    Uh-huh, uh-huh.

6          Q.    And they're in publications?

7          A.    Right.

8          Q.    So presumably you would have

9   access to those questionnaires if you're

10  using them?

11         A.    Yes, you buy them.

12         Q.    You buy them.  I see.

13         A.    You buy them.

14         Q.    So you buy them from the

15  authors or you buy them from the

16  publication?

17         A.    You buy them from a company

18  that publishes them.

19         Q.    Okay.  Are any of your

20  questionnaires or surveys that you've

21  prepared for sale?

22         A.    No.  Uh-uh.

23         Q.    Is the questionnaire or

24  survey you used in this case validated?

Annie G. Steinberg, M.D.

```
1           A.    No.

2           Q.    Is it widely accepted?

3           A.    It's individually designed

4    for this project.

5           Q.    Did you do any pretesting?

6           A.    No.  Pretesting in this

7    brief sense, that both Lisa and I ran

8    through the questionnaire as a pretest to

9    see how long it would take to complete.

10          Q.    So you -- you and Lisa ran

11   through the questionnaire for time?

12          A.    Uh-huh.  Yes.

13          Q.    Length?

14          A.    Uh-huh.

15          Q.    Okay.  Did you do any other

16   pretesting on the content or the tone of

17   the questions or the order of the

18   questions, anything like that?

19          A.    No.

20          Q.    I think we established

21   earlier, but you've never met Dr. Akoda,

22   correct?

23          A.    Correct.

24          Q.    And you've never spoken with
```

Annie G. Steinberg, M.D.

1    him?

2           A.    Correct.

3           Q.    You've never treated him?

4           A.    Correct.

5           Q.    And you've never diagnosed

6    him with anything?

7           A.    Correct.

8           Q.    And you've never been

9    treated by him?

10          A.    Correct.

11          Q.    And did you consult with an

12   OB/GYN in any way in preparing this

13   questionnaire and this survey?

14          A.    No.

15          Q.    Do you routinely in your

16   professional experiences work with

17   OB/GYNs --

18          A.    No.

19          Q.    -- for any purpose?

20                Okay.  Aside from whether or

21   not you are a patient, which I'm not

22   asking, do you interact with OB/GYNs

23   otherwise?

24          A.    I think you addressed the --

Annie G. Steinberg, M.D.

1          A.     Yes.

2          Q.     And 271 recipients did not

3     return the questionnaire at all, correct?

4          A.     Correct.

5          Q.     Okay.  At least before

6     September 23rd?

7          A.     Correct.

8          Q.     Okay.  And so I think you

9     had mentioned earlier that you think you

10    could use the responses from the 306 to

11    extrapolate to the 271; is that correct?

12         A.     Extrapolate is a funny word.

13    What did you mean by "extrapolate."

14         Q.     So to tell us anything

15    meaningful about the population that did

16    not respond.

17         A.     I do think it would tell us

18    something meaningful, yes.

19         Q.     What do you think it would

20    tell us?

21         A.     That there are some women in

22    that group that also may have experienced

23    some distress around Dr. -- around

24    Akoda's fraudulent claims of his

Annie G. Steinberg, M.D.

1    identity.

2         Q.    But not necessarily all of

3    them, correct?

4         A.    Absolutely not, yeah.

5         Q.    And so if I invited, as a

6    hypothetical, 100 relatives to a family

7    reunion and only 75 showed up, do you

8    think I could use the feelings or

9    experiences of those 75 about whether

10   they wanted to show up to tell me

11   anything about the 25 that chose not to

12   come?

13              MR. CERYES:  Objection.

14        Form and foundation.

15              THE WITNESS:  I think you'd

16        probably do better asking a

17        polling researcher that question.

18   BY MS. McENROE:

19        Q.    And you're not a polling

20   researcher, correct?

21        A.    That's correct.  I'm a

22   psychiatrist.

23        Q.    And you didn't conduct IMEs

24   in this case, correct?

Annie G. Steinberg, M.D.

1      A.    Correct.

2      Q.    So I want to make sure I

3 understand the summary statements we've

4 talked about a couple times, because in

5 your report you mention that summary

6 statements were offered by 131 women,

7 right?

8      A.    I thought it was a little

9 bit more, but maybe not.

10     Q.    So it's at page 4, if my

11 notes are right.  So there's a big

12 paragraph two paragraphs above where it

13 says "results" on page 4 and about in the

14 middle it says, summary statements were

15 offered by 131 women.

16     A.    Ah, okay.  I see it, yes.

17     Q.    Is that correct?

18     A.    Yes.

19     Q.    And are those the narratives

20 you were talking about earlier?

21     A.    Yes.

22     Q.    And so that's where in the

23 report there was an option to write in a

24 free text box after a statement colon?

Annie G. Steinberg, M.D.

1      A.     Correct.

2      Q.     And there were not separate

3  summary statements, right?  There weren't

4  other documents submitted?  Those were

5  the summary statements, the ones that

6  came in --

7      A.     Yes.

8      Q.     -- the responses?

9             Okay.  The only difference

10 from what you had had in your pile was

11 that you compiled those from each of the

12 individual reports or somebody compiled

13 those from each of the individual --

14     A.     Uh-huh.

15     Q.     -- reports?

16     A.     Yes.

17     Q.     And who did that?

18     A.     It was a combination of all

19 of us.

20     Q.     Okay.  When you say "all of

21 us," was it you, Lisa and Stephen?

22     A.     Lisa and Stephen.  We all

23 had our versions until we settled on that

24 one.  And then the major feat was getting

Annie G. Steinberg, M.D.

1    it to print out.

2         Q.    Are you a statistician?

3         A.    No.

4         Q.    On page 4 it also goes on to

5    say -- make sure I'm looking at the right

6    sentence -- right after where it said the

7    summary statements were offered by 131

8    women, in order to assess the aggregate

9    severity and distribution of potential

10   damages among the entire plaintiffs'

11   class, the response rate and sample size

12   would be more than adequate to provide

13   reasonable confidence intervals for the

14   percentages of plaintiffs in each of

15   several categories of damage severity,

16   but this exceeded the scope of this

17   report.

18         Did I read that correctly?

19        A.    You did.

20        Q.    What does that mean?

21        A.    That means that had one

22   wanted to look at statistical

23   significance of the response rate --

24        Q.    Yeah.

1      A.      -- that it would have been

2   statistically significant; however, this

3   was not being conducted as a research

4   study.  So it was beyond the scope of

5   this because we were not yet going to be

6   looking at the statistical significance.

7   I was mentioning that the response rate

8   was excellent, that we're pleased to have

9   that many women respond because it gave

10   us a good sense of what the general

11   experience might have been of all the

12   women, but that we were not going to be

13   conducting research yet about this

14   matter.

15      Q.    So in your professional

16   experience, is it fair to say that you're

17   saying that a population made up of

18   individuals who both approached counsel

19   and then chose to fill out a survey would

20   be statistically relevant in some way to

21   a population also treated by Akoda who

22   neither approached counsel or decided to

23   complete the survey?

24      A.    Possibly yes and possibly

Annie G. Steinberg, M.D.

1         better than previous pelvic exams

2         they had experienced.  Right?  And

3         10 percent said they were less

4         painful than other exams.

5    BY MS. McENROE:

6         Q.    But again, is this a way of

7    suggesting to the respondents as they go

8    through that Dr. Akoda might have been

9    more rough, insensitive, had longer

10   exams, sexual talk and/or touch?

11        A.    You know, if asking a

12   question is always perceived as

13   suggestive, then I would never ask

14   somebody if they have any suicidal or

15   homicidal ideation because they may never

16   give that answer unless I ask that

17   question.  But if asking the question is

18   sort of the same as the whole debate

19   about should you talk to kids about --

20   about their sexuality.  Well, when you

21   speak with a middle school child about

22   whether they've ever had sex or thought

23   about sex, is that suggestive to them

24   that, gee, maybe I should have sex?  So,

Annie G. Steinberg, M.D.

1  you know, I guess I could be mute and not

2  ask any questions, but if I want to be

3  effective as a person trying to gather

4  information then I'm going to ask the

5  questions in a way that gives people

6  permission to explain and to say more.

7         Q.    What about the difference in

8  length in the response options, do you

9  have any sense about -- in survey science

10 about how it influences respondents to

11 pick a certain response when that's the

12 longest one?

13        A.    I'm sure you can find

14 experts to that -- that can speak more to

15 that.

16        Q.    But you don't?

17        A.    I don't --

18        Q.    That's not something --

19        A.    -- have experts in my

20 pocket, no.

21        Q.    That's not something you

22 took into consideration when drafting

23 these responses?

24        A.    I took into consideration

Annie G. Steinberg, M.D.

1    doing the job that I was asked to do, to

2    understand what these women's experiences

3    were in the presence of Dr. Akoda, who

4    may or may not, have been a doctor as

5    certified by your client.

6            Q.    But without using survey

7    sciences?

8            MR. CERYES:  Objection.

9        Form and foundation.

10           THE WITNESS:  I'm sorry, I

11       think that the morning part of the

12       session I explained the background

13       that I had.  I'm sure there are

14       many aspects to survey science and

15       marketing.  That's not really the

16       domain of my training.  My

17       training was in ethnography,

18       microethnography, qualitative and

19       quantitative methodologies.

20   BY MS. McENROE:

21           Q.    Okay.  And for 3c, you ask

22   about having a nurse or a chaperone in

23   the room during pelvic examinations, and

24   I think this morning you referenced that

Annie G. Steinberg, M.D.

1    in the practice typically you would

2    expect that there would be a chaperone in

3    the room for all gynecological care on

4    what basis?

5           A.    In recent years that has

6    been the practice.

7           Q.    Okay.

8           A.    Now, you may have a

9    different experience if you have a very

10   deep and abiding relationship with your

11   practitioner, but most physicians

12   providing gynecologic care now will do

13   that for their own liability and

14   protection.

15          Q.    And on what basis do you say

16   that?

17          A.    On the basis of being a

18   physician and being at the University of

19   Pennsylvania communicating with my

20   colleagues about practice.

21          Q.    Who have you talked to about

22   specifically having chaperones in the

23   room during pelvic examinations?

24          A.    Oh, I have a number of

Annie G. Steinberg, M.D.

1           answered.

2                 THE WITNESS:  From reading

3           the newspaper and from common

4           knowledge that that is a standard

5           of care among American

6           obstetrics-gynecologists.

7     BY MS. McENROE:

8           Q.    For question 4, 4a, you had

9     asked, did you think that Dr. Akoda asked

10    you to come in for checkups more often

11    than needed.

12                Why did you ask that

13    question?

14          A.    That would suggest that he

15    was seeking contact with particular

16    patients for his own gratification rather

17    than for their medical need.

18          Q.    And you think that -- or

19    strike that.

20                You drafted this for a

21    second or third grade reading level, you

22    said?

23          A.    Uh-huh.

24          Q.    That's a yes?

Annie G. Steinberg, M.D.

1          A.     Yes.   Sorry.

2          Q.     And you're now asking them,

3     the respondents to make a determination

4     of whether they think that the requested

5     checkups were more frequent than would be

6     medically necessary?

7          A.     Yes.   Uh-huh.

8          Q.     Okay.   For 4c, that's the

9     question, pelvic exams are never fun, but

10    looking back do you think his exams were

11    more or less painful than other pelvic

12    exams you've had with other doctors.

13              There's no I don't know or

14    remember option there.   Why not?

15         A.     Probably were trying to keep

16    this to be a short survey and all the I

17    don't knows or remembers or -- add space

18    and time to read.   But there was a more,

19    there was a less and there was a -- I

20    don't know what the no is actually.   Do

21    you think he was more or less painful --

22    I don't even know what the no is.   That's

23    just probably an error.

24              Q.     So maybe that was intended

Annie G. Steinberg, M.D.

1    to be I don't know or remember?

2         A.    I don't remember actually

3    and I -- and I don't know.  It may have

4    been at 2:00 in the morning.

5         Q.    So you think you prepared

6    this at 2 o'clock in the morning?

7         A.    Very likely.

8         Q.    Okay.  And what review or

9    process was there before this went live

10   in terms of the content?

11        A.    I'm sorry, you want to

12   clarify that question, please.

13        Q.    Yeah, the questionnaire --

14        A.    Yeah.

15        Q.    -- what review or process

16   was there to verify that the questions

17   were what you meant to be asking before

18   it went live?

19        A.    I read them through a few

20   times and Lisa Bain read them through a

21   few times.

22        Q.    Anybody else?

23        A.    Probably Mr. Ceryes also or

24   his associate.

Annie G. Steinberg, M.D.

1    Q.   For 4e, did you ever

2  consider changing doctors, yes, no, I

3  don't know or remember.

4              I didn't see the data

5  reported on that in your report.  Do you

6  remember how that came out?

7    A.   No, there were lots of

8  things we did not report on.  Just not

9  enough time.  But you have the -- the raw

10 data, so you can calculate that.

11   Q.   Well, I have the raw

12 reports.  I think you said you had it

13 more in a tabulated data form that

14 Stephen could get for you as you needed

15 it.

16   A.   What we asked of him.  We

17 did not ask that of him.

18   Q.   Okay.  Why not?

19   A.   Probably a limitation of

20 time.

21   Q.   So in question 5b the

22 question is, how did you feel when you

23 heard about the charges against

24 Dr. Akoda?  Check all that apply.  And

Annie G. Steinberg, M.D.

1           A.    I meant emotional

2  distress --

3                 MR. CERYES:  Objection.

4           Form and foundation.

5                 THE WITNESS -- as a

6           layperson correlate of not -- not

7           settling well, not being

8           comfortable, not being happy, not

9           being satisfied, not feeling good.

10  BY MS. McENROE:

11          Q.    Do you have any

12  understanding of whether there's a legal

13  meaning to the term "emotional distress"?

14          A.    There probably is.

15          Q.    Were you intending to use

16  this in that way?

17          A.    No, I was not.  I'm not

18  sure.  I'm not a lawyer.

19                MR. CERYES:  Objection.

20          Form and foundation.

21                THE WITNESS:  And that's not

22          my intention.

23  BY MS. McENROE:

24          Q.    So you're meaning emotional

Annie G. Steinberg, M.D.

1   distress here to mean that in not sort of

2   a formal term, but in more of a

3   layperson's type of language --

4           A.      Correct.

5           Q.      -- is that what you mean?

6                   So let's turn real quick --

7   you still have that on your lap.

8           A.      I do.  Uh-huh.

9           Q.      Let's -- we're going to take

10  a look at -- I think it was Exhibit 6,

11  which is the collection of survey

12  responses.

13          A.      Yes.

14          Q.      And we put Bates numbers,

15  like I mentioned, at the bottom.

16          A.      Okay.

17          Q.      So it might be easiest if I

18  use those.

19          A.      Sure.

20          Q.      We're going to flip ahead to

21  page 185.

22          A.      Okay.

23          Q.      Let me get there.  One

24  second.  Okay.  So let's take a look --

Annie G. Steinberg, M.D.

1    this is the first of the questionnaires

2    that we're really going to look at for a

3    minute.  I'm only going to point to a

4    couple of particular responses because

5    I'm going to get back the questionnaire

6    before we come back to some more specific

7    responses.  But I wanted to look -- we

8    were just talking about 6a and it relates

9    to 6b.  So I want to take a look at this

10   respondent's responses to 6a and 6b.  So

11   6a is, did you experience emotional

12   distress as a result of Dr. Akoda's

13   conduct or as a result of learning that

14   he might not be a licensed doctor or that

15   his name and papers were not real.  And

16   this respondent said no.  So they didn't

17   experience emotional distress from that.

18   And then 6b, do you still experience

19   emotional distress as a result of

20   Dr. Akoda's conduct or as a result of

21   learning that he might not be a licensed

22   doctor or that his name and papers were

23   not real, and the respondent said yes.

24                 How do you reconcile those

Annie G. Steinberg, M.D.

1    two answers?

2         A.    Yeah.  It's -- it's

3    interesting.  This is a fairly benign

4    response.  This person was pretty pleased

5    with the care that she received with

6    Dr. Akoda.  She thought the pelvic exams

7    were fine, less painful.  Her daughter

8    saw him.  But she noted that she feels he

9    betrayed her trust and has led her to

10   change her practice about how often she

11   visits an OB/GYN and it has led her not

12   to trust doctors.  She is very clear it

13   hasn't affected other parts of her life,

14   although she says it's a -- still has a

15   pain in her stomach, which may or may not

16   be related, and that is the sum totality

17   of what she reports, not particularly --

18        Q.    Right.

19        A.    -- excessive.

20        Q.    So that --

21        A.    This is a woman --

22        Q.    -- wasn't my question, Dr.

23   Steinberg.

24              So 6a is no and it instructs

Annie G. Steinberg, M.D.

1    if you say no to move on to 6c, yet she

2    answered yes for 6b.  So I'm just trying

3    to understand as a survey design

4    standpoint, she was able to answer a

5    question she was supposed to have skipped

6    and then they give contradictory

7    responses, and I just wanted to

8    understand your --

9         A.    Right.

10        Q.    -- perspective on that from

11   a survey design perspective?

12        A.    My -- my thought is, and as

13   I'm looking at this right now, is that

14   this exemplifies the complex nature of

15   emotions and how a person can have

16   multiple and contradictory experiences of

17   the same thing.  Here's somebody who was

18   really okay with Dr. Akoda and yet she

19   was shocked to find out about this.  It

20   betrayed her trust and it altered her

21   practice.  So overall her distress is

22   limited to the sort of cognitive

23   dissonance of this person that she liked,

24   that she valued, that she trusted and

Annie G. Steinberg, M.D.

1  then this information that she couldn't

2  quite grapple with.  So in two questions,

3  one right next to the other, you see the

4  contradictory nature of her emotions

5  about this.

6       Q.    But that's a lot to take

7  from this, knowing this yes.  Right?  I

8  mean, she could have either made a

9  mistake, she could have not understood

10  the questions or could have just been

11  that when she hit no and it meant to skip

12  her along to the next question, the

13  design of the survey was just not robust

14  enough to direct her in that way.  Right?

15  She clearly saw 6b after answering 6a.

16       A.    Do you have a question for

17  me?

18       Q.    I'm asking you.  So isn't

19  that true?  I mean, she saw 6b then

20  clearly after she saw 6a, correct?

21       A.    You asked me what I took

22  from this.

23       Q.    Yeah.

24       A.    I'm explaining to you what I

Annie G. Steinberg, M.D.

1    took from the contradictory nature of her
2    responses on those two because I'm not
3    looking at exclusively at those two
4    questions.  I'm looking at the rest of
5    the responses that she had and I'm seeing
6    other information that fills it out a
7    little built more.  Kind of like if
8    you're coloring a page, there's an
9    outline and then there's a color.  So I
10   get the color from her responses.  She
11   really did not have terrible experiences
12   with him.  She liked him.  She trusted
13   him.  And she sent her daughter to him.
14   And she thought his pelvics were fine.
15   There is no sexually inappropriate
16   conduct that he had that she experienced.
17   And yet she felt that he betrayed her
18   trust.  Those are her words.  That was
19   not a choice.  She didn't check "other"
20   and leave it blank.  She explained what
21   she felt.  She colored in the lines as
22   she did in 7.  So while that may -- in
23   and of itself, those two questions might
24   be confusing to you as you look at them.

Annie G. Steinberg, M.D.

1  I have a little more information from
2  looking at her response to 7a and 7b and
3  5c.  That explains, yeah, she -- she was
4  really not -- she didn't really
5  experience emotional distress, but
6  then -- then she learned that that this
7  stuff was in the news and she heard about
8  it.  And so still, it has -- there's that
9  "still" word.  Do you still experience.
10  And when she saw the "still," is like
11  yes, I don't go to doctors as often, I
12  don't go to OB/GYNs as often.  The
13  difference between those two questions is
14  one of immediate.  When you heard about
15  it, did you have emotional distress?
16  Were you -- were you -- she might have
17  read emotional distress as like trauma.
18  Did you experience trauma.  This woman is
19  not really decrying trauma.  What she's
20  explaining is that it's affected me
21  still.  I -- I don't use practice --
22  practitioners in the same way that I did
23  before.  Those are her words.  I'm not
24  putting words into her mouth in this.

Annie G. Steinberg, M.D.

1   And you asked me what I take from those

2   two questions and that is my answer.

3         Q.    So with 6a, when you said no

4   and then in itals, if you answered no to

5   question 6a, skip to question 6c, you

6   didn't really mean it.  You thought they

7   might have cognitive dissonance and

8   answer 6b.

9         A.    No, I thought that she would

10  skip it, but she didn't.

11        Q.    Okay.  So it wasn't set up

12  to skip it for her?

13        A.    Apparently not.

14        Q.    Okay.

15        A.    That particular one was not.

16  Sometimes we did, sometimes we just

17  overlooked it.  But it is interesting how

18  she responded.

19        Q.    So question 6h.

20        A.    Yes.

21        Q.    And after that then 6i

22  through 6s.

23        A.    Yes.

24        Q.    We don't need to go through

Annie G. Steinberg, M.D.

1   each of them in detail, but starting with

2   6i, these are not questions tied to

3   experiences with Dr. Akoda in particular,

4   as written on their face.  Right?  So,

5   for example, 6i, have you experienced

6   mood changes or depression?  Then, yes,

7   only in the past month; yes, only prior

8   to the past month; yes, both in the past

9   month and prior to the past month; and

10   no.

11          Do you see that?

12   A.     Yes.  Uh-huh.

13   Q.     And then the rest of those

14   until 6s are the same, right?  They're

15   asking all sorts of questions.

16   A.     Uh-huh.

17   Q.     But they're not tied

18   specifically to experiences with

19   Dr. Akoda?

20   A.     They're asking if they've

21   had these experiences, correct.

22   Q.     Right.  So it's true that

23   the responses there on those, this could

24   have all different other sorts of causes.