# Exhibit 7



# Transcript of Susan McDonald, Ph.D.

**Date:** December 19, 2019
**Case:** Russell, et al. -v- Educational Commission for Foreign Medical Graduates

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE EASTER DISTRICT OF PENNSYLVANIA

3

MONIQUE RUSSELL, JASMINE RIGGINS, : NO.
4  ELSA M. POWELL, and DESIRE EVANS, : 18-5629
      Plaintiffs,            :
5                            :

6  v.                          :
                              :
7  EDUCATIONAL COMMISSION FOR      :
  FOREIGN MEDICAL GRADUATES,     :
8      Defendants.            :

9                    - - -

10          Thursday, December 19, 2019

11                    - - -

12         TRANSCRIPT OF DEPOSITION OF

13  SUSAN MCDONALD, Ph.D., taken by and before

14  Michelle Tormey, Professional Reporter and

15  Notary Public, at MORGAN, LEWIS & BOCKIUS

16  LLP, 1701 Market Street, Philadelphia,

17  Pennsylvania 19103, commencing at 9:10 a.m.

18

19

20

21

22

23

24

25

Transcript of Susan McDonald, Ph.D.
Conducted on December 19, 2019                    40

1    BY MR. CERYES:

2         Q    And that they may serve in that

3    role despite not having a subspecialty or

4    specialty in survey methodology or design?

5         A    Oh, absolutely.

6         Q    You write in your reports -- let's

7    turn to Page 8 -- in the first -- well, the

8    second sentence, she was specifically hired

9    to put numbers to her hypotheses concerning

10   the traumatic effects and life changes

11   experienced by women receiving care from

12   Dr. Akoda.

13              What do you mean by hired to

14   put numbers on her hypotheses?

15        A    Well, Dr. Steinberg entered this

16   process with the very strong hypothesis that

17   the women who were treated by Dr. Akoda had

18   experienced harm of various kinds.  And it's

19   my understanding based on her own sort of

20   vague description of what her mission was,

21   and what I intuit about the way she seems to

22   use her data, that her goal was to assign

23   numbers to those so that generalizations

24   could be made to the broader universe of

25   other women, the women that were solicited

1   for the survey, 575, or something like that.

2   So the assumption is when you're talking to

3   hundreds of women that the expectation is

4   that numbers will be generated.  And, in

5   fact, she did generate some numbers.

6        Q    Now, I want to briefly review some

7   of the various criticisms that you offer in

8   your report.

9             Among the criticisms

10  regarding -- I guess -- the generalizability

11  of the responses is the concept that these

12  women are -- I guess as you characterize here

13  on Page 9 -- alleged victims or financial

14  stakeholders, is that fair?

15       A    Let me find the line.  I'm not sure

16  that I heard your question correctly.  I

17  think you were referring to not alleged --

18  i.e., the participants are consumers or

19  voters -- the not alleged victims or

20  financial stakeholders.  And if you're asking

21  me whether I believe that statement is true,

22  the answer is, yes, but I'm not sure what

23  your question really was.

24       Q    Given that this population are

25  people who are potential plaintiffs in

Transcript of Susan McDonald, Ph.D.
Conducted on December 19, 2019                                    42

1    litigation -- or, claimants in litigation,

2    would there be any way to assess or survey

3    their potential emotional harm given the

4    potential financial stake that they may have

5    in the outcome of this litigation?

6         A    I certainly can't say no, there is

7    no way to do it.  There are better ways to do

8    it and there are limitations on the way you

9    interpret the responses of people who have

10   responded versus those who have chosen not

11   to.  So it's less about you can never do that

12   and more about understanding the implications

13   of the relationship between these survey

14   participants and the outcome of the case, so

15   that you can put the data in context and you

16   can evaluate its validity as well as its

17   statistical reliability.

18        Q    Dr. Steinberg did reference in her

19   report the -- or, at least included a

20   consideration that that's something that she

21   thought about, potential financial interest

22   in the outcome?

23        A    She may have.  I don't recall that

24   sentence particularly.

25        Q    You reference the survey

1    invitation -- which was sent by lawyers -- in

2    terms of the potential impacts that that

3    invitation might have on the individuals

4    filling out the survey, you've set forth

5    those concerns in your report in their

6    entirety?

7        A    I'm sorry.  I missed the question.

8    I did mention that, yes, but the entirety

9    part I don't recall.

10       Q    Within your report you've explained

11   why you think the invitation itself may have

12   had an impact on the individuals filling out

13   the survey?

14       A    Yes, both who chose to and what

15   they might have written.

16       Q    At the bottom of Page 9, you refer

17   to Dr. Steinberg making efforts to minimize

18   the potential biasing effects and welcoming

19   them bringing her own confirmation biases to

20   bear in construction of the survey and

21   analysis of the data.

22            What do you mean by

23   "minimizing and welcoming those biasing

24   effects?"

25            MR. SHAFFER:  Let me object to the

1          MR. SHAFFER:  Objection to form.

2          THE WITNESS:  Well, if someone were

3      to ask me to give examples, I would

4      certainly read them carefully with that

5      eye.  But there are a couple that I

6      recall; one, the ripping of the

7      clitoris, I found to be lacking in

8      credibility to me.  Not that I dispute

9      the conviction with which that statement

10     was offered, it just didn't necessarily

11     make sense to me.  You know, again, I am

12     not here to assert the truthfulness of

13     any given individual.  I am only here to

14     talk about the survey and what value it

15     has.  And individuals of course may

16     testify in courts or any other place and

17     be cross-examined on that.  But I can

18     say from a survey research perspective

19     that I don't know what to do with

20     anything that came out of this survey.

21 BY MR. CERYES:

22     Q    Okay.  Do these summary statements

23 provide you any information about the

24 individual experiences of the women who

25 completed this survey?

Transcript of Susan McDonald, Ph.D.
Conducted on December 19, 2019                    69

```
1                MR. SHAFFER:  Objection to form.
2                THE WITNESS:  I'm not sure what you
3          mean, exactly; what you're asking me if
4          I now know or feel as a result of
5          reading them.
6  BY MR. CERYES:
7      Q    Is there anything included within
8  Exhibit 5 -- the summary statements -- that
9  would allow you to learn anything about the
10 experiences that these women had through
11 their treatment with this individual?
12     A    I think that if I were responsible
13 for -- once we start talking about individual
14 women, I think if I were responsible for
15 drawing interpretations about individuals, I
16 would be thinking about qualitative research
17 in which these women were questioned and
18 probed on specific information to fully
19 understand their responses.  And what I said
20 earlier still holds.  This is not qualitative
21 information.  These are verbatims and their
22 interpretation and their meaningfulness
23 without further probing to contextualize and
24 confirm and explain some cases what they
25 meant -- because it's not always clear what
```

Transcript of Susan McDonald, Ph.D.
Conducted on December 19, 2019                    70

1    they mean -- would be necessary to make a
2    determination by someone -- not me; it's not
3    my role here -- about the veracity or
4    meaningfulness of any of them.
5        Q    Okay.  So without going through
6    that process that you described, Exhibit 5
7    provides no meaningful or helpful information
8    about the experiences of these women in your
9    view?
10              MR. SHAFFER:  Objection as asked
11         and answered.
12              THE WITNESS:  It depends on what
13         you mean by meaningful.  I don't know
14         what a judge would do with it.  I have
15         no idea.  If you present this
16         information this way, I don't know what
17         it's legal bearing has.  I can tell you
18         that it is neither qualitative research
19         nor is it quantitative research.
20   BY MR. CERYES:
21        Q    Would you defer to a psychiatrist
22   as to whether the verbatims included within
23   Exhibit 5 could be used to reach any opinions
24   about the nature and extent of damages
25   suffered by patients of Igberase/Akoda?

Transcript of Susan McDonald, Ph.D.
Conducted on December 19, 2019                    71

1              MR. SHAFFER:  Objection to form.

2              THE WITNESS:  No, I would not

3       because the method by which these data

4       were extracted is not the realm of

5       psychiatric examination.  The

6       methodology resides with survey

7       research.  This was a process that

8       occurred as a result of survey

9       invitations to women who chose to

10      respond to a survey among -- in a

11      population who chose to respond to

12      invitation to be part of litigation.

13      This is not notes from a psychiatric

14      interview.  So Dr. Steinberg can testify

15      with regard to how she would interpret

16      it.  She's entitled to do that.  But I

17      would not credit this as psychiatric

18      information myself because its source is

19      survey research.

20 BY MR. CERYES:

21      Q    Okay.  Is it fair to say that in

22 all of the responses and summary statements

23 provided, you would not feel comfortable

24 saying that any of that documentation

25 reflects that any women have experienced harm

Transcript of Susan McDonald, Ph.D.
Conducted on December 19, 2019                    72

1    by virtue of being treated by Igberase/Akoda?

2              MR. SHAFFER:  Objection to form.

3              THE WITNESS:  I don't know what to

4         do with this information.  And, in

5         part -- again, this is parsing.  I don't

6         know what any of these statements

7         themselves mean.  I don't know -- in

8         some cases, they're hard to even

9         interpret, just to understand what's

10        being said and what connections are

11        being made.  That's one thing.

12             What needs to be parsed is the "as

13        a result of being seen or treated by

14        Dr. Akoda," and it's not clear to me

15        what somebody would have said depending

16        on how they learned about or what

17        information was imparted to them about

18        Dr. Akoda, and that's part of this as

19        well.  I mean, that's the 600-pound

20        gorilla in the room.  What were these

21        women told about him.  What was their

22        experience or their thought process

23        before they were told about him.  So is

24        a result of being treated is not exactly

25        the same as a result of being treated