# Exhibit 3

1           IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2               CIVIL ACTION NO. 18-5629
3

   MONIQUE RUSSELL, JASMINE        :
4  RIGGINS, ELSA M. POWELL,        :
   and DESIRE EVANS,               :
5                                  :
                   Plaintiffs,     :
6                                  :
            vs.                    :
7                                  :
   EDUCATIONAL COMMISSION FOR      :
8  FOREIGN MEDICAL GRADUATES,      :
                                   :
9                  Defendant.      :
10
11                 Deposition of DR. DAVID
12 MARKENSON taken in the above-entitled matter
13 before Suzanne J. Stotz, a Certified Realtime
14 Reporter, Registered Professional Reporter, and
15 Notary Public of the State of Colorado, taken
16 at the WESTIN DENVER AIRPORT, 8300 Pena
17 Boulevard, Denver, Colorado 80249, on
18 October 22, 2019, commencing at 10:14 a.m.
19
20
21
22
23
24

Dr. David Markenson

1    Plaintiff -- plaintiff, on that side.

2         Q.     On behalf of the infant's family?

3         A.     Yes.

4         Q.     Were you -- you were a medical

5    expert in that case?

6         A.     Administrative and medical.

7         Q.     When you say "administrative,"

8    explain to me what you mean.

9         A.     Hospital policies and procedures.

10        Q.     Did you provide expert testimony

11   regarding credentialing in that case?

12        A.     Let's see.  I'm trying to think if

13   we got into credentialing.  I don't believe we

14   got into credentialing.

15        Q.     Did you give any testimony

16   regarding the Educational Commission for

17   Foreign Medical Graduates in that case?

18        A.     No, I did not.

19        Q.     In any of these cases we just

20   discussed, was there an issue regarding the

21   sufficiency of the credentialing by ECFMG?

22        A.     No, there was not.

23        Q.     You mentioned that you had some

24   cases that fell outside of the time frame

Dr. David Markenson

1    provided for by the Federal Rules for

2    Disclosure with your expert report earlier

3    today.

4              Do you remember that?

5       A.    Yes.

6       Q.    Do you remember any of those cases?

7       A.    Only a few -- several of them were

8    filed against me as a physician.

9       Q.    Sort of run-of-the-mill malpractice

10   types --

11      A.    Correct.

12      Q.    -- of cases?

13            In what specialty?

14      A.    Pediatric emergency and pediatric

15   critical care.

16      Q.    Did any concern your credentialing?

17      A.    I don't remember the specifics.  I

18   was a named defendant, so there may have

19   been -- there may have been something about

20   credentialing against me.  I don't know.  I

21   don't remember.  They were all dismissed.  I

22   don't remember most of the details.

23      Q.    Are you certified by ECFMG?

24      A.    No, I'm not.

Dr. David Markenson

1      Q.     Other than the Jenny Butler and the

2   Abid case listed here, have you ever served as

3   an expert witness other than the case that

4   brings us here today?

5      A.     I believe so, yes.

6      Q.     Do you recall in which cases?

7      A.     Not off the top of my head, no.

8      Q.     Do you recall, generally speaking,

9   the subject matter on which you have served as

10  an expert?

11     A.     It's varied either administratively

12  as a physician or in my specialties of

13  pediatrics.

14     Q.     Can you estimate to me how many

15  times other than the two listed on this

16  disclosure you've served as an expert witness?

17     A.     I think two or three roughly.

18     Q.     Do you recall whether you've ever

19  previously served as an expert witness

20  regarding credentialing?

21     A.     I may have been asked.  I don't

22  remember.  It may have been part of -- it may

23  have been part of the sort of overall hospital

24  administration and policies.

Dr. David Markenson

1      Q.      Do you recall whether credentialing

2  was ever a central element of your opinions

3  other than in the case today?

4      A.      In the administrative cases, it

5  usually is part of it.  It's usually all the --

6  it's one of the aspects.

7      Q.      What are the other aspects in

8  administrative as you've been talking about it?

9      A.      Hospital policies and procedures,

10  transfer admission guidelines.

11      Q.      Say that last one again.

12      A.      Admission guidelines.

13      Q.      For a patient to be admitted to the

14  hospital?

15      A.      Correct.

16      Q.      When you served as an expert

17  witness regarding administrative types of

18  issues, was that always about hospital

19  administration?

20      A.      Yes, predominantly hospital

21  administration.

22      Q.      Anything other than hospital

23  administration?

24      A.      It may be associated healthcare,

Dr. David Markenson

1   communities.

2         Q.     Do you still see patients?

3         A.     I do.

4         Q.     Where?

5         A.     Right now I'm doing that as

6   per-diem or part-time work.

7         Q.     At a particular hospital?

8         A.     It varies.  They're usually

9   temporary assignments.

10        Q.     Generally in the Denver, Colorado,

11  area?

12        A.     It can be anywhere.

13        Q.     In what specialty?

14        A.     Either pediatric emergency or

15  pediatric critical care.

16        Q.     Are you trained as an

17  obstetrician/gynecologist?

18        A.     No, I am not.

19        Q.     So your typical patients are

20  pediatric patients; is that correct?

21        A.     Yes, they are.

22        Q.     In the course of your practice,

23  have you knowingly come across any patients

24  treated by Dr. Akoda?

Dr. David Markenson

1      A.      I have not.

2      Q.      If I use the name Dr. Akoda, do you

3   know to whom I am referring?

4      A.      I am familiar with who he is.

5      Q.      For ease today, I'm just going to

6   use that one name; but I do intend it to be the

7   individual that is the subject of the lawsuit

8   that we're here for.

9              Do you understand that?

10     A.      Yes.

11     Q.      Okay.  Have you done any

12  examinations of any of the plaintiffs in this

13  lawsuit?

14     A.      No, I have not.

15     Q.      Have you met any of them?

16     A.      No, I have not.

17     Q.      Have you reviewed any of their

18  medical records?

19     A.      No, I have not.

20     Q.      Have you been able to evaluate

21  what, if any, harm has come to them by their

22  interactions Dr. Akoda?

23             MR. VETTORI:  Objection.  That's

24     not the scope of his expert testimony.

Dr. David Markenson

1  BY MS. McENROE:

2       Q.      You can answer the question anyway

3  unless he tells you not to?

4       A.      No, I have not.

5               (Whereupon, Exhibit No. 4, Report

6       of David Samuel Markenson, MD, was marked

7       for identification.)

8               MS. McENROE:  For the record, this

9       is a very wide table.

10  BY MS. McENROE:

11      Q.      All right.  So I just handed what's

12  been marked as Exhibit 4.

13      A.      Uh-huh.

14      Q.      Have you seen this document before?

15      A.      Yes, I have.

16      Q.      What is it?

17      A.      This is the report I had submitted.

18      Q.      In this lawsuit, correct?

19      A.      Correct.

20      Q.      I'd like to direct your attention

21  to page 5 in Exhibit 4, so page 5 of your

22  report?

23      A.      Yes.

24      Q.      The very last paragraph there says,

Dr. David Markenson

1   "It is my opinion, to a reasonable degree of

2   professional certainty, that these failures on

3   the part of ECFMG to comply with the standard

4   of care were the direct cause of Akoda being

5   certified by ECFMG and which are the direct

6   cause of the harms caused to the plaintiffs and

7   the members of the class."

8           Do you see that?

9       A.      Yes, I do.

10      Q.      On what basis are you saying that

11  you know what the direct cause of harms is, the

12  cause to the plaintiffs having never met them,

13  having never evaluated them, and not having

14  reviewed their medical records?

15      A.      Had ECFMG not certified Dr. Akoda,

16  he would have not been licensed as a physician,

17  admitted to a residency, or allowed to treat

18  the patient.  So no harm from him would have

19  come to them had ECFMG done their actions and

20  not certified him.

21      Q.      So you're not giving this opinion

22  here in this last paragraph on page 5 on the

23  basis of any specific knowledge of alleged

24  harms caused to the plaintiffs; you're just

Dr. David Markenson

1       Q.      And those reflected that he was

2   licensed to practice medicine in Nigeria,

3   correct?

4       A.      Without -- I don't know if they

5   were valid or not, but they do reflect that he

6   did attest to an ECFMG certified that he had.

7       Q.      So other than the course of events,

8   if you will --

9       A.      Uh-huh.

10      Q.      -- in this case, do you have any

11  knowledge or specific opinions about any

12  particular harms that you're making opinions

13  about for any of the plaintiffs in this case?

14          MR. VETTORI:  Objection.

15          You can answer.

16          THE WITNESS:  Sure.  Just that he

17      was allowed to hold himself out as a

18      physician having not met legal

19      requirements.

20          Obviously a patient who is going to

21      discover that someone who examined them,

22      you know, who was not who they said they

23      were is going to have an effect on that

24      patient.  It's tremendous invasion of

Dr. David Markenson

```
1        privacy.  It's a tremendous invasion of

2        their person.

3              Anything that happened subsequent

4        to that, in terms of all the medical care

5        he rendered, would have never been allowed

6        had the proper steps been done to not

7        allow him to proceed.

8  BY MS. McENROE:

9        Q.    But do you know about any specific

10  harm caused to any specific plaintiff in this

11  case?

12        A.    I did not read -- as I've said, I

13  have not reviewed their medical records.  All I

14  know is that they've come to be aware that they

15  were treated by someone who wasn't who he said

16  he was.  They were examined by someone who

17  wasn't who he said he was, and that by itself

18  to anyone is going to have significant effect.

19        Q.    Are you able to say I know that

20  this person suffered that harm?  Are you able

21  to specifically say that about any of the

22  plaintiffs in this case?

23        A.    All I'm able to say is they would

24  have never been treated by him had ECFMG done
```

Dr. David Markenson

1   their due diligence, and I am sure that they

2   themselves are having effects of being treated

3   by someone who isn't who they say they were and

4   isn't the physician he supposedly was.

5       Q.      Other than your armchair

6   perspective, on what basis do you say you're

7   sure that that's what's happening?

8               MR. VETTORI:  Objection as to form.

9               THE WITNESS:  I am -- well, one had

10      ECFMG not certified him, he would never

11      would have been in contact with those

12      patients.  That's a binary

13      black-and-white.

14              Number 2, they have now come to

15      know that someone who treated, examined

16      the, including invasive examinations was

17      not who they say they were.

18  BY MS. McENROE:

19      Q.      If the licensing boards had not

20  granted him medical licenses, do you believe he

21  would have treated these patients?

22      A.      I believe had -- if ECFMG had not

23  certified --

24      Q.      I'm sorry.  I'm going to move to

Dr. David Markenson

1    strike.

2              My question is specifically about

3    the medical boards.

4         A.    Uh-huh.

5         Q.    So I understand you're going back

6    to ECFMG, but I'm specifically asking --

7         A.    Uh-huh.

8         Q.    -- had the medical boards not

9    licensed him to practice medicine, is it your

10   position that he would have laid hands on the

11   patients anyway?

12        A.    I did -- so again, I was

13   communicating what's required to get licensed;

14   but if you want to just look at once he had a

15   license, without a license, he would not have

16   been able to obtain medical privileges.

17        Q.    Do you think the medical licensing

18   authorities in this case did what they should

19   have done regarding Dr. Akoda?

20             MR. VETTORI:  Objection.  It's

21        beyond the scope of his opinions.

22   BY MS. McENROE:

23        Q.    You may answer.

24        A.    The medical license boards as far

Dr. David Markenson

1   as I can tell -- I haven't seen their internal

2   records -- but from the records provided to me,

3   they issued him a license.

4        Q.     Right.  Do you think they should

5   have done that?

6        A.     I would have to review all their

7   internal records.  I do know that they based it

8   on the documents submitted at USMLE ECFMG

9   certification.

10       Q.     Do they only base it on USMLE ECFMG

11  certification when they license a medical

12  physician in their date?

13       A.     Again, I would have to review their

14  internal records and his application; but the

15  process for license -- when one applies for

16  licensure, it's based on either medical school

17  verification in the U.S., not in the U.S.

18  ECFMG, passing of your USMLEs under the current

19  situation -- before USMLE, there were other

20  exams -- and completion of at least, in most

21  states, one year of internship.

22       Q.     As part of a residency program

23  typically?

24       A.     Typically, yes.

Dr. David Markenson

1      Q.     And he was accepted to a residency

2   program that he then later completed at Howard

3   University Hospital, correct?

4      A.     Correct.

5      Q.     Do you think without getting

6   admitted to Howard University Hospital's

7   residency program, he would have treated these

8   patients?

9                MR. VETTORI:  Objection.

10               You can answer.

11               THE WITNESS:  It's purely

12          speculative.  He would have had to have

13          done one year of training somewhere to

14          obtain licensure.

15   BY MS. McENROE:

16      Q.     And is it your understanding that

17   the year of training he did to obtain licensure

18   in this case took place at Howard University

19   Hospital?

20      A.     That is my understanding, yes.

21      Q.     Have you done any analysis of what

22   was submitted to Howard University Hospital for

23   him to be admitted to a residency program

24   there?

Dr. David Markenson

1    A.    I have not.  I have no part of

2   those records.

3    Q.    Have you ever played a role in

4   hiring any medical school graduates into

5   residency programs?

6    A.    Yes.

7    Q.    At what residency programs?

8    A.    I served as what's known as the DIO

9   or designated institutional official for

10  multiple hospitals while I was VP of GME for

11  Hospital Corporation of America.

12   Q.    Where was that located?

13   A.    There were several -- a multitude

14  of hospitals.

15   Q.    You can take a minute to explain

16  just briefly so I understand.

17   A.    Yes.  I served for what was known

18  as HealthONE, which were hospitals in the

19  greater Denver area; for -- what was the

20  hospital called -- a hospital in Kansas City.

21  I'm totally blanking.

22   Q.    Your C.V. is there in case it's

23  helpful for you.

24   A.    Yeah.  I'm trying to remember the

Dr. David Markenson

1  name of the one.  So it was Research Medical

2  Center in Kansas City which oversaw the --

3  included the hospitals in the Kansas City area

4  that were owned by HCA, Ogden Regional Medical

5  Center which included the Salt Lake City

6  hospitals owned by HCA and Eastern Idaho

7  Regional Medical Center.

8      Q.    Were the residency programs

9  involved in those medical centers only about

10 pediatric emergency or critical care?

11     A.    No, they were not.

12     Q.    All right.  So it was a broader

13 range of residency programs?

14     A.    Yes, it was.

15     Q.    Was it the full range of residency

16 programs available at those hospitals?

17     A.    I'm not sure what you mean.

18     Q.    Yeah.  So I'm not trying to ask you

19 a trick question in any sense.  I'm just trying

20 to understand in your role as DIO for these

21 organizations that we were just referring to,

22 were you overseeing the admission to the

23 residency programs for all the residency

24 programs that those facilities offered at any

Dr. David Markenson

1    given time?

2         A.    I was involved -- the decision is

3    the program director's, but I oversee the

4    processes, procedures, and the program

5    directors.

6         Q.    Have you ever served as the program

7    direct for any residency programs?

8         A.    No, I have not.

9         Q.    Have you ever interviewed anybody

10   applying to a residency program?

11        A.    Yes, I have.

12        Q.    Approximately how many times?

13   Hundreds?  Five?  You know, somewhere --

14        A.    Probably not hundreds, but close to

15   it.

16        Q.    Okay.  So a large number of times?

17        A.    Yes.

18        Q.    In your experience -- in your

19   various roles, was an interview always involved

20   before a resident would get offered a residency

21   program as far as you're aware?

22        A.    In most cases, the last step after

23   all the screening that is done, you know,

24   verification of board scores, eligibility for

Dr. David Markenson

1   residency, all the steps, most residencies do

2   use as interview as the last step in the

3   process.

4        Q.     Were you ever involved in residency

5   programs that did not interview their residents

6   before they admitted them?

7        A.     I think there may have been cases.

8   There's something called a scramble, you know,

9   fill your spots.  Some --

10       Q.     So after the Match, if there's not,

11   if there are extra spots left, you get --

12       A.     Sometimes a resident may get in

13   without a formal interview.

14       Q.     But would there usually been an

15   informal interview or a conversation before

16   that would happen?

17       A.     Usually.

18       Q.     Is that in the vast majority or

19   vast minority of cases?

20       A.     That's minority.

21       Q.     You referred to the interview

22   typically being the last step, in your

23   experience, for residency program admission.

24   And you mentioned some other screening.

Dr. David Markenson

1                  What else, in your experience, is

2      involved in the offering of a residency

3      position to a resident?

4          A.     The initial screening is done to

5      make sure that the person is eligible for

6      residency.  So presence of medical school

7      graduation, confirmation, or ECFMG

8      certification.

9                  So it's sort of that's the first

10     step.  If they don't graduate medical school or

11     they don't have an ECFMG certification, the

12     process would stop.

13         Q.     Okay.

14         A.     Following that process, one that

15     has letters of reference, Dean's

16     recommendation, board scores; and there's

17     usually a cutoff to determine of those who then

18     obtain an interview.

19         Q.     When you say "of those," you mean

20     cutoff of the board scores?

21         A.     Board scores, letters of reference,

22     recommendations.

23         Q.     Any other information collected or

24     reviewed in connection with residency program

Dr. David Markenson

1    applications that you recall, you know, sitting

2    here today?

3          A.      Usually not, no.

4          Q.      Is there usually an application

5    form, like, they actually fill out like a job

6    application?

7          A.      They don't anymore.  It's all done

8    through the electronic system called ERAS.

9          Q.      Okay.  Previously, do you know

10   whether there had been applications to

11   residency programs in, say, the 2011 time

12   frame?

13         A.      There would have not been.  They

14   would have all been ERAS.

15         Q.      Even then?

16         A.      Yes.

17         Q.      In your experience, do residents

18   get paid?

19         A.      Yes, they do.

20         Q.      Do they get paid through any

21   sources of funding in particular?

22         A.      The hospital pays them.

23         Q.      Does the hospital typically

24   withhold taxes?

1  certification.

2      Q.     Okay.  You said for a U.S. grad, it

3  was possible to do additional confirmations or

4  checks of their medical school graduation.

5      A.     Well, just other checks.  We

6  could -- if you were deciding between two

7  applicants, the last stage of an interview

8  process, you might be able to call up there

9  Dean and get a personal feedback or a clerkship

10  director.  So at the final stage, we had that

11  ability.

12     Q.     And you couldn't do that for

13  foreign educated doctors?

14     A.     It was not feasible or possible.

15     Q.     Why not?

16     A.     Just we didn't have the access or

17  the registries of who the schools were, or who

18  the clerkship directors were.

19            Again, that was a last process if

20  you were deciding between one or two.  You had

21  that additional nuance you could use.

22     Q.     Would you expect a U.S. medical

23  school to be the source of social security

24  numbers for applicants to residency programs?

Dr. David Markenson

1          A.      Traditionally, I don't -- as a

2    program director, we weren't -- I would not

3    have been involved in social security.  That

4    would have been HR department.

5          Q.      But you would not have relied on

6    the medical schools in United States to do some

7    sort of identity verification or check that a

8    social security number was valid?

9          A.      I don't believe they would

10   traditionally do that because they weren't

11   employing individuals.

12         Q.      And what about ECFMG doing that?

13         A.      I don't -- I believe ECFMG -- my

14   understanding was, as a program director, my

15   role here is ECFMG verifies identity and

16   medical school graduation, the link between the

17   two.

18         Q.      What do you mean by "identity"?

19         A.      That the person who was holding

20   themselves out as Individual A who graduated

21   medical school and provides a medical school

22   documentation is Individual A who does have

23   that medical school diploma.

24         Q.      How do you expect that they do

Dr. David Markenson

1  that?

2      A.      They would -- again, any -- they

3  would verify with the medical school that the

4  individual who was presenting themselves with

5  the application was the one who was issued the

6  diploma; and that would be through, obviously,

7  the names matching completely.

8              And I know that ECFMG also uses

9  photographic identification too.

10     Q.      What's your understanding about how

11  photographic identification is used here?

12     A.      I believe, as I've seen, is that

13  it's on the application; and it's submitted

14  back to the medical school with the

15  verification.

16     Q.      Do you have any -- strike that.

17              Prior to being involved in this

18  lawsuit, had you ever seen an ECFMG

19  application?

20     A.      I had not.

21     Q.      Did you have any expectation prior

22  to being involved in this case about

23  photographic identification regarding ECFMG

24  certification?

Dr. David Markenson

1    A.    I had an expectation that it was

2  identity verification.  I didn't know the

3  mechanism used.

4    Q.    On what basis did you have an

5  expectation there was identity verification?

6    A.    ECFMG was held out to us based on

7  materials we had seen from them and just from

8  knowledge in the community that they were

9  responsible for and attesting to that the

10  individual who's applying to me, John Smith

11  I'll say, is, in fact, the John Smith who was

12  issued a medical school diploma from the

13  medical school in question.

14    Q.    So is it your expectation that

15  ECFMG would be certifying that the person who

16  would physically show up at your hospital was

17  the person who graduated from that medical

18  school?

19    A.    The person identified on their

20  certification.

21    Q.    Right.

22    A.    The person to which the

23  certification was issued was one and the same

24  with the person who had graduated the medical

Dr. David Markenson

1  school.

2       Q.      And you understood that was

3  completed through primary source verification

4  of the diploma?

5       A.      Correct.

6       Q.      And now you have the expectation

7  that it also had to do with the photograph?

8       A.      I knew that their -- I didn't know

9  the specific mechanism that they did, but now I

10  know that it was through photographic.

11       Q.      And you say that just based on

12  having seen applications in this case?

13       A.      Correct.

14       Q.      When hiring residents or

15  interviewing residents, have you come across

16  applicants who had failed components of the

17  USMLE?

18       A.      Yes.

19       Q.      And was it your expectation that

20  those individuals would have a higher or a

21  lower likelihood of being admitted into a

22  residency program?

23       A.      Someone who has failed would have a

24  lower likelihood than someone who had passed.

Dr. David Markenson

1       Q.      When hiring residents, do you have

2    an expectation or recollection of how

3    successful you would expect a foreign educated

4    physician to be in applying for a residency

5    program if they had multiple failures on a

6    step?

7       A.      There's no generic answer because

8    different residencies will have different

9    standards.

10      Q.      Do you have an understanding of

11   whether having failed one or more steps

12   multiple times could make applying for a

13   residency program more challenging for an

14   applicant?

15      A.      Failing would make you less

16   attractive than someone who passed to a

17   residency program.

18      Q.      Are there enough residency program

19   slots for the applicants applying each year in

20   your experience?

21      A.      It depends on the specialty.

22      Q.      Are there some specialties for

23   which there would be more applicants than slots

24   in any given year?

Dr. David Markenson

1  this morning, you are not ECFMG certified,

2  correct?

3       A.    Correct.

4       Q.    And you are a medical physician in

5  the United States?

6       A.    Correct.

7       Q.    You attended medical school in the

8  United States?

9       A.    Correct.

10      Q.    You are not currently an employee

11  of ECFMG, correct?

12      A.    Correct.

13      Q.    And have you ever been employed by

14  ECFMG?

15      A.    No, I have not.

16      Q.    Are you currently on the Board of

17  Trustees of ECFMG?

18      A.    No, I am not.

19      Q.    Have you ever been on the Board of

20  Trustees of ECFMG?

21      A.    No, I have not.

22      Q.    You've never sat on the Medical

23  Education Credentials Committee of the Board of

24  Trustees of ECFMG, correct?

Dr. David Markenson

1          A.      No, I have not.

2          Q.      Have you ever had direct personal

3    contact with that committee?

4          A.      I have not.

5          Q.      Prior to this case, did you know

6    that committee existed?

7          A.      I believe I've seen it in some of

8    the materials.

9          Q.      You mean some of ECFMG's materials?

10         A.      Correct.

11         Q.      Do you recall the circumstances in

12   which you saw that?

13         A.      I think it was just in learning

14   about it in some of them.

15         Q.      Prior to this case, had you ever

16   been personally involved in or aware of a case

17   or an allegation of irregular behavior by

18   ECFMG?

19         A.      By ECFMG?  No.

20         Q.      Have you ever been familiar with

21   the term of "irregular behavior" prior to this

22   case otherwise?

23         A.      Yes.

24         Q.      In what setting?

Dr. David Markenson

1     A.     I have heard it be used in USMLE

2 setting.

3     Q.     Have you ever been personally aware

4 of an allegation of irregular behavior in the

5 USMLE setting?

6     A.     Just heard about the process.

7     Q.     You personally have not been

8 involved in any irregular behavior proceedings?

9     A.     I have not.

10     Q.     As a witness or otherwise?

11     A.     No, I have not.

12     Q.     Have you ever sat on any committees

13 or boards for the USMLE?

14     A.     I have not.

15     Q.     Have you ever been employed by

16 USMLE?

17     A.     I have not.

18     Q.     When you were coming through and

19 becoming medical licensed, was the USMLE in

20 existence?

21     A.     Yes, it was.

22     Q.     Okay.  And you took the USMLE steps

23 that existed at that time?

24     A.     Yes, I did.

Dr. David Markenson

1      Q.      Was that Step 1, Step 2, and

2  Step 3?

3      A.      Yes.

4      Q.      And Steps 1 and 2 were prior to

5  residency.  And did you take Step 3 during your

6  residency?

7      A.      Yes, I did.

8      Q.      Aside from having read about the

9  Medical Education Credentialing Committee and

10  passing from some ECFMG materials, do you have

11  any other basis to have familiarity with the

12  work or business of the Medical Education

13  Credentials Committee?

14      A.      Not prior to this case.

15      Q.      Do you know anyone who sits on the

16  Medical Education Credentialing Committee?

17      A.      I do not believe so.

18      Q.      Have you spoken with, that you know

19  of, that sits on the Medical Education

20  Credentials Committee?

21      A.      No.

22      Q.      Do you know anybody on the board of

23  ECFMG?

24      A.      I do not.

Dr. David Markenson

1    Q.    Do you know the composition of the

2 board of ECFMG?

3    A.    I do not know the composition.

4    Q.    Do you know whether they're medical

5 professionals or otherwise?

6    A.    I believe they are, yes.

7    Q.    You believe there are some doctors

8 on?

9    A.    Yes.

10    Q.    Do you have any basis for that

11 knowledge, or that's just your expectation?

12    A.    I believe there's representatives

13 of different associations, so I presume that

14 there were physicians on it.

15    Q.    How do you have that understanding?

16    A.    Just from general knowledge,

17 nothing specific.

18    Q.    You've never appeared before the

19 Medical Education Credentialing Committee; is

20 that correct?

21    A.    Correct.

22    Q.    Have you ever been involved, that

23 you know of, in a request for an exception to

24 the Medical Education Credentials Committee.

Dr. David Markenson

1   If I can give you an example of what I mean:

2   Has someone ever come to you or been a resident

3   for you all where they, for example, were from

4   a war-torn country, couldn't get access to

5   their medical school so had letters of

6   attestation prepared by others in the United

7   States?

8        A.     No.

9        Q.     Not that you know of?

10       A.     Not that I know of.

11       Q.     Okay.  Are you familiar with the

12  concept or have you ever heard of the

13  seven-year rule?

14       A.     I'm not sure what you're referring

15  to.

16       Q.     Okay.  So do you have any

17  understanding of whether there is a time

18  limitation within which certain steps need to

19  be passed in order for examination scores to

20  remain valid?

21       A.     I do.  There were not when I was

22  involved.

23       Q.     Okay.  So you've never been

24  involved in a request for an exception to that

Dr. David Markenson

1   you're surmising as opposed to some knowledge

2   or specialized experience you have with the

3   Medical Education Credentials Committee; is

4   that correct?

5        A.     Correct.  It's based on the facts

6   that are in the file.

7        Q.     The way you read the facts in the

8   file?

9        A.     I believe it's pretty

10  straightforward that he admitted identity

11  fraud.

12       Q.     Well, he admitted to using his

13  cousin's social security number, but he denied

14  being that individual, correct?

15       A.     Correct.  But he held himself out

16  as the holder of that identity or social

17  security identity.

18       Q.     Do you know what, if for any

19  purpose, ECFMG uses social security numbers?

20       A.     I do not know.

21       Q.     Do you know if foreign medical

22  graduates need to have a social security number

23  to apply to ECFMG?

24       A.     I do not.

Dr. David Markenson

1    Q.    Do you know what resources, if any,

were available to ECFMG for verifying a social

security number at that time?

4    A.    I do not know.

5    Q.    Do you know how the Medical

Education Credentials Committee deliberates

over allegations of irregular behavior?

8    A.    My knowledge is based on the files

provided by ECFMG; and as far as I can see, at

the time of this event, there were no policies

and procedures or at least provided how they

deliberate.

13    Q.    When you say "provided," you mean

provided to you?

15    A.    Yes.

16    Q.    Did you ask for them?

17    A.    I believe the policies and

procedures were asked for.  I believe there was

one provided on irregular behavior; but that

wasn't, as far as from the records, that was

not in effect at the time of this incident.

22    Q.    From your own professional

experience, do you have firsthand knowledge of

whether and what policies and procedures ECFMG

Dr. David Markenson

1    had in time -- at the relevant time in place?

2         A.     I do not have any individual

3    knowledge.  I, as a physician, rely upon ECFMG

4    would have presume that they would have had

5    adequate policies and procedures to follow, to

6    process, verify, and adjudicate issues; but I

7    don't know those specific policies.  What -- I

8    have not seen any that were in effect at that

9    time.

10        Q.     But from your own professional

11   experience, you don't know one way or the other

12   whether ECFMG had policies in place at the

13   relevant time; is that correct?

14        A.     I believe from the depositions and

15   testimonies that were provided, there is claim

16   that they were not; but the policy was created

17   later.

18        Q.     I'm just trying to get an

19   understanding of your only personal knowledge

20   separate from this case.

21             Do you have any knowledge one way

22   or the other?

23        A.     I do not have any knowledge

24   separate from this case.

Dr. David Markenson

1       Q.      Do you know about USMLE's policies

2   and procedures on irregular behavior?

3       A.      I do not.

4       Q.      Okay.  Do you know whether at the

5   time they had policies on irregular behavior?

6       A.      I have not reviewed any.

7       Q.      But you don't know one way or the

8   other?

9       A.      I do not.

10       Q.      Do you have an understanding of

11   whether contemporaneously ECFMG staff evaluated

12   whether there was sufficient information to

13   bring an allegation of irregular behavior

14   against Dr. Akoda to the Medical Education

15   Credentials Committee?

16       A.      I'm sorry.  I'm losing you a little

17   bit in that question.

18       Q.      Sure.  Do you know if whether in

19   real time --

20       A.      Uh-huh.

21       Q.      -- ECFMG staff evaluated whether or

22   not in their experience and their view there

23   was sufficient information to bring an

24   allegation of irregular behavior against

Dr. David Markenson

1      Q.      -- they had the real number?

2      A.      Unfortunately, I think some

3  individuals were less than reputable, figured

4  that out, and went in and literally stamped --

5  these were the days that you still stamped and

6  signed prescriptions.

7      Q.      Before electronic?

8      A.      Yes.

9      Q.      Yeah.  Do you have an understanding

10  of the whether Dr. Akoda perpetrated a fraud of

11  any sort?

12      A.      Yes.

13      Q.      Okay.  On whom do you believe

14  Dr. Akoda perpetrated a fraud?

15      A.      Well, Dr. Akoda as we've previously

16  talked about said he used someone else's social

17  security number at, I believe, it was Jersey

18  Shore Hospital.  So he used someone else other

19  than that.

20              And in these files, we've come to

21  see that multiple times he applied to ECFMG and

22  held out that he had never applied before.

23      Q.      You would agree that he perpetrated

24  a fraud on ECFMG?

Dr. David Markenson

1      A.      I believe, yeah, he submitted -- I

2  believe he submitted an application that had

3  incorrect information on it.

4      Q.      Would you agree that he perpetrated

5  a fraud on the Maryland licensing authority?

6      A.      I'm not familiar with the

7  application whatever he submitted to them, so I

8  wouldn't be --

9      Q.      Do you believe Dr. Akoda

10  perpetrated a fraud on the patients he treated?

11      A.      I believe he did, yes.

12      Q.      Do you believe that Dr. Akoda

13  perpetrated a fraud at the hospital system at

14  which he practiced?

15      A.      Again, I was not privy to their

16  credentialing files or processes.

17      Q.      Who first contacted you in

18  connection with this lawsuit?

19      A.      I'm trying to remember.  I believe

20  it was a referral expert institute or if I

21  remember now.

22      Q.      It may have been through a

23  consulting company?

24      A.      It may have been, yes.

Dr. David Markenson

1      Q.      And what consulting companies do

2  you work with?

3      A.      There are a couple, two or three,

4  that list your name; and I believe I'm on

5  several of them.

6      Q.      Okay.  Do you know which ones

7  you're on?

8      A.      I think it's like a -- is it

9  Rooters or Randolph's?

10      Q.      All right.  But do you recall who

11  represents plaintiffs?  Who first contacted you

12  the first time you were in contact with

13  plaintiffs' counsel in this case?

14      A.      I believe it was -- the way it

15  worked is this referral agency that lists my

16  name said there was a case would I be

17  interested, and then we had a phone call with

18  plaintiffs' attorneys to discuss the case.

19      Q.      Was anyone else on the call with

20  you and plaintiffs' counsel?

21      A.      I believe it was just us and the

22  plaintiffs' counsel.

23      Q.      Do you recall who you spoke to at

24  plaintiffs' counsel?

Dr. David Markenson

1        A.      Uh-huh.

2        Q.      If there's anything else that we've

3   not yet discussed today that you considered in

4   rendering your opinions in this case?

5        A.      Just I've just reviewed the

6   materials that were sent by plaintiffs'

7   counsel.

8        Q.      Okay.  Did you ask for anything

9   additional that you did not receive?

10        A.      The only thing I asked for was were

11   there policies and procedures that ECFMG used

12   at the time of this event.

13        Q.      And did you get any in response?

14        A.      We have not gotten any.

15        Q.      Have you ever read an ECFMG

16   information booklet?

17        A.      Yes.

18        Q.      Do you know what that is?

19        A.      Yes.

20        Q.      Can you describe what that

21   information booklet is?

22        A.      I believe -- what I -- what I've

23   read is from the website.  There's a booklet

24   that the ECFMG puts out that provides

Dr. David Markenson

1    information.  I believe the target audience is

2    applicants, but I think it's also used by

3    residencies and hospitals and others.

4         Q.    And you said you looked at it on

5    the website.

6              So was that the most recent version

7    you were looking at?

8         A.    Yes.

9         Q.    Have you looked at any historic

10   information booklet?

11        A.    I have not.

12        Q.    Have you asked whether there was an

13   information booklet that controlled for the

14   relevant time period in this case?

15        A.    I had not.

16        Q.    Are you --

17        A.    I had asked for just policies and

18   procedures that they followed at the time.

19        Q.    So you received of the Bates

20   stamped ECFMG documents ECFMG '10 through '706,

21   correct?

22        A.    That's what it says, yes.

23        Q.    Are you aware that the production

24   ECFMG made that included those numbers also

Dr. David Markenson

1   went all the way up to '3084?

2        A.      I have not.

3        Q.      And included historic information

4   booklets containing policies and procedures

5   from 1992 through 2012?

6        A.      I'm not aware of that.

7        Q.      Okay.  And you didn't see those or

8   review those?

9        A.      No.  I specifically asked for

10  policies and procedures at the time.

11       Q.      Is there a reason why you're

12  drawing a distinction between an information

13  booklet and policies and procedures?  You don't

14  think policies and procedures could be

15  reflected in an information booklet?

16            MR. VETTORI:  Objection as to form.

17            Go ahead.

18            THE WITNESS:  In general an

19        information booklet is a summary or a

20        promotional document and not necessarily

21        what staff or others would follow in an

22        organization to handle affairs.

23            It would be similar to hospital.

24        We put out brochures about our hospital,

Dr. David Markenson

1          but I run the hospital by our policies and

2          procedures.

3     BY MS. McENROE:

4          Q.     Do you know whether ECFMG used

5     irregular behavior policy and procedures as

6     contained within the information booklet so

7     that the applicants have the entire policy

8     since it's important?

9          A.     All I know is what I saw in the, I

10    believe it was the deposition of, I believe it

11    was Mr. Kelly, who had said that at the time

12    that they didn't have one, and they created one

13    after this which is the current policies and

14    procedures.

15         Q.     We're going to take a quick break

16    to change the tape.

17         A.     Okay.

18              THE VIDEOGRAPHER:  The time is

19         12:52 p.m., and we are going off the

20         record -- 12:15 p.m.  We're going off the

21         record.

22              (Whereupon, a lunch break was

23         taken.)

24              THE VIDEOGRAPHER:  The time the

Dr. David Markenson

1          12:50 p.m., and we are back on the record.

2    BY MS. McENROE:

3          Q.     Good afternoon, Dr. Markenson.  You

4    understand you're still under oath?

5          A.     Yes.

6          Q.     Did you review any documents

7    produced by Howard University.

8          A.     I did not.

9          Q.     Okay.  Do you have any

10   understanding of whether or not those documents

11   were produced, that there were any Howard

12   University documents produced in this case?

13         A.     I do not.

14         Q.     Do you have any understanding of

15   what Howard University required from applicants

16   through their residency programs?

17         A.     I do not.

18         Q.     Do you know what Dr. Akoda provided

19   to Howard University in applying to their

20   residency programs?

21         A.     I do not.

22         Q.     Do you know under what name

23   Dr. Akoda applied to the Howard University

24   residency program?

Dr. David Markenson

1          A.      I do not know the specific name he

2     put on the application.

3          Q.      Do you know whether that name

4     matched the ECFMG certificate?

5          A.      I do not.

6          Q.      Have you seen any documents

7     produced in this case from the American Board

8     of Obstetrics and Gynecology?

9          A.      I have not.

10         Q.      Do you know whether or not

11    Dr. Akoda became certified in OB/GYN?

12         A.      I don't believe -- I don't remember

13    if there was anything I saw in the records that

14    said if he did or did not.

15         Q.      Would you be surprised to learn

16    that he did?

17         A.      Neither surprised or not.

18         Q.      Did you review any documents

19    produced in this case from Jersey Shore Medical

20    Center?

21         A.      Nothing produced -- the only

22    documents I saw were in the ECFMG file, a

23    letter from them to ECFMG.

24         Q.      So you haven't seen any documents

Dr. David Markenson

1  produced directly from Jersey Shore Medical

2  Center?

3      A.    No.

4      Q.    Unless they were duplicates?

5      A.    Yes.

6      Q.    Do you know whether Jersey Shore

7  Medical Center notified Maryland regarding

8  their dismissal of Dr. Akoda from their

9  residency program?

10     A.    I do not.

11     Q.    Do you know whether there are

12 certain moral or ethical standards for medical

13 licensing boards?

14     A.    I can speak to the states that I've

15 been a licensed in.

16     Q.    Sure.

17     A.    That they usually have is one of

18 the requirements that you can lose your license

19 and be reprimanded nonmoral or nonethical

20 behavior.  Sort of a catch-all phrase.

21     Q.    Moral torpitude types of things?

22     A.    Yeah.  They usually have some

23 catch-all.

24     Q.    So we discussed earlier this

Dr. David Markenson

1  relevant to your opinions in this case?

2      A.      I did not form an opinion about the

3  medical licensing of him other than -- I'm

4  sorry.

5              I have -- I've not seen this

6  letter, so it wasn't part of my opinion.

7      Q.      Okay.  Is it relevant to the

8  opinions you provided?

9      A.      To me, it's just further evidence

10  of his irregular behavior.

11      Q.      Right.  Or his fraud, right,

12  because he also was then defrauding Maryland

13  based on the information in this letter at

14  least?

15      A.      Based on this letter, they're

16  saying, yes, that he submitted an incorrect

17  one.

18      Q.      And Maryland knew that before they

19  issued him a medical license.

20              Do you see that as well?

21      A.      I don't know if Maryland knew or

22  didn't know or who did.

23      Q.      Would you expect that Maryland

24  would have issued him a medical license if

Dr. David Markenson

1   Maryland had known that he had, Dr. Akoda, had

2   submitted a social security number that was not

3   his own to Maryland?

4       A.    I can't speak to what Maryland

5   would do with their processes or their rules.

6       Q.    But you can speak to ECFMG's

7   processes and rules?

8       A.    I can speak to what I know about

9   ECFMG and their failure to, you know, revoke a

10  certification when this came to light about --

11  based on irregular behavior.

12           The processes that a licensing

13  board may take or not take, I would have to

14  review to know.

15      Q.    Okay.  So you would need more

16  complete information on what Maryland did

17  before you could form your opinions; is that

18  what you are saying?

19      A.    Well, I would need to know what

20  their process was; did they investigate, what

21  they did or did not do.

22      Q.    So what do you know about ECFMG

23  processes?  So how are you proffering opinions

24  on ECFMG when you're saying you can't on

Dr. David Markenson

1   Maryland?

2        A.      For what I've seen in the files

3   that ECFMG is has provided.

4        Q.      Well, that counsel has chosen to

5   provide to you, right?  That's only a subset of

6   the materials that ECFMG has provided.

7        A.      Well, I also have the depositions

8   of Mr. Kelly and -- hopefully I don't

9   mispronounce it -- Corda [sic] I believe --

10              MR. VETTORI:  Corrado.

11              THE WITNESS:  -- about the

12       processes that they follow.

13   BY MS. McENROE:

14       Q.      Did you get the deposition

15   transcript of Mr. Stephen Seeling?

16       A.      Yes.

17       Q.      Did you review that deposition

18   transcript?

19       A.      Yes.

20       Q.      Where is that listed on the

21   materials that I've been provided?  Why did you

22   not mention that previously?

23       A.      Well, what I mentioned to you is I

24   said I would have to review all the letters to

Dr. David Markenson

1    know every document I reviewed.

2         Q.    Do you understand that there's a

3    federal requirement in submitting your expert

4    report to include a list of your materials

5    considered?

6         A.    I believe -- if there is such a

7    rule, yeah, I believe we've talked about the

8    rules, yes.  I think I would have listed on my

9    report all the things that I did.

10        Q.    Did you list on your report all the

11   things you did?

12        A.    Let's see.  I have to go back to

13   the report.

14        Q.    Sure.  It's Exhibit 4.

15        A.    I listed, yes, the documents which

16   includes the documents you obtained -- you

17   submitted -- you provided to me.  I did not

18   list every single one that they provided to me

19   by detail in this report.

20        Q.    Right.  And you also didn't list

21   the deposition transcript of Mr. Seeling,

22   correct?

23        A.    Uh-huh.  I did not list that here,

24   no.

Dr. David Markenson

1       Q.      But did you consider that?

2       A.      I believe that was one of the

3   documents I looked at, yes.

4       Q.      So what else did you look at that's

5   not listed here?

6       A.      I'd have to go, like I said earlier

7   in the day, pull all of the files and letters

8   that I was sent to be accurate of every single

9   document I was sent.  I don't remember off the

10  top of my head every document I was sent.

11  (REQUEST NO. 1)

12              MS. McENROE:  So Counsel, it's a

13          material deficiency that there's not a

14          full list of the materials provided either

15          with his expert report; and we've even

16          asked for it in follow-up.

17              So I'll ask that following this

18          deposition, we get a complete list of

19          materials considered; and at the end of

20          the day, I'll reserves rights to reopen

21          the deposition depending on the

22          information we've learned.

23              MR. VETTORI:  I'll take your

24          question under consideration.

Dr. David Markenson

1    BY MS. McENROE:

2        Q.      So sticking with your expert report

3    you have in front of you.

4        A.      Okay.

5        Q.      Exhibit 4.

6        A.      Yes.

7        Q.      So you indicate that the documents

8    you reviewed are documents that were provided

9    to you.

10       A.      Right.

11       Q.      Did you do any other research

12   regarding ECFMG or anything else to help you

13   prepare this expert report?

14       A.      I think the only other thing that I

15   did is I went to ECFMG's website.

16       Q.      Okay.  And what did you do on

17   ECFMG's website?

18       A.      I looked at their "About," their

19   "Mission," their "Values," their "Statement."

20       Q.      Anything else?

21       A.      No.  I just looked through the

22   website.

23       Q.      Did you contact ECFMG?

24       A.      I did not.

Dr. David Markenson

1          Q.      Okay.  Did you initiate an

2    application to proceed through ECFMG's

3    certification process?

4          A.      I did not.

5          Q.      You have, if I may characterize it

6    correctly, you have at the beginning a summary

7    of the facts that you say you considered in

8    forming your opinions?

9          A.      I'm sorry?  Yes.

10         Q.      And then towards the back end, you

11   have opinions that you formed.

12                 Is that a fair description of the

13   setup of your expert report?

14         A.      Yes.

15         Q.      Okay.  So in forming the "Facts"

16   section towards the beginning of your report --

17         A.      Sure.

18         Q.      -- from where did you get the facts

19   that you recite here in your expert report?

20                 MR. VETTORI:  So for the record, I

21         instruct the witness not to answer any

22         questions about draft reports and whether,

23         in fact, it comes from a draft report that

24         he did and that counsel may have worked on

Dr. David Markenson

1        A.      Okay.

2        Q.      Do you see where I am?

3        A.      Yes, I do.

4        Q.      Okay.  It says, "In 2006,

5    IGBERASE."  I'm going to stop there for a

6    second.

7                You understand that's Dr. Akoda

8    that we've been talking about today?

9        A.      Yes.

10       Q.      "Using the name," quote, "'John

11   Charles Akoda,' and the 1623 SSN assigned to

12   Individual A, applied for residency at Howard

13   University."

14               Do you see that?

15       A.      Yes, I do.

16       Q.      It goes on to say, "In March of

17   2007, Howard University accepted IGBERASE into

18   its residency program, and asked IGBERASE to

19   submit evidence of legal residence in the

20   United States.  In response, IGBERASE submitted

21   a false permanent resident card in the name

22   "N. Akoda, John Charles."

23               Do you see that?

24       A.      Yes, I do.

Dr. David Markenson

1      Q.     Okay.  Did you take into account

2  these false materials provided to Howard

3  University in their process in forming your

4  opinions in this case?

5      A.     I mean, I've reviewed this

6  material; but which specific -- what are you

7  referring to?

8      Q.     Sure.  So it's saying here that

9  Dr. Akoda submitted a false permanent resident

10  card to Howard University.

11      A.     Uh-huh.

12      Q.     As well as him having been required

13  to submit evidence of legal residence in the

14  United States.

15      A.     Yes.

16      Q.     Did you take into account the fact

17  that he submitted a false permanent resident

18  card to Howard University in forming your

19  opinions?

20      A.     I knew this fact, but I wasn't

21  asked to opine on Howard University's actions.

22      Q.     Okay.  Do you know what, if

23  anything, Howard University did to verify the

24  1623 social security number provided to it by

Dr. David Markenson

1    Dr. Akoda?

2        A.      I do not know their processes.

3        Q.      Do you believe it's ECFMG'S fault

4    that Dr. Akoda submitted a false permanent

5    residency card to Howard University?

6        A.      I do not believe ECFMG -- I believe

7    he submitted the false residency card.

8        Q.      So Dr. Akoda perpetrated a fraud on

9    Howard University?

10       A.      He submitted a false

11   identification, yeah -- a false social security

12   number.

13       Q.      Okay.  Both a false social security

14   number and a false permanent residency card to

15   Howard University, correct?

16       A.      Yeah, I believe -- yes.

17       Q.      And to be a resident, I presume

18   someone needs to physically show up to finish a

19   residency program; is that correct?

20       A.      Yes.

21       Q.      And it's a quite a rigorous

22   experience, correct?

23       A.      It can be, yes.

24       Q.      And it's a lot of hours?

Dr. David Markenson

1    A.    It can be, yes.

2    Q.    So Howard University would have

3  supervised Dr. Akoda quite extensively for him

4  to complete a residency program there?

5    A.    They would have complied with the

6  supervision requirements, yes.

7    Q.    And what are the supervision

8  requirements, if you know, generally speaking?

9    A.    Generally speaking, ECFMG requires

10  progressive supervision.  They define it as

11  different levels, direct and indirect,

12  observed, not observed.  And throughout your

13  residency, the degree of supervision varies as

14  you progress.

15    Q.    In your experience, are medical

16  residents permitted to actually examine

17  patients?

18    A.    Yes.

19    Q.    And are medical residents allowed

20  to actually treat patients?

21    A.    What do you mean by "treat"?

22    Q.    Lay hands on patients.

23    A.    They're allowed to, yeah, examine,

24  yes.

Dr. David Markenson

1       Q.      Are they allowed to do any
2    procedures of any sort on patients?
3       A.      They are within their scope and
4    supervision requirements.
5       Q.      If a resident were to observe an
6    examination, for example, or were to examine a
7    patient but not lay hands on them, so take a
8    medical history, whatever it might be, would
9    their name necessarily appear in the medical
10   records, in the patient's medical records,
11   rather?
12      A.      Whether the resident's name appears
13   or not would really be related to what they did
14   and what the hospital's policies and procedures
15   are for documentation.
16      Q.      Sure.  So it's possible that a
17   resident can be involved in conducting an
18   examination, but their name would not appear in
19   a patient's medical records?
20      A.      It is possible.
21      Q.      Do you expect that somebody without
22   medical training could successfully complete a
23   residency program?
24      A.      It's a hard question.  I would

Dr. David Markenson

1   say -- I would like to say that they shouldn't,

2   but there probably is some ability -- there's

3   probably some ability that someone could have

4   in a certain -- in residencies.  Every

5   residency is different in requirements.

6              If they did some of their own

7   studying, virtual, who knows, that they might

8   be able to get through; but in general, one has

9   to have medical knowledge to get through a

10  residency.

11       Q.    And you would expect that to be

12  true for an OB/GYN specialist?

13       A.    I would expect in general, yes.

14  Not a hundred percent, it'd be a feat.

15       Q.    Going back to your expert report at

16  Exhibit 4.

17       A.    Uh-huh.

18       Q.    Page 3, third paragraph down.

19       A.    Page 3, third paragraph down.

20       Q.    I'm going to pick up where I had

21  just left off with the sentence that starts,

22  "He was licensed."

23       A.    Yes.

24       Q.    Do you see that?

Dr. David Markenson

1        A.      Yes.

2        Q.      It says, "He was licensed to

3   practice medicine in Maryland and Virginia, and

4   was granted privileges at Prince Georges'

5   Hospital Center based on application and

6   submission of required documentation including

7   an ECFMG certificate."

8              Do you see that?

9        A.      Yes, I do.

10       Q.      So I'm going to break that down a

11  little bit.

12             Have you looked into you or do you

13  know about the licensing requirements for

14  Maryland or for Virginia?

15       A.      Specific licensing?  Every detail?

16  No, I do not.

17       Q.      Do you know in broad strokes the

18  licensing requirements for Maryland and

19  Virginia?

20       A.      I know that all states have

21  certain -- there are certain requirements for

22  licensure that applies everywhere, which is

23  verification of medical school completion,

24  verification of a year of training.

Dr. David Markenson

1      Q.     Okay.  What else would you expect
2  to be included?
3      A.     Usually -- I don't know if it's a
4  requirement to get the license, but usually
5  they require information.  They usually ask
6  about past training, past hospital employment,
7  other licenses.
8             But what the criteria is, each
9  state has their own Medical Practice Act.
10      Q.     Would you expect that a licensing
11  board would ask about residency programs from
12  which an applicant had been dismissed from?
13      A.     May or may not.  I've seen
14  different forms of applications.
15      Q.     Looking back -- so we'll keep
16  Exhibit 4.
17      A.     Okay.
18      Q.     But let's take out Exhibit 9 again.
19      A.     Okay.
20      Q.     Looking back where we left off in
21  Exhibit 9.
22      A.     Yes.
23      Q.     Where we left off, we'll pick up at
24  "In 2011."

Dr. David Markenson

1               Do you see where I am?

2          A.     Yes, I do.

3          Q.     It says, "In 2011, after the

4     completion of his residency at Howard

5     University, IGBERASE, using the name 'Charles

6     John Nosa Akoda' and the 1623 SSN, applied for

7     medical licensure with the Maryland Board of

8     Physicians."

9               Do you see that?

10         A.     Yes, I do.

11         Q.     It goes on to say, "In support of

12    this application, IGBERASE submitted a false

13    permanent residence card, as well as a false

14    Nigerian passport."

15              Do you see that?

16         A.     Yes, I do.

17         Q.     It goes on to say, "In September

18    2011, the Maryland Board of Physicians granted

19    the requested medical license to IGBERASE under

20    the name," quote, "'Charles John Nosa Akoda,"

21    and IGBERASE began practicing medicine in the

22    field of obstetrics and gynecology."

23              Do you see that?

24         A.     Yes, I do.

Dr. David Markenson

1        Q.      Do you know what, if anything,

2    Maryland did to verify Dr. Akoda's permanent

3    residence card?

4        A.      I do not.

5        Q.      Do you know what, if anything,

6    Maryland did to verify Dr. Akoda's Nigerian

7    passport?

8        A.      I do not.

9        Q.      Following residency, in your

10   experience, would a medical license be required

11   to treat patients?

12       A.      Yes.  I -- yes, in States you're

13   required a license to practice.  Usually the

14   only exception is while in training.

15       Q.      Going back to where we were in your

16   expert report at page 3.

17       A.      Sure.

18       Q.      So we just talked about the

19   practicing of medicine in Maryland and

20   Virginia.

21               You also talked about Dr. Akoda

22   having been granted privileges at Prince

23   Georges' Hospital Center.

24               Do you remember that?

Dr. David Markenson

1      A.      Yes.  I see that here, yes.

2      Q.      So going back to Exhibit 9.

3      A.      Okay.

4      Q.      And where it starts, "In 2012."

5              Do you see where I am?

6      A.      Yes, I do.

7      Q.      It says, "In 2012, IGBERASE, using

8   the," quote, "'Akoda' identity, sought and

9   obtained medical privileges at Prince George's

10  Hospital Center," which they shorten to PGHC,

11  "in Maryland.  To do so, Igberase submitted a

12  false permanent residence card, as well as a

13  false Maryland driver's license."

14              Do you see that?

15     A.      Yes, I do.

16     Q.      Do you know what, if anything,

17  Prince George's did to verify Dr. Akoda's

18  permanent residence card?

19     A.      I do not.

20     Q.      Do you know what, if anything,

21  Prince George's did to verify Dr. Akoda's

22  driver's license?

23     A.      I do not.

24     Q.      Do you know anything about the

Dr. David Markenson

1      A.      Again, since I wasn't provided them

2  and all I have is the draft, I can't say that.

3      Q.      So you don't know what the policies

4  and procedures are as we sit here today?

5      A.      I just know the standard.  I don't

6  know what their -- I've asked for policies and

7  procedures, and we haven't been provided any.

8      Q.      You say "we."  You mean you haven't

9  been provided any, correct?

10     A.      Uh-huh, correct.

11     Q.      Is it your opinion that ECFMG has a

12  duty or an obligation to make sure that

13  individuals it certifies never break the law?

14     A.      Again, I personally believe -- this

15  is from my expertise and knowledge -- that

16  ECFMG'S role is not as a law enforcement agency

17  but a certification body.

18     Q.      Okay.  And so I just want to make

19  sure I understand.

20             So if ECFMG certifies someone and

21  they go on to commit tax fraud later on in

22  their career, would you then look back and hold

23  ECFMG accountable that they should have figured

24  that out?

Dr. David Markenson

1        A.      No.  But if in order to practice

2   tax, they needed ECFMG certification to be

3   licensed, then they would have never been

4   allowed to practice tax.

5              So I don't -- I don't hold them

6   accountable to law enforcement; but anything

7   that an individual was allowed to do based on

8   their certification, they do have culpability

9   in that case.

10       Q.      So you think if a practitioner, a

11  physician, goes on to be a creep, a sexual

12  predator, is that somehow ECFMG'S fault if

13  ECFMG had certified that that person had, in

14  fact, graduated from medical school and passed

15  exams?

16       A.      Well, what they did was their

17  action at that point; but one has to

18  acknowledge that if ECFMG did not allow them

19  to -- did not certify them, allowing them to

20  obtain a license, they would not be a physician

21  at that point.

22       Q.      Right.  But there are U.S. graduate

23  physicians who go on to become creeps, right?

24       A.      There are.

Dr. David Markenson

1       Q.      Sexual predators.

2               MR. VETTORI:  Is that a technical

3       term?

4               MS. McENROE:  I changed it to

5       sexual predators.

6    BY MS. McENROE:

7       Q.      Okay.  Is that fair?

8       A.      There are, yes.  Unfortunately,

9    yes.

10      Q.      And do you deem that to be a

11   failure of the medical school community or, you

12   know, or is that that practitioner's fault that

13   they went on to be somebody who breaks the law?

14      A.       It is the practitioner's fault, but

15   there is well documented studies that show that

16   there are usually red flags throughout their

17   career if people intervene, that patient would

18   have never been harmed.

19      Q.      Usually, like, while they're

20   actually practicing medicine.

21      A.      No.  There's throughout their

22   entire career.  There's well documented studies

23   that show whether it's medical school

24   residency, application processes, there are

Dr. David Markenson

1    links throughout a career that could have

2    stopped a progression of events.

3         Q.    So I'm just struggling with the

4    idea that this is like the ultimate Monday

5    morning quarterbacking, right?  You're saying

6    this person ended up being a sexual predator.

7    So looking back in history, we could pick up

8    bread crumbs where someone could have, said,

9    you don't graduate from middle school; you

10   don't graduate from high school; you don't

11   graduate from college.

12              So I'm just trying to understand --

13              MS. McENROE:  Let me finish my

14        question.

15              MR. VETTORI:  I am.

16   BY MS. McENROE:

17        Q.    I'm just trying to understand how

18   it is you pick where in that line you assume

19   and assign all of the fault, as you have with

20   ECFMG in this case?

21              MR. VETTORI:  Objection as to form.

22              THE WITNESS:  Where I've assigned

23        fault is the area I was asked to opine on,

24        which is he would not have been able to

Dr. David Markenson

1          obtain licensure or enter a residency had

2          ECFMG done the due diligence, picked up

3          the red flags and not certified him or

4          revoked the certification.

5     BY MS. McENROE:

6          Q.     So does your opinion basically boil

7     down to an on/off switch, that if ECFMG had

8     said he couldn't get a certificate, therefore,

9     he wouldn't have been able to practice

10    medicine; is that what you're saying?

11         A.     Well, as part of application for

12    residency and licensure, there are certain

13    things that are binary, yes or no; and in the

14    absence of them, you don't proceed to any other

15    steps.

16              ECFMG certification is a credential

17    that's binary.  You don't have it, you can't

18    get into residency.  Absent ECFMG

19    certification, you can't be licensed.  It is a

20    binary, that all the other things downstream

21    don't occur towards licensure if that binary

22    doesn't occur.

23         Q.     So if we were to take a step

24    forward and say graduation from a residency

Dr. David Markenson

1   program is binary, off and on or, you know, one

2   year of supervised practice, however you had

3   described it is binary off and on, you either

4   have that or you don't, that's another place

5   along the line, right?  That would either

6   on/off shut off the practicing medicine in the

7   United States?

8        A.     It depends on what the requirements

9   were.

10        Q.     And further stepping down the line,

11   eventually getting to the point of getting a

12   medical license is also off and on that in any

13   given jurisdiction, if you don't have a medical

14   license, you should not be lawfully be

15   practicing medicine, correct?

16        A.     Yes.  Without a medical license,

17   you can't practice medicine.

18        Q.     So that's another off/on switch,

19   correct?

20        A.     A medical license is an off/on,

21   yes.

22        Q.     Even if you have a ECFMG

23   certificate?

24        A.     If you have an ECFMG certificate