# Exhibit 6

```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2

 3

    MONIQUE RUSSELL, JASMINE    )
 4  RIGGINS, ELSA M. POWELL,    )
    and DESIRE EVANS,           )
 5                              )
             Plaintiffs,        )
 6                              ) Civil Action No. 18-5629
          vs.                   )
 7                              ) Honorable Joshua D.
    EDUCATIONAL COMMISSIONER    ) Wolson
 8  FOR FOREIGN MEDICAL         )
    GRADUATES,                  )
 9                              )
             Defendant.         )
10

11

12     VIDEOTAPED DEPOSITION OF JOHN CHARLES HYDE, Ph.D.
13               (Taken by Defendant)
14              November 18, 2019
15

                      9:40 a.m.
16

17

18

19

20       Renaissance Concourse Atlanta Hotel
            One Hartsfield Centre Parkway
21               Atlanta, Georgia
22

23

24

    Reported by:  F. Renee Finkley, RPR, RMR, CRR, CLR,
25  CCR-B-2289
```

John Charles Hyde, Ph.D.

```
 1   definition of credentialing.  What I'm -- what I'm

 2   asking for is what you would actually look at in

 3   deciding whether or not to credential a physician.

 4        A.    Okay.  Licensure, training, which could

 5   include, obviously, not just internship, but

 6   residency and/or fellowship.  You would look at their

 7   experience.  Some of them may not have any.  You

 8   know, they may be fresh out of the residency program,

 9   others may not.  You would look at litigation

10   history.  You would look at board certification.  You

11   would look at health status.  And you would look at

12   sort of their general ability to get along with

13   others.  Do they play well with others?

14            So you -- you're looking at a lot of

15   different factors that's going to get you that.

16   Also, you would look and see the National

17   Practitioner Data Bank.  Have they had any payouts or

18   any convictions of any type of morally-related, moral

19   turpitude, which is typically the terminology.  You

20   would look at Office of Inspector General to see if

21   they have had any claims or had the ability to be

22   involved in Medicare/Medicaid.

23            You would look potentially at insurance

24   companies to see if they've been providing on-panels

25   within the insurance world for managed care, so to
```

John Charles Hyde, Ph.D.

1   speak.  I gave you more than a quarter's worth, but

2   that's sort of going down the list.

3        Q.    Anything else that you haven't mentioned

4   that you recall that you would look at in deciding

5   whether or not to credential a physician?

6        A.    Recommendations, obviously, from -- you

7   know, that goes without saying.  Previous history.

8   We would query the other hospitals if the individual

9   was on their -- it depends on their point in their

10  career.  If somebody's just out of residency, they're

11  not going to have a lot of previous experience or

12  experiential training outside of residency; but if

13  they were on staff at another hospital, you would ask

14  the hospital, Are they on staff, What level, Are they

15  in good standing.

16            You'd like to get more, but that's sort of

17  all you're going to get.  You would probably also

18  query their health grades.  You know, there's a lot

19  of different things that would give some idea of some

20  feedback.

21       Q.    Anything in addition to that that you

22  would look at when deciding about privileging?  If

23  you've just gone through all that for credentialing

24  an individual, how do you go about -- what do you

25  look at for privileging purposes?

John Charles Hyde, Ph.D.

1    need to -- cause I -- yeah, I've hired a lot of

2    physicians, but what are you talking about from the

3    HR perspective?

4        Q.    So what I mean by that is have you ever

5    been involved in in-taking paperwork from them with

6    things like their Social Security number, getting

7    them enrolled in benefits programs or whatever it

8    might be, those sorts of Human Resources issues?

9        A.    I -- to be honest, when I first started,

10   we didn't hire a lot of physicians.  We hired some ER

11   docs mainly in radiology because we gave them

12   exclusive privileges.  But I've always been at a

13   level where I didn't do -- I was above that.  People

14   that did that reported to me -- reported to me.

15       Q.    Sure.

16       A.    And then the farther I got up, somebody

17   reported to me that somebody reported to them and

18   however long the chain was.  But did I physically

19   hand them certain things and check things?  No,

20   ma'am.

21       Q.    Okay.  So you weren't like running Social

22   Security numbers for the purpose of issuing a W-2 or

23   anything like that for taxpaying?

24       A.    No, I -- I wouldn't do that.  I never

25   have.  I know what it is; but, no, I didn't do that.

John Charles Hyde, Ph.D.

1      Q.     Sure.

2      A.     We had people to do that obviously.

3      Q.     And other than establishing before that

4  you are a Ph.D., not an M.D., do you have any other

5  medical clinical background?  Are you a nurse, a

6  nurse practitioner, any of that type of thing?

7      A.     None of the above.

8      Q.     Okay.

9      A.     I am not a clinician, and the only medical

10  care I've ever rendered to my kids, so -- and that is

11  questionable whether it was good or bad or

12  indifferent.  They're all alive, so I guess it was

13  okay.

14      Q.     We'll leave that for another deposition.

15      A.     Yes.

16      Q.     Have you ever attended any medical school?

17  Did you start and not finish?

18      A.     No.  I -- well, let me back up and say --

19  answer, too.  I've never been admitted nor applied.

20  Have I sat in on classes?  Yes.

21      Q.     Okay.

22      A.     Have I taught more classes than I sat in

23  on?  That is true.

24      Q.     On hospital administration?

25      A.     Well, statistical analysis, reading the

John Charles Hyde, Ph.D.

 1   literature.  I wouldn't -- actually, it's more

 2   research perspective that I've lectured.  And I don't

 3   teach and haven't taught very many medical students,

 4   but I have taught attendings and residents more

 5   frequently, but, again, not in medicine.  Don't get

 6   me wrong.

 7            So I've sat in on classes just to get a

 8   feel for it.  And like I said, I was at an academic

 9   medical center, that and UAB for almost 30 years.  So

10   I've been around, but I've never -- I never would

11   teach medicine.

12       Q.    In the course of your career, have you --

13   that you know of -- ever come across any patients

14   treated by Dr. Akoda?

15       A.    Oh, no, ma'am.  I -- I can say I've never

16   even heard of him before this case.

17       Q.    And when I say Dr. Akoda, you understand

18   who I'm talking about and the doctor who is the

19   subject of the allegations in this lawsuit?

20       A.    Yeah.  I don't know what his real name is,

21   but -- you know, he's had three or four; but, yes,

22   that's one of them I -- I recall.

23       Q.    Can we stick with Dr. Akoda for today?

24   You'll understand who I'm talking about?

25       A.    Sure.

John Charles Hyde, Ph.D.

1      Q.    Did you do any evaluation of the medical

2   records of any of the plaintiffs in this case?

3      A.    No.  I don't think I was given any medical

4   records.  I don't believe they're in there.  And if

5   they were, they were attached just in a -- as an

6   exhibit, but I don't recall any medical records at

7   all.

8      Q.    Did you do any statistical analysis of any

9   of the outcomes of Dr. Akoda's patients?

10     A.    No, I have not.  I know that for a fact.

11  I haven't.

12     Q.    Did you do any sort of analysis of the

13  outcomes for Dr. Akoda's patients?

14     A.    No, ma'am, I have not.

15     Q.    I asked whether you had met or come across

16  any of Dr. Akoda's patients.

17          I should also ask, have you ever come

18  across Dr. Akoda himself?

19     A.    Not that I recall.  Again, I've -- if

20  we've bumped into -- if it was a random occurrence, I

21  don't know, but I don't think so.

22     Q.    Do you have an understanding one way or

23  the other about whether he passed USMLE steps one and

24  two?

25     A.    My understanding is he ultimately did.

John Charles Hyde, Ph.D.

1          Let me back up.  Ultimately, somebody

2   passed them, and I'm not sure that it was him at all.

3   So, again -- well, I'll say it that way.  So somebody

4   passed using one of his names, or multiples of his

5   names actually.

6      Q.   Do you have any understanding that his

7   medical school, the University of Benin, verified a

8   diploma?

9      A.   I don't know if I -- I think I saw

10  verification of several medical degrees, two from a

11  different school with different dates, by the way,

12  and one date not even shown on the diploma.  And then

13  I don't -- again, they verified the name, maybe not

14  the person.

15     Q.   Do you know whether Dr. Akoda ever

16  finished a residency program?

17     A.   My understanding is one guy, I think

18  Akoda, finished the Howard's University OB/GYN

19  program.  But, again, I don't know who is what and

20  who's who in that -- in all the different names.

21     Q.   Do you know whether Dr. Akoda was board

22  certified in OB/GYN?

23     A.   There is a Dr. Akoda that became board

24  certified, yes.

25     Q.   Do you know anything about any medical

John Charles Hyde, Ph.D.

```
 1   treatment or patients that Dr. Akoda may have treated

 2   in Nigeria?

 3        A.    In where?

 4        Q.    In Nigeria.

 5        A.    No, ma'am.  I don't think they were

 6   included, so I don't know of any.

 7        Q.    Do you know anything about the quality of

 8   medical care provided by Dr. Akoda?

 9        A.    No, not really.  I mean, I read that Stat

10   News, and that may have given me something, but I'm

11   not into the -- into the clinical aspect, so it's

12   really something I'm not going to spend a lot of time

13   with.

14        Q.    When you say Stat News, that was a

15   publication that you read from the Internet?

16        A.    Yes.  It was one of the ones I read and

17   the only one I printed.

18        Q.    Did you do any analysis of the

19   credentialing of Dr. Akoda by Prince George's

20   Hospital?

21        A.    No.  I don't think I saw the package or

22   the packet, the credentialing packet, credentialing

23   information file, whatever you want to call it, from

24   Prince George's Hospital.  Maybe it's Prince George's

25   County Hospital.  I forget the technical name.
```

John Charles Hyde, Ph.D.

1        Q.     You might be more precise than I am.

2    Thank you.

3        A.     I think "county" is in there.

4        Q.     Have you ever issued opinions in any other

5    case regarding credentialing at Prince George's that

6    you can recall?

7        A.     And that's in Maryland, right?

8        Q.     Correct.

9        A.     You know, I don't know if I have.  Maybe

10   in the past.  I can't tell you.

11            MS. MCENROE:  You know, we've been going

12       about an hour.  How about we take a quick break?

13            MR. HAYNES:  Sure.

14            THE VIDEOGRAPHER:  We're now off the video

15       record.  The time is 10:46 a.m.

16            (A recess was taken.)

17            THE VIDEOGRAPHER:  We're back on the video

18       record with disc number two.  The time is 11:01

19       a.m.

20       Q.     (By Ms. McEnroe)  Dr. Hyde, you've never

21   applied to ECFMG for services, have you?

22       A.     You mean as being an international medical

23   graduate?

24       Q.     Correct.

25       A.     No, I have not, that is correct.

John Charles Hyde, Ph.D.

1      Q.    And you've never been employed by ECFMG,

2   correct?

3      A.    That's correct.

4      Q.    You've never been a member of ECFMG's

5   Board of Trustees, correct?

6      A.    Correct.

7      Q.    And you've never been a member of the

8   Medical Education Credentials Committee for ECFMG,

9   correct?

10     A.    Likewise, correct.

11     Q.    You mentioned earlier this morning that in

12  certain instances you've come across ECFMG documents

13  when reviewing foreign medical graduates in other

14  settings, other expert cases, for example.  Have you

15  ever interacted directly with ECFMG in connection

16  with any of those cases?

17     A.    The cases that I've looked at

18  forensically, or however you want to look at it, no,

19  I have not.

20           I -- in the past, I think I've interacted

21  with them, but never in a -- under the auspices of a

22  case or litigation.

23     Q.    Can you tell me about those interactions,

24  please?

25     A.    We had a question years ago, somebody that

John Charles Hyde, Ph.D.

```
 1    was later found out to be a non-medical graduate that

 2    was -- got in through ECFMG.

 3         Q.    What case was that?

 4         A.    Oh, it wasn't -- I don't know the case.

 5    It happened back in Kentucky back in the '70s or

 6    '80s, probably the '80s, but I can't tell you the --

 7    other than the fact that he was trying to come our

 8    way and we found out about it.

 9         Q.    Do you know if he was lying about ECFMG

10    certification?

11         A.    My understanding he was.  Had to do with

12    war torn unavailability of medical school

13    documentation.

14         Q.    And do you recall anything else about

15    those interactions with ECFMG back in the '70s or

16    '80s about this individual?

17         A.    Not really.  There may have been others

18    that I've contacted them about some questions about

19    things, but it's -- it's been very few and far

20    between.

21         Q.    When you say not really about recalling

22    anything else from the individual from the '70s or

23    '80s who you mentioned lied about ECFMG

24    certification, is there anything broadly that you

25    remember or anything specific that you remember?
```

John Charles Hyde, Ph.D.

1        A.     About that case?

2        Q.     Yeah.

3        A.     Yes, I think anesthesiology, I think

4    everybody was after him including the federal

5    government, I want to say Lebanon came into -- the

6    country he was from, and I want to say that they

7    found out.  He was a medic in the -- maybe the

8    Lebanese Army or maybe it was another splinter group.

9    It was probably the Beirut-Lebanon-type era where

10   there was finding and bombing.  I just remember that,

11   and it was in central Kentucky.

12       Q.     Do you recall believing that ECFMG had

13   done anything wrong or insufficient in that instance?

14       A.     At the time, no; but in retrospect, if

15   somebody is from a war-torn country -- it's like

16   people from Cuba.  They decided not to give those

17   people credentials, and all the ones I know of did

18   not become licensed in the United States.  They had

19   to do a sub -- a sub level job even though they may

20   have been bona fide physicians or dentists.

21       Q.     Do you believe that bona fide physicians

22   from foreign locations where there are war issues

23   should not be able to become physicians in the

24   United States?

25              MR. HAYNES:  Object to the form.

John Charles Hyde, Ph.D.

1    CEO of a smaller hospital.

2         Q.    Tell me about that case.

3         A.    Well, that was -- the individual lived in

4    an adjoining or a couple counties over from us and

5    wanted privileges and got a bad recommendation from a

6    residency site, and then the residency site tried to

7    rescind it, and I wanted to find out a little more.

8    And, also, part of the process was, he was a foreign

9    medical, graduate, or international, whatever it was

10   called at that time, I think FMG still 30 years ago.

11        Q.    Sure.

12        A.    And just called to see -- give me a little

13   about the training, and they wouldn't give me a lot,

14   but I was able to get some information from them.

15        Q.    Do you recall any other instances that

16   you've had direct contact with ECFMG throughout your

17   career?

18        A.    Direct, no, ma'am.  Indirect, yeah.

19   There's other that I've heard about and am

20   knowledgeable about.

21        Q.    Prior to your engagement in this case,

22   have you ever looked at ECFMG's policies or

23   procedures?

24        A.    I think I have because, again, we've had

25   cases -- or there have been plaintiff theories that

John Charles Hyde, Ph.D.

1    have looked at somebody's credentialing of foreign

2    medical graduates or international medical graduates;

3    and if that was part and parcel of the information

4    that I was provided, I looked at that, and I've seen

5    that before.  I'm trying to remember under what

6    conditions, but I've seen -- I've seen their packet

7    before.  I don't know if I'd seen 1996, but I've seen

8    additional information.  And, also, you can pull it

9    up on the website to get how they have classified

10   what they are, who they -- the irregular behavior's

11   available on the Internet and through their website,

12   so I've seen a lot of their policies over the years.

13        Q.    In written form?

14        A.    Yes.  I'm sorry.  Yes.

15        Q.    And when you refer to information, and you

16   talked specifically about 1996, were you talking

17   about the information booklet?

18        A.    Yes, ma'am.  The booklet that was maybe

19   Exhibit 1 to the Kelly -- Mr. Kelly's deposition.

20        Q.    Have any of your opinions in any other

21   case ever turned on the sufficiency of ECFMG's

22   policies or procedures?

23        A.    No, I don't think so.  And when you mean

24   turn, where I -- that was a pivotal issue and --

25        Q.    Correct.

John Charles Hyde, Ph.D.

```
1        A.      -- and conclusion?

2                You're right, no.

3        Q.      Or something --

4        A.      No -- no others.

5        Q.      And -- or something that you looked at

6  specifically to look at sufficiency of the policies

7  and procedures of ECFMG?

8        A.      Well, now that's a different question.

9        Q.      Yeah.  I'm asking about that.

10        A.      Yeah, okay.  That's fine.

11                I think that in the past the ones that

12  I've looked at I felt comfortable with.  So I can

13  say, yes, I think -- because there were no irregular

14  behaviors or claims of irregular behavior or some

15  sort of falsification that I saw.

16        Q.      Do you know anybody who sits on the

17  Medical Education Credentials Committee of ECFMG?

18        A.      I haven't looked at the list of

19  individuals, so I don't know.  I don't think I do;

20  but if I go down a list, there may be people that I

21  recognize being around for 40 years in healthcare and

22  the medical training, academic medical center sort of

23  process, there may be some people I know of, but I

24  don't think so.

25        Q.      But sitting here today, you don't know of
```

John Charles Hyde, Ph.D.

1    knowing of anybody from Medical Education Credentials

2    Committee?

3         A.    That's correct, I do not.

4         Q.    Have you ever appeared before the Medical

5    Education Credentials Committee?

6         A.    No, ma'am, I have not.  I haven't been

7    asked to.

8         Q.    We discussed credentialing and privileges

9    a little bit earlier today, correct?

10        A.    I believe we have.

11        Q.    Yes.

12        A.    For quite a bit of time.

13        Q.    For quite a bit of time.  And so I just

14   want to make sure that I understand the flow of the

15   way that credentialing and privileging happens in the

16   healthcare industry from your perspective.

17        A.    Okay.

18        Q.    So an individual, regardless of whether

19   they graduate from U.S. or international medical

20   school, would apply to a residency program if that

21   was the path they were to take; that would be a first

22   step out of medical school, correct?

23        A.    Correct.

24        Q.    Okay.  And they would either get admitted

25   or not get admitted to the residency program based on

John Charles Hyde, Ph.D.

```
 1   whatever criteria that residency program might have,
 2   correct?
 3        A.   Now, you started out saying credentialing.
 4   This is not credentialing.
 5        Q.   Sure.  I'm trying to understand the flow
 6   through --
 7        A.   Okay.
 8        Q.   And I will get to how credentialing fits
 9   in.
10        A.   Okay, yeah.  This -- this is not part of
11   the flow of credentialing what I'm trying to say.
12        Q.   Dr. Hyde, what would you characterize it
13   as?  I'm just trying --
14        A.   Well, that's --
15        Q.   -- to get the lifecycle?
16        A.   I'm sorry.  Credentialing and privileging
17   would be -- to be credentialed would be given the
18   right to practice medicine at a facility.
19        Q.   Sure.
20        A.   See, these individuals pre-residency are
21   not practicing anywhere, so they're not trying to get
22   privileges.  They're trying to get in the pipeline to
23   be able to get privileges at a later time.
24        Q.   So let's talk about the pipeline to get
25   credentials --
```

John Charles Hyde, Ph.D.

```
 1        A.    Okay.

 2        Q.    -- if that sounds okay.  So someone would

 3   graduate from medical school?

 4        A.    Correct.

 5        Q.    And apply to a residency program,

 6   presumably through the match, usually, but there are

 7   other avenues as well.

 8        A.    Typically, the match; but, yes, there's

 9   other avenues.

10        Q.    And they would apply to those residency

11   programs, oftentimes including an interview, correct?

12        A.    They would apply, yes, ma'am.  Maybe

13   interview; maybe not.  Depends upon if they were a

14   high match or a low match.

15        Q.    And there could be all sorts of

16   application materials connected with the resident

17   applying to a residency program, correct?

18        A.    Sure, sure.  There -- there's quite a bit

19   of paperwork.

20        Q.    Yep.  And assuming that that individual

21   was lucky enough to get accepted into a residency,

22   they could choose to attend and participate in that

23   residency, correct?

24        A.    Correct.

25        Q.    And they would have some oversight of
```

John Charles Hyde, Ph.D.

1   their performance during the residency, correct?

2       A.    They'd have a lot of oversight, not just

3   some.

4       Q.    Yep, okay.  And at some point during that

5   residency, they might get a training license from a

6   licensing board, correct?

7       A.    It -- it depends upon the state.  You're

8   right.  Some states do; some don't.

9       Q.    Okay.  And that would involve applications

10  as well, right, to the licensing board?

11      A.    Yes, to the jurisdiction.  Typically, the

12  state licensure board.

13      Q.    And assuming that individual was

14  performing up to snuff, they -- they might complete

15  their residency program?

16      A.    Correct.

17      Q.    From the residency program, they might

18  apply to full licensure, correct?

19      A.    Correct.

20      Q.    Take step three and -- and get licensed,

21  correct?

22      A.    Yeah, take step three first, then get

23  licensed --

24      Q.    Yep.

25      A.    -- on their own, non-training status.

John Charles Hyde, Ph.D.

1     Q.     Right.  So full, unrestricted medical

2  license?

3     A.     Yes.

4     Q.     And that would involve an application to

5  licensing board --

6     A.     Yes.

7     Q.     -- as well, correct?

8     A.     I'm sorry.  Yes, ma'am.

9     Q.     Okay.  Then the individual could become

10  board certified in a specialty?

11     A.     They could if they were eligible.

12     Q.     Or they could go ahead and get a

13  fellowship or some other sort of employment as a

14  physician, correct?

15     A.     Correct.

16     Q.     Is this where we get to credentialing?

17     A.     Well, if you're going to say -- throw the

18  word hospital and privileges or healthcare facility,

19  then we'll get to credentialing and privileging.

20     Q.     Great, okay.

21     A.     All of this -- let me back up.  A lot of

22  this is doing credentialing; but when I think of

23  credentialing and privileging, I think specifically

24  with the healthcare entity.

25     Q.     Sure.  Like a hospital or a nursing home,

John Charles Hyde, Ph.D.

1   something of that --

2         A.    Ambulatory surgical center, group

3   practice, yes, ma'am.

4         Q.    Urgent care or something like that?

5         A.    Right.

6         Q.    Okay.  So once that individual gets a full

7   unrestricted license to practice medicine, if they so

8   choose to go seek employment or affiliation with a

9   hospital or a hospital-like entity, they would then

10  get -- get into the pipeline for credentialing

11  process; is that correct?

12        A.    Yes, ma'am.  Specific for privileges, yes.

13        Q.    Yeah, okay.  And all of this would be

14  before they would be laying hands on a patient in a

15  hospital without supervision as the medical --

16  treating medical doctor; is that correct?

17        A.    Let me back up.  There are instances

18  where, for certain things, the resident may not be

19  supervised, so they would be laying hands upon

20  patients.  There might be some retrospective amount

21  of evaluation, which there would be, but they can lay

22  hands on -- when you go through, one's PGY1s, first

23  year or the interns, they don't do a lot

24  independently.  Twos begin it.  Threes are finishing

25  up.  If they become a fellow, whatever year it is --

John Charles Hyde, Ph.D.

 1   one, two, three -- they're going to do more

 2   independent work, but they're still -- even on --

 3   even through fellowship, there's going to be some

 4   modicum of supervision or a maximum of supervision on

 5   the first year.

 6       Q.   Sure.  Do you have any insight into what,

 7   if anything, Howard University Hospital did in

 8   evaluating whether Dr. Akoda should be accepted to

 9   their residency program?

10       A.   No, ma'am.  I haven't seen any

11   documentation at all from Howard University.

12       Q.   Have you seen any documentation regarding

13   any oversight or evaluation of Dr. Akoda's

14   performance during his residency?

15       A.   No.  That would be part of that, and I

16   haven't seen any of that, no.

17       Q.   And have you seen any documentation

18   regarding any hiring decisions by Prince George's

19   Medical Center?

20       A.   No.  I -- I didn't know that he was hired.

21   Maybe he was hired.  I -- I haven't seen any

22   credentialing or anything really of any consequence

23   from Prince George's County Hospital.

24       Q.   Okay.  Are you aware of a lawsuit

25   regarding Prince George's County Hospital and the

John Charles Hyde, Ph.D.

1    entity with legal responsibility for originating a

2    document and ensuring the accuracy of the information

3    it conveys?"  The prevailing definition of what a

4    Primary Source Verification is supposed to be and

5    what's the obligation of such.

6        Q.    So that would be like if you were trying

7    to primary source verify a diploma from the

8    University of Benin, it would be the University of

9    Benin that would tell you if it was valid or not?

10       A.    Yes, they're the -- the Primary Source

11   Verification is the entity that goes to the primary

12   source, which in your instance is exactly right,

13   would be the university itself.

14       Q.    The issuing university?

15       A.    Yes, the issuing granting university,

16   granted the degree.

17       Q.    Beyond that definition of the Primary

18   Source Verification, is it your opinion that

19   credentialing by Medicare Advantage organizations is

20   otherwise relevant to this case?

21       A.    No, it's not.  I mean, I just -- I was

22   asked different questions in our discussion and --

23   about -- it's sort of an educational thing.  I mean,

24   I'm a professor, so I like to give people definitions

25   that don't come from Dr. Hyde.  They come from other

John Charles Hyde, Ph.D.

1    sources.  I know them, but I want them to see it, see

2    the other sources.

3         Q.    And then in your pile of documentation you

4    brought, you have a copy of an article entitled,

5    "Celebrating 50 years of experience: An ECFMG

6    perspective," correct?

7         A.    Yes, ma'am, written by at the time the

8    president of ECFMG.

9         Q.    Yes.  Dr. Hallock and Dr. Kostis.

10        A.    Yes.  I think the first one was the

11   president.  I forget what the number two was.

12        Q.    Correct.  He was the president and CEO,

13   Dr. Hallock.

14        A.    Yes.

15        Q.    So then the next document was

16   paper-clipped together?

17        A.    Yes, ma'am.

18        Q.    And I want to get an understanding of what

19   it is from you and where you got it.

20        A.    Sure.

21        Q.    So I'll hand it over to you, if you

22   wouldn't mind.

23        A.    Okay.

24        Q.    Let me know.

25        A.    Sure.  I had referenced the 2008 Manual

John Charles Hyde, Ph.D.

1    For Joint Commission About Medical Staff

2    Credentialing --

3        Q.    Yes.

4        A.    -- for hospitals.  That was actually

5    listed in my opinion.  And I found that -- I used to

6    have going back 20 years all the hospital

7    accreditation standard manuals from the Joint

8    Commission; but, unfortunately, a few years ago I

9    didn't have any old-old cases, so I threw some away.

10   So -- but that's the first one is from '08, and it's

11   about the process of medical staff credentialing and

12   privileging at a hospital and, also, the acceptance

13   of certain entities as Primary Source Verification or

14   CVO, Credential Verification Organizations, that

15   would be such as ECFMG.

16           And then I ran across -- I did find an

17   older one, a 2004, again, Hospital Accreditation

18   Standards from the Joint Commission that actually

19   list out that the ECFMG is a primary source

20   designated CVO for foreign medical graduate

21   verification of their foreign medical school staff.

22   And then I did take -- or excuse me -- paper-clipped

23   these together just for -- I apologize, or to

24   whomever.

25       Q.    And I'm going to go ahead and mark these

John Charles Hyde, Ph.D.

1    two together as Exhibit 6, cause we were not able to

2    find these documents in our library, so that we can

3    keep them with the deposition transcript --

4         A.    Sure.

5         Q.    -- If that's okay.

6         A.    And they're out of my -- I have the whole

7    manuals, but I didn't bring them cause I don't want

8    them made exhibits and lose them.

9         Q.    Sure.  I appreciate it.

10        A.    But they're bona fide and -- I'll get it.

11              (Exhibit 6 was marked for

12        identification.)

13        Q.    (By Ms. McEnroe)  Then next we have a copy

14    of your, it looks like resume that says

15    "Credentialing related factors" --

16        A.    Yes, ma'am.

17        Q.    -- at the top.  And it says handwritten,

18    "Old one.  New is updated to May 10th, 2018."

19        A.    Yeah.  I'm trying to remember if I updated

20    it mentally or if I -- if I did a new copy.

21        Q.    So this looks like sort of a cribbing of

22    your CV, if you want to take a look at it.

23        A.    Yeah.

24        Q.    It's a little bit more of a shorthand.

25              MR. HAYNES:  I'm going to object.  Just

John Charles Hyde, Ph.D.

```
1   from a different publication.  This is a textbook

2   that's out for master level healthcare administration

3   students.  I authored a chapter in the book.  It's

4   "Credentialing of healthcare providers."  It's one of

5   my publications.  I have five or six or more.  I

6   can't -- I'd have to look -- on issues of

7   credentialing.  And it's just -- well, I guess -- and

8   the brag part becomes, the reason that the first page

9   is on here, it's one of the text -- it's a textbook

10  that has been identified as the study guide for your

11  fellowship and attaining fellowship in the American

12  College of Healthcare Executives.  So that's the book

13  and I just --

14       Q.   I see.

15       A.   Yes.  And I'm not trying to brag too much,

16  but that's -- that is probably the most widely

17  accepted and adopted textbook in Human Resource

18  management in healthcare.

19       Q.   So you have a copy of this.  I'm going to

20  go ahead and mark that --

21       A.   Oh, I do.

22       Q.   -- if that's okay.

23       A.   You can have that.  I've got the book

24  itself, several copies of that.  That came out of --

25  that actually came out of ACHE, Healthcare Executive,
```

John Charles Hyde, Ph.D.

1    one of our weekly -- or, no, monthly publications

2    and --

3        Q.    So I see on this first page of what's now

4    Exhibit 8, there is a picture of the book that has

5    the cover and the second page; is that correct?

6        A.    Yes, ma'am.

7        Q.    Okay.

8        A.    And I didn't do that.  I just -- I did the

9    picture because I wanted you to see the book.

10       Q.    Sure.  I appreciate that.

11             MR. HAYNES:  I know it's listed on his CV

12       in his publication, but because of its

13       relevance, we asked him to print a copy and

14       bring it here today for your convenience.

15             MS. MCENROE:  I appreciate that.  Thank

16       you.

17             (Exhibit 8 was marked for

18       identification.)

19       Q.    (By Ms. McEnroe)  Then it looks like there

20   are a couple of other documents from the Internet, so

21   I can move a little quicker through them.  One of

22   them is the printout from the Joint Commission

23   Acceptance of AMA Physician Master File Data,

24   correct?

25       A.    Yes.

John Charles Hyde, Ph.D.

```
 1        Q.     And you printed that off of the website?
 2        A.     I did.  I -- yes, ma'am, probably the AMA
 3   Master File website.  I think that's the source of
 4   that.
 5        Q.     Great.  And then you have a couple of
 6   printouts from the ECFMG website.  You have one,
 7   which is a document that has representative examples
 8   of irregular behavior?
 9        A.     Yes, ma'am.
10        Q.     You printed that off of ECFMG's website?
11        A.     I did, all of those.
12        Q.     And then there's another one -- another
13   document from ECFMG's website that looks like a
14   printout of the policies and procedures regarding
15   irregular behavior.
16        A.     Yes.
17        Q.     Correct?
18        A.     I did.  And that's where I got it, yes,
19   ma'am.
20        Q.     And then there's another document that's a
21   printout that is subject headed category, "Irregular
22   behavior," and then it has a subheading that says,
23   "USMLE takes action against individuals found to have
24   engaged in irregular behavior."  Is that correct?
25        A.     Yes.
```

John Charles Hyde, Ph.D.

1        Q.    And you printed out this as well from

2    ECFMG's website?

3        A.    I did.

4        Q.    While I'm doing that, I'll make sure I get

5    all ECFMG printouts.  I see one more that appears to

6    be from ECFMG's website that has a portion on the

7    Certification Verification Service for ECFMG --

8        A.    Yes.

9        Q.    -- correct?  And another one that just is

10    from a page that says, "Certification verification,"

11    is that correct?

12        A.    Correct.

13        Q.    And you printed these off of ECFMG's

14    website as well?

15        A.    I did, to establish they declare

16    themselves a primary source verifier.

17        Q.    A couple of other documents that I want to

18    make sure we're just clear for purposes of the record

19    what we have in your Redwell that you brought today.

20    You have a copy of Defendant's Disclosure of Expert

21    Testimony, which is revealing Dr. Fenichel and

22    Dr. Goldberg dated September 23rd, 2019?

23        A.    Yes.

24        Q.    And it looks like a copy of your expert

25    report, which we have marked as Exhibit --

John Charles Hyde, Ph.D.

```
 1        A.    Four?  Three?

 2        Q.    -- 5?

 3        A.    Sorry, five.  Yes.

 4        Q.    So is this report here, this is the same

 5   as what we received; is that correct?

 6        A.    I believe so.  You printed it on two

 7   sides, and I didn't; but I think it's the same thing.

 8        Q.    That's fair, and it says --

 9        A.    It's the same date.

10        Q.    It says "filed" with an "E" after it.  Do

11   you see that?

12        A.    Yeah, E-filed.

13        Q.    Oh, E-filed.

14        A.    Electronically, I'm sorry, that's my --

15        Q.    Sure, that's fine.

16        A.    -- shorthand.

17        Q.    That's -- that's what your notation there

18   means?

19        A.    Yes, because they filed it electronically

20   with my signature, electronic signature.

21        Q.    Got it, okay.  And then it looks like a

22   printout from FSMB's website that says, "Credentials

23   verification process."

24        A.    Yes.

25        Q.    And you printed this off of FSMB's website
```

John Charles Hyde, Ph.D.

1   hospitals that he -- against ECFMG.  He perpetuated a

2   lot of frauds.  I haven't counted them all up, but

3   there's a lot of fraudulent -- and even he admitted

4   it -- giving wrongful information to me that's

5   fraudulent.  I'm not a lawyer.  So you hadn't asked

6   me that; I'll tell you.  But to me, doing something

7   that's illegal and unethical and untruthful is

8   probably -- forget unethical.  That is untruthful

9   would be fraudulent, but there's a lot of people.

10  Ultimately, it's the patients.

11        Q.    I'm going to direct your attention back to

12  Exhibit 5, which is your --

13        A.    Sure.

14        Q.    -- report.

15        A.    I'll get it.

16        Q.    So you can set the other exhibits aside.

17        A.    I'll put these in order and then pull out

18  five.  I've got it.

19        Q.    Prior to this case, had you ever had any

20  involvement with or come across any allegations of

21  irregular behavior?

22            MR. HAYNES:  Object to the form and

23        foundation.  You mean like in life?

24            MS. MCENROE:  Yeah.

25            MR. HAYNES:  Any irregular behavior?

John Charles Hyde, Ph.D.

1           MS. MCENROE:  Yeah.  I'm using it as a

2      defined term as you use it in your report,

3      right.  So I'm going to go with, ECFMG has a

4      definition of irregular behavior.  I can restate

5      the question if your counsel would prefer.

6      Q.   (By Ms. McEnroe)  Have you ever come

7  across any allegations or investigations that you

8  know of by ECFMG pertaining to irregular behavior

9  prior to this case?

10          MR. HAYNES:  Okay.

11          THE WITNESS:  I've had knowledge.  I've

12      read things, sure, in the past.  Have I been

13      involved in those cases?  No, ma'am.

14      Q.   (By Ms. McEnroe)  Okay.

15      A.   But I'm aware of that term.  And at first

16  I thought irregular behavior any time.  And, yeah, we

17  have that.  We're humans.  There's irregular

18  behavior.  But I have never had a case where that's

19  been an issue, but I'm aware of the terminology.  And

20  I'm also aware of sort of the importance, or the

21  import of that from a standpoint of what does that

22  lead to and what's its consequence or outcome.

23      Q.   What do you mean by that?

24      A.   Well, you can have irregular behavior that

25  the individual gave the wrong -- I think he said the

John Charles Hyde, Ph.D.

1  birth date was wrong because his medical school had

2  the wrong birth date.  Well, that -- that's sort of,

3  Okay, that's -- that's a no-brainer.  Yes, that's

4  irregular, but what does it really mean?  Somebody

5  screwed up on the paperwork, if that was all.  So

6  that could be one of those instances of irregular

7  behavior that, yes, it's a technical -- it's like an

8  E -- EMTALA violation.  There could be technical

9  EMTALA violations that really have no effect on

10  anybody, but, technically, that was a violation.

11       Q.    What kind of violation were you just

12  saying?

13       A.    EMTALA, E-M-T-A-L-A.

14       Q.    What is that?

15       A.    The Emergency Medical Treatment and Labor

16  Act -- Active Labor Act.

17       Q.    You mean in a physician giving treatment

18  to a patient?

19       A.    No, no.

20            Okay.  Let me -- let me tell you what that

21  is.  Emergency Medical Treatment Active Labor Act,

22  that is the federal guidelines on -- it started out

23  on dumping hospitals that would -- somebody would

24  come into the ED either emergent or pregnant, you

25  know, sort of in the last stages or, you know, the

John Charles Hyde, Ph.D.

1   now you see it differently than how it was seen

2   contemporaneously, right?

3          MR. HAYNES:  Object to the form.

4       Misstates testimony.

5          THE WITNESS:  No.  The contemporaneous

6       part was when he apply -- when he was in an

7       appeals process with ECFMG and admitted lying on

8       different things, too.  So it had nothing to do

9       with his subsequent conviction of tax evasion or

10      whatever the -- I don't know what it was, his

11      federal conviction and time served.

12      Q.   (By Ms. McEnroe)  Right.  So that

13  admission and that appeals process where he showed up

14  and he admitted to -- lied, that was just with

15  respect to the identity for which ECFMG found to have

16  been irregular behavior three or four times, correct?

17  That was not the Akoda identity?

18      A.   That was -- see, other than the fact

19  that -- let me think.  There was an e-mail from Kelly

20  that went to Oluwafemi that came back answered by

21  Akoda.  So it's like --

22      Q.   Right.

23      A.   -- the Akoda name does come into it.

24          MR. HAYNES:  Let him finish.

25          MS. MCENROE:  I'm letting him finish.

John Charles Hyde, Ph.D.

1      Q.    (By Ms. McEnroe) Go ahead.

2      A.    I'm saying the -- the Akoda name does come

3   into it.

4            Now, you asked me a question.  I don't

5   know, technically, if when he was in front of the

6   ECFMG committee July 10th, '96, I -- but he says his

7   name now is Charles, comma, Igberase Oluwafemi.  He

8   didn't say Akoda.  You're right.

9      Q.    Right.  And -- and so the e-mail that you

10  raised having gone to one but coming back from the

11  other --

12     A.    Yeah.

13     Q.    -- that was an issue that Bill Kelly

14  identified contemporaneously, right?

15     A.    Yeah.  He didn't do anything about it.

16     Q.    But he --

17     A.    Okay, I'm sorry, he did.

18     Q.    Go ahead.

19           MR. HAYNES:  Go ahead.  Were you finished?

20           THE WITNESS:  I wasn't finished, no.  I'm

21     sorry.  We keep on -- I'm trying to pause

22     and --

23     Q.    (By Ms. McEnroe)  Go ahead.  You can

24  finish your answer.

25     A.    Okay.  The point is that that came back

John Charles Hyde, Ph.D.

1   contemporaneously as it wasn't the conviction at all

2   that sort of lets us Monday morning quarterback.

3   We're going back, and I'm looking at things that were

4   submitted by him contemporaneously, that, also,

5   knowledge of taking the test without the proper

6   identification, you know, false testing as -- I mean,

7   all we have to do is look at Hollywood and getting

8   into some exclusive schools to see what -- and people

9   can violate the -- the testing protocols.

10          So I think that there's a lot of

11  contemporaneous information that I would have not

12  allowed him to go any further, to be honest.  He

13  would have been permanently revoked, and I wouldn't

14  give him a five-year revocation, then let this start

15  over again because that in and of itself sets us

16  where we are today.

17      Q.   Have you ever been in a position where

18  anyone looked to you to set the outcomes of findings

19  of irregular behavior by ECFMG?

20      A.   Oh, by ECFMG?  No, ma'am.  This is the

21  first.  I mean, the first time that I've been

22  involved with a case that I found that there was

23  irregular -- not only irregular behavior on the part

24  of the applicant, but also very much irregular

25  behavior upon the part of ECFMG.

John Charles Hyde, Ph.D.

1       Q.    And the hospital would play no role in

2    terms of having the Social Security number and

3    knowing that that was a real Social Security number

4    for that physician?

5       A.    That's correct.  And you're talking about

6    practicing physicians outside of residency and

7    everything?

8       Q.    Correct.

9       A.    Yes, yeah.  They would have no -- unless

10   they were employed by the hospital, because they're

11   independent -- you know, by and large, they're

12   independent if they -- let me say, by and large, if

13   they're independent, their income is coming from a

14   tertiary source, secondary source, not primary from

15   the hospital.

16      Q.    Do you know how, if at all, Dr. Akoda was

17   paid by Prince George's?

18      A.    I don't know if he was an employee or not.

19   I don't know.  If he submitted and they found out --

20   oh, Prince George's.  No, I don't.  Let me just say I

21   don't.

22      Q.    I'd like to direct your attention to page

23   4 of your expert report.

24      A.    Okay.

25      Q.    At the very top, there's paragraph number

John Charles Hyde, Ph.D.

1    12.   Do you see that?

2          A.    Yes.

3          Q.    And it says, "To obtain a license to

4    practice medicine in Maryland, Akoda was required to

5    submit, among other essential components, a valid

6    ECFMG certificate."  Do you see that?

7          A.    I do.

8          Q.    What do you mean by "other essential

9    components"?

10         A.    Well, he would have to -- when he was

11   getting licensed to practice, he'd have to give

12   residency information.  We can look on the form, it's

13   here, that shows the other vital information.  Let me

14   get that.

15         Q.    Is that the Maryland document we --

16         A.    Yes, ma'am.

17         Q.    And I do believe we marked that one as an

18   exhibit.

19         A.    Oh, okay.  We're up to 15.  I've lost sort

20   of -- other information, vital personal information,

21   chronology of activities after graduating medical

22   school, all the information about medical education.

23   Then it says, "Graduates of foreign medical school, a

24   copy of valid ECFMG certificate, a copy of my medical

25   school diploma and a certified translation."  Also,

John Charles Hyde, Ph.D.

1    he has other -- there's probably another dozen things

2    that -- that he has to apply, so that's among others.

3        Q.    Could you -- could you -- for the "among

4    others," could you read in what the other dozen

5    things are?

6        A.    Okay.    "I have completed part one of IML-2

7    verification of education English language

8    instruction form and sent a copy to the information

9    institution from which I received my medical degree.

10   I have listed all postgraduate training I have

11   undertaken in the U.S.  I've listed all medical

12   licensure examinations I have ever taken and

13   requested transcripts from the appropriate

14   administering authority.  I've listed every license

15   registration I have ever been issued in the U.S."

16            Also, it says, "I do not have to take the

17   special purpose exam.  I have answered all character

18   and fitness questions explained by yes.  I have

19   attached a two by -- two-inch-by-two-inch passport

20   quality color photograph."  He's read all the

21   statements and he has to sign and date, send in

22   money.  And then if there's any supporting

23   documentation, he has to have it -- application

24   signed and notarized.  And then he also has to have a

25   criminal history records check.

John Charles Hyde, Ph.D.

```
 1              Those are all the checklist things that
 2   you need in the State of Maryland for a medical
 3   license.
 4        Q.    Do you know one way or the other whether
 5   the State of Maryland primary source verifies foreign
 6   graduate -- sorry.  Sorry, start that one --
 7              Do you know one way or the other whether
 8   the Maryland medical licensing board primary source
 9   verifies medical diplomas of foreign medical
10   graduates?
11        A.    Do the -- they don't -- they ask for a
12   certificate, so there's no statement.  No, they don't
13   primary source verify that.  That's up to ECFMG.
14        Q.    Well, I'm asking:  Do you know that for a
15   fact that they do not?
16        A.    I just read the application, and it says
17   that they want a copy of the certificate so --
18        Q.    Correct.  They want a copy of the
19   certificate.  They also want copy of the medical
20   diploma --
21        A.    Right.
22        Q.    -- and a certified translation, correct?
23        A.    Yes.  And they don't -- they do not say
24   that they're going to verify.  Do I know that they
25   turn around and verify that?  I don't know, but I'd
```

John Charles Hyde, Ph.D.

```
 1    be surprised if they even thought about doing it

 2    because that's what EC --

 3         Q.    So you don't know?

 4         A.    Well --

 5              MR. HAYNES:  You're interrupting him,

 6         counsel, several times.

 7              THE WITNESS:  Yeah.

 8              MR. HAYNES:  You're not letting him finish

 9         his answers.

10              THE WITNESS:  The point I know is that

11         ECFMG is a Primary Source Verification entity,

12         so there's no need for anybody else to do it.

13         Q.    (By Ms. McEnroe)  Right.  But that's not

14    an answer to my question.

15         A.    All right.

16         Q.    So my question is:  Do you know one way or

17    the other whether Maryland primary source verifies

18    themselves foreign medical graduates diploma?

19         A.    Well, I'm led to believe they don't based

20    upon the application itself.

21         Q.    Do you know?

22         A.    Well, I'm led to believe.  Do I know?  I

23    don't know yes or no.  But I know what ECFMG should

24    do, and I know what the application I just read into

25    the record states.
```

John Charles Hyde, Ph.D.

1        Q.    Okay.  Going back to page 4 of your

2    report.

3        A.    Sure.  Which one now?

4        Q.    Paragraph 18.

5        A.    Okay.

6        Q.    It says, "Mr. Akoda ultimately entered

7    into a plea bargain agreement and pled guilty to

8    Social Security fraud on November 15, 2016."

9    Correct?

10       A.    Yes, ma'am.

11       Q.    Then the next paragraph 19 says, "In the

12   spring of 2017, Mr. Akoda's license to practice

13   medicine in Virginia and Maryland was revoked."  Did

14   you see that?

15       A.    I did.

16       Q.    Okay.  Do you have any sense of what ECFMG

17   did following Dr. Akoda's guilty plea?

18       A.    I would have to look at the packet if

19   ECFMG permanently revoked.  I'm thinking they did.

20   I -- I can't recall that.  If you give me a page,

21   I'll go to it.

22              (Exhibit 16 was marked for

23         identification.)

24       Q.    (By Ms. McEnroe)  Dr. Hyde, I'm handing

25   you what I've marked as Exhibit 16.