# Exhibit 8

Jerry Williamson, M.D.

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3

 4        _____

          MONIQUE RUSSELL, JASMINE )

 5        RIGGINS, ELSA M. POWELL, )

          and DESIRE EVANS,        )   CIVIL ACTION NO.

 6                                  )   18-5629

                  Plaintiffs,       )

 7                                  )

          vs.                       )

 8                                  )

          EDUCATIONAL COMMISSION    )

 9        FOR FOREIGN MEDICAL       )

          GRADUATES,                )

10                                  )

                  Defendant.        )

11        _____)

12

13           VIDEO DEPOSITION OF JERRY WILLIAMSON, M.D.

14           DATE TAKEN:      Friday, November 22, 2019

15           TIME TAKEN:      10:00 a.m.

16           PLACE TAKEN:     9501 Market Place Rd.

                              Fort Myers, FL

17

             ON BEHALF OF:    Defendant

18

             REPORTER:        Wanda Jackson,

19                            Court Reporter

20

21

22

23

24

25
```

Jerry Williamson, M.D.

1   question before you respond.  If you do not let me know

2   that you do not understand that question, I will assume

3   that you do, is that fair?

4       A.   Fair.

5       Q.   If you ever want me to restate a question, just

6   let me know and I am happy to do so.  Okay?

7       A.   Okay.

8       Q.   And as we discussed before we came on the

9   record, if at any time you need to take a break, that is

10  just fine.  No problem at all.  Just let me know and we

11  will go off the record.  I do ask though, if there is a

12  question pending, unless there is an issue of privilege

13  that you need to discuss with counsel, that you answer

14  whatever question is pending before we take a break.  Do

15  you understand?

16      A.   I do.

17      Q.   Do you understand you are here today as an

18  expert witness on behalf of the Plaintiffs in the lawsuit

19  filed against the Educational Commission For Foreign

20  Medical Graduates?

21      A.   Yes.

22           MS. MCENROE:  I am going to hand you what I have

23  marked as Exhibit 1, which I am marking really for the

24  purposes of the record.

25           (Thereupon, Exhibit 1 was marked for

Jerry Williamson, M.D.

 1  identification.)

 2  BY MS. MCENROE:

 3      Q.   This is your notice of deposition for your

 4  deposition today.  Have you seen this before (indicating)?

 5      A.   Yes, I have.

 6      Q.   And are you appearing pursuant to this

 7  deposition notice?

 8      A.   Yes.

 9      Q.   Have you testified in any case as an expert

10  witness in the last four years?

11      A.   No.

12      Q.   When was the last time you served as an expert

13  witness?

14      A.   Many years ago.  I -- I can't give you a

15  specific -- probably about 12, 14 years ago,

16  approximately.

17          MR. THRONSON:  Counsel, I am sorry.  Do you mean

18  testified or just retained?

19          MS. MCENROE:  Testified.

20          MR. THRONSON:  Okay.  Okay.

21      A.   12, maybe 14 years ago.

22  BY MS. MCENROE:

23      Q.   Great.  And do you remember the subject matter

24  of that case?

25      A.   It was clinical.  It was pediatrics, but I don't

Jerry Williamson, M.D.

1    recall the specifics of it, no.

2        Q.   And did you testify at a trial or at a

3    deposition in that case?

4        A.   Both.

5        Q.   And then I presume that the other two or three

6    times that you served as an expert was prior to that?

7        A.   Correct.

8        Q.   And for those, did you testify just at a

9    deposition or also at a trial, do you recall?

10       A.   I don't recall.

11       Q.   Do you recall generally the subject matter of

12   those other testimonies?

13       A.   They were all clinical.

14       Q.   And when you say clinical, do you mean medically

15   clinical?

16       A.   Correct.

17       Q.   Did any involve the Educational Commission For

18   Foreign Medical Graduates?

19       A.   No.

20       Q.   Did any, to your recall, involve foreign medical

21   graduates or international medical graduates?

22       A.   I don't recall.

23       Q.   In terms of cases in which you served as an

24   expert and provided an expert report but did not testify,

25   do you recall when you most recently did that prior to

Jerry Williamson, M.D.

1  this case?

2      A.   That would have been -- well, there were -- I am

3  trying to remember the case now.  That would have been

4  a -- yes.  It would have been a fair hearing case where I

5  provided an expert report.

6      Q.   When was that?

7      A.   Within the last year, perhaps a year and a half.

8      Q.   When you say a fair hearing case, what do you

9  mean?

10     A.   A fair hearing at a hospital for a physician.

11     Q.   And just very briefly, what kind of

12  circumstances is it that a physician has a fair hearing

13  case?

14     A.   Yeah.  The circumstances were a physician who

15  was dismissed from -- from the hospital for reasons that

16  we are not in agreement with.

17     Q.   And are you on the side of the doctor or on the

18  side of the hospital?

19     A.   Physician, yes.

20     Q.   Prior to that, do you recall when you last

21  served as an expert?

22     A.   That was also a fair hearing case that is

23  pending and very, very similar circumstances in a

24  different city and state.

25     Q.   Are you on the side of the physician or the

Jerry Williamson, M.D.

1    hospital?

2         A.   The physician.

3         Q.   And prior to that?

4         A.   Well, there was another fair hearing case.

5         Q.   I am getting a sense of a pattern here.  Go

6    ahead.

7         A.   And this was a physician in a very similar type

8    of situation.  And I was -- provided an expert report for

9    the physician.

10        Q.   And prior to that?

11        A.   It was a credentialing case -- now, these are

12   all within the past four years.  I may not be giving them

13   to you in any particular order.

14        Q.   Okay.

15        A.   But they are all within the past four years.

16        Q.   I appreciate that.

17        A.   It was a negligent credentialing case where I

18   provided a report for the Plaintiff.

19        Q.   When you say negligent credentialing, of whom?

20        A.   Negligent credentialing of a hospital.

21        Q.   By a hospital but of whom?

22        A.   When you say of whom, I am not sure I understand

23   the question.

24        Q.   Who was the hospital negligent in credentialing?

25        A.   Was negligent in credentialing one of their

Jerry Williamson, M.D.

1    nurses.

2         Q.   A nurse?

3         A.   Yes.

4         Q.   And is that the Cane versus Memorial Hermann

5    Health Systems case?

6         A.   Is that Texas?

7         Q.   That is from -- yes, the District Court of

8    Texas, the 55th Judicial District.

9         A.   Correct.   That is correct.

10        Q.   Separate from the Cane case, have you ever

11   testified or -- strike that.   I will start over.

12             Besides this case and the Cane case have

13   you ever previously served as an expert in any case

14   regarding credentialing?

15        A.   The case -- there was one other case that

16   actually the -- the fair hearing case involved peer review

17   and credentialing as well.

18        Q.   Each of the fair hearing cases or one in

19   particular?

20        A.   No.  One -- well, actually two in particular.

21   Let me think now.  Yes, two in particular, two of the

22   three.

23        Q.   And when you say that those two fair hearing

24   cases involved credentialing, credentialing of the

25   physicians but by whom?

Jerry Williamson, M.D.

1        A.   Credentialing of the physicians by the hospital.

2        Q.   And I have learned from various depositions in

3   this case, there is a difference between credentialing and

4   privileging?

5        A.   Correct.  Correct.  Yes.

6        Q.   Okay.  And so were the fair hearings -- they

7   were specifically about credentialing as opposed to

8   privileging or were they a combination sometimes?

9        A.   Well, pretty much a combination.

10       Q.   Okay.  Are you drawing a distinction when you

11   say credentialing to exclude privileging or could it be

12   inclusive?

13       A.   It depends on who I am speaking with.

14       Q.   Okay.  Well, now, in describing your expert

15   experience, I just want to get an understanding if you are

16   using the term credentialing, could you also mean that to

17   be privileging as well?

18       A.   Well, they are very distinct.  They are

19   distinct.

20       Q.   In the cases in which you testified regarding

21   the credentialing of the physicians in the fair hearing

22   setting, and I think you said that there were two of them,

23   did both of those involve privileging as well?

24       A.   Correct.

25       Q.   Which specialities, if you don't mind?

Jerry Williamson, M.D.

1       A.    Sure.  The -- one is OB-GYN.  One is I believe

2  vascular surgery.

3       Q.    Were you providing expert testimony regarding

4  their specialties, the OB-GYN or the vascular surgery, in

5  either of those cases?

6       A.    No.  I was there basically providing information

7  regarding hospital bylaws and credentialing processes as

8  they relate to the two physicians involved.

9       Q.    Has any of your expert experience ever concerned

10  the Educational Commission For Foreign Medical Graduates

11  aside from the case we are here for today?

12       A.    No.

13       Q.    Do you recall if any of your previous expert

14  experience ever involved foreign medical graduates aside

15  from the case that we are here for today?

16       A.    I don't recall.

17       Q.    Do you recall the outcome in the Cane matter in

18  Texas?

19       A.    Yes.  The Cane matter in Texas -- actually,

20  there was a mediation this week.

21       Q.    Oh, okay.

22       A.    And I have not received the results of that.

23       Q.    Okay.

24       A.    But it was being mediated this week.

25       Q.    Can you give a very, brief high-level summary of

Jerry Williamson, M.D.

1    what the subject matter of that case is about?

2         A.    Sure.  The subject matter is a nurse who

3    sexually abused a patient in the hospital by anesthetizing

4    the patient with a paralytic medication and then sexually

5    abused the patient.  And the credentialing was inadequate

6    on this particular individual.  This individual had a

7    history of doing this previously or something similar to

8    that.

9         Q.    In your experience do you expect that a hospital

10   has a certain level of rigor or a certain set of steps

11   they go through when they are hiring a nurse?

12        A.    Yes.

13        Q.    Do you expect that those steps are more rigorous

14   or less rigorous than when a hospital is hiring a

15   physician?

16        A.    They are different.

17        Q.    In what way?

18        A.    They are different in terms of the -- the

19   educational backgrounds are different.  The training is

20   different and in many cases experience as well.

21        Q.    Would you expect a hospital to be more rigorous

22   in its screening of a nurse than it would be of a

23   physician?

24        A.    I think they are at risk with both.

25        Q.    Dr. Williamson, do you know if there has ever

Jerry Williamson, M.D.

```
 1   been a motion to exclude or preclude your testimony in a

 2   lawsuit for which you have served as an expert witness?

 3        A.   No.

 4        Q.   Aside from this case and the two fair hearing

 5   cases that you mentioned earlier that involved

 6   credentialing, do you recall having served as an expert in

 7   any other matter at any time regarding credentialing or

 8   privileging?

 9        A.   I don't recall.

10        Q.   Have you ever served as an expert in a matter

11   where you gave testimony or opinions regarding the

12   licensing of a physician by a licensing board?

13        A.   No.

14        Q.   Have you ever given testimony or opinions in a

15   matter in which you served as an expert where there was an

16   issue of a physician becoming board certified by a

17   specialty board?

18        A.   No.

19        Q.   Have you ever served as an expert witness giving

20   testimony or opinion regarding a residency program having

21   decided or decided not to hire a resident candidate?

22        A.   No.

23             MS. MCENROE:  Dr. Williamson, I am handing you

24   what I have marked as Exhibit 2.

25             (Thereupon, Exhibit 2 was marked for
```

Jerry Williamson, M.D.

1   identification.)

2   BY MS. MCENROE:

3       Q.   I presume this may look familiar.  Do you know

4   what this is?

5       A.   It appears to be my CV.

6       Q.   Yes.  Is this the CV that you provided in this

7   case?  Does this look like it is?

8       A.   I don't recall because I am looking at the

9   update on it.  And I believe there may be a more recent

10  update.

11      Q.   Okay.  So what leads you to believe that there

12  may be a more recent update?

13      A.   Well, I am just looking at the date and it says

14  June 17th.  I believe that I have -- I have one here.

15      Q.   Oh, do you have one with you?

16      A.   Yes, I do.

17      Q.   May I be able to see it, please?

18      A.   Yes.  May I get it?

19      Q.   Please.

20      A.   Sure.  August 2019.

21      Q.   Great.  Can I see it?

22      A.   Sure.

23      Q.   Wonderful.

24          MS. MCENROE:  And I am going to mark this as an

25  exhibit, if that is all right, and we will have it in the

Jerry Williamson, M.D.

1    a copy of that, but just Exhibit 3 would be great.

2         A.   (Witness complies).

3         Q.   Thank you.  And I see that the Morgan and Morgan

4    Law Blog from 2015 is entitled Doctors Without Conscience?

5         A.   Correct.

6         Q.   What was that about?

7         A.   I don't recall the specifies of that.

8         Q.   Okay.  Did that have anything to do with

9    physician credentialing?

10        A.   I don't believe so, but I can't say for sure.

11        Q.   And what about the Community Health Centers

12   Alliance publication or blog entitled The Devil Is In The

13   Details:  Resolve to Take a Second Look at Three

14   Meaningful Use Objectives?

15        A.   Yes.

16        Q.   Do you recall what that is about?

17        A.   Yes.  It was about the federal government's

18   Meaningful Use Program relating to electronic health

19   records.  And -- and I am getting caught up here.

20        Q.   Do you want to take a second?

21        A.   About the electronic health records and how they

22   have -- how this Meaningful Use Program has become a

23   significant burden on physicians.

24        Q.   In carrying out their duties?

25        A.   In carrying out their duties, correct, yes.

Jerry Williamson, M.D.

```
 1        Q.    I will give you back Exhibit 3.  Just hold onto
 2   that for a second.  So do you have any professional
 3   qualifications or certifications that are not listed here?
 4   So, for example, a Ph.D. in something or something that
 5   you deemed not relevant for these purposes but is a degree
 6   that you hold?
 7        A.    A degree, no.
 8        Q.    Any other qualifications or certificates that
 9   you hold that are not listed here other than like a
10   driver's license?
11        A.    No.
12        Q.    Okay.
13        A.    I don't believe -- I don't believe so.
14        Q.    And I see that in your graduate school section
15   you list Loyola University Chicago School Of Law?
16        A.    Yes.
17        Q.    Beazley Institute for Health Law and Policy that
18   you got a master's in health jurisprudence --
19        A.    Correct.
20        Q.    -- in 2010?
21        A.    Yes.
22        Q.    That is not a JD degree, correct?
23        A.    Correct.  It is an MJ.
24        Q.    And you are not a lawyer, correct?
25        A.    Correct.
```

Jerry Williamson, M.D.

```
 1        Q.   Have you taken or sat for the bar exam in any

 2   state?

 3        A.   I have not.

 4        Q.   And similarly in your appointments, I see that

 5   you have had some interactions with legal institutions,

 6   for example, being an adjunct professor of law at Loyola

 7   University Chicago School of Law, correct?

 8        A.   Correct.

 9        Q.   Were you serving in a lawyerly capacity there,

10   if you will, or -- strike that.  I can restate it.

11                  So what was the subject of your studies

12   that you did there?

13        A.   Risk -- subject of my studies or what I am

14   teaching?

15        Q.   Both.

16        A.   Okay.  The subject of my studies were pretty

17   much across the board in terms of risk management

18   compliance, regulatory issues.  It was a rather complete

19   program that ultimately ended up in a thesis.

20        Q.   And what was your thesis on there?

21        A.   My thesis was on -- let me think for a moment.

22   It was -- goodness.  It is a subject that I am actually

23   lecturing on now, and for some reason it has just

24   disappeared.

25        Q.   Sure.
```

Jerry Williamson, M.D.

```
1        A.   Let me think for a moment.

2        Q.   Does it relate to health and the law?

3        A.   Pardon me?

4        Q.   Does it relate to health and the law?

5        A.   Yes, it does.  It is specific to -- I have it

6   now.  Thank you.  Apology and disclosure.

7        Q.   And what do you mean by apology and disclosure?

8        A.   How physicians present themselves following a

9   medical mistake and what are some of the state law

10  requirements and what are their obligations ethically as

11  well.

12       Q.   When you say present themself, present themself

13  to who?

14       A.   To the patients and/or the family following a

15  medical mistake.  And basically it involves transparency.

16       Q.   So that is the subject both of your thesis and

17  also of the course that you have taught?

18       A.   That is a part of the subject matter in the

19  course, but that was my thesis, yes.

20       Q.   What is more broadly the subject matter of the

21  course you have taught?

22       A.   That I am currently teaching?

23       Q.   Correct.

24       A.   Risk management.

25       Q.   Have you taught any other courses at Chicago
```

Jerry Williamson, M.D.

 1    School of Law?

 2        A.   We have had programs that are live programs

 3    where I have presented similar types of programs in

 4    conjunction with others, but they vary.  But it was a

 5    single presentation.  It was not a course.

 6        Q.   Sure.  Like a single lecture type of experience?

 7        A.   Exactly.  Yes.

 8        Q.   Have you ever taught a course called Torts?

 9        A.   Called what?

10        Q.   Torts, Legal Torts?

11        A.   Torts.  No.  I have attended a course on torts

12    but, no, I have not taught it.

13        Q.   Okay.  So you are here serving as an expert, and

14    we have spoken a bit about your experience serving as an

15    expert.  I know you are also a medical doctor.  What would

16    you say your typical day job is?

17        A.   It varies.  Typically I am working with cases

18    like this.  I am teaching.  And I lecture around the

19    country in a variety of areas.  And I do consulting work

20    to assist physicians in developing compliance programs.

21        Q.   Are you currently credentialed at any medical

22    facility?  Are you on staff anywhere if I am not using the

23    right terminology?

24        A.   No.  I am not on staff, no.

25        Q.   Okay.  When were you last affiliated to be on

Jerry Williamson, M.D.

```
 1   staff with a medical facility?
 2        A.   Oh, dear.  That would have been -- probably
 3   would have been Mease Hospital, and that would have been a
 4   number of years ago.  It is M-E-A-S-E.
 5        Q.   And you have also spent time working in hospital
 6   administration, is that correct?
 7        A.   I have.
 8        Q.   Okay.  Do you currently work in hospital
 9   administration for any medical center or hospital?
10        A.   Only as a consultant when asked, yes.
11        Q.   When did you last work more formally, not in
12   just a consulting role, in hospital administration?
13        A.   More formally would have been at Cape Coral
14   Hospital where I was the vice president for medical
15   affairs.
16        Q.   And when did you do that until?
17        A.   I would probably have to look at my CV.
18        Q.   Go ahead -- go ahead and take a look.  I am not
19   trying to do a pop quiz.
20        A.   I understand.  I would say on or about 1993,
21   '94, somewhere in that.
22        Q.   I see on the second page at the very top you
23   have Cape Coral Hospital until '94?
24        A.   Yes.
25        Q.   Is that right?
```

Jerry Williamson, M.D.

```
 1       A.   Yes.

 2       Q.   And I know you testified earlier about serving

 3  as an expert in fair -- physician fair hearings?

 4       A.   Yes.

 5       Q.   Did you also ever serve professionally in your

 6  role as a hospital administrator in physician fair

 7  hearings?

 8       A.   As vice president of medical affairs I have.

 9       Q.   When you served as the vice president for

10  medical affairs for Cape Coral Hospital, did you also play

11  any role in the hiring or credentialing or privileging of

12  physicians?

13       A.   Most definitely.

14       Q.   And in other roles prior to that, did you do

15  that as well?

16       A.   I did.

17       Q.   Did you ever play a role in the hiring or

18  evaluation of resident applicants?

19       A.   I may have in the past, but I don't recall

20  exactly when.

21       Q.   Okay.  Have you ever been in a role throughout

22  your career where you oversaw directly or indirectly the

23  work of residents?

24       A.   Well, I currently am on the faculty at Florida

25  State University, and I work in their residency program
```

Jerry Williamson, M.D.

1    locally here in Fort Myers.  So I wouldn't call it an

2    oversight, but it is more of a -- I provide lectures to

3    the residents.

4         Q.   Do you have any say or responsibility in the

5    hiring or recruiting of any of the residents from Florida

6    State University?

7         A.   No.

8         Q.   And is that any particular specialty you are on

9    the faculty for at Florida State University?

10        A.   Family practice.

11        Q.   Family practice.  Do you still treat patients,

12   Dr. Williamson?

13        A.   No.

14        Q.   Okay.  When did you stop treating patients?

15        A.   Oh, it's been approximately 10 years ago,

16   perhaps longer.  I can't say for sure.

17        Q.   Why?

18        A.   Why did I stop?

19        Q.   Yeah.

20        A.   I wanted to spend more time doing administrative

21   work.

22        Q.   In the course of your career, including when you

23   treated patients and since, have you ever to your

24   knowledge come across anybody who was also a patient of

25   Dr. Akoda?

Jerry Williamson, M.D.

```
 1        A.    Of Dr. --

 2        Q.    Akoda.

 3        A.    No.

 4        Q.    When I say Dr. Akoda, I am going to use that as

 5   shorthand for the individual at issue in the litigation

 6   here.  I know he has gone by a number of names.  And if I

 7   need to make a distinction between the identities he's

 8   used, I will try and make that clear.  But you understand

 9   who I am talking about if I refer to Dr. Akoda?

10        A.    Yes, I do.

11        Q.    We talked just briefly earlier that you have

12   played some role in the hiring or credentialing or

13   privileging of physicians throughout your career.  I am

14   trying to get an understanding of what is involved in a

15   medical center or a hospital deciding to become affiliated

16   with a physician.

17                    I understand using the word employed is

18   a little bit loaded in the physician sense.  A lot of

19   physicians are not directly employed, so I am not trying

20   to overstate it, but just trying to understand what that

21   process is typically like.

22        A.    Well, it is not a one size fits all.  It depends

23   on who you are representing, whether it is a hospital in a

24   patient setting, whether it is a FQHC, a federally

25   qualified health center, where I was medical director.
```

Jerry Williamson, M.D.

1    Whether it is a health maintenance organization where I

2    was co-medical director and then medical director.  So it

3    varies depending upon whether it is an inpatient or

4    outpatient.  But I would say it is a very cumbersome and

5    very thorough process that requires significant attention

6    to the details.

7        Q.   What kind of details?

8        A.   The details in terms of the -- again, if we are

9    talking about residents or we are speaking to physicians

10   that have been employed previously that you are looking to

11   hire.  So it depends on what those details would be.

12       Q.   Sure.  So like a fresh hire of a brand-new

13   physician versus someone who maybe has had a career

14   elsewhere before, you are saying those are different

15   inquiries?

16       A.   Correct.

17       Q.   So let's talk about somebody coming more

18   directly through the education system out of a residency

19   program. What types of things in your experience would a

20   health care center or a hospital look at in trying to

21   decide whether or not they want to hire that individual?

22       A.   There is a list of items, and I am not sure that

23   I can give you the full list.

24       Q.   Sure.

25       A.   But we are certainly looking at the individual's

Jerry Williamson, M.D.

1   education as far as where they attended school.  And we

2   are certainly interested in finding out a little bit more

3   about the residency program that they attended as well.

4   We are interested in looking at whether there were any

5   national practitioner data bank issues involved, want to

6   know a little bit about their background.  We would do a

7   background check, looking at things like driver's license

8   and such.  Certainly we would consider looking at doing

9   things like drug testing to make certain that they were

10  clear.  And I am probably leaving some things out as well

11  I am sure.

12       Q.   Sure.

13       A.   But -- and it depends on -- on again whether it

14  is an inpatient or outpatient facility.  But again, it is

15  not a one size fits all, but it needs to be comprehensive

16  if one is going to not -- not have any potential

17  consequences as a result of the hire.  Additionally, I

18  would want to -- I always look at at least three

19  references, letters of reference.

20       Q.   When you say look at references, what do you

21  mean?

22       A.   Well, normally everything that we do is primary

23  source.  Everything I have done in the past in my career

24  has been primary source verification.  So when I say look

25  at the letters, receive the letters from the individuals

Jerry Williamson, M.D.

1   that were actually -- the ones that signed the letter and

2   wrote the letter.

3       Q.   So you are saying that you would directly

4   receive the letters of recommendation from the

5   recommenders themselves?

6       A.   Correct.  Either that -- and it is helpful when

7   we get those letters because it tells you a fair amount

8   about the individual, so that is helpful.  If in fact

9   there is something in the letter that is of concern to

10  me -- well, for the most part I was rather aggressive and

11  contacted all letters that I received.  And the reason for

12  that is because there's times where things are not placed

13  in a letter that is communicated best by telephone.

14      Q.   Sure.  There might be things that are more

15  unsaid than said?

16      A.   Nuances.

17      Q.   I understand.  Would you expect that there would

18  typically be an interview or in-person component?

19      A.   I have never hired an individual without an

20  interview.

21      Q.   Okay.  If the candidate were to have been

22  foreign educated, so educated outside the United States,

23  have you had experience with hiring foreign medical

24  graduates as well?

25      A.   Most certainly.

Jerry Williamson, M.D.

1        A.    Well, I think in part the FQHC, their mission

2    quite often aligns with the mission of foreign medical

3    graduates.  And it is more difficult for them to find work

4    outside of the FQHC environment.

5        Q.    Why do you think that is?

6        A.    Oh, I am sure there are reasons.  I don't know.

7        Q.    When evaluating foreign medical graduate

8    candidates as opposed to US-educated candidates in the

9    processes that you have described, aside from the medical

10   schools being in different places, how does that process

11   vary between a foreign medical graduate versus a US

12   medical graduate?

13       A.    To my recollection, it did not vary that much

14   because we were rather -- again, under my guidance we were

15   rather stringent in terms of making certain that we turned

16   over every stone.

17       Q.    For foreign medical graduates as well as

18   domestic?

19       A.    For all -- for all applicants in those

20   facilities.

21       Q.    So would you, for example, run background checks

22   on the foreign medical graduate candidates that came

23   through?

24       A.    Yes.

25       Q.    Would that involve verifying social security

Jerry Williamson, M.D.

1    numbers?

2         A.   Yes.

3         Q.   And you mentioned having interacted with ECFMG

4    during some of those processes?

5         A.   Correct.

6         Q.   What information did you recall receiving from

7    ECFMG during those processes?

8         A.   There were -- I don't recall them all, but they

9    were very helpful, because what ECFMG provided to us, we

10   relied upon and did not in fact need to duplicate our

11   efforts.  So that was -- and there were -- in essence for

12   us a ECFMG certificate meant a lot.

13        Q.   Do you recall what information was communicated

14   through the ECFMG certificate?

15        A.   I don't.  Not -- I mean, I know that they

16   provided for us the medical education and letters of

17   reference and such, but I don't recall each -- each item.

18   I don't.

19        Q.   I know I asked earlier about whether you have

20   come across Dr. Akoda's patients in your career.  Have you

21   ever come across Dr. Akoda directly himself?

22        A.   No.

23        Q.   Given that you have never met Dr. Akoda directly

24   yourself, from where did you get the information regarding

25   Dr. Akoda and his background for the purposes of serving

Jerry Williamson, M.D.

1   as an expert in this case?

2       A.   I think it was provided to me by my attorney.

3       Q.   Did you get any information regarding Dr. Akoda

4   from outside research you conducted independently?

5       A.   The only thing that I received was the -- I

6   believe it was the Department of Justice, their charges

7   and their decision in terms of -- I am trying to think.

8   That came through the American Board of Obstetrics and

9   Gynecology.  So that is my recollection on that, yes.

10      Q.   Did you, like, sit down and google Dr. Akoda and

11  read news articles about him or anything of the like?

12      A.   No.  That was the only news article that I saw

13  was through the American Board of Obstetrics and

14  Gynecology.  All of the other information was rather

15  comprehensive and complete in terms of what I received and

16  the documents that I received.

17      Q.   Did you interact with or read posts by any of

18  the Plaintiffs in this case on social media?

19      A.   Could you repeat that question?

20      Q.   Yeah.  Have you interacted with any of the

21  Plaintiffs in this case through social media?

22      A.   I -- I don't participate in social media at all.

23      Q.   You haven't read Facebook posts, for example?

24      A.   No.

25      Q.   Have you ever interacted with any of the

Jerry Williamson, M.D.

1        A.   I do not.

2        Q.   Do you expect that they should have?

3        A.   I don't know the inner workings of the American

4   Board of Internal Medicine, so I can't really say.

5        Q.   Do you think that they would have or should have

6   notified any other parties, hospital systems, boards of

7   medicine?

8        A.   Again, I don't know what their P&Ps are, their

9   policies and procedures are.  It is out of my area of

10  expertise.

11       Q.   Okay.  Are ECFMG's policies and procedures

12  within your area of expertise?

13       A.   I would say yes.

14       Q.   So how do you know more about ECFMG's policies

15  and procedures than you know about the American Board of

16  Internal Medicine's policies and procedures?

17       A.   I have had a fair amount of experience working

18  with ECFMG over the years as I mentioned previously.  So

19  that is the reason why the American Board of Internal

20  Medicine -- as a pediatrician, I have had, you know,

21  limited exposure to them.

22       Q.   Okay.  The next folder here is entitled

23  Plaintiffs' Timeline.

24            MS. MCENROE:  It is a document that we will mark

25  for purposes of the record, and I actually think I have

Jerry Williamson, M.D.

1   another copy here.  I might mark -- I am actually going

2   to mark this version with the highlighting on it as

3   Exhibit 11.

4           (Thereupon, Exhibit 11 was marked for

5   identification.)

6   BY MS. MCENROE:

7       Q.   So marking as Exhibit 11 the document from this

8   folder, and it includes a sticky note on the front page

9   there.  Could you read the sticky note into the record,

10  please?

11      A.   Sure.  Timeline by Plaintiffs' counsel not

12  exclusively relied on.  See enforcement timeline and

13  others in expert reports.

14      Q.   What does that mean?

15      A.   Well, that means that when I looked at this, I

16  had one document of the timeline.  But then I had other

17  documents of the timeline as well, specifically the

18  timeline that the Department of Justice had used in

19  developing their case.  And multiple timelines in terms of

20  the expert reports, not mine but the expert reports from

21  other experts.  So I pretty much had multiple timelines.

22  And I would say that for the most part the timelines --

23  the multiple timelines were pretty much consistent.

24      Q.   So the multiple timelines you had from the other

25  expert reports, did you have those timelines prior to the

Jerry Williamson, M.D.

1    issuance of your expert report?

2        A.   I am trying to remember which expert reports I

3    had prior to my expert report -- before developing my

4    expert report.  Again, I would have to look at that.

5        Q.   Go ahead and look at Exhibit 9.

6        A.   Okay.  Exhibit 9?

7        Q.   I believe 9 is your expert report.

8        A.   Yes.  I don't see it on there.

9        Q.   Okay.  So those were expert report timelines

10   that you would have had of the course of events after you

11   issued your expert report, correct?

12       A.   Yes.

13       Q.   Okay.  And so at the time of issuing your expert

14   report though, did you -- you had this timeline from

15   Plaintiffs' counsel, correct?

16       A.   Correct.

17       Q.   And that is what is reflected in your Materials

18   Considered list on page 2 of your report which is Exhibit

19   9 that says Timeline of Events, is that correct?

20       A.   Correct.

21       Q.   The next document here is in a folder entitled

22   ECFMG Rebuttals, is that correct?

23       A.   Uh-huh.

24       Q.   Is that yes?

25       A.   Yes.

Jerry Williamson, M.D.

```
 1        Q.    And then it has a number of expert reports, one

 2   for Dr. Beck, one for Dr. Finichel, another for Dr. Smith,

 3   an expert disclosure for rebuttal testimony by Kara

 4   Corrado and an expert rebuttal report by Dr. McDonald.

 5   Did you review all of these rebuttal reports?

 6        A.    I did.

 7        Q.    And presumably since they were issued after your

 8   report came out, they were after you prepared your expert

 9   report?

10        A.    May I look?  I don't recall off the top of my

11   head.

12        Q.    Sure.

13        A.    Correct.

14        Q.    The next folder here is entitled ABOG/AKODA.

15   And it is a series of documents from the ABOG which has

16   Bates numbers ABOG_nonparty_1 through 82.  Are these

17   documents that you reviewed?

18        A.    Yes.

19        Q.    There's some highlighting and some flags and

20   whatnot in here, is that demarcation, is that yours?

21        A.    Yes.

22        Q.    And do you know what the ABOG is?

23        A.    What it is?

24        Q.    Yes.

25        A.    American Board of Obstetrics and Gynecology,
```

Jerry Williamson, M.D.

 1   yes.

 2        Q.   And the last folder is entitled Corrado Depo and

 3   Exhibits.  And inside has a copy of Ms. Corrado's

 4   deposition transcript with some highlighting and some

 5   notes, is this yours?

 6        A.   Yes, it is.

 7             MS. MCENROE:  And there's some handwritten notes

 8   appended to the back here that I think we will mark as an

 9   exhibit as well.

10             (Thereupon, Exhibit 12 was marked for

11   identification.)

12   BY MS. MCENROE:

13        Q.   Is this your handwriting?

14        A.   Yes, it is.

15        Q.   And this is notes from your review of the

16   deposition of Ms. Corrado, is that correct?

17        A.   Correct.

18        Q.   And you prepared these notes yourself?

19        A.   I did.

20        Q.   I will add that to the pile of exhibits.  And

21   otherwise this includes a copy of Ms. Corrado's deposition

22   and her exhibits with some highlighting and other notes.

23   And all that highlighting and any notation, that is yours,

24   is that correct?

25        A.   That is correct.

Jerry Williamson, M.D.

1      Q.   So that's the sum total of the materials that

2    you indicated that you brought with you today.  Did you

3    bring anything else with you today?

4      A.   No.

5      Q.   And did you review anything else either before

6    the issuance of your report or after the issuance of your

7    report that we have not discussed today or was not listed

8    in the documents, either your expert report or the

9    addendum?

10     A.   Not to my recollection, no.

11     Q.   Okay.  A little bit earlier, I asked if you are

12   an expert on the policies and procedures of the American

13   Board of Internal Medicine and you said no.  And then I

14   asked if you were an expert about the policies and

15   policies of ECFMG and you indicated you had more

16   experience with ECFMG's policies and procedures, is that

17   correct?

18     A.   Correct.

19     Q.   Okay.  You have -- you went to medical school in

20   the United States, correct?

21     A.   Correct.

22     Q.   So you were never an applicant to ECFMG, is that

23   true?

24     A.   Correct.

25     Q.   Have you ever been an employee of ECFMG?

Jerry Williamson, M.D.

```
 1       A.   Have not.
 2       Q.   Have you ever been on the Board of Trustees of
 3  ECFMG?
 4       A.   Was not.
 5       Q.   Have you ever been on the Medical Education
 6  Credentials Committee for ECFMG?
 7       A.   No.
 8       Q.   Do you know anyone on the Medical Education
 9  Credentials Committee for ECFMG?
10       A.   Do not.
11       Q.   Do you know of anyone in the past who has been
12  on the Medical Education Credentials Committee that you
13  know of?
14       A.   Not that I know of.
15       Q.   Okay.  And through your work -- through your
16  career, you made reference to having been a recipient of
17  reports and information from ECFMG over time, is that
18  correct?
19       A.   Correct.
20       Q.   Through those experiences, have you ever had a
21  situation where you were involved in any way in an
22  allegation of irregular behavior by the ECFMG?
23       A.   Not to my recollection, no.
24       Q.   Do you have any experience with or knowledge of
25  the policies and procedures of the USMLE?
```

Jerry Williamson, M.D.

1      A.   Could you repeat that question?

2      Q.   Yeah.  Do you have any experience with the

3   policies and procedures of the USMLE?

4      A.   When you say the policies and procedures, I

5   understand the USMLE and what they do and their

6   examination process.  In terms of policies and procedures,

7   I would say very superficially.

8      Q.   Would you consider yourself an expert in USMLE

9   policies and procedures?

10      A.   No.  I would not.

11      Q.   So how is it that you have more experience with

12   ECFMG's policies and procedures than you have with USMLE's

13   policies and procedures?

14      A.   Again, more time.  And my career, in working

15   with foreign medical graduates I have spent more time

16   connecting with ECFMG and their -- and their work.  So

17   that is the only reason for that.

18      Q.   But both -- go ahead.

19      A.   The USMLE has been really more a question of

20   what their examination protocol is, and that is pretty

21   much it.

22      Q.   You understand that both foreign and domestic

23   medical graduates proceed through USMLE, is that correct?

24      A.   Correct.

25      Q.   Okay.  Do you believe that ECFMG credentials for

Jerry Williamson, M.D.

1  they want to do in addition to that is entirely dependent

2  upon them.

3      Q.   Okay.  But you are not trying to say that the

4  facilities specifically rely on ECFMG to do all of the

5  things you just listed as, you know, for example, tox

6  screen, that sort of thing?

7          MR. THRONSON:  Object to the form.

8      A.   Correct.  The facility is relying upon ECFMG to

9  take them to the next level.

10  BY MS. MCENROE:

11     Q.   And when you say that, what do you mean?

12     A.   Well, what I mean is that -- again, as I said

13  earlier, depending upon the facility and what their

14  policies and procedures are, there may be things that

15  ECFMG is not doing that they have in their policies and

16  procedures that they will pursue as well and may also be

17  state dependant.

18     Q.   Do you have any understanding of the limitations

19  on what ECFMG does indicate through its certification?

20     A.   To a certain extent, yes.

21     Q.   And what do you understand that ECFMG certifies

22  when it issues an ECFMG certificate?

23     A.   Currently or in what timeline?

24     Q.   I will say relevant for Dr. Akoda's

25  circumstances.

Jerry Williamson, M.D.

```
 1        A.    Okay.   Well, certainly they need to verify the

 2   individual's medical education.

 3        Q.    What do you mean by that?

 4        A.    Whether or not they attended a medical school in

 5   wherever in fact they were -- whatever country it might

 6   be.

 7        Q.    Yep.

 8        A.    And completed it successfully and

 9   satisfactorily.

10        Q.    Okay.   What else?

11        A.    They -- ECFMG does receive letters of reference,

12   letters of recommendation.

13        Q.    Yep.

14        A.    And that is something else that they -- they

15   verify as well, that they are accurate letters, that the

16   letters came from the people they say they came from.

17        Q.    And on what basis do you believe ECFMG held

18   itself out as verifying letters of recommendation?

19        A.    I believe -- I know I read it somewhere, and I

20   believe that they were doing that back when I was working

21   with ECFMG.  That in fact we -- when they verified the

22   letters, we did not pursue it although as I said, I was

23   whether aggressive and I wanted to connect with people as

24   well.

25        Q.    If I told you that ECFMG did not verify the
```

Jerry Williamson, M.D.

1    letters of recommendation, would that surprise you?

2         A.   It would.

3         Q.   And you believe that ECFMG affirmatively

4    indicated to you that the letters of recommendation had

5    been primary-source verified?

6         A.   Correct.  Correct.  And what I did not know was

7    if in fact they were unable to verify those letters, that

8    that in fact took place.  So I would not be aware that

9    letters that were not verified were not verified.

10        Q.   Anything else you think that ECFMG was verifying

11   in the time that Dr. Akoda was coming through?

12        A.   I can't recall right now.  I believe there were

13   other things, but I don't recall what they were now.

14        Q.   Do you think that ECFMG held itself out as

15   verifying social security numbers?

16        A.   I don't believe so.

17        Q.   Do you think that ECFMG held itself out as

18   verifying permanent residency cards?

19        A.   I don't recall.

20        Q.   Okay.  Do you believe that ECFMG would certify

21   that a physician would conduct himself or herself

22   appropriately and not in an inappropriate sexual way?

23        A.   Well, I think that -- that ECFMG would, when you

24   say held itself out, meaning -- I mean, that is something

25   that is at times difficult to ascertain.

Jerry Williamson, M.D.

1      Q.   Yeah.  I was going to ask you next how would

2  ECFMG know if an applicant coming through would, you know,

3  in the future act inappropriately in a sexual way?

4      A.   Well, I think that that is all part of the --

5  falls under the umbrella of professionalism.  And

6  professionalism includes honesty.  And a dishonest

7  individual should raise a flag that that individual may

8  not act appropriately going forward.  Now, whether it be

9  in a sexual or other nature, the concern that I would have

10  would be someone who is dishonest, someone who is not

11  being upfront, that there may be other issues as well.

12      Q.   Do you expect that residency programs have

13  standards to expect their residents to conduct themselves

14  in a certain level of professional --

15      A.   Most definitely.

16      Q.   And the same for hospitals or hospital systems

17  at which the physicians would work?

18      A.   Most definitely.

19      Q.   So that would include Howard University

20  Hospital where Dr. Akoda conducted his residency, as well

21  as Prince George's Medical Center?

22      A.   I can't speak to Howard because I don't know

23  what their policies or their requirements are.  Same thing

24  with Prince George, I can't speak to that.  But I can

25  say in general hospitals do require that.  Residency

Jerry Williamson, M.D.

 1   programs require that as well.  That is an expectation, I

 2   guess is the way I would leave that.

 3        Q.   Understood.  Have you done any analysis of the

 4   particulars of what Howard University Hospital did

 5   vis-a-vis Dr. Akoda through his residency, what they

 6   looked at with him, how they evaluated him or the like?

 7        A.   No.

 8        Q.   Have you done any evaluation of what Prince

 9   George's Medical Center did with respect to Dr. Akoda,

10   evaluations of him, credentialing of him, privileging of

11   him?

12        A.   No.

13        Q.   Do you understand that Dr. Akoda did practice

14   medicine at Prince George's Medical Center?

15        A.   I do.

16        Q.   Including procedures like C-sections and the

17   like?

18        A.   Correct.

19        Q.   Would you expect from your experience that while

20   practicing medicine at Prince George's Medical Center,

21   that there would be periodic reviews or checks on Dr.

22   Akoda's practice?

23        A.   Again, it depends upon the hospital.  It depends

24   upon, did he follow JCAHO requirements.  It depends on

25   other considerations as well.  So I can't -- I can't say

Jerry Williamson, M.D.

1   that I would expect it or not expect it.  I think it is

2   a -- I think it is important that a physician in a

3   residency program or in any program be periodically

4   reviewed, and the Joint Commission has made that rather

5   clear.  I can't tell you offhand whether the Prince

6   George's Joint Commission accredited or not.  I don't

7   know.

8        Q.   Okay.  Are you aware of a lawsuit against

9   Dimensions?

10       A.   I am aware of it, yes.

11       Q.   Okay.  And when you say you are aware of it,

12  what do you know about it?

13       A.   Well, I am aware that Dr. Akoda had -- was

14  providing clinical care at Dimensions and that there was a

15  lawsuit brought against Dimensions.

16       Q.   Are you an expert in that lawsuit?

17       A.   I don't think so.

18       Q.   Okay.  Do you have an understanding of who the

19  Plaintiffs are in the lawsuit against Dimensions?

20       A.   I believe it is the same Plaintiffs that are in

21  the lawsuit against ECFMG, I guess.  I shouldn't say I

22  guess.  I shouldn't speculate.  I don't know.

23       Q.   Okay.  Have you read or reviewed any documents

24  from that case like the complaint or discovery responses?

25       A.   No.

Jerry Williamson, M.D.

1        A.    Yes, because I am more familiar with the

2   policies of ECFMG than I am with the Maryland Board.

3        Q.    Is there any conceivable set of facts in which

4   you think the Maryland Board of Physicians should grant a

5   medical license to someone who had presented a false

6   medical residency -- sorry -- a false permanent residence

7   card and a false Nigerian passport to them in conjunction

8   with their application to practice medicine in that state?

9             MR. THRONSON:  Objection.  Speculation.

10             MS. MCENROE:  You can speculate.

11        A.    Okay.  It would be speculation on my part.

12   BY MS. MCENROE:

13        Q.    Yeah.

14        A.    I don't know.  It would be pure speculation.

15        Q.    You can't conceive of a set of facts in which

16   that would be appropriate, correct?

17        A.    Do I believe that it is appropriate or not?

18   Again, it depends on their policies.  I don't want to

19   speak for the Maryland Board.  I know nothing about the

20   Maryland Board to be perfectly candid.

21        Q.    So you think it is conceivable that their

22   policies could provide for a false permanent resident

23   card and a false passport to be okay for a physician

24   coming to practice medicine before them?

25        A.    I mean, there are considerations here, for

Jerry Williamson, M.D.

1    example, did they receive the letter?  I don't know

2    whether they received the letter.  I don't know how the

3    letter was mailed or how it was sent.  I don't know what

4    the communication was.  I don't know whether it was a

5    verbal communication along with the letter to someone.

6         Q.   So you are talking about Exhibit 14?

7         A.   Yes, ma'am.

8         Q.   What I am talking about is the findings of fact

9    from the Maryland Board.  That in 2011, when they had

10   issued the medical license, they had received a false

11   permanent residence card and a false Nigerian passport.

12        A.   Oh, I am sorry.  I may have misunderstood where

13   we were going.

14        Q.   Sure.

15        A.   So what you are reading, the Maryland Board of

16   Physicians granted the requested medical license.  Okay.

17   Let me read prior to that, if I may?

18        Q.   Of course.

19        A.   So he applied for medical licensure with the

20   Maryland Board of Physicians.  In support of the

21   application, he submitted these false documents.

22        Q.   Correct.

23        A.   Uh-huh.  And it goes on to say the Maryland

24   Board of Physicians granted the requested medical license.

25        Q.   Correct.

Jerry Williamson, M.D.

1          A.   So my question is when he submitted these false

2    documents, were they aware that they were false documents?

3    And what I am saying is that is a part of the policies and

4    procedures that is done at the Maryland Board.  So as a

5    result of that, I am not sure how I could determine -- I

6    just don't know.  It is saying here that they were false,

7    but were they determined to be false after the fact?

8          Q.   Right.  So you think it is okay that the

9    Maryland Board may not have known at the time that those

10   things were false, but it is not okay for ECFMG to have

11   been defrauded by Dr. Akoda in real time?

12          MR. THRONSON:  Objection.  Go ahead.

13          A.   It depends on each individual's organization's

14   policies in terms of what they hold themselves out

15   to be. Again, I am a lot more familiar with the ECFMG than

16   I am with the Maryland Board.

17          Q.   So you think it is conceivable that the Maryland

18   Board should have accepted a false passport from a foreign

19   national to practice medicine in their state, but it is

20   not conceivable that ECFMG could have also been mistaken

21   by the same false passport?  Do you think that is okay?

22          A.   No.  I -- I do not think it is okay.  That is

23   not what I am saying.  I guess what I am saying is how did

24   they make their determination?  What was used in making

25   that determination?  And what happened in that interim

Jerry Williamson, M.D.

1    time?  Did they in fact receive the letter?  Was it a

2    letter that we know they received and acted on it?  Maybe

3    -- I am sorry.  I may not be answering your question.  Can

4    you restate the question or rephrase the question?

5        Q.   Yes.  I just struggle to understand how it is

6    that you can be so certain with your opinions on what

7    ECFMG should have known in real time despite ECFMG

8    conducting investigations at the time into Dr. Akoda.

9    Also admitting that Dr. Akoda was defrauding at least some

10   parties but taking issue with ECFMG's findings but not

11   taking issue with the Maryland Board's findings.  I am not

12   understanding how they reconcile themselves.

13       A.   Well, I don't think they are -- I don't think

14   they are equal.  Okay?  And what I mean by I don't think

15   that they are equal is I don't think it ever would have

16   gotten to the Maryland Board had ECFMG done their

17   investigation properly and picked up on the red lights that

18   were flashing.  So it never would have gotten there.  That

19   is -- your question I guess is since it did get there, now

20   what?  And again, I don't -- I don't find this acceptable.

21       Q.   Do you think that Dr. Akoda could have treated

22   patients as he did that are Plaintiffs in this case if

23   the Maryland Board of Physicians had not granted him a

24   medical license like they did?

25       A.   If he was not granted a license, he would not

Jerry Williamson, M.D.

1  have been able to do that.  All I am saying is that if we

2  look at the cascade of events, I think we have to take

3  what is most proximate as the time where this could have

4  been all avoided.  And it could have been avoided at the

5  level of ECFMG, not at the Maryland Board.  That is all --

6      Q.   Why could it not have been avoided if the

7  Maryland Board had determined that Dr. Akoda should not

8  have been granted a medical license?

9      A.   It could have been, but I am saying it could

10 have been avoided a lot sooner than that as a result of

11 ECFMG doing what in fact they held themselves out to do.

12     Q.   Okay.

13     A.   And to your question, I am not suggesting either

14 is -- is -- is correct or proper.

15     Q.   Okay.  Do you have any idea about how Dr. Akoda

16 got into the country?

17     A.   I read I believe that it was in the early

18 1990s, 1991 or such on a -- it was a visa, but I don't

19 recall what the visa was.

20     Q.   And if he had not been able to get a visa to

21 come into the United States, that also would have been

22 earlier in what you have called the cascade of events,

23 preventing him from practicing medicine and treating these

24 patients, correct?

25     A.   Correct.  Now, the question from my perspective

Jerry Williamson, M.D.

1   is, was there a reason that he should not have been

2   provided that visa?

3        Q.   Right.  But it is possible if they had

4   discovered that he was doing whatever it was that he was

5   doing and being a fraud in the many ways that you have

6   articulated and others have articulated, that he may not

7   have gotten a visa to come to the United States?

8             MR. THRONSON:  Objection.

9        A.   When you say doing a fraud, meaning in his

10   country before coming here?

11   BY MS. MCENROE:

12       Q.   No.  I mean in coming to the United States.  I

13   am saying do you know one way or the other?

14       A.   No.

15       Q.   But if they had not permitted him to come in,

16   that would have even predated ECFMG's conduct, correct?

17       A.   Correct.  But my question to you, Counselor, is

18   why would he not have been permitted that visa?  Was there

19   a reason at that point for them to deny that visa?

20       Q.   I am just asking you in abstract.

21       A.   Oh, okay.

22       Q.   Yeah.  Do you know what name was on Dr. Akoda's

23   ECFMG certificate?

24       A.   I saw it, but I don't recall what it was.  There

25   were multiple names, and I am not sure which one was being

Jerry Williamson, M.D.

1   J.N. Akoda, M.D., do you see that?

2       A.   I am not sure where are you.

3       Q.   At the first page of Exhibit 15.

4       A.   First page?

5       Q.   Yes.  That this final decision and order is with

6   regards to Charles J.N. Akoda, do you see that?

7       A.   I do.

8       Q.   And that name is presumably also Charles John

9    Nosa Akoda, MD?

10      A.   I would agree.

11      Q.   So that is different than what is on the ECFMG

12  certificate, is that correct?

13      A.   Correct.

14      Q.   Do you have any idea how that would have

15  happened?

16      A.   I don't.

17      Q.   I want to turn back to Exhibit 9, which is your

18  expert report.  You can set those documents aside.  That

19  is it.  And this is your report in this case, correct?

20      A.   Yes, it is.

21      Q.   And there is a section called Summary of Facts

22  that starts on the second page.

23      A.   Okay.

24      Q.   From where did you get the information for this

25  summary of facts?

Jerry Williamson, M.D.

```
 1        A.   From the documents that I reviewed.

 2        Q.   Including the summary that Plaintiffs' counsel

 3   provided you?

 4        A.   Including the summary that Plaintiffs' counsel

 5   provided me.

 6        Q.   The timeline of events?

 7        A.   Yes.  The timeline was included in this.

 8        Q.   Okay.  Did you do any validation or verification

 9   to make sure that what was in the timeline of events from

10   counsel was accurate?

11        A.   When you say verification, describe what you

12   are --

13        Q.   Did you compare it to other documents or look at

14   any other underlying materials to make sure that every

15   fact you relied on in the timeline of events from counsel

16   was indeed accurate?

17        A.   To some extent, but I would not say that I

18   specifically went fact for fact, no.

19        Q.   So there are some facts in here that you derived

20   from the timeline of events from counsel that you did not

21   otherwise confirm in other documentation?

22        A.   No.  I don't think so.  I think whatever is in

23   here were in other documents as well, yes.

24        Q.   Did you write this whole report yourself?

25        A.   I did.
```

Jerry Williamson, M.D.

1       Q.   Did you have any help?

2       A.   No.

3       Q.   Do you have any legal assistants or do you

4    dictate your report or anything of the like?

5       A.   No.

6       Q.   Do you have any secretarial help?

7       A.   No.

8       Q.   Do you still hold all of the opinions you have

9    in this report today?

10      A.   Yes.

11      Q.   In looking at the series of events with regard

12   to Dr. Akoda, is it your view that ECFMG just totally

13   missed the issue and did not investigate, did not

14   acknowledge it, that Dr. Akoda sort of slipped through, or

15   do you think that they did conduct at least some

16   investigation?

17      A.   I think when they finally realized that there

18   were problems -- well, let me restate it differently.

19   I think that they made some proper investigations

20   initially, particularly when he had applied the first two

21   times.  And if my memory serves me, there was a revocation

22   of his first certificate.  And then there was -- I am not

23   sure if they revoked or if they delayed the second

24   certificate or they did something that I think went to

25   appeals and then it ended up being extended, if I am

Jerry Williamson, M.D.

```
 1       A.   This is what I was referring to, yes, ma'am.

 2       Q.   And so let's take a look at this memo together.

 3       A.   Okay.

 4       Q.   It says, attached is a copy of a memorandum for

 5   the file.  This memorandum is being written separately

 6   since I did not think it should be made part of the

 7   official file.  In my discussion with Dr. McCorkel he

 8   indicated he believed Igberase and Akoda were one in the

 9   same person.  He has no proof, just a strong suspicion.

10   Information he received from an "informant" provided

11   details that led him to believe this.

12            I also believe Akoda and Igberase are

13   one and the same.  However, at this point the only

14   information that we have for the ECFMG Credentials

15   Committee is Akoda's written statement that he is NOT

16   Igberase, although he did admit in writing that he used

17   Igberase's social security number.  He has given us a

18   passport that appears to confirm his identity as John

19   Akoda.  I don't think this is enough for the Committee.

20            Igberase has not replied to my letter.

21   The FedEx letter was returned undelivered.  I tried the

22   phone number he listed on his application and was told it

23   was a wrong number (although the correct address).  I sent

24   Igberase an E-mail -- and it has the E-mail address --

25   cfemi@hotmail.com and who should reply but Akoda!  Akoda
```

Jerry Williamson, M.D.

1    still has a valid ECFMG Certificate.  We need to

2    brainstorm on this one.  Maybe Shirley Williams (Miss

3    Sherlock) could sit in.  Is that correct?

4         A.   Correct.

5         Q.   Is it your opinion that ECFMG completely missed

6    and did not analyze at all whether Akoda was acting

7    appropriately or not?

8         A.   Well, let me start by saying this, that the idea

9    of placing this memorandum in terms of the first sentence,

10   memorandum is being written separately.  And since I do

11   not think it should be made a part of the official file,

12   that in and of itself is problematic.

13        Q.   Why?

14        A.   It is problematic because if it is not made part

15   of the official file, once that official file is -- and

16   again, I do not know what they do with their official

17   files or their non-official files, but my concern is

18   that the individuals or the organizations that reply upon

19   this information are not going to be provided that

20   information because it is not a part of the official file.

21        Q.   Do you have any sense or knowledge of whether

22   ECFMG's practice if this had became a part of the official

23   file, it would have been provided?

24        A.   No.  I don't.

25        Q.   You don't know one way or the other?

Jerry Williamson, M.D.

 1     A.   I don't know one way or the other.  But if it is

 2   a part of an unofficial file or a memorandum to the file,

 3   I don't know what they do with it.  But if I am a CEO of a

 4   hospital and I am receiving a certificate, an individual

 5   who has been certified by ECFMG, I am assuming that

 6   everything is out in the open, that there is transparency.

 7   So that in itself is a concern to me.  I think that if

 8   you look at the issue of behavior that ECFMG addresses in

 9   their policy as far as what constitutes that -- I forget

10   the term they use in terms of bad behavior or --

11     Q.   Irregular behavior?

12     A.   Irregular.  Thank you.  Irregular behavior, this

13   meets the criteria very easily and should have

14   precipitated an investigation.

15     Q.   Right.  So according to you now, but Mr. Kelly

16   whose job it was to investigate irregular behavior

17   contemporaneous at the time was looking at this and was

18   saying there was not enough to bring to the committee

19   based on the record he had then.  Right?  He was doing

20   some analysis and looking at this issue at the time,

21   correct?  You may not agree with the outcome.

22     A.   Well, again, the decision that was made here was

23   just made based on any policies that the organization had.

24   And from what my reading was that the organization did not

25   have a policy other than a definition of irregular

Jerry Williamson, M.D.

1    behavior.  So whether they should have gone to

2    credentials, which is I believe the next step if they had

3    a concern, I think they kind of missed the boat with that.

4                    There seems to be enough here or more

5    than enough in reading this letter and just at the very,

6    very bottom of what you just read, and it says something

7    to the effect of -- I forgot where it was with the

8    exclamation -- here it is.  I sent Igberase an E-mail and

9    who should reply but Akoda.  I mean, what more do you

10   need?  It seems like there is enough concern that the

11   concern should have been elevated to the next committee,

12   yes.

13        Q.   Do you know or understand the remit of the

14   Medical Education Credentials Committee?

15        A.   When you say the remit?

16        Q.   Do you know what their purpose is?  Do you know

17   what they do?

18        A.   Well, from what I have read is that they

19   basically make a decision on concerns that a lower

20   committee might have and make a determination on those

21   concerns.

22        Q.   Do you know how they go about deliberating if at

23   all?

24        A.   Well, what I read is that they deliberate I

25   believe three or four times per year.  They don't meet

Jerry Williamson, M.D.

1    that frequently is what I believe I read in terms of their

2    committee.  But beyond that, no.  I don't know the details

3    of how they arrive at decisions or whatever.

4                    But I guess what I am saying, Counselor,

5    is that for me reading this there is enough information

6    here that says that ECFMG should have been more aggressive

7    in pursuing this.  And there were other issues I think

8    even occurred prior in terms of, you know, his application

9    that he sent, I believe, to ECFMG, and the name on the

10   application and the name on the diploma were not

11   consistent as well, speaking of names here of the

12   certificate that you just provided me.

13       Q.   Do you have any sense of in the early 2000s

14   what the E-mail etiquette was as between cousins from

15   Nigeria, whether there was ever sharing of E-mail

16   addresses?

17       A.   I could not answer that.

18       Q.   You don't know one way or the other?

19       A.   No.

20       Q.   Do you know culturally about naming norms and

21   shortening of middle or surnames from people from Nigeria

22   during that time, what was customary?

23       A.   No.  I don't.

24       Q.   Okay.

25       A.   May I say one other thing on this letter?

Jerry Williamson, M.D.

1        Q.   I don't presently have any question pending.  If

2   you think any of your prior responses were not complete,

3   then I would welcome completion of it.  Otherwise, I am

4   not looking for just an open declaration.

5        A.   No.  No.  I just wanted to go over one other

6   sentence that you brought forward.

7        Q.   Sure.

8        A.   And you said, although he did admit in writing

9   that he used Igberase's social security number.  And I

10  guess that in and of itself would meet the concerns

11  regarding the -- meeting the definition of his improper

12  behavior.

13       Q.   Irregular behavior?

14       A.   Irregular behavior.  Thank you.

15       Q.   Do you know whether the misuse of a social

16  security number in ECFMG's definition does qualify as

17  irregular behavior?

18       A.   In the definition it talks about presenting

19  information that is inaccurate or in -- it may not be

20  inaccurate, but if you look at the definition.  I think I

21  may have it.  I don't know if I have that or not with me,

22  but, yes, it is a part of the definition.

23       Q.   Do you know whether applicants to ECFMG need to

24  have social security numbers at all?

25       A.   I don't believe they require it, but if one

Jerry Williamson, M.D.

1    presents it, one should act upon it.  I think there is a

2    duty to act upon it.

3         Q.   Do you know whether or not ECFMG considers

4    criminal conduct outside of the credentialing process to

5    be irregular behavior?

6         A.   Say that one more time, please.

7         Q.   Do you know whether ECFMG considers criminal

8    conduct outside of the credentialing process to be

9    irregular behavior?

10        A.   I would have to look at the definition.

11        Q.   You don't know one way or the other?

12        A.   No.  I don't know one way or the other.  I would

13   have to look at the definition.

14        Q.   Do you know whether when Dr. Akoda was coming

15   through ECFMG received or verified medical school

16   transcripts?

17        A.   Whether ECFMG had received a verified medical

18   school transcripts, I don't recall.

19        Q.   You don't know one way or the other?

20        A.   I may have read it but I just don't -- I can't

21   say for sure.  I don't recall.

22        Q.   You note in paragraph 8 of the summary of

23   findings in your report -- that is on page 3 at the

24   bottom.

25        A.   Uh-huh.

Jerry Williamson, M.D.

1      Q.   In the second sentence -- are you there?

2      A.   Uh-huh.

3      Q.   It says, the following year he was denied

4   enrollment in The Center for Medicare and Medicaid

5   Services (CMS) due to submitting an inaccurate social

6   security number, do you see that?

7      A.   Yes, I do.

8      Q.   What is the consequence of that, do you know?

9      A.   What is the consequence of that with CMS?

10  Well, what basically happened here is that they would not

11  provide him a number.  I don't know whether CMS would take

12  that any further in terms of whether they would contact

13  additional people to investigate that or make any further

14  determination other than not provide a number.

15     Q.   And CMS is a governmental entity, correct?

16     A.   It is.

17     Q.   So they could have taken that to the FBI for

18  example to say, hey, look, we have someone submitting an

19  inaccurate social security number?  They are conducting

20  social security fraud?

21     A.   Yeah.  I don't know what CMS' policies are

22  regarding that, specifically for a social security number.

23  And at times when -- well, for something like this, I

24  could not really say.

25     Q.   Do you know if Prince George's Hospital which

Jerry Williamson, M.D.

1    was employing Dr. Akoda would have known or found out that

2    he did not have enrollment in CMS?

3        A.   Well, again, I don't know a whole lot about

4    Prince George in terms of their patient population.  If

5    they had a significant Medicare population, I would think

6    that that would be something that they would require him

7    to have.  If they don't -- again, Prince George may be

8    predominantly a non-Medicare-type hospital.  So I really

9    -- I can't say.  But I would think that if he was

10   practicing there, he would need to have a Medicare number.

11       Q.   But yet he did not have one, right?  He was

12   denied one?

13       A.   Yes.  And again, I don't know what their

14   policies are.

15       Q.   In paragraph 11 on the next page you make

16   reference to inappropriate physical examinations of a

17   sexual nature, is that correct?  Take a look.

18       A.   Correct.

19       Q.   Did you evaluate any medical records in this

20   case?

21       A.   Did not.

22       Q.   And you did not conduct any medical evaluations

23   in conjunction with this case, correct?

24       A.   That is correct.

25       Q.   In your report you use the term duty a number of

Jerry Williamson, M.D.

1   times.

2        A.   Uh-huh.

3        Q.   Is that correct?

4        A.   Correct.

5        Q.   And you use the term duty as between ECFMG and

6   entities that received reports from ECFMG?

7        A.   Okay.  Yes.

8        Q.   And I am not trying to pull a fast one on you in

9   any way.  I am looking at paragraphs 4 and 5 in the

10  Analysis of Facts and Opinions on page 5 of your report.

11       A.   Uh-huh.

12       Q.   Is that correct?

13       A.   Yes.  That is correct.

14       Q.   So are you putting forth expert opinion on the

15  duty, if any, ECFMG owed to any other party in this case?

16       A.   Yes.

17       Q.   Are you holding yourself out to be a legal

18  expert in any way in connection with this case?

19       A.   A legal expert, no.

20       Q.   Okay.

21       A.   What I will say is the word duty that is used

22  here is used synonymously with responsibility.

23       Q.   So what do you mean by duty?

24       A.   Just that, responsibility.  They are the

25  responsible party.  They are responsible for making

Jerry Williamson, M.D.

1   certain that everything we've talked about is done

2   properly.

3        Q.   As a matter of law?

4        A.   Well, I think it is certainly a matter of

5   ethics. It is certainly a matter of medical ethics.  And I

6   -- from a matter of law, if they are holding themselves

7   out to provide certain information and they don't, then

8   they have not met their responsibility.  I think it

9   certainly has legal implications.

10       Q.   So are you saying that this is a legal duty, an

11  ethical duty or both in the way you use the term?

12       A.   Both.

13       Q.   Okay.  So you are purporting to put forth a

14  legal opinion in this case?

15       A.   In that sense, yes.

16       Q.   And you are asking the Court to rely on your

17  expert opinion for legal purposes?

18       A.   I am not sure I understand the question.

19       Q.   So you are putting forth an expert opinion in

20  the interest of aiding the Court from a legal perspective

21  with respect to ECFMG's duty?

22       A.   Well, from a credentialing perspective.  If

23  credentialing falls upon -- it certainly falls upon the

24  ethical.  But if it falls upon the legal as well, then I

25  guess what you are saying is correct.

Jerry Williamson, M.D.

```
 1      Q.   Yeah.  I am not trying to use my words.  I am

 2   just trying to understand.  You use the word duty

 3   repeatedly in your report.  So I am just trying to

 4   understand what it is you are asking the Court to look to

 5   you for.  And if that includes in your opinion a legal

 6   view of what duty ECFMG purportedly owed to these

 7   entities?

 8      A.   Well, I use that -- again, I have had legal

 9   training and I do have a master's degree in that, but I am

10   not a lawyer.  So I can't -- I guess perhaps I can present

11   a legal opinion without being a lawyer.  I don't know.  If

12   not, then it is not a legal opinion.

13      Q.   But you are intending to use the term duty to

14   mean both ethically and legally in the way you are using

15   it?

16      A.   Correct.  They had a responsibility to those

17   individuals and those organizations.

18      Q.   And later on in paragraph 11 of your report on

19   page 6 -- I will wait until you get there.

20      A.   Okay.

21      Q.   In the last sentence there in paragraph 11, it

22   says patients have a right to receive medical treatment

23   from physicians who have obtained ECFMG Certification

24   legitimately, not through falsities and

25   misrepresentations, do you see that?
```

Jerry Williamson, M.D.

```
1        A.   Yes, I do.

2        Q.   And, again, in using the word right here

3   similarly to my questions on duty, are you intending to be

4   assisting the Court in evaluating a legal position on the

5   rights of patients in this case?

6        A.   Well, I think that it's rather simple that the

7   American Medical Association provides what patients'

8   rights are as do other organizations such as the American

9   Academy of Pediatrics and The American Board of Medicine

10  and such, and they define what those rights are.  And I am

11  not sure it necessarily has to be a legal issue, but it is

12  certainly an ethical issue in terms of what the patient's

13  rights are.  Now, whether it morphs into legal, I couldn't

14  -- I couldn't offer an opinion on that.

15       Q.   So it could, but you don't know?

16       A.   Yes.  Correct.

17       Q.   You use the word foreseeable in a couple of

18  places in your report as well.

19       A.   Uh-huh.

20       Q.   And in particular, for example, on page 4.  I am

21  going backwards a little bit, in paragraph 12.

22       A.   Page 4.

23       Q.   Let me know when you are there.  Page 4,

24  paragraph 12 in the section above.

25       A.   Okay.
```

Jerry Williamson, M.D.

1      Q.   It says, the key question that must be resolved

2   is whether ECFMG's actions or failure to act resulted in

3   foreseeable injuries or damages to class members.  Do you

4   see that?

5      A.   I do.

6      Q.   And again, do you mean that to be legally

7   foreseeable?

8      A.   Legally foreseeable.  What I mean it to be is

9   that their actions should have -- that's the way I said it

10   and I don't -- when I wrote this, I don't recall if I was

11   thinking about this necessarily legally or in what

12   context.

13      Q.   So, you know, I am just trying to understand

14   what you mean when you use the term foreseeable here

15   because, for example, in Exhibit 17 we were looking at,

16   which was Mr. Kelly's memo, do you think at the time when

17   he was writing that memo he foreseeably thought that Dr.

18   Akoda would plead guilty to social security fraud and

19   would have committed sexually inappropriate conduct on

20   patients yet reach the same conclusion he had in his memo?

21           MR. THRONSON:  Objection.

22      A.   Perhaps.

23   BY MS. MCENROE:

24      Q.   So you think that Mr. Kelly would have been

25   involved in three or four investigations that resulted in

Jerry Williamson, M.D.

1   the revocation of Dr. Igberase Oluwafemi's certificate and

2   and thought when he issued this memo in December of 2000

3   that it was possible that Dr. Akoda was someone who had

4   perpetrate the types of alleged injuries he has here and

5   yet permit this to go forward anyway?

6       A.   I guess what I am saying is that when you use

7   the term or the word foreseeable is that one should --

8   when something this strong takes place, one should in fact

9   think about what are the potential consequences going

10  forward.  Okay?  That to me is foreseeable.  Foreseeable

11  that they would commit sexual acts, that I can't say.

12  Okay?  But foreseeable that there may be potential

13  problems going forward with this individual.

14              And -- and again, what I guess I am

15  connecting is I am connecting an individual's not being --

16  being irresponsible in terms of providing false

17  information and what that ultimately can -- can lead to.

18  So providing false information, what might that ultimately

19  develop into?

20      Q.   You make some reference to saying that ECFMG's

21  conduct directly impacted patient safety?

22      A.   Where are you?

23      Q.   I am looking at paragraph 11 on page 6.  It is

24  in two places on page 6.  So I see it in paragraph 11 in

25  the middle sentence there that starts with however.  Do

Jerry Williamson, M.D.

1    the newspapers and such but, no.

2        Q.    And have you made any medical judgment on the

3    treatment that Dr. Akoda gave to the patients in this

4    case?

5        A.    Well, number one, I am not an OB-GYN.  So I

6    really can't talk about medical treatment by another

7    specialty.  I leave that to the OB-GYN.  But from what I

8    did read regarding some of the patients' complaints --

9    what I did read about a couple of instances of what I

10   would call what appear to be inappropriate even to a

11   physician who is a pediatrician.  I had some concerns,

12   yes.

13       Q.    Okay.  You had concerns, but are you expressing

14   opinions on what you are asking the judge or the jury to

15   rely with regard to Dr. Akoda's medical --

16       A.    No.  I can't because I am not an OB-GYN.

17       Q.    Okay.

18       A.    I guess I should rephrase that to a certain

19   extent.  I am not an OB-GYN so I can't opine on that as an

20   OB-GYN, but I think I can opine on that as a physician.

21       Q.    Have you reviewed the patients' medical files?

22       A.    Not the medical files.  I have reviewed the

23   patients' commentaries in some of the expert reports.

24       Q.    So that would be the expert reports provided by

25   Plaintiffs' counsel?

Jerry Williamson, M.D.

1     A.   Correct.

2     Q.   Do you know what ECFMG did upon receiving

3 Dr. Akoda's guilty plea?

4     A.   From what I recall they -- they did take action.

5 That -- that I am certain of.  But I don't recall exactly

6 what that action was in terms of his certificates and such

7 but, yes, they did take action.

8     Q.   Do you believe that Dr. Akoda is still ECFMG

9 certified today?

10    A.   He is not.  I will rephrase that.  I don't

11 believe that he is.

12    Q.   Do you have an understanding that Dr. Akoda

13 passed USMLE steps 1 and 2?

14    A.   My understanding is that he did take them more

15 than once.  I don't recall exactly how many times, but

16 that he did take the USMLE more than once and did not pass

17 them -- did not pass them once or twice and then took them

18 another time and then did pass them.  And I believe it was

19 the same thing possibly with the USMLE 3.  I know he

20 passed the 3, but I can't remember if that was the first

21 time or not.  I don't recall.

22    Q.   Do you know if step 3 is of any consequence to

23 ECFMG certification?

24    A.   No.

25    Q.   When you say no, do you mean it is a consequence

Jerry Williamson, M.D.

1  or it is not a consequence?

2      A.   When you say is it of consequence to the ECFMG

3  --

4      Q.   Correct.

5      A.   -- that I would have to look at again.  I don't

6  recall off -- I don't recall yes or no.  I don't -- I

7  don't recall.

8      Q.   So you don't know one way or the other whether

9  an ECFMG certificate comes before or after step 3?

10     A.   Comes -- I -- I don't recall.

11     Q.   Do you have an understanding that a medical

12  school verified a diploma for John Nosa Akoda?

13     A.   Well, there's -- in reading the documents, there

14  was some question about whether or not that verification

15  was complete and accurate.

16     Q.   What do you mean by that?

17     A.   Well, what I mean is whether or not the -- the

18  diploma was in fact verified or real.

19     Q.   Right.  So was that from reading Plaintiffs'

20  timeline of events?

21     A.   That was from reading a variety of things that I

22  read in the course of the documents.

23          MS. MCENROE:  We are up to 18.

24          (Thereupon, Exhibit 18 was marked for

25  identification.)

Jerry Williamson, M.D.

1          MR. THRONSON:  It is coming up on 1:00.

2          MS. MCENROE:  Give me a couple more minutes and

3    we may be done.  No promises.

4    BY MS. MCENROE:

5          Q.   I am handing you what I have marked as Exhibit

6    18.  Have you seen this before?

7          A.   I believe I have.

8          Q.   Do you know what this is?

9          A.   This is something from Nigeria regarding his

10   University of Benin certification or his medical school.

11   Bachelor of medicine in surgery.  Uh-huh.

12         Q.   His medical school diploma?

13         A.   Correct.

14         Q.   So the first page is a form from ECFMG with the

15   name Dr. John Nosa Akoda on the top right-hand corner, if

16   you can take a look.

17         A.   Uh-huh.

18         Q.   Is that a yes?

19         A.   Yes.

20         Q.   And it says, I hereby certify that the attached

21   diploma or other credential for the individual noted above

22   is authentic and correct and that I am authorized to

23   certify this on behalf of this institution.  And then

24   it is signed and has a seal from the Dean of Faculty of

25   Medicine at the University of Benin.  Do you see that?