**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL, and DESIRE EVANS, <br><br> Plaintiffs, <br><br> v. <br><br> EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES, <br><br> Defendant. | Civil Action No. 18-5629 <br><br> Honorable Joshua D. Wolson |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT**
**EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES'**
**MOTION FOR SUMMARY JUDGMENT**

**The Educational Commission for Foreign Medical Graduates**

1.     Defendant Educational Commission for Foreign Medical Graduates ("ECFMG") is a private non-profit organization based in Philadelphia, Pennsylvania. About ECFMG page, https://ecfmg.org/about/index.html, attached Exhibit 1.

2.     ECFMG promotes quality health care for the public by, among other things, certifying physicians who received their basic medical degree outside of the United States and Canada (known as international medical graduates or "IMGs") as having met specific minimum requirements to be candidates for graduate medical education programs in the United States. Dep. of Kara Corrado, attached as Exhibit 2, at 40:1-22; About ECFMG, History, https://ecfmg.org/about/history.html, attached as Exhibit 3.

3.     At the relevant time, to qualify for ECFMG Certification, an IMG had to: (i) pass an English exam and two substantive exams, either Step 1 and Step 2 of the United States Medical Licensing Examination ("USMLE") or Basic Medical Science and Clinical Science of the Foreign

Medical Graduate Examination in the Medical Sciences ("FMGEMS"); and (ii) have their medical school diploma successfully primary-source verified with the issuing medical school as authentic. ECFMG Certification Page, attached as Exhibit 4; Ex. 2 at 88:21-89:2; Sep. 17, 1993 Letter from Marjorie P. Wilson, attached as Exhibit 5

4.      Once an applicant's record was verified and complete and the applicant passed the required substantive exams, ECFMG issued the applicant a certificate. Ex. 2 at 241:12-22.

### The Role of ECFMG Certification

5.      ECFMG Certification status information is made available only to certain third parties in the medical field, like residency programs, hospitals, licensing boards, and employers. Ex. 2 at 244:1–8.

6.      ECFMG Certification status information is not available to members of the general public (including patients of doctors who have received ECFMG Certification). Ex. 2 at 243:9-25.

7.      At the relevant time, ECFMG Certification status reports for residency programs contained the following information:

      a.      IMG's name

      b.      USMLE number

      c.      medical school name and country

      d.      graduation year

      e.      ECFMG Certification status

      f.      validity of ECFMG Certification

      g.      date of issuance of ECFMG Certification

Ex. 2 at 248:16-249:2.

8.      ECFMG Certification status reports for residency programs do **_not_** verify:

    a.     an IMG's identity

    b.     Social Security number

    c.     immigration status

    d.     passport information

    e.     criminal background

    f.     readiness to treat patients

    g.     ethics

    h.     honesty

    i.     morality

    j.     character

Ex. 2 at 198:16-22, 200:13-15, 240:18-241:6, 242:6-243:3, 244:22-245:13.

9.     ECFMG Certification does not authorize an IMG to treat patients as a doctor.  Ex. 2 at 244:22-245:1.

10.     Recipients of ECFMG Certification status reports, such as residency programs and hospitals, typically consider things like the following when evaluating IMGs:

    a.     in-person interviews

    b.     information provided directly by the IMG

    c.     letters of recommendation

    d.     skills assessments or additional examinations

    e.     reports from prior educational or training programs

    f.     medical school transcripts

    g.     information obtained as part of a background check

    h.     ongoing performance monitoring

Rebuttal Rep. of L. Beck, attached as Exhibit 6, at 4; Rebuttal Rep. of M. Smith, attached as Exhibit 7, at 2.

11.     The institution receiving the ECFMG Certification status report independently assesses the criteria enumerated in ¶ 8. Ex. 6 at 4–7.

12.     State licensing boards have their own requirements beyond ECFMG Certification for issuing a license to practice medicine. Ex. 6 at 3–4.

13.     In Maryland, those requirements include graduation from an approved medical school, being of good moral character, completion of at least 2 years of a residency program accredited by the Accreditation Council for Graduate Medical Education or the American Osteopathic Association, as well as further requirements.  Akoda App. to Md. Bd. of Physicians, attached as Exhibit 8. *See also* Ex. 6 at 4; Ex. 7 at 3-4.

14.     Residency programs typically track and evaluate residents on an ongoing basis based on a variety of factors other than ECFMG Certification status.  Ex. 7 at 3.  These evaluations often include annual progression reports, annual examinations, and ongoing supervision by the faculty of the residency program.  Ex. 7 at 3.

15.     Hospitals typically continue to evaluate their physicians on an ongoing basis through their Medical Director's office on attributes such as clinical performance, demeanor, and interactions with patients and staff. Ex. 6 at 6–7.

16.     IMGs are subject to normal employee processes—like payroll, taxes, healthcare programs and other requirements of employment— and residency programs and hospitals gather information from IMGs independently for these processes. Ex. 7 at 5.

17.     The American Board of Obstetrics and Gynecology has its own certification process independent of ECFMG Certification. Ex. 6 at 7.

18.     Medical specialty board certification typically requires passing a written and oral examination, undergoing a personal interview, review of academic credentials, review of prior case logs, letters of recommendation from residency and fellowship directors, and consideration of any disciplinary action, criminal, or immoral behavior that comes to their attention. Ex. 6 at 7.

19.     Following medical specialty board certification, a candidate must comply with annual requirements for ongoing educational modules to maintain certification. Ex. 6 at 7.

### ECFMG's Irregular Behavior Processes

20.     ECFMG defines conduct that does or tries to subvert ECFMG's processes and programs as "irregular behavior" and has a process for evaluating suspected irregular behavior.  ECFMG Irregular Behavior Policy, attached as Exhibit 9; Ex. 2 at 55:23-56:7.

21.     When ECFMG suspects that an individual may have engaged in irregular behavior, ECFMG staff investigates by, *inter alia*, communicating with the source of the suspicion and with the accused. Ex. 2 at 76:12-77:5.

22.     If ECFMG staff determines that there is sufficient evidence that an individual has engaged in irregular behavior, the matter is referred to ECFMG's Medical Education Credentials Committee ("MECC"), a sub-committee of ECFMG's Board of Trustees, for a formal determination on the merits. Ex. 2 at 76:24-77:5.

23.     Mere suspicions of irregular behavior are not made public or reported to third parties to avoid damage to the suspect individual's career and reputation based on unsubstantiated allegations. Ex. 2 at 181:9-23.

24.     If an IMG is found to have engaged in irregular behavior by ECFMG's MECC, ECFMG annotates the individual's record and can, *inter alia*, limit the individual's participation in ECFMG programs or withhold or revoke existing ECFMG Certificates. Ex. 9.

25.     ECFMG is not a government enforcement or investigative agency. Ex. 2 at 76:12-77:5.

**John Nosa Akoda and His Aliases**

26.     In 1992, an individual applied to ECFMG using the name Oluwafemi Charles Igberase. Verification Papers – University of Ibadan, attached as Exhibit 10.

27.     The individual who had applied to ECFMG under the name Oluwafemi Charles Igberase presented ECFMG with a medical school diploma from the University of Ibadan in Nigeria. Ex. 10.

28.     University of Ibadan sent ECFMG verification of diplomas and credentials for Charles Oluwafemi Igberase. Ex. 10.

29.     In July of 1992, the individual who had applied to ECFMG under the name Oluwafemi Charles Igberase passed the ECFMG English test and failed both the basic medical science component and the clinical science component of the FMGEMS. Sep. 15, 1992 Igberase Score Report, attached as Exhibit 11.

30.     In January of 1993, the individual who had applied to ECFMG under the name Oluwafemi Charles Igberase passed the ECFMG English test and the clinical science component of the FMGEMS but failed the basic medical science component of the FMGEMS. Mar. 27, 1993 Igberase Score Report, attached as Exhibit 12.

31.     In July of 1993, the individual who had applied to ECFMG under the name Oluwafemi Charles Igberase passed the basic science component of the FMGEMS. Ex. 5.

32.     In September of 1993, ECFMG notified the individual who had applied under the name Oluwafemi Charles Igberase that he had satisfied all testing criteria for ECFMG Certification. Ex. 5.

33.     ECFMG issued an ECFMG Certificate (No. 482-700-2) to the individual who had applied to ECFMG under the name Oluwafemi Charles Igberase. June 22, 1995 Letter from W. Kelly, attached as Exhibit 13.

34.     The individual who had applied to ECFMG under the name Oluwafemi Charles Igberase did not gain admission to a residency program. July 20, 1995 Letter from Igberase Oluwafemi Charles, attached as Exhibit 14, at 1–2.

35.     In 1994, the individual who had applied to ECFMG under the name Oluwafemi Charles Igberase applied again for ECFMG Certification, this time using the name Igberase Oluwafemi Charles. Plea Agreement Terms, attached as Exhibit 15, at 9.

36.     In the application under the name "Igberase Oluwafemi Charles," the individual answered "no" to the question of whether he had previously applied to ECFMG. Ex. 15 at 9; May 3, 2001 Letter from W. Kelly, attached as Exhibit 16.

37.     ECFMG issued an ECFMG Certificate (No. 0-519-573-0) to the individual who applied to ECFMG using the name Igberase Oluwafemi Charles. Dec. 7, 1995 Letter from W. Kelly, attached as Exhibit 17.

38.     Misrepresenting ECFMG application history to ECFMG can constitute irregular behavior. Ex. 17 at 14.

39.     ECFMG notified the individual who applied to ECFMG using the name Igberase Oluwafemi Charles that it was conducting an investigation of whether he had previously applied to ECFMG when he indicated on his application that he had not previously applied. Ex. 17 at 14.

40.     The individual who had applied to ECFMG under the name Igberase Oluwafemi Charles admitted that he had previously applied to ECFMG, despite representing otherwise on his application. Ex. 17 at 15–16.

41.     ECFMG staff determined that there was sufficient evidence that the individual who had applied to ECFMG under the name Igberase Oluwafemi Charles had engaged in irregular behavior by misrepresenting his application history with ECFMG to refer the matter to the MECC. Ex 17 at 13.

42.     The MECC found that the individual who had applied to ECFMG under the name Igberase Oluwafemi Charles had engaged in irregular behavior and (1) invalidated the ECFMG Certificate issued to Oluwafemi Igberase Charles; and (2) revoked the ECFMG Certificate issued to Oluwafemi Charles Igberase. Ex. 17.

43.     ECFMG later barred the individual who had applied to ECFMG under the names Oluwafemi Charles Igberase and Igberase Oluwafemi Charles from applying to ECFMG after he submitted additional fraudulent applications using other variations of the names Oluwafemi, Charles, and Igberase, each of which ECFMG identified and refused to process when received. Ex. 16; May 22, 2002 Letter from W. Kelly, attached as Exhibit 18.

44.     In 1996, an individual using the name John Nosa Akoda applied for ECFMG Certification with applicant number 0-553-258-5.  Akoda ECFMG Application, attached as Exhibit 19.

45.     The individual who had applied to ECFMG under the name John Nosa Akoda applied to take the March 1996 USMLE Step 2 exam and the June 1996 USMLE Step 1 exam. Aug. 22, 2000 Letter from W. Kelly, attached as Exhibit 20.

46.     The individual who had applied to ECFMG under the name John Nosa Akoda presented ECFMG with a medical school diploma from the University of Benin.  University of Benin Degree, attached as Exhibit 21.

47.     The University of Benin sent ECFMG verification of diploma and credentials for Johnbull Enosakhare Akoda. Ex. 21.

48.     The individual who applied to ECFMG under the name John Nosa Akoda misrepresented his ECFMG application history to ECFMG and made no reference to any previous applications to ECFMG. Ex. 19; Ex. 15 at 10.

49.     The individual who had applied to ECFMG under the name John Nosa Akoda passed the English exam in August 1996. Aug. 12, 1997 Letter from N. Gary, attached as Exhibit 22.

50.     The individual who had applied to ECFMG under the name John Nosa Akoda passed the USMLE Step 2 Exam in August 1996. Ex. 22.

51.     The individual who had applied to ECFMG under the name John Nosa Akoda passed the USMLE Step 1 Exam in June 1997. Ex. 22.

52.     ECFMG certified the individual who had applied to ECFMG under the name John Nosa Akoda in 1997 based on his passing of Steps 1 and 2 of the USMLE and the primary source verification of a diploma by the University of Benin. Verification Papers – University of Benin, attached as Exhibit 23; John Nosa Akoda ECFMG Certificate, attached as Exhibit 24

53.     After obtaining this ECFMG Certification, the individual who had applied to ECFMG under the name John Nosa Akoda successfully passed Step 3 of the USMLE.  Md. State Bd. of Physicians Decision, attached as Exhibit 25, at 5.

54.     Oluwafemi Charles Igberase, Igberase Oluwafemi Charles and John Nosa Akoda were all the same person (hereinafter referred to as "Akoda"). Ex. 15 at 9–11.

### Akoda's Residency at Jersey Shore Medical Center

55.     Akoda applied to a residency program in internal medicine at Jersey Shore Medical Center ("JSMC"). Ex. 15 at 10.; Nov. 7, 2000 Letter from A.M. Sesso, attached as Exhibit 26.

56.     JSMC accepted Akoda as a resident in its internal medicine program in 1998. Akoda Request for Permanent Revalidation of Standard ECFMG Cert., attached as Exhibit 27.

57.     In 1999, JSMC received an allegation that Akoda had participated in two other U.S. residency programs under the name Oluwafemi Charles Igberase. Aug. 11, 2000 Letter from J. McCorkel, attached as Exhibit 28.

58.     When JSMC tried to verify the Social Security number that Akoda provided directly to JSMC in his residency paperwork, JSMC concluded that it belonged to Charles Igberase. Ex. 28.

59.     JSMC notified ECFMG of its investigation into Akoda, but JSMC did not inform ECFMG of the source of the allegation against Akoda. Ex. 28.

60.     In an August 11, 2000 letter from James McCorkel at JSMC, Mr. McCorkel asked if ECFMG had received requests for Akoda's ECFMG certification status from Harlem Hospital Center or JFK Memorial Hospital. Ex. 28.

61.     ECFMG had no records indicating that Harlem Hospital Center or JFK Memorial Hospital had requested ECFMG verification for any of Akoda's aliases or USMLE / ECFMG identification numbers. Aug. 22, 2000 Letter from S. Seeling, attached as Exhibit 29.

62.     ECFMG conducted its own investigation to determine if Akoda and Igberase were the same person. Ex. Ex. 20; Sep. 27, 2000 Memo, attached as Exhibit 30; Dec. 21, 2000 Memo, attached as Exhibit 31.

63.     ECFMG required Akoda to submit an explanation for why it appeared he had previously applied to ECFMG but had answered "no" to the question whether he had previously submitted an application to ECFMG.  Ex. 20.

64.     In response to the inquiry from ECFMG, Akoda explained that "Igberase Charles" was his cousin and admitted using a social security number allegedly belonging to his cousin.  Aug. 29, 2000 Letter from Akoda, attached as Exhibit 32; Ex. 30.

65.     Akoda provided ECFMG with what appeared to be his Nigerian passport and an international driving permit as documentation of his identity.  Ex. 32; Ex. 30.

66.     ECFMG staff determined that there was insufficient evidence of irregular behavior to bring Akoda before the ECFMG MECC on an allegation that he was Igberase.  Dec. 22, 2000 Memo, attached as Exhibit 33; Ex. 2 at 150:24-151:6.

67.     In 2000, JSMC discharged Akoda because of perceived discrepancies involving his Social Security number and green card, which was not part of his ECFMG application. Ex. 31.

68.     In a November 7, 2000 letter, JSMC wrote to the Maryland Board of Physicians about the discrepancies in Akoda's Social Security number and green card. Nov. 7. 2000 Letter from A.M. Sesso, attached as Exhibit 34.

69.     ECFMG continued to investigate Akoda but took no adverse action against him at that time because ECFMG staff concluded there was insufficient evidence of irregular behavior. Ex. 2 at 150:24-151:6; Nov. 22, 2006 Letter from W. Kelly, attached as Exhibit 35.

70.     ECFMG staff was nonetheless suspicious of Akoda's identity.  Ex. 33.

**Akoda's Residency at Howard University Hospital**

71.     Akoda applied to Howard University Hospital's residency program. March 16, 2007 Letter to John-Charles Akoda from Howard University Hospital, attached as Exhibit 36.

72.     Howard sent Akoda a letter of acceptance dated March 16, 2007. Ex. 36.

73.     Akoda admitted to providing Howard a false permanent resident card in the name "N. Akoda, John Charles." Ex. 15 at 10.

74.     Akoda began Howard's residency program on July 1, 2007 and completed it on June 30, 2011. Howard University Hospital Certificate, attached as Exhibit 37.

**State Licenses to Practice Medicine**

75.     The Virginia Department of Health Professions licensed Akoda to practice medicine in the Commonwealth of Virginia in 2011. Virginia License Suspension, attached as Exhibit 38.

76.     The Maryland State Board of Physicians licensed Akoda to practice medicine in the state of Maryland in September of 2011. Ex. 25 at 5.

77.     On his application for medical licensure in Maryland, Akoda omitted his residency at JSMC. Akoda Md. Bd. of Physicians App., attached as Exhibit 39, at 5.

78.     Akoda's application for medical licensure in Maryland required that if his name was "not written the same way on all documents," he had to "submit documentation to explain how and why [his] name differs and submit one of the following documents to support the name change: Passport, INS card, birth certificate, court document, marriage license, court decree." Ex. 39 at 4.

79.     The ECFMG Certification status report for Dr. Akoda received by the Maryland Board of Physicians in 2011 stated that its purpose is to "indicate whether this individual is certified by ECFMG" and that ECFMG "verified medical school credentials directly with the medical schools[.]" ECFMG Certification Status Rep., attached as Exhibit 40.

80.     Akoda's name appeared differently on his medical licensure application ("John Charles Nosa Akoda" and "Charles John Nosa Akoda"), ECFMG Certificate ("John Nosa Akoda"), his medical school diploma ("Johnbull Enosakhare Akoda"), and his residency program certificate of completion ("John-Charles Nosa Akoda"). Ex. 25 at 3 n.4; Ex. 24; Ex. 23; Ex. 37.

81.     Akoda admitted to providing a false permanent resident card and a false Maryland driver's license in connection with:

      a.   His application for medical licensure in Maryland. Ex. 15 at 10.

      b.   His application for privileges at Prince George's Hospital Center.  Ex. 15 at 9.

82. The Maryland Board of Physicians was aware of the allegations that Akoda had used other names and may have misrepresented his identity in 2014. Email Correspondence Between ECFMG and Md. Bd. of Physicians, attached as Exhibit 41.

83. Akoda's Maryland medical license was not revoked until July 10, 2017. Ex. 25 at 8.

84. The grounds for revocation of Akoda's medical license were that he plead guilty in 2016 to Social Security fraud, which constituted a crime of moral turpitude requiring revocation. Ex. 25 at 5–6.

85. Akoda renewed his Maryland medical license through September 30, 2016, when it expired. Ex. 25 at 3.

86. The Virginia Department of Health Professions revoked Akoda's Virginia medical license on April 25, 2017 because of his criminal conviction. Ex. 38.

### Akoda's Employment at Prince George's Hospital and in Private Practice

87. Prince George's Hospital Center awarded Akoda medical privileges to treat patients in 2012. Ex. 15 at 9.

88. In a previous lawsuit, Plaintiff Evans claimed that Dimensions Healthcare, which operated Prince George's Hospital, could have "avoided all injuries, damages, . . . and disability" suffered by Ms. Evans:

> [Dimensions] and its duly authorized agents, apparent agents, servant and/or employees failed to perform an appropriate and proper investigation and background check of Akoda before granting him privileges to act as a practitioner and specialist in obstetrics and gynecology.  Had they done so, as was required, Akoda's fraudulent conduct would have been discovered, and he would have been precluded from seeing patients at [Dimensions'] institutions or entities, thereby avoiding all of the injuries, damages (economic and non-economics) and disability suffered by this Plaintiff.

Evans Dimensions Rog. Answers, attached as Exhibit 42, at 2-3.

89.     In a previous lawsuit, Plaintiffs offered an expert in health care administration, credentialing, and privileging who believed Dimensions Healthcare was responsible for Plaintiffs' injuries, damages and permanent disability:

> [Dimensions] breached the applicable standards of administrative care by negligently failing to use required and reasonable care to investigate, credential, grant privileges, monitor and supervise their medical personnel including, but not limited to, Akoda and to discover, stop and report any professional misconduct of which they should have known. As a direct and proximate result of the Defendants' continuing negligence, the Claimants, and others similarly situated, suffered physical pain, emotional anguish, and damages as well as permanent disability. Had [Dimensions] complied with the applicable standards of administrative care the Claimants, and others similarly situated, would not have suffered their injuries, damages and permanent disability.

Bojko Rep., attached as Exhibit 43, at 3.

90.     Akoda also worked with medical practices run by Dr. Abdul Chaudry and Dr. Javaka Moore.  Evans Supp. Answers to Rogs., attached as Exhibit 44 at Rog. 1; Powell Supp. Answers to Rogs., attached as Exhibit 45 at Rog. 1; Riggins Supp. Answers to Rogs., attached as Exhibit 46, at Rog. 1; & Russell Supp. Answers to Rogs., attached as Exhibit 47, at Rog. 1.

### Other Entities Evaluating Akoda

91.     In 2012, Akoda submitted a Medicare Enrollment Application to the Centers for Medicare and Medicaid Services ("CMS"). Ex. 15 at 10.

92.     CMS denied the application based, in part, on CMS's determination that Akoda did not provide an accurate Social Security number. Ex. 15 at 10.

93.     American Board of Obstetrics and Gynecology ("ABOG") certified Akoda on January 31, 2014.  ABOG Board Letter to Akoda, attached as Exhibit 48.

94.     ABOG waited until January 2018 to revoke his diplomate status. Aug. 30, 2017 ABOG Letter, attached as Exhibit 49.

**Law Enforcement Involvement and Guilty Plea**

95.     In 2014, ECFMG received a subpoena from a U.S. Attorney's office regarding Akoda. 2014 Email Correspondence between ECFMG and Md. Bd. of Physicians, attached as Exhibit 41.

96.     ECFMG cooperated with the investigation and followed instructions from federal authorities not to take adverse action against Akoda while the investigation was ongoing.  Ex. 41.

97.     In 2014, ECFMG worked together with the Maryland Board of Physicians to assist their investigation.  Ex. 41.

98.     In March 2016, Prince George's County Police Department contacted ECFMG about Akoda. Mar. 2016 ECFMG Email Chain, attached as Exhibit 50.

99.     ECFMG cooperated with the Prince George's County Police Department's investigation and followed additional instructions from law enforcement not to impede the investigation and not to take adverse action against Akoda while the investigation was ongoing. Nov. 2016 Email Chain, attached as Exhibit 51.

100.    On November 15, 2016, Akoda pled guilty to misuse of a Social Security number and stipulated that he and Oluwafemi Charles Igberase were the same person. Ex. 15.

101.    After Akoda pled guilty, ECFMG consolidated the Igberase and Akoda files and revoked the ECFMG Certificate issued to John Nosa Akoda. March 1, 2017  ECFMG Notice, attached as Exhibit 52.

**Plaintiff Desire Evans**

102.    Plaintiff Desire Evans is a resident of Waldorf, Maryland. Evans Dep., attached as Exhibit 53, at 14:22-24.

103.    Ms. Evans gave birth to her son on March 17, 2016 at Prince George's Hospital in Maryland. Ex. 53 at 35:22-25, 42:20-23.

104. Ms. Evans did not know which doctor would be there for her induction. Ex. 53 at 42:4-13; 83:4-20.

105. Ms. Evans consented to undergoing treatment by Akoda. March 16, 2016 Evans Consent Forms, attached as Exhibit 54.

106. Ms. Evans did not conduct any research into the credentials of her primary OB/GYN doctor, Dr. Moore or the physicians at Dr. Moore's practice. Ex. 53 at 44:20-45:9, 45:23-46:4.

107. Ms. Evans did not ask Akoda about his credentials or professional experience. Ex. 53 at 86:12-19, 87:2-5.

108. Akoda treated Ms. Evans while she was in labor and then performed a C-section on her. Ex. 53. at 87:6-23, 93:18-19.

109. Ms. Evans' son was delivered healthy. Ex. 53 at 95:16-17.

110. Ms. Evans testified that Akoda used language with her that she found "inappropriate," including calling her "baby" and "mama." Ex. 53 at 158:158:4-11.

111. Ms. Evans claims that Akoda performed "intrusive pelvic examinations" on her. Evans Rogs., attached as Exhibit 55, at 7.

112. Ms. Evans alleges that Akoda "was, like, fondling my clitoris" during her labor and that during her labor, she felt that he mistreated her. Ex. 53 at 131:20-132:3, 137:22-138:3; Ex. 55 at 7.

113. Ms. Evans testified that her husband questioned Akoda about how he touched Ms. Evans. Ex. 53 at 133:10-14.

114. Ms. Evans testified that she discussed Akoda's conduct with her husband and her mother shortly after the birth. Ex. 53 at 138:6-17.

115.    Ms. Evans claims that her husband and mother were both in the room with her while Akoda treated her. Ex. 53 at 132:7-12.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

117.    Ms. Evans learned of Akoda's identity after hearing a radio advertisement from a law firm in 2018. Ex. 53 at 73:12-74:13.

118.    Ms. Evans never sought treatment from a psychiatrist or psychologist prior to the birth of her son. Ex. 53 at 66:4-13.

119.    Ms. Evans has seen a doctor for her social anxiety since the birth of her son, and a physician's assistant recorded that Ms. Evans was experiencing "depression/anxiety" and "potential postpartum." Ex. 53 at 64:14-65:25, 105:24–106:5.

120.    Ms. Evans denied feeling anxious and depressed for most of her life, just "normal anxious." Ex. 53 at 112:19-113:5.

121.    Ms. Evans claims that she is afraid to see a doctor, does not know who to trust, and her trust in the medical profession has diminished. Ex. 53 at 165:8-21.

122.    None of Ms. Evans' medical records reference Akoda. Evans Dep. Ex. 3, attached as Exhibit 56.

123.    Ms. Evans had no knowledge of ECFMG when she was treated by Akoda. Ex. 53 at 82:20-22.

124.    Ms. Evans first learned of ECFMG from her lawyers. Ex. 53 at 70:24-71:17.

125.    Ms. Evans believes that ECFMG's purpose is "to verify identification documentation," not foreign medical diplomas, and that ECFMG is responsible for verifying IMGs' Social Security

numbers, birth certificates, green cards, state medical licenses, board certifications, and any other "piece of identifying information about a foreign medical graduate." Ex. 53 at 80:14-82:4.

126.    After conducting Internet research, Ms. Evans believed ECFMG "was some kind of credentialing company or something" and was not "100 perfect sure of the nature of the company." Ex. 53 at 72:18-19

127.    Dr. Gladys Fenichel examined Ms. Evans on September 9, 2019. Fenichel Rep. on Evans, attached as Exhibit 57, at 1.

128.    Dr. Fenichel did not find Ms. Evans' psychiatric conditions of major depression and panic disorder to be related to the allegations she made in the complaint against ECFMG. Ex. 57 at 8.

129.    Dr. Christine Tellefsen examined Ms. Evans on September 16, 2019. Tellefsen Rep., attached as Exhibit 58, at 4.

130.    Dr. Tellefsen concluded that Ms. Evans' conditions "is complicated by a number of other factors in her life." Ex. 58 at 4.

131.    Dr. Tellefsen also concluded that Ms. Evans likely has a "pseudotumor cerebri," causing her headaches and poor concentration. Ex. 58 at 4.

132.    Dr. Tellefsen found that Ms. Evans likely has Mood Disorder and Adjustment Disorder with Mixed Disturbance of Behavior. Ex. 58 at 5.

**Plaintiff Elsa Powell**

133.    Plaintiff Elsa Powell is a resident of Upper Marlboro, Maryland. Powell Dep., attached as Exhibit 59, at 20:1-3.

134.    Ms. Powell gave birth to her son on September 17, 2014. Ex. 59 at 22:4.

135.    Ms. Powell was originally supposed to be seen by Dr. Chaudry at his practice, but he was unavailable and she saw Akoda instead. Ex. 59 at 40:7-12.

136.    Ms. Powell consented to being treated by Akoda at Dr. Chaudry's practice and at Prince George's Hospital in Maryland during her pregnancy. Sep. 17, 2014 Powell Consent Forms, attached as 60; Ex. 59 at 40:7-12.

137.    Ms. Powell regularly saw Akoda starting in April of 2014, during her labor on September 17, 2014 and for post-natal care through January of 2015. Ex. 59 at 38:20-39:1-2, 39:21-40:16; Ex. 45 at 2, 8.

138.    Ms. Powell testified that Akoda was "flirtatious" towards Ms. Powell. Ex. 59 at 51:16-19.

139.    Ms. Powell testified that she requested that a nurse be present during her appointments with Dr. Akoda. Ex. 59 at 51:16-19.

140.    Ms. Powell testified that Akoda made lewd comments about her breasts.  Ex. 59 at 51:21-25.

141.    Ms. Powell claims Akoda performed "intrusive pelvic exams" on her. Powell Rog., attached as Exhibit 61, at 7.

142.    Akoda aided Ms. Powell in the delivery of her son. Ex. 59 at 44:11-14.

143.    Ms. Powell's son had no complications during delivery. Ex. 59 at 48:18-20.

144.    After the birth of her son, Ms. Powell experienced heavy bleeding while at the hospital, and Akoda took her into surgery. Ex. 59 at 45:12-46:7.

145.    Ms. Powell believes that before taking her into surgery, Akoda told her "I'm sorry, I should have detected it sooner, I'm so sorry, we're getting the O.R. ready for you." Ex. 59  at 45:12-46:2.

146.    Ms. Powell recovered well from the emergency surgery that Akoda performed on her after she delivered her son. Ex. 59  at 47:20-24.

147.    Ms. Powell claimed she suffered from emotional anguish, fear, and anxiety from learning that Akoda was not properly credentialed.  Ex. 45 at 3.

148.    Ms. Powell claims she does not "have a peace of mind" since finding out Akoda was not who he said he was.  Ex. 59 at 98:20-24.

149.    Ms. Powell has never sought treatment from a psychologist, psychiatrist, or counselor and did not seek any treatment after hearing about the charges brought against Akoda. Ex. 59 at 32:10-17, 99:10-12.

150.    Ms. Powell has seen doctors since finding out about Akoda's identity. Ex. 59 at 25:22-24.

151.    Ms. Powell has not sought treatment from any health care provider for alleged injuries related to this lawsuit.  Ex. 45 at 7.

152.    Ms. Powell contends that PGHC was negligent and should have discovered Dr. Akoda's alias sooner. Powell Dimensions Rog., attached as Exhibit 62, at 3.

153.    Ms. Powell first learned about the social security fraud charged against Akoda in 2017. Powell Dep. at 63:12-17.

154.    Ms. Powell had no knowledge of ECFMG prior to this lawsuit.  Ex. 45 at 4.

155.    Ms. Powell learned about ECFMG from her attorney.  Ex. 59 at 90:9-16.

156.    Ms. Powell believes ECFMG licenses foreign medical doctors to practice medicine in the United States.  Ex. 59 at 91:6-11.

157.    Ms. Powell testified that she believed it was wrong for ECFMG to provide Akoda with a license to practice medicine. Ex. 59 at 93:18-23.

158.    Ms. Powell doubts Akoda had medical training. Ex. 59 at 80:5-7.

159.    Dr. Fenichel examined Ms. Powell on September 9, 2019.  Fenichel Rep. on Powell, attached as Exhibit 63, at 1.

160.    Dr. Fenichel did not find Ms. Powell to present with any symptoms compatible with a psychiatric disorder causally related to her allegations in the complaint against ECFMG. Ex. 63 at 6.

161.    Dr. Tellefsen examined Ms. Powell on September 13, 2019. Ex. 58 at 3.

162.    Dr. Tellefsen diagnosed Ms. Powell with Adjustment Disorder with Anxiety. Ex. 58 at 4.

**Plaintiff Jasmine Riggins**

163.    Plaintiff Jasmine Riggins is a resident of Washington, D.C.  Riggins Dep., attached as Exhibit 64, at 20:1-3.

164.    Ms. Riggins gave birth to her son at Prince George's Hospital in Maryland on March 18, 2013. Riggins Rog. Answers, attached as Exhibit 65, at 2.

165.    Ms. Riggins chose to be treated by Dr. Abdul Chaudry's practice, with whom Akoda worked at Prince George's Hospital. Ex. 46 at 2-3.

166.    Ms. Riggins consented to treatment by Akoda. Riggins Consent Forms, attached as Exhibit 66.

167.    Akoda performed a C-section on Ms. Riggins on March 18, 2013. Ex. 46 at 3.

168.    Ms. Riggins learned of Akoda's identity in July of 2017. Ex. 64 at 84:16-85:5.

169.    Ms. Riggins claims to have experienced emotional distress only once she found about Akoda being a "fake doctor."  Ex. 64 at 55:19-24.

170.    Ms. Riggins testified that she feels angry, sad, embarrassed, and ashamed because of Akoda's conduct.  Ex. 64 at 57:8-13.

171.    Ms. Riggins has not sought medical attention for any of her alleged injuries. Ex. 64. at 86:14-87:11.

172.    Ms. Riggins has never been diagnosed with depression, post-traumatic stress disorder, a sleeping disorder or any psychiatric disorder. Fenichel Rep. on Riggins, attached as Exhibit 67 at 3; Riggins Dimensions RFA, attached as Exhibit 68 at 4.

173.    Since being treated by Akoda, Ms. Riggins does not typically feel anxious, worried, scared, or panicky. Ex. 64 at 60:7-9; Ex. 68 at 8.

174.    Ms. Riggins does not claim Akoda physically injured her. Ex. 64 at 56:4-6.

175.    Ms. Riggins has not suffered physical distress from learning about Akoda's guilty plea. Ex. 64 at 64:1-7.

176.    Ms. Riggins does not have a depressed mood or suicidal thoughts. Ex. 64 at 59:14-22.

177.    Ms. Riggins believed Dimensions' negligence "was the sole and proximate cause of [her] injuries". Ex. 64 at 123:7-15; Dimensions First Amended Compl., attached as Exhibit 69, ¶ 81.

178.    Ms. Riggins doubts whether PGHC performed a satisfactory background check on Akoda. Riggins Dimensions Dep., attached as Exhibit 70, at 78:2-8.

179.    Ms. Riggins has seen doctors since finding out about Akoda's identity. Ex. 64 at 103:9-104:18.

180.    Dr. Fenichel examined Ms. Riggins on September 20, 2019. Fenichel Rep. on Riggins, attached as Exhibit 71, at 1.

181.    Dr. Fenichel did not find Ms. Riggins to have any psychiatric disorder causally related to the allegations in the complaint. Ex. 71 at 4.

182.    Ms. Riggins believes the Maryland Board of Physicians, the American Board of Obstetricians and Gynecologists, and Dr. Chaudry are also responsible for the injuries she has alleged. Ex. 64 at 56:7-57:2.

183.    Ms. Riggins had never heard of ECFMG until her lawyers informed her of the existence of the organization. Ex. 64 at 130:18-131:1.

184.    Ms. Riggins believed ECFMG administers exams and licenses foreign doctors to practice medicine in the United States. Ex. 64 at 26:17-24, 27:20-24.

185.    Ms Riggins believes ECFMG should "[b]e more careful about who they certify." Ex. 64 at 138:17-23.

186.    Ms. Riggins testified that it might make a difference to her to know that ECFMG had cooperated with the U.S. Attorney's Office in its case against Akoda. Ex. 64 at 141;18-22.

**Plaintiff Monique Russell**

187.    Plaintiff Monique Russell is a resident of Annapolis, Maryland. Russell Dep., attached as Exhibit 72, at 10:24-25.

188.    Ms. Russell gave birth to her son on May 25, 2016 at Prince George's Hospital. Ex. 72 at 12:23-25, 32:24-25.

189.    Ms. Russell's primary OB/GYN during her pregnancy was Dr. Waldrop from Dr. Moore's practice. Ex. 72 at 32:11-25, 34:19-24.

190.    Ms. Russell knew before her delivery that Dr. Waldrop might be unavailable at the time and that her baby might be delivered by Akoda. Ex. 72 at 37:23-38:18.

191.    Ms. Russell consented to being seen by Akoda if Dr. Waldrop were unavailable. Russell Consent Forms, attached as Exhibit 73; Ex. 72 at 38:12-19.

192.    Akoda first treated Ms. Russell when she was in labor. Ex. 72 at 37:5-9.

193.    Akoda helped deliver Ms. Russell's son in 2016 via an unplanned C-section. Ex. 72 at 12:23-25, 37:5-9, 41:4-14.

194.    Ms. Russell consented to the C-section that Akoda performed. Ex. 72 at 45:1-3.

195.    Ms. Russell described her recovery from the C-section performed by Akoda as "minor." Fenichel Rep. on Russell, attached as Exhibit 74, at 7.

196.    Ms. Russell believed that the course of treatment from Akoda "really was best/necessary." Russell Facebook comments, attached as Exhibit 75, at 4.

197.    Ms. Russell alleges that Akoda's conduct has exacerbated her innate trust issues. Ex. 47 at 2-3.

198.    Ms. Russell claimed she experienced anxiety upon learning of Akoda's identity. Russell Dimensions RFA, attached as Exhibit 76, at 8.

199.    Ms. Russell experienced no atypical symptoms after her C-section, and her son has had no health problems. Ex. 72 at 53:15-21.

200.    Ms. Russell has not sought treatment from a psychiatrist or psychologist at any point in her adult life, including before and after Akoda delivered her baby. Ex. 72 at 69:21-70:5.

201.    In 2018, Ms. Russell gave no indication of depression, anxiety, suicidal thoughts, or other mental health issues to her doctor. Ex. 72 at 98:22-99:8.

202.    Ms. Russell does not claim to suffer from post-traumatic stress disorder. Ex. 72 at 121:23-25; Ex. 76 at 4-6.

203.    Ms. Russell has never been formally diagnosed with depression, anxiety, a permanent disability, or a sleeping disorder. Ex. 72 at 122:1-123:18; Ex. 76 at 6-7, 11.

204.    In a previous lawsuit, Ms. Russell admitted to not having depression as a result of learning about Akoda's identity. Ex. 76 at 6-7.

205.    In a previous lawsuit, Ms. Russell admitted to not having a physical injury or suffering from physical pain as a result of learning about Akoda's identity. Ex. 76 at 9.

206.    Ms. Russell does not claim to suffer sleeplessness. Ex. 76 at 10.

207.    Ms. Russell does not allege that Akoda sexually assaulted her. Ex. 72 at 129:16-130:11.

208.    Ms. Russell claims that her emotional distress and distrust of doctors were "amplified when Plaintiff discovered that Defendant Dimensions never performed an appropriate background check on Akoda." Ex. 47 at 3.  *See also* Ex. 69 ¶ 71.

209.    Ms. Russell has seen a doctor since finding out about Akoda. Ex. 72 at 60:4-10.

210.    Ms. Russell found out about Akoda's guilty plea in June of 2017. Ex. 72 at 31:1-7.

211.    Dr. Moore informed Ms. Russell that Dr. Moore's practice did not conduct a background check on Akoda. Ex. 72 at 57:11-21.

212.    Dr. Fenichel examined Ms. Russell on September 17, 2019. Ex. 74 at 1.

213.    Dr. Fenichel did not find Ms. Russell to have any psychiatric disorder causally related to the allegations in the complaint. Ex. 74 at 7.

214.    Ms. Russell believes ECFMG is a governmental entity. Ex. 72 at 77:13-23.

215.    Ms. Russell believes ECFMG does background checks on applicants such as Akoda. Ex. 72 at 77:13-23.

216.    Ms. Russell believes Akoda is a "fake doctor," who "was not properly trained as a doctor or credentialed as a doctor." Ex. 72 at 45:7-14.

217.    Ms. Russell has alleged back pain as a result of Dr. Akoda's treatment but also indicated she does not know if the pain is attributable to Dr. Akoda. Ex. 72 at 123:19-124:19.


Dated: December 10, 2021                        Respectfully submitted,

                                                */s/ Brian W. Shaffer*
                                                Brian W. Shaffer, PA Bar No. 78851
                                                Elisa P. McEnroe, PA Bar No. 206143
                                                Matthew D. Klayman, PA Bar No. 319105

MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone:     +1.215.963.5000
Facsimile:      +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com
matthew.klayman@morganlewis.com

*Attorneys for the Educational Commission for Foreign Medical Graduates*

## CERTIFICATE OF SERVICE

I do hereby certify that on this date, I caused true and correct copies of the foregoing document to be served via electronic filing upon all counsel of record via the ECF system and/or e-mail.


DATED: December 10, 2021          */s/ Brian W. Shaffer*
                                              Brian W. Shaffer