# Exhibit 2



Deposition of:

# Kara Corrado

*September 10, 2019*

In the Matter of:

# Russell, Monique  Vs. Educational Commission For Foreign Medical Graduates

Veritext Legal Solutions

Page 1

1              IN THE UNITED STATES DISTRICT COURT
2         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
3                        - - -
4    MONIQUE RUSSELL, JASMINE  :   Case No.
     RIGGINS, ELSA M. POWELL    :
5    AND DESIRE EVANS,          :   2:18-cv-05629-JW
                                :
6              Plaintiffs,      :
                                :
7         vs.                   :   Hon. Joshua D. Wolson
                                :
8    EDUCATIONAL COMMISSION      :
     FOR FOREIGN MEDICAL         :
9    GRADUATES,                  :
                                :
10             Defendant.       :
11                       - - -
12                  September 10, 2019
13                       - - -
14            Oral deposition of KARA CORRADO, taken
15      at the offices of MORGAN LEWIS BOCKUS, LLP,
16    1701 Market Street, Philadelphia, Pennsylvania
17         beginning at 10:48 a.m., before
18    Jennifer L. McDonald, a Professional Reporter
19    and a Notary Public in and for the Commonwealth
20                  of Pennsylvania.
21                       - - -
22        VERITEXT NATIONAL COURT REPORTING COMPANY
                  MID-ATLANTIC REGION
23          1801 Market Street - Suite 1800
            Philadelphia, Pennsylvania 19103
24

1          special investigations and the addition

2          of case managers, it fell under the

3          purview of the associate vice president,

4          who was Bill Kelly, and I, at the time, a

5          manager of operations program

6          development.

7                    So Bill, myself, and Virginia

8          Kesting, who reported to me, we were the

9          folks working on the irregular behavior.

10         So in that respect when I was working for

11         Bill, I was staff.

12   BY MR. THRONSON:

13         Q.       When did you get involved in

14   work on irregular behavior matters?

15         A.       That was around 2008 when I

16   moved -- changed position.

17         Q.       So the staff for the irregular

18   behavior is part of the special investigations

19   team?

20         A.       That is the special

21   investigations team now, yes.

22         Q.       Okay.  Got it.  How does ECFMG

23   serve the public?

24                    MS. McENROE:  Objection to form.

KARA CORRADO

Page 40

1                THE WITNESS:  ECFMG serves the
2        public in a number of ways.  Our original
3        program which was the certification
4        program severs the public in ensuring
5        that those physicians that are educated
6        outside of the U.S. and Canada meet
7        certain minimum requirements in order to
8        enter an accredited residency program in
9        the United States.
10                We also serve the public in
11        facilitating an appropriate review of
12        them, at the same time making sure that
13        we are efficient about doing it, because
14        IMGs -- or International Medical
15        Graduates represent about 25 percent of
16        the physicians that are working in the
17        United States.
18                So it's important from a
19        physician-workforce point of view to make
20        sure we have qualified physicians.  So in
21        those two broad ways I would say that we
22        serve the public.
23  BY MR. THRONSON:
24        Q.        How does ECFMG serve medical

KARA CORRADO

Page 41

1    residency programs?

2                    MS. McENROE:  Objection to form.

3                    THE WITNESS:  So ECFMG has a

4          certification program that is required

5          for entrance into ACGME accredited

6          residency programs.

7    BY MR. THRONSON:

8          Q.       Any other ways in which ECFMG

9    severs medical residency programs?

10                   MS. McENROE:  Objection to form.

11                   THE WITNESS:  So we also have an

12         exchange visitor sponsorship program.  We

13         are responsible for physicians who are

14         seeking residency and training in the

15         United States on a J-1 nonimmigrancy

16         step.

17   BY MR. THRONSON:

18         Q.       Beyond the ways in which you

19   serve medical residency programs that you

20   described, how else does ECFMG serve hospitals?

21                   MS. McENROE:  Objection to form.

22                   THE WITNESS:  I don't know that

23         I would say that we serve hospitals,

24         however, we do provide a service for

KARA CORRADO

Page 54

```
 1    obligated to exercise reasonable care in
 2    performing those services?
 3                    MS. McENROE:  Objection to form;
 4          calls for legal conclusion as does this
 5          whole line of questioning.
 6                    THE WITNESS:  So ECFMG has a set
 7          of policies and procedures that it
 8          enforces when it is processing applicants
 9          or certifying them.
10    BY MR. THRONSON:
11          Q.        Okay.  Is following -- does
12    ECFMG have the obligation to follow those
13    policies and procedures?
14                    MS. McENROE:  Objection to form;
15          also calls for legal conclusion.
16                    THE WITNESS:  I mean ECFMG, I
17          think, like any organization will follow
18          it's policies and procedures and the
19          staff will follow the policies and
20          procedures, and in the course of their
21          normal work will be working to make sure
22          they are appropriately following those
23          policies and procedures.
24    BY MR. THRONSON:
```

KARA CORRADO

Page 55

```
 1        Q.        Can you tell me about the
 2   various categories of policies and procedures
 3   that have applied perhaps at different times
 4   from 1996 to the present with respect to ECFMG
 5   certification of IMGs?
 6                  MS. McENROE:  Objection to form;
 7        calls for a narrative.
 8                  You can answer if you can.
 9                  THE WITNESS:  So there are
10        myriad policies and procedures that would
11        apply to ECFMG certification.  Is there a
12        specific one or type of policy that you
13        are interested in?
14   BY MR. THRONSON:
15        Q.        What I'm thinking of, is there a
16   set of policies on irregular behavior called
17   irregular behavior policies; is there a set of
18   policies called how to perform primary-source
19   verification of the diploma?
20                  Just sort of broad categories of
21   policies or names of sets of policies?
22                  MS. McENROE:  Objection to form.
23                  THE WITNESS:  So ECFMG has
24        irregular behavior policies and
```

KARA CORRADO

Page 56

1          procedures, and we also have an

2          information booklet that's updated yearly

3          that contains all of the policies related

4          to ECFMG certification; eligibility for

5          certification, eligibility for

6          examinations, and those types of

7          policies.

8    BY MR. THRONSON:

9          Q.        How about -- strike that.  Has

10   it had irregular behavior policies continuously

11   from 1996 to the present?

12         A.        Yes, that's my understanding.

13         Q.        Are there any internal irregular

14   behavior polices that are not necessarily

15   published on a website or in a booklet for the

16   benefit of IMGs?

17                   So basically internal procedures

18   that govern the operation of ECFMG with respect

19   to irregular behavior?

20                   MS. McENROE:  Objection to form.

21                   THE WITNESS:  So there are

22         policies that are published on the

23         website, but there are also procedures

24         that staff would follow in terms of

KARA CORRADO

Page 57

```
 1          preparing cases for the committee and
 2          sending letters out and things like that
 3          that are not necessarily published.
 4   BY MR. THRONSON:
 5          Q.      One of the things that we've
 6   been seeking in this case is just to get all
 7   the relevant sets of polices and procedures,
 8   and we have gotten some, but I'm trying to get
 9   a sense of the universe of documents that might
10   be relevant to this case just so we have a full
11   picture of what ECFMG polices are.
12                 So if we were to, say, request
13   polices from the organization obviously one set
14   of polices that we would request would be --
15   actually have some meaning, would be a request
16   for the irregular behavior policies and
17   procedures, right?
18                 MS. McENROE:  Objection to form.
19                 THE WITNESS: (Nonverbal
20          response.)
21   BY MR. THRONSON:
22          Q.      Is there another set of polices
23   called -- that governs when to refer cases to
24   the credentialing committee?
```

KARA CORRADO

Page 75

1        of.

2    BY MR. THRONSON:

3        Q.        So Mr. Kelly, in drafting this

4    document, never indicated to you that this is

5    something new that I'm putting in here, I think

6    we should change how we're doing a particular

7    thing?

8                  MS. McENROE:  Objection to form.

9                  THE WITNESS:  Not that I recall.

10   BY MR. THRONSON:

11       Q.        According to these procedures

12   when should an allegation of irregular behavior

13   be referred to the credentials committee?

14                 MS. McENROE:  Objection to form.

15   BY MR. THRONSON:

16       Q.        By these procedures I mean the

17   ones in Exhibit 2.

18       A.        There is, on page 4, an

19   indication to send the allegation of irregular

20   behavior which in quotes we call "the charge

21   letter to the applicant."

22       Q.        Can you show me the language you

23   are referring to; read it for me?

24       A.        The bottom of page 4.  The very

1   last two italicized phrases.

2        Q.        I see that.  So I'm interested

3   in knowing when staff becomes aware of an

4   allegation of irregular behavior, is there

5   anything in Exhibit 2 that indicates when staff

6   should refer that allegation to the credentials

7   committee?

8                  MS. McENROE:  Objection to form.

9   BY MR. THRONSON:

10       Q.        Or under what circumstances the

11  staff should refer to the --

12       A.        The document -- the procedures

13  are documenting walking through the process of

14  the investigation which starts with determining

15  whether the irregular behavior relates to

16  ECFMG, whether the source of the allegation is

17  credible, and the process you go through when

18  this comes to the source of the allegation.

19       Q.        Is it ECFMG's position that if

20  staff determines an allegation is credible,

21  that that allegation should be forwarded to the

22  credentials committee?

23                 MS. McENROE:  Objection to form.

24                 THE WITNESS:  So the policies

1          and procedures on irregular behavior

2          indicate that if staff determines there

3          is sufficient evidence of irregular

4          behavior the matter will be referred to

5          the credentials committee.

6    BY MR. THRONSON:

7          Q.          Is that language in this

8    procedure; is it written down somewhere else?

9          A.          So that language without sitting

10   and reading through here, I don't know for sure

11   if it's in this document or not; but it is in

12   the medical education credentials committee

13   polices and procedures on irregular behavior.

14         Q.          Okay.  Can you say that for me

15   again, if staff determines that there is

16   sufficient evidence; is that what you said?

17         A.          That is what I said, yes.

18         Q.          What is sufficient evidence?

19         A.          Sufficient evidence, it depends

20   on the case.  For example, if it's a falsified

21   credential and the school responded and said

22   the diploma is false, then that response would

23   be sufficient evidence to make an allegation of

24   irregular behavior on a falsified credential.

KARA CORRADO

Page 78

1        Q.        Okay.  I'd like to walk through
2    some -- strike that.  Has it been ECFMG's
3    procedure since 1996 that if staff determines
4    that an allegation is supported by sufficient
5    evidence that the allegation is referred to the
6    credentials committee?
7        A.        That is my understanding, yes.
8        Q.        Does the evidence have to be in
9    a particular form?  For example, does there
10   have to be a particular kind of documentary
11   evidence, or does that depend on the case?
12       A.        It depends on the case.
13       Q.        On page 6 of the polices and
14   procedures, this is Bates 10203, the procedure
15   reads "if the third party is not already
16   provided the appropriate identifying
17   information about the individual" -- so on and
18   so forth -- "ECFMG staff must determine whether
19   the individual is an applicant to ECFMG for any
20   program or service such as ECFMG certification,
21   EPIC, et cetera.  To do this staff must use all
22   the appropriate search functions to query all
23   ECFMG databases," and it mentions AMES, OASIS,
24   and EPIC as examples of those databases.

KARA CORRADO

Page 87

1  went to medical school beyond that ECFMG
2  received these two diplomas that were source
3  verified by the institution?
4        A.        Yes, that's correct.
5        Q.        Does ECFMG have any information
6  apart from the source verification of those
7  diplomas that would indicate where this
8  individual actually went to medical school, if
9  anywhere?
10       A.        All of the information we have
11 about his medical education, aside from the
12 verification of the diploma by the medical
13 school's officials, would have been provided by
14 him on his applications to ECFMG.
15       Q.        So just to be totally clear,
16 apart from having these two diplomas that were
17 source verified by the institution and ECFMG's
18 belief, ECFMG can't say where and when this
19 individual, Akoda Igberase, went to medical
20 school, if anywhere?
21                 MS. McENROE:  Objection to form.
22                 THE WITNESS:  We could only
23        provide the information that the school
24        verified to us, which would include the

KARA CORRADO

Page 88

1          graduation date on the diploma.

2     BY MR. THRONSON:

3          Q.          How did you obtain source

4     verification from the school?

5          A.          For those diplomas?

6          Q.          For those diplomas.

7          A.          We followed our processes at the

8     time for source verification which was to send

9     a copy of the diploma to the medical school

10    directly with a form for the school official to

11    complete, it's a safety paper form, and a

12    prepaid envelope, -- I'm sorry, it's not a

13    prepaid envelope, but an envelope addressed to

14    ECFMG to be returned to us.

15         Q.          At this time, did you also

16    request, we're talking about between 1992 to

17    2000, did you also request verification of

18    whether an individual was registered as a

19    medical practitioner or licensed to practice

20    medicine in his or her home country?

21         A.          The credentialing requirements

22    for certification at that time included source

23    verification of the diploma only, and the

24    individual was required to also submit a copy

KARA CORRADO

1  of their certificate of their full registration

2  or license, but those were not source-verified.

3          Q.        Why not?

4          A.        I don't know why they were not,

5  but the decision prior to me had been source

6  verification of diploma with a submission of

7  the license, which is not a requirement now.

8          Q.        Why did it cease becoming a

9  requirement?

10         A.        We introduced a clinical skills

11  assessment examination in 1998, and at that

12  time the organization determined it did not

13  need the license or certificate of registration

14  from an international medical graduate when it

15  introduced a clinic skill assessment which is

16  an in-person exam simulated with patients.

17         Q.        It has never been a requirement

18  for international medical graduates applying

19  for ECFMG certification to provide government

20  issued photoed identification, correct?

21         A.        It is a requirement to submit

22  photo identification currently, but it was not

23  in the past.

24         Q.        When did it become a

KARA CORRADO

Page 90

1  requirement?

2       A.      It varies based on the service.

3  So the international credential services, EPIC,

4  when that program was launched, which I believe

5  was I was in 2012 or 2013, part of the

6  requirement was to submit a copy of the

7  passport and have it notarized -- an

8  identification form notarized and for ECFMG

9  certification that became part of the

10 requirement in 2017, I believe, or 2018; maybe

11 2018, more recently.

12      Q.      Why did it become a requirement?

13      A.      We were looking across our

14 processes and programs and we wanted to

15 standardize it, work towards standardization,

16 and bring, like have a notary -- the process is

17 essentially the same as it had been but we

18 wanted to tighten it up in terms of having one

19 notary that we contract with to provide

20 notarization of the identification forms to us.

21      Q.      Is that a separate requirement,

22 in terms of ECFMG now has a requirement that an

23 applicant provide government issued photo

24 identification if I'm understanding you right?

1  security number to ECFMG itself, correct?

2        A.        It would depend on whether -- I

3  mean we would have known, yeah.  I think we put

4  that in the letter to them, we got the social

5  security number.  So if -- if we knew because

6  they advised us that he had used the other

7  social security number that that was not his

8  social security number, yes.

9        Q.        If you turn to Exhibit 31, this

10 is the letter we were talking about earlier.

11 Exhibit 31 to the Kelly deposition from Steve

12 Seeling to James McCorkle.  In the second

13 paragraph Steve Seeling states the social

14 security number he provided ECFMG in 1998 is

15 9065?

16       A.        Yes, I see that.

17       Q.        Providing a false social

18 security number or using a false social

19 security number can be a federal, criminal

20 offense; correct?

21             MS. McENROE:  Objection to form;

22       calls for a legal conclusion.

23             THE WITNESS:  That's my

24       understanding, yes.

KARA CORRADO

Page 150

1   BY MR. THRONSON:

2        Q.        At least based on the plea

3   agreement and so fourth --

4        A.        Yes.

5        Q.        Right, and it was also one of

6   the reasons that Akoda was ultimately kicked

7   out of the Jersey Shore residency, right?

8        A.        Yes.

9        Q.        Under ECFMG's judgement would

10   providing a false social security number to

11   ECFMG at that time have constituted irregular

12   behavior?

13        A.        I think it would depend on the

14   circumstances around how the information was

15   provided and what evidence we had of that.

16        Q.        Do you have a sense of what,

17   after ECFMG became aware that -- well, let me

18   back up.  You said it would depend on the

19   circumstances.  So under the circumstances of

20   this case, is it ECFMG's position that Akoda

21   providing a false social security number to

22   ECFMG in 1998 constituted irregular behavior?

23                  MS. McENROE:  Objection to form.

24                  THE WITNESS:  What I know is

KARA CORRADO

Page 151

1       that it constituted the allegation from

2       the residency program; constituted enough

3       information for us to do an investigation

4       on that, but we did not have sufficient

5       evidence of the irregular behavior to

6       charge him with irregular behavior.

7               So there would be a policy tie

8       to the provision of false information.

9       For example, I don't know where anybody

10      lives, you could put an address on the

11      application that is not really your

12      address.  You might be using someone

13      else's address that you know.  I don't

14      know that that necessarily constitutes

15      irregular.

16              So if I have evidence of -- if

17      someone wrote a social security number on

18      the application and maybe the number is

19      off, I don't have any way to verify

20      whether the social security is valid or

21      not.

22              So if you were providing a false

23      number to us, in addition to other pieces

24      of information, that would show that you

1          were trying to subvert our processes like
2          Dr. Igberase did in using different
3          pieces of information in order to subvert
4          the policy that you can't retake the
5          exam, then you would have evidence of
6          irregular behavior.
7    BY MR. THRONSON:
8          Q.        How about giving a false name on
9    an application, would you agree that in
10   applying for ECFMG certification in 1996 that
11   an individual identified himself as John Nosa
12   Akoda and that's a false name?
13                   MS. McENROE:   Objection to form.
14                   THE WITNESS:   Someone applied to
15         ECFMG in 1996 and used the name John Nosa
16         Akoda, and based on the facts that were
17         stipulated in plea bargain Igberase has
18         stated that he used John Nosa Akoda's
19         name.
20   BY MR. THRONSON:
21         Q.        It appears that Kelly suspected
22   in 2000 that Akoda and Igberase were the same
23   person, right?
24         A.        Yes.  He, I think, had a

Page 180

```
 1        residency program presumably on his
 2        merits, his own merits, and we would have
 3        verified it, as we do with all residency
 4        programs.
 5              What his certification status
 6        was, which was true at the time that we
 7        verified it to them, he had a certificate
 8        that was issued to him in that name, and
 9        it was valid.
10   BY MR. THRONSON:
11        Q.     That was information that -- the
12   certification information that ECFMG supplied,
13   that was one of the pieces of information that
14   Howard University had before when determining
15   whether to accept this person into its
16   residency program, correct?
17              MS. McENROE:  Objection to form.
18              THE WITNESS:  Yes.  They would
19        have received a status report through the
20        regular residency application process.
21   BY MR. THRONSON:
22        Q.     The same is true for the
23   Maryland Board of Physicians, in determining
24   whether to grant Igberase, Akoda a license to
```

KARA CORRADO

Page 181

1    practice medicine it would have had before it

2    information supplied by ECFMG regarding his

3    ECFMG certification status?

4           A.        Yes.

5           Q.        The same is true for Prince

6    George's County Hospital?

7           A.        Yes.  I believe they requested a

8    verification of his certification status.

9           Q.        Did ECFMG ever tell anyone

10   outside of the organization of the suspicion of

11   at least one of it's staff members, perhaps

12   more, that Igberase and Akoda were the same

13   person, before the law enforcement

14   investigation?

15          A.        Before the law enforcement, not

16   that I'm aware of.  I don't think it would have

17   necessarily been appropriate for them to do

18   that if we didn't feel that we had evidence

19   that they were the same person, because we

20   could potentially be providing information that

21   was not substantiated that may have an impact

22   on a physician's career or on residency

23   program.

24          Q.        Did ECFMG ever notify anyone

KARA CORRADO

Page 182

```
 1    outside of the organization, before the law
 2    enforcement investigation, that Jersey Shore
 3    had dismissed him from their residency program?
 4          A.        Not that I'm aware of.
 5          Q.        Why not?
 6          A.        Why didn't we tell anyone about
 7    a potential suspicion?
 8          Q.        Why didn't you tell anyone that
 9    he had been dismissed from his residency
10    program among other things, providing --
11          A.        That kind of information, that's
12    not within our scope or responsibility to
13    report loss of residency, I assume.  Well,
14    maybe not loss, but residents are dismissed
15    from their programs for a variety of reasons.
16    Unless they are a J-1, which he was not, we
17    don't get that kind of information or keep it
18    on a regular basis, and it's not in our scope
19    to report that to other organizations.
20          Q.        If this same set of facts came
21    before ECFMG today, came before your
22    department, would you handle it the same way?
23                    MS. McENROE:  Objection to form;
24          calls for speculation.
```

KARA CORRADO

Page 197

1  person?

2                    MS. McENROE:  Objection to form.

3                    THE WITNESS:  What other

4        information would we have expected?

5                    MR. THRONSON:  Yeah.

6                    THE WITNESS:  I don't know.  It

7        could be anything.

8  BY MR. THRONSON:

9        Q.          Is there any organization that

10  is better situated than ECFMG to determine

11  whether the applicant, who identified himself

12  as Igberase Charles, and the applicant who

13  identified himself as Akoda, were in fact the

14  same applicant?

15                    MS. McENROE:  Objection to form.

16                    THE WITNESS:  So the

17        verification of the identity of someone

18        who is showing up at the residency

19        program would be on the residency program

20        or the hospital, would be my assumption.

21               If they are hiring the

22        individual, they're not relying on ECFMG

23        to say that we identified -- that they

24        don't have to do their own review of who

KARA CORRADO

Page 198

```
 1        that person; is that what you're asking?
 2   BY MR. THRONSON:
 3        Q.        Who is better situated?  Are you
 4   saying the hospitals are in a better
 5   position to answer -- strike that.
 6                  Were the hospitals in this case
 7   in a better position to answer whether Igberase
 8   and Akoda are the same person; are you
 9   contending they were?
10                  MS. McENROE:  Objection to form.
11                  THE WITNESS:  What I'm saying
12        is, each organization has its own process
13        to verify identities or certification of
14        identities.
15                  We would not -- those processes
16        would differ.  We are not hiring the
17        person so whatever the requirements would
18        be for identity, for VISA status, for any
19        of those things, it wouldn't be
20        appropriate for us to check those because
21        it's not within our scope of the
22        certification program.
23                  For example, other than the J-1
24        visas we sponsor, we don't confirm to
```

1        residency programs that those individuals
2        have the appropriate visas to be in the
3        United States.
4               It is the responsibility of the
5        individual and then the organization
6        that's hiring them to do that kind of
7        identification and review of the
8        individual.
9               I don't know that one is in a
10       better position than the other.  It's
11       just that each organization has different
12       processes and ways to certify identities
13       and records.
14   BY MR. THRONSON:
15       Q.        So is it your contention, that
16   it would have been inappropriate for ECFMG to
17   do further investigation into this question of
18   identity, to determine whether Igberase and
19   Akoda are the same person?
20               MS. McENROE:  Objection to form.
21               MR. THRONSON:  Are you saying
22       that would have been inappropriate?
23               MS. McENROE:  Objection to form.
24               THE WITNESS:  I wouldn't use the

KARA CORRADO

Page 200

```
 1            word inappropriate, but it wasn't part of
 2            our process to go further or to see if
 3            some -- I don't know what other
 4            organization we could have gone to at the
 5            time to see if the two people were the
 6            same; if that's what you are asking.
 7     BY MR. THRONSON:
 8            Q.       Could you have consulted with
 9     someone from the Nigeria Consulate to determine
10     if the passport was authentic from their
11     perspective?
12                     MS. McENROE:  Objection to form.
13                     THE WITNESS:  I suppose we could
14            have, but that wasn't part of our process
15            at the time.
16     BY MR. THRONSON:
17            Q.       Could you have called any of the
18     references that Akoda gave to determine whether
19     the letters of recommendation were authentic?
20                     MS. McENROE:  Objection to form.
21                     THE WITNESS:  We could have, and
22            we may have.  I just don't have any
23            documentation in the file that we made
24            the phone calls.
```

Page 201

```
 1   BY MR. THRONSON:
 2        Q.      Obviously you could have
 3   compared the photos between the two
 4   applications to see if they resemble each
 5   other?
 6                  MS. McENROE:  Objection to form.
 7                  THE WITNESS:  Yes, we could.  We
 8           did when we reviewed the file.  We would
 9           have looked at both photographs when we
10           reviewed the file in 2000 in the
11           investigation, but again we would -- the
12           photos could be -- they could look like
13           each other, but I look like my cousin,
14           right, so they are not definitive in and
15           of themselves to say they are the same
16           person.
17                  We are not expert in being able
18           to do that between two photographs.
19   BY MR. THRONSON:
20        Q.      So you're saying that, ECFMG did
21   look through both applications; the
22   applications that Igberase Charles submitted
23   and the applications that Akoda submitted?
24        A.      In 2000 --
```

1   Igberase's information.

2        Q.        You were asked some questions a

3   little bit earlier today regarding whether and

4   when Dr. Akoda responded to the letter from

5   Mr. Kelly dated August 22, 2000.  Do you recall

6   that?

7        A.        Yes.

8        Q.        Does this refresh your

9   recollection for that testimony?

10       A.        Yes.  So I think I said that he

11  had not responded within the requisite 15 days,

12  but looking at the receipt date on this it

13  appears that he did.

14       Q.        There was some discussion

15  earlier today about what it means to have a

16  finding of irregular behavior for false

17  information on an application.  Do you remember

18  generally that kind of testimony?

19       A.        Yes.

20       Q.        Can you clarify what could

21  constitute irregular behavior for false

22  information on an application to ECFMG?

23       A.        False information on an

24  application for ECFMG would, could consist of

KARA CORRADO

Page 240

1    indicating to ECFMG that you had not taken an

2    exam previously when you had taken an exam.

3                    It could also refer to your

4    medical school attendance and graduation if

5    when we sourced verified your diploma, it was

6    inauthentic.

7         Q.        Could an inaccurate address be

8    considered by ECFMG to be false information

9    that would constitute irregular behavior?

10        A.        That is not something that we

11   would consider irregular behavior.

12        Q.        What about the location of the

13   birth?

14        A.        No.

15        Q.        What about social security

16   number?

17        A.        No.

18        Q.        Is it possible for there to be

19   information that is false on an ECFMG

20   application that might constitute a violation

21   of law, but would not constitute a basis for

22   irregular behavior for ECFMG?

23        A.        Yes, that's possible.

24        Q.        Does ECFMG make allegations of

KARA CORRADO

Page 241

1   irregular behavior for applicants' violations

2   of law just because they are a violation of

3   law?  So for example, rape or murder?

4        A.        No.  The criminal activities of

5   applicants are not within our jurisdiction for

6   irregular behavior.

7        Q.        There was a lot of discussion

8   today about ECFMG certification, correct?

9        A.        Yes.

10       Q.        What does an ECFMG certificate

11  signify?

12       A.        An ECFMG certificate signifies,

13  that the individual has met minimum

14  requirements which includes passing medical

15  licensing examinations, as well as meeting our

16  credentialing requirements.

17                 It signifies to an ACGME

18  accredited residency program that the

19  individual has met those requirements for

20  admission to GME, and it is part of the

21  requirements for eligibility for Step 3 and for

22  licensure.

23       Q.        Does an ECFMG certificate

24  signify certification of an applicant's

KARA CORRADO

Page 242

1    identity to a recipient of a ECFMG status
2    report indicating there's an ECFMG certificate
3    in place?
4           A.      No.
5           Q.      What do you mean by that?
6           A.      So when we certify the status of
7    an ECFMG certificate, we are not certifying to
8    the organization necessarily the identity of
9    the individual, but that an individual with
10   that name and date of birth has met the
11   requirements for certification and what the
12   validity is of their certificate and where they
13   went to medical school.
14          Q.      Is ECFMG certifying to the
15   recipients of the ECFMG certification
16   information that the applicant's social
17   security number is accurate?
18          A.      No.
19          Q.      Is ECFMG certifying to the
20   recipient of the ECFMG certification that the
21   location of the birth is accurate?
22          A.      No.
23          Q.      Is ECFMG certifying to the
24   recipients of the ECFMG certification status

KARA CORRADO

Page 243

1    that the clinical clerkships are accurate as

2    represented on ECFMG's application?

3           A.       No.

4           Q.       Is it ECFMG's expectations that

5    individuals from the public rely on ECFMG

6    certification for any purpose?

7           A.       I'm sorry, can you say that

8    again?

9           Q.       Yes.  Is it ECFMG's expectation

10   that individuals from the public rely on ECFMG

11   status for any purpose?

12          A.       No.

13          Q.       So can an individual off the

14   street or who is examining the credentials of a

15   potential physician they want to go see, are

16   they entitled to contact ECFMG and ask about a

17   physician's certification status?

18          A.       No.  We would not release a

19   physician's certification status or a status

20   report to a member of the public.

21          Q.       Would ECFMG release a

22   certification status report to the individual

23   himself?

24          A.       No.

KARA CORRADO

Page 244

1          Q.          To whom would ECFMG release a
2     ECFMG certification status report?
3          A.          To residency programs, licensing
4     boards, and other organizations that are
5     employing the physician as a physician.
6          Q.          Like hospitals and --
7          A.          Hospitals, right, CVOs that are
8     working on behalf of the hospitals.
9          Q.          Is it ECFMG's expectation that
10    recipients of ECFMG certification get
11    additional credentials before laying hands on
12    patients independently?  I can restate that if
13    you need?
14         A.          Yes, can you.
15         Q.          Yes.  So what I'm asking is
16    there was a lot of questions today about
17    whether an ECFMG certificate was necessary for
18    an applicant to do other things, for example go
19    to a residency program.  Do you remember that
20    testimony?
21         A.          Yes.
22         Q.          Is it ECFMG's understanding that
23    an ECFMG certificate is sufficient for an
24    applicant to treat patients?

KARA CORRADO

Page 245

1          A.          No, it's not sufficient.
2          Q.          What else would be required
3    under ECFMG's expectations?
4          A.          So ECFMG certification is one of
5    the initial steps in the process for an
6    international medical graduate to ultimately
7    practice medicine in the United States.
8                      While ECFMG certification may be
9    required for entrance into residency or for
10   licensure, it is not the only requirement that
11   the residency programs and the licensing boards
12   have in order to admit those individuals to
13   their programs or to license those individuals.
14         Q.          So to make sure I understand.
15   After an applicant gets an ECFMG certificate,
16   do they take any other board exams?
17         A.          Yes.  They need to take USMLE
18   Step 3.  So essentially they have to become
19   ECFMG certified which is the beginning of the
20   process, taking the examinations required for
21   certification; have their credentials source
22   verified; go through the residency application
23   process; get accepted to a residency program,
24   and meet whatever requirements the residency

KARA CORRADO

Page 246

1   programs has.

2                   They can then apply for Step 3,

3   and they have to be certified and meet the

4   eligibility requirements that the Federation of

5   State Medical Boards has for Step 3; complete

6   their training and then again meet whatever

7   requirements the licensing board would have on

8   them to be licensed.

9       Q.      You said "complete training,"

10  what do you mean by that?

11      A.      Graduate medical education

12  training is generally a requirement for

13  licensure in all states.

14      Q.      So in other words, would that be

15  like a residency program, for example?

16      A.      Yes, residency program.

17      Q.      So are the applicants coming

18  through ECFMG still in graduate medical

19  education as they are proceeding forward; do

20  they still have more education requirements

21  after they get an ECFMG certificate?

22      A.      To be licensed in the U.S., yes.

23      Q.      Is -- FSMB, that's an acronym

24  you just used, what does that stand for?

KARA CORRADO

Page 247

```
1        A.        That is the Federation of State
2   Medical Boards.
3        Q.        Is that an entity under ECFMG's
4   control?
5        A.        No.
6        Q.        That's a separate entity?
7        A.        Yes.
8        Q.        Thank you.
9                  I have no further questions of
10  this witness.
11                 MR. THRONSON:  Just a few follow
12      ups to echo a few of Counsel's questions.
13                      - - -
14                 REDIRECT EXAMINATION
15                      - - -
16  BY MR. THRONSON:
17       Q.        Is it ECFMG's expectation that
18  state medical boards will rely on reports of
19  ECFMG certification status for any purpose?
20       A.        Yes.  To meet the requirement
21  that the board might have for ECFMG
22  certification.
23       Q.        Is it ECFMG's expectation that
24  residency programs, such as that at Howard
```

KARA CORRADO

Page 248

1  University, would rely on ECFMG status for any

2  purpose?

3        A.        Yes, to demarcate that that

4  person met the certification so they could

5  enter GME among whatever other requirements the

6  program had.

7        Q.        It is ECFMG's expectation that

8  hospitals that are considering whether to grant

9  clinical privileges to a physician rely on

10 ECFMG status for any purpose?

11       A.        I think it would be fair to say

12 that they have the same expectation as the

13 licensing board and the residency programs have

14 on the status reports; on ECFMG providing

15 information about certificate status.

16       Q.        The status report that was

17 provided to the Howard residency program

18 regarding Akoda, what was all the information

19 that that status report contained?

20       A.        The status report would contain,

21 his name; his USMLE identification number; his

22 medical school; the year he graduated; the

23 country of medical school; the validity of his

24 ECFMG certificate, what the status is; whether

KARA CORRADO

Page 249

1   it expired or valid indefinitely; and when it
2   was issued.
3          Q.        If there were any finding of
4   irregular behavior, would the status report
5   contain an annotation reflecting that finding?
6          A.        Yes.
7          Q.        Any other information that the
8   status report contains, in that was submitted
9   to the Howard Residency Program?
10         A.        The status report to the
11  residency program may have had the dates that
12  he passed the USMLE examinations; and that
13  would be for the exams that met ECFMG's
14  examination requirement, but we would not
15  include scores to the residency program because
16  they would get those through a USMLE
17  transcript.
18         Q.        Any other information?
19         A.        No, electronically through the
20  system I don't believe there's any other
21  information.
22         Q.        ECFMG also provided status
23  reports to the Maryland Board -- a status
24  report to the Maryland Board of Physicians,

KARA CORRADO

Page 250

1    right?

2            A.        Yes.

3            Q.        Would that status report have

4    contained all the information that you just

5    mentioned?

6            A.        Yes.

7            Q.        Would it have been the same

8    status report that was sent to them?

9            A.        It would have been the same

10   status report, yes.  In terms of the

11   information that is on it, it's in a different

12   format.  When Howard gets it electronically,

13   it's not a PDF it's data; and when the Maryland

14   board gets it, it would be in more of a PDF

15   format --

16           Q.        Okay.

17           A.        -- the substance is the same.

18           Q.        Any additional information that

19   was on the report to the Maryland Board of

20   Physicians?

21           A.        Other than, our -- we have some

22   disclaimers at the bottom, but other than that

23   there's no other information that I recall.

24           Q.        What are the disclaimers?