# Exhibit 53

**REDACTED**

Desire Evans

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3

 4     -------------------------------x

 5     MONIQUE RUSSELL, JASMINE RIGGINS,    Civil Action No.

 6     ELSA M. POWELL, and DESIRE EVANS,    18-5629

 7          Plaintiffs,                     Honorable

                                           Joshua D. Wolson

 8     v.

 9     EDUCATIONAL COMMISSION FOR FOREIGN

10     MEDICAL GRADUATES,

11          Defendant.

12     -------------------------------x

13

14

15          VIDEOTAPED DEPOSITION OF DESIRE EVANS

16                  Washington, D.C.

17            Thursday, September 5, 2019

18

19

20

21

22

23            GOLKOW LITIGATION SERVICES

24         T 877.370.3377 | F 917.591.5672

25                 deps@golkow.com
```

Page 2

1
2
3
4
5       Thursday, September 5, 2019
6             10:32 a.m.
7
8
9
10
11        The following is the transcript of the
12  videotaped deposition of DESIRE EVANS held at the
13  offices of Morgan, Lewis & Bockius, LLP, 1111
14  Pennsylvania Avenue, NW, Washington, DC 20004.
15
16
17
18
19  Reported by:  Linda S. Kinkade, RDR CRR RMR RPR CSR
20  Registered Diplomate Reporter, Nationally Certified
21  Realtime Reporter, Registered Professional Reporter
22  with Merit Distinction, Certified Shorthand Reporter
23  (CA), Notary Public, within and for the District of
24  Columbia, and official duly authorized to administer
25  oaths and/or affirmations.

Page 3

1   A P P E A R A N C E S:
2
3
4   On Behalf of Plaintiffs MONIQUE RUSSELL, JASMINE
5   RIGGINS, ELSA M. POWELL, and DESIRE EVANS:
6        Schochor, Federico and Staton, P.A.
7        1211 St. Paul Street
8        Baltimore, Maryland 21202
9        (410) 234-1000
10       By:  Brent Ceryes, Esq.
11
12
13  -and-
14
15       Law Offices of Peter G. Angelos
16       One Charles Center
17       100 N. Charles Street
18       Baltimore, Maryland 21201
19       (410) 649-2000
20       By:  Paul M. Vettori, Esq.
21
22
23
24
25

Page 4

1   A P P E A R A N C E S (continued):
2
3   On Behalf of Defendant EDUCATIONAL COMMISSION FOR
4   FOREIGN MEDICAL GRADUATES:
5        Morgan, Lewis & Bockius, LLP
6        1701 Market Street
7        Philadelphia, Pennsylvania 19103
8        (215) 963-5609
9        By:  Elisa P. McEnroe, Esq.
10       By:  Matthew D. Klayman, Esq.
11
12
13
14
15
16
17
18
19
20
21
22  Also present:
23       Crystal Strawbridge, Videographer
24
25

Page 5

1            INDEX OF EXAMINATION
2
3   EXAMINATION OF DESIRE EVANS              PAGE
4       BY MS. MCENROE              8
5       BY MR. CERYES              181
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Desire Evans

E X H I B I T S

NO.          DESCRIPTION                    PAGE
Exhibit 1    Amended Notice of Deposition of ...  60
             Plaintiff Desire Evans
Exhibit 2    History and Physical Examination .. 100
             re Desire Evans
Exhibit 3    Medical Records re Desire Evans ... 108
             Smith 000001 - Smith 000023
Exhibit 4    Civil Action re Russell, et al. ...  148
             v. ECFMG

---

P R O C E E D I N G S

VIDEO SPECIALIST:  We're now on the record.
My name is Crystal Strawbridge.  I'm a videographer
for Golkow Litigation Services.  Today's date is
September 5th, 2019, and the time is 10:32 a.m.

This video deposition is being held at 1111
Pennsylvania Avenue, northwest, Washington, D.C., in
the matter of Monique Russell, et al. v. Educational
Commission for Foreign Medical Graduates, Civil Action
number 18-5629, for the United States District Court,
for the Eastern District of Pennsylvania.  The
deponent is Desire Evans.

Will counsel please identify themselves.

MR. CERYES:  Brent Ceryes on behalf of the
plaintiff.

MR. VETTORI:  Paul Vettori on behalf of the
plaintiffs.

MS. MCENROE:  Good morning.  Elisa McEnroe
for Morgan, Lewis & Bockius on behalf of defendant
Educational Commission for Foreign Medical Graduates,
and today I have with me my colleague, Matt Klayman.

VIDEO SPECIALIST:  The court reporter is
Linda Kinkade and will now swear in the witness.
//
//

---

DESIRE EVANS,
having been first duly sworn and/or affirmed
on their oath, was thereafter examined and testified
as follows:

EXAMINATION

BY MS. MCENROE:

Q.  Good morning, Ms. Evans.

A.  Good morning.

Q.  My name is Elisa McEnroe, counsel for the
Educational Commission for Foreign Medical Graduates.
We met briefly this morning for the first time; is
that correct?

A.  Yes, ma'am.

Q.  Could you please state and spell your name
for the record?

A.  Desire, D-E-S-I-R-E, Evans, E-V-A-N-S.

Q.  Great.  And your birthday is ████████
████  is that correct?

A.  Yes, ma'am.

Q.  That makes you ██ years old?

A.  Yes.

Q.  Thank you.

A.  Tell everybody.

Q.  We'll mark parts of the deposition
confidential as needed.

---

And you understand that you're here today
because you filed a lawsuit against my client, the
Educational Commission for Foreign Medical Graduates,
correct?

A.  Yes, ma'am.

Q.  Because of the nature of the allegations in
the lawsuit, certain of the topics we discuss today
may be particularly sensitive for you.  And so I want
to let you know that, if you need to take a break or
you need to take a minute, you just let us know.  This
is not meant to be a marathon today.  I want to make
sure you're in a position to be able to tell the truth
and a full answer every time I ask a question.  Do you
understand?

A.  Yes, ma'am.

Q.  If at any time today you do need to take a
break, I just ask that the question that's pending be
answered, and then I'd be happy to take a break.
Okay?

A.  Yes, ma'am.

Q.  And you've been deposed before?

A.  Yes, ma'am.

Q.  So you generally have a sense of how this
works?

A.  Yes, ma'am.

Desire Evans

Page 10

1    Q. I'm going to ask you some questions. I'm
2  going to ask that you give me answers.
3    A. Yes, ma'am.
4    Q. And it works best if we don't talk on top
5  of each other, correct?
6    A. Yes, ma'am.
7    Q. Great. And so you've been deposed
8  previously. How many times?
9    A. One time.
10   Q. Okay. And was that on March 28th, 2019?
11   A. Yes.
12   Q. And was that in connection with another
13  lawsuit that you had filed?
14   A. Yes.
15   Q. Against whom?
16   A. Dimensions Health Systems, I believe.
17   Q. In Maryland?
18   A. Yes.
19   Q. And you understand that there's a
20  deposition transcript that came out of that
21  deposition?
22   A. Yes.
23   Q. Have you seen that deposition transcript?
24   A. Yes.
25   Q. Do you confirm that what you testified to

Page 11

1  in that Dimensions deposition is true and correct?
2    A. Yes.
3       MR. CERYES: Objection to the breadth of
4  the question.
5       You can answer.
6    A. Yes.
7    Q. And from time to time your counsel will
8  object, so we'll just give him a second in case he
9  needs to get those in.
10      So, is that correct, that you confirmed that
11  you told the truth at the Dimensions deposition?
12   A. Yes.
13      MR. CERYES: Same objection.
14   Q. Anything you'd like to change or clarify
15  from your testimony as you recall from the deposition
16  in the Dimensions matter?
17      MR. CERYES: Same objection.
18   A. No.
19   Q. To help save some time, I may not ask you
20  every question that was asked there, but if there is
21  something in particular that, as we proceed today, you
22  remember that you would like to correct about either
23  your testimony today or your testimony at the
24  Dimensions deposition, I ask that you please let us
25  know. Okay?

Page 12

1    A. Yes, ma'am.
2    Q. Otherwise, we're going to take that
3  everything you tell us today and everything you told
4  the court when you were deposed in the Dimensions
5  litigation was the truth. Do you understand?
6    A. Yes, ma'am.
7    Q. Is there any reason that you can't tell the
8  truth today?
9    A. No, ma'am.
10   Q. Okay. Are you taking any medications that
11  make you confused or foggy at the moment?
12   A. I am on medication, but I haven't taken
13  anything today.
14   Q. And so your memory is clear?
15   A. Yes.
16   Q. Have you ever used a different last name
17  than Evans?
18   A. My maiden name is Clifton.
19   Q. And so at a point in time did you use the
20  name Desire Nichole Clifton?
21   A. Yes.
22   Q. Is it fair to say that you changed your
23  name because you got married?
24   A. Yes, ma'am.
25   Q. And when was that?

Page 13

1    A. I got married December 31st, 2015.
2    Q. To whom?
3    A. Michael Evans.
4    Q. And is he still your husband?
5    A. Yes, ma'am.
6    Q. And is he the father of the child that
7  we'll discuss a little bit later today that you have?
8    A. Yes, ma'am.
9    Q. Great. And what is that child's name?
10   A. Peyton Alexander Evans.
11   Q. And you still have your dog?
12   A. Huh?
13   Q. And you still have your dog?
14   A. Yes.
15   Q. Okay. Great. Do you have any other
16  children living with you?
17   A. No, ma'am.
18   Q. Do you have any other biological children
19  that you've birthed?
20   A. No, ma'am.
21   Q. What is Mr. Evans' profession?
22   A. He is a bus operator for Metro.
23   Q. For Metro. Great. And has that been
24  consistent over time?
25   A. Well, he just started working there. He

Desire Evans

Page 14

1  was previously a supervisor for Circulator, a
2  different transportation place in D.C., but same line
3  of work.
4      Q.  So he was a bus driver previously as well?
5      A.  Well, he was a road supervisor.  He was
6  promoted from a bus driver to a road supervisor, but
7  he went to Metro as a bus driver.
8      Q.  And since you guys were married has he
9  worked in the transportation industry?
10     A.  Yes.
11     Q.  And does he work full-time?
12     A.  Yes.
13     Q.  Does he have any FMLA or ADA leave that
14  he's on at the moment?
15     A.  No.
16     Q.  Has he ever to your knowledge had FMLA or
17  ADA leave?
18     A.  During the birth of our child he did FMLA.
19     Q.  And how long did he take?
20     A.  I don't remember.  Maybe two weeks.  It
21  wasn't long.
22     Q.  Is your current address 4057 Parker Court
23  in Waldorf, Maryland?
24     A.  Yes, ma'am.
25     Q.  You previously testified at the Dimensions

Page 15

1  deposition about your education and your professional
2  background, so I'm not going to get into all of those
3  details just to save us a little bit of time, but I am
4  going to do some of the just basic nuts and bolts to
5  make sure I have an understanding.  Is that fair?
6      A.  Yes.
7      Q.  You graduated high school in 1997; is that
8  correct?
9      A.  Yes, ma'am.
10     Q.  And you attended Strayer University to
11  study cybersecurity; is that correct?
12     A.  Current.
13     Q.  Have you finished that program of study?
14     A.  No, ma'am.  I'm currently there.
15     Q.  And when are you scheduled to finish?
16     A.  '22?
17     Q.  2022?
18     A.  Yes, 2022.  I'm on the dean's list too.
19     Q.  Congratulations.
20     A.  Thank you.
21     Q.  Is that a part-time schedule?  How does
22  that work with your work?
23     A.  No, so it's online school.  I go -- it's
24  Monday through Friday.  I just have to complete my
25  assignment, you know.  They set assignments before the

Page 16

1  end of the week.  So it's a full-time schedule.
2      Q.  So to restate it just to make sure I
3  understand, do you log in from a computer terminal at
4  home?
5      A.  Yes.
6      Q.  And you complete the coursework as it fits
7  your schedule?
8      A.  Yes.
9      Q.  And that's a full-time course load, Monday
10  through Friday?
11     A.  Yes.  Yes.
12     Q.  How many hours a day Monday through Friday
13  would you estimate you spend on your studies?
14     A.  Four and a half.
15     Q.  Hours?
16     A.  Yes, four and a half hours.
17     Q.  Thank you.  Does that involve other
18  homework outside of that, or is that inclusive of all
19  of your work for Strayer University each day?
20     A.  That's -- that's my just for Strayer
21  University each day.
22     Q.  And you said that's just for Strayer
23  University.  Do you do other work as well?
24     A.  Well, I work from home, so once I get off
25  of work from working for BlueCross BlueShield, I start

Page 17

1  doing my Strayer work.
2      Q.  And the BlueCross BlueShield job that you
3  just mentioned, is that the same job that you had when
4  you were deposed in the Dimensions litigation?
5      A.  Yes, ma'am.
6      Q.  Are you in the same position you were in
7  then?
8      A.  Yes, ma'am.
9      Q.  So that's the senior customer service
10  advisor; is that correct?
11     A.  Yes, ma'am.
12     Q.  How many hours a day would you estimate you
13  work for BlueCross BlueShield?
14     A.  Eight.
15     Q.  Monday through Friday?
16     A.  Yes.
17     Q.  Do any of your job responsibilities for
18  BlueCross BlueShield bleed into the weekend?
19     A.  No.
20     Q.  Is it shift work for BlueCross BlueShield,
21  like you have a certain time you're supposed to be on
22  and then you get off at a certain time?
23     A.  Yes, 8:30 to 5:00.
24     Q.  Is that a preset schedule?
25     A.  Yes.

Desire Evans

Page 18

1    Q.  And you mentioned that you work from out of
2  your home; is that correct?
3    A.  Yes.
4    Q.  Tell me a little bit about your office
5  setup at home.
6    A.  It's just an office.  It's in the down --
7  downstairs area of my home.
8    Q.  Is it a separate room?
9    A.  Yeah, it's a separate room.
10   Q.  With a door that closes?
11   A.  Yes, ma'am.  I have -- it's a setup
12  office -- a desk, printer, shredder, TV.
13   Q.  I presume a telephone?
14   A.  Yeah, telephone.
15   Q.  You spend a lot of time on the telephone in
16  that job?
17   A.  Yes.
18   Q.  Is that the majority of your job is spent
19  on the telephone?
20   A.  It is, yes.
21   Q.  And just very briefly, in terms of your job
22  responsibilities, as a senior customer service
23  advisor, I understand you spend a lot of time on the
24  phone.  What is it, just generally speaking, you're
25  doing when you're on the phone?

Page 19

1    A.  Help answering questions for insured
2  members, so fixing the claims.  I have a long list of
3  duties.
4    Q.  But, generally, sort of contained within
5  that universe?
6    A.  Yes.
7    Q.  How long have you had the job with
8  BlueCross BlueShield?
9    A.  Since, I want to say, June 25th, 2015.  I
10  might -- the day might be wrong, but it was June 2015.
11   Q.  That was before you had your son, correct?
12   A.  Yes.
13   Q.  Prior to having your son did you work from
14  home?
15   A.  No.
16   Q.  Did you work in an office setting?
17   A.  Yes.
18   Q.  Where was that office?
19   A.  In Fairfax, Virginia.
20   Q.  How far is that from where you reside, or
21  resided at the time, I should say?
22   A.  About an hour, 45 minutes to an hour.
23   Q.  Hour or 45-minute commute each way?
24   A.  Yes.
25   Q.  Would you drive?

Page 20

1    A.  Yes.
2    Q.  When did you stop working out of the
3  office?
4    A.  I want to -- after I had my son.  I want to
5  say maybe two months after I had my son.
6    Q.  Did you take time out of work for the birth
7  of your child?
8    A.  I did.
9    Q.  How long?
10   A.  I stopped working in February, at the end
11  of February.  I want to say maybe four weeks prior.
12   Q.  You stopped four weeks before you had your
13  son?
14   A.  I believe it was four weeks prior, yes.
15   Q.  And then how long were you out after you
16  had your son?
17   A.  Another maybe additional 30 days.  I can't
18  really remember.
19   Q.  After you had your son, did you return to
20  work in the office physically for
21  BlueCross BlueShield?
22   A.  No.
23   Q.  Did you switch directly to working from
24  home for them?
25   A.  Yes.

Page 21

1    Q.  And when did you start your studying for
2  your cybersecurity certificate from Strayer
3  University?
4    A.  In April of this year.
5    Q.  So that would be April 2019?
6    A.  2019, yes.
7    Q.  How old is your son, Peyton?
8    A.  Three.  I was trying to make sure I started
9  in April.  I have to think about -- I'm not sure if it
10  was in April -- I'm not sure if I started the spring
11  or the winter semester.
12   Q.  But 2019 either way?
13   A.  2019, yes.
14   Q.  So either winter or spring 2019 for sure.
15   A.  Yes.
16   Q.  Thank you.  I appreciate you keeping your
17  answers precise.
18        So Peyton is three years old, you said?
19   A.  Yes, ma'am.
20   Q.  And what is his schedule like?  Does he
21  have a childcare provider other than you and your
22  husband?  Does he go to daycare?
23   A.  No, he doesn't go to daycare.  He just
24  recently, since my husband started working for Metro,
25  started going to his grandmoms' house during the day

Desire Evans

Page 22

1   so I can work and concentrate on school.
2       Q.  Is that your mom or is that your husband's
3   mom?
4       A.  Both.
5       Q.  Oh.
6       A.  Mondays and Fridays he's with my mother and
7   Tuesdays, Wednesdays and Thursdays he's with my
8   husband's mother.
9       Q.  What kind of hours?
10      A.  Six in the morning until 5 p.m.
11      Q.  So it's about 6 a.m. to 5 p.m.?
12      A.  Yes, ma'am.
13      Q.  And how far do those grandmothers live from
14  where you reside?
15      A.  My mother lives about ten minutes away, and
16  my husband's mother lives here in D.C., so about an
17  hour.
18      Q.  When did this arrangement with the
19  grandmother childcare, I'll call it that, begin?  When
20  did that start?
21      A.  I want to say approximately 11 weeks ago
22  when my husband started for Metro.
23      Q.  So for the period of time between when
24  Peyton was born and about 11 weeks ago when he started
25  having some care during the day from his grandmothers,

Page 23

1   were you primarily responsible for his childcare?
2       A.  Yes.
3       Q.  So there was a period of time when you were
4   working full-time for BlueCross BlueShield, doing
5   full-time studies at Strayer University, and having
6   full childcare responsibilities as well?
7       A.  Yes.  Yes.
8       Q.  Prior to your husband joining Metro, what
9   was the company you said he worked for?
10      A.  Circulator First Transit is the actual...
11      Q.  Where was that located?
12      A.  Here in D.C.
13      Q.  And you said that's about an hour from your
14  home?
15      A.  Yes.
16      Q.  What kind of hours did he work when he was
17  at Circulator First Transit?
18      A.  He worked evening hours.
19      Q.  And what does that mean?
20      A.  So that was like 5 to 1.
21      Q.  5 p.m. to 1 a.m.?
22      A.  Yeah, 5 p.m. to 1 p.m. and on the weekends
23  8 p.m. to 4 a.m.
24      Q.  I want to make sure I got the first --
25  during the weekdays, when was it?

Page 24

1       A.  About 5 p.m. to 1 p.m. -- I mean 5 p.m. to
2   1 a.m.  Excuse me.
3       Q.  1 a.m., great, okay.  Just trying to make
4   sure we're on the same page.
5       So he was working the night shift?
6       A.  Yes.
7       Q.  Is he working the night shift currently
8   with Metro?
9       A.  It fluctuates, because he's still in his 90
10  days in training.  So he doesn't really have a set
11  schedule yet.
12      Q.  And what is his commute like now that he's
13  working for Metro?
14      A.  It's about -- it's the same.  It's about 45
15  minutes to an hour.
16      Q.  Prior to 11 weeks ago when you began using
17  the grandmothers' help for caring for Peyton during
18  the day, did you have any other adult help while you
19  were working or in school for watching Peyton?  So did
20  you have any babysitters, someone from the
21  neighborhood who would come, like a nanny?
22      A.  No, just my husband.
23      Q.  Just you and your husband?
24      A.  Yes, ma'am.
25      Q.  When your husband was working for

Page 25

1   Circulator and he was working the night shift, when
2   would he sleep?
3       A.  Never.  That's the truth.  He literally was
4   working 20 hours a day at a point, like going from one
5   job to the next because he was doing Metro at the same
6   time.
7       So he would get home around 2:00 in the
8   morning, go to sleep maybe around 3:00, be up again by
9   4:30, 5:00 so he could be out to take Peyton by 6.
10      Q.  To take him to --
11      A.  His grandmom's house.
12      Q.  The grandmothers.  But before --
13      A.  Before that, before that, he was -- he was
14  still working two jobs, so he was still having the
15  same amount of sleep, get home around 1:30 or get home
16  around 2:00, be asleep by 3:00, up by 4:30, 5:00, so
17  he can go to Metro.
18      Q.  So before he was working at Metro when he
19  was working at Circulator, was he working another job
20  as well?
21      A.  He was working overtime at Circulator.
22  Sometimes working double shifts.
23      Q.  And when you say "double shifts," you mean
24  he would work the night shift and the day shift?
25      A.  Yes, ma'am.

Desire Evans

Page 26

1    Q.  Is he doing that also now that he's working
2  at Metro?
3    A.  No.  Now he's just working one job.
4    Q.  Why the switch 11 weeks ago to have the
5  grandmother care?
6    A.  Because my husband was no longer going to
7  be able to be there during the day and his schedule
8  was going to be unpredictable.  So in order for me to
9  be able to work and be productive, I needed someone --
10  I needed help because I couldn't -- Peyton is three
11  now, so it's not like I could lay him down for a nap.
12  He's running all -- he's very, very active.  So he
13  needed to be with other adults, other children, so we
14  decided to try to do that.
15    Q.  When he was -- when your husband was
16  working at Circulator, how frequently was he working
17  overtime so he was doing double shifts?
18    A.  He would work overtime Thursday, Fridays,
19  and Saturdays.  So mostly on Fridays and Saturdays, he
20  would go in around -- he would go in around maybe 8:30
21  in the morning and work until 4:30 in the morning.
22    Q.  And then he'd have an hour commute home?
23    A.  Mm-hmm.  Yes.  I'm sorry.
24    Q.  Thank you.  You remember well from your
25  last deposition to give oral responses.

Page 27

1    A.  Yes, ma'am.
2    Q.  I appreciate that.  Thank you.
3      So we talked a little bit about your husband's
4  sleep.  Let's talk a quick minute about your sleep
5  between your work and your childcare responsibilities.
6      When Peyton came home from the hospital, did he
7  sleep through the night?
8    A.  At -- yeah, he was a pretty good baby.
9    Q.  He was a pretty good baby?  Were you
10  breastfeeding?
11    A.  Yes.
12    Q.  And did you have to get up in the night to
13  feed him?
14    A.  Yes.
15    Q.  How frequently approximately at the
16  beginning?
17    A.  About every three hours.  I would actually
18  have to wake him up to feed him.
19    Q.  Has Peyton stayed a good sleeper?
20    A.  No.
21    Q.  You laughed and said that.  So what do you
22  mean by that?
23    A.  No, now -- now it's -- I mean, once he goes
24  to sleep, it's fine.  It's just a struggle to get him
25  to go to sleep just because he thinks he's going to

Page 28

1  miss something.
2    Q.  And what time is bedtime for him at your
3  house?
4    A.  I try 8:00.
5    Q.  P.m.?
6    A.  P.m., yes.  That's my goal.
7    Q.  And when is, realistically, when he sets
8  his head down to sleep?
9    A.  Around 9:30-ish, 10:00, depends on what
10  time his dad gets in the house sometimes, because
11  sometimes I can't get him to go to sleep until he sees
12  his dad.
13    Q.  Sure.  And so when is he sleeping until
14  once he goes to sleep?  When does he wake up?
15    A.  He'll sleep until he gets to his grandmom's
16  house, because we don't really wake him up in the
17  morning.  We just take him out of the bed and take him
18  straight to his grandmom's house so we don't wake him
19  up.
20      So he sleeps through the night until he gets to
21  his grandmom's house, and she will do whatever she
22  does.
23    Q.  Does he still nap?
24    A.  Yes.
25    Q.  About how long?

Page 29

1    A.  About an hour and a half, two hours
2  depending.
3    Q.  Once a day or twice a day?
4    A.  Once a day.
5    Q.  On the weekends also?
6    A.  No.
7    Q.  Okay.  So that's just during the weekday?
8    A.  Yeah, just on the weekday.  I let him have
9  free time during the weekend, unless he's tired.  If
10  he's tired, I don't stop him from taking a nap, but I
11  don't force naps on weekend.
12    Q.  When were you most recently treated by a
13  doctor for anything?
14    A.  I'm treated by a doctor now.  The last time
15  I went to the doctor --
16    Q.  Correct.
17    A.  -- was, I want to say, August 1st maybe --
18    Q.  For what?
19    A.  -- August 2nd.  I went to see my
20  psychologist, Dr. Donato.
21    Q.  Why?
22    A.  He's my psychologist and I speak to him
23  often, and it was time to review my FMLA.
24    Q.  You say you speak to him often.  Are you
25  talking by telephone, in person?

Desire Evans

Page 30

1    A.  Both.
2    Q.  How frequently do you speak to Dr. Donato?
3    A.  Sometimes, depending on how much I need
4  him, twice a week sometimes or twice a month.  It
5  depends.  It just really depends.  I don't really have
6  a set time to talk to him.
7    Q.  How do you arrange speaking with him?
8    A.  I can just call the front desk and just let
9  them know that I need to speak to him, and he'll
10  either call me back or we can set up an appointment.
11    Q.  Dr. Donato works in a practice?
12    A.  Yes.
13    Q.  And they have a reception area, it sounds
14  like?
15    A.  Yes.
16    Q.  Where is Dr. Donato's office located?
17    A.  In 600 Post Office Road in Waldorf,
18  Maryland.
19    Q.  How far is that from your home?
20    A.  About five minutes.
21    Q.  When did you first start seeing Dr. Donato?
22    A.  I don't remember the exact date.  I want to
23  say it was like April of '18 maybe.  I can't really
24  remember the month, but it was 2018.
25    Q.  Around spring of 2018?

Page 31

1    A.  Spring or summer, somewhere around there,
2  2018.
3    Q.  Besides Dr. Donato, are you currently under
4  the care of any physicians?
5    A.  Yes, I'm also seeing Ebony Cross.  She is a
6  psychiatrist and medication management.
7    Q.  How often do you see Dr. Cross?
8    A.  Once a month.
9    Q.  Is that a regularly scheduled appointment?
10    A.  Well, we schedule it at the end of each
11  appointment, so it's not like a set date.
12    Q.  So you'll schedule it out the next time
13  each time you're there?
14    A.  Yes.
15    Q.  And do you physically go see Dr. Cross in
16  person?
17    A.  Yes.
18    Q.  You mentioned medication management from
19  Dr. Cross.  Does Dr. Donato prescribe you medication
20  as well?
21    A.  No, he cannot prescribe medication.
22    Q.  Besides Dr. Donato and Dr. Cross, are you
23  presently under the care of any other physicians?
24    A.  No.
25    Q.  Do you currently have an ob/gyn?

Page 32

1    A.  No.
2    Q.  And you understand, when I use the phrase
3  "ob/gyn," I mean obstetrician/gynecologist?
4    A.  Yes, ma'am.
5    Q.  It's okay with you if I use the term
6  ob/gyn?
7    A.  Yes, ma'am.
8    Q.  It's a little easier for me to say, so I
9  appreciate that.
10    Do you have a primary care physician?
11    A.  I have one assigned to me from my
12  insurance.  Do I see her?  No.
13    Q.  What do you mean you have one assigned to
14  you from your insurance?
15    A.  So I have an HMO, so they have to assign
16  you a primary care physician through the insurance.
17    Q.  And who is your primary care physician
18  assigned to you from your HMO?
19    A.  Dainty Jackson.
20    Q.  Have you ever seen Dr. Jackson?
21    A.  I saw her once, yes.
22    Q.  When was that?
23    A.  Maybe September of '17 maybe.  I really
24  don't remember.
25    Q.  Do you remember your purpose for visiting

Page 33

1  with Dr. Jackson?
2    A.  I needed blood work for medication
3  management.
4    Q.  Blood work from medication management by
5  whom?
6    A.  From -- at the time I was seeing Shanda --
7  what was her name?  My goodness.
8    Q.  Would that be Dr. Smith?
9    A.  Shanda Smith from Kaiser.
10    Q.  Are you still seeing Dr. Smith?
11    A.  No.
12    Q.  When did you start seeing Dr. Smith, do you
13  recall?
14    A.  February -- I don't know if it was '17 or
15  '18.  I don't remember the year, ma'am.  I'm sorry.
16    Q.  Do you remember when you stopped seeing
17  Dr. Smith?
18    A.  It was in -- so I want to say it was '18,
19  because I started -- stopped seeing her right before I
20  started seeing Dr. Donato, which was in, like, June --
21  April, June-ish.
22    Q.  So I just want to make sure that I'm
23  understanding.  So are you saying you believe you
24  started seeing Dr. Smith approximately in February
25  2018?

## Page 34

1    A. Mm-hmm.
2    Q. That's correct?
3    A. Yes. Yes. I'm sorry. Yes.
4    Q. And you made the decision to switch from
5  Dr. Smith to Dr. Donato; is that correct?
6    A. My insurance changed, so I had to.
7    Q. Was it an issue of having a physician in
8  network?
9    A. Correct. We were using my husband's
10  insurance at first and he had Kaiser, so we had to use
11  Kaiser.
12    Q. And then you switched insurance?
13    A. Yes, through my own employer.
14    Q. I presume that was BlueCross BlueShield
15  Insurance?
16    A. Yes, ma'am.
17    Q. Okay. Were you covered by insurance when
18  you delivered Peyton?
19    A. I had Medicaid.
20    Q. Even though you were working for
21  BlueCross BlueShield?
22    A. I was a temp at the time.
23    Q. Ah. Okay. So when you first started
24  working for BlueCross BlueShield, were you a full-time
25  employee?

## Page 35

1    A. So I started as a temp in June.
2    Q. Of what year?
3    A. Of 2015. I became permanent in January of
4  2016, but my benefits didn't kick in until April of
5  2016.
6    Q. So when you had Peyton, you were a
7  full-time employee and not a temp, but you didn't have
8  your benefits accruing yet?
9    A. Correct.
10    Q. Okay. And then did you switch from being
11  on BlueCross BlueShield being on your husband's
12  insurance?
13    A. No.
14    Q. Can you explain how that worked?
15    A. So -- so I went to my -- I went to my
16  husband's insurance, because we weren't -- we weren't
17  married when I got pregnant with Peyton, so I needed
18  my own insurance. So I was on Medicaid. Once we got
19  married and Peyton came, then we -- then I went to my
20  husband's insurance, and then I switched to
21  BlueCross BlueShield.
22    Q. I see. When was Peyton born?
23    A. In March of '16.
24    Q. When in March of '16?
25    A. March 17. Excuse me.

## Page 36

1    Q. I have it marked down that you were married
2  on December 31st, 2015. Is that not correct?
3    A. Mm-hmm.
4    Q. That is correct?
5    A. Correct.
6    Q. So you were married to your husband in
7  December 2015?
8    A. Right, and had Peyton in March of '16.
9    Q. And you had him in March of '16?
10    A. Right. I was seven months pregnant when we
11  got married.
12    Q. I see. I want to back up a minute, because
13  I got a little off on to a different topics. Back to
14  doctors you're currently being treated by.
15    So you mentioned that you're currently being
16  treated by Drs. Donato and Cross.
17    A. Yes.
18    Q. And you technically have a primary care
19  physician assigned to you, but you do not go to
20  Dr. Jackson for treatment; is that correct?
21    A. Correct.
22    Q. Are you currently being seen by any other
23  physicians?
24    A. No.
25    Q. In the time between when you had Peyton and

## Page 37

1  now, have you seen any other physicians besides
2  Dr. Smith we just talked about?
3    A. Besides going to the ER?
4    Q. We'll get to that in one quick second.
5    A. No.
6    Q. And you mentioned going to the ER. When
7  did you go to the emergency room?
8    A. It was before the last deposition. So I
9  want to say maybe March of '19.
10    Q. For what reason did you go to the emergency
11  room?
15    Q. Did that visit to the emergency room result
16  in an overnight stay at the hospital?
17    A. No.
20                                              ob/gyn.
21    Q. And did you have an ob/gyn in March of
22  2019?
23    A. No.
24    Q. Did you actually go see an ob/gyn for
25  treatment in March of 2019?

Page 38

1    A. No.
2    Q. Did you have health insurance in March of
3  2019?
4    A. Yes.

7    A. Yes.
8    Q. Besides going to the emergency room in

13    A. No.
14    Q. Prior to giving birth to Peyton, what
15  physicians were you treated by?
16    A. Javaka Moore was my OB, and I really didn't
17  have a primary care. Everything was basically done
18  through the ob/gyn.
19    Q. When did Dr. Moore become your ob/gyn?
20    A. In June of 2015.
21    Q. And pardon me for not knowing this, but is
22  Dr. Moore a woman or a man?
23    A. A man.
24    Q. Did you see Dr. Moore prior to becoming
25  pregnant with Peyton?

Page 39

1    A. No.
2    Q. How far along in your pregnancy with Peyton
3  did you become a patient of Dr. Moore's?
4    A. Seven weeks?
5    Q. When you saw him, was Dr. Moore a member of
6  a medical practice?
7    A. Yes.
8    Q. Were you ever treated by any other doctors
9  in Dr. Moore's practice?
10    A. No.
11    Q. Were you ever seen by any doctors other
12  than Dr. Moore in his practice?
13    A. Yes, but I don't know her name.
14    Q. And when you say you were seen by her, did
15  you have an appointment and she covered that
16  appointment?
17    A. Yes.
18    Q. Did you ever see any other medical
19  professionals in connection with your pregnancy? And
20  what I mean is somebody like a midwife or a doula.
21    A. No.
22    Q. Do you know what a doula is?
23    A. Yes, ma'am.
24    Q. Do you know what a midwife does?
25    A. Yes, ma'am.

Page 40

1    Q. When did you stop being a patient of
2  Dr. Moore's?
3    A. After I had my son, so -- I never went
4  back.
5    Q. When you say you never went back, what do
6  you mean?
7    A. After I had my child, I never went back to
8  that practice.
9    Q. The other doctor you mentioned in
10  Dr. Moore's practice who you were seen by, that was a
11  woman doctor, you said?
12    A. Yes. I think it was -- her first name was
13  Donna. I'm not one hundred percent sure. Caucasian
14  lady.
15    Q. Donna, you said?
16    A. I think.
17    Q. Thank you.
18    A. Diane, Donna, something like that.
19    Q. Probably started with a D?
20    A. It definitely started with a D.
21    Q. How did you come to be a patient of
22  Dr. Moore's?
23    A. It was assigned by Medicaid.
24    Q. When you say that Dr. Moore was assigned by
25  Medicaid, do you mean Dr. Moore in particular or

Page 41

1  Dr. Moore's practice?
2    A. Dr. Moore's practice.
3    Q. Do you know how many doctors were in
4  Dr. Moore's practice?
5    A. I do not.
6    Q. Do you know if Dr. Moore's practice was
7  affiliated with any hospitals?
8    A. I do not. Well, I'm lying. I'm lying. So
9  during the -- not lying.
10    I'm sorry. That was wrong. I didn't mean to
11  say it.
12    So during the time that they were setting up
13  my -- my induction --
14    Q. Yep.
15    A. -- they were saying that he was affiliated
16  with Dimensions Hospital, but I didn't know that prior
17  to that.
18    Q. Thank you. So when you said that when they
19  were setting up the induction, who do you mean they
20  were?
21    A. Like the front desk at the doctor's office.
22    Q. At Dr. Moore's office?
23    A. Yes.
24    Q. Is it fair to say that, when you were
25  setting up your induction at Dr. Moore's office, they

Desire Evans

Page 42

1  explained to you that you would be induced at Prince
2  George's Hospital?
3      A.  Correct.
4      Q.  When you were setting up your induction
5  with Dr. Moore's practice, did they tell you what
6  physician would be doing your induction?
7      A.  I was under the impression it would be
8  Dr. Moore.
9      Q.  Did they tell you, though --
10     A.  No.
11     Q.  -- who it would be?
12     A.  But I was under the impression it would be
13 Dr. Moore.
14     Q.  What time of day, if you remember, were you
15 scheduled to have your induction?
16     A.  I was scheduled at 8 a.m.
17     Q.  Do you remember what day of the week it
18 was?
19     A.  I want to say maybe a Thursday.
20     Q.  Having looked at your medical records, is
21 it correct that you did actually go to Prince George's
22 Hospital to be induced?
23     A.  Yes.
24     Q.  And was that at the scheduled time that you
25 had arranged with Dr. Moore's office?

Page 43

1      A.  No.  They called me and rescheduled me to a
2  later time.
3      Q.  How much later?
4      A.  Two.
5      Q.  Two days?
6      A.  No, at 2:00.
7      Q.  Oh, 2:00 in the afternoon?
8      A.  Yeah, because they were -- they were saying
9  they were going to call me and let me know, but I was
10 already two weeks past due at that time, so I wasn't
11 having that.  So I said I'll just come up there and
12 sit and wait until you guys are ready.
13     Q.  So did you go at 2 p.m. to be induced?
14     A.  I went around 11:30, so I sat there until
15 they took me back.
16     Q.  At Prince George's Hospital?
17     A.  At Prince George's Hospital.
18     Q.  Aside from Dr. Moore, who you mentioned
19 having been treated by prior to delivering Peyton,
20 were you under the care of any other physicians or
21 psychiatrists at the time?
22     A.  No.
23     Q.  Any psychologists you were being treated
24 by?
25     A.  No.

Page 44

1      Q.  And was that while you were pregnant with
2  your son?
3      A.  What?
4      Q.  The time period we're talking about.
5      A.  Yes.
6      Q.  Prior to being pregnant with your son, have
7  you ever been treated by a psychologist or a
8  psychiatrist?
9      A.  No.
10     Q.  When your insurance set you up with
11 Dr. Moore's practice, how did Dr. Moore come to be
12 your physician in particular?
13         MR. CERYES:  Objection, foundation.
14     You can answer.
15     A.  Huh?
16         MR. CERYES:  You can answer.
17     A.  Oh.  He just came in the room.  I wasn't --
18 I didn't ask for him or anything.  He just was the
19 doctor assigned to me at the practice.
20     Q.  Did you do any research into the physicians
21 at the practice Dr. Moore was a part of?
22     A.  No.
23     Q.  Did you do any research into Dr. Moore's
24 credentials or background?
25     A.  No.

Page 45

1      Q.  Did you do any research into Dr. Moore's
2  educational history?
3      A.  No.
4      Q.  Did you do any research into whether
5  Dr. Moore was board certified?
6      A.  No.
7      Q.  Did you talk to any of his other patients,
8  Dr. Moore's?
9      A.  No.
10     Q.  Prior to having Dr. Moore as your
11 physician, had you ever previously been treated by an
12 ob/gyn?
13     A.  Previously?
14     Q.  Yeah.
15     A.  Like anytime in my life?
16     Q.  Anytime in your life.
17     A.  Yes.
18     Q.  And who was that?
19     A.  I don't remember their names.
20     Q.  Okay.  But other ob/gyn's previously in
21 your life?
22     A.  Mm-hmm.  Yes, ma'am.
23     Q.  Do you remember doing any research into any
24 of their credentials or educational background?
25     A.  No.

Desire Evans



Page 46

1    Q.  Do you remember doing any research into any
2  of their certifications or whether they were a member
3  of any board?
4    A.  No.
5    Q.  It sounded like before Dr. Moore you had
6  seen more than one ob/gyn previously; is that correct?
7    A.  Mm-hmm.
8    Q.  Can you estimate for me about how many you
9  think you've seen over the course of your life?
10    A.  Maybe two.
11    Q.  Do you remember if they were male
12  physicians or woman physicians?
13    A.  Women physicians.
14    Q.  Both women physicians?
15    A.  (Nodding head up and down.)
16    Q.  Having had another moment to think about
17  it, do you remember either of their names?
18    A.  No.  I do know that Dr. Moore is the only
19  male ob/gyn I've ever had.  That I can attest to.
20    Q.  Do you remember any medical practice or
21  hospital that those two prior ob/gyn's were affiliated
22  with?
23    A.  No.
24    Q.  Prior to delivering Peyton, had you been
25  pregnant previously?

Page 48

1  about from March 2019 and the ▇▇▇▇▇▇
2  about a year before you had Peyton, have you ever
3  otherwise been treated in an emergency room?
4    A.  Oh, yes.  I'm sorry. ▇▇▇▇▇▇▇▇▇▇
5    Q. ▇▇▇▇ you said?
6    A.  Yes, the ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
7  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ I'm sorry.  I
8  forgot about that.
9    Q.  Did you go to the emergency room for that?
10    A.  I did.
11    Q.  That was May of 2019?
12    A.  Mm-hmm.  Yes.
13    Q.  Were you treated by a physician then?
14    A.  Yes.
15    Q.  What kind of treatment did they give you
16  for ▇▇▇▇▇▇▇
17  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Page 47

1  ▇
2  ▇▇▇▇▇▇▇▇▇▇
3  ▇
4    Q.  And were you treated by an ob/gyn during
5  that experience?
6  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇
7  ▇
8    Q.  Did you have a specific ob/gyn attending to
9  you?
10    A.  I mean, not that I can remember.  I wasn't
11  going to an office, no, at that time. ▇▇▇▇▇▇
12  ▇
13    Q.  Did you go to the emergency room?
14    A.  I did.
15  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇
16  ▇▇▇▇▇▇▇▇▇▇
17    A.  Right.
18  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
19  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
20  ▇▇▇▇▇▇▇▇
22    Q.  Do you remember when that occurred?
23    A.  Approximately one year prior to having
24  Peyton.
25    Q.  Aside from the ▇▇▇▇▇ you testified

Page 49

1    A.  Yes.
2    Q.  So aside from the ▇▇▇▇▇ the
3  ▇▇▇▇▇ and the ▇▇▇▇▇ have you otherwise
4  ever gone to the emergency room for yourself?
5    A.  Not that I can remember.
6    Q.  Did you go to the emergency room for
7  falling down the steps?
8    A.  I did.
9    Q.  Can you tell me about that?
10    A.  I'm sorry.  That was in 2014 or '15.  I
11  fell down the steps, and I had a ruptured disc, I
12  believe.  I was in the hospital for a week.
13    Q.  Was that a back injury?
14    A.  Back injury, yes.
15    Q.  Where were you when you fell down the
16  steps?
17    A.  I was at home.  I was living in Oxon Hill
18  at the time.
19    Q.  This is a different home than where you
20  live now?
21    A.  Yes.
22    Q.  Were those interior steps or exterior
23  steps?
24    A.  Interior steps.
25    Q.  Were those carpeted or was there other kind

Desire Evans

Page 50

1  of material on them?
2      A. No, just a wooden step.
3      Q. So hardwood?
4      A. Mm-hmm.
5      Q. In the home you live now, is that where
6  you've lived since you had Peyton?
7      A. No, we moved. We bought that house in
8  April.
9      Q. Of what year?
10     A. I'm sorry, ma'am.
11     Q. It's okay.
12     A. 2018. We've been there for a little bit
13  over a year.
14     Q. And did you move directly from the place
15  you had lived when you fell down the steps to where
16  you live now?
17     A. No. So we lived in a place where I fell
18  down the steps, and then we moved to Waldorf, which
19  was -- do you need the address?
20     Q. If you would just describe it so I can talk
21  about it generally, that's fine.
22     A. Holly Station. Moved there, stayed there
23  for about a year, and then we moved in with my mother,
24  which was also in Waldorf.
25     Q. Is that where you reside now?

Page 51

1      A. No. We stayed --
2      Q. So you moved again?
3      A. We stayed there for about a year, and then
4  we moved to where I live now.
5      Q. And that's about a five-, ten-minute drive
6  from your house now, you said?
7      A. Yes.
8      Q. In which of those homes did you live when
9  you delivered Peyton?
10     A. In Holly Station.
11     Q. Was it a house or an apartment?
12     A. Apartment -- a townhouse.
13     Q. Did it have steps?
14     A. Yes.
15     Q. And what was the covering, if any, on those
16  steps?
17     A. Carpet.
18     Q. Carpet. And how many floors was the Holly
19  Station home?
20     A. Two.
21     Q. And your mother's home, does it have
22  interior steps?
23     A. Yes.
24     Q. Is it a standalone house?
25     A. It's a townhouse also.

Page 52

1      Q. Townhouse also? What kind of covering are
2  there on the steps?
3      A. Wood.
4      Q. And where you live now, is that an
5  apartment, a townhouse?
6      A. A house.
7      Q. And are there interior steps?
8      A. Yes.
9      Q. And what are those covered with?
10     A. Carpet.
11     Q. Going back to your fall, and you said that
12  was in 2014 or 2015; is that correct?
13     A. Mm-hmm, yes.
14     Q. Do you remember what time of year it was?
15     A. I don't. I don't want to make up anything.
16  I just want to say between July and September maybe.
17     Q. Of which year, do you remember?
18     A. No, I don't. 2014, '15, somewhere around
19  there.
20     Q. And you mentioned you were hospitalized for
21  five days; is that correct?
22     A. Yes.
23     Q. And did you only injure your back during
24  that fall?
25     A. Yes.

Page 53

1      Q. What kind of treatment did you receive for
2  your back?
3      A. They really didn't treat me at all. They
4  just kept me there under observation and gave me a lot
5  of medication, and then gave me PT while I was there.
6      Q. And by "PT" do you mean physical therapy?
7      A. Physical therapy, yes.
8      Q. Did you do physical therapy after you left?
9      A. No.
10     Q. Why not?
11     A. I didn't have any insurance, I don't think,
12  at that time.
13     Q. Did you do any follow-up visits with anyone
14  about your back?
15     A. I had one follow-up visit, and that was so
16  I can return to work.
17     Q. Okay. So that was to get permission to go
18  to work?
19     A. Yes.
20     Q. Because at that time you were working in an
21  office setting, correct?
22     A. Correct.
23     Q. When you were discharged from the hospital
24  from your back injury, did they recommend to you that
25  you continue doing physical therapy?

Desire Evans

Page 54

1   A. I don't recall. I don't recall.
2   Q. When you were discharged from the hospital
3   after your back injury, did you continue taking
4   medication?
5   A. The medication that was prescribed to me,
6   yes.
7   Q. Do you recall how long after you left the
8   hospital you continued to take medication relating to
9   your back injury?
10   A. I don't know. Maybe, I don't know, 30 days
11   maybe, I'm not -- I'm not 100 percent sure.
12   Q. Are you still on medication relating to
13   your back injury?
14   A. No.
15   Q. When you were pregnant with Peyton, were
16   you on medication relating to your back injury?
17   A. No.
18   Q. When you were pregnant with Peyton, were
19   you on any medication?
20   A. No. ███████ does that count?
21   Q. Anything you were on.
22   A. Progesterone, yes.
23   Q. And what were you being treated for?
███████████████████████████████

Page 55

1   A. Yes.
███████████████████████████████
███████████████████████████████
███████████████████████████████
6   A. No.
7   Q. Any other emergency room visits in your
8   life that you remember having had other than the ones
9   you've talked about already today?
10   A. Not that I can recall. I really don't
11   remember.
12   Q. Any other hospitalizations that you've ever
13   had other than for delivering Peyton and relating to
14   your back injury you've already testified about?
15   A. No.
16   Q. Have you ever taken FMLA leave?
17   A. Yes.
18   Q. Are you presently taking any leave for
19   FMLA?
20   A. Yes.
21   Q. Could you explain to me what you're taking
22   for FMLA at the present time?
23   A. I have, like my condition, the reason why
24   I'm --
25   Q. Well, I'm first asking about how that

Page 56

1   impacts on your schedule, so how many hours a week
2   maybe or in a day.
3   A. Okay. So I'm scheduled for eight hours of
4   FMLA a day three days a week, so 24 hours a week of
5   FMLA.
6   Q. And who -- have you seen a doctor in
7   connection with getting paperwork relating to that?
8   A. Mm-hmm, Dr. Donato.
9   Q. When did you first get that FMLA leave from
10   Dr. Donato?
11   A. June, maybe June of last year, June of
12   2018, I'm assuming.
13   Q. Around that summertime?
14   A. Yes, ma'am.
15   Q. Prior to that, were you on FMLA leave?
16   A. No.
17   Q. Prior to the FMLA leave that you're on now
18   for which you've gotten paperwork from Dr. Donato,
19   have you ever been on FMLA leave?
20   A. No.
21   Q. Are you currently on any ADA leave?
22   A. Yes.
23   Q. Can you tell me about that?
24   A. ADA is the reason why I work from home. So
25   they afford me the opportunity to, you know, work from

Page 57

1   home and not have to travel into the office.
2   Q. Is that the accommodation you have through
3   the ADA?
4   A. Yes.
5   Q. Do you have any other accommodations
6   through the ADA?
7   A. No.
8   Q. Do you have any doctor paperwork that you
9   had to get in order to have that accommodation awarded
10   to you?
11   A. Yes.
12   Q. And from who?
13   A. Dr. Donato.
14   Q. When did you get that?
15   A. Excuse me. Sorry. Around the same time.
16   Q. At the same visit?
17   A. Yeah.
18   Q. Prior to the ADA leave that you just
19   described, had you ever been on ADA leave before?
20   A. No.
21   Q. Had you ever had any ADA accommodations
22   before?
23   A. No, ma'am.
24   Q. We discussed a little bit earlier today
25   that you've been deposed in a matter concerning

Desire Evans

Page 58

1  Dimensions.  Do you remember that?
2      A.  Yes, ma'am.
3      Q.  And it's fair to say you were a plaintiff
4  in that matter?
5      A.  Yes, ma'am.
6      Q.  Aside from that lawsuit and aside from this
7  lawsuit, have you ever been involved in any other
8  lawsuit?
9      A.  No, ma'am.
10     Q.  Have you ever sued anybody other than ECFMG
11  and Dimensions?
12     A.  No, ma'am.
13     Q.  Have you ever been a defendant in any
14  lawsuit?
15     A.  No, ma'am.
16     Q.  Have you ever been a defendant in any
17  criminal matters?
18     A.  No, ma'am.
19     Q.  Have you ever been a witness in any civil
20  or criminal matters that you went to testify like at a
21  trial or a hearing?
22     A.  No, ma'am.
23     Q.  In the Dimensions litigation, is it fair to
24  say that, just like in this litigation, you're what
25  you would consider a Class representative?

Page 59

1      A.  Yes, ma'am.
2      Q.  Do you know what that means?
3      A.  Yes, ma'am.
4      Q.  Other than the Dimensions litigation and
5  this litigation, have you ever been a Class
6  representative?
7      A.  No, ma'am.
8      Q.  Have you ever considered being a Class
9  representative in any litigation besides Dimensions
10  and the ECFMG litigation?
11     A.  No, ma'am.
12     Q.  Do you know what the allegations are in the
13  litigation against Dimensions?
14     A.  Yes, ma'am.
15     Q.  And have you ever reviewed the complaint
16  that was filed in that case?
17     A.  Yes, ma'am.
18     Q.  Do you believe the allegations in the
19  complaint against Dimensions are true and correct?
20     A.  Yes, ma'am.
21     Q.  Have you provided discovery responses in
22  the Dimensions litigation?
23     A.  Yes, ma'am.  Yes, ma'am.
24     Q.  Were those responses true and correct?
25     A.  Yes, ma'am.

Page 60

1      Q.  Aside from a lawsuit, have you ever made a
2  claim for injury against anybody, any business, any
3  workplace?
4      A.  No, ma'am.
5      Q.  Any person?
6      A.  No.
7      Q.  Have you ever made a workers' compensation
8  claim?
9      A.  No, ma'am.
10     Q.  Have you ever suffered an injury at work?
11     A.  No, ma'am.
12     Q.  Have you ever suffered, aside from the
13  issues involved in this litigation, have you ever
14  suffered any physical, emotional, or sexual abuse from
15  any person?
16     A.  No, ma'am.
17     Q.  Have you ever been the victim of a crime?
18     A.  No, ma'am.
19     Q.  I would like to hand you what I'm going to
20  mark as Exhibit 1.
21          (Exhibit 1 marked for
22          identification: Amended Notice of
23          Deposition of Plaintiff Desire Evans)
24     Q.  Have you ever seen this document before?
25     A.  Yes.

Page 61

1      Q.  And this is the Amended Notice of
2  Deposition of Plaintiff Desire Evans.  Do you see
3  that?
4      A.  Yes.
5      Q.  And that's you?
6      A.  Yes.
7      Q.  And you're appearing today pursuant to this
8  deposition notice to be deposed?
9      A.  Yes.
10     Q.  So like I'm going to do a couple times
11  today, we've been going about an hour, so we'll take a
12  quick break, if that's okay.
13          MR. CERYES:  Sounds good.
14          VIDEO SPECIALIST:  We're going off the
15  record at 11:28.
16          (Proceedings recessed)
17          VIDEO SPECIALIST:  We're back on the record
18  at 11:39.
19  BY MS. MCENROE:
20     Q.  Ms. Evans, I want to ask you whether you
21  have ever been treated by a psychiatrist named
22  Dr. Nnamani.  Am I saying that correctly?
23     A.  Yeah.
24     Q.  Are you currently being treated by
25  Dr. Nnamani?

Page 62

1    A.  No.  That was one visit.
2    Q.  One visit?
3    A.  One visit.
4    Q.  Okay.  And when was that?
5    A.  I was -- I want to say maybe September
6  of -- had to be '18 because we're in '19 now.  I was
7  referred to her by Dr. Donato.
8    Q.  For what purpose?
9  ███████████████████████████
10   Q.  You mentioned you only went to her one
11 time?
12   A.  Yes.
13   Q.  Why did you only go to her one time?
14 ██████████████████████████████████████
15 ██████████████████████████████████████
16 ████████████████████████████████████
17   Q.  And did you choose to switch then to a
18 different physician?
19   A.  Yes.  That's when I switched to Ebony
20 Cross.
21   Q.  So it was your choice to switch from
22 Dr. Nnamani to Dr. Cross?
23   A.  Yes.
24   Q.  What kind of considerations did you take
25 into account when you were deciding to switch from

Page 63

1  Dr. Nnamani to Dr. Cross?
2  ███████████████████████████████████
3  ███████████████████████████████████
4  ███████████████████████████████
5  ████████████████████
6    Q.  You weren't clicking; is that a fair way to
7  say it?
8    A.  No.  Yeah.
9    Q.  Did you feel uncomfortable being treated by
10 Dr. Nnamani?
11   A.  A little.
12   Q.  Why?  Do you know?
13   A.  Just certain --
14 I can answer this?
15     MR. CERYES:  To the best of your
16 understanding.
17 ████████████████████████████████████
18 ████████████████████████████████████
19 ████████████████████████████████████
20 ████████████████████████████████████
21 ████████████████████
22   Q.  Is she a woman doctor?
23   A.  Yes.
24   Q.  And Ms. Cross -- sorry.  Dr. Cross is a
25 woman doctor as well?

Page 64

1    A.  Yes.
2  ███████████████████████████████████
3  ██
4    A.  Mm-hmm.
5  ███████████████████████████████████
6    A.  Maybe for the past two years.
7    Q.  When did you get your driver's license?
8    A.  When I was 19.
9    Q.  So about 21 years ago?
10   A.  Tell everybody.
11   Q.  So you've been -- but you've been driving
12 for over 20 years?
13   A.  Mm-hmm.
14 ████████████████████████████████████
15 ██████████████████
16   A.  No.
17 ████████████████████████████  what
18 do you mean?
19 ████████████████████████████████
20 ████████████████████████████████████
21 ████████████████████████████████████
22 ████████████████████████████████████
23 ████████████████████████████████████
24 ████████████████████████████████
25 ████████████████████████████████████

Page 65

1  ██████████
2    A.  Yes.
3    Q.  You said that began around two years ago?
4    A.  Yeah, about.
5    Q.  Do you have an estimation of more
6  specifically when?
7    A.  No.  No, it's just something that's getting
8  increasingly worse.  I can't really put a time stamp
9  on the exact time that it started.  It's just been
10 something that's been getting increasingly worse from
11 ██████████████████████████████
12   Q.  So including the driving, but more than
13 that?
14   A.  Yes.
15   Q.  And so you would say you had that to some
16 extent before two years ago, is that right ██████████
17 ████████████████████████████████████
18 ████████████████████████
19 ████████████████████████████████
20 ████████████████████████████████████
21 ████████████████████████████████████
22 ████████████████████████████████████
23 ████████████████████████████████████
24 ████████████████████████████████████
25 to having had your son?

Desire Evans

Page 66

1      A. Not that I could identify ███████

███████████████████████████████████

4      Q. Prior to having your son did you ever have
5  depression?
6      A. No.
7      Q. Prior to having your son have you ever had
8  any treatment by any psychiatrist or psychologist?
9      A. No.
10     Q. A school counselor?
11     A. About depression?
12     Q. Or anxiety.
13     A. No.
14     Q. School counselor for anything else?
15     A. School stuff.
16     Q. Okay. When you were switching from
17  Dr. Nnamani to Dr. Cross, how did you find Dr. Cross?
18     A. I found Dr. Cross through another provider
19  within Dr. Donato's office, so -- because she was --
20  she goes to her. So she told me that I should try her
21  out, because she was more of a -- she was -- she just
22  said that she was a good psychiatrist and she
23  recommended her.
24     Q. Fair to say it was more of like a
25  word-of-mouth kind of recommendation?

Page 67

1      A. Yes.
2      Q. Did you do any research about Dr. Cross
3  before you started going to her?
4      A. Nothing besides talking to the people that
5  I knew that she went to, that go to her, no.
6      Q. Did you Google her?
7      A. No. Yeah, I did actually Google her.
8      Q. Did you see where she went to school?
9      A. No.
10     Q. What did you see when you Googled
11  Dr. Cross?
12     A. Just the practices that she has.
13     Q. The areas that she treats?
14     A. Mm-hmm.
15     Q. Anything else?
16     A. No, ma'am.
17     Q. Did you do any research into Dr. Donato
18  before you went to see her?
19     A. No.
20     Q. No Googling?
21     A. No.
22     Q. Did you do any research into Dr. Moore
23  either before you saw him or once you started being
24  treated by him?
25     A. No.

Page 68

1      Q. You never Googled him?
2      A. Nope.
3      Q. Aside from Dr. Cross, you mentioned that
4  you had done a little bit of research into -- do you
5  know if you ever known where any of your physicians
6  have attended medical school?
7      A. No.
8      Q. Have you ever asked that you know of?
9      A. No.
10     Q. Do you know if any of your physicians
11  you've been treated by have gone to medical school
12  outside of the United States?
13     A. No.
14     Q. Do you think some of them could have, you
15  just don't know?
16     A. I can't -- I don't know.
17     Q. You don't know one way or the other?
18     A. Right. Yeah, I wouldn't know to have to
19  ask that question. I would think that I could take
20  them at their word that they have done the things that
21  they say they did.
22     Q. Right, but you never, like, looked to see
23  did Dr. Moore go to -- I'm making this up -- Johns
24  Hopkins or Harvard or something?
25     A. Nope.

Page 69

1      Q. Okay. Do you have any medical doctors in
2  your family?
3      A. I do.
4      Q. Who is a medical doctor in your family?
5      A. Terrell Newton.
6      Q. How is Dr. Newton related to you?
7      A. He's my cousin.
8      Q. On which side, your mom's side or your
9  dad's side?
10     A. My mom's side.
11     Q. An aunt's child or an uncle's child?
12     A. Aunt.
13     Q. So it's your mom's sister's son?
14     A. Yep. Yes, ma'am.
15     Q. Any other physicians in your family?
16     A. No.
17     Q. And what does Dr. Newton's specialize in?
18     A. He's an anesthesiologist.
19     Q. Where does he practice?
20     A. I don't know. He has his own practice in
21  Florida for pain management.
22     Q. In Florida?
23     A. Yeah. I don't know the name of it.
24     Q. Do you know where Dr. Newton went to
25  medical school?

Desire Evans

Page 70

1    A. North Carolina.
2    Q. In the United States?
3    A. Yes. What's the school down in North
4  Carolina? I can't think of the name of the school.
5  It's a school in North Carolina.
6    Q. But a medical school in North Carolina?
7    A. Mm-hmm.
8    Q. And Dr. Newton is not an ob/gyn?
9    A. No.
10    Q. Are you friends with any other medical
11  doctors?
12    A. No.
13    Q. Are you acquainted with or know anybody who
14  went to medical school outside of the United States?
15    A. No.
16    Q. You understand that my client, the
17  Educational Commission for Foreign Medical Graduates,
18  is the defendant in this case, correct?
19    A. Yes.
20    Q. Is it okay if I refer to them as ECFMG?
21    A. Yes, ma'am.
22    Q. You'll know what I'm talking about?
23    A. Yes, ma'am.
24    Q. Prior to meeting counsel in connection with
25  this lawsuit or the Maryland lawsuit, had you ever

Page 71

1  heard of ECFMG before?
2    A. No.
3    Q. Do you have any understanding of what ECFMG
4  does?
5    A. Yes.
6    Q. And from where did you get that
7  understanding?
8      MR. CERYES: Objection.
9      MS. MCENROE: Not asking for specifics.
10  I'm just asking generally where she got the
11  understanding from.
12    Q. I'm not trying to get into specific
13  conversations you had with counsel, but I'm just
14  trying to understand from where did you get that
15  understanding?
16      MR. CERYES: I'll allow you to answer it.
17    A. From counsel.
18    Q. Aside from conversations you had with
19  counsel, have you learned anything about ECFMG outside
20  of what counsel told you?
21    A. Well, I did -- once I found out what their
22  responsibilities were, I did look them up, yes.
23    Q. So you Googled them?
24    A. Yes.
25    Q. And you read some information about ECFMG

Page 72

1  on the Internet?
2    A. Yes.
3    Q. Do you remember what you read on the
4  Internet?
5    A. Just what their job responsibilities were,
6  where they are located.
7    Q. Was that from the ECFMG website?
8    A. Yeah. I just Googled.
9    Q. You said you looked up what the job
10  responsibilities were for ECFMG. What do you mean by
11  that?
12    A. I wanted to know exactly what kind of
13  company it was. So not exactly -- I didn't look up,
14  you know, exactly job responsibility, but what kind of
15  company it was and what they performed, what they did.
16    Q. What do you mean by what kind of company
17  they are?
18    A. So I just knew that it was some kind of
19  credentialing company or something, but I wasn't sure.
20  Like, I wasn't 100 percent sure of the nature of the
21  company, so I wanted to know exactly what the nature
22  of the company was.
23    Q. And when did you conduct this Internet
24  research, before you met counsel or after you met
25  counsel?

Page 73

1    A. After.
2    Q. When did you first meet the counsel that
3  represents you in this litigation and in the
4  Dimensions litigation?
5    A. I don't remember. Was it November? I
6  think the first meeting was in November.
7    Q. Of what year?
8    A. '18?
9    You don't know? You can't help me.
10      MR. CERYES: Do your best.
11    A. I'm sorry.
12    Q. Do you remember how you came to meet
13  counsel?
14    A. Yeah. I heard an ad.
15    Q. You heard an advertisement for a law firm?
16    A. An advertisement, uh-huh.
17    Q. Do you remember for which law firm?
18    A. For Schochor, Federico and Staton.
19    Q. And you said you heard it. How did you
20  hear it?
21    A. Actually my husband heard it on the radio.
22    Q. When was that?
23    A. Ma'am, I'm old. You keep asking me all
24  these dates. I don't know. I don't know. Maybe
25  summer of 2018 maybe.

Desire Evans

Page 74

1    Q.  Did you hear the radio advertisement at any
2    time personally?
3        A.  Yes.  I heard it after the fact, yes.
4        Q.  When you say "after the fact" --
5        A.  Well, after my husband heard it.
6        Q.  Did you hear it?  Did you personally hear
7    it before you contacted counsel?
8        A.  Yes.
9        Q.  What did the radio advertisement say?
10       A.  If you were seen by Charles Akoda, give us
11   a call, something to that effect.
12       Q.  Did it say anything about why?
13       A.  I don't think it went into detail.
14       Q.  Was the firm that was advertised in that
15   radio advertisement the same firm that you then
16   reached out to?
17       A.  Yes.
18       Q.  Had you consulted with any other lawyers?
19       A.  No.
20       Q.  You mentioned earlier that you conducted
21   some Internet research into ECFMG.  Do you remember
22   that discussion?
23       A.  Yes.
24       Q.  Do you know what it means for a foreign
25   medical graduate to be certified by ECFMG?

Page 75

1        A.  Yes.
2        Q.  To you what does that mean?
3        A.  To me it means that they have completed
4    everything that they were supposed to do successfully
5    in order to gain the certification from ECFMG to
6    practice.
7        Q.  Do you understand or -- strike that.
8            Do you have an understanding of whether or not
9    a foreign medical graduate can come to the
10   United States, get an ECFMG certification, and then
11   practice medicine, or if they have to do something
12   else before that?
13       A.  My understanding is you have to do
14   something before that.
15       Q.  Do you know what that something is?
16       A.  Certifications, some kind of testing?
17       Q.  Okay.  Do you know what a residency program
18   is --
19       A.  I do.
20       Q.  -- for a physician?  What does that mean to
21   you?
22       A.  A residency program is kind of like an
23   internship for doctors.
24       Q.  And that's still medical education.  Do you
25   understand that?

Page 76

1        A.  Mm-hmm.
2        Q.  Is that a yes?
3        A.  Yes.
4        Q.  Okay.  And the medical care -- strike that.
5            Where Peyton was delivered, was that in
6    Maryland?
7        A.  Yes.
8        Q.  And do you have an understanding of whether
9    Maryland requires physicians to be licensed by the
10   State of Maryland to practice medicine there?
11       A.  No.  I would assume that they would.
12       Q.  So you think that they do.
13       A.  Yeah.
14       Q.  Okay.  So that's just what I'm trying to
15   ask.  Do you have an understanding that the State of
16   Maryland requires physicians doing medical care there
17   to be licensed by the state?
18       A.  Yes.
19       Q.  Okay.  Have you ever heard of the
20   United States Medical Licensing Examinations?
21   Sometimes it's called USMLE.
22       A.  No.
23       Q.  Do you have any understanding that, in
24   order to become a physician in the United States,
25   graduates of medical school need to take what's called

Page 77

1    medical boards?
2        A.  Yes.
3        Q.  Do you have an understanding of whether
4    some physicians can get additional credentialing by
5    becoming board certified?
6        A.  No.
7        Q.  Okay.  So you've never heard like he's a
8    board -- he's board certified in --
9        A.  Yes.
10       Q.  -- and then a specialty?
11       A.  Yes.
12       Q.  You've heard that before?
13       A.  Yes, I've heard that before.
14       Q.  Okay.  And what does that mean to you?
15       A.  That they were certified by some type of
16   medical board.
17       Q.  Okay.  Do you know whether Dr. Akoda --
18   when I say "Dr. Akoda," do you know who I'm referring
19   to?
20       A.  Yes.
21       Q.  Okay.  Do you know whether Dr. Akoda took
22   any United States medical licensing examinations?
23           MR. CERYES:  Objection, foundation.  You
24   can answer to the extent you're able.
25       A.  Yeah.  I mean, I'm assuming he did, yes.

Desire Evans

Page 78

1      Q.  Okay.  Do you know whether Dr. Akoda passed
2  the USMLE components?
3          MR. CERYES:  Same objection.
4      A.  If he passed, after failing?  Yes.
5      Q.  So you're asserting that you think that
6  Dr. Akoda failed them.
7      A.  I don't -- I mean, that's my assumption.
8  That's --
9      Q.  Why is that your assumption?
10     A.  Because I read through the documents that
11  were given to me.
12     Q.  What documents were given to you?
13     A.  The discovery and things like that.
14     Q.  What discovery was given to you?
15     A.  From my -- this stuff (indicating) that
16  my -- that my counsel gave to me.
17     Q.  Okay.  What did they show you that made you
18  think that Dr. Akoda had failed examinations?
19         MR. CERYES:  I'm going to object to the
20  extent I think we're getting into attorney-client
21  privilege.  I can proffer to you what she's talking
22  about, if that's helpful.
23     Q.  Were these documents that were produced in
24  this litigation?  Did they have Bates-stamped numbers
25  on the bottom?

Page 79

1          MR. CERYES:  Are you asking me?
2          MS. MCENROE:  I'm asking whoever will tell
3  me.
4          MR. CERYES:  I think what she's referring
5  to is the complaint.
6          MS. MCENROE:  The complaint.
7      A.  The complaint.
8      Q.  Okay.  So you've seen the allegations
9  drafted as by counsel --
10     A.  Correct.
11     Q.  -- about Dr. Akoda.
12     A.  Correct.
13     Q.  Okay.  Have you ever seen underlying
14  original documents -- and by "original," I mean they
15  could be copies -- but underlying documents regarding
16  Dr. Akoda's credentials?
17     A.  No.
18     Q.  Have you ever seen his medical school
19  diploma?
20     A.  No.
21     Q.  Were you lead to believe he did not
22  graduate from medical school?
23     A.  I wasn't lead to believe anything.  I'm
24  just going off of what I read in the complaint myself,
25  ma'am.

Page 80

1      Q.  Right.  So those are allegations in the
2  complaint.
3      A.  Mm-hmm.
4      Q.  Did you write the complaint?
5      A.  No.
6      Q.  Do you know who wrote the complaint?
7      A.  My counsel, I would assume.
8      Q.  Okay.  Do you know whether any of the other
9  physicians you've ever been treated by in your life
10  have been ECFMG certified?
11     A.  I don't know.
12     Q.  You don't know one way or the other?
13     A.  No.
14     Q.  Do you know if, as part of ECFMG
15  certification program, it verifies Social Security
16  numbers?
17     A.  No.  Well, I'm assuming that they do.
18     Q.  You're assuming they do?
19     A.  I would hope so.
20     Q.  On what basis?
21     A.  Because you have someone coming from
22  another country, how else are you going to identify
23  them besides their identification number, which is
24  their Social.
25     Q.  Do you know for a fact whether as part of

Page 81

1  its certification program ECFMG verifies birth
2  certificates?
3      A.  I would assume they should.
4      Q.  On what basis are these assumptions made
5  on?
6      A.  Because how else are you going to identify
7  someone without those identification things?
8      Q.  And you think that ECFMG's purpose is to
9  verify identification documentation?
10     A.  Yes.
11     Q.  Do you know if, as part of its
12  certification program, ECFMG verifies green cards?
13     A.  I don't know, but I would assume they
14  would.
15     Q.  Do you know whether if, as part of its
16  certification programs, ECFMG verifies state medical
17  licenses?
18     A.  I would assume they would.
19     Q.  Same basis?
20     A.  Yes.
21     Q.  And do you know whether for a fact, as part
22  of its certification program, ECFMG verifies board
23  certifications?
24     A.  I would assume as well.
25     Q.  Okay.  So is it your understanding that

Desire Evans

Page 82

1  ECFMG is responsible for verifying any piece of
2  identifying information about a foreign medical
3  graduate?
4      A.  Absolutely.
5          MR. CERYES:  Object to the extent I think
6  we're getting into expert testimony, but you can
7  answer to the best of your understanding.
8          MS. MCENROE:  Well, I'm asking about the
9  witness's understanding, so I think that's a fair --
10     A.  Yes.
11     Q.  So on what basis do you have that
12 understanding?
13     A.  The basis that if you are -- if someone is
14 going to be caring over someone medically, that I
15 would assume that they would do their due diligence to
16 find out that this person is who they say they are,
17 and you would have to go through all of those things
18 to make sure that this person is exactly who they are
19 stating to be.
20     Q.  Is it fair to say that, when you were
21 treated by Dr. Akoda, you had not heard of ECFMG?
22     A.  Correct.
23     Q.  Is it fair to say that we're here today
24 because of Dr. Akoda's treatment of you?
25         MR. CERYES:  Objection, form, foundation.

Page 83

1      You can answer, if you understand the question.
2      Q.  I'm not trying to make this a hard one.
3  I'm just trying to transition to another general area.
4      Have you ever been treated by a doctor who
5  called himself Dr. Akoda?
6      A.  Yes.
7      Q.  When was that?
8      A.  March 16th into 17th of 2008 -- '16.
9  Jesus, '16.
10     Q.  Why were you being treated by Dr. Akoda,
11 for what condition?
12     A.  Delivery, pregnancy.
13     Q.  How did you come to be treated by
14 Dr. Akoda?
15     A.  He was the doctor on call, I guess.
16     Q.  Where?
17     A.  At Dimensions Health Systems.
18     Q.  Earlier today we were discussing you being
19 induced to have your labor; is that correct?
20     A.  Yes.
21     Q.  Was Dr. Akoda the doctor that induced you
22 to labor?
23     A.  No.  The nurse -- a nurse gave me the
24 medication.
25     Q.  So you were originally seen by another

Page 84

1  medical professional to get that process started?
2      A.  By another -- mm-hmm, yes.
3      Q.  And that would have been Pitocin; is that
4  correct?
5      A.  Yes.  Yes, ma'am.
6      Q.  How did you react to the Pitocin?  Did that
7  work for you?
8      A.  Yes.
9      Q.  How long were you in labor?
10     A.  Twenty-two, 24 hours, 26 hours, somewhere
11 between there.
12     Q.  And did you spend a period of that time
13 pushing?
14     A.  Twelve hours.
15     Q.  Twelve hours.  Was Dr. Akoda your physician
16 the entire 22, 24, 26 hours that you were in labor?
17     A.  Yes.
18     Q.  Did you see any other ob/gyn's during your
19 labor or delivery?
20     A.  No.
21     Q.  You already made reference to one nurse.
22 Do you recall being treated by nurses while you were
23 laboring and delivering?
24     A.  Yes.
25     Q.  Do you recall about how many?

Page 85

1      A.  Two.
2      Q.  At any one time or over the course of time?
3      A.  Over the course of time.  It was shift
4  work.
5      Q.  Do you remember the names?
6      A.  I do not.
7      Q.  Were the nurses men or women?
8      A.  Women.
9      Q.  Can you tell me about when you first met
10 Dr. Akoda?
11     A.  He just came in and introduced himself, and
12 I guess -- I don't remember -- asked me a few
13 questions and then --
14     Q.  Sure.  Did you ask -- oh, go ahead.
15     A.  And then said that he was going to prepare
16 the room for delivery.
17     Q.  Did he actually prepare the room for
18 delivery?
19     A.  He and another nurse.
20     Q.  What did they do to prepare the room for
21 delivery?
22     A.  They brought in like a little table and
23 some supplies and moved my bed from where it was into
24 like the middle of the floor.
25     Q.  How far along was this in the 22, 24, or 26

Desire Evans

Page 86

1  hours you were describing for your labor?
2      A. So I got there around -- so this was
3  approximately 10:00 in the morning on the 17th. So I
4  got there the day before on the 16th around 11:30, and
5  I was taken back around 1:00-ish.
6      Q. Were you being treated by Dr. Akoda before
7  you got taken back?
8      A. No.
9      Q. Were you being treated by any ob/gyn before
10 you got taken back?
11     A. No.
12     Q. When you first met Dr. Akoda, did you ask
13 him at all about his credentials or his background?
14     A. No.
15     Q. Did you at any point ask him about his
16 background or his experience?
17     A. No.
18     Q. About his credentials?
19     A. I was in labor, ma'am.  No.
20     Q. I understand.  I'm just asking questions.
21     A. Oh.  No.
22     Q. Do you know whether Dr. Akoda completed a
23 residency program?
24     A. I don't know.
25     Q. You don't know?

Page 87

1      A. No.
2      Q. Do you know whether Dr. Akoda was board
3  certified by the American Board of Obstetrics and
4  Gynecology?
5      A. No.
6      Q. So I want to talk a little bit more about
7  your labor and delivery experience.  About how long
8  between when Dr. Akoda started treating you and you
9  delivered Peyton, about how long was that period of
10 time?
11     A. About 11, 12 hours or so.
12     Q. Was Dr. Akoda in the room with you that
13 entire time?
14     A. No.
15     Q. Okay.  Did he come in and out of the room?
16     A. Yes.
17     Q. Approximately how many times, do you know?
18     A. No, ma'am.
19     Q. Was it on a regular schedule or was it just
20 sort of --
21     A. Just -- from my understanding, he was the
22 only physician there, so he was delivering other
23 babies.
24     Q. Did a nurse stay with you the entire time?
25     A. They were both in and out.  No one was in

Page 88

1  the room with me for the entire time.
2      Q. Was your husband with you?
3      A. Yes.
4      Q. Was your mother with you?
5      A. Yep.
6      Q. Was anybody else with you?
7      A. No.
8      Q. Did your husband and mother remain with
9  you --
10     A. Yes.
11     Q. -- barring bathroom trips or whatnot the
12 entire time?
13     A. Yes, uh-huh.
14     Q. Does your husband have any other children
15 besides Peyton?
16     A. Mm-hmm.
17     Q. How many children does he have?
18     A. Three.
19     Q. Do they reside with you?
20     A. No.
21     Q. How old are they?
22     A. Fifteen, eleven, and seven.
23     Q. And seven?
24     A. Yeah.
25     Q. Okay.  Are they boys or girls?

Page 89

1      A. Mixed, two boys and one girl.
2      Q. And how old is the girl?
3      A. The girl is seven.
4      Q. Okay.  So the older two are boys.
5      A. Yes.
6      Q. Do you know if your husband was present for
7  their deliveries?
8      A. I don't know.
9      Q. Are the three of them with the same mother?
10     A. No.
11     Q. Okay.  Do any of them share a mom?
12     A. Yes, two of them.
13     Q. Which two?
14     A. The two boys have the same mom.
15     Q. How many children does your mother have?
16     A. Two.
17     Q. Do you know if that's the number of
18 children she delivered?
22     A. No, I don't know.
23     Q. So you have one sibling?
24     A. Yes.
25     Q. Is it a brother or a sister?

Desire Evans

Page 90

1    A.  A brother.
2    Q.  Older or younger?
3    A.  Younger.
4    Q.  And he's not a physician?
5    A.  No.
6    Q.  What does he do?
7    A.  He is a general manager for a nightclub.
8    Q.  In the area?
9    A.  Yes.
10   Q.  Does he have any children?
11   A.  No.
12   Q.  About how much time total would you
13   estimate you spent with Dr. Akoda?
14   A.  Out of that 12 hours, I want to say maybe
15   eight hours.
16   Q.  So he was with you for eight out of the 12
17   hours?
18   A.  Yeah, in and out.  I was having
19   difficulties pushing, so he was in and out trying to,
20   you know, he would come in and then leave and then
21   come back, leave and then come back, and try to get me
22   to push again, that type of situation.
23   Q.  Got it.  Okay.  And each time he would come
24   in, approximately how long would he be in the room
25   for, a couple minutes at a time?

Page 91

1    A.  Maybe 10, 15 minutes.
2    Q.  And you testified that you were pushing for
3    a long time; is that correct?
4    A.  Yes.
5    Q.  Okay.  I apologize for the personal nature
6    of this question, but were your legs in stirrups or
7    were people holding your feet?
8    A.  They were holding my feet.
9    Q.  And who was holding your feet?
10   A.  My mom and my husband.
11   Q.  So your mom was holding one and your
12   husband was holding the other?
13   A.  Yes, ma'am.  At a later point there was a
14   nurse there holding -- holding my other leg while my
15   husband was down there with Dr. Akoda.
16   Q.  Okay.  So that was one of the two nurses
17   you were talking about --
18   A.  Yes.
19   Q.  -- who was holding one of the legs --
20   A.  Yes.
21   Q.  -- while your husband was standing next to
22   Dr. Akoda?
23   A.  Yes.
24   Q.  And how long was your husband standing next
25   to Dr. Akoda while he treated you and a nurse held

Page 92

1    your leg?
2    A.  During that particular time, I want to say
3    it might have been around 30 minutes, because at that
4    time the baby's head started coming out but kept going
5    back in.  So he stayed in the room for a little bit
6    longer at that -- at that time.
7    Q.  Did he use forceps or any other tools in
8    that way?
9    A.  No.
10   Q.  Did you have an epidural during your labor?
11   A.  Mm-hmm.
12   Q.  Is that a yes?
13   A.  Yes, ma'am.  Sorry.
14   Q.  Around what time during this whole process
15   do you remember getting an epidural?
16   A.  The epidural was the night before, so I
17   want to say maybe 11 or 12 in the evening after they
18   had given me the first dosage of Pitocin.
19   Q.  So 11 or 12 the night before you delivered?
20   A.  Yes.
21   Q.  After you got the epidural, were you
22   connected to an IV?
23   A.  Mm-hmm.  Yes.
24   Q.  Is that yes?  And you were confined to your
25   bed; is that correct?

Page 93

1    A.  Yes.
2    Q.  Did the epidural work?  Were your legs
3    numb?
4    A.  Yes.
5    Q.  Yes.  Okay.  You ultimately ended up having
6    a C-section; is that correct?
7    A.  Yes.
8    Q.  And do you understand whether they used the
9    C-section as the anesthesia -- I'm sorry.  Strike
10   that.
11       Do you know whether they used the epidural as
12   the anesthesia for your C-section or if they gave you
13   something else?
14   A.  They gave me something else.
15   Q.  And did you remain awake during your
16   C-section?
17   A.  Yes.
18   Q.  Who conducted your C-section?
19   A.  Dr. Akoda.
20   Q.  So when you were laboring and your mom and
21   husband had one foot and then later the nurse swapped
22   in for your husband, were you laying on your back?
23   A.  Yes.
24   Q.  And did you have a sheet over your legs --
25   A.  Well.

Desire Evans

Page 94

1    Q. -- a blanket or something?
2    A. Yeah. I mean, it wasn't over my legs any
3 longer because my legs was up, but, yeah, it was one
4 covering my stomach area.
5    Q. And were you able to see your baby's head
6 coming in and out --
7    A. Yes.
8    Q. -- over your tummy?
9    A. Well, because I was up.
10    Q. How were you positioned?
11    A. I was like up.
12    Q. If you could describe it a little. We have
13 the video camera, but it would be helpful if you could
14 describe it as well.
15    A. I wasn't laying flat. I mean, I was on my
16 back, but I was kind of in a C kind of position.
17    Q. Yep.
18    A. So my body was up like this, and they were
19 holding my legs like this. So I was pushing -- they
20 were -- it's hard to explain.
21    Q. Yeah.
22    A. They were pulling my legs back this way
23 trying to get the baby out.
24    Q. Yep.
25    A. So I'm up like, and they were pulling my

Page 95

1 legs back. Does that make sense?
2    Q. Got it. I think it does. So if I can
3 articulate it correctly, was your -- you were seated
4 somewhat with your legs elevated.
5    A. Yes.
6    Q. And you were pushing?
7    A. Yes. Yes.
8    Q. Is that correct?
9    A. Yes.
10    Q. And did you actually see the baby's head
11 when it was coming in and out?
12    A. Yeah, I saw it twice.
13    Q. And did Peyton have hair when he was
14 delivered?
15    A. A lot. He still has a lot.
16    Q. Peyton was delivered healthy?
17    A. Yes.
18    Q. Any issues or concerns from breastfeeding?
19    A. No.
20    Q. Was he a good eater?
21    A. Yes.
22    Q. How was your labor and delivery recovery
23 yourself?
24    A. It was okay.
25    Q. How was your C-section incision?

Page 96

1    A. It was okay.
2    Q. You had no infection?
3    A. No.
4    Q. How long after you had Peyton did you go
5 back to working? And I understand you were working
6 from home, but did you return to working?
7    A. I want to say -- I want to say I was out
8 for maybe two months, but I'm not 100 percent sure.
9 I'm pretty sure it was like eight weeks.
10    Q. Do you know if there were any medical
11 students or residents present for your labor or
12 delivery?
13    A. I don't recall.
14    Q. Is it possible that there could have been
15 other medical professionals coming in and out of the
16 room?
17    A. It's possible.
18    Q. Do you know who placed your epidural? Was
19 it an anesthesiologist?
20    A. Yes.
21    Q. So that was a doctor different from
22 Dr. Akoda?
23    A. Yes.
24    Q. Was that doctor, the anesthesiologist,
25 present during your C-section, do you know?

Page 97

1    A. I don't think it was the same doctor.
2    Q. But was there an anesthesiologist --
3    A. Yes.
4    Q. -- present during your C-section?
5    A. Yes. Yes, because they gave me additional
6 medication before.
7    Q. You mentioned earlier that, when you came
8 in for your induction or when you scheduled your
9 induction, you expected you would be delivered by
10 Dr. Moore; is that correct?
11    A. Yes.
12    Q. When did you learn that that was not going
13 to happen?
14    A. When Dr. Akoda came in the room and said
15 that he was going to be delivering my baby.
16    Q. So you didn't find that out beforehand?
17    A. No.
18    Q. Did you ask any questions about why
19 Dr. Moore would not be delivering your baby?
20    A. No. At that point I just wanted the baby
21 out.
22    Q. How long did you stay in the hospital after
23 you had Peyton?
24    A. Five days? Five days.
25    Q. Do you know if that was the standard length

Desire Evans

Page 98

```
1   of time or if you stayed any longer for any reason?
2       A.  I believe that's the standard length of
3   time for a C-section.
4       Q.  Did Peyton remain in the hospital with you
5   that whole time?
6       A.  Yes.
7       Q.  Is Prince George's Hospital a rooming in
8   hospital?  Do you know what that means?
9       A.  No.
10      Q.  Did they have the baby sleep with you in
11  your hospital room?
12      A.  Yes.  Yes.
13      Q.  Was he sleeping while he was in the
14  hospital at least some of the time?
15      A.  Yes.
16      Q.  Did he need to be treated with anything
17  initially when he was born?  Did he have jaundice or
18  any of those types of newborn things?
19      A.  No, huh-uh.
20      Q.  You said he was good?
21      A.  He was good, yes.
22      Q.  And did a pediatrician come to treat Peyton
23  while you were in the hospital, do you remember?
24  Treat, or I should say observe.
25      A.  Yeah.
```

Page 99

```
1       Q.  Yep.
2       A.  Yeah.
3       Q.  After you delivered, did any ob/gyn's come
4   to visit you?  Did Dr. Moore come and see you at any
5   time during those five days?
6       A.  No.
7       Q.  Did any other physicians come to you?
8       A.  No, just had a nurse after that.
9       Q.  Just a nurse?
10      A.  (Nodding head up and down.)
11      Q.  Okay.  Did anyone talk to you about
12  postpartum depression when you were being released
13  from the hospital or during your hospital stay?
14      A.  Not that I can remember, no.
15      Q.  Do you know what postpartum depression is?
16      A.  Yes.
17      Q.  Do you believe you've suffered ever from
18  postpartum depression?
19      A.  No.
20      Q.  Have you ever spoken to any of your
21  training psychologists or psychiatrists about
22  postpartum depression?
23      A.  No.
24      Q.  Were you ever treated by somebody named
25  Dionne Lucas?  Maybe a physician's assistant.
```

Page 100

```
1       A.  Dionne Lucas...
2       Q.  I might be saying the name wrong.  It's
3   D-I-O-N-N-E.
4       A.  I believe I went to her for a physical.  I
5   don't remember when, though.  ███████████████
    █████████████████████████████████████████████
    ██
8                   (Exhibit 2 marked for
9               identification: History and Physical
10              Examination re Desire Evans)
11      MR. CERYES:  Thank you.
12      Q.  Ms. Evans, I'm handing you a copy of some
13  medical records that we've received in discovery in
14  this case.  So you'll see the first page is an
15  Affidavit of Authentication of Records.  Do you see
16  that?
17      A.  Mm-hmm.  Yes.
18      Q.  And you'll see at the bottom there's a
19  little number that starts with the word "plaintiffs."
20      A.  Yes.
21      Q.  And then a number of zeros and then it says
22  5833.  Do you see that at the way bottom, Plaintiffs'
23  5833, all the way at the bottom?
24      A.  Oh, yeah, yeah, yeah.
25      Q.  So that's what we call a Bates stamp.  So
```

Page 101

```
1   if I refer you to a Bates stamp, it's the individually
2   numbered page number specific for this litigation.
3   Okay?
4       A.  Mm-hmm.
5       Q.  Do you see that?
6       A.  Yes.
7       Q.  Okay.  And I'd like to direct you to the
8   second page in that document, which at the top says
9   History and Physical Examination.  Do you see that?
10      A.  Mm-hmm.
11      Q.  Okay.  And you said yes?
12      A.  Yes.
13      Q.  Okay.  And at the top it says DOS and then
14  July 25th, 2016.  Do you see that?
15      A.  Yes.
16      Q.  Is that around the time you think you saw
17  Dionne Lucas?
18      A.  Yes.
19      Q.  And to help refresh your recollection, if
20  you take a look at the very next page, you'll see that
21  the document was electronically signed by Dionne Lucas
22  two days after that date.  Do you see that?
23      A.  Yes.
24      Q.  Does that sound familiar to you that you
25  would have been treated by this physician's assistant
```

Desire Evans

Page 102

1  in July 2016?
2      A. Yes.
3      Q. And looking back to the page that has
4  History and Physical Examination at the top, do you
5  see that?
6      A. Mm-hmm.
7      Q. There's a section that says, History of
8  Present Illness.  Is that correct?  Do you see that?
9  I'd like to direct you to the first paragraph there,
10  and it starts -- do you see where I am?
11      A. Mm-hmm.
12      Q. It says, "this is a new patient to our
13  practice.  She is complaining of feeling sad all the
14  time and having severe anxiety.  She just had a baby
15  in 03/16 and since then has not been able to sleep."
16  Do you see that?
17      A. Mm-hmm.  Yes.
18      Q. Did you say yes?  Is that correct for what
19  you presented to Dionne Lucas for when you went to see
20  her?
21      A. Yes.
22      Q. The next sentence goes on to say, "She is
23  afraid to drive her car.  She is afraid of walking
24  down the steps with her son because she thinks she
25  might drop him.  She is afraid to let her son be

Page 103

1  watched by other people."  Do you see that?
2      A. Yes.
3      Q. And was that accurate to how you were
4  feeling at the time?
5      A. Yes.
6      Q. Did you get help having others watch Peyton
7  when he was an infant?
8      A. What do you mean "get help," like mental
9  help?
10      Q. No, I'm sorry, I mean physical help.  Did
11  you have others come watch him and so that you could
12  get a break, take a shower?
13      A. Yeah, like my family, my mom, my husband.
14      Q. Your family.  And how frequently would
15  others come in to help watch Peyton?
16      A. Daily.  Having other people watch him, like
17  sending him to daycare, like that's what --
18      Q. So your concern was not letting other
19  people outside of your family watch him?
20      A. Yes, yes.
21      Q. Okay.  And then it continues to say, "she
22  is losing her hair."  Do you see where I am?
23      A. Mm-hmm.
24      Q. "And has not been able to go into work
25  since her maternity leave ended.  When she saw her

Page 104

1  gynecologist, they gave her a note for reasonable
2  accommodation, which allowed her to work from home
3  until August 1st, 2016."  Do you see that?
4      A. Yes.
5      Q. Which gynecologist gave you a note to work
6  from home?
7      A. I believe that that was Donna from
8  Dr. Moore's office.
9      Q. Is that a gynecologist at Dr. Moore's
10  office?
11      A. Well, that's the gynecological office, so I
12  would assume that she's a gynecologist.
13      (Clarification by reporter.)
14      Q. So that was the other ob/gyn at Dr. Moore's
15  practice you testified about having met with earlier?
16      A. Yes.
17      Q. And did you see her after you delivered
18  Peyton?
19      A. For my six-week checkup, I believe.
20      Q. And so you went to Dr. Moore's practice but
21  saw the other ob/gyn after you delivered Peyton; is
22  that correct?
23      A. Yes.
24      Q. Is that the only time you saw that other
25  doctor besides Dr. Moore at Dr. Moore's practice?

Page 105

1      A. Yes.
2      Q. It was after you had delivered?
3      A. (Nodding head up and down.)
4      Q. That's a yes?
5      A. Yes.  Sorry.
6      Q. Thank you.  Did any doctor or nurse talk to
7  you about hair loss after delivery?
8      A. No.
9      Q. Has anyone ever -- any physician ever
10  talked to you about hair loss after delivery?
11      A. No.
12      Q. The document goes on to say, "she is
13  asking --"  Do you see where I am?
14      A. Uh-huh.
15      Q. "She is asking for an updated letter and
16  evaluation/treatment for this complaint.  Prior to
17  having her baby she did not have any issues with
18  anxiety or depression."  Do you see that?
19      A. Yes.
20      Q. And then going on to the next page there,
21  there is a section that's called "Impression/Plan."
22  Do you see that?
23      A. Yes.
24      Q. And the first bullet point there says,
25  "depression/anxiety" and then in parentheses,

Page 106

1  "possible postpartum."  Do you see that?
2      A.  Yes.
3      Q.  And so are you saying that the physician's
4  assistant, Dionne Lucas, who you saw in July 2016 did
5  not talk to you about postpartum depression?
6      A.  No.
7      Q.  Was this physician's assistant who you saw
8  the first medical professional you discussed your
9  anxiety with or your depression with after delivering
10  Peyton?
11      A.  Yes.
12      Q.  On that same paragraph I was just talking
13  about, the number 1 under Impression/Plan, do you see
14  that?
15      A.  Yes.
16      Q.  The last sentence says, "a reassessment
17  during the week of 090516 will be made in our office."
18  Do you see that?
19      A.  Yes.
20      Q.  And did you actually go back for that
21  reassessment?
22      A.  No.
23      Q.  And the sentence before that says, "I have
24  written her a note extending the reasonable
25  accommodations until the week of 09-12-2016."  Do you

Page 107

1  see that?
2      A.  Yes.
3      Q.  So this was in July, and this visit you
4  came out of it with a note extending your
5  accommodations to work from home until mid September;
6  is that a fair summary?
7      A.  Yes.
8      Q.  Do you recall now, having seen these
9  medical records, does it refresh your recollection at
10  all about how long you stayed out on maternity leave
11  or when you returned to work?
12      A.  No, because I was -- I still returned to
13  work; I just was working from home.
14      Q.  Right.  I'm sorry.  I used rather imprecise
15  language.
16      So what I meant was return to the workforce.
17  So returning to working.
18      A.  Yes.
19      Q.  So do you remember with any more precision
20  having now seen this note of medical treatment in July
21  when it is after you delivered Peyton you returned to
22  the workforce?
23      A.  Yeah, I was still working.
24      Q.  So you were working?
25      A.  Yeah.

Page 108

1      Q.  As of July?
2      A.  Yeah.
3      Q.  Do you know how long you had been working
4  since your delivery with Peyton as of this time?
5      A.  I was out of work for like eight weeks.
6      Q.  Okay.
7          (Exhibit 3 marked for
8          identification: Medical Records re
9          Desire Evans
10          Smith 000001 - Smith 000023)
11      Q.  Ms. Evans, I'm going to hand you some more
12  medical records that were produced to us in this
13  litigation for you.  And you'll see the very first
14  page is a certification of medical records from Kaiser
15  Permanente.  Do you see that?
16      A.  Yes.
17      Q.  Turning to the second page of that
18  document, so it has a Bates number ending in 5736 at
19  the bottom, do you see that?
20      A.  Yes.
21      Q.  Okay.  It's double-sided.  Thank you.
22      There's a big redacted box up top.  Do you know
23  what that's covering?
24      A.  No.
25      Q.  These are records for you visiting

Page 109

1  Dr. Shanda Smith.  Do you see that?  On that second
2  page, right under the redaction box, it says, under
3  "Provider Name," "Smith, Shanda J, (MD)."  Do you see
4  that?
5      A.  Yes.
6      Q.  And this was the Dr. Smith you referred to
7  a little bit earlier this morning; is that correct?
8      A.  Yes.
9      Q.  Have you ever seen these medical records
10  before?
11      A.  No.
12      Q.  Can you remind me, how is it that you first
13  came to meet Dr. Smith?
14      A.  I had Kaiser and she was one of the doctors
15  there.
16      Q.  When you say you had Kaiser, that was your
17  insurance company?
18      A.  Yes.
19      Q.  They referred you to her?
20      A.  Yes.
21      Q.  And how did they come to refer her to you?
22  So how did they know you were looking for a doctor
23  like Dr. Smith?
24      A.  I called and asked for a doctor.  I called
25  to make an appointment, and she was the doctor that

Page 110

1  was assigned to me.
2  Q. So these records appear to me to have begun
3  from, at least what we can see, in early 2018. Does
4  that line up with when you believe you first started
5  seeing Dr. Smith, or do you believe you had seen her
6  prior to that?
7  A. No, I believe I said February of '18.
8  Q. February of '18. Okay. So January of '18
9  is sort of in the ballpark?
10  A. Yeah. Yes.
11  Q. I'd like to direct your attention to the
12  document Bates-stamped ending in 5742, 5742, and
13  you'll see there's a section there in the middle that
14  starts with the words "Progress Notes," it's like a
15  heading. Do you see that? Is that a yes?
16  A. Yes.
17  Q. And it says, it's from Shanda Smith, MD, on
18  January 17th, 2018 at 4:10 p.m. Do you see that?
19  A. Yes.
20  Q. And then it says it was signed, right?
21  A. Mm-hmm, yes.
22  Q. And it says, "Psychiatric Evaluation, new
23  evaluation"; is that correct?
24  A. Yes.
25  Q. So this, just trying to orient the timing,

Page 111

1  was after you had delivered Peyton, correct?
2  A. Correct.
3  Q. And was it before or after you had met
4  Plaintiffs' counsel in connection with this or the
5  Maryland litigation?
6  A. Before.
7  Q. Before you had met counsel.
8  A. (Nodding head up and down.)
9  Q. So continuing down the page from where we
10  were, it says "depression and anxiety." Do you see
11  that?
12  A. Yes.
13  Q. Okay. And it says, "Desire N. Evans" --
14  and that's you, right?
15  A. Yes.
16  Q. -- [redacted] who presents
17  voluntarily to Kaiser Permanente Largo Medical Center
18  Behavioral Health for psychiatric evaluation." That's
19  correct, you presented voluntarily, correct?
20  A. Yes.
21  Q. "She is self-referred after consultation
22  with her primary care doctor, Dilasha Katwal MD, MD."
23  Do you see that?
24  A. Yes.
25  Q. Is that the primary care physician you were

Page 112

1  referring to earlier, or is that a different doctor?
2  A. No, I never saw this doctor. This could
3  have been -- Kaiser also assigns you doctors, so that
4  could have just been a doctor that was listed on my
5  Kaiser card at the time.
6  Q. So that would have been from the insurance
7  company's perspective --
8  A. Correct.
9  Q. -- who they told you your primary --
10  A. My primary care is, correct.
11  Q. And did you ever go to a primary care
12  physician when you had your Kaiser insurance?
13  A. No.
14  Q. And then it goes on to say, "Desire N.
15  Evans is a [redacted] who
16  presents for psychiatric evaluation." Do you see
17  where I am?
18  A. Yes.

Page 113

1  A. I wouldn't say most of my life, no.
2  Q. But at any time prior to this had you felt
3  anxious/depressed?
4  A. As I mentioned, normal anxious, but nothing
5  that I would need to seek help for, no.
6  Q. So you think that these medical records are
7  inaccurate?
8  MR. CERYES: Objection, form, foundation.
9  A. Yes.
10  Q. It goes on to say, "reports significant
11  anxiety described as excess worry that is difficult to
12  control, intermittent panic," it looks like that's
13  "sx's," which I think is a medical terminology, then
14  in parentheses it says, "SOB/palpitations/insolable
15  weeping." Do you see that?
16  A. Mm-hmm.
17  Q. Is that yes?
18  A. Yes.
19  Q. And then it says, "cries seemingly out of
20  the blue for no reason." Is that part that I just
21  read accurate?
22  A. Yes.

Page 114

1   attachment to her two-year-old son," quote, 'he keeps
2   me going,'" end quote.  Do you see that?
3       A.  Yes.
4       Q.  Was that accurate?
5       A.  I guess, yes.
6       Q.  Then it goes on to say, "endorses depressed
7   mood, anhedonia," I think it's another medical term,
8   then "initial/middl████████████████
    ████████████████████  you see
10  that?
11      A.  Yes.
12      Q.  Aside from the medical word that I don't
13  know what it means -- but if you do you can tell me --
14  is that accurate?
15      A.  Yes.
16      Q.  And then it says, "also poor focus at times
17  because of anxiety/thoughts jumping around"; is that
18  correct?
19      A.  Yes.
20      Q.  And then it says, "works from home so she
21  can watch her son but he's growing more --
22  growing/more active and this is becoming more of a
23  challenge"; is that correct?
24      A.  Correct.
25      Q.  So this is from January 2018, and then it

Page 115

1   was only up until 11 weeks ago you started getting
2   more help outside of yourself and your husband for
3   watching your son during the day?
4       A.  Correct.
5       Q.  Then the next thing is it goes on to say,
6   "denies any specific stressors/changes.  Does note not
7   feeling satisfied with where she is in life.  'I have
8   so many ideas,' end quote.  Says she cannot focus or
9   pursue any of her goals ████████████  Do you
10  see that?
11      A.  Yes.
12      Q.  Is that accurate?
13      A.  Yes.
14      Q.  And was that before you were doing your
15  coursework at Strayer University?
16      A.  Yes.
17      Q.  It goes on to say, "patient describes
18  herself as very private. ███████████████████
    ██████████████████████████
20  mother as well, but their response is to give her
21  space, and she often can be short/easily irritated,
22  which pushes them away"; is that correct?
23      A.  Yes.
24      Q.  And then it says, ███████████████
    ████████████████████"; is

Page 116

1   that correct?
2       A.  Yes.
    ████████████████████████████████
    ████████████████████████████████
    ████████████████████████████████
8       A.  Correct.
9       Q.  Then it goes on to say, "Past Psychiatric
10  History."  Do you see where I am?
11      A.  Yes.
12      Q.  And it says, "Hx," which I think might be
13  history, "of symptoms on/off throughout adult life."
14  Do you see that?
15      A.  Yes.
16      Q.  And you think that's not correct?
17      A.  No.
18      Q.  What do you mean "no"?
19      A.  Because it wasn't -- it wasn't that kind of
20  situation.  My mom and -- my mom and dad -- ████████
    ████████████████████████████████
    ████████████████████████████████
    ████████████████████████████████
    ████████████████████████████████
    ████████████████████████████████

Page 117

1       Q.  When you say it was being forced on you,
2   what do you mean?
3       A.  Like my -- people trying to make it seem
4   like I was a certain way.  Like I have a stigma on me
5   that I have an attitude or that type of thing, where I
6   don't.
    ████████████████████████████████
    ████████████████████████████████
9       A.  No.
10      Q.  So when you said that they were trying to
11  put it on you -- tell me if I'm misstating things --
12  when you said they were trying to put it on you so
13  that you would talk to someone about it, what did you
14  mean about so that you would talk to someone about it?
    ████████████████████████████████
    ████████████████████████████████
    ████████████████████████████████
    ████████████████████████████████
20  go stay with my grandmom.
21      Q.  And how old were you approximately when
22  this was happening?
23      A.  I don't know.  Sixteen maybe.
    ████████████████████████████████
    ████████████████████████████████



Desire Evans



Page 122

5    A.  Ebony Cross.
6    Q.  Dr. Cross?

Page 124

Page 125

        Do you take Peyton to a pediatrician?
11    A.  No.  I took Peyton the last time -- I took
12  Peyton on -- in March for the first time since he was
13  six months, because I was thinking about putting him
14  in daycare and he needed shots.
16    A.  Yes.
17    Q.  So he was about two and a half years old
18  when you took him to the pediatrician; is that
19  correct?
20    A.  Yes.
21    Q.  Was he diagnosed with anything when you
22  took him to the pediatrician?
23    A.  No.
24    Q.  Does he have any developmental or
25  neurological delays?

Desire Evans

Page 126

1    A.  No.  I'm not a doctor, but --
2    Q.  That you know of.
3    A.  No, I don't think -- I think he's a normal
4  three-year-old, I guess.
5    Q.  When you took him to the pediatrician about
6  six months ago, was he measuring on anticipated
7  schedule?
8    A.  Yes.
9    Q.  Did you take him to the pediatrician when
10  he was an infant?
11    A.  Yes.
12    Q.  And when you took him last six months ago,
13  how long had it been since you had taken him to the
14  pediatrician before that?
15    A.  He was six months.
16    Q.  When he was six months old?
17    A.  Mm-hmm.
18    Q.  Okay.  Did you take him back to the same
19  pediatrician when he was two and a half?
20    A.  Yes.
21    Q.  In the document that I've handed you marked
22  as Exhibit 3, on the page ending 5743 -- so that was
23  the page we were just last looking at -- in the middle
24  there's a section that says ████████████  Do you
25  see that?

Page 127

1    A.  Mm-hmm.
2    Q.  And then there's a section that says ████
████  Do you see where I am?
4    A.  Yes.
5    Q.  And it says, ███████████████████
█  Do you see that?
7    A.  Yes.
8    Q.  Is that referring to ████████
9    A.  Yes.
████████████████████████
████
12    A.  No.
13    MR. CERYES:  I'm going to object and advise
14  you not to answer any questions █████████
████
16    A.  Oh.  Sorry.
17    MR. CERYES:  Okay.
18    Q.  Were you working at the time in January
19  2018 when you went to go see Dr. Smith --
20    A.  Yes.
21    Q.  -- for BlueCross BlueShield?
22    A.  Yes.
████████████████████████
25    MR. CERYES:  Objection, form, foundation,

Page 128

1  and I'm going to advise you not to answer that
2  question.
3    Q.  So you're going to accept your counsel's
4  instruction not to answer?
5    A.  Yes.
6    Q.  So we looked in these records from
7  Dr. Smith, and I could not find any mention of
8  Dr. Akoda.  Did you mention your experience with
9  Dr. Akoda to Dr. Smith?
10    A.  Yes.
11    Q.  What did you tell her?
12    A.  I just told her that I felt uncomfortable
13  and that I was touched in a way that I felt was
14  inappropriate and I didn't know how to deal with it.
15    Q.  Did you tell her by whom?
16    A.  No.
17    Q.  Did you explain to her that it was during
18  your delivery of your son?
19    A.  Mm-hmm, yes.
20    Q.  Yes?  You said you felt uncomfortable and
21  you believed you were touched inappropriately; is that
22  correct?
23    A.  Yes.
24    Q.  Did you say something else too?  I may not
25  have gotten it down.

Page 129

1    A.  No, that's what I said.
2    Q.  Do you believe you told her the name
3  Dr. Akoda at that time?
4    A.  No.
5    Q.  Did you believe you told her that it was
6  your obstetrician/gynecologist at the time?
7    A.  I told her during the delivery of my son.
8    Q.  And did you mention it was a doctor?
9    A.  Mm-hmm, yes.
10    Q.  Is that yes?  Thank you.
11    Within the same Exhibit 3, if you could turn
12  back to the page ending in 5741, which is just
13  flipping it back a page, there's a section that says
14  "Obstetric History."  Do you see that?
15    A.  Mm-hmm.
16    Q.  Is that a yes?
17    A.  Yes.
18    Q.  And it says, "Obstetric History."  "The
19  patient has not been asked about pregnancy."  Do you
20  see that?
21    A.  Mm-hmm, yes.
22    Q.  And you believe that's incorrect; you did
23  talk about your labor and delivery at least?
24    MR. CERYES:  Objection, form, foundation.
25    You can answer.

Desire Evans

Page 130

1      A.  Yes.  She didn't ask.
2      Q.  She didn't ask?
3      A.  Right, she didn't ask, but I told her why I
4   was feeling the way that I was feeling.
5      Q.  Okay.  And you explained to her that it was
6   connected with your obstetric history?
7      A.  Yes.
8      Q.  Did she say anything in response to you
9   when you told her that you had felt uncomfortable or
10  you were touched inappropriately during your delivery
11  of Peyton?
12     A.  Just about how I felt about it and how I
13  felt it was affecting me, and I just told her that I
14  didn't want to be touched.  And I also explained
15  how -- to her how it was affecting my relationship
16  with my husband.
17     Q.  What did you tell her in January of 2018
18  about how your experience during your delivery of
19  Peyton has affected your relationship with your
20  husband?
21     A.  Because I don't want anybody to touch me,
22  and we wanted to have another baby, so that was not an
23  option anymore.
24     Q.  Is that still the case?
25     A.  Yes.

Page 131

1      Q.  When's the last time you engaged in sexual
2   relations with your husband?
3      A.  Eight months ago.
4      Q.  From now?
5      A.  Yeah.
6      Q.  Eight months ago prior?  Are you still
7   trying to have a baby?
8      A.  No.
9      Q.  Did you want to have a baby in January of
10  2018 when you met with Dr. Smith?
11     A.  Well, we wanted to -- after I had my son,
12  that was -- I no longer wanted to have another baby.
13     Q.  So if I can say it back to you, and you can
14  tell me if I said it the right way.
15     So is it fair to say that, prior to having
16  Peyton, you had intended to have more than one child,
17  but after having delivered him you only wanted to stay
18  with having one child?
19     A.  Correct.
20     Q.  And we've made some vague references to
21  it -- and I know this may not be the easiest thing to
22  talk about -- but for the record and just so that I
23  fully understand, can you please describe to me the
24  experience with Dr. Akoda that you're talking about
25  with him touching you during your delivery?

Page 132

1      A.  He was -- he was, like, fondling my
2   clitoris, saying that he needed to do that in order to
3   stimulate me to push the baby.
4      Q.  And he verbalized that to you?
5      A.  Yeah, because my husband asked him what was
6   he doing.
7      Q.  And were your husband and mother and the
8   delivery nurses in the room at the same time this was
9   occurring?
10     A.  Yes.  I don't -- I don't remember if the
11  delivery nurse was in there, but my husband for sure
12  and my mother for sure.
13     Q.  Was this during the time that your husband
14  was standing next to Dr. Akoda?
15     A.  Yes.
16     Q.  And so was the delivery nurse holding one
17  of your legs at that time?
18        MR. CERYES:  Objection, foundation.
19     Q.  Well, we talked about it earlier.  I can
20  restate the question.
21     A.  Yes.  Yes.
22     Q.  So during the time your husband was
23  standing --
24     A.  I'm not -- see, I'm not one hundred percent
25  sure because there was a point where they were holding

Page 133

1   my legs and there was a point where we were just
2   laying there, he was trying to get me to relax and to
3   push.  So I don't really know if the nurse was in
4   there at that particular moment.
5      Q.  Okay.  And was it one moment when this
6   happened with Dr. Akoda?
7      A.  I mean, he -- no.  He did it several times,
8   but it was only spoken of one time because he made it
9   seem like that was the normal.
10     Q.  Did your husband ask him about it the first
11  time that it happened?
12     A.  Mm-hmm.
13     Q.  Is that a yes?
14     A.  Yes.
15        MR. CERYES:  Let us know if you need to
16  take a break at any time.
17     A.  I'm all right.
18        MR. CERYES:  Okay.  I'll get some tissues.
19        MS. MCENROE:  Do we have a box?
20     A.  Thank you.
21     Q.  When Dr. Akoda was stimulating your
22  clitoris, how long did each instance of that last, do
23  you know?
24     A.  I don't know.  A few seconds maybe.
25     Q.  And do you have an estimation of how many

Desire Evans

Page 134

1  times that happened?
2      A. Several.
3      Q. Were you ever alone with Dr. Akoda in the
4  room?
5      A. No.
6      Q. Other than taking Pitocin -- which was used
7  to start your induction, correct?
8      A. Yes.
9      Q. -- and the experience we were just talking
10 about with Dr. Akoda, did your medical professional
11 team try any other ways to help speed along your
12 delivery?
13     A. No.
14     Q. Did they feed you spicy food?  I don't
15 know.  Just anything you can remember.
16     A. No, no.
17     Q. Okay.  Do you know if they continued
18 treating you with Pitocin as you were pushing?
19     A. I don't remember.
20     Q. If you remember.
21     A. I don't remember.
22     Q. Is your mother married?
23     A. No.
24     Q. Does she have a boyfriend?
25     A. Yes.

Page 135

1      Q. Has she had that boyfriend for a while?
2      A. Yes.
3      Q. For about how long?
4      A. Over ten years.
5      Q. Do you guys get along, you and your
6  mother's boyfriend?
7      A. He's okay.
8      Q. Directing you back to the exhibit we were
9  just looking at, which I think was Exhibit 3, take a
10 look at the page ending in 50.  It's a little further
11 along in the document.  Let me know when you get
12 there.  And they are double-sided again.
13     A. Okay.
14     Q. Are you there?
15     A. Mm-hmm.  Yes.
16     Q. And this in the middle of the page says,
17 "Telephone Contact Summary."  Do you see that?
18     A. Yes.
19     Q. And it's from February 6th, 2018.  Do you
20 see that?
21     A. Yes.
22     Q. Do you believe you spoke with Dr. Smith in
23 or around February 6th, 2018 by telephone?
24     A. Yes, I guess.  I mean, if she says so, I
25 guess.  I don't remember.

Page 136

1      Q. Do you have any reason to think you didn't?
2      A. No.
3      Q. And there's -- it then says "encounter
4  documentation."  Do you see that?  Right above --
5      A. Yes.
6      Q. -- where it says scheduled telephone --
7  "medication management visit."  Do you see that?
8      A. Yes.
9      Q. And it says, "patient called for scheduled
10 follow-up, symptoms assessment and medication review."
11 Does that refresh your recollection of having spoken
12 to Dr. Smith?
13     A. Yes.
14     Q. "Chart and history reviewed,
15
16
17
18
19
20
21
22
23
24
25     A. Yes.

Page 137

1
2      A. Yes.
3      Q. Because of those -- the side effects?
4      A. Yes.
5      Q. It goes on to say:
6
7
8
9
10
11
12
13
14
15 Do you see that?
16     A. Yes.
17     Q. Is that all accurate?
18     A. Yes.
19     Q. Is the home that you were buying at that
20 time the home you now live in?
21     A. Yes.
22     Q. At the time you delivered Peyton were you
23 dissatisfied with Dr. Akoda's care?
24     A. Yes.
25     Q. Tell me about that.

Desire Evans

Page 138

1     A.  I felt like he was inappropriately touching
2   me, which made me uncomfortable for the rest of my
3   stay there.
4     Q.  Did you tell anybody about that?
5     A.  Outside of the people in the room, no.
6     Q.  When you say outside the people in the
7   room, did you tell anybody about that who was in the
8   room?
9     A.  No.  Well, my husband was there, and I told
10   my mom.  And she really didn't know, like, she wasn't
11   fully aware of what was going on until we explained it
12   to her.
13     Q.  Okay.  Even though she had been present in
14   the room?
15     A.  Mm-hmm.
16     Q.  That's a yes?
17     A.  Yes.
18     Q.  And did your husband, do you know, if he
19   said anything to anybody about Dr. Akoda's conduct
20   that you've described while you were at the hospital?
21     A.  No, not that I'm aware of.
22     Q.  Have you ever spoken to an ob/gyn about the
23   treatment you got from Dr. Akoda?
24     A.  No.
25     Q.  Have you ever talked to any psychiatrist or

Page 139

1   psychologist about the details of treatment from
2   Dr. Akoda?
3     A.  Yes.
4     Q.  Have you ever gotten a medical opinion from
5   any of them on the medical treatment from Dr. Akoda?
6     A.  No.
7     MS. MCENROE:  So it's about 1:00.  It might
8   be a good time to take a lunch break.
9     VIDEO SPECIALIST:  We're going off the
10   record at 1:04.
11     (Proceedings recessed)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 140

1     AFTERNOON SESSION
2     VIDEO SPECIALIST:  We're back on the record
3   at 1:44.
4     EXAMINATION (resumed)
5   BY MS. MCENROE:
6     Q.  Good afternoon, Ms. Evans.
7     A.  Good afternoon.
8     Q.  You understand you're still under oath?
9     A.  Yes.
10     Q.  And you need to still tell the truth?
11     A.  Yes.
12     Q.  What did you do, if anything, to prepare
13   for today's deposition?
14     A.  Nothing.
15     Q.  Did you meet with counsel?
16     A.  Oh, we had a phone call just about dates
17   and times.
18     MR. CERYES:  Don't discuss any information
19   about what we discussed, but I'll let you share that.
20     A.  No, we just talked about what time to be
21   there and that time of situation.
22     Q.  And when did you speak with counsel about
23   the deposition?
24     A.  Yesterday.
25     Q.  For how long?

Page 141

1     A.  Fifteen, 20 minutes.
2     Q.  Is yesterday the first you had learned that
3   you were going to be deposed in this case?
4     A.  No.
5     MR. CERYES:  I'm going to object.  I think
6   we're getting into attorney-client privileged
7   material.
8     MS. MCENROE:  Sure.  That's not my
9   intention.  So let me just restate it this way.
10     Q.  Prior to your short phone call yesterday,
11   had you previously prepared for today's deposition by
12   speaking with counsel?
13     A.  No.  I just received the phone call that I
14   would be getting a phone call yesterday about the
15   deposition today.
16     Q.  Okay.  Did you do anything to prepare for
17   your deposition in the Dimensions matter?
18     A.  No.
19     Q.  Did you review any documents in preparation
20   for today?
21     A.  No, nothing that I already didn't have.
22     Q.  And what do you already have about this
23   case?
24     A.  Nothing particular to this case, but I
25   reviewed my previous deposition.

Page 142

1    Q. So you have a copy of that deposition
2  transcript?
3    A. Yes.
4    Q. And you reviewed that deposition transcript
5  before your deposition today?
6    A. Mm-hmm.
7    Q. Is that a yes?
8    A. Yes, ma'am. Sorry.
9    Q. Do you have a copy of the complaint in this
10 case?
11   A. I don't have my own copy, no.
12   Q. Have you reviewed it recently?
13   A. Yes.
14   Q. Do you remember when you most recently saw
15 the complaint in this case?
16   A. No.
17   MR. CERYES: Object. Again, I think we're
18 getting into attorney-client material. I'm not sure
19 any of this is relevant or discoverable.
20   MS. MCENROE: Well, it's publicly available
21 information. The complaint can be found online.
22   MR. CERYES: Sure.
23   MS. MCENROE: I'm just --
24   Q. I'm not trying to ask what your counsel
25 told you, but you don't personally have a copy of the

Page 143

1  complaint in this case?
2    A. No.
3    Q. Did you read and verify it before it was
4  filed?
5    A. Read and verify?
6    Q. Yeah.
7    A. I believe it was shown to me, yeah, before.
8    Q. Did you review it before it was filed?
9    A. Yes.
10   (Clarification by reporter.)
11   Q. We discussed earlier today that you met
12 your counsel as a result of a radio ad that you heard;
13 is that correct?
14   A. Yes.
15   Q. And first your husband heard the radio ad
16 and then you heard the radio ad; is that accurate?
17   A. Yes.
18   Q. Thereafter, how did you make contact with
19 counsel?
20   A. I called him.
21   Q. On the telephone?
22   A. Yes, ma'am.
23   Q. Did you meet anybody in person?
24   MS. MCENROE: That's not privileged.
25   MR. CERYES: I think it is. I think we've

Page 144

1  gotten to the point where she has retained counsel,
2  and in terms of any other communication she has had
3  with her firm, that was for purposes of being
4  represented in this matter.
5    MS. MCENROE: Right.
6    MR. CERYES: So the details, the times and
7  the dates --
8    MS. MCENROE: -- is not privileged. It's
9  all information that should be on a privilege log or
10 could be put on a privilege log, if you were doing
11 that.
12   So I didn't ask her what you talked about or
13 what you told her. I'm just asking if she met with
14 anybody in person after she spoke to them on the
15 telephone.
16   MR. CERYES: I'll let you answer that
17 question.
18   A. Yes.
19   Q. Do you remember when that was?
20   A. I do not.
21   Q. Until you first communicated with
22 counsel -- strike that.
23   Do you have any understanding of whether or not
24 Dr. Akoda has pleaded guilty to any crimes in a court
25 of law?

Page 145

1    A. Yes.
2    Q. Could you tell me about that?
3    A. I saw on the Internet that he got six
4  months in jail.
5    Q. Do you know for what?
6    A. No. I'm not exactly sure what he was
7  charged with.
8    Q. So have you read the indictment?
9    A. No, I haven't read it.
10   Q. Have you read his guilty plea?
11   A. No.
12   Q. Do you have any understanding of whether or
13 not he was found to have committed Social Security
14 fraud?
15   A. No, I do not.
16   Q. Do you have any understanding of whether or
17 not his criminal conviction had anything to do with
18 practicing medicine without a license?
19   A. I do not.
20   Q. You don't know one way or the other?
21   A. No.
22   Q. Did you ever look into that?
23   A. Briefly. I just saw that he got six months
24 in jail, but I don't know anything -- anything in
25 depth about it.

Desire Evans

Page 146

1    Q.  Did you read an article about him getting
2  six months in jail?
3    A.  I saw it on the news and then I looked it
4  up.
5    Q.  You saw it on the news on the television?
6    A.  Yes.
7    Q.  And when you say you saw it on the news, do
8  you recall what news station you were watching?
9    A.  No, just local news.
10    Q.  Do you watch a particular station?
11    A.  Fox, I guess.
12    Q.  And you don't believe that they mentioned
13  what he actually went to jail for?
14    A.  If they do -- if they did, I don't recall.
15  I just remember the timing, six months.  That's what
16  stuck out to me.
17    Q.  The six months?
18    A.  Yep.
19    Q.  But not what it was that he was -- actually
20  pleaded guilty to.
21    A.  Right.  I know it wasn't what he did to me.
22    Q.  What do you mean by that?
23    A.  I wasn't -- for how I felt that I was
24  treated, I know that he wasn't in jail for that, so
25  that was my concern.

Page 147

1    Q.  Did you ever pursue trying to have criminal
2  charges brought up against him for what he did to you?
3    A.  No.  I -- no.
4    Q.  Did you ever pursue a medical malpractice
5  suit against Dr. Akoda?
6    A.  No.
7    Q.  Did you ever pursue litigation or a lawsuit
8  against Dr. Akoda himself?
9    A.  No.
10    Q.  Sitting here today, do you know where
11  Dr. Akoda went to medical school?
12    A.  No.
13    Q.  Sitting here today, do you know whether
14  Dr. Akoda went to medical school?
15    A.  No.
16    Q.  Sitting here today -- strike that.
17    Until you had heard or -- strike that.
18    Comparing the timing between when you heard the
19  radio ad and when you saw on the news that Dr. Akoda
20  had gone to jail, which happened first?
21    A.  The radio ad.
22    Q.  To make sure I'm understanding, so you
23  first contacted counsel in connection with the lawsuit
24  against Dimensions and then eventually ECFMG before
25  you heard about Dr. Akoda having pleaded guilty and

Page 148

1  serving six months in jail; is that correct?
2    A.  Correct.
3    Q.  Do you know how long it was in between
4  those two things?
5    A.  No.
6    Q.  Were they close in time?
7    A.  I mean, everything happened pretty fast, so
8  I would say so.  I would say -- I would say within two
9  months or so.
10    Q.  Until you had heard the radio ad for the
11  law firm, had you had any suspicion that Dr. Akoda did
12  not go to medical school?
13    A.  No.
14    Q.  And until you had heard the radio ad, did
15  you have any reason to believe that Dr. Akoda was not
16  a licensed physician?
17    A.  No.
18       (Exhibit 4 marked for
19        identification: Civil Action re
20        Russell, et al. v. ECFMG)
21       MS. MCENROE:  Do you want a copy for Paul
22  also?
23       MR. CERYES:  No, that's okay.
24    Q.  Ms. Evans, I'm handing you what has been
25  marked as Exhibit 4.  Do you recognize this document?

Page 149

1  You can take a minute and look at it.
2    A.  Yes.
3    Q.  What is it?
4    A.  The complaint.
5    Q.  So this is the complaint in the lawsuit
6  that you and some others have filed against the
7  Educational Commission for Foreign Medical Graduates,
8  correct?
9    A.  Yes.
10    Q.  And just so the record is clear, this is
11  the Philadelphia Court of Common Pleas complaint that
12  has since been removed to federal court.
13    And, Ms. Evans, you testified that you saw this
14  before it was filed, correct?
15    A.  Yes.
16    Q.  And I'd like to direct your attention
17  within that document -- it might be easier to find it
18  from the back.  Actually it may be the very last page.
19    If you flip all the way to the very last page,
20  the back of the documents, I think it's the page after
21  that one you're looking at.  Is that your signature?
22    A.  Yes.
23    Q.  Okay.  And at the top of it, it says
24  "Verification."  Do you see that?
25    A.  Yes.

Page 150

1    Q. And it says, "I verify that the statements
2  made in this complaint are true and correct to the
3  best of my knowledge and belief."  Do you see that?
4    A. Yes.
5    Q. "I understand that false statements herein
6  are made subject to the penalties of 18 Pa. C.S.
7  Section 4904 relating to unsworn falsification to
8  authorities."  Do you see that?
9    A. Yes.
10   Q. It's dated November 9th, 2018, and that's
11 your signature, correct?
12   A. Yes.
13   Q. So earlier I had asked if you had reviewed
14 and verified the complaint.  Does this refresh your
15 recollection that you did verify the complaint?
16   A. Yes.
17   Q. Is it still your belief today that the
18 information about which you have knowledge and belief
19 that's contained in the complaint is true and
20 accurate?
21   A. Yes.
22   Q. Are there things contained in the complaint
23 as you recall it that you did not have knowledge or
24 belief about?
25   A. No.

Page 151

1    Q. So the information in here is all stuff you
2  knew to be true yourself?
3      MR. CERYES:  Objection, form, foundation.
4    A. From what I read through, yes.  I didn't
5  find anything that I didn't agree with.
6    Q. I see.  So is it fair, just to make sure I
7  understand, to say that you had no reason to disagree
8  with any of the information in here?
9    A. Correct.
10   Q. But is it also fair to say that there are
11 some things in here about which you did not have
12 personal independent knowledge?
13   A. Correct.
14   Q. Okay.  Sitting here today, do you know of
15 anything contained in the complaint that you now
16 believe to be false or inaccurate?
17   A. No.
18   Q. I'd like to direct your attention, you'll
19 see within the document there are paragraph numbers,
20 so if you keep flipping until the meat of the
21 complaint gets started, there are paragraph numbers.
22 Could you please flip to paragraph 43?
23   That paragraph reads -- are you there?  I'll
24 give you a second.
25   A. One second.

Page 152

1    Q. It's on page 9.
2    A. Okay.
3    Q. That paragraph reads:
4      "The Plaintiff Desire Evans was a
5      patient of Igberase on or about March
6      17th, 2016.  Igberase delivered her
7      child on that date at Prince George's
8      Hospital Center."
9    Do you see that?
10   A. Yes.
11   Q. And Ms. Desire Evans, that's referring to
12 you; is that correct?
13   A. Yes.
14   Q. And do you understand that Dr. Igberase is
15 another way to refer to Dr. Akoda as used in this
16 complaint?
17   A. Yes.
18   Q. So is that correct as written in paragraph
19 43?
20   A. Yes.
21   Q. All right.  So I want to direct you --
22 sorry.  We're going to hop around in this document a
23 little bit.
24   I want to direct you all the way back to the
25 beginning of the complaint, so it will be page 2 at

Page 153

1  the bottom.  And you'll see there's a heading that
2  says "Class Action Civil Complaint."  Do you see that?
3    A. Yes.
4    Q. And there are a number of plaintiffs
5  listed, including Desire Evans.  Do you see that?
6    A. Yes.
7    Q. And then it says, "on their own behalf and
8  on behalf of all others similarly situated through
9  their undersigned attorneys."  Do you see that?
10   A. Yes.
11   Q. Do you have an understanding of what that
12 means, the on their own behalf and on behalf of all
13 others similarly situated?
14   A. Yes.
15   Q. What does that mean?
16   A. Not only am I speaking for myself but
17 everyone who was affected.
18   Q. And when you say "everyone who was
19 affected," what do you mean?
20   A. Everyone who was affected by Dr. Akoda
21 Igberase, whatever -- everyone that was affected by
22 his actions.
23   Q. When you say "affected by his actions,"
24 what do you mean?
25   A. Everyone that -- everyone that he treated,

Desire Evans

Page 154

1   everyone who saw him, everyone who -- all of his
2   patients.
3        Q.  Do you think that all of his patients had
4   the same experience you did?
5        A.  I don't know.
6        Q.  Have you ever spoken to any of Dr. Akoda or
7   Dr. Igberase's other patients?
8        A.  No.
9        Q.  Have you ever met another person who has
10  been treated or had seen Dr. Akoda?
11       A.  No.
12       Q.  And I'm going to use the name Dr. Akoda,
13  but you understand that's also to include
14  Dr. Igberase, as we've been discussing?
15       A.  Mm-hmm, yes.
16       Q.  I'd like to direct you back to paragraph
17  44.  So that's on the top of page 10 of the complaint.
18  Do you see where I am?
19       A.  Yes.
20       Q.  It reads:
21           "The Plaintiffs and others similarly
22           situated chose Igberase, who they
23           knew as Akoda, as their
24           obstetrician/gynecologist, on the
25           basis of their belief that Akoda had

Page 155

1           obtained all necessary credentials
2           and certifications required of
3           physicians practicing in the
4           United States, including
5           certification from ECFMG."
6   Do you see that?
7        A.  Yes.
8        Q.  Is that true of yourself?
9        A.  No.
10       Q.  What do you mean by that?
11       A.  I didn't choose Dr. Akoda.
12       Q.  Did you have any knowledge about his
13  credentials when he came to start treating you?
14       A.  No.
15           MR. CERYES:  Objection, form, foundation.
16       Q.  Did you have any knowledge about his
17  certifications when he came to treat you?
18       A.  No.
19       Q.  I'd like to direct you to paragraph 45, so
20  I'm just going to keep reading, if you're on the same
21  page.
22       It says, "None of Igberase's patients,
23  including those at Howard University Hospital, Prince
24  George's Hospital Center, and the medical practice of
25  Abdul G. Chaudry, M.D., knew Igberase's true identity

Page 156

1   but rather knew him as Akoda."  Do you see that?
2        A.  Yes.
3        Q.  Is it true that you knew Dr. Igberase as
4   Dr. Akoda?
5        A.  Correct.
6        Q.  Do you know if anybody else knew of
7   Dr. Akoda actually being Dr. Igberase when they were
8   treated by him?
9            MR. CERYES:  Objection, form, foundation.
10       A.  I'm not aware.
11           MS. MCENROE:  Well, it says none of the
12  patients knew and she's a plaintiff in this case.
13           MR. CERYES:  But you said anyone, not just
14  patients, which would refer potentially to ECFMG
15  personnel.
16       Q.  Sure.  So let me -- let me restate that.
17       Do you know if any of Dr. Igberase's patients
18  knew he was Dr. Igberase when he was using the name
19  Dr. Akoda?
20       A.  I'm not -- I've never spoken to anyone
21  else.
22       Q.  Do you know about any consents that
23  Dr. Igberase or Dr. Akoda's patients provided to him
24  in connection with their treatment?
25       A.  No.

Page 157

1        Q.  I'd like to direct you to paragraph 47.
2   It's still on page 10.  It starts:
3           "On many occasions, Igberase
4           penetrated his patients with parts of
5           his body through the vaginal canal
6           and through the stomach in performing
7           medical services.  Additionally,
8           Igberase performed inappropriate
9           examinations of a sexual nature while
10          utilizing inappropriate and explicit
11          sexual language.
12          Igberase's penetrations of his
13          patients were clear boundary
14          violations."
15  Do you see that?
16       A.  Yes.
17       Q.  So I have a couple questions.  I just want
18  to clarify.  It says with parts of his body that he
19  penetrated his patients.  Did Dr. Akoda penetrate you
20  with anything other than his hands or his fingers?
21       A.  No.
22       Q.  He didn't ever penetrate you with his
23  penis?
24       A.  No.
25       Q.  And when it says that he penetrated you

Desire Evans

Page 158

1 through the stomach, was that in connection with
2 performing a C-section?
3     A. Yes.
4     Q. Did Dr. Igberase use explicit sexual
5 language with you?
6     A. I felt the language was inappropriate,
7 calling me "Baby" and "Mama" and stuff like that.
8     Q. So besides calling you "Baby" and "Mama,"
9 was there any other inappropriate language that
10 Dr. Akoda used with you?
11     A. No.
12     Q. I'm sorry. I didn't hear you.
13     A. No. I'm sorry.
14     Q. Thank you. The last sentence in that
15 paragraph says, "Igberase's penetrations of his
16 patients were clear boundary violations." Do you see
17 that?
18     A. Yes.
19     Q. Did the words "clear boundary violations"
20 come from you? Are those words you used?
21     A. I didn't say them.
22     Q. Do you know what's meant here by "clear
23 boundary violations"?
24     A. Yeah.
25     Q. What?

Page 159

1     A. Touching, touching someone and talking to
2 them in the way that he did is not -- is a boundary
3 violation between patient and provider, so 100
4 percent.
5     Q. Are you characterizing your C-section as a
6 boundary violation?
7     A. I'm characterizing the way that he touched
8 me prior to my C-section being a boundary violation.
9     Q. And when you say that, are you specifically
10 referring to the clitoral stimulation?
11     A. Yes.
12     Q. To any other part of his treatment?
13     MR. CERYES: Objection, foundation.
14     You can answer.
15     A. No.
16     Q. Moving on to paragraph 48, still on page
17 10, you'll see there's a heading that says "Class
18 Action Allegations P.a. Rule 1702." Do you see where
19 that is?
20     A. Yes.
21     Q. Paragraph 48 says, "Named Plaintiffs bring
22 this action on behalf of a class which consists of."
23 Do you see where I am?
24     A. Yes.
25     Q. And then it says, "All patients examined

Page 160

1 and/or treated in any manner by Oluwafemi Charles
2 Igberase," and then in parentheses it says "(a/k/a
3 Charles J. Akoda M.D.)." Do you see that?
4     A. Yes.
5     Q. And we already talked about that you have
6 not met any other person who is defined in that class;
7 is that correct?
8     A. Correct.
9     Q. Have you ever spoken or corresponded with
10 anybody else that is defined in that class that you
11 know of?
12     A. No.
13     Q. Have you ever met with, in person or on a
14 videoconference or by telephone, anybody else who is
15 defined in that class that you know of?
16     A. No.
17     MR. CERYES: Objection, asked and answered.
18     Q. Moving along to page 11, paragraph 54 says,
19 "Named Plaintiffs will fairly and adequately assert
20 and protect the interests of the Class under the
21 criteria set forth in Rule 1709. The interests of
22 named Plaintiffs and of all other members of the Class
23 are identical." Do you see that?
24     A. Yes.
25     Q. Do you know if your interests and those of

Page 161

1 everybody else who has been treated by Dr. Akoda are
2 identical?
3     MR. CERYES: Objection, form, foundation.
4     A. I don't know.
5     Q. Do you know if any of Dr. Akoda's patients
6 were satisfied with his treatment?
7     A. I don't know.
8     Q. Do you think it's possible?
9     MR. CERYES: Objection, form, foundation.
10     A. I don't know.
11     MR. CERYES: Calls for speculation.
12     Q. In paragraph 55 it says, "Named Plaintiffs
13 are cognizant of their duties and responsibilities to
14 the Class." Do you see that?
15     A. Yes, ma'am.
16     Q. Earlier today I think I asked you if you
17 knew what your responsibilities were as a Named
18 Plaintiff. Do you remember that?
19     A. Yes, ma'am.
20     Q. What are those responsibilities?
21     A. Just to give my account to the best of my
22 knowledge and to represent everyone else that feels
23 the same.
24     Q. Did you also provide any input for
25 discovery responses in this case?

Desire Evans

Page 162

1    A. Did I do what?
2    Q. Provide input for any discovery responses
3  in this case.
4    A. I don't understand that question.
5       MR. CERYES: Objection to form.
6    Q. Have you ever heard the word
7  "interrogatories"?
8    A. Yes. Oh, yes.
9    Q. Did you provide any input to support the
10  drafting of responses to interrogatories in this case?
11    A. Yes.
12    Q. Having done that and having given input on
13  the complaint, which I think we talked about earlier
14  today, have you done anything else in furtherance of
15  your role as a named plaintiff in this lawsuit?
16    A. No.
17    Q. Aside from showing up today?
18    A. Right. No, besides this kind of stuff
19  here.
20    Q. So I'd like to move to paragraph 65 at the
21  bottom of page 12. It says:
22       "The likelihood that individual
23       members of the Class will prosecute
24       separate actions is remote. Also,
25       because most Class members do not

Page 163

1       know that a claim against ECFMG
2       exists."
3    Did I read that correctly?
4    A. Yes.
5    Q. We talked earlier about the allegations in
6  this lawsuit being about alleged boundary violations
7  by Dr. Akoda; is that correct?
8    A. Yes.
9    Q. Is it your belief that members of the Class
10  don't know that their boundaries were violated by
11  Dr. Akoda?
12       MR. CERYES: Objection, form, foundation.
13  You can answer.
14    A. No, I can't say that. I wouldn't imagine
15  them joining a class if they didn't feel like their
16  boundaries were violated.
17    Q. Do you know if every single one of
18  Dr. Akoda's patients feels as if they had their
19  boundaries violated?
20    A. I do not know that.
21    Q. What are you hoping to get out of this
22  lawsuit?
23       MR. CERYES: Objection.
24    A. What I'm hoping is for someone to take
25  responsibility or maybe even do their job a little bit

Page 164

1  more diligently next time. Because this situation
2  affected not only me but a lot of other people. And I
3  believe that, if it was done correctly, that none of
4  us would be going through this.
5       So I just want whoever this person is to pay
6  for what he's done, and I want -- I want the facility
7  that is supposed to make sure these people are who
8  they are, I want them to make sure that they are doing
9  that.
10    Q. When you refer to a male, "he," in your
11  last answer, were you referring to saying about
12  Dr. Akoda?
13    A. Correct.
14    Q. Are you specifically seeking money from
15  ECFMG in this lawsuit?
16    A. I'm not seeking --
17       MR. CERYES: Objection, form, foundation.
18  The complaint says what we're seeking on behalf of
19  Ms. Evans and the Class.
20       MS. MCENROE: I'm allowed to ask the
21  witness about the damages she is seeking, if any.
22    A. Yes. Yeah, because I missed work. I've
23  had doctors' appointments. I've had a lot of things
24  that I was affected by.
25    Q. Have you done any calculation of how much

Page 165

1  money that is?
2    A. No.
3    Q. Have you collected up any invoices or bills
4  from any of those experiences to be able to help
5  catalog what that might be?
6    A. I haven't collected them, but they're
7  readily available, if I needed anything.
8    Q. So what injury, if any, did you experience
9  as a result of ECFMG's conduct?
10       MR. CERYES: Objection, form, foundation,
11  calls for somewhat of a legal conclusion, but you can
12  answer.
13    A. Okay. I feel that, because of them, I'm
14  afraid to seek a doctor. I don't know who to trust.
15  I don't know who to send my son to. Because if the
16  places that are supposed to be doing these
17  credentialing, if I can't trust what they're telling
18  me, I don't really know how to do my own investigation
19  to find out if a doctor is really a doctor or who they
20  say they are. So it has diminished my trust in the
21  medical profession.
22    Q. Do you have a belief that Dr. Akoda is not
23  a doctor?
24       MR. CERYES: Objection.
25    A. Yes.

Desire Evans

| Page 166 |
| --- |

1      Q. From where did you get that belief?

2      A. Well, from the fact that he's using two

3  different names, we really don't even know who he is,

4  so I don't know -- I can't say what he's done.

5      Q. Right. But you used a different name

6  before you got married, right?

7      A. That's different. My name is going to

8  change as a woman. Unless his name is hyphenated, I

9  can't really see that is the same.

10      Q. Do you think there are no scenarios in

11  which someone could use a different name and still be

12  a physician?

13          MR. CERYES: Objection, form, foundation.

14      A. Use a different name along with a different

15  Social? No.

16      Q. Do you know if any of the other physicians

17  who have ever treated you have you ever had

18  convictions for any crimes?

19      A. No, I do not.

20      Q. Do you know if any of them have ever been

21  convicted for tax fraud?

22      A. No, I do not.

23      Q. Do you know if any of them have ever been

24  convicted for not paying their housekeeper or their

25  nanny aboveboard?

| Page 167 |
| --- |

1      A. No, ma'am.

2      Q. Do you know if any of them have ever smoked

3  pot?

4      A. No. No, ma'am.

5      Q. Do you believe that doing any of those

6  things would make them any less of a doctor than they

7  were when they treated you?

8          MR. CERYES: Objection, form.

9      A. I don't think -- I don't think one has

10  anything to do with the other, but no.

11      Q. So Social Security fraud would have nothing

12  to do with whether someone was actually a doctor.

13      A. Using someone else's Social Security

14  number? Absolutely. Because you don't know who that

15  person is. You have no idea who you're dealing with.

16  You're born with one Social Security number. That

17  doesn't never change.

18      Q. Do you know the process for a foreign-born

19  individual to obtain a Social Security number in the

20  United States?

21      A. No, but I do believe, once you get it, it

22  doesn't change.

23      Q. Do you -- so you draw a line between a

24  doctor committing tax fraud and a doctor committing

25  Social Security fraud?

| Page 168 |
| --- |

1      A. Yes.

2      Q. Do you draw -- where do you draw the line

3  compared to insurance fraud? Is that okay for a

4  doctor or not okay for a doctor?

5      A. No, I mean, nothing is okay. However, when

6  you're dealing with other -- when you're dealing with

7  people's lives and you're treating people, you should

8  be who you say you are.

9      So him having tax fraud has nothing to do with

10  him faking his identity and telling me that he's

11  somebody that he's not. It's not the same.

12      So he should pay for whatever crime he commits,

13  absolutely, but lying about your identity to become a

14  doctor or whatever he did is a totally different

15  situation.

16      Q. Is that something you believe or something

17  someone told you?

18      A. That's what I believe.

19      Q. And you think it's okay to be treated by a

20  doctor who smoked pot?

21          MR. CERYES: Objection, form, foundation,

22  relevance.

23          MS. MCENROE: Well, it's a violation of law

24  and I'm allowed to explore. This is squarely at issue

25  for the claims she has brought in this case.

| Page 169 |
| --- |

1      A. Depends on which state they live in because

2  smoking pot is not illegal everywhere.

3      Q. Is smoking pot legal in Maryland?

4      A. No, but it's legal in D.C.

5      Q. So it's not that you have an issue with

6  your doctor breaking the law necessarily; it's that

7  you have an issue specifically with Social Security

8  fraud.

9          MR. CERYES: Objection to form.

10      A. I have -- I have an issue with not knowing

11  who was treating me, yes.

12      Q. But it's not an issue of whether the doctor

13  has the skills to treat you; it's about whether the

14  doctor is who they say they are when they're treating

15  you. Is that right?

16          MR. CERYES: Objection to form.

17      A. I wouldn't know if they really had the

18  skills if they're not using their correct identity.

19      Q. So if a doctor cuts open your abdomen,

20  completes a C-section, and mommy and baby both come

21  out healthy, you doubt that that person is a doctor?

22          MR. CERYES: Objection, form.

23      A. Yeah.

24      Q. And if someone completed a residency

25  program, which is part of medical graduate education,

Desire Evans

Page 170

1  you still doubt that that person's a doctor?
2        MR. CERYES:  Objection, form, foundation.
3        A.  Yes.
4        Q.  And if a person completed all the
5  substantive examinations required to become a
6  physician in the United States, do you still doubt
7  that that person is a doctor?
8        MR. CERYES:  Objection to form, foundation.
9        A.  Yes, when you're using a different
10 identity, who is to say it was the same person every
11 time that they went to take the certification?
12 Because obviously the facility is not checking to make
13 sure this is the same person or to see if this person
14 has been there before.
15       So I don't know if that was the same person
16 that took all of those residencies or that went
17 through those programs.  I have no idea.
18       Q.  So you are doubting that Dr. Akoda who
19 completed the residency is not who actually delivered
20 your baby?
21       A.  That's not what I'm saying.  What I'm
22 saying is, is that he could have gotten -- there's a
23 lot of people who know how to deliver babies who
24 didn't go through medical training, like it happens
25 all the time.  People give birth in the back of taxi

Page 171

1  cabs.  It happens all the time.  It's something that
2  people can do.
3        So he could have had some kind of other
4  training, I'm not sure, but I don't know who he is and
5  I don't know what school he went to.  I don't know
6  anything about that because he chose to use a
7  different identity.
8        Q.  Did you ask any of those questions before
9  he delivered your baby?
10       A.  I didn't know I had to.
11       Q.  Did -- have you ever heard of a taxi driver
12 delivering a baby by C-section?
13       A.  No.
14       Q.  Have you ever heard of a taxi driver
15 completing a residency program who is not a physician?
16       A.  Nope.
17       Q.  What do the words "excruciating emotional
18 anguish" mean to you?
19       A.  How I feel when I have to talk about what
20 Dr. Akoda did to me.
21       Q.  Are those your words?  Are those words that
22 you would use naturally?
23       A.  No.  It's how I feel, though.
24       Q.  Trying to speed this up a little.  Sorry.
25       Did you feel differently about your birth

Page 172

1  experience of Peyton before you heard the radio ad
2  than you did after you heard the radio ad?
3        A.  No.  That was the reason why my husband
4  told me about the radio ad is because it was something
5  that was in our discussion since we had Peyton and we
6  didn't know how to deal with it.
7        Q.  What do you mean you didn't know how to
8  deal with it?
9        A.  We didn't know what course we can take,
10 whether what he did was wrong.  We didn't know.  We
11 didn't know anything.  We didn't know what to do, but
12 we were both uncomfortable.  I was uncomfortable and
13 it affected me.
14       So when I heard the ad about Dr. Akoda, he was
15 like, oh, my God, this is probably what we were
16 feeling the whole time, you know, like, so reach out
17 to them because you're not the only person that he's
18 done this to.
19       So I wasn't even aware at the time that it was
20 about him possibly not being a doctor.  I thought it
21 was about him touching women inappropriately, because
22 that's how I felt, and that was my main -- my main
23 issue at the beginning.
24       Q.  How did you feel when you got the
25 impression that it was possibly about him not being a

Page 173

1  doctor?
2        A.  I felt even worse about it.
3        Q.  And if it had turned out that he actually
4  was really a doctor, would that being told that maybe
5  he wasn't really a doctor be part of what has made
6  your experience worse since that time?
7        MR. CERYES:  Objection, form, foundation.
8        A.  So can you say it again?
9        Q.  So if it turns out that it was wrong that
10 he was not a doctor, so he actually was a doctor, was
11 having been told that he was not a doctor part of what
12 caused you anguish since that time?
13       MR. CERYES:  Objection, form, foundation.
14       A.  I was already feeling anguish, but, yes, it
15 made it worse.
16       Q.  How did you come to have the impression
17 that Dr. Akoda may not have been a doctor?
18       MR. CERYES:  Objection, form, foundation.
19       A.  Through speaking to counsel.
20       Q.  Did you do any independent investigation
21 about whether that was true?
22       A.  What, if Dr. Akoda wasn't actually a
23 doctor?
24       Q.  Correct.
25       A.  I mean, I Googled it.  I Googled him.  And

Desire Evans

Page 174

1  as I mentioned, I saw the news ad where he was
2  actually in jail, so...
3      Q.  But you mentioned earlier you didn't see
4  why he was in jail.
5      A.  No, but I saw that he was in jail.
6      Q.  So you didn't investigate about whether
7  that was for unlawful practice of medicine?
8      A.  No.
9      Q.  So did you do anything other than consult
10  with counsel to find out whether Dr. Akoda was a
11  doctor or not?
12      A.  No.
13      Q.  You just mentioned a moment ago that your
14  husband and yourself had discussed your experience
15  with Dr. Akoda following Peyton's birth; is that
16  correct?
17      A.  Yes.
18      Q.  Approximately how many times?
19      A.  It was quite -- it was quite often.  It
20  was --
21      Q.  More frequently at one point than another
22  or consistently throughout?
23      A.  Consistently throughout.
24      Q.  Was this a daily conversation?
25      A.  I mean, not daily, but it was something

Page 175

1  that -- that affected -- that affected us.
2      Q.  Did you discuss your experience with
3  Dr. Akoda from your birth with Peyton with your mother
4  following the birth of Peyton?
5      A.  Yes.
6      Q.  How frequently?
7      A.  Maybe three, four times.
8      Q.  When most recently?
9      A.  Most recently?  Letting her know that I was
10  coming to a deposition.
11      Q.  Before that time, when most recently to
12  that?
13      A.  Oh.  Maybe a few months ago.
14      Q.  And before that?
15      A.  Probably a few months before that.  I can't
16  really say.
17      Q.  And do you remember after Peyton's birth
18  when the first time you spoke again with your mother
19  about Dr. Akoda's conduct was?  Maybe how old Peyton
20  was, if that's helpful.
21      A.  I told -- we discussed it, like, as soon as
22  I got home.
23      Q.  Do you remember what you discussed?
24      A.  How -- what he did and how it made me feel
25  uncomfortable.  And then she said I didn't even notice

Page 176

1  that.  And then my husband -- me and my husband
2  explained to her what happened.
3      Q.  Did you discuss anything else?
4      A.  No.
5      Q.  Through your discussions with your husband
6  or with your mother, did you consider going to consult
7  legal counsel?
8      A.  We were thinking about it.
9      Q.  Did you ever consult with legal counsel
10  prior to hearing the radio ad?
11      A.  No.
12      Q.  Did you ever consult with another physician
13  other than Dr. Newton?
14      A.  No.
15      Q.  Did you consider going to consult with
16  another physician?  I don't mean for medical
17  treatment.  I mean regarding your experiences with
18  Dr. Akoda after your delivery with Peyton.
19      A.  No.
20      Q.  And Dr. Newton is your cousin, we discussed
21  earlier, correct?
22      A.  Yes.
23      Q.  And have you discussed your experiences
24  with Dr. Akoda with Dr. Newton?
25      A.  At the very beginning, yes.

Page 177

1      Q.  When was that approximately?
2      A.  Maybe April 2016.
3      Q.  Do you remember what you talked about with
4  Dr. Newton?
5      A.  I was just explaining to him -- well, I was
6  asking him about how -- I was telling him that I felt
7  uncomfortable and I didn't really know if there was
8  anything that I could do about it or, like, should he
9  have done that, like, am I right for feeling this way.
10  I just wasn't -- I wasn't 100 percent sure if he would
11  even -- like, if that's really something that you do,
12  is that really how you stimulate for a baby to come
13  out.
14      Like I had no idea, so I was just trying to get
15  a little bit more information about if I -- what I was
16  feeling was -- what's the word I'm looking for -- not
17  accurate, but if what I was feeling was right.  Was I
18  right in feeling that he wasn't supposed to treat me
19  like that, or he was violating his place, and he said
20  that he thought so.
21      Q.  What did Dr. Newton tell you?
22      A.  He said he thought -- he said he thought
23  so.  He said he wouldn't touch anyone that way.
24      Q.  He's an anesthesiologist, correct?
25      A.  Mm-hmm.

Desire Evans

Page 178

1  Q. Is that yes?
2  A. Yes.
3  Q. So for his profession do you know if he's
4  touching anybody's private parts?
5  A. No.
6  Q. Do you know when the last time Dr. Newton
7  delivered a baby was?
8  A. No, I don't.
9  Q. Do you know if Dr. Newton has ever
10  delivered a baby?
11  A. I don't know if he's ever delivered a baby.
12  Valid, if my feelings were valid, that's the
13  word I was looking for.
14  Q. Oh, from your earlier answer.
15  A. Yes.  Yes.
16  Q. Do you use any social media, Ms. Evans?
17  A. Yes.
18  Q. What social media do you use?
19  A. I have Facebook.
20  Q. Are you on Facebook as Desire Evans?
21  A. Yes.
22  Q. Are you an active user of Facebook?
23  A. Yeah, you can say that.
24  Q. Do you keep a diary, Ms. Evans?
25  A. No.

Page 179

1  Q. Do you have a blog?
2  A. No.
3  Q. Do you keep a calendar or a daily diary of
4  your activities?
5  A. No.
6  Q. Do you have in your possession any medical
7  records that were not provided to counsel in this
8  litigation?
9  A. No.
10  Q. You mentioned that you are currently being
11  treated by a Paul Donato, correct?
12  A. Yes.
13  Q. Do you know if you signed a consent form
14  for Dr. Donato's office to release records about your
15  treatment?
16  A. I'm pretty sure I did.
17  Q. Do you know if you signed a release or a
18  consent form for Dr. Nnamani's office to release
19  records?
20  A. I'm pretty sure I did.
21  Q. Have you ever seen those doctors' records
22  from either Drs. Donato or Nnamani?
23  A. No.

Page 180

2  A. No.
3  Q. Do you have any documentation about that
4  experience at all?
5  A. No.
6  MS. MCENROE:  I'd like to take a quick
7  break.
8  MR. CERYES:  Okay.
9  VIDEO SPECIALIST:  We're going off the
10  record at 2:29.
11  (Proceedings recessed)
12  VIDEO SPECIALIST:  We're back on the record
at 2:41.
14  BY MS. MCENROE:
18  A. Yes.
21  A. Yes.
22  Q. What hospital was that at?
23  A. Laurel?
24  Q. Where?
25  A. Wait.  Hold on.  I was living in -- Laurel

Page 181

1  Regional Medical Center, I'm assuming.
2  Q. In Maryland?
3  A. Yes.
4  MS. MCENROE:  From our perspective,
5  counsel, there's still some significant open medical
6  records that have not been produced, most notably from
7  Dr. Donato and Dr. Nnamani,
9  So pending those productions and our ability to
10  review them, we're going to suspend the deposition and
11  leave it open.
12  We appreciate your attending here today and
13  answering my questions.
14  MR. CERYES:  Okay.  And we'll evaluate from
15  our perspective -- we have requested those records, so
16  once they come in, we'll discuss the proprietary of
17  reopening the deposition at that time.
18  MS. MCENROE:  We look forward to reviewing.
19  Thank you.
20  THE WITNESS:  I'm going to have to come
21  back?
22  MR. CERYES:  We'll see about that.
23  Ms. Evans, I do have just a couple follow-up
24  questions for you.
25  EXAMINATION

Desire Evans

Page 182

BY MR. CERYES:

Q. First of all, you were asked by counsel some questions about your knowledge of the process that physicians have to go through in order to become -- in order to see and treat patients. Do you recall those questions?

A. Yes.

Q. Okay. Prior to undergoing care and treatment from Akoda, was it your belief that physicians did have to go through a process in order to be entrusted with the responsibility of seeing and treating patients as a physician?

MS. MCENROE: Objection to form, leading.

A. Yes.

Q. Okay. And was it your assumption in agreeing to undergo treatment by the person you knew -- you knew as Dr. Akoda, that he had gone through that process in a lawful way without having misrepresented his identity?

MS. MCENROE: Objection to form, leading.

A. Yes.

Q. Okay. And had you understood that Akoda had misrepresented his identity in order to go through that process, would you have agreed to undergo treatment from him?

Page 183

MS. MCENROE: Objection to form, leading.

A. No.

Q. Okay. You were also asked some questions about your role as a Class representative in this case. Do you recall those questions?

A. Yes.

Q. Is it your intention in this case to seek on behalf of yourself and others who are patients of Dr. Akoda compensatory damages, meaning monetary damages, for the emotional distress caused by having undergone treatment by Akoda in an amount that a jury deems appropriate?

MS. MCENROE: Objection to form --

A. Yes.

MS. MCENROE: -- leading. Counsel is testifying.

MR. CERYES: That's all I have.

MS. MCENROE: No questions from us. Again, we suspend the deposition. Thank you.

VIDEO SPECIALIST: We're going off the record at 2:44.

//

//

(The deposition of DESIRE EVANS adjourned

Page 184

at 2:44 p.m.)

//

Page 185

ACKNOWLEDGMENT OF DEPONENT

I, DESIRE EVANS, do hereby acknowledge that I have read and examined the foregoing testimony and that the same is a true, correct and complete transcription of the testimony given by me, with the exception of the noted corrections, if any, appearing on the attached errata page(s).

_____    _____
DATE          DESIRE EVANS

Subscribed and sworn to before me this _____ day of
_____, 20_____ .

_____ (Notary Public)

My Commission expires: _____

[SEAL]

Page 186

```
1          C E R T I F I C A T E

2

3      I, LINDA S. KINKADE, Registered Diplomate

4  Reporter, Certified Realtime Reporter, Registered

5  Merit Reporter, Certified Shorthand Reporter, and

6  Notary Public, do hereby certify that prior to the

7  commencement of examination the deponent herein was

8  duly sworn by me to testify truthfully under penalty

9  of perjury.

10     I FURTHER CERTIFY that the foregoing is a true

11  and accurate transcript of the proceedings as reported

12  by me stenographically to the best of my ability.

13     I FURTHER CERTIFY that I am neither counsel for

14  nor related to nor employed by any of the parties to

15  this case and have no interest, financial or

16  otherwise, in its outcome.

17     IN WITNESS WHEREOF, I have hereunto set my hand

18  and affixed my notarial seal this 9th day of

19  September, 2019.

20     My commission expires:  July 31, 2022

21

22  _____

23  NOTARY PUBLIC IN AND FOR

24  THE DISTRICT OF COLUMBIA

25
```

Page 187

```
1          WITNESS ERRATA SHEET

2  REF. NO. 225851        Page 1 of _____

3  NAME OF CASE: RUSSELL, et al. v. ECFMG

4  DEPONENT:  DESIRE EVANS

5  DATE OF DEPOSITION: September 5, 2019

6  PLEASE INSERT REASON FOR CHANGE:

7        1.  To clarify the record.
          2.  To conform to the facts.

8        3.  To correct a transcription error.

9  Page      Line      Reason No.

10  From _____ to _____

11  Page      Line      Reason No. _____

12  From _____ to _____

13  Page      Line      Reason No.

14  From _____ to _____

15  Page      Line      Reason No.

16  From _____ to _____

17  Page      Line      Reason No.

18  From _____ to _____

19  Page      Line      Reason No.

20  From _____ to _____

21

22

23  SIGNED: _____ DATE: _____

24  (Signature of DESIRE EVANS)

25
```