# Exhibit 74

**Gladys S. Fenichel, MD**
**210 Kent Road**
**Ardmore, PA 19003**
**FenichelMD@FenichelMD.com**
**(610) 649-8940**
**FAX (610) 649-5071**

September 23, 2019

Elisa P. McEnroe
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, Pennsylvania 19103-2921

**RE: Monique Russell et al. v. Educational Commission for Foreign Medical Graduates**

Dear Ms. McEnroe,

On September 17, 2019, I had the opportunity to see Monique Russell for an independent psychiatric evaluation.

The examination was requested to comment on Ms. Russell's psychiatric condition in relation to the Complaint in *Monique Russell et al. v. Educational Commission for Foreign Medical Graduates*.

At the start of the examination, I discussed with Ms. Russell that the evaluation was not for purposes of treatment and that it was not a confidential examination. I discussed with Ms. Russell that I would prepare a report based on the psychiatric evaluation and review of records.

In preparation of this report I have reviewed the following documents:

1. Medical Records:
   Plaintiffs0000000932 – Plaintiffs0000001133;
   Plaintiffs0000001243 – Plaintiffs0000001685;
   Plaintiffs0000001686 – Plaintiffs0000001839;
   Plaintiffs0000001840 – Plaintiffs0000001845;
   Plaintiffs0000001846 – Plaintiffs0000001994;
   Plaintiffs0000005338 – Plaintiffs0000005429;
   Plaintiffs0000067757 – Plaintiffs0000067847;
   Plaintiffs0000118654 – Plaintiffs0000118679
2. Complaint in *Russell et al. v. ECFMG*
3. Monique Russell's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents (3/29/2019)
4. Monique Russell's Supplemental Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents (6/13/2019)
5. Amended Class Action Complaint in *Russell v. Dimensions Health*, CAL 18-07863 (3/16/2018)

RE:  Monique Russell
Page 2

6. Monique Russell's Responses to Defendants' Request for Admissions in CAL 18-07863 (7/10/2018)

**HISTORY REPORTED BY MONIQUE RUSSELL:**

Monique Russell (date of birth ▆▆▆▆▆▆) stated that she instigated the lawsuit *Russell et al v. ECFMG* because of her feeling that she was violated by the man who had identified himself as Dr. Akoda. She said that Dr. Akoda was not a real doctor, and there is no real evidence that this man had attended medical school. Ms. Russell said that she read the "transcripts" from his federal trial. She said that she believes that Dr. Akoda had faked his way into residency programs. Ms. Russell said it is her opinion that "without consent she was subjected to assault." As a consequence of her reported experience with Dr. Akoda, Ms. Russell said she feels that she cannot trust the medical system or doctors. Ms. Russell said that she believes that Dr. Akoda had three different Social Security numbers and three different names. Ms. Russell said that she believes Dr. Akoda had applied to take the medical board examinations three times. Ms. Russell said that she does not know if Dr. Akoda could have had his license reinstated in another state.

Ms. Russell said that Dr. Akoda was not her doctor. She said that she had chosen to have her OB treatment with Dr. Danielle Waldrop at the practice of Javaka Moore, M.D. Ms. Russell said that she had expected that either Dr. Moore or Dr. Waldrop would deliver her baby, but it was Dr. Akoda who was in the delivery room. Ms. Russell said that she later wanted to recommend Dr. Waldrop to a friend who was looking for an obstetrician. Ms. Russell said that she had told this friend that if she went to the practice with Dr. Waldrop and Dr. Akoda was still in the practice, she may be treated by Dr. Akoda, and Ms. Russell had not had a good experience with him. Ms. Russell said that when she looked for information about Dr. Moore's practice, she saw that Dr. Akoda was not on the list of practitioners. Ms. Russell said that in June 2017, she began an investigation and found a release from the Justice Department regarding Dr. Akoda. Ms. Russell said that she was blown away and horrified. She said that she spent days and nights trying to make sense of the available information. Ms. Russell questioned how it was possible that this "alleged doctor" had delivered her child. Ms. Russell acknowledged that the consequences to her regarding the treatment she received from Dr. Akoda were, "For me, minor." Ms. Russell said that she read about another lawsuit against Dr. Akoda alleging that there were permanent injuries to a child as a consequence of his treatment. Ms. Russell said Dr. Akoda should never have had access to women.

Ms. Russell said that when she learned this information about Dr. Akoda, she was reminded of prior trauma and abuse. She said that she was ▆▆▆▆▆▆ when she was a child and again when she was in her early twenties.

Ms. Russell said that she does not have regular gynecologic appointments. Ms. Russell said that she has problems with trust in regard to the credentials of doctors. Ms. Russell said that the experience with Dr. Akoda has gotten in the way of family planning. She said that she wanted other children, but she has not had gynecologic treatment. Ms. Russell also said that she does not know if the caesarean section was medically necessary. She said that there was no damage to her son, but she questions the medical decision that Dr. Akoda made.

Ms. Russell had a doula in the delivery room. Her husband and her mother-in-law were also in the delivery room. Ms. Russell said that she did not like Dr. Akoda's behavior. She said that he would come into the delivery room and talk to her husband and not to her. She said that she found him to be really misogynistic. Ms. Russell said that she told her husband that if Dr. Akoda spoke to him one more time about her vagina, then they would need a different doctor. Ms. Russell said that after her husband spoke to Dr. Akoda, he began to talk to her, but she said that she did not like him.

Ms. Russell said that she was in labor for 32 hours. She said that she was given antibiotics after 18 hours because her water had broken. She said that she was only 1 cm dilated and she was started on Pitocin. Ms. Russell said that she had horrible contractions, but she still did not dilate. Dr. Akoda suggested an epidural hoping that the epidural would relax her and help with the contractions. Ms. Russell said that the baby went into distress. Although the baby's stats went back to normal, Dr. Akoda recommended an emergency caesarean section. Ms. Russell repeated that she trusted that Dr. Akoda was a real doctor. Ms. Russell said that looking back, she does not know if she had an unnecessary surgery. Ms. Russell said that she continues to have itching at the scar from the surgery. Ms. Russell said when she thinks about the caesarean section, she thinks that Dr. Akoda was rough, and he was "playing football with my organs." Ms. Russell said that she was discharged from the hospital after three days. She said that her husband took two weeks off and she had help from a postpartum doula and her mother-in-law.

Ms. Russell said that she had an appointment with Dr. Waldrop for an IUD when her son was six months old. In response to the question of how the experience with Dr. Akoda affected her family planning, Ms. Russell said that she found it hard to be intimate with her husband after she learned about Dr. Akoda.

Ms. Russell said that she thinks she went back to see Dr. Moore after she learned about the charges against Dr. Akoda. She described the visit as a meeting with Dr. Moore, and not a medical appointment. Ms. Russell said that she questioned Dr. Moore about why she had not been notified about Dr. Akoda's federal charges, and Dr. Moore told her that it was not his practice's responsibility to notify the patients. Ms. Russell said that she disagreed. Ms. Russell said that she believes it was someone's job to notify patients about Dr. Akoda. Ms. Russell said that Dr. Moore was not defensive, but rather surprised about her questions. Ms. Russell said that she was really angry and really in shock.

Ms. Russell then provided additional information of what she has learned about Dr. Akoda. She said that Dr. Akoda did not have an office practice with Dr. Moore, but he worked in Dr. Chaudry's practice. She said that Dr. Akoda delivered babies for Dr. Moore's practice and for Dr. Chaudry. Ms. Russell said that Dr. Akoda's office and home were raided. Ms. Russell said that multiple passports were found, along with a machine to create diplomas. Ms. Russell said that she has to have her fingerprints checked every two years to be a Washington, DC public school teacher. Ms. Russell said that she does not understand how Dr. Akoda was able to apply to ECFMG three times, especially after he was kicked out of a residency program in New Jersey when it was discovered he was a fraud. Ms. Russell said that she believes that this information about the New Jersey residency was reported to ECFMG. She said that after "this reported doctor" was kicked out of the New Jersey program, he reapplied to ECFMG using different

RE:  Monique Russell
Page 4

names and different Social Security numbers.  Ms. Russell said that Dr. Akoda got through ECFMG and was able to finish an OB/GYN residency program at Howard University.  She said that Dr. Akoda met Dr. Chaudry and Dr. Moore, who were both attendings at Howard University.  Ms. Russell said that in between Dr. Akoda's first residency program and the residency at Howard, Dr. Akoda had worked in Florida as a nurse.  She said again there is no evidence that he had graduated from medical school.

Ms. Russell said that she believes that she was the first patient who found out about Dr. Akoda's identity and criminal charges.  Ms. Russell said that she chose an attorney who was recommended to her by a friend.

Ms. Russell said that she would like to get pregnant again, but she does not have a doctor.  She said that she did have complications (bleeding and cramping) with her IUD in 2018 or 2019.  She said that a doctor removed the IUD at an urgent care in Costa Rica.  Ms. Russell said that she was really anxious about the IUD removal.  She said that she did look up information about the doctor, and she leaned the doctor was American-trained.  Ms. Russell said that the experience was okay.

Ms. Russell described her mood noting that she is a pretty positive person.  She tries to keep things in perspective.  Ms. Russell said that she does not sleep enough, but she has a toddler and a demanding job.  Ms. Russell said she does focus on self-care.  She said that she walks one to two miles every day and that she does yoga.  Ms. Russell said that she gets up between 5:00 a.m. – 5:30 a.m.  She said that she tries to go to sleep by 10:00 p.m. – 11:00 p.m. and she does sleep through the night.  Ms. Russell said that she does not have problems with her appetite.  She said her concentration is fine.  She said she is able to experience pleasure.  Ms. Russell said she enjoys her job, and she likes to walk, hike, do yoga, and read.  Ms. Russell said that she has a lot of plans for her future with her husband and son.

Ms. Russell said that in a way she feels lucky.  She said that the situation could have been worse.  She acknowledged there were no physical consequences to the medical experience with Dr. Akoda.  She said the experience with Dr. Akoda brought up past trauma ▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇  Ms. Russell said that the suffering she experienced may be less than what other women experienced, but she feels a responsibility to stand up for other women who had trauma as a consequence of their experiences with Dr. Akoda.  Ms. Russell repeated that she remains concerned that Dr. Akoda will try to practice medicine again.  Ms. Russell wants to make sure in any way she can that it will be impossible for Dr. Akoda to practice medicine again.

## PAST MEDICAL HISTORY

Ms. Russell said that she had an emergency appendectomy in 2000.  She said her appendix did not rupture.

Ms. Russell had ▇▇▇▇▇▇▇▇ in 2004.

In 2005, Ms. Russell had bleeding and ▇▇▇▇▇▇▇▇▇▇▇▇▇▇  This was not a planned pregnancy.

RE: Monique Russell
Page 5

In 2012, Ms. Russell had an unplanned pregnancy. She did not plan to terminate the pregnancy. She had ▮▮▮▮▮▮▮▮ at six weeks.

Ms. Russell said when she became pregnant with her son, she spoke to doctors and nurses about her history of miscarriages. Ms. Russell said that she learned that women often have miscarriages before they know they are pregnant. Ms. Russell said that she was not concerned about her history of miscarriages with her pregnancy with her son.

Ms. Russell said that her pregnancy with her son was challenging. She said that she had early bleeding. She had an evaluation with a high-risk pregnancy doctor, and she was closely monitored in the first trimester. Ms. Russell said that at 6.5 months, she developed problems with vomiting; she would throw up whenever she ate, but she continued to gain weight.

Ms. Russell has a condition known as vasovagal syncope that she was diagnosed with when she was in her thirties. She said that she had to be careful during her pregnancy for dizzy spells. Ms. Russell said that she learned what to do when she felt dizzy, and she was able to watch for triggers. Ms. Russell said that in the last two months of her pregnancy, she was on modified bedrest. She said that she was able to work from home. Ms. Russell said that she has only had one vasovagal episode since her son was born.

Ms. Russell said that she has a history of chronic back pain that she believes is stress related. Ms. Russell said that she developed back pain after her sister died such that she could not walk. Ms. Russell said that she learned breathing techniques and has been doing daily meditation for many years. Ms. Russell said that when her son was about one year old, she developed back pain again, and she had a course of physical therapy.

## PAST PSYCHIATRIC HISTORY:

Ms. Russell said that she had counseling growing up. She said that she was five years old when she and her sister were adopted, and four years later, her parents adopted a baby girl. Ms. Russell said that her biological sister had problems with acting out, and they had counseling.

Ms. Russell said that she was sexually molested by a family member when she was six or seven years old. She said that she did not report the abuse until she was 15 years old. Ms. Russell said she reported the abuse when her baby sister was the same age as when the assault happened to her. Ms. Russell said that the first person she told was a male guidance counselor, and the guidance counselor called Ms. Russell's parents and the police. Ms. Russell said she wanted to make sure that her sister was protected. Ms. Russell said that the guidance counselor started a support group for young girls who were victims of sexual abuse or assault.

Ms. Russell said that she was sexually assaulted as an adult when she was in her early twenties. She said that this was date rape. Ms. Russell said this was perhaps her third date with this man. She said that he did not listen when she told him to stop, and he apologized to her afterward. Ms. Russell said that she did not see a counselor and that she does not know if she dealt with the

consequences of this reported date rape effectively. Ms. Russell said later on that she did some personal work to examine her relationships and her underlying beliefs.

Ms. Russell said that her adopted sister had depression and committed suicide at the age of 21 in 2007. Ms. Russell said that her sister had a history of prior suicide attempts that Ms. Russell believes were calls for attention. Ms. Russell said that she did not go to counseling when her sister committed suicide. Ms. Russell said her family doctor prescribed ████ and she took the medication for six months after the suicide of her sister. Ms. Russell said that she did not see the suicide coming. Ms. Russell said that she had trouble functioning after her sister's suicide. She said that she was then a student at the University of Maryland and that she was also working. She said that her professors and her employer were understanding, and she had a really strong network of friends.

## SOCIAL HISTORY:

Ms. Russell said that she lives in Costa Rica and works at a private international school as the curriculum coordinator for early childhood to fifth grade. Ms. Russell said that her contract is up in August 2020. She said she thinks that she will renew the contract and stay in Costa Rica. She said that she can stay in one place for up to five years working for this company.

Ms. Russell said that her undergraduate degree is from the University of Maryland in studio arts and education. Ms. Russell said that she was certified in 2009 to teach early childhood to third grade. She has a Master of Arts in Teaching from Trinity University that she completed in 2014. She said that in this program she took a deep dive into literacy instruction. Ms. Russell said that she has bounced back from jobs supporting teachers to teaching in the classroom. She said in 2014, she was working as an instructional specialist in the Washington, DC public schools.

Ms. Russell said that she grew up in a Catholic family, and she became a Quaker in her early twenties. She said that she knew by the age of 13 that she did not believe in Catholicism. She said that her mother told her not to proceed with confirmation if she did not believe in all the tenets. Ms. Russell said that she and her sister tried out different houses of worship. She said when she went to a Quaker meeting, she realized this was home. Ms. Russell said that she has a home meeting in Washington, DC. There is a Quaker settlement three or four hours from where she lives in Costa Rica, but she has not gone to meetings.

Ms. Russell said that she met her husband on a dating site in 2014. She said that they went on three dates in three days, and they knew that this was it. She said he proposed after five months. Ms. Russell said she and her husband met in February 2014, and they were married on October 3, 2014. She said that she was 35 and he was the man of her dreams.

Ms. Russell said that her husband is a DJ, and he travels to Washington, DC to work at weddings. She said that he cannot work in Costa Rica because of his visa. Ms. Russell said she always wanted to live in Costa Rica. She said that the culture is warm and family-oriented. She said that she works from 7:30 a.m. until 4:30 p.m. and her son is in school from 7:30 a.m. until 3:00 p.m.

**MENTAL STATUS EXAMINATION:**

Mental status examination revealed a casually groomed 42-year-old woman who appeared younger than her stated age. Her speech was goal-directed and spontaneous, and she easily established rapport. Ms. Russell provided a detailed history and explained how she had learned about the federal charges against Dr. Akoda.

Ms. Russell described her mood noting that she is a pretty positive person, and she keeps things in perspective. Ms. Russell said in a way she feels lucky that what happened to her with Dr. Akoda was not worse. She said that she had no physical consequences from the birth of her son. She said that she feels responsible to stand up for women who were subjected to trauma. Ms. Russell revealed a full range of affect appropriate to content. She denied a history of suicidal ideation.

Ms. Russell denied a history of anxiety attacks.

Memory, intelligence, and fund of knowledge were grossly within normal limits.

**REVIEW OF RECORDS:**

I have reviewed the records identified at the start of the report. There were no records that referred to any psychiatric or psychological treatment or complaints of anxiety or depression to a treating doctor.

**SUMMARY AND IMPRESSION:**

It is my opinion Ms. Russell does not have any psychiatric disorder causally related to the allegations in the Complaint.

Ms. Russell related a past history of counseling and treatment with the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ She reported a history of seeking treatment and medication at times of stress. Ms. Russell did not engage in treatment related to learning information about Dr. Akoda. Ms. Russell acknowledged that the consequences in regard to the treatment she received from Dr. Akoda were, "For me, minor."

It is my opinion Ms. Russell did not present with symptoms compatible with any psychiatric diagnosis. Ms. Russell described her mood noting that she is a pretty positive person, and she keeps things in perspective. She has strong relationships with her husband and her son, and she is optimistic about her future. It is my opinion there is no indication for psychiatric or psychological treatment for Ms. Russell in relation to the allegations in the Complaint.

The opinions noted in this report have been stated within a reasonable degree of medical certainty.

RE: Monique Russell<br>Page 8

I reserve the right to supplement this report if additional records become available for review.

Sincerely,

*[signature]*

Gladys S. Fenichel, MD

GSF/cl