**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL AND DESIRE EVANS, | CIVIL ACTION NO. 18-5629 |
| | Honorable Joshua D. Wolson |
| **Plaintiffs,** | |
| v. | |
| EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES, | |
| **Defendant.** | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**ITS OPPOSITION TO DEFENDANT EDUCATIONAL COMMISSION FOR**
**FOREIGN MEDICAL GRADUATES MOTION FOR SUMMARY JUDGMENT**

Dated: January 14, 2022                    Respectfully submitted,

JANET, JANET & SUGGS, LLC                  CONRAD O'BRIEN PC

*/s/ Patrick Thronson*                     */s/ Robin S. Weiss*
  Patrick A. Thronson                        Nicholas M. Centrella (Pa. ID 67666)
  Brenda A. Harkavy                          Robin S. Weiss (Pa. ID 312071)
  4 Reservoir Circle, Suite 200              1500 Market Street, Suite 3900
  Baltimore, MD 21208                        Philadelphia, PA 19102-2100
  (410) 653-3200                             (215) 864-9600

LAW OFFICES OF PETER G. ANGELOS,           SCHOCHOR, FEDERICO AND STATON
P.C.
                                             Brent Ceryes
  Paul M. Vettori                            The Paulton
  One Charles Center                         1211 St. Paul Street
  100 N. Charles Street, 20th Floor          Baltimore, Maryland 21202
  Baltimore, Maryland 21201                  (410) 234-1000
  (410) 649-2000

Z LAW, LLC

Cory L. Zajdel
2345 York Rd. Suite B-13
Timonium, MD 21093
(443) 213-1977

THE COCHRAN FIRM

Karen E. Evans
David E. Haynes
1100 New York Avenue, N.W.
Suite 340, West Tower
Washington, DC 20005
(202) 682-5800

*Attorneys for Plaintiffs, on behalf of
themselves and all others similarly situated*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ **1**

STATEMENT OF FACTS ................................................................................... **2**

    ECFMG's Role in the American Healthcare System .................................................... 2

    Igberase obtains initial ECFMG certification after failing medical examination twice. 3

    Igberase obtains second certification under the "Charles" identity. ECFMG
investigates and revokes Igberase's certification.......................................................... 3

    Igberase applies and is certified under the "Akoda" identity. ....................................... 4

    ECFMG learns Akoda and Igberase are the same person............................................... 4

    ECFMG nonetheless represents to Howard University's residency program, the State
of Maryland, and Prince George's Hospital Center that "Akoda" has a valid ECFMG
certificate........................................................................................................................ 6

    Igberase faces six felony charges and pleads guilty to one. ........................................... 7

    Damages to the Plaintiffs .............................................................................................. 8

  PLAINTIFFS ...................................................................................................... **8**

  LEGAL STANDARD.......................................................................................... **10**

  ARGUMENT...................................................................................................... **11**

    I.    The Plaintiffs May Recover Damages for their Emotional Distress.................... 11

      1.    The Plaintiffs have sustained a physical impact under the standards for recover
of emotional distress damages. .................................................................................... 11

      2.    The reasoning which permits recovery for those in the "zone of danger"
supports recovery for emotional distress damages here. ...................................................... 13

      3.    Historical concerns limiting recovery for emotional distress do not apply here.
      14

    II.    ECFMG Owed the Plaintiffs A Duty of Care;.................................................... 16

      1.    ECFMG has undertaken a critical gatekeeping role in the United States Medical
system for the protection of patients, and thereby owes a duty of care to patients. ............. 16

      2.    The Defendants owe the Plaintiffs a duty under the Restatement (Second) of
Torts § 324A ................................................................................................................ 17

      3.    The Defendants Owe the Plaintiffs a Duty under the Atlhaus factors.............. 23

      4.    ECFMG is liable to Plaintiffs under Maryland law ......................................... 29

    III.  ECFMG Was a Proximate Cause of Plaintiffs' Emotional Distress.................... 31

    IV.  ECFMG's Breach Was a But-For Cause of Plaintiffs' Emotional Distress ........ 33

    V.  The Plaintiffs Did Not Consent to Treatment by Igberase............................... 35

    VI.  The Plaintiffs' Severe Emotional Distress is Compensable ............................... 37

    VII.    The Claims of Plaintiffs Powell and Evans are not Barred by the Statute of
Limitations    39

  CONCLUSION................................................................................................... **40**

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Albany Urology Clinic, P.C. v. Cleveland,* 528 S.E.2d 777 (Ga. 2000) ....................................... 37

*Alderwoods (Pa.), Inc. v. Duquesne Light Co*., 106 A.3d 27 (2014) ........................................... 16

*Althaus v. Cohen*, 756 A.2d 1166 (Pa. 2000).............................................................. 17, 23, 25, 30

*Anderson v. Bushong Pontiac Co*., 171 A.2d 771 (Pa. 1961)................................................. 27, 28

Ashburn v. Anne Arundel Cty., 510 A.2d 1078 (Md. 1986) .......................................................... 30

*Brown v. Phila. College of Osteopathic Med.*, 674 A.2d 1130 (Pa. Super. 1996)................. 11, 12

*Campo v. St. Luke's Hosp.*, 755 A.2d 20 (Pa. Super 2000)............................................................ 16

*Cantwell v. Allegheny Cty*., 483 A.2d 1350 (1984) ....................................................................... 21

*Cantwell v. Allegheny Cty*., 483 A.2d 1350, 1353 (Pa 1984) ....................................................... 16

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ..................................................................... 10

*Commerce Bank v. First Union Nat'l Bank*, 911 A.2d 133 (Pa Super 2006).......................... 17, 33

*DeJesus v. United States VA*, 2005 WL 2175174 (E.D. Pa. Sep. 6, 2005)................................... 37

*DiMarco v. Lynch Homes-Chester Cty., Inc*., 583 A.2d 422 (1990) ............................... 16, 22, 24

*Doe I v. Evanchick*, 355 F. Supp. 3d 197, 213 (E.D. Pa. 2019).................................................... 10

*Doe v. Bradley*, 58 A.3d 429 (Del. Super. Ct. 2012) .................................................................... 18

*Doyle v. South Pittsburgh Water Co*., 199 A.2d 875 (1964) ........................................................ 22

*Duttry v. Patterson*, 771 A.2d 1255 (2001) .................................................................................. 36

*E.G. Rock, Inc. v. Danly*, 633 A.2d 485 (Md App. 1993)............................................................. 31

*Emerich v. Phila. Ctr. For Human Dev., Inv.,* 720 A.2d 1032 (Pa. 1998) ................................... 24

*Faya v. Almaraz*, 620 A.2d 327 (1993) ........................................................................................ 30

*Fragale v. Wells Fargo Bank, N.A.*, 480 F. Supp. 3d 653 (E.D. Pa. 2020) ................................. 27

*Galullo v. Fed. Express Corp.,* 937 F. Supp. 392 (E.D. Pa. 1996) ................................. 33

*Hamilton v. Ford Motor Credit Co.*, 502 A.2d 1057 (Md. Ct. Spec. App. 1986) ...................... 30

*Hunt v. Mercy Med. Ctr.*, 121 Md. App. 516, (1998) .................................... 30

*Kapil v. Association of Pa. State College and Univ. Facilities*, 470 A.2d 482 (Pa. 1983) ........... 39

*Khouri v. Koloniaris*, 1997 WL 80676 (Super. Ct. Feb. 7, 1997) ................................. 36

*Korinko v. Come Ready Nutrition, LLC*, 2020 WL 4926177 (W.D. Pa. Aug. 21, 2020) ............. 12

*Love v. Cramer*, 606 A.2d 1175 (Pa. Super 1992)........................................ 38

*Lux v. Gerald E. Ort Trucking, Inc.,* 887 A.2d 1281 (Pa Super 2005) ......................... 32

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ................. 10

*Migyanko v. Thistlethwaite*, 419 A.2d 12 (Pa. Super 1980) ......................... 16

*Nelson v. Monroe Regional Medical Center*, 925 F.2d 1555 (7th Cir. 1991) ............................ 37

*Nicini v. Morra*, 212 F.3d 798, 805-06 (3d Cir. 2000) .................................. 10

*Niederman v. Brodsky*, 261 A.2d 84, 85 (Pa. 1970) ......................................... 1, 11, 12, 13, 14, 37

*Palsgraf v. Long Island Railroad Co.*, 162 N.E. 99, 100 (N.Y. 1928) ......................... 16

*Pendleton v. State*, 921 A.2d 196 (Md. 2007) ............................... 30

*Phillips v. Cricket Lighters*, 841 A.2d 1000 (2003)........................................ 25

*Potere v. Philadelphia*, 112 A. 2d 100 (Pa. 1955)................................. 11, 12

*Prince v. Esposito*, 628 S.E.2d 601 (Ga. App. 2006) ........................... 6, 7, 8, 9, 26, 36

*Quinby v. Plumsteadville Fam. Prac. Inc.*, 907 A.2d 1061 (Pa. 2006) ....................... 31

*Reilly v. Tiergarten Inc.*, 633 A.2d 208 (Pa. Super. 1993) ........................... 31

*Rice v. Brakel*, 310 P.3d 16 (Ariz. Ct. App. 2013) ................................. 36

*Robertson v. Allied Signal, Inc.,* 914 F.2d 360 (3d Cir. 1990) ..................................... 34

*Russell v. Educ. Comm'n for Foreign Med. Graduates*, 2020 WL 1330669

    (E.D. Pa. Mar. 23, 2020) ........................................................................ 29, 30

*Saksek v. Janssen Pharm., Inc. (In re Risperdal Litig.*), 223 A.3d 633 (Pa. 2019) ............... 39, 40

*Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538

    (3d Cir. 2006) ........................................................................................ 11

*Shumosky v. Lutheran Welfare Svcs. of Northeastern Pa.*, 784 A.2d 196 (Pa. Super. 2001) ....... 12

*Sinn v. Burd*, 404 A.2d 672 (Pa. 1996) .......................................................... 11, 12, 14

*Stoddard v. Davidson*, 513 A.2d 419 (Pa. Super. 1986) ............................................. 12

*Straw v. Fair, ,* 187 A.3d 966 (Pa. Super. 2018) ................................................. 31

*Takach v. B. M. Root Co.*, 420 A.2d 1084 (Pa Super 1980) ........................................ 34

*Taylor v. Johnson*, 985 P.2d 460 (Alaska 1999) ................................................ 35, 36

*Toney v. Chester Cty. Hosp.*, 36 A.3d 83 (Pa. 2011) ............................................. 14, 15

*Tulp v. Educ. Comm'n for Foreign Med. Graduates*, 376 F. Supp. 3d 531 (E.D. Pa. 2019) ....... 24

*Vance v. Vance*, 408 A.2d 728, 733–34 (Md. 1979) ............................................... 30

*Vattimo v. Lower Bucks Hosp., Inc., ,* 465 A.2d 1231 (Pa. 1983) ................................ 31

*Welsh v. Bulger,* 698 A.2d 581 (Pa 1997) ....................................................... 18

*Willard v. Interpool, Ltd.*, 758 A.2d 684 (Pa. Super. 2000) .................................... 32

*Wilson v. El-Daief*, 964 A.2d 354, 361 (Pa. 2009) .............................................. 39

*Zelinsky v. Chimics*, 175 A.2d 351 (Pa. Super. 1961) ........................................... 12

### Other Authorities

42 Pa. Cons. Stat. Ann. § 5502 ................................................................. 39

Fed. R. Civ. P. 56 ............................................................................. 10

Fed. R. Evid. 801 ............................................................................. 20

Fed. R. Evid. 802 ........................................................................................................ 20

Fed. R. Evid. 803 ........................................................................................................ 20

Fed. R. Evid. 804 ........................................................................................................ 20

Fed. R. Evid. 805 ........................................................................................................ 20

Restatement (Second) of Torts § 15 ...................................................................... 19, 38

Restatement (Second) of Torts § 436A .................................................................. 37, 38

Restatement (Second) of Torts § 7 .............................................................................. 19

Restatement (Second) of Torts, § 892 ........................................................................ 35

## INTRODUCTION

Plaintiffs are four individuals who were fraudulently induced to undergo medical procedures, including childbirth, by a man who utilized a fictious identity, and who, the evidence indicates, had no medical degree whatsoever, and no medical license, privileges or board certification in his name.  What credentials were associated with his fictious name, "Akoda," were the product of fraud and misrepresentation.

ECFMG's negligence made this possible. ECFMG was aware of allegations of fraud concerning Igberase's "Akoda" identity well before he began treating patients.  As a quasi-public entity with a stated mission to promote quality health care for the public by certifying international medical graduates for entry into U.S. graduate medical education, ECFMG owed a duty to the Plaintiffs by virtue of their unique role within the United States medical system and the foreseeability that their negligence would result in the harm alleged in this case. As the Plaintiffs' experts have opined, ECFMG was required under the applicable standard of care to take action to prevent Igberase from continuing to perform medical procedures on patients. ECFMG breached that duty, which caused Plaintiffs to suffer severe emotional harm.  ECFMG is answerable in tort for the consequences of its negligence.

As noted by the Court in *Niederman v. Brodsky*, 261 A.2d 84, 85 (Pa. 1970), "it is fundamental to our common law system that one may seek redress for every substantial wrong," and that "'[t]he best statement of the rule is that a wrongdoer is responsible for the natural and proximate consequences of his misconduct . . . .'" *Id*. (citation omitted). The Plaintiffs are entitled to redress for their emotional harm, which occurred as a natural and proximate consequence of ECFMG's breach of its duty to the Plaintiffs.

## STATEMENT OF FACTS

This action arises from allegations that Defendant Educational Commission for Foreign Medical Graduates ("ECFMG") negligently investigated and certified Oluwafemi Charles Igberase, a/k/a John Nosa Akoda (among other aliases), as eligible to enter a residency program, notwithstanding compelling evidence that Igberase/"Akoda" had committed extensive fraud as to his identity and credentials. As Plaintiffs allege, ECFMG knew of Igberase's fraud, but failed to appropriately investigate and respond to it. ECFMG failed to inform state medical boards, residency programs, and hospitals of Igberase's fraud, even as it attested that Igberase held a valid ECFMG certification.

ECFMG acknowledges that "patients have the right not to be treated by physicians who have obtained ECFMG certification based on false pretenses."  Plaintiff's Statement of Additional Material Facts ¶86 (hereinafter "¶___").  Yet ECFMG failed to respect this right and protect the public. As a result, Igberase had the opportunity to examine, touch, harass, and sexually abuse hundreds of women under the guise of providing OB/GYN care. These patients would never have consented to examination and treatment by Igberase had they known—as ECFMG did—that Igberase had obtained his credentials through repeated acts of fraud, later found to constitute a "crime of moral turpitude." Defendant's Statement of Undisputed Material Facts ¶84 (hereinafter "Def.'s SUMF ¶____").

### ECFMG's Role in the American Healthcare System

According to Defendant, "[p]art of ECFMG's mission is to promote public health and to protect the public."  ¶76.  ECFMG certifies international medical graduates ("IMGs," defined as those who attend medical school outside the U.S. and Canada) as eligible to enter US graduate medical education programs and verifies an IMG's credentials for hospitals and state medical licensing boards. Def.'s SUMF ¶2.

2

To practice medicine in the U.S., an IMG must first apply to ECFMG, which verifies from primary sources that the IMG has obtained a valid diploma from a medical school recognized by the school's home country.  An IMG must also pass portions of the United States Medical Licensing Examination (USMLE) and a clinical skills assessment.  When these steps are satisfactorily completed, ECFMG issues a certificate to the IMG.  Def.'s SUMF ¶4.  ECFMG also acts as a dean's office for IMG's applying to residency programs. ¶68.

**Igberase obtains initial ECFMG certification after failing medical examination twice.**

In 1992, Igberase applied to ECFMG to take the Foreign Medical Graduate Examination in Medical Sciences ("FMGEMS") and the ECFMG English Test.  Igberase provided ECFMG with a purported 1987 diploma from the University of Ibadan in Nigeria.  Def.'s SUMF ¶27;  ¶9.

Igberase failed the FMGEMS of multiple occasions, first failing both the basic medical science and clinical science components of the July 1992 FMGEMS, and subsequently failing the medical science component yet again in January 1992.  ECFMG SUMF ¶45.  Igberase next applied for and failed Step 1 of the USMLE in September 1992. *Id.*  ECFMG issued him a certificate in 1993 after he passed steps 1 and 2 of the USMLE.  ECFMG SUMF ¶4.

**Igberase obtains second certification under the "Charles" identity. ECFMG investigates and revokes Igberase's certification.**

In 1994, ECFMG received a second application from Igberase, using the name "Igberase Oluwafemi Charles," to take steps 1 and 2 of the USMLE examination (again).  ¶11.  His application falsely represented he had never taken the USMLE examination before. After "Charles" successfully completed the USMLE examinations, ECFMG issued him a certificate under the Charles identity.  ECFMG SUMF ¶37.

Shortly thereafter, ECFMG investigated whether Igberase and Charles were the same person.  Igberase admitted he had lied about his identity and examination history because

residency programs had rejected him for repeatedly failing the USMLE examinations. ¶14, ECFMG SUMF ¶40.

ECFMG referred the matter to its Committee on Medical Education Credentials. The Committee found Igberase had engaged in "irregular behavior," invalidated the certificate issued to "Charles" and revoked Igberase's original certificate. ¶6.   In 1996, after Igberase appealed, ECFMG's Review Committee for Appeals limited the period of revocation to five years.  ¶18. Thereafter, the Committee extended the revocation period indefinitely.  ¶22.  Igberase wrote to ECFMG and admitted that he had previously taken the MSLE exams.  ¶23.  Ultimately, the Committee revoked permanently Igberase's certificate.  ¶24.

### Igberase applies and is certified under the "Akoda" identity.

While appealing this revocation, Igberase submitted a third application to ECFMG to take Steps 1 and 2 of the USMLE examination under the name "John Nosa Akoda."  ¶32; Def.'s SUMF ¶44.  This time, he provided ECFMG a purported 1988 diploma issued to "Johnbull Enosakhare Akoda" from the University of Benin. ¶35.   ECFMG takes no position on where or whether Igberase/"Akoda" actually went to medical school.   It merely claims that it verified Igberase's diploma from primary sources.  Def.'s SUMF ¶28.  It did not, however, verify Akoda's purported certificate of registration as a physician in Nigeria. ¶9.

After he passed the required examinations, ECFMG issued "Akoda" a certificate in 1998. Def's SUMF ¶52.  Akoda then entered a residency program at Jersey Shore Medical Center (JSMC).  ECFMG sent a permanently validated ECFMG certificate for Akoda to JSMC.  ¶38; Def.'s SUMF ¶52.

### ECFMG learns Akoda and Igberase are the same person.

In August 2000, JSMC notified ECFMG it was investigating whether Akoda had used a Social Security number issued to Igberase and whether he had attended two other residency

programs.  ¶40; Def's SUMF ¶57.   ECFMG sent Akoda a "charge letter" advising it had

received information alleging he may have engaged in irregular behavior and demanded a

written explanation within fifteen days.  ¶44; Def.'s SUMF ¶63.   Akoda admitted in a written

response to ECFMG that he used the Social Security number of his "cousin," purportedly named

Igberase Oluwafemi Charles.  ¶46; Def.'s SUMF ¶64.  As noted, ECFMG had previously

revoked the certificate of Charles.

JSMC advised ECFMG that it had suspended Akoda due to "inconsistencies."  Igberase

met with William Kelly ("Kelly"), Manager of ECFMG's Medical Education Credentials

Department at Kelly's office.  ¶49.  This was not the first time Kelly had met Igberase: Kelly

attended a hearing on the revocation of Igberase's certificate, where Igberase testified.  ¶54.

Igberase gave Kelly a fraudulent Nigerian passport and international driving permit listing the

Akoda identity.  ¶49; ECFMG SUMF ¶65.  But Kelly did not make any effort to verify the

authenticity of these documents, even though he believed Igberase and Akoda were the same

person. ¶50, 82, 84.  A phone call to the Nigerian Consulate would have revealed that the

passport was a forgery. ECFMG also failed to compare information on the passport with other

information provided by "Akoda." For example, ¶38, the Request for Permanent Revalidation of

Standard ECFMG Certificate, was sent on September 2, 1998. Igberase stated on this document

that Akoda's date of birth was April 17, 1963. The passport he presented to Kelly stated that

Akoda's date of birth was January 11, 1959.  Def.'s SUMF ¶65.  The Application to take the

MSLE exams for Akoda stated that Akoda's date of birth was January 1, 1959. JSMC had

advised ECFMG that Akoda had already used three different dates of birth: April 12, 1962;

January 1, 1993 and April 17, 1963, ECFMG Ex. 28.   At this time, he was using a fourth date of

birth. Yet all of this was ignored by ECFMG merely because Akoda denied being Igberase.

Misuse of a Social Security number was enough for JSMC to dismiss Akoda from its residency program and for the government to charge and convict him of a crime of moral turpitude. But it was not enough for ECFMG to even send the matter to its credentials committee. As ECFMG has testified, usually when a charge letter is sent, the matter is sent to the credentials committee. ¶78.  With Akoda, however, ECFMG ignored its usual practice.

In December 2000, ECFMG learned that JSMC dismissed Akoda from its residency program, because he had used a false Social Security number and provided JSMC with two inconsistent green cards. ¶37.

In a December 22, 2000, memorandum that Kelly intentionally left out of "Akoda's" official file, Kelly stated he and the director of JSMC's residency program believed that Igberase and Akoda were the same person. ¶59.  In that same memo, he reported that he had sent Igbease an email "and who should reply but Akoda!" Id.  Kelly testified that was surprised at this. ¶60. Somehow, Kelly did not think there was enough information to refer the matter to the ECFMG's Credentials Committee for investigation.  Had the Committee known, Kelly acknowledges, it would have investigated and charged Akoda with "providing false information to ECFMG on an application, among other things," as it did after discovering that Igberase's initial application in his own name was fraudulent.  ¶93.

> **ECFMG nonetheless represents to Howard University's residency program, the State of Maryland, and Prince George's Hospital Center that "Akoda" has a valid ECFMG certificate.**

In October 2006, Akoda used ECFMG's Electronic Residency Application System (ERAS) to apply for residency at Howard University Medical Center. ¶64.  The application included three purported letters of reference.  *Id.*  Although not part of the ERAS process, Kelly undertook to verify the letters' authenticity, because he doubted Akoda's credibility. He never

received responses from the supposed authors.  ¶69.  Kelly never notified anyone outside the organization of his concerns, and ECFMG did not investigate the matter further.  ¶¶67, 70, 71.

Later, ECFMG verified Akoda had a valid ECFMG certificate to the Maryland Board of Physicians and Prince George's Hospital Center (PGHC).  In 2011, Akoda obtained privileges and became a member of the medical staff at PGHC.   He began seeing patients there in 2011.  Def.'x SUMF ¶¶76, 79, 87.

ECFMG never notified any residency program, hospital, or other entity of the concerning information it had obtained regarding Igberase/Akoda's character and fitness—and the conclusions it drew from that information—until law enforcement became involved.  Def.'s SUMF ¶100.

**Igberase faces six felony charges and pleads guilty to one.**

ECFMG had not investigated the matter further since Akoda's residency application.  In June 2016, officers executed search warrants at Igberase's residence, medical office and vehicle.  They found fraudulent or altered immigration documents, medical diplomas, medical transcripts, letters of recommendation and birth certificates.  ECFMG Ex. 15.

Igberase was charged with six felony counts.  On November 15, 2016, Igberase signed a plea agreement admitting to felony misuse of a Social Security number to obtain a medical license.

In 2017, the United States District Court for the District of Maryland sentenced Igberase to six months incarceration, followed by probation.  PGHC terminated his privileges and the Maryland Board of Physicians revoked "Akoda's" medical license.   ECFMG Ex. 15, Def.'s SUMF ¶ 84.

**Damages to the Plaintiffs**

As Plaintiffs allege, none of Akoda's patients knew his true identity as Igberase, but rather knew Igberase as Akoda. Akoda's penetrations of his patients were clear boundary violations. From 2011 through 2016, Igberase (using the Akoda identity) acted as a medical doctor practicing the specialty of obstetrics and gynecology on the Plaintiffs, and others similarly situated. During this time, he unlawfully practiced medicine and surgery and provided obstetric and gynecological services to the Plaintiffs, and others similarly situated, at Prince George's Hospital Center. None of Igberase's patients (the Plaintiffs and others similarly situated) knew his true identity or of his fraudulent background and conduct. Moreover, none of Igberase's patients were capable of giving consent for any of the medical services he provided.

On a continuing basis, Igberase touched and penetrated his patients, constituting battery, and committed ongoing boundary violations by performing inappropriate examinations of a sexual nature and utilizing inappropriate language. Igberase also recommended and performed— or failed to perform—tests, studies, procedures, or surgery that were required.

## <u>PLAINTIFFS</u>

**Monique Russell** is a 46 year old mother of one child, Luka, born May 25, 2016.  ¶95. Igberase delivered Ms. Russell's baby by emergency C-section. ¶96.  Ms. Russell learned of Igberase's guilty plea from a Department of Justice press release. ¶97. Ms. Russell read the federal sentencing transcript. ¶98.   She has suffered from emotional distress as a result of learning about Igberase. ¶99.   Ms. Russell feels Igberase violated her. ¶99.  She has difficulty going to the gynecologist, distrusts the medical community, and distrusts institutions that credential doctors.  ¶100.  She also suffers from intimacy issues and anxiety, and feels like a victim of sexual assault because Igberase examined her vagina under false pretenses. ¶101.

**Jasmine Riggins** is a 27 year old mother of three children, ages 10, 6 and 2.  ¶102.   She lives in northeast Washington, DC.  She has a high school GED.   ¶103.  Ms. Riggins was a patient of Igberase between August 2012 and March 2013. ¶103. Igberase delivered her second child by C-section.  ¶104.   Messiah, her son, was born on March 18, 2013. Ms. Riggins was in the hospital for several days following delivery.   ¶104.  After the C-section, Ms. Riggins suffered severe abdominal pain and could not undergo a tubal ligation because of scarring. ¶105. As a result of what she learned about who she believed to be Akoda, she has suffered emotional distress. ¶106. After learning the truth about Igberase from a Facebook group, "Embracing Mommies," Ms. Riggins felt angry, sad, embarrassed, and ashamed about receiving treatment from Igberase.   ¶106.  Ms. Riggins was deeply affected by what Igberase did and felt outraged because his dishonesty enabled him to perform C-sections, examine women's genitals, touch and violate them.  ¶106.

**Elsa Powell** is a 32 year old mother of five children.  ¶107.  Ms. Powell initially encountered Igberase, whom she knew as Charles Akoda, upon presentation to the medical office of Abdul Chaudry, M.D., in 2014.  Ms. Powell had been referred to Dr. Chaudry for obstetric care, but was assigned to Igberase due to Dr. Chaudry's unavailability.  ¶108.  Igberase also delivered her child at Prince George's Hospital Center, and saw Ms. Powell post-delivery as well.  ¶109.  The delivery was complicated by significant bleeding requiring additional medical care.  ¶109.   Ms. Powell trusted that Igberase was a duly licensed and credentialed physician and suffered emotional harm upon learning that the man she trusted to touch the most intimate parts of her body and deliver her baby, had lied about his identity and background. ¶110.

**Desiree Evans** is a 40 year old mother of one child. ¶111.  Ms. Evans first encountered Igberase, whom she knew as Charles Akoda, at Prince George's Hospital Center for the delivery

of her child in March of 2016.   During Ms. Evans's labor, Igberase manipulated her clitoris,

telling her he needed to do so to stimulate her to push the baby. ¶112.  Ms. Evans has suffered

emotional distress upon learning that physician whom she trusted for medical care

misrepresented his identity. ¶113. Ms. Evans is afraid to seek medical care for her and her child

and has lost trust in the medical system.  ¶113.

## LEGAL STANDARD

"Granting summary judgment is an extraordinary remedy." *Doe I v. Evanchick*, 355 F.

Supp. 3d 197, 213 (E.D. Pa. 2019).  Summary judgment is appropriate "if the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). In reaching this decision, the court must determine whether

"the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is

no genuine issue of material fact and that the moving party is entitled to judgment as a matter of

law." *Nicini v. Morra*, 212 F.3d 798, 805-06 (3d Cir. 2000).

The party moving for summary judgment has the initial burden "of informing the district

court of the basis for its motion, and identifying those portions of the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, which it

believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986) (internal quotation marks omitted).  Only once that burden has been

met, must the nonmoving party set forth "specific facts showing that there is a genuine issue for

trial" or the factual record will be taken as presented by the moving party and judgment will be

entered as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574,

587 (1986).

When ruling on a motion for summary judgment, the court shall consider facts in the light

most favorable to the non-moving party and draw all reasonable inferences in that party's favor.

*Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006).

## ARGUMENT

**I.    The Plaintiffs May Recover Damages for their Emotional Distress**

Pennsylvania law recognizes that negligent acts can result in compensable emotional distress.  While Pennsylvania historically permitted recovery for emotional distress only where this distress was accompanied by "physical impact," Pennsylvania courts have expanded the grounds upon which plaintiffs can recover for emotional distress damages, even in the absence of physical impact, including when the plaintiff is in the zone of danger and at risk of an immediate physical injury; where the plaintiff had a contemporaneous perception of a tortious injury to a close relative; or where the defendant had a contractual or fiduciary duty toward the Plaintiff. *See Niederman v. Brodsky*, 261 A.2d 84 (Pa. 1970) (adopting the zone of danger as a basis for an NIED claim); *Sinn v. Burd*, 404 A.2d 672 (Pa. 1996) (recognizing a bystander's right to pursue an NIED claim for observance of injury to a close relative); *Toney v. Chester Cty. Hosp.*, 36 A.3d 83, 89 (Pa. 2011)(persuasive opinion of an evenly divided court, recognizing that a plaintiff can bring an NIED claim based upon a plaintiff's special relationship with a defendant).

**1.    The Plaintiffs have sustained a physical impact under the standards for recover of emotional distress damages.**

A "physical impact" occurs "where … a plaintiff sustains bodily injuries, *even though trivial* or minor in character, which are accompanied by fright or mental suffering directly traceable to the peril in which the defendant's negligence placed the plaintiff, then mental suffering is a legitimate element of damages." *Niederman v. Brodsky*, 261 A.2d 84, 86 (Pa. 1970), quoting *Potere v. Philadelphia*, 112 A. 2d 100, 104 (Pa. 1955) (emphasis original); *see also Brown v. Phila. College of Osteopathic Med.*, 674 A.2d 1130 (Pa. Super. 1996).  Neither

11

*Niederman* nor *Sinn* abrogated a plaintiff's right to recover for emotional distress suffered from a physical impact or injury. *Brown*, 674 A.2d at 1134; *Shumosky v. Lutheran Welfare Svcs. of Northeastern Pa.*, 784 A.2d 196 (Pa. Super. 2001).

If the slightest impact has occurred, "the plaintiff can recover for any damages which resulted from the accompanying fright." *Niederman*, 261 A.2d at 86; *see also Zelinsky v. Chimics*, 175 A.2d 351, 353 (Pa. Super. 1961) ("[I]f a plaintiff receives physical injury or physical impact to any degree, no matter how slight, he is entitled to recovery for fright or emotional distress."). The requirements of the impact rule have been met by mere touching that results in no physical injury. *See Brown*, 674 A.2d at 1134 (finding that the plaintiff was physically impacted after a miscarriage, when a nurse handed her the deceased fetus to hold); *Stoddard v. Davidson*, 513 A.2d 419 (Pa. Super. 1986) (finding that the jostling of an automobiles occupants while it drove over a corpse was a "physical impact"); *Korinko v. Come Ready Nutrition, LLC*, 2020 WL 4926177 (W.D. Pa. Aug. 21, 2020) ("emotional distress caused by unwanted touching could plausibly fall under … the "impact rule.").

It is not necessary that the physical impact occur directly with the defendant, nor is it necessary that the impact occur simultaneously with the negligent act. In this regard, the *Stoddard* Court explained as follows:

> In *Potere*, . . . the city negligently maintained a water line which leaked into an underground tunnel dug by a contractor which caused subsidence and a cave-in of the road while plaintiff was driving a truck on it. One of plaintiff's claims was for negligent infliction of emotional distress. In *Potere* as here, the **impact was not directly with the defendant, nor did it occur simultaneously with the negligent act**. **However, as long as the plaintiff's suffering or mental fright is "directly traceable to the peril in which the defendant's negligence placed the plaintiff, then mental suffering is a legitimate element of damages**."

*Stoddard*, 513 A.2d at 422 (citing *Potere v. City of Phila.*, 112 A.2d 100, 104 (Pa. 1955)) (emphasis added).

12

Each of the Plaintiffs were subjected to physical medical treatment, satisfying this rule. Each of the Plaintiffs testified that Igberase engaged in physical contact, without appropriate consent, satisfying the physical impact requirement.  He delivered the children of each of the Plaintiffs and in some instances performed Caesarean sections as part of the delivery process ¶96; ¶ 104; ¶109; ¶ 112.  In some instances, Igberase engaged in patently offensive physical contact.  ¶112 ("[H]e was fingering my clitoris."). Because there is a physical component to the Plaintiffs' interaction with Igberase that led to their subsequent emotional harm, the physical injury standard for recovery for emotional distress has been met.

### 2. The reasoning which permits recovery for those in the "zone of danger" supports recovery for emotional distress damages here.

In *Niederman*, in adopting the zone of danger rule, the court held that permitting recovery for emotional distress in the absence of physical impact presented no insurmountable challenge to establishing medical causation and no appreciable risk of fictious or fraudulent claims. *Niederman v. Brodsky*, 261 A.2d 84, 90 (Pa. 1970).   It also held that the fear of "an avalanche of claims" was neither justified, nor an appropriate basis to restrict access to justice for those who have suffered a substantial wrong.  *Id.* The *Neiderman* court chose to "abandon the requirement of a physical impact as a precondition to recovery" in certain circumstances where the plaintiff was in personal danger of physical impact and actually feared the impact. *Id.* at 90.

Here, the Plaintiffs underwent life threatening and intensively private gynecologic and obstetric procedures by an imposter, operating under a fictious identity with fictitious and fraudulently obtained credentials.  This conduct, which occurred as a direct and proximate result of ECFMG's failure to carry out its gatekeeping role with respect to IMGs, presented substantial risk of physical harm to the Plaintiffs, given the potential for serious medical complications. Upon realizing this conduct occurred, the Plaintiffs suffered severe emotional distress.  The

13

Court in *Niederman* recognized that the conventional justifications for the physical impact rule were without basis, and adopted a more flexible standard for emotional distress damages, recognizing "the gravity of appellant's injury and the inherent humanitarianism of our judicial process and its responsiveness to the current needs of justice." *Niederman,* 261 A.2d 85. The Plaintiffs here are similarly entitled to relief.

### 3.  Historical concerns limiting recovery for emotional distress do not apply here.

The Pennsylvania Supreme Court has evaluated historical restrictions on recovery of emotional distress damages and concluded that medical science has sufficiently developed such that under appropriate circumstances, a Plaintiff should have an opportunity to present his case to a jury even in the absence of a physical injury. *Niederman v. Brodsky,* 261 A.2d 84 (Pa. 1970). The Court has further recognized that conventional tort principals of foreseeability will provide the necessary limits on the scope of a defendants' liability. *Niederman v. Brodsky,* 261 A.2d 84 (Pa. 1970); *Sinn v. Burd*, 404 A.2d 672 (Pa. 1996).

Here, it was highly foreseeable to ECFMG that its negligence would result in emotional distress on the part of patients subjected to treatment from unqualified individuals, particularly those practicing as OBGYNs.  Part of ECFMG's mission in certifying foreign medical graduates to practice medicine in the United States is to promote public health and to protect the public. ¶¶6, 76.  ECFMG negligently failed to carry out its mission, subjecting patients to medical and obstetrical care from an unqualified OBGYN.  It is highly foreseeable that these circumstances would result in severe emotional distress. The relationship between an OBGYN and its patients is one which the Supreme Court has acknowledged is "very sensitive and emotionally charged" and has the potential to cause compensable emotional distress. *Toney*, 36 A.3d at 95.  Here, as a result of the Defendants' negligence, the Plaintiffs have experienced shock, nausea, nervous

14

sweating, anxiety, disgust, feelings of having been violated, and have developed distrust in the medical community.  ¶99; ¶106; ¶110; ¶113.  In some cases, the substantial and severe emotional distress suffered by the Plaintiffs has impacted their intimate relationships.  ¶101; ¶113.

Additionally, medical causation for the Plaintiffs' damages is supported by expert testimony. Three of the Plaintiffs have been evaluated by Christine Tellefsen, M.D., a specialist in forensic psychiatry.  Dr. Tellefsen has offered a report based on her evaluation of Plaintiffs Riggins, Powell, and Evans.  Def.'s SUMF ¶58.  In each case, Dr. Tellefsen has concluded that the Plaintiffs have suffered emotional distress as result of learning that the individual they trusted as their physician to perform obstetric and gynecologist procedures was in fact a fraud.  *Id*.  The Plaintiffs have met their burden of establishing medical causation with respect to these damages for purposes of summary judgment.

The circumstances of this case, wherein an individual without a medical diploma or lawful medical license, relied upon a false identity to perform gynecologic and obstetric procedures and examinations on the Plaintiffs, resulting in emotional distress of patients, meets the requirements of Pennsylvania law for the recovery of damages for emotional distress.  The Plaintiffs' emotional distress is a predictable and foreseeable result of ECFMG's failure in adequately carrying out its gatekeeping role, particularly given the special and emotionally charged relationship between a patient and their OBGYN.  *See Toney*, 36 A.3d at 95.  The underlying conduct physically impacted the Plaintiffs, placed them in reasonable fear of potential medical complications, and placed their newborn children at similar risk of harm. The Plaintiffs' emotional distress is compensable under Pennsylvania law.

II.     **ECFMG Owed the Plaintiffs A Duty of Care;**

1.   **ECFMG has undertaken a critical gatekeeping role in the United States Medical system for the protection of patients, and thereby owes a duty of care to patients.**

In determining the existence of a duty of care, the time-honored test formulated by Judge Cardozo is that "[t]he risk reasonably to be perceived defines the duty to be obeyed." *Migyanko v. Thistlethwaite*, 419 A.2d 12, 14 (Pa. Super 1980), (citing *Palsgraf v. Long Island Railroad Co.*, 162 N.E. 99, 100 (N.Y. 1928)).  "[O]nly when the question of foreseeability is undeniably clear may a court rule as a matter of law that a particular defendant did not have a duty to a particular plaintiff." *Campo v. St. Luke's Hosp.*, 755 A.2d 20, 24, 755 (Pa. Super 2000).

Pennsylvania law recognizes that a Defendant owes a duty to a Plaintiff where the Defendant has undertaken to render services necessary for the protection of third persons under the circumstances set forth in the Restatement (Second) of Torts, § 324. *Cantwell v. Allegheny Cty.*, 483 A.2d 1350, 1353 (Pa 1984); *DiMarco v. Lynch Homes-Chester Cty., Inc.*, 583 A.2d 422 (1990).   Additionally, when necessary to evaluate a previously unrecognized duty[1], Pennsylvania courts have held that the determination of whether a duty exists in a particular case involves the weighing of several discrete factors, which include (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution.  *Walters v. UPMC Presbyterian*

---

[1] As Pennsylvania already recognizes a duty under Restatement (Second) of Torts, § 324, it is not necessary for the Court to evaluate the *Althaus* factors.  *See*, *Walters v. UPMC Presbyterian Shadyside*, 187 A.3d 214, 222 (Pa. 2018); *Alderwoods (Pa.), Inc. v. Duquesne Light Co.*, 106 A.3d 27, 40-41 (2014) ("we find [the Althaus factors] to be more relevant to the creation of new duties than to the vindication of existing ones. It is not necessary to conduct a full-blown public policy assessment in every instance in which a longstanding duty imposed on members of the public at large arises in a novel factual scenario. Common-law duties stated in general terms are framed in such fashion for the very reason that they have broad-scale application.")

*Shadyside*, 187 A.3d 214, 222 (Pa. 2018), citing *Althaus v. Cohen*, 756 A.2d 1166, 1169 (Pa.

2000); *see also Commerce Bank/Pennsylvania v. First Union Nat. Bank*, 2006 PA Super 305 (Pa.

Super 2006).  ECFMG owes a duty to the Plaintiffs both under the Restatement § 324A and also

in consideration of the *Althaus* factors.

### 2.   The Defendants owe the Plaintiffs a duty under the Restatement (Second) of Torts § 324A

ECFMG is liable to the Plaintiffs under the Restatement (Second) of Torts, § 324.  This

provision provides:

> One who undertakes, gratuitously or for consideration, to render services to
> another which he should recognize as necessary for the protection of a third
> person or his things, is subject to liability to the third person for physical harm
> resulting from his failure to exercise reasonable care to protect his undertaking,
> if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon
> the undertaking.

### a)   ECMFG undertook to render to services necessary for the protection of third persons – the Plaintiffs.

ECFMG's stated mission is to promote quality health care for the public by certifying

international medical graduates for entry into U.S. graduate medical education.  Def.'s SUMF ¶2.

If their certification process promotes quality healthcare, it is axiomatic that attempts to thwart

the legitimacy of their certification would put patients at risk. ECFMG undertook to provide

primary source verification, along with testing of basic competence, for the benefit of residency

programs, hospitals, and medical boards, who relied upon ECFMG's services in granting IMGs

licensure and privileges. These services are necessary for the protection of that IMG's future

patients, including the Plaintiffs.

17

**b) ECMFG's conduct meets each of the three criteria of liability under § 324A.**

In this circumstance, ECFMG's negligence in granting Igberase certification under the Akoda identity in 1996, despite numerous irregularities, not only increased, but was the inciting cause for the risk of harm to the Plaintiffs. In the absence of ECFMG certification, or had ECFMG revoked Igberase's certification when still more irregularities were noted in 2000, Igberase would not have been able to practice medicine whatsoever. ECFMG's negligence increased the risk of harm to the Plaintiffs as under subsection (a) of § 324A.

ECFMG is liable to the Plaintiffs under subsections (b) and (c) of § 324 as well. ECFMG certification is a condition precedent for IMGs to practice medicine in the United States. Other entities, like residency programs, medical boards, and future employers, rely on the service provided by ECFMG in credentialing and licensing IMGs. ¶¶ 75, 114. ECFMG has therefore undertaken to perform a duty which hospitals and other medical employers otherwise owe to their patients under subsection (b) of § 324 – the duty to provide appropriate credentialing of medical providers. *See, e.g. Welsh v. Bulger*, 698 A.2d 581, 585 (Pa 1997) (recognizing a hospital's duty to patients to select and retain competent physicians). Additionally, as set forth within subsection (c) § 324, the emotional distress the Plaintiffs have suffered occurred because subsequent medical entities – residency programs, medical boards and employers – relied on ECFMG's undertaking. *See, e.g. Doe v. Bradley*, 58 A.3d 429, 461 (Del. Super. Ct. 2012) (finding that the Plaintiffs, minors sexually abused by a pediatrician, plead a viable claim under § 324A as to the Delaware Medical Society, a voluntary association of physicians, where that entity was made aware of a complaint regarding the physician's conduct, performed an initial investigation, but took no further act to further report the physician to the Delaware Board of Medical Practice). Thus ECFMG possesses a duty under each of the three potential criteria of Restatement § 324A. ECMFG has undertaken to provide a credentialing service, for a fee, to

promote quality and safe healthcare, with full knowledge that medical entities like residencies and hospitals rely upon their services and determinations.  It must be held liable for its failure to exercise due care.

### c)  The Plaintiffs have suffered physical harm as defined under the Restatement

The Defendants incorrectly assert that the Plaintiffs have not suffered physical harm. Under the Restatement, the words "physical harm" "denote the physical impairment of the human body, or of land or chattels."  Restatement (Second) of Torts § 7.  A comment to § 7 explains that where the harm is impairment of the body, it is called "bodily harm," which in turn, is defined in Restatement (Second) of Torts § 15, as any physical impairment of the condition of another's body, or physical pain or illness.   A comment to section 15 explains further that "[t]here is an impairment of the physical condition of another's body if the structure or function of any part of the other's body is altered to any extent even though the alteration causes no other harm*." Id*. at cmt. A.

In this action, each of the Plaintiffs has undergone extensive medical care, without appropriate consent.  This conduct represents physical and bodily harm under the Restatement. In fact, Illustration 1 to section 15 provides the example where a physician provides unconsented medical care as bodily harm:

> A has a wart on his neck. His physician, B, advises him to submit to an operation for its removal. A refuses to do so. Later A consents to another operation, and for that purpose is anesthetized. B removes the wart. The removal in no way affects A's health, and is in fact beneficial. A has suffered bodily harm.

Restatement (Second) of Torts, § 15. Here, Igberase performed medical procedures on each of the Plaintiffs that qualify as alteration of the body.  Igberase delivered the children of each of the named Plaintiffs. ¶96; ¶ 104; 109; 112.  He performed a Cesarean section on Ms. Russell, Ms. Riggins, and Ms. Evans.  ¶96; ¶104; ¶112 In some instances, the unauthorized physical contact

19

went beyond performing C-sections and/or delivering children and included sexualized conduct.

¶112.  Some of this unconsented medical treatment involved permanent medical injury.  For

example, Ms. Riggins testified that she is unable to receive a tubal ligation as a result of the C-

section performed by Igberase.  ¶105.  Igberase's medical treatment of the Plaintiffs satisfies the

physical harm standard of the Restatement (Second) of Torts § 324A.

> **d) ECFMG's contention that they should be immune on the basis of an alleged instruction from law enforcement after Igberase had begun practicing medicine is hearsay and irrelevant.**

ECFMG next contends that there was a window of time in which ECFMG was "told not

to take action."  First, this is hearsay, and not supported by any evidence beyond the

representations of ECFMG personnel.  The only evidence offered in support of this fact is an

email sent by ECFMG Assistant Vice President for Operations, Kara Corrado, to an employee of

the National Board of Medical Examiners, stating that they did not move forward with their

irregular behavior process "[a]t Maryland's request." ECFMG Exhibit 51.  This is inadmissible

hearsay within hearsay, as a statement made by Kara Corrado, describing a statement allegedly

made by an unidentified individual within the United States Attorneys Office, to prove the truth

of the matter asserted – that ECFMG was precluded from taking action on the "Akoda"

certification during the investigation by law enforcement.  Fed. R. Evid. 801; 802; 805.  This e-

mail and any testimony from Ms. Corrado do not meet any hearsay exception. Fed. R. Evid. 803;

804.  It can neither be admitted at trial nor support a motion for summary judgment. Second, to

the extent this is accurate and admissible, it is reasonably foreseeable that forbearing from

contacting hospitals and patients to warn them about Igberase would prolong the period within

which the Plaintiffs would be exposed to Igberase. ECFMG is liable for the foreseeable

consequences of its negligence.  Further, ECFMG had more than sufficient opportunity to further

investigate Igberade's fraud and revoke the Akoda certification over many years prior to the US

Attorney's office beginning its investigation.

> **e)  Pennsylvania case law interpreting Restatement § 324A supports the imposition of liability in this case.**

Defendant's citation to *Cantwell v. Allegheny Cty*., 483 A.2d 1350 (1984) is misplaced.

In *Cantwell*, the Plaintiff had been arrested and charged with multiple rapes, after a rape victim

identified him as the perpetrator. *Cantwell v. Allegheny Cty*., 506 Pa. at n.7.   As part of

discovery in his criminal matter, the Plaintiff requested certain testing from the crime lab

performing laboratory testing for the police, which he believed would exculpate him.  The crime

lab either refused to test the samples, on the basis that the tests would be unreliable, or performed

the tests incorrectly.  Later, the crime lab tested and retested certain samples, and on the basis of

the results, the district attorney's office concluded that the Plaintiff could not have been the rapist

in three of the eight rapes.  The Plaintiff brought suit against the crime lab for mistaken

incarceration, alleging that the crime lab should have known that its services were necessary for

the protection of criminal defendants, and that they negligently failed to perform testing in the

manner the Plaintiff deemed necessary.

The court found that "the Crime Lab does not exist or render its services for the

protection of suspects or potential suspects; rather, its purpose is to assist the police and the

Commonwealth in collecting and analyzing evidence which may be relevant in presenting a case

to a jury." *Cantwell*, 483 A.2d 1354.  The court further reasoned that the discretion of the

Commonwealth in conducting criminal prosecutions precluded the crime lab from being able to

foresee how their decisions may have impacted outcomes for criminal defendants. In particular,

the court noted that even if the testing had been performed as requested, the Plaintiff may still

have been charged on the basis of other evidence, including eyewitness evidence.

Here, ECFMG renders its service for the protection of patients, consistent with its self-described mission to promote the quality of healthcare.  Additionally, while evidence from the crime lab was just one piece of the puzzle, ECFMG plays a unique and ultimately determinative role with respect to their role in the certification of IMGs.  Subsequent entities like residency programs and hospitals rely on their determination that, for example, an IMG attended medical school, and lack any effective ability to consider other evidence regarding this conclusion.

The circumstances of this case are more analogous to *DiMarco v. Lynch Homes-Chester Cty., Inc*., 583 A.2d 422 (1990), wherein the Pennsylvania Supreme Court found that a physician was liable to a third party under the Restatement (Second) of Torts § 324A, for having given a patient incorrect information regarding the risks of spreading a communicable disease.  In that case, the Court noted that "physicians are the first line of defense against the spread of communicable diseases, because physicians know what measures must be taken to prevent the infection of others." The Court further noted that advising patients on precautions to prevent the spread of disease were "taken not to protect the health of the patient, whose well-being has already been compromised, rather such precautions are taken to safeguard the health of others." *DiMarco v. Lynch Homes-Chester Cty., Inc*., 583 A.2d 422 (1990). "Thus, the duty of a physician in such circumstances extends to those 'within the foreseeable orbit of risk of harm.'" *Id*. (quoting *Doyle v. South Pittsburgh Water Co*., 199 A.2d 875 (1964)).  Here, ECFMG is not only the first line of defense against fraudulent conduct of the type undertaken by Igberase—as the only entity which provides primary source verification of foreign medical graduates—but also a line of defense on which state medical boards, hospitals, and other healthcare institutions rely in their own efforts to safeguard patients. ECMFG possesses libraries of information not available to subsequent medical entities, and those subsequent medical entities rely upon that

22

determination, without the resources to engage in their own assessment of the available evidence. ECFMG Ex. 3.  Instead, ECFMG provides a conclusion to subsequent medical entities, with the knowledge and expectation that it will be relied upon, without further discretion, by residency programs and hospitals.  ¶75.

### 3.  The Defendants Owe the Plaintiffs a Duty under the *Atlhaus* factors.

In *Walters v. UPMC Presbyterian Shadyside*, 187 A.3d 214 (Pa. 2018), the Supreme Court applied the *Althaus* factors to consider whether a defendant hospital owed a duty to third parties who had been infected with hepatitis by the Defendant's former employee.  The Defendant hospital had been made aware that the employee, a radiology technician, diverted drugs by using a fentanyl syringe intended for a patient, and later refilled that syringe with saline. The defendant discharged the employee, allegedly reported this conduct to the state Attorney General, but did not report the conduct to US Drug Enforcement Agency. *Id.* at 242.  The radiology technician went on to employment with other health care providers, where he continued his conduct and caused patients to be infected with hepatitis. *Id.* at 219.   In evaluating whether the medical center owed a duty to future patients of other health care providers, the Pennsylvania Supreme Court applied each of the *Althaus* factors, concluding that the medical center did owe future patients a duty to report this conduct to the DEA. *Id.* at 240.   The existence of ECFMG's duty is even more obvious here, where ECFMG has undertaken a unique gatekeeping role in certifying foreign medical graduates in the interest of public health, with the understanding that residency programs and future potential employers will rely upon that certification.

#### a)  Relationship of the Parties

A defendant need not have a direct relationship with the plaintiff to impose a duty.  *See*, *Walters* 187 A.3d 214 (imposing a duty on a hospital as to patients of a separate medical

facility); *Emerich v. Phila. Ctr. For Human Dev., Inv.,* 720 A.2d 1032, 1044 (Pa. 1998) (holding

that a mental health counselor had a duty to protect a woman from her ex-boyfriend who

threatened to harm her during a counseling session); *DiMarco v. Lynch Homes-Chester Cty.,*

*Inc.,* 583 A.2d 422 (1990) (physician liable to third parties for harm resulting negligent medical

advice to patient).

     As set forth above, ECFMG owes a duty to patients pursuant to Restatement § 324A, on

the basis of ECFMG's undertaking to provide services that others rely upon for the protection of

patients. "ECFMG—like professional membership organizations and accreditation

associations—is a 'quasi-public' private organization because it 'exercises significant authority

in areas of public concern.'" *Tulp v. Educ. Comm'n for Foreign Med. Graduates*, 376 F. Supp.

3d 531, 543 (E.D. Pa. 2019).  ECFMG's existence is premised on its unique role in verifying the

credentials of foreign medical graduates and ensuring a basic level of competence to practice

medicine on patients in the United States through the administration of the USMLE.  ¶76.  No

other entity provides this service for IMGs, and each subsequent step of an IMG's journey to

become a physician relies upon ECFMG's certification.  ¶¶ 5, 75.  ECFMG's own staff

acknowledges the role they play in ensuring quality medical care in the US.  ¶¶ 6, 76.  The

Pennsylvania Superior Court acknowledged the duty that entities like ECMFG play with respect

to patient safety.

     In this particular instance, ECFMG had numerous opportunities to restrict Igberase's

ability to practice medicine under the Akoda identity, beginning immediately with Akoda's

application, which contained numerous irregularities, and continuing as ECFMG was later

advised of yet further and substantial irregularities and evidence of fraud.  Under these

circumstances, particularly in the context of ECFMG's prior knowledge of Igberase's

misconduct, ECFMG possessed a special relationship both as to Igberase, whose conduct they had a unique ability to restrict and control, and his ultimate patients, who would be harmed by this misconduct.

### b) Social Utility of the Actor's Conduct

The second *Althaus* factor has been interpreted to consider the social utility of asserted negligent conduct, if any, the social utility of imposing a duty, or the social utility of the defendant's conduct generally.  *See Walters*, 187 A.3d at 235; *Phillips v. Cricket Lighters*, 841 A.2d 1000, 1009 (2003).  In this case, despite conducting an interview of Igberase, learning that "Akoda" had, at a minimum, used a fraudulent social security number in his application, and reaching the belief that "Akoda" was in fact Igberase, ECFMG elected not to bring this matter to the ECFMG Credentials Committee for review.  There is no social utility in this behavior. The underlying facts of this case show that ECFMG disregarded information from credible sources, that if acknowledged, would have prevented Igberase from practicing medicine.  **¶¶ 42, 72.** ECFMG claims it has no role in whether an IMG is accepted to a residency program, and yet the primary materials submitted for acceptance into a residency is their graduate record (which is this case ECMFG negligently failed to detect as fraudulent), and their ECMFG examination record, which demonstrates medical competence.  Id.  The Defendant contends that there is little social utility in imposing a duty on ECFMG to carry out its functions in a manner consistent with the standards of care.  Instead, ECFMG suggests that subsequent medical entities, like hospitals or residencies, should second guess their determination and should have disregarded ECFMG's decision to maintain a certification under the "Akoda" identity.

ECFMG may not now disclaim its role in the certification of IMGs, where so many entities have relied on their services as the sole accreditation association for IMGs.  In the absence of certification, Igberase would not have been eligible for residency, and subsequent

medical entities, including Howard University and Prince George's Hospital Center, would not have relied upon ECFMG's gatekeeping services in allowing him to engage in the practice of medicine. ¶ 114.   This factor clearly favors imposition of a duty to ECFMG. ¶ 5.

### c)   Nature of the risk imposed and foreseeability of the harm incurred.

Just as in *Walters*, [i]t would be difficult to overstate the risk to public health that this case presents." *Walters*, 187 A.3d at 236. Igberase forged multiple medical school transcripts, repeatedly failed basic assessments of competence administered by ECFMG under a variety of identities, used ECFMG to pass forged letters of recommendation to residency programs, and then obtained a medical license under a fictious name.  He then provided intensively personal and risky obstetric and gynecologic operations and assessments on unsuspecting patients under this assumed name.  The risk to patients associated with this conduct is clear and expansive given the number of years during which Igberase was permitted to practice medicine.

In *Walters*, in considering this factor, the court concluded that it was reasonably foreseeable on the part of his employers that (1) if the radiologist repeated this conduct, he could go on to create a serious risk of transmission of infectious disease to future patients; and (2) that given the nature of addiction, this technician would likely to engage in this conduct again. *Walters*, 187 A.3d at 236.  The Court concluded that "taking no action beyond terminating [the technician] from the hospital created a foreseeable risk that [the technician] would continue to work in the field and repeat the same dangerous behaviors. *Id* at 237.

Here, it is plainly foreseeable to ECFMG that failing to take action on Igberase's fraud would subject obstetric and gynecologic patients to treatment from an individual without appropriate education, and without any lawful credentials or licensure to do so. This is particularly true as ECFMG's relevance in the United States medical system depends on residency programs and hospitals to be able to rely upon ECFMG's determination.

This case is clearly distinguishable from *Fragale v. Wells Fargo Bank, N.A.*, 480 F. Supp. 3d 653 (E.D. Pa. 2020), cited by the Defendant.  In *Fragale*, the plaintiff was the victim of a fraudulent scheme perpetrated by a third party, in which the plaintiff was induced to wire money to a Wells Fargo bank account under false pretenses. The wired funds were immediately withdrawn by the third party, preventing recovery of those funds.  The plaintiff alleged that Wells Fargo owed the plaintiff a duty of care, and should have recognized the potential for fraud, given that they were "generally on notice that such schemes exist." *Fragale*, 480 F. Supp. 3d 664.  The Court noted, "Plaintiff does not allege any facts to suggest that when Wells Fargo actually opened the [third party's] Account, it should have been on notice that this particular account was being opened for criminal or fraudulent purposes." *Fragale*, 480 F. Supp. 3d, 664. Here, very unlike *Fragale*, ECFMG had notice that Igberase had engaged in fraud in the past, believed that Igberase and "Akoda" were the same person, and certainly knew that he would likely go on to treat patients under this fraudulent identity.   More than just reasonably foreseeable, ECFMG knew precisely what Igberase intended to do and did nothing to prevent it. Instead, ECFMG's, gave him the continued opportunity and ability to do so.

Pennsylvania courts have found far less predictable outcomes foreseeable, for purposes of establishing a duty.  In *Anderson v. Bushong Pontiac Co*., 171 A.2d 771 (Pa. 1961), examined by the *Fragale* Court, the Court held that a car dealership had a duty to a pedestrian, where that pedestrian had been struck by a vehicle stolen from the dealership.  In *Anderson*, the defendant car dealership was aware that teenagers had frequently trespassed on the lot and had discovered that the keys to one of the cars had been stolen.  The dealership left the lot unattended, during which time a teenager stole the vehicle, drove it in a reckless manner, and injured the pedestrian. *Id*. at 772.  The court concluded that it was reasonably foreseeable that a teenager might steal the

car and that the plaintiff, as a pedestrian, was within the class of persons endangered by the

defendant's negligence. *Anderson,* 171 A.2d, 775.  The foreseeability of harm is far more

obvious here, where ECFMG was on notice that "Akoda" was a fictious identity held by

Igberase, created for the purpose of rendering medical treatment to patients.

### d)  The consequences of imposing a duty upon the actor

Even where imposing a duty upon a defendant could come at potentially great cost

(which is not the case here), "the potential for tremendous harm to innocent patients cannot be

gainsaid." *Walters*, 187 A.3d at 238. In *Walters*, the Court observed that it needed to determine

who should bear the cost of harm: the defendant with the opportunity and/or obligation to take

steps to prevent the harm, or the victims and society at large. *Walters*, 187 A.3d at 238-39.

In *Walters*, the Court acknowledged the breadth of potential liability which could result

from imposing a duty upon a medical center to report the conduct of radiology technician, but

ultimately found that the social utility of imposing this duty outweighed the costs. *Walters*, 187

A.3d at 240.  The court imposed this duty despite the fact that the facility's reporting obligations

were tangential to the business of the defendant – providing medical care.  Here, imposition of a

duty simply requires the Defendant to do what it exists to do – verify the applications of IMG,

assess them for potential fraud, and revoke their certifications when necessary.  The Defendant

characterizes the duty the Plaintiffs seek to impose as one to "disclose suspicions about Dr.

Akoda[2] to third parties" or to "become a guarantor of each IMG's trustworthiness."  These are

not the duties at issue here.   Instead, ECMFG had a duty to investigate and ultimately revoke the

certification granted to "Akoda," having been provided notice and soon thereafter confirmation

---

[2] The Defendants continue to refer to Igberase as "Dr. Akoda," despite ECFMG's
acknowledgement that Akoda never existed, there is no evidence to suggest that Igberase
possessed a valid medical degree, and that any credential obtained under the Akoda identity was
premised on countless substantive misrepresentations and fraud.

that this certification was granted on the basis of fraud. ¶¶ 42-72..   This duty is limited and

consistent with the primary role and mission of ECFMG. Imposing a duty on ECFMG to perform

this function in a manner consistent with the standards of care imposes no further cost or burden.

### e)   The overall public interest in the proposed solution

The public interest clearly weighs in favor of imposing a duty to require ECFMG to

revoke certifications found to have been obtained through fraud. Such a duty is necessary to

protect future patients from inadequately trained individuals and those engaged in acts of

repeated fraud.  This duty is limited and narrow, and is necessary where, as here, ECFMG is in a

unique position to identify fraud, and where ECFMG's determination regarding an IMG's

training and background will be relied upon by subsequent medical entities.  ECFMG cannot

disclaim responsibility when their failures result in harm to patients.  Sound public policy favors

ECFMG taking all reasonable steps to prevent improperly certified IMGs from treating patients.

### 4.   ECFMG is liable to Plaintiffs under Maryland law

ECFMG asserts that there are two conflicts of law between Maryland and Pennsylvania,

and that Maryland law should apply.  As briefed in connection with the Plaintiffs' Motion for

Class Certification, and consistent with this Court's Order Granting Certification, Pennsylvania

law applies to this dispute. *Russell v. Educ. Comm'n for Foreign Med. Graduates*, 2020 WL

1330669 (E.D. Pa. Mar. 23, 2020).   Further, regardless of whether Maryland or Pennsylvania

law applies, ECFMG is liable to the Plaintiffs for emotional distress.

Pennsylvania has a strong interest in regulating the conduct of its domiciliary

corporations by applying its substantive tort law, and other jurisdictions have no interest in

applying their own law if, as the Defendants claim, doing so would limit their citizen's right to

recover for the benefit of a foreign corporation. *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170,

187–88 (3d Cir. 1991). As this Court has already concluded, Pennsylvania law should apply with

respect to all the claims in this case. *Russell v. Educ. Comm'n for Foreign Med. Graduates*, 2020

WL 1330669 (E.D. Pa. Mar. 23, 2020).

Even assuming *arguendo* that Maryland law applies, however, ECFMG is liable to the

Plaintiffs for their emotional distress.   As this Court has already recognized, although Maryland

does not recognize negligent infliction of emotional distress as a distinct claim, Maryland

permits recovery for emotional distress arising out of negligence, and the same result would

ensue under Maryland or Pennsylvania law. *Russell v. Educ. Comm'n for Foreign Med.*

*Graduates*, 2020 WL 1330669 (E.D. Pa. Mar. 23, 2020) (citing *Hamilton v. Ford Motor Credit*

*Co.*, 502 A.2d 1057, 1066 (Md. Ct. Spec. App. 1986)).   Damages for emotional distress are

available in Maryland where there has been a physical impact, such as damages arising out of the

provision of medical care, as here, or in the absence of a physical impact, where a Plaintiff has

suffered an injury that is "capable of objective determination." *See, e.g., Vance v. Vance*, 408

A.2d 728, 733–34 (Md. 1979) (upholding damages for spouse's distress in discovering her

marriage was void); *Faya v. Almaraz*, 620 A.2d 327, 337-39 (Md. 1993) (holding that patients of

a surgeon who did not disclose he had AIDS, but who did not themselves become infected with

HIV, could nonetheless recover for their mental and emotional distress they experienced between

the time they learned of the physician's HIV-positive status and the time they learned they were

not infected); *Hunt v. Mercy Med. Ctr.*, 121 Md. App. 516, 537-38 (1998) (holding that a

plaintiff mistakenly misdiagnosed with cancer may recover emotional distress damages).

Defendant next cites to an alleged difference in the legal standards for the imposition of

duty as between Maryland and Pennsylvania, comparing the list of factors set forth in *Althaus*,

with those in *Pendleton v. State,* 921 A.2d 196, 205 (Md. 2007) *(quoting Ashburn v. Anne*

*Arundel Cty.,* 510 A.2d 1078, 1083 (Md. 1986)).   This too is a false conflict. First, both

30

Maryland and Pennsylvania recognize a duty under Restatement § 324A, and therefore a duty

exists in this matter under both Maryland and Pennsylvania law. *E.G. Rock, Inc. v. Danly*, 633

A.2d 485, 491 (Md App. 1993) (recognizing that the terms of Restatement 324A are part of

Maryland law).  Further, as to *Althaus* and *Pendleton*, Defendant does not identify any

substantive distinctions in the two sets of analysis, as there are none which would impact the

outcome of this matter.  Both analyses consider questions of public policy, foreseeability and the

costs of imposing a duty.  *See* Section II, *supra*.  For the reasons set forth above, imposition of a

duty is appropriate under either Pennsylvania or Maryland law.

### III.    ECFMG Was a Proximate Cause of Plaintiffs' Emotional Distress

To establish causation, a plaintiff must "demonstrate that the breach was both the

proximate cause and the actual cause of his injury." *Reilly v. Tiergarten Inc.*, 633 A.2d 208, 210

(Pa. Super. 1993).  Proximate cause is defined as "a wrongful act which was a substantial factor

in bringing about the plaintiff's harm." *Dudley v. USX Corp.*, 606 A.2d 916, 923 (Pa. Super.

1992) (citations omitted). The question of whether Defendant's negligence was a proximate

cause of the injury is ordinarily one to be decided by the fact finder.  *Quinby v. Plumsteadville*

*Fam. Prac. Inc.*, 589 Pa. 183, 907 A.2d 1061, 1077 (Pa. 2006).  If a jury may reasonably differ

on whether the defendant's conduct was a substantial factor in causing the injury, generally, the

case must go to the jury on those issues. *Straw v. Fair*, , 187 A.3d 966, 994 (Pa. Super. 2018)

(citing *Vattimo v. Lower Bucks Hosp., Inc*., , 465 A.2d 1231, 1233-1234 (Pa. 1983)).

Pennsylvania courts have identified several considerations which are in themselves or in

combination with one another important in determining whether the actor's conduct is a

substantial factor in bringing about harm to another:

> (a) the number of other factors which contribute in producing the harm and the
> extent of the effect which they have in producing it;

(b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible;

(c) lapse of time.

*Lux v. Gerald E. Ort Trucking, Inc.,* 887 A.2d 1281, 1287 (Pa Super 2005), (citing *Willard v. Interpool, Ltd.,* 758 A.2d 684, 688 (Pa. Super. 2000)).

ECFMG asserts that there is "undisputed negligence of intervening third parties," which preclude ECFMG from being a legal cause of the injuries, without identifying those acts of negligence or intervening third parties. There is no evidence before this Court that any other entity was negligent in bringing about the harm in this case. Plaintiffs' experts have testified that ECFMG was negligent.  ¶114.  Defendant's expert does not assert that any other entity was negligent in failing to prevent Igberase from treating patients.  ECFMG Ex. 6.  To the contrary, subsequent entities relied upon ECFMG's decision to certify and retain the "Akoda" certification, which ECFMG retained despite possessing clear evidence that it was obtained via fraud.  Residencies, state licensure boards, and credentialling committees rely on ECFMG to provide primary source verification of foreign medical graduates.  ¶ 114.  That Igberase was able to proceed through a residency, state licensure and obtain privileges represents an unbroken chain that began when ECFMG ignored evidence from Jersey Shore Medical Center that Igberase was a fraud.

ECFMG actively maintained Igberase's credentials for many years, and participated in submitting his application materials to Howard.  ¶ 64.   In fact, ECFMG staff identified further concerns regarding the "Akoda" identity at the time of the residency application, but continued to take no action to revoke or restrict his certification  ¶¶ 69-71.  ECFMG's negligence continued, on an active basis, to the time of his residency application and beyond.

32

In *Commerce Bank v. First Union Nat'l Bank*, 911 A.2d 133 (Pa Super 2006), cited by the Defendant, the plaintiff, a bank, alleged that the defendant, also a bank, had reason to know that an individual was operating a check-kiting scheme, but failed to report the behavior or shut down the perpetrator's account.  The plaintiff incurred monetary losses and alleged that they based their decision to open an account for the perpetrator in part based on the fact that they possessed an account at the defendant bank, without further background checks. The court concluded that the defendant owed no duty to the plaintiff, in part, because the two entities had no relationship. The court further noted that even assuming there was such a duty, it would affirm the trial court's grant of summary judgment with respect to proximate cause.  The court concluded that the defendant's conduct was only "one minor factor" in the entire chain of events.  Unlike the defendant bank, which had no relationship with the plaintiff bank, and undertook to provide no service to them or anyone else, ECFMG holds itself out to residency programs, hospitals and licensing organizations as providing the service of verifying the credentials of foreign medical graduates.  There services are unique, and all IMG's must utilize ECMFG's services before applying to these programs. Unlike the defendant in *Commerce Bank,* which maintained no role and undertook to perform no duty to their peer institutions, ECFMG knew that subsequent entities would rely on ECFMG's decision to maintain Igberase's certification as Akoda.  That Igberase would go on to practice medicine as Akoda, and cause the harm alleged, is an outcome that "reasonable people would consider fair, natural, and probable." *Commerce Bank*, 911 A.2d at 142 (Pa Super 2006).

## IV.      ECFMG's Breach Was a But-For Cause of Plaintiffs' Emotional Distress

Cause in fact, or "but for" causation, requires proof that the alleged injury would not have occurred but for the negligent conduct of the defendant. *Galullo v. Fed. Express Corp.,* 937 F. Supp. 392, 395 (E.D. Pa. 1996) (citing *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 366 (3d

Cir. 1990)).  The "but for" standard is a *de minimis* standard of causation, under which even the most remote and insignificant force may be considered the cause of an occurrence.  *Takach v. B. M. Root Co*., 420 A.2d 1084, 1086 (Pa Super 1980).

Defendant's assessment of "but for" causation confuses concepts of proximate cause with "but for" causation, and argues factual issues not appropriate for resolution by summary judgment, including whether ECFMG was negligent, and what was required under the applicable standards of care.  Defendant continues to mischaracterize Igberase's acts, ECFMG's role, and the basis for the Plaintiff's emotional distress.  Among virtually endless acts of fraud, there is no evidence that Igberase ever attended medical school, and the medical transcripts submitted to ECFMG, which ECFMG "verified," were fraudulent.  He was admitted to a residency program only a result of ECFMG's decision to allow Igberase to continue to perpetrate his fraud.

It is undisputed that in the absence of ECFMG certification, Igberase would never have practiced medicine in the United States.  ¶ 87.  It is further undisputed that when ECFMG last investigated Igeberase, they concluded that he had engaged in fraud, and revoked his ECFMG certification.   ECFMG Ex. 24.  Thus, it cannot seriously be disputed that had ECFMG conducted a reasonable investigation, the ECFMG certification in the name of "Akoda" would have been revoked.  Further, the Plaintiffs have designated multiple experts who will opine that the standards of care required that ECFMG revoke Igberase's certification.  ¶114.  Under these circumstances, Igberase would never have performed obstetric and gynecologic procedures on the Plaintiffs, and all harm would have been avoided.  The Plaintiffs have established "but for" causation.

V.     **The Plaintiffs Did Not Consent to Treatment by Igberase.**

The Defendant next suggests that Igberase's misrepresentations were not substantial enough to vitiate the Plaintiffs consent, and that the Plaintiffs should therefore be precluded from recovery under Restatement (Second) of Torts, § 892B.  This is bereft of plausibility.

Restatement (Second) of Torts § 892B(2) states:

> If the person consenting to the conduct of another is induced to consent by a substantial mistake concerning the nature of the invasion of his interests or the extent of the harm to be expected from it and the mistake is known to the other or is induced by the other's misrepresentation, the consent is not effective for the unexpected invasion or harm.

The medical care these Plaintiffs received was provided by an individual using a fake name, who had no valid medical school diploma, had been admitted to a residency program with false letters of recommendation.  Dr. Akoda did not exist.  Igberase, who is an actual person, had no medical license, was not board certified, and was not employed by any hospital.  Igberase, not "Akoda," performed gynecologic examinations of the Plaintiffs which constituted unconsented touching, purportedly for the purpose of medical treatment, and complex medical surgeries, including the delivery of their children.  ECFMG's arguments imply that these Plaintiffs are entitled to no autonomy in their decision making regarding which physician they trust to provide their medical care.  This is plainly not the case.

Defendant cites numerous cases which it represents demonstrates that "[c]ourts have uniformly held that misrepresentations like Dr. Akoda's—including those concerning the experience or credentials of a licensed physician—do not vitiate consent." ECFMG Brief at  35. This is inaccurate and is not supported by the cases cited by Defendant. ECFMG cites *Taylor v. Johnson*, 985 P.2d 460 (Alaska 1999), in which the court explicitly noted "that a battery claim may lie if a person falsely claiming to be a physician touches a patient, even for the purpose of providing medical assistance."  *Taylor*, 985 P.2d at 465.  The Court found no battery under those

particular facts because the Defendant "had a medical degree, was certified by the American Board of Physical Medicine and Rehabilitation, and was licensed to practice in Alaska." *Id*. None of those facts are true here, as Igberase lacked a medical degree and possessed no certification or licensure in his name.

The *Taylor* case goes on to cite *Khouri v. Koloniaris*, 1997 WL 80676 (Super. Ct. Feb. 7, 1997), a more analogous case to this one, in which a Plaintiff brought a claim for battery against a provider of dental care, on the basis that the provider was not licensed by the Connecticut Department of Health. .  Concluding that the Plaintiff possessed a cause of action for battery, the Court held that "plaintiff's consent … should … be negated because the defendant allegedly misrepresented himself as a licensed dentist to the plaintiff in order to obtain the plaintiff's consent to perform dental work on him. *Khouri v. Koloniaris*, 1997 WL 80676 (Super. Ct. Feb. 7, 1997).  The same applies here.

 Defendant's other cited cases do not support its argument.  In *Duttry v. Patterson*, 771 A.2d 1255 (2001), the Court found that a physician's misrepresentation regarding the number of times he performed a surgery (approximately nine total times, rather than once per month, as represented) could not form the basis of a claim for lack of informed consent, as this particular tort theory was limited to lack of information concerning the risks of a particular procedure.  *Id*. The Court acknowledged the availability of other potential forms of tort recovery.  *Id*.

The Defendant's other citations are similarly distinguishable.  *See, e.g.*, *Prince v. Esposito*, 628 S.E.2d 601 (Ga. App. 2006) (failure of chiropractor to disclose allegation of sexual battery by other patient years earlier was not failure of informed consent); *Rice v. Brakel*, 310 P.3d 16 (Ariz. Ct. App. 2013) (physician's dependency on unprescribed prescription drugs did not form the basis of informed consent claims); *Albany Urology Clinic, P.C. v. Cleveland,* 528

36

S.E.2d 777 (Ga. 2000) (physician was not required to disclose cocaine use to patient for informed consent).  None of these cases bear any similarity to this matter, where the Plaintiffs received gynecologic and obstetric case from a man, Igberase, who lacked any medical license or valid medical degree. Moreover, each of these matters involve allegations of informed consent, which the Plaintiffs have not pled.

## VI.     The Plaintiffs' Severe Emotional Distress is Compensable

The Defendant next claims that the Plaintiffs must experience physical manifestations of their emotional distress for this injury to be compensable.  This Court has interpreted the requirement for "proof of physical manifestation in emotional distress cases as a substitute for proof of injury caused by a physical impact." *DeJesus v. United States VA*, 2005 WL 2175174 (E.D. Pa. Sep. 6, 2005); citing *Niederman*, 261 A.2d at 85; *Nelson v. Monroe Regional Medical Center*, 925 F.2d 1555, 1561 (7th Cir. 1991).  Therefore, it is not necessary that the Plaintiffs establish both a physical manifestation of emotional distress as well as a physical impact.  As set forth above, the Plaintiffs have pled and established through deposition testimony and medical records proof of physical impact, by virtue of the medical procedures undertaken by Igberase.  Thus, the Plaintiffs may recover for their emotional distress in the absence in a physical manifestation of that distress.

This is consistent with *Armstrong v. Paoli Mem'l Hosp.,* 633 A.2d 605 (Pa. Super 1993), cited by the Defendants.  As the Court explained in *Armstrong*, the requirement that "physical harm" must accompany emotional distress to state a cause of action is based on the Restatement (Second) of Torts § 436A.  *Armstrong,* 633 A.2d at 609.  Section 436A states:

> If the actor's conduct is negligent as creating an unreasonable risk of causing either bodily harm or emotional disturbance to another, and it results in such emotional disturbance alone, without bodily harm or other compensable damage, the actor is not liable for such emotional disturbance.

Restatement (Second) of Torts, § 436A.

As set forth in Section II (2) above, the requirement of "bodily harm" is met "if the structure or function of any part of the other's body is altered to any extent even though the alteration causes no other harm."  Restatement (Second) of Torts, § 15 comment a. As described above, the obstetric and gynecologic procedures performed by Igberase on the Plaintiffs satisfies the requirement of "bodily harm."  Thus, the limitation of liability set forth in § 436A does not apply to the Plaintiffs, as their emotional distress is associated with bodily injury.

Even assuming, however, that there is a requirement for physical manifestations of emotional distress, the Plaintiffs have met this burden. Pennsylvania Courts have held that "symptoms of severe depression, nightmares, stress and anxiety, requiring psychological treatment, and . . . ongoing mental, physical and emotional harm" sufficiently stated physical manifestations of emotional suffering to sustain a cause of action.  *Love v. Cramer*, 606 A.2d 1175 (Pa. Super 1992) As the Court noted in *Armstrong*, cases from other jurisdictions cite "depression, nightmares, nervousness, insomnia and hysteria as physical symptoms warranting recovery." *Armstrong*, 633 A.2d 609.

Each of the Plaintiffs have suffered from conditions which meet the criteria for physical manifestations.  ¶¶99 - 101; ¶106; ¶110; and ¶113 Additionally, Christine Tellefsen, M.D., a forensic psychiatrist, examined each of the Plaintiffs.  Based upon her examinations and a review of the facts in this case, Dr. Tellefsen has diagnosed two of the Plaintiffs, Ms. Powell and Ms. Evans, with the need for future treatment as a result of their experiences with Igberase.  ECFMG SUMF ¶58.

**VII.     The Claims of Plaintiffs Powell and Evans are not Barred by the Statute of Limitations**

Limitations periods are computed from the time the cause of action accrued. 42 Pa. Cons. Stat. Ann. § 5502(a). Under Pennsylvania law, a cause of action accrues at "the time when the plaintiff could have first maintained the action to a successful conclusion*." Kapil v. Association of Pa. State College and Univ. Facilities*, 470 A.2d 482, 485 (Pa. 1983).

The discovery rule is an exception that tolls the statute of limitations when an injury or its cause is not reasonably knowable. *Saksek v. Janssen Pharm., Inc. (In re Risperdal Litig.*), 223 A.3d 633, 640 (Pa. 2019)  The discovery rule will toll the applicable statute until a plaintiff could reasonably discover the cause of his action, including in circumstances where the connection between the injury and the conduct of another are not readily apparent. *Id*. (citing *Wilson v. El-Daief*, 964 A.2d 354, 361 (Pa. 2009).  Although objective, the objective reasonable diligence standard is "sufficiently flexible ... to take into account the differences between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question," and, as such, "is to be applied with reference to individual characteristics." *Saksek*, 223 A.3d at 640.  Pennsylvania courts have expressly declined to hold, as a matter of law, that a layperson may be charged with knowledge greater than that which was communicated to her by the medical professionals who provided treatment and diagnosis. *Saksek*, 223 A.3d at 640-41 (citing *Wilson*, 964 A.2d at 365).

Each of the Plaintiffs, including Ms. Evans and Ms. Powell, have filed suit against ECFMG for damages related to the emotional distress that has resulted from their discovery that the individual they knew as "Dr. Akoda" was in fact, Oluwafemi Igberase, who possessed no medical degree, and no medical license.  These damages accrued, at the earliest, when they became aware of criminal proceedings against Igberase.  ¶108; ¶112.  In the case of Ms. Evans

39

and Ms. Powell, this realization compounded certain concerns that they held at the time of their treatment.  In the case of Ms. Evans, she possessed concerns about his conduct, but trusted that her physician was behaving consistent with the standards of care.  ¶112.  As contemplated by *Saksek* 223 A.3d at 640-41, as a layperson, Ms. Evans trusted the individual she believed to be her physician.  Moreover, this incident certainly did not provide her constructive knowledge of Igberase's fraud – the basis for the cause of action asserted here.

Ms. Powell also expressed certain concerns about her treatment from the man she knew as Dr. Akoda, but she does not seek medical malpractice damages associated with the potentially delayed treatment of her post-partum bleeding, or any flirtatious conduct.  Instead, as with the other plaintiffs, she seeks separate damages – emotional distress damages incurred as a result of learning that "Dr. Akoda" was a fictious persona of Oluwafemi Igberase.  ¶110.  To find that the causes of action of Ms. Powell of Evans accrued for these separate damages at a time before hospitals, medical boards, and the Howard residency program knew of Igberase's conduct is clearly inappropriate.

## **CONCLUSION**

For these reasons, the Court should deny summary judgment.

Dated: January 14, 2022                                Respectfully submitted,


JANET, JANET & SUGGS, LLC                  CONRAD O'BRIEN PC

*/s/ Patrick Thronson*                                   */s/ Robin S. Weiss*
  Patrick A. Thronson                                     Nicholas M. Centrella (Pa. ID 67666)
  Brenda A. Harkavy                                      Robin S. Weiss (Pa. ID 312071)
  4 Reservoir Circle, Suite 200                       1500 Market Street, Suite 3900
  Baltimore, MD 21208                                  Philadelphia, PA 19102-2100
  (410) 653-3200                                            (215) 864-9600

LAW OFFICES OF PETER G. ANGELOS,
P.C.

  Paul M. Vettori
  One Charles Center
  100 N. Charles Street, 20th Floor
  Baltimore, Maryland 21201
  (410) 649-2000

Z LAW, LLC

  Cory L. Zajdel
  2345 York Rd. Suite B-13
  Timonium, MD 21093
  (443) 213-1977

SCHOCHOR, FEDERICO AND STATON

  Brent Ceryes
  The Paulton
  1211 St. Paul Street
  Baltimore, Maryland 21202
  (410) 234-1000

THE COCHRAN FIRM

  Karen E. Evans
  David E. Haynes
  1100 New York Avenue, N.W.
  Suite 340, West Tower
  Washington, DC 20005
  (202) 682-5800

*Attorneys for Plaintiffs, on behalf of
themselves and all others similarly situated*