# Exhibit 1

**CERTIFIED COPY**

Dr. David Markenson

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL ACTION NO. 18-5629

MONIQUE RUSSELL, JASMINE     :
RIGGINS, ELSA M. POWELL,     :
and DESIRE EVANS,            :
                             :
            Plaintiffs,      :
                             :
    vs.                      :
                             :
EDUCATIONAL COMMISSION FOR   :
FOREIGN MEDICAL GRADUATES,   :
                             :
            Defendant.       :

            Deposition of DR. DAVID MARKENSON taken in the above-entitled matter before Suzanne J. Stotz, a Certified Realtime Reporter, Registered Professional Reporter, and Notary Public of the State of Colorado, taken at the WESTIN DENVER AIRPORT, 8300 Pena Boulevard, Denver, Colorado 80249, on October 22, 2019, commencing at 10:14 a.m.

Golkow Litigation Services    |    877.370.DEPS

```
 1    I'm going to talk about a couple of them just
 2    to make sure I understand.
 3                 So the third failing down, if you
 4    will -- I don't have a better way to refer to
 5    it -- says -- oh, no, you know what, we talked
 6    about that one already.
 7                 Keep on going down to the one that
 8    talks about the diploma from the University of
 9    Ibadan.  It says, "Failing to reasonably
10    investigate Akoda's diploma from the University
11    of Ibadan."
12                 Do you see that?
13        A.       Yes.
14        Q.       That looks like the fifth one down.
15        A.       Correct.
16        Q.       Which diploma are you talking about
17    because I don't believe I've seen a diploma
18    from the University of Ibadan with Akoda's name
19    on it?
20        A.       Let's see.  Can I go back to the --
21        Q.       Sure.  You can look at the exhibits
22    we were looking at.
23        A.       Thank you so much.  Yeah.
24                 I am wondering whether that is --
```

| | | |
|---|---|---|
| 1 | Q. | And on page 4, there is a, sort of |
| 2 | the second full paragraph down, if you will -- |
| 3 | it's just one line.  It says, "ECFMG breached |
| 4 | the standard of care in, among others, the |
| 5 | following ways." |
| 6 | | Do you see that? |
| 7 | A. | Yes, I do. |
| 8 | Q. | And then there's a number of |
| 9 | entries, all starting with the word "failing" |
| 10 | on the rest of page 4 and at the top of page 5. |
| 11 | | Do you see that? |
| 12 | A. | Yes, I do. |
| 13 | Q. | And are those each an opinion that |
| 14 | you're offering in this case? |
| 15 | A. | Yes, that is. |
| 16 | Q. | Okay.  And we talked about the |
| 17 | standard of care a few minutes ago. |
| 18 | | Were you referring to the same |
| 19 | standard of care here that you have been |
| 20 | previously in your report? |
| 21 | A. | Yes. |
| 22 | Q. | Okay.  I'm not going to go through |
| 23 | every single one because some of them |
| 24 | conceptually we've talked about already, but |

Dr. David Markenson

Page 223

1  but you don't have a license, yes, you cannot
2  practice medicine.
3           Before you ask another question, is
4  this an okay time to break?
5      Q.   Sure.  Absolutely.
6      A.   I saw you reading up.  I just
7  wanted to make sure.
8      Q.   Go ahead.
9      A.   Thank you.
10          MS. McENROE:  Let's take a break.
11          (Discussion held off the record.)
12          THE VIDEOGRAPHER:  The time is
13  2:10 p.m., and we are going off the
14  record.
15          (Whereupon, a short break was
16  taken.)
17          THE VIDEOGRAPHER:  The time is
18  2:20 p.m., and we are back on the record.
19  BY MS. McENROE:
20      Q.   We were just looking at your expert
21  report at Exhibit 4 before we went off the
22  record.
23          Do you recall that, Dr. Markenson?
24      A.   Yes.

```
 1   program is binary, off and on or, you know, one
 2   year of supervised practice, however you had
 3   described it is binary off and on, you either
 4   have that or you don't, that's another place
 5   along the line, right?  That would either
 6   on/off shut off the practicing medicine in the
 7   United States?
 8        A.      It depends on what the requirements
 9   were.
10        Q.      And further stepping down the line,
11   eventually getting to the point of getting a
12   medical license is also off and on that in any
13   given jurisdiction, if you don't have a medical
14   license, you should not be lawfully be
15   practicing medicine, correct?
16        A.      Yes.  Without a medical license,
17   you can't practice medicine.
18        Q.      So that's another off/on switch,
19   correct?
20        A.      A medical license is an off/on,
21   yes.
22        Q.      Even if you have a ECFMG
23   certificate?
24        A.      If you have an ECFMG certificate
```

Dr. David Markenson

Page 221

```
 1        obtain licensure or enter a residency had
 2        ECFMG done the due diligence, picked up
 3        the red flags and not certified him or
 4        revoked the certification.
 5   BY MS. McENROE:
 6        Q.     So does your opinion basically boil
 7   down to an on/off switch, that if ECFMG had
 8   said he couldn't get a certificate, therefore,
 9   he wouldn't have been able to practice
10   medicine; is that what you're saying?
11        A.     Well, as part of application for
12   residency and licensure, there are certain
13   things that are binary, yes or no; and in the
14   absence of them, you don't proceed to any other
15   steps.
16               ECFMG certification is a credential
17   that's binary.  You don't have it, you can't
18   get into residency.  Absent ECFMG
19   certification, you can't be licensed.  It is a
20   binary, that all the other things downstream
21   don't occur towards licensure if that binary
22   doesn't occur.
23        Q.     So if we were to take a step
24   forward and say graduation from a residency
```

1  links throughout a career that could have
2  stopped a progression of events.
3      Q.    So I'm just struggling with the
4  idea that this is like the ultimate Monday
5  morning quarterbacking, right?  You're saying
6  this person ended up being a sexual predator.
7  So looking back in history, we could pick up
8  bread crumbs where someone could have, said,
9  you don't graduate from middle school; you
10 don't graduate from high school; you don't
11 graduate from college.
12         So I'm just trying to understand --
13         MS. McENROE:  Let me finish my
14     question.
15         MR. VETTORI:  I am.
16 BY MS. McENROE:
17     Q.    I'm just trying to understand how
18 it is you pick where in that line you assume
19 and assign all of the fault, as you have with
20 ECFMG in this case?
21         MR. VETTORI:  Objection as to form.
22         THE WITNESS:  Where I've assigned
23     fault is the area I was asked to opine on,
24     which is he would not have been able to

```
 1        Q.     Sexual predators.
 2               MR. VETTORI:  Is that a technical
 3        term?
 4               MS. McENROE:  I changed it to
 5        sexual predators.
 6   BY MS. McENROE:
 7        Q.     Okay.  Is that fair?
 8        A.     There are, yes.  Unfortunately,
 9   yes.
10        Q.     And do you deem that to be a
11   failure of the medical school community or, you
12   know, or is that that practitioner's fault that
13   they went on to be somebody who breaks the law?
14        A.     It is the practitioner's fault, but
15   there is well documented studies that show that
16   there are usually red flags throughout their
17   career if people intervene, that patient would
18   have never been harmed.
19        Q.     Usually, like, while they're
20   actually practicing medicine.
21        A.     No.  There's throughout their
22   entire career.  There's well documented studies
23   that show whether it's medical school
24   residency, application processes, there are
```

Dr. David Markenson

Page 218

1    A.    No.  But if in order to practice
2  tax, they needed ECFMG certification to be
3  licensed, then they would have never been
4  allowed to practice tax.
5          So I don't -- I don't hold them
6  accountable to law enforcement; but anything
7  that an individual was allowed to do based on
8  their certification, they do have culpability
9  in that case.
10   Q.    So you think if a practitioner, a
11 physician, goes on to be a creep, a sexual
12 predator, is that somehow ECFMG'S fault if
13 ECFMG had certified that that person had, in
14 fact, graduated from medical school and passed
15 exams?
16   A.    Well, what they did was their
17 action at that point; but one has to
18 acknowledge that if ECFMG did not allow them
19 to -- did not certify them, allowing them to
20 obtain a license, they would not be a physician
21 at that point.
22   Q.    Right.  But there are U.S. graduate
23 physicians who go on to become creeps, right?
24   A.    There are.

1    A.    No. But if in order to practice
2  tax, they needed ECFMG certification to be
3  licensed, then they would have never been
4  allowed to practice tax.
5          So I don't -- I don't hold them
6  accountable to law enforcement; but anything
7  that an individual was allowed to do based on
8  their certification, they do have culpability
9  in that case.
10   Q.    So you think if a practitioner, a
11 physician, goes on to be a creep, a sexual
12 predator, is that somehow ECFMG'S fault if
13 ECFMG had certified that that person had, in
14 fact, graduated from medical school and passed
15 exams?
16   A.    Well, what they did was their
17 action at that point; but one has to
18 acknowledge that if ECFMG did not allow them
19 to -- did not certify them, allowing them to
20 obtain a license, they would not be a physician
21 at that point.
22   Q.    Right. But there are U.S. graduate
23 physicians who go on to become creeps, right?
24   A.    There are.

1    A.    Again, since I wasn't provided them
2    and all I have is the draft, I can't say that.
3    Q.    So you don't know what the policies
4    and procedures are as we sit here today?
5    A.    I just know the standard. I don't
6    know what their -- I've asked for policies and
7    procedures, and we haven't been provided any.
8    Q.    You say "we." You mean you haven't
9    been provided any, correct?
10   A.    Uh-huh, correct.
11   Q.    Is it your opinion that ECFMG has a
12   duty or an obligation to make sure that
13   individuals it certifies never break the law?
14   A.    Again, I personally believe -- this
15   is from my expertise and knowledge -- that
16   ECFMG'S role is not as a law enforcement agency
17   but a certification body.
18   Q.    Okay. And so I just want to make
19   sure I understand.
20         So if ECFMG certifies someone and
21   they go on to commit tax fraud later on in
22   their career, would you then look back and hold
23   ECFMG accountable that they should have figured
24   that out?

```
 1      Q.      So is your participation with the
 2   clear evaluation process, are you sitting on a
 3   committee of ACGME?
 4      A.      Committee, yes.
 5      Q.      Is that a volunteer position?
 6      A.      Yes, it is.
 7      Q.      And when did you begin that?
 8      A.      I believe about a year and a half
 9   ago.
10      Q.      Any other current involvement in
11   residency programs?
12      A.      Not direct, no.
13      Q.      Not directly, but anything else
14   indirectly?
15      A.      I still have academic appointments
16   at Columbia University in New York -- sorry,
17   Colorado university and New York Medical
18   College.  So I could be asked to give a lecture
19   from time to time within Colorado or in
20   New York to residents.
21      Q.      Do residents typically get
22   lectures?
23      A.      Yes.
24      Q.      So just so that I understand, would
```

Dr. David Markenson

Page 47

```
 1         Q.      Do you still have any role or
 2   responsibilities for any residency programs?
 3         A.      Not directly anymore.
 4         Q.      When you say "not directly," do you
 5   indirectly?
 6         A.      I serve on a national committee
 7   with the ACGME.
 8         Q.      What role do you serve with ACGME?
 9         A.      They have a committee that oversees
10   what's known as their clear clinical learning
11   environment review program, and I serve on that
12   committee.
13         Q.      What does the clear committee do?
14         A.      It helps them set the standards for
15   the Clear Evaluation program.
16         Q.      What is the Clear Evaluation
17   program?
18         A.      It evaluates hospitals' learning
19   environments for residencies.
20         Q.      Is that there accreditation
21   program?
22         A.      It is separate from the
23   accreditation.
24         Q.      Is it a higher level than
```

1  schools, typically the Dean writes a letter for
2  every graduate, which summarizes their medical
3  school experience and provides evaluation of
4  the student.
5      Q.    And for U.S. medical school
6  graduates, you said that as an initial
7  screening for eligibility, there would be
8  verification of medical school graduation; is
9  that correct?
10     A.    Correct.
11     Q.    How would that usually be
12 accomplished in your experience?
13     A.    Through the ERAS process.
14     Q.    What do you mean by that?
15     A.    The programs themselves don't do
16 it. It's done in the ERAS system. So that's
17 the program that the residents apply through,
18 and that program does the verification of the
19 medical school.
20     Q.    For lack of a better term, is it
21 like a portal you can log into and check or
22 how --
23     A.    It's a portal you can log into and
24 check.

Dr. David Markenson

Page 45

```
 1        Q.      In your experience in hiring
 2   residents or residency programs, what, if
 3   anything, was done with the letters of
 4   reference that were submitted?
 5        A.      Letters of reference are submitted
 6   through ERAS and then become part of an
 7   electronic file that the program director can
 8   review.
 9        Q.      Do you know if anything else was
10   done typically other than just review them?
11        A.      Typically they're just read by the
12   residency director.  Sometimes they would also
13   be read by an interviewer prior to an
14   interview.
15        Q.      Do you know if there was anything
16   done typically to validate that the letters of
17   recommend were legitimate?
18        A.      I know that -- I've never -- I've
19   never seen a residency program do it, and I do
20   not believe that ERAS's normal procedures --
21   sorry -- are to verify them.
22        Q.      You mentioned a Dean's
23   recommendation.  What is that?
24        A.      So for graduates of U.S. medical
```

Dr. David Markenson

Page 44

```
 1        A.      Typically, yes.
 2        Q.      When you say "typically," do you
 3   know of any circumstances when they don't
 4   withhold taxes?
 5        A.      I believe it's different -- sorry.
 6   Hospitals employ them or the university
 7   sometimes does.  Withholding is done as would
 8   be per whatever the employment standards are
 9   for taxes and other fees.
10        Q.      Which would require, in addition to
11   other potential information, a social security
12   number?
13        A.      That is correct.
14        Q.      Do you know what the source of the
15   social security number is for residents coming
16   into residency programs?  So I can say that
17   another way.  Strike that.  Let me restate
18   that.
19                Do you know from where the
20   residency programs get the social security
21   number for the applicants coming to them?
22        A.      Again, I'm not involved in the HR
23   department, but my understanding is it comes
24   from the applicant.
```

```
 1   applications that you recall, you know, sitting
 2   here today?
 3        A.    Usually not, no.
 4        Q.    Is there usually an application
 5   form, like, they actually fill out like a job
 6   application?
 7        A.    They don't anymore.  It's all done
 8   through the electronic system called ERAS.
 9        Q.    Okay.  Previously, do you know
10   whether there had been applications to
11   residency programs in, say, the 2011 time
12   frame?
13        A.    There would have not been.  They
14   would have all been ERAS.
15        Q.    Even then?
16        A.    Yes.
17        Q.    In your experience, do residents
18   get paid?
19        A.    Yes, they do.
20        Q.    Do they get paid through any
21   sources of funding in particular?
22        A.    The hospital pays them.
23        Q.    Does the hospital typically
24   withhold taxes?
```

```
 1             What else, in your experience, is
 2   involved in the offering of a residency
 3   position to a resident?
 4       A.    The initial screening is done to
 5   make sure that the person is eligible for
 6   residency.  So presence of medical school
 7   graduation, confirmation, or ECFMG
 8   certification.
 9             So it's sort of that's the first
10   step.  If they don't graduate medical school or
11   they don't have an ECFMG certification, the
12   process would stop.
13       Q.    Okay.
14       A.    Following that process, one that
15   has letters of reference, Dean's
16   recommendation, board scores; and there's
17   usually a cutoff to determine of those who then
18   obtain an interview.
19       Q.    When you say "of those," you mean
20   cutoff of the board scores?
21       A.    Board scores, letters of reference,
22   recommendations.
23       Q.    Any other information collected or
24   reviewed in connection with residency program
```