# EXHIBIT 9

Jerry Williamson, M.D.

```
 1              IN THE UNITED STATES DISTRICT COURT
 2            FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3
 4       _____
         MONIQUE RUSSELL, JASMINE )
 5       RIGGINS, ELSA M. POWELL, )
         and DESIRE EVANS,        )  CIVIL ACTION NO.
 6                                 )  18-5629
                 Plaintiffs,      )
 7                                 )
         vs.                       )
 8                                 )
         EDUCATIONAL COMMISSION    )
 9       FOR FOREIGN MEDICAL       )
         GRADUATES,                )
10                                 )
                 Defendant.        )
11       _____)
12
13           VIDEO DEPOSITION OF JERRY WILLIAMSON, M.D.
14           DATE TAKEN:     Friday, November 22, 2019
15           TIME TAKEN:     10:00 a.m.
16           PLACE TAKEN:    9501 Market Place Rd.
                             Fort Myers, FL
17
             ON BEHALF OF:   Defendant
18
             REPORTER:       Wanda Jackson,
19                           Court Reporter
20
21
22
23
24
25
```

 1   identification.)

 2   BY MS. MCENROE:

 3       Q.   This is your notice of deposition for your

 4   deposition today.  Have you seen this before (indicating)?

 5       A.   Yes, I have.

 6       Q.   And are you appearing pursuant to this

 7   deposition notice?

 8       A.   Yes.

 9       Q.   Have you testified in any case as an expert

10   witness in the last four years?

11       A.   No.

12       Q.   When was the last time you served as an expert

13   witness?

14       A.   Many years ago.  I -- I can't give you a

15   specific -- probably about 12, 14 years ago,

16   approximately.

17           MR. THRONSON:  Counsel, I am sorry.  Do you mean

18   testified or just retained?

19           MS. MCENROE:  Testified.

20           MR. THRONSON:  Okay.  Okay.

21       A.   12, maybe 14 years ago.

22   BY MS. MCENROE:

23       Q.   Great.  And do you remember the subject matter

24   of that case?

25       A.   It was clinical.  It was pediatrics, but I don't

Jerry Williamson, M.D.

1    recall the specifics of it, no.

2        Q.    And did you testify at a trial or at a

3    deposition in that case?

4        A.    Both.

5        Q.    And then I presume that the other two or three

6    times that you served as an expert was prior to that?

7        A.    Correct.

8        Q.    And for those, did you testify just at a

9    deposition or also at a trial, do you recall?

10       A.    I don't recall.

11       Q.    Do you recall generally the subject matter of

12   those other testimonies?

13       A.    They were all clinical.

14       Q.    And when you say clinical, do you mean medically

15   clinical?

16       A.    Correct.

17       Q.    Did any involve the Educational Commission For

18   Foreign Medical Graduates?

19       A.    No.

20       Q.    Did any, to your recall, involve foreign medical

21   graduates or international medical graduates?

22       A.    I don't recall.

23       Q.    In terms of cases in which you served as an

24   expert and provided an expert report but did not testify,

25   do you recall when you most recently did that prior to

Jerry Williamson, M.D.

```
1    this case?
2         A.   That would have been -- well, there were -- I am
3    trying to remember the case now.  That would have been
4    a -- yes.  It would have been a fair hearing case where I
5    provided an expert report.
6         Q.   When was that?
7         A.   Within the last year, perhaps a year and a half.
8         Q.   When you say a fair hearing case, what do you
9    mean?
10        A.   A fair hearing at a hospital for a physician.
11        Q.   And just very briefly, what kind of
12   circumstances is it that a physician has a fair hearing
13   case?
14        A.   Yeah.  The circumstances were a physician who
15   was dismissed from -- from the hospital for reasons that
16   we are not in agreement with.
17        Q.   And are you on the side of the doctor or on the
18   side of the hospital?
19        A.   Physician, yes.
20        Q.   Prior to that, do you recall when you last
21   served as an expert?
22        A.   That was also a fair hearing case that is
23   pending and very, very similar circumstances in a
24   different city and state.
25        Q.   Are you on the side of the physician or the
```

Jerry Williamson, M.D.

```
 1   hospital?

 2        A.   The physician.

 3        Q.   And prior to that?

 4        A.   Well, there was another fair hearing case.

 5        Q.   I am getting a sense of a pattern here.  Go

 6   ahead.

 7        A.   And this was a physician in a very similar type

 8   of situation.  And I was -- provided an expert report for

 9   the physician.

10        Q.   And prior to that?

11        A.   It was a credentialing case -- now, these are

12   all within the past four years.  I may not be giving them

13   to you in any particular order.

14        Q.   Okay.

15        A.   But they are all within the past four years.

16        Q.   I appreciate that.

17        A.   It was a negligent credentialing case where I

18   provided a report for the Plaintiff.

19        Q.   When you say negligent credentialing, of whom?

20        A.   Negligent credentialing of a hospital.

21        Q.   By a hospital but of whom?

22        A.   When you say of whom, I am not sure I understand

23   the question.

24        Q.   Who was the hospital negligent in credentialing?

25        A.   Was negligent in credentialing one of their
```

Jerry Williamson, M.D.

1    nurses.

2        Q.   A nurse?

3        A.   Yes.

4        Q.   And is that the Cane versus Memorial Hermann

5    Health Systems case?

6        A.   Is that Texas?

7        Q.   That is from -- yes, the District Court of

8    Texas, the 55th Judicial District.

9        A.   Correct.  That is correct.

10        Q.   Separate from the Cane case, have you ever

11    testified or -- strike that.  I will start over.

12              Besides this case and the Cane case have

13    you ever previously served as an expert in any case

14    regarding credentialing?

15        A.   The case -- there was one other case that

16    actually the -- the fair hearing case involved peer review

17    and credentialing as well.

18        Q.   Each of the fair hearing cases or one in

19    particular?

20        A.   No.  One -- well, actually two in particular.

21    Let me think now.  Yes, two in particular, two of the

22    three.

23        Q.   And when you say that those two fair hearing

24    cases involved credentialing, credentialing of the

25    physicians but by whom?

Jerry Williamson, M.D.

1       A.   Credentialing of the physicians by the hospital.

2       Q.   And I have learned from various depositions in

3   this case, there is a difference between credentialing and

4   privileging?

5       A.   Correct.  Correct.  Yes.

6       Q.   Okay.  And so were the fair hearings -- they

7   were specifically about credentialing as opposed to

8   privileging or were they a combination sometimes?

9       A.   Well, pretty much a combination.

10      Q.   Okay.  Are you drawing a distinction when you

11  say credentialing to exclude privileging or could it be

12  inclusive?

13      A.   It depends on who I am speaking with.

14      Q.   Okay.  Well, now, in describing your expert

15  experience, I just want to get an understanding if you are

16  using the term credentialing, could you also mean that to

17  be privileging as well?

18      A.   Well, they are very distinct.  They are

19  distinct.

20      Q.   In the cases in which you testified regarding

21  the credentialing of the physicians in the fair hearing

22  setting, and I think you said that there were two of them,

23  did both of those involve privileging as well?

24      A.   Correct.

25      Q.   Which specialities, if you don't mind?

Jerry Williamson, M.D.

1      Q.   I will give you back Exhibit 3.  Just hold onto

2   that for a second.  So do you have any professional

3   qualifications or certifications that are not listed here?

4   So, for example, a Ph.D. in something or something that

5   you deemed not relevant for these purposes but is a degree

6   that you hold?

7      A.   A degree, no.

8      Q.   Any other qualifications or certificates that

9   you hold that are not listed here other than like a

10   driver's license?

11      A.   No.

12      Q.   Okay.

13      A.   I don't believe -- I don't believe so.

14      Q.   And I see that in your graduate school section

15   you list Loyola University Chicago School Of Law?

16      A.   Yes.

17      Q.   Beazley Institute for Health Law and Policy that

18   you got a master's in health jurisprudence --

19      A.   Correct.

20      Q.   -- in 2010?

21      A.   Yes.

22      Q.   That is not a JD degree, correct?

23      A.   Correct.  It is an MJ.

24      Q.   And you are not a lawyer, correct?

25      A.   Correct.

Jerry Williamson, M.D.

1      Q.    Have you taken or sat for the bar exam in any

2   state?

3      A.    I have not.

4      Q.    And similarly in your appointments, I see that

5   you have had some interactions with legal institutions,

6   for example, being an adjunct professor of law at Loyola

7   University Chicago School of Law, correct?

8      A.    Correct.

9      Q.    Were you serving in a lawyerly capacity there,

10  if you will, or -- strike that.  I can restate it.

11              So what was the subject of your studies

12  that you did there?

13     A.    Risk -- subject of my studies or what I am

14  teaching?

15     Q.    Both.

16     A.    Okay.  The subject of my studies were pretty

17  much across the board in terms of risk management

18  compliance, regulatory issues.  It was a rather complete

19  program that ultimately ended up in a thesis.

20     Q.    And what was your thesis on there?

21     A.    My thesis was on -- let me think for a moment.

22  It was -- goodness.  It is a subject that I am actually

23  lecturing on now, and for some reason it has just

24  disappeared.

25     Q.    Sure.

Jerry Williamson, M.D.

```
 1        A.   Let me think for a moment.

 2        Q.   Does it relate to health and the law?

 3        A.   Pardon me?

 4        Q.   Does it relate to health and the law?

 5        A.   Yes, it does.  It is specific to -- I have it

 6   now.  Thank you.  Apology and disclosure.

 7        Q.   And what do you mean by apology and disclosure?

 8        A.   How physicians present themselves following a

 9   medical mistake and what are some of the state law

10   requirements and what are their obligations ethically as

11   well.

12        Q.   When you say present themself, present themself

13   to who?

14        A.   To the patients and/or the family following a

15   medical mistake.  And basically it involves transparency.

16        Q.   So that is the subject both of your thesis and

17   also of the course that you have taught?

18        A.   That is a part of the subject matter in the

19   course, but that was my thesis, yes.

20        Q.   What is more broadly the subject matter of the

21   course you have taught?

22        A.   That I am currently teaching?

23        Q.   Correct.

24        A.   Risk management.

25        Q.   Have you taught any other courses at Chicago
```

Jerry Williamson, M.D.

1    School of Law?

2        A.   We have had programs that are live programs

3    where I have presented similar types of programs in

4    conjunction with others, but they vary.  But it was a

5    single presentation.  It was not a course.

6        Q.   Sure.  Like a single lecture type of experience?

7        A.   Exactly.  Yes.

8        Q.   Have you ever taught a course called Torts?

9        A.   Called what?

10       Q.   Torts, Legal Torts?

11       A.   Torts.  No.  I have attended a course on torts

12   but, no, I have not taught it.

13       Q.   Okay.  So you are here serving as an expert, and

14   we have spoken a bit about your experience serving as an

15   expert.  I know you are also a medical doctor.  What would

16   you say your typical day job is?

17       A.   It varies.  Typically I am working with cases

18   like this.  I am teaching.  And I lecture around the

19   country in a variety of areas.  And I do consulting work

20   to assist physicians in developing compliance programs.

21       Q.   Are you currently credentialed at any medical

22   facility?  Are you on staff anywhere if I am not using the

23   right terminology?

24       A.   No.  I am not on staff, no.

25       Q.   Okay.  When were you last affiliated to be on

Jerry Williamson, M.D.

```
 1   staff with a medical facility?

 2        A.   Oh, dear.  That would have been -- probably

 3   would have been Mease Hospital, and that would have been a

 4   number of years ago.  It is M-E-A-S-E.

 5        Q.   And you have also spent time working in hospital

 6   administration, is that correct?

 7        A.   I have.

 8        Q.   Okay.  Do you currently work in hospital

 9   administration for any medical center or hospital?

10        A.   Only as a consultant when asked, yes.

11        Q.   When did you last work more formally, not in

12   just a consulting role, in hospital administration?

13        A.   More formally would have been at Cape Coral

14   Hospital where I was the vice president for medical

15   affairs.

16        Q.   And when did you do that until?

17        A.   I would probably have to look at my CV.

18        Q.   Go ahead -- go ahead and take a look.  I am not

19   trying to do a pop quiz.

20        A.   I understand.  I would say on or about 1993,

21   '94, somewhere in that.

22        Q.   I see on the second page at the very top you

23   have Cape Coral Hospital until '94?

24        A.   Yes.

25        Q.   Is that right?
```

Jerry Williamson, M.D.

 1      A.   Yes.

 2      Q.   And I know you testified earlier about serving

 3  as an expert in fair -- physician fair hearings?

 4      A.   Yes.

 5      Q.   Did you also ever serve professionally in your

 6  role as a hospital administrator in physician fair

 7  hearings?

 8      A.   As vice president of medical affairs I have.

 9      Q.   When you served as the vice president for

10  medical affairs for Cape Coral Hospital, did you also play

11  any role in the hiring or credentialing or privileging of

12  physicians?

13      A.   Most definitely.

14      Q.   And in other roles prior to that, did you do

15  that as well?

16      A.   I did.

17      Q.   Did you ever play a role in the hiring or

18  evaluation of resident applicants?

19      A.   I may have in the past, but I don't recall

20  exactly when.

21      Q.   Okay.  Have you ever been in a role throughout

22  your career where you oversaw directly or indirectly the

23  work of residents?

24      A.   Well, I currently am on the faculty at Florida

25  State University, and I work in their residency program

Jerry Williamson, M.D.

 1  that were actually -- the ones that signed the letter and

 2  wrote the letter.

 3      Q.   So you are saying that you would directly

 4  receive the letters of recommendation from the

 5  recommenders themselves?

 6      A.   Correct.  Either that -- and it is helpful when

 7  we get those letters because it tells you a fair amount

 8  about the individual, so that is helpful.  If in fact

 9  there is something in the letter that is of concern to

10  me -- well, for the most part I was rather aggressive and

11  contacted all letters that I received.  And the reason for

12  that is because there's times where things are not placed

13  in a letter that is communicated best by telephone.

14      Q.   Sure.  There might be things that are more

15  unsaid than said?

16      A.   Nuances.

17      Q.   I understand.  Would you expect that there would

18  typically be an interview or in-person component?

19      A.   I have never hired an individual without an

20  interview.

21      Q.   Okay.  If the candidate were to have been

22  foreign educated, so educated outside the United States,

23  have you had experience with hiring foreign medical

24  graduates as well?

25      A.   Most certainly.

Jerry Williamson, M.D.

 1    numbers?

 2         A.   Yes.

 3         Q.   And you mentioned having interacted with ECFMG

 4    during some of those processes?

 5         A.   Correct.

 6         Q.   What information did you recall receiving from

 7    ECFMG during those processes?

 8         A.   There were -- I don't recall them all, but they

 9    were very helpful, because what ECFMG provided to us, we

10    relied upon and did not in fact need to duplicate our

11    efforts.  So that was -- and there were -- in essence for

12    us a ECFMG certificate meant a lot.

13         Q.   Do you recall what information was communicated

14    through the ECFMG certificate?

15         A.   I don't.  Not -- I mean, I know that they

16    provided for us the medical education and letters of

17    reference and such, but I don't recall each -- each item.

18    I don't.

19         Q.   I know I asked earlier about whether you have

20    come across Dr. Akoda's patients in your career.  Have you

21    ever come across Dr. Akoda directly himself?

22         A.   No.

23         Q.   Given that you have never met Dr. Akoda directly

24    yourself, from where did you get the information regarding

25    Dr. Akoda and his background for the purposes of serving

Jerry Williamson, M.D.

1    as an expert in this case?

2        A.    I think it was provided to me by my attorney.

3        Q.    Did you get any information regarding Dr. Akoda

4    from outside research you conducted independently?

5        A.    The only thing that I received was the -- I

6    believe it was the Department of Justice, their charges

7    and their decision in terms of -- I am trying to think.

8    That came through the American Board of Obstetrics and

9    Gynecology.  So that is my recollection on that, yes.

10       Q.    Did you, like, sit down and google Dr. Akoda and

11   read news articles about him or anything of the like?

12       A.    No.  That was the only news article that I saw

13   was through the American Board of Obstetrics and

14   Gynecology.  All of the other information was rather

15   comprehensive and complete in terms of what I received and

16   the documents that I received.

17       Q.    Did you interact with or read posts by any of

18   the Plaintiffs in this case on social media?

19       A.    Could you repeat that question?

20       Q.    Yeah.  Have you interacted with any of the

21   Plaintiffs in this case through social media?

22       A.    I -- I don't participate in social media at all.

23       Q.    You haven't read Facebook posts, for example?

24       A.    No.

25       Q.    Have you ever interacted with any of the

Jerry Williamson, M.D.

```
 1              (Whereupon, a brief break was taken.)

 2              VIDEOGRAPHER:  Back on the record at 10:43.

 3    BY MS. MCENROE:

 4        Q.   So, Dr. Williamson, I want to make sure we get

 5    for purposes of the record a clear indication of what it

 6    is that you have brought with you today.  And is this the

 7    sum total of the materials you have looked at and

 8    considered in the preparation of your report?

 9        A.   Correct.  You haven't looked at these

10    (indicating).  This is a part of it as well.

11        Q.   Thank you.

12        A.   You're welcome.

13        Q.   We will look through this as well.

14    So the first thing I want to do is go through a black

15    binder that you handed up that has a label on the side

16    that says Class Action Lawsuit ECFMG, Janet, Janet &

17    Suggs.  And in the front pocket there was some handwritten

18    notes it looks like by you.  Is this your handwriting?

19        A.   Correct.

20              MS. MCENROE:  And I am going to go ahead and mark

21    this as Exhibit 4 so we can keep it as part of the record.

22              (Thereupon, Exhibit 4 was marked for

23    identification.)

24    BY MS. MCENROE:

25        Q.   And it is subject lined or you have written on
```

Jerry Williamson, M.D.

1   the top of it, Kelly Depo Key Points, is that correct?

2       A.   Correct.

3       Q.   And those are your notes from Mr. Kelly's

4   deposition?

5       A.   Correct.

6       Q.   I don't have a paper clip but we can hold those

7   together.

8            MR. THRONSON:  I have got one.

9            MS. MCENROE:  Great.

10  BY MS. MCENROE:

11      Q.   And that was in the front pocket of a binder

12  that has an index with the following entries, and so I am

13  just going to read these into the record.

14               The first is William Kelly, 8-20-19

15  deposition transcript with Exhibits 1 to 25.  And that is

16  material you reviewed and considered, is that correct?

17      A.   Correct.

18      Q.   And then it says Tab B is the class action

19  complaint, is that correct?

20      A.   I can't see it from here.

21      Q.   Did you review the class action complaint in

22  this case?

23      A.   I did.  Yes.

24      Q.   And that was the complaint from this case, is

25  that correct?

Jerry Williamson, M.D.

```
1        A.    Correct.

2        Q.    Have you reviewed the complaint in any other

3   case filed by these Plaintiffs?

4        A.    I don't understand the question.

5        Q.    Have you reviewed any complaint filed by the

6   same group of Plaintiffs in any other case against any

7   defendant other than ECFMG?

8        A.    No.

9        Q.    And then it says Tab C is the Answer to Class

10  Action Complaint and Alternative Defenses.  Do you recall

11  reviewing that?

12       A.    I do.

13       Q.    Okay.  And then the next tab is Defendant's

14  Responses and Objections to Plaintiff Jasmine Riggins'

15  First Set Of Interrogatories and First Request For

16  Production.  Do you recall having reviewed those?

17       A.    May I ask, is that highlighted?

18       Q.    It is highlighted.

19       A.    Whatever is highlighted, I reviewed.

20       Q.    Okay.  So the things that are not highlighted,

21  you did not review?

22       A.    Correct.

23       Q.    Okay.  So that one is highlighted.  The next one

24  is also highlighted, Defendant's Objections and Responses

25  to Plaintiffs' Request For Admission Of Facts and
```

Jerry Williamson, M.D.

1    Genuineness Of Documents.  Do you recall having reviewed

2    that?

3         A.   Yes.

4         Q.   Okay.  Then there are two more entries that are

5    not highlighted.  One is Defendant's Objections And

6    Responses to Plaintiffs' Second Request For Admission Of

7    Facts and Genuineness of Documents.  That is not

8    highlighted.  Does that mean you did not review it?

9         A.   I don't recall reviewing that, but I can't say

10   for certain.

11        Q.   Okay.  And then the last thing in this binder is

12   a non-highlighted tab that says ECFMG web pages.

13        A.   I did look at that.

14        Q.   You did look at that?

15        A.   Yes.

16        Q.   And I want to take a quick look at what that is.

17   In fact, I am going to hand this back to you to see if you

18   can point me to what that is.

19        A.   Okay.

20        Q.   You might be better able to navigate than I am

21   through this.  We'll get you all mic'd back up.

22        A.   I did not look at that.

23        Q.   Okay.  And can I just see what that is real

24   quick?

25        A.   Sure.

Jerry Williamson, M.D.

1      Q.   Thank you.  So for the purposes of the record

2   the ECFMG web pages references here are the About ECFMG

3   page, the About Certification page, Continued

4   Certification Information --

5      A.   Oh, I am sorry.  My mistake.  I did look at

6   that.

7      Q.   Okay.  So the part that you did review is the

8   policies and procedures regarding irregular behavior?

9      A.   Correct.

10     Q.   Okay.  And that is from ECFMG's website?

11     A.   It's what's here.

12     Q.   Great.  Okay.  And then there is an article,

13  USMLE Takes Action Against Individuals Found to Have

14  Engaged in Irregular Behavior.  Have you reviewed that?

15     A.   I believe so.

16     Q.   And then there is an ECFMG certification fact

17  sheet.  Have you reviewed that?

18     A.   I don't believe so.

19     Q.   Okay.  And then there is a page entitled ERAS

20  Support Services for ECFMG?

21     A.   The reason -- if I may, Ms. McEnroe?

22     Q.   Yes.

23     A.   The reason -- I am thinking in terms of -- I

24  also saw some of this material on a website.  I also saw

25  some of this material elsewhere.  And I may not have seen

Jerry Williamson, M.D.

1   this particular document, but what you are describing or

2   listing, I have seen that material.  I just don't know

3   exactly where.

4        Q.   Understood.  So some of that may be material you

5   saw on ECFMG's website directly?

6        A.   Correct.  Yes.

7        Q.   And were you directed to those web pages or did

8   you navigate to those web pages independently?

9        A.   No.  I navigated independently.

10        Q.   And the last one in this set of ECFMG web pages

11   is a page entitled An Announcement Regarding Fraudulent

12   Letters of Recommendation.  Do you recall having reviewed

13   that?

14        A.   No.

15        Q.   Okay.  There is a Tab L in this binder that has

16   a piece of paper at the top of it that says ECFMG Fast

17   Facts.  Do you recall if you reviewed this page?

18        A.   Again, I may have seen that same information on

19   the website.  I don't know what's on that page.  I can't

20   -- I can't say.

21        Q.   Okay.

22        A.   May I see that?

23        Q.   Yes.  Absolutely.  It looks like there's a

24   couple of copies of the same thing.  So I might ask if you

25   don't mind comparing that to the page behind it, and then

Jerry Williamson, M.D.

1  we can take one of those out and mark it as an exhibit.

2       A.   They are duplicate.

3       Q.   Great.  Thank you.

4            MS. MCENROE:  I am going to mark this as Exhibit

5  5.  And again, this came out of Tab L from Dr.

6  Williamson's binder.

7            (Thereupon, Exhibit 5 was marked for

8  identification.)

9  BY MS. MCENROE:

10      Q.   And so at the top it says ECFMG Fast Facts.  Do

11  you see that?

12      A.   Yes.

13      Q.   Okay.

14      A.   And I am familiar with this.  And I can't tell

15  you specifically which document had the same information

16  but --

17      Q.   Okay.  Thank you.  Can I see the binder back?

18      A.   Sure.

19      Q.   Thank you.  Who put this binder together, did

20  you?

21      A.   No.  It was -- I received it as such.  I changed

22  the binder itself because the other binder was too small.

23      Q.   Oh, the physical binder?

24      A.   The physical binder, correct.

25      Q.   You brought other hard copy materials with you

Jerry Williamson, M.D.

1    in addition to this binder including a pile you had handed

2    me with a number of binder-clipped sets of documents

3    together?

4        A.   Yes.

5        Q.   The first one I am looking at has a cover page

6    in all caps that says JW-NOTES: MONIQUE RUSSELL

7    DEPOSITION:.  Did you prepare this cover page?

8        A.   I did.

9        Q.   And then it looks behind it that it has Monique

10   Russell's deposition transcript with a couple of

11   highlightings and some flags.  Is that highlighting and

12   are those flags yours?

13       A.   Yes.

14       Q.   And on the front cover it says 2.0 hours.  Is

15   that your handwriting?

16       A.   Yes.

17       Q.   Does that mean you spent two hours looking at

18   this?

19       A.   Correct.

20           MS. MCENROE:  And for the purposes of the record,

21   I am just going to mark this cover page.

22               (Thereupon, Exhibit 6 was marked for

23   identification.)

24   BY MS. MCENROE:

25       Q.   Did you prepare these notes prior to issuing

Jerry Williamson, M.D.

1   your expert report?

2        A.   No.

3        Q.   When did you prepare those notes?

4        A.   Shortly after I reviewed them.  And that was

5   after my expert report.  I don't recall the exact date and

6   time.

7        Q.   Okay.  Did you receive Ms. Russell's deposition

8   transcript prior to issuing your expert report?

9        A.   No.

10        Q.   When did you receive it?

11        A.   I don't know exactly, but it was after the

12   expert report.

13        Q.   Okay.  And the next set of pages here from the

14   same pile has a cover page that says JW-NOTES: ELSA

15   POWELL DEPOSITION:, and then it has some all-caps notes.

16   Again, are these your notes?

17        A.   Yes, they are.

18        Q.   And behind it is appended Ms. Powell's

19   deposition transcript with handwriting of 1.6 hours.  Is

20   that your handwriting?

21        A.   Correct.

22        Q.   And is that the time you spent?

23        A.   Correct.

24        Q.   And there is again highlighting and tabs, and

25   that is your highlighting and your tabs?

Jerry Williamson, M.D.

```
 1      A.   That is correct.

 2           MS. MCENROE:  And for the purposes of our record,

 3   I am just going to mark this cover page as well.  And this

 4   will be Exhibit 7.

 5           (Thereupon, Exhibit 7 was marked for

 6   identification.)

 7   BY MS. MCENROE:

 8      Q.   And again, did you receive Ms. Powell's

 9   deposition transcript following the issuance of your

10   expert report?

11      A.   Yes.

12      Q.   Okay.  And then the next thing in the pile is a

13   copy of a deposition transcript from Jasmine Riggins dated

14   September 12th, 2019.  And you wrote .7 hours on it.  And

15   there is a handwritten note that says deposition

16   interrupted to accommodate schedules.  Discussion focuses

17   on -- I can't read that.  What does that say next?

18      A.   Okay.  Discussion focuses on adhesions.

19      Q.   Okay.  Can you keep reading the rest of the

20   note?

21      A.   Sure.  Noted by Akoda following C-section.

22   Ms. Riggins holds Akoda accountable.

23      Q.   And is that your handwriting?

24      A.   Yes, it is.

25      Q.   And those are your notes?
```

Jerry Williamson, M.D.

```
1         A.   Yes, it is.

2         Q.   And is the .7 noted there the time you spent

3    looking at the deposition transcript?

4         A.   Correct.

5         Q.   Did you receive that deposition transcript

6    before or after you issued your expert report?

7         A.   After.

8         Q.   Thank you.

9         A.   You are welcome.

10        Q.   And the next in this pile is a set of pages that

11   has on the top of it a cover page headed JW-NOTES: DESIRE

12   EVANS DEPOSITION: and then a series of all caps notes and

13   one handwritten that says, unwillingness to take her child

14   to PEDI; loss of trust.  Are those your notes?

15        A.   Yes.

16        Q.   And I assume the P-E-D-I means pediatrician?

17        A.   Correct.

18        Q.   And behind this cover page is a copy of Ms.

19   Evan's deposition transcript with some highlighting and

20   flags.  Are the highlighting and flags yours?

21        A.   Yes.

22             MS. MCENROE:  I am going to mark this cover note

23   as Exhibit 8.

24             (Thereupon, Exhibit 8 was marked for

25   identification.)
```

Jerry Williamson, M.D.

```
 1   BY MS. MCENROE:

 2       Q.   And did you receive and review this deposition

 3   transcript following the issuance of your expert report in

 4   this case?

 5       A.   I did.

 6       Q.   Okay.  And the next thing in this pile is a

 7   printout of the deposition of David Markenson.  And it

 8   doesn't have any cover notes to it.  It does have some

 9   highlighting in it.  Is the highlighting yours?

10       A.   Yes.

11       Q.   When did you review this deposition transcript?

12       A.   I don't recall.

13       Q.   Okay.  It is dated October 22nd, 2019.  So that

14   would have been following the issuance of your expert

15   report, correct?

16       A.   I would have to look at my expert report date.

17   I don't recall what the date on that is, if I may?

18       Q.   Sure.

19           MS. MCENROE:  I am handing you what I have marked

20   as Exhibit 9.

21           (Thereupon, Exhibit 9 was marked for

22   identification.)

23   BY MS. MCENROE:

24       Q.   You will see at the top it is labeled Jerry

25   Williamson, M.D., F.A.A.P., M.J., CHC., LHRM and then it
```

Jerry Williamson, M.D.

1    says September 22nd, 2019?

2        A.   Yes.

3        Q.   And is that your expert report in this case?

4        A.   Yes.

5        Q.   And that date, September 22nd, 2019, is to the

6    day, a month before Dr. Markenson's deposition, correct?

7        A.   Correct.

8        Q.   So you reviewed Dr. Markenson's deposition

9    transcript after you provided your expert report in this

10   case?

11       A.   Yes.

12       Q.   There is another whole set of documents here,

13   and I will go through what they are for the purposes of

14   the record, but is there a reason this set was set aside

15   separately from the rest of the documents?  Are these

16   specific documents received after your expert report or is

17   it just the way that they ended up being organized?

18       A.   It's just the way they were organized.

19       Q.   Okay.  Moving to the file folder set you have

20   here, I am just going to go through the contents of each

21   for purposes of the record, trying not to take the whole

22   day with this, but just making sure we have this clear.

23   The very first thing in here is what you have headed on

24   your folder, Joint Commission Comment.

25       A.   Yes.

Jerry Williamson, M.D.

1        Q.   In a manila folder?

2        A.   Uh-huh.

3        Q.   And then the contents though are about ECFMG's

4   certification page, is that correct?

5        A.   That is correct.

6        Q.   And why did you do that?  Why did you put that

7   in that folder?

8        A.   Well, because the Joint Commission has made it

9   rather clear that the credentialing -- the primary source

10  credentialing by ECFMG is satisfactory for any other

11  credentialing organization to accept.

12       Q.   Then you have a folder entitled Williamson

13  Expert Report, and it has a sticky note inside that says

14  ForensisGroup, Inc, Thomson Reuters, The Expert Institute.

15  Do you see that?

16       A.   Yes.  I put that in there just to remind myself

17  in the event that you want to know who I potentially work

18  with in terms of expert companies that retain me.

19       Q.   Okay.  And are you working in this case through

20  any of those expert groups?

21       A.   I have no idea who I am working through.

22       Q.   Okay.  That is fair.  So these are groups that

23  you have worked through before?

24       A.   Worked through before, yes.

25       Q.   Okay.  And there is highlighting on this copy of

Jerry Williamson, M.D.

1   your expert report.  Is that your highlighting?

2       A.   Yes, it is.

3       Q.   And why did you highlight some of this?

4       A.   Just to remind myself of some key points.

5       Q.   Okay.  The next file folder is entitled ECFMG

6   Irregularity Report, is that correct?

7       A.   Yes.

8       Q.   And that is a folder that includes a one page

9   document Bates number ECFMG_RUSS_90, 9-0, and it is

10  subject headed ECFMG Irregularity Report, so it make

11  senses why you called it the ECFMG Irregularity Report.

12  Did you receive this prior to the issuance of your expert

13  report?

14      A.   No.

15      Q.   Do you recall when you received that?

16      A.   Within the past week.

17      Q.   Did you ask for that?

18      A.   I did.

19      Q.   Okay.  And what specifically did you ask for?

20      A.   If there was an irregularity report.  I believe

21  that you had -- when I received my deposition request,

22  that that was an item that was specifically on your list

23  as well.

24      Q.   The next folder is called Dr. David Markenson

25  Exhibits.  And it has the set of exhibits with some

Jerry Williamson, M.D.

1    handwritten notes and some highlighting.  Are these notes

2    and highlighting yours?

3         A.   Yes.

4         Q.   Did you receive these exhibits at the same time

5    you received the -- I am sorry -- the deposition

6    transcript for Dr. Markenson?

7         A.   I don't recall.

8         Q.   Do you know Dr. Markenson?

9         A.   I do not.

10        Q.   Have you ever spoken to him before?

11        A.   I have not.

12        Q.   Have you ever met with him or been in a meeting

13   with him that you know of?

14        A.   I have not.

15        Q.   Okay.  The next folder is subject headed

16   Addendum of Documents Rule 26.  And it says -- at the top

17   it has your name and then it says addendum as of November

18   21st, 2019.  And then it looks to be a disclosure of

19   additional documents.  There's a couple of copies in here.

20   So I will hand you one of them.

21        A.   Yes.

22        Q.   Is that intended for disclosure today?

23        A.   Yes.

24        Q.   Okay.  This might help shortcut some of the

25   discussion of what was reviewed when.

Jerry Williamson, M.D.

1        A.    Sure.

2              MS. MCENROE:  I am marking this as Exhibit 10.

3              (Thereupon, Exhibit 10 was marked for

4    identification.)

5    BY MS. MCENROE:

6        Q.    And you write:  After submitting my expert

7    report that included the documents I reviewed pursuant to

8    Rule 26, there were additional documents reviewed.  The

9    following list represents the additional documents I

10   received and reviewed from legal counsel at Janet, Janet &

11   Suggs.  And then you have a list, right?

12       A.    Correct.

13       Q.    And then you say reviewing the aforementioned

14   documents did not change my opinion in any material way.

15   My conclusions have not changed.  And then you have your

16   name at the bottom, is that correct?

17       A.    Correct.

18       Q.    So is this an intended addendum of your expert

19   report which we have as Exhibit 9?

20       A.    For completeness, yes.

21       Q.    Would you have any other intended addenda or

22   modifications of your expert report aside from this

23   Exhibit 10 I think we marked it?

24       A.    I don't believe so, no.

25       Q.    Do you know why you received these?  Did you ask

Jerry Williamson, M.D.

```
 1   for them?

 2        A.   I don't recall.

 3        Q.   Okay.  Moving along in the manila folders that

 4   you have brought.  There is a folder named Plaintiff's

 5   expert report Jonathan Burroughs, M.D., and then a copy of

 6   Dr. Burroughs' expert report in this matter.  Did you

 7   review that?

 8        A.   I did.

 9        Q.   When?

10        A.   I believe in the past week.

11        Q.   So it was after the issuance of your expert

12   report?

13        A.   Yes.

14        Q.   Do you know Dr. Burroughs?

15        A.   I do not.

16        Q.   Do you have any understanding of whether

17   Dr. Burroughs is still being put forward as an expert in

18   this case?

19        A.   I have no idea.

20        Q.   You don't know one way or the other?

21        A.   Don't know.

22        Q.   To your knowledge, have you ever spoken to

23   Dr. Burroughs?

24        A.   No.  I have not.

25        Q.   To your knowledge, have you ever been in a
```

Jerry Williamson, M.D.

1    meeting with him?

2        A.   I suspect -- not to my knowledge, but I suspect

3    that he has attended the same meetings that I have because

4    we are both members of AHLA.  And at AHLA meetings where

5    I have either presented a program or attended as an

6    attendee, I suspect he may very well have been there.

7        Q.   But not related to this case in particular?

8        A.   No.

9        Q.   Okay.  The next folder is entitled Plaintiff's

10   Expert Disclosure, Plaintiff's Rebuttal Expert Disclosure.

11   And it includes a copy of two filings from this case,

12   Plaintiffs' Rebuttal Expert Disclosure and Plaintiffs'

13   Expert Disclosure, the actual sort of written-up documents

14   that are formal court documents.  Did you review these in

15   connection with forming your opinion?

16       A.   I did.  I did -- not in forming my opinion.

17       Q.   So these would have been received afterwards?

18       A.   Correct.

19       Q.   Okay.  The next folder is entitled Expert

20   Reports Plaintiff Dr. Tellefsen/John Hyde.  And inside

21   there is a copy of Dr. Tellefsen's report dated September

22   20th, 2019, in connection with this case and the report of

23   Dr. Hyde dated September 23rd, 2019, in this case.  Did

24   you review these two reports?

25       A.   I did.

Jerry Williamson, M.D.

1      Q.   Okay.  Is there a reason why you put them

2   together in the same folder?

3      A.   Just to save on a folder.

4      Q.   Okay.  There is some highlighting here.  Is that

5   your highlighting?

6      A.   It is.

7      Q.   Do you know Dr. Tellefsen?

8      A.   Do not.

9      Q.   Have you ever been in a meeting with her to your

10  knowledge?

11     A.   Not to my knowledge.

12     Q.   Do you know Dr. Hyde?

13     A.   I do not.

14     Q.   Have you ever been in a meeting with him to your

15  knowledge?

16     A.   Not to my knowledge.

17     Q.   Have you spoken to either Drs. Tellefsen or

18  Hyde?

19     A.   I have not.

20     Q.   We are making process here.  The next folder

21  is entitled Plaintiff Expert Reports

22  Markenson/Phillips/Luciani.  And then inside there is a

23  copy of an expert report from Dr. Markenson, a copy of a

24  report from Dr. Luciani and a report from Dr. Phillips.

25  Have you reviewed these reports?

Jerry Williamson, M.D.

1        A.   I have.

2        Q.   And the highlighting or handwritten notes on

3   these, are those yours?

4        A.   They are.

5        Q.   Do you know Drs. Luciani, Markenson or

6   Phillips?

7        A.   Do not.

8        Q.   Have you spoken to any of them?

9        A.   I have not.

10       Q.   To your knowledge have you been in a meeting

11   with any of them?

12       A.   To my knowledge, I have not.

13       Q.   In advance of providing your expert report, did

14   you review any drafts of any other expert reports in this

15   case?

16       A.   Whatever is listed in my expert report is what I

17   reviewed.

18       Q.   So if there are no drafts listed there, then you

19   did not review any drafts, is that correct?

20       A.   Drafts from?

21       Q.   Other experts.

22       A.   Other experts.  I did not.

23       Q.   Okay.  The next in this set of documents and

24   without a manila folder is a copy of the rough transcript

25   of Stephen Seeling.  And at the top it is handwritten

Jerry Williamson, M.D.

1    deposition of Stephen Seeling, do you see that?

2        A.   Yes.

3        Q.   Is this something that you reviewed in

4    conjunction with the preparation of your expert report?

5        A.   I did.

6        Q.   And there are flags and handwritten notes and

7    some highlighting in these.  Is that marcation yours?

8        A.   Yes, it is.

9        Q.   Okay.  The next folder in what you brought is

10   subject line -- or I should say is titled Expert Report

11   Plaintiff Annie Steinberg, M.D., and then inside is a copy

12   of Dr. Steinberg's report and there's highlighting on

13   this.  Is that highlighting yours?

14       A.   Yes.

15       Q.   Do you know Dr. Steinberg?

16       A.   I do not.

17       Q.   Have you spoken to Dr. Steinberg?

18       A.   I have not.

19       Q.   Do you know if you have ever been in a meeting

20   with Dr. Steinberg?

21       A.   Not to my knowledge.

22       Q.   Okay.  The next folder is entitled ABIM

23   Report/Akoda.  And then inside I see the cover page is a

24   subpoena to produce documents, information or objects or

25   to permit inspection on premises in a civil action

Jerry Williamson, M.D.

 1   directed to the American Board of Internal Medicine.  And

 2   then some documents that it looks like they produced

 3   behind that.  Do you know when you received these

 4   documents?

 5        A.   I don't recall.

 6        Q.   Okay.  Do you know if you reviewed them in

 7   conjunction with the preparation of your report?

 8        A.   If it is not listed, then I did not.  It is not

 9   listed in my expert report.

10        Q.   Okay.  On the third page from the back of this

11   set of documents, you highlighted a line that says

12   unsatisfactory, consistently falls short of reasonable.

13   And then you have some handwritten notes.  Could you

14   please read those notes into the record?

15        A.   How conclusions were reached.  Go to moral and

16   ethical impacting patient safety.  Risks to patients

17   increased.  Rights to be free from sexual assault.

18   Question mark, ABIM notify ECFMG.

19        Q.   And what did you mean by that last --

20        A.   Whether or not the American Board of Internal

21   Medicine had notified ECFMG regarding this report.

22        Q.   Can I see that back?

23        A.   Uh-huh.

24        Q.   And do you know one way or another if the

25   American Board of Internal Medicine did notify ECFMG?

Jerry Williamson, M.D.

1      A.   I do not.

2      Q.   Do you expect that they should have?

3      A.   I don't know the inner workings of the American

4  Board of Internal Medicine, so I can't really say.

5      Q.   Do you think that they would have or should have

6  notified any other parties, hospital systems, boards of

7  medicine?

8      A.   Again, I don't know what their P&Ps are, their

9  policies and procedures are.  It is out of my area of

10  expertise.

11      Q.   Okay.  Are ECFMG's policies and procedures

12  within your area of expertise?

13      A.   I would say yes.

14      Q.   So how do you know more about ECFMG's policies

15  and procedures than you know about the American Board of

16  Internal Medicine's policies and procedures?

17      A.   I have had a fair amount of experience working

18  with ECFMG over the years as I mentioned previously.  So

19  that is the reason why the American Board of Internal

20  Medicine -- as a pediatrician, I have had, you know,

21  limited exposure to them.

22      Q.   Okay.  The next folder here is entitled

23  Plaintiffs' Timeline.

24          MS. MCENROE:  It is a document that we will mark

25  for purposes of the record, and I actually think I have

Jerry Williamson, M.D.

1    that correct?

2         A.   Once ECFMG provides that certificate for the

3    physician, then we are looking at a residency program,

4    and the residency program needs to be completed

5    satisfactorily.  At that point in time, the individual can

6    go ahead and practice medicine with a license.

7         Q.   Okay.  So there are more steps between ECFMG

8    certification and licensure than just a certificate is

9    issued and then there is a license issued, correct?

10        A.   Correct.  No, there are additional steps, but

11   the ECFMG point in the cascade of events is critical for

12   the others to take place.

13        Q.   Right.

14        A.   So it is a -- it is an important -- possibly the

15   most important step in moving forward.

16        Q.   So moving forward from ECFMG certification, the

17   next step would be application and acceptance with a

18   residency program, correct?

19        A.   Correct.

20        Q.   And if no residency program accepts an

21   applicant, then that is just as critical as if ECFMG

22   didn't issue an ECFMG certificate, is that fair?

23        A.   That is fair.  And I would then ask why did the

24   residency program not accept the individual.

25        Q.   Are you aware of reasons why a residency program

Jerry Williamson, M.D.

1    may not accept an individual?

2        A.    Well, their -- the basic one is that they don't

3    have any room.

4        Q.    Sure.

5        A.    That they are full in terms of the number of

6    residents they have.  Other reasons that the specialty or

7    the -- I should not say the specialty, but that the

8    applicant's application did not meet certain criteria.

9        Q.    Including, for example, there could be failures

10   on USMLE steps?

11       A.    That I could not say.  That I don't know.

12       Q.    Okay.  And then in the next steps -- so after an

13   individual is accepted to a residency program they then

14   need to actually perform, right, and participate in the

15   residency program satisfactorily so they can complete the

16   residency, is that correct?

17       A.    That is correct.

18       Q.    Okay.  And at some point during the residency,

19   presumably they would take step 3 of the USMLE as well?

20       A.    Correct.

21       Q.    And they would need to be able to pass step 3?

22       A.    Correct.

23       Q.    In your experience, are residents supervised or

24   not supervised during the course of the residency program?

25       A.    When you say supervised, there are various

Jerry Williamson, M.D.

1    levels of supervision.  So depending upon where they are

2    in their program, whether they are a first, second or

3    third year resident would make that determination in terms

4    of what the oversight would be.

5        Q.   So they would start out being more supervised at

6    the beginning of their residency and presumably could be

7    less towards the end?

8        A.   Correct.

9        Q.   And then they would -- presumably if they finish

10   their residency and they passed step 3, they then would be

11   eligible to apply for licensure?

12       A.   That is correct.

13       Q.   And in some states -- do I have this correct,

14   that there could be a restricted license during the course

15   of a residency sort of like a student license?

16       A.   That is my understanding as well, yes.

17       Q.   Okay.  But some states don't really have that

18   kind of concept?

19       A.   Correct.

20       Q.   But then for full unrestricted licensure in the

21   United States, you need to finish your residency program

22   satisfactorily, correct?

23       A.   Yes.

24       Q.   And then have you been licensed to practice

25   medicine in any states in the United States?

Jerry Williamson, M.D.

1  The American Academy of Pediatrics.

2      Q.   That is what I am getting at.  So you would say

3  you are board certified in pediatrics?

4      A.   I am.

5      Q.   Are you board certified in any other

6  specialties?

7      A.   No.

8      Q.   Have you ever been involved in admitting anybody

9  to a specialty board?  And what I mean by that is, have

10  you ever been, you know, a participant on the other side

11  trying to decide if someone should or should not be

12  admitted to a specialty board?

13      A.   Have not.

14      Q.   Do you have an understanding of whether

15  residents get paid?

16      A.   Do they get paid?

17      Q.   Yes.

18      A.   Most definitely.

19      Q.   And do they get paid as W-2 employees, do you

20  know?

21      A.   I don't know what the -- how that -- how the

22  payment is made, no.  I don't know.

23      Q.   Do you know if they provide social security

24  numbers and if those are run through in order to do

25  payroll?  Do you know one way or the other?

Jerry Williamson, M.D.

1    background checks.

2        A.    A CVO.  Yeah.  CVO, credential verification

3    organization, yes.  And at times they will do that.  At

4    times -- and there are -- I think right now there's

5    probably about hundred of these organizations that have

6    been certified or credentialed to be a CVO.

7        Q.    Would you expect that, for example, ECFMG checks

8    whether each applicant coming through it has an active or

9    restricted driver's license?

10       A.    Do I know whether they do or not?

11       Q.    Yes.

12       A.    No.  I don't know.

13       Q.    Okay.  But if a foreign applicant would be

14   coming through, the CVO that would be doing that kind of

15   check would be a different CVO than ECFMG, correct?

16       A.    If -- I am not sure I understand the question.

17       Q.    Sure.  So my question is if you are having

18   applicants come through, is there any background check

19   done for foreign medical graduates aside from just an

20   ECFMG certificate?

21       A.    Again, that depends on the individual

22   organization, the individual facility as far as what their

23   policies and procedures are in terms of what they do.  But

24   what I said earlier is that these facilities generally

25   will rely on ECFMG to provide accurate and comprehensive

Jerry Williamson, M.D.

1    information to that facility and not necessarily repeat

2    those -- those -- that work.

3         Q.   Right.  But do you have any reason to believe

4    that ECFMG actually conducts a background check of every

5    foreign medical graduate that comes through that would

6    include, for example, whether there is an active or

7    restricted driver's license?

8         A.   Oh, I thought your question was what would a

9    facility do in terms of doing a background check.  I

10   didn't understand the question in terms of being specific

11   to ECFMG.

12        Q.   Got it.  Okay.  And so you are saying that the

13   facility -- you are saying that the facility looking to

14   hire or credential the individual would be doing these

15   sorts of background checks, correct?

16        A.   Correct.  Correct.

17        Q.   They would not necessarily look to ECFMG to have

18   done the full plethora of background check that you

19   described?

20        A.   No.  They would look to ECFMG specifically for

21   what ECFMG holds themselves out to do.

22        Q.   Right.

23        A.   So whatever it is they hold themselves out to

24   do, then they rely upon that information.  And then

25   depending upon the facility or the organization, whatever

Jerry Williamson, M.D.

```
 1   used at the time.

 2           MS. MCENROE:  I am handing you what I have marked

 3   as Exhibit 16.

 4           (Thereupon, Exhibit 16 was marked for

 5   identification.)

 6   BY MS. MCENROE:

 7       Q.   I am handing you a copy of Dr. Akoda's ECFMG

 8   certificate.

 9       A.   Okay.

10       Q.   Have you seen this before?

11       A.   I believe I have.

12       Q.   What name was issued -- what name is on this

13   ECFMG certificate?

14       A.   John Nosa Akoda.

15       Q.   And then pull out Exhibit 15 at the same time,

16   if you could.

17       A.   Okay.

18       Q.   And I will direct you back to that same

19   paragraph where you were looking before.  So page 4, third

20   paragraph from the bottom, you will see that the medical

21   license was issued to a Charles John Nosa Akoda, do you

22   see that?

23       A.   That is correct.

24       Q.   And if you look all of the way to the beginning

25   of Exhibit 15, you will see that it pertains to a Charles
```

Jerry Williamson, M.D.

```
 1        Q.   Did you have any help?

 2        A.   No.

 3        Q.   Do you have any legal assistants or do you

 4   dictate your report or anything of the like?

 5        A.   No.

 6        Q.   Do you have any secretarial help?

 7        A.   No.

 8        Q.   Do you still hold all of the opinions you have

 9   in this report today?

10        A.   Yes.

11        Q.    In looking at the series of events with regard

12   to Dr. Akoda, is it your view that ECFMG just totally

13   missed the issue and did not investigate, did not

14   acknowledge it, that Dr. Akoda sort of slipped through, or

15   do you think that they did conduct at least some

16   investigation?

17        A.    I think when they finally realized that there

18   were problems -- well, let me restate it differently.

19   I think that they made some proper investigations

20   initially, particularly when he had applied the first two

21   times.  And if my memory serves me, there was a revocation

22   of his first certificate.  And then there was -- I am not

23   sure if they revoked or if they delayed the second

24   certificate or they did something that I think went to

25   appeals and then it ended up being extended, if I am
```

Jerry Williamson, M.D.

1    correct in my memory.

2              So I think that was proper in terms of

3    doing that.  But subsequent to that, there were numerous

4    flashing red lights that I think ended up getting missed.

5    And I mean, there were multiple issues that they should

6    have acted on.  So to answer your question, yes, I think

7    that there was some proper investigation initially, but

8    then subsequent to that, it was -- it was lost.

9        Q.   So do you think that the Igberase and Oluwafemi

10   type of identities that got caught earlier on -- and

11   I'll represent for the record, there were more than two --

12   but you think that was proper investigation that resulted

13   in the revocation of his certificate, but that later on

14   that what was done with Dr. Akoda was a total miss?

15       A.   Well, when you say a total miss, I think it

16   becomes a total miss as the story continues.  And there

17   are more issues that are surfacing.  And then as we talked

18   about earlier, that subsequently led to a certificate into

19   a residency program which ultimately eventually turned

20   into a licensure and then harmed the patients.  So when

21   you say a total miss, I think the end result becomes a

22   total miss.  Yes.

23       Q.   The end result becomes a total miss, but along

24   the way there was thought given by ECFMG to whether

25   there was a problem here, correct?

Jerry Williamson, M.D.

```
1        A.   No.  I don't agree with that.  I think that they

2   initially saw a problem and having the two certificates

3   and doing the revocation and such.  But then as other

4   things surfaced even prior to that, such as medical school

5   -- or not medical school, but photographs that they had

6   from these multiple -- well, the same individual with

7   multiple names.

8             For example, not identifying the proper

9   photograph, and there were others that I can't recall

10  right at the moment.  But I think even the 2000 letter

11  from -- the letter that went to the file from -- I think

12  it was Mr. Kelly to the COO -- I am trying to remember his

13  name.  You had his deposition on the table before.

14       Q.   I can hand it to you right now.

15       A.   Thank you.  But I think that letter is very,

16  very disturbing and very of concern.  Make sure it's the

17  same letter.

18            MS. MCENROE:  So I am handing you Exhibit 17,

19  which is a December 22nd, 2000 memorandum from William

20  Kelly to Stephen Seeling.

21            (Thereupon, Exhibit 17 was marked for

22  identification.)

23            WITNESS:  Correct.

24  BY MS. MCENROE:

25       Q.   Is this what you were referring to?
```

Jerry Williamson, M.D.

```
1        A.    This is what I was referring to, yes, ma'am.

2        Q.    And so let's take a look at this memo together.

3        A.    Okay.

4        Q.    It says, attached is a copy of a memorandum for

5    the file.  This memorandum is being written separately

6    since I did not think it should be made part of the

7    official file.  In my discussion with Dr. McCorkel he

8    indicated he believed Igberase and Akoda were one in the

9    same person.  He has no proof, just a strong suspicion.

10   Information he received from an "informant" provided

11   details that led him to believe this.

12                 I also believe Akoda and Igberase are

13   one and the same.  However, at this point the only

14   information that we have for the ECFMG Credentials

15   Committee is Akoda's written statement that he is NOT

16   Igberase, although he did admit in writing that he used

17   Igberase's social security number.  He has given us a

18   passport that appears to confirm his identity as John

19   Akoda.  I don't think this is enough for the Committee.

20                 Igberase has not replied to my letter.

21   The FedEx letter was returned undelivered.  I tried the

22   phone number he listed on his application and was told it

23   was a wrong number (although the correct address).  I sent

24   Igberase an E-mail -- and it has the E-mail address --

25   cfemi@hotmail.com and who should reply but Akoda!  Akoda
```

Jerry Williamson, M.D.

1    still has a valid ECFMG Certificate.  We need to

2    brainstorm on this one.  Maybe Shirley Williams (Miss

3    Sherlock) could sit in.  Is that correct?

4         A.   Correct.

5         Q.   Is it your opinion that ECFMG completely missed

6    and did not analyze at all whether Akoda was acting

7    appropriately or not?

8         A.   Well, let me start by saying this, that the idea

9    of placing this memorandum in terms of the first sentence,

10   memorandum is being written separately.  And since I do

11   not think it should be made a part of the official file,

12   that in and of itself is problematic.

13        Q.   Why?

14        A.   It is problematic because if it is not made part

15   of the official file, once that official file is -- and

16   again, I do not know what they do with their official

17   files or their non-official files, but my concern is

18   that the individuals or the organizations that reply upon

19   this information are not going to be provided that

20   information because it is not a part of the official file.

21        Q.   Do you have any sense or knowledge of whether

22   ECFMG's practice if this had became a part of the official

23   file, it would have been provided?

24        A.   No.  I don't.

25        Q.   You don't know one way or the other?

Jerry Williamson, M.D.

```
 1        A.   I don't know one way or the other.  But if it is

 2   a part of an unofficial file or a memorandum to the file,

 3   I don't know what they do with it.  But if I am a CEO of a

 4   hospital and I am receiving a certificate, an individual

 5   who has been certified by ECFMG, I am assuming that

 6   everything is out in the open, that there is transparency.

 7   So that in itself is a concern to me.  I think that if

 8   you look at the issue of behavior that ECFMG addresses in

 9   their policy as far as what constitutes that -- I forget

10   the term they use in terms of bad behavior or --

11        Q.   Irregular behavior?

12        A.   Irregular.  Thank you.  Irregular behavior, this

13   meets the criteria very easily and should have

14   precipitated an investigation.

15        Q.   Right.  So according to you now, but Mr. Kelly

16   whose job it was to investigate irregular behavior

17   contemporaneous at the time was looking at this and was

18   saying there was not enough to bring to the committee

19   based on the record he had then.  Right?  He was doing

20   some analysis and looking at this issue at the time,

21   correct?  You may not agree with the outcome.

22        A.   Well, again, the decision that was made here was

23   just made based on any policies that the organization had.

24   And from what my reading was that the organization did not

25   have a policy other than a definition of irregular
```

Jerry Williamson, M.D.

1   behavior.  So whether they should have gone to

2   credentials, which is I believe the next step if they had

3   a concern, I think they kind of missed the boat with that.

4              There seems to be enough here or more

5   than enough in reading this letter and just at the very,

6   very bottom of what you just read, and it says something

7   to the effect of -- I forgot where it was with the

8   exclamation -- here it is.  I sent Igberase an E-mail and

9   who should reply but Akoda.  I mean, what more do you

10  need?  It seems like there is enough concern that the

11  concern should have been elevated to the next committee,

12  yes.

13      Q.   Do you know or understand the remit of the

14  Medical Education Credentials Committee?

15      A.   When you say the remit?

16      Q.   Do you know what their purpose is?  Do you know

17  what they do?

18      A.   Well, from what I have read is that they

19  basically make a decision on concerns that a lower

20  committee might have and make a determination on those

21  concerns.

22      Q.   Do you know how they go about deliberating if at

23  all?

24      A.   Well, what I read is that they deliberate I

25  believe three or four times per year.  They don't meet

Jerry Williamson, M.D.

1   that frequently is what I believe I read in terms of their

2   committee.  But beyond that, no.  I don't know the details

3   of how they arrive at decisions or whatever.

4               But I guess what I am saying, Counselor,

5   is that for me reading this there is enough information

6   here that says that ECFMG should have been more aggressive

7   in pursuing this.  And there were other issues I think

8   even occurred prior in terms of, you know, his application

9   that he sent, I believe, to ECFMG, and the name on the

10  application and the name on the diploma were not

11  consistent as well, speaking of names here of the

12  certificate that you just provided me.

13      Q.   Do you have any sense of in the early 2000s

14  what the E-mail etiquette was as between cousins from

15  Nigeria, whether there was ever sharing of E-mail

16  addresses?

17      A.   I could not answer that.

18      Q.   You don't know one way or the other?

19      A.   No.

20      Q.   Do you know culturally about naming norms and

21  shortening of middle or surnames from people from Nigeria

22  during that time, what was customary?

23      A.   No.  I don't.

24      Q.   Okay.

25      A.   May I say one other thing on this letter?

Jerry Williamson, M.D.

1      Q.   I don't presently have any question pending.  If

2  you think any of your prior responses were not complete,

3  then I would welcome completion of it.  Otherwise, I am

4  not looking for just an open declaration.

5      A.   No.  No.  I just wanted to go over one other

6  sentence that you brought forward.

7      Q.   Sure.

8      A.   And you said, although he did admit in writing

9  that he used Igberase's social security number.  And I

10  guess that in and of itself would meet the concerns

11  regarding the -- meeting the definition of his improper

12  behavior.

13      Q.   Irregular behavior?

14      A.   Irregular behavior.  Thank you.

15      Q.   Do you know whether the misuse of a social

16  security number in ECFMG's definition does qualify as

17  irregular behavior?

18      A.   In the definition it talks about presenting

19  information that is inaccurate or in -- it may not be

20  inaccurate, but if you look at the definition.  I think I

21  may have it.  I don't know if I have that or not with me,

22  but, yes, it is a part of the definition.

23      Q.   Do you know whether applicants to ECFMG need to

24  have social security numbers at all?

25      A.   I don't believe they require it, but if one

Jerry Williamson, M.D.

1    times.

2         A.   Uh-huh.

3         Q.   Is that correct?

4         A.   Correct.

5         Q.   And you use the term duty as between ECFMG and

6    entities that received reports from ECFMG?

7         A.   Okay.  Yes.

8         Q.   And I am not trying to pull a fast one on you in

9    any way.  I am looking at paragraphs 4 and 5 in the

10   Analysis of Facts and Opinions on page 5 of your report.

11        A.   Uh-huh.

12        Q.   Is that correct?

13        A.   Yes.  That is correct.

14        Q.   So are you putting forth expert opinion on the

15   duty, if any, ECFMG owed to any other party in this case?

16        A.   Yes.

17        Q.   Are you holding yourself out to be a legal

18   expert in any way in connection with this case?

19        A.   A legal expert, no.

20        Q.   Okay.

21        A.   What I will say is the word duty that is used

22   here is used synonymously with responsibility.

23        Q.   So what do you mean by duty?

24        A.   Just that, responsibility.  They are the

25   responsible party.  They are responsible for making

Jerry Williamson, M.D.

1   certain that everything we've talked about is done

2   properly.

3        Q.   As a matter of law?

4        A.   Well, I think it is certainly a matter of

5   ethics. It is certainly a matter of medical ethics.  And I

6   -- from a matter of law, if they are holding themselves

7   out to provide certain information and they don't, then

8   they have not met their responsibility.  I think it

9   certainly has legal implications.

10       Q.   So are you saying that this is a legal duty, an

11  ethical duty or both in the way you use the term?

12       A.   Both.

13       Q.   Okay.  So you are purporting to put forth a

14  legal opinion in this case?

15       A.   In that sense, yes.

16       Q.   And you are asking the Court to rely on your

17  expert opinion for legal purposes?

18       A.   I am not sure I understand the question.

19       Q.   So you are putting forth an expert opinion in

20  the interest of aiding the Court from a legal perspective

21  with respect to ECFMG's duty?

22       A.   Well, from a credentialing perspective.  If

23  credentialing falls upon -- it certainly falls upon the

24  ethical.  But if it falls upon the legal as well, then I

25  guess what you are saying is correct.

Jerry Williamson, M.D.

 1      Q.   Yeah.  I am not trying to use my words.  I am

 2  just trying to understand.  You use the word duty

 3  repeatedly in your report.  So I am just trying to

 4  understand what it is you are asking the Court to look to

 5  you for.  And if that includes in your opinion a legal

 6  view of what duty ECFMG purportedly owed to these

 7  entities?

 8      A.   Well, I use that -- again, I have had legal

 9  training and I do have a master's degree in that, but I am

10  not a lawyer.  So I can't -- I guess perhaps I can present

11  a legal opinion without being a lawyer.  I don't know.  If

12  not, then it is not a legal opinion.

13      Q.   But you are intending to use the term duty to

14  mean both ethically and legally in the way you are using

15  it?

16      A.   Correct.  They had a responsibility to those

17  individuals and those organizations.

18      Q.   And later on in paragraph 11 of your report on

19  page 6 -- I will wait until you get there.

20      A.   Okay.

21      Q.   In the last sentence there in paragraph 11, it

22  says patients have a right to receive medical treatment

23  from physicians who have obtained ECFMG Certification

24  legitimately, not through falsities and

25  misrepresentations, do you see that?

Jerry Williamson, M.D.

1       A.   Yes, I do.

2       Q.   And, again, in using the word right here

3    similarly to my questions on duty, are you intending to be

4    assisting the Court in evaluating a legal position on the

5    rights of patients in this case?

6       A.   Well, I think that it's rather simple that the

7    American Medical Association provides what patients'

8    rights are as do other organizations such as the American

9    Academy of Pediatrics and The American Board of Medicine

10   and such, and they define what those rights are.  And I am

11   not sure it necessarily has to be a legal issue, but it is

12   certainly an ethical issue in terms of what the patient's

13   rights are.  Now, whether it morphs into legal, I couldn't

14   -- I couldn't offer an opinion on that.

15      Q.   So it could, but you don't know?

16      A.   Yes.  Correct.

17      Q.   You use the word foreseeable in a couple of

18   places in your report as well.

19      A.   Uh-huh.

20      Q.   And in particular, for example, on page 4.  I am

21   going backwards a little bit, in paragraph 12.

22      A.   Page 4.

23      Q.   Let me know when you are there.  Page 4,

24   paragraph 12 in the section above.

25      A.   Okay.

Jerry Williamson, M.D.

1        Q.   It says, the key question that must be resolved

2    is whether ECFMG's actions or failure to act resulted in

3    foreseeable injuries or damages to class members.  Do you

4    see that?

5        A.   I do.

6        Q.   And again, do you mean that to be legally

7    foreseeable?

8        A.   Legally foreseeable.  What I mean it to be is

9    that their actions should have -- that's the way I said it

10   and I don't -- when I wrote this, I don't recall if I was

11   thinking about this necessarily legally or in what

12   context.

13       Q.   So, you know, I am just trying to understand

14   what you mean when you use the term foreseeable here

15   because, for example, in Exhibit 17 we were looking at,

16   which was Mr. Kelly's memo, do you think at the time when

17   he was writing that memo he foreseeably thought that Dr.

18   Akoda would plead guilty to social security fraud and

19   would have committed sexually inappropriate conduct on

20   patients yet reach the same conclusion he had in his memo?

21           MR. THRONSON:   Objection.

22       A.   Perhaps.

23   BY MS. MCENROE:

24       Q.   So you think that Mr. Kelly would have been

25   involved in three or four investigations that resulted in

Jerry Williamson, M.D.

1    the revocation of Dr. Igberase Oluwafemi's certificate and

2    and thought when he issued this memo in December of 2000

3    that it was possible that Dr. Akoda was someone who had

4    perpetrate the types of alleged injuries he has here and

5    yet permit this to go forward anyway?

6         A.   I guess what I am saying is that when you use

7    the term or the word foreseeable is that one should --

8    when something this strong takes place, one should in fact

9    think about what are the potential consequences going

10   forward.  Okay?  That to me is foreseeable.  Foreseeable

11   that they would commit sexual acts, that I can't say.

12   Okay?  But foreseeable that there may be potential

13   problems going forward with this individual.

14                  And -- and again, what I guess I am

15   connecting is I am connecting an individual's not being --

16   being irresponsible in terms of providing false

17   information and what that ultimately can -- can lead to.

18   So providing false information, what might that ultimately

19   develop into?

20        Q.   You make some reference to saying that ECFMG's

21   conduct directly impacted patient safety?

22        A.   Where are you?

23        Q.   I am looking at paragraph 11 on page 6.  It is

24   in two places on page 6.  So I see it in paragraph 11 in

25   the middle sentence there that starts with however.  Do

Jerry Williamson, M.D.

1    Williamson.

2              THE WITNESS:  Thank you.

3                       CROSS-EXAMINATION

4    BY MR. THRONSON:

5         Q.   Dr. Williamson, are you familiar with the

6    standard of care as it applies to ECFMG?

7              MS. MCENROE:  Objection to form.

8         A.   To the standard of care?

9    BY MR. THRONSON:

10        Q.   Uh-huh.

11        A.   In terms of their credentialing process is well

12   recognized by the Joint Commission on accreditation as

13   being a -- my interpretation is that of an excellent CVO,

14   connection verification organization, so I would think

15   that it would meet the highest standard of care.  And with

16   what we have discussed throughout this deposition, and I

17   will repeat what I said is that I believe that they did

18   not meet the standard of care in terms of this particular

19   practitioner.

20        Q.   And how -- how do you know in terms of your

21   education, training and experience that certain

22   individuals at ECFMG as you have outlined in your report

23   and expressed today did not meet the standard of care?

24             MS. MCENROE:  Objection to form.

25        A.   Simply that there were multiple opportunities to

Jerry Williamson, M.D.

1    learn that this physician was a fraud, and those

2    opportunities were not acted upon.  And it resulted in

3    what we have been discussing in terms of potential harm to

4    patients.

5         Q.   You have had, as we discussed, the opportunity

6    to work -- strike that.

7                        During the course of your

8    professional experience, have you had -- I believe we have

9    discussed that you have had occasion to have interactions

10   with ECFMG in the course of privileging and credentialing

11   positions, is that correct?

12        A.   In the course -- in the course of credentialing,

13   yes.

14        Q.   And so you have -- have you gained experience

15   through that process with ECFMG as an organization and the

16   role that it plays?

17             MS. MCENROE:  Objection to form.

18        A.   Could you repeat that again for me?

19   BY MR. THRONSON:

20        Q.   Sure.  I believe you've testified that during

21   the course of interacting with ECFMG and given your

22   background and credentials in the hospital administration

23   credentialing, you have gained familiarity with ECFMG's

24   practices?

25             MS. MCENROE:  Objection to form.

Jerry Williamson, M.D.

```
1   BY MR. THRONSON:

2       Q.   Is that right?

3       A.   Yes, I have.  Yes, I have.

4       Q.   Do you -- is it your opinion that the

5   obligations of ECFMG when encountering potential

6   fraudulent conduct are similar to the obligations of a

7   credentialing organization like a hospital credentialing

8   committee?

9            MS. MCENROE:  Objection to form.

10      A.    I would probably suggest that they are at a --

11  at least at the same level, perhaps at a higher level of

12  credentialing, yeah.  I think they -- particularly with

13  foreign medical graduates, they are the go-to

14  organization.  And many hospitals and other organizations

15  rely upon the accuracy and completeness of their

16  evaluation.

17      Q.   Does the standard of care in your view require

18  that ECFMG's employees when confronting circumstances that

19  suggest that a physician has or a candidate for a

20  certification has behaved in a fraudulent fashion or has

21  made false representations in an effort to obtain ECFMG

22  certification, does the standard of care in those

23  circumstances require that ECFMG act in a reasonably

24  prudent manner to rule out that fraud has been committed?

25           MS. MCENROE:  Objection to form including
```

Jerry Williamson, M.D.

1     leading.

2        A.   Yeah, most definitely.  And again, they hold

3    themselves out to be that organization.  And as I

4    mentioned in the course of the deposition that there were

5    multiple times over this timeline that ECFMG should have

6    acted more prudently and did not, did not.  So the

7    standard of care there, whether you are CVO or a hospital

8    credentialing an individual, should be the same and they

9    missed their mark.

10       Q.   Is it -- did you review the deposition of Kara

11   Corrado?

12       A.   I did.

13       Q.   Did you review the exhibits to that deposition?

14       A.   I did.

15       Q.   And did you rely on that deposition and those

16   exhibits in forming your opinions in this case?

17       A.   I did.

18       Q.   Did you read the deposition of William Kelly?

19       A.   I did.

20       Q.   Did you review all of the exhibits to the

21   deposition of William Kelly?

22       A.   I did.

23       Q.   And did Mr. Kelly's deposition and the exhibits

24   thereto form part of the basis of your opinion in this

25   case?

Jerry Williamson, M.D.

1       A.   Yes.

2       Q.   Is it your understanding that ECFMG took no

3   additional investigatory action between the time that

4   Mr. Kelly wrote the note that was not to be made a part of

5   the official file in Exhibit 17 and when ECFMG began --

6   was alerted by the Department of Justice of its

7   investigation into Dr. Akoda?

8            MS. MCENROE:  Objection to form.

9       A.   That is my understanding.

10  BY MR. THRONSON:

11      Q.   Do you believe -- strike that.

12           Do you believe it was foreseeable at the

13  time that Mr. Kelly wrote the note in Exhibit 17 that

14  Akoda would come in contact with patients?

15           MS. MCENROE:  Objection to form.

16      A.   Yes.

17  BY MR. THRONSON:

18      Q.   Do you believe it was foreseeable that Akoda

19  would perform medical examinations on patients of an

20  intimate nature?

21           MS. MCENROE:  Objection to form.

22      A.   I am trying to remember whether he was looking

23  for certification in OB-GYN or what specialty specifically

24  he was planning to enter.  So the answer if it was known

25  that it was OB-GYN, I would say yes.  If he was going to

Jerry Williamson, M.D.

```
 1   provide adult medicine, which I presume that that was the

 2   case here, he would still have contact with individuals

 3   both male and female in a sensitive way, yes.  So I think

 4   regardless of what direction he would have gone, he would

 5   have been providing sensitive examinations to patients,

 6   more so if he was an OB-GYN would be of greater concern,

 7   yes.

 8        Q.   Are you familiar with the concept of informed

 9   consent?

10        A.   I am.

11        Q.   How are you familiar with that?

12        A.   I lecture on that.  And it is part of my

13   curriculum at Loyola Law School, the curriculum in terms

14   of the course that I teach.

15        Q.   Is -- do you believe obtaining informed consents

16   -- strike that.

17             Is informed consents important in medical

18   care?

19             MS. MCENROE:  Objection to form.

20        A.   Informed consent is very important.  And

21   informed consent needs to be -- it is a process as opposed

22   to a signature on a piece of paper.  So, yes, it is very

23   important.

24   BY MR. THRONSON:

25        Q.   Is part of informed consent that a patient
```