# EXHIBIT 3



# Transcript of Stephen S. Seeling

**Date:** September 16, 2019
**Case:** Russell, et al. -v- Educational Commission for Foreign Medical Graduates

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
www.planetdepos.com

```
 1              IN THE UNITED STATES DISTRICT COURT
 2           FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3   _____
 4   MONIQUE RUSSELL, JASMINE    :  CASE NO.
 5   RIGGINS, ELSA M. POWELL     :  2:18-cv-05629-JW
 6   and DESIRE EVANS,           :
 7                               :
 8            Plaintiffs         :
 9                               :
10       vs.                     :
11                               :
12   EDUCATIONAL COMMISSION      :
13   FOR FOREIGN MEDICAL         :
14   GRADUATES,                  :
15                               :
16            Defendants         :
17   _____
18                         - - -
19              Monday, September 16, 2019
20                         - - -
21           Deposition of STEPHEN S. SEELING was taken
22   pursuant to notice at 1701 Market Street, Philadelphia,
23   Pennsylvania, before Nancy Carides, RPR, CRR and Notary
24   Public, on the above date, and commencing at 12:00 p.m.
25
```

```
 1   court reporter can take down my questions and your
 2   answers.  Please, first of all, wait for me to finish
 3   my question before you answer, and I will wait for you
 4   to finish your answer before I ask another question.
 5   Okay?
 6          A.    Yes.
 7          Q.    If at any point in time I ask you a
 8   question that you don't understand, please let me know
 9   and I'll make an effort to rephrase the question.
10   Okay?
11          A.    Yes.
12          Q.    If you answer a question that I've
13   asked, I'm going to assume that you've understood the
14   question.  Is that fair?
15          A.    Yes.
16          Q.    And if you need to take a break at any
17   point in time, please let me know and we'll take a
18   break.  Okay?
19          A.    Um-hum.  Yes.
20                MR. CERYES:  Patrick, are you hearing
21       us okay?
22                MR. THRONSON:  I am.  Thanks.
23   BY MR. CERYES:
24          Q.    All right.  Mr. Seeling, are you
25   currently employed?
```

```
1          A.     I am not.
2          Q.     Where were you last employed?
3          A.     I was a consultant with St. George's
4    School of Medicine.
5          Q.     When were you last employed with ECFMG?
6          A.     2013.
7          Q.     And when did you begin with ECFMG?
8          A.     1998.
9          Q.     Mr. Seeling, can you describe for me
10   your educational background?
11         A.     Sure.  College and beyond?
12         Q.     Let's start with college.
13         A.     Graduated from Tufts University in
14   Medford, Massachusetts in 1971.  Graduated from Temple
15   University School of Law in 1976.
16         Q.     And can you provide for me a brief
17   narrative of your professional career since the
18   completion of your law degree?
19         A.     Sure.  My first job was in the
20   Philadelphia District Attorney's Office beginning in
21   1976.  We relocated to South Carolina.  I was an
22   Assistant Attorney General in South Carolina.
23   Subsequent to that, I became the Executive Director of
24   the South Carolina State Board of Medical Examiners.
25   I then had a position as Vice President and General
```

```
 1   Counsel with UCI Medical Affiliates and with a
 2   practice management firm in South Carolina.  Then in
 3   1998 I was recruited by ECFMG, and I returned to the
 4   Philadelphia area.
 5          Q.    When you started at ECFMG, what role
 6   did you come into?
 7          A.    Vice President of Operations.
 8          Q.    Is that a role that you maintained
 9   until you left in 2013?
10          A.    Yes, sir.
11          Q.    So, where did you go after you left
12   ECFMG?
13          A.    I worked with St. George's University
14   School of Medicine, which the campus is in Grenada.
15          Q.    What caused you to leave ECFMG in 2013?
16          A.    I had had a really good run of almost
17   fifteen years.  I was a bit bored, and I had a very
18   good opportunity with St. George's.
19          Q.    And when did you leave St. George's?
20          A.    I worked with St. George's for two
21   years.
22          Q.    Would that be approximately 2015 when
23   you left?
24          A.    Yes.
25          Q.    What caused you to leave St. George's?
```

Transcript of Stephen S. Seeling
Conducted on September 16, 2019                                    8

```
 1          A.    My wife was retiring, we were
 2   relocating outside the Philadelphia area, and I
 3   thought that it was time to relax a bit.
 4          Q.    Have you left each of your professional
 5   roles, positions, on a volunteer basis through the
 6   course of your career?
 7          A.    Yes.
 8          Q.    Have you ever been a defendant in any
 9   criminal matter since turning the age of eighteen?
10          A.    No.
11          Q.    Now, while you were with ECFMG, did you
12   participate in any criminal investigation of an
13   individual who was variously known as Akoda or
14   Igberase?
15          A.    Let me make sure I understand.  You're
16   asking about a criminal investigation?
17          Q.    Correct.
18          A.    No.
19          Q.    Okay.  Did you participate in any
20   internal investigation by ECFMG regarding the person,
21   again, variously known as Akoda or Igberase after
22   approximately the year 2006?
23                MS. McENROE:  Objection to form.
24                THE WITNESS:  I just don't remember
25        after 2006.
```

1         that question, because it seems that it
2         involves both hindsight, foresight, and
3         speculation.  So, again, this letter speaks
4         for itself.  In typical fashion, I would have
5         approved a letter like this.  Again, I have no
6         specific recollection of this letter.  But I
7         can't answer your question further.
8    BY MR. CERYES:
9         Q.    How often did the committee meet?
10        A.    Generally speaking, it met in
11   conjunction with board meetings, like, three times a
12   year.
13        Q.    So, I would assume, based upon what we
14   discussed earlier, in most cases, there will be some
15   matters for the committee to consider and to schedule
16   a meeting; fair?
17        A.    They generally had a fairly full
18   agenda.
19        Q.    Can you recall any other instance in
20   which an applicant received a letter setting forth
21   charges of irregular behavior but that matter did not
22   get brought to the attention of the medical education
23   credentials committee?
24        A.    You know, I don't have a recollection
25   yay or nay.  I would say just generally that this is a

1  snapshot, things can change subsequent to, but I just
2  don't have a recollection whether or not there were
3  other cases where a charge letter was issued and then
4  subsequently a re-evaluation took place.  I know that
5  was always built into the process.  I just don't
6  remember whether or not that, in fact, happened.
7           Q.    And you refer to the process.  This is
8  not a written process, correct?
9           A.    Well, I mean, there were procedures set
10 forth in the documents relating to the credentials
11 committee in terms of the process of the hearing and
12 that kind of thing.  Again, at some point, I can't
13 recall, but sometime after I came onboard, those
14 procedures were substantially revised.  So, there were
15 documents that pertained, generally, to the scope and
16 purview and authority of the credentials committee.
17          Q.    If, in fact, you believed that Akoda
18 and Igberase were, in fact, one and the same person,
19 you would agree that in that circumstance that would
20 warrant referral to the Committee on Medical Education
21 Credentials?
22                MS. McENROE:  Objection to form.
23                THE WITNESS:  Probably, yes.
24 BY MR. CERYES:
25          Q.    And why is that?

1   A.   Because there was precedent.
2   Q.   And what's the precedent that you're
3   referring to?  Is that Igberase's history?
4   A.   No, I'm talking about other cases.
5   Q.   So, describe what you mean by
6   precedent.  What are the other instances?
7   A.   I think you know what a precedent
8   means.  It means that there may have been other cases
9   in the past where the question number 1, have you
10  ever, was answered incorrectly.
11  Q.   Did you ever meet with Akoda,
12  personally?
13  A.   No.
14  Q.   Did you instruct Bill Kelly to meet
15  with Akoda, personally?
16  A.   I don't have any recollection of that.
17  Q.   I'd like to direct your attention to
18  Exhibit Number 37 from Mr. Kelly's deposition.  This
19  is a memo to the file from William Kelly.  My first
20  question is when a memorandum was written to a
21  particular file, such as this, was there a physical
22  file that it would get slipped into for a particular
23  applicant?
24  A.   In 2000?
25  Q.   Yes.

```
1           A.      Probably.
2           Q.      So, was there, and I'm just kind of
3    trying to wrap my ahead around it, was there a
4    particular manila folder, or something to that effect,
5    in a file room where if everything was going to plan
6    you could go down to the file, pick out the Akoda
7    file, and there would be a memo such as this from
8    William Kelly in that file?
9           A.      Well, there were cases that were under
10   review by the credentials committee, and those files
11   were maintained.
12          Q.      Was Akoda's file under review by the
13   credentials committee?
14          A.      I may have misspoke or I may have
15   misled.  When there was an allegation that was being
16   looked at, generally, a file would be generated.
17          Q.      I assume that every applicant at ECFMG
18   has some kind of file, a physical file, or did have in
19   2000?
20          A.      Back in those days, yes.
21          Q.      So, when there was an allegation of
22   irregular conduct, a secondary file would be created
23   relating to that allegation?
24                  MS. McENROE:  Objection to form.
25                  THE WITNESS:  You know, I, A, can't
```

```
 1                C E R T I F I C A T I O N
 2
 3        I hereby certify that the proceedings and
 4   evidence noted are contained fully and accurately in
 5   the stenographic notes taken by me in the foregoing
 6   matter, and that this is a correct transcript of the
 7   same.
 8
 9
10
11
                   _____
12
13        NANCY CARIDES, RPR, CRR
14        Notary Public
15
16
17
18        (The foregoing certification of this transcript
19   does not apply to any reproduction of the same by any
20   means unless under the direct control and/or
21   supervision of the certifying reporter.)
22
23
24
25
```