**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **MONIQUE RUSSELL, *et al.*,** *Plaintiffs,* v. **EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,** *Defendant.* | **Case No. 2:18-cv-05629-JDW** |

## MEMORANDUM

Memories are a tricky thing. Once an event happens, it has happened. There is no changing what occurred. But a person's memories of those events are not nearly as static. What someone remembers one day is not necessarily the same as what she remembers the next. Sometimes memories fade, and precise details are lost to the ether. Other times, social mores or a person's belief system evolves or changes, causing her to reassess her memories. And still other times, a person learns new information that causes her to remember events differently, either by filling in gaps in her memory or by viewing them in an entirely different light.

The Plaintiffs in this case learned that their obstetrician was not who he claimed. He did not graduate from medical school, and his identity was false. That information came as a shock, and it has caused them to reassess their memories of the treatment that they received from this "doctor." And that reassessment has caused them emotional distress for which they seek to hold the Educational Commission For Foreign Medical Graduates ("ECFMG") liable. Their claims test the

outer limits of the tort of negligent infliction of emotional distress ("NIED"). As explained below, the Court concludes that their claims stretch that tort too far. They cannot maintain their claims against ECFMG, so the Court will grant ECFMG's motion for summary judgment.

## I.      BACKGROUND

### A.      Factual Background

#### 1.      ECFMG certification

ECFMG certifies that international medical graduates ("IMGs") graduated from a recognized foreign institution, demonstrate English-language proficiency, and pass the first two steps of the United States Medical Licensing Examination. IMGs can use an ECFMG certification to apply to residency and other graduate medical education programs and to apply for state medical licenses.

ECFMG also investigates what it calls "irregular behavior." If ECFMG receives an allegation of irregular behavior, it reviews the allegation and determines whether sufficient evidence supports the charge. If so, ECFMG notifies the applicant of the allegation and permits him to submit a written explanation or other evidence. The applicant may request a hearing and hire legal counsel. Then, ECFMG determines whether, by a preponderance of the evidence, the applicant engaged in the irregular behavior. ECFMG may revoke its certification, but it does not have to do so. In all cases where ECFMG determines there was irregular behavior, ECFMG will add a note in the IMG's ECFMG record.

### 2.     IMGs' medical practice in the United States

To practice medicine in the United States, an IMG must complete additional steps beyond an ECFMG certification. An IMG may apply to a residency program, and those programs typically consider in-person interviews, information provided by the IMG, letters of recommendation, skills assessments and additional examinations, medical school transcripts, ECFMG certification, and a background check to evaluate IMGs. During residency, a residency program supervises and evaluates residents with progress reports and exams, among other things.

To get licensed, an IMG must also apply for licensure with the state licensing board. In Maryland, the Maryland State Board of Physicians requires ECFMG certification, completion of three medical licensing exams, good moral character, and completion of two years of an accredited residency program.

IMGs may also seek hospital staff privileges. Each hospital has its own application. Typically, hospitals interview applicants and review several things, including ECFMG certification, personal reference contacts, certificates of residency completion, letters of recommendation from program directors, a Social Security number, a valid passport or birth certificate, a background check, and a drug screen. Hospitals also conduct ongoing reviews of a physician's clinical performance, demeanor, and interactions with patients.

### 3.     Mr. Igberase aka Mr. Akoda

In April 1992, Oluwafemi Charles Igberase applied to ECFMG for certification, claiming that he graduated from medical school in Nigeria. ECFMG issued him a certificate. Despite the certificate, no residency program admitted him. In March

3

1994, Mr. Igberase submitted a second application to ECFMG for certification. This time, he used a false date of birth and a different name: Igberase Oluwafemi Charles. ECFMG approved this second application. ECFMG later determined that Mr. Igberase fraudulently applied for two ECFMG certifications under two different names and revoked each certification.

In 1996, Mr. Igberase applied to ECFMG using a fake passport and yet another name: John Charles Akoda. ECFMG certified Mr. Akoda in August 1997. In 1998, Jersey Shore Medical Center ("JSMC") admitted Mr. Akoda to its internal medicine residency program. In August 2000, JSMC asked ECFMG to investigate Mr. Akoda because JSMC learned that he might have served as a resident in two other U.S. residency programs under the name "Igberase." ECFMG began an investigation. Mr. Igberase[1] disputed the JSMC allegations. In 2000, JSMC discharged Mr. Igberase due to discrepancies between his Social Security number and green card. ECFMG continued to investigate but took no adverse action because it concluded there was insufficient evidence of irregular behavior.

In 2006, Mr. Igberase applied for a residency at Howard University Hospital, using the Akoda identity and a false permanent residency card. He completed the program in 2011. That same year, he applied for and received medical licenses in Maryland and Virginia. He also used the Akoda identity to apply for and receive admitting privileges at Prince George's Hospital Center in Maryland. For his Maryland license and hospital application, he submitted a fake permanent resident

---

[1] The Court will refer to Mr. Igberase as "Mr. Igberase," even though he was using the "Akoda" identity.

card and a false Maryland driver's license. At Prince George's Hospital Center, Mr. Igberase worked with patients from medical practices run by Drs. Abdul Chaudry and Javaka Moore. The American Board of Obstetrics and Gynecology certified Mr. Igberase on January 31, 2014.

On June 9, 2016, law enforcement executed search warrants concerning Mr. Igberase and discovered fraudulent or altered documents, including medical diplomas, transcripts, and letters of recommendation. He signed a plea agreement admitting to misuse of a Social Security number. ECFMG revoked the certification it had issued to him. After his sentencing, Prince George's Hospital Center terminated his medical privileges, and the Maryland Board of Physicians revoked his license.

### 4.    Plaintiffs' knowledge of and treatment with Mr. Igberase

The four named Plaintiffs—Monique Russell, Jasmine Riggins, Elsa Powell, and Desire Evans—each received medical treatment from Mr. Igberase at Prince George's Hospital Center. Mr. Igberase treated Ms. Riggins beginning in August 2012, and he performed unplanned emergency caesarean-section surgery on Ms. Riggins in March 2013 and Ms. Russell in May 2016.[2] He treated Ms. Powell regularly beginning in April 2014, delivered her child in September 2014, and provided post-natal care through January 2015. He delivered Ms. Evans's child via caesarean-section surgery in March 2016. Some of the Plaintiffs allege that during treatment he performed inappropriate examinations of a sexual nature while utilizing

---

[2] At one point during her deposition Ms. Russell said that Mr. Igberase delivered her child in 2017, but Plaintiffs admit the child was delivered in 2016.

inappropriate and explicit sexual language. None of them knew that Mr. Igberase was not really a doctor when he treated them.

Ms. Powell learned of Mr. Igberase's identity in 2017 from online media. Ms. Russell learned about his guilty plea some time around June 2017 from a Department of Justice press release. Ms. Riggins learned from a Facebook post in July 2017. Ms. Evans learned from a radio advertisement likely in the summer of 2018.

### B.    Procedural History

Plaintiffs seek to hold ECFMG liable for incorrectly certifying Mr. Igberase as an IMG. They assert NIED and propose to represent a class of Mr. Igberase's patients. In a Memorandum and Order dated March 23, 2020, this Court certified an "issue class" pursuant to Federal Rule of Civil Procedure 23(c)(4) with respect to four issues: (1) whether the Commission undertook or otherwise owed a duty to class members; (2) whether the Commission breached any duty that it owed to class members; (3) whether the Commission undertook or otherwise owed a duty to hospitals and state medical boards, such that it may be held liable to class members pursuant to the Restatement (Second) of Torts § 324A; and (4) whether the Commission breached any duty that it owed to hospitals and state medical boards. On September 23, 2021, the Third Circuit vacated the Court's Order and remanded the case for further consideration. After remand, ECFMG moved for summary judgment, and the Parties re-briefed class certification.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to

6

any material fact and the movant is entitled to judgment as a matter of law." Fed. R.
Civ. P. 56(a). "[T]he plain language of Rule 56[(a)] mandates the entry of summary
judgment, after adequate time for discovery and upon motion, against a party who
fails to make a showing sufficient to establish the existence of an element essential to
that party's case, and on which that party will bear the burden of proof at trial."
*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In ruling on a summary judgment
motion, a court must "view the facts and draw reasonable inferences 'in the light
most favorable to the party opposing the [summary judgment] motion.'" *Scott v.
Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). However, "[t]he non-moving
party may not merely deny the allegations in the moving party's pleadings; instead
he must show where in the record there exists a genuine dispute over a material
fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation
omitted). The movant is entitled to judgment as a matter of law when the non-moving
party fails to make such a showing. *See Celotex*, 477 U.S. at 323.

## III.   ANALYSIS

### A.   Choice Of Law

The Parties devote most of their argument to Pennsylvania law, but they
dispute whether Maryland law applies and whether ECFMG could be liable under
Maryland law. In its class certification ruling, the Court held that Pennsylvania law
applies, and that remains its conclusion. A federal court sitting in diversity must
apply the choice-of-law rues of the forum state, so Pennsylvania choice-of-law rules
apply. *See Klaxon v. Stentor Mfg. Co.*, 313 U.S. 487, 496 (1941). Pennsylvania applies
a flexible approach that considers both contacts establishing significant

relationships with a state and a qualitative appraisal of the relevant states' policies with respect to the controversy. *See Garcia v. Plaza Oldsmobile Ltd.*, 421 F.3d 216, 219–20 (3d Cir. 2005). Under that approach, the Court must determine if an actual conflict exists between the laws of two or more states. If so, the Court must decide if the conflict is true, false, or "unprovided-for." *Rose v. Dowd*, 265 F. Supp.3d 525, 530 (E.D. Pa. 2017) (citation omitted). A true conflict exists "when the governmental interests of both jurisdictions would be impaired if their law were not applied." *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187 n.15 (3d Cir. 1991). If there is a true conflict, then the Court must apply the law of the state with the "most significant contacts or relationships with the particular issue." *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007) (quotation omitted).

For the reasons the Court stated in its class certification decision, there is no true conflict here. *See Russell v. Ed. Comm'n for Foreign Med. Grads.*, Case No. 2:18-cv-5929-JDW, 2020 WL 1330699, at * 4 (E.D. Pa. Mar. 23, 2020). But even if there were a true conflict, Pennsylvania law would apply. At bottom, this case is about how ECFMG performed the role that it assumed and whether its performance of that role led Plaintiffs to suffer harm. The work that ECFMG did, both its certification of Mr. Igberase in 1997 (when he used the Akoda identity) and its later response to allegations of improper conduct, occurred in Pennsylvania. Pennsylvania has a particularly strong interest the way that a Pennsylvania entity conducts itself in Pennsylvania. ECFMG argues that Maryland law should apply because the claim is "based on treatment rendered in Maryland by a physician licensed to practice in Maryland." (ECF No. 81-1 at 27–28.) But it's not. This isn't a case against Mr.

Igberase. It's a case against ECFMG for enabling Mr. Igberase to perform medical services, and that enablement happened in Pennsylvania. That's a subtle but important distinction, and one that ECFMG overlooks. Pennsylvania law applies.

## B.   NIED

The Pennsylvania Supreme Court has not considered whether plaintiffs can raise NIED claims where they learn new information about some prior event. Because this case arises under the Court's diversity jurisdiction, the Court must predict how the Pennsylvania Supreme Court would decide the issue. *See Berrier v. Simplicity Mfg., Inc.*, 563 F.3d 38, 45–46 (3d Cir. 2009). Historically, the Pennsylvania Supreme Court has limited NIED claims. Until 1970, it only permitted physical impact claims. *See Kazatsky v. King David Memorial Park, Inc.*, 527 A.2d 988, 992 (Pa. 1987). The Supreme Court created two limited exceptions to that rule: zone of danger; and bystander claims. *See id*. at 992–93. Recently, the Supreme Court has suggested that a plaintiff might also be able to recover if the defendant has certain special contractual or fiduciary duties toward the plaintiff. *See Toney v. Chester Cty. Hosp.*, 36 A.3d 83, 100 (Pa. 2011) (affirmance by evenly-split court).

Given these holdings, a claim for NIED must fall within four factual scenarios: (1) the plaintiff suffered a physical impact; (2) "the plaintiff was in a zone of danger, thereby reasonably experiencing a fear of impending physical injury;" (3) the plaintiff observed a tortious physical injury to a close relative; or (4) the defendant had a special contractual or fiduciary duty toward the plaintiff. *Toney v. Chester Cty. Hosp.*, 961 A.2d 192, 197–98 (Pa. Super. Ct. 2008), *aff'd* 36 A.3d 83 (Pa. 2011). The latter three scenarios reflect situations in which Pennsylvania courts have indicated a

willingness to relax the rule requiring a physical impact. If a plaintiff's claim falls

within one of the four recognized scenarios, then she must also establish negligence,

*i.e.* that the "defendant owed a duty of care to the plaintiff, the defendant breached

that duty, the breach resulted in injury to the plaintiff, and the plaintiff suffered an

actual loss or damage." *Id.* at 198 (quotation omitted).

### 1.   NIED-triggering factual scenarios

### a.   Physical impact

To bring a physical impact claim, a plaintiff's emotional distress must be

"accompanied by a physical injury or impact upon the complaining party." *Toney*,

36 A.3d at 88 (citing *Kazatsky*, 527 A.2d at 992). The physical impact may be minor; it

need not be directly with the defendant; and it need not occur simultaneously with

the negligent act. *See Shumosky v. Lutheran Welfare Servs. of Ne. PA, Inc.*, 784 A.2d

196, 200–01 (Pa. Super. Ct. 2001); *Stoddard v. Davidson*, 513 A.2d 419, 422 (Pa. Super.

Ct. 1986).

To maintain such a claim, the emotional impact must be contemporaneous

with the event that causes it. *See, e.g., Doe v. Philadelphia Cmty. Health Alternatives

AIDS Task Force*, 745 A.2d 25, 28 (Pa. Super. Ct. 2000) ("a plaintiff who alleges

[NIED] must suffer ***immediate*** and ***substantial*** physical harm") (emphasis in

original); *Toney*, 961 A.2d at 200 (same); *Brown v. Philadelphia Coll. of Osteopathic

Med.*, 674 A.2d 1130, 1132, 1136 (Pa. Super. Ct. 1996) (distress began when woman

miscarried, and nurse placed a bloody fetus in patient's arms); *Botek v. Mine Safety

Appliance Corp.*, 611 A.2d 1174, 1175, 1177 (Pa. 1992) (headaches and insomnia

began while, and soon after, using a gas mask filled with carbon monoxide rather

10

than oxygen); *Est. of Rennick v. Universal Credit Servs., LLC*, No. CV 18-3881, 2019 WL 196539, at *5 (E.D. Pa. Jan. 15, 2019) (requiring "immediate" physical harm); *Martin v. Finley*, No. 3:15-CV-1620, 2016 WL 8257720, at *10 (M.D. Pa. Aug. 17, 2016), report and recommendation adopted in part, overruled in part, No. 3:15-CV-1620, 2017 WL 626752 (M.D. Pa. Feb. 15, 2017) (requiring "temporal and physical proximity to some direct physical harm"). Indeed, the Pennsylvania Supreme Court has explained that NIED provides a remedy for "trauma derived from a ***contemporaneous*** physical impact." *Schmidt v. Boardman Co.*, 11 A.3d 924, 948 (Pa. 2011) (emphasis added). The Court acknowledges, of course, that shock might cause a delay in the full onset of emotional symptoms after a traumatic event. But even then, the shock itself is an immediate emotional reaction to a physical impact.

Courts have imposed a similar timing restriction in claims without a physical impact, in the context of a bystander plaintiff or a plaintiff who was in a zone of danger. *See, e.g., Mazzagatti v. Everingham*, 516 A.2d 672, 678–80 (Pa. 1986); *Love v. Cramer*, 606 A.2d 1175, 1177 (Pa. Super. Ct. 1992); *Drake v. United States*, No. 1:20-CV-0972, 2021 WL 4502240, at * 6 (M.D. Pa. Sept. 30, 2021). In *Toney*, the Pennsylvania Supreme Court acknowledged that by adopting rules regarding the timing of an event and the resulting emotional distress, some people who suffer distress will not be able to recover, "in part because [the courts] must draw lines to prevent unlimited liability to an unlimited number of plaintiffs, notwithstanding the commission of negligent acts." *Toney*, 36 A.3d at 91.

The only cases that appear to relax the requirement that the emotional distress be contemporaneous with a physical impact are cases involving an

11

exposure to a disease. In those cases, when a plaintiff learns that she might be at a latent risk of disease, she can pursue a claim for the ongoing emotional distress of that knowledge. *See, e.g., Shumosky*, 784 A.2d at 201–02; *Plummer v. United States*, 580 F.2d 72, 77 (3d Cir. 1978). But in those cases, the plaintiff has an ongoing concern, not just a different perspective on past events. In contrast, when a plaintiff has emotional distress from a feared disease exposure but no ongoing risk of disease, she cannot pursue an NIED claim. *See Phila. Cmty. Health Alternatives Task Force*, 745 A.2d at 28; *Lubowitz v. Albert Einstein Med. Ctr., N. Div.*, 623 A.2d 3, 4–5 (Pa. Super. Ct. 1993).

Plaintiffs suffered a physical impact when they received medical treatment from Mr. Igberase at various points between August 2012 and May 2016. But their emotional distress did not accompany that impact; it arose when they learned about Mr. Igberase's arrest and his background. There was no ongoing threat or risk that caused any of their distress. Rather, their distress is a product of reconceiving their memories in light of new information. The Court predicts that the Pennsylvania Supreme Court would not recognize such a claim.

The problem with permitting a claim in these types of circumstances is that people's perceptions of their own memories change all the time, often for valid reasons. The emotional trauma is real in those circumstances, but the Pennsylvania Supreme Court has made clear that not everyone who experiences emotional trauma has a legal remedy available. Expanding the physical impact test to encompass claims of this type would also lead to burdensome liability and difficulty circumscribing the area of liability, two issues against which the Supreme Court has

warned. *See Sinn v. Burd*, 404 A.2d 672, 678 (Pa. 1979); *Kazatsky*, 527 A.2d at 993. And, where uncertainty in state law exists, this Court must choose "the interpretation that restricts liability, rather than expands it, until the [Pennsylvania Supreme Court] decides differently." *Travelers Indem. Co. v. Dammann & Co.*, 594 F.3d 238, 253 (3d Cir. 2010) (citation omitted). Taken together, all of these factors lead the Court to conclude that Plaintiffs cannot prevail on a claim based on a physical impact.

### b.    Zone of danger

Plaintiffs argue that the "reasoning which permits recovery for those in the 'zone of danger' supports recovery for emotional distress damages here." (ECF No. 93-2 at 13–14.) From that obtuse language, it is not clear whether Plaintiffs assert a zone-of-danger theory or whether they are asking the Court to allow a new category of recovery that is similar to the zone-of-danger theory. Either way, they fail.

Under the zone of danger theory, a plaintiff may recover if she (1) was in personal danger of physical impact because of the direction of a negligent force against her and (2) actually feared the physical impact. *See Niederman v. Brodsky*, 261 A.2d 84, 90 (Pa. 1970) (abrogated on other grounds). At a minimum, Plaintiffs fail the second prong of this test. "Fear," by definition, implies anticipation or apprehension about what is to come. *See, e.g.,* Webster's New World Dictionary of Am. English 495 (3d Coll. ed.1988); New Oxford Am. Dictionary 632 (3d ed. 2010). Plaintiffs did not fear the physical impact from Mr. Igberase. Instead, they loathe the

memory of that treatment now that they know Mr. Igberase was not qualified to render it. That loathing is understandable, but it's not actionable.

Plaintiffs have not demonstrated that the Pennsylvania Supreme Court would create a new category of recovery without a physical impact. They argue that "conventional tort principals [sic] of foreseeability will provide the necessary limits on the scope of a defendants' [sic] liability," so they suggest that the Court should not impose limits for recovery of emotional distress. (ECF No. 93-2 at 14.) In effect, they argue that the Court should treat claims for emotional distress like every other claim for negligence and evaluate it based on foreseeability. That's not the approach that Pennsylvania courts have taken, though. They continue to adhere to the idea that NIED is a different tort than negligence and that a plaintiff's claim must fall into a few specific factual patterns to be actionable. In fact, the last time the Pennsylvania Supreme Court considered whether to relax the physical impact requirement and create a new category of relief, it split 3-3. *See generally Toney*, 36 A.3d. That split suggests a reticence on the Supreme Court's part to relax the physical impact requirement. Even the opinion favoring affirmance in *Toney* acknowledged that Pennsylvania law engages in line-drawing exercises in which some people who experience understandable emotional trauma cannot recover under an NIED theory. *See id.* at 91–92.

All of this leads the Court to predict that the Pennsylvania Supreme Court would not relax the physical impact requirement to permit claims like the ones in this case. To start, the fact that Pennsylvania continues to restrict NIED claims to certain scenarios means there must be some limiting principle to any new category

of claims. Plaintiffs do not propose such a limit, and their theory is largely boundless.
As the Court has already said, there are too many ways that someone can suffer
trauma as a result of viewing a memory through a new prism. In effect, permitting
Plaintiffs to pursue a claim in this case would impose limitless liability and throw
open the courthouse doors to a flood of NIED claims, something against which the
Pennsylvania Supreme Court has warned. *See Toney*, 36 A.3d at 88; *Sinn*, 404 A.2d at
678.

### 2.   Proximate cause

Even if Plaintiffs could shoehorn their claim into a factual scenario that allows
for an NIED claim, they would have to demonstrate factual disputes concerning the
traditional elements of negligence, including proximate cause. To satisfy the
causation element, a plaintiff must prove both cause in fact (but-for causation) and
proximate cause. To show proximate cause, a plaintiff must show that the wrongful
act was a "substantial factor" in producing her harm. *Vattimo v. Lower Bucks Hosp.,
Inc.*, 465 A.2d 1231, 1234 (Pa. 1983) (citing Restatement (Second) of Torts § 431
(1965)); *see also Lux v. Gerald E. Ort Trucking, Inc.*, 887 A.2d 1281, 1286 (Pa. Super.
Ct. 2005). To determine whether the wrongful act was a substantial factor in bringing
about the harm, courts consider three factors:

> (a) the number of other factors which contribute in producing the harm
> and the extent of the effect which they have in producing it;
>
> (b) whether the actor's conduct has created a force or series of forces
> which are in continuous and active operation up to the time of the harm,
> or has created a situation harmless unless acted upon by other forces
> for which the actor is not responsible; [and]
>
> (c) lapse of time.

*Vattimo*, 465 A.2d at 1234 (citing Restatement (Second) of Torts § 433 (1965)).

The ultimate inquiry is whether the "negligence, if any, was so remote that as a

matter of law, [the actor] cannot be held legally responsible for [the] harm which

subsequently occurred." *Lux*, 887 A.2d at 1286 (quotation omitted). These factors

demonstrate that ECFMG's conduct was too remote to be a proximate cause of

Plaintiffs' harm.

<u>Number of factors</u>. A lengthy chain of causal events separates ECFMG's

alleged conduct and Plaintiffs' emotional distress. Mr. Igberase decided to defraud

various entities by submitting false materials and lying about his background. Other

entities evaluated Mr. Igberase and concluded he was fit to practice medicine in the

United States. Howard University Hospital admitted Mr. Igberase to its residency

program, monitored his performance throughout his residency, and permitted him

to graduate. The Maryland State Board of Physicians and the Virginia Department of

Health Professions licensed Mr. Igberase. Prince George's Hospital Center granted

Mr. Igberase medical privileges. Dr. Moore's and Dr. Chaudhry's practices sent

patients to Mr. Igberase. None of these entities detected Mr. Igberase's fraud, even

though they conducted background investigations and assessed his medical skill.

Each of those failures contributed to the events that led to Mr. Igberase treating each

Plaintiff.

In a similar case, the Pennsylvania Superior Court found an absence of

proximate cause. *See Commerce Bank/Pennsylvania v. First Union Nat. Bank*, 911 A.2d

133, 140–42 (Pa. Super. Ct. 2006). In that case, First Union failed to issue a Suspicious

Activity Report based on an entity's fraudulent activity, and the entity later engaged

16

in a check-kiting scheme with an account at Commerce Bank. The Superior Court concluded that First Union's failure was not a proximate cause of the fraud because there were too many events within the chain of causation, including (1) the entity's decision to open a second account at Commerce Bank; (2) Commerce Bank's decision to open the account based on the First Union account without further background checks; (3) the check-kiting action on the Commerce Bank account; and (4) Commerce Bank's failure to detect the scheme earlier. *See id.* at 140–42.

Like in *First Union*, ECFMG failed to detect Mr. Igberase's fraud, and downstream entities relied on ECFMG. But also like in *First Union*, those downstream entities could have conducted their own diligence, and in many respects they did. Yet they did not ferret out the truth about Mr. Igberase. That failure was not just because ECFMG had certified Mr. Igberase; it was also because their own processes failed to detect anything wrong with Mr. Igberase's application, character, or medical skill. That failure came despite the fact many reviewed Mr. Igberase's paperwork, many conducted interviews with him and with others who knew him, and many had an opportunity to evaluate his medical skill. In that regard, all of those entities stand in contrast to JSMC, which identified discrepancies on its own when it reviewed Mr. Igberase's social security number and green card (which ECFMG did not review as part of its process). JSMC's ability to raise a red flag shows that other entities could have done so, too.

Plaintiffs downplay these intervening factors and suggest that ECFMG's certification set everything else in motion, but that is but-for causation. ECFMG's certification did not compel anyone to permit Mr. Igberase to practice medicine. The

17

entities that came later exercised their own discretion, based on the investigations and evaluations that they conducted. The exercise of that discretion by later actors lessens the link between ECFMG's certification and the harm to Plaintiffs. *See Cantwell v. Allegheny Cnty.*, 483 A.2d 1350, 1354 (Pa. 1984).

<u>Force or series of forces</u>. ECFMG's certification was necessary to set Mr. Igberase on a path to treating Plaintiffs and other patients. But it wasn't sufficient. The certification was harmless unless others, including a residency program, a state licensure board, and a hospital that offered admitting privileges, acted on it. When ECFMG certified Mr. Igberase in 1992, he could not get into a residency program, so that certification did not result in him treating any patients. The harmless certification in 1992 demonstrates that ECFMG's certification was harmless unless others acted upon it, and those others had independent discretion. *See id.*

<u>Lapse of time</u>. ECFMG certified Mr. Igberase in 1997 and it failed to act in response to JSMC's request for an investigation in 2000. Mr. Igberase did not treat the Plaintiffs until August 2012, and they did not experience any emotional distress until 2017. "At some point along the causal chain, the passage of time . . . mandate[s] a cut-off point for liability." *Mazzagatti*, 516 A.2d at 676. A lapse of six years suggests an absence of proximate cause. *See Holt v. Navarro*, 932 A.2d 915, 922 (Pa. Super. Ct. 2007) (citing *Brown v. Philadelphia Coll. of Osteopathic Med.*, 760 A.2d 863, 870 (2000)). The decade-plus lapse in this case leads to that same conclusion.

## IV.   CONCLUSION

Mr. Igberase's conduct was despicable, and his patients are understandably traumatized. ECFMG played a role in permitting the events to transpire, but it was

only one of many organizations that failed Mr. Igberase's patients. It might bear

moral or ethical responsibility for the resulting trauma; that's not for the Court to say.

But the Court can say that ECFMG does not bear legal responsibility. The Court will

grant ECFMG's motion for summary judgment. An appropriate Order follows.

**BY THE COURT:**

_/s/ Joshua D. Wolson_
**JOSHUA D. WOLSON, J.**

May 19, 2022